1          IN THE UNITED STATES DISTRICT COURT

2         FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA

3                      Beckley Division

4              Civil Action No.:  5:14-cv-24506

5     _____

6     DAVID M. DAUGHERTY,

7          Plaintiff,

8             vs.                    DEPOSITION OF:

9     EQUIFAX INFORMATION SERVICES, LLC,  DAVID M. DAUGHERTY

10    and OCWEN LOAN SERVICING, LLC,

11         Defendants.

12    _____/

13

14           TRANSCRIPT of the stenographic notes of the

15    proceedings in the above-entitled matter, as taken by

16    and before, DEBRA A. VOLK, a Professional Court Reporter

17    and Notary Public of the State of West Virginia, held at

18    the offices of HAMILTON, BURGESS, YOUNG & POLLARD, PLLC,

19    5493 Maple Lane, Fayetteville, West Virginia, on

20    Wednesday, June 17, 2015, commencing at 1:05 p.m.

21

22

23    Job No. 2084505

24

Page 2

1 A P P E A R A N C E S :

2

3 HAMILTON, BURGESS, YOUNG & POLLARD, PLLC

4 BY:  JED R. NOLAN, ESQ.

5 5493 Maple Lane

6 Fayetteville, West Virginia 25840

7 (304) 574-8038

8 jnolan@hamiltonburgess.com

9 Attorney for the Plaintiff

10

11 TROUTMAN SANDERS, LLP

12 BY:  JON M. KENNEY, ESQ.

13 222 Central Park Avenue

14 Suite 2000

15 Virginia Beach, Virginia 23462

16 (757) 687-7500

17 jon.kenney@troutmansanders.com

18 Attorney for the Defendants

19 (Via telephone)

20

21

22

23

24

Page 3

1              I N D E X

2 WITNESS          DIRECT  CROSS  REDIRECT  RECROSS

3 DAVID M. DAUGHERTY

4 BY MR. KENNEY       4    --    91       --

5 BY MR. NOLAN        --   89    --       --

6           E X H I B I T S

7 NUMBER      DESCRIPTION           PAGE

8  1    Complaint              15

9  2*   Aggressive Credit Report, pg. 1    29

10  3*   Promissory Note        33

11  4    Automated Consumer Dispute

12       Verification Form         37

13  5    7/3/13 Automated Consumer Dispute

14       Verification Form         37

15  6    7/3/13 Automated Consumer Dispute

16       Verification Form         38

17  7    Ocwen Data List           47

18  8    Expert Report             49

19  9*   CreditScore.com Report      52

20  10*  ACR Document 75 - 117       55

21  11   EIS Document 257 - 261      57

22  12*  Quicken Loan Letter        60

23  13*  ACR Document 43 - 74       73

24  *(Exhibit Nos. 2, 3, 9, 10, 12 and 13 were retained.)

Page 4

1 D A V I D  M.  D A U G H E R T Y

2 35 Valley View Drive

3 Vienna, West Virginia 26105

4 having been duly sworn by the Notary,

5 testifies as follows:

6 DIRECT EXAMINATION BY MR. KENNEY:

7 Q.    Good afternoon.  I'm sure you've already heard me

8 say several times now, my name is Jonathan Kenney and

9 I'm the attorney that's representing the Defendant,

10 Ocwen Loan Servicing in this case.

11 A.    Yes.

12 Q.    We're here today for your deposition.  Have you

13 ever been in a deposition before?

14 A.    Yes, I have.

15 Q.    Okay.

16 And I'd like to ask you just a few questions about that,

17 but I'll wait until just a little bit later.  So you're

18 aware that you filed a Complaint alleging some

19 misrepresentations in your credit report by my client;

20 correct?

21 A.    Yes.

22 Q.    All right.

23       And like I said, this is the opportunity for my

24 client to find out what you know, what your testimony

Page 5

1 will be at trial. And this is a deposition, which means

2 that it's taken under oath. So you're swearing that

3 everything you say is true and accurate to the best of

4 your knowledge.

5 A.    Yes.

6 Q.    Okay.

7       And as I'm asking you questions, the court

8 reporter is writing down everything you say, so if you

9 could answer verbally in yes's or no's, it would make it

10 easier on us and also, of course, if you can wait until

11 I finish the question, that will also make it easier on

12 us; is that fair?

13 A.    Yes.

14 Q.    Okay.

15       And you do understand that you're under oath

16 today just as you would be in court; correct?

17 A.    That's correct, I do.

18 Q.    Okay.

19       And do you have any medical conditions that might

20 hinder your ability to testify accurately today?

21 A.    No.

22 Q.    And are you taking any medication that might

23 affect your memory?

24 A.    No.

2 (Pages 2 - 5)

212-267-6868

Veritext Legal Solutions
www.veritext.com
CONFIDENTIAL

516-608-2400
EXHIBIT A

Page 18

1    So you had mentioned that at the time that you
2  first met with your attorney, you weren't certain who
3  was causing the information to appear in your credit
4  report?
5  A.    That's correct.
6  Q.    Has anything changed since then?  Do you have any
7  idea who was causing that now?
8  A.    Well, actually yes.  From my last meeting, I was
9  told that it was Ocwen that was reporting.  When I had
10 actually written, I thought it might have been Equifax,
11 but it turned out to be Ocwen the entire time even
12 though they denied it numerous times.  Ocwen told me I
13 would have to contact Equifax because they were the
14 problem.
15 Q.    And when you had said at your last meeting you
16 learned that it was Ocwen, what meeting are you
17 referring to?
18 A.    The deposition that we were supposed to have with
19 you here about three weeks ago --
20 Q.    I see.
21 A.    -- where the mistake in the time was made.
22 Q.    Okay.  Okay.
23      Now, I'd like to ask you just a few questions
24 about the disputes, the accounts that you had disputed

Page 19

1  on your credit report.  When did you first determine
2  that your credit report contained information that you
3  wanted to dispute?
4  A.    I would say it was around October 2013, somewhere
5  in the fall.  I knew I was going to have a maturity date
6  coming up the following July of 2014.  I was already,
7  you know, paying attention and try to have everything in
8  shape, getting ready for refinancing.  And that's when
9  it was first discovered when the first mortgage company
10 I talked to, I can't remember right off which one, but
11 they told me that the report came back that -- bad with
12 the mortgage company showing I was late all those days.
13 Q.    Right.
14      And did you do anything to try and fix your
15 credit?
16 A.    Yes.  I did several things trying to work on my
17 credit.
18 Q.    And what did you do?  And I mean other than
19 consult with an attorney, what did you do before you
20 found --
21 A.    You know, at one time, we had some credit
22 problems and I had worked to try to straighten them all
23 out and pay off the ones I had to pay off.  And I had
24 had a lot of medical bills that were turned into

Page 20

1  collections and I had to pay them off.  There were
2  things on there that -- and another thing was, I had
3  actually hired a credit repair company called Aggressive
4  Credit Repair to try to -- I saw online where they were
5  highly recommended and supposedly there were things that
6  were paid that were still on there that had been on
7  there longer than seven years, et cetera, that I was
8  told that they could get off.  The guy that owns
9  Aggressive Credit Repair, his name is Loren Hanks; I
10 went ahead and signed up with him.  And Loren actually
11 told me there were a lot of things that I had -- you
12 know, the things that I owed, I paid.  And I was told
13 that if there was any money owed, I would have to pay to
14 clean up my records, but, yeah, I was concentrating on
15 cleaning my records up.
16 Q.    And you had mentioned that at one time you had
17 some issues with your credit report and you had
18 mentioned about some medical bills?
19 A.    Yes.
20 Q.    Do you recall about when that was?
21 A.    Well, several years ago we had quite a few issues
22 with it.
23 Q.    When you say several years ago, do you mean like
24 five years ago or ten years ago or longer than that?

Page 21

1  A.    Even probably three years past that.
2  Q.    So around 2012?
3  A.    Probably 2012 is when we started -- that's when I
4  started working on cleaning it up.
5  Q.    Okay.
6      And I'd like to ask you just a few questions
7  about your relationship with Aggressive Credit Repair.
8  Do you recall when you first went to Aggressive Credit
9  Repair?
10 A.    Well, I can't recall exactly, no.
11 Q.    Do you have like a ballpark idea around a season
12 or year or a month and year?
13 A.    I really don't because, like I said, I've had
14 credit problems in the past I had been working on.  I
15 can't remember.  I just remember from like 2012 on that
16 my credit had to be -- everything had to be paid on
17 time.  And some of the things that I've talked to, when
18 you apply for mortgage financing, you can't be late for
19 anything in the past year.  So we made a point that we
20 -- everything was paid on time.
21 Q.    So when you first met with Aggressive Credit
22 Repair, what did they say that they were going to do for
23 you?
24 A.    They told me they thought there were a lot of

6 (Pages 18 - 21)

1 things that they could clean up on my records.  And they
2 actually told me that they could get a lot of stuff off
3 my records.  And they didn't really talk about how they
4 were going to do it.  And like I said, I saw on the
5 Internet that they were highly rated in what they did,
6 so I thought I would give them a try and he did clean a
7 lot of things off of the record.
8 Q.    Okay.
9        And was this around the same time that you were
10 trying to refinance for -- the loan?
11 A.    Actually, I had him working before because I knew
12 I had it coming up.
13 Q.    Okay.  I see.
14        And so do you know what exactly Aggressive Credit
15 Repair did for you, -- I'm sorry.  What exactly
16 Aggressive Credit Repair did to fix your credit report?
17 A.    No.  The only thing I can tell you, I've received
18 letters back from the credit reporting agencies
19 confirming that certain accounts were mine or saying
20 that certain accounts were removed from my records and
21 then the minute I would get them, I'd mail those to
22 Loren Hanks.  And then he would call me once a month to
23 let me know that he had more letters going out, where he
24 constantly was working on anything he had on there.

1 Q.    And those letters, do you know what those letters
2 said?
3 A.    That he sent out?
4 Q.    Yes.
5 A.    No.
6 Q.    And so I can assume that you didn't have any part
7 in drafting those letters, right?
8 A.    No, I did not.
9 Q.    Okay.
10        And I think you previously stated there was a
11 couple of things that you had that you wanted to
12 dispute, so it wasn't just the Ocwen account that you
13 were disputing; correct?
14 A.    That's correct.
15 Q.    Okay.
16        And we were talking about these letters that were
17 sent out on your behalf from Aggressive Credit Repair.
18 And I would like to direct you to one of those dispute
19 letters, if we can make that available to you, and this
20 is from the documents that were produced by Aggressive
21 Credit Repair, it's page one.
22 A.    Okay.  I have it.
23 Q.    Okay.
24        Are you familiar with this document?

1 A.    I wouldn't say I'm familiar with it.  I might
2 have seen it.
3 Q.    And do you recall if this document was sent to
4 Equifax more than once?
5 A.    No, I do not know that.
6 Q.    Okay.
7        And you can see here, there appears to be about
8 11, I think, 12, 12 different accounts on here that
9 Aggressive Credit Repair is disputing on your behalf.
10 And you can see that the first account is Verizon.  It
11 says not mine, changes have been made to this account
12 since previously verified.  Do you recall what the
13 dispute you were having with Verizon was?
14 A.    Actually, yes, I do.
15 Q.    And what was that?
16 A.    That actual account with Verizon was, I went with
17 another service and they were saying I was going to have
18 to owe a disconnection fee for not going through with my
19 contract and I was arguing with Verizon that I was well
20 past my contract.  You were supposed to have a two-year
21 contract and I was at least two and a half, three years
22 into it.  And we were arguing over the time and I was
23 asking them to prove when that contract started and I
24 would pay that, but I told them I was way past that

1 contract date and they never did -- would come forward
2 and show me where I had actually had it for only two
3 years and they turned around and they put this on my
4 credit report.
5 Q.    You see where it says not mine here.  Do you have
6 any idea why it says not mine?
7 A.    That's -- I had nothing to do with that.  That's
8 a Loren Hanks tactic, I guess.
9 Q.    Okay.
10        And these two West Asset accounts; do you recall
11 that these were for?
12 A.    Those are hospital bills.
13 Q.    Okay.
14 A.    All the West Assets are from medical bills.
15 Q.    And do I understand that West Asset is a
16 collection agency; is that right?
17 A.    Yes, for the hospitals.
18 Q.    Okay.
19        And they also say not mine.  Did you have
20 anything to do with that?
21 A.    No.
22 Q.    Okay.
23        And there's an Ocwen account there, and I'll get
24 to that in just a second.  And then there's a credit

7 (Pages 22 - 25)

Page 26

1 C-O-L-L, do you know what that is?
2 A.   I have no clue what that one is.
3 Q.   Okay.
4 A.   Oh, that's a credit collection, that's another
5 medical bill, I believe.
6 Q.   Okay.
7       And that one says not mine.  And I can assume
8 that means that you didn't have anything to do with
9 that?
10 A.   Yes, that's correct.
11 Q.   Okay.
12      Then there's Frontier.
13 A.   Yes.
14 Q.   Do you know what the Frontier one is?
15 A.   Yes, I do.
16 Q.   And what is that?
17 A.   That was with Frontier, we switched companies
18 from our cable company, our Internet company, and we
19 found that Frontier was completely incompetent.  It took
20 us six months to get them to install our Internet
21 correctly.  And until they got it correctly, they had us
22 go ahead and keep SuddenLink at the same time.  And they
23 told me that they would reimburse me or they would give
24 us a credit on that for the SuddenLink and they never

