# Expert Report of John Ulzheimer

**David M. Daugherty**
**vs.**
**Equifax Information Services, LLC** *et al.*

**May 13, 2015**

system called Online Solution for Complete and Accurate Reporting or "e-OSCAR." Once the data furnisher receives the ACDV via the e-OSCAR system, they can see the name and identification of the consumer, as well as the nature of the dispute.

The data furnisher usually has 30 days to determine if the consumer's dispute requires a modification to their credit report or if the challenged item is accurate. Either way, the data furnisher should fill out the "response" portion of the ACDV form with directions to modify the item, delete the item, or leave the credit report item unchanged. The data furnisher's response is sent back the credit bureaus via e-OSCAR. Once the credit bureaus receive the data furnisher's response, they will modify, delete, or do nothing to the credit report entry.

The credit bureau then sends correspondence, usually by mail, to the consumer with the results of the investigation. Under the Fair Credit Reporting Act (FCRA), this entire process may take up to 45 days, although the Consumer Data Industry Association (CDIA) reports that the process generally takes less time thanks to automation.

### B.    Opinion #1 – No single item on a credit report determines a credit score.

Single entries on a credit report, regardless of the type, do not have a set value in a credit scoring system because no particular item is worth any specific number of "points." Instead, credit-scoring systems are multivariate[4] and, as discussed above, credit scores are determined using a series of characteristics, variables, and weights.[5] That means that no single item on the Plaintiff's credit report, including the Ocwen entry, is responsible for his credit score. Instead, his final credit score results from consideration of items in his credit report that are predictive of elevated risk and subject to the characteristics, variables, and weights used by the model chosen for that individual.

Illustrative of this are Plaintiff's credit reports ranging as far back as April 2013. At all times starting in April of 2013 the Plaintiff's credit reports were heavily populated with derogatory information unrelated to Ocwen[6]. This derogatory information included 11 collection accounts and 2 tax liens. As a result of the aggregate of derogatory credit information the Plaintiff's credit scores were very poor. As of April 17, 2014 Plaintiff's credit scores were 561 at Experian, 564 at Equifax, and 565 at TransUnion. The poor credit scores at Experian and TransUnion exist despite those credit reports being void of any derogatory Ocwen credit reporting. Plaintiff's Experian credit report did not include any derogatory reporting by Ocwen and Experian credit score was still lower than the Equifax credit score. This underscores the fact that Ocwen's credit reporting had no incremental negative effect on the Plaintiff's credit scores.

---

4. *See* pages 7-8 of this report.

5. *See* pages 8-9 of this report.

[6] EIS Daugherty 00006, 000040, 000364, 000436, 000476, ACRLLC75-118, and Plaintiff's Document Production

### C.       <u>Opinion #2</u> – There is no evidence the Plaintiff was damaged as a result of Ocwen's credit reporting.

The Plaintiff claims he was damaged as a result of Ocwen's credit reporting in the form of credit denials, increased insurance rates, increased interest rates, and the loss of credit. He has provided no documentation, at all, referencing increased insurance rates or increased interest rates. As such, it is my opinion that there is no information to support any of those claims.

Regarding the claim that he was denied credit as a result of Ocwen's credit reporting, there is also no support of those claims either. When a consumer applies for and is denied credit as a result of information on his credit reports, the lender is obligated under Federal law to provide them with a notice of such. This notice is formally referred to as a "Notice of Adverse Action" although most consumers refer to them simply as declination letters.

The Plaintiff suggests he was denied credit by Chase, Quicken Loans, Embrace Loans, One Community Federal Credit Union, and GE acting on behalf of Sandy Furniture. He has, however, provided no documents from GE, Quicken Loans, Embrace Loans, or One Community Federal Credit Union suggesting that he applied for credit with them, let alone was denied credit by them.

The Plaintiff has provided documents from Comenity Capital Bank and Chase. Each of those documents, however, confirms that the Plaintiff was denied credit for some reason other than Ocwen's credit reporting.

<u>Comenity Capital Bank</u> – On or about May 21, 2014 the Plaintiff applied for credit with Comenity Capital Bank of behalf of a company called Bill Me Later, Inc. His application for credit was denied[7]. Comenity based their decision on the Plaintiff's Equifax credit report and credit score, which was 580 at the time and in the lowest 11th percentile nationally. According to Comenity the Plaintiff was denied credit because he had too many seriously delinquent accounts. As stated above in my Opinion #1, the Plaintiff's credit reports were awash with seriously delinquent information even in the absence of the Ocwen account. The conditions that caused the Plaintiff to be denied credit were present even in the absence of Ocwen's credit reporting. It's also important to note that the Ocwen account on the Plaintiff's Equifax credit report showed as being "in dispute" at this time with the Compliance Condition Code XB.

