```
                                                         Page 1
 1         IN THE UNITED STATES DISTRICT COURT
 2       FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA
 3                    Beckley Division
 4           Civil Action No.:  5:14-cv-24506
 5   _____
 6   DAVID M. DAUGHERTY,
 7            Plaintiff,
 8       vs.                          DEPOSITION OF:
 9   EQUIFAX INFORMATION SERVICES,  STEVEN F. NAPIER
10   LLC, and OCWEN LOAN SERVICING,
11   LLC,
12            Defendants.
13   _____/
14
15           TRANSCRIPT of the stenographic notes
16   of the proceedings in the above-entitled matter,
17   as taken by and before, CONNIE M. NICHOLS,
18   Registered Professional Reporter and Notary
19   Public of the State of West Virginia, held at
20   the offices of WINGATE BY WYNDHAM, 1502 Grand
21   Central Avenue, Vienna, West Virginia, on
22   Friday, August 21, 2015, commencing at 2:06 p.m.
23
24   Job No. 2123679
```

Page 2

1 A P P E A R A N C E S:
2
3 HAMILTON, BURGESS, YOUNG & POLLARD, PLLC
   BY: JED R. NOLAN, ESQ.
4 5493 Maple Lane
   Fayetteville, West Virginia 25840
5 (304) 574-8038
   jnolan@hamiltonburgess.com
6 Attorney for the Plaintiff
   (via teleconference)
7
8 TROUTMAN SANDERS, LLP
   BY: JON M. KENNEY, ESQ.
9 222 Central Park Avenue, Suite 2000
   Virginia Beach, Virginia 23462
10 (757) 687-7500
   jon.kenney@troutmansanders.com
11 Attorneys for the Defendants
   (via teleconference)
12
13 ANDREW C. WOOFTER, III, PLLC
   BY: ANDREW C. WOOFTER, III, ESQ.
14 429 Market Street, Suite 201
   Parkersburg, West Virginia 26101
15 (304) 834-1145
   info@woofterlaw.com
16 Attorney for One Community Federal Credit Union
17
18
19
20
21
22
23
24

Page 3

1           I N D E X
2 WITNESS       DIRECT  CROSS  REDIRECT  RECROSS
3 STEVEN F. NAPIER
4 BY MR. KENNEY   4    --    43, 46     --
5 BY MR. NOLAN   --    41     --        45
6
7          E X H I B I T S
8 NUMBER      DESCRIPTION              PAGE
9 Exhibit 1   Notice of Deposition      12
10            for Steven F. Napier
11 Exhibit 2  Amended Notice of Deposition  12
12            for One Community
13 Exhibit 3  Computer notes           18
14 Exhibit 4  Affidavit                23
15 Exhibit 5  Documents produced in response  29
16            to subpoena
17 Exhibit 6  Handwritten note         37
18
19
20
21
22
23
24

Page 4

1            * * *
2        STEVEN F. NAPIER,
3 being first duly sworn, was examined and deposed
4 as follows:
5            * * *
6        E X A M I N A T I O N
7 BY MR. KENNEY:
8    Q.   Now I'd ask you to please state your
9 name and date of birth on the record, please.
10   A.   Steven F. Napier, 5/14/1965.
11   Q.   Thank you very much, Mr. Napier. My
12 name is Jon Kenney, and I'm the attorney that is
13 representing the defendant in this case, Ocwen
14 Loan Servicing. And we're here today for your
15 deposition. Have you ever given deposition
16 testimony before?
17   A.   Yes, sir.
18   Q.   And how many times have you given
19 deposition testimony?
20   A.   Probably a half-dozen times.
21   Q.   Have you ever given a Rule 30(b)(6)
22 deposition for One Community Federal Credit
23 Union?
24   A.   No, sir.

