**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA
Beckley Division**

**DAVID M. DAUGHERTY,**

      **Plaintiffs,**

     **v.**                          **Civil Action No. 5:14-cv-24506**

**EQUIFAX INFORMATION
SERVICES, LLC, and
OCWEN LOAN SERVICING, LLC,**

      **Defendants.**

**MEMORANDUM IN SUPPORT OF DEFENDANT OCWEN LOAN SERVICING, LLC'S
MOTION FOR SUMMARY JUDGMENT**

     Defendant Ocwen Loan Servicing, LLC ("Ocwen"), by counsel, pursuant to Fed. R. Civ. P. 56, submits this Memorandum in Support of its Motion for Summary Judgment. For the reasons set forth below, Ocwen is entitled to judgment as a matter of law on Plaintiff's claims.

## I.    INTRODUCTION

     This case involves David M. Daugherty's ("Plaintiff") allegations that Ocwen negligently and willfully violated the Fair Credit Reporting Act ("FCRA"). Plaintiff claims that Ocwen failed to conduct a reasonable investigation when responding to disputes sent on his behalf to Equifax Information Services, LLC ("Equifax"), thereby violating 15 U.S.C. § 1681s-2(b). But Plaintiff's credit reporting issues indisputably were caused by Equifax, which – for unknown reasons – reported two tradelines for Ocwen's account, one of which showed negative information. Neither Equifax nor Plaintiff ever told Ocwen about the duplicate reporting; that fact never appeared in *any* dispute. Given the scant information provided by Plaintiff and Equifax, Ocwen reasonably investigated and responded to all the automated credit dispute verification forms ("ACDVs") submitted by Equifax. Without more information, Ocwen had no

duty to conduct the type of wide-ranging investigation necessary to unearth Equifax's mistake. As a matter of law, Ocwen cannot be liable for a failing to conduct a reasonable investigation.

Plaintiff also cannot recover for a negligent violation of the FCRA because he cannot establish that he suffered actual damages or that Ocwen caused any such damages. The undisputed evidence is that Ocwen's monthly reporting data to the credit reporting agencies was accurate. Neither TransUnion nor Experian reported a duplicate tradeline. Had Equifax properly reported the Ocwen tradeline or, for that matter, deleted the duplicate tradeline after it received information from Ocwen that the account was current, there would have been no issue. Moreover, Plaintiff concedes that his credit reports were rife with negative credit reporting unrelated to Ocwen's tradeline, including federal tax liens that dramatically decreased his credit scores. No evidence, beyond speculation, supports Plaintiff's claim that he was unable to obtain a loan due to Ocwen's actions, as opposed to other derogatory credit information on his report.

Likewise, the record in this case is devoid of evidence establishing a willful violation of the FCRA. Instead, the undisputed facts show that Ocwen made a continuing effort to comply with the FCRA's requirements through written procedures and training, and complied with those procedures in investigating and responding to the disputes it received from Equifax. Accordingly, Plaintiff's Complaint should be dismissed.

## II.   STATEMENT OF UNDISPUTED FACTS

### A.   <u>Origination of the Loan and Litton Servicing.</u>

1.      On July 20, 1999, Plaintiff and his wife executed a promissory note ("Note") in the original principal amount of $100,860.00 in favor of EquiFirst Corporation. The Note was secured by a deed of trust ("DOT") on property located at 16 Valley View Drive, Vienna, West Virginia. Plaintiff's deposition ("Pl. Dep.") is attached as <u>Exhibit A</u>, to which the Note and DOT

were Exhibit 3.   (Pl. Dep., Ex. A, p. 33-35 & Ex. 3 thereto).   The Note called for monthly payments of principal and interest, with a balloon payment of $82,666.36 due July 26, 2014.  *Id.*

3.      On or about November 20, 2004, the loan evidenced by the Note and DOT (the "Loan") was transferred to Litton Loan Servicing, LLC ("Litton") for servicing.  Litton serviced the Loan from 2004 through October 2009.  The deposition of Ocwen's corporate representative ("Def. Dep."), Sandra Lyew, is attached as Exhibit B.  (Def. Dep., Ex. B., 37).

4.      During the time that Litton serviced the Loan, Plaintiff suffered financial hardship and repeatedly fell behind.   (Pl. Dep., 27-28; Notices Default from Litton, attached as Exhibit C).  As a result of their financial difficulties, Mrs. Daugherty cashed in a 401K account, resulting in a number of federal tax liens against Plaintiff and his wife   (Pl. Dep. 79:4-20; 80:14-21).

**B.      Transfer of Servicing to Ocwen.**

5.      Effective November 1, 2011, the servicing rights for the Loan were transferred to Ocwen.  When the Loan was transferred to Ocwen, it was boarded with the information provided by Litton.  For unknown reasons, Litton listed August 26, 1999 as the date of the Loan, instead of the correct date, July 20, 1999. (Def. Dep. 37:23-38:4; 140:5-21).

