IN THE UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF WEST VIRGINIA
AT BECKLEY

DAVID M. DAUGHERTY,                          PLAINTIFF

V.                                           CIVIL ACTION NO. 5:14-24506

EQUIFAX INFORMATION SERVICES
LLC and OCWEN LOAN SERVICING, LLC,           DEFENDANTS

**PLAINTIFF'S RESPONSE IN OPPOSITION TO OCWEN LOAN SERVICING, LLC'S
MOTION FOR SUMMARY JUDGMENT**

**STATEMENT OF FACTS**

Plaintiff David Daugherty had a home mortgage loan, currently serviced by Ocwen, that contained a Balloon Payment of approximately $80,000.00, due on July 26, 2014. [Exhibit 1, Deed of Trust and Note, Bates OLS 323-331] In March 2013, Plaintiff began reviewing his credit report in preparation for seeking a loan to refinance his balloon payment. [Exhibit 2, Plaintiff's Deposition, Tr. 19:5-23] Plaintiff discovered that his credit report contained a tradeline from Ocwen stating that his loan was 120 days past due and that the foreclosure process had begun. [Exhibit 2, Pl. Dep., 15:13-18] This was false.  At all times, Plaintiff's credit report contained a separate, correct tradeline regarding his Ocwen Loan Servicing account, which indicated that he was current since April 2012 and had been 30 days late in March 2013.

**a. March 2013 Dispute**

To rectify this reporting error, Plaintiff faxed a letter to Ocwen describing the error and attached a copy of the incorrect tradeline to help Ocwen identify the specific issue. [Exhibit 3, Bates OLS 576] In this letter, Plaintiff stated, "I am writing you concerning my credit report with Equifax, it states that I am currently behind $6,128.00 dollars with Ocwen Loan Services and that I am in foreclosure.  Please correct those records as soon as possible." [*Id.*] Plaintiff further informed Ocwen that he would dispute the inaccuracy through the credit reporting agency as well. [*Id.*] Sure enough, Ocwen acknowledged receiving this dispute through the credit reporting agency Equifax on March 20, 2013. [Exhibit 4, Bates OLS 183]

Ocwen responded to Plaintiff's direct dispute via a letter from its research department confirming that Plaintiff was not currently in foreclosure. [Exhibit 3, Bates OLS 225] However, Ocwen's response investigated a tradeline from March 2012 instead of the tradeline that Plaintiff identified in his letter as being incorrect, which was March 2013. [*Id*.] Ocwen did not address Plaintiff's concern about the derogatory tradeline for the March 2013 credit report that Plaintiff attached to his dispute. [*Id*.]

On the same day that Ocwen acknowledged receipt of Plaintiff's direct dispute, Ocwen responded to an Automated Consumer Dispute Verification ("ACDV") form from Equifax containing the dispute code 007, "Disputes present/previous Account Status/Payment History Profile/Payment Rating. Verify Payment History Profile, Account Status, and Payment Rating."[1] [Exhibit 5, Defendant Corporate Representative Deposition at Exhibit 7 (Bates EIS 30)][2] This ACDV, identified by its control number ending in 9088, reported a tradeline indicating a past due amount of $6,128, an account status of 120 days past due, and the special comment code that foreclosure proceedings started. [*Id*.] Plaintiff's concurrent direct dispute alerted Ocwen to the inaccuracy of this specific tradeline. [Exhibit 3, Bates OLS 576] Despite receiving a specific dispute from Plaintiff regarding the incorrect trade line, and despite receiving an ACDV from Equifax stating that Plaintiff disputed his account status and payment history, Ocwen verified the tradeline that stated Plaintiff remained in foreclosure. [*Id*.]

In fact, Ocwen's notes regarding its investigation of ACDV control number ending in 9088 show that it only investigated the first dispute code reported on the ACDV, which was 001 - Not His/Hers.

---

[1] Ocwen testified that it never received any documentation from Equifax regarding any disputes. Instead, Ocwen testified that it only received the dispute code. [Exh. 5, Def. Dep. 20-21:1-10]

[2] Ocwen did not present its responses to the ACDVs from March 2013 in discovery. Ocwen confirmed that it relied on the e-Oscar standardized system of investigating consumer disputes initiated through credit reporting agencies. [Exh. 5, Def. Dep. 19:7-25; 21:7-10]

[Exhibit 7, Defendant's Transaction Logs, at Bates OLS 1664-1665] Ocwen entirely ignored the second dispute code regarding Plaintiff's dispute of his payment history. [*Id.*] Ocwen's notes do not indicate any investigatory steps taken regarding this ACDV, much less any review of Plaintiff's contemporaneously submitted dispute.  [*Id.*] Instead, Ocwen verified the grossly derogatory tradeline as reported. [*Id.*][3] Ocwen's investigation failed to uncover that it was verifying not one, but two tradelines with the same account number to Equifax.

### b. March 2014 Dispute

As the July 2014 deadline for the maturation of Plaintiff's balloon mortgage drew nearer, Plaintiff submitted another detailed dispute to both Ocwen and Equifax regarding his credit report in March 2014. [Exhibit 8, Bates OLS 570-572] Simultaneously, Plaintiff submitted an online complaint to the Consumer Financial Protection Bureau (herein "CFPB"). [Exhibit 9, CFPB Dispute, Pl.'s Rule 26(a)(1) Disclosures] In each dispute, Plaintiff alerted Ocwen, Equifax, and the CFPB that Ocwen Loan Servicing showed a tradeline reporting that he was 120 days late in March, June, July, October, and December 2013 as well as being past due in the amount of $6,128.00 and in foreclosure. [*Id.*; Exhibit 8] Incomprehensibly, Ocwen failed to respond to the substance of Plaintiff's dispute in each of its responses.

