Page 1

1          IN THE UNITED STATES DISTRICT COURT

2        FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA

3                    Beckley Division

4             Civil Action No.:  5:14-cv-24506

5    _____

6    DAVID M. DAUGHERTY,

7          Plaintiff,

8             vs.                      DEPOSITION OF:

9    EQUIFAX INFORMATION SERVICES, LLC,   DAVID M. DAUGHERTY

10   and OCWEN LOAN SERVICING, LLC,

11         Defendants.

12   _____/

13

14          TRANSCRIPT of the stenographic notes of the

15   proceedings in the above-entitled matter, as taken by

16   and before, DEBRA A. VOLK, a Professional Court Reporter

17   and Notary Public of the State of West Virginia, held at

18   the offices of HAMILTON, BURGESS, YOUNG & POLLARD, PLLC,

19   5493 Maple Lane, Fayetteville, West Virginia, on

20   Wednesday, June 17, 2015, commencing at 1:05 p.m.

21

22

23   Job No. 2084505

24

Page 2

1 APPEARANCES:
2
3 HAMILTON, BURGESS, YOUNG & POLLARD, PLLC
4 BY: JED R. NOLAN, ESQ.
5 5493 Maple Lane
6 Fayetteville, West Virginia 25840
7 (304) 574-8038
8 jnolan@hamiltonburgess.com
9 Attorney for the Plaintiff
10
11 TROUTMAN SANDERS, LLP
12 BY: JON M. KENNEY, ESQ.
13 222 Central Park Avenue
14 Suite 2000
15 Virginia Beach, Virginia 23462
16 (757) 687-7500
17 jon.kenney@troutmansanders.com
18 Attorney for the Defendants
19 (Via telephone)
20
21
22
23
24

Page 3

1 INDEX
2 WITNESS        DIRECT CROSS REDIRECT RECROSS
3 DAVID M. DAUGHERTY
4 BY MR. KENNEY      4    --   91   --
5 BY MR. NOLAN       --   89   --   --
6      EXHIBITS
7 NUMBER    DESCRIPTION          PAGE
8  1   Complaint          15
9  2*  Aggressive Credit Report, pg. 1    29
10 3*  Promissory Note          33
11 4   Automated Consumer Dispute
12     Verification Form      37
13 5   7/3/13 Automated Consumer Dispute
14     Verification Form      37
15 6   7/3/13 Automated Consumer Dispute
16     Verification Form      38
17 7   Owen Data List          47
18 8   Expert Report          49
19 9*  CreditScore.com Report      52
20 10* ACR Document 75 - 117      55
21 11  EIS Document 257 - 261      57
22 12* Quicken Loan Letter      60
23 13* ACR Document 43 - 74      73
24 *(Exhibit Nos. 2, 3, 9, 10, 12 and 13 were retained.)

Page 4

1 DAVID M. DAUGHERTY
2 35 Valley View Drive
3 Vienna, West Virginia 26105
4 having been duly sworn by the Notary,
5 testifies as follows:
6 DIRECT EXAMINATION BY MR. KENNEY:
7 Q.   Good afternoon. I'm sure you've already heard me
8 say several times now, my name is Jonathan Kenney and
9 I'm the attorney that's representing the Defendant,
10 Ocwen Loan Servicing in this case.
11 A.   Yes.
12 Q.   We're here today for your deposition. Have you
13 ever been in a deposition before?
14 A.   Yes, I have.
15 Q.   Okay.
16 And I'd like to ask you just a few questions about that,
17 but I'll wait until just a little bit later. So you're
18 aware that you filed a Complaint alleging some
19 misrepresentations in your credit report by my client;
20 correct?
21 A.   Yes.
22 Q.   All right.
23 And like I said, this is the opportunity for my
24 client to find out what you know, what your testimony

Page 5

1 will be at trial. And this is a deposition, which means
2 that it's taken under oath. So you're swearing that
3 everything you say is true and accurate to the best of
4 your knowledge.
5 A.   Yes.
6 Q.   Okay.
7 And as I'm asking you questions, the court
8 reporter is writing down everything you say, so if you
9 could answer verbally in yes's or no's, it would make it
10 easier on us and also, of course, if you can wait until
11 I finish the question, that will also make it easier on
12 us; is that fair?
13 A.   Yes.
14 Q.   Okay.
15 And you do understand that you're under oath
16 today just as you would be in court; correct?
17 A.   That's correct, I do.
18 Q.   Okay.
19 And do you have any medical conditions that might
20 hinder your ability to testify accurately today?
21 A.   No.
22 Q.   And are you taking any medication that might
23 affect your memory?
24 A.   No.

2 (Pages 2 - 5)

Page 6

1 Q.   Okay.

2      Again, if you don't understand the question I'm

3 asking you or if you would like me to repeat the

4 question, just let me know and I will repeat the

5 question.  Otherwise, I'll assume that you understand

6 the question I'm asking you; is that fair?

7 A.   Yes.

8 Q.   Okay.

9      And what did you do to prepare for your

10 deposition?

11 A.   Really nothing.  Just drove to Fayetteville.

12 Q.   Okay.

13      Did you review any documents?

14 A.   No.  As far as reviewing any of them, no, I did

15 not.  I copied a document on a loan approval this

16 morning and I had one there, laid out to bring up here

17 in regards to my insurance.

18 Q.   Okay.

19      And you met with your attorney; correct?

20 A.   You mean today?

21 Q.   In preparation for your deposition, you had met

22 with your attorney, right?

23 A.   I met with him one time when we thought we had

24 that deposition a couple, two or three weeks ago.  It

Page 7

1 was the first time, and only time in person, I had ever

2 talked to him.

3 Q.   Okay.

4      And have you spoken with anybody else about this

5 deposition?

6 A.   No.

7 Q.   Have you talked --

8 A.   Other than my immediate family.

9 Q.   Okay.

10      Have you talked with anyone other than your

11 immediate family about this lawsuit in general?

12 A.   No.

13 Q.   Okay.

14 A.   Maybe a couple of friends, but nothing I can

15 actually recall.

16 Q.   Do you know the specific nature of that

17 conversation, was it just generally what this lawsuit

18 was about?

19 A.   Just in general, yes.

20 Q.   Okay.

21      And, again, if you need a break for any reason,

22 if you need to use the bathroom or get a drink of water,

23 just let me know and I'll be happy to go off the record;

24 okay?

Page 8

1 A.   Yes, I'm good.

2 Q.   Okay.

3      So will you please state your full name and date

4 of birth?

5 A.   David Max Daugherty.  December 14, 1957.

6 Q.   Thank you.

7      And I'd like to ask you a little bit about your

8 education now.  Did you complete high school?

9 A.   Yes.

10 Q.   Okay.

11      And do you have any college education?

12 A.   Yes, I do.  I have numerous college hours.  I

13 spent time as a full-time student at WVUP in

14 Parkersburg, I completed their paramedic program there.

15 Q.   Okay.

16      And very generally -- so I can assume that your

17 field of study was medicine as a paramedic?

18 A.   Yes.

19 Q.   Okay.

20      And very generally, what has your employment been

21 most recently?

22 A.   I retired from the Parkersburg Fire Department as

23 a full-time employee with 28 years, I believe, back in

24 2010.  And I also worked 27 years as a full-time

Page 9

1 employee for St. Joseph's Ambulance Service.  And I

2 retired there in 2009, a few months from each other.

3 Q.   Okay.  Well, congratulations on your retirement.

4 Okay.

5      And so I understand that your wife is retired as

6 well and you were retired from the fire department and

7 the ambulance service, the hospital.  Do you have any

8 other sources of income?

9 A.   Yes.  Well, I've had a heating and cooling

10 business but I've pretty much given that all up.  If I

11 have a friend call me every now and then, if they have a

12 problem, I may go fix their furnace, usually not charge

13 anything.  And I'm also on Social Security disability.

14 Q.   Okay.

15      And other than that, are there any other sources

16 of income?

17 A.   No.

18 Q.   All right.

19      And you're married, right?

20 A.   Yes.

21 Q.   And your wife's name is Tina Daugherty?

22 A.   Yes, it is.

23 Q.   And you have two children, right?

24 A.   Yes.

3 (Pages 6 - 9)

Page 10

1 Q.   And I understand that your son lives with you?
2 A.   Yes, he does.
3 Q.   Okay.
4        And does anyone else live at your residence
5 besides your wife and son?
6 A.   No.
7 Q.   And how long have you lived at your current
8 residence?
9 A.   Somewhere around 17, 18 years or so, maybe
10 longer.
11 Q.   Okay.
12       And you had said that you had been in a
13 deposition before. Have you been involved in any other
14 litigation before this case, any other lawsuits?
15 A.   Yes.
16 Q.   Okay.
17       And about how many lawsuits?
18 A.   That I was actually a plaintiff in, probably two
19 or three with the Parkersburg Fire Department where we
20 had lawsuits against the City over benefit packages, et
21 cetera.
22 Q.   And would you say that all two or three lawsuits;
23 were they all with the fire department?
24 A.   Yes.

Page 11

1 Q.   And all times it was over benefits?
2 A.   Yes, normally. Where the City wasn't paying into
3 our pension fund like they were supposed to be, things
4 like that.
5 Q.   And can I assume that your deposition was part of
6 those lawsuits, your previous depositions?
7 A.   I've got to restate that.
8 Q.   Okay.
9        You had mentioned earlier that you had been in a
10 deposition before?
11 A.   I've got to restate that. I don't think I
12 actually gave depositions on those particular lawsuits.
13 I've given depositions during the St. Joseph's ambulance
14 lawsuits where I've been called to testify in trials
15 where people had gotten hurt, where there was litigation
16 between them or people or things that have hurt them on
17 their behalf.
18 Q.   About how many lawsuits would you say you've been
19 involved in where you were not the plaintiff?
20 A.   Where I was not the plaintiff? Probably two or
21 three.
22 Q.   And those lawsuits where you were not the
23 plaintiff; were all of those related to your job as a
24 paramedic?

