## PLAINTIFF'S RULE 26(a)(2) EXPERT WITNESS REPORT

I, Evan Hendricks, provide the following Expert Report pursuant to Federal Rules of Civil Procedure 26(a)(2) in connection with the action entitled ***David M. Daugherty v. Equifax Information Services, Ocwen Loan Servicing, et al.,***: U.S. District Court for the District of West Virginia (Beckley Div.); No.: 5:14-cv-24506.

At the time of the issuance of this report, the Plaintiff David M. Daugherty ("Plaintiff") is not in possession of sufficient information and documentation to provide me so I can fully and completely evaluate the adequacy or reasonableness of Defendant Equifax's procedures for ensuring accuracy or its reinvestigations of Plaintiff's disputes, or the adequacy or reasonableness of Defendant Ocwen's investigation of Plaintiff's disputes.

For example, in order to conduct a full and complete analysis of Ocwen's investigation, the Plaintiff needs to provide me with Ocwen's policies, practices and procedures. Moreover, Plaintiff must provide me with the specific details of Ocwen's actual actions during the investigation. Such detail includes who reviewed Plaintiff's dispute package (letter and supporting documentation), what information (i.e. records, computer systems, individuals) did Ocwen examine and/or rely on in its investigation, who or what determined whether Plaintiff's dispute had merit, and who or what determined whether Plaintiff's dispute should or should not alter Ocwen's reporting or whether it should be notated "disputed by consumer" with the proper code from "Metro 2," the industry standard. It is my understanding that Ocwen is obligated to disclose this information to Plaintiff in discovery, but has not fully done so.

Once Plaintiff's obtains and provides me the above noted information and documentation from the Defendants I will supplement this report.

That said, based upon my specialized knowledge and the information about Plaintiff's case that thus far is available, I have concluded that Defendant Equifax's procedures for ensuring accuracy were not adequate, and its reinvestigation of Plaintiff's dispute was not adequate to determine if the disputed information was accurate. Moreover, I have concluded that Ocwen's investigations of Plaintiff's disputes were not adequate or reasonable.

### Ocwen

In March of 2013, Plaintiff disputed directly to Ocwen that he $6,128 past due on his mortgage. [DD/OLS 000576]

Ocwen's records supported Plaintiff's dispute, as they showed that he was not delinquent on his payments.  [DD/OLS 000228-231].

But went Plaintiff's disputes of the accuracy and completeness of the Ocwen account went to Equifax, and Equifax forwarded the disputes to Ocwen, Ocwen failed to

(1) Report to Equifax that Plaintiff's account was notated as "disputed by consumer" with the proper code from "Metro 2;"

1

(2) Discover that it was furnishing not one, but two accounts with the same account number; and

(3) Discover that it was furnishing one of the two accounts as $6,128 past due with "Foreclosure proceedings started," but with the other account, again with the same account number; as a current account with no past due amount owed. (See for instance, EIS-Daugherty 000060-63, and EIS-Daugherty 000089 & 000095.)

That Ocwen's response to Plaintiff's disputes via Equifax failed to discover or notate "(1)-(3)" above underscores the inadequacy of Ocwen's so-called "investigation," which, in my opinion, did not constitute an investigation at all, as an investigation is defined as "[a] detailed inquiry or systematic examination." (American Heritage Dictionary 920 [4th ed.2000]); see Webster's Third New Int'l Dictionary 1189 (1981) (defining "investigation" as "a searching inquiry"). Thus, the plain meaning of "investigation" clearly requires some degree of careful inquiry by creditors, which Ocwen did not demonstrate or conduct.

Further discovery is needed to determine why Ocwen's response to Plaintiff's dispute was so inadequate, and if Ocwen's failures were the foreseeable result of Ocwen's policies, practices or procedures ("PPPs"), and/or its disregard of the foreseeable causes of inadequate responses to consumer disputes.

### Equifax

Equifax is supposed to follow reasonable procedures for ensuring the maximum possible accuracy of consumer credit report data.

However, Equifax repeated included in Plaintiff's file:

(1) Not one, but two accounts with the same account number; and

(2) One of those two accounts was $6,128 past due with "Foreclosure proceedings started," but the other account, again with the same account number; was current account with no past due amount owed. (See for instance, EIS-Daugherty 000060-63, and EIS-Daugherty 000089 & 000095.)

This demonstrated that there were serious defects in Equifax's procedures, as they should have detected and prevented the type of reporting described above in "(1) & (2)."

Further discovery is needed to determine why Equifax failed to detect and prevent such conflicting data, and if Equifax's failures were the foreseeable result of Equifax's policies, practices or procedures ("PPPs"), and/or its disregard of the foreseeable causes of conflicting tradeline data – for example, including in the file of a consumer like Plaintiff any information furnished by a paying customer like Ocwen without subjecting that information to reasonable procedures to assure accuracy.

2

Moreover, when Plaintiff disputed the contradictory Ocwen tradelines with Equifax's so-called "reinvestigations" failed to detect and delete the conflicting data, or alternatively, determine whether closer examination of the conflicting data was necessary.

Further discovery is needed to determine why Equifax's response to Plaintiff's dispute was so inadequate, and whether Equifax's failures were the foreseeable result of Equifax's policies, practices or procedures ("PPPs"), and/or its disregard of the foreseeable causes of inadequate responses to consumer disputes.

## Relevant Standards, History & Context

Importantly, the following sections on relevant standards and the Johnson v. MBNA case are not included to express legal opinions or conclusions. Rather, they are included to demonstrate that Ocwen was on notice of important standards that it at least should take into account, and not disregard, when responding to consumers' disputes of data furnished to CRAs by Ocwen.

To understand why Ocwen's actions in Plaintiff's case reflected serious disregard for well-known, long-standing standards of accuracy, it is helpful to review the some of the most relevant applicable standards. Here is the Section listing the FCRA (§ 1681s-2(b)) requirements for creditors like Ocwen, known as "Furnishers" of credit report information:

(b) Duties of Furnishers of Information upon Notice of Dispute

(1) *In general.* After receiving notice pursuant to section 611(a)(2) [§ 1681i] of a dispute with regard to the completeness or accuracy of any information provided by a person to a consumer reporting agency, the person shall

*(A) conduct an investigation with respect to the disputed information; [Emphasis added]*

(B) review all relevant information provided by the consumer reporting agency pursuant to section 611(a)(2) [§ 1681i];

(C) report the results of the investigation to the consumer reporting agency;

(D) if the investigation finds that the information is incomplete or inaccurate, report those results to all other consumer reporting agencies to which the person furnished the information and that compile and maintain files on consumers on a nationwide basis; and

(E) if an item of information disputed by a consumer is found to be inaccurate or incomplete or cannot be verified after any reinvestigation under paragraph (1), for purposes of reporting to a consumer reporting agency only, as appropriate, based on the results of the reinvestigation promptly–

(i) modify that item of information;

3

(ii) delete that item of information; or
(iii) permanently block the reporting of that item of information.

*[End of Excerpt from FCRA]*

### Setting The Standard: Fourth Circuit, <u>Johnson vs. MBNA</u>

In 2004, the U.S. Court of Appeals for the Fourth Circuit made it clear to creditors that upon receiving a consumer's dispute from a CRA, they needed to conduct a *reasonable* investigation, and that MBNA's violated this standard because it merely engaged in a cursory review of the consumer's file and comparison of identifying and account data. (357 F.3d 426, 429-31 *(4th Cir. 2004).*

In Plaintiff's case, Ocwen astonishingly engaged in the same superficial reviews as MBNA, underscoring Ocwen's disregard for relevant standards of what constitutes a reasonable investigation under the FCRA.

At the heart of both MBNA's inadequate response in <u>Johnson</u>, and Ocwen's response to Plaintiff, was the "ACDV Exchange." Under this system, when a CRA receives a consumer's dispute, it electronically sends an "Automated Consumer Dispute Verification" form (ACDV) to the creditor/furnisher, like MBNA and Ocwen.

