1

IN THE UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF WEST VIRGINIA
AT BECKLEY

------------------------------------

DAVID M. DAUGHERTY,

             Plaintiff,

    v.                                    CIVIL ACTION
                                          NO. 5:14-24506
EQUIFAX INFORMATION SERVICES, LLC
and OCWEN LOAN SERVICING, LLC,

             Defendants.

------------------------------------

30(b)(6)DEPOSITION UPON ORAL EXAMINATION
OF SANDRA LYEW
TAKEN ON BEHALF OF THE PLAINTIFF

Virginia Beach, Virginia

August 28, 2015

Lyew, Sandra

August 28, 2015

2

```
 1    Appearances:

 2

 3           HAMILTON, BURGESS, YOUNG & POLLARD, PLLC

 4        By:  JED R. NOLAN, ESQUIRE

 5             STEVEN R. BROADWATER, JR., ESQUIRE

 6             5493 Maple Lane

 7             Fayetteville, WV 25840

 8             (304)574-2727

 9             jnolan@hamiltonburgess.com

10             sbroadwater@hamiltonburgess.com

11             Counsel for the Plaintiff

12

13        TROUTMAN SANDERS, LLP

14        By:  JASON E. MANNING, ESQUIRE

15             222 Central Park Avenue, Suite 2000

16             Virginia Beach, VA 23462

17             (757)687-7564

18             jason.manning@troutmansanders.com

19             Counsel for the Defendant

20             OCWEN Loan Servicing, LLC

21

22

23

24

25
```

Lyew, Sandra

August 28, 2015

3

```
1                    I N D E X

2

3    WITNESS          EXAMINATION BY           PAGE

4    Sandra Lyew      Mr. Nolan                  5

5                     Mr. Manning              132

6                     Mr. Nolan                163

7

8                    E X H I B I T S

9    NO.              DESCRIPTION              PAGE

10   Exhibit 1    Third Notice of Deposition    7

11   Exhibit 2    Litton Notice of Default letter

12                DD/OLS 000493-494            37

13   Exhibit 3    "Draft" document,

14                DD/OLS 000594-601            38

15   Exhibit 4    Letter dated March 18, 2013,

16                DD/OS 000225-2226            39

17   Exhibit 5    OCWEN Detail Transaction

18                History, DD/OLS 001635-1746  41

19   Exhibit 6    Letter dated March 20, 2013,

20                DD/OLS 000183                42

21   Exhibit 7    ACDV 3/19/2013               44

22   Exhibit 8    ACDV 5/31/2013               63

23   Exhibit 9    Equifax document, DD/OLS 000320  73

24   Exhibit 10   ACDV response 11/13/2014,

25                DD/OLS 001333-1334           76
```

