Page 1

1          IN THE UNITED STATES DISTRICT COURT

2      FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA

3                   Beckley Division

4          Civil Action No.:  5:14-cv-24506

5    _____

6    DAVID M. DAUGHERTY,

7             Plaintiff,

8        vs.                          DEPOSITION OF:

9    EQUIFAX INFORMATION SERVICES,   STEVEN F. NAPIER

10   LLC, and OCWEN LOAN SERVICING,

11   LLC,

12            Defendants.

13   _____/

14

15            TRANSCRIPT of the stenographic notes

16   of the proceedings in the above-entitled matter,

17   as taken by and before, CONNIE M. NICHOLS,

18   Registered Professional Reporter and Notary

19   Public of the State of West Virginia, held at

20   the offices of WINGATE BY WYNDHAM, 1502 Grand

21   Central Avenue, Vienna, West Virginia, on

22   Friday, August 21, 2015, commencing at 2:06 p.m.

23

24   Job No. 2123679

Page 2

```
 1    A P P E A R A N C E S:

 2

 3    HAMILTON, BURGESS, YOUNG & POLLARD, PLLC
      BY:  JED R. NOLAN, ESQ.
 4    5493 Maple Lane
      Fayetteville, West Virginia 25840
 5    (304) 574-8038
      jnolan@hamiltonburgess.com
 6    Attorney for the Plaintiff
      (via teleconference)
 7

 8    TROUTMAN SANDERS, LLP
      BY:  JON M. KENNEY, ESQ.
 9    222 Central Park Avenue, Suite 2000
      Virginia Beach, Virginia 23462
10    (757) 687-7500
      jon.kenney@troutmansanders.com
11    Attorneys for the Defendants
      (via teleconference)
12

13    ANDREW C. WOOFTER, III, PLLC
      BY:  ANDREW C. WOOFTER, III, ESQ.
14    429 Market Street, Suite 201
      Parkersburg, West Virginia 26101
15    (304) 834-1145
      info@woofterlaw.com
16    Attorney for One Community Federal Credit Union

17

18

19

20

21

22

23

24
```

Page 3

1                         I N D E X

2    WITNESS          DIRECT   CROSS   REDIRECT   RECROSS

3    STEVEN F. NAPIER

4    BY MR. KENNEY       4       --      43, 46       --

5    BY MR. NOLAN       --      41        --         45

6

7                      E X H I B I T S

8    NUMBER              DESCRIPTION                    PAGE

9     Exhibit 1        Notice of Deposition           12

10                     for Steven F. Napier

11    Exhibit 2        Amended Notice of Deposition    12

12                     for One Community

13    Exhibit 3        Computer notes                 18

14    Exhibit 4        Affidavit                      23

15    Exhibit 5        Documents produced in response 29

16                     to subpoena

17    Exhibit 6        Handwritten note               37

18

19

20

21

22

23

24

Page 4

1                           *   *   *

2                   STEVEN F. NAPIER,

3  being first duly sworn, was examined and deposed

4  as follows:

5                           *   *   *

6                   E X A M I N A T I O N

7  BY MR. KENNEY:

8      Q.    Now I'd ask you to please state your

9  name and date of birth on the record, please.

10     A.    Steven F. Napier, 5/14/1965.

11     Q.    Thank you very much, Mr. Napier.  My

12  name is Jon Kenney, and I'm the attorney that is

13  representing the defendant in this case, Ocwen

14  Loan Servicing.  And we're here today for your

15  deposition.  Have you ever given deposition

16  testimony before?

17     A.    Yes, sir.

18     Q.    And how many times have you given

19  deposition testimony?

20     A.    Probably a half-dozen times.

21     Q.    Have you ever given a Rule 30(b)(6)

22  deposition for One Community Federal Credit

23  Union?

24     A.    No, sir.

Page 5

1      Q.     In the depositions that you've given

2    previously, have they been 30(b)(6) depositions

3    or have they been depositions in your personal

4    capacity?

5      A.     They were more along the lines of when

6    I was in the collections field and a

7    repossession agent.

8      Q.     Okay.

9             And I'll just go over a couple ground

10   rules anyway, because I just like to have it on

11   record.

12            So I'll be asking some questions

13   today, and some of them you may want to answer

14   with a "yes" or "no."  And if that's the answer

15   you care to give, I just ask you to verbalize it

16   for the court reporter.  Okay?

17     A.     Yes, sir.

18     Q.     And you understand today that you are

19   under oath just as you would be in court?

