**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA**

**BECKLEY DIVISION**

DAVID M. DAUGHERTY,

               Plaintiff,

v.                                      CIVIL ACTION NO.  5:14-cv-24506

EQUIFAX INFORMATION SERVICES, LLC,
and OCWEN LOAN SERVICING, LLC,

               Defendants.

**MEMORANDUM OPINION AND ORDER**

The Court has reviewed *Defendant Ocwen Loan Servicing, LLC's Motion for Summary Judgment* (Document 95) and accompanying exhibits, and the *Memorandum in Support* (Document 96).  The Court has also reviewed the *Plaintiff's Response in Opposition to Ocwen Loan Servicing, LLC's Motion for Summary Judgment* (Document 101) and accompanying exhibits, and the *Reply Memorandum in Support of Defendant Ocwen Loan Servicing, LLC's Motion for Summary Judgment* (Document 103).   For the reasons stated herein, the Court finds that the motion should be granted in part and denied in part.

**PROCEDURAL HISTORY**

The Plaintiff initiated the present action with the filing of a *Complaint* on June 8, 2014, in the Circuit Court of Raleigh County, West Virginia.  (Pl.s' Compl., Document 1:1.)  The Plaintiff named Equifax Information Services, LLC ("Equifax") and Ocwen Loan Servicing, LLC ("Ocwen") as Defendants, asserting that when Plaintiff sought to refinance a mortgage loan, currently serviced by Ocwen, false or misleading statements on his credit report attributable to

both Defendants prevented him from doing so.  (Compl. at 3.)   The Plaintiff asserted a number of claims against the Defendants, including violation of Section 1681s-2(b)(1)(A) of the Fair Credit Reporting Act ("FRCA"), 15 U.S.C. §1681s-2(b)(1)(A), unlawful debt collection practices under West Virginia Code §46A-2-127(d), and various claims sounding in West Virginia common law, including negligence and the tort of outrage.  (*Id*. at 6-9.)   The Plaintiff also requested that the court exercise equitable power to prevent foreclosure of his property, invoking the common-law doctrine that equity abhors a forfeiture.  (*Id*. at 9-11.)

On August 7, 2014, the case was removed to the United States District Court for the Southern District of West Virginia.  (Document 1:3.)   Ocwen filed its *Answer* to the Plaintiff's complaint on August 8, 2014.  (Document 4.)   Ocwen denied any unlawful conduct and all assertions of liability.  (*Id*.)   On July 8, 2015, Counsel for the Plaintiff notified the Court by letter that all claims against Defendant Equifax had been settled.  (Document 80.)   The Defendant's motion for summary judgment is ripe for review.

## STATEMENT OF FACTS

On July 20, 1999, the Plaintiff and his spouse executed a promissory note (the "loan") with EquiFirst Corporation for a property located at 16 Valley View Drive in Vienna, West Virginia (the "property"), with an original principal amount of $100,860.00.  (Def. Mem. in Supp. of Mot. Summ. J. at ¶1.)  The loan called for monthly payments, and a balloon payment of $82,666.34 due on July 26, 2014.  (*Id.*)  The loan was transferred to Litton Loan Servicing, LLC on November 20, 2004.  (*Id*. at ¶3).  On November 1, 2011, Ocwen acquired the servicing rights to the loan.  (*Id*. at ¶5.)   When Ocwen acquired the loan, the Plaintiff was past due on his monthly payments, and the Plaintiff was subsequently delinquent on payments for December 2011, January 2012 and February 2012, for a total delinquency of $6,128.39.  (*Id*. at ¶6.)  In December 2011, Ocwen began

furnishing monthly reports on the loan to the consumer reporting agencies ("CRAs").  From November 2011 through April 10, 2012, Ocwen "accurately reported" the loan as overdue.  (*Id*. at ¶9.)  The April 10, 2012 report reflected the status of Plaintiff's account from March 1, 2012 through March 31, 2012.  (*Id*.)  In April of 2012, the Plaintiff's delinquency led Ocwen to commence foreclosure proceedings against the Plaintiff.  (*Id*. at ¶6.)  On April 23, 2012, the Plaintiff paid the past due balance and reinstated the loan.  (*Id*.)  With the exception of a late payment in March of 2013, the Plaintiff has remained current on the loan since that date.  (Def. Mot. for Summ. J. at ¶8.)

When Ocwen acquired the loan, the date of origination was incorrectly listed.  (Def. Mem. in Supp. of Mot. Summ. J. at ¶5.)  Ocwen realized the error in March 2012, and "corrected" the opening date to July 20, 1999.  (*Id*., at ¶7.)  Equifax then added a second listed account, or "tradeline," for the Ocwen account.  (*Id*.)  One tradeline reported the account as current, while the other tradeline continued to reflect the account as 120 days past due.  (*Id*.)  No other CRA reported a second tradeline, and it is undisputed that Ocwen never reported a duplicate tradeline to Equifax. (*Id*. at ¶7)

Ocwen reports to each CRA using the e-Oscar system, a "web-based, automated" portal run by the CRAs that "enables CRAs to create and data furnishers like Ocwen to respond" to credit disputes using Automated Credit Dispute Verifications ("ACDVs").  (*Id*. at ¶16.)  When a consumer disputes an entry on a credit report, the CRA sends the dispute to the data furnisher through e-Oscar, and, after "conducting an investigation," the data furnisher responds through e-Oscar through an ACDV.  (*Id*.)  When a CRA sends a credit dispute to Ocwen via e-Oscar, a code is assigned to the dispute describing the nature of the dispute.  (*Id*. at ¶17.)  The parties do not dispute that the only two codes assigned by the CRAs to disputes filed by the Plaintiff in this case

were "001," which is used when the customer disputes ownership of the account, and "106," referring to a dispute about the "present/previous account status/payment history profile, payment rating." (*Id*. at ¶16.)

