```
 1              IN THE UNITED STATES DISTRICT COURT
            FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA
 2                         AT BECKLEY

 3                  TRANSCRIPT OF PROCEEDINGS

 4
       -----------------------------------x
 5     DAVID M. DAUGHERTY,               :
                                         :
 6                    Plaintiff,         :    CIVIL ACTION
                                         :    NO. 5:14-cv-24506
 7              -vs-                      :
                                         :
 8     OCWEN LOAN SERVICING, LLC,        :    May 23, 2016
                                         :
 9                    Defendant.         :
       _____x
10

11
                           TRIAL
12                       VOLUME VI

13
            BEFORE THE HONORABLE IRENE C. BERGER,
14               UNITED STATES DISTRICT JUDGE

15

16     APPEARANCES:

17     For the Plaintiff:     MR. JED ROBERT NOLAN
                              MR. RALPH C. YOUNG
18                            MR. STEVEN R. BROADWATER
                              Hamilton Burgess Young & Pollard
19                            P. O. Box 959
                              Fayetteville, WV  25840-0959
20

21     For the Defendant:     MR. JASON E. MANNING
                              MR. JONATHAN M. KENNEY
22                            Troutman Sanders
                              222 Central Park Avenue
23                            Suite 2000
                              Virginia Beach, VA  23462
24

25
```

I N D E X

                                              PAGE

CHARGE CONFERENCE...................................3

MOTION............................................10

COURT'S CHARGE AND INSTRUCTIONS....................11

CLOSING ARGUMENT (NOLAN)..........................29

CLOSING ARGUMENT (MANNING)........................47

CLOSING ARGUMENT (YOUNG)..........................69

VERDICT...........................................87

PUNITIVE CLOSING ARGUMENT (YOUNG)................101

PUNITIVE CLOSING ARGUMENT (MANNING)..............103

PUNITIVE VERDICT.................................109


EXHIBITS

PLAINTIFF'S                    MARKED       ADMITTED

   30                            91            95

   31                            91            95


    Proceedings recorded by mechanical stenography,
transcript produced by computer.

            **Mary A. Schweinhagen, RDR, CRR**
            Federal Official Court Reporter
             300 Virginia Street, East
              Charleston, WV  25301

                *** *** *** ***

P R O C E E D I N G S

1

2       (Trial resumed at 9:01 a.m.)

3            THE COURT:  Good morning, everyone.

4            RESPONSE:  Good morning, Judge.

5            THE COURT:  Have you all had an opportunity to

6   review the revised charge, Counsel?

7            MR. NOLAN:  Yes, Your Honor.

8            MR. MANNING:  Yes, Your Honor.

9            THE COURT:  All right.  Mr. Nolan, let me begin

10  with you.  Are there objections?

11           MR. NOLAN:  No objections, Your Honor.

12           THE COURT:  All right.  Mr. Manning?  I did have

13  an opportunity to review all of your instructions.

14           MR. MANNING:  Thank you, Judge.  And I see a

15  number have been incorporated, and I thank you for that.

16           THE COURT:  No thanks necessary.  I apologize that

17  I did not review them earlier.

18           MR. MANNING:  Judge, I have minor edits on page

19  17.

20           THE COURT:  All right.

21           MR. MANNING:  There is a double negative.  It's

22  the first full paragraph beginning "Further, you are

23  instructed."

24           THE COURT:  Um-hmm.

25           MR. MANNING:  And I would want to simplify that

1   and just say "concluding its investigation was reasonable,"

2   rather than "not inaccurate."

3          THE COURT:  In other words, it should read, after

4   "concluding its investigation was accurate, then you must

5   conclude that Ocwen has not violated the Fair Credit

6   Reporting Act"?

7          MR. MANNING:  Right.  I think everything's hinged

8   to reasonable investigation, which is why I proposed "its

9   investigation was reasonable."  As opposed to "not

10  inaccurate."

11         THE COURT:  All right.  Any objection, Mr. Nolan?

12         MR. NOLAN:  Your Honor, I believe this paragraph

13  seems more tailored to the information provided itself, and

14  that's why I would prefer the Court's suggestion with

15  changing it to --

16         THE COURT:  I feel --

17         MR. NOLAN:  -- "was accurate."

18         THE COURT:  I'm sorry.  I think it is tailored,

19  and Mr. Manning is correct, "not inaccurate" is not a good

20  way of putting it.  I think it should read, "concluding its

21  investigation was accurate."

22      Let me read it, Counsel, the whole thing, and I'll make

23  a decision here.

24      Um-hmm, that should be "was accurate."  And it does go

25  back, Mr. Manning, as opposed to accurate being with the

```
 1    investigation, it's with the information.
 2              MR. MANNING:  I understand.
 3              THE COURT:  Does that make sense to you?
 4              MR. MANNING:  Yes.
 5              THE COURT:  All right.  Go ahead, please.
 6              MR. MANNING:  Page 18, paragraph 9 is causation,
 7    and I understand that this paragraph has both causation and
 8    damages in it, so I would -- I would -- my preference would
 9    be to have separate paragraphs on causation and damages.
10    Here they are just kind of blended together under one.  They
11    are actually two separate elements, and the jury needs to
12    find both.
13        My proposal would be to have two separate paragraphs.
14              THE COURT:  All right.  Well, I preserve your
15    objection and exception there.  I, again, am trying to put
16    this in language as simple as I can for the jury.  I think
17    that it's appropriate as it is, and I'm going to leave that
18    as is, but I want to preserve Ocwen's objection and
19    exception to -- to that.
20              MR. MANNING:  With that in mind, Judge, then I
21    would just turn to some of the word choice in that same
22    paragraph.
23              THE COURT:  All right.  Which paragraph?  The
24    first one?
25              MR. MANNING:  The single paragraph under
```

1    "Damages."

2            THE COURT:  Okay.  On page 18?

3            MR. MANNING:  Yes, Your Honor.  The sentence I'm

4    looking at, it's a long sentence.  It's the second sentence,

5    "You should only award."  I think you could break that

6    sentence into two.  Again, it's addressing two things:  One

7    is causation and one is damages.

8        As it's written now, it's a five-sentence -- it's a

9    five-line sentence.  I think it's appropriate to break it

10   right in the middle where it says, "to have actually been

11   suffered.  Further, that those damages have been proven by a

12   preponderance of the evidence."

13           THE COURT:  All right.  And, again, I preserve

14   your objection and exception.  And it is a long sentence,

15   which I agree with you, I don't normally like either,

16   Mr. Manning, but there I want to make a point to them in

17   that sentence that they have to be proven by a preponderance

18   of the evidence and suffered as a result of Ocwen's conduct.

19   I think it's a two-prong issue that should be included in

20   the same sentence.

21       I will leave it as is, preserving Ocwen's objection and

22   exception.

23           MR. MANNING:  That's all I have, Judge.

24           THE COURT:  All right.  I want -- the jury isn't

25   coming until 9:30, but I want you all to also have an

1  opportunity to look at the jury verdict form.  And I only

2  have two copies here, so one of you will have to give me

3  yours back for the jury.

4      In the first --

5          MR. NOLAN:  Here you go.

6          THE COURT:  I'm sorry.  In the first instance,

7  those are the only matters that the jury needs to consider,

8  whether or not they find liability by virtue of conducting a

9  reasonable investigation, then willful or negligent, and

10 then damages.  And, of course, depending on what they do

11 with respect to willfulness or negligence, we'll discuss the

12 issue of punitives.

13         MR. MANNING:  Judge, the only other issue we had

14 was there is a pending motion to strike that portion of

15 Mr. Hendricks' testimony where he testified as to causation.

16 We argued that again during the Rule 50 motion.  And as Your

17 Honor saw in his report, there isn't a causation opinion.

18     And what we requested, because of the prejudice from

19 having him say things after two side bars that involved

20 causation, the curative instruction that's appropriate there

21 is for Your Honor to instruct the jury:  The only expert who

22 is to be considered as offering a causation opinion in this

23 case is Mr. Ulzheimer.

24         THE COURT:  Tell me -- you argued that in your

25 Rule 50 motion and I made a note, because I did not recall

1    leaving anything unruled on during Hendricks' testimony.  I

2    want you to tell me specifically what opinion he gave,

3    Mr. Manning, that you are objecting to.

4              MR. MANNING:  It was --

5              THE COURT:  I couldn't find in my notes that I had

6    left anything unruled on in Hendricks' testimony.  Go ahead.

7              MR. MANNING:  It was really related to

8    foreclosure.  He said that the foreclosure was a stop sign

9    and that that stopped creditors from considering the credit

10   application.  And it was linked up to that One Community

11   Federal Credit Union.  That was number one.

12        And number two, that that foreclosure appearing on his

13   credit report causes damages.

14        And really, Your Honor could probably search the

15   transcript for "foreclosure," and that's not in his opinion,

16   that that causes anything whatsoever.  And so that's why we

17   requested the curative instruction, just as Your Honor gave

18   a curative instruction as to Mr. Ulzheimer regarding the

19   ability to pull a hard pull credit report, as being a

20   permissible purpose.

21        I understand Your Honor's ruling on that, and I think

22   it should be mutually applied here that there is a

23   disclosure that's not made in the report under 26(a)(2) and

24   wasn't supplemented under 26(e)(2).  The jury heard it, and

25   they need to be instructed about it.

1            THE COURT:  Mr. Nolan?

2            MR. NOLAN:  Your Honor, on page 6 of

3    Mr. Hendricks' report, he discusses damage to plaintiff's

4    credit and states, "The derogatory Ocwen trade line on

5    plaintiff's credit report was very damaging.  This is

6    because it shows incorrectly the plaintiff was past due on

7    his account.  When this happens, it typically means that a

8    creditor will not extend credit to applicants until they

9    resolve the outstanding debt.  The consumer can sometimes

10   resolve it by disputing it and removing it from the credit

11   report; however, given the difficulty that this can entail,

12   it is often easier and faster to resolve it by paying it.

13   But plaintiff justly failed to do this.  Thus, as soon as

14   the damaging inaccurate Ocwen trade line was removed from

15   plaintiff's Equifax file, plaintiff has been able to move

16   forward on his home loan application with Quicken Loans."

17           THE COURT:  All right.  I will look at the

18   transcript, gentlemen, and get you a ruling here on that

19   pretty quickly, before the jury comes in.

20       Anything further?

21           MR. NOLAN:  No, Your Honor.

22           THE COURT:  All right.  We'll stand in recess

23   until 9:30, or shortly before then.

24       (Recess taken at 9:14 a.m.)

25       (Trial resumed at 9:30 a.m.)

1          THE COURT:  Mr. Manning and Mr. Nolan, as it

2     relates to Mr. Hendricks' testimony, I find that the general

3     characterization in his testimony regarding what you have

4     termed an opinion, Mr. Manning, is generally included in the

5     language of the report.

6          I deny the motion to strike or give a curative

7     instruction, preserving Ocwen's objection and exception.

8          There is an issue you all want to address with the jury

9     verdict form.  We'll do that after your closings, before it

10    goes to the jury.

11         MR. YOUNG:  Your Honor, I have a motion in limine

12    with respect to the closings.

13         THE COURT:  All right.

14         MR. YOUNG:  Your Honor, it has been Ocwen's

15    position and argument throughout this trial that as long as

16    Ocwen investigated the two dispute codes, that they did all

17    they were required to do.  If they argue that in closing,

18    it's absolutely contrary to the Court's instructions.

19         The Court is going to instruct the jury that they have

20    to do a complete review.  They have to look at all of the

21    material.  But every one of the witnesses, including the

22    expert witness, tried to hold the standard out there that

23    all Ocwen had to do was look at the dispute codes, and if it

24    confirmed the dispute codes, then it did nothing wrong.

25         If that continues to be the line of argument, it's

1   contrary to law.  In fact, the entire defense is premised on

2   that.  It's contrary to the law in the Fourth Circuit.  It's

3   contrary to the law under the *Saunders versus BB&T.*

4        And as sure as I am standing here, if the Court doesn't

5   limit Mr. Manning, he is going to insist to the jury that

6   you told them that as long as they looked at the dispute

7   codes and verified those, that somehow they complied with

8   the law.

9             THE COURT:  All right.  Well, let me say this:  If

10  Mr. Manning would argue that to the jury, I would expect

11  there to be an objection, and I will call the jury's

12  attention to the instruction.

13       If Mr. Manning, on behalf of Ocwen, is taking the

14  position that simply looking at the dispute codes is a

15  reasonable investigation as they are required to conduct

16  under the law, I'm going to not prohibit him from arguing

17  that, and to that ruling I preserve the plaintiff's

18  objection and exception.

19       (Jury returned into the courtroom at 9:33 a.m.)

20            THE COURT:  Good morning, ladies and gentlemen.

21  You all have a seat, please.

22       Ladies and gentlemen, now that you have heard all of

23  the evidence, it becomes my responsibility to instruct, or

24  charge, you concerning the law that applies to this case.

25  It is my exclusive responsibility and duty to consider,

determine, and explain the rules of law that apply in a
particular case.  It's the jury's, or your, exclusive
responsibility and duty to consider and determine what
occurred factually, that is, what the jury believes the true
facts are from among all of the evidence and testimony which
has been produced.  I have no right to tell you which facts
are established by the testimony and any exhibits, as that
determination is exclusively yours.

You, and only you, are the judges of the facts.  If any
expression of mine or anything I may or may not have done or
said would seem to indicate any opinion related to any
factual matters in this case, I instruct you to disregard
it.

It is your duty as juries -- it is your duty as jurors
to accept and follow the law as contained in these
instructions, and to apply that law to the facts that you
believe have been proven and established from all of the
evidence in the case.  If I state any rule, direction, or
idea in varying ways, no emphasis is intended by me and none
must be inferred by you.

Each instruction is as important as any other.  You are
not to single out one statement or instruction alone as
stating the law and ignore the other instructions or parts
of instructions.  You are to consider and apply these
instructions together as a whole, and you are to regard each

instruction in the light of all others.  Neither are you to be concerned with the wisdom of any rule of law stated by me.

If you have any personal opinion as to what the law is, or ought to be, you must put that opinion aside and accept and apply the law as it is.  It would be a violation of your sworn duty to base a verdict upon any view of the law other than that given in these instructions; just as it would be a violation of your sworn duty, as judges of the facts, to base a verdict upon anything other than the evidence in this case.

In performing your duties as jurors, you must not permit yourself to be influenced or swayed by sympathy, biased, prejudice, or favor as to any party.  All parties expect that you will carefully and impartially consider all of the evidence, follow the law as it is now being given to you, and reach a just verdict, regardless of consequences.

This case must be considered and decided by you as an action between persons of equal standing in the community and holding the same or similar stations in life.  A corporation is entitled to the same fair and impartial consideration as is a private individual.  All persons, including corporations, stand equal under the law.

A corporation, such as the defendant, can only act through its officers, agents, and employees.  Consequently,

1    any act or omission by officer, agent, or employee of the

2    defendant in the performance of his or her duties is held in

3    law to be the act of the defendant.

4        The burden of proof is on the plaintiff in a civil

5    action, such as this, to prove each and every element of his

6    claim by a preponderance of the evidence.  If the proof

7    should fail to establish any element of the plaintiff's

8    claim by a preponderance of the evidence in the case, or if

9    the defendant's evidence outweighs the plaintiff's, or if

10   the evidence is equally balanced in the case, the jury

11   should find for the defendant as to that claim.

12       To establish by a preponderance of the evidence means

13   to prove that something is more likely so than not so.  In

14   other words, a preponderance of the evidence in the case

15   means such evidence, as when compared and considered with

16   that opposed to it, has more convincing force and produces

17   in your mind a belief that that which is sought to be proved

18   is more likely true than not true.

19       While the burden is on the plaintiff to prove his claim

20   by a preponderance of the evidence, this rule does not

21   require proof to an absolute certainty.  Such proof to an

22   absolute certainty is seldom possible in any case.

23       In a civil case, such as this, as opposed to criminal

24   cases, it is proper to find that the plaintiff has succeeded

25   in carrying the burden of proof if, after consideration of

1    all of the evidence in the case, you believe that what is

2    sought to be proven on that issue is more likely true than

3    not true.

4         You are to determine the facts of this case from the

5    evidence alone.  The evidence in the case always consists of

6    the sworn testimony of all the witnesses, whether the

7    witness appeared in person or by deposition, regardless of

8    who may have called the witness; and all exhibits received

9    in evidence, regardless of who may have produced them; and

10   all facts which may have been admitted by stipulation or

11   admission.