Page 27

1 did get our cable -- once we got it, our Internet was
2 freezing all the time.  And I think they were saying we
3 owed -- we ended up owing $75, but they actually
4 owed me like a $340 credit.  And I was trying to get
5 them to swap it out and they wouldn't do it and they put
6 this on my credit report.
7 Q.   Okay.
8       And that one says not mine, and can I assume that
9 you didn't have anything to do with that?
10 A.   I had nothing to do with that.
11 Q.   Okay.
12      And Green Tree, do you know what that one is?
13 A.   Yes.
14 Q.   And what is that one?
15 A.   That was a second mortgage on the house that
16 ended up -- I think that was back in the time period
17 when we were having problems financially and we ended up
18 paying it off.
19 Q.   Okay.
20      You said that there was a time period when you
21 were having problems financially.
22 A.   Yes.
23 Q.   Do you know what time period that was?
24 A.   We had about five or six years probably that

Page 28

1 things were pretty rough.
2 Q.   Do you have like a range in years?
3 A.   I would imagine there were times that we did okay
4 but we had some problems in a few years.  I was taking
5 care of both my parents, where I was taking time off of
6 work, but it was probably anywhere from three to the
7 last six years or so we had had some problems.
8 Q.   Okay.
9 A.   Yeah, I admit we've had some problems in the past
10 but I cleared all of that up and worked on trying to get
11 everything cleared up on my accounts.
12 Q.   Sure.  I completely understand.
13      And there's a Fidelity account there; do you know
14 what the Fidelity is?
15 A.   Actually, I don't know what that's in regards to.
16 I don't know if that's a medical bill or what.
17 Q.   Do you know what the First Federal is?
18 A.   I can imagine it was one of the charge cards that
19 got paid off, but I'm not sure.
20 Q.   Okay.
21      And this letter was sent to Equifax.  Do you have
22 any idea if TransUnion or -- I'm sorry, do you have any
23 idea if a letter was sent to TransUnion or Experian?
24 A.   What letter are you talking about?

Page 29

1 Q.   This letter that we're looking at here.  And if
2 we didn't mark this as an Exhibit, I'd like to mark this
3 as Exhibit 2 --
4            *  *  *
5      (Whereupon, Deposition Exhibit No. 2 marked for
6 purposes of identification.)
7            *  *  *
8          THE WITNESS:  I assume that he sent it to
9 all three.
10 BY MR. KENNEY:
11 Q.   Okay.
12      But do you know or do you just not know?
13 A.   Well, I didn't hire him to do -- I hired him to
14 clean up my credit record, period, not just with
15 Equifax.
16 Q.   Sure.
17 A.   So I'm under the assumption he was working with
18 all three credit bureaus.
19 Q.   But you don't know if this letter for sure was
20 sent to Experian or TransUnion; is that right?
21 A.   That's correct, yes.
22 Q.   Okay.
23      And you had mentioned that there was a period
24 there with financial difficulty and you had also

8 (Pages 26 - 29)

Page 30

1 mentioned that you were taking care of your parents,
2 were there any other reasons why you began experiencing
3 financial difficulty?
4   A.   Not really, other than just illnesses and medical
5 bills which can add up pretty quickly.
6   Q.   Sure.
7        So the Ocwen account, and this is back to Exhibit
8 2, this letter to Equifax.  The Ocwen account here is
9 listed twice.  Do you have any idea why it's listed
10 twice?
11  A.   I have no idea.
12  Q.   But the account numbers are the same here; do you
13 see that?
14  A.   Yes.
15  Q.   And on the first line it says, not mine; is that
16 right?
17  A.   Uh-huh (yes).
18  Q.   And did you have any part in saying that this
19 account is not yours?
20  A.   No.  I had nothing to do with these letters.
21  Q.   And the second Ocwen account says never late.  So
22 you had nothing to do with saying that you were never
23 late here?
24  A.   Yes, I nothing to do with it.

Page 31

1   Q.   Okay.
2        Do you know if the Ocwen account was appearing
3 twice in your Equifax report?
4   A.   Yes.  I did discover that later on, yes, I did
5 know that.
6   Q.   And when did you discover that?
7   A.   Probably early 2014.
8   Q.   And do you know if either you or Aggressive
9 Credit Repair did anything to tell Ocwen that the
10 account was appearing twice -- that the Ocwen account
11 was appearing twice and should not be?
12  A.   I did explain that to Loren Hanks and he
13 supposedly was going to send a letter trying to dispute
14 that being on there twice for the same account.
15  Q.   So you explained to Loren Hanks that the Ocwen
16 account was appearing twice, did you explain that to
17 anyone else?
18  A.   I'm trying to think.  I think I might have
19 explained it to Consumer Financial, a lady there.
20  Q.   Okay.
21       And was there anyone else?
22  A.   I don't believe so.
23  Q.   Do you know if it was Ocwen or Equifax that was
24 responsible for reporting this account twice?

Page 32

1   A.   I did not know that until recently.
2   Q.   And by recently, do you mean when you spoke with
3 your attorney?
4   A.   Yes.  Can you rephrase that question again?
5   Q.   I'm sorry.  I had asked you if you knew either it
6 was Ocwen or Equifax that was responsible for reporting
7 the Ocwen account twice.  And you said that you learned
8 that, and so I was wondering where you learned --
9   A.   No, no, no, I didn't know who was the one that
10 was reporting it.
11  Q.   Do you know if the Ocwen account was appearing
12 twice in your TransUnion report?
13  A.   I don't believe it is.
14  Q.   And do you know if any Ocwen account was being
15 reported in your Experian report?
16  A.   You mean twice?  Or just reported?
17  Q.   Well, I guess I should go back and ask you, do
18 you know whether Ocwen was reporting to Experian?
19  A.   Yes, they were reporting to Experian.
20  Q.   Okay.
21       I'll ask you just a few more questions about that
22 in just a minute.  But, let's see, so as we discussed,
23 the first time that Ocwen appears in this letter, it
24 says not mine, and I understand that you had no part in

Page 33

1 saying that; right?
2   A.   That's correct.
3   Q.   Okay.
4        So I'd like to turn to the note in this case, the
5 promissory note, if you have that available to you.
6 Just let me know when you have that available.  And this
7 is in the documents that were produced by Ocwen; they
8 say DD/OLF at the bottom.  And the promissory note
9 begins on page 356.  And we can mark this as Exhibit 3,
10 I believe.
11             *  *  *
12       (Whereupon, Deposition Exhibit No. 3 marked for
13 purposes of identification.)
14             *  *  *
15       THE WITNESS:  Okay.  I'm on 356.
16 BY MR. KENNEY:
17  Q.   Okay.
18       And do you agree that this is a copy of the note
19 that you signed when you originally took out this loan?
20  A.   Yes, it is.
21  Q.   And if you turn to page 357, there are two
22 signatures there at the bottom for David Daugherty and
23 Tina Daugherty. Are those you and your wife's
24 signatures?

9 (Pages 30 - 33)

Page 34

1  A.   Yes, I believe so.
2  Q.   And on the next page, page 358, there's a balloon
3  payment addendum; do you see that?
4  A.   Yes.
5  Q.   And there's also two signatures there, David
6  Daugherty and Tina Daugherty.  Are those you and your
7  wife's signatures?
8  A.   Yes, I believe they are.
9  Q.   And you would agree that your loan here has a
10  maturity date on July 26, 2014, right?
11  A.   Yes.
12  Q.   But you didn't make any payment on the balloon by
13  your maturity date of July 26, 2014, right?
14  A.   That's correct.
15  Q.   Okay.
16       I'd also like for you to turn to page 346.
17  A.   Okay.
18  Q.   And pages 346 through 355 appear to be the Deed
19  of Trust for this loan.  Are you familiar with this
20  document?
21  A.   Yes.
22  Q.   And if you turn to page 353 there are two
23  signatures there, David Daugherty and Tina Daugherty.
24  Are those you and your wife's signatures?

Page 35

1  A.   Yes, I believe they are.
2  Q.   So you would agree that you and your wife were
3  the borrowers on this loan, right?
4  A.   Yes.
5  Q.   And so you would agree that by saying that this
6  loan is not yours in this dispute letter, it really was
7  yours, right?
8  A.   Yes.
9  Q.   Okay.
10      I'd like to ask you to turn to the Automated
11  Consumer Dispute Verification forms, and this was
12  produced by Equifax.  And so at the bottom, there are
13  numbers there that say EIS Daugherty and I'd like you to
14  first turn to page 60.
15  A.   Okay.
16  Q.   And you can see on that page it says grantor
17  name, and it says Ocwen Loan Servicing, right?
18  A.   I'm still looking.  Okay, I see it now.
19  Q.   And that's your loan number there where it says
20  account number?
21  A.   I assume it is.
22  Q.   Do you know for sure what your loan number is?
23  A.   No, I don't, not right here, right now, no.
24  Q.   Okay.

Page 36

1       And so there under reported consumer identity, it
2  has your name, Daugherty, David Max; do you see that?
3  A.   Yes.
4  Q.   Okay.
5       Are you familiar with what this document is?
6  A.   No, I'm not -- I'm not familiar with it.
7  Q.   Okay.
8       If you look at the top of this document where it
9  says dispute one, you'll see that it says user one, not
10  his, hers, provide complete ID; do you see that?
11  A.   Yes, I do.
12  Q.   And if you turn to page 62, this appears to be
13  the same document that was created May 31, 2013?
14  A.   Where's page 62 at?  Okay.
15  Q.   This is another Automated Consumer Dispute
16  Verification form and there under dispute one, it says
17  not his, hers, provide complete ID; do you see that?
18  A.   Yes, I see it.
19  Q.   And you would agree that that Ocwen Loan
20  Servicing and your name is listed on this page as well?
21  A.   Yes.
22  Q.   And if you'll turn to page 89 there's another
23  Automated Consumer Dispute Verification form --
24           MR. NOLAN:  Do you want to mark that as

Page 37

1  an Exhibit before we move on, Jon?
2           MR. KENNEY:  I'm sorry?
3           MR. NOLAN:  Did you want to mark that as
4  an Exhibit before we move on?
5           MR. KENNEY:  Yes, Exhibit 4, please.
6                 *  *  *
7       (Whereupon, Deposition Exhibit No. 4 marked for
8  purposes of identification.)
9                 *  *  *
10  BY MR. KENNEY:
11  Q.   And page 89, which we can mark as Exhibit 5 is
12  another Automated Consumer Dispute Verification form.
13  This one appears to be dated July 3, 2013; do you see
14  that?
15  A.   Yes.
16                 *  *  *
17       (Whereupon, Deposition Exhibit No. 5 marked for
18  purposes of identification.)
19                 *  *  *
20  BY MR. KENNEY:
21  Q.   And that's your loan number and Ocwen Loan
22  Servicing listed there?
23  A.   Yes.
24  Q.   And that's your name, David Daugherty; correct?

10 (Pages 34 - 37)

Page 38

1  A.    That's correct.
2  Q.    And under the dispute, it says not his or hers,
3  right?
4  A.    Yes.
5  Q.    And if you turn to page 95, I believe this will
6  be Exhibit 5.
7          MR. NOLAN: It will be number 6.
8          MR. KENNEY:  I'm sorry, Exhibit 6.
9                      * * *
10      (Whereupon, Deposition Exhibit No. 6 marked for
11  purposes of identification.)
12                     * * *
13  BY MR. KENNEY:
14  Q.    And this is another document dated 7/3/2013 with
15  your loan number and Ocwen Loan Servicing; correct?
16  A.    That's correct.
17  Q.    And that's your name, right?
18  A.    Yes.
19  Q.    And under the dispute, it says not his or hers,
20  right?
21  A.    That's correct.
22  Q.    So you would agree that this loan was yours,
23  right?
24  A.    I assume it was.

Page 39

1  Q.    Okay.
2        And so I'd like to go back to that letter from
3  Ocwen to Equifax.
4  A.    Okay.
5  Q.    I'm sorry. I'm trying to mark them trying.
6  Actually, I'm getting the numbers wrong. I believe this
7  is Exhibit 3; is that right?
8          MR. NOLAN:  Is this the letter from Loren
9  Hanks?
10         MR. KENNEY:  Yes.
11         MR. NOLAN:  That's Exhibit 2, I think. I
12  think 3 was the note.
13         MR. KENNEY:  Right. Okay. You're right.
14  BY MR. KENNEY:
15  Q.    And so the letter from you to Equifax, the second
16  time that Ocwen is listed here, it says never late; do
17  you see that?
18  A.    Yes.
19  Q.    Were you late at any time in making payments to
20  Ocwen?
21  A.    Yes, I had been late.
22  Q.    And I believe you mentioned in your Complaint you
23  were late on your Ocwen payment in March of 2013; is
24  that right?