<u>Chase</u> – On or about May 6, 2014 the Plaintiff applied for a credit card with Chase Bank. His application was denied[8]. Chase based their decision on the Plaintiff's Equifax credit report and credit score, which was 561 at the time. Chase gave four reasons for their denial decision including the Plaintiff's credit score, the prevalence of delinquent credit obligations, balances on credit cards that are too high relative to their credit limits, and foreclosure/repossession/early lease termination. According to Chase the Plaintiff's credit score

---

[7] Plaintiff's Document Production (Plaintiff's production contains no Bates numbers of other control numbers).

[8] Ibid

was too low because of "Delinquency/public record/bankruptcy, length of time since last delinquency on accounts, total available credit on revolving lines, installment loans not paid as agreed and the number of requests for new credit." As with Comenity Capital Bank, the conditions that caused the Plaintiff's lower credit score were present even in the absence of Ocwen's credit reporting. It's also important to note that the Ocwen account on the Plaintiff's Equifax credit report showed as being "in dispute" at this time with the Compliance Condition Code XB.

Embrace Loans – On or about June 17, 2013 Embrace Home Loans pulled the Plaintiff's TransUnion and Experian credit reports[9], which did not contain the Ocwen "foreclosure" credit reporting. Embrace did not pull the Plaintiff's Equifax credit report, which was the only credit report that did include the Ocwen foreclosure reporting. As such, there is no indication or support to the Plaintiff's claim that he was denied by Embrace Loans because according to his own document production, Embrace didn't pull a credit report from Equifax in 2013. This is further confirmed by Equifax's production.[10] Their internal records of the Plaintiff's credit report as of June 2013 show no credit inquiry from Embrace in 2013.

Quicken Loans – The Plaintiff and his expert suggest that Plaintiff has been denied a mortgage loan by Quicken Loans[11]. There are, however, no documents suggesting that the Plaintiff ever even applied for a loan with Quicken, let alone was denied a loan by Quicken. Plaintiff has produced no Adverse Action letter or Score Disclosure Notice from Quicken, both of which would have been required disclosures had the Plaintiff applied for a loan that was eventually denied by Quicken.

    D.    **Opinion #3 – Defendant Ocwen did, in fact, report their account as being "in dispute" when it was disputed.**

The Plaintiff's expert has suggested in his report that Ocwen failed to list their account as being "in dispute.[12]" This is simply incorrect and there are a variety of documents produced that confirm Ocwen did, in fact, report the account on multiple occasions to the credit reporting agencies as being in dispute.

As stated above on pages 9 and 10, accounts in dispute are labeled as such with the Compliance Condition Code "XB." On a credit report the code XB reads, "Consumer Disputes, reinvestigation in process per Fair Credit Reporting Act" or a reasonable derivative of that phrase. Ocwen began reporting the account as being in dispute by using the aforemen-

---

[9] Ibid

[10] EIS-Daugherty 000041

[11] Hendricks' report, page 6

[12] Hendricks' report, page 1

tioned XB code in October 2013[13]. Further, Equifax also has produced numerous records showing the Ocwen account as being in dispute[14].

More specifically, on at least three separate occasions in October, November and December of 2013 Ocwen proactively reported the Plaintiff's account as being in dispute by reporting the XB Compliance Condition Code as part of their monthly credit reporting[15]. Equifax's internal credit file records also confirm that the Ocwen account was, in fact, showing as being in dispute[16]. And, at least as of August 2014 the Ocwen account no longer appeared on the Plaintiff's Equifax credit report[17] and Equifax even informed the Plaintiff as much in their communications with him[18]. Finally, there is nothing to indicate the subject Ocwen account has been reinserted into Plaintiff's Equifax credit file since August 2014.

And, unless the credit reporting agencies removed the "in dispute" code it would remain on the Plaintiff's credit report indefinitely. The "XB" in dispute code is what's referred to as a "sticky" code, which means it doesn't simply fall off of the credit report after one month. It will remain on the consumer's credit report until a "removal" code is used in its place, thus deleting it.

At all times the "XB" code was associated with the Ocwen account it was rendered harmless to the Plaintiff's credit scores. All credit scores (FICO and VantageScore) will ignore the payment history and all balances (current or past due) associated with an account that carries the XB code. As such, any scores that were calculated at the same time the XB code was present were not influenced by the Ocwen payment history or balance.

Additionally, Ocwen, and all other companies that provide data to the credit bureaus, are only required to show their accounts as being in dispute when a consumer files a valid dispute directly with them. If a consumer files a dispute with a credit reporting agency then the agency is obligated to show that account as being in dispute, rather than the lender. In fact, Equifax has gone on record previously stating that they do, in fact, show accounts as being in dispute when they receive disputes from consumers. If a consumer files a frivolous dispute with a lender/data furnisher then that lender is not obligated to show the account as being in dispute because there is no need for an investigation to take place.