Page 5

1    Q.   In the depositions that you've given
2 previously, have they been 30(b)(6) depositions
3 or have they been depositions in your personal
4 capacity?
5    A.   They were more along the lines of when
6 I was in the collections field and a
7 repossession agent.
8    Q.   Okay.
9         And I'll just go over a couple ground
10 rules anyway, because I just like to have it on
11 record.
12        So I'll be asking some questions
13 today, and some of them you may want to answer
14 with a "yes" or "no." And if that's the answer
15 you care to give, I just ask you to verbalize it
16 for the court reporter. Okay?
17   A.   Yes, sir.
18   Q.   And you understand today that you are
19 under oath just as you would be in court?
20   A.   Yes, sir.
21   Q.   Okay.
22        And it's very important that you
23 listen to the question that I ask, so that you
24 can give me a responsive answer. So if I ask a

Page 22

1  talked to me about the loan, wanted to make sure
2  we were comfortable granting the loan for the
3  van repairs.
4     Q.  Was there any formal application that
5  was made with regard to this private consumer
6  loan?
7     A.  Yes.
8     Q.  And what did that application involve?
9     A.  What a normal process you go through
10 for an application: name, address, Social
11 Security number, income.
12    Q.  Was there a credit check that was done
13 with regard to this loan?
14    A.  I'm almost positive there was, yes.
15    Q.  And that credit check, would that have
16 been done within the same time period, July 24,
17 2014?
18    A.  Yes, sir.
19    Q.  And it looks like he was ultimately
20 approved for this loan; is that right?
21    A.  Correct.
22    Q.  Okay.
23        And I'd like to turn now to the
24 affidavit that you had submitted.

Page 23

1         MR. KENNEY:  And this is tab 6, and
2  we can mark this Exhibit 4.
3              * * *
4         (Whereupon, Napier Deposition Exhibit 4
5  was marked for purposes of
6  identification.)
7              * * *
8  BY MR. KENNEY:
9     Q.  Mr. Napier, are you familiar with this
10 document?
11    A.  Yes, sir.
12    Q.  And this is an affidavit that was
13 executed by you; is that correct?
14    A.  Correct.
15    Q.  Did you write this affidavit?
16    A.  Yes.
17    Q.  I'd like to turn to paragraph 4 here,
18 which says: "One Community Federal Credit Union
19 procedures require that the lending process ends
20 if an applicant is in bankruptcy or
21 foreclosure."
22    A.  Okay.
23    Q.  Is that right?
24    A.  Yes, sir.

Page 24

1     Q.  And I understand that the context that
2  this is in was that because there was a
3  foreclosure appearing on Mr. Daugherty's credit
4  report, there was no further inquiry in the
5  application process; is that right?
6     A.  Correct.  We couldn't proceed any
7  further with the process.
8     Q.  And how did you know that the
9  foreclosure was appearing?
10    A.  It showed up on his Tri-Merge credit
11 report, when Debbie Lee pulled credit on
12 Mr. Daugherty.
13    Q.  So in connection with this refinance,
14 you had actually run a credit inquiry; is that
15 right?
16    A.  Yes.
17    Q.  And going back to this affidavit,
18 paragraph 5 says:  "Although Mr. Daugherty had
19 state tax liens on his credit report and other
20 collections, the Credit Union may have offered a
21 loan to Mr. Daugherty because of his history
22 with the Credit Union."
23        Is that correct?
24    A.  Yes, sir.

Page 25

1     Q.  And I understand you have written here
2  the word "may."  And so I just want to ask:  You
3  can't say with reasonable certainty that One
4  Community would have offered a loan; is that
5  correct?
6     A.  Correct.  Too many variables.
7     Q.  And you have here at the bottom of it:
8  "May have offered a loan to Mr. Daugherty
9  because of his history with the Credit Union."
10        However it's not a -- it's not a
11 common practice to approve loans simply because
12 of a relationship with One Community; is that
13 right?
14    A.  It depends on the situation and the
15 individual.
16    Q.  If there were adverse tradelines
17 appearing on a consumer's credit report, it
18 would not be the normal practice of One
19 Community to approve a loan for that consumer
20 simply on the basis of their relationship with
21 the bank -- well, let me rephrase that.
22        If there were adverse tradelines on a
23 consumer's credit report, it wouldn't be the
24 normal practice of One Community to approve a