6.      In November 2011, when the Loan was transferred to Ocwen, Plaintiff was past due on his payments.  Plaintiff remained delinquent in December 2011, January 2012 and February 2012, for a total delinquency of $6,128.39.  As a result of the delinquency, foreclosure proceedings were commenced in April, 2012.  (Def. Dep. 154:4-10).  On or about April 23, 2012, Mr. and Mrs. Daugherty paid the $6,128.39 to reinstate the Loan and thereby avoid foreclosure.  As a result, foreclosure proceedings were stopped.  (*Id.* 109:16-21).

7.      About the time the Loan was reinstated, Ocwen discovered that the Loan had been boarded from Litton with an incorrect account opening date.  Accordingly, Ocwen corrected the

account opening date to July 20, 1999.  At the time it corrected this information, the most recent credit reporting reflected the account as past due 120 days.  (Def. Dep. 141: 9-11.)  For reasons unknown, Equifax then added a second tradeline reporting the same account twice.  Expert Report of John Ulzheimer, attached as Exhibit D hereto, p. 16.  Equifax reported one tradeline as current, but the other tradeline continued to reflect the account as 120 days past due.  None of the other CRAs reported a duplicate tradeline, and Ocwen never reported a duplicate tradeline.  *Id.*

8.  After reinstating the Loan, Plaintiff remained current until March 2013, when his payment was late due to a delay in his pension check being deposited.  Plaintiff remained current through the date of the Complaint. (Pl. Dep. 39:22-40:5).

**C.  Ocwen's Monthly Reporting to the Consumer Reporting Agencies was Correct.**

9.  Ocwen began furnishing monthly reporting to the consumer reporting agencies ("CRAs") regarding the Loan in December 2011, for the period beginning November 1, 2011. (Def. Dep. 132 & Ex. 23 thereto (Ocwen's monthly reporting data)).  From November 2011 through April 10, 2012, Ocwen accurately reported the Loan as overdue on its monthly credit reporting.  The April 10, 2012 reporting was for the March 1st to March 31st time period.

10.  In May 2012, after Plaintiff had reinstated the Loan in April, Ocwen reported the Loan as current.  *Id.*  Thereafter and through the date of the Complaint, Ocwen reported the Loan as current, with the exception of the April 2013 reporting, which reported the Loan as overdue as a result of the March 2013 late payment.  *Id.*  Ocwen never reported two accounts to the CRAs. (Def. Dep. 133:18-24).

**D.  Plaintiff's Credit Disputes.**

11.  Plaintiff alleges that, "while seeking to refinance his mortgage to avoid the balloon payment, he encountered problems securing a new loan due to his credit." (Compl. ¶ 7.)

"He investigated and obtained a credit report in January 2014." (*Id.*) According to Plaintiff, he discovered then that Ocwen had reported the Loan "as 120 days delinquent in March 2013, July 2013, October 2013, December 2013 and January 2014." (Compl. ¶ 8.)

12.     However, by March 2013, Plaintiff had already engaged the services of Aggressive Credit Repair.  He admits that his credit report showed at least twelve adverse tradelines, other than Ocwen. (Pl. Dep. 19:21-20:8; 24:7-14).  Lorin Hanks, an employee of Aggressive Credit Repair, testified that Equifax was reporting the Ocwen account with two tradelines, but was uncertain whether the accounts were the same.  (Hanks Dep., attached as Exhibit E, 25:16-26:12).

13.     Equifax was the only CRA reporting two tradelines for the same Ocwen account number.  Equifax also was the only CRA reporting a foreclosure.  Experian was not reporting the account at all.  (Hanks Dep. 26:24-27:4; Ulzheimer Report p. 12).

14.     Beginning in March, 2013, Aggressive Credit Repair drafted and sent a series of letters to Equifax and the other CRAs on behalf of Daugherty disputing numerous tradelines appearing on his credit reports.  The letters were substantially identical. (Hanks Dep. 21:25-22:6 & Ex. 4 thereto, p. 1.)  The Aggressive Credit Repair dispute letters all indicated the same two disputes with respect to the two Ocwen tradelines reported by Equifax: "never late" and "not mine." *Id.*  Neither Aggressive Credit Repair nor Daugherty ever disputed the account on the grounds that Equifax was reporting a duplicate tradeline.  In fact, both Aggressive Credit Repair and Daugherty evidently thought there were two accounts.  (Hanks Dep. 26:13-21)

15.     On March 17, 2014, Plaintiff sent a letter to Ocwen complaining that Equifax was showing his account as 120 days late in the months of June and July 2013 and October and December 2013.  (Def. Dep. 102 & Exhibit 16 thereto).  He sent a copy of the letter to the

Consumer Financial Protection Bureau ("CFPB").  (Def. Dep. 99:25-100:3.)  Neither of these letters advised Ocwen that Equifax was reporting the account twice, that there were duplicate accounts, or that the tradeline appeared twice on Equifax's reports.