Ocwen's response to Equifax's ACDV, identified as Control Number ending in 5125, purported to "modify" Plaintiff's tradeline by submitting data indicating that the account was current rather than 120 days past due and a zero balance past due as opposed to $6,128.00. [Exhibit 10, Bates OLS 1343-1344] However, Ocwen's response verified that "foreclosure proceedings started" and "5 or more payments past

---

[3]In March 2013, Plaintiff hired a credit repair company to assist him in clearing up his credit. [Exhibit 2, Pl. Dep., 21-22:21-24]  Plaintiff was not aware of the contents of the disputes sent by Aggressive Credit Repair. [*Id.*, 23:1-8] Neither was Ocwen. [Exhibit 5, Def. Dep., 20-21:1-4] Ocwen only received dispute codes contained on the ACDVs sent by Equifax.  [*Id.*, 21:5-10] Regardless of the number of disputes Ocwen received, Ocwen claims that it investigated each dispute on its individual merits and never disregarded a dispute as frivolous.  [*Id.*, 30-31:22-6]

due." [*Id.*] Ocwen's notes regarding the investigation into ACDV Control Number ending 5125 show that Equifax informed Ocwen that the tradeline was being reported as 120 days past the due date. [Exhibit 7 at Bates OLS 1727] Ocwen's notes do not show any additional investigation into the notation regarding foreclosure or payments past due. [*Id.*] Ocwen's investigation verified that Plaintiff's account was current. [*Id.*] Inexplicably, Ocwen did not send an automated universal data form ("AUDF") to delete the inaccurate tradeline. Instead, Ocwen attempted to modify parts of the tradeline, while leaving other inaccuracies that Ocwen's limited investigation had proven to be inaccurate. [*Id.*; Exhibit 10]

Ocwen's direct response to Plaintiff was even more befuddling. Plaintiff identified incorrect reports for the months of March, June, July, October, and December 2013 by Ocwen as 120 days past due and in foreclosure. [Exh 8] In response to Plaintiff's disputes regarding past-due tradelines reported in the year 2013, Ocwen informed Plaintiff that it had updated his tradeline to indicate that his current balance was $80,499.78. [Exh 11, Bates OLS 223-224] Ocwen's response did not mention any investigation regarding the foreclosure and late notations. [*Id.*] Ocwen's response did not mention any investigation regarding the tradeline that Plaintiff attached to his dispute. [*Id.*] Ocwen did not reference Plaintiff's direct dispute when investigating the ACDV.

Ocwen's response to the CFPB mirrored its response to Plaintiff's direct dispute. Ocwen received Plaintiff's dispute to the CFPB on March 26, 2014. [Exh 7 at 1720] Ocwen sent Plaintiff a letter stating that it would review and respond to the CFPB within ten days. [*Id.*] Ocwen responded to the CFPB with an identical letter to the one it sent Plaintiff on April 8, 2014. [*Id.* at 1722] Again, Ocwen failed to address Plaintiff's specific concerns relating the tradelines showing 120 days past due and foreclosure. [*Id.*] The CFPB relayed Ocwen's response to Plaintiff, who told the CFPB on April 17, 2014:

> I sent Ocwen a copy of my Equifax report. It shows me being currently past due $6,128.00 and being late 120 days in the months of March, June, July, October, and December. I understand Equifax is now showing that my loan is current, but they still show me being late 120 days all of

those months.  There is no way I can be satisfied with this as my loan will mature in July with Ocwen demanding a balloon payment for the balance.  It appears neither Ocwen or Equifax is going to cooperate and time is a real issue to obtain a loan in time.

[Exh 9] The CFPB began an investigation at that point. [*Id*.]

### c.  June 2014 Dispute

Plaintiff kept in regular contact with Ocwen following these dismal investigations.  Plaintiff called Ocwen on May 2, 2014 in response to a letter he received advising him to call 'research.' [Exh 7 at 1728] Plaintiff called in on June 9, 2014 to again verbally dispute Ocwen's credit reporting and asking for a letter from Ocwen stating that he is current. [*Id*. at 1733-34] During this call, Plaintiff asked Ocwen to write a letter on his behalf that he could show to other lenders stating that he was current in March, June, July, September, and October 2013 in order to refinance his balloon payment. [*Id*.] Ocwen never wrote a letter.

Plaintiff submitted yet another dispute to Equifax, which Ocwen received in mid June 2014, identified by Control Number ending 1129. [Exh 7 at 1736; Exh 11, Bates OLS 1357-58]  Ocwen's response to Equifax's ACDV again purported to "modify" Plaintiff's tradeline by submitting data indicating that the account was current rather than 120 days past due and a zero balance past due as opposed to $6,128.00. [Exh 11] However, Ocwen's response verified the report of "5 or more payments past due." [*Id*.] Ocwen's notes regarding the investigation into ACDV Control Number ending 1129 show that Equifax informed Ocwen that the tradeline was being reported as 120 days past the due date. [Exh 7 at 1737] Ocwen's notes do not show any additional investigation into the notation regarding foreclosure, payments past due, or whether the note included a balloon payment. [*Id*.]  Ocwen's investigation verified that Plaintiff's account was current. [*Id*.] Inexplicably, Ocwen did not send an AUDF to delete the inaccurate tradeline.  Instead, Ocwen attempted to modify parts of a tradeline, while leaving other inaccuracies that Ocwen's limited investigation had proven to be inaccurate. [*Id*.; Exh 11]

**d. CFPB Follow up Investigation**

Soon thereafter on June 26, 2014, Ocwen received a follow up request from the CFPB, which was still investigating Ocwen's credit reporting. [Exh 7 at 1738] Specifically, the CFPB requested that Ocwen state whether Plaintiff was 120 days delinquent in March, June, July, October, and December 2013 and whether Ocwen updated its tradelines with the credit reporting agencies to state that Plaintiff was current. [*Id.*] By requesting these specific records, the CFPB demonstrated that it was able to review Plaintiff's dispute and determine that an Ocwen tradeline indicated Plaintiff was in foreclosure.  Nonsensically, Ocwen responded to the CFPB follow up request by explaining that Plaintiff was delinquent in the year 2012. [*Id.* at 1739] The CFPB never asked Ocwen about the year 2012. [*Id.* at 1738]  It remains unclear as to why Ocwen responded to the CFPB dispute by investigating an entirely separate year.