Page 12

1 A.   Yes.
2 Q.   Okay.
3        And you were testifying on behalf of the
4 hospital; is that correct?
5 A.   Yes. Actually, not on -- I was being employed by
6 the hospital. The hospital wasn't the one being sued,
7 it was like in one case someone had fallen down, an
8 elderly lady that fell on an elevator at a senior
9 citizens high-rise and it was due to the elevator had
10 malfunctioned and jumped.
11 Q.   I see.
12 A.   And it did the same thing to us enroute to the
13 floor; it would be one example.
14 Q.   Okay.
15       So --
16 A.   Go ahead.
17 Q.   So other than the lawsuits involving the fire
18 department and the lawsuits involving the hospital, were
19 there any other lawsuits that you've been a part of?
20 A.   Yes, back in the early '80s, I had a lawsuit
21 against the City of Vienna.
22 Q.   And were you the plaintiff in that?
23 A.   Yes, I was.
24 Q.   And can you very generally tell me the nature of

Page 13

1 that?
2 A.   I was doing construction work back then and I was
3 doing pretty well. I had won the bid to refurbish the
4 municipal swimming pool and we had a problem with the
5 pool covering on the initial pool that was already on
6 the pool. Some things called, it was a coating they put
7 on called TheraSeal. And it's tested at 60,000 PSI's
8 but as it turns out, it was taking a lot of time to
9 remove the TheraSeal using a diamond concrete grinder.
10 And I was running -- it was going to run me over past
11 their initial pool opening and it kind of came became a
12 contract dispute over it. And my contract was canceled
13 while we were still working on it. And I took them to
14 court, and according to the court, I won the case or
15 according to the papers, I won the case. But I don't
16 really feel like I won, but I supposedly won.
17 Q.   Sure, I understand.
18       And did you testify at all in that case?
19 A.   Yes, I did.
20 Q.   Okay.
21       So we've got the lawsuits with the city in
22 Indiana --
23 A.   The City of Vienna.
24 Q.   Oh, I'm sorry.

4 (Pages 10 - 13)

Page 14

1  A.   That's Vienna, V-I-E-N-N-A.

2  Q.   The lawsuits with the City, the lawsuits with the

3  fire department and lawsuits with the hospital. Are

4  there any other ones --

5  A.   Not that I'm aware of.

6  Q.   -- that you were a party to?

7  A.   No.

8  Q.   Okay. Okay.

9       So I'd like to first refer you to the Complaint

10 that you have filed in this case. Do you have that available

11 in front of you?

12          MR. NOLAN: I left that one on the

13 printer. Let me go grab that one. Two seconds.

14          MR. KENNEY: Sure.

15             * * *

16          (Brief break)

17             * * *

18          THE WITNESS: Okay, I have it.

19 BY MR. KENNEY:

20 Q.   Okay.

21      And let me know whenever you're ready, whenever

22 you have the Complaint.

23 A.   I have it in my hands.

24 Q.   Okay.

Page 15

1       I'm sorry. Sometimes I just can't tell who's

2  talking. Okay. So we can mark the Complaint here as

3  Exhibit 1. Are you familiar with this document?

4  A.   Yes.

5             * * *

6       (Whereupon, Deposition Exhibit No. 1 marked for

7  purposes of identification.)

8             * * *

9  BY MR. KENNEY:

10 Q.   Okay.

11 And can you tell me in your own words what you're

12 complaining about in this case?

13 A.   I'm complaining about this case that my credit

14 record was inaccurately reported, where my credit report

15 was saying I was late, 120 days late in the year of 2013

16 in the months of March, June, July, October and

17 December, I believe, and past due, if I remember right.

18 $6,128 and in foreclosure when I wasn't.

19 Q.   Okay.

20      And is there anything else that you're

21 complaining about in this case?

22 A.   Well, other than that and the fact that it

23 actually -- it caused a lot of complications from being

24 on my credit report and some of the things that we were

Page 16

1  -- I knew we had some tax issues from 2012 when my wife

2  cashed in a 401(k) and we owed money to the state that I

3  was planning on -- I knew my loan was going to need to

4  be financed because I had balloon balance coming up in

5  July of 2014, and I really wasn't sweating it too bad

6  when I saw what we owed on taxes because that's when I

7  was going to refinance my house. I was planning on

8  paying off those taxes. And to find out that I couldn't

9  get a loan because the way the credit report showed, I

10 was in foreclosure.

11 Q.   Okay.

12      And do you recall which credit report had the

13 information about the 120 days late and the amount past

14 due, do you recall which credit report was reflecting

15 that information?

16 A.   Yes, I do.

17 Q.   Which one was it?

18 A.   Equifax.

19 Q.   So is it fair to say -- was Equifax only the

20 credit report of the three that was reporting this

21 information?

22 A.   It was the only one reporting that information.

23 Q.   Okay.

24      So when did you first meet with your attorney?

Page 17

1  A.   I would say in the spring of 2014.

2  Q.   And what was the purpose of meeting with your

3  attorney?

4  A.   Because I couldn't resolve this with -- between

5  Ocwen and Equifax. At that time, I didn't know who was

6  making the mistake by putting this on my record, and I

7  couldn't get either corporation to assist in

8  straightening it out even though I had made phone calls

9  to Ocwen. You can't call Equifax; you've got to do

10 everything in writing, which I did.

11 Q.   Right.

12 A.   You know, I sent registered letters, very

13 explicit registered letters that I think anyone would

14 understand and they still refused to correct it. From

15 that, I actually called in Parkersburg the local

16 Consumer Credit Counseling and asked for advice and they

17 put me in touch with Consumer Financial out of

18 Washington DC, which is a government agency. They had

19 me send them the information and after I talked to them,

20 they told me that I ought to file complaints against

21 both corporations. I personally thought they were both

22 in cahoots together to try to take my house because I

23 had $100,000 in equity, or up to that in equity.

24 Q.   Sure.

5 (Pages 14 - 17)

Page 18

1    So you had mentioned that at the time that you
2 first met with your attorney, you weren't certain who
3 was causing the information to appear in your credit
4 report?
5 A.    That's correct.
6 Q.    Has anything changed since then?  Do you have any
7 idea who was causing that now?
8 A.    Well, actually yes.  From my last meeting, I was
9 told that it was Ocwen that was reporting.  When I had
10 written, I thought it might have been Equifax,
11 but it turned out to be Ocwen the entire time even
12 though they denied it numerous times.  Ocwen told me I
13 would have to contact Equifax because they were the
14 problem.
15 Q.    And when you had said at your last meeting you
16 learned that it was Ocwen, what meeting are you
17 referring to?
18 A.    The deposition that we were supposed to have with
19 you here about three weeks ago --
20 Q.    I see.
21 A.    -- where the mistake in the time was made.
22 Q.    Okay.  Okay.
23    Now, I'd like to ask you just a few questions
24 about the disputes, the accounts that you disputed

Page 19

1 on your credit report.  When did you first determine
2 that your credit report contained information that you
3 wanted to dispute?
4 A.    I would say it was around October 2013, somewhere
5 in the fall.  I knew I was going to have a maturity date
6 coming up the following July of 2014.  I was already,
7 you know, paying attention and try to have everything in
8 shape, getting ready for refinancing.  And that's when
9 it was first discovered when the first mortgage company
10 I talked to, I can't remember right off which one, but
11 they told me that the report came back that -- bad with
12 the mortgage company showing I was late all those days.
13 Q.    Right.
14    And did you do anything to try and fix your
15 credit?
16 A.    Yes.  I did several things trying to work on my
17 credit.
18 Q.    And what did you do?  And I mean other than
19 consult with an attorney, what did you do before you
20 found --
21 A.    You know, at one time, we had some credit
22 problems and I had worked to try to straighten them all
23 out and pay off the ones I had to pay off.  And I had
24 had a lot of medical bills that were turned into

Page 20

1 collections and I had to pay them off.  There were
2 things on there that -- and another thing was, I had
3 actually hired a credit repair company called Aggressive
4 Credit Repair to try to -- I saw online where they were
5 highly recommended and supposedly there were things that
6 were paid that were still on there that had been on
7 there longer than seven years, et cetera, that I was
8 told that they could get off.  The guy that owns
9 Aggressive Credit Repair, his name is Loren Hanks; I
10 went ahead and signed up with him.  And Loren actually
11 told me there were a lot of things that I had -- you
12 know, the things that I owed, I paid.  And I was told
13 that if there was any money owed, I would have to pay to
14 clean up my records, but, yeah, I was concentrating on
15 cleaning my records up.
16 Q.    And you had mentioned that at one time you had
17 some issues with your credit report and you had
18 mentioned about some medical bills?
19 A.    Yes.
20 Q.    Do you recall about when that was?
21 A.    Well, several years ago we had quite a few issues
22 with it.
23 Q.    When you say several years ago, do you mean like
24 five years ago or ten years ago or longer than that?

Page 21

1 A.    Even probably three years past that.
2 Q.    So around 2012?
3 A.    Probably 2012 is when we started -- that's when I
4 started working on cleaning it up.
5 Q.    Okay.
6    And I'd like to ask you just a few questions
7 about your relationship with Aggressive Credit Repair.
8 Do you recall when you first went to Aggressive Credit
9 Repair?
10 A.    Well, I can't recall exactly, no.
11 Q.    Do you have like a ballpark idea around a season
12 or year or a month and year?
13 A.    I really don't because, like I said, I've had
14 credit problems in the past I had been working on.  I
15 can't remember.  I just remember from like 2012 on that
16 my credit had to be -- everything had to be paid on
17 time.  And some of the things that I've talked to, when
18 you apply for mortgage financing, you can't be late for
19 anything in the past year.  So we made a point that we
20 -- everything was paid on time.
21 Q.    So when you first met with Aggressive Credit
22 Repair, what did they say that they were going to do for
23 you?
24 A.    They told me they thought there were a lot of

6 (Pages 18 - 21)

Page 22

1 things that they could clean up on my records. And they
2 actually told me that they could get a lot of stuff off
3 my records. And they didn't really talk about how they
4 were going to do it. And like I said, I saw on the
5 Internet that they were highly rated in what they did,
6 so I thought I would give them a try and he did clean a
7 lot of things off of the record.
8 Q.   Okay.
9     And was this around the same time that you were
10 trying to refinance for -- the loan?
11 A.   Actually, I had him working before because I knew
12 I had it coming up.
13 Q.   Okay. I see.
14     And so do you know what exactly Aggressive Credit
15 Repair did for you, -- I'm sorry. What exactly
16 Aggressive Credit Repair did to fix your credit report?
17 A.   No. The only thing I can tell you, I've received
18 letters back from the credit reporting agencies
19 confirming that certain accounts were mine or saying
20 that certain accounts were removed from my records and
21 then the minute I would get them, I'd mail those to
22 Loren Hanks. And then he would call me once a month to
23 let me know that he had more letters going out, where he
24 constantly was working on anything he had on there.

Page 23

1 Q.   And those letters, do you know what those letters
2 said?
3 A.   That he sent out?
4 Q.   Yes.
5 A.   No.
6 Q.   And so I can assume that you didn't have any part
7 in drafting those letters, right?
8 A.   No, I did not.
9 Q.   Okay.
10     And I think you previously stated there was a
11 couple of things that you had that you wanted to
12 dispute, so it wasn't just the Ocwen account that you
13 were disputing; correct?
14 A.   That's correct.
15 Q.   Okay.
16     And we were talking about these letters that were
17 sent out on your behalf from Aggressive Credit Repair.
18 And I would like to direct you to one of those dispute
19 letters, if we can make that available to you, and this
20 is from the documents that were produced by Aggressive
21 Credit Repair, it's page one.
22 A.   Okay. I have it.
23 Q.   Okay.
24     Are you familiar with this document?