Here's why the Fourth Circuit found MBNA's response problematic:

> "MBNA argues that the language of § 1681s-2(b)(1)(A), requiring furnishers of credit information to 'conduct an investigation' regarding disputed information, imposes only a minimal duty on creditors to briefly review their records to determine whether the disputed information is correct," the panel wrote, in an opinion authored by Chief Judge William W. Wilkens. "Stated differently, MBNA contends that this provision does not contain any qualitative component that would allow courts or juries to assess whether the creditor's investigation was reasonable."

> "The key term at issue here, 'investigation,' is defined [by the dictionary] as 'a detailed inquiry or systematic examination.' Thus, the plain meaning of 'investigation' clearly requires some degree of careful inquiry by creditors," he wrote.

> Further, he said, the statute "uses the term 'investigation' in the context of articulating a creditor's duties in the consumer dispute process outlined by the FCRA. *It would make little sense to conclude that, in creating a system intended to give consumers a means to dispute – and, ultimately, correct – inaccurate information on their credit reports, Congress used the term 'investigation' to include superficial, unreasonable inquiries by creditors.* We therefore hold that § 1681s-2(b)(1) requires creditors, after

4

receiving notice of a consumer dispute from a credit reporting agency, to conduct a reasonable investigation of their records to determine whether the disputed information can be verified." *[Emphasis added.]*

MBNA also tried to argue that its investigation in Johnson's case was reasonable.  But the court pointed to the specific nature of Johnson's dispute, and the testimony of MBNA agents that their investigation was primarily limited to (1) confirming that the name and address listed on the ACDVs were the same as the name and address contained in the Customer Information System, and (2) noting that the CIS contained a code indicating that Johnson was the sole responsible party on the account.

"The MBNA agents also testified that, in investigating consumer disputes generally, *they do not look beyond the information contained in the CIS and never consult underlying documents such as account applications. Based on this evidence, a jury could reasonably conclude that MBNA acted unreasonably in failing to verify the accuracy of the information contained in the CIS,*" Judge Wilkens wrote.  *[Emphasis added.]*

### Ocwen Did Nothing More Than 'ACDV Exchange'

Discovery will confirm that in Plaintiff's case Ocwen did nothing more than engage in the superficial, discredited "ACDV-exchange," reflecting its disregard of the history and context that clearly put it on notice that this did not constitute a reasonable investigation for a dispute like Plaintiff's. (For additional details on the history and context putting Ocwen on notice, see below).

For example, Ocwen's operation of the ACDV-exchange disregarded a crucial aspect of Plaintiff's dispute, namely that he wasn't past due $6,128 on his account and that he had only one account.

In my opinion, this shows that Ocwen, like MBNA in the <u>Johnson</u> case, at best merely did a cursory review of Plaintiff's file and some rudimentary data comparison.  It also shows that Ocwen response did not amount to an "investigation" because it lacked the necessary fundamental investigative steps, like checking its own payment-history records, or simply picking up the phone and talking to Plaintiff (again, a common investigative step).

In essence, what Ocwen did in Plaintiff's case, was that upon receiving the ACDV from the CRA, it effectively told the CRA, "Yeah, this is what we reported before, so keep it on there." Thus, Ocwen "parrots" back to the CRA the data it previously furnished, and the CRA "parrots" that result back to the consumer.

### Damage to Plaintiff's Credit

The derogatory Ocwen tradeline on Plaintiff's credit reports was very damaging. This was because it showed incorrectly that Plaintiff was $6,128 past due on his account. When this happens, it typically means that a creditor will not extend credit to applicants until they "resolve" the outstanding debt. A consumer sometimes can "resolve" it by disputing it and removing it from his credit report. However, given the difficulty that this can entail, it is often easier and faster to resolve it by paying it. But Plaintiff justly refused to do this.

Thus, as soon as the damaging, inaccurate Ocwen tradeline was removed from Plaintiff's Equifax file, Plaintiff has been able to move forward on his home loan application with Quicken Loans.

### Context

Context is extremely important in this type of case, in part because credit reporting, along with inaccuracies stemming from furnisher mistakes, mixed files or misinterpretation of public records, is a long-standing and well-known problem. An important role of experts in FCRA cases is to help the trier of fact understand the relevant context.[1] Accordingly, I provide a brief history. An important theme emerging from this history is that consumer reporting agencies (CRAs) like Equifax were consistently provided notice in one form or another of the importance of ensuring the accuracy of information it reports and promptly restoring accuracy when the consumer disputes inaccuracies. This history also notified Equifax of the potential damage to consumers of reporting erroneous information and failing to correct it.

### Operation Busy Signal

Prior to any of these trials at which I testified, Equifax had stood out for its non-responsiveness to consumer disputes. In the 1996 amendments to the FCRA, Congress required the "Big Three' CRAs, including Equifax, to provide toll free numbers that consumers could call to dispute errors on their credit reports. The Amendments also required them to have adequate staff to assist consumers. Just a few years after the effective date, however, the FTC's "Operation Busy Signal" investigation found that Equifax, as well as Experian and Trans Union, had again failed to be adequately responsive to consumer disputes because they were not doing a good enough job answering the phones. In January 2000, the FTC imposed a combined $2.5 million in civil penalties on the three CRAs for failing to comply with these new customer service duties. In addition to the fines, the CRAs were enjoined from further violations. (www.ftc.gov/opa/2000/01/busysignal.shtm)

---

[1] Kirkpatrick v. Equifax, U.S. District Court for District of Oregon, (Slip. Op. CV-02-1197-MO; In rejecting Defendant Equifax's motion to exclude Mr. Hendricks' testimony, Judge Michael W. Mosman, ruling from the bench, stated: "As a general statement, what I'm allowing and the reason I'm allowing it is testimony that puts the particular actions of the defendant in particular here in context, in the context of the nationwide problem of identity theft, in the context of the congressional reaction to that and other issues in the credit-reporting industry, when he can by virtue of his study and his prior testimony, both in court and to Congress, make comparisons, then that's something that's helpful to the jury." (January 18, 2005; Transcript available upon request.)

But again, Equifax stood out.  In 2003, the FTC brought a second action against Equifax and reached a follow-up consent agreement, singling out Equifax for "blocking and delaying consumers' dispute calls" in violation of the 2000 Consent Decree.  This time the FTC singled out Equifax for a fine of $250,000 to settle the charges.

Plaintiff's case underscores how on the issue of responsiveness, Equifax continues to fail to make obviously needed changes to be sufficiently responsive to consumers' disputes and to avoid inflicting foreseeable damage on consumers.  It also underscores how the jury verdicts mentioned above were not sufficient to prompt such changes.

### History of Significant Inaccuracy Problems

It is essential that the trier of fact understand that there is a long-standing problem of significant inaccuracy rates in credit reporting data. Since 1990, several non-industry studies have concluded that credit report inaccuracy is a problem of significant proportions that can have a major negative impact on the victims of inaccuracy, and that can potentially be detrimental to the credit system as well.[2] This history is covered in Chapter 10 of my book, "Credit Scores and

---

[2] See discussion of credit report errors in "Consumer Reporting Reform Act of 1994," Report of the House Committee on Banking, Finance & Urban Affairs, (Rpt. No. 103-486, 103rd Congress, 2nd Session), "Consumer advocates, state law enforcement officials, and federal regulators all testified that the number of errors in consumer reports was unacceptably high and that the process for reinvestigating consumer disputes was lengthy and inefficient.  The FTC testified that the number of complaints about the credit reporting industry exceeded the number of any other category of complaints in both 1991 and 1992 … "  The committee report also cited several studies, starting with (1) James Williams (CIS), "Credit File Errors, A Report," August 7, 1989 -- A survey of 1,500 consumer reports and found serious error rate of 42% to 47%;  and (2) Consumers Union, "What Are They Saying About Me?  The Results of A Review of 161 Credit Reports From The Three Major Credit Bureaus, April 29, 1991 -- 48% contained "serious errors," defined as meaning those that could, or did, cause the denial of credit, employment or insurance.  [I currently do not have copies of these two studies.]  The committee report also cited the three U.S. PIRG studies listed below, as well as various consent agreements, discussed below, between the three major credit bureaus and/or the FTC and/or State Attorneys General.