Lyew, Sandra                                          August 28, 2015

4

1              E X H I B I T S    (CONTINUED)

2     NO.              DESCRIPTION                    PAGE

3     Exhibit 11    ACDV 7/3/2013                     80

4     Exhibit 12    ACDV 10/1/2013                    82

5     Exhibit 13    ACDV 11/14/2013                   86

6     Exhibit 14    ACDV 1/10/2014                    89

7     Exhibit 15    Letter and attached documents

8                   from Mr. Daugherty, 3/19/14,

9                   DD/OLS 000570-577                 93

10    Exhibit 16    Letter dated March 17, 2014,

11                  DD/OLS 000566-568                 102

12    Exhibit 17    ACDV response 4/24/2014           103

13    Exhibit 18    ACDV response 5/5/2014            111

14    Exhibit 19    ACDV response 6/16/2014           115

15    Exhibit 20    Letter dated April 19, 2014,

16                  DD/OLS 000223-224                 117

17    Exhibit 21    ACDV response 6/20/2014           119

18    Exhibit 22    Universal Data Form,

19                  DD/OLS 000310                     125

20    Exhibit 23    ACDV response 8/8/2014            129

21    Exhibit 24    ACDV response 9/19/2014           130

22    Exhibit 25    Letter dated March 14, 2013,

23                  DD/OLS 000576-577                 130

24    Exhibit 26    Credit Reporting Histories,

25                  DD/OLS 000602-645                 132

Lyew, Sandra

August 28, 2015

5

```
1              30(b)(6) deposition upon oral
2    examination of SANDRA LYEW, taken on behalf of the
3    Plaintiff, before Penny C. Wile, RPR, RMR, CRR, a
4    Notary Public for the Commonwealth of Virginia at
5    large, taken pursuant to notice, commencing at 9:20
6    a.m. on August 28, 2015, at the law offices of
7    Troutman Sanders, LLP, 222 Central Park Avenue, Suite
8    2000, Virginia Beach, Virginia; and this in
9    accordance with the Federal Rules of Civil Procedure.
10             - - - -
11             SANDRA LYEW was sworn and deposed on
12   behalf of the Plaintiff as follows:
13             EXAMINATION
14   BY MR. NOLAN:
15        Q.    My name is Jed Nolan, and I represent
16   David Daugherty who filed a claim against OCWEN Loan
17   Servicing in this matter.
18             Can you state your name for the record?
19        A.    Sandra Lyew, L-Y-E-W.
20        Q.    And it's pronounced Lyew?
21        A.    Yes.
22        Q.    Hopefully I don't butcher that up.  I
23   apologize if I do.
24             We've asked to take OCWEN's deposition
25   today.  And they've designated you as their corporate
```

Lyew, Sandra

August 28, 2015

6

1   representative.

2       **A.**    **Yes.**

3       Q.    So when I say you, I mean actually

4   OCWEN.  I don't mean you, Ms. Lyew.

5           If you need a break at any time, we'll

6   take breaks.

7       **A.**    **Yes.**

8       Q.    We're not trying to do a real marathon

9   or anything else.  We're just trying to get these

10  questions out.

11          MR. MANNING:  And just in terms of

12  breaks, I ordered the food to come between 12:00 and

13  1:00.  We can take as long or as short as you guys

14  want, depending on how your pace is.  Sandra has a

15  flight she has to be on that boards at 5:20, so she

16  has a car coming at 4:00.  If that means you're going

17  to be real tight on time, we'll take little to no

18  lunch, because we know that you said you had a lot to

19  get through, but we just kind of wanted to defer to

20  you on the lunch timing issue.

21          MR. NOLAN:  And we'll see.  I might be

22  able to breeze through it quicker than I thought.  If

23  we get bogged down, we'll just take a look at it

24  then.

25

Lyew, Sandra                                        August 28, 2015

7

 1    BY MR. NOLAN:

 2         Q.    If I ask a question, you don't know what

 3    I'm talking about, please ask me to rephrase it.

 4    Make me do my job and ask clear questions, okay?

 5         A.    **Of course.**

 6               MR. NOLAN:  The first thing I'd like to

 7    do is mark this as Exhibit 1.

 8               (Exhibit No. 1 was marked for

 9               identification.)

10    BY MR. NOLAN:

11         Q.    I've handed you -- this is our Third

12    Notice of Deposition that we filed in this matter.

13    Have you had a chance to review this before coming in

14    today?

15         A.    **Yes, I have.**

16         Q.    Okay.  I'd like to begin by talking

17    broadly about OCWEN's disputes in their

18    reinvestigation process.

19               How many credit disputes does OCWEN

20    receive annually?

21         A.    **That I don't know.**

22         Q.    And I'm just looking for a ballpark

23    figure.

24         A.    **More than 100.**

25         Q.    More than 100?

Lyew, Sandra                                           August 28, 2015

8

1      A.      Yes.

2      Q.      More than 150?

3      A.      That's possible.  I don't know.

4      Q.      More than 200?

5      A.      I don't know.

6      Q.      So OCWEN, from my understanding, is a

7  mortgage loan servicer; is that correct?

8      A.      Yes.

9      Q.      Do they have any other creditors for any

10 other types of loans besides mortgages?

11     A.      Other creditors?

12     Q.      Do they service any types of debt other

13 than mortgage loans?

14     A.      They do, as far as I know, residential,

15 mostly residential.  I believe there is probably a --

16 they do have a commercial division.

17     Q.      And so how many loans would OCWEN

18 service at any given time, just a rough estimate?

19     A.      Hundreds of thousands.

20     Q.      So out of the hundreds of thousands of

21 loans they have that they're servicing, you estimate

22 that at least 100 disputes come in every year?

23     A.      I can vouch for -- well, I can't vouch

24 for that, but I'm going to assume that.  I don't want

25 to assume.  This is why it is a hypothetical.