20     A.     Yes, sir.

21     Q.     Okay.

22            And it's very important that you

23   listen to the question that I ask, so that you

24   can give me a responsive answer.  So if I ask a

Page 6

1    question that you don't understand for any

2    reason, please just let me know and I'll be a

3    happy to repeat myself.  Okay?

4        A.    Not a problem.

5        Q.    And if you need a break for any

6    reason, just let me know and I'm happy to go off

7    the record.  Okay?

8        A.    Okay.  Thank you.

9        Q.    And do you have any kind of medical

10   condition which might hinder your ability to

11   testify accurately today?

12       A.    No.

13       Q.    Are you taking any medication that

14   might affect your memory?

15       A.    No, sir.

16       Q.    Okay.

17             And I'd just like to ask you what you

18   did to prepare for your deposition today.

19       A.    I met with Andrew Woofter yesterday

20   for approximately a half-hour, and kind of read

21   through the notes.  And that was about it.

22       Q.    Did you review any documents?

23       A.    No.

24       Q.    Have you had a chance to review the

Page 7

1   documents that were provided to -- provided in

2   response to the subpoena, the document subpoena?

3       A.    Yes.

4       Q.    Okay.

5            And I understand that you had met with

6   Mr. Woofter.  Had you met with anyone else to

7   discuss this deposition?

8       A.    No.

9       Q.    And have you talked with anyone other

10  than your attorney about this deposition?

11      A.    My CEO.

12      Q.    Okay.

13           And what is his or her name?

14      A.    It's Randall W. Brooks.

15      Q.    And just very briefly, what was the

16  nature of that conversation?

17      A.    He was just curious as to what the

18  deposition was about.

19      Q.    Okay.

20           So you just sort of explained what the

21  deposition was about?

22      A.    Yeah, from my understanding.  I just

23  explained to him what my understanding of it was

24  about.

Page 8

1     Q.    Okay.

2           Are you aware that the plaintiff in

3     this case, Mr. Daugherty, had filed a complaint?

4     A.    Yes.

5     Q.    And have you had a chance to review

6     that complaint?

7     A.    I quickly read through it this

8     morning.  It was the first time I'd seen it.

9     Q.    And what is your understanding of this

10    lawsuit?

11    A.    My understanding is that there was an

12    error that was reported on a credit bureau

13    incorrectly, and he was trying to get it

14    resolved.  And that was basically it, in a

15    nutshell.

16    Q.    Okay.

17          And so what is it that you -- what is

18    it that, in your understanding, that my client,

19    Ocwen, did wrong in this case?

20    A.    From my understanding, it was

21    something that was reported on the credit bureau

22    in error, and they just haven't been able to get

23    it resolved or corrected on the credit report.

24    Q.    Okay.

Page 9

```
 1            Is there anything else?
 2     A.    From my understanding, as a result of
 3   that, then he has had a hard time getting
 4   refinanced on his loan.
 5     Q.    Okay.
 6            And I'd just like to ask a couple
 7   questions about you.  Can you tell me about your
 8   education.  What is the highest level of
 9   education that you received?
10     A.    Got a bachelor's degree in business
11   administration from Glenville State College.
12     Q.    Okay.
13            And how long have you been working for
14   One Community?
15     A.    I have been with One Community since
16   2006, but in the credit union business since
17   1995.
18     Q.    And what is your current position with
19   One Community?
20     A.    The operations manager.
21     Q.    And when you were hired at One
22   Community, what was your position?
23     A.    Operations manager.
24     Q.    So is it fair to say that the entire
```

Page 10

1    span of your employment with One Community, you

2    have been the operations manager?

3        A.    Yes, sir.

4        Q.    Okay.

5              And what are your duties as operations

6    manager?

7        A.    I have multiple duties, as far as the

8    oversight of the -- overall general operations

9    of the credit union and as far as supervision of

10   its staff, procedures and policies.

11       Q.    Okay.

12             And did you receive any sort of

13   specialized training, other than your

14   bachelor's, before taking this position?

15       A.    Just various training throughout the

16   years of being in the credit union movement, as

17   far as seminars or Webinars, things along that

18   nature.

19       Q.    And is this just internal training

20   that's done by the bank?

21       A.    No, most of it was done either by

22   League Services or other third-party

23   institutions.