### A. The March 2013 Disputes

In March 2013, the Plaintiff reviewed his credit report, anticipating efforts to refinance the loan due to the pending balloon payment. (Document 101, at 1.) The Plaintiff then discovered that his Equifax report contained two tradelines for the Ocwen loan. One tradeline reflected that the loan was delinquent for March of 2013. The second tradeline inaccurately reported that the Plaintiff's account was over 120 days past due, and that foreclosure had begun. (Pl.s' Mem. in Opp. of Mot. Summ. J. at 1.) Shortly thereafter, on March 14, 2013, the Plaintiff sent a letter to Ocwen stating that his "credit report with Equifax" reflected a delinquency of $6,128.00 with Ocwen Loan Servicing, and also stated that his loan was in foreclosure. The Plaintiff requested that Ocwen "please correct these records". (Pl.s' Mem. in Opp. of Mot. Summ. J., Ex. 8.) The Plaintiff attached to the letter a credit report showing an Ocwen tradeline ending in 2012. The tradeline reflected a delinquency of at least 120 days, and also stated that foreclosure proceedings had begun. (Pl.s' Mem. in Opp. of Mot. Summ. J., Ex -19, at 17.) On March 18, 2013, Ocwen responded to Plaintiff's letter, stating that "[a]s of March, 2012, your loan was due for the November 26, 2011 contractual payment and the total amount past due on the loan was in the amount of $6,128.39." (Pl.'s Mem. in Opp. of Mot. Summ. J., Ex. 7.) The letter also noted that foreclosure proceedings began on April 18, 2012 and stopped on April 23, 2012. (*Id*.)

The Plaintiff disputed the Ocwen tradeline with Equifax on March 20, 2013. Ocwen's service logs for the Plaintiff's loan reflect that on March 20, 2013, an ACDV was received, stating "Borrower's concern with reporting: Not his/hers. Provide or confirm complete ID." (Pl.s' Mem.

in Opp. of Mot. Summ. J., Ex 23, at 16.)   The logs also show that on March 20, 2013, Ocwen reported to "credit bureau" that the account was "[v]erified, hence bwr[sic] is responsible." (*Id*. at 17).   On March 20, 2013, Ocwen sent the Plaintiff a letter confirming receipt of the request for research on his loan, and stating that "[i]t is Ocwen's policy to perform all research and provide a written response to you within twenty (20) days from the receipt of your letter."  (Pl.s' Mem. in Opp. of Mot. Summ. J., Ex 7.)   The Plaintiff also claimed to have also submitted a dispute to Equifax in March of 2013, disputing the account status and payment history.  (Pl.s' Mem. in Opp. of Mot. Summ. J. at 2.)   The Plaintiff claims the ACDV reported a "tradeline indicating a past due amount of $6,128, an account status of 120 days past due, and the special comment code that foreclosure proceedings started."

Also in March of 2013, the Plaintiff engaged a credit repair service, Aggressive Credit Repair ("ACR").   At the time, the Plaintiff had at least twelve additional adverse tradelines, including tax liens and various delinquencies.  (Def. Mem. in Supp. of Mot. Summ. J. at ¶12.)   In June and July of 2013, ACR and the Plaintiff disputed the Ocwen tradeline with Equifax, resulting in several ACDVs.  Ocwen's logs reflect that the ACDVs only requested confirmation that Plaintiff owned the account.  (Pl.s' Mem. in Opp. of Mot. Summ. J. Ex. 24, at 24.)   Ocwen responded to each ACDV by verifying that the Plaintiff was responsible for the account.

### B.  The March 2014 Disputes

On March 19, 2014, the Plaintiff sent a letter to Ocwen complaining that Equifax was showing his account as 120 days late in the Months of June, July, October and December of 2013, and reporting an incorrect balance.  (Pl.s' Mem. in Opp. of Mot. Summ. J. Ex. 19, at 15.)  Attached to the letter was an Equifax credit report showing that the Ocwen account was at least "120 days or more than four payments past due," that the "foreclosure process" had begun, and that the

5

Plaintiff had missed payments in March, June, July, October and December of 2013.  (*Id*. at 17.)
The Plaintiff also sent a copy of the letter to the Consumer Financial Protection Bureau ("CFPB").
(Def. Mem. in Supp. of Mot. Summ. J., at 6.)  The Defendant responded by informing the Plaintiff
it had sent a request to the CRAs to correct any discrepancy in the loan balance, and also told him
it would provide him with a payment history.  (Def. Reply in Supp. of Mot. Summ. J., at 6.)