12        When the attorneys for all parties stipulate or agree

13   as to the existence of a fact, the jury must, unless

14   otherwise instructed, accept the stipulation and regard that

15   fact as conclusively proven.

16        During the trial of this case, certain deposition

17   testimony was read to you from a written transcript and

18   consisting of answers under oath to questions asked of the

19   witness in advance of the trial in the presence of a

20   court -- of a court reporter.  The testimony of a witness

21   who, for some reason, cannot be present to testify from the

22   witness stand may be presented in the form of a deposition

23   under oath by written transcript or by videotape.  Such

24   testimony is entitled to the same consideration and is to be

25   judged as to credibility and weight as if the individual had

1    been present and had testified from the witness stand.

2    Accordingly, during your deliberations, you should carefully

3    consider the testimony of each and every witness and all

4    exhibits and not disregard or overlook any testimony,

5    witness, exhibit, or evidence.

6         There are, generally speaking, two types of evidence

7    from which a jury may properly find the truth as to the

8    facts of the case.  One is direct evidence, such as the

9    testimony of an eyewitness.  The other is indirect or

10   circumstantial evidence:  the proof of a chain of

11   circumstances pointing to the existence or nonexistence of

12   certain facts.

13        As a general rule, the law makes no distinction between

14   direct and circumstantial evidence, but simply requires that

15   the jury find the facts in accordance with all of the

16   evidence in the case, both direct and circumstantial.

17        You may not guess or speculate as to the existence of

18   any facts in this case.  But, in your consideration of the

19   evidence, you are not limited solely to what you see and

20   hear as the witnesses testify.  On the contrary, you are

21   permitted to draw, from the facts which you find have been

22   established and proven, such reasonable inferences and

23   conclusions which reason and common sense lead you to make

24   and as seen justified in the light of your own observations

25   and experience in the ordinary affairs of life.

1       Nothing that I have said or done at any time during the

2  trial is to be considered by you as evidence of any fact or

3  as indicating any opinion concerning any fact, the

4  credibility of any witness, the weight of any evidence, or

5  the verdict that should be reached.

6       Nothing said or done by the attorneys is to be

7  considered by you as evidence of any fact.  Opening

8  statements and final arguments are intended to help you to

9  understand the evidence and apply the law, but they are not

10  evidence.  If any argument, statement, or remark of counsel

11  during open statements and closing arguments is inconsistent

12  with the evidence or with my instructions, you should

13  disregard that argument, statement, or remark.

14       Disregard entirely questions and exhibits to which an

15  objection was sustained or answers and exhibits ordered

16  stricken out of the evidence.  Do not draw any inferences

17  therefrom, or speculate as to matters thereby hinted.

18       Anything you may have seen or heard outside the

19  courtroom is not evidence, and must be entirely disregarded.

20       Now, in saying that you must consider all of the

21  evidence, I do not mean that you must accept all of the

22  evidence as true or accurate.  You, as jurors, are the sole

23  judges of the credibility of a witness and the weight of the

24  evidence.  The credibility of a witness means the

25  truthfulness or lack of truthfulness of the witness, and the

1    weight of the evidence means the extent to which you are or

2    are not convinced by the evidence.

3        A witness is presumed to speak the truth, but this

4    presumption may be outweighed by the manner in which the

5    witness testifies, by the character of the testimony given,

6    the circumstances under which the witness has testified, and

7    every matter in evidence which tends to indicate whether the

8    witness is worthy of belief.

9        Inconsistencies or discrepancies in the testimony of a

10   witness, or between the testimony of different witnesses,

11   may or may not cause the jury to discredit such testimony.

12   Two or more persons witnessing an incident may see or hear

13   it differently, and innocent recollection --

14   misrecollection, like failure of recollection, is not an

15   uncommon experience.  Inconsistencies or discrepancies in

16   the testimony of a witness, or between the testimonies of

17   different -- differing witnesses, should be considered by

18   you, but, in weighing their effect, you should consider

19   whether the inconsistencies or discrepancies pertain to a

20   matter of importance or an unimportant detail, and whether

21   the discrepancy or inconsistency results from innocent error

22   or willful falsehood.

23       A witness, whether or not a party, may be discredited

24   or impeached by contradictory evidence, or by evidence that

25   at prior times the witness has testified or has made

1  statements which are inconsistent with the witness' present

2  testimony in this trial.

3      The number of witnesses testifying on one side or the

4  other of an issue is not alone the test of credibility of

5  the witnesses and the weight of the evidence.  If warranted

6  by the evidence, you may believe one witness against a

7  number of witnesses testifying differently.  The tests are:

8  How truthful is the witness, and how convincing is his or

9  her evidence, and which witnesses and which evidence appeals

10  to your minds as being most accurate and otherwise

11  trustworthy in light of all of the evidence and

12  circumstances shown.

13      In determining the credit and weight you will give to

14  the testimony of any witness who has testified before you,

15  you may consider, if found by you from the evidence, his or

16  her good memory or lack of memory; the interest or lack of

17  interest of a witness in the outcome of a trial; the

18  relationship of any witness to any of the parties or other

19  witnesses; his or her demeanor and manner of testifying; his

20  or her opportunity and means or lack of opportunity and

21  means of having knowledge concerning the matters which he or

22  she testified; the reasonableness or unreasonableness of the

23  witness' testimony; his or her apparent fairness or lack of

24  fairness; the intelligence or lack of intelligence of the

25  witness; the bias, prejudice, hostility, friendliness, or

unfriendliness of the witness for or against any of the
parties; contradictory statements of any witness if you
believe that such were made by the witness and that the same
are contradictory of his or her testimony; however,
contradictory statements, if any, may or may not be
considered by the jury to establish the truth of such
statement; contradictory acts of any witness, if you believe
that such were committed by the witness and that they were
contradictory of his or her testimony.

From these considerations and all other conditions and
circumstances appearing from the evidence, you may give to
the testimony of the witness such credit and weight as you
believe it is entitled to receive.

If you believe that any witness in this case has
knowingly testified falsely as to any material fact, you
may, after considering and weighing the testimony of such
witness, disregard the whole of the testimony of such
witness or give it, or any part thereof, such weight and
credit as you believe it to be entitled to receive.

Ordinarily, witnesses are not permitted to testify as
to opinions or conclusions.  However, the rules of evidence
provide that if scientific, technical, or other specialized
knowledge might assist the jury in understanding the
evidence or in determining a fact at issue, a witness
qualified as an expert by knowledge, skill, experience,

training, or education may testify and state his or her

opinion concerning such matters, and may state the reasons

for the opinion.

     You should consider each expert opinion received in

evidence in this case, and the reasons given in support of

the opinion, and give it such weight as you may think it

deserves.

     In determining the weight to be given to the opinion of

an expert, you should consider the education, training, and

experience of the expert, the basis for the opinion, the

confidence of the witness, the reasons and reasoning stated

by the witness, the opinion of other similar witnesses on

the same matters, and the rules generally applicable to

other witnesses in this case.  If you should decide that the

opinion of an expert witness is not based upon sufficient

education and/or experience, or if you should conclude that

the reasons given in support of the opinion are not sound,

or that the opinion is outweighed by other evidence, then

you may disregard the opinion entirely, or give it such

weight as you find it deserves.

     Expert witnesses were, at times, asked hypothetical

questions, and they gave answers to such questions.  A

hypothetical question has been defined as a form of question

in which facts that counsel claims or assumes to have been

proved are stated as a hypothesis and the opinion of an

1    expert is asked thereon.

2        In answering a hypothetical question, an expert witness

3    must accept as true every fact stated therein, but this does

4    not mean that the jury must.  If the jury finds that assumed

5    conditions, circumstances, or facts are not proven by the

6    evidence, the validity of the opinion may dissolve, and both

7    the question and the answer may be disregarded entirely, or

8    given such weight as you may deem it entitled to receive.

9        In this case, the plaintiff, David M. Daugherty,

10   alleges that the defendant, Ocwen Loan Servicing, failed to

11   conduct a reasonable investigation after being notified that

12   Equifax, the credit reporting agency, was reporting a

13   delinquency on his mortgage loan with Ocwen.  Ocwen denies

14   this allegation.

15       Under the Fair Credit Reporting Act, after receiving

16   notice of a dispute with regard to the completeness or

17   accuracy of any information provided by a person to a

18   consumer reporting agency, the person shall, A, conduct an

19   investigation with respect to the disputed information; B,

20   review all relevant information provided by the consumer

21   reporting agency; C, report the results of the information

22   to the consumer reporting agency; D, if the investigation

23   finds that the information is incomplete or inaccurate,

24   report those results to all other consumer reporting

25   agencies to which the person furnished the information and

1    that compiled and maintained files on consumers on a

2    nationwide basis; and, E, if an item of information disputed

3    by a consumer is found to be inaccurate or incomplete or it

4    cannot be verified after any investigation, for purposes of

5    reporting to a consumer reporting agency only, as

6    appropriate, based on the results of the re-investigation,

7    promptly, one, modify the item of information; two, delete

8    that item of information; or, three, permanently block the

9    reporting of that item of information.

10        If the plaintiff proves his case by a preponderance of

11   the evidence, the law specifically permits damages to be

12   awarded to the plaintiff for either willful or negligent

13   noncompliance with the Fair Credit Reporting Act by a

14   furnisher, like the defendant, Ocwen Loan Servicing.

15        Therefore, if you find that the defendant violated the

16   Fair Credit Reporting Act, you must determine whether such

17   violations were negligent or willful.

18        The jury is instructed that negligence is the doing of

19   something which a reasonably prudent person would not do, or

20   the failure to do something which a reasonably prudent

21   person would do, under circumstances similar to those shown

22   by the evidence.  It is the failure to use ordinary or

23   reasonable care.  Ordinary or reasonable care is that which

24   persons of ordinary prudence would use in order to avoid

25   injury to themselves or others under circumstances similar

1   to those shown by the evidence.

2      You will note that the person whose conduct is set up

3   as a standard is a person of reasonable and ordinary

4   prudence.  The conduct in question must be viewed in light

5   of all of the surrounding circumstances as shown by the

6   evidence.

7      Willful violations can be proven by showing not only

8   knowing, intentional violations, but also violations in

9   reckless disregard of the law.  Actual knowledge, malice, or

10   evil motive is not required to show willfulness.  Reckless

11   disregard requires a known or obvious risk that was so great

12   as to make it highly probable that harm would follow.  In

13   other words, Ocwen's conduct must have involved an

14   unjustifiably high risk of harm to the plaintiff that is

15   either known or so obvious it should be known.  The

16   defendant, Ocwen's conduct is not willful if you find that

17   it diligently and in good faith attempted to fulfill its

18   statutory duty.

19      The defendant, Ocwen, was required to conduct a

20   reasonable investigation into the information identified as

21   disputed on the ACDV received from a consumer reporting

22   agency.  A reasonable investigation is a careful inquiry

23   into the relevant information provided by the consumer

24   reporting agency and the records of the defendant, Ocwen, to

25   determine whether the disputed information is reporting

1    accurately or should be modified.  A reasonable

2    investigation does not necessarily require Ocwen to consult

3    external sources.

4         The Court instructs the jury that to determine whether

5    Ocwen conducted a reasonable investigation of the

6    plaintiff's dispute, you must consider the ACDVs received

7    from the credit bureau, each of the steps it took, and what

8    steps it might have taken, but did not.  Under the law, any

9    information Ocwen furnishes to a credit bureau about the

10   dispute must be complete and accurate.

11        Perfect consumer credit reports or the reporting of

12   perfectly accurate information by a furnisher like the

13   defendant, Ocwen, is not required.  The law recognizes that

14   total accuracy in consumer credit reports and reporting

15   information is not a realistic objective.  The mere fact

16   that information furnished to a consumer reporting agency

17   may not be perfectly accurate is not, in and of itself,

18   sufficient for you to find that Ocwen failed to conduct a

19   reasonable investigation.  In other words, if you simply

20   find that Ocwen failed to report account information on the

21   plaintiff free of mistakes, that is not sufficient unless

22   you find that Ocwen failed to conduct a reasonable

23   investigation.

24        Further, you are instructed that if you find that the

25   information reported on the ACDV to a consumer reporting

1    agency by the defendant, Ocwen, after concluding its

2    investigation was accurate, then you must conclude that

3    Ocwen has not violated the Fair Credit Reporting Act.

4         So you must determine whether its investigation was at

5    least sufficient to ensure that any information Ocwen

6    verified about David Daugherty was both complete and

7    accurate.  An investigation requires some degree of careful

8    inquiry.  Thus, a reasonable investigation is one that is

9    not casual, hasty, or superficial, but one which would be

10   sufficient to discover the validity or nonvalidity of a

11   consumer's dispute.

12        The reasonableness of Ocwen's investigation is measured

13   by its response to the specific information provided by

14   Equifax; that is, whether the investigation was reasonable

15   is determined in light of what Ocwen learned about the

16   dispute from Equifax's notice of dispute.

17        If you find by a preponderance of the evidence that the

18   defendant, Ocwen Loan Servicing, failed to conduct a

19   reasonable investigation after receiving notice of the

20   plaintiff, David Daugherty's dispute, then you must find in

21   favor of the plaintiff.  However, if you find that the

22   defendant, Ocwen, conducted a reasonable investigation, then

23   you must find in favor of the defendant.

24        If you find by a preponderance of the evidence that the

25   defendant, Ocwen, failed to conduct a reasonable

1    investigation -- failed to conduct a reasonable

2    investigation, you should consider the issue of damages.

3    You should only award the plaintiff such a sum of

4    compensatory damages as will reasonably and fairly

5    compensate for the losses that have been proven by a

6    preponderance of the evidence to have actually been suffered

7    and proven by a preponderance of the evidence to have been a

8    proximate result of the conduct of the defendant in this

9    case.

10        In order for any act to proximately cause damages, you

11   must find that the act significantly caused or contributed

12   to plaintiff's alleged damages.  If you believe that these

13   alleged damages are not proximately caused by any conduct of

14   the defendant, then you may not award compensation for such

15   damages.

16        If the jury is uncertain as to whether any particular

17   element of damage was directly or proximately caused by the

18   alleged conduct of the defendant, or if it appears just as

19   probable that any injury or element of damage complained of

20   resulted from a cause other than the alleged conduct of the

21   defendant, then the plaintiff cannot recover therefor

22   against the defendant.

23        You shall not award compensatory damages based on

24   conjecture, speculation, or sympathy.  Your assessment of

25   compensatory damages must be based only upon the evidence

1    which is presented at trial.

2        In determining the amount of plaintiff's damages, if

3    any, you may take into consideration humiliation, emotional

4    distress, embarrassment, injury to the plaintiff's

5    reputation, and annoyance and inconvenience, if any.  You

6    are instructed that the law cannot give you a precise

7    formula or yardstick by which you can fix with any degree of

8    exactness compensation for such intangible items as

9    humiliation, mental anguish, embarrassment, injury to the

10   plaintiff's reputation, or annoyance or inconvenience, but

11   the law contemplates that jurors, exercising common sense

12   and calling upon their experiences in life, can

13   satisfactorily fix and determine a proper award of money for

14   this item of damage under proper instructions from the

15   Court.

16       These damages are never awarded on the basis of

17   punishment to a defendant for the injuries which the

18   plaintiff sustained, nor are they to be measured by the

19   amount of money which you as jurors would demand or ask for

20   enduring the pain which the plaintiff has endured.  On the

21   contrary, damages for this item are to be awarded solely on

22   the basis of compensation -- fair, reasonable, and adequate

23   compensation -- taking into consideration the nature and

24   extent of the injury, the character and frequency of the

25   pain resulting from it, and the period it has persisted.

1          The Court instructs the jury that you may only award

2     damages for conduct which occurred between April 9, 2013,

3     and July 8, 2014.

4          The Court instructs the jury that the fact that the

5     Court has instructed you relative to damages must not be

6     considered by you as any -- any indication that the Court

7     has an opinion relative to the liability of the defendant.

8     It is for you, and you alone, to determine whether there

9     should be a recovery in this case.

10         Mr. Nolan, will you go forward with closing argument?

11              MR. NOLAN:  Yes, Your Honor.  May we publish?

12         Good morning, everyone.  Thank you all.  Thank you for

13    your time.  Thank you for your attention.  Thank you for

14    your service here this last week.

15         You have a unique opportunity here in front of you.

16    Mr. Daugherty could never get Ocwen to listen to him.  Ocwen

17    has to listen to you.  Now is the time for your voice to be

18    heard.

19         Now, our laws in this nation must be enforced, and

20    today, whether the Fair Credit Reporting Act is going to be

21    enforced and how it's going to be enforced is entirely up to

22    you.