Page 40

1  A.    Yes, I was late because my pension check hadn't
2  made it into the bank and I didn't know until a couple
3  of weeks later that it didn't go through because it
4  wasn't in there yet, but that was the only time that it
5  had been late in 2013.
6  Q.    There was no time before March 2013 that you were
7  late on a payment to Ocwen?
8  A.    Previously -- months, yeah, I believe yes, but
9  that was back before I was really working hard on my
10  credit repairs.
11  Q.    Right.
12        So this letter to Equifax where it says never
13  late next to your Ocwen account, you would agree that
14  you had been late before; correct?
15  A.    Yes. This wasn't -- these letters weren't from
16  me.
17  Q.    Right. Okay.
18        And if you recall -- let me ask you this.  Did
19  you ever tell Ocwen that you were never late on
20  payments?
21  A.    No, not personally.  Now, I'm going to recant
22  part of that.  I did tell Ocwen that I wasn't late in
23  that time period in 2013.  And they actually told me
24  that I wasn't late in those time periods in 2013.  And

Page 41

1  they told me --
2  Q.    What time periods are you talking about?
3  A.    I'm talking about -- I'll revise that even.  Back
4  in the late part, October 2013, when I found out there
5  was a problem and I talked to Ocwen, they -- I could go
6  online and it showed all of those months clear.  And
7  when I talked to the mortgage people, their officers,
8  they said -- I told them that I hadn't been late, that I
9  was being told on the credit report that it was.  And
10  they told me my problems were with Equifax.
11  Q.    Okay.  And I apologize.  I'm just trying to
12  understand.
13        So in October of 2014, you spoke with Ocwen; is
14  that right?
15  A.    No.  In October of 2013 --
16  Q.    Okay.
17  A.    -- when this all first started, I talked to them
18  about what I found on there that was incorrect and they
19  were telling me their records showed that I was current.
20  Q.    And so when you talked to Ocwen in October 2013,
21  did you tell them that you were never late at all or did
22  you tell them that you were never late for that month?
23  A.    I told them I was never late in all those months
24  that they had me reported up to that point.  And I

11 (Pages 38 - 41)

212-267-6868

Veritext Legal Solutions
www.veritext.com

516-608-2400

CONFIDENTIAL

EXHIBIT A

Page 66

1 him.

2 Q. Okay.

3     So it was your understanding that the foreclosure
4 and the past due amount was not appearing in your
5 TransUnion report, right?

6 A. Yes, I understood that to be correct.

7 Q. Okay.

8     So going back to this letter, it says from
9 Quicken Loans, and the page that says, we obtained your
10 credit score from TransUnion and used it to make our
11 credit decision, right?

12 A. Yeah, I understand this.

13 Q. So if Quicken Loans obtained your credit score
14 from TransUnion, they would have no knowledge of what
15 Experian or Equifax reported, right?

16 A. Well, that's correct. But they told me on the
17 phone -- they never even mentioned TransUnion, like I
18 said, I wasn't even aware they were going to go further
19 than that because the conversation was over with when he
20 told me it wouldn't be approved with that on the record.

21 Q. Right.

22     And I understand what may have been told to you
23 on the phone, but as far as this particular letter that
24 says we obtained credit score from TransUnion in making

Page 67

1 our credit decision, then as far as what's contained in
2 this letter, what is appearing in your Equifax report is
3 irrelevant to whether or not you were denied credit?

4 A. Well, that's not true either. According to
5 Consumer Credit Counseling, having a government lien put
6 on you, really drops your credit score dramatically.

7 Q. Right, I understand that.

8 A. And that played a major part, even if it was
9 TransUnion.

10 Q. Right.

11     I understand that, but specifically about the
12 foreclosure and the past due amount, which was not
13 appearing on your TransUnion report?

14 A. Yes.

15 Q. So from what's contained in this letter from
16 Quicken, when they obtained your credit score, they had
17 no knowledge of the foreclosure or the past due amount
18 that was appearing in your Equifax report because they
19 had obtained your credit score from TransUnion, right?

20 A. On paper here, yes, on the phone, no.

21 Q. Okay.

22     And I understand you had also applied for credit
23 from Visa, a Disney Visa card; is that right?

24 A. No, actually, that's not true.

Page 68

1 Q. So you did not apply for credit from Disney Visa
2 platinum credit card?

3 A. I will guarantee you I didn't, but I will tell
4 you who did.

5 Q. And who did that?

6 A. I'm sure my wife. She absolutely goes crazy if
7 anything has Disney on it, I'm sure she did. And I hate
8 Disney World and there's no way I would have a Disney
9 platinum card.

10 Q. Oh, I understand you there.

11     So you were not aware whether you had -- so what
12 you're saying is that you did not apply for credit from
13 --

14 A. No, it wasn't me. Evidently she forgot because
15 it was not me.

16 Q. Okay. Okay.

17     And because you did not apply for this, I'm
18 assuming you don't know whether the application for this
19 credit card was a joint application or a separate
20 application?

21 A. I saw the -- I'm the one that gets the mail every
22 day and, yeah, I did see the rejection notice from the
23 Visa card company.

24 Q. Right.

Page 69

1     But do you know whether your wife had applied for
2 this card under both of your names or just under your
3 name?

4 A. I can't remember. I don't have that paper in
5 front of me right this minute. I don't know if she did
6 it on her own or in both of our names.

7 Q. Okay. All right.

8     There is another document from -- let's see,
9 okay. So other than this Disney Visa platinum credit
10 card and this Quicken Loans, were you denied credit from
11 many other entities?

12 A. Yes.

13 Q. And who are those entities?

14 A. Actually, early on I was denied credit with Big
15 Sandy Furniture Store in Parkersburg.

16 Q. Other than that?

17 A. As far as mortgage companies, and actually, a few
18 minutes ago I saw the one, it was actually the very
19 first company, it was Embrace Loans, mortgage loans,
20 they were the first ones that I applied with and I also
21 applied with -- let me think here, back in February of
22 this year with One Community Federal Credit Union that I
23 was denied and the loan officer came out and actually
24 told me that the decision by the two guys that makes the

18 (Pages 66 - 69)

Page 74

1  Q.    And if you could, just turn to page 45.  And this
2  appears to be correspondence from Loren Hanks to you
3  dated April 17th; do you see that?
4  A.    I'm looking.  Yes, I see this.
5  Q.    Okay.
6        And here Loren is telling you, it says as
7  discussed, I see nothing that shows you late on Ocwen in
8  2013; do you see that?
9  A.    Yes, I see that.
10  Q.    Okay.
11        So this is Loren telling you that as of April
12  17th, 2014, he sees nothing that shows you late on Ocwen
13  in 2013, right?
14  A.    Yes.
15  Q.    And it also states -- it also states below the
16  screenshot in the last response we got from Equifax,
17  below you can see the account is current.  The last late
18  payments were March 2012; do you see that?
19  A.    I see that on this particular, yes.
20  Q.    And underneath that, he says you can see that
21  Experian not even reporting on this account; do you see
22  that?
23  A.    Yes, I see that.
24  Q.    Is there anything to suggest that he was wrong in

Page 75

1  what he's saying in this email?
2  A.    Well, actually, at one point, and I can't
3  remember if this is the one, but I had to correct him.
4  He didn't see the second Ocwen report.  He didn't see
5  that it was listed twice for the same account number and
6  I'm not sure if this is the one that had them both or
7  not.  And there was a time that we were discussing this
8  and I had to make him aware that it was reported twice.
9  And he didn't even see it either.  And I told him that's
10  what I've been complaining about, disputing.  And that's
11  what kept showing up when loan companies were checking
12  out the credit.
13  Q.    Okay.
14        So with regard to this particular -- and I
15  understand when you're saying that the Ocwen account was
16  appearing twice, but with regard to this particular
17  account that he was referring to, this particular time
18  that Ocwen is appearing, is there anything to suggest
19  that he's wrong in saying that there's nothing that
20  shows you late from Ocwen in 2013?
21  A.    Not on this particular page but I'm not sure if
22  this is the one -- I mean I'm not sure if this is the
23  same conversation that we were having where he didn't
24  understand it was reported twice.

Page 76

1  Q.    Right.
2        So we have one account that was reporting saying
3  that there was a foreclosure and a past due amount?
4  A.    Correct.
5  Q.    There's another account that he is referring to
6  in this, you know, here, where he's saying that he sees
7  nothing showing you late with Ocwen in 2013, below you
8  can see the account is current, the last payment
9  was March 2012 and you can see Experian is not reporting
10  on this account, right?
11  A.    That's correct.
12  Q.    So but that account, I'm not talking about the
13  one that says the foreclosure, but for this other
14  account, is there anything to suggest that Mr. Hanks was
15  incorrect in his assessment here?
16  A.    On this particular page, no, I don't see anything
17  that's incorrect.
18  Q.    Okay.
19        And if you turn to page 47, this is
20  correspondence dated March 28th, 2014.  And this is from
21  Loren to you as well, right?
22  A.    Yes, I believe.
23  Q.    And referring to the Equifax report, it states
24  Ocwen does not show you past due; do you see that?

Page 77

1  A.    Yes.
2  Q.    And it says it still reports you late but you can
3  see a note disputing it, right?
4  A.    Yes.
5  Q.    And also you see the note disputing it.
6        Is there anything to suggest that he was
7  incorrect in his assessment here?
8  A.    No, not that I can tell.
9  Q.    Okay.
10        So from what we've seen in the -- well, let's
11  turn back to the CreditScore.com report, and from what
12  we've discussed through looking through -- and from the
13  email from Loren Hanks, we've discussed that Experian
14  was not reporting on your Ocwen account, right?
15  A.    That's what I understand, yes.
16  Q.    Okay.
17        And if we go to page 38 on the CreditScore.com
18  report, it gives you your three credit scores, right?
19  A.    Yes.
20  Q.    And this is the report as of April 17, 2014,
21  right?
22  A.    That's correct.
23  Q.    So the Experian score is actually lower than the
24  Equifax and TransUnion scores; do you see that?

20 (Pages 74 - 77)

212-267-6868

Veritext Legal Solutions
www.veritext.com

516-608-2400

CONFIDENTIAL

EXHIBIT A

Page 78

1  A.    Yes, I do.

2  Q.    And we talked earlier about how Experian was not

3  reporting at all on Ocwen and so given that the Experian

4  and TransUnion were actually higher -- I'm sorry, given

5  that the Equifax and TransUnion were actually higher

6  than Experian, is it fair to say that the Ocwen account

7  didn't have much impact on your credit score here?

8  A.    It absolutely did have impact on my credit score.

9  Q.    And why do you say that?

10  A.    Because if it wasn't for all of that, I never

11  would've had the tax liens put on me which really

12  dramatically dropped my credit scores.

13  Q.    Okay.

14        So we can go back to that.  I understand that you

15  have the tax liens and that you wanted to refinance your

16  home so that you could use part of that to pay off the

17  tax lien, right?

18  A.    Absolutely.

19  Q.    And you're claiming that you were unable --

20  A.    I want to rephrase that.

21  Q.    Sure.

22  A.    There never would've been a tax lien if the

23  financing would have gone through.  It would've never

24  have come to the tax lien and it never would've tanked

Page 79

1  my credit scores on all three credit-reporting

2  companies.

3  Q.    So how did the tax lien come about again?

4  A.    My wife cashed in a 401(k).  When she retired,

5  she had two 401(k) plans.  With my medical bills and

6  different things, she cashed one in, in 2012 for the

7  year 2012, it ended up we owed like $11,000 or $12,000

8  in state tax from her cashing that 401(k) in.  We also

9  owed one for the federal government and I knew I was

10  going to have to refinance the house. I was going to

11  take out enough to pay the tax situations off.  But

12  since the loans didn't go through because of this on my

13  credit report, I couldn't get the loan.  I couldn't pay

14  the taxes at the time.  The state wouldn't cooperate as

15  far as me making payments and they put a tax lien on me

16  and I really didn't give it any -- even with the tax

17  lien on there, I thought it would all work out and I

18  could still go pay the lien off and be no problems and

19  move on.  But, yes, all of this made a major implication

20  with my credit scores being low.

21  Q.    Okay.

22        So I understand that the lien -- so is it fair to

23  say that the lien occurred because you were not able to

24  pay off the tax liabilities, but is it fair to say that

Page 80

1  the tax liabilities arose completely independent by

2  anything that Ocwen may have reported?

3  A.    Well, if --

4  Q.    I'll rephrase that.

5  A.    Okay.

6  Q.    Is it fair to say that Ocwen had nothing to do

7  with the origination of the tax liabilities themselves?

8  A.    Actually, no, that's not fair to say.

9  Q.    And why is that?

10  A.    If they wouldn't have reported that, there never

11  would have been a tax lien.  It would have been paid off

12  in a timely manner.

13  Q.    So let me go back.

14        So when I say tax liability, I mean, the tax

15  liability was created when your wife cashed in a 401(k);

16  right?

17  A.    Absolutely.

18  Q.    Okay.

19        But you would agree that Ocwen had nothing to do

20  with cashing in a 401(k), right?

21  A.    That's true.

22  Q.    So when the tax liability, meaning the money that

23  you owe, when that was created, Ocwen had no part in

24  causing that creation, right?