On at least 10 separate occasions the Plaintiff filed frivolous disputes with Equifax challenging solely whether or not the subject Ocwen account actually belonged to him[19]. The Plaintiff hasn't asserted in his Complaint that the account was not his or that he was not liable for the debt. In fact, he admits in his Statement of Facts from the Complaint that

---

[13] DD/OLS 000322 and 000625

[14] EIS Daugherty 000260-261 & 308

[15] DD/OLS 000322 and 000625 - 645

[16] Examples can be found at EIS-Daugherty 260-261, 268-269, 308, 311

[17] Examples can be found at EIS-Daugherty 364-373, 421-426, 430-433, 436-445, 497-503, 507-510

[18] EIS-Daugherty 412-413, 427-429, 474-475, 476-485, 504-506

[19] Examples can be found at EIS-Daugherty 000089, 192, 227, 255, 303, 360, 389, 416

Ocwen is the servicer of his mortgage loan[20]. However, he chose to challenge the Ocwen reporting under that misleading premise with Equifax on multiple occasions. Each of these disputes is frivolous, as the Plaintiff knows that the Ocwen mortgage is, in fact, his account. Because the disputes are frivolous there is no obligation for Equifax to instigate an investigation and no obligation for Ocwen to show the account as being in dispute. Furthermore, Ocwen responded accurately to each ACDV indicating Plaintiff disputed that the account was not his or that he was not liable for the debt by verifying the subject mortgage account belongs to Plaintiff.

### E.    Opinion #4 – Defendant Ocwen did not report multiple accounts to the credit reporting agencies.

The Plaintiff's expert has suggested in his report that Ocwen furnished two accounts with the same number to the credit bureaus.[21] This is also incorrect or, at best, speculation as there are a variety of documents produced that confirm Ocwen did, in fact, report only one account to the credit reporting agencies.

It appears that Ocwen changed the "Date Opened" field from "08/26/1999" to "07/20/1999" in its 04/30/2012 credit reporting tape[22], which was a warranted correction as the mortgage opening date was, in fact, 07/20/1999[23]. It appears the prior loan servicer was reporting the opening date as 08/26/1999 and that Ocwen updated the reporting to the correct date after it started servicing this account.[24] This is likely the cause of the account being reported twice by Equifax[25]. It appears Equifax treated the "07/20/1999" change by Ocwen as a new account or "tradeline."

This also provides an explanation as to why Ocwen's responses to Equifax's ACDVs weren't resulting in both accounts being updated. When the ACDVs are fully processed they may not have updated the derogatory Ocwen account as a result of the duplicative tradeline. The trade line with the 08/26/1999 opening date contained the negative information including late payments and $6,128 past due. This is likely because Equifax was still showing much older monthly credit reporting from as far back as March 2012 rather than what Ocwen was sending via its monthly credit reporting and dispute response ACDVs.

Clearly this isn't something Ocwen caused as it was simply changing the date opened on one account. There's nothing to suggest Ocwen sent a second and different account to Equifax or any of the other credit reporting agencies.

---

[20] Complaint, paragraphs 5-6

[21] Hendricks' report, page 2

[22] DD/OLS 606-607

[23] DD/OLS 648

[24] DD/OLS 594-601 and 602

[25] EIS-Daugherty 42-43 as an example of the two Ocwen accounts with two "Date Opened" values

F.  **Opinion #5** – Defendant Ocwen's monthly credit reporting in 2013 and 2014 did not state that Plaintiff was 120 days delinquent or that his account was past due $6,128.

In his Complaint[26], Plaintiff says he obtained a credit report in January 2014 and discovered that Ocwen had reported to Equifax that his loan was 120 days delinquent in March 2013, June 2013, July 2013, October 2013, December 2013 and January 2014, as well as that Ocwen reported to Equifax that Plaintiff had a past due balance of $6,128.

However, Ocwen never reported on its monthly credit tape in 2013 or 2014 that Plaintiff was 120 days delinquent or that his account was past due $6,128.[27] Instead, the only time this information was reported on Ocwen's monthly credit tape was in March 2012.[28] In fact, beginning June 2012, Ocwen reported Plaintiff as current with no past due balance for every month except March 2013.

* * * * *

This expert report is based on my 24-plus years of experience and knowledge gained as a professional in the consumer credit industry, specifically as an employee or contractor of Equifax Credit Information Services, Fair Isaac Corporation, Credit.com, and Credit.com Educational Services, on my review of relevant documents and testimony produced in this matter, and as a result of my previous expert witness work, which includes more than 165 cases. All of my comments are accurate to the best of my knowledge as of the time I prepared this report. All of the opinions and comments stated in this report are expressed to a reasonable degree of professional certainty.

I reserve the right to supplement or amend my opinions. I declare that the foregoing is true and accurate to the best of my ability based on the documents I have reviewed, my education, my experience, my training, and my expertise.

Executed this 13th day of May, 2015,
in Atlanta, Georgia

_____
John Ulzheimer

---

[26] Complaint pars. 7-9

[27] DD/OLS 000322 and 000616 - 635

[28] DD/OLS 000322 and 000602 - 645