7 (Pages 22 - 25)

Page 26

1 large refinance, such as the one at issue here,
2 simply on the basis of the consumer's
3 relationship with the bank; is that correct?
4     A.   Correct.
5     Q.   And so the last paragraph here,
6 paragraph 6, says: "The Credit Union cannot
7 proceed with the loan after noting that Ocwen
8 reported to Equifax that his home is in
9 foreclosure."
10       Is that right?
11    A.   That's correct.
12    Q.   So what would be the next step --
13 after a credit report is run -- what would be
14 the next step in proceeding with the loan
15 application?
16    A.   They would make sure that the --
17 probably the next thing would be is make sure
18 that the debt-to-income ratio would fall in
19 line.
20    Q.   And how about after that?
21         MR. WOOFTER:  Jon, this is Andrew
22 Woofter.
23         Just to clarify, you're asking in the
24 event there would not have been a foreclosure or

Page 27

1 bankruptcy listed on the credit report, correct?
2         MR. KENNEY:  That's right.
3 BY MR. KENNEY:
4     Q.   I'm asking in your typical -- in your
5 typical loan, such as the one at issue here,
6 after a credit report is run, I'm just wondering
7 what the next steps are to proceed with the loan
8 application that would ultimately lead to
9 approve or denial.
10    A.   Yeah, you've got several factors that
11 would be involved.  You'd have to look at a
12 debt-to-income ratio.  You'd have to look at the
13 loan-to-value ratio.  Okay.  You'd have to look
14 at the number of tradelines the member may or
15 may not have.  There's several factors involved
16 in going through whether you're going to approve
17 or deny a loan.
18    Q.   And it's my understanding that there
19 was no debt-to-income ratio analysis that
20 occurred here, correct, with Mr. Daugherty?
21    A.   Correct.  Once the foreclosure was
22 reported, everything stopped at that point.
23    Q.   And there was no loan-to-value
24 analysis with Mr. Daugherty; is that correct?

Page 28

1     A.   Correct.
2     Q.   So even if Mr. Daugherty had no
3 foreclosure appearing on his credit report, it
4 is possible that he could have still been
5 ultimately denied for the loan depending on his
6 debt-to-income ratio and the loan-to-value?
7     A.   Yes, that's true.
8     Q.   Did Mr. Daugherty ever fill out a
9 formal credit application?
10    A.   I don't know, I wasn't in when Debbie
11 Lee took the application.  But I'm assuming he
12 did.
13    Q.   Is this a common practice that a
14 consumer would fill out a formal loan
15 application before a credit inquiry would be
16 run?
17    A.   Yes.
18    Q.   And when One Community runs their
19 credit check, is there a particular service that
20 they use?  For example, do they typically check
21 the TransUnion FICO score, Equifax or Experian?
22    A.   On the mortgages?  Mortgage loans are
23 what they call a Tri-Merge, they pull all three.
24 And then on the consumer side, we pull a

Page 29

1 TransUnion credit score.
2     Q.   I'm sorry, so who pulls the
3 TransUnion?
4     A.   On the consumer side, it's TransUnion.
5     Q.   Oh, for consumer loans it's a
6 TransUnion report, and for the mortgage loans,
7 it's a Tri-Merge; is that right?
8     A.   Yes, sir.
9     Q.   Okay.  I understand.
10        So going -- I'd like to discuss the
11 TransUnion report now that was produced.
12        MR. KENNEY:  And this is behind, I
13 believe this was produced in response to the
14 subpoena.  Let's just mark the documents that
15 were produced by One Community in response to
16 the subpoena -- and this is the file that's
17 behind tab 5.  We can just mark this as
18 Exhibit -- I believe we're on Exhibit 5 or 6; is
19 that right?
20        THE COURT REPORT:  This will be
21 Exhibit 5.
22              * * *
23        (Whereupon, Napier Deposition Exhibit 5
24 was marked for purposes of

8 (Pages 26 - 29)