**E.**     **Ocwen's Credit Reporting and Dispute Policies and Procedures.**

16.    Ocwen reports on a monthly basis to the national credit bureaus.  (Def. Dep. 66:19-20).  The e-OSCAR system is a web-based, automated system run by the CRAs that enables CRAs to create and data furnishers, such as Ocwen, to respond to consumer credit disputes using an ACDV. (*Id.* 19:7-25.)  CRAs, such as Equifax, submit disputes to Ocwen through e-OSCAR.  After conducting an investigation, Ocwen responds by means of e-OSCAR, by submitting an ACDV response.  *Id.*

17.    When CRAs send ACDVs to Ocwen through e-OSCAR, they contain codes identifying the type of dispute to which Ocwen is expected to respond.  The CRAs assign the codes, based on their interpretation of the consumer's dispute.  (Def. Dep. 21:7-10.)  Here, the dispute codes were "001" referring to a consumer's dispute that the account is "not his," and "106" referring to a dispute about "present/previous account status/payment history profile, payment rating." (*Id.* 65:9-10; 104:15-17).

18.    When credit disputes are received, they are sent to Ocwen's credit reporting department, which conducts internal research to respond to complaints and resolve any reporting discrepancies.  (Def. Dep. 12:20-13:1).  Ocwen has numerous employees in its credit reporting department, who receive several weeks of training including classroom and job shadowing (*Id.* 137-138).  Due to the nature of the system, ACDVs received from CRAs – even if concerning the same tradeline or account – may be responded to by different employees.  (*Id.* 57:25-58:5.)

19.     Ocwen has written policies and procedures for credit reporting and the handling of credit disputes from consumers.  Ocwen conducts a reasonable investigation of the dispute, reviewing all available information necessary, and provides a timely response with the appropriate verification.  As part of that review process, the dispute analyst has access to a number of systems including loan documents and account information that may be reviewed as appropriate.  Ocwen followed its procedures and reasonably responded to Plaintiff's disputes on numerous occasions.  (Def. Dep. 22:1-24:8; 34:1-17; 155:5-159:3; Ulzheimer Report p. 14-17).

**F.     <u>Ocwen Investigated and Responded to all the ACDVs it Received from Equifax.</u>**

20.     As a result of the disputes submitted by Aggressive Credit Repair, Ocwen received multiple ACDVs from Equifax through e-OSCAR.  Each ACDV identified the dispute code and the particular dispute identified and submitted by Equifax.  The only two disputes ever submitted by Equifax were Code 001 – "not his/hers" and Code 106 – "disputes present/previous account status/payment history profile/payment rating."   Ocwen conducted a reasonable investigation into these disputes and timely responded on numerous occasions.  (Def. Dep. 159:4-163:1 & Ex. 17 attached thereto; Ulzheimer p. 15 ("[o]n at least 10 separate occasions the Plaintiff filed frivolous disputes").

**G.     <u>Ocwen's Responses to Plaintiff's Direct Disputes.</u>**

21.     On or about March 19, 2014, Plaintiff wrote directly to Ocwen noting that Equifax was reporting his account late for several months in 2013.  (Def. Dep. 93 & Ex. 15) Plaintiff admitted that he was late in March 2013.  He also disputed the total mortgage debt listed by Equifax.  On March 21, 2014, Ocwen submitted an AUD to all the CRAs, updating and reporting the current balance of the Loan as $80,499.78. (Def. Dep. 150:13-18 & Ex. 5 thereto).

22.     Ocwen responded on April 19, 2014 to Plaintiff's letter and on April 8, 2014 to the CFPB.  (Def. Dep. 117 & Ex. 20 thereto)  Ocwen advised Plaintiff that it had correctly reported to the CRAs that the Loan was current with the exception of March 2013 and advised him that it had no control over when Equifax would update its reports.  Ocwen also advised Plaintiff that it had sent a request to the CRAs to correct any discrepancy in the Loan balance and that it would provide him with an account payment history. *Id.*

23.     Ocwen also responded to an ACDV submitted by the CFPB, correcting the account to reflect that it was current.  In June 2014, the CFPB requested additional information from Ocwen and Ocwen confirmed that Plaintiff was current for the months of June, July, October and December 2013. (Def. Dep. 126:23-127:5).

24.     On July 2, 2014, Ocwen submitted AUD to all CRAs reflecting the Loan as current for March, June, July, October and December 2013, even though Plaintiff's payment admittedly was late in March 2013.  (Def. Dep. 125 & Ex. 22 thereto).  As of September 23, 2014, Equifax had removed the incorrect duplicate tradeline and was no longer reporting the Loan as delinquent or in foreclosure.  (Pl. Dep. 84:5-21.)

## H.     Plaintiff's Claimed Damages are Not Supported by the Evidence.

25.     Plaintiff claims that, as a result of Ocwen's credit reporting, he has suffered a "loss of credit, loss of the ability to purchase and benefit from credit, increased insurance rates, increased interest rates, and the mental and emotional pain, anguish, humiliation and embarrassment of credit denials."  (Compl. ¶ 21.)  However, Plaintiff has no evidence to support his alleged damages, let alone that Ocwen's actions caused them.  (Ulzheimer Report p. 12-14).

26.     Plaintiff claims that he has suffered from stress, but admits that he has had no trouble sleeping, and is not under the care of a doctor or psychiatrist for this case. (Pl. Dep.

87:12-14; 89:9-11).   Plaintiff asserts that he attempted to refinance the Loan and was denied credit by Chase Bank, N.A. ("Chase") Quicken Loans,[1] Embrace Home Loans ("Embrace"), Comenity Capital Bank ("Comenity"), and One Community Federal Credit Union ("OCFCU").