Four days later on June 30, 2014, the CFPB again contacted Ocwen. [*Id.* at 1739] The CFPB attached records showing Ocwen the incorrect tradeline reported against Plaintiff for the months of March, June, July, October, and December 2013. [*Id.*] The CFPB demanded that Ocwen "provide documentation that show[s] that you have reported the consumer as current for those months." [*Id.*] In response to this CFPB investigation, Ocwen sent an AUDF to "update" Plaintiff's incorrect account. [Exh 12] Ocwen did not specify which tradeline it directed this AUDF to address, as one tradeline was always correct while the second tradeline was always incorrect.  Nor did Ocwen "delete" the incorrect tradeline that was still reported on Plaintiff's credit report. [*Id.*]

Nonetheless, even after taking these purportedly remedial steps to fix Plaintiff's credit report, Ocwen continued to verify the tradeline that indicated Plaintiff was 120 days past the due date, 5 or more payments past due, foreclosure proceedings started, and $6,128.00 past due. [Exh 13] Although the ACDV, identified by Control Number ending in 8138, contained two dispute codes, Ocwen notes reveal that it only investigated whether the account belonged to Plaintiff.  [Exh 7 at 1744] Ocwen did not investigate

Plaintiff's dispute regarding his previous account status.  [*Id.*] Plaintiff had sent disputes directly to Ocwen in March 2013 and March 2014.  The CFPB investigation revealed to Ocwen the incorrect tradeline it reported regarding Plaintiff.  Nonetheless, when Ocwen received an ACDV with a dispute code challenging Plaintiff's payment history, Ocwen declined to investigate any of Plaintiff's or the CFPB's evidence of inaccuracy.  Instead, Ocwen verified that Plaintiff was in foreclosure and $6,128.00 past due on August 8, 2014. [*Id.*]

### e.  Plaintiff Was Damaged by Ocwen's False Reports

Plaintiff's loan with Ocwen contained a balloon payment provision, which meant that Plaintiff was responsible to pay Ocwen $80,000 by July 2014. [Exh 1] Plaintiff was aware of this provision and was working to clear his credit in March 2013. [Exh 2, Tr. 19:5-23] Plaintiff recalled discussions with Ocwen representatives in October 2013, wherein Ocwen advised Plaintiff that he was current in his account. [Exh 2, Tr. 41: 15-19] Plaintiff further recalls monitoring his Ocwen account online, which showed that Plaintiff was current. [*Id.* at 41:5-6] Plaintiff called Ocwen "several" times to confirm what he already knew to be true: that he was current on his account. [*Id.* at 43:3-5] When Plaintiff realized that these calls were not resolving the issue, he began typing and sending registered letters and seeking assistance from third parties, such as Consumer Counseling, the CFPB, and an attorney. [*Id.* at 43-44:22-2] Plaintiff attempted to obtain refinancing of his balloon note mortgage with Quicken Loans, but when Plaintiff explained on the telephone that he was having an issue with his mortgage on his credit report, Quicken Loans ended the loan application. [*Id.* at 64-65: 16-16; 66:16-20] Plaintiff recounted being denied mortgage refinancing from Embrace Home Loans and from One Community Federal Credit Union.  [*Id.* at 69-70:17-4; Exh 18, Plaintiff's Verified Responses to Ocwen's First Set of Interrogatories and Requests for Production] As Plaintiff quickly learned when applying for credit, "I couldn't get a loan to get a hot dog." [*Id.* at 71:16-17]

Plaintiff was denied loan refinancing opportunities because of Ocwen's incorrect tradeline.  Plaintiff

had banked with One Community Federal Credit Union for over ten years. [Exh 16, Steve Napier Dep. Tr. 14: 7-16] Plaintiff went to One Community to apply for a refinancing after being denied elsewhere. However, not even Plaintiff's long standing membership with One Community Federal Credit Union could overcome the foreclosure notation on his credit report. One Community denied Plaintiff's mortgage loan application because of the foreclosure notation. [*Id*. At 41: 9-12] One Community stated that other derogatory items, such as tax liens and collection accounts, could be overcome in a mortgage application. [*Id*. at 45-46:22-3]

Soon after denying Plaintiff's mortgage loan refinancing application, One Community granted Plaintiff a consumer loan secured by Plaintiff's vehicle. [*Id*. At 41-42:23-3] One Community extended this loan despite Plaintiff's tax liens and collections accounts. [*Id*. at 41:17-23] One Community did not access Plaintiff's Equifax report for his consumer loan application, and thus did not see any foreclosure notation on Plaintiff's report. [*Id*. at 42:4-13] If foreclosure had appeared, One Community would have denied the consumer loan. [*Id*.] Luckily for Plaintiff, he was not in foreclosure.

Equifax removed *all* Ocwen tradelines in September 2014.[4] [Exh 2, Tr. 84:19-21] Plaintiff's tax liens continued to be reported because he was unable to refinance and pay those off. [*Id*.] Despite the presence of the tax liens, Plaintiff was able to secure conditional approval for a refinance loan through Quicken Loans in February 2015. [Exh 17, Plaintiff's 26(a)(1) Initial Disclosure]

Plaintiff testified to other, less tangible damages he suffered. Plaintiff was denied credit by Chase Bank USA, NA for a Disney Visa Platinum credit card in May 2014. [Exh 14, Plaintiff's Initial Rule

---

[4]Equifax's removal of both the correct tradeline showing a current mortgage payment and the incorrect tradeline showing foreclosure creates the ultimate irony. A favorably reported current mortgage is valuable to Plaintiff as he shopped for a mortgage refinance loan. Because Ocwen would not investigate and correct the errors in Plaintiff's credit report, Equifax "threw up its corporate hands" and even deleted Plaintiff's positive credit history.