Page 24

1 A.   I wouldn't say I'm familiar with it. I might
2 have seen it.
3 Q.   And do you recall if this document was sent to
4 Equifax more than once?
5 A.   No, I do not know that.
6 Q.   Okay.
7     And you can see here, there appears to be about
8 11, I think, 12, 12 different accounts on here that
9 Aggressive Credit Repair is disputing on your behalf.
10 And you can see that the first account is Verizon. It
11 says not mine, changes have been made to this account
12 since previously verified. Do you recall what the
13 dispute you were having with Verizon was?
14 A.   Actually, yes, I do.
15 Q.   And what was that?
16 A.   That actual account with Verizon was, I went with
17 another service and they were saying I was going to have
18 to owe a disconnection fee for not going through with my
19 contract and I was arguing with Verizon that I was well
20 past my contract. You were supposed to have a two-year
21 contract and I was at least two and a half, three years
22 into it. And we were arguing over the time and I was
23 asking them to prove when that contract started and I
24 would pay that, but I told them I was way past that

Page 25

1 contract date and they never did -- would come forward
2 and show me where I had actually had it for only two
3 years and they turned around and they put this on my
4 credit report.
5 Q.   You see where it says not mine here. Do you have
6 any idea why it says not mine?
7 A.   That's -- I had nothing to do with that. That's
8 a Loren Hanks tactic, I guess.
9 Q.   Okay.
10     And these two West Asset accounts; do you recall
11 that these were for?
12 A.   Those are hospital bills.
13 Q.   Okay.
14 A.   All the West Assets are from medical bills.
15 Q.   And do I understand that West Asset is a
16 collection agency; is that right?
17 A.   Yes, for the hospitals.
18 Q.   Okay.
19     And they also say not mine. Did you have
20 anything to do with that?
21 A.   No.
22 Q.   Okay.
23     And there's an Ocwen account there, and I'll get
24 to that in just a second. And then there's a credit

7 (Pages 22 - 25)

Page 26

1 C-O-L-L, do you know what that is?
2 A.   I have no clue what that one is.
3 Q.   Okay.
4 A.   Oh, that's a credit collection, that's another
5 medical bill, I believe.
6 Q.   Okay.
7       And that one says not mine.  And I can assume
8 that means that you didn't have anything to do with
9 that?
10 A.   Yes, that's correct.
11 Q.   Okay.
12       Then there's Frontier.
13 A.   Yes.
14 Q.   Do you know what the Frontier one is?
15 A.   Yes, I do.
16 Q.   And what is that?
17 A.   That was with Frontier, we switched companies
18 from our cable company, our Internet company, and we
19 found that Frontier was completely incompetent.  It took
20 us six months to get them to install our Internet
21 correctly.  And until they got it correctly, they had us
22 go ahead and keep SuddenLink at the same time.  And they
23 told me that they would reimburse me or they would give
24 us a credit on that for the SuddenLink and they never

Page 27

1 did get our cable -- once we got it, our Internet was
2 freezing all the time.  And I think they were saying we
3 owed -- we ended up owing them $75, but they actually
4 owed me like a $340 credit.  And I was trying to get
5 them to swap it out and they wouldn't do it and they put
6 this on my credit report.
7 Q.   Okay.
8       And that one says not mine, and can I assume that
9 you didn't have anything to do with that?
10 A.   I had nothing to do with that.
11 Q.   Okay.
12       And Green Tree, do you know what that one is?
13 A.   Yes.
14 Q.   And what is that one?
15 A.   That was a second mortgage on the house that
16 ended up -- I think that was back in the time period
17 when we were having problems financially and we ended up
18 paying it off.
19 Q.   Okay.
20       You said that there was a time period when you
21 were having problems financially.
22 A.   Yes.
23 Q.   Do you know what time period that was?
24 A.   We had about five or six years probably that

Page 28

1 things were pretty rough.
2 Q.   Do you have like a range in years?
3 A.   I would imagine there were times that we did okay
4 but we had some problems in a few years.  I was taking
5 care of both my parents, where I was taking time off of
6 work, but it was probably anywhere from three to the
7 last six years or so we had had some problems.
8 Q.   Okay.
9 A.   Yeah, I admit we've had some problems in the past
10 but I cleared all of that up and worked on trying to get
11 everything cleared up on my accounts.
12 Q.   Sure.  I completely understand.
13       And there's a Fidelity account there; do you know
14 what the Fidelity is?
15 A.   Actually, I don't know what that's in regards to.
16 I don't know if that's a medical bill or what.
17 Q.   Do you know what the First Federal is?
18 A.   I can imagine it was one of the charge cards that
19 got paid off, but I'm not sure.
20 Q.   Okay.
21       And this letter was sent to Equifax.  Do you have
22 any idea if TransUnion or -- I'm sorry, do you have any
23 idea if a letter was sent to TransUnion or Experian?
24 A.   What letter are you talking about?

Page 29

1 Q.   This letter that we're looking at here.  And if
2 we didn't mark this as an Exhibit, I'd like to mark this
3 as Exhibit 2 --
4               * * *
5       (Whereupon, Deposition Exhibit No. 2 marked for
6 purposes of identification.)
7               * * *
8       THE WITNESS:  I assume that he sent it to
9 all three.
10 BY MR. KENNEY:
11 Q.   Okay.
12       But do you know or do you just not know?
13 A.   Well, I didn't hire him to do -- I hired him to
14 clean up my credit record, period, not just with
15 Equifax.
16 Q.   Sure.
17 A.   So I'm under the assumption he was working with
18 all three credit bureaus.
19 Q.   But you don't know if this letter for sure was
20 sent to Experian or TransUnion; is that right?
21 A.   That's correct, yes.
22 Q.   Okay.
23       And you had mentioned that there was a period
24 there with financial difficulty and you had also

8 (Pages 26 - 29)

1 mentioned that you were taking care of your parents,
2 were there any other reasons why you began experiencing
3 financial difficulty?
4 A.    Not really, other than just illnesses and medical
5 bills which can add up pretty quickly.
6 Q.    Sure.
7        So the Ocwen account, and this is back to Exhibit
8 2, this letter to Equifax. The Ocwen account here is
9 listed twice. Do you have any idea why it's listed
10 twice?
11 A.    I have no idea.
12 Q.    But the account numbers are the same here; do you
13 see that?
14 A.    Yes.
15 Q.    And on the first line it says, not mine; is that
16 right?
17 A.    Uh-huh (yes).
18 Q.    And did you have any part in saying that this
19 account is not yours?
20 A.    No. I had nothing to do with these letters.
21 Q.    And the second Ocwen account says never late. So
22 you had nothing to do with saying that you were never
23 late here?
24 A.    Yes, I nothing to do with it.

1 Q.    Okay.
2        Do you know if the Ocwen account was appearing
3 twice in your Equifax report?
4 A.    Yes. I did discover that later on, yes, I did
5 know that.
6 Q.    And when did you discover that?
7 A.    Probably early 2014.
8 Q.    And do you know if either you or Aggressive
9 Credit Repair did anything to tell Ocwen that the
10 account was appearing twice -- that the Ocwen account
11 was appearing twice and should not be?
12 A.    I did explain that to Loren Hanks and he
13 supposedly was going to send a letter trying to dispute
14 that being on there twice for the same account.
15 Q.    So you explained to Loren Hanks that the Ocwen
16 account was appearing twice, did you explain that to
17 anyone else?
18 A.    I'm trying to think. I think I might have
19 explained it to Consumer Financial, a lady there.
20 Q.    Okay.
21        And was there anyone else?
22 A.    I don't believe so.
23 Q.    Do you know if it was Ocwen or Equifax that was
24 responsible for reporting this account twice?

1 A.    I did not know that until recently.
2 Q.    And by recently, do you mean when you spoke with
3 your attorney?
4 A.    Yes. Can you rephrase that question again?
5 Q.    I'm sorry. I had asked you if you knew either it
6 was Ocwen or Equifax that was responsible for reporting
7 the Ocwen account twice. And you said that you learned
8 that, and so I was wondering where you learned --
9 A.    No, no, no, I didn't know who was the one that
10 was reporting it.
11 Q.    Do you know if the Ocwen account was appearing
12 twice in your TransUnion report?
13 A.    I don't believe it is.
14 Q.    And do you know if any Ocwen account was being
15 reported in your Experian report?
16 A.    You mean twice? Or just reported?
17 Q.    Well, I guess I should go back and ask you, do
18 you know whether Ocwen was reporting to Experian?
19 A.    Yes, they were reporting to Experian.
20 Q.    Okay.
21        I'll ask you just a few more questions about that
22 in just a minute. But, let's see, so as we discussed,
23 the first time that Ocwen appears in this letter, it
24 says not mine, and I understand that you had no part in

1 saying that; right?
2 A.    That's correct.
3 Q.    Okay.
4        So I'd like to turn to the note in this case, the
5 promissory note, if you have that available to you.
6 Just let me know when you have that available. And this
7 is in the documents that were produced by Ocwen; they
8 say DD/OLF at the bottom. And the promissory note
9 begins on page 356. And we can mark this as Exhibit 3,
10 I believe.
11                          * * *
12        (Whereupon, Deposition Exhibit No. 3 marked for
13 purposes of identification.)
14                          * * *
15        THE WITNESS: Okay. I'm on 356.
16 BY MR. KENNEY:
17 Q.    Okay.
18        And do you agree that this is a copy of the note
19 that you signed when you originally took out this loan?
20 A.    Yes, it is.
21 Q.    And if you turn to page 357, there are two
22 signatures there at the bottom for David Daugherty and
23 Tina Daugherty. Are those you and your wife's
24 signatures?

9 (Pages 30 - 33)

Page 34

1  A.   Yes, I believe so.

2  Q.   And on the next page, page 358, there's a balloon

3  payment addendum; do you see that?

4  A.   Yes.

5  Q.   And there's also two signatures there, David

6  Daugherty and Tina Daugherty.  Are those you and your

7  wife's signatures?

8  A.   Yes, I believe they are.

9  Q.   And you would agree that your loan here has a

10  maturity date on July 26, 2014, right?

11  A.   Yes.

12  Q.   But you didn't make any payment on the balloon by

13  your maturity date of July 26, 2014, right?

14  A.   That's correct.

15  Q.   Okay.

16      I'd also like for you to turn to page 346.

17  A.   Okay.

18  Q.   And pages 346 through 355 appear to be the Deed

19  of Trust for this loan.  Are you familiar with this

20  document?

21  A.   Yes.

22  Q.   And if you turn to page 353 there are two

23  signatures there, David Daugherty and Tina Daugherty.

24  Are those you and your wife's signatures?

Page 35

1  A.   Yes, I believe they are.

2  Q.   So you would agree that you and your wife were

3  the borrowers on this loan, right?