U.S. Public Interest Research Group (US PIRG), "Nightmare On Credit Street (Or How The Credit Bureau Ruined My Life): Case Studies Documenting Consumer Complaints and Recommendation For Amending the FCRA," June 12, 1990

U.S. Public Interest Research Group (US PIRG), "Don't Call; Don't Write; We Don't Care." 1991 -- Review of 156 consumer report complaints on file at the FTC revealed that the average duration of complaints against a CRA was 22.5 weeks, or almost 6 months

U.S. Public Interest Research Group (US PIRG), "Public Enemy #1 At The FTC " October 1993, Based upon a Freedom of Information Act request, the 1993 report found that between 1990-93, problems with credit bureaus was the leading cause of complaints to the FTC (30,901, 20.6%). The 1993 PIRG found that 44% of complaints concerned mixed files, and that among those, 64% involved the mixing of data with total strangers.

U.S. Public Interest Research Group (US PIRG), "Mistakes Do Happen: Credit Report Errors Mean Consumers Lose," March 1998

"Credit Reports: How Do Potential Lenders See You?" *ConsumerReports.org*, July 2000.

Credit Reports." As that Chapter notes, in the early 1990s, problems with inaccuracy and "mixed files," CRA non-responsiveness and inadequate reinvestigations became the cause of complaints to the FTC. These and other complaints prompted the FCRA's oversight authorities – the FTC and State Attorneys General – to launch investigations and take enforcement actions.

These actions resulted in a series of separate consent decrees involving Equifax, Experian and Trans Union in which each pledged to do a better job of maintaining accuracy, avoiding mixed files and the reappearance of previously deleted data, being more responsive and conducting adequate reinvestigations.

For example, on June 22, 1992, Equifax signed an "Agreement of Assurances" with 18 State Attorneys General (AGs). In 1994, it signed an "Agreement Containing Consent Order To Cease and Desist" with the FTC.  The first problem identified by the 1992 State AG Agreement was the need to avoid the occurrence or reoccurrence of mixed files. The Agreement defined "Mixed File" as a ***"Consumer Report in which some or all of the information pertains to a person or persons other than the person who is the subject of the Consumer Report."*** The 1994 FTC Consent Order's definition of Mixed File was identical. The Agreement also emphasized the importance of using "full identifying information," defined as "full last and first name; middle initial; full street address; zip code, year of birth; any generational designation; and social security number."

The 1994 FTC Consent Order also emphasized the prevention of mixed files. In highlighting the need for adequate reinvestigations, the Order stated that such reinvestigations shall include…:

---

Consumer Federation of America and National Credit Reporting Association, *Credit Score Accuracy and Implications for Consumers*, December 2002.

Robert Avery, Paul Calem, Glenn Canner, and Raphael Bostic, "An Overview of Consumer Data and Credit Reporting," *Federal Reserve Bulletin*, February 2003.

U.S. Public Interest Research Group (US PIRG), "Mistakes Do Happen: A Look at Credit Report Errors," June 2004

Turner, Michael A., Robin Varghese, and Patrick D. Walker, Policy and Research Council (PERC), "U.S. Consumer Credit Reports: Measuring Accuracy and Dispute Impacts." (2011).

Jill Riepenhoff & Mike Wagner, "Credit Scars: Mixed and marred. When credit-reporting agencies blend your files with others', the financial damage can be devastating;" *Columbus Dispatch*, May 7, 2012. "… About six percent of nearly 21,500 consumers who complained to the FTC during a 30-month period beginning in 2009, and nearly 8 percent of 1,842 who complained to state attorneys general in 2009 and 2010, said their credit reports had been mixed with another person's.  Consumers' files had been merged with those of their mothers, fathers, brothers, sisters, in-laws and neighbors. They were mixed with strangers with the same name, a similar name, a similar Social Security number or no known similarities whatsoever."  www.dispatch.com/content/stories/local/2012/05/07/mixed-and-marred.html

Federal Trade Commission, "Report to Congress Under Section 319 of the Fair and Accurate Credit Transactions Act of 2003." (December 2012)

… Accepting the Consumer's version of the disputed information and correcting or deleting the disputed information, when the Consumer submits to Equifax documentation obtained from the source of the information in dispute which confirms that the disputed information on the Consumer Report was inaccurate or incomplete …

### History: Increased Attention on Role of Furnisher

These Consent Agreements are relevant because (1) they created widespread publicity about the problems of credit report inaccuracy, (2) they articulated (an agreed upon) higher and more specific standard of care to ensure accuracy and fairness, and (3) they formed the foundation for the 1996 Amendments to the FCRA. However, Congress knew that to ensure accuracy, it needed to go beyond the Consent Agreements by placing duties on furnishers to report information accurately.

The April 1994 House Banking Committee Report on the proposed amendments explained why, despite the consent agreements, and subsequent industry guidelines, legislation was necessary: "Moreover, because the industry guidelines are simply voluntary, they are unenforceable and may be changed or revoked at any time. Many of the provisions in the consent agreements expire after a short period of time, are not enforceable by consumers, and do not apply in every state. *Additionally, these agreements do not impose any reinvestigation obligations on furnishers of information or on credit bureaus other than the three largest. Because of these limitations, federal legislation is necessary to improve accuracy-related protections for consumers. Consequently, the bill contains new reinvestigation procedures which are intended to cut down on the number of errors in consumer reports and to reduce the delay in correcting those errors."* [Emphasis Added]

Importantly, the Consent Agreements' language on preventing reinsertion was incorporated and expanded upon in the 1996 Amendments to the FCRA. Under Sect. 1681 (a)(5)(B), information cannot be reinserted unless it is "certified" as complete and accurate by the furnisher. Moreover, a CRA, five business days prior to any reinsertion, must notify the consumer, and also provide the name and address of the furnisher and inform her or her of his right to add a statement.

Despite these Consent Decrees, the problems of mixed files, inadequate reinvestigations and reappearance did not go away. Throughout the early 1990s, Congress held a series of hearings in which numerous consumers and consumer advocates described problems with inaccuracy, mixed files, CRA non-responsiveness, and inadequate reinvestigations. This resulted in the 1996 legislative amendments to the FCRA.

I cite this brief history because it makes clear that for well over 10 years, Equifax was on notice from Congress, the FTC, State AGs, and the public that there were serious shortcomings in their routine practices for producing credit reports, reinvestigating, preventing reappearance of previously deleted data and being responsive to consumers complaining about disputes. Equifax was also on notice that these shortcomings caused damage to consumers. The expectation of Congress, the FTC, State AGs, and the public was that Equifax would improve their procedures

and practices for ensuring accuracy, adequately reinvestigating, preventing reappearance and being more responsive to consumers, in my opinion.

### History: FCRA Litigation Provided Important Notice To Defendant Equifax

I have testified seven times at trials as a Plaintiff's expert witness in FCRA trials in which Equifax was the Defendant. Each case involved allegations of unreasonable procedures and unreasonable reinvestigations. In each case, the jury found for Plaintiff and awarded damages. In three of the most recent cases, juries awarded punitive damages.

Nonetheless, in Plaintiff's case, Equifax failed because exhibited some of the same discredited practices that juries considered in the previous cases.

### Areas of Testimony: General Issues, Context

A. **The Nature and Purpose of Credit Scores**
B. **The Nature and Purpose of Credit Reports**

### Nature & Purpose of Credit Scores

It is possible that the trier of fact is not intimately familiar with either the credit reporting or credit scoring systems. If this is the case, I can provide expert testimony on the nature of both systems, how to read and understand credit reports and how to dispute errors, the parameters of credit scoring, the general impact that derogatory data have on a credit score, the interplay between identify theft, credit scoring and credit reporting, and other related matters.