Lyew, Sandra

August 28, 2015

9

1        Q.      Sure.  I'm just trying to get a ballpark

2    figure to see how many disputes would come in on an

3    annual basis.

4        A.      We have different departments that

5    handle different functions when it comes to disputes

6    or any type of -- any type of disputes, whether it's

7    credit or the actual accounts.  I don't work in those

8    departments, so this is why I can't --

9        Q.      Give an actual firm number?  Sure.

10               And so if I were to ask the amount of

11   time that OCWEN allocates to investigating disputes,

12   would you be able to provide a guesstimate on that?

13       A.      An actual time that they're supposed to

14   respond to a dispute?

15       Q.      Okay.  We'll start with that.  Yes.

16       A.      They respond to a dispute within

17   30 days.

18       Q.      Does it typically take 30 days to

19   respond to a dispute?

20       A.      Well, the guidelines is supposed to be

21   30 days -- up to 30 days to respond to a dispute.

22       Q.      And do you have any -- does OCWEN have a

23   typical response time?  Is it typically 30 days or do

24   they usually get it done quicker than that?

25       A.      It can be done in less time, depending

Lyew, Sandra                                               August 28, 2015

10

1    on the dispute.

2         Q.      Now, does OCWEN investigate disputes

3    inhouse or do they outsource that job function?

4         A.      No.  They do it inhouse.

5         Q.      So those are OCWEN employees that are

6    investigating disputes?

7         A.      Yes.

8         Q.      How are these employees compensated?

9         A.      Compensated?  I want to assume that

10   there is an hourly pay.

11        Q.      Is there a range of salaries or an

12   hourly rate paid to these reinvestigation employees?

13        A.      I don't know.

14        Q.      Is compensation strictly hourly or is it

15   tied to -- are there any incentives for these

16   employees?

17        A.      I don't know.

18        Q.      And so it's my understanding there are

19   two ways OCWEN can receive a dispute regarding their

20   credit:  They can get a dispute directly from a

21   borrower or a dispute can come from a credit

22   reporting agency; is that correct?

23        A.      That is correct.

24        Q.      Are there any other ways a dispute can

25   come to OCWEN regarding a debtor's account?

Lyew, Sandra

August 28, 2015

11

1    A.      To my knowledge, it's the borrower's

2    dispute in writing or it goes -- it's from the credit

3    reporting agency.

4        Q.      Is there any difference in the way that

5    OCWEN treats a dispute directly from a borrower

6    versus a dispute received from a credit reporting

7    agency?

8        A.      No.

9        Q.      What if a dispute was to come in from a

10   third-party?

11       A.      They would have to be authorized.

12               Let me make that clear.  Authorized by

13   the borrower in order to speak on their behalf on the

14   account.

15       Q.      So an attorney, in order to file a

16   dispute, would have to be authorized by the borrower

17   before OCWEN would process that dispute?

18       A.      Yes.

19       Q.      And the same for a government agency?

20       A.      That is correct.

21       Q.      So when OCWEN receives a dispute either

22   from a borrower or a credit reporting agency, what's

23   the first step?

24       A.      The first step is, of course, you

25   receive the response.  The response is noted in the

Lyew, Sandra                                                    August 28, 2015

12

1    account.

2         Q.      I'm sorry.  Can you define response for

3    me?

4         A.      Okay.  The correspondence --

5         Q.      Correspondence?  Okay.

6         A.      -- is received, and it's noted in the

7    account, in the system.  And an acknowledgment letter

8    is sent acknowledging receipt of the correspondence.

9    And then the investigation and/or research is

10   conducted at that point.  And then, once that is

11   done, then the response gets sent to the borrower.

12        Q.      So the correspondence is received and

13   noted in the account?

14        A.      Correct.

15        Q.      At that point the reinvestigation

16   occurs?

17        A.      That is correct.

18        Q.      Now, what type of reinvestigation is

19   done?

20        A.      It depends on the dispute that comes in.

21   So that, based on the dispute, there is not only the

22   system that is -- that gets verified, there is --

23   we -- I should say we, meaning OCWEN, the credit

24   reporting department, has authority by going into and

25   reviewing the borrower's documentation, business

Lyew, Sandra                                    August 28, 2015

13

1    records, that is kept in the ordinary course of

2    business.

3         Q.    You mentioned the credit reporting

4    department?