24       Q.    Okay.

Page 11

```
 1          And I know you had mentioned earlier
 2   that before you were at One Community you were
 3   in the collections industry.  So what was your
 4   most recent employment before One Community?
 5      A.    Before One Community Federal Credit
 6   Union I was working at -- let me think here.  I
 7   came from Mountain Heritage Federal Credit
 8   Union.  It was formerly the IRS credit union,
 9   where I was the assistant manager there.  And
10   that was basically collections/operational.
11      Q.    And about how long did you work there?
12      A.    Approximately two years.
13      Q.    And what were your responsibilities as
14   the assistant manager there?
15      A.    We had multiple branches throughout
16   the state of West Virginia.  We revamped the
17   loan policies and procedures in collection
18   efforts, and supervision of staff.
19      Q.    Okay.
20          And if you will, take a look at the
21   Notice of Deposition for Steve Napier.
22          MR. KENNEY:  And I believe this
23   should be what's marked under tab 3, and we can
24   just mark it Exhibit 1.
```

Page 12

1                              *   *   *

2              (Whereupon, Napier Deposition Exhibit 1

3   was marked for purposes of

4   identification.)

5                              *   *   *

6   BY MR. KENNEY:

7       Q.    Have you had a chance to review this

8   document?

9       A.    Yes.

10      Q.    And are you willing to testify to the

11  matters set out in this notice?

12      A.    Yes.

13      Q.    Okay.

14            And I'd like you to next look at the

15  Amended Notice of Deposition for One Community.

16            MR. KENNEY:  And we can mark this

17  as Exhibit 2.

18                             *   *   *

19            (Whereupon, Napier Deposition Exhibit 2

20  was marked for purposes of

21  identification.)

22                             *   *   *

23  BY MR. KENNEY:

24      Q.    And, Mr. Napier, have you had a chance

Page 13

1    to review this document?

2        A.    Yes.

3        Q.    And are you the person who's been

4    designated to testify as the matters set forth

5    in this deposition?

6        A.    Yes.

7        Q.    And are you willing to testify about

8    the matters set out in the list of designated

9    topics?

10       A.    Yes.

11       Q.    And do you understand that you're

12   testifying today both in your personal capacity

13   and as the representative of One Community?

14       A.    Yes, sir.

15       Q.    And do you understand that the answers

16   that you give today are binding on One

17   Community?

18       A.    Yes, sir.

19       Q.    Okay.

20             I'd just like to ask you now a couple

21   of questions about your relationship with the

22   plaintiff in this case, Mr. Daugherty.  Do you

23   recall when you first met Mr. Daugherty?

24       A.    It was many years ago.  Many, many

Page 14

1    years ago at a former credit union that I used

2    to work at.  He was one of our members in

3    another credit union I used to work at years

4    ago.

5         Q.    Okay.

6               And so do you have an approximation?

7    Has it been 10 years?  Twenty years?

8         A.    If I had to guess, I would say it's

9    probably been around 10 years ago.

10        Q.    Okay.

11              And when you had moved over to One

12   Community, is this about the time that

13   Mr. Daugherty had moved over to One Community?

14        A.    I think Mr. Daugherty had been at One

15   Community long before I got there.  I think he

16   was a member there long before that time.

17        Q.    Okay.

18              And specifically about, in the last

19   three years or so, I understand Mr. Daugherty

20   had got a couple loans from One Community; is

21   that right?

22        A.    I think that he had gotten some car

23   loans and maybe some unsecured loans with One

24   Community during that time.

Page 15

1      Q.     And did he ever interact with you when

2   trying to get any of the loans, the car loan?

3      A.     Most of the time the loan officers

4   dealt with David.

5      Q.     Had you ever dealt with him directly?

6      A.     Not directly on a loan.  I would

7   sometimes look at some of his requests after the

8   fact.

9      Q.     Do you know if you ever discussed

10   applying for or being denied for credit as a

11   result of what appeared on his credit report?

12      A.      Not until this mortgage loan.  When he

13   was looking to refinance his house with us,

14   Debbie Lee is actually the first person that

15   talked with him.  And for One Community

16   procedures, if there's a person that's in

17   bankruptcy or foreclosure, then we're not

18   allowed to proceed with that loan, as far as

19   doing any further steps into that loan.

20      Q.     Do you recall when Mr. Daugherty had

21   first spoken with One Community regarding

22   attempting to refinance this property?

23      A.      Debbie Lee had brought that to my

24   attention and wanted to know if there was

Page 16

1    anything we could do for him.  But I told him

2    with the foreclosure, we couldn't proceed any

3    further with that.