The Plaintiff sent a similar letter to the CFPB on March 26, 2014.   The letter stated that
his Equifax report showed late mortgage payments to Ocwen for March, July, October and
December of 2013, as well as a past-due balance of $6,128.00.  The Plaintiff expressed suspicions
that Ocwen was deliberately refusing to correct the incorrect reports in order to "profit from [the
plaintiff's] equity."  (Pl.s' Mem. in Opp. of Mot. Summ. J. Ex. 29, at 1-2.)  Ocwen received notice
of all communications with the CFPB.  (Pl.s' Mem. in Opp. of Mot. Summ. J. Ex. 26, at 8-10.)  On
April 17, 2014, the Plaintiff updated the request, stating that he had "sent Ocwen a copy of my
Equifax report," showing a delinquency of 120 days in March, June, July and October of 2013.
On or before June 9, 2014, the CFPB communicated with Ocwen about the account, and Ocwen
confirmed that the Plaintiff was current for June, July, October and December of 2013.  The CFPB
issued a response to Plaintiff on June 9, 2014, noted the past due payment from March 2013, and
also noted that the balance of the account was currently correct.  (*Id*.)

Ocwen's logs reflect five phone calls from the Plaintiff on March 17, 2014, requesting,
*inter alia*, the payment due on the account, the fax number for the Research department, and the
credit reporting on the account in 2013.  After initially informing the Plaintiff that the account was
current, Ocwen reported that the account was reported late in March 2013 due to a late payment.
(Pl.s' Mem. in Opp. of Mot. Summ. J. Ex. 26, at 1.)  The Plaintiff then initiated a dispute with
Equifax.  Equifax created an ACDV on March 18, 2014, requesting that Ocwen confirm that the

6

loan was not "his/hers".  Ocwen informed the CRAs that the Plaintiff was responsible for the account.  (*Id*. at 2.)  Later, on March 21, 2014, Ocwen updated the Plaintiff's account information by distributing an Automated Universal Dataform ("AUD"), which "[u]pdated and reported the current balance of the loan … as per transaction history to all four credit bureaus.  (Def. Mem. in Supp. of Mot. Summ. J. at 7; Pl.s' Mem. in Opp. of Mot. Summ. J. Ex. 26, at 2.)

Ocwen also responded to ACDVs filed by the Plaintiff on April 23, 2014.  (Pl.s' Mem. in Opp. of Mot. Summ. J. Ex. 30.)  Ocwen's logs reflect that through the ACDVs, Ocwen learned that the account was listed "120 days past the due date."  Ocwen therefore reported that the account was current as of March 2014.  (Pl.s' Mem. in Opp. of Mot. Summ. J. Ex. 26, at 13.)  Ocwen also "modified" the Plaintiff's account to reflect that the account was current, that there was a zero balance, and also "modified the payment history profile."  (Pl.s' Mem. in Opp. of Mot. Summ. J. at 3; Def. Reply in Supp. of Mot. Summ. J. at 7.)

### C.  The June 2014 ACDVs

In June 2014, Plaintiff disputed the Ocwen tradeline several times, resulting in multiple ACDVs.  (Pl.s' Mem. in Opp. of Mot. Summ. J. Ex. 27 at 5-8). These ACDVs indicated that the Plaintiff continued to dispute ownership of the inaccurate Ocwen tradeline, and also disputed the account status and payment history.  (*Id*.; Pl.s' Mem. in Opp. of Mot. Summ. J. Ex. 31.)   Ocwen informed Equifax that the account was "current," that the Plaintiff did not have a past due balance, and also updated the payment history profile.  (Def. Reply in Supp. of Mot. Summ. J. at 8.)

### D.  The June 2014 CFPB Inquiry and Subsequent Events

The CFPB submitted a second request to Ocwen on June 26, 2014.  The CFPB specifically inquired about whether Plaintiff was late with payments in March, June, July, October and December 2013.  (Def. Reply in Supp. of Mot. Summ. J. at 8.)  The CFPB submitted a third request on June 30, 2014.  According to the Defendant's logs, the CFPB noted that Ocwen "indicated that

[their] records show that the credit reporting correctly reflected the loan as current for the months of March, June, July, October and December 2013." (Pls.' Mem. in Opp. of Mot. Summ. J. Ex. 27, at 9.) The CFPB requested that Ocwen "provide documentation" showing Ocwen had reported the Plaintiff as current for that period of time. (*Id*. at 10.) Neither request mentions foreclosure, or a duplicative tradeline. (*Id*.) On July 2, 2014, the log indicates that Ocwen completed an e-OSCAR Credit Update, reporting the loan as "Paid as Agreed and Current" for the months of March, June, July, October and December 2013." (*Id*. at 11-12.)   On July 2, 2014, Ocwen sent an AUD to each of the CRAs, showing that Plaintiff was current for all of 2013, not in foreclosure, and had a zero balance. (Pl.s' Mem. in Opp. of Mot. Summ. J. Ex. 32.) The Plaintiff commenced this action on July 14, 2014.  Since the commencement of this action, the Plaintiff has not been turned down for credit, and Equifax deleted the inaccurate tradeline no later than September 2014. (Def. Reply in Supp. Mot. Summ. J. at 9.)   Quicken Loans agreed to refinance the Plaintiff's mortgage in May 2015. (*Id*.)