23         And that's why I ask, vindicate David Daugherty.

24    Confirm that he hasn't wasted the last three years of his

25    life battling Ocwen over a trade line that never should have

1    been there.  Confirm that the sacrifice he made by opening

2    himself up in a lawsuit, opening up his decisions, his

3    financial decisions, his personal life, his words, his

4    letters, his calls to scrutiny, the most intense reason that

5    it could possibly be subject to, vindicate David Daugherty

6    here today.

7         Now, we just heard the Court instruct us on what the

8    legal issue is in this case.  And despite everything we've

9    heard this last week, the sole issue before you today is:

10   Did Ocwen do a reasonable job?  Did they conduct a

11   reasonable investigation when they received one of these

12   ACDV disputes?  That's the sole issue in this case.

13        There are some red herrings about where did the trade

14   line come from.  It doesn't matter.  Well, we didn't report

15   every month incorrect information.  It doesn't matter.  The

16   only issue that matters here is when they got this dispute,

17   what did they do with it?  Did they do enough with it?

18        And the Court, again, instructed us on what you look at

19   when you are looking at these investigations to determine

20   did they do enough.  Did Ocwen look at all the relevant

21   information from Equifax?  Did Ocwen check its own records?

22   Did they do a careful inquiry?  Or was it hasty and

23   superficial?

24        Well, I know we heard, our witness was pretty adamant

25   that these were pretty superficial investigations when

1    asked.

2        And Ocwen again has made it clear that it's their

3    policy, it's their practice to not do a careful inquiry in

4    this case.  It's their policy and practice to only look at

5    the dispute codes from Equifax.

6        We asked them multiple times, and they confirmed

7    multiple times, they are only going to do a look at the

8    dispute codes.  They are not going to do a careful inquiry.

9    They are not even going to look at all of the relevant

10   information on the dispute itself.  We are going to go

11   through that.

12       So now we have to determine, is the defendant's -- is

13   Ocwen's failure to comply with the Fair Credit Reporting Act

14   willful or negligent?

15       And what is willful?  Well, in this case willful

16   doesn't mean willful.  I'm sorry to sound like a lawyer up

17   here, but willful means reckless.  Well, what does reckless

18   mean?  Reckless means ignoring the rules, ignoring the

19   standard when you know that there is a risk, a substantial

20   risk involved in ignoring the rules.

21       Ocwen knew the standard.  They have known it since

22   2004.  You heard Mr. Hendricks testify that they had robust

23   notice at that point that you have to do a reasonable

24   investigation.  You have to do this careful inquiry.  You

25   can't just look at the Social Security number.  You can't

1    just look for a signature online.  You have to do a careful

2    inquiry.  You have to figure out, is this dispute valid?

3        And Ocwen has told us all week -- their witness told

4    us, their expert told us -- that, no, we are going to look

5    at the dispute code.  That is reckless.  That is a reckless

6    disregard of the law.

7        And the obvious risk of harm is what you see here

8    today.  Mr. Daugherty has spent 14 months before this

9    lawsuit was filed trying to prove that he wasn't in

10   foreclosure.  A fact that Ocwen agreed to.  And yet they

11   couldn't investigate.  They couldn't be bothered to take a

12   couple minutes to investigate this.

13       We have to vindicate David Daugherty here today.

14       Now, as I said, Mr. Daugherty has put himself on trial

15   here.  Just make no mistake, that's what's going on here.

16   As soon as he walked in that door, he's been in the

17   crosshairs.

18       But Mr. Daugherty came up and testified.  He took

19   responsibility when he needed to.  Yes, 2012, I was in

20   foreclosure.  I had some medical issues.  I had some at-work

21   issues.  And we cleaned out my wife's retirement account.

22   We borrowed from our future to make sure we took care of our

23   responsibilities.  He took that head on.

24       March 2013, there was an issue with his payment.  Ocwen

25   called him up and let him know that, and, by gosh, David

1    Daugherty took care of it.  He took care of that right away.

2    He took responsibility when he had to.

3         Now, Ocwen, what responsibility have they taken here?

4    Well, you all recall when Mr. Young asked Ms. Lyew

5    point-blank:  Has Ocwen done anything wrong here this week?

6    Anything at all in this matter?  Her answer was clearly:

7    No.

8         What did they do?  Well, they turned around and pointed

9    the finger at David Daugherty.  David Daugherty didn't tell

10   us enough.  David Daugherty didn't give us enough

11   information when he told us what was wrong with his credit

12   report.  He didn't do enough.

13        Now, we heard their expert come up here and testify,

14   what would he do if he had had an issue?  He would send a

15   letter to the corporation, and he would send a dispute to

16   the credit bureaus.

17        Mr. Daugherty checked both of those boxes.  And you

18   heard their expert say he'd expect it to be resolved within

19   24 to 72 hours after that.  Well, actually for him, he knew

20   someone at the credit bureau; he could get it done a little

21   quicker.  But typically, he said, 24 to 72 hours should be

22   sufficient.  You would expect the company to take care of

23   it, and he would expect it, too.

24        That's exactly what Mr. Daugherty did here today, this

25   year, since March of 2013.

1    Mr. Daugherty didn't do enough.  Well, Mr. Daugherty

2    was never going to get a loan anyways.  Their expert came

3    and talked about multivariant statistics and how you

4    calculate credit scores, and he said that David Daugherty

5    was never going to get a loan regardless of his trade line.

6    Well, you all recall hearing the deposition transcript

7    read of Steven Napier, the friendly banker at the One

8    Community Federal Credit Union.  And he testified that soon

9    after that report that the expert was talking about, David

10   Daugherty came walking in.  David Daugherty said, "I need a

11   loan for my van.  I need to get some repairs done."  They

12   looked at his report.  They saw the paid collection accounts

13   on there.  And they saw the tax liens.  They said, "Sure,

14   Dave, you got a loan.  You have a loan for your van."

15   We'll stick with the facts in this case.  We don't need

16   opinions when we have facts showing that he was going to get

17   a loan.

18   And what else did Mr. Napier tell David Daugherty?

19   "David, we know you've been a member here of the credit

20   union over 20 years.  I've been here 10 years myself, and I

21   know you personally," said Mr. Napier.  "We wish there was

22   something we could do to help you, but this foreclosure

23   trade line is a stop sign.  We can't look past that."

24   That was Mr. Napier's testimony.  Not a word about

25   credit scores.  Not a word about the collection accounts.

1    He knew they were going to roll those tax liens into all

2    that equity Dave Daugherty had.

3        The foreclosure trade line was the stop sign.

4        Now, if you will recall, the expert came in here to

5    testify, never said a word about the sole issue the Court's

6    just instructed us on was the sole issue in this case.  He

7    never said a word about the investigation.  He didn't touch

8    that one.  Because it wasn't reasonable.

9        Now, when Ocwen realized they couldn't point the finger

10   at David Daugherty, they turned around and tried to find

11   someone else to blame for this.  They are not taking the

12   responsibility here.  Equifax must have done something

13   wrong.

14       Again, this is the ultimate red herring in this case.

15   This is the ultimate misdirection.  They are trying to

16   confuse the issue here.

17       They stated the monthly furnishing was never an issue

18   in this case.  David Daugherty could never bring a claim

19   about their monthly credit reporting, even if it was wrong.

20   No one's disputed that.  The sole dispute in this case is

21   about the investigations.  It doesn't matter what they

22   reported on a monthly basis; all that matters is what they

23   reported in response to these.

24       Where did the trade line come from?  They spent a lot

25   of time trying to get to the bottom of this, and their

1    expert had a theory.  They don't know where it came from.

2    And it doesn't matter.  It could have come from the man on

3    the moon for all it mattered.  What matters is their

4    investigation.  When David Daugherty said you need to fix

5    this, this isn't right, Ocwen had the duty at that point to

6    do what -- to conduct a reasonable, careful inquiry and to

7    figure out what was going on.

8         It doesn't matter where it came from.

9         Now, their reckless witness, she had never been trained

10   in credit reporting.  She had never done any credit

11   reporting.  She had never done any investigations.  She had

12   never taken the training on how to investigate these.

13        And the only records we have of these investigations

14   are the Ocwen notes that show five seconds from the time

15   that ACDV comes in till the time it's sent back out to

16   Equifax:  Seven seconds, 15 seconds.

17        Now, they want us to take their word for it, that these

18   come in a secret back door somewhere else, and they are not

19   logged in on any computers, and that some investigator,

20   Harish Rao, Raj Kumar, Kusha Mokashoka, are sitting back

21   there running over these reports, spending tireless time,

22   and then only after they do a thorough investigation do they

23   come, put them together, and type them into the computer.

24        Well, even if that's the case, they are holding two

25   disputes in their hands.  One shows he's current; one shows

1    he's in foreclosure.  Does something click in their heads,

2    maybe we need to take a closer look at this?  Nah.  Punch

3    them in the computer and verify it.

4        What's more realistic here?  Is it Harish Rao sitting

5    at his computer when that ACDV comes across?  He checks that

6    Social Security number, checks the signature docs, verify.

7        Seven seconds.  Five seconds.  That's how much

8    attention they cared.  That's how much attention they paid

9    for David Daugherty.

10        Let's take a look at some of these disputes.  First

11   dispute, March 2013.  Not his or hers.  007 code,

12   investigate everything:  payment history, account status,

13   everything.  Look at all of it.

14        Down here on the bottom, foreclosure started.  Account

15   120 days past due.

16        Let's take a look at what Mr. Rao has.  3-20 at 1:40

17   a.m.  Same control number.  Borrower's concern, not his or

18   hers.  Provide complete identification.

19        Well, that's one of the dispute codes.  Where is the

20   007 code?  He doesn't even list that in his notes of his

21   investigation.  He doesn't investigate all the relevant

22   information from Equifax.

23        And what does his report turn up?  Verified.  Hence,

24   borrower is responsible.  Doesn't say he checked Social.  It

25   doesn't say he checked signature docs.  It doesn't show he's

1   looked in the file to see David Daugherty's letter.  It

2   doesn't show he called David Daugherty.

3        He did nothing.  This is not a reasonable

4   investigation.

5        And, once again, the time stamps.  1:40:41 a.m.,

6   1:40:46 a.m.  Five seconds.  And you tell me.  There is

7   nothing else on that investigation.  There is nothing to

8   show that he took more than five seconds to look at that.

9        And, again, foreclosure proceedings started.  They have

10  to fit all the relevant information from Equifax, all of it.

11  And right there on the page, right there in the data, across

12  from Equifax:  Foreclosure proceedings started.  Verified.

13       June, June 2013, you have another one.  David Daugherty

14  says, this is not my account.  My account is not in fore-

15  closure.  My account is not 120 days past due.  Hey, my

16  account was not opened in August 1999.  I paid more than

17  $200.  None of it is accurate.  This is not mine.

18       What does Ocwen do?  They say not his or hers, so they

19  check his Social.  They check for the signature documents.

20  Verified.  Verified foreclosure.

21       They didn't look at all the reasonable -- they did not

22  look at all the relevant information from Equifax.  If they

23  had, they would see foreclosure.  Take a couple extra

24  seconds.  Read the entire thing.  Read all the data.

25       July 2013, David Daugherty, this is not my account.  My

1    account is not in foreclosure.  My account is not 140 days

2    past due.

3        What did they look at?  Social Security number.  David

4    Daugherty signed it.  Verified.

5        October.  October 2013, this is not my account, David

6    Daugherty says.  My account's not in foreclosure.  My

7    account is not 120 days past due.  I do not owe $6,000

8    behind.

9        What does Ocwen look at?  They don't look at all the

10   relevant information, that's for sure.

11       Verified.

12       December 2013, David Daugherty's once again saying, not

13   my account.  Not in foreclosure.  And it's not past due.

14   This is not mine.

15       Ocwen, again, completely ignores the relevant

16   information from Equifax.

17       Five times in this year, verified that he is in

18   foreclosure.

19       January 2014, Mr. Daugherty's not giving up, is he?

20   This is not my account, Ocwen.  I am not in foreclosure.  I

21   am not $6,000 past due.

22       Deaf ears.  Verified.

23       Mr. Daugherty calls often:  Guys, this is not my

24   account.  This is showing me in foreclosure.  This is not

25   accurate information.  You need to fix this.  Mr. Daugherty

1    writes the letter -- Mr. Daugherty writes a letter to Ocwen

2    saying, this is not my account.  All this information is

3    wrong.  This is not correct.  This is what you're showing,

4    and this is not accurate.

5        Soon after, five days later, again, not my account.  I

6    am not in foreclosure.  I am not 120 days past due.  You

7    have my letter showing, this is what you are doing wrong.

8    I've called you.  Fix this, please.

9        We're just going to verify that foreclosure again.

10       Mr. Daugherty calls the Consumer Financial Protection

11   Bureau.  He's got to get someone involved to help him here.

12   Because Ocwen clearly can't be bothered to look at five

13   lines of data from Equifax, to look at the other ACDVs of

14   David Daugherty.

15       Again, you get another dispute, Ocwen actually paid

16   attention to on this one.  They update the past due amount

17   to zero.  But what do they leave on there?  They leave the

18   "foreclosure proceedings started" notation.  Why?  Because

19   they did not look at all relevant information.  They didn't

20   conduct a reasonable investigation.  Each of which is a

21   violation of the Fair Credit Reporting Act.  Two more

22   violations right there.

23       And after they updated, now we get to Ocwen's forms.

24   Account 120 days past due.  Five more payments past due.

25   Foreclosure started.

1       David Daugherty says, this is not mine.  This is not my

2    account.  This is May 2014 we're in now.

3       What does Ocwen do?  Robert Rajina says, account

4    information accurate as of date.  Verified.

5       End of June, June 16th, another one.  David Daugherty

6    again says, this is not my account.

7       I sound like a broken record here, don't I?  Time after

8    time:  This is not my account.  I'm not $6,000 past due.  I

9    am not in foreclosure.

10      This time Raj Kumar, once again -- Reckless Raj --

11   says, this is your account.  We're going to go ahead and

12   verify that, Mr. Daugherty.

13      Week before that, David Daugherty had called up again

14   and said, please, my balloon is due on July 8th.  It's due.

15   My balloon.  I'm out of time.  This is it.  This is June

16   9th.  My balloon is due.  Give me a letter I can take to my

17   lenders.  Give me something I can take to say that I am

18   current.  You are obviously not taking this off my trade

19   line.  You are not looking at my disputes.  Give me

20   something.

21      Well, here's what Ocwen's got for him.  August 8th, a

22   month after the lawsuit's been filed, yet another dispute

23   comes in.  Two dispute codes:  not mine, disputes the

24   payment history, the 007 code.  Check everything.  Just look

25   at everything on this trade line.

1      And it notes the account is past due.  In foreclosure.

2  And what does Daniel John Wesley do?  You guessed it.

3  Verified.

4      Let's take a look at what Daniel John looked at.  On

5  this August day at 1:47:04 a.m., with this control number,

6  borrower's concern:  not his or hers.

7      Well, what about the 007 code, Daniel?  Aren't we going

8  to look at all of the relevant information from Equifax?

9      And what does he do with this information?  Borrower

10  has signed the note; hence, he's liable.  And they verified

11  that once again.

12      And so what we look at here is we need to do a

13  balancing test.  What is the burden on Ocwen?  To conduct an

14  investigation.  To look at all the lines of data they get on

15  this form when it comes in.  Spend five minutes pulling up

16  your account record.  We're not even asking -- we're not

17  asking them to jump on a plane from Bangalore, India, to

18  come over to West Virginia to talk with Dave.  We just want

19  them to look at the freaking ACDV that they've got, that

20  Equifax sent them.  Look at the all of the information they

21  have.  It just so happens to be a legal requirement that

22  they have to do that.  I don't think that's too much to ask.

23      Now, I would balance the burden on Harish Rao and

24  Reckless Raj to take a couple minutes and look at this

25  versus what's the harm?  What's the harm to David Daugherty

1    here?  It's just his house.  It's just a bunch of bricks and

2    blocks and sticks and nails.

3        Well, actually, it's his home.  It's the neighborhood

4    he grew up in.  It's the neighborhood where his father laid

5    the foundations for most every house in there, and paved the

6    streets.  It's a neighborhood where he saw the banker lived

7    in that nice house up the street, and he admired this house.

8    Always thought he would like to get back in this

9    neighborhood some day.

10       It's almost 18 years ago, when he had that opportunity,

11   he jumped at it.  You better believe he jumped at it.

12       And he brought his kids, where they had their own

13   separate bedrooms now.  And he brought his wife, and they

14   finally had the space.  So instead of at the holidays you go

15   to one Thanksgiving dinner at the in-laws and you go to

16   another Thanksgiving dinner at the other in-laws, he had the

17   space now where Thanksgiving dinner was at his house.