Page 81

1  A.    They didn't create it, no.

2  Q.    Okay.  And that's all that I was asking.

3        So I understand that what you're saying is

4  because you were unable to get refinancing, you were

5  unable to pay off that tax liability which resulted in a

6  tax lien, right?

7  A.    That's correct.

8  Q.    Okay.

9        So if we look at the Experian score, which we've

10  already talked about not reporting the Ocwen account, so

11  in the Experian, the realm of the Experian report, there

12  was nothing in there regarding the Ocwen account, right?

13  A.    That's correct.

14  Q.    Yet the Experian score itself is lower than the

15  Equifax and TransUnion scores, right?

16  A.    That's correct.  And it's right back there with

17  the tax liens.

18  Q.    So you would agree that if not for the tax lien

19  -- I'm sorry.  Would you say that if not for the tax

20  liens then your credit scores would have been higher?

21  A.    Absolutely.  And that's according to Consumer

22  Credit Counseling; they're saying that's a major

23  infraction of having a government tax lien on you.

24  Q.    Sure.  I understand.  I'm just trying to make

21 (Pages 78 - 81)

Page 82

1 sure I'm getting -- that I understand this right.
2     So what you're saying is -- so is it fair to say
3 that the Experian score was low because of the tax lien,
4 but not because of the Ocwen account that was saying a
5 foreclosure and amounts due, right?
6 A.   That was just something that was caused by not
7 being able to get the loan itself, not directly from
8 Ocwen because I had a tax liability; it was just because
9 of the records themselves not being correct.
10 Q.   Right.  I understand what you're saying, I
11 understand it's your position that the tax lien was
12 caused by the inability to get credit, but what I'm
13 asking is, is it fair to say that this Experian score
14 was low because of the tax lien but not because of what
15 was being reported to it by Ocwen because Ocwen didn't
16 report it at all?
17 A.   Yes, that's fair to say.
18 Q.   Okay.  All right.
19     And do you know if Ocwen stopped reporting the --
20 I'm sorry.  Do you know when Equifax stopped reporting
21 Ocwen information?
22 A.   Repeat that.
23 Q.   Do you know when your Equifax report stopped
24 showing the Ocwen account?

Page 83

1 A.   They've never stopped showing the Ocwen account.
2 Q.   So do you think that the Ocwen account is
3 appearing on your Equifax report right now?
4 A.   Well, it is, but not in a negative way as far as
5 I know.
6 Q.   Okay.
7     I'd like to go back to Exhibit 10, which is the
8 --
9 A.   Now, I'm going to ask you a question with that.
10 Ocwen is not reporting anything month-to-month right now
11 on me if that's what you're asking?
12 Q.   Right.  That is what I'm asking you.
13 A.   Okay.  I misunderstood what you were asking.  No,
14 they're not reporting anything on me month-to-month
15 right now until this issue is resolved from what I
16 understand, from what I've seen.
17 Q.   Okay.
18     And do you know when they quit reporting
19 month-to-month?
20 A.   I can't remember what month.  It was after Mr.
21 Nolan had made contact with Ocwen's attorneys, whether
22 that was you or someone else.
23 Q.   Okay.
24 A.   That was supposedly an arrangement that was made.

Page 84

1 Q.   I'd like to still go back to the Aggressive
2 Credit Repair documents, Exhibit 10, and turn to page 75
3 of Exhibit 10.
4 A.   I'm on there.
5 Q.   And you can see this is a response from Equifax
6 dated September 23rd, 2014; is that right?
7 A.   Yes.
8 Q.   And under where it says results of our
9 investigation there on page 75, as we have reviewed your
10 concerns and our conclusions are; do you see that?
11 A.   Yes.
12 Q.   And then underneath that it says, please be
13 advised that the following accounts are not reporting on
14 your Equifax credit file?
15 A.   Okay.
16 Q.   And among those accounts, Ocwen is listed twice
17 with that same loan number; do you see that?
18 A.   Yes, I do see them twice.
19 Q.   So is it fair to say that as of September 23rd,
20 2014, the Ocwen was no longer reporting to Equifax?
21 A.   That's correct.
22 Q.   Okay.
23     MR. NOLAN:  Jon, do you mind if we take a
24 break for a minute?

Page 85

1     MR. KENNEY:  I probably just have about
2 ten minutes left.  I'm happy to take a break, but --
3     MR. NOLAN:  Okay.  We can stick it out.
4 We'll stay here.
5 BY MR. KENNEY:
6 Q.   Okay.
7     Mr. Daugherty, I'm just going to ask you a few
8 questions about how you personally have been impacted as
9 a result of the problems you've had with refinancing.
10 A.   Okay.
11 Q.   And I understand that you have become stressed
12 through trying to refinance; is that right?
13 A.   I guess I'd say -- I usually keep things to
14 myself most of the time.  I would say this has been a
15 very difficult time period for me.
16 Q.   And when you say that you've been stressed, is
17 there anything in particular that you've noticed has
18 changed about you, you know, in the last two years or
19 so?
20 A.   Well, I tend to worry more about things.  I tend
21 to worry about making sure everything is paid on time,
22 how it affects your records and I'm probably a little
23 snappy around the house as far as shutting down on funds
24 on things I don't think we need.  I try to have

22 (Pages 82 - 85)

212-267-6868

Veritext Legal Solutions
www.veritext.com
CONFIDENTIAL

516-608-2400
EXHIBIT A

Page 86

1 everything in order to obtain a mortgage financing.
2 Q. Sure.
3 A. So I'm sure it's been a little more hectic around
4 my house and throughout all of this it's been, you know,
5 quite discouraging to go through all this to where, you
6 know, you can't get financing to try to go through and
7 get something, you know, I just wanted this fixed.
8 Q. Right. I understand.
9 A. And it's just fallen on deaf ears and no one
10 would assist and to go through all of these motions to
11 try to have something fixed is quite frustrating. And I
12 usually do this myself because usually if I involved my
13 wife on something, I never get any sleep.
14 Q. Right, I understand.
15 A. You know, this has gone on, you know, forever it
16 seems like, you know, I kind of got some relief here
17 just in the past month or so where I am able to get
18 credit now since this was taken off my record, but, you
19 know, just everyday life has completely changed with not
20 knowing whether or not we're going to lose our house
21 that we've had all these years and where I planned to
22 stay.
23 Q. What do you mean by life has completely changed?
24 A. Well, when you don't know -- here's a good

Page 87

1 example. There's a lot of things I like to do around
2 the house as far as I've been working on fixing it up
3 and different things and I've stopped doing that, why
4 should I fix it up if I may lose it? So things were put
5 on hold as far as landscaping and different things I
6 normally do because I don't know if I'm going to own
7 this house when this is all said and done. It's things
8 like that that you worry about. You know, I'm not going
9 to invest a lot of money adding to it and things that I
10 want to the house without knowing it's going to be mine.
11 Q. Right.
12 And I understand you had said, did you say that
13 you had trouble sleeping?
14 A. No. I said if I actually talk about this much to
15 my wife, I'd have trouble sleeping.
16 Q. Oh, I see.
17 A. Because she wouldn't be letting me sleep.
18 Because things like this would bother her a lot more
19 than it does me and it bothers me bad enough, but if
20 she's involved with things like this, it would be a
21 never-ending conversation 24 hours a day.
22 Q. Right. I understand.
23 And do you recall about when this, you know, when
24 this started, when you started feeling, you know, more

Page 88

1 stressed out than normal?
2 A. About the first time or the second time I was
3 turned down on the mortgage to where I was actually
4 looking at -- the timeframe was really starting to make
5 me sweat whether I was going to be able to get it done
6 by July of last year, July 26th.
7 Q. Right.
8 I know you had mentioned that this -- the
9 financial difficulty that you experienced, you were
10 saying that it was caused for various reasons and you
11 said that it started about six years ago; is that right?
12 A. Yes, that's correct.
13 Q. Is it fair to say that as you started feeling,
14 you know, more stressed out than normal when that all
15 started about six years ago?
16 A. No, I wouldn't say that. It was mainly after I
17 -- after I had really been concentrating -- and you can
18 look at my credit reports where my credit -- where all
19 my accounts were paid on time and to see this isn't
20 going, you know. I met the qualifications as far as
21 obtaining a loan, as far as not being late and
22 everything being paid off and still -- I was still
23 having problems with it until just recently when I was
24 conditionally approved on a three-and-a-half percent

Page 89

1 loan from Quicken.
2 Q. Right. Okay.
3 As far as the Ocwen account, is there anything
4 that -- well, let me scratch that question.
5 You're not claiming any physical harm as a result
6 of --
7 A. No.
8 Q. Okay.
9 And are you under the care of a doctor or a
10 psychiatrist for this case?
11 A. No.
12 Q. Okay.
13 And do you have any other testimony today to
14 support your claims other than what you have already
15 told me?
16 A. No, I don't.
17 Q. Okay.
18 I think those are all the questions that I have
19 for you. I really do appreciate your time.
20 A. Okay. Thank you.
21 MR. NOLAN: I have just two quick
22 follow-ups on Exhibit No. 9.
23 CROSS EXAMINATION BY MR. NOLAN:
24 Q. First, I want to look at document number 38,

23 (Pages 86 - 89)

Page 94

```
1  THE STATE OF       :
   WEST VIRGINIA
2          : SS:  C E R T I F I C A T E
   COUNTY OF OHIO     :
3
4       I, DEBRA A. VOLK, Professional Court
   Reporter, do hereby certify that the testimony given by
5  the within-named witness, DAVID M. DAUGHERTY, was by me
   reduced to stenotype in the presence of the witness;
6  afterwards reduced to Computer Aided Transcription under
   my direction and control; that the foregoing is a true
7  and correct transcription of the testimony given by said
   witness.
8
9       I do further certify that this testimony was
   taken at the time and place in the foregoing caption
10 specified; that the reading and signing was not
   requested and was completed without adjournment.
11
12      I do further certify that I am not a
   relative, counsel or attorney of either party, or
13 otherwise interested in the event of this action.
14
        I do further certify that the attached
15 transcript meets the requirements set forth within
   Article 27, Chapter 47 of the West Virginia Code to the
16 best of my ability.
17
        IN WITNESS THEREOF, I have hereunto set my
18 hand in Wheeling, West Virginia, on the 2nd day of July,
   2015.
19
20
21      _____
        DEBRA A. VOLK,
22      Professional Court Reporter
23
24
```

Page 95

```
1
   THE STATE OF    :
2  WEST VIRGINIA
           : SS:  C E R T I F I C A T E
3  COUNTY OF OHIO  :
4
        I, DEBRA A. VOLK, Notary Public within and
5  for the State of West Virginia, duly commissioned and
   qualified, do hereby certify that the within-named
6  witness, DAVID M. DAUGHERTY, was by me duly sworn to
   testify to the truth, the whole truth and nothing but
7  the truth in the cause aforesaid.
8
        I do further certify that I am not a
9  relative, counsel or attorney of either party, or
   otherwise interested in the event of this action.
10
11      I do further certify that the attached
   transcript meets the requirements set forth within
12 Article 27, Chapter 47 of the West Virginia Code to the
   best of my ability.
13
14      I further certify that the reading and
   signing of the transcript was not requested.
15
16      IN WITNESS THEREOF, I have hereunto set
   my hand and affixed my seal of office at Wheeling,
17 West Virginia, on the 2nd day of July, 2015.
18
19
        _____
20      DEBRA A. VOLK, Notary Public
        within and for the State of
21      West Virginia
22 My Commission expires:
   July 25, 2015
23
24
```

25 (Pages 94 - 95)

WOOD COUNTY COMMISSION
DEED              Clerk 02
Date/Time: 07/28/1999  09:17
Inst #:           243526
Book/Page: UCINDA/A. 221-
Recl/Tax:     514.85    311.85

THIS DEED, Made this the 20th day of July, 1999, by and between LUCINDA A.
WISEMAN, unmarried, party of the first part, and DAVID M. DAUGHERTY and TINA M.
DAUGHERTY, husband and wife, parties of the second part

W I T N E S S E T H :

That for and in consideration of the sum of Ten Dollars ($10 00), cash in hand paid, and other
good and valuable considerations hereinafter set forth, the receipt and sufficiency of all of which is
hereby acknowledged, the said party of the first part does hereby **GRANT and CONVEY** unto the
said parties of the second part, as joint tenants with the right of survivorship, and not as tenants in
common, all that certain lot, tract or parcel of land, together with the improvements thereon and the
appurtenances thereunto belonging, situate in the City of Vienna, County of Wood and State of West
Virginia, more particularly described as follows:

BEING all of Lot No 35 of Forest Hills Addition No 8 as more particularly shown on a plat
of said Addition of record in the Office of the Clerk of the County Commission of Wood County,
West Virginia, in Plat Book 12, at page 33, reference to which plat is hereby made for a more
particular description of the said lot

And being the same property conveyed unto Lucinda A. Wiseman by Cathy A. Adams by
deed dated April 6, 1993, and of record in the aforesaid Clerk's Office in Deed Book 931, at page
846.