Exhibit H

Page 46

1  Q. And were other negative tradelines a
2 stop sign on his mortgage application?
3  A. Not in every circumstance, no.
4     MR. NOLAN: That's all I have.
5     MR. KENNEY: I'll just follow up
6 with one last thing.
7        * * *
8     E X A M I N A T I O N
9 BY MR. KENNEY:
10  Q. You said "not always." But it is
11 possible that tax liens could be a stop sign on
12 a mortgage application; is that correct?
13  A. Yes, sir.
14  Q. Okay.
15  A. Again, it's going to have to be looked
16 at on an individual case.
17  Q. Sure, sure.
18  A. If it's a small tax lien or a large
19 tax lien, you know.
20  Q. Sure.
21     And I think that's all the questions
22 we have for you.
23  A. Okay, gentlemen. Appreciate it.
24     MR. WOOFTER: He'll waive review

Page 47

1 and signature.
2     THE COURT REPORTER: Are you
3 gentlemen ordering your transcripts?
4     MR. KENNEY: Yes. This is Jon
5 Kenney. I'd like an E-tran with electronic
6 exhibits. I'm sorry, we don't need any
7 exhibits, I have all those. So just an E-tran
8 and just regular delivery.
9     THE COURT REPORTER: Mr. Nolan?
10     MR. NOLAN: Yes, I'll take a
11 condensed copy, regular delivery is fine.
12     THE COURT REPORTER: Thank you.
13        * * *
14     (Whereupon, this deposition was
15 concluded at 2:54 p.m.)
16        * * *

Page 48

1 THE STATE OF   :
  WEST VIRGINIA  :
2          : SS: C E R T I F I C A T E
  COUNTY OF OHIO :
3
4     I, CONNIE M. NICHOLS, Registered
  Professional Reporter, do hereby certify that
5 the testimony given by the within-named witness,
  STEVEN F. NAPIER, was by me reduced to stenotype
6 in the presence of the witness; afterwards
  reduced to Computer Aided Transcription under my
7 direction and control; that the foregoing is a
  true and correct transcription of the testimony
8 given by said witness.
9     I do further certify that this
  testimony was taken at the time and place in the
10 foregoing caption specified; that the reading
  and signing was not requested, and this
11 deposition was completed without adjournment.
12     I do further certify that I am not a
  relative, counsel or attorney of either party,
13 or otherwise interested in the event of this
  action.
14
     I, to the best of my ability, do
15 further certify that the attached transcript
  meets the requirements set forth within
16 Article 27, Chapter 47 of the West Virginia
  Code.
17
     IN WITNESS THEREOF, I have hereunto
18 set my hand in Wheeling, West Virginia, on the
  1st day of September, 2015.
19
20     _____
21     CONNIE M. NICHOLS
       Registered Professional Reporter
22
23
24

Page 49

1 THE STATE OF   :
  WEST VIRGINIA  :
2          : SS: C E R T I F I C A T E
  COUNTY OF OHIO :
3
4     I, CONNIE M. NICHOLS, Notary Public
  within and for the State of West Virginia, duly
5 commissioned and qualified, do hereby certify
  that the within-named witness, STEVEN F. NAPIER,
6 was by me duly sworn to testify to the truth,
  the whole truth and nothing but the truth in the
7 cause aforesaid.
8
     I do further certify that I am not a
9 relative, counsel or attorney of either party,
  or otherwise interested in the event of this
10 action.
11
     I, to the best of my ability, do
12 further certify that the attached transcript
  meets the requirements set forth within
13 Article 27, Chapter 47 of the West Virginia
  Code.
14
15     I further certify that the reading and
  signing of the transcript was not requested.
16
17     IN WITNESS THEREOF, I have hereunto
  set my hand and affixed my seal of office at
18 Wheeling, West Virginia, on the 1st day of
  September, 2015.
19
20
21     _____
       CONNIE M. NICHOLS
       Notary Public within and for the
22     State of West Virginia
23 My Commission expires:
   October 16, 2016
24

13 (Pages 46 - 49)