27.   On or about June 17, 2013, Embrace pulled Plaintiff's TransUnion and Experian credit reports, neither of which contained the Ocwen delinquent / foreclosure credit reporting. Embrace did not pull Daugherty's Equifax credit report.  (Ulzheimer Report p. 14).

28.   On or about May 6, 2014, Plaintiff and his wife applied for a credit card with Chase.  Their application was denied because their credit scores were too low.  The reasons Chase gave for the low credit scores included "delinquency/public record/bankruptcy/length of time since last delinquency on accounts, total available credit on revolving lines, installment loans not paid as agreed and the number of requests for new credit."   (Credit Denial Attached hereto as Exhibit F [Pl 26a1 initial disclosures]).

29.   On or about May 21, 2014, Plaintiff applied for credit with Comenity.   His application was denied due to a low credit score caused by too many seriously delinquent accounts.  (Comenity Denial Letter, attached hereto as Exhibit G).   Plaintiff applied for a loan with OCFCU sometime in the spring of 2014, but never completed the application because OFCFU's policy is to stop the inquiry if there is a foreclosure appearing in a tri-merged report. The transcript of the deposition of OCFCU's corporate representative ("Napier Dep") is attached hereto as Exhibit H. (Napier Dep. 24:1-5). If fully processed, his application could have been rejected due to other adverse credit information on his credit report.  (Napier Dep. 28:2-7).

---

[1] Plaintiff produced a denial letter from Quicken Loans dated May 2, 2014, but it indicates that Quicken Loans relied on Plaintiff's TransUnion credit reports.  TransUnion was reporting the Ocwen account as disputed preventing any derogatory effect.  (Ex. C; Ulzheimer Report p. 12).

30.     At the time he applied for credit, his credit reports showed eleven collection accounts and two tax liens.  Daugherty admits that the tax liens dramatically affected his credit score.  (Pl. Dep. 67:4-6).  Daugherty's Equifax score actually was higher than his scores from TransUnion and Experian, reflecting the fact that other derogatory information on his credit reports was negatively impacting his ability to obtain credit.  (Pl. Dep. 77:17-78:1; Ulzheimer Report p. 12-13).  On February 21, 2015, Daugherty was approved for refinancing by Quicken Loans.  (Loan approval letter, attached hereto as Exhibit I).

### III.   ARGUMENT

### A.     Standard of Review

Under the well-established summary judgment standard, once the moving party has satisfied its "initial burden" of demonstrating the absence of a genuine dispute as to any material fact, the non-moving party must "make a showing sufficient to establish the existence of an element essential to that party's case" to avoid summary judgment.  *Lujan v. National Wildlife Federation*, 497 U.S. 871, 883 (1990).  The nonmoving party cannot rely on conclusory allegations, "mere speculation," the building of one inference upon another, or the appearance of some "metaphysical doubt."  *See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 252, 106 S. Ct. 2505, 91 L. Ed. 2d 202 (1986).*  Instead, "a party opposing a properly supported motion for summary judgment . . . must 'set forth specific facts showing that there is a genuine issue for trial.'"  *Bouchat,* 346 F.3d at 522 (quoting Fed. R. Civ. P. 56(e)).  Applying this standard, Ocwen is entitled to judgment as a matter of law.

### B.     Plaintiff's FCRA Claim Fails as a Matter of Law

Ocwen complied with the obligations of the FCRA in investigating Plaintiff's disputes. When a CRA, such as Equifax, notifies a furnisher of information, such as Ocwen, of a "dispute

with regard to the completeness or accuracy of information furnished by a provider," the provider has a duty to conduct an investigation with respect to the disputed information, review all relevant information provided to it by the CRA, and report the results to the CRA. 15 U.S.C. 1681s-2(b)(1)(A)-(C). FCRA liability is imposed only if the defendant negligently or willfully violated the Act. *Id.* §§ 1681o, 1681n.

1.   Plaintiff Cannot Demonstrate that Ocwen Negligently Violated the FCRA.

To establish negligent non-compliance, a plaintiff must prove: (1) inaccurate information was included on his consumer report; (2) the inaccuracy was due to the defendant's failure to follow reasonable procedures to ensure maximum possible accuracy; (3) the consumer suffered injury; (4) the consumer's injury was caused by the inclusion of the inaccurate entry. *Spitzer v. Trans Union LLC*, 140 F. Supp.2d 562, 564 (E.D.N.C. 2000), *aff'd* 3 Fed. Appx. 54 (4th Cir. 2001). Summary judgment is appropriate when the reasonableness of the defendant's procedures is beyond question. *Westra v. Credit Control of Pinellas*, 409 F.3d 825, 827 (7th Cir. 2005). Here, the undisputed facts show that Ocwen's procedures were reasonable, that it followed its procedures and conducted a reasonable investigation of Plaintiff's disputes. Moreover, Plaintiff cannot show that his damages were caused by Ocwen's actions, as opposed to the other derogatory credit information appearing on his credit reports.