26(a)(1) Disclosure] Plaintiff intended to use the equity from his refinancing to pay off existing tax liens. [Exh 2, Tr. 79: 4-20] These tax liens were attributable directly to Ocwen's erroneous credit report: if Ocwen would not have reported a second tradeline showing Plaintiff in foreclosure, then Plaintiff would have been able to obtain refinancing and paid his taxes in a timely manner. [*Id*. 80: 6-12] The incorrect tradelines led Plaintiff to suspect that Ocwen was conspiring to steal Plaintiff's equity from his home. [*Id.* 45:3-5] Every month, Plaintiff received an update from creditscore.com alerting him to negative information on his credit report from Ocwen. [Exh 15, Plaintiff's Initial Rule 26(a)(1) Disclosure] Further, Plaintiff received aggressive debt collection from the state of West Virginia regarding these taxes, including the placement of a tax lien on Plaintiff's home, the charging of additional interest, and placement of a tax levy on Plaintiff's income. [Exh 18, at 3]  Plaintiff suffered emotionally as well, including:

> I tend to worry more about things.  I tend to worry about making sure everything is paid on time, how it affects your records and I'm probably a little snappy around the house as far as shutting down on funds on things I don't think we need.  [Exhibit 2, Tr. 85-86: 13-7]

> And it's just fallen on deaf ears and no one would assist and to go through all of these motions to try to have something fixed is quite frustrating. And I usually do this myself because usually if I involved my wife on something, I never get any sleep.  [Exhibit 2, Tr. 86: 9-13] [I]f I actually talk about this much to my wife, I'd have trouble sleeping...Because she wouldn't be letting me sleep. Because things like this would bother her a lot more than it does me and it bothers me bad enough, but if she's involved with things like this, it would be a never-ending conversation 24 hours a day. [Exhibit 2, Tr. 87: 14-21]

> [T]his has gone on, you know, forever it seems like,...just everyday life has completely changed with not knowing whether or not we're going to lose our house that we've had all these years and where I planned to stay. ...Here's a good example.  There's a lot of things I like to do around the house as far as I've been working on fixing it up and different things and I've stopped doing that, why should I fix it up if I may lose it?  So things were put on hold as far as landscaping and different things I normally do because I don't know if I'm going to own this house when this is all said and done.  It's things like that you worry about.  [Exhibit 2, Tr. 86-87: 15-8]
> About the first time or the second time I was turned down on the mortgage to where I was actually looking at – the timeframe was really starting to make me sweat whether I was going to be able to get it done by July of last year, July 26th.  [Exhibit 2, Tr. 88: 2-6]

> [I started feeling more stressed out than normal] mainly after I – after I had really been concentrating – and you can look at my credit reports where my accounts were paid on time and to see this isn't

going, you know. I met the qualifications as far as obtaining a loan, as far as not being late and everything being paid off and still – I was still having problems with it until just recently when I was conditionally approved on a three and a half percent loan from Quicken. [Exhibit 2, Tr. 88-89: 13-1]

I sent registered letters, very explicit registered letters that I think anyone would understand and they still refused to correct it. From that, I actually called in Parkersburg the local Consumer Credit Counseling and asked for advice and they put me in touch with Consumer Financial out of Washington DC, which is a government agency. They had me send them the information and after I talked to them, they told me that I ought to file complaints against both corporations. I personally thought they were both in cahoots together to try to take my house because I had $100,000 in equity, or up to that in equity. [Exhibit 2, Tr. 17: 12-23]

Adding insult to injury, Ocwen repeatedly reminded Plaintiff of his impending balloon note. On July 26, 2013, Ocwen mailed Plaintiff a "friendly reminder" regarding the upcoming balloon note maturity to "provide you sufficient notice...so that you can make the necessary arrangements to pay the entire amount due." [Exh 19] This notice was sent in spite of Plaintiff's ongoing dispute with Ocwen, which Ocwen first received four months before in March 2013. On February 5, 2014, Ocwen mailed Plaintiff a second reminder "to allow you sufficient time to secure alternate financing for your loan." [Exh 20] This notice was sent nearly a year after Ocwen received notice that its credit reporting was preventing Plaintiff from securing this necessary refinancing.

**f. Ocwen is barred from relying on its policies and procedures.**

On December 15, 2014, Plaintiff requested that Ocwen provide "all policy manuals, procedure manuals or other documents which address your policies, practices or procedures in the investigation or reinvestigation of credit data which is disputed as inaccurate by a consumer." Ocwen objected on January 30, 2015, stating:

Defendant objects to this request as unduly burdensome, overly broad and not reasonable (sic) calculated to lead to the discovery of admissible evidence because it seeks discovery of all policy manuals, procedure manuals, or other documents which address Ocwen's polices, practices or procedures in the investigation or reinvestigation of credit data which is disputed as inaccurate by a consumer, including those manuals or other documents which are wholly irrelevant to the claims and defenses in this suit (in particular because the request is not limited to indirect credit disputes). Defendant objects to this request as being overly broad in duration...Finally, Defendant also objects

because this request seeks confidential and proprietary commercial or business information and no mutually agreeable protective order has been entered by the Court.

[Exh 21, Defendant's Objections Filed January 30, 2015] On March 2, 2015, Plaintiff sent Ocwen a good faith letter to follow up on the deficient discovery responses. [Exh 22] The Southern District of West Virginia's form protective order was agreed to in April 2015. Notwithstanding the agreement on a protective order, Ocwen submitted three supplements to its Rule 26(a)(1) initial disclosures, none of which contained any policies and procedures. After it became apparent that Ocwen intended to rely on these non-disclosed policies and procedures at the deposition of Ocwen's corporate representative on August 28, 2015, Plaintiff again requested that Ocwen disclose those policies and procedures. [Exh 6, Tr. 163:8-15] Ocwen now states in its Motion that "[t]he only evidence in the record is that Ocwen had in place written procedures and policies governing its investigation of credit disputes." [Dkt. 96, p. 16] Ocwen refused and stonewalled all of Plaintiff's requests for this information. Ocwen never provided these and is now barred from relying on these oft-requested, yet non-disclosed policies.

## STANDARD OF REVIEW

Under Rule 56 of *Federal Rules of Civil Procedure*, "[t]he court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Summary judgment is appropriate if "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to material fact and the moving party is entitled to judgment as a matter of law." WV R FRCP Rule 56; *Saunders v. Equifax Info. Servs., L.L.C.*, No. 3:05 CV 731, 2006 WL 2850647, at *1 (E.D. Va. Oct. 3, 2006) *aff'd sub nom. Saunders v. BB And T Co. Of VA*, 526 F.3d 142 (4th Cir. 2008). The Court will draw any permissible inference from the underlying facts in the light most favorable to the nonmoving party. *Matsushita Electric Industrial Co. Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587-88 (1986).