4  A.   Yes.

5  Q.   And so you would agree that by saying that this

6  loan is not yours in this dispute letter, it really was

7  yours, right?

8  A.   Yes.

9  Q.   Okay.

10      I'd like to ask you to turn to the Automated

11  Consumer Dispute Verification forms, and this was

12  produced by Equifax.  And so at the bottom, there are

13  numbers there that say EIS Daugherty and I'd like you to

14  first turn to page 60.

15  A.   Okay.

16  Q.   And you can see on that page it says grantor

17  name, and it says Ocwen Loan Servicing, right?

18  A.   I'm still looking.  Okay, I see it now.

19  Q.   And that's your loan number there where it says

20  account number?

21  A.   I assume it is.

22  Q.   Do you know for sure what your loan number is?

23  A.   No, I don't, not right here, right now, no.

24  Q.   Okay.

Page 36

1      And so there under reported consumer identity, it

2  has your name, Daugherty, David Max; do you see that?

3  A.   Yes.

4  Q.   Okay.

5      Are you familiar with what this document is?

6  A.   No, I'm not -- I'm not familiar with it.

7  Q.   Okay.

8      If you look at the top of this document where it

9  says dispute one, you'll see that it says user one, not

10  his, hers, provide complete ID; do you see that?

11  A.   Yes, I do.

12  Q.   And if you turn to page 62, this appears to be

13  the same document that was created May 31, 2013?

14  A.   Where's page 62 at?  Okay.

15  Q.   This is another Automated Consumer Dispute

16  Verification form and there under dispute one, it says

17  not his, hers, provide complete ID; do you see that?

18  A.   Yes, I see it.

19  Q.   And you would agree that that Ocwen Loan

20  Servicing and your name is listed on this page as well?

21  A.   Yes.

22  Q.   And if you'll turn to page 89 there's another

23  Automated Consumer Dispute Verification form --

24      MR. NOLAN:  Do you want to mark that as

Page 37

1  an Exhibit before we move on, Jon?

2      MR. KENNEY:  I'm sorry?

3      MR. NOLAN:  Did you want to mark that as

4  an Exhibit before we move on?

5      MR. KENNEY:  Yes, Exhibit 4, please.

6           * * *

7      (Whereupon, Deposition Exhibit No. 4 marked for

8  purposes of identification.)

9           * * *

10  BY MR. KENNEY:

11  Q.   And page 89, which we can mark as Exhibit 5 is

12  another Automated Consumer Dispute Verification form.

13  This one appears to be dated July 3, 2013; do you see

14  that?

15  A.   Yes.

16           * * *

17      (Whereupon, Deposition Exhibit No. 5 marked for

18  purposes of identification.)

19           * * *

20  BY MR. KENNEY:

21  Q.   And that's your loan number and Ocwen Loan

22  Servicing listed there?

23  A.   Yes.

24  Q.   And that's your name, David Daugherty; correct?

10 (Pages 34 - 37)

Page 38

1  A.     That's correct.

2  Q.     And under the dispute, it says not his or hers,
3  right?

4  A.     Yes.

5  Q.     And if you turn to page 95, I believe this will
6  be Exhibit 5.

7           MR. NOLAN: It will be number 6.

8           MR. KENNEY: I'm sorry, Exhibit 6.

9                    * * *

10  (Whereupon, Deposition Exhibit No. 6 marked for
11  purposes of identification.)

12                   * * *

13  BY MR. KENNEY:

14  Q.     And this is another document dated 7/3/2013 with
15  your loan number and Ocwen Loan Servicing; correct?

16  A.     That's correct.

17  Q.     And that's your name, right?

18  A.     Yes.

19  Q.     And under the dispute, it says not his or hers,
20  right?

21  A.     That's correct.

22  Q.     So you would agree that this loan was yours,
23  right?

24  A.     I assume it was.

Page 39

1  Q.     Okay.

2           And so I'd like to go back to that letter from
3  Ocwen to Equifax.

4  A.     Okay.

5  Q.     I'm sorry. I'm trying to mark them trying.
6  Actually, I'm getting the numbers wrong. I believe this
7  is Exhibit 3; is that right?

8           MR. NOLAN: Is this the letter from Loren
9  Hanks?

10          MR. KENNEY: Yes.

11          MR. NOLAN: That's Exhibit 2, I think. I
12  think 3 was the note.

13          MR. KENNEY: Right. Okay. You're right.

14  BY MR. KENNEY:

15  Q.     And so the letter from you to Equifax, the second
16  time that Ocwen is listed here, it says never late; do
17  you see that?

18  A.     Yes.

19  Q.     Were you late at any time in making payments to
20  Ocwen?

21  A.     Yes, I had been late.

22  Q.     And I believe you mentioned in your Complaint you
23  were late on your Ocwen payment in March of 2013; is
24  that right?

Page 40

1  A.     Yes, I was late because my pension check hadn't
2  made it into the bank and I didn't know until a couple
3  of weeks later that it didn't go through because it
4  wasn't in there yet, but that was the only time that it
5  had been late in 2013.

6  Q.     There was no time before March 2013 that you were
7  late on a payment to Ocwen?

8  A.     Previously -- months, yeah, I believe yes, but
9  that was back before I was really working hard on my
10  credit repairs.

11  Q.     Right.

12          So this letter to Equifax where it says never
13  late next to your Ocwen account, you would agree that
14  you had been late before; correct?

15  A.     Yes. This wasn't -- these letters weren't from
16  me.

17  Q.     Right. Okay.

18          And if you recall -- let me ask you this. Did
19  you ever tell Ocwen that you were never late on
20  payments?

21  A.     No, not personally. Now, I'm going to recant
22  part of that. I did tell Ocwen that I wasn't late in
23  that time period in 2013. And they actually told me
24  that I wasn't late in those time periods in 2013. And

Page 41

1  they told me --

2  Q.     What time periods are you talking about?

3  A.     I'm talking about -- I'll revise that even. Back
4  in the late part, October 2013, when I found out there
5  was a problem and I talked to Ocwen, they -- I could go
6  online and it showed all of those months clear. And
7  when I talked to the mortgage people, their officers,
8  they said -- I told them that I hadn't been late, that I
9  was being told on the credit report that it was. And
10  they told me my problems were with Equifax.

11  Q.     Okay. And I apologize. I'm just trying to
12  understand.

13          So in October of 2014, you spoke with Ocwen; is
14  that right?

15  A.     No. In October of 2013 --

16  Q.     Okay.

17  A.     -- when this all first started, I talked to them
18  about what I found on there that was incorrect and they
19  were telling me their records showed that I was current.

20  Q.     And so when you talked to Ocwen in October 2013,
21  did you tell them that you were never late at all or did
22  you tell them that you were never late for that month?

23  A.     I told them I was never late in all those months
24  that they had me reported up to that point. And I

11 (Pages 38 - 41)

Page 42

1 admitted I was late the month of March.
2 Q. Okay.
3 And do you recall how you talked to Ocwen; did
4 you call them?
5 A. I called them on two or three occasions. I
6 actually called them and tried to get their assistance
7 because they were telling me that their reporting was
8 correct, that I was not late, and that they were telling
9 me that Equifax had made the problem, had the incorrect
10 information, it wasn't them.
11 Q. Do you recall the names of anyone that you spoke
12 to at Ocwen?
13 A. Well, one of the loan officers that I talked to,
14 his name is John. I talked to him a couple, two or
15 three times. So he must be one of the main ones that --
16 I think they have specific people handle a certain
17 numbers of accounts and I think he was -- I don't how
18 they go by, but it seemed like he was one of the ones I
19 talked to most times when I called.
20 Q. Do you recall a last name or just John?
21 A. It was just John. I can't remember the last
22 name. He sounded African-American.
23 Q. Did you speak with anyone other than John?
24 A. I believe I did on one occasion but I can't

Page 43

1 remember who it was. I don't think I talked to John
2 every time because I made more than a couple of phone
3 calls, two or three phone calls or four or more. I
4 don't know. I called several times. Like I said,
5 inquiring and requesting help.
6 Q. Do you recall when you made those phone calls?
7 A. Well, they started off, like I said, in like
8 October of 2013. When I finished talking to them on the
9 phone, I started trying to find a number for Equifax and
10 you can't just call Equifax; you've got to do everything
11 in writing. So I started sending letters out from me to
12 Equifax with the situation. And I think I'd get one
13 back and it was saying they -- the one letter said that
14 they found that my dispute was not accurate and that it
15 was verified and they weren't going to make any changes.
16 And I think I called Ocwen back again and I really
17 wasn't that -- I just wanted the record fixed. I wasn't
18 at any point where I was actually worrying about it
19 because I thought I had plenty of time to get mortgage
20 financing. I just wanted my record fixed.
21 Q. Right.
22 A. And it escalated from phone calls to where I was
23 actually typing up letters, sending registered letters,
24 getting advice from Consumer Counseling clear up until

Page 44

1 -- Consumer Financial actually recommended that I find
2 an attorney.
3 Q. And do you have copies of any of those letters
4 that you sent -- did you send any letters to Ocwen?
5 A. Yes. I did. I sent them and Equifax the first
6 letters I sent out. I sent a copy to both of them --
7 both of them said literally the same thing except the
8 name of the different corporation on each one.
9 Q. And do you have available copies of those
10 letters?
11 A. Yes, we do.
12 Q. Okay.
13 And when you were sending the letters and the
14 phone calls, was that before or after you met with
15 Aggressive Credit Repair?
16 A. After.
17 Q. Okay.
18 So I understand that you had called in October
19 2013; do you remember the month, years of any other
20 calls that you had placed to Ocwen?
21 A. Well, I believe it took about a month before I
22 got an answer back from Equifax and I called again
23 saying that they're saying it's verified. And I was
24 told that my argument was with Equifax. So at that

Page 45

1 point, somewhere around that point, I think was when I
2 typed up the letters and officially, formally, sent them
3 out to both places. In my mind, I thought they were
4 both in cahoots to try to take my house I had all the
5 equity in.
6 Q. So when you had spoken with Ocwen, were you aware
7 that the Ocwen account was appearing twice in your
8 Equifax credit report?
9 A. No at that time, no.
10 Q. Okay.
11 So you never told Ocwen directly that the account
12 was appearing twice in your Equifax credit report;
13 correct?
14 A. That's correct.
15 Q. Okay.
16 A. Not until later.
17 Q. Right.
18 And I understand that you had some issues with
19 refinancing; is that right?
20 A. Yes.
21 Q. And when did you first seek any sort of credit
22 that you were denied because of your credit report?
23 A. It was probably in October of 2013.
24 Q. And do you recall the first place that you were

12 (Pages 42 - 45)

Case 5:14-cv-24506   Document 101-2   Filed 09/25/15   Page 13 of 23 PageID #: 699