A credit score is a number that reflects a consumer's creditworthiness at a given point in time. The FICO model credit score, which is used by 75 percent of lenders, is based entirely on information in a consumer's credit report. The model was developed by Fair, Isaac & Co., which licenses it to Equifax, Experian and Trans Union and others. The scoring range for the FICO "classic" model is 300-850. The various types of "Beacon" scores sold by Equifax, and "Classic FICOs" sold by Trans Union and Experian, are based upon the FICO model. The higher the credit score, the less risky the consumer is viewed by creditors. Consequently, consumers with higher-end credit scores (720 and above) often can obtain the most favorable rates for mortgages, refinancing, personal and auto loans and auto and homeowners insurance, and also often receive solicitations for the best quality credit cards. Conversely, the lower the score, the less favorable the rate. A credit score of 620 and below is widely regarded as "sub-prime."

Maintaining a good credit score is important because of a fundamental rule: the lower one's score, the more one pays for credit, including higher interest on mortgages, auto loans, installment loans and credit cards.

For example, the Web site of Fair Isaac Corp., www.myfico.com,[3] gives this example of the difference that credit scores make in terms of interest and monthly payments, on a $300,000 30-year, fixed-rate mortgage:

---

[3] Visited January 9, 2012

| Your FICO® Score | Your Interest Rate | Your Monthly Payment |
|---|---|---|
| 760 - 850 | 3.581% | $1,361 |
| 700 - 759 | 3.803% | $1,398 |
| 680 - 699 | 3.980% | $1,429 |
| 660 - 679 | 4.194% | $1,466 |
| 640 - 659 | 4.624% | $1,542 |
| 620 - 639 | 5.170% | $1,642 |

A similar chart exists for auto loans. Moreover, about half of the major credit card companies practice "Universal Default," meaning that these companies will raise their cardholders' interest rates if those cardholders' credit scores drop below certain levels – even if the cardholder never had a late payment with the company.

1. The precise workings of the FICO score are highly proprietary and therefore closely guarded. However, the general parameters are publicly available:[4]

**35% -- Payment history.** Late payments, particularly major or serious derogatories, like 90-days late or worse, and particularly on important accounts like mortgages, are very damaging to one's credit score.

**30% -- Credit Utilization.** The ratio between available "revolving" credit and how much is actually used (credit card balances vs. credit card limits).

**15% -- Length of Credit History.** The longer you maintain a positive credit history, the better it is for your credit score.

**10% -- How Much New Credit?.** This relates to "inquiries" that creditors make when you apply for credit.

**5% -- Healthy Mix of Credit?** The scoring model prefers to see a "healthy mix" of mortgage, credit cards and perhaps other kinds of credit.

2. It is important to understand that consumers are most severely penalized when they have a serious derogatory within the past eleven months. The "importance of being recent" is illustrated by the following Fair Isaac chart, which shows, in a proportional sense, that the more recent the delinquency, the greater negative impact.

---

[4] These parameters are published in Chapter 1 of both Editions of "Credit Scores and Credit Reports," op. cit.

 Previous credit performance 



There is growing public awareness about credit scoring, but it is by no means complete. A September 2004 survey by Opinion Research Corporation Intl. sponsored by the Consumer Federation of America (CFA) and Providian Financial, a major credit card issuer, found that:

> Few consumers know what constitutes a good score. Only 12% correctly identified the low 600s as the level below which they would be denied credit or have to pay a higher, sub-prime rate. (One-third thought this level was the low 500s, and 30% said they didn't know.) And, only 13% correctly understand that scores above the low 700s usually qualify them for the lowest rates.

http://www.consumerfed.org/092104creditscores.PDF

A March 2005 General Accounting Office study found that about one-third of respondents had obtained their credit scores. While 70 percent of respondents correctly identified the definition of a credit score and understood many of the factors that could impact credit scores, only 28 percent could provide a number within a range of possible credit scores. In addition, consumers were more familiar with some of the factors that affected credit scores than with others. For example, while most consumers knew that skipping loan payments or making late credit card payments had a negative effect on credit scores, about half did not know that using all the credit available to them, such as reaching the maximum limit on a credit card or home equity loan, had a negative effect. Also, when asked about information that had no effect on credit scores (such as a low checking account balance), about half of consumers answered the questions incorrectly or said that they did not know, the GAO found.[5]

---

[5] General Accounting Office, "Credit Reporting Literacy: Consumers Understood the Basics but Could Benefit from Targeted Educational Efforts" (GAO-05-223). www.gao.gov/new.items/d05223.pdf

### Opinions: Nature & Purpose Of Credit Reports

Similar to credit scoring, there is growing public awareness about the credit reporting system, but it is not universal.

It is important that the trier of fact have an accurate understanding of the nature and purpose of credit reports. Accordingly, a brief description of the consumer report is fundamental to my opinions in this case.

A consumer report, sometimes referred to as a credit report, consists of highly sensitive and personal information, containing a compilation of a consumer's current credit relationships, their credit history, their employment history, estimated income and identifying information, such as name, address, phone number and Social Security Number (SSN). There are three major repositories known as credit bureaus or consumer reporting agencies (CRAs) -- Equifax, Trans Union and Experian. The CRAs regularly receive updates on a consumer's credit relationships from credit grantors -- banks, mortgage companies, credit card issuers, department stores and others. The consumer report typically contains highly sensitive details about a consumer's finances, including account numbers, loan amounts, credit limits and payment history. It also can contain information on the consumer's interaction with the judicial system, including paid or unpaid civil judgments or bankruptcies.

The Credit Report consists of three (or four) basic sections:

(1)     A section with the consumer's *identifying information*-name, address, Social Security number, date of birth, previous address, employer, and sometimes phone number.
(2)     A section with the consumer's *payment history*, including mortgage, auto and installment loans, credit cards and department store cards, collections, and public records like bankruptcy and court judgments.
(3)     If applicable, a section showing *public record* information, like bankruptcies, court judgments and tax liens.
(4)     A section showing *inquiries*, in other words, those companies which accessed the report and for what purposes.

In addition, attached to the credit report is

(1)     A form for disputing errors, and
(2)     A statement of your rights under the FCRA

Each of the Big Three CRAs uses a slightly different format. A fundamental purpose of the credit report is to describe a consumer's creditworthiness. For example, the Equifax report lists the codes showing how consumers are classified when they don't pay their bills on time. Along with these numeric codes, a credit report can have a letter showing the type of credit, i.e., "R" for revolving (credit card) and "I" for installment (personal loan). The code for someone who always paid his credit card on time would be "R1." Here are the numeric codes:

- 2 : 30-59 Days Past Due

13

- 3 : 60-89 Days Past Due
- 4 : 90-119 Days Past Due
- 5 : Over 120 Days Past Due
- 7 : Included in Wage Earner Plan
- 8 : Repossession
- 9 : Charge Off
- Blank : No Data available for that month
- 0 : Too new to rate, or unrated
- 1 :  On Time

The Trans Union and Experian credit reports describe similar categories with a text narrative, rather than with an alpha-numeric code.

It is important to note that public record information like bankruptcy, judgments and tax liens, and charge-offs (R-9) and collections, are considered some of the most negative entries. It is also important to note that when a creditor reports a negative tradeline as disputed, that tradeline typically is not scored and therefore does not negatively impact the credit score.

Credit grantors typically review a consumer's report and/or credit score when deciding to grant that consumer some form of credit, whether it is a loan or a credit card. Credit grantors also review consumer reports and/or credit scores on current customers to periodically check on their customers' creditworthiness. This is known as an "Account Review." Credit card issuers regularly use consumer reports and/or credit scores to screen consumers for "pre-approved" credit offers. Some employers use consumer reports to evaluate job applicants. Insurers use credit reports for underwriting purposes, and also use credit scores, but presumably only where not prohibited by State law.

Credit grantors typically review a consumer's report and/or credit score when deciding to grant that consumer some form of credit. Credit grantors also review consumer reports and/or credit scores on current customers to periodically check on their customers' creditworthiness. This is known as an "Account Review." Credit card issuers regularly use consumer reports and/or credit scores to screen consumers for "pre-approved" credit offers. Some employers use consumer reports to evaluate job applicants. Insurers also can use credit reports for underwriting purposes. Landlords also use credit reports for tenant screening.