5         A.    Yes.

6         Q.    So once this initial dispute or the

7    correspondence response comes in, it gets noted, does

8    it get shipped to this credit reporting department?

9         A.    Again, it depends on the dispute.  So it

10   goes to a research department.  We have a research

11   department.  And based on the dispute, if the dispute

12   is dealing on credit reporting or an account claiming

13   that is not theirs, then it would go into the -- it

14   would go to the credit reporting department.

15        Q.    So the research department kind of

16   funnels it out?  They get it and look at it and see

17   where it needs to go from there?

18        A.    Correct.  Or they respond to it.

19        Q.    What types of disputes would the

20   research department respond to directly without

21   shipping it on to another department?

22        A.    Servicing.  Servicing research of a

23   dispute.

24        Q.    And what type of employees are employed

25   in the research department?

Lyew, Sandra                                          August 28, 2015

14

1        A.    What type of employees?  They're

2    employees.

3        Q.    What kind of educational backgrounds or

4    qualifications are required to work in the research

5    department?

6        A.    I don't know.  Everything is based on

7    experience.

8        Q.    What type of experience would they look

9    for?

10       A.    Research, mortgage background.

11       Q.    So someone in the research department

12   analyzes the dispute, and then, at this point, if

13   they deem that it's regarding the credit reporting it

14   gets shipped along to the credit reporting

15   department?

16       A.    That is correct.

17       Q.    And where is the credit reporting

18   department based out of mainly?

19       A.    That's a -- well, we have Waterloo,

20   Iowa.  We have West Palm Beach, Florida.

21       Q.    That's where we tried to do this

22   deposition, but we couldn't get it worked out.  It

23   would have been a lot nicer down there; what do you

24   think?

25       A.    I can only name the offices that we're

Lyew, Sandra

August 28, 2015

15

1    located in at this point.

2        Q.      Sure.

3        A.      There is, of course, India.  I mean --

4    it depends.  It's spread out.

5        Q.      Now, what qualifications are sought for

6    employees in these departments?

7        A.      I don't know.  I mean -- I guessed for

8    the research department, so I'm not going to

9    second-guess it again.

10       Q.      Are these typically entry level type

11   positions?  You said that some experience in mortgage

12   background you thought, you guessed, would be sought?

13       A.      It's an assumption.  You know -- so I'm

14   going to say I don't know.

15       Q.      And so at this point the research

16   department has the correspondence, and they reviewed

17   it.  What do they pass along to the credit research

18   department?

19       A.      The actual correspondence.  And it's

20   also noted in the account when they receive it, as

21   well, and what they have done in order to conduct

22   that research.

23       Q.      What would they have done at that point?

24       A.      Well, it depends on the situation.  It

25   depends on the dispute.

Lyew, Sandra

August 28, 2015

16

1      Q.      So the research passes on the entire

2   correspondence that they received?

3      A.      Right.  They can pass that

4   correspondence on to that department, as well as

5   there is -- well, I'll just say pass on that

6   correspondence from the research to that department.

7      Q.      So once the credit reporting department

8   receives this correspondence, they receive the notes

9   in the system of what's been done to that point, what

10  is their first step?

11     A.      Their step is based on the dispute they

12  will conduct their research to make -- to reaffirm

13  that, in this case, that the account belongs to the

14  borrower.  They will also, as far as notate the

15  account, to input -- to show what they've done to

16  reaffirm that this account is the borrower's account.

17  So they can look into -- review the business records,

18  the note, the mortgage, any additional closing docs.

19     Q.      And so when you say they reaffirm the

20  account belongs to the borrower, is that something

21  that's done regardless of the dispute?

22     A.      Yes.  That can be done in the research

23  department, as well as before forwarding over to the

24  credit reporting department.  Again, it depends on

25  the dispute.  So if there is a credit reporting

Lyew, Sandra                                             August 28, 2015

17

1   dispute, it would go to the credit reporting

2   department.

3        Q.    And so regardless of what else the

4   correspondence disputes, once -- the credit reporting

5   department is going to reaffirm that the debt belongs

6   to the borrower?

7        A.    That is correct.

8        Q.    And are there any other steps that are

9   taken in every dispute regardless of what the

10  specific content is?  Because it sounds like --

11       A.    Yes.  Again, you have to be a little

12  more -- you have to generalize based on a dispute or

13  be a little more specific on what type of dispute in

14  the credit reporting department that they handled.