4         Q.    Do you recall when he first sought to

5    refinance with One Community?

6         A.    No, I don't remember the exact dates.

7         Q.    And did he ever tell you or anyone at

8    One Community that his credit report was

9    reflecting the property as being in foreclosure?

10        A.    No, the only thing he said that he had

11   some credit report issues that were in error,

12   that they weren't correct.

13        Q.    Did he tell you anything -- did he

14   tell you or One Community anything specifically

15   about the Ocwen tradelines that were appearing

16   on his credit report?

17        A.    The only thing he said was Ocwen had

18   things on his credit report that were not

19   correct, is basically all that he said, until we

20   actually pulled credit on him.

21        Q.    Okay.

22              And how many times did Mr. Daugherty

23   meet with One Community to discuss this

24   refinance?

Page 17

1      A.      I believe that he met with Debbie Lee

2   one time.  And there -- he came into my office

3   one time and talked with me about the

4   possibilities of it.  So a total of just two

5   times, that I can remember.

6      Q.      Were there any other employees at One

7   Community that worked with Mr. Daugherty about

8   this refinance?

9      A.      Not on the mortgage, no.

10     Q.      And I know that you had said that he

11  had spoken within Debbie Lee and he had spoken

12  with you.  Do you recall when he had spoken with

13  you?

14     A.      If I had to guess, I would say it was

15  probably maybe May of 2014, possibly.  Somewhere

16  in that time frame.

17     Q.      And do you recall when he had first

18  spoken with Debbie Lee?

19     A.      I would say it was probably within

20  that same month.  And don't quote me on that,

21  I'm not exactly sure of those dates.

22     Q.      Okay.

23          And I'd like to ask you now just a

24  couple questions about the documents that were

Page 18

```
 1   produced in response to the subpoena.  I'd first
 2   like to look at the -- it looks to be some
 3   computer notes.
 4                  MR. KENNEY:  I believe these were
 5   what was previously marked as tab 7, and I'd
 6   like to have those marked as Exhibit 3.
 7                       *   *   *
 8                  (Whereupon, Napier Deposition Exhibit 3
 9   was marked for purposes of
10   identification.)
11                       *   *   *
12   BY MR. KENNEY:
13       Q.    Mr. Napier, are you familiar with this
14   screen print?
15       A.    Yes, sir.
16       Q.    And can you just describe generally
17   what this is?
18       A.    This is basically a loan officer's
19   comments about a loan that is being applied for.
20   And this is where they put their notes in there,
21   so two months down the road we can remember why
22   we did what we did.
23       Q.    So this was not Debbie Lee or you,
24   this is a separate employee at One Community?
```

Page 19

1       A.      Yes, sir.  That 001 up there in the

2    square, and it's got the 731, that 001 is a

3    teller ID.  And that belongs to our loan officer

4    named Stacy Darling.  So this would be her

5    notes.

6       Q.      Okay.

7               But Mrs. Darling didn't have any

8    direct interaction with Mr. Daugherty; is that

9    right?

10      A.      Not about the mortgage loan, correct.

11      Q.      And this was just her notes after

12   reviewing his file, correct?

13      A.      Correct.  About a consumer loan.

14      Q.      And these notes, the first one here

15   appears to be dated July 23, 2014, at

16   10:38 a.m.; is that right?

17      A.      Yes, sir.

18      Q.      And is that the date that this note

19   would have been entered?

20      A.      Correct.

21      Q.      And just going through the notes here,

22   I see it mentions a couple tax liens.  Are you

23   aware of any tax liens that were appearing on

24   Mr. Daugherty's credit report?

Page 20

1      A.      Yes, sir.

2      Q.      And what is your understanding of

3  those tax liens?

4      A.      They, from my understanding, they were

5  federal or state tax liens.  I think they were

6  federal tax liens.

7      Q.      And these were outstanding, nonpaid

8  liens?

9      A.      Yes, sir, they were outstanding liens.

10  That was part of the reason he was asking for

11  the refinance, I believe, was to refinance a

12  house and pay those tax liens.

13      Q.      Okay.

14          And it looks like there's a note in

15  here about a van -- it's notated, it says:

16  "Member wants loan to repair van instead of

17  taking on a new car payment.  LTV" -- which I

18  imagine stands for "loan to value."  Is that

19  correct?

20      A.      Yes, sir.

21      Q.      Okay.

22          And so these are notes with regard to

23  a consumer loan to repair a van, it appears; is

24  that correct?