### E. The Plaintiff's Credit Applications

The record indicates that during the relevant period, the Plaintiff sought consumer credit on several occasions, and inquired with multiple lenders about refinancing his Ocwen loan.  On or about June 17, 2013, the Plaintiff sought to refinance his loan with Ocwen through Embrace Home Loans.  In May 2014, the Plaintiff communicated with Quicken Loans about refinancing the loan. The Plaintiff informed Quicken that he was having problems with his mortgage on his credit report, and Quicken Loans "quickly ended the loan application." (Pls.' Mem. in Opp. Mot. Summ. J. Ex. 2, at 61:23-63:9.)  The Plaintiff also applied for a home loan with One Community Federal Credit Union in May 2014.  (*Id*. at 16:22-17:16.)  The Plaintiff did not proceed with the application

because of the reported foreclosure.  (*Id.*)  Finally, the Plaintiff was declined by Chase Bank USA, NA for a Disney Visa Platinum Card on May 6, 2014.  (Pl.s' Mem. in Opp. Mot. Summ. J. at 8.)

### F.  The Plaintiff's Alleged Emotional Distress

The Plaintiff also testified that as a result of his credit problems and inability to refinance his mortgage, he suffered emotional trauma.  (Pl.s' Mem. in Opp. Summ. J. at 9.)  The Plaintiff testified about significant anxiety about his ability to resolve the pending balloon payment, and a resulting decline in quality of life. (*Id.*)  The Plaintiff testified that he has felt more "stressed out than normal" since discovering the inaccurate Ocwen tradeline, and that his sleep has been significantly disturbed.  (*Id.*)  However, as Ocwen notes, the Plaintiff does not provide any evidence showing that he has sought medical treatment for his anxiety, or that he is currently under the care of any mental health practitioner.

## STANDARD OF REVIEW

The well-established standard in consideration of a motion for summary judgment is that "[t]he court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a)–(c); *see also Hunt v. Cromartie*, 526 U.S. 541, 549 (1999); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247 (1986); *Hoschar v. Appalachian Power Co.*, 739 F.3d 163, 169 (4th Cir. 2014).  A "material fact" is a fact that could affect the outcome of the case.  *Anderson*, 477 U.S. at 248; *News & Observer Publ'g Co. v. Raleigh-Durham Airport Auth.*, 597 F.3d 570, 576 (4th Cir. 2010).  A "genuine issue" concerning a material fact exists when the evidence is sufficient to allow a reasonable jury to return a verdict in the nonmoving party's favor.  *FDIC v. Cashion*, 720 F.3d 169, 180 (4th Cir. 2013); *News & Observer*, 597 F.3d at 576.

The moving party bears the burden of showing that there is no genuine issue of material fact, and that it is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a); *Celotex Corp.*, 477 U.S. at 322–23. When determining whether summary judgment is appropriate, a court must view all of the factual evidence, and any reasonable inferences to be drawn therefrom, in the light most favorable to the nonmoving party. *Hoschar*, 739 F.3d at 169. However, the non-moving party must offer some "concrete evidence from which a reasonable juror could return a verdict in his favor." *Anderson*, 477 U.S. at 256. "At the summary judgment stage, the non-moving party must come forward with more than 'mere speculation or the building of one inference upon another' to resist dismissal of the action." *Perry v. Kappos*, No.11-1476, 2012 WL 2130908, at *3 (4th Cir. June 13, 2012) (unpublished decision) (quoting *Beale v. Hardy*, 769 F.2d 213, 214 (4th Cir. 1985)).

In considering a motion for summary judgment, the court will not "weigh the evidence and determine the truth of the matter," *Anderson*, 477 U.S. at 249, nor will it make determinations of credibility. *N. Am. Precast, Inc. v. Gen. Cas. Co. of Wis.*, 2008 WL 906334, *3 (S.D. W. Va. Mar. 31, 2008) (Copenhaver, J.) (citing *Sosebee v. Murphy,* 797 F.2d 179, 182 (4th Cir. 1986). If disputes over a material fact exist that "can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party," summary judgment is inappropriate. *Anderson*, 477 U.S. at 250. If, however, the nonmoving party "fails to make a showing sufficient to establish the existence of an element essential to that party's case," then summary judgment should be granted because "a complete failure of proof concerning an essential element . . . necessarily renders all other facts immaterial." *Celotex*, 477 U.S. at 322–23.

**DISCUSSION**

Ocwen seeks summary judgment on Count Four, in which Plaintiff seeks actual and punitive damages under 15 U.S.C. §1681(n) and (o) for Ocwen's allegedly willful and negligent violations of 15 U.S.C. §1681(s)-2(b)(1)(A). Ocwen also seeks summary judgment on Count Five, which alleges violations of West Virginia Code Section 46A-2-127(d), Count Six, alleging negligence, and Count Seven, alleging the tort of outrage. Ocwen also requests that the Court dismiss Count Eight, "equity abhors a forfeiture," for failing to state a claim upon which relief can be granted. The Plaintiff opposes summary judgment on all counts except Count Five, which the Plaintiff agrees to dismiss. (Document 101, at 21.)