18       And he's a firefighter, and he knows how to do these

19   dinners up right.  He gets out those eight-foot long tables

20   and stacks them one next to the another so everybody's

21   sitting around and everybody can see everybody at the same

22   table.

23       It's not just David Daugherty's house; it's his wife,

24   his kids, their whole extended family.  This is their

25   gathering place.  This is their Fourth of July house, their

1    Christmas dinner house.  This is not just bricks and blocks.

2    This is their home.  Balance that against Raj taking a

3    couple extra minutes maybe.  Pull up the file.

4         And we talked about credit denials a lot during the

5    trial last week, and no doubt that was certainly one aspect

6    of damages we are seeking compensation for here today.

7         Mr. Daugherty was denied credit at the One Community

8    Federal Union.  He's been denied credit other places.  And

9    that's something that he needs to be compensated for, based

10   on the inaccurate, false foreclosure black mark.  I am

11   trying to remember how Mr. Young said it.

12        That's only one aspect, though.  That's not the whole

13   story here.

14        Mr. Daugherty, we heard in the jury instructions, is

15   entitled to compensation for the humiliation.  Walking out

16   the door at the One Community Federal Credit Union when they

17   told him, "Sorry, Dave.  You are telling us you are not in

18   foreclosure but this is what your report says.  You are not

19   creditworthy."

20        The embarrassment of being turned down by the Disney

21   Movie Club.  He can't even get the Disney Movie of the Month

22   Club to help take his mind off his issues because the first

23   line of that denial was the foreclosure.

24        The stress.  The anxiety.  The worry.  The anger.

25        Now, he wrote a letter in March of 2013, and I am sure

1    he thought that was a headache, but surely this is:  It's

2    inaccurate.  I am not behind in -- I am not in foreclosure.

3    We can get this fixed.  That first dispute was definitely a

4    headache.

5         But what about the second dispute?  That's twice as

6    stressful.  Because it didn't get fixed the first time.

7         What about the third dispute?  The fourth dispute?  The

8    fifth dispute?

9         Five times the stress.  Five times the worry.  It

10   doesn't start fresh every time.  This is building.  He's got

11   a deadline.  David Daugherty has a deadline of when that

12   mortgage is due, and he's got this big, false foreclosure

13   black mark on his credit report, and he knows that's false.

14   And Ocwen knows it's false.  And he can't get it off of

15   there.

16        The sixth dispute.  The seventh dispute.

17        Now we're into 2014.  That clock is ticking.  He

18   doesn't even have a year.

19        The eighth dispute, the March 2014 letter.  He is back

20   writing this down again.  He is spelling it out.  He thinks

21   they are trying to steal his equity in his home.  What

22   possible rational reason could Ocwen have otherwise?  He is

23   trying to figure out some reason why this isn't being fixed.

24   Why is it not being fixed?

25        The stress is building.  The anxiety is building.  The

1    anger is building.  He is calling in the government.  He is

2    calling in the feds:  Can you do something about this?  I

3    can't.  I've called them.  I have written them.  I've sent

4    disputes in through the credit bureaus.  Can you help me

5    out?

6        And he gets a response from the CFDB, from Ocwen,

7    saying, we are not doing anything.  You are current.

8        We're in April now.  We're three months away from his

9    foreclosure, his balloon coming due.  Another dispute.

10   Another phone call.  He's pleading with them, give me a

11   letter.  Give me something to show that I am not behind.

12       Twenty times as intense as that initial letter.  If

13   that initial letter was a headache, that June 9th phone call

14   was a punch in the gut.

15       He needs compensated for all of this stress, all of

16   this anger, all of this, all the worry, all the anger.  And

17   it compounds itself.  It stacks on itself.  It builds.  All

18   the way up until he's got to file a lawsuit.  He's got no

19   choice left but to come in here and try and resolve it.

20       Now, Ocwen has told us --

21            THE COURT:  Counsel, you've used 25 minutes.

22            MR. NOLAN:  Let me wrap up quickly.

23       Ocwen has told us that it plans to keep doing

24   investigations for its customers this way because they

25   said -- and we asked them, Have you done anything wrong

1   here?  And they said no.

2      Well, David Daugherty stood up and said, you can't

3   treat your customers this way.  You can't treat me this way.

4   He stood up because he said he felt like he was sinking and

5   that Ocwen was the anchor.

6      You need to cut him loose from that anchor.  Vindicate

7   David Daugherty.

8      Thank you.

9        MR. MANNING:  Jed, I am going to use some of this

10   space right here, if you could just slide over a little bit.

11        THE COURT:  Mr. Manning.

12        MR. MANNING:  Almost ready, Judge.  I've just got

13   to get my exhibits in order.

14        Thank you, Judge.

15        THE COURT:  Yes, sir.

16        MR. MANNING:  Good morning.  Thanks for your time,

17   your attention.  I know you've been here longer than you

18   anticipated.  And I thank you for listening to all the

19   witnesses, seeing the exhibits.

20      And in just a little while, you are going to have the

21   opportunity to finally talk with each other about the case.

22   And you are going to have these exhibits that we keep

23   talking about.  You are going to be able to bring them back

24   into the room with you.

25      So, first, I just want to say thank you for your time

1   and attention.  This is a service to both parties and to

2   this Court, and we all are grateful for that.

3       So my job right now is to try to summarize a week's

4   worth of testimony and exhibits.  And I'm going to do the

5   best I can, and I am going to try to reference different

6   exhibits by number so that when you go back into the room,

7   you can look at those.  And I encourage you to look at them

8   and test everything I say against the documents.  You are

9   the finders of fact.

10      I want to start with the point of agreement.  The

11  agreement is the jury instructions.  So the Court has read

12  to you what the charge is.  That's what the law means for

13  you.

14      Mr. Nolan spent a lot of time, as the plaintiffs have

15  throughout this case, talking about the word "verified."

16  What is being verified?  And repeatedly, verified false,

17  verified false.

18      And you remember that with our witness as well and how

19  long they spent going through that.  We even said we will

20  stipulate that the times are in the comment log.

21      What we're doing is we are looking at the dispute.  So

22  let's listen to what the Court told you about the dispute.

23      Under the Fair Credit Reporting Act, what is Ocwen's

24  responsibility?  To, quote, "conduct an investigation with

25  respect to the disputed information."  That's why you need

1    to look at the ACDVs and see, what's the dispute code?   What

2    is being asked to be investigated?   That's the first

3    instruction from the Court.

4         The second states, quote, "The reasonableness of

5    Ocwen's investigation is measured by its response to the

6    specific information provided by Equifax; that is, whether

7    the information was reasonable is determined in light of

8    what Ocwen learned about the dispute from Equifax's notice

9    of the dispute."

10        So that's the second instruction.

11        Again, both parties agree on this.   That's straight

12   from the Court.   Her Honor just said it.

13        The third instruction is, if you, as members of the

14   jury, believe that any alleged damages are not proximately

15   caused by the conduct of the defendant -- that's my client,

16   Ocwen -- then you may not award compensation.

17        So, very big picture, you may recall the first day,

18   where we started, I told you that a furnisher is what, under

19   the Fair Credit Reporting Act, what my client is, and a

20   furnisher is like a mailman; they deliver data.   And that

21   data in this case isn't being delivered through a mailbox.

22   They are not dropping something in the mailbox like you and

23   I would do on an everyday.   It's going through an electronic

24   system called e-Oscar.   It's just a fancy mailbox.   That's

25   how they send it back and forth.

1    Now, what I've stacked up here, just so you can get a

2    flavor for how this works under this analogy, we've been

3    talking throughout the case about the roles and

4    responsibilities.  Who does what, and what are they

5    responsible for?

6    And I told you how my client, Ocwen, Sara Markert's

7    been here every single day with you, listening to the entire

8    trial, and she works at Ocwen.  And she's heard everything

9    that you've said.  She represents the mail carrier.  Okay,

10   Ocwen, the furnisher, the mail person.

11   Then you have Equifax.  Equifax is a credit bureau.

12   That credit bureau is like the Postmaster General, right?

13   He sends out all the mail -- the mail carriers, and they

14   control the routes, and they tell them what the codes mean

15   on the envelopes.

16   You may not have thought we used codes.  We use them

17   every day when we mail an envelope.  We put a zip code on

18   the envelope.  That zip code tells the mail carrier, when

19   they pick it up from a mailbox and bring it back to the

20   mailbox, how to sort it.  I mean, they have to look at it,

21   and they match it up with a mail route, and they send it on

22   its way to the correct route.  That's what the mail carrier

23   does.

24   That's the shipping and handling piece, right?  You are

25   not just picking it up and putting it somewhere.  You are

1    handling it.  And that's controlled by Equifax.

2         You heard both experts -- again, I like to emphasize

3    points of agreement.  Both experts agree that the credit

4    bureau's responsible for receiving the dispute.  They

5    receive it from the borrower.  And they interpret what the

6    borrower tells them about the dispute.  And by interpret, I

7    mean they put a code on it.  And that code then governs the

8    investigation because the code tells the mailman where to

9    go.  It tells them what to do.

10        And there is only two codes in this case.  One is 001,

11   not his.  What are the instructions?  Confirm complete ID.

12        It says, deliver this message to Beckley, 25801.  Well,

13   now, if they took that and they delivered it someplace else,

14   that would be a problem.  They didn't do what they were

15   instructed.  80 percent of these ACDVs that you are going to

16   look at here all have that same single dispute:  001, not

17   his/not hers.  Right here at the top in the dispute number

18   one.  That's the instruction.  That's what my client, Ocwen,

19   is supposed to do to investigate and determine.

20        Now, the second code, 007 or 106, depending on which

21   ACDV you look at, it's very similar in that it's a code,

22   like a zip code; that gives instructions to the mail carrier

23   what to do.

24        I will just pull one randomly.  It says 007.  It's the

25   second dispute code.  What does it say?  Quote, verified

1    payment history profile.  That's field number one.  Account

2    status, field number two.  Payment rating, field number

3    three.

4         Each one of those have the specific instructions that

5    appear right here and tell Ocwen The Mail Carrier to go to

6    those places.  Payment rating.  Account status.

7         And third, on this document here -- it's actually more

8    easily visible on the Ocwen documents -- account status,

9    payment rating, payment history.  This is called the grid.

10   You may recall that.

11        So, what is Ocwen delivering?  And let's get back to

12   this mail -- mail carrier analogy.

13        So, first, we have monthly data.  This is the monthly

14   data that's being furnished every month.

15        Everybody in this case agrees this is perfect.  It's

16   correct.  This is Ocwen's data about Mr. Daugherty's

17   account.  Every month it's sending it correctly.  It's

18   sending through e-Oscar, the mailbox.  This is like a

19   magazine subscription, *Reader's Digest, Sports Illustrated*.

20   Every month it's coming through the same time, the same way.

21        Everybody in this case agrees Ocwen did it perfectly.

22   No small thing.  Even opposing counsel and their expert have

23   to concede, Ocwen's doing this right.

24        The other point I want to emphasize, agreement between

25   the experts.  And you heard them say it repeatedly, what's

1    the cause of this duplicative trade line?  Who caused it?

2    Mr. Hendricks, the plaintiff's expert, and Mr. Ulzheimer,

3    defendant's expert, agree:  It was Equifax.

4         Because this data was correct.  There is no

5    duplication.  Ocwen is always only reporting once.  Even

6    their expert has to concede that.

7         So the cause is not Ocwen, and causation is one of

8    those elements we just read to you about, that the Judge

9    instructed you; it's not enough to say something bad

10   happened or is frustrating.  You have to have a link, the

11   bad act, somebody did something wrong, actually causes the

12   harm.

13        And we'll get -- we'll get to that in a second.

14        The second category of documents, or the ACDVs -- and

15   we've talked about these more than any of us ever want to

16   hear again.  So I'm going to try to simplify this.

17   Envelopes.  Okay?  001 -- is that upside down?  001.

18        We all use zip codes, right?  Mail carrier gets it from

19   the mailbox and looked at the zip code.  Has to say, okay,

20   where does this go?  What route do I send this to?  How long

21   is it supposed to take?  What's the postage?  How do I

22   handle this?

23        The shipping and handling.  That's what a mail carrier

24   does.  That's what Ocwen did in this case.  You heard the

25   testimony about, it trains its mail carrier.  It's not just

1    sending these people out on the route.  There's a month of

2    training.  The first two weeks is in the classroom.  The

3    second two weeks is shadowing with the supervisor.  They are

4    not even live at this point.  They are still being trained;

5    they are not on the floor.

6         After a full month, then they are on the floor but they

7    are still supervised.  And then there's random sampling of

8    their work to ensure compliance.  These are people who are

9    trained.

10        And when they say flipping things like Reckless Raj?  I

11   mean, those are people.  I mean, there are people doing this

12   work.  And when you cast aspersions at somebody, those are

13   people -- and I know Ocwen is a business, but it does its

14   work through people.  People who have families, people who

15   have jobs, people who pay their mortgages.

16        So let's take this seriously.  Let's look at the codes

17   that they were actually given.  There is a code 001.  It

18   means, confirm ID.

19        Every single time Ocwen did that.  How did it do it?

20   It went into its system.  It has a system called CIS, also

21   known as the vault.  It has the loan documents.  You can

22   verify the signature, the Social Security number, the

23   identification, the property address.  That's being done.

24        Next you have another code.  On some ACDVs you see it's

25   106, others you will see it's 007.  They are both the same,

1    verify the payment history profile and account status and

2    payment rating.  This is the instruction.  This is what

3    tells the furnisher, the mail carrier, what to do with it.

4         Now, what don't you see?  Experts agree, you never see

5    Equifax, the Postmaster General who actually knows all the

6    information, the one who caused Mr. Daugherty's problem, the

7    one who's reported this duplicative trade line, they never

8    identify the duplicative trade line, not once.

9         There is one account, and it's being reported twice;

10   one is perfect because the monthly subscription's coming

11   through on time.  The right way every day.  Every month,

12   sorry.

13        And what's not there is the duped code.  You heard the

14   experts both agree that in this box, right at the top of the

15   page, called FOA relevant information.  That's where the dup

16   or duplicative account -- or one account twice, however you

17   phrase it -- both experts agreed, that's where you are

18   supposed to put a dispute, because the dispute about a

19   duplicative trade line has to be identified in order to be

20   corrected.  And everybody agrees it didn't happen.  You will

21   never see dup as a code.

22        Look through them.  I encourage you, please, look

23   through them.  You will never see duplicate.

24        Another variation, you will never see one account

25   number reported twice.

1          These are all codes that are utilized in the industry,

2     which the experts talk about.  They guide what the furnisher

3     is supposed to do.

4          Now, you heard about how Ocwen does its investigation.

5     You heard about its training.  You heard about how it

6     responded.

7          Plaintiffs are arguing the law now.  Right?  We are in

8     closing.  The judge has instructed you.  Reasonable

9     investigation means you look at the dispute notified and the

10    information that comes from the credit bureau and you

11    investigate that.  How do you do it?  You look at your

12    systems.  You use the relevant information.  That's what

13    Ocwen did.

14         Now, if -- they have to prove that that didn't happen,

15    and there's two ways they do that.  The first is that Ocwen

16    failed to do it, and it was negligent.  Negligent just means

17    they should have known better.  Should have known better.  A

18    reasonable person would have known better.  That's like

19    getting a piece of mail in your mail carrier, and it's got a

20    zip code on it, and it says Charleston but the mail carrier

21    makes the mistakes and thinks it says Charlestown,

22    completely different parts of the state.  I mean, you could

23    see how it would happen, but they should know better.

24         They could negligently take that letter and sort it and

25    send it on a route, and it gets lost.  They should have

1    known better.

2        That didn't happen.  We always did what the code told

3    us to do.  There is no negligence.

4        Next, you have willfulness.  Now, this is a higher

5    threshold where they have to prove you either knew what to

6    do and knowingly rejected it, or you knew what to do and you

7    consciously disregarded it.

8        So what's that look like?  001.  I'm the mail carrier;

9    I get my code.  I'm instructed how to deliver this.  I know

10   what I'm supposed to do, and I throw it away.  That's

11   knowing.  There is nobody in this whole room who says that's

12   what happened.

13       Talk about reckless.  What's reckless?  I get this

14   code.  I know what I'm supposed to do.  I got to deliver

15   this to Beckley.  I see the zip code.  Whoops.  And then I

16   know I dropped it, and I leave it there.  I consciously

17   disregard it.

18       That's reckless.  That didn't happen.  Nobody says that

19   happened.