This conveyance is made subject to the restrictions of record in Plat Book No 12, at page
33   This conveyance is further subject to all existing reservations, restrictions, and easements
created in prior deeds in the chain of title to the property hereby conveyed and subject further to the
lien of the 1999 real estate taxes which shall be prorated between the parties hereto, the said party
of the first part covenants to and with the said parties of the second part, that the property herein
conveyed is free and clear of all liens and encumbrances, and she will **WARRANT GENERALLY**
the title to the property herein conveyed

DD/OLS 000346

DECLARATION OF CONSIDERATION OF VALUE·  Under the penalties of fine and imprisonment as provided by law, the Grantor does hereby declare that the total consideration for the property transferred by this document is Ninety-four Thousand Three Hundred Thirty-four and 63/100 Dollars ($94,334.63).

This instrument was prepared by Johnson Law Offices, Suite 200 Woodrums' Building, 602 Virginia Street, East, Charleston, West Virginia

**WITNESS** the following signature and seal.

_Lucinda A. Wiseman_

Lucinda A. Wiseman

STATE OF _New Mexico_

COUNTY OF _Curry_, TO-WIT

The foregoing instrument was acknowledged before me this 26TH day of July, 1999 by Lucinda A. Wiseman.

My commission expires: _July 26, 2000_

_Rhonda Murdock_

Notary Public within and for
the aforesaid County and State

( ✓ )        Purchaser will occupy property

(    )        Purchaser will not occupy property

F:\WP60\DEEDS\OTHER\9922DE WPD

DD/OLS 000347

CONFIDENTIAL          EXHIBIT 3 TO EXHIBIT A

BOOK 849 PAGE 798

ATTACHMENT

All that certain lot, tract or parcel of land, together with the improvements thereon and the appurtenances thereunto belonging, situate in the City of Vienna, County of Wood and State of West Virginia, more particularly described as follows:

BEING all of Lot No. 35 of Forest Hills Addition No. 8 as more particularly shown on a plat of said Addition of record in the Office of the Clerk of the County Commission of Wood County, West Virginia, in Plat Book 12, at page 33, reference to which plat is hereby made for a more particular description of the said lot.

And being the same property conveyed unto David M. Daugherty and Tina M. Daugherty by Lucinda A. Wiseman by deed dated July 20, 1999, and to be recorded simultaneously herewith this transaction.

This conveyance is made subject to the restrictions of record in Plat Book No. 12, at page 33.

DD/OLS 000348

CONFIDENTIAL          EXHIBIT 3 TO EXHIBIT A

BOOK 849 PAGE 799

TOGETHER WITH all the improvements now or hereafter erected on the property, and all easements, appurtenances, and fixtures now or hereafter a part of the property. All replacements and additions shall also be covered by this Security Instrument. All of the foregoing is referred to in this Security Instrument as the "Property."

BORROWER COVENANTS that Borrower is lawfully seised of the estate hereby conveyed and has the right to grant and convey the Property and that the Property is unencumbered, except for encumbrances of record. Borrower warrants and will defend generally the title to the Property against all claims and demands, subject to any encumbrances of record.

THIS SECURITY INSTRUMENT combines uniform covenants for national use and non-uniform covenants with limited variations by jurisdiction to constitute a uniform security instrument covering real property.

UNIFORM COVENANTS. Borrower and Lender covenant and agree as follows:

1. **Payment of Principal and Interest; Prepayment and Late Charges.** Borrower shall promptly pay when due the principal of and interest on the debt evidenced by the Note and any prepayment and late charges due under the Note.

2. **Funds for Taxes and Insurance.** Subject to applicable law or to a written waiver by Lender, Borrower shall pay to Lender on the day monthly payments are due under the Note, until the Note is paid in full, a sum ("Funds") for: (a) yearly taxes and assessments which may attain priority over this Security Instrument as a lien on the Property, (b) yearly leasehold payments or ground rents on the Property, if any, (c) yearly hazard or property insurance premiums, (d) yearly flood insurance premiums, if any, (e) yearly mortgage insurance premiums, if any, and (f) any sums payable by Borrower to Lender, in accordance with the provisions of paragraph 8, in lieu of the payment of mortgage insurance premiums. These items are called "Escrow Items." Lender may, at any time, collect and hold Funds in an amount not to exceed the maximum amount a lender for a federally related mortgage loan may require for Borrower's escrow account under the federal Real Estate Settlement Procedures Act of 1974 as amended from time to time, 12 U.S.C. §2601 et seq ("RESPA"), unless another law that applies to the Funds sets a lesser amount. If so, Lender may, at any time, collect and hold Funds in an amount not to exceed the lesser amount. Lender may estimate the amount of Funds due on the basis of current data and reasonable estimates of expenditures of future Escrow Items or otherwise in accordance with applicable law.

The Funds shall be held in an institution whose deposits are insured by a federal agency, instrumentality, or entity (including Lender, if Lender is such an institution) or in any Federal Home Loan Bank. Lender shall apply the Funds to pay the Escrow Items. Lender may not charge Borrower for holding and applying the Funds, annually analyzing the escrow account, or verifying the Escrow Items, unless Lender pays Borrower interest on the Funds and applicable law permits Lender to make such a charge. However, Lender may require Borrower to pay a one-time charge for an independent real estate tax reporting service used by Lender in connection with this loan, unless applicable law provides otherwise. Unless an agreement is made or applicable law requires interest to be paid, Lender shall not be required to pay Borrower any interest or earnings on the Funds. Borrower and Lender may agree in writing, however, that interest shall be paid on the Funds. Lender shall give to Borrower, without charge, an annual accounting of the Funds showing credits and debits to the Funds and the purpose for which each debit to the Funds was made. The Funds are pledged as additional security for all sums secured by this Security Instrument.

If the Funds held by Lender exceed the amounts permitted to be held by applicable law, Lender shall account to Borrower for the excess Funds in accordance with the requirements of applicable law. If the amount of the Funds held by Lender at any time is not sufficient to pay the Escrow Items when due, Lender may so notify Borrower in writing, and, in such case Borrower shall pay to Lender the amount necessary to make up the deficiency. Borrower shall make up the deficiency in no more than twelve monthly payments, at Lender's sole discretion.

Upon payment in full of all sums secured by this Security Instrument, Lender shall promptly refund to Borrower any Funds held by Lender. If, under paragraph 21, Lender shall acquire or sell the Property, Lender, prior to the acquisition or sale of the Property shall apply any Funds held by Lender at the time of acquisition or sale as a credit against the sums secured by this Security Instrument.

3. **Application of Payments.** Unless applicable law provides otherwise, all payments received by Lender under paragraphs 1 and 2 shall be applied: first, to any prepayment charges due under the Note; second, to amounts payable under paragraph 2; third to interest due; fourth, to principal due; and last, to any late charge due under the Note.

4. **Charges; Liens.** Borrower shall pay all taxes, assessments, charges, fines and impositions attributable to the Property which may attain priority over this Security Instrument, and leasehold payments or ground rents, if any. Borrower shall pay these obligations in the manner provided in paragraph 2, or if not paid in that manner, Borrower shall pay them on time directly to the person owed payment. Borrower shall promptly furnish to Lender all notices of amounts to be paid under this paragraph. If Borrower makes these payments directly, Borrower shall promptly furnish to Lender receipts evidencing the payments.

Borrower shall promptly discharge any lien which has priority over this Security Instrument unless Borrower (a) agrees in writing to the payment of the obligation secured by the lien in a manner acceptable to Lender; (b) contests in good faith the lien by, or defends against enforcement of the lien in, legal proceedings which in the Lender's opinion operate to prevent the enforcement of the lien; or (c) secures from the holder of the lien an agreement satisfactory to Lender subordinating the lien to this Security Instrument. If Lender determines that any part of the Property is subject to a lien which may attain priority over this Security Instrument, Lender may give Borrower a notice identifying the lien. Borrower shall satisfy the lien or take one or more of the actions set forth above within 10 days of the giving of notice.

5. **Hazard or Property Insurance.** Borrower shall keep the improvements now existing or hereafter erected on the Property insured against loss by fire, hazards included within the term "extended coverage" and any other hazards, including floods or flooding, for which Lender requires insurance. This insurance shall be maintained in the amounts and

*(Page 2 of 6 pages)*

DD/OLS 000349

CONFIDENTIAL                    EXHIBIT 3 TO EXHIBIT A

BOOK 849 PAGE 800

for the periods that Lender requires. The insurance carrier providing the insurance shall be chosen by Borrower subject to Lender's approval which shall not be unreasonably withheld. If Borrower fails to maintain coverage described above, Lender may, at Lender's option, obtain coverage to protect Lender's rights in the Property in accordance with paragraph 7.

All insurance policies and renewals shall be acceptable to Lender and shall include a standard mortgage clause. Lender shall have the right to hold the policies and renewals. If Lender requires, Borrower shall promptly give to Lender all receipts of paid premiums and renewal notices. In the event of loss, Borrower shall give prompt notice to the insurance carrier and Lender. Lender may make proof of loss if not made promptly by Borrower.

Unless Lender and Borrower otherwise agree in writing, insurance proceeds shall be applied to restoration or repair of the Property damaged, if the restoration or repair is economically feasible and Lender's security is not lessened. If the restoration or repair is not economically feasible or Lender's security would be lessened, the insurance proceeds shall be applied to the sums secured by this Security Instrument, whether or not then due, with any excess paid to Borrower. If Borrower abandons the Property, or does not answer within 30 days a notice from Lender that the insurance carrier has offered to settle a claim, then Lender may collect the insurance proceeds. Lender may use the proceeds to repair or restore the Property or to pay sums secured by this Security Instrument, whether or not then due. The 30-day period will begin when the notice is given.

Unless Lender and Borrower otherwise agree in writing, any application of proceeds to principal shall not extend or postpone the due date of the monthly payments referred to in paragraphs 1 and 2 or change the amount of the payments. If under paragraph 21 the Property is acquired by Lender, Borrower's right to any insurance policies and proceeds resulting from damage to the Property prior to the acquisition shall pass to Lender to the extent of the sums secured by this Security Instrument immediately prior to the acquisition.

6.   Occupancy, Preservation, Maintenance and Protection of the Property; Borrower's Loan Application; Leaseholds. Borrower shall occupy, establish, and use the Property as Borrower's principal residence within sixty days after the execution of this Security Instrument and shall continue to occupy the Property as Borrower's principal residence for at least one year after the date of occupancy, unless Lender otherwise agrees in writing, which consent shall not be unreasonably withheld, or unless extenuating circumstances exist which are beyond Borrower's control. Borrower shall not destroy, damage or impair the Property, allow the Property to deteriorate, or commit waste on the Property. Borrower shall be in default if any forfeiture action or proceeding, whether civil or criminal, is begun that in Lender's good faith judgment could result in forfeiture of the Property or otherwise materially impair the lien created by this Security Instrument or Lender's security interest. Borrower may cure such a default and reinstate, as provided in paragraph 18 by causing the action or proceeding to be dismissed with a ruling that, in Lender's good faith determination, precludes forfeiture of the Borrower's interest in the Property or other material impairment of the lien created by this Security Instrument or Lender's security interest. Borrower shall also be in default if Borrower, during the loan application process, gave materially false or inaccurate information or statements to Lender (or failed to provide Lender with any material information) in connection with the loan evidenced by the Note, including, but not limited to, representations concerning Borrower's occupancy of the Property as a principal residence. If this Security Instrument is on a leasehold, Borrower shall comply with all the provisions of the lease. If Borrower acquires fee title to the Property, the leasehold and the fee title shall not merge unless Lender agrees to the merger in writing.

7.   Protection of Lender's Rights in the Property. If Borrower fails to perform the covenants and agreements contained in this Security Instrument, or there is a legal proceeding that may significantly affect Lender's rights in the Property (such as a proceeding in bankruptcy, probate, for condemnation or forfeiture or to enforce laws or regulations), then Lender may do and pay for whatever is necessary to protect the value of the Property and Lender's rights in the Property. Lender's actions may include paying any sums secured by a lien which has priority over this Security Instrument, appearing in court, paying reasonable attorneys' fees and entering on the Property to make repairs. Although Lender may take action under this paragraph 7, Lender does not have to do so.

Any amounts disbursed by Lender under this paragraph 7 shall become additional debt of Borrower secured by this Security Instrument. Unless Borrower and Lender agree to other terms of payment, these amounts shall bear interest from the date of disbursement at the Note rate and shall be payable, with interest, upon notice from Lender to Borrower requesting payment.

8.   Mortgage Insurance. If Lender required mortgage insurance as a condition of making the loan secured by this Security Instrument, Borrower shall pay the premiums required to maintain the mortgage insurance in effect. If for any reason, the mortgage insurance coverage required by Lender lapses or ceases to be in effect, Borrower shall pay the premiums required to obtain coverage substantially equivalent to the mortgage insurance previously in effect, at a cost substantially equivalent to the cost to Borrower of the mortgage insurance previously in effect, from an alternate mortgage insurer approved by Lender. If substantially equivalent mortgage insurance coverage is not available, Borrower shall pay to Lender each month a sum equal to one-twelfth of the yearly mortgage insurance premium being paid by Borrower when the insurance coverage lapsed or ceased to be in effect. Lender will accept, use and retain these payments as a loss reserve in lieu of mortgage insurance. Loss reserve payments may no longer be required, at the option of Lender, if mortgage insurance coverage (in the amount and for the period that Lender requires) provided by an insurer approved by Lender again becomes available and is obtained. Borrower shall pay the premiums required to maintain mortgage insurance in effect, or to provide a loss reserve, until the requirement for mortgage insurance ends in accordance with any written agreement between Borrower and Lender or applicable law.