a.   *As a matter of law, Ocwen conducted a reasonable investigation.*

All of the ACDVs received by Ocwen in this case indicated one of two disputes: "not his/hers" or "disputes present/previous account status/payment history profile/payment rating." This is the only information Equifax provided. Notably, none of the ACDVs indicated that Equifax was reporting duplicate tradelines. Nor did Plaintiff himself ever advise Ocwen that Equifax was showing two separate tradelines on his report. Each time Ocwen received an

ACDV from Equifax, it investigated the specific dispute identified and responded to Equifax in a timely fashion.  For all disputes that the account was "not his/hers," Ocwen accessed the underlying loan documents and verified that the account belonged to Daugherty.  If the ACDV reflected an "account status/payment history" dispute, Ocwen also accessed its servicing records and verified the payment history and account status.  On numerous occasions, Ocwen reported to Equifax that the account was "current."[2]  Ocwen has no control over whether, or when, the CRAs correct information on a consumer's credit report.

Given the cursory notice and scant information provided to Ocwen, its investigation of Plaintiff's disputes was reasonable.  Courts confronted with the same facts involved in this case have held that a furnisher conducts a reasonable investigation when it responds to the particular dispute identified by the CRA.  *Westra*, 409 F.3d at 827 (furnisher's investigation was reasonable given the scant information it received regarding the nature of Westra's dispute, which indicated only that the consumer asserted only that the account did not belong to him); *Malm v. Houshold Bank (SB), N.A.*, 2004 U.S. Dist. LEXIS 12981, *14-15 (D. Minn. July 7, 2004) (when ACDV indicated only cursory dispute that the account was "not his/hers," furnisher reasonably investigated by verifying that plaintiff's personal information matched its records).  As in *Malm* and *Westra*, Ocwen received only cursory information concerning Daughtery's dispute – that the account was "not his/hers" or to verify "account status/payment history."  Ocwen did not receive any other information to indicate that Equifax was reporting duplicate tradelines.  Accordingly, Ocwen was not obligated to conduct a more wide-ranging investigation.  *Westra*, 409 F.3d at 827 (when ACDV did not provide information about fraud, furnisher not required to conduct more thorough investigation or contact consumer directly); *Malm*, 2004 U.S.

---

[2] Likewise, there is no dispute that Ocwen always accurately reported the account in its monthly data reporting to CRAs.  Ocwen never reported two tradelines.

Dist. 12981, *14-15 (without more information to apprise it of plaintiff's actual dispute, creditor not required to conduct more rigorous investigation).  In short, given the information Equifax provided, Ocwen's investigation was reasonable as a matter of law.

> b.  *Daughtery cannot show he suffered damages as a result of Ocwen's actions.*

Daughtery's inability to prove actual damages is fatal to his claim asserting a negligent violation of the FCRA.  Without damages, a FCRA claim cannot go forward.  "The FCRA does not presume damages; instead . . . the consumer must affirmatively prove that [he] is entitled to damages." *Ruffin-Thompkins v. Experian Info. Solutions, Inc.*, 422 F.3d 603, 610 (7th Cir. 2005). To establish compensable damages, a plaintiff may not rest on mere allegations or denials, but must demonstrate the existence of specific facts that create a genuine issue for trial.  *Sloane v. Equifax Info. Servs., LLC*, 510 F.3d 495, 503 (4th Cir. 2007) (stating that a plaintiff must "reasonably and sufficiently explain the circumstances of [the] injury and not resort to mere conclusory statements") (*quoting Price v. City of Charlotte*, 93 F. 3d 1241, 1251 (4th Cir. 1996)).  Plaintiff has no evidence that he suffered any actual monetary damages as a result of Ocwen's alleged non-compliance with the FCRA.  Likewise, aside from Plaintiff's own conclusory testimony, he cannot demonstrate that he suffered any emotional distress as a result of the alleged failure to properly investigate his disputes.

As an initial matter, Daughtery has no evidence, aside from his own allegations, that he suffered increased insurance rates or increased interest rates.  Of the credit denials he points to, only Chase and Comenity even looked at his Equifax report; OCFCU pulled his tri-merged report.  Moreover, the undisputed evidence demonstrates that Plaintiff was not turned down for a loan because of anything Ocwen reported the CRAs or any failure to respond properly to his disputes.  Instead, the evidence shows that Ocwen reported only one account and its reporting

accurately reflected the payment status (no late payments except for March 2013, which Ocwen ultimately waived). Moreover, Ocwen responded correctly to numerous ACDVs, verifying the account status as current. There is no evidence whatsoever that Ocwen's actions contributed to the negative information that appeared on Plaintiff's Equifax credit report. Moreover, Chase and Comenity both denied credit based on his credit scores. Plaintiff conceded that the federal tax liens severely impacted his credit scores. Indeed, his Equifax score actually was *higher* than his scores from either Experian or TransUnion. Accordingly, there is no evidence that the negative Ocwen tradeline resulted in the Chase or Comenity denials.