## **ARGUMENT**

### **A.  Plaintiff's FCRA claim is well supported by the facts and law in the Fourth Circuit.**

The Fair Credit Reporting Act exists "to ensure fair and accurate credit reporting, promote efficiency in the banking system, and protect consumer privacy." *Safeco Ins. Co. v. Burr*, 551 U.S. 47, 52 (2007). To that end, 15 U.S.C. § 1681s-2 is designed to prevent "furnishers of information" from spreading inaccurate consumer-credit information. Section 1681s-2 works in two phases. Initially, furnishers have a duty to provide the credit reporting agencies with accurate information about their consumers. §1681s-2(a).  A furnisher may be asked by a credit reporting agency to respond to disputes about the consumer information provided.  *See Boggio v. USAA Fed. Sav. Bank*, 696 F.3d 611, 614 (6th Cir. 2012).   Upon receiving notice of a dispute from a credit reporting agency, a furnisher faces the following duties:

> (A) conduct an investigation with respect to the disputed information;
> (B) review all relevant information provided by the [CRA] pursuant to 1681i(a)(2) of this title;
> (C) report the results of the investigation to the [CRA];
> (D) if the investigation finds that the information is incomplete or inaccurate, report those results to all other [CRAs] to which the person furnished the information and that compile and maintain files on consumers on a nationwide basis; and
> (E) if an item of information disputed by a consumer is found to be inaccurate or incomplete or cannot be verified after any reinvestigation under paragraph (1), for purposes of reporting to a [CRA] only, as appropriate, based on the results of the reinvestigation promptly-
> > (i) modify that item of information;
> > (ii) delete that item of information; or
> > (iii) permanently block the reporting of that item of information.  15 U.S.C. §

1681s-2(b)(1).

In sum, after receiving notice from a Credit Reporting Agency (herein "CRA") that information provided by the furnisher has been disputed, the furnisher must review the information provided by the CRA *and* conduct its own investigation of the accuracy and completeness of the disputed information.  *Id*.

### **1.   The Fourth Circuit requires a furnisher conduct a "reasonable" investigation of disputed tradelines, including looking beyond information provided by a CRA.**

The Fourth Circuit has consistently adopted the "reasonable investigation" standard that requires

the furnisher to conduct a substantive inquiry "to determine whether the disputed information can be verified." *Johnson v. MBNA Am. Bank*, 357 F.3d 426, 431 (4th Cir. 2004).  Numerous courts have upheld this standard.  *See SimmsParris v. Countrywide Fin. Corp.*, 652 F.3d 355 (3rd Cir. 2011); *Chiang v. Verizon New England, Inc.*, 595 F.3d 26 (1st Cir. 2010); *Gorman v. Wolpoff & Abramson, LLP*, 584 F.3d 1147, 1155 (9th Cir.2009) ("'investigation' 'requires an inquiry likely to turn up information about the underlying facts and positions of the parties, not a cursory or sloppy review of the dispute'"); *Ayers v. Equifax*, 2003 WL 23142201 (E.D. Va. Dec. 16, 2003).

A furnisher may not limit its investigation to only that information supplied by the CRA.  *See Saunders v. Equifax Info. Servs., L.L.C.*,  2006 WL 2850647, at *7 (E.D. Va. Oct. 3, 2006) *aff'd sub nom. Saunders v. Branch Banking and Trust Co. Of VA*, 526 F.3d 142 (4th Cir. 2008) (finding furnisher improperly affirmed inaccurate account history "despite the history of the Account that it no doubt possessed in its own files.") The furnisher must also consider other information available to it, including earlier complaints or other communications received from the consumer before reinvestigation was even begun.  *See McDonald v. OneWest Bank, FSB*, 2013 WL 858197, at *4 (W.D. Wash. Mar. 7, 2013) ("there is no statutory, policy, or case law justification for allowing a furnisher to ignore what it knows about a consumer's complaint simply because it was not included in the notice from the CRA."); *Rogers v. JPMorgan Chase Bank, N.A.*, 2012 WL 2190900 at *9 (W.D.Wash. June 13, 2012) (although Chase's investigation would have been reasonable had it possessed only the notice of dispute from the CRA, Chase's failure to take into consideration an oral report of identity theft lodged by the consumer raised a fact issue for the jury regarding the reasonableness of the investigation); *Watson v. Citi Corp.*, 2008 WL 4186317, at *10 (S.D. Ohio Sept. 5, 2008) ("[t]his information, together with Ms. Watson's sworn statement that she had provided the details of the settlement to Citibank by telephone prior to Citibank's receipt of the notice of dispute and the evidence of written communications between ARS and Citibank

regarding the settlement, is sufficient to establish the existence of an issue of material fact").

Ultimately, the standard for FCRA compliance is reasonableness. A furnisher who has additional information available to at least clarify the dispute from the CRA, and who fails or refuses to refer to and act on that information, will be liable if its conduct is unreasonable, so long as it is otherwise notified by the CRA of the consumer's dispute. Additionally, the fact that ongoing discrepancies inexplicably remain on a consumer's report after the furnisher purports to have made corrections is sufficient to warrant denial of summary judgment and require trial to determine whether the furnisher's investigation was in fact reasonable. *Kennedy v. Equifax, Inc.*, 641 F. Supp. 2d 788, 793 (S.D. Ind. 2009).

The Fourth Circuit's seminal case of *Johnson v. MBNA* established that the substantive inquiry into consumers' disputes required by the 'reasonable reinvestigation' standard is not satisfied by the blatantly inadequate practice of conducting a mere 'data conformity' review that simply confirms that the disputed information in the CRA computer accurately reflects information in the furnisher's computer that generated the report in the first place. 357 F.3d 426. This is especially inadequate when the furnisher has additional information regarding a consumer dispute from the consumer himself. Because the practice is so deficient and so contrary to the established standard, the continued employment of data conformity non-investigations constitute a willful violation and expose the furnisher to punitive damages.