Case 5:14-cv-24506   Document 101-2   Filed 09/25/15   Page 13 of 23 PageID #: 699

Page 46

1 denied credit from?
2 A. I would have to look it up. It was on one of
3 them inquiries. If I saw the name of it, I'd remember
4 it.
5 Q. Okay.
6     And do you recall which institutions you were
7 denied credit from?
8 A. If I saw the names on the credit report, I can
9 tell you which ones they were. They all had to do with
10 mortgage financing or refinancing.
11 Q. Do you recall any credit card companies?
12 A. Yeah, there was a couple.
13 Q. Okay.
14     And I would like to direct you to a document
15 that's called Ocwen's data list, and this is located in
16 documents that Ocwen produced as DD/OLS and it's page
17 32. Just let me know when you get there.
18     MR. NOLAN: I have 322.
19     MR. KENNEY: Oh, I'm sorry 322, that's
20 correct.
21     THE WITNESS: Okay, I have it.
22     MR. KENNEY: And I'd like to mark this
23 document as Exhibit 7.
24         * * *

Page 47

1     (Whereupon, Deposition Exhibit No. 7 marked for
2 purposes of identification.)
3         * * *
4 BY MR. KENNEY:
5 Q. And there are several columns on this document;
6 do you see that?
7 A. Yes.
8 Q. At the top it says CRA data list and loan number
9 and that's your loan number; do you see that?
10 A. I see it.
11 Q. And there is one column there called compliance
12 and its ten columns from the right; do you see that?
13 A. I see the compliance column.
14 Q. And in three of the boxes under the compliance
15 column, it says XB; do you see that?
16 A. Yes.
17 Q. And I'll represent to you that the code XB means
18 that account information is disputed under the Fair
19 Credit Reporting Act?
20 A. Okay.
21 Q. And if you look, there's an XB in the column that
22 is associated with the row dated October 31st, 2013; do
23 you see that?
24 A. Yes.

Page 48

1 Q. And there's an XB in the column for the row dated
2 November 30 of 2013, right?
3 A. I assume. I'm having trouble reading this but I
4 assume that's the column.
5 Q. And there's another XB in the column for the row
6 dated December 31st, 2013, right?
7 A. Yes.
8 Q. So knowing that the code XB means that Ocwen
9 reported the account as disputed under the Fair Credit
10 Reporting Act --
11     MR. NOLAN: Objection. The client
12 doesn't know what Ocwen's codes mean.
13     MR. KENNEY: And like I said, under my
14 representation that XB means that account information is
15 disputed under the FCRA or the Fair Credit Reporting
16 Act, is it fair to say that Ocwen reported this account
17 as disputed in October of 2013?
18     THE WITNESS: Well, if you say that's
19 what it is, I couldn't tell you. If you say that's what
20 it is, I'd have to take your word for it.
21 BY MR. KENNEY:
22 Q. Do you know if Ocwen ever reported the account as
23 disputed to Equifax?
24 A. No, I don't know that.

Page 49

1 Q. So am I right in saying that you don't know if
2 they did or if they didn't?
3 A. That's correct, I don't know.
4 Q. Okay.
5     And I would like you to look now at the expert
6 reports that were provided on your behalf. And just let
7 me know when that's available to you.
8 A. Okay. I have it in my hand.
9 Q. And we can mark this as Exhibit 8.
10         * * *
11     (Whereupon, Deposition Exhibit No. 8 marked for
12 purposes of identification.)
13         * * *
14 BY MR. KENNEY:
15 Q. And the first page says Plaintiff's Rule 26(a)(2)
16 Expert Witness Report; do you see that?
17 A. Yes.
18 Q. And this is a document that Evan Hendrix provided
19 on your behalf. And if you look at the bottom of this
20 page, it says page 1 at the bottom.
21 A. Okay.
22 Q. And under the parentheses one, above the
23 parentheses one, it says when plaintiff disputes the
24 accuracy and completeness of the Ocwen account, went to

13 (Pages 46 - 49)

Page 50

1 Equifax and Equifax forwarded the dispute to Ocwen,
2 Ocwen failed to, one, report to Equifax that plaintiff's
3 account was notated as disputed by consumer with the
4 proper code from metro two; do you see that?
5 A.   Actually, I don't see any of that.
6 Q.   Do you see --
7 A.   Okay, I'm on page one now.
8 Q.   And at the very bottom of page one, --
9 A.   Okay.
10 Q.   -- it says Ocwen, and underneath that at the very
11 bottom there's a parentheses that says one; do you see
12 that?
13 A.   Yes.
14 Q.   And above that it says when plaintiff disputes
15 the accuracy and completeness of the Ocwen account went
16 to Equifax and Equifax forwarded the disputes to Ocwen,
17 Ocwen failed to -- and then in parentheses one it says,
18 report to Equifax that plaintiff's account was notated
19 as disputed by consumer with a proper code from metro
20 two; do you see that?
21 A.   Yes.
22 Q.   So under my representation, that being code XB
23 does in fact mean that the account information as
24 disputed under the Fair Credit Reporting Act, would you

Page 51

1 agree that this report is incorrect because Ocwen did,
2 in fact, report the account as disputed?
3 A.   I guess if that's what you say it is, I'd have to
4 believe you.
5 Q.   Okay.
6       And I'd like to direct you now to your
7 CreditScore.com report. We can mark this as Exhibit 9.
8       MR. NOLAN:  And this is the one we
9 produced in discovery?
10      MR. KENNEY:  So you produced this
11 document in discovery and Aggressive Credit Repair
12 produced this document as well.
13      MR. NOLAN:  Okay.
14      MR. KENNEY:  The documents that you
15 produced do not have Bates numbers on the bottom. And
16 so if it would make it easier, we can use the
17 CreditScore.com report that Aggressive Credit Repair
18 produced. That way we can just navigate a little bit
19 easier.
20      MR. NOLAN:  Got you.  And is it correct
21 that it's ARC seven through 41?
22      MR. KENNEY:  That's right.
23      THE WITNESS:  Okay.  I have it in my
24 hand.

Page 52

1             * * *
2       (Whereupon, Deposition Exhibit No. 9 marked for
3 purposes of identification.)
4             * * *
5 BY MR. KENNEY:
6 Q.   Okay.
7       And this is a -- have you ever seen this document
8 before?
9 A.   I'm not sure.
10 Q.   You can see it says CreditScore.com, credit
11 report prepared for David Max Daugherty?
12 A.   Yeah, I believe I've seen this before.  Yes.
13 Q.   The report is dated April 17, 2014, right?
14 A.   Yes, I think I've seen this one before.
15 Q.   Okay.
16      And, like I said, this document was produced by
17 Aggressive Credit Report Repair --
18 A.   Yes.
19 Q.   -- but the same report that your Counsel
20 provided, and we'll just use this one because it's a
21 little bit easier with the numbers down there at the
22 bottom.
23 A.   Okay.
24 Q.   Would you say that this credit report accurately

Page 53

1 reflects your credit report as of April 17, 2014?
2 A.   I couldn't tell you.  I'd have to look at it.
3 Q.   And, again, this is a credit report that you
4 provided but what you're saying is, you're not sure if
5 this is an accurate credit report or not?
6 A.   I assume it is.  I'm not sure if this one has all
7 of the things that are incorrect on it.
8 Q.   Okay.
9       If you turn to page 23, at the bottom, right-hand
10 corner is marked as page 23.
11 A.   (Witness complies).
12 Q.   There is an Ocwen account and there are three
13 boxes that say Experian, Equifax and TransUnion, right?
14 A.   Yes.
15 Q.   And in the TransUnion box it states account
16 information disputed by consumer; do you see that?
17 A.   I'm looking.  You say on page 23?
18 Q.   Yes.
19 A.   Where are you seeing that; disputed by consumer?
20 Q.   In the TransUnion box at the bottom it says
21 account information disputed by consumer?
22 A.   I see that, yes.
23 Q.   So is it fair to say that TransUnion was
24 reporting your Ocwen account as disputed as of April 17,

14 (Pages 50 - 53)

Page 54

1  2014?

2  A.    Yes.

3  Q.    And in the Equifax box, under the payment status

4  it says paid as agreed; do you see that?

5  A.    Yes.

6  Q.    And in the Experian box there's nothing; do you

7  see that?

8  A.    Yes, I see that.

9  Q.    So you would agree that Experian was not

10  reporting on your Ocwen account at all?

11  A.    Maybe not that particular month but many months

12  they did, I believe, I'm not sure, but evidently not in

13  this box.

14  Q.    Okay.

15        So it's fair to say that as of April 17, 2014

16  Experian was not reporting?

17  A.    Yes.

18  Q.    Okay.

19        And the Equifax box because it says paid account

20  as agreed, is it fair to say that as of April 17, 2014

21  Equifax is not reporting you as currently delinquent on

22  this account here?

23  A.    That's correct.

24  Q.    Okay.

Page 55

1        And there are additional documents that were

2  produced by Aggressive Credit Repair. These are

3  documents from Equifax that were sent to you in response

4  to your credit dispute and these are pages 75 through

5  117, ACR document 75 through 117. Are you familiar with

6  these documents?

7  A.    No, not really. I believe these are -- let me

8  take a look here for a minute.

9  Q.    Okay.

10        I'd like to mark these -- I believe, are we at

11  Exhibit 10?

12        MR. NOLAN: Yes.

13              * * *

14        (Whereupon, Deposition Exhibit No. 10 marked for

15  purposes of identification.)

16              * * *

17        THE WITNESS: Yeah, I'm vaguely familiar

18  with some of these.

19  BY MR. KENNEY:

20  Q.    Okay.

21        I'd like you to turn to page 93 on the bottom

22  right-hand corner. And this is a letter from Equifax

23  dated March 24th, 2014; do you see that?

24  A.    Okay. Page 93, March 24th?

Page 56

1  Q.    Right.

2  A.    Okay. I have it in front of me.

3  Q.    And you'll see there are a couple of boxes there

4  where it says we've researched the collection account

5  number for West Asset Management. And if you turn to

6  page 94, you'll see at the bottom there, there's a box

7  where it says we've researched the account for Ocwen

8  Loan Servicing; do you see that?

9  A.    It's at the very bottom?

10  Q.    It's at the bottom of page 94, it says Ocwen Loan

11  Servicing?

12  A.    And it says pays as agreed?

13  Q.    Right. Right.

14        And under the status it says pays as agreed. And

15  on page 95, at the top of page 95, there's a second

16  Ocwen Loan Servicing box; do you see that one?

17  A.    Yes.

18  Q.    And this one also says pays as agreed, right?

19  A.    Yes.

20  Q.    So would you agree that on March 24, 2014 Equifax

21  was not reporting you currently delinquent on any Ocwen

22  accounts, right?