14

### Background & Qualifications (Curriculum Vitae Attached)

My expertise in credit reporting stems from several of my professional activities, including:

(1) Editor/Publisher of a specialty news reporting service that covers credit reporting, Fair Information practices and related matters;

(2) Author of the book <u>Credit Scores and Credit Reports: How The System Really Works, What You Can Do</u>, 3rd Edition, (Privacy Times 2005), and co-author of a book with a chapter on credit reporting;

(3) An expert witness qualified by Federal and State courts in Fair Credit Reporting Act (FCRA) litigation:

(4) an expert on credit reporting who has testified before Congress on numerous occasions, including four hearings in 2003, and who has testified twice before the California legislature in regards to legislation on the use of financial data, and who regularly presents at Continuing Legal Education and other professional events; and

(5) an expert consultant to government agencies and private corporations, a member of the Consumer Advisory Council of Experian (one of the three national Credit Reporting Agencies (CRAs), and as one who has earned FCRA Certification from the National Credit Reporting Association (NCRA).

Since 1981, I have been Editor/Publisher of *Privacy Times*, a biweekly, Washington-based newsletter that reports on privacy and information law, including the Fair Credit Reporting Act (FCRA). The newsletter ranges from 8-12 pages, 23 issues per year. Thus, I have researched, written, edited and published many articles on Congressional and State legislative actions, judicial opinions, industry trends and actions, executive branch policies and consumer news as they related to the FCRA.

I am author of the book, <u>Credit Scores and Credit Reports: How The System Really Works, What You Can Do</u> (3rd Edition, Privacy Times 2007. The book has 23 Chapters, 399 pages and 415 footnotes. As the title indicates, it describes how the credit scoring and credit reporting systems work and what consumers can do to obtain their reports, read and understand them, correct errors in them and enforce their rights. I also am co-author of <u>Your Right To Privacy: A Basic Guide To Legal Rights In An Information Society</u> (2nd Edition, Southern Illinois University Press, 1990), which has a chapter on credit reporting.

Since the early 1990s, I have served as an expert witness in numerous FCRA cases and have been qualified by the federal courts. As an expert witness, I have had the opportunity to read thousands of pages of deposition testimony by consumer reporting agency officials and by credit grantor personnel responsible for reporting data to CRAs. This is significant because CRAs and credit grantors do not openly discuss or publish information on their procedures and practices for handling personal data. In fact, CRAs typically consider such procedures and practices to be proprietary and/or trade secrets. To my knowledge, the best (and possibly only)

15

sources for finding candid descriptions of CRAs' and credit grantors' procedures and practices in relation to credit reporting data are the depositions of CRA and credit grantor employees in FCRA litigation. Due to my access to this information, I have augmented my specialized body of knowledge on practices and procedures related to credit scoring and credit reporting.

I have testified numerous times before Congress – always by invitation – on issues related to the collection, maintenance, security, use and disclosure of sensitive personal data, including credit reports and other financial information. (Consult CV for list of hearings and Web links to testimony.)

In 2003, the year in which Congress was dedicated to a major upgrade of the FCRA, I testified twice before the Senate and twice before the House, and presented once before the FTC. The hearings covered a wide range of credit reporting issues, accuracy, fairness, privacy, CRA procedures and security:

"The Accuracy of Credit Report Information and the Fair Credit Reporting Act;" Senate Banking Committee, July 10, 2003[6]

"The Role of FCRA in the Credit Granting Process," House Financial Services Subcommittee on Financial Institutions & Consumer Credit, June 12, 2003[7]

"Database Security: Finding Out When Your Information Has Been Compromised," Senate Judiciary Subcommittee on Technology, Terrorism and Government Information, Nov. 4, 2003[8]

"Fighting Fraud: Improving Information Security," House Financial Services Subcommittee on Financial Institutions & Consumer Credit, and Oversight, April 3, 2003[9]

"Information Flows: The Costs and Benefits to Consumers and Businesses of The Collection and Use of Consumer Information," Federal Trade Commission, National Workshop, June 18, 2003

Some of my recommendations were reflected in the final FCRA Amendments approved by Congress and signed by President Bush in December 2003.

On December 3, 2002, I testified before the California State Senate Insurance Committee. On January 29, 2003, I testified before the California State Assembly Insurance Committee. Both Committees were considering financial privacy legislation (SB 1), which ultimately was enacted by the legislature and signed into law in September 2003.

---

[6] http://banking.senate.gov/03_07hrg/071003/index.htm
[7] http://financialservices.house.gov/hearings.asp?formmode=detail&hearing=229
[8] http://judiciary.senate.gov/testimony.cfm?id=983&wit_id=2790
[9] http://financialservices.house.gov/hearings.asp?formmode=detail&hearing=202

I regularly present at Continuing Legal Education or professional seminars related to the FCRA. (Consult CV.)

Two of the three major CRAs have acknowledged that I am an expert on credit reporting as it relates to "Fair Information Practices." First developed in the United States in the late 1960s, Fair Information Practices (FIPs) standards are at the core of the FCRA and most other U.S. and European privacy and data protection laws, and serve as an internationally accepted standard for gauging privacy policy and practices.

In 1990, Equifax published "The Equifax Report on Consumers In the Information Age," a nationwide opinion survey and analysis by Louis Harris and Associates and Prof. Alan F. Westin. The report listed me as a privacy expert to whom the authors expressed appreciation for my advice on survey coverage.

In April 2002, I accepted Experian's invitation to serve on the Experian Consumer Advisory Council of Experian (formerly TRW), a national CRA and vendor of other information services. Before being disbanded in 2004, the Council met twice a year to offer non-binding advice and to discuss a host of credit reporting, marketing and other privacy-related topics.

In 2004, I passed an industry examination, thereby earning "FCRA Certification" from the National Credit Reporting Association.

Since August 1998, I have served under contract as a member of the Social Security Administration's Panel Of Privacy Experts advising the agency on a host of issues.

(Please consult the attached CV for additional information.)

## Testimony & Expert Reports

I have testified at trial, or been deposed as an expert, in the following cases:

Andrews v. Trans Union Corp. et al., Case No. 96-7369, (USDC-C.D. Calif.), concerning theft-of-identity and consumer report inaccuracies. Expert report, deposition, trial testimony. Judge Lourdes Baird presiding. The U.S. Court of Appeals for the Ninth Circuit specifically found that my opinion on the prevalence of identity theft was relevant to the reasonableness of CRA procedures. (see 225 F.3d 1063 (2000)).

April K. Barnett v. Chase Bank (USA) N.A. et al.: U.S. District Court for the Northern District of Alabama [Eastern Div.] (1:12-CV-1745-VEH). Expert disclosure and report. Deposition. Judge Virginia Emerson Hopkins rejected Chase's Daubert motion to exclude my testimony.

Terry D Toler & Donna R. Toler v. PHH Mortgage Corp., Experian Information Solutions, Inc., et al.: U.S. District Court for the Western District of Arkansas [Hot Springs Div.]; (Case No. 6:12-cv-06032-RTD) Expert Report. Deposition. Trial Testimony. (2014) Judge Robert T. Dawson presiding.

Angela P. Williams vs. Equifax Information Services, LLC, et al., Circuit Court for the Ninth Judicial Circuit, Orange County Florida. Credit Reporting. Expert disclosure and report. Deposition. Trial Testimony. Judge George A. Sprinkel IV presiding.

Eric Robert Drew vs. Equifax Information Services, LLC, et al., U.S. District Court for the Northern District of California, Case No. CV 07-00726-SI. Expert report, Deposition, Trial Testimony. Judge Susan Illston presiding.

Dennis Hollidayoke vs. JBL Mortgage Network: In the Circuit Court for Anne Arundel County, Maryland, No. 02C10155944. Expert report, Deposition, Trial Testimony.

Direct Data Solutions, Inc., v. Bailey & Associates Advertising, Inc.: Circuit Court of the Eleventh Judicial Circuit, Miami-Dade County, Florida; Case No.: 07-9322 CA 09. Judge Jerald Bagley presiding.