15       Q.    But they do reaffirm the debt belongs to

16  the borrower?

17       A.    That is correct.

18       Q.    Regardless of dispute?

19            But beyond that, there is no other

20  standard practice in the research department?

21       A.    Again, it depends on the type of

22  dispute.  And then the response goes back to the

23  borrower based on what they've concluded on their --

24  on their research.

25       Q.    Now, is that -- even if a dispute is

18

1    originated from the credit reporting agency, does the

2    borrower still get a direct resolution letter from

3    OCWEN?

4         A.    Can you repeat that question?

5         Q.    Yes.

6               So there are two ways a consumer can

7    dispute their debt, either directly or through a

8    credit reporting agency?

9         A.    That is correct.  We start with a

10   borrower's dispute.

11        Q.    So if a dispute came through a credit

12   reporting agency --

13        A.    Then it goes directly to the credit

14   reporting department.  There is a separate system

15   that they use that does the communications to the

16   national agencies.

17        Q.    Let me back up then.  I'm sorry.  I got

18   confused.

19               So this is when the borrower submits the

20   dispute, the --

21        A.    A direct dispute from the borrower.  I

22   think that was your initial question.

23        Q.    Got you.

24               And so the response would go directly

25   back to the borrower at that point?

Lyew, Sandra

August 28, 2015

19

1       **A.      That's correct.**

2       Q.      If a dispute originated from a

3   third-party that was authorized to file that dispute,

4   would they get the dispute resolved?

5       **A.      All parties should receive it.  The**

6   **borrower should receive, as well as the third-party.**

7       Q.      And so -- okay.  So when the credit

8   reporting agency initially makes the dispute with

9   OCWEN, is there a different process?  Does it go to

10  the research department?

11      **A.      No, because the credit agency went**

12  **directly to the credit reporting department.  They**

13  **use a separate system to do their communications**

14  **regarding the dispute.**

15      Q.      What system is that?

16      **A.      e-Oscar.**

17      Q.      So what form comes to the credit

18  reporting department through e-Oscar?

19      **A.      e-Oscar is an ACDV.**

20      Q.      Is it always automated or is there ever

21  just a regular consumer dispute verification form

22  sent, a paper form sent?

23      **A.      No.  Everything is through the system.**

24      Q.      Strictly automated?

25      **A.      Yes.**

Lyew, Sandra                                      August 28, 2015

20

1        Q.      And does anything come along with the
2    ACDV?
3        A.      No.
4        Q.      Are there ever any attachments to the
5    ACDV from the credit reporting agencies to OCWEN?
6        A.      No.  It's just the type of dispute.  And
7    based on the type of dispute, the credit reporting
8    department then notates the OCWEN system of the
9    dispute coming in.  And that also takes within
10   30 days to respond back.
11       Q.      The 30 days starts as soon as OCWEN
12   receives the ACDV?
13       A.      That is correct.  And that stays
14   directly in the credit reporting department.
15       Q.      So OCWEN's investigation is based solely
16   off of the credit reporting agency's dispute?
17       A.      OCWEN, meaning the credit reporting
18   department?
19       Q.      Yes.
20       A.      Yes.
21       Q.      Sorry.
22               So they don't receive correspondence
23   when they get an ACDV --
24       A.      No.
25       Q.      -- is that correct?

Henderson Legal Services, Inc.

202-220-4158                    www.hendersonlegalservices.com

Lyew, Sandra

August 28, 2015

21

1       A.      No.

2       Q.      So, for instance, Equifax would not

3   attach a letter from a consumer?

4       A.      No.

5       Q.      So how does Equifax communicate the

6   dispute for OCWEN to reinvestigate?

7       A.      Certain codes that they use, and based

8   on the code they -- for instance, Equifax stipulates

9   what the dispute is about.  And that also gets

10  notated in OCWEN's system.

11      Q.      When you say stipulates what the dispute

12  is about --

13      A.      Right.  Based on an AC -- ACDV form that

14  comes through to OCWEN through the e-Oscar, it tells

15  you what the dispute is, borrower's name,

16  information, and the type of dispute that the

17  borrower has sent to them.

18      Q.      So based on that -- based on

19  Equifax's -- in this example, based on Equifax's

20  designation of the dispute, OCWEN investigates that

21  specific dispute?