Page 21

1       A.      Correct.

2       Q.      Okay.

3               And on the next page, there's a

4    another entry of notes underneath this note, and

5    this one looks like it's also dated July 24,

6    2014.  And it looks like it says:  "I've known

7    Dave for a long time.  I believe he will pay.

8    Other income not included from the business.

9    Value of the van will cover most of the loan if

10   push comes to shove."

11              And it looks like this is your name;

12   is that right?

13      A.      Yes, sir.

14      Q.      So was this an entry that was made by

15   you?

16      A.      Yes.

17      Q.      So when Mr. Daugherty was applying for

18   this consumer loan, what was the process for

19   that?  The consumer loan with regard to this van

20   that's being spoken of in these notes here, what

21   was the process for applying for that loan?

22      A.      He would have come in and talked to

23   Stacy Darling and applied for the loan.  And if

24   I remember correctly, Stacy come around and had

Page 22

1    talked to me about the loan, wanted to make sure

2    we were comfortable granting the loan for the

3    van repairs.

4         Q.    Was there any formal application that

5    was made with regard to this private consumer

6    loan?

7         A.    Yes.

8         Q.    And what did that application involve?

9         A.    What a normal process you go through

10   for an application:  name, address, Social

11   Security number, income.

12        Q.    Was there a credit check that was done

13   with regard to this loan?

14        A.    I'm almost positive there was, yes.

15        Q.    And that credit check, would that have

16   been done within the same time period, July 24,

17   2014?

18        A.    Yes, sir.

19        Q.    And it looks like he was ultimately

20   approved for this loan; is that right?

21        A.    Correct.

22        Q.    Okay.

23              And I'd like to turn now to the

24   affidavit that you had submitted.

Page 23

1              MR. KENNEY:  And this is tab 6, and

2    we can mark this Exhibit 4.

3                        *   *   *

4              (Whereupon, Napier Deposition Exhibit 4

5    was marked for purposes of

6    identification.)

7                        *   *   *

8    BY MR. KENNEY:

9        Q.    Mr. Napier, are you familiar with this

10   document?

11       A.    Yes, sir.

12       Q.    And this is an affidavit that was

13   executed by you; is that correct?

14       A.    Correct.

15       Q.    Did you write this affidavit?

16       A.    Yes.

17       Q.    I'd like to turn to paragraph 4 here,

18   which says:  "One Community Federal Credit Union

19   procedures require that the lending process ends

20   if an applicant is in bankruptcy or

21   foreclosure."

22       A.    Okay.

23       Q.    Is that right?

24       A.    Yes, sir.

Page 24

1      Q.     And I understand that the context that

2   this is in was that because there was a

3   foreclosure appearing on Mr. Daugherty's credit

4   report, there was no further inquiry in the

5   application process; is that right?

6      A.     Correct.  We couldn't proceed any

7   further with the process.

8      Q.     And how did you know that the

9   foreclosure was appearing?

10      A.     It showed up on his Tri-Merge credit

11   report, when Debbie Lee pulled credit on

12   Mr. Daugherty.

13      Q.     So in connection with this refinance,

14   you had actually run a credit inquiry; is that

15   right?

16      A.     Yes.

17      Q.     And going back to this affidavit,

18   paragraph 5 says:  "Although Mr. Daugherty had

19   state tax liens on his credit report and other

20   collections, the Credit Union may have offered a

21   loan to Mr. Daugherty because of his history

22   with the Credit Union."

23             Is that correct?

24      A.     Yes, sir.

Page 25

1      Q.    And I understand you have written here

2   the word "may."  And so I just want to ask:  You

3   can't say with reasonable certainty that One

4   Community would have offered a loan; is that

5   correct?

6      A.    Correct.   Too many variables.

7      Q.    And you have here at the bottom of it:

8   "May have offered a loan to Mr. Daugherty

9   because of his history with the Credit Union."

10           However it's not a -- it's not a

11   common practice to approve loans simply because

12   of a relationship with One Community; is that

13   right?

14      A.    It depends on the situation and the

15   individual.

16      Q.    If there were adverse tradelines

17   appearing on a consumer's credit report, it

18   would not be the normal practice of One

19   Community to approve a loan for that consumer

20   simply on the basis of their relationship with

21   the bank -- well, let me rephrase that.

22           If there were adverse tradelines on a

23   consumer's credit report, it wouldn't be the

24   normal practice of One Community to approve a