*A. The Plaintiff's FCRA Claim*

Count Four of the Plaintiff's Complaint alleges that the Defendant violated 15 U.S.C. §1681s-2(b)(1)(A). (Compl. at 8.) This section provides, in pertinent part, that after receiving notice of a dispute, a furnisher of information, such as Ocwen, must "conduct an investigation with regard to the disputed information." 15 U.S.C. §1681s-2(b)(1)(A).[1] It is well-established that a private plaintiff has a cause of action for violations of Section 1681s-2(b)(1)(A). *See Ayers v. Equifax Info. Servs.,* No.03-551, 2003 WL 23142201, at *5 (E.D.Va. Dec. 16, 2003). Congress has also empowered private plaintiffs to seek civil damages for willful or negligent violations of the FCRA. Damages for willful breaches of the FCRA are governed by 15 U.S.C. §1681n, which allows a private plaintiff to claim actual and punitive damages for a Defendant's willful violation.

---

[1]  The Court notes that the Plaintiff's Complaint does not address the remaining prongs of 15 U.S.C. §1681s-2(b)(1), including whether Ocwen "reviewed all relevant information" provided by Equifax under 15 U.S.C. §1681s-2(b)(1)(B), and reported their findings to Equifax under 15 U.SC. §1681s-2(b)(1)(B). The Plaintiff also does not contest whether Ocwen satisfied the statutory timeline for completing investigations, set forth in 15 U.S.C. §1681s-2(b)(2). Therefore, the Court's analysis will focus exclusively on whether Ocwen satisfied the standard for Summary Judgment on the Plaintiff's claim under 15 U.S.C. §1681s-2(b)(1)(A).

Plaintiffs may also claim actual damages for a Defendant's negligent conduct under 15 U.S.C. §1681o.

The FCRA provides consumers with a reliable and systematic method to dispute and correct inaccurate information in credit reports. *Johnson v. MBNA America Bank, NA*, 357 F.3d 426, 430-31 (4th Cir. 2004.)  The Fourth Circuit has interpreted Section 1681s-2(b)(1)(A) of the FRCA to require that, when a customer disputes a tradeline on a credit report through a CRA, the furnisher of the tradeline must conduct a "reasonable," rather than a superficial or minimal investigation. *Johnson v. MBNA America Bank*, NA, 357 F.3d 426, 430-31.  The Fourth Circuit has thus "infused a qualitative component" into the obligations of a data furnisher.  To satisfy the reasonable investigation standard, a data furnisher must conduct a "searching inquiry" into the dispute. *Jones v. Experian Information Systems, Inc*., *et. al.*, 2012 WL 2905089, at *4 (E.D.Va. 2012), citing *Johnson*, at 430-31.  The duty is triggered when a data furnisher receives notification of a dispute from the CRA.  15 U.S.C. §1681s-2(b)(1); *Mavilla v. Absolute Collection Service, Inc., et. al.*, 539 F.Appx. 202 (4th. Cir. 2013) (unpublished).  A reasonable investigation requires the data furnisher to go beyond a cursory review of internal records. *Johnson*, 357 F.3d at 431.  Nor may a data furnisher restrict an investigation to information provided by the CRA. *Saunders v. Equifax Information Services*, L.L.C., 2006 WL 2850647 (E.D.Va. October 3, 2006) (unpublished), aff'd sub nom. *Saunders v. Branch Banking and Trust Co. of Va*, 526 F.3d 142 (4th Cir. 2008).  However, a "reasonable" investigation does not require the data furnisher to consult external sources. *Jones*, 2012 WL 2905089, at *5. To determine whether a furnisher's investigation is reasonable, the fact-finder must weigh the "cost of verifying the accuracy of the information" against the "possible harm of reporting inaccurate information." *Akalwadi v. Risk Management Alternatives, Inc*., 336 F. Supp. 2d 492, 510 (D.Md. 2004), quoting *Johnson*, 357

F.3d at 432.  It is generally a question of fact for the jury as to whether a data furnisher conducted

a reasonable investigation under Section 1681s-2(b)(1)(A).  *Akalwadi*, at 510, *citing Bruce v. First*

*U.S.A. Bank*, *N.A*., 103 F.Supp. 2d 1135, 1143 (E.D.Mo. 2000).  Thus, the threshold task for the

Court is to determine if any issue of material fact exists as to whether Ocwen conducted a

reasonable investigation of the Plaintiff's disputes.

Ocwen argues that as a matter of law, its investigation of the Plaintiff's disputes was

reasonable.  (Def. Mem. in Supp. of Mot. Summ. J. at 11.)  (*Id*.)  Ocwen states that it never reported

two tradelines, and that the Plaintiff never explicitly informed Ocwen that Equifax showed two

separate Ocwen tradelines on the Plaintiff's report.  (*Id*.)  Ocwen acknowledges the high volume

of ACDVs on the account, but claims to have reasonably investigated each in a timely fashion.

(*Id*. at 12.)  Ocwen notes that all of the ACDVs from Equifax regarding the Plaintiff's account fell

into two categories: disputes about the Plaintiff's ownership of the account, and disputes about the

account's status, payment history and payment rating.  (*Id*. at 7.)  For those ACDVs that disputed

ownership of the account, Ocwen claims that it conducted a reasonable investigation by

"access[ing] the underlying loan documents and verify[ing] that the account belonged" to the

Plaintiff.  (*Id*.)   For ACDVs that disputed the status and payment history of the account, Ocwen

claims that it "accessed its servicing records" and "verified the payment history and account

status." (*Id*.)  Ocwen also emphasizes that "[o]n numerous occasions," Ocwen reported to Equifax

that the Plaintiff's account was current.  (*Id*.)