20       Their best day is negligence, and the negligence is,

21   they got a code and they sent it to the wrong place.  It

22   went to Charlestown instead of Charleston.  That's not what

23   the evidence shows.  You can look at these codes.  You can

24   look at these forms -- and I know you are probably sick of

25   them -- but I have to show you just a sample.

1          These forms are being modified by Ocwen.  And the

2     testimony is that that's the -- the entry in the comment log

3     is the last thing they do.  It's like ordering lunch over at

4     the bake shop.  They take your order and they ring you up at

5     the same time.  That doesn't mean you've cooked the meal and

6     eaten the meal at the same time.  It's just when you pay for

7     it.  It's logging what was done.  It doesn't show every

8     step.  It doesn't show you put the bread on the plate and

9     then you add the mayo and the cheese and then you took a

10    bite.  It just logs the completion of the work.

11         What this is showing is that there is no way anybody

12    could think this took five seconds.  There are 11 different

13    fields being modified here, which have to be matched to the

14    modified dates from this monthly data, which everybody

15    agrees is correct.

16         So we receive this ACDV form.  We have got to go into a

17    different system, look up the correct page.  This is from

18    June.  I have got to go to June 2013.  And now I've got to

19    match up the fields in this document and type them into a

20    separate system.  These are two different systems, Real

21    Servicing and e-Oscar.

22         There is 11 different fields modified.  It's not being

23    done by accident.  They are precise numbers.  Current

24    balance, $79,857.  Zero past due.  Date of last payment, May

25    2014.  It all matches.  It's not happening by accident;

1    somebody's comparing this and typing it into this.

2        The only logical explanation is, all that work was done

3    before they actually gave you the receipt, like you ordered

4    it at lunch.

5        Now, the evidence has shown from the testimony that not

6    only was all of Ocwen's monthly data correct, and not only

7    did they respond after all the codes in the ACDVs, but it

8    also sent an AUD on two occasions.

9        Now, what's the AUD?  We have all seen something like

10   the Priority mail.  It's special.  The mailman gets it, and

11   he knows, I've got to treat this differently.  It's not just

12   a regular envelope.  I've got something special here.  The

13   Priority mail, it's tracked; it's insured.

14       That's what an AUD is like.  An AUD is when Ocwen is

15   informed by somebody that there is an issue, and it's clear,

16   it's not getting resolved by whoever caused it, Equifax in

17   this case.

18       So what does Ocwen do?  They prepare a separate form,

19   this special delivery.  This is Defendant's Exhibit 4.  And

20   what does it tell the credit bureaus?  It's sent -- up here

21   in the top right, it's sent to all four credit bureaus.  And

22   it's saying, the plaintiff is complaining that somebody has

23   the account wrong.  We've checked.  It's not us.  We

24   responded to ACDVs about his dispute -- which, incidentally,

25   never mentions foreclosure, never mentions duplicative.

1    It's not being fixed.  Whatever his dispute is that we

2    responded to, the root cause is unaddressed.  Please,

3    everybody, update his account.  All four bureaus nationally,

4    make it reflect:  Zero past due.  Current status, no

5    foreclosure.  Current in every single month in 2013.

6    Current in every single month in 2014.  And a request to

7    update it.

8        This isn't the first time we did this.  This happened

9    July 2nd, 2014, before the lawsuit was even filed.

10       There was a prior one in March.  That March AUD is also

11   referenced in a document which we have seen.  It's

12   Plaintiff's Exhibit 5, where in March 2014, when

13   Mr. Daugherty complained, he said there is still an issue.

14   We said, we've checked.  It's not with us.  But we're

15   sending you this special delivery to all the credit bureaus

16   to make sure they get it right.

17       And that was March 21st, 2014.  That's, again, three

18   months before the lawsuit was even filed.  We're doing

19   everything that we're supposed to and then some.  We're

20   spending -- we're spending additional time, special

21   priority, fix whatever this problem is.  We didn't cause it.

22   We don't know who did.  No one ever identified the

23   duplicative trade line to us.

24       Now, one of the -- one of the specific elements that

25   the Court has instructed you about is causation.  Now,

```
 1   Mr. Daugherty's complaining about 30 instances of trying to
 2   fix this problem.
 3        Let's talk about the facts.  The facts in evidence are
 4   that there were three letters that Mr. Daugherty sent.  And
 5   I've told you about one of them, Exhibit 5.  Exhibit 2 and 3
 6   were also letters.  Those are his direct letters.
 7        All these other disputes that are being referenced as
 8   these ACDV forms, they are not from Mr. Daugherty.  He hired
 9   a separate business called Aggressive Credit Repair, and his
10   testimony --
11             MR. YOUNG:  Objection, Your Honor.  This is beyond
12   any evidence offered to the jury.
13             MR. MANNING:  Judge, the plaintiff testified that
14   he never saw the letter that he hired a third party --
15             MR. YOUNG:  Judge, this is --
16             THE COURT:  Come to the bench, you all.
17        (Bench conference on the record.)
18             THE COURT:  Go ahead, Mr. Manning.
19             MR. MANNING:  Your Honor, this is based on the
20   plaintiff's own testimony.  His testimony is that he never
21   saw -- he never saw the letters, and so when Mr. Young has
22   repeated the reference, plaintiff himself repeated this 24
23   times, that's not true.  And plaintiff admitted it.  He
24   didn't send those letters.  He didn't even know what they
25   said.
```

```
1              THE COURT:  Okay.  Mr. Young.

2              MR. YOUNG:  Your Honor, you prohibited this

3    evidence from coming in.  Those ACDVs, no one disputes they

4    were sent on behalf of my client.  But you prohibited all

5    the evidence from Aggressive and what the letters said, et

6    cetera.  And he's just going to get it in the back door what

7    you ruled, and ruled that none of that was admissible.

8    That's why all the testimony wasn't read into the record

9    about Aggressive reporting, and he's just going there when

10   he's not supposed to.

11             THE COURT:  I recall, based on a motion

12   prohibiting the deposition testimony coming in, Mr. Young,

13   it's my belief and recollection that on cross-examination by

14   Mr. Manning, your client was asked these questions relative

15   to the letters that were sent by Aggressive Credit

16   Reporting.

17       I believe that your argument thus far is within the

18   confines of a response from the defendant to

19   cross-examination.

20       Do you not recall those questions asked on cross?

21   Because I do.

22             MR. YOUNG:  But he is going beyond that, Your

23   Honor, by suggesting that this is how some the fault of

24   Aggressive Credit for not putting the magic words in it, and

25   none of that's before the Court.
```

1          THE COURT:  No, none of -- the content of the

2     letters is not --

3          MR. NOLAN:  I understand.

4          THE COURT:  -- is not in, but the fact that he

5     went through Aggressive Credit and that he didn't see the

6     letters I recall coming out on cross-examination.  I'll

7     permit that.  But the content, yes, that's been excluded.

8          MR. NOLAN:  Understand, Your Honor.

9          MR. YOUNG:  Understood.

10          THE COURT:  I preserve an objection and exception

11     for either party aggrieved by that ruling.

12        Thank you, gentlemen.

13        (Bench conference concluded.)

14          MR. NOLAN:  Where were we?  We were talking about

15     the letters.  And Mr. Nolan talked about 20 different

16     letters, each time was getting worse.

17        Mr. Daugherty didn't send those letters.  He sent three

18     letters.  Each time Ocwen responded to them.  All these

19     other letters were from a third-party company that he hired,

20     and Mr. Daugherty admitted during his examination, he never

21     even looked at them.  He didn't know what was sent.  He

22     never reviewed them.  And that they were so important and

23     they were this cause of great stress, he didn't even bother

24     to look at what this company you hired is actually saying on

25     your behalf?  He admitted he didn't.  He never even checked.

1    So to say now that each time his situation's getting worse,

2    it's just not credible.  He admitted himself on the stand,

3    and you heard him say it.

4        Let's continue with that line on causation and damages.

5    So we talked about bad acts -- there is none here --

6    connecting to harm.

7        Now, at some point everybody's had a flat tire.  Okay,

8    it happens.  It's frustrating.  It's stressful.  It can

9    be -- you know, make you mad.  Make you sad.  But that

10   doesn't mean that somebody purposely caused you to have a

11   flat tire.

12       Well, it could be.  Maybe you are in the parking lot

13   and you see that there is -- somebody has clearly put a nail

14   right in the side of your tire.  Usually there is a nail in

15   the side; you didn't roll over it.  That would indicate to

16   you that somebody knowingly did it.  That's part of this

17   willful thing.

18       Then it could be that there is someone carrying a box

19   of nails, and they -- they trip and they spill nails all

20   over the parking lot.  They don't bother to clean it up.

21   They know they spilled it, but they don't bother it clean up

22   after themselves.  That's reckless.  If you roll over those

23   nails, they caused you to have a flat tire by the

24   recklessness.  That's the cause that the Court was telling

25   you about in the instructions.

1    Negligence, what would that look like?  Negligence

2  would be:  I spilled them, and I tried to clean them up, but

3  I missed a couple.  Or I just dropped a couple and I didn't

4  know, but I should have known because I knew I was carrying

5  a box of nails in a parking lot with parked cars all around.

6  That would be negligence.

7    Here the testimony shows that none of the harm that

8  Mr. Daugherty is complaining about is caused by Ocwen.  This

9  duplicative trade line was caused by somebody completely

10 different, and their own expert says that.  They say this

11 was a systematic failure by Equifax.  Mr. Hendricks on the

12 stand said that.  He agrees.  That was one of the few things

13 John Ulzheimer said I actually agreed with him on that

14 point:  They caused it.

15   Mr. Ulzheimer spent a lot of time talking about credit

16 scores and the factors for how you score credit and how it's

17 used and how it's applied.  He is uniquely qualified for

18 this case.  He spent six years at Equifax.  He spent seven

19 years at Fayco.  He's been in the industry for 24 years.

20   And his testimony is, none of the issue with this

21 duplicative trade line had any factor whatsoever on the

22 denial of the credit.

23   Now, the hook for Mr. Daugherty's trying to prove that

24 this is Ocwen's fault is that it has to link that

25 duplicative account as the cause of his inability to get

1    credit and as the sole cause of his emotional distress.

2         But what's the facts?  What are the facts in this case?

3    John Ulzheimer summarized them for you.  He said that in

4    this case, there is 11 collection accounts and two tax

5    liens, and those derogatory remarks are completely unrelated

6    to anything that's being reported by Equifax.

7         The Ocwen account isn't even a collection account even

8    with the foreclosure.  It's -- this case, Mr. Daugherty's

9    trying to get to the bank to get a loan, but he's got a flat

10   tire.  The flat tire is his bad credit.  Nobody on that side

11   of the room caused it.  Ocwen didn't do it.  He's got 11

12   collection accounts and two tax liens.

13        Now, we can feel bad about it, but the Court has

14   instructed you not to be driven by sympathy.  Because you

15   have to look at cause.  Why does that matter?  Because

16   Mr. Daugherty's got 14 nails in his tire.  Those nails were

17   not put there by Ocwen.  You take out one nail, you've still

18   got a flat tire.  You take out ten nails, you've still got a

19   flat tire.  It wasn't caused by anything Ocwen did.  It

20   wasn't even caused by that duplicative trade line.  Because

21   even without that, you still have 13 nails in your tire.

22   You still have bad credit.  You are not going to get a loan.

23        And that cause of denial of the loan and that -- the

24   sense of sadness or anger that he has testified to, that's

25   not even the worst of it.  You have got 13 other nails in

1   your tire.  And the foreclosure, Mr. Ulzheimer explained,

2   it's not any worse or different; it's actually not as bad as

3   all the other things.  Even when they are paid, for seven

4   years they remain on the account and they are derogatory.

5   That wasn't caused by my client.

6        Why does that matter?  Because your job is to do what's

7   fair and do what's the right thing.  And one of those

8   elements is to tie a bad act -- which there is none -- to a

9   harm, and there is no connection here.  They are not causing

10  that harm.  It's separate and unrelated.

11       Those people at Ocwen that are doing this job, they are

12  doing the best they can, and it shows reasonable

13  investigation.  And they are real people with real

14  responsibilities.

15       Mr. Daugherty's blaming them while meanwhile not paying

16  his own mortgage for two years.  If he's paying $1,000 a

17  month for the last two years, he's avoided paying $20,000

18  that he admits he owes, and that he admits he's responsible

19  for.

20       He's also admitted he could have gotten a refinance.

21  In February of 2015.  It's been over a year.

22       But he's chosen to blame Ocwen and the people that work

23  there, who are doing the best they can, and have all these

24  documents to show it, and not pay his own responsibilities,

25  which his own words say he owes.

 1       That's not fair.  At the heart of it, it is about

 2    fairness.

 3       Don't blame the mailman.  At the end of this closing

 4    argument, you are going to be given a jury instruction, and

 5    that jury instruction is going to show you boxes to check

 6    based on your findings.

 7       The first question is going to be about reasonable

 8    investigation.  And based on all this evidence, you should

 9    check the box "No."  There is no liability here.  The

10    problems weren't caused by Ocwen.  A reasonable

11    investigation was done.

12       Sure, today all of us in this room know there was a

13    duplicative trade line.  We know that.  We knew that from

14    day one.  I told that you that in my opening.  But the

15    people at Ocwen who were doing this work when this single

16    form comes in with a specific code that tells them exactly

17    where to look and what to do, they did it every time.  And

18    they looked at it in their systems, and they pulled up the

19    documents.  And it's not fair to say they are at fault and I

20    don't have to pay my mortgage.

21       There is clearly no basis for willfulness.  Willfulness

22    is tearing it up, throwing it over your shoulder.

23       There is no basis for negligence.  That's knowing that

24    you should have done something other than look at the codes.

25    That means go someplace else.  That's like sending the mail

1    to Charleston instead of Charlestown.

2         Here, the mail carrier, sitting at that table over

3    there, did her job.  She looked at it.  The employees did

4    what they were supposed to do.  They were trained.

5         And none of this was caused by Ocwen.  Everyone agrees

6    it originated with Equifax.  And these damages that are

7    being complained about, they were there before Ocwen ever

8    got involved, these 11 other accounts and two trade lines.

9         And at the end of the day, you are going to decide.

10   You've heard all the evidence.  You've heard the Court's

11   instructions.  You'll receive the verdict form.  And I

12   encourage you to take your time and look through all of

13   these documents because they all show that the only result

14   that's warranted here by the evidence is a decision in favor

15   of the defendant, Ocwen Loan Servicing.

16        Thank you.

17             THE COURT:  Mr. Young.  Mr. Young, you have ten

18   minutes remaining.

19             MR. YOUNG:  Thank you, Your Honor.

20        Members of the jury, everything Mr. Manning told you

21   from the moment he stood up here in opening argument,

22   through the closing argument, through every witness he

23   called, the whole defense is based on a misstatement of the

24   law.

25        And in closing, he actually got up here and said, I

1    quote -- and he read one sentence -- that their duty is to

2    conduct an investigation with respect to the disputed

3    information.

4        And then he didn't read any more.  And based upon that

5    statement, his whole case is, we only had to look at the

6    dispute codes.  But we know they didn't look at the dispute

7    codes, because even with the two disputes, they didn't look

8    at it, but that is not the law.

9        The entire defense is based upon a misstatement of the

10   law.  And, you know, when you are in court, you have to tell

11   the truth, the whole truth, nothing but the truth.  Well,

12   the reason you can't tell half truths is because half truths

13   are lies if you only tell part of the truth.

14       Now, no, that's -- the Judge didn't say, no, the Court

15   never said that all they have to do is check the dispute

16   codes.  Their witnesses said that.  Mr. Manning said it at

17   opening, and he said it in closing.

18       And here is the quotation he read to you.  When he

19   read, and he said, I quote, "The person shall" -- and the

20   person, of course, is Ocwen -- "conduct an investigation

21   with respect to disputed information," and that's all he

22   said.  But that's not the law.

23       The law is, not only conduct an investigation with

24   respect to the disputed information, review all relevant

25   information provided by the consumer reporting agency.

Case 5:14-cv-24506   Document 190   Filed 05/26/16   Page 71 of 115 PageID #: 2797

71

1    They had to look at everything.  Every time he said and

2  a witness said that all they had to do was look at the

3  dispute code, that was a lie.  That's not the law.  This is

4  the law.

5    And the Judge told you that once they make the

6  reasonable investigation, look at all the relevant

7  information, they got to do three things.  If they find

8  anything inaccurate, they got to modify it, delete it, or

9  permanently block it.