9.   Inspection. Lender or its agent may make reasonable entries upon and inspections of the Property. Lender shall give Borrower notice at the time of or prior to an inspection specifying reasonable cause for the inspection.

Form 3048 5/90

(Page 3 of 6 pages)

CONFIDENTIAL                    EXHIBIT 3 TO EXHIBIT A

BOOK 849 PAGE 801

10. Condemnation. The proceeds of any award or claim for damages, direct or consequential, in connection with any condemnation or other taking of any part of the Property, or for conveyance in lieu of condemnation, are hereby assigned and shall be paid to Lender.

In the event of a total taking of the Property, the proceeds shall be applied to the sums secured by this Security Instrument, whether or not then due, with any excess paid to Borrower. In the event of a partial taking of the Property in which the fair market value of the Property immediately before the taking is equal to or greater than the amount of the sums secured by this Security Instrument immediately before the taking, unless Borrower and Lender otherwise agree in writing, the sums secured by this Security Instrument shall be reduced by the amount of the proceeds multiplied by the following fraction: (a) the total amount of the sums secured immediately before the taking, divided by (b) the fair market value of the Property immediately before the taking. Any balance shall be paid to Borrower. In the event of a partial taking of the Property in which the fair market value of the Property immediately before the taking is less than the amount of the sums secured immediately before the taking, unless Borrower and Lender otherwise agree in writing or unless applicable law otherwise provides, the proceeds shall be applied to the sums secured by this Security Instrument whether or not the sums are then due.

If the Property is abandoned by Borrower, or if, after notice by Lender to Borrower that the condemnor offers to make an award or settle a claim for damages, Borrower fails to respond to Lender within 30 days after the date the notice is given, Lender is authorized to collect and apply the proceeds, at its option, either to restoration or repair of the Property or to the sums secured by this Security Instrument, whether or not then due.

Unless Lender and Borrower otherwise agree in writing, any application of proceeds to principal shall not extend or postpone the due date of the monthly payments referred to in paragraphs 1 and 2 or change the amount of such payments.

11. Borrower Not Released; Forbearance By Lender Not a Waiver. Extension of the time for payment or modification of amortization of the sums secured by this Security Instrument granted by Lender to any successor in interest of Borrower shall not operate to release the liability of the original Borrower or Borrower's successors in interest. Lender shall not be required to commence proceedings against any successor in interest or refuse to extend time for payment or otherwise modify amortization of the sums secured by this Security Instrument by reason of any demand made by the original Borrower or Borrower's successors in interest. Any forbearance by Lender in exercising any right or remedy shall not be a waiver of or preclude the exercise of any right or remedy.

12. Successors and Assigns Bound; Joint and Several Liability; Co-signers. The covenants and agreements of this Security Instrument shall bind and benefit the successors and assigns of Lender and Borrower, subject to the provisions of paragraph 17. Borrower's covenants and agreements shall be joint and several. Any Borrower who co-signs this Security Instrument but does not execute the Note: (a) is co-signing this Security Instrument only to mortgage, grant and convey that Borrower's interest in the Property under the terms of this Security Instrument; (b) is not personally obligated to pay the sums secured by this Security Instrument; and (c) agrees that Lender and any other Borrower may agree to extend, modify, forbear or make any accommodations with regard to the terms of this Security Instrument or the Note without that Borrower's consent.

13. Loan Charges. If the loan secured by this Security Instrument is subject to a law which sets maximum loan charges, and that law is finally interpreted so that the interest or other loan charges collected or to be collected in connection with the loan exceed the permitted limits, then: (a) any such loan charge shall be reduced by the amount necessary to reduce the charge to the permitted limit; and (b) any sums already collected from Borrower which exceeded permitted limits will be refunded to Borrower. Lender may choose to make this refund by reducing the principal owed under the Note or by making a direct payment to Borrower. If a refund reduces principal, the reduction will be treated as a partial prepayment without any prepayment charge under the Note.

14. Notices. Any notice to Borrower provided for in this Security Instrument shall be given by delivering it or by mailing it by first class mail unless applicable law requires use of another method. The notice shall be directed to the Property Address or any other address Borrower designates by notice to Lender. Any notice to Lender shall be given by first class mail to Lender's address stated herein or any other address Lender designates by notice to Borrower. Any notice provided for in this Security Instrument shall be deemed to have been given to Borrower or Lender when given as provided in this paragraph.

15. Governing Law; Severability. This Security Instrument shall be governed by federal law and the law of the jurisdiction in which the Property is located. In the event that any provision or clause of this Security Instrument or the Note conflicts with applicable law, such conflict shall not affect other provisions of this Security Instrument or the Note which can be given effect without the conflicting provision. To this end the provisions of this Security Instrument and the Note are declared to be severable.

16. Borrower's Copy. Borrower shall be given one conformed copy of the Note and of this Security Instrument.

17. Transfer of the Property or a Beneficial Interest in Borrower. If all or any part of the Property or any interest in it is sold or transferred (or if a beneficial interest in Borrower is sold or transferred and Borrower is not a natural person) without Lender's prior written consent, Lender may, at its option, require immediate payment in full of all sums secured by this Security Instrument. However, this option shall not be exercised by Lender if exercise is prohibited by federal law as of the date of this Security Instrument.

If Lender exercises this option, Lender shall give Borrower notice of acceleration. The notice shall provide a period of not less than 30 days from the date the notice is delivered or mailed within which Borrower must pay all sums secured by this Security Instrument. If Borrower fails to pay these sums prior to the expiration of this period, Lender may invoke any remedies permitted by this Security Instrument without further notice or demand on Borrower.

18. Borrower's Right to Reinstate. If Borrower meets certain conditions, Borrower shall have the right to have enforcement of this Security Instrument discontinued at any time prior to the earlier of: (a) 5 days (or such other period as

(Page 4 of 6 pages)

DD/OLS 000351

CONFIDENTIAL                    EXHIBIT 3 TO EXHIBIT A

BOOK 849 PAGE 802

applicable law may specify for reinstatement) before sale of the Property pursuant to any power of sale contained in this Security Instrument; or (b) entry of a judgment enforcing this Security Instrument. Those conditions are that Borrower: (a) pays Lender all sums which then would be due under this Security Instrument and the Note as if no acceleration had occurred; (b) cures any default of any other covenants or agreements; (c) pays all expenses incurred in enforcing this Security Instrument, including, but not limited to, reasonable attorneys' fees; and (d) takes such action as Lender may reasonably require to assure that the lien of this Security Instrument, Lender's rights in the Property and Borrower's obligation to pay the sums secured by this Security Instrument shall continue unchanged. Upon reinstatement by Borrower, this Security Instrument and the obligations secured hereby shall remain fully effective as if no acceleration had occurred. However, this right to reinstate shall not apply in the case of acceleration under paragraph 17.

19. Sale of Note; Change of Loan Servicer. The Note or a partial interest in the Note (together with this Security Instrument) may be sold one or more times without prior notice to Borrower. A sale may result in a change in the entity (known as the "Loan Servicer") that collects monthly payments due under the Note and this Security Instrument. There also may be one or more changes of the Loan Servicer unrelated to a sale of the Note. If there is a change of the Loan Servicer, Borrower will be given written notice of the change in accordance with paragraph 14 above and applicable law. The notice will state the name and address of the new Loan Servicer and the address to which payments should be made. The notice will also contain any other information required by applicable law.

20. Hazardous Substances. Borrower shall not cause or permit the presence, use, disposal, storage, or release of any Hazardous Substances on or in the Property. Borrower shall not do, nor allow anyone else to do, anything affecting the Property that is in violation of any Environmental Law. The preceding two sentences shall not apply to the presence, use, or storage on the Property of small quantities of Hazardous Substances that are generally recognized to be appropriate to normal residential uses and to maintenance of the Property.

Borrower shall promptly give Lender written notice of any investigation, claim, demand, lawsuit or other action by any governmental or regulatory agency or private party involving the Property and any Hazardous Substance or Environmental Law of which Borrower has actual knowledge. If Borrower learns, or is notified by any governmental or regulatory authority, that any removal or other remediation of any Hazardous Substance affecting the Property is necessary, Borrower shall promptly take all necessary remedial actions in accordance with Environmental Law.

As used in this paragraph 20 "Hazardous Substances" are those substances defined as toxic or hazardous substances by Environmental Law and the following substances: gasoline, kerosene, other flammable or toxic petroleum products, toxic pesticides and herbicides, volatile solvents, materials containing asbestos or formaldehyde, and radioactive materials. As used in this paragraph 20, "Environmental Law" means federal laws and laws of the jurisdiction where the Property is located that relate to health, safety or environmental protection.

NON-UNIFORM COVENANTS. Borrower and Lender further covenant and agree as follows:
21. Acceleration; Remedies. Lender shall give notice to Borrower prior to acceleration following Borrower's breach of any covenant or agreement in this Security Instrument (but not prior to acceleration under paragraph 17 unless applicable law provides otherwise). The notice shall specify: (a) the default; (b) the action required to cure the default; (c) a date, not less than 30 days from the date the notice is given to Borrower, by which the default must be cured; and (d) that failure to cure the default on or before the date specified in the notice may result in acceleration of the sums secured by this Security Instrument and sale of the Property. The notice shall further inform Borrower of the right to reinstate after acceleration and the right to bring a court action to assert the non-existence of a default or any other defense of Borrower to acceleration and sale. If the default is not cured on or before the date specified in the notice, Lender at its option may require immediate payment in full of all sums secured by this Security Instrument without further demand and may invoke the power of sale and any other remedies permitted by applicable law. Lender shall be entitled to collect all expenses incurred in pursuing the remedies provided in this paragraph 21, including, but not limited to, reasonable attorneys' fees and costs of title evidence.

If Lender invokes the power of sale, Lender or Trustee shall give Borrower, in the manner provided in paragraph 14, notice of Lender's election to sell the Property. Trustee shall give notice of sale by public advertisement for the time and in the manner prescribed by applicable law and, when required by applicable law, shall cause such notice to be served personally upon Borrower or other persons. Trustee, without demand on Borrower, shall sell the Property at public auction to the highest bidder for cash at the time and place and under the terms designated in the notice of sale in one or more parcels and in any order Trustee determines. Trustee may postpone sale of the Property by public announcement at the time and place of any previously scheduled sale. Lender or its designee may purchase the Property at any sale.

Trustee shall deliver to the purchaser Trustee's deed conveying the Property without any covenant or warranty, expressed or implied. The recitals in the Trustee's deed shall be prima facie evidence of the truth of the statements made therein. Trustee shall apply the proceeds of the sale in following order: (a) to all expenses of the sale, including, but not limited to, reasonable Trustee's fees; (b) to all sums secured by this Security Instrument; and (c) any excess to the person or persons legally entitled to it.

22. Release. Upon payment of all sums secured by this Security Instrument, Lender shall release this Security Instrument without charge to Borrower. Borrower shall pay any recordation costs.

23. Substitute Trustee. Lender, at its option, may from time to time remove Trustee and appoint a successor trustee to any Trustee appointed hereunder by an instrument recorded in the county in which this Security Instrument is recorded. Without conveyance of the Property, the successor trustee shall succeed to all the title, power and duties conferred upon Trustee herein and by applicable law.

*(Page 5 of 6 pages)*

DD/OLS 000352

CONFIDENTIAL          EXHIBIT 3 TO EXHIBIT A

BOOK 849 PAGE 803

34. Beneficiary's Address. The beneficial owner and holder of the Note at the time of execution and delivery hereof is Lender, whose residence address is stated in the first paragraph of the first page of this Security Instrument.

35. Attorney's Fees. The provisions in this Security Instrument for Borrower to pay "attorneys' fees" shall be void.

36. Riders to this Security Instrument. If one or more riders are executed by Borrower and recorded together with this Security Instrument, the covenants and agreements of each such rider shall be incorporated into and shall amend and supplement the covenants and agreements of this Security Instrument as if the rider(s) were a part of this Security Instrument. (Check applicable box(es))

| ☐ Adjustable Rate Rider | ☐ Condominium Rider | ☐ 1-4 Family Rider |
| ☐ Graduated Payment Rider | ☐ Planned Unit Development Rider | ☐ Biweekly Payment Rider |
| ☒ Balloon Rider | ☐ Rate Improvement Rider | ☐ Second Home Rider |
| ☒ Other(s) (specify) Prepay Rider and Arbitration Rider | | |

BY SIGNING BELOW, Borrower accepts and agrees to the terms and covenants contained in pages 1 through 6 of this Security Instrument and in any rider(s) executed by Borrower and recorded with it.