With respect to OCFCU, Plaintiff never completed an application because OFCFU's policy is to stop the inquiry if there is a foreclosure appearing in a tri-merged report. If fully processed, his application could have been rejected due to other adverse credit information appearing on his credit report. Indeed, at the time he applied, his credit reports showed eleven collection accounts and two tax liens. In short, nothing more than speculation supports Daugherty's claim that OCFCU would have agreed to extend funds to refinance the Loan had the negative Ocwen account not been reported on his Equifax report.

The same is true for his claims of "emotional pain, anguish and embarrassment." The Fourth Circuit has recognized that "not only is emotional distress fraught with vagueness and speculation, it is easily susceptible to fictitious and trivial claims." *Price*, 93 F. 3d at 1250; *Ross v. Federal Deposit Ins. Corp.*, 625 F.3d 808, 818 (4th Cir. 2010) (presented only with Ross's conclusory assertions, no reasonable jury could find that WaMu's debt collection practices were the proximate cause of his emotional distress). Similarly, courts have required more than an FCRA plaintiff's own testimony to support a claim for emotional distress damages. *See Sampson v. Equifax Info. Servs.*, *LLC*, No. CV204-187, 2005 U.S. Dist. LEXIS 19240, 2005 WL 2095092,

*5 (S.D. Ga. Aug. 29, 2005) (concluding that an FCRA plaintiff "must produce some form of independent, corroborating evidence of her humiliation and embarrassment at trial to recover compensatory damages for emotional distress"). Here, Plaintiff has nothing more than his vague testimony that he suffered "stress" as a result of attempting to correct his credit report. Accordingly, he cannot demonstrate emotional distress damages.

2.     Plaintiff Cannot Demonstrate Willfulness

Plaintiff bears the burden of demonstrating that Ocwen's conduct was willful. *See Parker v. Sony Pictures Entertainment, Inc*., 260 F.3d 100, 111 (2d Cir. 2001) (a defendant need not prove a negative when it moves for summary judgment on an issue that the plaintiff must prove at trial). In *Safeco Insurance Co. of America v. Burr*, 551 U.S. 47, 69 (2007), the United States Supreme Court established a two-part inquiry to demonstrate willfulness: (1) objective reasonableness; and (2) subjective intent. *See also Fuges v. Southwest Fin. Servs., Ltd.*, 707 F.3d 241, 248 (3d Cir. 2012) (finding "evidence of defendant's intent or subjective bad faith is irrelevant when there is an objectively reasonable interpretation of the [FCRA]").

The first of the two inquiries assesses whether the defendant's attempts at FCRA compliance were "objectively unreasonable." *Safeco*, 551 U.S. at 69-70. This inquiry is not concerned with technical compliance; even if a technical violation has occurred, "a violation does not cross the willfulness threshold just because a defendant's interpretation is erroneous; it must instead be 'objectively unreasonable.'" *Long v. Tommy Hilfiger U.S.A., Inc.*, 671 F.3d 371, 376 (3d Cir. 2012) (citing *Safeco*, 551 U.S. at 69). Only if a court finds a defendant's actions objectively unreasonable is evidence of subjective intent relevant. [3] *See Safeco*, 551 U.S. at 70

---

[3] In other words, *Safeco* "established a safe harbor against liability for willfulness." *Fuges*, 707 F.3d at 248; *see also Singleton v. Domino's Pizza, LLC*, 2012 U.S. Dist. LEXIS 8626, *33-34 (D. Md. Jan. 25, 2012) ("[U]nless the defendant's interpretation of the statute is objectively

n.20. Plaintiff has no evidence demonstrating that Ocwen's actions were objectively unreasonable, or that it acted in knowing or reckless violation of the FCRA.

> a.   *Ocwen's actions were not objectively unreasonable.*

There is no evidence in the record to demonstrate that Ocwen's interpretation of the FCRA was objectively unreasonable or that its actions involved an "unjustifiably high risk of violating the statute." *Safeco*, 551 U.S. at 70 (internal quotations omitted). Instead, the Complaint contains a generic, conclusory allegation, with no supporting facts, contending that "Ocwen's conduct, action and inaction were willful." (Compl. ¶ 37.) The record established during discovery likewise contains no support for Plaintiff's claim that Ocwen willfully violated the FCRA. The only evidence in the record is that Ocwen had in place written procedures and policies governing its investigation of credit disputes. Personnel are trained on each system used by Ocwen to service loans, as well as on the FCRA and the handling of credit disputes. Plaintiff cannot produce any evidence to demonstrate that Ocwen did not comply with these procedures in investigating his disputes. Accordingly, even if Ocwen made some technical error in the investigation, there is absolutely no evidence that it acted in a manner that was objectively unreasonable. Plaintiff's claims of willfulness should be dismissed.

> b.   *There is no evidence that Ocwen acted with reckless disregard for Plaintiff's rights.*

If (and only if) the Court determines that Plaintiff has established objective unreasonableness, which Ocwen disputes, is Ocwen's subjective intent relevant. Nonetheless, Plaintiff's claim still fails because there is no support for a claim that Ocwen "'knowingly and intentionally committed an act in conscious disregard for the rights of others.'" *Stevenson v.*

---

unreasonable, a plaintiff will be unable to show that the defendant willfully violated the FCRA.").