Ocwen cites the case of *Westra v. Credit Control of Pinellas*, 409 F.3d 825 (7th Cir. 2005), for the proposition that a furnisher can rely solely on the information provided by a CRA when reinvestigating consumer disputes. However, the *Westra* consumer sent an explanatory letter directly to the furnisher after the furnisher had initially declined to correct the disputed information. *Id*. at 826. When the CRA sent a second notice of dispute, that letter formed part of the information considered during the investigation. *Id*. The *Westra* Court found that because the furnisher did not have any additional information to review from either the CRA or the consumer during the initial dispute, its initial reinvestigation was sufficient.

*Page 14 of 23*

That is not the case here.  Given the additional information Ocwen had regarding the nature of Plaintiff's objections, the reasonableness of Ocwen's investigation is not appropriate for summary judgment.

*Westra* has been distinguished on these grounds in another district court in the Fourth Circuit.

In *Alabran v. Capital One Bank*, the Court reasoned:

> [I]n *Johnson [v. MBNA]* and here, the Plaintiff had lodged the dispute directly with the furnisher involved as well as the CRAs, and although the furnishers did not have the obligation under § 1681s-2b(1) to conduct a "reasonable" investigation until they received notice from a CRA, they maintained the specifics of the dispute in their records that would have detailed the problem if the investigation reached beyond simply confirming identity. ...In both *Westra* and *Malm*, the consumer lodged his/her dispute with only the CRA (or, as in *Malm*, with a successor creditor) such that the furnisher involved did not have any additional information at its disposal to at least clarify what those courts concluded to be insufficient notification.  2005 WL 3338663, at *7 (E.D.Va.Dec.2005)

### 2. Ocwen did not conduct a reasonable investigation based upon Plaintiff's disputes.

In this case, the facts do not warrant summary judgment regarding the reasonableness of Ocwen's investigations.  To begin, a simple investigation would have placed Ocwen on notice that one consumer cannot have two tradelines for the same account.  It is inflammatory for Ocwen to claim that it needed additional notice to investigate the dispute and find that it was responsible for verifying two separate tradelines for a single account, especially when the tradelines contained such contrary information.  One simply cannot be "current" and "in foreclosure" on the same mortgage.

Ocwen repeatedly claims that it relied on the information provided by Equifax when responding to Plaintiff's disputes.  Ocwen conveniently ignores all the information sent by Plaintiff, beginning in 2013, regarding the incorrect report showing on his files. [Exhibits 4, 8] Ocwen also ignores the CFPB dispute that it investigated and responded to in April and June 2014. [Exhibit 9] The Fourth Circuit requires that Ocwen conduct a reasonable investigation.  *See Johnson v. MBNA*, *supra*.  Instead of conducting a reasonable investigation based upon all of the evidence Ocwen had available, it merely conducted a data conformity review in March 2013, April 2014, June 2014, and August 2014. [Exhibits  6-7, 10-11, 13]

*See e.g. Saunders v. Equifax Info. Servs., L.L.C.*,  2006 WL 2850647, at *7 (E.D. Va. Oct. 3, 2006) *aff'd sub nom. Saunders v. BB and T Co. Of VA*, 526 F.3d 142 (4th Cir. 2008).

Ocwen's purported steps to  correct the inaccurate information on Plaintiff's credit report failed. Ocwen 'modified' Plaintiff's tradeline in response to disputes submitted in April 2014 and June 2014. [Exh 10-11] Ocwen sent an AUDF to 'update' Plaintiff's tradeline in July 2014. [Exh 12] A reasonable trier of fact could find that these 'modifications' and 'updates' where inadequate responses to address the entirely inaccurate tradeline on Plaintiff's credit report.  This is especially true when considering that the entire tradeline was inaccurate and should have been deleted, not modified.  Further, Ocwen's remedial steps did not prevent  the inaccurate information from remaining on Plaintiff's report.  *See Kennedy*, *supra*.

The reasonableness of Ocwen's reinvestigation is called into further question by the CFPB's ability to step in and identify the issue regarding Plaintiff's credit report instantly. [Exh 9, 7 at 1738]  On June 26, 2014, Ocwen received a follow up request from the CFPB asking that Ocwen state whether Plaintiff was 120 days delinquent in March, June, July, October, and December 2013 and whether Ocwen updated its tradelines with the credit reporting agencies to state that Plaintiff was current. [*Id*.] By requesting these specific records, the CFPB showed that it was able to review Plaintiff's dispute and determine that an Ocwen tradeline indicated Plaintiff was in foreclosure.  Nonsensically, Ocwen responded to the CFPB follow up request by explaining that Plaintiff was delinquent in the year 2012. [*Id*. at 1739] The CFPB never asked Ocwen about the year 2012. [*Id*. at 1738]  It remains unclear as to why Ocwen believes its response was reasonable to the CFPB dispute by investigating an entirely separate year.

Four days later on June 30, 2014, the CFPB again contacted Ocwen, attached records showing Ocwen the incorrect tradeline reported against Plaintiff for the months of March, June, July, October, and December 2013, and demanded that Ocwen "provide documentation that show[s] that you have reported the consumer as current for those months." [*Id*.] In response, Ocwen sent an AUDF to "update" Plaintiff's

incorrect account. [Exhibit 12, Bates OLS 310] Ocwen did not specify which tradeline it directed this AUDF to address, as one tradeline was always correct while the second tradeline was always incorrect. Nor did Ocwen "delete" the incorrect tradeline that was still reported on Plaintiff's credit report. [*Id*.] Plaintiff disputed the incorrect tradeline again in August 2014, following the CFPB and remedial AUDF sent by Ocwen because the foreclosure tradeline persisted. Ocwen again verified the foreclosure tradeline.