23  A.    I don't know that for certain.

24  Q.    We had discussed here for this report or this

Page 57

1  letter from Equifax dated March 24, 2014, in the first

2  box for Ocwen on page 94 it says status, paid as agreed.

3  And the second Ocwen account, which is on page 95 under

4  the status it says pays as agreed; right?

5  A.    I see that's what they say here. I'm not sure

6  when they actually took that off my records.

7  Q.    Okay.

8  A.    There was one account they had listed paid as

9  agreed and the other account said just exactly the

10  opposite and on the same account number. And I'm not

11  sure what month but I recall that they took it off, but

12  it was after the lawsuit was filed.

13  Q.    Right.

14        And I'd like you to turn now to a document that

15  Experian produced. This is EIS -- I'm sorry, a document

16  that Equifax produced, this is EIS 257 through 261.

17              * * *

18        (Whereupon, Deposition Exhibit No. 11 marked for

19  purposes of identification.)

20              * * *

21        THE WITNESS: Okay. I have it.

22  BY MR. KENNEY:

23  Q.    Again, this is a document that Equifax produced

24  and on page 257 at the top, you see a timestamp there,

15 (Pages 54 - 57)

Page 58

1 April 24th, 2014, right?
2 A.   Yes.
3 Q.   And it's got your name on this document?
4 A.   Yes.
5 Q.   Can you turn to page 260?
6 A.   (Witness complies).  Okay.
7 Q.   There at the bottom there is a -- let me make
8 sure I have the right page.  Okay.  At the very bottom
9 of page 260, it says Ocwen Loan Servicing; do you see
10 that?
11 A.   Yes, I do.
12 Q.   And on page 261 is the remainder of that entry
13 for Ocwen Loan Servicing, right?
14 A.   Yes.
15 Q.   And you'll see that it says consumer disputes,
16 reinvestigation in process; do you see that?
17 A.   Yes.
18 Q.   And underneath that is another box that says
19 Ocwen Loan Servicing, right?
20 A.   Yes.
21 Q.   And under that it says consumer disputes,
22 reinvestigation in process, right?
23 A.   Yes.
24 Q.   So is it fair to say that as of April 24th, 2014,

Page 59

1 Equifax was aware that these two Ocwen accounts were
2 disputed?
3 A.   I'm sure they were.  It also states on there the
4 foreclosure process started on that same line.
5 Q.   And going off of this document that we're looking
6 at now, page 260 and 261 where it says consumer
7 disputes, reinvestigation in progress, in process, and
8 this document is dated April 24th, 2014 --
9 A.   What page are you on?
10 Q.   This is page 260 to 261, the pages that we were
11 just looking at.
12 A.   Okay.
13 Q.   And the two Ocwen accounts, they say consumer
14 disputes, reinvestigation in process, right?
15 A.   Yes.
16 Q.   And this document is dated April 24th, 2014,
17 right?
18 A.   Yes.
19 Q.   And this is an Equifax document, right?
20 A.   I'm told it is.
21 Q.   Well, it was produced by Equifax in this case,
22 right?
23 A.   Okay.
24 Q.   So is it fair to say that as of April 24th, 2014,

Page 60

1 Equifax was aware and knew that these Ocwen accounts
2 were disputed because that's what they had written here?
3 A.   I would say that's correct.
4 Q.   Okay.
5    Now, I'd like to go to some documents that you
6 provided and this is the Quicken letter.  I'd like to
7 ask you a few questions about when you had applied for
8 credit with some of these lending institutions.  And so
9 we'll just be looking at all of the documents that you
10 provided in this case.  In the first page of the
11 documents that you provided is letter from Quicken
12 Loans?
13 A.   Yes.
14 Q.   We can mark this as Exhibit 12.
15         *  *  *
16    (Whereupon, Deposition Exhibit No. 12 marked for
17 purposes of identification.)
18         *  *  *
19 BY MR. KENNEY:
20 Q.   And you can just let me know when you're there.
21 A.   Now what page are we looking at?
22 Q.   Well, these actually don't have page numbers at
23 the bottom, but there's a letter from Quicken Loans and
24 it has your name there and address on it says, Dear

Page 61

1 David M. Daugherty and Tina M. Daugherty; do you see
2 that?
3 A.   I have that in front of me.
4 Q.   Okay.
5    Are you familiar with this document?
6 A.   Yes.
7 Q.   And this is a document stating that Quicken Loans
8 is unable to offer you financing at this time, right?
9 A.   That's correct.
10 Q.   Do you recall when you applied for credit from
11 Quicken Loans?
12 A.   It was in the spring of 2014.
13 Q.   Okay.
14    And how many times did you apply for credit with
15 Quicken Loans?
16 A.   That was the first time.
17 Q.   And you applied again, right?
18 A.   Yes.
19 Q.   And when was that, when was the second time?
20 A.   I believe -- let me think here, I believe it was
21 in April of this year.
22 Q.   Okay.
23    So I'm just going to ask you a few questions
24 about the first time that you applied for credit from

16 (Pages 58 - 61)

Page 62

1 Quicken Loans. When you applied, did you apply for this
2 as a joint application with you and your wife or did you
3 apply by yourself?
4 A.    This was over the phone and he took information
5 on my wife and myself.
6 Q.    So would you say that your application to Quicken
7 Loans was a joint application with you and your wife?
8 A.    Yes.
9 Q.    And that would explain why this Quicken Loans
10 letter is addressed to you and your wife; correct?
11 A.    That's correct.
12 Q.    And do you know why you were denied credit from
13 Quicken Loans?
14 A.    I can only tell you what the loan officer on the
15 phone told me. When I explained to him that with my
16 mortgage payments, he told me there was no way they
17 would approve that with that on there.
18 Q.    But you had still applied, right, despite what he
19 told you?
20 A.    I applied over the phone, yes.
21 Q.    And what was the reason for applying despite what
22 he had told you?
23 A.    Well, the reason I applied was because I knew I
24 had this maturity date in July.

Page 63

1 Q.    So do I understand that it was just kind of to
2 give it a shot kind of thing even though he was telling
3 you that?
4 A.    Well, I applied -- during the application of
5 applying, that's when I discussed the situation that I
6 was in. He told me over the phone that it wasn't going
7 to go through because of this and I actually didn't even
8 know it was going to be considered a loan application.
9 I gave him information over the phone, yes.
10 Q.    I see. Do you know --
11 A.    But the conversation --
12 Q.    I'm sorry.
13 A.    But the conversation ended pretty much there that
14 it wasn't going to be approved with what I had on my
15 records.
16 Q.    I'm assuming that you had given him you and your
17 wife's Social Security numbers as part of this process;
18 is that right?
19 A.    That's correct.
20 Q.    Okay.
21       And on this letter, on the second page of this
22 letter on the back, it says your name and it says that
23 we obtained your credit score from TransUnion, right?
24 Do you see that?

Page 64

1 A.    Yes. Yes.
2 Q.    And underneath that it gives you your credit
3 score and it gives you the date and tells you where the
4 scores range and then it gives you key factors which
5 advertently affect your credit score; right?
6 A.    Yes.
7 Q.    And there are four items there; correct?
8 A.    That's correct.
9 Q.    And again, at the top it says we obtained your
10 credit score from TransUnion, right?
11 A.    That's correct.
12 Q.    So is it fair to say that Quicken did not deny
13 your loan on the basis of your Equifax score because
14 they're saying they obtained your credit score from
15 TransUnion; right?
16 A.    That is not what they told me.
17 Q.    What did they tell you?
18 A.    When I discussed it with Quicken Loans on the
19 phone, when I told him up front that I had a problem
20 with my mortgage, before he even goes any further with
21 this application, I wanted to talk to him about what was
22 going on with my mortgage and after I talked about with
23 him, he said it wasn't going to go through with that and
24 I assumed that the application had actually ended at

Page 65

1 that point.
2 Q.    Let's just take a couple of steps back. When you
3 were talking about the trouble with your mortgage, what
4 exactly where you referring to?
5 A.    When I told him I had a lot of things reported in
6 2013 on my mortgage that was incorrect, and showing I
7 was in foreclosure and $6,128 past due, that that was
8 incorrect and I was in the process of trying to have it
9 fixed. And even at that point I had already had -- I
10 don't know if we had filed suit but I had already been
11 well started on that when this was all done.
12 Q.    And so the information that was reported
13 regarding the foreclosure and the amount that was past
14 due, that was appearing on your Equifax credit report;
15 correct?
16 A.    That's correct.
17 Q.    And are you aware that that information,
18 specifically regarding the foreclosure and the amount
19 past due, are you aware if that information was
20 appearing on your TransUnion report?
21 A.    No, I was aware -- I was pretty much aware it was
22 not appearing on my TransUnion report -- but I wasn't
23 aware that he was even going to check it on any of the
24 credit reporting agencies with phone call I had with

17 (Pages 62 - 65)

Page 66

1 him.
2 Q.    Okay.
3       So it was your understanding that the foreclosure
4 and the past due amount was not appearing in your
5 TransUnion report, right?
6 A.    Yes, I understood that to be correct.
7 Q.    Okay.
8       So going back to this letter, it says from
9 Quicken Loans, and the page that says, we obtained your
10 credit score from TransUnion and used it to make our
11 credit decision, right?
12 A.    Yeah, I understand this.
13 Q.    So if Quicken Loans obtained your credit score
14 from TransUnion, they would have no knowledge of what
15 Experian or Equifax reported, right?
16 A.    Well, that's correct. But they told me on the
17 phone -- they never even mentioned TransUnion, like I
18 said, I wasn't even aware they were going to go further
19 than that because the conversation was over with when he
20 told me it wouldn't be approved with that on the record.
21 Q.    Right.
22       And I understand what may have been told to you
23 on the phone, but as far as this particular letter that
24 says we obtained credit score from TransUnion in making

Page 67

1 our credit decision, then as far as what's contained in
2 this letter, what is appearing in your Equifax report is
3 irrelevant to whether or not you were denied credit?
4 A.    Well, that's not true either. According to
5 Consumer Credit Counseling, having a government lien put
6 on you, really drops your credit score dramatically.
7 Q.    Right, I understand that.
8 A.    And that played a major part, even if it was
9 TransUnion.
10 Q.    Right.
11       I understand that, but specifically about the
12 foreclosure and the past due amount, which was not
13 appearing on your TransUnion report?
14 A.    Yes.
15 Q.    So from what's contained in this letter from
16 Quicken, when they obtained your credit score, they had
17 no knowledge of the foreclosure or the past due amount
18 that was appearing in your Equifax report because they
19 had obtained your credit score from TransUnion, right?
20 A.    On paper here, yes, on the phone, no.
21 Q.    Okay.
22       And I understand you had also applied for credit
23 from Visa, a Disney Visa card; is that right?
24 A.    No, actually, that's not true.