Brenda F. Campbell v. Experian: U.S. District Court for the Western District of Missouri (No. 07-2514). FCRA. Expert report, deposition. Trial Testimony. Judge Nanette K. Laughrey presiding.

Laura Jones v. Capital One: U.S. Bankruptcy Court for the Eastern District of Virginia (Alexandria), Case 09-14499-BFK, Chapter 7. Post-bankruptcy credit reporting. Expert report. Trial Testimony. Judge Brian F. Kenney presiding, said from the bench:

> "Before we begin with Mr. Hendricks, a brief disclosure. I had a case a few years ago. Mr. Hendricks may recall that I was representing a creditor in which Mr. Hendricks was identified as an expert witness in the Eastern District of Virginia. I believe it was the Sloane case, Mr. Hendricks. I took Mr. Hendricks' deposition and I subsequently moved to exclude him as an expert in the case on a Daubert challenge. I lost the Daubert

challenge. The court allowed him to testify as an expert witness; and I will say, during the course of his deposition and the Daubert challenge, I learned quite a bit about credit reporting. Just in the interest of full disclosure, I'll disclose that to the parties."

In Re: MicroBilt Corp. et al., U.S. Bankruptcy Court for the District of New Jersey (Trenton Div.); Case No. 11-18143 (MBK). Deposition, Trial Testimony. (I was retained by MicroBilt counsel Bruce Luckman, who in previous years as counsel for TransUnion, unsuccessfully opposed me with a Daubert challenge in the Sandra Cortez case (see below).

Steven W. Haberman v. PNC Mortgage Company, et al.: U.S. District Court for the Eastern District of Texas [Sherman Div]. Case No. 4:11cv126.  FCRA, identity theft. Expert report. Deposition. Trial Testimony. Magistrate Judge Amos L. Mazzant presiding.

Harold & Beryllin Gamby v. Equifax Information Services, et al.: U.S. District Court for the Eastern District of Michigan [Southern Div.] (CV-06-11020-MO).  FCRA, identity theft. Expert report. Deposition. Trial Testimony. Judge Marianne O. Battani presiding.

Deborah Adams v. National Engineering Service Corp./Verifications Inc..: U.S. District Court for the District of Connecticut. 3:07-cv-01035-JCH. FCRA. Expert report, deposition. Trial Testimony. Judge Warren W. Eginton presiding.

Rebecca L. Valentine. v. Equifax Credit Information Services, et al.: U.S. District Court for the District of Oregon; No. CV 05-801-JO. FCRA, identity theft. Expert report. Deposition. Trial Testimony. Judge Robert E. Jones presiding.

Nicole Robinson vs. Equifax Information Services, LLC, et al., U.S. District Court for the Eastern District of Virginia (Alexandria Div.), Case No. CIV 1:05 cv 1272.  Expert reports. Deposition. Trial Testimony  Judge Walter H. Rice presiding.

Suzanne Sloane vs. Equifax Information Services, LLC, et al., U.S. District Court for the Eastern District of Virginia (Alexandria Div.), Case No. CIV 1:05 cv 1272.  Expert reports. Deposition. Trial Testimony  Judge Leonie M. Brinkema presiding.

Matthew Kirkpatrick v. Equifax, LLC,  U.S. District Court for District of Oregon, (Slip. Op. CV-02-1197-MO. FCRA  Expert report. Trial Testimony. Judge Michael W. Mosman presiding.

Sandra Cortez vs. Trans Union, LLC., U.S. District Court for the Eastern District of Pennsylvania: No. 2:05 –cv—05684-JF.  FCRA.  Expert Report. Daubert Hearing. Trial Testimony.  Senior Judge John P. Fullam qualified me to testify at trial.

Patricia Holmes vs. TeleCheck Intl., Inc., U.S. District Court for the Middle District of Tennessee (Nashville Div.).  FCRA. Expert report. Deposition. Trial Testimony.  Chief District Judge Todd J. Campbell presiding.

Tracy Terry v. Cheryl Shepard, Eve Shepard, Frank Ferro, and STAR Consulting, LLC, CAL08-03428 - - In the Circuit Court for Prince George's County, Maryland, Michele D. Hotten, Associate Judge presiding.  Breach of contract.  Damage to credit.  Trial testimony.  September 22, 2009.

Richard Alexander Williams v. First Advantage LNS Screening Solutions, et al.: U.S. District Court Northern District of Florida [Gainesville Div.].  (Case No. 1:13-cv-00222-MW-GRJ) Expert Report. Deposition. (2014). Video Trial Testimony. Judge Mark E. Walker   rejected First Advantage's Daubert motion to exclude my testimony (2015).

Federal Trade Commission vs. Accusearch, Inc., et al., U.S. District Court for the District of Wyoming, Case No. 06CV0105-D.  FTC Section 5.  Expert Report.  U.S. Magistrate Judge William C. Beaman rejected Defendant's motion to exclude my testimony.

Eddie Silva, et al. v. Haynes Furniture Co., Inc.: U.S. District Court for the Eastern District of Virginia: No. 4:04CV82. FCRA.  Fairness hearing testimony. Judge Walter D. Kelley, Jr. presiding.

Joi Helmes v. Wachovia Bank N.A.: U.S. Bankruptcy Court for the Eastern District of Virginia (Alexandria), Case No: 01-81277-RGM, Chapter 7. Post-bankruptcy credit reporting. Expert report. Deposition. Trial Testimony.  Judge Robert G. Mayer presiding.

Alex Campos and Michael York v. ChoicePoint Services, Inc.: U.S. District Court for the District of Georgia (Atlanta), Civ. Action No. 1-03-CV-3577-WSD.  FCRA. Expert Declaration. Fairness hearing testimony. Judge William S. Duffey, Jr. presiding.

Denis W. Stasulis v. Suntrust:  U.S. Bankruptcy Court for the Eastern District of Virginia (Alexandria), Case No: 04-12542-RGM, Chapter 7. Post-bankruptcy credit reporting. Expert report. Deposition. Trial Testimony.  Judge Robert G. Mayer presiding.

Dwaine Perry, et al. v. FleetBoston Financial Corp.: U.S. District Court for the Eastern District of Pennsylvania: No. 04-507. FCRA. Expert Report.  Fairness hearing testimony.  Judge Berle M. Schiller presiding.

Tammy Cochran v. C&M Motors, LLC, dba I-10 Toyota, et al: U.S. District Court for the Central District of California, No. CV-03-3568FMC. FCRA. Expert Report. Trial Testimony Judge Florence-Marie Cooper presiding.

Myra Coleman v. Trans Union LLC, CA4: 98-CV-169B-B (USDC-Mississippi) FCRA.  Expert report, deposition, trial testimony.  Judge Neal B. Biggers presiding.

Arthur Spengler v. Sears Roebuck & Co., Case No. C-03-0557. (Circuit Court, Wicomico County, Maryland). Tort, Interference with Business Relationships. Trial Testimony. Judge D. Davis qualified me as expert on credit scoring, credit reporting and FCRA-related issues.

Judy C. Thomas v. Trans Union LLC, U.S. District Court for the District of Oregon; Case No. 00-1150-JE. FCRA. Expert report, deposition, trial testimony.  Magistrate Judge John Jelderks presiding.

Scott E. Campbell v. G.E. Capital Auto Lease, Circuit Court For St. Mary's County, Maryland, Case No. 99-522. FCRA, invasion of privacy. Expert report, deposition. Judge Karen Abrams qualified me to testify, but the case settled one week before trial.

Franklin F. Grizzard, Jr.  v. Trans Union, L.L.C., & Equifax Information Services L.L.C., et al.: U.S. District Court for the District of Virginia (Richmond Div.); Nos. 04-CV-625 & 04-CV-626, respectively. Expert report. Affidavit. Deposition.  On the eve of trial, Judge Richard Williams rejected Defendant's motion to disqualify me.  The case settled shortly thereafter.

Catherine Smith, et al. v. Progressive Corporation, et al.: U.S. District Court for the Middle District of Florida (Gainesville), Case No.1:00-CV-210-MMP. Expert Report, Declaration of Value, Fairness Hearing testimony. Judge Maurice M. Paul presiding.