22      A.      Yes.  That's correct.

23      Q.      Along with affirming that the account

24  belongs to the borrower?

25      A.      That is correct.

Lyew, Sandra

August 28, 2015

22

1     Q.     So what are OCWEN's -- what's their

2  decision tree once they receive a dispute and they've

3  reinvestigated it?

4     A.     The response goes back to the credit

5  agency based on their findings.

6     Q.     And what are the possible responses?

7     A.     The possible responses is reconfirming

8  that the borrower's name matches to OCWEN's records,

9  Social Security number, property address, and

10  whatever the findings are as far as the credit that

11  OCWEN has reported to the credit agency.  And the

12  credit reporting also does initial investigation as

13  far as reviewing the business records, as well as

14  what's in the OCWEN system, to assure that the

15  account does belong to the borrower.

16     Q.     So you say they can review the business

17  records?

18     A.     Yes.

19     Q.     And you reference the mortgage?

20     A.     The mortgage, any closing documentation,

21  anything that is forwarded to us.

22     Q.     Forwarded from where?

23     A.     From the processors, in this case Litton

24  Mortgage.  So in this case OCWEN acquired Litton

25  Mortgage, so OCWEN also had access to their business

Lyew, Sandra

August 28, 2015

23

1    records, as well, their system, reconfirming that.

2         Q.    Okay.  In a hypothetical where OCWEN

3    received a dispute, they look over the closing

4    documents and they're still not able to resolve the

5    dispute by looking at those, other paperwork, is

6    there anything else they can do to investigate such a

7    dispute?

8         A.    Well, hypothetical question?

9         Q.    Yes.

10        A.    Hypothetical.

11        Q.    Can they, for instance, contact the

12   research department for a service question?

13        A.    They have access to contact any

14   department within OCWEN, as well as they can

15   research -- they're trained to research anything --

16   anything as far as the whole system, so the whole

17   system is the loan servicing system.  They can find

18   any additional information or any information that

19   they can possibly find in the OCWEN system.

20        Q.    So they do have broader access -- they

21   typically would look to closing documents or

22   documents from the prior servicer, but if they needed

23   additional information they have access to that?

24        A.    Yes.  The system -- I have access.  I

25   can view each -- I can view as far as escrows, loan

Lyew, Sandra

August 28, 2015

24

1   information, taxes, anything dealing with the loan

2   servicing of that loan.

3           And just to clarify, each department

4   have certain -- have their own functions as far as

5   system -- well, like credit reporting deals strictly

6   with credit reporting.  They're not accessed to input

7   other information other than the credit reporting

8   information.  Same goes for any other department.

9       Q.    So someone in credit reporting could

10  review an escrow department?

11      A.    They can only review it.

12      Q.    But they can't add to it?

13      A.    They can't add to it.

14      Q.    Okay.  Is there ever a situation where

15  credit reporting identifies an issue in the escrow

16  department and they need to communicate to escrow to

17  fix it or to collaborate?  Does that occur?

18      A.    It could occur with any department, so

19  an email and/or -- as well as identifying in the note

20  log an email sent to; for instance, you mentioned

21  escrow department, identifying an error.

22      Q.    Okay.

23      A.    Or a correction in -- error, a

24  correction that needs to be made.

25      Q.    So if the credit reporting department

Lyew, Sandra

August 28, 2015

25

1    identifies an issue that has arisen in another

2    department, are they able to change the credit report

3    without modifying the other department, as well?

4         A.     Who?

5         Q.     So, for instance, the credit reporting

6    department identifies an issue with escrow based on a

7    consumer dispute, they notify the escrow department.

8    Are they allowed to modify the credit report based on

9    this dispute and their investigation without getting

10   a simultaneous modification in the escrow department?

11              MR. MANNING:  Object to the form.

12              You can answer if you understand.

13              THE WITNESS:  I think I understand.  I

14   think.

15   BY MR. NOLAN:

16        Q.     Convoluted there, so --

17        A.     Based on your question, nothing can be

18   done to -- in regards to credit reporting until the

19   full investigation is completed, if that's what you

20   meant.  And these are all hypothetical questions.

21        Q.     That is correct.

22        A.     Okay.

23        Q.     So once the credit reporting department

24   completes its review and sends a response back to the

25   credit reporting agency, I assume?