Ocwen relies heavily upon two cases from outside the Fourth Circuit in seeking summary

judgment on the Plaintiff's FCRA claim: *Westra v. Credit Control of Pinellas*, 409 F.3d 825 (7th

Cir. 2005) and *Malm v. Household Bank* (SB), N.A., 2004 U.S. Dist. LEXIS 12981 (D. Minn. July

7, 2004).  In *Westra*, a victim of identity theft disputed a medical bill through a CRA, and provided

the CRA with a description of the fraud and information about the perpetrator.  *Westra,* 409 F.3d at 825.  The CRA generated a dispute verification form, and sent the form to the data furnisher. *Id*.  The form did not refer to fraud or identity theft, or include the victim's documentation.  *Id*.  As a result, the data furnisher verified the account information as accurate.  *Id*.  The victim later brought suit against the data furnisher under Section 1681s-2(b)(1)(A), claiming that the investigation was unreasonable.  *Id*. at 827.  The defendant moved for summary judgment, and the District Court granted the motion.  *Id*.  On appeal, the Seventh Circuit found that the data furnisher's investigation, which involved verification of the victim's name, date of birth, and mailing address, was reasonable because the CRA provided "scant information" about the dispute. Id.  The Seventh Circuit also disagreed with the victim's assertion that the CRA should have "contacted him directly" about the account, finding that "[w]hile that would have undoubtedly helped matters in the instant case," requiring data furnishers to individually contact every customer that disputed an account would "be terribly inefficient," and was not required by the FCRA.  *Id*. Similarly, in *Malm*, the District Court for the District of Minnesota found that in the absence of additional information from the CRA, a data furnisher had reasonably investigated an ACDV that disputed ownership of an account by verifying that the plaintiff's name, date of birth and other identifying information matched its internal records.  *Malm*, 2004 U.S. Dist. 12981, at *14-15. Ocwen argues that, like the defendants in *Westra* and *Malm*, Equifax provided "scant information" about the Plaintiff's disputes, and that in light of the information provided, Ocwen's investigation was reasonable as a matter of law.  (Pl.s' Mem. in Supp. of Mot. Summ. J. at 13.)  Ocwen urges the Court to follow these cases, and argues that "[g]iven the cursory notice and scant information provided" by Equifax and the Plaintiff, its investigation of each ACDV was reasonable.  (*Id*.)

The Plaintiff, meanwhile, argues that Ocwen fails to satisfy the standard for summary judgment on the FCRA claim.  (Def. Mem. in Opp. of Mot. Summ. J. at 12-13.)  The Plaintiff argues that under *Johnson*, Ocwen was obligated to conduct more than a mere "data conformity" review of the Plaintiff's numerous disputes.  (*Id*. at 14.)  The Plaintiff argues that this sort of cursory investigation is "especially inadequate" where "the furnisher has additional information regarding a consumer dispute from the consumer himself."  (*Id*.)  Noting Ocwen's reliance on *Westra*, the Plaintiff distinguishes *Westra* by noting that here, the Plaintiff had provided additional information to Ocwen in the form of multiple letters.  (*Id*.)  To support this distinction, the Plaintiff refers the Court to *Alabran v. Capital One Bank*, 2005 WL 3338663 (E.D.Va. December 8, 2005) (unpublished).  (*Id*.)  In that case, the Eastern District of Virginia found that the "scant information" test set forth by *Westra* was inapplicable where the plaintiff had "lodged the dispute directly with the furnisher" as well as with the CRAs.  *Alabran,* 2005 WL 3338663, at *7.

The Plaintiff emphasizes that a "simple investigation" would have notified Ocwen that a customer cannot have "two tradelines for the same account," and that suggestions that Ocwen required additional notice are "inflammatory."  (Pls. Mem. in Opp. of Mot. Summ. J. at 15.) Moreover, the Plaintiff argues that Ocwen cannot be excused from liability simply because it received and responded to ACDVs from Equifax.  Instead, the Plaintiff argues that the ACDVs, taken with the additional information the Plaintiff provided directly to Ocwen and the inquiries by the CFPB, required Ocwen to conduct a more vigorous investigation. (*Id*.)  In support of this point, the Plaintiff also notes that any actions Ocwen took to "correct" inaccurate information on the Plaintiff's credit report ultimately "failed," because the inaccurate tradeline remained.  (Document 101, at 16.)

After careful review, the Court finds Ocwen fails to establish that summary judgment should be granted on the Plaintiff's claim under Section 1681s-2(b)(1)(A). Ocwen repeatedly emphasizes three facts in seeking summary judgment: (1) that the Plaintiff never explicitly informed Ocwen that the Plaintiff's Equifax credit report showed two tradelines for his Ocwen account; (2) that the Plaintiff never provided Ocwen with a complete copy of the erroneous Equifax report, reflecting the two tradelines; and (3) that Ocwen never reported two tradelines to Equifax or any other CRA. However, these facts do not establish that there is no genuine issue of material fact as to whether Ocwen conducted a reasonable investigation of the Plaintiff's disputes under Section 1681s-2(B)(1)(A). They do not establish, that as a matter of law, Ocwen reasonably investigated the Plaintiff's CRA disputes.