10    Counsel suggested that there is nothing to show

11  willfulness.  Yet, if I punch somebody in the nose, that's

12  willful.  But the Judge told you in this case, reckless

13  disregard of a known risk, that's good enough to show

14  willfulness.  Disregarding all the relevant information,

15  that proves willfulness.

16    Ocwen was required to conduct a reasonable

17  investigation, a careful inquiry into the relevant

18  information provided by the consumer reporting agency and

19  the records of the defendant, Ocwen.

20    Every time he said that they are limited to the dispute

21  code, every time a witness said that, that was a lie, 'cause

22  that's not the law.  They have to look at all the relevant

23  information, and the Judge told you that.

24    You must determine whether the investigation was at

25  least sufficient to ensure that the information Ocwen

1  verified about David Daugherty was both complete and

2  accurate.  Careful inquiry.  Not casual, hasty, superficial.

3  That's the standard.  All relevant information.  And

4  everything to the contrary is a lie.

5       You can't explain away inaccurate, inaccurate.  This

6  was in the hands of Ocwen.  You can't explain that away.

7       Damages.  You heard the testimony of the banker, a man

8  that Mr. Daugherty knew, and his testimony was, we can make

9  you a car loan because we only look at Experian.  And he --

10 but when we make mortgages, we have to look at the Tri-Merge

11 report, and there is going to be a foreclosure on there, and

12 you are out.  We can't help you.

13      As much as the friendly banker wanted to bend over

14 backward, he said, huh-un, stop sign.  I can't help you.

15      And -- I don't think Mr. Nolan even mentioned this --

16 after this lawsuit, the misinformation came off, then he

17 qualified for a Quicken mortgage.

18      With all those horrible, old paid collections, with

19 those tax liens, he still qualified for a mortgage.  The

20 only thing different is, we got the lies off his credit

21 report that, over and over again, Ocwen verified lie after

22 lie after lie after lie, 12 times.  Even verified it after

23 this lawsuit was filed.

24      He got a loan once it came off, notwithstanding the

25 unpaid credits, and they all want to talk like these credits

1    are -- he paid these bills.  It shows he was paid, not

2    unpaid.  But he still got a loan with that and with the tax

3    liens.  He would have gotten the loan from the savings and

4    loan back in the middle of this fiasco but for the stop sign

5    of the foreclosure.

6        Duplicate trade line.  How can Ocwen not know that

7    there is something wrong when it gets double ACDVs in month

8    after month showing, amongst the -- in the relevant

9    information that he's in foreclosure.  And this is what they

10   verified.  Twelve times they verified that.

11       The burden of proof.  We have to show something is more

12   likely than not.  You can draw reasonable inferences from

13   the evidence.  You can disregard inconsistent testimony.

14   The law requires a reasonable investigation, review all

15   relevant information, report the results back.  If they are

16   not accurate, either modify it, delete it, or block it.

17       Willful.  Reckless disregard of the law.  It doesn't

18   mean someone at Ocwen had sticking pins in Mr. Daugherty's

19   picture.  It just means that they were reckless.  That they

20   had this policy that all they do is they look at these ACDVs

21   with blinders on:  oh, dispute code, dispute code; verified,

22   verified.

23       The investigation has to be sufficient to ensure that

24   any information verified was both complete and accurate.

25   And that's in the Judge's charge.

1    Ocwen hung a lie over Mr. Daugherty's head, and they

2    kept that lie over his head for 15 months no matter what he

3    did.  That lie stayed over his head.

4    Many, many years ago, I was qualified as an English

5    teacher.  I don't know the story of the albatross around her

6    neck, but it's the saber that killed the lucky bird, and

7    they made him wear it around his neck.

8    He had this foreclosure hanging around his neck when it

9    was false all of this time, and he had to file a federal

10   lawsuit.  Even then it was still verified.  And only after

11   Ocwen trade line were removed by Equifax -- not Ocwen.

12   Ocwen never did anything to help him -- it was only then

13   that he could qualify for a mortgage loan, and he did.

14   And they want to say why didn't he make his payments?

15   He made his payments.

16            THE COURT:  Finish up, Mr. Young.

17            MR. YOUNG:  Thank you, Your Honor.

18   He made his payments.  He even made the first payment

19   after the mortgage was due.  He tried to make his payments.

20   They want to hold him out to be a bad guy.  If they had

21   accepted his payments, he would be making them all along and

22   an additional $10,000 of interest wouldn't have accumulated.

23   He tried to do the right thing, hold the status quo,

24   while he had to bring a lawsuit to get his credit cleared.

25   The jury verdict is going to ask you, was it

reasonable?  I believe you should say yes.  I mean, they failed to conduct the reasonable investigation.  Yes, they failed to conduct it.

Was the failure to conduct a reasonable investigation willful or negligent?  It was willful.  It was reckless.  It presented a high risk of harm.  Reckless.  Willful.

And then the third question is, what's fair compensation?  And there's a blank there.  This is what the -- this is what the form is going to be.

And I ask that you return a verdict in favor of Mr. Daugherty, finding that Ocwen failed to conduct a reasonable investigation, finding that it was willful, and returning a verdict sufficient to compensate him for what he has been through.

THE COURT:  Your time is up.

MR. YOUNG:  Thank you.

THE COURT:  Ladies and gentlemen, in conducting your deliberations and returning your verdict, there are certain rules you must follow.

First, when you go to the jury room, you must select one of your members as your foreperson.  That person will preside over your discussions and will speak for you here in open court.

Second, it is your duty, as jurors, to discuss the case with one another in the jury room.  You should try to reach

1    agreement if you can do so without violence to individual

2    judgment, because a verdict must be unanimous.

3        Each of you must make your own conscientious decision,

4    but only after you have considered all of the evidence,

5    discussed it fully with your fellow jurors, and listened to

6    the views of your fellow jurors.

7        Do not be afraid to change your opinions if the

8    discussions persuade you that you should.  But do not come

9    to a decision simply because other jurors think it is right,

10   or simply to reach a verdict.

11       Third, if you need to communicate with me during your

12   deliberations, you can send a note to me through the court

13   security officer, who will be close to your door.  If you

14   knock on the inside of your door, the court security officer

15   will respond to your need.  That note must be signed by the

16   foreperson.  I will respond as soon as possible either in

17   writing or verbally in open court.  Remember, you should not

18   tell anyone, including me, how your vote stands numerically.

19       Fourth, your verdict must be based solely on the

20   evidence and on the law which I have given to you in my

21   instructions.  The verdict must be unanimous.  Nothing I

22   have said or done is intended to suggest what your verdict

23   should be.  That is entirely for you to decide.

24       Finally, the verdict form is simply the written notice

25   of the decision that you reach in this case.  You will take

1    this form to the jury room, and when each of you has agreed

2    on the verdict, your foreperson will fill it in, sign it,

3    and date it, knock on the inside of your door, and the court

4    security officer will respond and let me know that you

5    are -- let the court security officer know that you are

6    ready to return to the courtroom and report your verdict.

7         Ladies and gentlemen, when I release you, you will

8    decide how you work from now on.  It's unlikely that I am

9    going to interrupt you because I will not know where you are

10   in your deliberations, so if you want a recess for lunch or

11   you want a break for some other reason, you will need to

12   send a note to me signed by your foreperson.

13        I cannot repeat any of the evidence in this case for

14   you or permit anyone else to do that.

15        The clerk will bring to you all documents that have

16   been admitted into evidence.  I cannot give you other

17   documents.

18        She will also bring to you the jury verdict form, which

19   is self explanatory, for you to make your selection, and

20   your foreperson will need to sign that document before you

21   return your verdict.

22        She will bring to you the written form of the charge

23   that I have read to you this morning.  I simply say to you

24   to apply all of those instructions together as a whole and

25   do not single out any one instruction to the exclusion of

 1   the others.

 2        Counsel, let me see you here shortly at the bench,

 3   please.

 4        (Bench conference on the record.)

 5             THE COURT:  Do you know that at this point we put

 6   a muzzle on the alternate?  What I have done on many

 7   occasions, but only with the consent of both counsel, is to,

 8   when I say put a muzzle on the alternate, because we select

 9   an alternate because we don't know what's going to happen

10   during the course of the trial and, of course, we don't know

11   what's going to happen during deliberations.  I instruct

12   that alternate not to participate but simply listen; not

13   participate verbally, in writing, or with facial

14   expressions.  And that way, if we should lose the juror, we

15   will be up to speed.

16        But I cannot and will not do that without both of your

17   consent.  So if you will tell me your position, I will need

18   to know whether I need to release Ms. Harless.

19             MR. NOLAN:  Plaintiff consents, Your Honor.

20             MR. MANNING:  Defendant consents.

21             THE COURT:  All right.  I will give her those

22   instructions then and send her back.

23             MR. YOUNG:  Your Honor, I noticed when you read

24   the charge the mistake, it says April 9, 2013.  It should

25   have been March 9.

```
1              THE COURT:  All right.

2              MR. YOUNG:  That wasn't on the one we had Friday,

3    and I just missed it.

4              THE COURT:  All right.

5              MR. YOUNG:  I apologize.

6              THE COURT:  Mr. Manning, do you agree?

7              MR. MANNING:  Yes, Judge.  We wanted to talk about

8    the verdict form.

9              THE COURT:  We will do that in a minute.

10             MR. MANNING:  Okay.

11             THE COURT:  I will have that -- if you all agree,

12   I will have that -- I also made some readings that I've had

13   my judicial assistant to clean up.  I didn't read it in

14   detail to the jurors.  I didn't read about videotaped

15   deposition.  I took that out.

16        So I e-mailed my clerk -- my judicial assistant to make

17   that clean copy for the jury.  I will make my alteration for

18   the jury.

19             MR. YOUNG:  Thank you, Your Honor.

20             MR. MANNING:  And I guess my thought is that can

21   just go back to the jury.  I don't know that they need a

22   separate instruction from Your Honor.

23             THE COURT:  What you are talking about?

24             MR. MANNING:  The amended version will go with

25   them to the room?
```

1          THE COURT:  Yes.

2          MR. MANNING:  Got it.  Thank you.

3      (Bench conference concluded.)

4          THE COURT:  What I am about to give consideration

5  of your work, Ms. Harless, you are our alternate juror.  It

6  is a very important role that you were to expected to assist

7  if one of the other jurors could not participate.

8      So I am going to give you some specific instruction.

9  And I am going to send you back with the other six jurors

10  and ask and order that you simply listen; that you don't

11  participate in the discussion verbally, in writing, or by

12  facial expression but you simply listen so if there should

13  be a need for me to replace one of them with you, you will

14  be up to speed.

15      Do I have your assurance, Ms. Harless, that you can

16  abide by that instruction?

17          THE JUROR:  Yes.

18          THE COURT:  All right.  I release you, ladies and

19  gentlemen, to give consideration of your verdict.

20      (Jury exited the courtroom at 11:25 a.m.)

21          THE COURT:  All right.  Mr. Manning, the jury

22  verdict form.

23          MR. MANNING:  Yes, Judge.  It's page 2, paragraph

24  3.  It only says, "Find by a preponderance of the evidence

25  damages," and I just want to insert, "and consistent with

1   Your Honor's jury instructions, preponderance of the

2   evidence that defendant, Ocwen, caused damages to

3   plaintiff."

4           THE COURT:  Well, I will overrule that if it is an

5   objection, because, if you look at it, long before they get

6   to question 3, they have to make that finding.  They make

7   that finding in number 1.  They then go to 2 to talk about

8   whether it's negligent or willful.  And then they can only

9   do 3 if they get through 1 and 2.

10      Your position, I take it, is that the causation element

11  is missing?

12          MR. MANNING:  Yes, Judge.  It's -- under the

13  Fourth Circuit case law, it's a separate element, and it's

14  addressed as a separate element in the jury instructions.

15  It should also be a separate element on the verdict form.

16          THE COURT:  Let me see this.  As I have indicated

17  to you, you all have my only -- maybe it doesn't read it.  I

18  think it does.

19      Mr. Nolan and Mr. Young, any position you want to take

20  on the objection?

21          MR. YOUNG:  The verdict's fine in our -- the

22  verdict form's fine as written, and I really need to hear

23  where counsel wants to inject additional language to see if

24  I have any objection.  I couldn't really follow.

25          THE COURT:  Okay.  I see what he is saying.

1        In question number 1, it asks, if they find by a

2   preponderance of the evidence that, you know, they failed to

3   conduct a reasonable investigation; then it's asked whether

4   or not that was willful or negligent.

5        And Mr. Manning is correct, the language does not

6   include causation.  So he wants number 3 to read, "We, the

7   jury, after careful consideration of the evidence and the

8   Court's instructions, find by a preponderance of the

9   evidence that defendant, Ocwen, actually caused damages to

10   the plaintiff in the following amount."

11            MR. YOUNG:  No objection to that modification,

12   Your Honor.

13            THE COURT:  I think that's appropriate.

14   Mr. Manning, this does not read like I thought it did.  And

15   causation is totally missing.  I'll have that amended,

16   Counsel.

17        Anything further?

18            MR. YOUNG:  No, thank you, Your Honor.

19            THE COURT:  All right.  We'll stand in recess for

20   your purposes until we hear from the jury.

21        (Recess taken at 11:28 a.m.)

22        (Trial resumed at 11:57 a.m.)

23            THE COURT:  Counsel, I have a note for the jurors

24   to go to lunch.

25        Bring them in.

1     Are they in the hallway?

2          MR. NOLAN:  Mr. Young and Mr. Daugherty?  They

3    actually were loading boxes.

4     (Jury returned into the courtroom at 11:57 a.m.)

5          THE COURT:  You all may be seated, ladies and

6    gentlemen.

7     Ms. Warden and ladies and gentlemen of the jury, I have

8    received your note indicating that you would like to recess

9    for an hour.  I am going to recess you.  While you are out,

10   do not discuss this case among yourselves or permit anyone

11   to discuss it with you or in your presence.

12    Please be in your jury lounge at 1 o'clock, and when

13   you all have reassembled, without hearing from me, you can

14   begin your deliberations.

15    Have a good luncheon recess.

16    (Jury exited the courtroom at 11:58 a.m.)

17         THE COURT:  We will stand in recess, Counsel.

18    (Recess taken at 11:58 a.m.)

19    (Trial resumed at 1:37 p.m.)

20         THE COURT:  Counsel, I have a note from the jury,

21   "We need a good explanation for willful and negligent."

22   It's signed by Donna Warden.

23    I intend to tell them that the only definitions I can

24   give them of those two terms are included in the charge.

25   Anyone want to object?

1          MR. YOUNG:  No, Your Honor.  Can you direct them

2     to the page of the charge?

3          THE COURT:  Yes, I can do that.

4       Mr. Manning, any objection to my telling the jury that?

5          MR. MANNING:  I think because they are contained

6     throughout, it would be appropriate to reference -- the jury

7     may refer to the Court's charge.

8          THE COURT:  All right.  What I will do -- I don't

9     think I have a final version here on the bench.  Just a

10    second.

11         MR. MANNING:  Your Honor, for reference, it looks

12    like they appear on pages 14 and 15 specifically, which is

13    part of paragraph 8, "The Issues You Are to Decide in This

14    Case."

15         THE COURT:  Yes, I know where they are, but I

16    don't have a final version, and so I want to see it -- I

17    mean, I know it's under "The Issues You Are to Decide in

18    This Case," but I don't have a final version.  I am getting

19    one so I'll be able to see specifically what's there.  Thank

20    you, though.

21      The last note about lunch was marked as Court's Exhibit

22    1, and I'll have the clerk to mark this as Court's Exhibit 2

23    for purposes of this.

24         (Pause.)

25         THE COURT:  All right.  I have the final version

1    of the charge now, and looking under title 8, "The Issues

2    You Are to Decide in This Case," the only definitions that I

3    see relative to negligence and willfulness begin at the

4    bottom of page 14 and continue through page 15.  And so I

5    will instruct them that I have given them the only

6    definitions of those two terms that I can give them.  They

7    will -- they can locate those on pages 14 and 15 of the

8    charge.

9        And then I will instruct them, as I did earlier, not to

10   single out any one or more instructions to the exclusions of

11   the others.

12       Any objection to proceeding in that way from either of

13   you?

14           MR. YOUNG:  No.  Your Honor.  Do you bring them

15   back out to tell them that?

16           THE COURT:  Yes.

17           MR. YOUNG:  I have seen courts that just go to the

18   door and answer the question, and I just was curious about

19   the procedure.

20           THE COURT:  I have, in Charleston, often taken the

21   court reporter back without counsel and answered them, but,

22   quite frankly, the way this place is configured, it's very

23   difficult to do that, so it's easier for me to bring them

24   out.