_____ (Seal)
David M. Daugherty        -Borrower

_____ (Seal)
Tina M. Daugherty         -Borrower

_____ (Seal)
                          -Borrower

Witness:

_____ (Seal)
                          -Borrower

_____ (Seal)
                          -Borrower

_____ (Seal)
                          -Borrower

Witness:

STATE OF WEST VIRGINIA, Wood                County ss:

The foregoing instrument was acknowledged before me this 20th day of July 1999

by David M. Daugherty and Tina M. Daugherty
(person acknowledging)

Emily B. Johnson
Notary Public

OFFICIAL SEAL
NOTARY PUBLIC
STATE OF WEST VIRGINIA
EMILY B JOHNSON
CHARLESTON, WV 25311
My Commission Expires July 4, 1929

This instrument was prepared by:

Dustin Boyd

(Page 6 of 6 pages)

DD/OLS 000353

CONFIDENTIAL            EXHIBIT 3 TO EXHIBIT A

BOOK 849 PAGE 804

**Balloon Payment Rider to Security Instrument**
(To Be Recorded Together with Security Instrument)

This BALLOON PAYMENT RIDER (the "Rider") is made this 29th day of July, 1999 and amends the Mortgage, Deed of Trust or Security Deed (the "Security Instrument") dated the same date and given by the person(s) who sign below (the "Borrower(s)") to EquiFirst Corporation (the "Lender") to secure repayment of a Note in the amount of U.S $ 100,500 .

In addition to the agreements and provisions made in the Note and the Security Instrument, both the Borrower(s) and and the Lender further agree as follows:

"THIS LOAN IS PAYABLE IN FULL AT THE MATURITY DATE. THE MATURITY DATE IS
July 26, 2014 . YOU MUST REPAY THE ENTIRE PRINCIPAL BALANCE OF THE
LOAN AND UNPAID INTEREST THEN DUE. THE LENDER IS UNDER NO OBLIGATION TO
REFINANCE THE LOAN AT THAT TIME. YOU WILL, THEREFORE, BE REQUIRED TO MAKE
PAYMENT OUT OF OTHER ASSETS THAT YOU MAY OWN, OR YOU WILL HAVE TO FIND A
LENDER, WHICH MAY BE THE LENDER YOU HAVE THIS LOAN WITH, WILLING TO LEND
YOU THE MONEY. IF YOU REFINANCE THIS LOAN AT MATURITY, YOU MAY HAVE TO
PAY SOME OR ALL OF THE CLOSING COSTS NORMALLY ASSOCIATED WITH A NEW LOAN
EVEN IF YOU OBTAIN REFINANCING FROM THE SAME LENDER. THIS CONTRACT IS NOT
PAYABLE IN INSTALLMENTS OF EQUAL AMOUNTS. AN INSTALLMENT OF $93,661.34
WILL BE DUE ON July 26, 2014 .

At least ninety (90), but not more than one hundred twenty (120) days prior to the Maturity Date, the Lender
must send the Borrower(s) a notice which states the Maturity Date and the amount of the "Balloon Payment" which
will be due on the Maturity Date (excluding all scheduled payments due between the date of the notice and the
Maturity Date are made on time).

_____          _____
David M. Daugherty                        Witness

_____          _____
Thea M. Daugherty                         Witness

_____          _____
                                          Witness

_____          _____
                                          Witness

DD/OLS 000354

CONFIDENTIAL          EXHIBIT 3 TO EXHIBIT A

BOOK 849 PAGE 805

### Prepayment Penalty Rider to Security Instrument
(To Be Recorded Together with Security Instrument)

This PREPAYMENT PENALTY RIDER (the "Rider") is made this _____20th_____ day of _____July_____ 1999 and amends the Mortgage, Deed of Trust or Security Deed (the "Security Instrument") dated the same date and given by the person(s) who's sign below (the "Borrower(s)") to ___EquiFirst Corporation___ (the "Lender") to secure repayment of a Note in the amount of $ __100,000__.

In addition to the agreements and provisions made in the Note and the Security Instrument both the Borrower(s) and and the Lender further agree as follows:

### PREPAYMENT PENALTY

IF I PREPAY THIS LOAN IN FULL WITHIN _____3_____ YEAR(S) FROM THE DATE OF THIS LOAN, I AGREE TO PAY A PREPAYMENT TO THE NOTE HOLDER. THE AMOUNT OF THE PREPAYMENT WILL BE THE AMOUNT EQUAL TO ___SIX (6) MONTHS INTEREST___ AT THE INTEREST RATE SHOWN IN SECTION 2 OF THIS NOTE ON THE UNPAID PRINCIPAL BALANCE OF THE LOAN OUTSTANDING ON THE DATE OF PREPAYMENT. THIS AMOUNT WILL BE IN ADDITION TO ANY OTHER AMOUNTS I MAY OWE UNDER THE PROVISIONS OF THIS NOTE OR THE SECURITY INSTRUMENT THAT SECURES THIS NOTE. IF I MAKE A PREPAYMENT IN FULL ON OR AFTER THE THIRD ANNIVERSARY OF THE DATE OF THE DATE OF THIS NOTE, THE NOTE HOLDER WILL IMPOSE NO PREPAYMENT PENALTY.

David M. Dougherty
David M. Dougherty

Tina M. Dougherty
Tina M. Dougherty

Emilyn Johnson
Witness

Witness

Witness

Witness

DD/OLS 000355

CONFIDENTIAL          EXHIBIT 3 TO EXHIBIT A

# NOTE

July 20, 1999   Charleston   West Virginia
(Date)     (City)     (State)

35 Valley View Drive
Vienna, WV 26104
(Property Address)

## 1. BORROWER'S PROMISE TO PAY

In return for a loan that I have received, I promise to pay U.S. $100,860.00 (this amount is called "principal"),
plus interest, to the order of the Lender.  The Lender is

**EQUIFIRST CORPORATION**

I understand that the Lender may transfer this Note.  The Lender or anyone who takes this Note by transfer and who is
entitled to receive payments under this Note is called the "Note Holder."

## 2. INTEREST

Interest will be charged on unpaid principal until the full amount of principal has been paid.  I will pay interest at a
yearly rate of 9.75 %.

The interest rate required by this Section 2 is the rate I will pay both before and after any default described in Section 6(B) of this Note.

## 3. PAYMENTS

**(A) Time and Place of Payments**

I will pay principal and interest by making payments every month.

I will make my monthly payments on the 26th day of each month beginning on  August 26, 1999
I will make these payments every month until I have paid all of the principal and interest and any other charges
described below that I may owe under this Note.  My monthly payments will be applied to interest before principal.  If, on
 July 26, 2014 , I still owe amounts under this Note, I will pay those amounts in full on that date,
which is called the "maturity date."

I will make my monthly payments at **EquiFirst Corporation**
**P.O. Box 60882**
**Charlotte, NC 28260-0882**

or at a different place if required by the Note Holder.

**(B) Amount of Monthly Payments**

My monthly payment will be in the amount of U.S. $866.54 .  THIS CONTRACT IS NOT PAYABLE IN INSTALLMENTS O
OF EQUAL AMOUNTS:  AN INSTALLMENT OF $82,666.36 WILL BE DUE ON  July 26, 2014.

## 4. BORROWER'S RIGHT TO PREPAY

**(A) Prepayment**

I have the right to make payments of principal at any time before they are due.  A payment of principal only is known as a "prepayment".
When I make a prepayment, I will tell the Note Holder in writing that I am doing so.  If I make a partial prepayment, there will be
no changes in the due date or in the amount of my monthly payment unless the Note Holder agrees in writing to those changes.

**(B) Prepayment Penalty**

If I prepay this loan in full within 3 year(s) from the date of this loan, I agree to pay a prepayment penalty to the Note Holder.  The
amount of the prepayment will be the amount equal to SIX (6) MONTHS INTEREST at the interest rate shown in Section 2 of this
Note on the unpaid principal balance of the loan outstanding on the date of prepayment.  This amount will be in addition to any other amounts I may
owe under the provisions of this Note or the Security Instrument that secures this Note.  If I make the prepayment in full on or after the third
anniversary of the date of this Note, the Note Holder will impose no prepayment penalty.

## 5. LOAN CHARGES

If a law, which applies to this loan and which sets maximum loan charges, is finally interpreted so that the interest or other loan
charges collected or to be collected in connection with this loan exceed the permitted limits, then: (i) any such
loan charge shall be reduced by the amount necessary to reduce the charge to the permitted limit; and (ii) any sums already
collected from me which exceeded permitted limits will be refunded to me.  The Note Holder may choose to make this
refund by reducing the principal I owe under this Note or by making a direct payment to me.  If a refund reduces principal,
the reduction will be treated as a partial prepayment.

## 6. BORROWER'S FAILURE TO PAY AS REQUIRED

**(A) Late Charge for Overdue Payments**

If the Note Holder has not received the full amount of any monthly payment by the end of 15 days
(calendar days) after the date it is due, I will pay a late charge to the Note Holder.  The amount of the charge will be
 5% of my overdue payment of principal and interest but not more than U.S. $5.00 and not less than U.S. $1.00.  I will pay this late
charge promptly but only once on each late payment.

**(B) Default**

If I do not pay the full amount of each monthly payment on the date it is due, I will be in default.

**(C) Notice of Default**

If I am in default, the Note holder may send me a written notice telling me that if I do not pay the overdue amount
by a certain date, the Note Holder may require me to pay immediately the full amount of principal which has not been paid
and all the interest that I owe on that amount.  That date must be at least 30 days after the date on which the notice is
delivered or mailed to me.

**(D) No Waiver by Note Holder**

Even if, at a time when I am in default, the Note Holder does not require me to pay immediately in full as described
above, the Note Holder will still have the right to do so if I am in default at a later time.

**(E) Payment of Note Holder's Costs and Expenses**

If the Note Holder has required me to pay immediately in full as described above, the Note Holder will have the right
to be paid back by me for all of its costs and expenses in enforcing this Note to the extent not prohibited by applicable
law.

MULTISTATE FIXED RATE NOTE ----Single Family----   PREPAYMENT PENALTY

Loan Number: 132385-1   PAGE 1 of 2  INITIALS _____

West Virginia                    Revised 01-Jul-99

DD/OLS 000356

CONFIDENTIAL     EXHIBIT 3 TO EXHIBIT A

**7. GIVING OF NOTICES**

Unless applicable law requires a different method, any notice that must be given to me under this Note will be given by delivering it or by mailing it by first class mail to me at the Property Address above or at a different address if I give the Note Holder a notice of my different address.

Any notice that must be given to the Note Holder under this Note will be given by mailing it by first class mail to the Note Holder at the address stated in Section 3(A) above or a different address if I am given a notice of that different address.

**8. OBLIGATIONS OF PERSONS UNDER THIS NOTE**

If more than one person signs this Note, each person is fully and personally obligated to keep all of the promises made in this Note, including the promise to pay the full amount owed.  Any person who is a guarantor, surety or endorser of this Note is also obligated to do these things.  Any person who takes over these obligations, including the obligations of a guarantor, surety or endorser of this Note, is also obligated to keep all of the promises made in this Note.  The Note Holder may enforce its rights under this Note against each person individually or against all of us together.  This means that any one of us may be required to pay all of the amounts owed under this Note.

**9. WAIVERS**

I and any other person who has obligations under this Note waive the rights of presentment and notice of dishonor and waive the homestead exemption.  "Presentment" means the right to require the Note Holder to demand payment of amounts due.  "Notice of dishonor" means the right to require the Note Holder to give notice to other persons that amounts due have not been paid.

**10. UNIFORM SECURED NOTE**

This Note is a uniform instrument with limited variations in some jurisdictions.  In addition to the protections given to the Note Holder under this Note, a Mortgage, Deed of Trust or Security Deed (the "Security Instrument"), dated the same date as this Note, protects the Note Holder from possible losses which might result if I do not keep the promises which I make in this Note.  That Security Instrument describes how and under what conditions I may be required to make immediate payment in full of all amounts I owe under this Note.  Some of those conditions are described as follows:

Transfer of the Property or a Beneficial Interest in Borrower.  If all or any part of the Property or any interest in it is sold or transferred (or if a beneficial interest in Borrower is sold or transferred and Borrower is not a natural person), without Lender's prior written consent, Lender may, at its option, require immediate payment in full of all sums secured by this Security Instrument.  However, this option shall not be exercised by Lender if exercise is prohibited by federal law as of the date of this Security Instrument.  If Lender exercises this option, Lender shall give Borrower notice of acceleration.  The notice shall provide a period of not less than 30 days from the date the notice is delivered or mailed within which Borrower must pay all sums secured by this Security Instrument.  If Borrower fails to pay these sums prior to the expiration of this period, Lender may invoke any remedies permitted by this Security Instrument without further notice or demand on Borrower.

WITNESS THE HAND(S) AND SEAL(S) OF THE UNDERSIGNED

_David M. Daugherty_ (signature) _____ (Seal)
David M. Daugherty                                    -Borrower

_Tina M. Daugherty_ (signature) _____ (Seal)
Tina M.  Daugherty                                    -Borrower

_____ (Seal)
                   -Borrower

_____ (Seal)
                   -Borrower

[Sign Original Only]

Without Recourse, Pay to the Order of:

**EFC Holdings Corporation**

**EquiFirst Corporation**

By: _Amy Acevedo_ (signature)
~~Julie Godsey, Assistant Vice President~~
Amy Acevedo
Asst. Vice President

Without Recourse, Pay to the Order of:

**EFC Holdings Corporation**

By: _Amy Acevedo_ (signature)
~~Julie Godsey, Assistant Vice President~~
Amy Acevedo
Asst. Vice President

PAY TO THE ORDER OF NORWEST BANK MINNESOTA, N.A.,
AS TRUSTEE FOR PROVIDENT BANK HOME EQUITY LOAN TRUST 1999-3,
WITHOUT RECOURSE.