*TRW, Inc.*, 987 F.2d 288, 293 (5th Cir. 1993) (quoting *Pinner v. Schmidt*, 805 F.2d 1258, 1263 (5th Cir. 1986).  Under this standard, even "the failure to delete erroneous information after receipt of notice by the consumer [has] . . . been found to fall short of the knowing and intentional disregard standard."  *Reed v. Experian Info. Solutions, Inc.*, 321 F. Supp. 2d 1109, 1116 (D. Minn. 2004)).  Rather, the evidence must show the defendant's "intention to thwart consciously [plaintiff's] right to have inaccurate information removed promptly from his report."  *King v. Asset Acceptance*, 452 F. Supp. 2d at 1272, 1280 (N.D. Ga. 2006).

Daugherty cannot produce evidence that Ocwen consciously intended to thwart his right to have inaccurate information removed from his credit report promptly.  The record also is devoid of support for a claim that Ocwen willfully violated the FCRA by adopting a procedure with reckless disregard for whether it contravenes consumers' rights under the FCRA. Instead, the only evidence is that Ocwen had in place reasonable procedures to respond to disputes and followed those procedures.  It is undisputed that it was Equifax's actions in reporting duplicate tradelines that resulted in the negative reporting; Ocwen did not cause the problem.  The record also establishes that, on July 2, 2014 (approximately two months after Daughtery contacted Ocwen and the CFPB), Ocwen advised the CRAs, including Equifax, that the Loan was current for 2013.  In short, Daugherty does not have any evidence that Ocwen concealed information, deviated from its own procedures, or refused to correct an admitted error.  Consequently, Ocwen is entitled to summary judgment on Daugherty's claim for a willful violation of the FCRA.

**B.**  **Plaintiff's State Law Causes of Action Should be Dismissed**

1.  Plaintiff's WVCCPA Claim is Preempted.

Plaintiff asserts that Ocwen violated the West Virginia Consumer Credit Protection Act ("WVCCPA"), W. Va. Code § 46A-2-127(d) by "misrepresenting the amounts due against the

Plaintiff."   (Compl. ¶ 40.)   His claim is based on the same actions that form the basis of his FCRA claim, namely Ocwen's duties under 15 U.S.C. § 1681s-2(b).   Accordingly, Daughtery's WVCCPA claim is expressly preempted by the FCRA.   The FCRA provides that "[n]o requirement or prohibition may be imposed under the laws of any State (1) with respect to any subject matter regulated under . . . (F) section 1681s-2 of this title, relating to the responsibilities of persons who furnish information to consumer reporting agencies." 15 U.S.C. § 1681t(b)(1)(F). This subsection preempts state laws concerning any matter covered in 15 U.S.C. § 1681s-2. *Evans v. TransUnion, LLC*, 2011 U.S. Dist. LEXIS 14724, *6 (S.D. W.Va. Feb. 14, 2011) (adopting the "statutory approach" to FCRA preemption, pursuant to which state statutory causes of action are preempted by 15 U.S.C. § 1681t(b)(1)(F)).   Because Plaintiff bases his WVCCPA claim on the same actions regulated by the FCRA, the cause of action is preempted and must be dismissed.   *See Pacheco v. Citibank (SD), N.A.*, 2007 U.S. Dist. LEXIS 34821, *6 (C.D. Cal. Apr. 27, 2007) (the FCRA preempts state law claims premised on providing inaccurate information to a CRA).

        2.      <u>Plaintiffs' Negligence Claim Lacks Merit</u>.

Plaintiff brings a negligence claim, asserting that "Defendants engaged in significant communications and activities with Plaintiff and the loan thereby creating a special relationship with Plaintiff" that gave rise to a duty to provide him with accurate information about his loan account and its obligations and rights thereunder."   (Compl. ¶ 42.)   Thus, Plaintiff alleges that the source of Ocwen's duty was a "special relationship" between the parties.   Federal courts in West Virginia, addressing the relationship between a loan servicer and borrower, have held that a tort duty exists only "if the loan servicer provided services beyond those normally extant in a borrower-servicer relationship."   *Carter v. National City Mortg., Inc.*, 2015 U.S. Dist. LEXIS

25766, *18 (N.D. W.Va. March 3, 2015) (collecting cases).  In this case, Plaintiff cannot point to any facts demonstrating that Ocwen provided services other than those normally provided by a loan servicer – in this case responding to disputes and providing regular monthly credit reporting to CRAs.  *Id.*, 2015 U.S. Dist. LEXIS 25766, *19 (rejecting negligence claim and finding that the only service provided was to review application for loss mitigation, which is not a service that goes beyond those normally provided).  Because Plaintiff has failed to show that Ocwen took any actions that gave rise to a tort duty, his negligence claim fails as a matter of law.

>    3.    Plaintiff's "Tort of Outrage" and "Equity Abhors a Forfeiture Claims" must be dismissed.