Ocwen's duty to conduct a reasonable investigation is independent of any information it receives in an automated consumer dispute verification form. Once Ocwen receives the dispute from Equifax, it is required to conduct a reasonable investigation. Based upon all of the information provided by Plaintiff, and based upon the follow up disputes from the CFPB, Ocwen's investigation of Plaintiff's repeated disputes could hardly be classified as 'reasonable.' A trier of fact must be permitted to hear the evidence regarding Ocwen's investigations considering all of the information it had at its disposal.

### 3.  Plaintiff suffered damages directly caused by Ocwen's inadequate investigations.

Plaintiff has alleged sufficient facts that would allow a trier of fact to award damages. Plaintiff has shown that he applied for a mortgage loan through Quicken Loans in May 2014. [Exhibit 18] Plaintiff testified that he was denied over the phone by Quicken Loans because of the foreclosure notation on his credit report. [Exhibit 2, 64-65: 16-16; 66:16-20] Quicken Loans sent Plaintiff a letter stating its reason for denial as "Credit History: Current/previous slow payments, judgments, liens or BK." [Exhibit 18] However, Plaintiff was subsequently approved for a loan by Quicken in February 2015. [Exhibit 17] Plaintiff's tax liens were unresolved in February 2015, but Equifax no longer reported a foreclosure for Plaintiff's Ocwen account. [Exhibit 2, Tr. 84:19-21] A reasonable trier of fact could conclude that Ocwen's inaccurate report was the cause for Plaintiff's loan denial with Quicken.

Further, One Community Federal Credit Union was able to pinpoint Ocwen's foreclosure notation as the sole reason that Plaintiff was denied a refinance of his home loan. [Exhibit 16, 41: 9-12]  One

Community stated that other derogatory items, such as tax liens and collection accounts, could be overcome in a mortgage application. [*Id*. at 45-46:22-3] Soon after denying Plaintiff's mortgage loan refinancing application, One Community granted Plaintiff a consumer loan, despite Plaintiff's additional adverse tradelines, including his tax liens and collections accounts, because there was no foreclosure notation on Plaintiff's TransUnion credit report. [*Id*. at 41:17-23] One Community stated that it would have denied the consumer loan if 'foreclosure' had appeared on Plaintiff's report. [*Id*.] Ocwen's inaccurate and false report was the reason Plaintiff was denied a mortgage loan with One Community FCU.

Plaintiff has proven that Ocwen verified inaccurate information to Equifax, which stated Plaintiff was in foreclosure and $6,128.00 behind in his payments. [Exhibits 6-7, 10-11, 13] Plaintiff has presented a question of fact as to whether Ocwen's investigations were reasonable. Plaintiff has further shown that the inaccurate 'foreclosure' tradeline destroyed at least two applications for a refinanced home loan through Quicken and One Community Federal Credit Union. Ocwen's inaccuracy was, at the very least, a substantial factor in Plaintiff's credit denials. *See Philbin v. TransUnion Corp*., 101 F.3d 957 (3rd 1997); *Guimond v. TransUnion Credit Info. Co.*, 45 F.3d 1329 (9th Cir. 1995); *Dixon-Rollins v. Experian Info. Solutions, Inc.*, 753 F.Supp.2d 452 (E.D.Pa. 2010) (actual damages based in part on damages plaintiff incurred in connection with her efforts to correct the error in TransUnion's credit report); *Bradshaw v. BAC Home Loan Serv., Ltd.*, 816 F.Supp.2d 1066, 1075 (D. Or. 2011) (letters from prospective creditors listing CRA they obtained information on plaintiff's creditworthiness were sufficient to create a triable issue of fact). The Fourth Circuit has explicitly allowed damages for mental anguish, humiliation, embarrassment, and mental distress over an inaccurate credit report. *See Robinson v. Equifax*, 560 F.3d 235, 241 (4th Cir. 2009); *Sloane v. Equifax Info. Serv., LLC*, 510 F.3d 495, 507 (4th Cir. 2007); *Dalton v. Capital Assoc. Indus.*, 257 F.3d 409 (4th Cir. 2001) (damages for emotional distress are available under the FCRA). Plaintiff testified extensively regarding the time he spent addressing his disputes with Ocwen, both in

writing and on the phone, as well as the stress it caused in his everyday life.  *Supra*.  A trier of fact must determine whether to award Plaintiff actual damages for these claims.

**4.  The trier of fact must determine whether Ocwen acted willfully**.

Willful violations can be proven by showing not only knowing, intentional violations, but also violations in reckless disregard of the law.  *Safeco Ins. Co. v. Burr*, 551 U.S. 47, 127 S.Ct. 2201 (2007).  Actual knowledge or malicious intent is not required to show willfulness.  *Id*.  Plaintiff needs only show that Ocwen's reading of the FCRA was objectively unreasonable and that Ocwen ran a risk of violating the law substantially greater than the risk associated with a reading that was merely careless."  *Id*. at 2215.  Ocwen's subjective belief that it is appropriately interpreting its duty to investigate under the FCRA is irrelevant to a finding of willfulness.

Ocwen asserts that it complied with its statutory investigation duties by merely completing data conformity reviews in this case.  Ocwen never reviewed Plaintiff's direct disputes or the CFPB's investigation when it received ACDVs from Equifax.  Instead, Ocwen merely responded to the dispute code Equifax created.  For over a decade, the seminal case in the Fourth Circuit has adopted the "reasonable investigation" standard that requires the furnisher to conduct a substantive inquiry "to determine whether the disputed information can be verified."  *Johnson v. MBNA Am. Bank*, 357 F.3d 426, 431 (4th Cir. 2004).  Ocwen's assertions that it complied with this duty through its data conformity reviews is objectively unreasonable.  Ocwen's reliance on policies and procedures that it never disclosed during discovery in this matter do not rescue Ocwen's deficient investigations.  The trier of fact is entitled to determine whether Ocwen's disregard of long settled Court of Appeals case law, in its investigations and in its brief, is objectively unreasonable.