Page 68

1 Q.    So you did not apply for credit from Disney Visa
2 platinum credit card?
3 A.    I will guarantee you I didn't, but I will tell
4 you who did.
5 Q.    And who did that?
6 A.    I'm sure my wife. She absolutely goes crazy if
7 anything has Disney on it, I'm sure she did. And I hate
8 Disney World and there's no way I would have a Disney
9 platinum card.
10 Q.    Oh, I understand you there.
11       So you were not aware that you had -- so what
12 you're saying is that you did not apply for credit from
13 --
14 A.    No, it wasn't me. Evidently she forgot because
15 it was not me.
16 Q.    Okay. Okay.
17       And because you did not apply for this, I'm
18 assuming you don't know whether the application for this
19 credit card was a joint application or a separate
20 application?
21 A.    I saw the -- I'm the one that gets the mail every
22 day and, yeah, I did see the rejection notice from the
23 Visa card company.
24 Q.    Right.

Page 69

1       But do you know whether your wife had applied for
2 this card under both of your names or just under your
3 name?
4 A.    I can't remember. I don't have that paper in
5 front of me right this minute. I don't know if she did
6 it on her own or in both of our names.
7 Q.    Okay. All right.
8       There is another document from -- let's see,
9 okay. So other than this Disney Visa platinum credit
10 card and this Quicken Loans, were you denied credit from
11 many other entities?
12 A.    Yes.
13 Q.    And who are those entities?
14 A.    Actually, early on I was denied credit with Big
15 Sandy Furniture Store in Parkersburg.
16 Q.    Other than that?
17 A.    As far as mortgage companies, and actually, a few
18 minutes ago I saw the one, it was actually the very
19 first company, it was Embrace Loans, mortgage loans,
20 they were the first ones that I applied with and I also
21 applied with -- let me think here, back in February of
22 this year with One Community Federal Credit Union that I
23 was denied and the loan officer came out and actually
24 told me that the decision by the two guys that makes the

18 (Pages 66 - 69)

Page 70

1 decisions on the loans had actually said if it wasn't
2 for the late, 120 days late, for all those months in
3 2013 and also the foreclosure and this situation being a
4 court case, they said they would have given me the loan.
5 Q.    Okay.
6       So there's a furniture -- was that just financing
7 from the furniture store?
8 A.    Yes.
9 Q.    Okay.
10       And Embrace, right?
11 A.    Yes. Embrace was the very first mortgage company
12 I tried to obtain a refinancing loan and I think Quicken
13 was the second.
14 Q.    Okay.
15       So I have the furniture store, Embrace, One
16 Community and Quicken and this Disney card; were there
17 any others?
18 A.    There might have been, I can't remember. There
19 were several.
20 Q.    Well, let me ask you about the Embrace, do you
21 recall when you applied for that loan?
22 A.    Well, actually, I didn't. I thought it was
23 around October but I think the paperwork I saw a few
24 minutes ago had like around in June or July of 2013.

Page 71

1 And they were showing I was actually currently late,
2 that's when I found out that I was showing currently 120
3 days late that particular month that I actually applied,
4 on my mortgage.
5 Q.    Okay.
6       So you're saying June or July of 2013 for
7 Embrace?
8 A.    Correct.
9 Q.    Okay.
10       And how about the furniture store?
11 A.    I think that was in or around January of 2014.
12 Q.    And what were the circumstances there; were you
13 trying to purchase furniture?
14 A.    I was having some back problems and my bed needed
15 to be replaced and I thought I would try to get another
16 mattress, but I sort of found out quickly that I
17 couldn't get a loan to get a hot dog.
18 Q.    Okay. So that was January 2014.
19       And do you have any documents from the furniture
20 store that denied you credit or were you just told that
21 by the associates there at the furniture store?
22 A.    She had told me that, but I think they did send
23 me a letter later on in the mail.
24 Q.    And do you have that letter available to you?

Page 72

1 A.    I don't think I do.
2 Q.    Okay.
3       So the One Community, do you recall when you
4 applied for credit with them?
5 A.    Did you say who?
6 Q.    One Community, the federal credit union.
7 A.    Yes.
8 Q.    When did you apply for credit with them?
9 A.    I believe it was February of this year.
10 Q.    And do you recall if you applied in your own name
11 or if you applied in both you and your wife's name?
12 A.    Just my name.
13 Q.    Okay.
14       And the Embrace loan, do you recall if you
15 applied for that in just your name or whether a joint
16 application of you and your wife?
17 A.    I assume it was just in my name. I can't be
18 positive, I assume, I usually did everything myself.
19 Q.    Okay.
20       So other than being denied credit from certain
21 lending institutions, did your credit report affect you
22 adversely for anything else?
23 A.    Absolutely.
24 Q.    And what was that?

Page 73

1 A.    My insurance, it lists all the complications from
2 the liens on my credit report; that raised all my
3 insurances from my auto to my homeowner's insurance.
4 Q.    Okay.
5       Anything else?
6 A.    As far as monetary, that's probably it.
7 Q.    Okay.
8       So I would like to go back to the -- I apologize.
9 Let me straight that.
10       So I'd like to go back to when we were talking
11 about your relationship with Aggressive Credit Repair.
12 A.    Okay.
13 Q.    And there are some documents that were produced
14 by Aggressive Credit Repair that contain correspondence
15 between you and Loren Hanks. And this begins on page 43
16 through 74 of the ACR docs.
17 A.    Okay. I have them.
18 Q.    All right.
19       And I'd like to mark this as an exhibit as well.
20                    * * *
21       (Whereupon, Deposition Exhibit No. 13 marked for
22 purposes of identification.)
23                    * * *
24 BY MR. KENNEY:

19 (Pages 70 - 73)

Page 74

1 Q.    And if you could, just turn to page 45. And this
2 appears to be correspondence from Loren Hanks to you
3 dated April 17th: do you see that?
4 A.    I'm looking. Yes, I see this.
5 Q.    Okay.
6       And here Loren is telling you, it says as
7 discussed, I see nothing that shows you late on Ocwen in
8 2013; do you see that?
9 A.    Yes, I see that.
10 Q.    Okay.
11       So this is Loren telling you that as of April
12 17th, 2014, he sees nothing that shows you late on Ocwen
13 in 2013, right?
14 A.    Yes.
15 Q.    And it also states -- it also states below the
16 screenshot in the last response we got from Equifax,
17 below you can see the account is current. The last late
18 payments were March 2012; do you see that?
19 A.    I see that on this particular, yes.
20 Q.    And underneath that, he says you can see that
21 Experian not even reporting on this account; do you see
22 that?
23 A.    Yes, I see that.
24 Q.    Is there anything to suggest that he was wrong in

Page 75

1 what he's saying in this email?
2 A.    Well, actually, at one point, and I can't
3 remember if this is the one, but I had to correct him.
4 He didn't see the second Ocwen report. He didn't see
5 that it was listed twice for the same account number and
6 I'm not sure if this is the one that had them both or
7 not. And there was a time that we were discussing this
8 and I had to make him aware that it was reported twice.
9 And he didn't even see it either. And I told him that's
10 what I've been complaining about, disputing. And that's
11 what kept showing up when loan companies were checking
12 out the credit.
13 Q.    Okay.
14       So with regard to this particular -- and I
15 understand when you're saying that the Ocwen account was
16 appearing twice, but with regard to this particular
17 account that he was referring to, this particular time
18 that Ocwen is appearing, is there anything to suggest
19 that he's wrong in saying that there's nothing that
20 shows you late from Ocwen in 2013?
21 A.    Not on this particular page but I'm not sure if
22 this is the one -- I mean I'm not sure if this is the
23 same conversation that we were having where he didn't
24 understand it was reported twice.

Page 76

1 Q.    Right.
2       So we have one account that was reporting saying
3 that there was a foreclosure and a past due amount?
4 A.    Correct.
5 Q.    There's another account that he is referring to
6 in this, you know, here, where he's saying that he sees
7 nothing showing you late with Ocwen in 2013, below you
8 can see the account is current, the last late payment
9 was March 2012 and you can see Experian is not reporting
10 on this account, right?
11 A.    That's correct.
12 Q.    So but that account, I'm not talking about the
13 one that says the foreclosure, but for this other
14 account, is there anything to suggest that Mr. Hanks was
15 incorrect in his assessment here?
16 A.    On this particular page, no, I don't see anything
17 that's incorrect.
18 Q.    Okay.
19       And if you turn to page 47, this is
20 correspondence dated March 28th, 2014. And this is from
21 Loren to you as well, right?
22 A.    Yes, I believe.
23 Q.    And referring to the Equifax report, it states
24 Ocwen does not show you past due; do you see that?

Page 77

1 A.    Yes.
2 Q.    And it says it still reports you late but you can
3 see a note disputing it, right?
4 A.    Yes.
5 Q.    And also you see the note disputing it.
6       Is there anything to suggest that he was
7 incorrect in his assessment here?
8 A.    No, not that I can tell.
9 Q.    Okay.
10       So from what we've seen in the -- well, let's
11 turn back to the CreditScore.com report, and from what
12 we've discussed through looking through -- and from the
13 email from Loren Hanks, we've discussed that Experian
14 was not reporting on your Ocwen account, right?
15 A.    That's what I understand, yes.
16 Q.    Okay.
17       And if we go to page 38 on the CreditScore.com
18 report, it gives you your three credit scores, right?
19 A.    Yes.
20 Q.    And this is the report as of April 17, 2014,
21 right?
22 A.    That's correct.
23 Q.    So the Experian score is actually lower than the
24 Equifax and TransUnion scores; do you see that?