Franklin E. Clark, et al. v. Experian, et al.: U.S. District Court for the District of South Carolina, Case Nos. 8:00-1217-22, 8:00-1218-22, 8:00-1219-22. Affidavit, Supplemental Affidavit (both affidavits were admitted into evidence without objection). Judge Cameron McGowan Currie presiding.

Elizabeth Roberts v. Vincent St. John & Safeco Insurance Co. of America: In the District Court of Oklahoma County, State of Oklahoma (Case No. CJ-2012-1051). Expert Report. Deposition. (2015)

Roy Jack Williams v. Allstate Fire & Casualty Co., U.S. District Court for the Eastern District of Oklahoma (Case No. 5:13-cv-00828-D). Expert Report. Deposition. (2015)

John Mark Cowan v. GE Capital Retail Bank, et al.: U.S. District Court for the Northern District of California [San Jose Division]; 5:13-cv-3935-BLF-PSG. Expert Report. Deposition. (2015)

Martin Kevin Sammy v. Equifax Information Services, LLC: U.S. District Court for the Eastern District of Pennsylvania. (Case No. 2:14-cv-00307-BMS) Expert Report. (2014) Deposition. (2014)

Richard G. Beck, et al. v. Eric K. Shinseki, et al.: U.S. District Court for the District of South Carolina [Columbia Div.] (No. 3:13-cv-999-TLW). Expert Report. Deposition. (2014)

Roberto Sevi v. Experian Information Solutions, Inc., Trans Union LLC & Nationstar Mortgage, LLC.: U.S. District Court for the Middle District of Florida [Orlando Div.]; No. 6:13-cv-1433-Orl-37KRS. Expert Report. Deposition. (2014)

Jean Gardy Lacroix v. Equifax Information Services, LLC: U.S. District Court for the Southern District of Florida. (Case No. 9:14-cv-80334) Expert Report. Deposition. (2014)

Thanh Cham Thi Thach v. Virginia. U.S. District Court for the Eastern District of Virginia [Alexandria Div.] (Case No. 3:14-cv-00070-HEH) Expert Report. Deposition. (2014)

Lee Pele v. Pennsylvania Higher Education Authority, Inc., U.S. District Court for the Eastern District of Virginia [Alexandria Div.] (Case No. 1:13-cv-01531-JCC-TRJ)  Expert Report. Deposition. (2014)

Anthony Peck v. Equifax Information Services, LLC, Experian Information Solutions, Inc., & DTE Energy Co.: U.S. District Court for the District of Colorado (No. 13-cv-02924-PAB-CBS). Expert Report. Deposition. (2014)

Timothy Lawrence v. National Grid USA Service Co., National Recovery Agency, et al.: U.S. District Court for the Eastern District of New York (13 CV 4979 – CBA/VMS).

Rockwell Scharer III v. OneWest Bank, Experian Information Solutions, Inc., Equifax Information Services, LLC, Trans Union LLC, et al.,: U.S. District Court for the Central District of California; No.: 2:13-cv-00080-DSF-AGR.  Expert report. Deposition. (2014)

Ronald A. Jackson, et al. v. Equifax Information Services, LLC, et al.: U.S. District Court for the Southern District of Florida. 1:13-cv-21691-DLG

James A. Davenport v.  Sallie Mae, Inc., et al.: U.S. District Court for the District of Maryland; PJM 12-1475. Expert report. Deposition. (2014)

Steven Strong v. Collecto, et al., Experian Information Solutions, LLC: U.S. District Court for the Northern District of Texas [Dallas Div.]; No. 3-12-cv-05115-P. Expert report. Deposition. (2014)

Kovalerchik v. Experian Information Solutions, LLC: U.S. District Court for the Central District of California (No. 2:13-cv-05419 – GHK-FFMx).  Expert report. Deposition. (2014)

Michael Dreher v. Experian Information Solutions, Inc., et al.: U.S. District Court for the Eastern District of Virginia (Case 3:11-cv-00624-JAG). Expert report. Deposition. (2014)

Gary Wright v. Equifax Information Solutions, LLC, et al: U.S. District Court for the District of Colorado (No 1:12-cv-3268). Expert Report. Deposition. (2013)

Patriot General Insurance Company v. Lisa Krebs and Carmen McReynolds: U.S. District Court for the Northern District of Georgia [Atlanta Div.] (1:12-CV-0997-RWS). Expert Report. Deposition. (2013)

Courtney Douglass v. Convergent Outsourcing.  (U.S. District Court for the Eastern District of Pennsylvania; Civil No. 2-12-cv-01524). Expert Declaration. Deposition. (2013)

Amanda Ellis v. Experian Information Solutions, Inc., Trans Union LLC, Equifax Information Services, LLC &: U.S. District Court for the Northern District of Alabama [Middle Div.]; No.: 4:12-cv-02779 RBP.  Expert report. Deposition.

Denese Toliver v. Experian Information Solutions, Inc., Trans Union LLC, et al.: U.S. District Court for the Southern District of Texas [Houston Div]. No. 4:12-cv-02436; Expert report. Expert rebuttal report. Declaration. Deposition.

David Osada, et al. v. Experian Information Solutions, Inc.: U.S. District Court for the Northern District of Illinois (Eastern Division), No. 11-CV-02856. Expert report. Deposition.

Kathleen Jane Ferguson v. Asset Acceptance Services, LLC,, et al.: U.S. District Court for the District of Missouri [Eastern Div.]. (4:11-cv-00425--AGF). Expert report. Deposition.

Arin A. Bovay, et al. v. Sears, Roebuck, and Co.: U.S. Circuit Court of Cook County, Illinois [County Dept., Chancery Div.]; Case No. 01-CH-18096; consolidated with Case Nos. 02-CH-4693 & 03-CH-07605. Expert report. Deposition.

Mary Perkins White v. Green Tree Servicing LLC, GMAC Mortgage LLC, Trans Union LLC, Equifax Information Services, LLC & Experian Information Solutions, Inc.,: U.S. District Court for the Western District of Washington [Tacoma Div.]; No.: 3:11-CV-005439RBL  Expert report. Deposition.

Ilene Modica v. American Suzuki Financial Services, TransUnion, LLC, & Equifax Information Services, LLC: U.S. District Court for the District of Arizona. (2:11-CV-02183-PHX-DGC) Expert report. Deposition.

Denise Acquafredda v. Experian Information Solutions, et. al: U.S. District Court for the District of Arizona – (No. CV 2011-054368). Expert report. Deposition.

Jose Calderon v. Experian Information Solutions: U.S. District Court for the District of Idaho (No. 1:11-cv-00386-EJL). Expert report. Deposition.

First Carolina Bank v. Charles S. McCue, et al.: In The Court of Common Please, Fourteenth Judicial Circuit, State of South Carolina, County of Beaufort. Civil Action No: 07-CP-07-03027. Deposition.

Maria Pintos v. Pacific Creditors Assoc., et al.: U.S. District Court for the Northern District of California [Oakland Div.] C 03-5471 CW. Expert report. Deposition.

Marie Ann Fuges v. Southwest Financial Services, LTD: U.S. District Court for the Eastern District of Pennsylvania (No 09-699). Expert report. Deposition.

Alisha Wilkes v. Experian Information Solutions, et al.: U.S. District Court for the Eastern District of Virginia (CV- 1:10-cv-01160-CMH -TRJ). Expert report. Deposition.

Serena Beachley v. PNC Bank N.A..: U.S. District Court for the District of Maryland [Northern Div., Case No. CCB-10-1774. Expert report. Deposition.

In re: Pammalla Shannon Uplinger v. Rees Broome, P.C,,: U.S. Bankruptcy Court for the Eastern District of Virginia (Alexandria Div.); Case No. 90-13129-RGM. Expert report. Deposition.

Jose Soto v. Capital One Auto Finance, et al.: U.S. District Court for the District of Western Washington (2:08-cv-01838-RSM). Expert report, deposition.