The record reveals that the Plaintiff discovered the inaccurate Equifax report in March 2013, and immediately disputed the inaccurate report. The Plaintiff continued to dispute the inaccurate tradeline through June 2014. Ocwen received numerous ACDVs from Equifax as a result of these disputes, requesting that Ocwen confirm that the Plaintiff was the proper owner of the account, and also requesting confirmation of the account status and payment history. When Ocwen received ACDVs seeking confirmation that the Plaintiff was responsible for the account, Ocwen uniformly reviewed its records and confirmed Plaintiff's identity and that he was responsible for the Ocwen loan. In April and June of 2014, when Ocwen received requests to verify the account status and payment history, Ocwen made several corrections to the Plaintiff's account, and reported that the account was current.

The record also reveals that the Plaintiff informed Ocwen in writing about specific inaccuracies in his Equifax report on two separate occasions, and provided Ocwen with credit reports from Equifax which inaccurately reflected missed payments, serious delinquencies and/or

16

foreclosure proceedings on the Plaintiff's account.  Ocwen also received inquiries and information from the CFPB about the Plaintiff's account.  Despite actions taken by Ocwen in response to these inquiries and to the ACDVs, the Plaintiff's Equifax credit report continued to reflect inaccurate information about the Ocwen account through at least June 2014.  Analyzing these facts in the light most favorable to the non-moving Plaintiff, they indicate that Ocwen had available for review additional information about potential inaccuracies with the Plaintiff's account, had direct communications with the Plaintiff about the inaccuracies, had knowledge that the Plaintiff's credit report inaccurately showed that the Ocwen account was past due, and, in at least one instance, that foreclosure proceedings had commenced.

Possibly in an effort to mitigate the impact of the Plaintiff's letters and the CPFB communication, the Defendants urge that *Westra* and *Malm* counsel for granting summary judgment in this case, because Ocwen only received "scant information" about the Plaintiff's disputes.  Viewing the evidence as required, the Court is unpersuaded.  As a preliminary matter, *Westra* and *Malm* do not reflect the law of the Fourth Circuit.  The Court also notes that *Westra* and *Malm* involved disputes limited to the ownership of an account, and did not encompass the payment history or status of the account.  More significantly, in neither case did the plaintiff contact the data furnisher directly, in addition to submitting a dispute to a CRA.  Viewing the evidence in the light most favorable to the Plaintiff, these distinctions are significant.  The letters and attached credit reports provided Ocwen with significantly more information than the ACDVs.  Moreover, the Court in *Malm* explicitly noted that had the relevant credit dispute in that case included more "specific notice about the Plaintiff's concerns," the Defendant may have been "compelled to conduct a more thorough review, thus creating an issue of reasonableness."  *Malm*, 2004 U.S. Dist. LEXIS 12981, at *12.  Fourth Circuit precedent holds that a reasonable

investigation must be "searching," rather than limited to brief reviews of internal records. The Court therefore finds that in light of the direct communication by the Plaintiff with Ocwen, the multiple ACDVs regarding the ownership, payment history and account status of the Ocwen account, the inquiries by the CFPB and the modifications made by Ocwen to the Plaintiff's tradeline, a genuine issue of material fact remains as to whether Ocwen reasonably investigated the Plaintiff's dispute.   And while the Court notes the Defendant's arguments that genuine issues of material fact may exist as to whether the Defendant suffered actual damages under 15 U.S.C. §1681n and 15 U.S.C. §1681o, the Court concludes that, in light of the finding that there exist issues of material fact as to whether Ocwen's investigation was reasonable, issues of damages under the FCRA are appropriately left for resolution at trial.

B. *Negligence*

Count Six of the Plaintiff's Complaint argues that Ocwen's "significant communications and activities" with the Plaintiff, in conjunction with the Plaintiff's existing loan with Ocwen, created a "special relationship" which, under West Virginia law, required Ocwen to provide the Plaintiff with "accurate information about his loan account and its obligations and rights hereunder."  (Compl. at ¶41-42.)  The Plaintiff further asserts that the Defendant breached that obligation by "refusing to respond to … inquiries," noting but failing to correct inaccuracies in the Plaintiff's Equifax credit report, "advising Plaintiff to contact [Equifax]," rather than resolving the inaccuracies directly, and "ultimately denying Plaintiff assistance."  (*Id.* at ¶43.)  The Plaintiff alleges that this misconduct led to "severely negative credit reporting" which rendered futile the Plaintiff's efforts to refinance his loan.  (Id. at ¶44.)

"In order to prove actionable negligence there must be shown a duty on the part of the person charged with negligence . . . ." Syl. Pt. 2, *Atkinson v. Harman*, 151 W. Va. 1025, 158 S.E.2d

18

169, 171 (W. Va. 1967).   The law provides many sources from which a duty may arise, for example, a statute, the common law, or public policy. *See generally* 65 C.J.S. Negligence § 35 (2014).  Besides these traditional sources, West Virginia law also recognizes that a duty in tort can arise from a "special relationship" between the parties. S*ee O'Brien v. Quicken Loans, Inc*., Nos. 2:12CV5138, 2:12CV5262, 2013 U.S. Dist. LEXIS 74363, 2013 WL 2319248, at *10 (S.D.W. Va. May 28, 2013) (citing *Glascock v. City Nat'l Bank of W. Va.*, 213 W. Va. 61, 576 S.E.2d 540, 545 (W. Va. 2002)).  In this context of a borrower-servicer relationship, West Virginia law requires the Plaintiff to establish a "special relationship" by showing that the servicer performed services that go beyond the normal scope of a borrower-servicer relationship.  *Carter v. Nat'l City Mortg., Inc*., 2015 U.S. Dist. LEXIS 25766, at #18 (N.D.W.V. March 3, 2015).  The Court finds that the Plaintiff has made no such showing in this case.  To the contrary, the evidence on the record reveals that Ocwen has provided the Plaintiff with routine lender services.   There exists no genuine disputes as to material fact on this issue, and therefore, the Defendant is entitled to summary judgment on this claim.