25           MR. YOUNG:  Thank you.

1          MR. MANNING:  Thank you, Judge.

2      (Jury returned into the courtroom at 1:44 p.m.)

3          THE COURT:  Ms. Warden, I was afraid they had done

4  something to you back there.

5      You all be seated, please.

6      Ms. Warden and ladies and gentlemen of the jury, I

7  received your note, "We need a good explanation for willful

8  and negligent," and it's signed by your foreperson, Donna

9  Warden.

10     Ladies and gentlemen of the jury, I will instruct you

11 that I have given you the only definition of those two terms

12 that I can give you.  They are located on pages 14 and 15 of

13 your charge.

14     I will simply instruct you and remind you, as I did

15 earlier, to apply all of the instructions as a whole and not

16 single out any one or more to the exclusion of the others.

17     I release you now to give consideration of your

18 verdict.

19     (Jury exited the courtroom at 1:45 p.m.)

20         THE COURT:  All right, Counsel.  I think they knew

21 that would be the answer by the looks on their faces.

22     We will stand in recess until we hear from them.

23     (Recess taken at 1:46 p.m.)

24     (Trial resumed at 3:06 p.m.)

25         THE COURT:  Counsel, I received a note from the

1    jury that indicates, "We have a verdict."

2        Would you get them, please.

3        (Jury returned into the courtroom at 3:07 p.m.)

4            THE COURT:  You all can be seated, ladies and

5    gentlemen.

6        Ms. Warden, I have received a note that the jury has

7    reached a verdict; is that correct?

8            THE JUROR:  That's correct.

9            THE COURT:  Has the verdict been placed on the

10   jury verdict form and signed and dated by you as the

11   foreperson?

12           THE JUROR:  Yes, ma'am.

13           THE COURT:  Would you pass it to the court

14   security officer, please.

15       "We, the jury, after careful consideration of the

16   evidence and the Court's instructions, find by a

17   preponderance of the evidence that Ocwen Loan Servicing

18   violated the Fair Credit Reporting Act by failing to conduct

19   a reasonable investigation."

20       "Yes."

21       "We, the jury, after careful consideration of the

22   evidence and the Court's instructions, find by a

23   preponderance of the evidence that the defendant, Ocwen's

24   failure to conduct a reasonable investigation was:

25   Willful."

1      "We, the jury, after careful consideration of the

2   evidence and the Court's instructions, find by a

3   preponderance of the evidence that defendant, Ocwen,

4   proximately caused damages to the plaintiff, David

5   Daugherty, in the following amount:

6      "Humiliation, emotional distress, embarrassment, injury

7   to the plaintiff's reputation, annoyance and inconvenience,

8   $6,128.39."

9      Let me ask you, Ms. Brown, is this or is it not your

10  verdict?

11            THE JUROR:  Yes, ma'am.

12            THE COURT:  Ms. Cook, is this or is it not your

13  verdict?

14            THE JUROR:  Yes, ma'am.

15            THE COURT:  Ms. Warden, is this or is it not your

16  verdict?

17            THE JUROR:  Yes, ma'am.

18            THE COURT:  Ms. Liegle, is this or is it not your

19  verdict?

20            THE JUROR:  Yes, ma'am.

21            THE COURT:  Mr. Ellis, is this or is it not your

22  verdict?

23            THE JUROR:  Yes, ma'am.

24            THE COURT:  Ms. Gwinn, is this or is it not your

25  verdict?

1          THE JUROR:  Yes, ma'am.

2          THE COURT:  And, Ms. Harless, you did not

3    participate; is that correct?

4          THE  JUROR:  Yes.

5          THE COURT:  Counsel, do you all want to inspect

6    the jury verdict form?  Come to the bench, please.

7       (Bench conference on the record.)

8          THE COURT:  They have made a finding of

9    willfulness.  At this time I will instruct the jury on it.

10      Plaintiffs, what other evidence, if any, do you want to

11   present?

12         MR. YOUNG:  Is the 30(b)(6) witness available?

13         MR. MANNING:  Are you talking about Sandra Lyew?

14         MR. YOUNG:  Yes.

15         MR. MANNING:  She is in another hearing today.

16   She is not in West Virginia.

17         MR. YOUNG:  She was designated as the witness to

18   give testimony as to the net worth of this corporation.

19   However, I have the most recent filing with the SEC of this

20   defendant, which shows the net worth or actual assets.  And

21   this Court, under the Rules of Evidence, can take judicial

22   notice of it because it's -- I don't have the exact cite

23   here, but it's a government document required to be filed

24   under penalty of fine and imprisonment.  It's the most

25   recent financial document of Ocwen Financial Corporation,

1    and I -- that's all I'd want to offer into evidence.

2              THE COURT:  Mr. Manning?

3              MR. MANNING:  May I see a copy of it?

4              THE COURT:  If you all want to, yes, you can.

5         (Bench conference concluded.)

6              MR. MANNING:  Your Honor?

7              THE COURT:  Yes, sir.

8              MR. MANNING:  The proposed offering by the

9    plaintiff is a lengthy document.  May I have a moment to

10   review it?

11             THE COURT:  Yes, sir.

12        (Pause.)

13             THE COURT:  Ladies and gentlemen of the jury, you

14   have been in your jury lounge since 1 o'clock.  Why don't I

15   give you a recess, and while you are out, don't discuss the

16   case any further or permit anyone to discuss it with you in

17   your presence.

18        And be in your jury lounge at half after the hour.

19   We'll stand in recess.

20        (Jury exited the courtroom at 3:14 p.m.)

21             MR. YOUNG:  May I approach the Court -- or the

22   clerk, Your Honor?

23             THE COURT:  Yes.

24             MR. YOUNG:  I'd like to have that marked next in

25   order.

1      (Plaintiff's Exhibit Number 30 was marked for

2    identification.)

3          MR. YOUNG:  I'd like to have that marked next in

4    order.

5      (Plaintiff's Exhibit Number 31 was marked for

6    identification.)

7          MR. MANNING:  Your Honor?

8          THE COURT:  Yes, sir.

9          MR. MANNING:  These two documents purport to be

10   from some SEC filings; however, they -- they were not

11   identified.  They weren't on any exhibit list.  And we don't

12   have any prior notice of their intent to offer them.

13     I would -- I would request the opportunity to counter-

14   designate judicial notice from other SEC filings, now

15   knowing that they intend to offer those for the first time,

16   and I believe that we are entitled the opportunity to cross-

17   designate for purposes of judicial notice.

18         THE COURT:  Mr. Young?

19         MR. YOUNG:  Your Honor, we --

20         THE COURT:  I think -- well, go ahead.

21         MR. YOUNG:  The defendant designated Ms. Lyew as a

22   corporate designee, and two of the issues that she was

23   designated for were the net worth and other financial --

24   without looking at the document, essentially the net worth

25   of this defendant.

1    I told Mr. Manning Friday that if the jury returned the

2    verdict today on willfulness, I was going to recall the

3    corporate witness.

4    Now, we approached the bench earlier.  It's the first

5    time I heard she was somewhere else.  She was never excused

6    from this case.  In lieu of calling Ms. Lyew, I'm offering a

7    public record that Ocwen filed with the Securities and

8    Exchange Commission.

9    I have not only the 10-Q for the period ending the last

10   fiscal year, I also have the updated filing -- excuse me.

11   10-K is what we have marked as the plaintiff's exhibit next

12   in order, and I also have Ocwen's financial first quarter

13   report, which is a publication on Ocwen stationery filed

14   with the SEC, showing their financial position as of the

15   first quarter of 2016.

16          MR. NOLAN:  Mr. Manning, anything further?

17          MR. MANNING:  Yes, Judge.  The mention of --

18          THE COURT:  Don't use your phone while you're

19   addressing me.

20          MR. MANNING:  I need to clarify because Mr. Young

21   said he talked with me about Ms. Lyew.

22          THE COURT:  Well, you can make your

23   representation.  I am going to accept your representation,

24   but you don't use your phone while you're addressing the

25   bench.

1      Go ahead, please.

2           MR. MANNING:  I understand, Judge.  I apologize.

3      It was by e-mail after the witness had been dismissed.

4  So this court -- court was over.  This was on Friday.  There

5  is no mention.  And then I get an e-mail Friday night from

6  Steve Broadwater, and that's what I was going to clarify for

7  Your Honor.

8      In terms of the issue of the documents themselves, it's

9  a prejudice issue, Judge.  There's -- there isn't notice of

10  what they intend to offer.  That's, again, it gets back to

11  the rules, and if they intend -- even if it's judicial

12  notice, they still have to identify what they intend to

13  offer for purposes of judicial notice.

14      Judicial notice is -- is just a potential exception to

15  hearsay.  It establishes authenticity.  It's not going to

16  result in an excuse for prejudice.  And it hasn't been

17  identified prior to this moment.

18           THE COURT:  I want to know what it is you want to

19  designate, Mr. Manning.

20           MR. MANNING:  I -- I haven't had the opportunity

21  to hop on the SEC's website in order to determine what to

22  counter-designate.

23           THE COURT:  Okay.  I'm going to allow the

24  document.  I don't think it came as a surprise to anyone

25  that a verdict might come in today, and if it came in under

1    willfulness, that the issue of punitive damages would be at

2    issue.

3         The 30(b)(6) witness is not available to testify, and

4    in the interest of proceeding, I do not believe that this

5    prejudices your client.  Your client's fully aware of these

6    documents.  Even though they might not have known that the

7    plaintiff was going to submit the documents, it's my

8    understanding they are submitting them in lieu of the fact

9    that Ms. Lyew is not here present to testify.

10        So I am going to permit it here and preserve Ocwen's

11   objection and exception.

12        You all can review this instruction on punitive damages

13   that I intend to give to the jury.

14             MR. MANNING:  Your Honor, is this a copy that I

15   can write on?

16             THE COURT:  Yes, sir.

17        Plaintiff have an objection to the punitive damages

18   instruction?

19             MR. YOUNG:  The plaintiff has no objection to that

20   instruction, Your Honor.

21             THE COURT:  All right.  Mr. Manning, any

22   objection?

23             MR. MANNING:  I've almost finished it.  I'm on the

24   last page.

25        No objection, Your Honor.

 1          THE COURT:  All right.  If they are in the jury

 2     room, would you get them, please.

 3          The documents, Counsel, have been marked as Plaintiff's

 4     Exhibit 30 and 31, which the Court admits into evidence,

 5     preserving the defendant's objection and exception to their

 6     issue.

 7          (Plaintiff's Exhibit Numbers 30 and 31 received in

 8     evidence.)

 9          (Jury returned into the courtroom at 3:27 p.m.)

10          THE COURT:  You all be seated, please.

11          Anything to present in terms of documents, Counsel?

12          MR. YOUNG:  Yes, Your Honor.  Plaintiffs offer

13     what have been marked for identification as Plaintiff's

14     Exhibits 30 and 31.

15          THE COURT:  I'll admit them, Mr. Manning, subject

16     to the discussion we had just a moment ago, unless you want

17     to state anything further at this point.

18          MR. MANNING:  Nothing further, Judge.

19          THE COURT:  All right.  Ladies and gentlemen of

20     the jury, inasmuch as you have found Ocwen's conduct to be

21     willful, you have the option of awarding punitive damages.

22          Punitive damages are damages that are awarded to punish

23     a defendant who has damaged the plaintiff by acting

24     willfully, wantonly, maliciously, or oppressively; or

25     through gross fraud; or through reckless conduct affecting

1    the rights of others.  They are intended to deter the

2    defendant and others from engaging in a similar course of

3    conduct in the future.

4        Punitive damages are not compensation for injury.  An

5    award of punitive damages means that you, the jury, believe

6    that the defendant should be punished for its conduct as

7    proven by the evidence in this case.

8        A plaintiff is not entitled to punitive damages as a

9    matter of right.  In other words, even if you should find

10   that a defendant's conduct rises to the level of gross

11   fraud, malice, or oppression, wanton, willful, or reckless

12   conduct, as you have in this case as to willfulness, the

13   decision to impose or to withhold punitive damages lies with

14   your sound discretion.  However, if you determine that

15   punitive damages are appropriate, you may award them even if

16   you do not award compensatory damages, or if you award only

17   minimal compensatory damages.

18       The amount of punitive damages, if any, that may be

19   awarded is that amount of damages which would be sufficient

20   in the jury's judgment to punish the defendant and to deter

21   others from engaging in a similar course of conduct.

22       In determining the amount of punitive damages, if any,

23   to award in this case, you should take into consideration

24   all the circumstances surrounding the particular occurrences

25   involved here, including the nature of defendant's

1    wrongdoing, the extent of the harm it inflicted upon the

2    plaintiff, the defendant's intent in committing its wrongful

3    acts, and defendant's wealth, as well as any mitigating

4    circumstances.

5        You are instructed that if you find by clear and

6    convincing evidence that the acts of the defendant were

7    willful or with -- or with reckless disregard for the

8    plaintiff, then you may award punitive damages against the

9    defendant.

10       The clear and convincing proof standard is the highest

11   standard of civil proof.  It is defined as that measure or

12   degree of proof which will produce in your mind a firm

13   belief or conviction as to the allegations sought to be

14   established.  The standard is intermediate, being more than

15   a mere preponderance, but not to the extent that certainty

16   as is required beyond a reasonable doubt as in a criminal

17   case.

18       In determining the amount of punitive damages which

19   should be awarded, you must consider the following factors:

20   One, punitive damages should bear a reasonable relationship

21   to the harm that is likely to occur from the defendant's

22   conduct as well as the harm that actually occurred; two, you

23   should consider how long the defendant's willful or reckless

24   actions continued, and whether the defendant was aware that

25   the actions were causing or likely to cause harm; you should

1  consider whether the defendant attempted to conceal or cover

2  up its actions; you should consider whether the defendant

3  engaged in similar conduct in the past, and you should

4  consider whether the defendant made reasonable efforts to

5  make amends; the financial position of the defendant is

6  relevant in determining the appropriate amount of punitive

7  damages, if any, against the defendant in this case.

8       The Court instructs the jury that the fact that the

9  Court has instructed you relative to damages must not be

10  considered by you as an indication that the Court has an

11  opinion relative to whether punitive damages should be

12  awarded.  It is for you and you alone to determine whether

13  there should be an award of punitive damages.

14       Ladies and gentlemen, the clerk will bring to you two

15  exhibits which have been admitted relative to your

16  consideration of whether or not to give an award of punitive

17  damages as well as my instruction of law.

18       I am going to release you to give consideration to that

19  verdict.

20       Ms. Harless, I keep you under the prior instructions

21  that I gave to you.

22       I release you at this time to give consideration of

23  your verdict, ladies and gentlemen.

24       (Jury exited the courtroom at 3:33 p.m.)

25            THE COURT:  All right, counsel.  As you saw, I

1    read out inapplicable portions.  I'll have my office to

2    clean this up before sending it to the jury.

3            MR. MANNING:  Your Honor, was that the malicious

4    and wanton?

5            THE COURT:  Yes.

6            MR. MANNING:  I thought that's what I had heard.

7            THE COURT:  And at the end, Mr. Manning, the

8    second line up from the bottom, I read whether "punitive

9    damages" should be awarded where it simply has "damages."

10   And at the end, instead of "should be a recovery in this

11   case," I read "an award of punitive damages."

12           MR. MANNING:  I see that now, Judge.  Thank you.

13           THE COURT:  All right.  We'll stand in recess.

14   I'll get a clean copy of this.

15       Oh, by the way, the jury verdict form will simply have

16   on it the question of whether or not -- yes or no as to

17   whether or not Mr. Daugherty should receive an award of

18   punitive damages; and, secondly, if they answer that, they

19   are instructed to go to question number 2, and then they

20   award an amount.

21           MR. MANNING:  Your Honor --

22           MR. YOUNG:  Your Honor?

23           THE COURT:  Yes, Mr. Young.

24           MR. YOUNG:  I was not -- I was taken by surprise,

25   I guess.  I did not realize, due to the bifurcation, that I

1  wouldn't be able to make any argument to the jury about

2  bifurcation.  I obviously couldn't mention punitive damages

3  when I made -- Mr. Nolan and I made our closing arguments,

4  and I just thought I would have that opportunity to make a

5  closing as to that issue just because it was bifurcated.

6       THE COURT:  Well, I didn't intend to preclude you

7  from doing it, but I did not have any way of knowing that

8  you all wanted to.  And that's -- when I told you that I

9  would instruct the jury, neither of you asked for that.

10      It would not certainly have been unusual, Mr. Young,

11  for you to be able to do that.  I don't know what you are

12  asking for at this time, but I did not know that you wanted

13  to do that.