The Provident Bank, d/b/a Provident Consumer Financial Services

By: _____

VICE PRESIDENT

| MULTISTATE FIXED RATE NOTE | --Single Family-- | PREPAYMENT PENALTY |
|---|---|---|

Loan Number: _____ 132385-1     PAGE 2 of 2     INITIALS_____

West Virginia                                              Revised     01-Jul-99

DD/OLS 000357

CONFIDENTIAL          EXHIBIT 3 TO EXHIBIT A

## Balloon Payment Addendum to Note

This BALLOON PAYMENT ADDENDUM is made this ____20th____ day of ____July____ 1999 , and amends the Mortgage, Deed of Trust or Security Deed (the "Security Instrument") dated the same date and given by the person(s) who sign below (the "Borrower(s)") to    **EquiFirst Corporation**    (the "Lender") to secure repayment of a Note in the amount of U.S.$ ___100,860___ .

In addition to the agreements and provisions made in the Note, both the Borrower(s) and the Lender further agree as follows:

THIS LOAN IS PAYABLE IN FULL AT THE MATURITY DATE. THE "MATURITY DATE" IS:

____July 26, 2014____   YOU MUST REPAY THE ENTIRE PRINCIPAL BALANCE OF THE

LOAN AND UNPAID INTEREST THEN DUE. THE LENDER IS UNDER NO OBLIGATION TO

REFINANCE THE LOAN AT THAT TIME. YOU WILL, THEREFORE, BE REQUIRED TO MAKE

PAYMENT OUT OF OTHER ASSETS THAT YOU MAY OWN, OR YOU WILL HAVE TO FIND A

LENDER, WHICH MAY BE THE LENDER YOU HAVE THIS LOAN WITH, WILLING TO LEND

YOU THE MONEY. IF YOU REFINANCE THIS LOAN AT MATURITY, YOU MAY HAVE TO

PAY SOME OR ALL OF THE CLOSING COSTS NORMALLY ASSOCIATED WITH A NEW LOAN

EVEN IF YOU OBTAIN REFINANCING FROM THE SAME LENDER. THIS CONTRACT IS NOT

PAYABLE IN INSTALLMENTS OF EQUAL AMOUNTS: AN INSTALLMENT OF ___$82,666.36___

WILL BE DUE ON ____July 26, 2014.____

At least ninety (90), but not more than one hundred twenty (120) days prior to the Maturity Date, the Lender must send the Borrower(s) a notice which states the Maturity Date and the amount of the "Balloon Payment" which will be due on the Maturity Date (assuming all scheduled payments due between the date of the notice and the Maturity Date are made on time).

_David M. Daugherty_
David M. Daugherty

_Tina M. Daugherty_
Tina M. Daugherty

_Emily B. Johnson_
Witness

_____
Witness

_____
Witness

_____
Witness

West Virginia                                                                    Revised   01-Jul-99

DD/OLS 000358

CONFIDENTIAL          EXHIBIT 3 TO EXHIBIT A

## Balloon Payment Rider to Security Instrument
(To Be Recorded Together with Security Instrument)

This BALLOON PAYMENT RIDER (the "Rider") is made this __20th__ day of __July__ 1999 , and amends the Mortgage, Deed of Trust or Security Deed (the "Security Instrument") dated the same date and given by the person(s) who sign below (the "Borrower(s)") to **EquiFirst Corporation** (the "Lender") to secure repayment of a Note in the amount of U.S $ __100,860__ .

In addition to the agreements and provisions made in the Note and the Security Instrument, both the Borrower(s) and and the Lender further agree as follows:

THIS LOAN IS PAYABLE IN FULL AT THE MATURITY DATE. THE "MATURITY DATE" IS:

__July 26, 2014__ YOU MUST REPAY THE ENTIRE PRINCIPAL BALANCE OF THE

LOAN AND UNPAID INTEREST THEN DUE. THE LENDER IS UNDER NO OBLIGATION TO

REFINANCE THE LOAN AT THAT TIME. YOU WILL, THEREFORE, BE REQUIRED TO MAKE

PAYMENT OUT OF OTHER ASSETS THAT YOU MAY OWN, OR YOU WILL HAVE TO FIND A

LENDER, WHICH MAY BE THE LENDER YOU HAVE THIS LOAN WITH, WILLING TO LEND

YOU THE MONEY. IF YOU REFINANCE THIS LOAN AT MATURITY, YOU MAY HAVE TO

PAY SOME OR ALL OF THE CLOSING COSTS NORMALLY ASSOCIATED WITH A NEW LOAN

EVEN IF YOU OBTAIN REFINANCING FROM THE SAME LENDER. THIS CONTRACT IS NOT

PAYABLE IN INSTALLMENTS OF EQUAL AMOUNTS: AN INSTALLMENT OF __$82,666.36__

WILL BE DUE ON __July 26, 2014.__

At least ninety (90), but not more than one hundred twenty (120) days prior to the Maturity Date, the Lender must send the Borrower(s) a notice which states the Maturity Date and the amount of the "Balloon Payment" which will be due on the Maturity Date (assuming all scheduled payments due between the date of the notice and the Maturity Date are made on time).

_David M. Daugherty_         _Emily J. Johnson_
David M. Daugherty                      Witness

_Tina M. Daugherty_
Tina M. Daugherty                      Witness

_____                     Witness

_____                     Witness

West Virginia                              Revised   01-Jul-99

DD/OLS 000359

CONFIDENTIAL             EXHIBIT 3 TO EXHIBIT A

### Prepayment Penalty Rider to Security Instrument
(To Be Recorded Together with Security Instrument)

This PREPAYMENT PENALTY RIDER (the "Rider") is made this __20th__ day of ____July____ 1999
and amends the Mortgage, Deed of Trust or Security Deed (the "Security Instrument") dated the same date and given
by the person(s) who sign below (the "Borrower(s)") to        **EquiFirst Corporation**        (the "Lender") to secure
repayment of a Note in the amount of U.S $ ___100,860___ .

In addition to the agreements and provisions made in the Note and the Security Instrument, both the Borrower(s) and
and the Lender further agree as follows:

#### PREPAYMENT PENALTY

IF I PREPAY THIS LOAN IN FULL WITHIN        3        YEAR(S) FROM THE DATE OF THIS LOAN, I

AGREE TO PAY A PREPAYMENT TO THE NOTE HOLDER.   THE AMOUNT OF THE PREPAYMENT

WILL BE THE AMOUNT EQUAL TO        SIX (6) MONTHS INTEREST        AT THE INTEREST RATE SHOWN

IN SECTION 2 OF THIS NOTE ON THE UNPAID PRINCIPAL BALANCE OF THE LOAN OUTSTANDING

ON THE DATE OF PREPAYMENT. THIS AMOUNT WILL BE IN ADDITION TO ANY OTHER AMOUNTS I MAY

OWE UNDER THE PROVISIONS OF THIS NOTE OR THE SECURITY INSTRUMENT THAT SECURES THIS

NOTE.  IF I MAKE A PREPAYMENT IN FULL ON OR AFTER THE THIRD ANNIVERSARY OF THE DATE OF

THE DATE OF THIS NOTE, THE NOTE HOLDER WILL IMPOSE NO PREPAYMENT PENALTY.


_____        _____
David M. Daugherty                                    Witness

_____        _____
Tina M. Daugherty                                      Witness

_____        _____
                                                                      Witness

_____        _____
                                                                      Witness


West Virginia                                                    Revised      01-Jul-99

DD/OLS 000360

CONFIDENTIAL                    EXHIBIT 3 TO EXHIBIT A

## ARBITRATION RIDER
(To Be Recorded Together with Security Instrument)

THIS RIDER is made this      20th      day of      July, 1999      and is incorporated into and shall be deemed to amend and supplement the Mortgage, Deed of Trust, or Security Deed (the "Security Instrument") of the same date given by the undersigned (the "Borrower") to secure Borrower's Note (the "Note") to EquiFirst Corporation (the "Lender") of the same date and covering the property described in the Security Instrument and located at:

35 Valley View Drive, Vienna, WV 26104
*(Property Address)*

As used in this Rider, the term "Lender" includes Lender's successors and assigns and the company servicing the Note on Lender's behalf.

**ADDITIONAL COVENANTS.**    In addition to the covenants and agreements made in the Security Instrument, Borrower and Lender further covenant and agree as follows:

**ARBITRATION OF DISPUTES.**    Any claim, dispute, or controversy (whether in contract, tort, or otherwise) arising from or related to the loan evidenced by the Note, including but not limited to all statutory claims, any claim, dispute or controversy that may arise out of or is based on the relationships which result from the Borrower's application to the lender for the loan, the closing of the loan, or the servicing of the loan, or any dispute or controversy over the applicability or enforceability of this arbitration agreement or the entire agreement between Borrower and Lender (collectively "claim"), shall be resolved, upon the election of either Borrower or Lender, by binding arbitration, and not by court action, except as provided under Exclusions from Arbitration below.

This arbitration agreement is made pursuant to a transaction involving interstate commerce, and shall be governed by the Federal Arbitration Act (9 U.S.C. Sections 1-16) and the Code of Procedure of the National Arbitration Forum in effect at the time a claim is filed.    Copies of the arbitration rules and forms can be obtained and any claims can be filed at any National Arbitration Forum office, at P.O. Box 50191, Minneapolis, MN 55404, on the World Wide Web at www.arb-forum.com, or by calling (800) 474-2371.

This agreement to arbitrate shall apply no matter by whom or against whom a claim is made. Any election to arbitrate may be made at any time, regardless of whether a lawsuit has been filed or not, and such party making the election may bring a motion in any court having jurisdiction to compel arbitration of any claim, and/or to stay the litigation of any claim pending arbitration. Any participatory arbitration hearing will take place in the federal judicial district of the Borrower's residence, unless a different location is agreed to by Borrower and Lender.    At Borrower's request, Lender will advance the first $150 of the filing and hearing fees for any claim which the Borrower may file against Lender.    The arbitrator will decide which party will ultimately be responsible for paying these fees.    All claims between the Borrower and Lender shall be arbitrated individually, and shall not be subject to being joined or combined in any proceeding with any claims of any persons, or class of person other than Borrower or Lender. The arbitrator shall apply relevant law and provide written, reasoned findings of fact and conclusions of law.    Judgment upon the award rendered by the arbitrator may be entered in any court having jurisdiction.

**EXCLUSIONS FROM ARBITRATION.**    This arbitration agreement shall not apply to rights of obligations under the loan documents that allow the Lender to foreclose or otherwise take possession of property securing the loan, including repossession, foreclosure or unlawful detainer.    Nor shall it be construed to prevent any party's use of bankruptcy or judicial foreclosure.    No provision of this agreement shall limit the right of the Borrower to exercise Borrower's rights under the Uniform Covenant labeled "Borrower's Right to Reinstate".    Subject to these limitations, this arbitration agreement will survive the pay-off of the loan.

**SEVERABILITY.**    If the arbitrator or any court determines that one or more terms of this arbitration agreement or the arbitration Code are unenforceable, such determination shall not impair or effect the enforceability of the other terms of this arbitration agreement or the arbitration Code.

**NOTICE.**    WHEN YOU SIGN THIS ARBITRATION RIDER, YOU ARE AGREEING THAT EVERY DISPUTE DESCRIBED ABOVE MAY BE DECIDED EXCLUSIVELY BY ARBITRATION.    YOU ARE GIVING UP RIGHTS YOU MIGHT HAVE TO LITIGATE THOSE CLAIMS AND DISPUTES IN A COURT OR JURY TRIAL OR TO PARTICIPATE AS A REPRESENTATIVE OR MEMBER OF ANY CLASS OF CLAIMANTS IN CONNECTION WITH A CLAIM OR DISPUTE.    DISCOVERY IN ARBITRATION PROCEEDINGS IS LIMITED IN THE MANNER PROVIDED BY THIS AGREEMENT AND THE RULES OF ARBITRATION.    THE ARBITRATORS DECISION WILL GENERALLY BE FINAL AND BINDING.    OTHER RIGHTS THAT YOU WOULD HAVE IF YOU WENT TO COURT MAY ALSO NOT BE AVAILABLE IN ARBITRATION.    IT IS IMPORTANT THAT YOU READ THIS ENTIRE ARBITRATION AGREEMENT CAREFULLY BEFORE SIGNING THIS ARBITRATION RIDER.

BY SIGNING BELOW,    Borrower accepts and agrees to the provisions contained in this Rider.

*David M. Daugherty*
Borrower

*Trina M. Daugherty*
Borrower

West Virginia

DD/OLS 000361

CONFIDENTIAL              EXHIBIT 3 TO EXHIBIT A