>    a.    *As a matter of law, Ocwen's actions were not outrageous.*

Plaintiff's claim for outrage must be dismissed.  In order to prevail on a claim for outrage, also known as intentional infliction of emotional distress, a plaintiff must show that "the defendant's conduct was atrocious, intolerable, and so extreme and outrageous as to exceed the bounds of decency" and "the defendant acted with the intent to inflict emotional distress, or acted recklessly when it was certain or substantially certain emotional distress would result from his conduct."  Syl. Pt. 3, *Travis v. Alcon Labs., Inc.,* 202 W. Va. 369, 504 S.E.2d 419 (W.Va. 1998).  In evaluating a claim, the Court's role is to determine whether the alleged conduct reasonably may be regarded as so extreme and outrageous as to constitute the intentional or reckless infliction of emotional distress. Whether conduct may reasonably be considered outrageous is a legal question.  *Id.* at Syl. Pt. 4.

There is no evidence in this case that Ocwen's actions, which amount to responding to ACDVs, as well as responding to Plaintiff's direct dispute, were "so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and be regarded atrocious and utterly intolerable in a civilized community." *Tanner v. Ride Aid of W. Va., Inc.*, 194 W. Va.

643, 461 S.E.2d 149 (W. Va. 1995). Numerous courts have held, even when a creditor's actions violated the FCRA, those actions are insufficient to rise to the level of intentional infliction of emotional distress. *See*, *Burghy v. Dayton Racquest Club, Inc.*, 695 F. Supp.2d 689, 707 (S.D. Ohio 2010) (obtaining credit report under false pretenses not actionable when the intentional infliction claim merely duplicated the FCRA claim); *Love-Sawyer v. Equifax, Inc.*, 2009 U.S. Dist. LEXIS *4 (M.D. Tenn. Sept. 28, 2009) (even if defendant's conduct resulted in inaccurate reporting of plaintiff's credit information, the conduct simply is not so outrageous as to establish a claim for intentional infliction of emotional distress). Similarly, in this case, as a matter of law, Ocwen's actions cannot reasonably be considered so "outrageous" as to constitute intentional infliction of emotional distress. Ocwen is entitled to judgment as a matter of law on Count VII.

> b.     *Plaintiff's equitable claim must be dismissed.*

Plaintiff asserts a claim title "equity abhors a forfeiture." As an initial matter, this is not a cause of action. Instead, it is an equitable maxim invoked by courts when asked to address equitable claims: "Never to declare or enforce a forfeiture, nor divest an estate or title for violation of a condition subsequent, is an invariable rule of equity, if there be a legal remedy. . . 'Equity abhors a forfeiture.'" *Headley v. Hoopengarner*, 60 W.Va. 626, 646, 55 S.E. 744. There is no risk of forfeiture in this case because Plaintiff has refinanced the Loan, thereby removing the grounds for this cause of action. (Compl. ¶ 51) ("Defendants are seeking forfeiture of equity in [Plaintiff's] home.") Accordingly, Count VIII should be dismissed with prejudice.

## IV.     CONCLUSION

For the foregoing reasons, Defendant Ocwen Loan Servicing, LLC, respectfully requests that this Court grant its Motion for Summary Judgment, enter judgment against Plaintiff on all counts of the Complaint asserted against Ocwen, and grant it such other relief as it may deem appropriate.

Dated:  September 11, 2015

Respectfully submitted,

OCWEN LOAN SERVICING, LLC


By:     /s/ Jason E. Manning
                     Of Counsel

Jason E. Manning (W. Va. Bar No. 11277)
Jonathan M. Kenney (W. Va. Bar No. 12458)
Counsel for Ocwen Loan Servicing, LLC
Troutman Sanders LLP
222 Central Park Avenue, Suite 2000
Virginia Beach, Virginia 23462
Telephone:  (757) 687-7564
Facsimile:  (757) 687-1524
E-mail:  jason.manning@troutmansanders.com
E-mail: jon.kenney@troutmansanders.com

**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA
Beckley Division**

**DAVID M. DAUGHERTY,**

       **Plaintiffs,**

       **v.**                                  **Civil Action No. 5:14-cv-24506**

**EQUIFAX INFORMATION
SERVICES, LLC, and OCWEN
LOAN SERVICING, LLC,**

       **Defendants.**

## CERTIFICATE OF SERVICE

    I hereby certify that on the 11th day of September, 2015, I electronically filed the foregoing *Memorandum in Support of Motion for Summary Judgment* with the Clerk of the Court using the CM/ECF System which will then send a notification of such filing (NEF) to the following:

**Counsel for Plaintiff**
Ralph C. Young, Esq.
Christopher B. Frost, Esq.
Steven R. Broadwater, Jr., Esq.
Jed R. Nolan, Esq.
HAMILTON, BURGESS, YOUNG & POLLARD, PLLC
P.O. Box 959
Fayetteville, WV 25840
E-mail: ryoung@hamiltonburgess.com
E-mail: cfrost@hamiltonburgess.com
E-mail: sbroadwater@hamiltonburgess.com
E-mail: jnolan@hamiltonburgess.com

/s/ Jason E. Manning
Jason E. Manning (W. Va. Bar No. 12458)
TROUTMAN SANDERS LLP
222 Central Park Avenue, Suite 2000
Virginia Beach, Virginia 23462
Telephone:  (757) 687-7562
Facsimile: (757) 687-1524
E-mail: jason.manning@troutmansanders.com
*Counsel for Ocwen Loan Servicing, LLC*

26616705