Ocwen attempts to recharacterize the second prong of the willfullness analysis as concerning Ocwen's subjective belief.  The Court's inquiry is whether Ocwen's disregard of the Fourth Circuit's

requirement that a "reasonable investigation" occur for every dispute was reckless.  That is, Plaintiff need only show that Ocwen's interpretation of its duty was objectively unreasonable and that Ocwen's disregard of its duty was unreasonable, even if Ocwen subjectively thought that it was right.  As stated, the Fourth Circuit adopted the "reasonable investigation" standard over a decade ago in 2004.  *Id*.; *see generally Saunders v. BB&T*, 526 F.3d 142, 151 (4th Cir. 2008).  Ocwen's failure to conduct any investigation into Plaintiff's disputes regarding his account history was reckless because the precedent delineating this duty is clear and longstanding.  The harm to Plaintiff for Ocwen's reckless disregard of the investigatory requirements of the FCRA are evident.  Ocwen's request for summary judgment must be denied.

**B.  Plaintiff's other common law claims must be allowed to proceed to the trier of fact.**

Plaintiff alleged that Ocwen assumed a duty through its conduct toward Plaintiff.  As Ocwen frequently states, it had no responsibility to investigate any direct consumer disputes under the FCRA.  Ocwen also states that it had no FCRA duties to investigate disputes generated through third parties, such as the CFPB.  Ocwen's FCRA liability was generated only through ACDV disputes provided through Equifax.  The facts have shown that Ocwen assumed a duty to reasonably investigate and respond to Plaintiff's disputes, as well as the dispute through the CFPB.  Quite clearly, Ocwen breached this duty, often by responding to disputes by investigating the incorrect calendar year.  Further, one of Ocwen's remedial actions was done at the behest of the CFPB and not through a response to an ACDV - Ocwen sent an automated universal data form to 'update' Plaintiff's incorrect tradeline.  A trier of fact could find that Ocwen breached its duty to carefully investigate and respond to Plaintiff's and the CFPB's disputes, and the trier of fact could find that Ocwen's grossly inadequate investigations and responses were done maliciously and intentionally.

Ocwen cites the correct requirements for the tort of outrage.  However, the facts established through discovery could certainly be considered outrageous.  To begin, Ocwen verified two tradelines for the same

*Page 20 of  23*

account repeatedly, when such reports were polar opposites. Any dispute should have triggered an investigation, which would have showed multiple tradelines for a single account. It is further outrageous that Ocwen would completely disregard Plaintiff's repeated showings that Ocwen was verifying inaccurate tradelines. Plaintiff and the CFPB alerted Ocwen to all the information it needed to investigate and determine that Plaintiff's credit report was not accurate. Ocwen's refusal to investigate Plaintiff's disputes, the CFPB's disputes, or the ACDVs submitted by Equifax could be found to go beyond all possible bounds of decency and be regarded atrocious and utterly intolerable in a civilized community. *See Tanner v. Rite Aid of W.Va. Inc*, 194 W.Va. 643 (W.Va. 1995). The trier of fact must be allowed to resolve this claim.

Ocwen asserts that Plaintiff's claim of "Equity Abhors a Forfeiture" must be dismissed because Plaintiff is no longer facing forfeiture. This is incorrect. Although Plaintiff has been pre-approved for a home refinancing, the loan has not been finalized. Plaintiff's home is not secure, and Plaintiff should not risk losing his home and equity in his home because Ocwen could not be bothered to conduct any investigation beyond a mere data conformity review.

**C. Plaintiff will agree to voluntarily dismiss his WVCCPA claims.**

In the interest of judicial economy, Plaintiff will agree to the dismissal of his claims under the West Virginia Consumer Credit and Protection Act.

## CONCLUSION

In this case, every entity that reviewed Plaintiff's credit report, be it creditscore.com, Quicken Loans, One Community Federal Credit Union, the CFPB, Chase Bank, Comenity Bank, was able to identify the obviously inaccurate double reporting of Plaintiff's loan with Ocwen. Any minimal investigation would have uncovered this fact. Because Ocwen failed to conduct even such a minimal investigation of Plaintiff's disputes, Ocwen's motion must be denied, and this matter must be heard by the trier of fact.

*Page 21 of 23*

**DAVID M. DAUGHERTY**

BY COUNSEL

HAMILTON, BURGESS, YOUNG
      & POLLARD, *pllc*


BY:    /s/    Jed R. Nolan
        Ralph C. Young  *(W. Va. Bar #4176)*
           ryoung@hamiltonburgess.com
        Christopher B. Frost  *(W. Va. Bar #9411)*
           cfrost@hamiltonburgess.com
        Steven R. Broadwater, Jr. (*W. Va. Bar #11355*)
           sbroadwater@hamiltonburgess.com
        Jed R. Nolan (*W. Va. Bar #10833*)
           jnolan@hamiltonburgess.com
        *Counsel for Plaintiff*
        P. O. Box 959
        Fayetteville, WV 25840
        304-574-2727

IN THE UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF WEST VIRGINIA
AT BECKLEY

DAVID M. DAUGHERTY,                          PLAINTIFF

V.                                           CIVIL ACTION NO. 5:14-24506

EQUIFAX INFORMATION SERVICES LLC
and OCWEN LOAN SERVICING, LLC,               DEFENDANTS

## CERTIFICATE OF SERVICE

I, Jed R. Nolan, counsel for Plaintiff, hereby certify that I have filed this CERTIFICATE OF

SERVICE for PLAINTIFF'S RESPONSE IN OPPOSITION TO OCWEN LOAN SERVICING, LLC'S

MOTION FOR SUMMARY JUDGMENT with the Clerk of the Court using the CM/ECF system which

will send notification of such filing to the following CM/ECF participants, and that I served a true

and accurate copy of the entire document via United States mail, postage prepaid, to each of the

following on September 25, 2015:

John C. Lynch, Esq.
Jason E. Manning, Esq.
TROUTMAN SANDERS LLP
222 Central Park Avenue, Suite 2000
Virginia Beach, VA  23462
*Counsel for Defendant Ocwen Loan Servicing, LLC*
john.lynch@troutmansanders.com
jason.manning@troutmansanders.com

/s/ Jed R. Nolan
JED R. NOLAN *(WVSB #10833)*
jnolan@hamiltonburgess.com

[F:\CM\21352\21352RESP Mtn Sum Judg.wpd]