20 (Pages 74 - 77)

Page 78

1   A.    Yes, I do.
2   Q.    And we talked earlier about how Experian was not
3   reporting at all on Ocwen and so given that the Experian
4   and TransUnion were actually higher -- I'm sorry, given
5   that the Equifax and TransUnion were actually higher
6   than Experian, is it fair to say that the Ocwen account
7   didn't have much impact on your credit score here?
8   A.    It absolutely did have impact on my credit score.
9   Q.    And why do you say that?
10  A.    Because if it wasn't for all of that, I never
11  would've had the tax liens put on me which really
12  dramatically dropped my credit scores.
13  Q.    Okay.
14        So we can go back to that. I understand that you
15  have the tax liens and that you wanted to refinance your
16  home so that you could use part of that to pay off the
17  tax lien, right?
18  A.    Absolutely.
19  Q.    And you're claiming that you were unable --
20  A.    I want to rephrase that.
21  Q.    Sure.
22  A.    There never would've been a tax lien if the
23  financing would have gone through. It would've never
24  have come to the tax lien and it never would've tanked

Page 79

1   my credit scores on all three credit-reporting
2   companies.
3   Q.    So how did the tax lien come about again?
4   A.    My wife cashed in a 401(k). When she retired,
5   she had two 401(k) plans. With my medical bills and
6   different things, she cashed one in, in 2012 for the
7   year 2012, it ended up we owed like $11,000 or $12,000
8   in state tax from her cashing that 401(k) in. We also
9   owed one for the federal government and I knew I was
10  going to have to refinance the house. I was going to
11  take out enough to pay the tax situations off. But
12  since the loans didn't go through because of this on my
13  credit report, I couldn't get the loan. I couldn't pay
14  the taxes at the time. The state wouldn't cooperate as
15  far as me making payments and they put a tax lien on me
16  and I really didn't give it any -- even with the tax
17  lien on there, I thought it would all work out and I
18  could still go pay the lien off and be no problems and
19  move on. But, yes, all of this made a major implication
20  with my credit scores being low.
21  Q.    Okay.
22        So I understand that the lien -- so is it fair to
23  say that the lien occurred because you were not able to
24  pay off the tax liabilities, but is it fair to say that

Page 80

1   the tax liabilities arose completely independent by
2   anything that Ocwen may have reported?
3   A.    Well, if --
4   Q.    I'll rephrase that.
5   A.    Okay.
6   Q.    Is it fair to say that Ocwen had nothing to do
7   with the origination of the tax liabilities themselves?
8   A.    Actually, no, that's not fair to say.
9   Q.    And why is that?
10  A.    If they wouldn't have reported that, there never
11  would have been a tax lien. It would have been paid off
12  in a timely manner.
13  Q.    So let me go back.
14        So when I say tax liability, I mean, the tax
15  liability was created when your wife cashed in a 401(k);
16  right?
17  A.    Absolutely.
18  Q.    Okay.
19        But you would agree that Ocwen had nothing to do
20  with cashing in a 401(k), right?
21  A.    That's true.
22  Q.    So when the tax liability, meaning the money that
23  you owe, when that was created. Ocwen had no part in
24  causing that creation, right?

Page 81

1   A.    They didn't create it, no.
2   Q.    Okay. And that's all that I was asking.
3         So I understand that what you're saying is
4   because you were unable to get refinancing, you were
5   unable to pay off that tax liability which resulted in a
6   tax lien, right?
7   A.    That's correct.
8   Q.    Okay.
9         So if we look at the Experian score, which we've
10  already talked about not reporting the Ocwen account, so
11  in the Experian, the realm of the Experian report, there
12  was nothing in there regarding the Ocwen account, right?
13  A.    That's correct.
14  Q.    Yet the Experian score itself is lower than the
15  Equifax and TransUnion scores, right?
16  A.    That's correct. And it's right back there with
17  the tax liens.
18  Q.    So you would agree that if not for the tax lien
19  -- I'm sorry. Would you say that if not for the tax
20  liens then your credit scores would have been higher?
21  A.    Absolutely. And that's according to Consumer
22  Credit Counseling; they're saying that's a major
23  infraction of having a government tax lien on you.
24  Q.    Sure. I understand. I'm just trying to make

21 (Pages 78 - 81)

Page 82

1 sure I'm getting -- that I understand this right.
2     So what you're saying is -- so is it fair to say
3 that the Experian score was low because of the tax lien,
4 but not because of the Ocwen account that was saying a
5 foreclosure and amounts due, right?
6 A.   That was just something that was caused by not
7 being able to get the loan itself, not directly from
8 Ocwen because I had a tax liability; it was just because
9 of the records themselves not being correct.
10 Q.   Right. I understand what you're saying, I
11 understand it's your position that the tax lien was
12 caused by the inability to get credit, but what I'm
13 asking is, is it fair to say that this Experian score
14 was low because of the tax lien but not because of what
15 was being reported to it by Ocwen because Ocwen didn't
16 report it at all?
17 A.   Yes, that's fair to say.
18 Q.   Okay. All right.
19     And do you know if Ocwen stopped reporting the --
20 I'm sorry. Do you know when Equifax stopped reporting
21 Ocwen information?
22 A.   Repeat that.
23 Q.   Do you know when your Equifax report stopped
24 showing the Ocwen account?

Page 83

1 A.   They've never stopped showing the Ocwen account.
2 Q.   So do you think that the Ocwen account is
3 appearing on your Equifax report right now?
4 A.   Well, it is, but not in a negative way as far as
5 I know.
6 Q.   Okay.
7     I'd like to go back to Exhibit 10, which is the
8 --
9 A.   Now, I'm going to ask you a question with that.
10 Ocwen is not reporting anything month-to-month right now
11 on me if that's what you're asking?
12 Q.   Right. That is what I'm asking you.
13 A.   Okay. I misunderstood what you were asking. No,
14 they're not reporting anything on me month-to-month
15 right now until this issue is resolved from what I
16 understand, from what I've seen.
17 Q.   Okay.
18     And do you know when they quit reporting
19 month-to-month?
20 A.   I can't remember what month. It was after Mr.
21 Nolan had made contact with Ocwen's attorneys, whether
22 that was you or someone else.
23 Q.   Okay.
24 A.   That was supposedly an arrangement that was made.

Page 84

1 Q.   I'd like to still go back to the Aggressive
2 Credit Repair documents, Exhibit 10, and turn to page 75
3 of Exhibit 10.
4 A.   I'm on there.
5 Q.   And you can see this is a response from Equifax
6 dated September 23rd, 2014; is that right?
7 A.   Yes.
8 Q.   And under where it says results of our
9 investigation there on page 75, as we have reviewed your
10 concerns and our conclusions are; do you see that?
11 A.   Yes.
12 Q.   And then underneath that it says, please be
13 advised that the following accounts are not reporting on
14 your Equifax credit file?
15 A.   Okay.
16 Q.   And among those accounts, Ocwen is listed twice
17 with that same loan number; do you see that?
18 A.   Yes, I do see them twice.
19 Q.   So is it fair to say that as of September 23rd,
20 2014, the Ocwen was no longer reporting to Equifax?
21 A.   That's correct.
22 Q.   Okay.
23     MR. NOLAN: Jon, do you mind if we take a
24 break for a minute?

Page 85

1     MR. KENNEY: I probably just have about
2 ten minutes left. I'm happy to take a break, but --
3     MR. NOLAN: Okay. We can stick it out.
4 We'll stay here.
5 BY MR. KENNEY:
6 Q.   Okay.
7     Mr. Daugherty, I'm just going to ask you a few
8 questions about how you personally have been impacted as
9 a result of the problems you've had with refinancing.
10 A.   Okay.
11 Q.   And I understand that you have become stressed
12 through trying to refinance; is that right?
13 A.   I guess I'd say -- I usually keep things to
14 myself most of the time. I would say this has been a
15 very difficult time period for me.
16 Q.   And when you say that you've been stressed, is
17 there anything in particular that you've noticed has
18 changed about you, you know, in the last two years or
19 so?
20 A.   Well, I tend to worry more about things. I tend
21 to worry about making sure everything is paid on time,
22 how it affects your records and I'm probably a little
23 snappy around the house as far as shutting down on funds
24 on things I don't think we need. I try to have

22 (Pages 82 - 85)

Page 86

1 everything in order to obtain a mortgage financing.
2 Q.    Sure.
3 A.    So I'm sure it's been a little more hectic around
4 my house and throughout all of this it's been, you know,
5 quite discouraging to go through all this to where you
6 know, you can't get financing to try to go through and
7 get something, you know. I just wanted this fixed.
8 Q.    Right. I understand.
9 A.    And it's just fallen on deaf ears and no one
10 would assist and to go through all of these motions to
11 try to have something fixed is quite frustrating. And I
12 usually do this myself because usually if I involved my
13 wife on something, I never get any sleep.
14 Q.    Right, I understand.
15 A.    You know, this has gone on, you know, forever it
16 seems like, you know, I kind of got some relief here
17 just in the past month or so where I am able to get
18 credit now since this was taken off my record, but, you
19 know, just everyday life has completely changed with not
20 knowing whether or not we're going to lose our house
21 that we've had all these years and where I planned to
22 stay.
23 Q.    What do you mean by life has completely changed?
24 A.    Well, when you don't know -- here's a good

Page 87

1 example. There's a lot of things I like to do around
2 the house as far as I've been working on fixing it up
3 and different things and I've stopped doing that, why
4 should I fix it up if I may lose it? So things were put
5 on hold as far as landscaping and different things I
6 normally do because I don't know if I'm going to own
7 this house when this is all said and done. It's things
8 like that that you worry about. You know, I'm not going
9 to invest a lot of money adding to it and things that I
10 want to the house without knowing it's going to be mine.
11 Q.    Right.
12     And I understand you had said, did you say that
13 you had trouble sleeping?
14 A.    No. I said if I actually talk about this much to
15 my wife, I'd have trouble sleeping.
16 Q.    Oh, I see.
17 A.    Because she wouldn't be letting me sleep.
18 Because things like this would bother her a lot more
19 than it does me and it bothers me bad enough, but if
20 she's involved with things like this, it would be a
21 never-ending conversation 24 hours a day.
22 Q.    Right. I understand.
23     And do you recall about when this, you know, when
24 this started, when you started feeling, you know, more

Page 88

1 stressed out than normal?
2 A.    About the first time or the second time I was
3 turned down on the mortgage to where I was actually
4 looking at -- the timeframe was really starting to make
5 me sweat whether I was going to be able to get it done
6 by July of last year, July 26th.
7 Q.    Right.
8     I know you had mentioned that this -- the
9 financial difficulty that you experienced, you were
10 saying that it was caused for various reasons and you
11 said that it started about six years ago; is that right?
12 A.    Yes, that's correct.
13 Q.    Is it fair to say that as you started feeling,
14 you know, more stressed out than normal when that all
15 started about six years ago?
16 A.    No, I wouldn't say that. It was mainly after I
17 -- after I had really been concentrating -- and you can
18 look at my credit reports where my credit -- where all
19 my accounts were paid on time and to see this isn't
20 going, you know. I met the qualifications as far as
21 obtaining a loan, as far as not being late and
22 everything being paid off and still -- I was still
23 having problems with it until just recently when I was
24 conditionally approved on a three-and-a-half percent

Page 89

1 loan from Quicken.
2 Q.    Right. Okay.
3     As far as the Ocwen account, is there anything
4 that -- well, let me scratch that question.
5     You're not claiming any physical harm as a result
6 of --
7 A.    No.
8 Q.    Okay.
9     And are you under the care of a doctor or a
10 psychiatrist for this case?
11 A.    No.
12 Q.    Okay.
13     And do you have any other testimony today to
14 support your claims other than what you have already
15 told me?
16 A.    No, I don't.
17 Q.    Okay.
18     I think those are all the questions that I have
19 for you. I really do appreciate your time.
20 A.    Okay. Thank you.
21     MR. NOLAN: I have just two quick
22 follow-ups on Exhibit No. 9.
23 CROSS EXAMINATION BY MR. NOLAN:
24 Q.    First, I want to look at document number 38,

23 (Pages 86 - 89)