Terri N. White, Jose Hernandez, et al. v. Experian Information Solutions, et al.: USDC-Central Dist. Of California; Case No. 05-cv-1070- DOC (MLGx). Declarations, Deposition.

Tara Andrews v. Equifax Information Solutions, Inc., et al.: U.S. District Court for the Western District of Washington; (No. 2:09–CV–00817–JJC). Expert report. Deposition.

Michelle Jansen v. Equifax Credit Information Services, et al.: U.S. District Court for the District of Oregon; No. 05-CV 0385-BR. Expert report. Deposition.

James Byrd v. TransUnion LLC, Experian Information Solutions, Inc., Equifax Credit Information Services, LLC: U.S. District Court for the District of South Carolina [Columbia Div.]. Expert report. Deposition.

David L. Jackson v. Trans Union, et al.: U.S. District Court for the District of Oregon. FCRA. No. CV-08-0060-MO. Expert report. Deposition.

Richard Chakejian v. Equifax Information Services, LLC. : U.S. District Court for the Eastern District of Pennsylvania; No. 07-2211. Bruce A. Summerfield v. Equifax Information Services, LLC. : U.S. District Court for the District of New Jersey; No. 08-1450. FCRA. Expert reports. Consolidate deposition.

Marlos Uzzell v. Experian Information Systems, Trans Union, et al.: U.S. District Court for the Eastern District of Pennsylvania (No. 2:08-CV-02538-CMR). Expert report. Deposition.

Baxter Robinson v. Chase Mortgage Services, Inc., et al.: U.S. District Court for the District of South Carolina (Charleston Div.) (2:08-cv-02087-PMD). Expert report, deposition.

Risa Joyce Deutsch v. Arrow Financial Services LLC, et al: U.S. District Court for Middle the District of Florida [Tampa]; No. 8:08-cv-01469. Damage to credit. Expert report, deposition.

Michael D. Scott, et al. v. Graphic Center, CalPERS, et al.: Superior Court of the State of California, County of Los Angeles. Case No. BC390593397636. Data breach. Declaration.

Christopher K. Jung v. Trans Union, et al.: U.S. District Court for the Eastern District of Pennsylvania (No. 07-2514). Expert report, deposition.

Robert Saindon v. Equifax Information Services, et al.: U.S. District Court for the Northern District of California (08-cv-01744 WHA). Expert report, declaration. Deposition.

Christina Lee v. TransUnion, et al.: U.S. District Court for the District of Oregon (CV-07-0998-MO). Expert report, deposition.

24

Emelia Pasternak v. TransUnion, et al.: U.S. District Court for the Northern District of California. Case No. 4:07-cv-04980-CW Expert report, deposition.

Stacy Fiano v. Experian Information Solutions, et al., U.S. District Circuit Court of the Southern District of Florida 9:08-cv-80555.  Expert report, deposition.

Alana Valerie Sheldon v. Trans Union, LLC., LVNV Funding, LLC, & Resurgent Capital Services L.P.: U.S. District Court for the District of Maryland; 8:08-cv-00057-PJM.  Expert report, deposition.

In Re: Cellphone Termination Fee Cases, Superior Court of the State of California, Alameda County, JCCP No. 4332.  Deposition.

Karl Benedikt v. ChoicePoint, Inc.,: U.S. District Court for the District of New Jersey [Newark Vicinage]; 07-2569. Expert report, deposition.

Abdirizak Gayre v. CSC Credit Services, Inc., Equifax Information Services, LLC, and Afni, Inc.: U.S. District Court for the District of Minnesota (C.A. No. 07-CV-0622 [JRT/FLN]).  FCRA.  Expert report, deposition.

Erin Ayles v. Experian Information Solutions, Inc.: U.S. District Court for the Eastern District of Virginia (Alexandria Division); 1:07cv 662.  Expert report, deposition.

Maria D. v. Comcast Corp., Sacramento Superior Court, Case No. 03AS05745. Deposition.

Terri N. White, et al. v. Experian Information Solutions, Inc., U.S. Dist. Ct. Central Dist. Of Calif. – Case No. 05-cv-1070- DOC (MLGx); Lead Case. Expert declarations. Depositions.

In Re: Farmers Insurance Co., Inc., FCRA Litigation, U.S. District Court for the Western District of Oklahoma, Case No. CIV 03-158-F.  FCRA. Expert report, deposition.

Steven E. Beck v. Equifax Information Services, et al.: U.S. District Court for the Eastern District of Virginia: No. 1-05cv347. FCRA.  Expert report, deposition.

Mary Ann Whiteker, et al. v. Chase Bank, et al..

Ford Motor Credit Co. v. Sudesh Agrawal, Court of Common Pleas, Cuyahoga Country, Ohio; Case No. CV04536588.  Credit reporting and credit scoring. Deposition.

Larry Alabran v. Capital One Services, Inc.: U.S. District Court for the Eastern District of Virginia (Richmond Division); Case No. 3:04-CV-935. Expert report, deposition.

Gail Cope v. MBNA American Bank NA: U.S. District Court for the District of Oregon; No. 04-CV-493-JE.  Expert report, deposition.

Robert Gordon Peoples v. Experian Services Corp., et al.: U.S. District Court for the Central District of California: No. CV-04-1378 CAS (Ex). Expert report. Deposition.

Lottie Robertson v. Experian Information Services, Inc. & Capital One Bank: U.S. District Court for the Eastern District of Michigan (Southern Div.) No. 04-72308. Expert report. Deposition.

Barbara A. Harris v. Experian Information Solutions, Inc., and Equifax Credit Information Services, Inc: U.S. District Court for the District of Oregon, Civil No. 01-1728-JE.    FCRA. Expert reports. Deposition

Bruce Danielson v. Experian Information Solutions:  U.S. District Court for the Northern District of Texas, Case No: 3-04CV-1722N. FCRA. Expert report. Deposition.

Stacy Lawton Guin, et al. v. Brazos Higher Education Service Corporation, Inc.: USDC-Minnesota – No. CV 05-668 RHK/JSM. Negligence. Security Breach. Affidavit. Deposition.

Anthony Chin v. State Dept. Federal Credit Union: Circ. Ct. Prince George's County (Maryland); Civ. Act. No. CAL04-12778; Tort. Deposition.  Trial testimony.

James M. McKeown v. Sears Roebuck & Co., et al: U.S. District Court for the Western District of Wisconsin, Civil No. Case No. 03-CV-0528 C.  Expert Report, deposition.

Paulette Field v. Trans Union LLC, et al., Case No. 01 C 6390 (USDC-N.D. Illinois - Eastern Div. FCRA. Expert report.  Deposition.

Earle E. Ausherman, et al. v. Bank of America Corporation et al.: U.S. District Court for the District of Maryland, Civil Action No. MJG-01-438.  FCRA. Expert report.  Deposition.

Jesse Klco v. Elmhurst Dodge, U.S. District Court for the Northern District of Illinois (Eastern Division) Civil Action No. 01 C 0433.  FCRA.  Expert report, deposition.

(David & Ruthie Keefner v. Webb Ford, Inc. & Deon L. Willis.: U.S. District Court for the Northern District of Illinois (Eastern Division), Civil Action No. 02C-4643. FCRA. Expert report. Deposition.

Anthony & Alethea Preston v. MGIC, U.S. District Court for the Middle District of Florida (Ocala), Case No. 5:03-cv-111-Oc-10GRJ. FCRA. Expert report, deposition.

Bruce Butcher and Pam Butcher v. Chase Manhattan Bank, U.S.A., Inc., U.S. District Court for District of South Carolina, Case No. 8:03-3184-26. FCRA. Expert report, deposition.

Karen Nienaber, et al. v.Citibank (South Dakota) N.A.: U.S. District Court for the District of South Dakota [Southern Div.}; Civ. No. CIV 04-4054.  Declaration relied upon by court in settlement hearing.

## FEE

My fee is $300 per hour for preparation, consulting trial testimony, plus reasonable travel time, plus travel costs and expenses; $400 per hour, or a minimum of $1,200 per day, for deposition testimony, plus reasonable travel time, plus travel costs and expenses.