### C.  Tort of Outrage

Count Seven of the Plaintiff's Complaint alleges the Tort of Outrage. (Compl. at 10.)  In moving for summary judgment on this Count, Ocwen correctly states that as a matter of West Virginia law, a plaintiff must show that a defendant's conduct was "atrocious, intolerable, and so extreme and outrageous as to exceed the bounds of decency" to establish the Tort of Outrage, which is also known as Intentional Infliction of Emotional Distress. (Def. Mem. in Supp. of Mot. Summ. J. at 19, citing *Syl. Pt. 3*, *Travis v. Alcon Labs*., *Inc.*, 202 W. Va. 369, 504 S.E.2d 419 (W.Va. 1998).  A plaintiff must also show that the defendant acted with intent to inflict emotional distress, or acted recklessly when "certain or substantially certain" such distress would result from

his conduct. *Travis*, 202 W.Va. at 375, 504 S.E.2d at 425, citing *Hines v. Hills Department Stores Inc.*, 193 W.Va. 91, 98, 454 S.E. 2d 385, 454 (1994) (per curiam). Finally, the plaintiff must show that the actions caused the plaintiff to suffer emotional distress, and that the emotional distress was "so severe that no reasonable person could be expected to endure it." *Id*.

In this case, the Plaintiff sets forth several facts in support of this claim. The Plaintiff argues that the existence of two tradelines in the Equifax credit reports, each providing different facts about the Ocwen account, is per se evidence of outrage. (Pl. Mem. in Opp. to Mot. Summ. J. at 21.) The Plaintiff also alleges that Ocwen "completely disregard[ed] Plaintiff's repeated showings that Ocwen was verifying inaccurate tradelines." (*Id*.) Finally, the Plaintiff alleges that Ocwen's "refusal to investigate" the disputes in this case "could be found to go beyond all possible bounds of decency," and thus be "regarded atrocious and utterly intolerable in a civilized community." In the view of the Court, the Plaintiff sets forth no facts which would allow a trier of fact to find that Ocwen's conduct satisfies the standard for Outrage under West Virginia law. Most notably, the Plaintiff fails to plead or assert any facts which suggest Ocwen acted with the intent to cause emotional distress, or that even if Ocwen was "reckless" in investigating his credit disputes, it was "certain or substantially certain" that such conduct would cause emotional distress. The Plaintiff's testimony about his concern and worry and the emotional costs of his recurring credit problems, without more, is insufficient to support a genuine dispute of material fact regarding the requisite elements of this claim. The Defendant is entitled to summary judgment as to the Plaintiff's claim for the Tort of Outrage.

D.  *Equity Abhors a Forfeiture*

The Eighth and final Count of the Plaintiff's Complaint is uniquely phrased as "[e]quity [a]bhors a [f]orfeiture." (Compl. at 10.) In moving for summary judgment on this Count, the

Defendant correctly asserts that "equity abhors a forfeiture" fails to establish a cause of action. (Def. Reply in Supp. of Mot. Summ. J. at 20.)  The Plaintiff, by contrast, argues that the Court should apply the common-law doctrine that equity abhors a forfeiture in order to preserve the Plaintiff's home.  (Pl. Mem. in Opp. Summ. J. at 21.)  However, the Plaintiff provides no precedential support for the use of that doctrine in this case.  The Plaintiff instead argues that because the Plaintiff has not finalized the terms of the pending refinancing with Quicken Loans, the Court should consider Ocwen's misconduct, and take such action as is necessary to prolong the Plaintiff's ability to reside in his home.  (*Id*.)  There is no basis in law for such a claim, and the Court, therefore, finds that the same must be dismissed.

## CONCLUSION

Wherefore, after careful consideration and for the reasons stated herein, the Court **ORDERS** that *Defendant Ocwen Loan Servicing, LLC's Motion for Summary Judgment* (Document 95) be **DENIED** as to Count Four of the Plaintiff's *Complaint* (Document 1:1), alleging violations of the Fair Credit Reporting Act, 15 U.S.C. §1681s-2(b)(1)(A).  The Court further **ORDERS** that the motion be **GRANTED** as to Counts Six and Seven of the Plaintiff's Complaint, and that Count Eight of the Plaintiff's Complaint be **DISMISSED** with prejudice.  The Plaintiff has agreed to voluntarily **DISMISS** Count Five of the Complaint.

The Court **DIRECTS** the Clerk to send a copy of this Order to counsel of record and to any unrepresented party.

ENTER:      October 26, 2015

IRENE C. BERGER
UNITED STATES DISTRICT JUDGE
SOUTHERN DISTRICT OF WEST VIRGINIA

21