14      MR. YOUNG:  I'd like to address the jury five

15  minutes, give a closing with respect to damages.

16      THE COURT:  Mr. Manning?

17      MR. MANNING:  It's pretty late in the day, Judge.

18  I mean, I thought that would have been the appropriate time,

19  but I don't -- I don't know that it's necessary.

20      THE COURT:  Well, I want to give that to you all

21  if you want it.  But, again, no one indicated to me that

22  they wanted to address the jury when I asked about the

23  instructions.

24      So let's do it.  Bring the jury back.  The order is

25  somewhat unusual.

1          MR. MANNING:  Judge, will you just note my

2     objection to that?

3          THE COURT:  Yes, I will note the objection and

4     exception for the defendant.

5          (Jury returned into the courtroom at 3:37 p.m.)

6          THE COURT:  You all have a seat.

7        Ms. Shepherd [sic] and ladies and gentlemen of the

8     jury, I got ahead of myself.  The parties are going to make

9     brief argument to you relative to punitive damages.  I

10    appreciate you giving them the opportunity.

11        Mr. Young.

12          MR. YOUNG:  Thank you, Your Honor.

13        Members of the jury, this is your opportunity to send

14    the message to Ocwen -- now, my client's already been

15    compensated by your verdict, but this is your opportunity to

16    send a message to Ocwen not to do this again to anyone in

17    the Southern District of West Virginia and, for that matter,

18    across the country.

19        That's why we have punitive damages.  That's why the

20    Judge broke it into two sections.  If you find willfulness,

21    at that point you may award punitive damages.

22        And punitives are just that, they are to punish the

23    defendant.  To say:  Don't do this again.  Think twice

24    before you ever fail to investigate a consumer's dispute.

25    That's the whole purpose.

1        The award, if you decide that's appropriate, has to be

2   enough to punish this defendant, to make him take notice.

3        You know, if you got -- if I got a $1,000 speeding

4   ticket, my goodness, I am going to -- I am going to take

5   notice.

6        But this is a $7 billion corporation.  If you look at

7   the second exhibit, the short exhibit, this corporation at

8   the end of the first quarter of 2016 had $7.4 billion.

9        Now, on these documents, it says 7,407,110, but they

10   leave off the last three zeros.  It's not 7 million of

11   assets, it's 7.4 billion.

12        Cash on hand.  At the end -- next page.  Cash on hand.

13   At the end of March 2016, they had $280 million cash on

14   hand.

15        One tenth -- or one percent of the cash in hand alone

16   that they have as of March is $2.8 million.  One tenth of

17   one percent of the cash they have available as of the end of

18   March is $280,000.

19        Whatever penalty, if you decide to award a penalty, it

20   has to be enough to sting.  It has to be enough to say,

21   Ocwen, you better fix your system.  It's broken.  If not,

22   this same system is going to chew up and spit out other

23   people just like Dave Daugherty.  Other people who are

24   trying to refinance.  Other people who can't get illegal,

25   wrong things off of their credit reports.  Other people in

1    West Virginia who can't get lies taken off their credit

2    report.

3         That's the purpose of punitive damages.  The Judge

4    instructed you on them.  And the figures I mentioned, they

5    are in the big, thick exhibit, which is the end of 2000 -- I

6    guess 2015 annual report, and then the smaller document is

7    their first quarter of 2016 report showing the assets of 7

8    billion and cash on hand of $280.5 million.

9         Thank you.

10             THE COURT:  Mr. Manning.

11             MR. MANNING:  Ladies and gentlemen, again, you are

12   going to have the instructions from the Court about what

13   this law and how -- is and how it applies.

14        And I want to draw your attention, as I did previously,

15   to language that's relevant to this decision.

16        On the first page, the decision to impose or to

17   withhold punitive damages lies within your sound discretion.

18   It's up to you.  And I understand your decision to award the

19   $6,128 to Mr. Daugherty, which reflects the amount that he

20   was being shown past due.  I understand that.  That is not

21   the same as finding a company to the higher standard of

22   clear and convincing evidence of willful or reckless.  And

23   that's at page 2 of the Court's instruction.

24        And I am going to read, again, a portion of that.

25        The defendant's intent -- that's the mindset, what was

1    in their mind when they did this -- in committing these

2    wrongful acts, the defendant's wealth -- which I am going to

3    talk about in a second -- and then, third, any mitigating

4    circumstances.

5         Now, we've talked about mitigating circumstances, and

6    we've also talked about intent, how in this case what we

7    summarized in the closing for you is the codes; that the

8    codes govern the control.  I understand your ruling on the

9    past due, that you think he's entitled to that past due

10   amount because it was still showing it.

11        Again, that's different than intent.  There is -- there

12   is no evidence to show that my client intentionally did

13   anything wrong.  The codes were governing the investigation.

14   And they made due diligent efforts in order to investigate

15   that.

16        The mitigating circumstances.  Mr. Daugherty in this

17   case had a flat tire, and we talked about that already.  The

18   mitigating circumstances show that even with the issues that

19   have already been resolved, there is still a flat tire

20   completely separate and independent.  And what's happened in

21   this case is Mr. Daugherty has withheld the payment of this

22   full amount which was due back in July of 2014.

23        Now, that amount is still owed, and he admits it's

24   owed, and he hasn't provided any reason for not paying the

25   full amount.  What he has told you is that he intended to

1    pay on a monthly basis.  But the full balance is owed.

2        And that's relevant when we talk about some of these

3    figures on the sheets.  Because just pointing to a bottom-

4    line number doesn't tell you what those assets are.

5        And I want to tell you what those assets are because

6    the forms are -- are somewhat complicated.  I would turn

7    your attention first to the smaller sheet, because this is

8    the one that's the most recent.  This is the one from April

9    27, 2016.  And, specifically, it describes how, in just the

10   first quarter of 2016, my client had a pre-tax loss in the

11   first quarter of $102 million.  It's tough all around in the

12   economy.  And Ocwen employs a lot of people.

13       The second thing -- this is all on the first page of

14   this summary.  The servicing record.  Again, you've heard my

15   client's a loan servicer.  When people don't pay their

16   bills, it's not collecting that money to be distributed to

17   whoever owns the loan.  My client didn't lend this money.

18   It's servicing it for someone else, another bank.

19       And in this case, this is an example where

20   Mr. Daugherty, that money that's been owed for two years,

21   hasn't been collected to pay off that other bank.  And as a

22   result, you'll see a similarity on this sheet, on the first

23   page, servicing recorded, there is $68 million in pre-tax

24   losses just on the servicing piece.  That's 68 million loss,

25   first quarter, just on servicing.

1    Additionally, there is $32 million in loss on MSR fair

2    value changes.  These loans are part of servicing pools; a

3    big batch of them are serviced.  And when people don't pay

4    them --

5         MR. YOUNG:  Objection, Your Honor.  Counsel can't

6    testify and give explanation to the jury of --

7         THE COURT:  The objection to testifying and going

8    beyond what's contained in the documents is sustained.

9    And your time is just about up, Mr. Manning.

10        MR. MANNING:  So I'll just read from the last

11   paragraph.

12   "Unfortunately, $30 million of monitored costs and $33

13   million in MSR value decline from the drop in interest rates

14   during the quarter negatively impacted the first quarter

15   results."

16   I want you to have the complete picture here.

17   Now, the Court instructed you specifically on the

18   standard.  For this, the standard is much higher.  The Court

19   instructed you that this is the highest civil standard that

20   any bank can be held -- held to.  They have to prove clear

21   and convincing evidence.

22        THE COURT:  Your time is up, counsel.

23        MR. MANNING:  And so for that reason, I'd ask you

24   to review the documents and award zero dollars in punitive

25   damages.

1    Thank you.

2         THE COURT:  Ladies and gentlemen, I am going to

3    allow you at this time to further deliberate your verdict.

4    The clerk will bring to you those exhibits that have been

5    admitted, as well as the jury verdict form and the

6    instructions that I have read to you relative to punitive

7    damages.

8         I release you now to give consideration to your

9    verdict.

10        (Recess taken at 3:47 p.m.)

11        (Trial resumed at 5:02 p.m.)

12        THE COURT:  Counsel, I have a note from the jury,

13   "Judge, what happens if we cannot come to an agreement on

14   the amount of punitive damages?  We are at polar opposites

15   now.  Donna Warden.

16   "Do we have to stay until we can come to an agreement?"

17        That's the extent of the note.

18        I intend to instruct them that they will need to

19   continue to deliberate their verdict with respect to

20   punitive damages, given the amount of time that they have

21   deliberated thus far.  And you all let me know what

22   objection you have.

23        I also don't want them to feel under pressure to reach

24   any verdict this evening, but I will tell them that if they

25   do not reach a verdict this evening, I will bring them back

1    on Wednesday for further deliberations.  If you all have

2    objections to that, please let me know.

3              MR. YOUNG:  No objection, Your Honor.

4              MR. MANNING:  On Wednesday as opposed to tomorrow?

5              THE COURT:  Yes, sir.

6              MR. MANNING:  Okay.

7              THE COURT:  Sort of in a box.  You don't know

8    what --

9              MR. MANNING:  Yes.

10             THE COURT:  Any objection to what I said?

11             MR. MANNING:  No objection.

12             THE COURT:  All right.  If you would get them and

13   bring them out, please.

14        (Jury returned into the courtroom at 5:04 p.m.)

15             THE COURT:  Good afternoon, ladies and gentlemen.

16   You all be seated, please.

17        Ms. Warden and ladies and gentlemen of the jury, I have

18   received your note, "Judge, what happens if we cannot come

19   to an agreement on the amount of punitive damages?  We are

20   at polar opposites now."  Signed, "Donna Warden."

21        "Do we have to stay until we come to an agreement?"

22        Ladies and gentlemen, I am going to order that you

23   continue your deliberations with respect to punitive

24   damages, given the limited amount of time that you have

25   deliberated this issue.  However, I do not want you to feel

1    under pressure and so you all will decide how we proceed.

2    As I indicated, if you want to stay, I will stay with you;

3    if you want to go home, I will bring you back on Wednesday

4    for further deliberation.

5         With that, ladies and gentlemen, I release you for

6    further deliberations and for you to let me know how you

7    want to proceed.

8         (Jury exited the courtroom at 5:05 p.m.)

9              THE COURT:  Counsel, for your information, I have

10   a memorial service in Morgantown tomorrow that I have to

11   attend.

12        (Recess taken at 5:06 p.m.)

13        (Trial resumed at 7:24 p.m.)

14             THE COURT:  Counsel, the jury's returned a

15   verdict.

16        (Jury returned into the courtroom at 7:24 p.m.)

17             THE COURT:  Good evening, ladies and gentlemen.

18   You all have a seat.

19        Ms. Warden and ladies and gentlemen of the jury, you

20   have sent to me through the court security officer your jury

21   verdict form.  Is that correct, Ms. Warden?

22             THE JUROR:  Yes, ma'am.

23             THE COURT:  And did you sign and date this form as

24   the foreperson?

25             THE JUROR:  Yes, ma'am.

```
1              THE COURT:  "We, the jury, find that the

2    plaintiff, David Daugherty, should receive an award of

3    punitive damages?"

4         Answer:  "Yes."

5         "We, the jury, award punitive damages in favor of the

6    plaintiff, David Daugherty, in the following amount:  $2.5

7    million."

8         Juror number 1, Ms. Brown, is this or is it not your

9    verdict?

10             THE JUROR:  Yes, ma'am.

11             THE COURT:  Juror number 2, Ms. Cook, is this or

12   is it not your verdict?

13             THE JUROR:  Yes, ma'am.

14             THE COURT:  Juror number 3, Ms. Warden, is this or

15   is it not your verdict?

16             THE JUROR:  Yes, ma'am.

17             THE COURT:  Jury number 4, Ms. Liegle, is this or

18   not -- is this or is it not your verdict?

19             THE JUROR:  Yes, ma'am.

20             THE COURT:  Juror number 5, Mr. Ellis, is this or

21   is it not your verdict?

22             THE JUROR:  Yes, ma'am.

23             THE COURT:  And juror number 6, Ms. Gwinn, is this

24   or is it not your verdict?

25             THE JUROR:  Yes, ma'am.
```

1            THE COURT:  Ms. Harless, you did not participate;

2    is that correct or not?

3            THE JUROR:  Yes.

4            THE COURT:  All right.  Counsel, do you all want

5    to inspect the jury verdict form prior to my releasing the

6    ladies and gentlemen?

7            MR. MANNING:  Yes, please.

8            MR. YOUNG:  Thank you.

9            MR. MANNING:  Thank you.

10           THE COURT:  Ladies and gentlemen, on behalf of

11   these parties and the Court, I want to thank you for your

12   service in this case.

13       Any time that a juror comes together with people from

14   different backgrounds and reaches a verdict, the parties

15   have had their day in court.

16       You heard me early on tell your counterparts who were

17   released that jurors, when they come to the courthouse, add

18   some credibility to what happens at the courthouse because

19   the public generally doesn't trust lawyers and judges but

20   they do generally trust what a jury does.  So your service

21   is extremely important to this system being accepted by the

22   public, and so I thank each of you.

23       And if you will wait momentarily for me in the jury

24   room, I am going to release you here shortly.

25       Thank you very much.

1          (Jury exited the courtroom at 7:28 p.m.)

2               THE COURT:  Counsel, anything further today?

3               MR. MANNING:  Yes, Judge.  We'd like to renew our

4    Rule 50 motion and a Rule 50(b) for lack of any support for

5    causation or role from us in particular.

6          Second, the punitive award is grossly excessive.  I

7    mean, when you look at the factor of 6,000 of compensatories

8    versus, by ratio, 2.5 million, there is no case that

9    supports that.

10         The highest ratio that's been supported in the Fourth

11   Circuit is the case *Saunders versus BB&T*, and that is 526

12   F.3d 142, and that's a 2008 opinion from the Fourth Circuit,

13   and there was an 80 to 1 ratio.  And it's obvious grossly

14   excessive and arbitrary in this case.

15         The case on point from the U.S. Supreme Court is *State

16   Farm Mutual Auto Insurance Co. versus Campbell*, 538 U.S.

17   408-416, 2003 and factors to include are degree of

18   reprehensibility, such as intentional malice, disregard of

19   health and safety of the public in which they apply; and the

20   disparity -- number two, the disparity between the

21   compensatories versus the punitives, which clearly is an

22   issue.

23              THE COURT:  Mr. Manning, I will give you an

24   opportunity to file your motions in writing, but, generally

25   speaking, I just wanted to know if there is anything further

1    here today.  You can make your motions and preserve them on

2    the record, but if there is detailed argument, you can do

3    that in writing.

4            MR. MANNING:  Thank you, Judge.  The other two

5    procedural matters:  One, we have a motion for contribution

6    to offset with the Equifax settlement to avoid duplicative

7    recovery.  There was a settlement with Equifax as a

8    defendant.

9            THE COURT:  I know that.

10           MR. MANNING:  We are not aware of what the number

11   is, and so that will be the third issue.

12           THE COURT:  All right.

13           MR. MANNING:  And then the fourth issue, Judge, is

14   we'd just like to speak with whatever jurors are willing to

15   speak with us after you have the opportunity.  We'd like to

16   just stick around for a little bit.  We can meet them

17   outside.

18           THE COURT:  Okay.  I am not going to allow you

19   access to the jury this evening.

20       Anything further?

21           MR. YOUNG:  Not on behalf of plaintiff, Your

22   Honor.  I thought the local rule absolutely prohibited all

23   contact at any time ever with juries.

24           THE COURT:  It does, unless there is approval from

25   the Court.  And, again, I'm not granting approval on that.

1          MR. YOUNG:  The plaintiff has nothing further,

2     Your Honor.  Thank you.

3          THE COURT:  All right.  Any written motions,

4     Counsel, I will want them within 10 business days of today's

5     date.

6          You all have a good evening.

7          (Court adjourned at 7:31 p.m.)

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

CERTIFICATE OF REPORTER

1

2

3        I, Mary A. Schweinhagen, Federal Official Realtime

4   Court Reporter, in and for the United States District Court

5   for the Southern District of West Virginia, do hereby

6   certify that pursuant to Section 753, Title 28, United

7   States Code that the foregoing is a true and correct

8   transcript of the stenographically reported proceedings held

9   in the above-entitled matter and that the transcript page

10  format is in conformance with the regulations of the

11  Judicial Conference of the United States.

12

13  s/Mary A. Schweinhagen

14  _____ MAY 25, 2016

15  MARY A. SCHWEINHAGEN, RDR, CRR
    FEDERAL OFFICIAL COURT REPORTER
16