IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA
AT BECKLEY

TRANSCRIPT OF PROCEEDINGS

```
----------------------------x
                            :
DAVID M. DAUGHERTY,         :          CIVIL ACTION
                            :          NO. 5:14-CV-24506
        Plaintiff,          :
vs.                         :
                            :
OCWEN LOAN SERVICING, LLC,  :          May 16, 2016
                            :
        Defendant.          :
                            :
----------------------------x
```

TRIAL
VOLUME I

BEFORE THE HONORABLE IRENE C. BERGER
UNITED STATES DISTRICT JUDGE

APPEARANCES:

For the Plaintiff:          MR. RALPH C. YOUNG
                            MR. JED ROBERT NOLAN
                            MR. STEVEN R. BROADWATER
                            Hamilton Burgess Young &
                            Pollard
                            P.O. Box 959
                            Fayetteville, WV  25840-0959

APPEARANCES (Continued):

For the Defendant:                  MR. JASON E. MANNING
                                    MR. JONATHAN M. KENNEY
                                    Troutman Sanders
                                    Suite 2000
                                    22 Central Park Avenue
                                    Virginia Beach, VA  23462

                                    MS. SARA L. MARKERT
                                    1661 WORTHINGTON ROAD
                                    Suite 100
                                    West Palm Beach, FL  33409

Court Reporter:                     Lisa A. Cook, RPR-RMR-CRR-FCRR

Proceedings recorded by mechanical stenography; transcript
produced by computer.

1                        I N D E X

2

3                                              PAGE

4    PRELIMINARY INSTRUCTIONS TO JURY . . . . . . .  4 - 11

5    OPENING STATEMENT BY MR. YOUNG . . . . . . . . 17 - 31

6    OPENING STATEMENT BY MR. MANNING . . . . . . 41 - 63

7

8    PLAINTIFF'S WITNESS:                           PAGE

9    **DAVID DAUGHERTY**

10        Direct Examination (By Mr. Nolan) . . . . . . 63

11        Cross Examination (By Mr. Manning) . . . . . 116

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                P R O C E E D I N G S

2          THE COURT:  Ladies and gentlemen, you have, of

3    course, been selected as jurors and have taken an oath to

4    well and truly try this case.  And as I've indicated, I

5    expect the case to last four days.

6       During the trial the Court will take breaks called

7    recesses, as you saw earlier.  During those times, you must

8    not talk about this case among yourselves or with anyone

9    else.

10      Further, you are instructed not to permit anyone to

11   discuss the case in your presence.  This instruction goes to

12   your families and friends as well.  It's your sole and

13   exclusive responsibility in the case to decide the case

14   solely on the law and the evidence without help and

15   assistance from persons other than your fellow jurors.

16         You'll find yourself together in the jury room in the

17   mornings before trial, in the afternoon after the luncheon

18   recess, and at various other times.  Even though you are all

19   together, you're not to discuss the case until you have

20   heard all of the evidence and the instructions on the law

21   that I will give to you and until after you have been

22   released to deliberate your verdict.

23         Further, you are instructed not to conduct any

24   independent investigation or research the facts and

25   circumstances of the case or research the law related to the

1  case.  Nor are you to use a dictionary, computer, or other

2  reference materials including but not limited to Bing,

3  Google, or any other research tool to define terms or gain

4  knowledge about issues or people, including the lawyers,

5  which you hear about during the course of the trial.

6      You may not communicate with anyone about the case on

7  your cell phone, through e-mail, BlackBerry, iPhone, text

8  messaging or on Twitter, through any blog or website,

9  through any internet chat room or by way of any other social

10  networking websites including, again, but not limited to

11  Facebook, Myspace, LinkedIn, and YouTube.

12      You will have access to notepads.  Feel free to take

13  notes during the trial.  At the end of each day you should

14  leave your notepads in the jury room which will be locked

15  during the evening.

16      At the conclusion of the trial you will leave your

17  notes in the jury room and I will personally ensure that

18  they are shredded.  You're instructed not to take any

19  photographs or videos with your cell phones of fellow jurors

20  or of any part of the court proceedings.

21      During the trial do not talk to the plaintiff or a

22  representative of the defendant, their lawyers, any of the

23  witnesses, or anyone that you see observing the trial.

24      In fact, if you see any of the parties seated at

25  counsel table on the elevator or outside on the sidewalk and

1    say "good morning" or "good afternoon" to them, they are

2    likely to shy away from you ladies and gentlemen of the

3    jury.

4         That's not intended as any arrogance or unfriendliness

5    on their parts.  They're simply trying to keep my

6    instruction that they stay clear of you ladies and gentlemen

7    of the jury.

8         If anyone tries to talk to you about any of the matters

9    under consideration in this trial, you should immediately

10   report that to the court security officer or to me.

11        There will be people meeting in other rooms while you

12   are in the jury room.  So be sure to keep the jury room door

13   closed whenever possible.  If you hear anything about the

14   case, be sure to let me know.

15        It's a judge's responsibility to preside over a trial

16   impartially and without favor to either side.  So while

17   judges may exhibit certain attitudes or may make rulings for

18   one side or another in any given situation, you should not

19   take this in any way as any indication that the Judge wishes

20   you to reach a certain result in the case.  You should keep

21   an open mind.  You should not form or express a final

22   opinion on any issue during the course of the trial.

23        You should keep from reaching a conclusion on the case

24   until you have heard all of the evidence, the arguments of

25   the attorneys, and the final instructions on the law that I

1  will give to you after you have heard all of the evidence.

2      You must not permit yourself to be influenced by

3  sympathy, bias, passion, or favor as to either party.

4  Remember, you have a duty to discuss the case with your

5  fellow jurors during deliberations prior to reaching a

6  conclusion on the case.

7      In a civil case such as this the plaintiff has the

8  burden of proving each and every element of the case by a

9  preponderance of the evidence.  To prove by a preponderance

10  of the evidence means to prove that something is more likely

11  so than not so.

12      Now I will instruct you on how to view some of the

13  events that are likely to occur during the trial.

14      Initially the attorneys will have an opportunity to

15  make opening statements.  Counsel for the plaintiff will

16  make an opening statement first.  Then counsel for the

17  defendant may, but does not have to, make an opening

18  statement.

19      These statements should be considered only as a preview

20  of what the attorneys expect the evidence in the case to be.

21  The opening statements themselves are not evidence.

22      Next, witnesses will be called to testify.  You will --

23  or they will be placed under oath and questioned by the

24  attorneys.

25      First, counsel for the plaintiff will present witnesses

1   through direct examination and counsel for the defendant can

2   cross-examine them if there is cross-examination.  Then

3   counsel for the plaintiff will have an opportunity to

4   redirect the witness and that will conclude the testimony of

5   that particular witness.

6        At the conclusion of the plaintiff's case, counsel for

7   the defendant may, but is not required to, call witnesses.

8   Counsel for the plaintiff will have the opportunity to

9   cross-examine those witnesses.  If that occurs, counsel for

10  the defendant will conduct redirect examination if he or she

11  chooses, and that will be the conclusion of the witness's

12  testimony.

13       You will determine the credit and weight you will give

14  to the testimony of each witness.  In doing this, you can

15  consider his or her good memory or lack of memory; his or

16  her interest or lack of interest in the outcome of the

17  trial; the intelligence or lack of intelligence of the

18  witness; his or her demeanor and manner of testifying; his

19  or her opportunity and means or lack of opportunity and

20  means of having knowledge concerning the matters which he or

21  she testify; the bias, prejudice, hostility, friendliness or

22  unfriendliness of the witness for or against any of the

23  parties; the relationship of any witness to any of the

24  parties or other witnesses; the reasonableness or

25  unreasonableness of the witness's testimony; and his or her

1    apparent fairness or lack of fairness.

2         At times witnesses may appear by deposition testimony

3    read to you from a written transcript or shown by videotape

4    recording consisting of answers under oath to questions

5    asked of the witness in advance of the trial in the presence

6    of a court reporter.

7         These depositions are taken out of the presence of the

8    Court.  The testimony of a witness who for some reason

9    cannot be physically present to testify from the witness

10   stand is entitled to the same consideration and is to be

11   judged as to credibility and weight as if the individual had

12   been present and had testified here from the witness stand.

13        Also, during the trial I might receive documents and

14   other exhibits as evidence.  If evidence is given to you to

15   examine, you should examine it carefully without comment and

16   remember that you will have another opportunity to examine

17   the evidence during the course of your deliberations.

18        You should also know, ladies and gentlemen, that it is

19   an attorney's right and duty to object when testimony or

20   other evidence is being offered that the attorney believes

21   should not be admitted into evidence.

22        When I decide that an objection is correct, I will

23   sustain it and you should act as if you never saw the

24   evidence or heard the attorney's question or the witness's

25   answer if one is given.

1    There also may be times when I will strike evidence

2    from the record.  You should act as if this evidence never

3    existed.  However, if I decide that an objection is not

4    correct, I will overrule it and you should give that

5    evidence no more or less weight than if the objection had

6    not been made.

7        Sometimes an attorney will request a bench conference

8    to -- or a recess to discuss an objection.  That's not

9    intended to hide or conceal anything from you jurors, but it

10   is to -- is designed to ensure that only legally admissible

11   evidence comes in in your presence.

12       There may be times that I will refuse a bench

13   conference or a recess.  You should give no consideration or

14   draw no inference from that whatsoever.

15       Finally, the attorneys will make closing arguments.

16   These arguments, like opening statements, are not evidence.

17   The attorneys at this time are permitted to summarize the

18   evidence and the law and try to persuade you to decide on a

19   particular verdict.

20       You may accept or reject these arguments as you see

21   fit.  If any argument, statement, or remark of counsel is

22   not consistent with the evidence or with my instructions on

23   the law, then you should disregard that argument, statement,

24   or remark.

25       In conclusion, do not read any newspaper accounts,

1    listen to any radio, view or listen to any television or

2    internet coverage of the trial, or make contact with any

3    media personnel during the course of the trial.

4        You are instructed to completely disregard such

5    information and decide the issues solely on the basis of the

6    facts and law presented to you here in the courtroom.

7        To help ensure that your decision is based only on the

8    law and the facts, the jury room door should remain closed

9    at all times.

10       For your planning, ladies and gentlemen, we will try to

11   begin court around 9:00 in the morning and conclude around

12   5:00 in the evening.

13       If at any time during the course of the trial you

14   become tired or you have difficulty seeing or hearing or you

15   experience any discomfort whatsoever and you feel it

16   necessary to take a break, please raise your hand and I will

17   be happy to accommodate you at any time.  Even if we have

18   just taken a break and you need one, please do not hesitate

19   to raise your hand.

20       Will the plaintiff go forward with opening statement?

21           MR. YOUNG:  Thank you, Your Honor.

22           THE COURT:  Mr. Young.

23           MR. MANNING:  Your Honor, may we have a brief

24   sidebar before that begins?

25           THE COURT:  Yes, sir.

```
 1              (Bench conference on the record)

 2              THE COURT:  Mr. Manning.

 3              MR. MANNING:  Thank you.  I'm not sure whether

 4    there are going to be demonstratives used during the

 5    opening, but we have a couple of evidentiary issues which

 6    have already been briefed.

 7         Really the two that I want to highlight for Your

 8    Honor's attention are -- they're both under 26(e).  26(e)(1)

 9    requires that any 26(a)(3) disclosures of exhibits be

10    on-goingly [sic] updated.

11              THE COURT:  Can I interrupt you for just a second?

12         Do you all intend to use demonstrative exhibits during

13    your opening?

14              MR. YOUNG:  No, Your Honor.  I have a timeline

15    that I'm going to lay out right in front of the jury bar

16    where they can't see it.  I'm going to refer to it, but they

17    won't be able to see it.

18              THE COURT:  All right.  Are you going to be

19    referring specifically to the documents that Mr. Manning is

20    referring to that's the subject of his evidentiary motion?

21              MR. YOUNG:  I will be referring to ACDVs,

22    Automated Consumer Dispute Verifications.

23              THE COURT:  All right.

24              MR. MANNING:  Which are the Equifax documents.

25              THE COURT:  Yes.  There are -- I'm sorry.  Go
```

1    ahead, Mr. Manning.

2            MR. MANNING:  Thank you, Judge.  And there have

3    been no amended 26(a)(3)s, no supplemented 26(a)(3)s.  And

4    26(e)(1) says it's an on-going obligation and you have to

5    disclose it and they haven't been.

6        The second issue related to that is expert testimony.

7    It's -- again, I'm not sure what the timeline is going to

8    show.  But to the extent they seek to get something in

9    through an expert witness, there's also an on-going

10   obligation to supplement a 26(a)(2) disclosure.  And that's

11   26(e)(2).

12       And it says you have to -- you're constrained to the

13   disclosed opinion.  And in this case, their expert has very

14   little disclosed opinions, specifically nothing pertaining

15   to causation or damages and no details regarding any

16   documents.

17       So to the extent that they want to seek to offer

18   testimony or argument based on the expert, they have to be

19   limited to that expert report.  And the --

20            THE COURT:  I think they understand that.  I'm not

21   going to allow opinions that have not been disclosed, which

22   seems to me what you're asking for, Mr. Manning.

23            MR. MANNING:  Yes, Judge.

24            THE COURT:  Any intention of offering opinions

25   that have not previously been disclosed, Mr. Young,

1    Mr. Nolan?

2            MR. YOUNG:  No, Your Honor.  I doubt if I even

3    make any reference to the expert.

4            THE COURT:  All right.  That takes that issue off

5    the table, Mr. Manning.  Go ahead, please.

6            MR. MANNING:  So to the extent that the plaintiff

7    intends to refer in any way in timeline format or a summary

8    to evidence that is based on Equifax documents, the

9    documents that were not disclosed on a 26(a)(3), then that

10   would be inadmissible and potentially reversible error for

11   the jury to hear it.

12       I know that Your Honor could seek to cure it by

13   instructing them to disregard, but it's difficult to unring

14   the bell.  And I just wanted to -- having not seen what he

15   intends to offer, I just wanted to raise that issue with

16   Your Honor beforehand.

17           THE COURT:  All right.

18       Mr. Young.

19           MR. YOUNG:  Your Honor, I intend to outline my

20   case including what was demonstrated by the Equifax reports.

21   I'm not sure what counsel's objection is with respect to

22   disclosure.  Those documents were exchanged.  They were set

23   forth in our list of exhibits.  And we took a records

24   authentication deposition last week which at some point, if

25   necessary, I will read that portion of the deposition to the

1    jury where those records are authenticated.

2              THE COURT:  As I understand the outstanding

3    motion, we'll get to that -- regarding the admissibility of

4    those documents based on hearsay in addition to the

5    authentication issue, we'll get to that at a particular

6    time.

7        Is there a way in your timeline so that you are able to

8    do justice to your client to refer to these documents,

9    Mr. Young, in a general as opposed to a very specific way?

10             MR. YOUNG:  My reference will be that there were

11   periodic ACDVs received by Ocwen to which Ocwen responded.

12   And I characterize it as -- there's 24 of them that came in

13   sets of two.  And I characterize them as confirming the loan

14   is current in one ACDV and confirming that the loan is in

15   foreclosure in the other ACDV.  That's the, to the extent,

16   the depth I intend to go.

17             THE COURT:  All right.  Mr. Manning.

18             MR. MANNING:  That's exactly what's at issue here.

19   That's based on Equifax documents.

20             THE COURT:  Uh-huh.

21             MR. MANNING:  I have the 26(a)(3)s printed out if

22   you want to look at them, but there's no reference to those

23   documents as exhibits for this trial.

24       What Mr. Young is referring to as having been disclosed

25   is last week when we did the authenticity deposition.

1          THE COURT:  Uh-huh.

2          MR. MANNING:  It's not on a 26(a)(3).  It was

3    never amended.  It was never supplemented.  And 26(e)(1) is

4    very clear you have to do that or it's not admissible.

5          And then second, Your Honor had a scheduling order and

6    I think it was from October, 2014.  It was ECF 12.  I

7    remember that.  In Paragraph 2 of your order in all caps, in

8    all bold you said, "To the extent it's not disclosed on

9    time, it will be excluded."

10          THE COURT:  Uh-huh, if there's an objection.

11          This is what we're going to do so that we get past this

12    juncture, gentlemen.  I've instructed the jury, and I'll

13    preserve the defendant's objection, that these opening

14    statements are not evidence.

15          I'm going to permit you to do your opening and, to some

16    extent, Mr. Young, at your own peril because I will rule on

17    the admissibility of these documents as we go forward.  So I

18    say at your own peril in terms of promising the jury

19    something that you may not be able to look -- to deliver, of

20    course, depending on my rulings.

21          I'm going to preserve your objection and exception to

22    my allowing them to go forth with mentioning, as he has

23    stated here, in their opening.

24          But then, gentlemen, I will rule on the admissibility

25    of those documents as we go forward as has been raised based

1    on disclosure, and as I understand the more recent document

2    that I've read also that they do not comply with an

3    exception to the hearsay rule.

4        I preserve your objection and exception to my allowing

5    them to go forward in opening statement.

6               MR. MANNING:  Thank you, Judge.

7               THE COURT:  Anything further?

8               MR. YOUNG:  No.  Thank you, Your Honor.

9               THE COURT:  All right.  Thank you both.

10              (Bench conference concluded)

11              THE COURT:  Mr. Young.

12              MR. YOUNG:  Yes, Your Honor.

13              THE COURT:  Are you ready to go forward?

14              MR. YOUNG:  I am, Your Honor.

15       May it please the Court, --

16              THE COURT:  Yes, sir.

17              MR. YOUNG:  -- counsel, members of the jury, I'm

18   Ralph Young.  I've been practicing law here in the Raleigh

19   County area for many, many years.  And Mr. Nolan and I have

20   the privilege of representing Mr. Daugherty in a claim

21   against his mortgage company for falsely or incorrectly

22   reporting his current mortgage as being both current and in

23   foreclosure simultaneously.

24       Credit reporting is at the center of this case.  And

25   what we're here to determine is did Ocwen, his mortgage

1   company, did they do a reasonable investigation when he

2   complained about the fact that his mortgage was both showing

3   on his credit as current, which it was, 12 months previous

4   to never a late payment.  The whole period of time that's

5   going to be an issue, the evidence is going to show he was

6   never late.  He was on time.

7       More importantly, it was very important, the evidence

8   will show, for Mr. Daugherty to have good credit because his

9   mortgage was coming due for renewal.  He had a balloon note.

10      A balloon note is a mortgage where you agree to pay so

11  many payments over 10 years.  But at that 10th year, 15th

12  year, whenever the balloon comes due, the whole balance of

13  the mortgage comes due and you have to go out and refinance.

14      Sometimes that works to the benefit of the bank.  If

15  the bank's locked into a low interest loan and interest

16  rates go up, well, when the balloon comes around, whoever

17  finances it is going to make more money.

18      In this case, the rates had dropped significantly and

19  Mr. Daugherty had a, I think a six percent or so loan.  The

20  rates were significantly less than that.

21      A year and a half before Mr. Daugherty's balloon note

22  came due -- now, this is a note -- this is a mortgage on his

23  home.  This is his home where he's raised his family, he's

24  lived 18 years.

25      A year and a half before the balloon came due,

1    Mr. Daugherty did his homework.  He said, "I need to make

2    sure that my credit is up to snuff so I can refinance my

3    home when the balloon comes due."

4        So he started a year and a half early.  That will be

5    our evidence.  And when he first looked at his credit and

6    saw the error was way back in March of 2013.

7        And I have a timeline here, folks.  I can't keep all of

8    this straight.  And this is lineal.  It starts here in March

9    of 2013.  And our evidence is going to go clear to this

10   point in time, August of 2014 when Mr. Daugherty's credit

11   was finally fixed.  The improper notation was taken off of

12   his credit report.

13       Now, the evidence is going to be Ocwen shows up on

14   Mr. Daugherty's credit report as current, payments made on

15   time.  But then it appears again as in foreclosure, more

16   than five months in default, just polar opposites; same

17   name, same account number.  Yet, he is shown in his report

18   as both current and in default.

19       And this existed despite what our evidence will show

20   numerous -- actually, 29 times our evidence will show Ocwen

21   had an opportunity to fix this by reasonably investigating

22   his complaint and fixing it.

23       Our evidence will be that on 29 occasions Ocwen didn't

24   recognize the problem, didn't reasonably investigate, and

25   didn't fix it.

1    In fact, our evidence is going to show that even after

2    this lawsuit was filed and assigned to Judge Berger, Ocwen

3    again confirmed that Mr. Daugherty's note was current, but

4    on another line that he was still in foreclosure and five

5    months behind even after this lawsuit was filed.

6    And the evidence will be that the only way

7    Mr. Daugherty's credit ever got fixed was not because Ocwen

8    finally fixed it.  Ocwen never fixed it, never tried to fix

9    it.  It was only after this lawsuit was brought that

10   Equifax, the reporting agency, on its own took his current

11   mortgage off his credit report and his defaulted mortgage.

12   So they not only took off the bad one that he had been

13   trying to get off all along.  They took off the good one as

14   well.  But that's how it happened, not because Ocwen said or

15   did anything to try to help him.

16   And, again, we start back in March of 2013.  The

17   evidence will be when Mr. Daugherty checks, he's shocked.

18   He's in default, but he's not in default.  He's current.

19   But his report's showing him in default.

20   So he did what I think anyone would do.  He contacted

21   Ocwen.  He wrote them a letter.  Ocwen acknowledges receipt

22   of the letter.  And in his letter he said, "My credit report

23   states that I'm currently behind $6,128 with Ocwen Loan

24   Services and that I am in foreclosure."  He wrote them that

25   letter.

1      They logged it into their records and they wrote him a

2   letter back.  And they wrote back to him saying, "Well, you

3   had some concern about your credit report back in 2012."

4   Well, they missed the point.

5      Ocwen's records show that they said, "Well, back in

6   2012 you were late on some payments."  But what

7   Mr. Daugherty wrote them and said, "I am currently showing

8   $6,000 behind and I'm current."

9      It didn't -- they didn't fix the problem.  They

10   essentially did nothing.  They wrote him back and said, "We

11   show you as current," but they didn't investigate.  They

12   didn't look to see what was actually showing up on his

13   credit report; that is, he was current on one line and in

14   foreclosure on another.

15      Next, Equifax contacted Ocwen.  They said -- and you're

16   going to hear a lot about this term, an Automated Consumer

17   Dispute Verification, ACDV.  And it's a universal document

18   used throughout the credit industry for a credit reporting

19   agency like Equifax or Experian or TransUnion when a

20   consumer says, "Hey, you got my report wrong," the reporter,

21   that's being one of the three credit agencies, they fill out

22   this ACDV and send it electronically to the creditor; in

23   this case, Ocwen.

24      In -- a few days after Mr. Daugherty's letter, on

25   March 20th Ocwen's notes reflect that it received two ACDVs

1  from Ocwen.  One ACDV said the account was showing as

2  current and they wanted Ocwen to verify that.  Ocwen

3  verified that it was current.

4      A second or two later, seconds or two later another

5  request comes in for an ACDV for Ocwen to verify that

6  Mr. Daugherty was in foreclosure.  And Ocwen verified it.

7  Within a minute of verifying that he was current and

8  responding to one ACDV, it responded to another ACDV that

9  said he was in default.

10      And the first time this happened in March, there were

11  actually two different employees of Ocwen.  There were two

12  different employees.  The first employee received it and

13  confirmed that it was in foreclosure.  The second employee a

14  minute or so later received an ACDV and he confirmed that it

15  was current.  Two different employees.

16      As we go on, there's actually 24 of these that

17  happened.  They come in sets of two.  So the two came in in

18  March.  One employee verified him in foreclosure.  The other

19  employee verified him as current.

20      In June, two more ACDVs come from Equifax to Ocwen.

21  One says, "Verify whether or not he's current."  The other

22  says, "Verify whether or not he is in foreclosure."

23      Ocwen responded, "Yes, he is current," to the one ACDV

24  and, "Yes, he is in default $6,000, five or more payments

25  behind," when they responded to the other ACDV.

1    This time, the same employee, a fellow named Daniel

2  John Wesley from Benhaluru, India, received the one that

3  said he was in foreclosure and verified it.  Within a

4  minute, he received the one that said he was current.  He

5  verified that too.

6    So nothing's happened.  We're now into June.  July, the

7  same thing.  Two ACDVs roll in back-to-back.  The same

8  employee, Raj Kumar Singh in Benhaluru, India, he receives

9  the first one that says they're in foreclosure, five or more

10  payments behind, owes $6,000.  He verifies that.

11    Within seconds, he gets a second request for

12  verification, an ACDV that says Mr. Daugherty is current.

13  He verifies that too.

14    This -- it goes on and on and on.  Twelve times over

15  the course of a year and a half the ACDVs come in from

16  Equifax, and every one of them is verified as correct by

17  Ocwen.

18    Mr. Daugherty's credit is smeared.  He can't explain to

19  a banker that, "Even though it says I'm in foreclosure, I'm

20  really not in foreclosure.  I'm current."  Well, Ocwen is

21  going to tell you that he was current this whole time.

22    So it happened in -- the evidence will be it happened

23  again in October.  The same employee within minutes

24  confirmed that he was current on one ACDV and he was in

25  default on another.

1    It happens again in December.  The same employee within

2  minutes of each other confirms that he's current and

3  confirms on another form that he is in foreclosure, $6,000

4  behind, five or more payments behind.

5    It happens again in January.  January 17th another

6  employee, Suresh VK from Bangalore, India, receives two

7  ACDVs, one saying confirm that he's current.  The other

8  saying confirm that Mr. Daugherty is in foreclosure.  And

9  they verify both of them and send them back to Equifax.

10    It happens again in March of 2014.  Mr. Daugherty

11  calls.  He testified he called them up.  And it's in their

12  notes.  He called them up and explained to them that, you

13  know, "You've got to fix this.  I have to get re-fi-ed.  I

14  have a balloon coming due."

15    And he started back in March of 2013.  We're now up

16  into March -- we're a year later.  It's still not fixed.

17  And Mr. Daugherty's going to tell you about calling Ocwen to

18  try to get it fixed and talking to some fellow named TR

19  Rajani.  And he's going to tell you that nothing got fixed.

20    He not only called, he faxed in a letter.  And the

21  letter explained in great detail how his credit has been

22  showing as current and in default at the same time.  Ocwen

23  has the letter.  The text of the letter is right in Ocwen's

24  records.

25    In March -- later in March, two more ACDVs come in from

1    Equifax.  One says, "Please confirm that he's current."  The

2    other one says, "Please confirm he's in foreclosure."  And,

3    of course, the same employee, Raj Kumar.  We met him

4    earlier.  He confirmed within seconds of each other that he

5    is -- yes, he's current and the other one he confirmed, yes,

6    he is in foreclosure.

7        Now, each time one of these ACDVs come in, I think the

8    Judge is going to tell you at the end of the case that the

9    duty is for Ocwen to make a reasonable investigation.  And

10   we can show you what their investigation consisted of and

11   how long it took in seconds.

12       Each of these so-called investigations took less than a

13   few seconds.  None of them was any investigation.  The only

14   thing any employee ever did was to confirm the last four of

15   Mr. Daugherty's Social Security number or look and see that

16   he actually signed the deed of trust.

17       That's the only investigation that was done over and --

18   well, this, this rubber stamping verifying these accounts

19   was done over and over again.  And each time, the employee

20   merely confirmed the Social Security number or peeked in a

21   file and said, "Yep, he signed it, verified."

22       April, 2014, two more ACDVs come in.  One he's current;

23   one he's in default.  They confirm both, verify both, send

24   them back.

25       Finally, Mr. Daugherty's going to tell you in June he

1    actually called Ocwen, June of 2014, and said, "Listen, you

2    can't seem to fix this, but can you give me a letter?  I

3    just need a letter that I can take to the bank to show that

4    my mortgage is current, that I'm not in foreclosure."

5         That's all in the notes of Ocwen.  And Ocwen's notes

6    show that they did not provide any such letter.  And, in

7    fact, within a few days, two more ACDVs came in from Equifax

8    saying, "Hey, please verify that he's current or please

9    verify that he's in default."

10        And the same employee, again Mr. Raj Kumar Singh from

11   Bangalore, India, he confirmed that the account was current.

12   And a minute or so later, he confirmed that the account was

13   in default.

14        It happens again in June.  By this time, Mr. Daugherty

15   got the Consumer Financial Protection Bureau in Washington,

16   D.C., to try to help him.  They wrote Ocwen -- it's in

17   Ocwen's notes -- and said, "What's going on here?  How is

18   this guy being shown as in default?  Was he in default?"

19        And he wasn't in default in these months of 2013 and

20   they give I think five months.  And, of course, he was

21   current every month in 2013.  But, nonetheless, the Consumer

22   Bureau in Washington, D.C., asked Ocwen to confirm that he

23   was current for those five months in 2013.

24        Well, they did a quick investigation, a minute or two

25   the records will show, Ocwen's own records.  And they

1   responded, "Well, he was in default in 2012."

2       The CFPB contacts him again and says, "We need to know

3   about 2013."  At that point, Ocwen gets back to the CFPB and

4   they copy Mr. Daugherty and they say, "We're going to fix

5   it."

6       And they actually sent a form in to fix it.  But they

7   didn't fill the form out right.  They said -- they took the

8   foreclosure off, but they left and validated the fact that

9   he was still five or more months behind.

10      So when they validate that he's five or more months

11  behind, it washes out the fact that they said he was current

12  because they -- we'll see the form.  You can see it in

13  Ocwen's notes.

14      After the CFPB got done, it still wasn't fixed.  In

15  July of 2014 Mr. Daugherty's filed this lawsuit.  We filed

16  this lawsuit, and this lawsuit was assigned to Judge Berger.

17      His balloon note came due.  Suit was filed July 8th.

18  His balloon note came due July 26th.  He still has not been

19  able to refinance.  He's made every payment on time for the

20  past 14, 15 months.

21      Even though his balloon came due, even though they

22  wouldn't fix his credit, even though he couldn't get a loan,

23  he made his next payment.  After the balloon came due, he

24  made his next payment on time and that was in July.

25      Suit is -- that was in August.  July the suit's filed.

1   He makes his payment.  He makes his August payment.  It's
2   accepted.
3       The suit is filed.  It's assigned to Judge Berger.  And
4   two more ACDVs come in from Equifax in August of 2014.  One
5   says, "Please verify that he's current."  The other says,
6   "Please verify that he's in default and in foreclosure and
7   $6,000 behind."
8       The employee of Ocwen, even with this lawsuit pending,
9   Daniel John Wesley of Benhaluru, India, confirms that the
10  account is current, and then seconds later confirms that
11  it's in default.
12      Finally, Equifax erases all mention of Ocwen from
13  Mr. Daugherty's credit report.  Ocwen never did fix it.
14  They never asked Equifax to take it off.  They never asked
15  them to strike it, to remove it.  They just did these 10-,
16  15-, 30-second investigations.
17      And we think the Judge is going to tell you at the
18  conclusion of the trial that you just can't do a cursory
19  investigation.  And you're going to -- we can show you every
20  one of these investigations was a few seconds where someone
21  looked and said, "Yep, the Social Security matches;
22  verified.  Yep, he signed the note; verified."
23      There were no real investigations.  No one looked past
24  the last four of his Social Security number or the fact that
25  he signed the mortgage document.

1    At no time will there be any evidence that Ocwen

2    actually looked at the credit report.

3    Now, there's going to be an exhibit, and it comes right

4    out of Ocwen's file.  And we're going to offer a, what

5    Mr. Daugherty sent to -- what Mr. Daugherty actually sent to

6    Ocwen and said, "Fix this."

7    And he also sent it to the Consumer Financial

8    Protection Bureau who sent it to Ocwen.  And this exhibit

9    that Ocwen acknowledges receiving, not only when

10   Mr. Daugherty sent it to Ocwen but when the Federal Consumer

11   Financial Bureau sent it to Ocwen and said, "Fix this," and

12   it has circled with an arrow to it "inaccurate" where it

13   shows him in foreclosure and has circles and arrows saying

14   "inaccurate" when they're showing him late.

15   Where they're showing him late, as 120 days past due in

16   March of 2013, Ocwen had this two different ways.

17   Mr. Daugherty sent it to them.  The federal government sent

18   it to them.  It has a big circle, "inaccurate."  Ocwen loan,

19   his loan number at least 120 days or more than four months

20   past due for $100,000.

21   And it also shows that he was 120 days past due in

22   March, but he was current in February.  Well, this is

23   impossible.  If you're current in February and you don't

24   make your March payment, which he did, you would be 30

25   days -- well, it's 120.

1    And then in April and May they say he's current and
2    then in June he becomes 120 days in default again.  And in
3    July again he's showing 120.  None of this can possibly be.
4        But even with this in their hands, Ocwen couldn't fix
5    it, never fixed it, and that's why we're here today.  Our
6    burden is to prove that Ocwen never conducted any
7    investigation, let alone a reasonable investigation.
8        I think the Judge is going to tell you that an
9    investigation -- the duty of Ocwen is to make a searching
10   inquiry.  Look at all available facts.  Look beyond the
11   Social Security number.
12       I think the Judge is going to tell you at the end of
13   the case that Ocwen's duty is to go beyond a cursory view of
14   internal records, and that Ocwen can't just restrict its
15   investigation to looking at a Social Security number,
16   looking at a signature.
17       Any reasonable investigation would have fixed this
18   problem like that, and it should have been fixed in March of
19   2013 when they got a letter in their records saying, "I'm
20   showing as in foreclosure and $6,000 behind."
21       But notwithstanding that and notwithstanding the 24
22   ACDVs that Ocwen received and verified, 12 of them verifying
23   he's in default and 12 of them verifying he's current,
24   notwithstanding three inquiries by the Consumer Financial
25   Protection Bureau in Washington, D.C., and notwithstanding a

1   letter and another phone call, 29 times there was an

2   opportunity for someone to fix this and it never happened.

3       And we're going to ask you to conclude at the end of

4   the trial that Ocwen did not do a reasonable investigation

5   to fix what was stopping Mr. Daugherty from getting a loan.

6   And, in fact, once it came off, once this lawsuit was filed

7   and it finally came off, he qualified for a loan.

8       Thank you.

9           THE COURT:  Mr. Manning.

10          MR. MANNING:  May I have a brief sidebar before I

11  begin?

12          THE COURT:  If it's needed.

13          MR. MANNING:  Yes, Judge.

14          THE COURT:  Come on up.

15          (Bench conference on the record)

16          THE COURT:  Mr. Manning.

17          MR. MANNING:  Prior to Mr. Young beginning his

18  opening statement I drew Your Honor's attention to emphasis

19  of Equifax documents as being improper.  The theme

20  throughout his opening -- you heard it a number of times --

21  was that Ocwen verified that this account was both current

22  and delinquent.

23      That word "verified" comes straight from the Equifax

24  documents.  It does not appear on the ACDV responses from

25  Ocwen.  And I want to show it to you because this is exactly

1 what I'm talking about.

2          THE COURT:  I don't need to see the document,

3 counsel.  Go ahead and make your argument.

4          MR. MANNING:  It says right there "verified."

5          THE COURT:  I don't need to see the document.  Go

6 ahead and make your argument.

7          MR. MANNING:  Okay.  Thank you, Judge.

8     The reference to 24 ACDVs as verifying anything is

9 Equifax ACDV responses.  They are not Ocwen documents.

10 They're not proper.  They were not disclosed on the

11 26(a)(3)s.  They're hearsay.  And they are the underlying

12 theme of his entire opening.

13     On the contrary, the ACDV responses from Ocwen that

14 Ocwen produced tell a very different story.  They verify the

15 specific dispute.  It's not a verification of the whole

16 form.  It's only a response to the dispute.

17     And Mr. Young repeatedly said that Ocwen only did an ID

18 check.  And, I mean, here's another exhibit from Ocwen, OLS

19 1343, that says that specific dispute was showing late and

20 Ocwen modified it.

21     That's a misstatement.  Unless he's relying on the

22 Equifax documents, he's misstating the testimony.  And I

23 understand that I can refute that.  What I can't refute is

24 the fact that he's referencing verification 24 times which

25 is only in these Equifax documents which should be improper.

1          THE COURT:  Any response you want to give?

2          MR. YOUNG:  Your Honor, let me first point out

3     that both versions of the ACDVs say "verified."  Both -- the

4     Ocwen notes show that they verified this each and every

5     time.  The Ocwen notes show that they received each and

6     every one of these ACDVs from Equifax.  And then at some

7     point in time the ACDVs of Equifax and the ones that have

8     actually been produced by Ocwen are mirror images of

9     themselves.

10         Counsel is still trying to argue something that he

11    can't argue.  This Equifax document is, in fact, -- it's

12    Equifax's insofar as this is what Equifax sent to them.  But

13    then when Equifax sent -- when Ocwen sends it back and

14    checks "verified" and changes the information, at that point

15    it's their record.  There's no difference between these two

16    sets of records.

17         Counsel is trying to take advantage of the fact that

18    they didn't give us the ACDVs for that initial period of

19    time.

20         THE COURT:  Counsel, unless I am misunderstanding,

21    the objection is to the use -- your use of the word

22    "verification" which, according to Mr. Manning, can only

23    come from the Equifax documents.

24         I ruled earlier that I was going to allow you to talk

25    about the Equifax documents and I would rule on their

1 | admissibility and that I would permit you to do so at your
2 | own peril.

3 |     I don't think we're at any different juncture than we
4 | were when you all were here before other than now in the
5 | opening, if I accept Mr. Manning's argument as correct, you
6 | have relied on the Equifax documents which I indicated I was
7 | going to permit you to do at your own peril.  So I don't see
8 | that we're at much of a different juncture.

9 |     I overrule what I perceive to be an objection.  I've
10 | told the jury that these opening statements are not evidence
11 | and specifically ruled that you could make reference to the
12 | Equifax documents even if that is what you were doing.

13 |     I preserve the defendant's objection and exception to
14 | my ruling.

15 |     Anything further?

16 |     MR. YOUNG:  Your Honor, I just want to point out
17 | that the word "verified" is in their own notes each and
18 | every, every -- the numbers match and they say "verified."
19 | So it's not as if I was at my own peril relying upon the
20 | Equifax documents.  Every Equifax document acknowledges
21 | receipt and verified in their notes.

22 |     THE COURT:  Your position, as I understand it, is
23 | to refute that portion of the objection which indicated that
24 | it's a misstatement, that Ocwen verified it.  I accept that
25 | as true.

1   I know that you all have a dispute about it, but

2 there's nothing that's happened that I didn't authorize when

3 you all were here initially.

4   I preserve the defendant's objection and exception to

5 my ruling.

6      MR. MANNING:  Thank you, Judge.

7      MR. YOUNG:  Thank you, Your Honor.

8      (Bench conference concluded)

9      MR. MANNING:  Your Honor, I need to use the

10 PowerPoint so the jury can see it.  Could we publish that?

11      THE COURT:  Is there an objection?  I don't know

12 what you want to publish.  Has it been shown to counsel for

13 the plaintiff, Mr. Manning?

14      MR. MANNING:  Okay.

15      THE COURT:  The -- whatever it is you want -- or

16 maybe there's no objection.

17      MR. YOUNG:  I'd be glad to look at it.

18      THE COURT:  All right.

19   (Pause)

20      MR. MANNING:  Your Honor, they would like more

21 time.  My thought is if we take an early recess.  I don't

22 have any problem with them taking as much time as they want

23 to look at it.  I defer to Your Honor on how you want to do

24 that.

25      THE COURT:  How much time do you need, counsel?

1    MR. YOUNG:  I think we've looked at half of the 57

2    slides.  We would at least like an opportunity -- we've had

3    several issues we've already addressed, but we're only

4    halfway through the slides.

5    THE COURT:  How much time do you think you will

6    need, counsel?

7    MR. YOUNG:  Fifteen minutes additionally.

8    THE COURT:  All right.  Let's take that and I will

9    see what, if any, issues remain.  I would like to get these

10   opening statements in this morning if possible.

11   Ladies and gentlemen, I'm going to give you a recess.

12   While you're out, do not discuss this case among yourselves

13   or permit anyone to discuss it with you or in your presence.

14   And please be in your jury lounge at ten minutes till the

15   hour.

16   We'll stand in recess for your purposes.  The court

17   security officer will show you where your jury lounge is.

18   (Jury retired to the jury room at 11:33 a.m.)

19   THE COURT:  We'll stand in recess until ten

20   minutes till the hour for you to review those, counsel.  And

21   I will take the bench before bringing the jury in to see if

22   there are any issues.

23   Going forward, you all need to take care of this before

24   presentation so we don't have this type of delay with the

25   jury.

1      (Recess taken from 11:34 a.m. until 11:45 a.m.)

2          THE COURT:  All right, counsel, you've had an

3   opportunity to review the documents that Mr. Manning wants

4   to show to the jury during opening.  Any objections?

5          MR. YOUNG:  Yes, Your Honor.  I object to the use

6   of such presentation.  We identified numerous slides where

7   counsel makes reference to evidence that no one has ever

8   seen.  It's not -- he's not going to be able to prove it.

9   At several points it crosses into closing argument.

10     But I can't ask this Court to go through 57 slides and

11  hear evidentiary arguments is basically what we have.  And,

12  you know, there's slides about credit scores.  There's no

13  evidence of credit scores in this case, but he's going to

14  talk about credit scores in these slides.

15     But then again I'm in the -- he shows what he wants and

16  says what he wants at his peril.  But now I'm in a position

17  where I don't want the jury to think that I somehow bless

18  this slideshow which is full of things that they can't prove

19  and crosses over into closing argument on multiple

20  occasions.  I don't want this jury to think that I somehow

21  bless this presentation.

22     And there are -- there are things in there that there's

23  no evidence.  They're setting up straw men that they can't

24  prove.  So at this point, I just don't -- if he uses it, I

25  don't want to be held accountable or somehow because the

1   jury knows that I had the chance to review it, or we can go

2   through the 57 slides or the 59 slides one by one.  I've

3   identified six, eight, ten of them that we thought were

4   clearly wrong.

5           THE COURT:  My suggestion, counsel, is that we do

6   as I did with respect to Mr. Manning's objections to the

7   documents which he indicates you were going to make

8   reference to and later indicated you did make reference to

9   during opening that he considered to be inadmissible is to

10  allow him to go forward with my saying at the beginning of

11  his opening that I will take up your objections at a later

12  point.

13      That gets rid of your concern that the jury thinks that

14  you have acquiesced in the substance of what's included.

15  But, at the same time, if there are things that are such

16  that you don't want the jury to hear about and there's an

17  objection that I need to hear specifically, I will take that

18  up.  But generally that would be my answer to what you have

19  said thus far.

20          MR. YOUNG:  Thank you, Your Honor.

21      I'm just concerned that -- caution the jury that the

22  plaintiff has not sanctioned or approved any of these

23  materials that they're going to see.

24          THE COURT:  Well, I don't want to take a position

25  with the jury so that you lawyers are able to try your

1    respective cases other than at the beginning of Mr.

2    Manning's opening I will say in front of the jury,

3    Mr. Young, that I will take up your objections to anything

4    contained in it at a later point.

5              MR. YOUNG:  Thank you, Your Honor.

6              THE COURT:  Mr. Manning, any objection to

7    proceeding in that fashion?

8              MR. MANNING:  I would just prefer that it be

9    mutual, that it be -- you say his objections are preserved

10   as you did with me.  I don't think there's anything to take

11   up at a later point.  He's preserving them now.  That's the

12   issue.

13             THE COURT:  Well, he hasn't really preserved them

14   because there's no specifics here.  He's just indicated that

15   there are some things that he objects.  It's very hard for

16   me to preserve an objection generally based on what's been

17   stated here thus far that he has an objection to some of the

18   slides.

19        And, so, if he wants to object specifically, I want to

20   give him that opportunity at a later point as I took up

21   specific objections to what you thought he was going to use

22   in his opening.

23             MR. MANNING:  And, Judge, the only specific

24   objection that I've heard is the credit score issue.  And

25   that comes straight out of Mr. Daugherty's deposition.

1    On Page 77 and 78 of Mr. Daugherty's deposition he says

2    that, "Yes, I see that my Equifax score was lower than my

3    TransUnion and Experian score."

4    And I don't know -- I mean, he's identified that on a

5    couple of the slides but, again, that's evidentiary.

6         THE COURT:  Mr. Manning, your objection to what

7    I've proposed is that you would simply have me to say your

8    objections are preserved; is that correct?

9         MR. MANNING:  I don't, I don't view them as having

10   made any objection but that.  And so my, my preference,

11   Judge, is to -- as you've indicated, there's no specific

12   objection.  I should proceed.

13        THE COURT:  All right.  I'm going to allow you to

14   proceed with the jury.  And when the jury comes in, I will

15   tell them that I will take up his objections at a later

16   point.

17   I do that, gentlemen and lady, to preserve our ability

18   to go forward with these opening statements at this time

19   and, at the same time, not to preclude either of you from

20   bringing up objections as we go forward.

21   To the extent that I'm not giving the exact language

22   that you asked for, Mr. Manning, I preserve your objection

23   and exception.

24        MR. MANNING:  And, Judge, if I may, as you said to

25   us outside the jury's hearing, you know, we'll deal with the

1   objections at a later point.  Maybe the instruction is, "As

2   I did with the defendant and his objections, I'll do the

3   same for the plaintiff."

4        (The jury returned into the courtroom)

5             THE COURT:  Mr. Manning, will you go forward with

6   opening statement at this time?

7             MR. MANNING:  Yes, Judge.

8             THE COURT:  Mr. Young, I'll take up your

9   objections at a later point.

10            MR. YOUNG:  Thank you, Your Honor.

11            MR. MANNING:  Ladies and gentlemen, thank you for

12  your time today.  Thank you for your service.  We greatly

13  appreciate it.

14       As I have already introduced myself, I represent the

15  defendant, Ocwen Loan Servicing.  And I want to start just

16  by talking about the importance of roles.  It's very

17  important for us to know who the parties are and what their

18  roles are.

19       So I have a couple of slides that hopefully will just

20  give background.  You probably all have at one point seen

21  your credit report, or maybe if you haven't, you've seen the

22  advertisements that you can get a free credit report, you

23  know, download it here.  The dispute here has to do with

24  credit reports.

25       Now, the entity that prepares the credit report,

1    there's three major credit bureaus.  Those credit bureaus

2    are Equifax, TransUnion, and Experian.  You may have heard

3    their names before.  Those are the three national credit

4    reporting agencies.

5         And that's important to understand because those credit

6    bureaus are going to actually report.  They actually produce

7    the credit report and provide a score.  And you'll hear

8    testimony from our expert witness, a man who actually worked

9    at Equifax, who talks about how they have proprietary ways

10   of scoring.  But the importance here is Ocwen, my client, is

11   not a credit bureau.  They don't report anything on a

12   report.  What they do is they furnish data.

13        So what is a furnisher?  A furnisher is the, the credit

14   agency.  We have a loan, and you've heard testimony or --

15   I'm sorry -- opening statements about how Mr. Daugherty has

16   a loan with my company.  And that loan is a mortgage.  So

17   every month, you'll hear testimony from our corporate

18   representative, that Ocwen furnishes data about the status

19   of that loan.

20        A furnisher is like a mailman.  They receive the mail

21   and they look at the envelope and they deliver it to whoever

22   needs it.  They send it where it's addressed.

23        And the evidence in this case will show that the data

24   that was delivered, furnished by my client, Ocwen, was

25   always accurate.  And that's why you heard Mr. Young during

1    his opening statement say that there was always one account

2    that was right.  But then there was a second account.

3        Now, what Mr. Young didn't tell you is that no one ever

4    told my client, Ocwen, that there were two accounts being

5    reported on his credit report with Equifax.

6        Of all three of these credit reporting agencies, only

7    Equifax had this problem.  TransUnion had it right.

8    Experian had it right.  Equifax was showing two.

9        But the plaintiff, Mr. Daugherty, the company he hired

10   to help him with his credit called Aggressive Credit Repair

11   and then Equifax, none of those three entities ever provided

12   my client, Ocwen, with a credit report showing the same

13   account was reporting twice with different information.

14   That's very important to understand the roles.

15       So let's talk about generally what the case is about.

16   I mentioned Aggressive Credit Repair.  That's the company

17   that Mr. Daugherty hired to dispute various information

18   about his credit report.  He had bad credit at the time and

19   he wanted to improve it.  So he hired a company to help him

20   dispute those accounts.

21       Those disputes are on forms written by this company

22   called Aggressive Credit Repair.  They're then sent to the

23   Credit Bureau where -- I'm going to talk about Equifax a lot

24   because that's the company that had the issue.

25       Equifax would then receive those letters and would have

1   to send on the dispute to my client, Ocwen.

2       What's important again is the role. When they -- when

3   Equifax receives that dispute, they're like a quarterback.

4   Okay? They call the play. They say, "We received a

5   dispute," and then they assign a code to it. This is what

6   the dispute is about.

7       Equifax controls that code. They put a code on a form.

8   It's just a document that goes through a system called

9   e-OSCAR. It's electronic. But the point is Equifax

10  identifies the dispute and then they say, "Go investigate

11  this."

12      Now, the evidence will show that Ocwen, when it

13  received those forms, every time investigated the dispute.

14  It ran the play the quarterback called. That's what the

15  evidence will show about the reasonable investigation.

16      Now, let's go on to the next. So when we have these

17  disputes, and we're talking about disputes, there are a

18  couple of different -- really in this case only two disputes

19  that were ever identified.

20      One was Equifax assigned a code called 001 which just

21  means Mr. Daugherty is saying, "It's not my account." The

22  second one is 007. And that means, "Go investigate the

23  account status, the pay history, and the rate the -- the

24  payment rate."

25      These are just codes. The importance is those are,

1  those are what my client then has to look for.  And you'll

2  see in plaintiff's own exhibits where we have our ACDV forms

3  that we went and we investigated each one of those disputes

4  and responded accurately.

5      Now, let's go on to what the claims are.  So

6  Mr. Daugherty says that my client didn't do a reasonable

7  investigation.  And he claimed that's what caused him to be

8  denied credit.  He also claims that it caused him emotional

9  distress.  And we're going to talk about what the evidence

10  will show on each of those.

11      The evidence will show that the denial of credit was

12  being caused not by what Ocwen was doing, but by other

13  factors on his credit report.

14      Now, as you can imagine, any one person has more than

15  one loan.  You have one mortgage perhaps, but you may have

16  credit cards.  You may have a loan for your car, et cetera.

17  All of those creditors are furnishing data.  They're,

18  they're delivering the mail to the credit bureaus.  Here's

19  what the status of this account is.  And the credit bureaus

20  collect that info and report on it.  My client doesn't

21  report on it.  It furnishes data.

22      The evidence will show that here plaintiff was denied

23  credit because he had 11 other accounts that were in

24  collection.  And he also had two liens for unpaid taxes; one

25  for federal and one for state.

1          What's important is the parties agree that the only

2     issue is appearing on Equifax's credit report.  Equifax's

3     credit report, his score, Mr. Daugherty's score on that was

4     actually higher than it was with the Experian company.  And

5     Experian wasn't reporting on the Ocwen account at all.  It

6     just wasn't considering it.

7          And even though Equifax was doing it wrong, its score

8     was still higher.  And that helps explain why he was having

9     difficulty getting credit.  It wasn't something that Ocwen

10    had caused.  There's also no evidence that he was

11    emotionally distressed.

12         So we've talked already briefly about who's involved;

13    the plaintiff, my client, Equifax, the credit bureau, and

14    then this third party called Aggressive Credit Repair.

15         And you'll recall the Court asked you during *voir dire*

16    about a man named Lorin Hanks.  He's the owner of that

17    business.  We deposed him and you'll hear testimony from his

18    deposition.

19         So starting at the beginning, the plaintiff took out a

20    loan on his home, a $100,000 mortgage.  As you know, a

21    mortgage requires you to make payments every month.  The

22    payment in full was due in July, 2014.  And currently the

23    plaintiff owes $95,000 on the loan.  And you heard Mr. Young

24    tell you that he was able to qualify for additional credit

25    so he could refinance.

1        But in the last almost two years he hasn't paid

2   anything on that mortgage.  He continues to live there and

3   he's not paying my client or anybody else anything.

4        Next, my client Ocwen.  What's Ocwen?  Ocwen is a loan

5   servicer.  So we didn't lend the money.  It was a different

6   entity that actually did the loan.  But the loan was

7   transferred to us to service it, which is things like

8   collecting the payments, telling him about taxes and

9   insurance that are due, making sure that the property is

10  maintained.  If he falls behind, we have to make sure the

11  property is protected.

12       When the loan came over to Ocwen, Mr. Daugherty was

13  three months behind and in foreclosure.  And he doesn't

14  dispute that.  He was having financial difficulty.  To his

15  credit, he was able to get current.

16       When that occurred and Ocwen investigated what it had

17  received from the prior company, it noticed that the opening

18  date on the account was wrong, meaning the prior company

19  that was involved with the loan had an opening date with the

20  wrong month.  So it corrected it.

21       And you'll hear testimony from our expert witness that

22  says when Ocwen actually did the right thing and corrected

23  the opening date, Equifax interpreted that as a new account.

24  And that's why it had two accounts on his credit report.

25       But, again, the evidence will show that my client never

 1    knew that because we never received the credit report.  All

 2    we get are these ACDVs which Mr. Young told you about.  And

 3    we're asked, like a quarterback, to address the specific

 4    play.  Go look at this.

 5         Every time we looked at it and addressed it and we

 6    repeatedly told Equifax, "Look, he's current.  He's not

 7    late."  But Equifax kept reporting two tradelines; one

 8    current like we told them, the other late.

 9         So Equifax is not a party to this suit.  You won't hear

10    testimony from them about why they were doing this

11    duplicative account, why they failed to correct it.  They're

12    not here.

13         We already talked about when -- what happened -- the

14    evidence will show that Ocwen became the loan servicer.

15    Again, it's not disputed that when it came over, it was

16    late.  But that got corrected.

17         I'm going to skip for the interest of lunch a couple of

18    slides here.

19         John, let's go to slide 15, please.

20         So the evidence will show here through the documents

21    that Equifax was only updating one of those two trade

22    accounts.  They're called tradelines.  It's just a summary

23    of the information on a credit report.

24         Because Equifax didn't update both, one of them

25    continued to show that old information when he had been late

1    and in foreclosure.

2         When Mr. Daugherty attempted to refinance, he had a

3    number of other collection accounts.  And you'll hear

4    testimony from him as well that he knew he had bad credit

5    and he was trying to get it cleaned up.

6         Our expert witness, who actually worked at Equifax,

7    will explain that any one of those collection accounts or

8    tax liens could have been the reason why he was denied

9    credit.  You can't pinpoint it to any one thing that Equifax

10   was reporting as late, especially when the score was higher

11   than Experian and it wasn't showing him as late on these,

12   both accounts.  One was perfect.

13        So the dispute process started in March, 2013.  And

14   that's when the first letters came over from this company

15   Mr. Daugherty hired, Aggressive Credit Repair.  And they

16   sent a letter every month and it disputed a number of

17   different accounts.  And you'll see the letter during the

18   testimony.  And for each one of those, that company wrote

19   the same thing.  "It's not my account and I was never late."

20        Now, the evidence will show that neither one of those

21   is accurate as it appears to Ocwen.  Ocwen -- Mr. Daugherty

22   admits he had an account with Ocwen and he still does.  And

23   also he had been late.  When the account came over, he was

24   three months behind in foreclosure.

25        So when we receive those, we have to investigate what

1    the dispute is.  The dispute was not accurate.  Nonetheless,

2    the evidence will show that Ocwen repeatedly investigated

3    each new request and went in and checked.  Some of the

4    requests were just, "Verify that he has an account with you.

5    Check his Social Security number."  And our witness will,

6    will describe that process.

7         Ocwen has a number of databases that it has access to

8    and our credit analysts.  They can go in and they can pull

9    the original loan documents.  It's in a system called CIS.

10   It's now called Vault.

11        But the point is it's a software program where you can

12   pull up the actual note.  And there were entries that show,

13   "We looked at the note.  He signed it.  He verified that it

14   was his, Social matches, account number matches, name

15   matches."

16        So then we would respond to that dispute, "not his/not

17   hers."  Yes, it is his and here's the information.

18        The second dispute, "never late," my client didn't just

19   say, "No, he was late in the past."  They went and they

20   checked the current status.  Is he current or late right

21   now?

22        And you'll see a number of those ACDVs where my client

23   responded and actually modified it.  It didn't know there

24   were two accounts.  It had only always said he was current

25   in months when he was current.

1    But when it got Equifax disputing it, it actually

2  looked at the second system called REALServicing.

3  REALServicing has the whole pay history, and we'll show you

4  that during the trial.  The pay history of when he paid, was

5  he late, was he on time, that information is all in the

6  system and it's able to be accessed by the credit analysts.

7  And that's how they were able to modify the account to say,

8  no, he's not late, he's current.

9    And the evidence will show that Ocwen did that a number

10  of times, ultimately culminating in a new form.  I know the

11  forms -- there's too many of them.  It's called an Automated

12  Universal Data Form.  What that means is Ocwen on a form to

13  all three credit bureaus says, "All of you all update this

14  account.  He's current.  He's not past due."

15    Because we had had so many repeat disputes, Ocwen on

16  its own voluntarily said, "We're just going to send this

17  universal data form.  We're going to tell everybody."

18    Even after that, the evidence will show Equifax was

19  still reporting a second account that Ocwen didn't know

20  about and that it was still late.

21    The problem here is the duplicative account that

22  plaintiff and the company he hired, the so-called

23  professional Aggressive Credit Repair, never told Ocwen.

24  Equifax never told Ocwen.  Ocwen did what it was asked by

25  the quarterback to run the play, go check this dispute, and

1    responded, and did so reasonably as the evidence will show.

2         I'm going to skip a couple more slides.  Let's go to

3    18.

4         John Ulzheimer, I mentioned his name.  So he worked at

5    Equifax for six years.  He's got 24 years of experience in

6    the industry.  He's going to be able to help you understand

7    how the dispute process works, the different roles, and

8    specifically how Ocwen as a furnisher only responds to the

9    dispute.  It, it looks where it's told to look and it goes

10   and addresses that.  That's its responsibility.

11        Then it's the responsibility of the credit bureau to

12   fix it.  And his testimony will be that Equifax caused the

13   problem, continued the problem, and never fixed the problem

14   until months after this lawsuit.

15        Okay.  Let's go to slide 20.

16        So you've heard a little bit about this, but I want to

17   give you kind of the high-level overview.  So Mr. Daugherty

18   sees he needs to get better credit.  He disputes through

19   this company what he thinks is questionable.

20        Now, the testimony will be that his company handled it.

21   They, they sent the same letter every month and disputed the

22   same things every month.  And our expert will testify that

23   actually made things worse because they never actually

24   identified the problem, which was the duplicative tradeline,

25   that one account was reporting twice.

1    And his testimony will be that's an error, but it's an

2    error that's not that uncommon, so much so that in the

3    industry he'll explain there's actually a specific way to

4    fix it.

5    On these forms there's a box called FCRA, relevant

6    information.  And in there you would identify dupe for

7    duplicative or dupe tradeline or duplicative tradeline.  You

8    will not see a single ACDV response that ever says that.

9    The quarterback never called that play.  That's what the

10   evidence will show.

11   That burden, as Mr. Ulzheimer will explain, in the

12   industry is on the credit bureau to provide all the relevant

13   data.  There's no evidence, and you will hear no testimony,

14   that anyone ever told Ocwen that there were two tradelines

15   with one account; never saw the credit report.  All that

16   information is housed with Equifax.  Plaintiff had it, but

17   he didn't provide it to us.

18   So let's go to 22, skip a little bit.

19   So the boxes here at the bottom of this sheet show --

20   it's a bit like the telephone game if you've ever played

21   that.  You know, some of the communication sometimes gets

22   lost in translation.  But plaintiff has a credit report.  He

23   talks to a third party.  That third party, Aggressive Credit

24   Repair, then has to dispute and do so accurately.  Then

25   Equifax has to receive that dispute and apply and interpret

1  the correct code.

2      Then Equifax sends that code to Ocwen, my client.  My

3  client investigates the specific dispute, runs the play, and

4  has to do so with a reasonable investigation.  We respond to

5  that form, the ACDV, back to Equifax.  Equifax then has to

6  update it and then can provide an updated credit report to

7  the plaintiff.

8      So we've talked about the first step and I'm going to

9  go quickly through these.  On slide 23, the first step,

10 plaintiff to Aggressive Credit Repair.

11     Aggressive Credit Repair wrote all those letters that

12 went to Equifax, the same letter every month, the same

13 disputes, never mentions duplicative tradeline.

14     Next slide.  Then you have the Aggressive Credit Repair

15 going to Equifax.  Again, there's other credit bureaus.  The

16 only problem here is with the Equifax credit report.  Every

17 dispute is the same, "not mine, never late."  That's all

18 they said.

19     Next you go from Equifax to Ocwen.  Equifax assigns a

20 dispute code.  Some these ACDV forms say "not mine."  Other

21 ones say "account status, pay history, payment rating."  We

22 go to the specific dispute identified, investigate it, and

23 you'll see those forms.

24     When Ocwen received it and it said "not mine," that's

25 where we look and we validate.  We're not verifying all the

1    data.  We're verifying the data that is in the dispute.  We

2    run the play the quarterback calls.

3        So here's a sample ACDV form.  There's nothing magical

4    about it.  It's just a printout of this system called

5    e-OSCAR.  And it has a number of fields in it.  And I'll

6    blow it up a little bit for you on slide 27.

7        So at the top of this form -- this is an example of one

8    of the Ocwen forms that you'll see.  The top is what Equifax

9    fills in and provides to my client as the furnisher.  The

10   gray on the right-hand side, you'll see that's where Ocwen

11   fills in the information.  That's the information that it's

12   either verifying or modifying.

13       And if you see the dispute code number 1 there, it says

14   "not his/not hers."  That's the code that Equifax applied.

15   And it said, with instructions like a quarterback calling a

16   play, "provide or confirm complete ID."  That's what we're

17   asked to do.  And you'll see an example of what we filled

18   out.

19       Oh, I mentioned -- go back one second.  I mentioned

20   this FCRA relevant information box.  That's where our expert

21   witness will explain the duplicative tradeline should have

22   been identified had Equifax done it right.

23       You'll see that in here and on some of these others

24   they knew how to use it.  Equifax knew how to use that box

25   because they did fill in information in there.  They just

1    never filled in what the actual problem was.

2        Okay.  So let's skip 28.  We talked about 29.  Let's go

3    to 30.

4        So then you've got Equifax going to Ocwen and

5    explaining what the dispute is.  From Equifax to Ocwen you

6    have the ACDV form.  Ocwen responds and then it goes back to

7    Equifax.

8        Now we're on 33.  So how does Ocwen do this?  Now,

9    you'll hear testimony from our corporate representative,

10   Sandra Lyew, who explains that there's a month-long training

11   process for these credit analysts.  And once they're

12   trained, classroom lecture, then there's going to be

13   shadowing where they have an assigned supervisor who knows

14   how to do this and shows them how to do it.

15       Then after that, there's actually supervision and

16   random sampling to make sure they're doing it right.  They

17   want to make sure that when these responses come in, they

18   investigate the specific dispute with any information that

19   they need to make sure that it's reporting correctly.  And

20   she'll describe all of that training, policy, and procedure

21   for you.

22       The evidence will show that Ocwen reasonably

23   investigated both disputes; that there were duplicative

24   accounts that weren't identified.  So when Ocwen has it

25   coming in, it doesn't know that Equifax alone out of

1   everybody is the only one who's reporting one account twice.

2   He doesn't have two accounts.  There's no dispute.  That was

3   an Equifax mistake that was never revealed to Ocwen.

4       When Ocwen responds in its form and modifies or

5   corrects the account, then it's up to Equifax to make sure

6   it makes those adjustments to the credit report.  And the

7   evidence will show that it didn't.  It didn't take that

8   information and either delete that duplicative tradeline or

9   make sure it never showed late again.

10      Let's skip over to 37.

11      So the Court will instruct you on the law.  The Court

12  has to provide you with the instructions at the conclusion

13  about legally who's responsible for what.  But there are

14  elements of those, and the Court will explain that you -- my

15  client has to do a reasonable investigation.  And to the

16  extent there wasn't, it actually had to cause something to

17  happen.  That was the cause of a denial of credit; that that

18  specific incorrect response caused a denial; and then,

19  second, that there were damages flowing from that causation.

20      The evidence will show the plaintiff can't prove any of

21  those elements.

22      The next is the evidence has to show that there were

23  reasonable investigations in these disputes.  And as I've

24  mentioned, the evidence will show that when the disputes

25  came in, Ocwen responded to each dispute as it was

1    specified.  And you'll hear testimony from our corporate

2    representative that it investigated them using documents in

3    its system and confirmed, yeah, he signed it and, yet, he

4    had been late but he's not late anymore.

5         We talked about the training policies and procedures.

6    We talked about the causation.  Okay.  So let's go to 43.

7    We're going to skip a little bit.  We're pushing lunch.  I'm

8    sorry about that.  Hang in there for a little bit more and

9    we'll take a break.

10        Causation.  So let's talk about what the evidence will

11   show about responsibility.

12        The first mistake is that -- I've already mentioned

13   this to you briefly -- Equifax without Ocwen knowing added a

14   second mortgage loan.  It had the same account number but it

15   had different information.

16        Equifax next failed to update both accounts.  So one

17   was right, but one continued to show old information.

18        Mistake number three, Aggressive Credit Repair -- we've

19   abbreviated it here ACR -- when they were hired and paid

20   money by the plaintiff to help him, they never identified a

21   duplicative account in any of their letters.  They were

22   charging him every month and they didn't actually write a

23   letter that said, "Hey, there should be only one account

24   here.  He only has one mortgage with Ocwen."

25        Next this so-called expert didn't realize himself, and

1   you'll hear it from his deposition testimony, that only one

2   of the entries of these duplicates was being updated.

3       The next mistake was that Aggressive Credit Repair

4   didn't mention the duplicative tradeline.  And every month

5   it kept sending the same form which, again, Ocwen had

6   already responded to.  But Equifax continued to do the wrong

7   thing.

8       Now, mistake number seven, there was no credit report

9   from Equifax showing that there were two tradelines ever

10  given to my client, Ocwen.  We didn't know about it.  And

11  Equifax didn't correctly update that second account even

12  when Ocwen told it to, even when it went in there and said,

13  "Hey, you're reporting this account as past due and they're

14  current."

15      And you'll see this in plaintiff's own exhibits from my

16  client how they identified, yeah, this is showing late and

17  we said modify it.  We didn't just verify it as Mr. Young

18  said in his opening statement.  The documents will show we

19  said, "Correct it."

20      So, overall, we've identified those six mistakes.

21  We've also identified how plaintiff himself had 11 other

22  accounts in collection.  And our expert witness will explain

23  if you have two or more accounts in collection, you're

24  already at the maximum adverse rating for that factor.  If

25  you have tax liens on top of that and a bunch of other, of

1    course you're going to have credit problems.  There's no

2    link to anything that Ocwen did.

3        One of the factors for that is the plaintiff in his

4    deposition -- and you'll hear testimony from him -- said he

5    was aware that his score with Equifax, the one that was

6    doing it wrong, was still higher than the other credit

7    report that wasn't reporting it.

8        So to the extent that Equifax was reporting something

9    it shouldn't have about his past due or foreclosure status,

10   that score is still higher than Experian who's not reporting

11   it.  You can't link anything to a causation of what

12   happened.

13       Further, you'll hear testimony about how the plaintiff

14   was denied other accounts.  He sought to get credit like

15   there was a Disney credit card that he had applied for.  He

16   didn't get it.

17       And the evidence will show that lenders that he applied

18   for denied him without ever even seeing the Equifax report

19   because, as you'd imagine, a credit company doesn't have to

20   rely on just Equifax.  There's three.  They can choose any

21   one of them.

22       And the evidence will show that he was denied credit by

23   people who never even saw the Equifax report, which is the

24   only one that he's providing any complaint about here.

25       So the damages that the plaintiff is seeking in this

1    case involve denial of credit, which we've touched on, and

2    then, second, emotional distress.

3        The denial of credit -- I just want to highlight these

4    for you.  You're going to hear testimony about them.  We

5    should be on slide 50.

6        There's five different credit applications that were

7    denied.  And I'm going to run through them real quick.

8    We're getting to the finish line.

9        The first two, Comenity Bank and Embrace Home Loans.

10   Those were the two that didn't even look at Equifax.  To the

11   extent that this problem is being caused by Equifax, it

12   couldn't have been here.  They didn't even see that report.

13       Next, One Community Federal Credit Union.  That -- they

14   pulled what's called a tri-merge.  It's a combination of the

15   three credit bureaus' reports.  And our expert witness,

16   again, will explain that in this situation, Equifax actually

17   had the higher score.

18       And when he was -- he actually wasn't denied.  You'll

19   hear testimony by deposition from Mr. Napier.  He won't be

20   here today because -- well, I don't need to say why.  But in

21   his deposition he states that the application was never

22   completed, that he stopped.

23       And it could have been denied had it been processed for

24   any number of reasons.  Again, you have to look at the link.

25   Is there anything that's being caused just because of

1    something Ocwen did in their response.  That's the third

2    credit denial.

3         The last two, Quicken Loans mortgage refinance, and

4    then a Chase Bank credit account.  The Chase credit account

5    was that Disney credit card.  So in those you have a denial

6    because the credit score is too low.

7         And there you'll hear testimony from our expert witness

8    to explain how these credit bureaus score based on a

9    collection of all the furnisher data, how many accounts in

10   collection.  And when you have a lot of accounts in

11   collection past due or tax liens, that's going to affect

12   your credit.  And that could be the cause of the denial.

13        So it's plaintiff's burden by a preponderance of the

14   evidence to prove that there was a causation.  And the

15   evidence will show that he can't prove that.

16        The emotional distress piece, plaintiff will testify

17   that he felt stressed.  And he will admit, however, that he

18   had no problems sleeping and he didn't seek medical

19   attention.

20        So the, the following things that have to be proven, as

21   the Court will instruct you about the law, the evidence

22   doesn't support it.

23        And, so, at the conclusion of this case, you're the

24   finders of the facts.  You make the decisions after hearing

25   all the testimony and seeing all the evidence.  It's up to

David Daugherty - Direct (Nolan)

1   you to decide.  And I appreciate your patience and service.

2       At the end when you make the decision, if you conclude

3   that plaintiff was unable to prove by preponderance of the

4   evidence any one of those required elements, then the Court

5   will instruct you that you're required to check "no" for

6   liability.  And there's a sample of:  Was there a

7   preponderance of the evidence to prove those elements?  If

8   you're not convinced, then you have to check "no."

9       I thank you for your time and attention.

10          THE COURT:  Ladies and gentlemen, at this juncture

11  I'm going to give you your luncheon recess.  While you're

12  out, do not discuss this case among yourselves or permit

13  anyone to discuss it with you or in your presence.  And

14  please be in your jury lounge at 2:00 this afternoon.  We'll

15  begin promptly then.

16      We'll stand in recess.

17      (Recess taken from 12:29 p.m. until 2:03 p.m.)

18          THE COURT:  Good afternoon, everyone.

19      Counsel, call your first witness, please.

20          MR. NOLAN:  Your Honor, the plaintiff calls David

21  Daugherty.

22          THE COURT:  Mr. Daugherty, would you come up and

23  take an oath or affirmation, please.

24          **DAVID DAUGHERTY**, PLAINTIFF, SWORN

25                  DIRECT EXAMINATION

David Daugherty - Direct (Nolan)

1    BY MR. NOLAN:

2    Q.    Hello, Mr. Daugherty.  Could you please introduce

3    yourself to the jury?

4    A.    Hello.  My name is David Max Daugherty.

5    Q.    Tell them, what did you do for a living?

6    A.    I was a firefighter for the City of Parkersburg for

7    almost 28 years.  I retired as a Lieutenant in 2010.

8    Q.    Did you do anything else, any other occupation?

9    A.    Yes.  I was also an EMT for Saint Joseph's Hospital and

10   the ambulance service, but I worked in the ER there also and

11   I was also -- I had two full-time jobs.

12   Q.    Are you still working for those employers?

13   A.    No.  I retired both places.

14   Q.    When did you retire?

15   A.    I retired from the ambulance service in 2009, and

16   December 10th of 2010 from the fire department.

17   Q.    What's your current source of income?

18   A.    I'm on pension from the fire department, and I'm also

19   on disability.

20   Q.    Let's talk about your disability.  What, what type of

21   injuries led to your disability?

22   A.    I've had several.  The biggest one occurred from the,

23   an injury on a fire scene back in 1993 where we had a

24   structure collapse and the ceiling came down on us.  And I

25   ended up with a concussion and my neck messed up with a

David Daugherty - Direct (Nolan)

1    bulging disk at C5.

2        I also had injuries with my rotator cuff.  And since

3    I've retired, both my knees have gone bad and they've

4    replaced the left one and it's on schedule to be replaced

5    again.

6    Q.  Well, since the injury in 1993, has your health ever

7    been right, so to speak?

8    A.  No.  That was -- actually, I had a bulging disk from

9    1993 until 2006 when the disk impinged.  And overnight I

10   lost the use of my right arm and I had to have surgery.

11       And right after the surgery -- and I can't explain the

12   dates or times.  But from 2006 to 2012, I had chronic

13   pneumonia where I could never quite get over it, and

14   frequent stays in the hospital for a week at a time, usually

15   always the week of Christmas there for like three years in a

16   row.

17       I kept getting worse as the years went by where I

18   was -- my health was in really poor shape.  I was having

19   trouble breathing.  I'd have to walk 50 feet and I'd have to

20   sit down and catch my breath.

21       And finally in 2012 it was diagnosed what was going on

22   that some -- like I say, during the impingement, not the

23   surgery because the surgery went really well.  But the nerve

24   to my diaphram, which is the muscle that goes up and down

25   and makes your lung open and close, is paralyzed in the up

David Daugherty - Direct (Nolan)

1  position which is not letting my right lung open up which is

2  a big contributor to why I was having all the pneumonias.

3  Q.   So would these medical conditions affect your ability

4  to work at various points during this time period?

5  A.   Yeah.  I was having to take a lot of sick leave and

6  time off for weeks at a time.  And it actually ultimately

7  was the reason why I retired.  I loved the jobs I had, but I

8  couldn't keep up with it.

9       The day I actually retired officially -- that

10 December 10th at 8:00 in the morning is my official time I

11 retired.  By 3:00 I was admitted to Saint Joe's for a week

12 with pneumonia where I was in that bad a shape.

13 Q.   So the health injuries, did they ever cause problems

14 with your ability to make a mortgage payment?

15 A.   It caused a lot of problems financially with, with

16 all -- they were sending me to OSU.  I was being sent to

17 Morgantown for WVU, Ruby.  Yes, it was -- we were having

18 trouble at that time trying to keep up.

19 Q.   What specifically was going on in the winter and early

20 spring of 2012 with your health?

21 A.   I was having trouble breathing for one.  I mean, --

22 Q.   And during this period, you got behind on your mortgage

23 due to your inability to work?

24 A.   Yeah.  I had, I had a really -- the last couple years

25 was really bad where -- you know, I worked in an ER setting

David Daugherty - Direct (Nolan)

 1   for 26, 27 years and really I wasn't -- I personally didn't

 2   think I was -- I'd never said nothing to any of my family.

 3   I just kept chugging away.  I had a -- my father-in-law was

 4   terminal and I was the only one in the family that knew how

 5   to take -- to go to Pittsburgh to take him to Pittsburgh

 6   Presby.  So I was always his transportation even when I was

 7   sick.

 8        But, yeah, it's really hard to focus and really do

 9   anything when you're that sick all the time.

10   Q.   So in April of 2012 you were behind on your mortgage,

11   though; correct?

12   A.   Yes.

13   Q.   Do you recall approximately how far behind you were?

14   A.   I was probably three or four months.

15   Q.   Were you able to get caught up at that point?

16   A.   Yes, we did.

17   Q.   What did you do to get caught up?

18   A.   We cashed in one of my wife's 401(k) plans to catch up

19   on the home mortgage and pay off the medical bills.

20   Q.   Why did you cash out your 401(k) at that time?

21   A.   Because we were showing that we were late on the

22   mortgage payments and worried about foreclosure.

23   Q.   I want to ask you about the particular -- the house

24   here in general.  I'm going to show you what I'd like to

25   mark for identification purposes as Plaintiff's Exhibit

David Daugherty - Direct (Nolan)

1    Number 1.  Do you recognize the document on your screen?

2    A.    Yes, I do.

3    Q.    Can you describe what this is?

4    A.    This is the deed where I bought the house in 1999.

5    Q.    Can you tell us the exact date?

6    A.    The 20th of July, 1999.

7    Q.    Okay.  I'm going to scroll along to the note.  This is

8    your signature on the deed?

9    A.    Yes, it is.

10   Q.    And can you describe what this page of the document is?

11   A.    That's showing where I have a balloon payment at the

12   end of the loan, maturity of the loan.

13   Q.    And what's your understanding of what a balloon payment

14   is?

15   A.    That's the balance of your account that at the end of

16   the balloon when it matures that you have to pay the balance

17   or refinance.

18   Q.    Can you identify this page as well?

19   A.    That just shows the terms of the loan.

20   Q.    So it shows your interest rate?

21   A.    Yes.

22   Q.    What was that?

23   A.    Back 15 years ago a lot of the interest rates was

24   higher.  It was 9.75.

25   Q.    What was the total amount of the loan?

David Daugherty - Direct (Nolan)

1   A.    I believe it says $100,000.

2          MR. NOLAN:  Your Honor, we would move to introduce

3   this as Plaintiff's Exhibit Number 1.

4          THE COURT:  Any objection, Mr. Manning?

5          MR. MANNING:  No objection, Your Honor.

6          THE COURT:  All right.  In that event, the deed

7   that's been marked as Plaintiff's Exhibit Number 1 will be

8   admitted into evidence without objection and can be

9   published at your discretion.

10  BY MR. NOLAN:

11  Q.   Mr. Daugherty, I want to ask you, how did you identify

12  this house?

13  A.   Well, this house turns out to be -- my family grew

14  up -- my dad played a big part in that addition that was

15  developed.  It was one of the first -- he built one of the

16  first three houses in the addition which is actually about

17  eight houses up from where I live now.  He did all -- he had

18  finishing crews.  That was what he did back then.  He had

19  two different finishing crews and they did large jobs.  But

20  they did all the basements and driveways, sidewalks.

21  Q.   So you grew up in this neighborhood?

22  A.   Yes, I did.  When we first moved up there, it was just

23  dirt roads.  And by the time we left, it was already

24  starting to get paved.

25          The house that I'm living in now that I bought, I

David Daugherty - Direct (Nolan)

1    was -- it belonged to a bank president.  And when I bought

2    the house, because I worked at the hospital, I was always

3    real concerned about getting older because I knew that was

4    the house I was wanting to stay in.

5         And when we would go out looking at houses, I'd always

6    be going down the hallways with my hands out thinking was it

7    wide enough to make a turn with the ambulance cot because I

8    didn't want anyone carrying me out.  But I was wanting to

9    make sure that if they had emergency access, they could get

10   in all the rooms.

11        And it's a tri-level home but the steps aren't very

12   steep and they're not very many and a perfect home for

13   somebody to get older in.

14   Q.   You mentioned getting older.  How about in your past?

15   How long have you been in this house now?

16   A.   Well, we've been in it 18 years I believe.

17   Q.   And why was this house the right house for you guys

18   besides the reasons you just gave us?

19   A.   Well, this house, it's a great neighborhood.  I've got

20   great neighbors.  I've got really good access.  All the

21   family events occurs at this house, my house, my wife's

22   house.  All the holiday events -- always in the past before

23   this house we'd have to go spend half the day with my, my

24   family because there wasn't enough room to -- and even then

25   you'd end up eating in different rooms a lot of times

David Daugherty - Direct (Nolan)

1   because there would be enough people there.  And the same

2   way, we'd have to go spend the other half with my in-laws.

3        And when we bought this house, we had everybody come

4   together.  All the holidays would be at our house,

5   Christmas, Thanksgiving, New Year's, pretty much any

6   function because we had the room.  Our family room -- from

7   being in the fire department, I was actually one of the

8   cooks already on the fire department.

9        One of the nicest things I could always remember was

10  during the holidays, especially Thanksgiving, that's the

11  only time that all six stations in Parkersburg all come

12  together.  Usually they don't let them come out of their

13  territories.  But they let us for Christmas to have our

14  Christmas dinner together.  And we'd have one table all the

15  way across where we could all sit down and eat together.

16       Well, we started doing the same thing at my house where

17  the in-laws and my family could all sit at the same table

18  and it actually makes it a lot more family like.

19            MR. MANNING:  Your Honor, I'm sorry to interrupt.

20  I just noticed that one of the witnesses came in and I just

21  wanted to verbally request a motion to sequester witnesses.

22            THE COURT:  I'll grant the motion to sequester,

23  counsel, with the exception of expert witnesses.  You

24  lawyers need to advise your witnesses that they are to

25  remain outside of the courtroom until they have testified,

David Daugherty - Direct (Nolan)

1  and further that they are not to relate the questions that

2  were asked or the testimony that was given to any witness

3  who is yet to testify.

4           MR. NOLAN:  Yes, Your Honor.  This is our expert

5  witness.

6           THE COURT:  All right.  Further objection?

7           MR. MANNING:  Judge, I believe in the interest of

8  making sure that the experts aren't being influenced in

9  their testimony that they should be sequestered as well.

10          THE COURT:  All right.  I overrule that objection.

11 As you lawyers know, the experts generally give their

12 testimony based on facts which you all have provided from

13 depositions, which are oftentimes the same testimony that

14 they're hearing here in court.  They use those facts in

15 arriving at their expert opinions that you all call upon

16 them to give.

17     And for those reasons, it's my practice to allow

18 experts to remain in the courtroom.  I find that they are

19 not unduly influenced because, generally speaking, they have

20 heard deposition or reviewed deposition testimony of most

21 all of the witnesses who are going to testify in formulating

22 their opinions.

23     I preserve the defendant's objection and exception to

24 that ruling, but that is my practice.

25          MR. MANNING:  Thank you, Judge.

David Daugherty - Direct (Nolan)

1        THE COURT:  Go ahead, please.

2        THE WITNESS:  Are you wanting me to finish talking

3    about the house?

4    BY MR. NOLAN:

5    Q.    So you were discussing your family and the home.

6    A.    Yes.  You know, I raised both of my kids.  Now I have

7    three grandkids with my daughter and they live close.  So

8    they spend a lot of time with us.

9         All the neighbors are really good neighbors.  We're not

10   butted up against each other, and we actually look after

11   each other's pets.  We're a close-knit neighborhood.  It's a

12   place I've -- the minute I moved there, and in the back of

13   my mind I always wanted to live back in that neighborhood.

14   And when I had that opportunity, I took that and --

15   Q.    How long do you intend to stay in this home?

16   A.    I don't plan on ever moving is what I was actually

17   hoping.

18   Q.    Okay.  So when did you begin to focus on your credit

19   report?

20   A.    In 2012.  Actually, I started focusing on it because I

21   knew we had to get all these past debts straightened up.

22   But I wasn't aware of it until I applied for a mortgage

23   loan.

24   Q.    So --

25   A.    I wasn't aware of a problem.

David Daugherty - Direct (Nolan)

1   Q.   And what was your understanding of how you needed to

2   prepare for the note?

3   A.   That I would have had to have all my debts caught up

4   and paid off, which we did.

5   Q.   Did you hire any advisors at this time?

6   A.   I believe I might have hired Lorin Hanks to help out,

7   but --

8   Q.   How did you come to find Lorin Hanks?

9   A.   I looked up credit repair companies on the internet

10  that had good references, ratings.

11  Q.   Before you hired him, did you have any discussions with

12  Mr. Hanks?

13  A.   Yes, I did.

14  Q.   What did you talk about?

15  A.   We talked about -- we talked about my credit, things

16  that were on my credit record.  He had told me that things

17  that I still owed for that I would have to pay off, which I

18  did.

19       And I believe he even told me, "If you owe it, you've

20  got to pay it."  It's not a quick way to cheat somebody out

21  of money by having a credit repair company.  That's -- they

22  work on things that shouldn't be on there that's outdated.

23       But he told me -- I thought Lorin was on the up and up

24  when he told me that I needed to pay certain things.  And he

25  kept in contact with me each month that he was submitting

David Daugherty - Direct (Nolan)

1    certain disputes.

2    Q.    So what was your involvement in his day-to-day work?

3    A.    I had none.

4    Q.    So you left that to him?

5    A.    Yes.

6    Q.    Okay.  Did you ever see any of the disputes he created?

7    A.    No.

8    Q.    He didn't run those by you for approval?

9    A.    (Nodded negatively)

10   Q.    Did you enroll in any credit monitoring programs?

11   A.    Yes, I did.

12   Q.    What did you enroll in?

13   A.    Creditscore.com.

14   Q.    And what kind of program was that?

15   A.    That was a program where I'd pay a monthly fee and

16   actually I could see the reports each month.  And they'd

17   also send you credit alerts if there was any problems.

18   Q.    How would they send you those?

19   A.    By e-mail.

20   Q.    And, so, you talked about when you first discovered

21   Ocwen was a potential issue on your credit.  When was that?

22   A.    March, March 12th, 2013.

23   Q.    What happened that day?

24   A.    Well, that's where I was contacted by the mortgage

25   company when I --

David Daugherty - Direct (Nolan)

1   Q.   Do you recall which company?

2   A.   I don't recall.  I think it might have been Quicken

3   Loans, but I'm not sure which one it was early on.  But I

4   submitted an application, which your mortgage payment had to

5   be up-to-date for so many months.  And they called me back

6   and said, "Mr. Daugherty, I thought you said you're current

7   on your mortgage."  And I said, "Yes, I am."

8        And they said, "This month right now is showing you 120

9   days late."  I said, "No, I'm not.  I can go right on-line

10  with the Ocwen statements where you can look at your account

11  and I'm current."  And they said, "No, it's showing that

12  you're past due."

13       So I called, I called Ocwen at that point.  And they

14  said, "No, Mr. Daugherty, you're current."  And I said,

15  "Well, that's not what my credit report is showing."  And I

16  asked if they could help clear this up and they said they,

17  they wouldn't.  They told me that was between me and the

18  credit reporting company.

19  Q.   I'd like to mark this for identification purposes as

20  Plaintiff's Exhibit Number 2.  Do you recognize this

21  document, Mr. Daugherty?

22  A.   Yes, I do.

23  Q.   Can you tell us what this is?

24  A.   That's a letter I believe I sent two days later on the

25  14th.

David Daugherty - Direct (Nolan)

1    Q.   How did you send it?  Did you mail it or fax it?

2    A.   I can't -- I believe I faxed it.

3    Q.   Okay.  And who did you fax it to?

4    A.   To Ocwen Research Department.  And that was one of the

5    things that came out of our phone call on the 12th when I

6    was talking to them that they said that I'd have to send the

7    complaint or dispute to their Ocwen Research Department for

8    them to get it.

9    Q.   Did you attach anything to this?

10   A.   Yes.  I attached the --

11   Q.   Is this what you attached?

12   A.   -- the line item on the credit report to show them it

13   shows I'm late.

14   Q.   This page, the second page?

15   A.   Okay.  Yeah, this isn't -- I'm trying to read the

16   screen.

17   Q.   So the first page has your letter and the second page

18   you attach this tradeline; correct?

19   A.   Right.

20   Q.   All right.

21        MR. NOLAN:  I would move for the admission of

22   Plaintiff's Exhibit 2 at this point, Your Honor.

23        THE COURT:  Mr. Manning, any objection?

24        MR. MANNING:  Yes, Judge.

25        THE COURT:  All right.  Basis?

David Daugherty - Direct (Nolan)

1          MR. MANNING:  It's hearsay and it's an

2    out-of-court statement offered for the truth of the matter

3    asserted, specifically Page 2.  It's only by this witness's

4    testimony a portion of something else from somebody else.

5    And he's not in a position to lay a foundation as to what it

6    is, what it means or --

7          THE COURT:  All right.  I'm sorry.  I didn't mean

8    to cut you off, Mr. Manning.  I thought you were done.

9          MR. MANNING:  I'm done, Judge.

10         THE COURT:  Repeat your last few words for me.  I

11   was talking and I didn't hear them.

12         MR. MANNING:  Foundation.  He's not in a position

13   to lay the foundation for what this document, this partial

14   excerpt, what it is, what it means or who it's from.

15         THE COURT:  All right.  The objection, counsel, is

16   that it's hearsay.  Is it being offered for the truth of

17   what's contained in it?

18         MR. NOLAN:  Your Honor, it's being offered to show

19   that this is what he provided to Ocwen at this point.  It's

20   not being offered for the truth of the matter.  It's the

21   steps the plaintiff took at this point.

22         THE COURT:  All right.

23         MR. NOLAN:  It comes, as you can notice, from the

24   Bates stamp, Ocwen's discovery.  They had received it in

25   their files.

David Daugherty - Direct (Nolan)

1    THE COURT:  Mr. Manning, because it is not being

2 offered for the truth of what's contained in the letter, I

3 overrule the hearsay objection, preserving the defendant's

4 objection and exception.

5    I allow this document to show what the defendant did,

6 Mr. Manning, based on your -- or, Mr. Nolan, based on your

7 representation.

8    MR. NOLAN:  Thank you, Your Honor.

9    MR. MANNING:  Thank you, Judge.

10   THE COURT:  Yes, sir.

11   MR. NOLAN:  At this point, we'd like to publish it

12 to the jury.

13   THE COURT:  All right.  First, Plaintiff's Exhibit

14 2 will be admitted into evidence, preserving the defendant's

15 objection and exception, and can be published at your

16 discretion.

17 BY MR. NOLAN:

18 Q.   Mr. Daugherty, can you read this letter?

19 A.   Yes.  It says:

20   "Dear sir, I am writing you concerning my credit report

21 with Equifax.  It states that I'm currently behind $6,128

22 with Ocwen Loan Services and that I am in foreclosure.

23 Please correct those records as soon as possible.  I have a

24 professional company assisting fixing my credit past so

25 please clear that record.  Thank you, David M. Daugherty."

David Daugherty - Direct (Nolan)

1   Q.   Is this the page you attached to your letter?

2   A.   Yes.

3   Q.   And what was your intent with that letter which you

4   were attaching?

5   A.   I was hoping that they could see that the dates was

6   wrong, and I was just wanting this fixed so I could go ahead

7   and refinance my house.

8   Q.   Did you hear back from Ocwen after you sent this

9   letter?

10  A.   Yes, I did.

11  Q.   When did you hear back from them?

12  A.   I believe March 18th.

13  Q.   And we'll move on to our next exhibit.

14           MR. NOLAN:  I'd like to mark this for

15  identification purposes as Plaintiff's Exhibit Number 3.

16  BY MR. NOLAN:

17  Q.   Mr. Daugherty, do you recognize this letter?

18  A.   Yes, I do.

19  Q.   Can you tell us what it is?

20  A.   That is the response from Ocwen saying they -- this is

21  their response to that communication that I had with Ocwen.

22  Q.   And you received it on or about March 18th?

23  A.   Yes, on March 18th.

24           MR. NOLAN:  Your Honor, I'd like to move for the

25  admission of Plaintiff's Exhibit Number 3.

David Daugherty - Direct (Nolan)

1          THE COURT:  Mr. Manning, objection?

2          MR. MANNING:  Judge, the Plaintiff's Exhibit 3

3     that I was given is different.

4          MR. NOLAN:  Your Honor, I believe I moved the

5     admission and we're waiting for Mr. Manning's response.

6          THE COURT:  Mr. Manning, objection?

7          MR. MANNING:  I'm not sure what the document is

8     being offered for.  It is a hearsay document.  It's a

9     third-party out-of-court statement.  If it's being offered

10    for the truth of the matter asserted, then it would be

11    hearsay and it's objectionable.

12         THE COURT:  It's a response from Ocwen or Equifax?

13         MR. MANNING:  It's a response from Ocwen.

14         THE COURT:  All right.  Any response before I

15    rule?

16         MR. NOLAN:  It's a statement by a party opponent,

17    Your Honor.

18         THE COURT:  Under Rule 801 it would not be

19    considered to be hearsay.  I overrule the objection.  I will

20    admit Defendant's (verbatim) Exhibit Number 3, preserving

21    Ocwen's objection and exception.

22         MR. MANNING:  Thank you, Judge.

23         THE COURT:  Yes, sir.

24         MR. NOLAN:  May I publish this to the jury,

25    please?

David Daugherty - Direct (Nolan)

1    THE COURT:  Yes, sir.

2    BY MR. NOLAN:

3    Q.   Now, Mr. Daugherty, can you tell us how they summarized

4    your concern?

5    A.   Well, from what I understand on this, this is saying

6    that they actually -- they thanked me for my communication

7    and they actually say that they have it wrong here.  They

8    have it March of 2012 when I told them originally 2013 was

9    my concern.

10   Q.   So you never complained about March, 2012, to them?

11   A.   No.

12   Q.   And then the remainder of this letter they tell you

13   that you were, in fact, in foreclosure in March, 2012;

14   correct?

15   A.   Yes.

16   Q.   Which we've discussed when you cashed out your 401(k)

17   at that point?

18   A.   Yes.

19   Q.   And you weren't disputing that; correct?

20   A.   No, I was not disputing that.

21   Q.   Can you read this last sentence for us at the indented

22   paragraph?

23   A.   "As of this date"?

24   Q.   Yes, please.

25   A.   "As of this date of this letter, the loan is due for

David Daugherty - Direct (Nolan)

1    the March 26, 2013, payment.  For any further concerns

2    regarding the loan, please contact our Customer Care Center

3    at 1-800, or (800)746-2936."

4    Q.    So they confirmed you're current; correct?

5    A.    Well, they said I'm current right there, yes.

6    Q.    Okay.  But that wasn't your concern in your letter to

7    them?

8    A.    No.

9    Q.    And, now, just for clarity sake, you did have an issue

10   with your March, 2013, payment at that time; right?

11   A.    Yes, sir.

12   Q.    What happened with that?

13   A.    There was a glitch with my automated pension going into

14   my pension.  It didn't go in when it should have.  And I

15   went ahead and paid it by phone.  And by the time I found

16   out that it was rejected -- when I found out it was

17   rejected, I went ahead and I made it immediately.

18   Q.    So would it be accurate for Ocwen to say you were 30

19   days late in March, 2013?

20   A.    It probably would be.

21   Q.    But not 120?

22   A.    No.

23   Q.    Okay.  So when was the next contact you had with Ocwen?

24   A.    I believe around March 17th, 2014.

25   Q.    What was that?

David Daugherty - Direct (Nolan)                                   84

1   A.   Once again, I called them because my --

2   Q.   Why did you call Ocwen in March of 2014?

3   A.   Because I got -- I was running out of options.  I

4   called to try to get, request help.  My credit report every

5   month for 2013 wasn't correct.

6   Q.   So what did you discuss on the phone with Ocwen at this

7   point?

8   A.   I discussed the entire matter on the phone as far as

9   all the months that I was being shown that I was late.  And

10  it was actually making things worse because they just kept

11  tacking them on.

12  Q.   What was the response?

13  A.   They weren't going to help me.  I requested help and

14  they wouldn't assist me in any way.

15  Q.   Did they ask you to write another letter?

16  A.   I don't recall if they asked me to write a letter, but

17  I did write another letter.

18  Q.   When would you have sent that letter?

19  A.   March 19th, 2014, two days later.

20  Q.   If you take a look at your screen, is this the letter

21  that you sent at that time?

22  A.   Yes.

23  Q.   Was anything attached to this letter?

24  A.   Yes.  I attached a credit report.

25  Q.   Is this the credit report you attached?

David Daugherty - Direct (Nolan)

1    A.    Yes.

2    Q.    This is the fax cover page?

3    A.    Yes, it is.

4          MR. NOLAN:  Your Honor, I'd like to mark for

5    identification purposes Plaintiff's Exhibit Number 4.

6          THE COURT:  Yes, sir.

7          MR. NOLAN:  And at this time, we'd like to move

8    the admission of Plaintiff's Exhibit Number 4.

9          THE COURT:  Mr. Manning, any objection?

10         MR. MANNING:  Your Honor, I would have an

11   objection to the third page of the document which appears to

12   be an excerpt of something from a third party.  It's

13   incomplete.  And if it's being offered for the truth of the

14   matter asserted, it should not be admitted.

15         THE COURT:  Response to the objection, counsel?

16         MR. NOLAN:  It's the same as his last letter, Your

17   Honor.  He's not offering it for the truth of the matter.

18   He's offering it to show the steps that he took to inform

19   Ocwen of his concerns and what he attempted to show them.

20         THE COURT:  All right.  And the third page that

21   Mr. Manning refers to as containing an incomplete document,

22   does it represent what was actually sent with the letter?

23         MR. NOLAN:  Yes, Your Honor.

24         THE COURT:  All right.  In that event, I overrule

25   the objection for the reasons I've previously stated.  It's

David Daugherty - Direct (Nolan)

1    not being offered for the truth of the matter stated.

2        And apparently, based on counsel's representation, it

3    is an accurate representation, Mr. Manning, of what was

4    actually sent with that letter, even though that document

5    may be incomplete as you've indicated.

6        MR. MANNING:  Thank you, Judge.

7        THE COURT:  I preserve Ocwen's objection and

8    exception to my ruling.

9        MR. NOLAN:  Thank you, Your Honor, if we could

10   publish the exhibit at this time.

11       THE COURT:  Exhibit 4 will be admitted and can be

12   published at your discretion, preserving the defendant's

13   objection.

14   BY MR. NOLAN:

15   Q.   So this is the letter you sent --

16   A.   Yes, it is.

17   Q.   -- in March of 2014?  Can you read this letter for us,

18   Mr. Daugherty?  I know it's long, but I think --

19   A.   Not from this distance.  Okay.

20       "Dear sir:  This letter is to complain about the

21   service I recently received from Ocwen Loan Servicing and

22   Equifax for this past year.  Ocwen has my mortgage account

23   7092244537 that matures July, 2014, with a balloon payment

24   due at that time.  That will require me to refinance my

25   mortgage with the balance of $80,000.

David Daugherty - Direct (Nolan)

1    "I have been working to secure a loan and came across

2    in my credit report problems with the reporting of

3    information on my account.  Equifax has placed information

4    on my credit report stating my account with Ocwen was 120

5    days late in the month of March, 2013.  They show it was 120

6    days late in the months of June and July, 2013.  They show

7    it was 120 days late in the month of October, 2013, and

8    December of 2013.

9        "These statements are completely false.  Equifax also

10   shows that I have a past due balance right now of $6,128.  I

11   sure can see why I'm having problems securing a new loan.  I

12   noticed on my account that there is no account statement

13   listed on your website for June and July of 2013.

14       "I was late in March, 2013, when Ocwen's payment did

15   not go through because my automatic payroll deposit did not

16   go in the accounts on time, but it was paid the same day

17   that that was realized.

18       "I have disputed these reporting inaccuracies with

19   Equifax several times and that they claim they are correct.

20   I also have a complaint with the total mortgage debt listed

21   by Equifax showing that we owe a total of $168,750.  We paid

22   $105,000 originally for the house.  I really appreciate

23   those numbers too.

24       "My house has a value of $165,000 so I can understand

25   why the negative reporting could be coming from becoming a

David Daugherty - Direct (Nolan)

1   tool -- excuse me.  I can understand why the negative

2   reporting could be coming from Ocwen.  I can only imagine

3   Ocwen would want to have this corrected as soon as possible

4   if the company is innocent.

5        "I had a consultation with a consumer credit attorney

6   who advised me to send Ocwen and Equifax notice that my

7   rights concerning consumer credit are being extremely

8   slighted.

9        "Ocwen should immediately update all three credit

10  agencies concerning my account and send letters to me

11  showing this.  I am planning to file a lawsuit if these

12  inaccuracies cause a problem with the refinancing process

13  with my house.  Sincerely," I believe it was cut off after

14  that, "David M. Daugherty."

15  Q.   Did you attach anything to this letter?

16  A.   Yes.  I attached that credit report with all the arrows

17  where I showed that was all inaccurate that they had placed

18  on that account.  And also I circled the balance of $168,750

19  which was also inaccurate.

20  Q.   This is your handwriting on the document?

21  A.   Yes, where it says "inaccurate" both times with the

22  arrows and the circles, yes.

23  Q.   And you sent this via fax?

24  A.   To the Ocwen Loan Research Department.

25  Q.   Did you send it any other way?

David Daugherty - Direct (Nolan)

1   A.    Actually, I sent that registered mail.

2   Q.    So in this week, you've called them.  You've faxed them

3   a letter.  You've mailed them a letter.

4   A.    Yes.

5   Q.    Did you communicate with anyone else at this point?

6   A.    Yes.  After that, I communicated with Consumer Credit

7   Counseling in Parkersburg just to get advice because I

8   couldn't get this off my record.  And they advised me to get

9   in contact with the Consumer Protection Agency over consumer

10  rights violations.  It's a government agency in Washington,

11  D.C.

12  Q.    The feds?

13  A.    The feds.

14  Q.    And did you reach out to the Consumer Financial

15  Protection Bureau?

16  A.    Yes, I did.

17  Q.    And what, what was your discussion with them like?

18  A.    I talked to a lady at first on the phone and she

19  actually told me to send her the information.  When I sent

20  her the information, I faxed her the information, she told

21  me my consumer rights were being violated and these were

22  federal charges.  And she advised me to go ahead and file a

23  complaint against Ocwen or dispute with Ocwen.

24  Q.    So you recall submitting a dispute to the Consumer

25  Financial Protection Bureau?

David Daugherty - Direct (Nolan)

1    A.    Yes, sir.

2              THE COURT:  Is there an objection, Mr. Manning?

3              MR. MANNING:  Yes, Judge.  I couldn't tell if the

4    witness was trying to testify about what the CFPB said or if

5    it was somebody else.  If it's the CFPB that he's purporting

6    to represent he had a conversation and they told him

7    something, then that's hearsay and would be inadmissible.

8              THE COURT:  Response to the objection, counsel?

9              MR. NOLAN:  I believe he probably did talk about

10   his conversation with the CFPB.

11             THE COURT:  My recollection of his testimony is

12   that he was told by them to file an action, if I remember

13   correctly.

14        And, ladies and gentlemen, I am going to order that you

15   disregard that portion of the answer that was given by the

16   witness.

17             MR. MANNING:  Thank you, Judge.

18             THE COURT:  Yes, sir.

19   BY MR. NOLAN:

20   Q.    But you did send documents to the CFPB; correct?

21   A.    Yes, I did.

22   Q.    If we could un-publish this exhibit, we'll go on to the

23   next.  Do you recall when that was?  When did you send

24   information to the CFPB?  Do you recall?

25   A.    That was in, I believe, March.

David Daugherty - Direct (Nolan)

1   Q.   And this document on the screen, is that the

2   information you provided to them?

3   A.   Yes.  It's basically almost the same letter that I'd

4   sent Ocwen earlier.

5   Q.   How long did it take you to write that letter?

6   A.   Probably 20 minutes.  I was kind of angry when I wrote

7   it.  It didn't take very long.

8   Q.   It wasn't a hard letter to write?

9   A.   No.  I was angry when I, when I wrote it.  So I -- it

10  didn't take very long.  I usually do better.

11  Q.   And is this document I'm showing you here, is this the

12  electronic file that the CFPB maintains of your dispute?

13  A.   Yes.

14  Q.   Can you tell us all what's included in this response

15  and this file?  So does this file contain your initial

16  complaint to the CFPB?

17  A.   Yes.

18  Q.   Does it contain anything else?

19  A.   It shows what my current balance is.

20  Q.   Did anyone respond to your complaint?

21  A.   Yes.  I believe I got another memo saying that it had

22  been investigated.

23  Q.   And does this file contain the response?  The page

24  we're looking at, the bottom, can you see who was the

25  respondent on that?

David Daugherty - Direct (Nolan)

1   A.    Yeah, okay.   That was the response from Ocwen.

2   Q.    This file contains your complaint and Ocwen's response?

3   A.    Which they still didn't correct the mistake that I was

4   complaining about.

5              MR. NOLAN:   I'll mark this for identification

6   purposes Plaintiff's Exhibit 5.

7   BY MR. NOLAN:

8   Q.    So it contains your complaint and Ocwen's response.

9   Did you have another response included on this?

10  A.    Yes, I did.

11  Q.    And what date was that?

12  A.    The 17th.

13  Q.    Of?

14  A.    Of April.

15  Q.    And that's -- is that solely your statement?

16  A.    Yes.

17  Q.    Did anyone else provide input on your statement at that

18  point?

19  A.    No.

20             MR. NOLAN:   Your Honor, at this time we'd like to

21  move the admission of Plaintiff's Exhibit Number 5.

22             THE COURT:   Mr. Manning?

23             MR. MANNING:   Your Honor, it's represented as a

24  CFPB document, but it does contain an Ocwen response within

25  it.   So I don't have any objection to this document.

David Daugherty - Direct (Nolan)

1          THE COURT:  All right.  In that event, Plaintiff's

2    Exhibit 5 will be admitted into evidence without objection

3    and can be published at your discretion, counsel.

4          MR. NOLAN:  Thank you, Your Honor.

5    BY MR. NOLAN:

6    Q.   This document is a little bit out of order, so I'm

7    going to try and help us keep it the right chronology here.

8    So here is your initial complaint; correct?

9    A.   Yes.

10   Q.   Under the heading "what happened."

11   A.   Yes.

12   Q.   And this complaint, you go on for a page and a half

13   here.  Again, this is similar to your letter you sent to

14   Ocwen you stated?

15   A.   Yes, it was.

16   Q.   And, so, then thereafter this was sent to Ocwen.  Who

17   provided a response?

18   A.   I believe it was Ocwen.

19   Q.   Did Ocwen's response address your concerns?

20   A.   Well, they didn't correct them.

21   Q.   And, so, there was the Ocwen response.  And here I want

22   to indicate -- was this your follow-up after Ocwen's

23   response?

24   A.   Yes.

25   Q.   Can you read that, please, for the jury?

David Daugherty - Direct (Nolan)

1   A.   Okay.  "I sent Ocwen a copy of my Equifax report.  It

2   shows me being currently past due $6,128 and being late 120

3   days in the months of March, June, July, October, and

4   December.  I understand Equifax is now showing my loan as

5   current, but they still show me being late 120 days all of

6   those months.  There is no way I can be satisfied with this

7   as my loan will mature in July with Ocwen demanding a

8   balloon payment for the balance.  It appears neither Ocwen

9   or Equifax is going to cooperate at this time and it is a

10  real issue to obtain a loan in time."

11  Q.   Did you ever hear back from the CFPB after this?

12  A.   Actually, I remember I talked to the lady there at

13  consumer protection and --

14  Q.   Talked to her on the phone?

15  A.   Yes.

16  Q.   What did you tell her?

17  A.   I told her still they're not fixing this with the

18  response.

19  Q.   But as far as -- she never sent you anymore letters?

20  A.   I can't recall right off.

21  Q.   Do you know if they followed up in any way after this?

22  A.   Not that I can recall.

23  Q.   Okay.  And, so, at this point we are in April 17th of

24  2014.  When is the next time you hear from Ocwen?

25  A.   I'm wanting to think it was in May.  I also had -- I

David Daugherty - Direct (Nolan)

1    might have received one of my notices at that point too as
2    far as the balloon payment coming up.
3    Q.    Let me ask you to look at this document.  Do you
4    recognize this document, Mr. Daugherty?
5    A.    Yes.
6    Q.    Please tell us what this letter is.
7    A.    This is just another letter that, like the other ones
8    where, just thanking me for the opportunity to, for my
9    recent communication regarding the above-referenced loan.
10   It says, "We appreciate the time and effort on your part to
11   bring your concern to our attention."
12   Q.    And, so, what was their concern they claimed to address
13   in this letter?
14   A.    Could you repeat that?
15   Q.    What was the concern they claimed to address in this
16   letter?
17   A.    It says I requested to remove delinquent reporting
18   reference in my correspondence.
19   Q.    And what delinquency do they specifically address in
20   this letter?
21   A.    The one, March of 2013.
22   Q.    Did you ever complain about the March, 2013, --
23   A.    No, not -- no.
24   Q.    What were you complaining about?
25   A.    The ones that were all marked 120 days late.

David Daugherty - Direct (Nolan)

1  Q.   And that's the letter you sent them showing what you

2  were complaining about?

3  A.   Yes.

4  Q.   And this is the response you received?

5  A.   Yes.

6  Q.   And now they indicate on here that they submitted a

7  request for Ocwen's payment reconciliation history to be

8  sent to your attention which reflects all credits and

9  disbursements.  Did that address your concern?

10 A.   No, it didn't correct my concerns, no.

11       MR. NOLAN:  Your Honor, we move for the admission

12 of Plaintiff's Exhibit Number 6.

13       THE COURT:  Mr. Manning, objections to Number 6?

14       MR. MANNING:  No, Your Honor.

15       THE COURT:  All right.  Plaintiff's Exhibit Number

16 6 will be admitted into evidence without objection and can

17 be published at your discretion.

18 BY MR. NOLAN:

19 Q.   So what's the next time you heard from Ocwen?

20 A.   I believe, I believe in May for one.  But I also --

21 somewhere in that time I had that letter I mentioned that,

22 to let me know that the balance or the balloon payment was

23 coming due.

24 Q.   They're sending you reminder letters about your balloon

25 note --

David Daugherty - Direct (Nolan)

1   A.   Yes.

2   Q.   -- in case you forgot?

3   A.   Yes.

4   Q.   How did that feel when you got those letters?

5   A.   It started to sink in things weren't working out very

6   well for this.  And it was almost going to panic mode at

7   this point.

8   Q.   Did you need to be reminded your balloon was coming

9   due?

10  A.   No, I didn't need to be reminded because I worried

11  about it all the time.  But I -- to go that long with it, I

12  always thought that this would be a simple correction to be

13  fixed.  I'd get to refinance and just move on and not -- I

14  never thought it would be this big of a problem, this many

15  months.

16  Q.   When is the next time you spoke with Ocwen?  Was it a

17  phone conversation?

18  A.   Yes.  I believe June 9th I believe.

19  Q.   What did you talk about on June 9th?

20  A.   I think June 9th is when I was trying to refinance

21  again with One Community Federal Credit Union.  And they

22  were telling me that we needed to get that fixed as far as

23  this being reported and foreclosure for them to approve the

24  loan.

25       And I called pleading and requesting a letter from

David Daugherty - Direct (Nolan)                                    98

1   Ocwen to at least state -- because they're telling me it's

2   current each time and I'm saying it's not, and they're

3   telling me it's current.  So I'm telling them, "Well, if

4   it's current, can you not send me a letter saying that it's

5   current and that I'm not in foreclosure?"  And they refused

6   to help with that.

7   Q.   They disregarded your request for a letter?

8   A.   Yes.  And it was a lengthy conversation.

9   Q.   After they had disregarded your --

10  A.   Yes.

11  Q.   -- complaint with the circles and the arrows?

12  A.   Yes.

13          MR. MANNING:  Objection, leading.

14          THE COURT:  The objection to leading is sustained.

15  BY MR. NOLAN:

16  Q.   And had you been applying for credit during this time

17  period?

18  A.   Which, which time period are you talking about?

19  Q.   March, 2013, to July, 2014.

20  A.   Yes.  I've been trying to find different ways to find

21  financing.

22  Q.   Is the letter on the screen one of those times?

23  A.   Well, that was over a credit card.

24  Q.   Did you apply for a credit card during this time?

25  A.   Indirectly.

David Daugherty - Direct (Nolan)

1   Q.   And this one --

2   A.   As in my deposition, which Mr. Manning knew.

3   Q.   This is for the Disney Book of the Month Club I

4   believe.  Is that what's on your screen here?

5   A.   Yes.

6   Q.   And did you receive this notice?

7   A.   Yes.

8   Q.   How would you have received this?

9   A.   This came in the mail.

10   Q.   And you just received the mail and opened it?

11   A.   Yes.

12   Q.   And what's this letter say?

13   A.   It says -- basically thanking me for an interest in a

14   Disney --

15          MR. MANNING:  Objection, Your Honor.  This is

16   hearsay.  This is a third-party document.

17          THE COURT:  Response, counsel?

18          MR. NOLAN:  Your Honor, he received this at his

19   house and we're offering it for its effect on Mr. Daugherty,

20   not for the truth of the matter asserted.  When he's

21   receiving this correspondence, what is the effect on

22   Mr. Daugherty, how does he internalize it, how does he feel

23   about it.  And it goes directly to his damages.

24          THE COURT:  Response, Mr. Manning.  Anything

25   further?

David Daugherty - Direct (Nolan)                    100

1           MR. MANNING:  Well, the third party that sent this

2    isn't here to tell us what it is, what it meant.  For

3    Mr. Daugherty to attempt to interpret it is raw speculation.

4    And it is a third party, so it's certainly not for the truth

5    of the matter but it's not a reliable piece of evidence

6    regardless.

7           THE COURT:  Well, I overrule the objection.  It

8    has been represented, of course, it's not being offered for

9    the truth of the matter, but being offered to, towards

10   damages in terms of its effect on him.

11       And I think that he can testify to that, Mr. Manning.

12   Even if his interpretation of the letter would be different

13   than the interpretation of the writer, his interpretation is

14   what matters when it comes to its impact on him.

15       So for that reason, I overrule the objection,

16   preserving the defendant's objection and exception.

17           MR. MANNING:  Thank you, Judge.

18           MR. NOLAN:  Your Honor, at this time we'd like to

19   move the admission of Plaintiff's Exhibit Number 7.

20           THE COURT:  I will admit Plaintiff's Exhibit

21   Number 7 for the purpose that has been outlined here on the

22   record by you, Mr. Nolan, preserving the defendant's

23   objection and exception to it for that limited purpose.

24           MR. NOLAN:  Thank you, Your Honor.

25   BY MR. NOLAN:

David Daugherty - Direct (Nolan)

1    Q.   So can you again describe what this letter is,

2    Mr. Daugherty?

3    A.   This is actually a, a letter from the Disney Visa

4    Platinum Credit Card from Chase Bank.  And it's actually

5    saying the credit application has been turned down.  It

6    says, "You have a foreclosure, repossession, or early lease

7    termination and balance in accounts are too high compared to

8    credit limits."

9    Q.   Mr. Daugherty, are you a Disney fan?

10   A.   Well, first off, I didn't do this application.  I

11   wasn't aware of it.  My wife submitted this application.

12   Q.   Your wife is a Disney fan; right?

13   A.   My wife is a Disney fan.  When they asked -- when Mr.

14   Manning showed this to me in my deposition, I told him, no,

15   I didn't do an application for Disney.  And --

16   Q.   But when your wife applied in your name, were you able

17   to get credit?

18   A.   No.

19   Q.   Couldn't get the Disney movies to watch.

20        MR. NOLAN:  I'd like to mark for identification

21   purposes Plaintiff's Exhibit Number 7.

22        THE CLERK:  Mr. Nolan, we already did 7.

23        MR. NOLAN:  Number 8.  Excuse me.

24   Your Honor, may I approach the witness to hand him the

25   exhibit?

David Daugherty - Direct (Nolan)

1          THE COURT:  Yes, sir.

2   BY MR. NOLAN:

3   Q.    Do you recognize this document, Mr. Daugherty?

4   A.    Yes.

5   Q.    Can you tell us what that document is?

6   A.    This is where I was turned down.  It's the response on

7   May -- the letter came May 21st.  It was a bill-me-later

8   payment method on 5-11, 2014.  And it was turned down with

9   the report from Equifax.

10  Q.    And you received this letter in the mail?

11  A.    Yes, I believe so.

12          MR. NOLAN:  Your Honor, we'd like to move the

13  admission of Plaintiff's Exhibit Number 8 at this time.

14          THE COURT:  Mr. Manning, objection?

15          MR. MANNING:  Similar objection, Judge.  It's a

16  third-party document.  It can't be admitted for the truth of

17  the matter and there's no foundation for it.

18          THE COURT:  All right.  I overrule the objection

19  essentially for the reasons that I overruled the objection

20  as to Plaintiff's Exhibit Number 7.  The witness has

21  indicated that he received the document.  If it's being

22  offered for that purpose -- and I may have jumped the gun.

23  I apologize to you, Mr. Nolan.  Is that the purpose or not?

24          MR. NOLAN:  It's just that he received the

25  document and the effects it had on him.

David Daugherty - Direct (Nolan)

1    THE COURT:  The same as Plaintiff's Exhibit 7?

2    MR. NOLAN:  Correct, Your Honor.

3    THE COURT:  All right.  I overrule the objection

4  then for that reason, Mr. Manning, preserving the

5  defendant's objection and exception.  It can be published at

6  your discretion.

7    MR. MANNING:  Thank you, Judge.

8    MR. NOLAN:  May we publish this, please?

9  BY MR. NOLAN:

10  Q.   Now, who is the bank at the top of this page?

11  A.   Can you blow that up just a hair more?  This is from

12  Comenity Capital Bank.

13  Q.   And this letter denies you credit?

14  A.   Yes.

15  Q.   And what credit reporting agency does this letter state

16  that it relied on?

17  A.   Equifax.

18  Q.   Now, didn't we hear earlier in openings that Comenity

19  didn't look at your Equifax report?

20  A.   That's what we understood.

21  Q.   And do you know what you were applying for with this

22  credit application?

23  A.   Actually, I don't recall.

24  Q.   Is this indicative of the success you were having

25  applying for credit during this time period?

David Daugherty - Direct (Nolan)

1    A.    Yes.

2    Q.    Were you able to get credit anywhere?

3    A.    Pretty much I couldn't get credit to buy a hotdog.  I

4    mean, I couldn't get any kind of credit.

5    Q.    And, now, during openings we heard about your tax

6    liens.  I want you to tell me where did these tax liens come

7    from?

8    A.    When -- during my illnesses and when we fell behind on

9    the mortgage payments, we cashed in the 401(k) to catch up

10   on the mortgage payments.  And one of the things that we

11   weren't really counting on, it turned out that we ended up

12   having a large liability with the State of West Virginia on

13   our income tax.

14   Q.    For withdrawing the 401(k)?

15   A.    Yes.

16   Q.    And how were you planning to resolve this tax lien

17   issue?

18   A.    Well, that was early on in 2013 before taxes when we

19   realized that we were going to have this liability.  And the

20   solution was to go ahead and refinance the house.  And since

21   I had $80,000 in equity in the house, we'd just go ahead and

22   take out enough to pay off the liability.

23         Plus, at the same time we knew that the balloon balance

24   was coming up, so we -- and with the interest rate I had

25   back then, the one that I was looking at --

David Daugherty - Direct (Nolan)

1    Q.    Back then you had the nine percent; correct?

2    A.    Right.  And it would probably save me $200 or $300 a

3    month with the new rate.

4    Q.    Even with paying off the tax liens?

5    A.    Yes.

6    Q.    When did the tax liens first appear on your credit?  Do

7    you know?

8    A.    I believe it was in around April, 2014.

9    Q.    That's over a year after you started disputing with

10   Ocwen; correct?

11   A.    Yes.

12   Q.    So you were denied loans before the tax liens?

13   A.    Yes.

14   Q.    So the tax liens weren't the problem?

15   A.    No.

16   Q.    Now, you mentioned earlier you applied for credit at

17   the One Community Federal Credit Union; correct?

18   A.    Yes, I did.

19   Q.    Do you recall when you did that?

20   A.    I'm wanting to say around May.

21   Q.    So May of 2014?

22   A.    Yes.

23   Q.    And remind us again, when was the balloon due?

24   A.    July 26th of 2014.

25   Q.    Now, what made you go to the One Community Federal

David Daugherty - Direct (Nolan)

1  Credit Union?

2  A.   I had actually -- I had always banked there.  They have

3  certain -- I met their standards of what they needed for me

4  to be approved.

5  Q.   How long did you bank there?

6  A.   Probably 20 -- I think I became a member when I entered

7  the fire department, probably 28 years.

8  Q.   And had you always had success with your loans there?

9  A.   I had different cars that I bought multiple times.  I

10 don't think I ever recall being late on any of my accounts,

11 or I never had any kind of problems with any of my accounts

12 there.

13 Q.   And, so, why in May did you choose to go there?

14 A.   Well, I, I actually met what was required to get

15 approved there.

16 Q.   And you felt comfortable with your credit union?

17 A.   Yes.

18 Q.   And what happened in that application?

19 A.   I jumped all -- made it through all the hurdles even

20 with the, you know, explaining what was going on with this.

21 Q.   Explain what was going on with what?

22 A.   With the lawsuits, the lawsuit over this.  They knew

23 about the liability with the income tax.  And it was

24 understood that at the closing that the income tax

25 liabilities would be paid off.  The liens would be paid off

                    David Daugherty - Direct (Nolan)

1    during the closings.

2    Q.    So it was your understanding the taxes weren't a

3    problem at that point?

4    A.    No, the taxes weren't a problem.

5    Q.    What was the problem at that point?

6    A.    The foreclosure that was listed on -- was the thing

7    that stopped the loan from going through.

8    Q.    Now, we're going to hear from Steve Napier through his

9    deposition in a little bit.  But what did Mr. Napier tell

10   you?

11   A.    He told me I would have been approved.

12           MR. MANNING:  Objection to hearsay, Your Honor.

13           MR. NOLAN:  Your Honor, my response is he has

14   personal knowledge of the statement that was made and it's

15   not being offered for the truth of the matter again.  Again,

16   it is being offered to show the effects on Mr. Daugherty

17   when he heard this and how it relates to his damages and the

18   struggles he encountered at this point moving forward.  He

19   has personal knowledge of the statement that was made and

20   it's not being offered for the truth, but --

21           THE COURT:  I'm sorry.  Go ahead.

22           MR. NOLAN:  It's being offered to show the effect

23   on Mr. Daugherty and his plight at this point moving forward

24   in his loan application process.

25           THE COURT:  Well, it cannot be offered for the

David Daugherty - Direct (Nolan)

1    truth of the statement if it is being offered to show the

2    impact.

3         However, Mr. Manning, on the plaintiff it could very

4    well be admissible.  Do you have other grounds that you want

5    to state?

6              MR. MANNING:  No, Judge.  My objection, as others,

7    is to limit the admissibility so that it's not for the truth

8    of the matter.

9              THE COURT:  All right.  That objection is

10   sustained.  I'm going to allow him to testify to the

11   response for the limited purpose that you have stated here,

12   Mr. Nolan.  It will not be considered by the jury for the

13   truth of the statement.

14             MR. MANNING:  Thank you, Judge.

15   BY MR. NOLAN:

16   Q.   What did Mr. Napier tell you?

17   A.   He told me if it wasn't for the foreclosure on the

18   credit report, I would be approved for that loan.

19   Q.   And how did that make you feel?

20   A.   Well, I felt, I felt horrible that this is still

21   holding me up.  At the same time, I was glad that, you know,

22   that he was still kind of siding with me on this.  But it

23   was kind of like the last ditch effort to try to get this

24   loan to go through.

25   Q.   Now, why did you call it the last ditch effort?

David Daugherty - Direct (Nolan)

1   A.   Well, this loan was going to mature in two months,

2   three months.  So, I mean, where was, where was I going to

3   go after this to try to get this settled because I had

4   already spent 15 months with all the paperwork and all the

5   calls and letters and even going through the federal agency

6   to try to get them to fix this on my credit report.

7   Q.   And even your local credit union couldn't help you?

8   A.   No.

9   Q.   And where do you go from there?

10  A.   Well, from there I had to get a law firm to step in and

11  try to get this corrected.

12  Q.   You had to file a federal lawsuit at that point?

13  A.   Yes, I did.

14  Q.   Do you know when Ocwen quit reporting on your credit?

15  Let me rephrase that.  When did the Ocwen tradeline fall off

16  of your credit report?

17  A.   I believe it was around August of 2014.

18  Q.   After --

19  A.   Well after the lawsuit had been filed.

20  Q.   Now, did you -- what did you do after the lawsuit had

21  been filed?  Did you continue to try to refinance your loan?

22  A.   Yes.  I went ahead -- after they removed this, I went

23  ahead with Equifax.  Ocwen had actually told me that once

24  this is all overwith to come back and they would probably go

25  ahead and give me the loan.

David Daugherty - Direct (Nolan)

1   Q.   Who told you that?

2   A.   Ocwen -- or One Community.

3   Q.   Not Ocwen?

4   A.   Not Ocwen.  One Community had told me that I'd still --

5   once this was overwith, they'd probably go ahead and grant

6   the loan.

7        I went ahead -- just to try to get my house off the

8   table because I'm still worried about losing my house, I

9   went ahead and applied with Quicken Loans once again after I

10  talked to them on the phone.  And they seemed to think that

11  they could try to swing it through and get the loan

12  approved.  And --

13  Q.   Well, Mr. Daugherty, can you look at the document on

14  the screen?

15  A.   Yes.

16  Q.   Can you identify this for us?

17  A.   Yes.  This is where I was -- it says, "Congratulations.

18  You've been conditionally approved for an FHA 15-year fixed

19  loan."

20  Q.   What's the date on this letter?

21  A.   February 21st, 2015.

22  Q.   Seven months after the lawsuit was filed?

23  A.   Yes.

24  Q.   And six months after the Ocwen foreclosure tradeline

25  fell off your credit?

David Daugherty - Direct (Nolan)

1    A.    Yes.

2    Q.    Now, at this point -- did you receive this letter in

3    the mail?

4    A.    Yes, I did.

5    Q.    At this point in February of 2015, did you still have

6    your state tax liens?

7    A.    Yes.

8    Q.    Did you still have other payment collection accounts on

9    your credit report?

10            MR. MANNING:  Objection, leading.

11   BY MR. NOLAN:

12   Q.    Was there anything else on your --

13            THE COURT:  Just a second.  There's an objection

14   to the question being leading.  He has asked whether he

15   still had the tax liens.  And then he asked the similar

16   second question.

17       Even though it calls for a "yes" or "no" answer, Mr.

18   Manning, I overrule it because I don't think it suggests the

19   answer.  He is free to answer either way.

20            MR. MANNING:  Okay.  I understand, Judge.

21            THE COURT:  For that reason, I overrule the

22   objection.  Go ahead, please.

23   BY MR. NOLAN:

24   Q.    Were the other paid collection accounts still on your

25   credit report at that time?

David Daugherty - Direct (Nolan)                112

1   A.    They were paid.  They were still on there, but they

2   were paid.

3   Q.    But yet you were conditionally approved at this point?

4   A.    Yes.

5         MR. NOLAN:  Your Honor, I'd move for the admission

6   of Plaintiff's Exhibit Number 9.

7         THE COURT:  Any objection, Mr. Manning?

8         MR. MANNING:  Yes, Judge, to the purpose.  It may

9   not be offered for the truth of the matter asserted.  For

10  the third-party document, there's no one here to talk about

11  what, who wrote it, what it means and how it should be

12  interpreted.  But I understand Your Honor's rulings on the

13  prior documents.

14        THE COURT:  Anything further?

15        MR. NOLAN:  Your Honor, it's just limited to the

16  effect on Mr. Daugherty and his state of mind moving forward

17  at this point.

18        THE COURT:  All right.  I will admit the document

19  for the purpose that's been outlined here by you, Mr. Nolan.

20     It will not be admitted for the truth of what's

21  contained in the document, ladies and gentlemen.

22     Why don't you all stand and stretch there in the box

23  for a moment.  It might help you.

24     (Pause)

25        THE COURT:  I apologize for the interruption,

David Daugherty - Direct (Nolan)

1    Mr. Nolan.

2        All right.  Thank you all.

3        Mr. Nolan.

4            MR. NOLAN:  May we publish this exhibit to the

5    jury, Your Honor?

6            THE COURT:  Yes, sir, you can publish it at your

7    discretion.  And that is Number 9; is that correct?

8            MR. NOLAN:  Correct, Judge.

9            THE COURT:  All right.

10   BY MR. NOLAN:

11   Q.   Mr. Daugherty, can you read the first sentence for us,

12   please?

13   A.   It says, "Congratulations.  You have been conditionally

14   approved for an FHA 15-year fixed loan in the amount of

15   $101,750 for the refinance of your primary residence at 35

16   Valley View Drive, Vienna, West Virginia, 26105."

17   Q.   And the rest of this document tells you what's still

18   needed to complete the application.  Okay.  So at this

19   point, how do you feel when you get a letter like this?

20   A.   I was feeling pretty good.  They had also I believe

21   talked to me on the phone.  There was some more paperwork

22   that came that it was going to be a three and a half percent

23   loan on top of it.

24   Q.   Now, Mr. Daugherty, I want to go back.  Your balloon

25   matured July 26th, 2014; correct?

David Daugherty - Direct (Nolan)

1    A.    Yes.

2    Q.    How do you typically make your payments?

3    A.    I usually made them over the phone.

4    Q.    You'd call up Ocwen?

5    A.    Yes.  It would be automatically, to their automatic

6    system I'd pay it.

7    Q.    And after July 26th, did you call up Ocwen any other

8    time to make a payment?

9    A.    Well, I went head and I made the August payment.

10   Q.    You made a payment in August?

11   A.    Yes.

12   Q.    Even though --

13   A.    Even though it was closed and --

14   Q.    Did you try to make payments after that time?

15   A.    Yes.  They wouldn't take payments after that.

16   Q.    They wouldn't take your payments?

17   A.    No.  If you went on the website, it looked like my --

18   where I always looked at my account, everything was just

19   like I didn't have an account there.

20   Q.    So where were you supposed to send your money?

21   A.    When I saw that I was off-line and everything, I

22   believe that's when I called.

23   Q.    Mr. Daugherty, what has this experience been like for

24   you from March, 2013?  I just want you to summarize for us.

25   Take us through what your experience has been like.

David Daugherty - Direct (Nolan)

1  A.   To, to go through this, it's pretty frustrating to work

2  on something that -- and I wasn't worried too much about it

3  at the beginning.  I just thought another paper glitch and,

4  you know, I'd be able to get it fixed, no problem, move on

5  and continue.  You know, I had bigger issues with my health

6  at the time to me.

7      But this has been probably one of the most frustrating

8  things I've ever dealt with ever to go on this long and try

9  to explain to someone that you've got a problem and you're

10  just basically being ignored.  They never did respond in a

11  way that looked like they would ever fix it.

12     And it's gone on and on and on clear up to the point

13  where, you know, whether you're going to own a house or

14  where you're going to be.

15  Q.   About that, what would you have done if you lost your

16  home?

17  A.   Well, basically, you'd have to start all over.  We

18  would have had to move elsewhere.  We would have had to find

19  another house and we would have had to start completely

20  over.

21  Q.   And remind us again, what were the specific aspects of

22  this house?

23  A.   This is where I wanted to be my final house.

24  Q.   And you've had significant health problems you

25  testified to; correct?

David Daugherty - Cross (Manning)

1   A.   My health was in really poor shape at one point.

2   Q.   Which is why that was a crucial factor in your home?

3   A.   Yes.

4   Q.   Thank you, Mr. Daugherty.  Mr. Manning might have some

5   questions for you.

6            THE COURT:  Cross-examination, Mr. Manning?

7            MR. MANNING:  Thank you, Judge.  May we take a

8   five-minute recess, Judge?

9            THE COURT:  Yes, sir.

10       Ladies and gentlemen, I'll give you a recess.  Let's

11   just take our afternoon recess.  While you're out, do not

12   discuss this case among yourselves or permit anyone to

13   discuss it with you or in your presence.  And please be in

14   your jury lounge at 25 minutes till the hour.  We'll stand

15   in recess.

16       (Recess taken from 3:19 p.m. until 3:38 p.m.)

17            THE COURT:  You all be seated, please.

18       Mr. Manning.

19                    CROSS EXAMINATION

20   BY MR. MANNING:

21   Q.   Mr. Daugherty, are you ready to answer some questions?

22   A.   Yes, I am.

23   Q.   Okay, great.  Let me start by asking you whether you

24   know the difference -- you're aware there's a difference

25   between reporting credit and furnishing data to a credit

David Daugherty - Cross (Manning)

1   reporting company; right?

2   A.    A little bit.

3   Q.    Okay.  You understand that Ocwen doesn't report

4   anything about your credit; right?

5   A.    No.  I understood they do send information to the

6   credit reporting agencies.

7   Q.    Okay.  And when I use the word "furnishing" are you

8   aware that's what I'm referring to, like a mailman providing

9   the data to the credit bureau, that that's what Ocwen's role

10  is?

11  A.    Yes.

12  Q.    Okay.  And then the credit bureaus are the ones who

13  actually do the reporting about your credit; right?

14  A.    I understand they're reporting what they're being

15  shown.

16  Q.    So you know there's a difference in the roles between

17  those two companies; right?

18  A.    Yes.

19  Q.    Okay.  And I want to make sure we're clear on the front

20  end of that because a number of times you used the word

21  "reporting" as opposed to" furnishing" and I just want to

22  make sure that we get that straight as we go forward.  Okay?

23  A.    Okay.

24  Q.    If at any time what I'm asking you is confusing, just

25  let me know and I'll re-ask it.

David Daugherty - Cross (Manning)                     118

1    A.    Okay.

2    Q.    So let's next go to -- you talked a little bit about

3    the denials of these five different credit applications;

4    right?

5    A.    Yes.

6    Q.    Do you recall that?

7    A.    Yes.

8    Q.    Now, there were a couple of those that you didn't apply

9    for yourself; right?

10   A.    That's correct, the one.

11   Q.    Was that the Disney card?

12   A.    Yes.

13   Q.    And that was something your wife had done using your

14   name?

15   A.    Yes.

16   Q.    And you were fine with that because she's your wife?

17   A.    Yes.

18   Q.    Okay.

19   A.    Actually, I wasn't but there was nothing I could do

20   about it.

21   Q.    Okay, fair enough.

22   A.    I hate Disney.

23   Q.    You yourself --

24          THE COURT:   That's more than you wanted, Mr.

25   Manning.

David Daugherty - Cross (Manning)                    119

1   BY MR. MANNING:

2   Q.   You yourself don't have any experience or knowledge or

3   expertise about why you were being denied credit; right?

4   A.   Not expertise, no, but I was getting to where I thought

5   I was getting to understand it a lot more.

6   Q.   And you don't, you don't know why those companies

7   denied for any particular reason, whether it was these 11

8   other collection accounts or the tax liens; right?

9   A.   Well, first off, the other collection accounts were

10  paid off, but they were still going to stay on my report.

11  And then the ones like Disney was saying due to the

12  foreclosure.

13  Q.   So let's take it step by step.

14  A.   Okay.

15  Q.   So you'd agree that your personal credit, you had --

16  other than the one mortgage with Ocwen, you had 11 other

17  accounts in collection; right?

18  A.   No.  At one --

19  Q.   At no point that's never been true?

20  A.   At one time, yes.

21  Q.   Okay.

22  A.   I, I had a credit history where I had problems, yes, at

23  one time.

24  Q.   Okay.  And as time passed, you were able to correct

25  some of that; right?

David Daugherty - Cross (Manning)

1   A.   Most all of it.

2   Q.   Okay.  And it's also true that you had two tax liens

3   because you hadn't paid your state or federal taxes; right?

4   A.   Yes.  But if I had to refinance it, I wouldn't have had

5   tax liens.  That came afterwards.

6   Q.   Okay.  So I'm going to take you through a couple of the

7   documents.  I figure we'll start right where these exhibits

8   came in.  If we could look at Exhibit 2, Plaintiff's Exhibit

9   2 again.

10          MR. MANNING:  Is it okay if I just connect the

11  computer up here?

12          THE CLERK:  I can give you the hard copy if you

13  want to do it on the ELMO.

14          MR. MANNING:  I don't think the ELMO appears very

15  well.  I'm sorry.  We'll attach this up here if that's okay.

16  BY MR. MANNING:

17  Q.   How about now?  Is that better?  We have it hooked up

18  here.

19      So, Mr. Daugherty, just to reorient you, you recall

20  being asked about this document; right?

21  A.   Yes.

22  Q.   Okay.  So this has already been identified as

23  Plaintiff's Exhibit 2.  And in this letter you again specify

24  that your problem is with an Equifax credit report; right?

25  A.   Yes.

David Daugherty - Cross (Manning)

1   Q.   You didn't have any problem with TransUnion or

2   Experian?

3   A.   That's correct.

4   Q.   To the extent all these other collection accounts and

5   tax liens are appearing on TransUnion and Experian, you

6   don't dispute those; right?

7   A.   The tax lien was not on this at this time.

8   Q.   Okay.  So let's just --

9   A.   So the other accounts were paid off on that.

10  Q.   Okay.  So you don't dispute that Experian and

11  TransUnion showing that you had 11 other collection accounts

12  would have been accurate?

13  A.   No.  They weren't the issue.

14  Q.   Okay.  This dispute that you're here about today is

15  just about Equifax; right?

16  A.   Yes.

17  Q.   And you're not aware of TransUnion or Experian

18  reporting this one Ocwen account twice at any point; right?

19  A.   Could you repeat that, please?

20  Q.   Sure.  You're not aware of these two other credit

21  bureaus, TransUnion and Experian, that you were also

22  receiving credit information from ever reporting the one

23  Ocwen account twice?

24  A.   No.

25  Q.   You don't have any dispute with them doing that wrong?

David Daugherty - Cross (Manning)

1    A.    No.

2    Q.    Okay.  It's solely because Equifax was reporting the

3    same account twice; right?

4    A.    It was because it was on that report, yes.

5    Q.    And you agree that there's just one Ocwen account;

6    right?

7    A.    Yes.

8    Q.    And that Ocwen account you identify in this letter, if

9    we could scroll down just a little bit, by a loan number.

10   And that loan number is 7092244573.  That is your loan with

11   Ocwen?

12   A.    That's correct.

13   Q.    And to the extent Equifax is reporting that loan twice,

14   that's a mistake; right?

15   A.    At that point, I wasn't even aware that it was on there

16   twice.

17   Q.    Okay.  So at this point, March, 2014, this is four

18   months before your full loan payment became due; right?

19              MR. NOLAN:  Sorry, Your Honor, to interject.  I

20   think this is March, 2013, just to clarify.

21   BY MR. MANNING:

22   Q.    March 14th, 2013.  As of the date of this letter, you

23   weren't aware that Equifax was reporting two accounts?

24   A.    That's correct.

25   Q.    Okay.  And in this account you're taking issue with the

David Daugherty - Cross (Manning)

1  fact that Equifax is saying that your Ocwen account is past

2  due, but it wasn't; right?

3  A.   I believe I was late that month, but it was the

4  thirty-day mark that I admitted to.

5  Q.   Okay.  On the second page of this document you have an

6  excerpt from -- well, let me ask you.  Do you know where you

7  obtained this excerpt from?

8  A.   I believe this came from the consumer financial, or

9  not -- creditscore.com I believe.

10  Q.   Okay.  So you had a complete creditscore.com credit

11  report --

12  A.   Yes.

13  Q.   -- which would have combined TransUnion, Experian, and

14  Equifax credit reporting information about you?

15  A.   Yes.

16  Q.   But you didn't provide that with this letter?

17  A.   I didn't need to.  I was being told that the loan

18  wouldn't go through because this was showing a foreclosure.

19  Q.   Okay.  And just focus on my question if you could.  You

20  didn't give the complete creditscore.com report to Ocwen

21  with this letter?

22  A.   No.  I just showed them what was wrong with the report.

23  Q.   Okay.  And you didn't tell Ocwen that Equifax was

24  reporting the one account two times?

25  A.   At that point, no.

David Daugherty - Cross (Manning)

1    Q.   Okay.  You have hand-written on here "Equifax."  That's

2 your handwriting?

3    A.   Yes.

4    Q.   And you're identifying that Equifax is reporting you as

5 past due and the actual foreclosure process had been

6 started; right?

7    A.   Yes.

8    Q.   But you don't know why they were doing that.  You just

9 know Equifax was doing it?

10    A.   That's correct.  But at the same time, you know, we had

11 had that previous conversation on the phone where I

12 explained that this was on there with the Ocwen rep before

13 this letter came out.

14    Q.   And at no point during your testimony with your

15 attorneys here today did you ever say that you ever told

16 Equifax or Ocwen that they were reporting the same account

17 twice?

18    A.   I did later on.

19    Q.   Okay.  But my question again, sir, during your

20 testimony today, you never said that; right?

21    A.   That's correct.

22    Q.   Okay.

23    A.   That's the first time it's been asked like that, but

24 later on, yes, I did.

25    Q.   And you'd agree it's not in this letter?

David Daugherty - Cross (Manning)

1    A.    It's not in that letter.

2    Q.    And there's not a full credit report?

3    A.    That's correct.

4    Q.    And you didn't provide any letter today that shows a

5    complete credit report as having been provided to my client,

6    Ocwen; correct?

7    A.    Repeat that, please.

8    Q.    Yes.  We looked at a number of documents with your

9    testimony with your counsel.

10   A.    Yes.

11   Q.    None of the letters and none of those documents show

12   that at any point you provided Ocwen a complete credit

13   report; correct?

14   A.    That's correct.

15   Q.    Okay.  Similarly, you talked about this Aggressive

16   Credit Repair company with Lorin Hanks; right?

17   A.    Yes.

18   Q.    You haven't provided any documents to show that

19   Aggressive Credit Repair provided a complete credit report

20   from Equifax to Ocwen; right?

21   A.    That's correct.

22   Q.    You're not aware of any documents by Equifax,

23   Aggressive Credit Repair, or you that ever told Ocwen that

24   there was two accounts being reported for your one mortgage

25   loan; right?

                    David Daugherty - Cross (Manning)

1    A.    Not documents.  I explained it, but not documents.

2    Q.    Okay.  Let's go to Exhibit 4, please.

3          MR. MANNING:  This is Plaintiff's Exhibit 4, Your

4    Honor.

5          THE COURT:  All right.

6    BY MR. MANNING:

7    Q.    Do you recall being asked about this document,

8    Mr. Daugherty?

9    A.    Yes.

10   Q.    Okay.  Let's see if we can make it a little bit bigger.

11   I'm having trouble reading it.  Let's just focus on the text

12   of the first paragraph.

13         Okay.  So in this letter -- and this is why I was

14   asking you about the difference between furnishing and

15   reporting.  About four or five lines down you'll see,

16   "Equifax has placed information on my credit report stating

17   my account with Ocwen was 120 days late in the month of

18   March, 2013."  Do you see that?

19   A.    Yes.

20   Q.    So Equifax is the one who's reporting it that way, not

21   Ocwen; correct?

22   A.    That's what Ocwen was telling me when, the times I had

23   conversations that actually I was believing it was Equifax.

24   Q.    Okay.  And Equifax was the one who reports because we

25   know Ocwen is a furnisher and they don't do any reporting;

David Daugherty - Cross (Manning)

1    right?

2    A.    Yes.

3    Q.    Okay.  So next you go on to say more of what Equifax is

4    showing, that they're showing you 120 days late and they --

5    you identify a couple months in particular, October, 2013,

6    and December, 2013.  Do you see that?

7    A.    Yes.

8    Q.    Are you aware that Ocwen, when it furnishes the data,

9    when it conveys every month the data about your account to

10   Equifax, that that information was never wrong?  Are you

11   aware of that?

12   A.    No, I'm not aware of that.

13   Q.    Are you aware that in the monthly data that Ocwen

14   provided about your account to Equifax, in those particular

15   months, October and December, 2013, that there was actually

16   a code put on the account as you having disputed it?  Are

17   you aware of that?

18   A.    Well, I believe you, yes.

19   Q.    So do you know the effect of whether Ocwen was

20   reporting that account as disputed when it -- when Equifax

21   computes your score?  Do you know what effect that would

22   have?

23   A.    Well, it didn't appear to have any effect.

24   Q.    You don't know?

25   A.    I don't know.

David Daugherty - Cross (Manning)

1  Q.  Okay.  Next it says that the statements that Equifax

2  was making were false; right?

3  A.  Yes.

4  Q.  Again, the focus here is statements Equifax was making;

5  right?

6  A.  Yes.

7  Q.  Okay.  The next sentence says, "Equifax also shows that

8  I have a past due balance right now of $6,128."

9      You're not aware of any of that monthly data that Ocwen

10 was furnishing to Equifax that ever showed you were that

11 amount late when you weren't, are you?

12 A.  I never seen anything like that, no.

13 Q.  And when you talked to Ocwen they said, "No, we're

14 showing that you're current;" right?

15 A.  Yes.

16 Q.  If you go down two more sentences, I believe you

17 already talked about this so I won't belabor it.  You were

18 late in March, 2013.  And I think there was some snafu

19 with -- was it on-line billing?

20 A.  It was just automated billing, automatic payroll going

21 in a couple days late.

22 Q.  Gotcha.  The next line talks about, "We have disputed

23 these reporting inaccuracies with Equifax several times and

24 that -- claim they are correct."  I take it by that you mean

25 Equifax is claiming they're reporting it right?

David Daugherty - Cross (Manning)

1   A.   My knowledge was that the information come back from

2   Ocwen to Equifax that it was right.

3   Q.   And when you complained to Equifax, Equifax is telling

4   you, "No, we're doing it right."

5   A.   Yes, they would come back and say that.

6   Q.   And that's what you were reflecting in this letter?

7   A.   Yes.

8   Q.   Now, if you look at the second page of this letter, the

9   next one, we'll again see here that there's a partial

10  excerpt.  Maybe we can zoom out a little bit.

11       So you'd agree that what's being shown on this screen

12  here, Mr. Daugherty, this is not your complete credit

13  report; right?

14  A.   That's correct.

15  Q.   This is -- I believe your testimony on your direct

16  examination was a portion of a document that you received

17  from creditscore.com.  Is that right?

18  A.   Yes.

19  Q.   All right.  Now, is this your handwriting on here?

20  A.   Yes, it is.

21  Q.   Okay.  So you referenced the report date and pulled

22  this specific tradeline -- maybe I shouldn't use that word.

23  Are you familiar with the word "tradeline" where it's just a

24  summary of that account?

25  A.   Yes, yes.

David Daugherty - Cross (Manning)

1  Q.    Okay.  So this tradeline is the only one that you

2  pulled out of that report and provided to Ocwen?

3  A.    It's the only one I have a problem with.

4  Q.    And you didn't explain to Ocwen at least as of March,

5  2014 -- you see the date on this; right?

6  A.    Yes.

7  Q.    -- that there were two accounts for Equifax for your

8  one mortgage loan; right?

9  A.    I believe my conversation before this letter we went

10  over it briefly.

11  Q.    Okay.

12  A.    We had a pretty good discussion on that original phone

13  conversation.

14  Q.    You'd agree it's not in this letter?

15  A.    It's not in that, no.

16  Q.    And you never in any of these letters say duplicative

17  tradelines?

18  A.    No.

19  Q.    And you're saying the problem that you had was you took

20  an excerpt and gave them this, but you didn't give them

21  everything; right?

22  A.    That's correct.  I would have thought they could have

23  looked it up themselves when they were doing their

24  investigation.

25  Q.    Well, maybe I should ask you this.  Do you know whether

David Daugherty - Cross (Manning)

1    Ocwen has access to Equifax's system?

2    A.    Not personally, no.

3    Q.    Okay.  You were assuming that they must have?

4    A.    Well, I would assume that if I'm showing that there's a

5    problem coming across this when I'm current on my mortgage

6    for those particular months, they would actually follow up

7    and correct it --

8    Q.    Okay.

9    A.    -- whether, no matter what agency I went through.

10   Q.    Are you aware that Ocwen repeatedly was following up

11   with Equifax to say you're current?

12   A.    That's what I understood.

13   Q.    Okay.  Now, if you look at your handwriting here,

14   you've identified what you believe to be inaccurate, which I

15   take it is the past due amount, both the total of the 6,000

16   and change plus the number of months past due; right?

17   A.    Yes.

18   Q.    Okay.  But there was another tradeline on there for the

19   same account that Equifax was reporting that was correct;

20   right?

21   A.    Yes.

22   Q.    And you've already said today that you had no problem

23   with that because the data Ocwen was furnishing for that

24   tradeline was right; correct?

25   A.    That's correct.

David Daugherty - Cross (Manning)

1  Q.  And you have no evidence that Ocwen was furnishing this

2  data because the other account was perfectly correct; right?

3  A.  No, I, I wasn't aware that -- go ahead and repeat that

4  one more time for me, please.

5  Q.  Sure.  So I'll break it down.  There are two

6  tradelines --

7  A.  Yes.

8  Q.  -- on your credit report for your one account, but

9  that's only on the Equifax credit report.

10  A.  Yes.

11  Q.  One of those tradelines is perfectly accurate because

12  that's the data Ocwen --

13  A.  That's correct.

14  Q.  -- was provided.

15  A.  That's correct.

16  Q.  The second one which is duplicative that you never told

17  Ocwen about in any of these letters was wrong and Ocwen

18  didn't know about it; right?

19  A.  They knew about it because I sent them a letter showing

20  this.

21  Q.  Okay.  But they didn't know there were two; right?

22  A.  That's correct.  They may not have known there was two.

23  Q.  And, so, when they received this, they told you, "No,

24  we're not reporting you as late for the months that you've

25  circled and drawn arrows to."  Right?

David Daugherty - Cross (Manning)

1  A.   That -- they told me I was current, yes.  All the way

2  through they kept telling me I was current until I got the

3  report in front of me saying I'm not.

4  Q.   And you don't have any knowledge of any evidence that

5  Ocwen ever reported you as late for the months of June,

6  July, October, or December that you've identified here;

7  right?

8  A.   Well, I, I was told after this up closer date to my

9  deposition that it all generated from Ocwen is what I was

10  told, not from this right here but, no.  Up to this point, I

11  thought it was Equifax.

12  Q.   Okay.  As you sit here today, Mr. Daugherty, you're not

13  aware of any evidence that Ocwen ever itself furnished any

14  data to Equifax that you were late for the months of June,

15  July, October, or December; correct?

16  A.   That's correct.

17  Q.   Okay.  Thank you.  The one exception to this letter

18  that I think you've now clarified is you said -- here you've

19  drawn an arrow to March, 2013, as being inaccurately

20  reporting you as late.  But you were late.  You just weren't

21  120 days late?

22  A.   That's correct.

23  Q.   Okay.  So I want to ask a specific question on that.

24  You're also not aware of any evidence that Ocwen ever

25  reported you -- ever furnished data to Equifax that you were

David Daugherty - Cross (Manning)

1  120 days late in March, 2013; right?

2  A.    That's correct.

3  Q.    Thank you.  Now, I'd like to go to Exhibit 5.  You'll

4  recall, Mr. Daugherty, that this is the letter -- it's on

5  CFPB letterhead, which stands for Consumer Financial

6  Protection Bureau.  And during your direct you went through

7  and talked about -- this is actually a compilation of a

8  couple of different sets of correspondence; right?

9  A.    Yes.

10 Q.    So let's go to the earliest one in this chain, if we

11 could go all the way to the bottom.  It looks like the

12 earliest message here is from March 26th, 2014.  And this

13 is -- it really is very similar to the letter we just read;

14 right?

15 A.    Yes, it is.

16 Q.    You're, you're identifying that Equifax is -- if you go

17 about halfway down, "Equifax shows on my credit report --"

18 if you can blow up just that section.  This is hard to read.

19 We'll do the best we can.  Hopefully we can all see it.

20      About halfway down there's a sentence that begins,

21 "Equifax shows on my credit report that I was late on my

22 mortgage payment by 120 days in March, June, July, October,

23 and December, 2014.  They also show that I am currently past

24 due by $6,178."

25      Do you see that?

David Daugherty - Cross (Manning)

1    A.    Yes, I do.

2    Q.    Okay.  And, so, that's the same issue that you're

3    identifying in the other one?

4    A.    Yes.

5    Q.    And that prior letter you attached an extra credit

6    report, but you don't recall attaching anything to this

7    letter; right?

8    A.    That I sent in to the consumer protection?

9    Q.    Right.

10   A.    I, I did send that in.

11   Q.    The same excerpt?

12   A.    I believe so.

13   Q.    Okay.  But you'd agree it's not on this document?

14   A.    Yeah, it's not on that document, but I did send that in

15   I do believe.

16   Q.    Okay.  Then if you go to the next entry, it looks like

17   it's two pages up.  It has a date -- let's look at

18   April 17th, 2014.

19        Mr. Daugherty, if you look at the entry there, it says,

20   "Customer David Daugherty via web."  And it's dated

21   April 17th, 2014; right?

22   A.    Yes.

23   Q.    Okay.  So this is something that you wrote?

24   A.    Yes.

25   Q.    And it says, "I sent Ocwen a copy of my Equifax

                        David Daugherty - Cross (Manning)

1    report."  Right?

2    A.    That's correct.

3    Q.    But you don't mean the whole report because you've

4    already said what you sent was an excerpt?

5    A.    It should have been sent what I had -- the problem I

6    had with my report I sent, yeah.

7    Q.    Okay.  This statement here is clear that it shouldn't

8    be interpreted as you sent the whole credit report because

9    you did not do that; right?

10   A.    That's correct.

11   Q.    So then it goes on to identify the same issue, the

12   second sentence.  "I understand Equifax is now showing that

13   my loan is current but they still show me being 120 days

14   late" -- I'm sorry -- "120 days all of those months.  There

15   is no way I can be satisfied with this as my loan will

16   mature in July with Ocwen."  Right?

17   A.    That's correct.

18   Q.    Okay.  So you sent this and the same issue.  Equifax is

19   still reporting you as late; right?

20   A.    Yes.

21   Q.    And your testimony during your direct examination was

22   Equifax didn't correct that until after you filed the

23   lawsuit; right?

24   A.    That's correct.  The report on that particular report

25   was not correct until after the lawsuit was filed.

                    David Daugherty - Cross (Manning)

1  Q.   And, actually, it wasn't until a couple months after

2  the lawsuit?

3  A.   Several months.

4  Q.   Does the, does the date, September 23rd, --

5  A.   That sounds --

6  Q.   -- 2014 sound right?

7  A.   That sounds about right.

8  Q.   Okay.  And we'll see other evidence in the trial about

9  that.  But I just wanted to see if you knew the approximate

10 date.

11      Now, if you go to the first page, I want to start at

12 the -- we can start right at the top just to orient you.

13 Let's see if we can make that a little bigger.  Okay.

14      So the response from Ocwen at the top, "The Office of

15 the Consumer Ombudsman for Ocwen Loan Servicing would like

16 to take this opportunity to respond to your recent concern

17 regarding the referenced loan.  The Consumer Ombudsman was

18 created to provide Ocwen's customers with a resource to

19 assist with unresolved concerns and issues."

20      Do you see that?

21 A.   Yes.

22 Q.   So that's like a salutation.  Now we're going to get

23 into the substance.  Right?

24      So the substance begins, "Ocwen is obligated to report

25 the loan accurately to the credit bureaus."  That's the

David Daugherty - Cross (Manning)

1  furnishing process; right?  We have to give the correct data

2  to them; right?

3  A.    I would think.

4  Q.    Based on the due date.  And, so, what they're referring

5  to as the contractual due date is your note.  Remember

6  looking at Exhibit 1, the note?

7  A.    Yes.

8  Q.    And you agree that the note is money that you borrowed

9  and that you promised to repay; right?

10  A.    Yes.

11  Q.    And you had to repay it?

12  A.    Yes.  I have not repaid yet.

13  Q.    Then if you go to the next sentence, it says, "Further,

14  if payments are not received within the 30 days of the month

15  then the account will be reported as delinquent."

16       And you understand that just means if you're not paying

17  every month on time, the status of your loan is delinquent?

18  A.    That's correct.

19  Q.    And you've already testified that you were delinquent a

20  number of months in the past on this account; right?

21  A.    Yes.

22  Q.    And here specifically Ocwen's addressing March 26th,

23  2013, a payment was -- that payment was received on

24  April 30th.  And I want to clarify.  That's the payment you

25  were referring to as the on-line payment issue?

David Daugherty - Cross (Manning)

1   A.   Yes.

2   Q.   Okay.  So you were delinquent.  You agree with that.

3   It's just that it wasn't 120 days late?

4   A.   That's correct.

5   Q.   Okay.  So Ocwen's statement here is accurate; right?

6   A.   Yes.

7   Q.   Next it says, "A further review indicates that on

8   March 21st, 2014, our office submitted a request to the four

9   major credit reporting agencies, Equifax, TransUnion,

10  Experian, and Innovis to reflect the current balance of the

11  loan in the amount of $80,499.78."  Do you see that?

12  A.   Yes, I do.

13  Q.   So we've talked about the three major credit bureaus,

14  Equifax, TransUnion, and Experian.  They're also referencing

15  a fourth which may be lesser known, Innovis.  Is that your

16  understanding?

17  A.   Yes.

18  Q.   So here Ocwen is telling you, "We sent an update to all

19  four that your balance is $80,499.78."  Right?

20  A.   That's correct.

21  Q.   And then they give you a confirmation number of how

22  that was submitted so that you would know; right?

23  A.   That's correct.

24  Q.   It says, "Ocwen reports to Equifax, TransUnion,

25  Experian, and Innovis.  These bureaus provide information to

1  the local credit bureaus to update and correct your credit

2  file.  Unfortunately, Ocwen is unable to control when the

3  credit reporting agencies will update their records.  In the

4  interim, you may use this letter as evidence that the

5  request has been submitted."

6      Do you see that?

7  A.   Yes, I do.

8  Q.   Okay.  So you can agree based on this letter that Ocwen

9  sent an update that they wanted the current balance of the

10  loan to be reflected accurately to all four credit bureaus;

11  right?

12  A.   I see that.

13  Q.   Right?

14  A.   Yes.

15  Q.   And then it goes on to state that Ocwen doesn't control

16  what they report; right?

17  A.   Yes, I see that.

18  Q.   And you understand that that's the way it works; right?

19  A.   Yeah, I understand that.

20  Q.   Then they go on to tell you, "As of the date of this

21  letter, your loan is due for the April 26th, 2014, payment.

22  If you require further assistance regarding the loan, you

23  may contact Ocwen's Customer Care Center."  And they give a

24  number.  Right?

25  A.   That's correct.

David Daugherty - Cross (Manning)

1   Q.   Okay.  And you'd agree again that at that point in time

2   what was due was the April 26th, 2014, payment?

3   A.   Yes.

4   Q.   Okay.  So you don't have any problem with what's being

5   stated in this letter.  It's all true and accurate.

6   A.   That part of the letter, yes, I agree.

7   Q.   Okay.  Let's go to Plaintiff's Exhibit 7 now.  This is

8   one of the exhibits that was admitted not for the truth of

9   the matter.  So I really wanted to limit my questions again

10  to the purpose of it, which is your understanding and how

11  you made -- how it made you feel.  Okay?

12       So let's start with identifying this.  This is the

13  Chase, the Disney credit card your wife applied for.  And in

14  this account here it says a couple of things about why that

15  credit card was denied.  Right?

16  A.   Yes.

17  Q.   Do you know why you -- why your wife was applying for

18  that credit card?

19  A.   As far as I know, anything that has the word "Disney"

20  on it, she likes it.

21  Q.   You don't have any, any reason to believe --

22  A.   I have no reason why she -- I, I -- personally I think

23  it's just the novelty of having a Disney credit card.

24  Q.   Okay.  You're not claiming that you were somehow

25  damaged by not receiving a Disney credit card you didn't

David Daugherty - Cross (Manning)

1    want; right?

2    A.    Well, this goes on my record.  So, yes, I am being

3    damaged by this being denied.

4    Q.    Okay.  Let me, let me clarify then.  You're not trying

5    to refinance the house that you're saying was the -- the

6    reason you were applying for credit because the balloon note

7    due in July, 2014; right?

8    A.    That's correct.

9    Q.    This wasn't going to pay for that?

10   A.    No, that wasn't going to pay for that.

11   Q.    This was a completely unrelated credit application --

12   A.    Absolutely.

13   Q.    -- that at the time you knew nothing about?

14   A.    That's correct.

15   Q.    And then if you go to the second page, at the top --

16   let's see if we can make that a little bit bigger.  The

17   print's so small.  And then it gives the primary factors

18   that negatively affect your credit score.  Do you see that?

19   A.    Yes.

20   Q.    Okay.  It says "delinquency."

21   A.    Yes.

22   Q.    It says "length of time since last delinquency on all

23   accounts."  Right?

24   A.    Yes.

25   Q.    It says "total available credit on all revolving

David Daugherty - Cross (Manning)

1   accounts."  Right?

2   A.   Yes.

3   Q.   "Installment loans not paid as agreed compared to all

4   installment loans."  Right?

5   A.   Yes.

6   Q.   And "number of requests for new credit."

7   A.   Yes.

8   Q.   None of those identify an Ocwen account; right?

9   A.   Some of those do.

10  Q.   Okay.

11  A.   The installment loans not paid in time, absolutely,

12  right there.  The delinquency public record is due to the

13  tax liabilities which wouldn't have been on there.

14  Q.   You had -- let me see if I can correct that.  You had a

15  number of different accounts, right, --

16  A.   Yes.

17  Q.   -- on credit?

18  A.   Yes.

19  Q.   And nowhere on this statement of primary factors that

20  negatively affect your credit score does it say that the

21  reason for that is because you're late on your Ocwen

22  mortgage loan?

23  A.   The installment loans.

24  Q.   Okay.  Maybe, maybe we're quibbling over terminology.

25  It doesn't say the word "Ocwen."

David Daugherty - Cross (Manning)

1   A.   No, it doesn't say the word "Ocwen."  But the only one

2   that I had listed that could possibly have been listed

3   paid -- not paid as agreed would only be Ocwen.

4   Q.   But you don't know what Chase was relying on when it

5   denied this because you didn't make this determination to

6   deny your credit application.  You didn't even know the

7   credit application was being made.  Right?

8   A.   Part of that is correct, but that's the only one it

9   could be on the installment loans.

10  Q.   Okay.  So let's, let's make sure we're clear.  This

11  application you didn't know about and you don't know why

12  Chase decided not to give you a Disney credit card; right?

13  A.   Well, I can understand why they didn't because this is

14  listed on here.

15  Q.   Okay.  And that's just your speculation that someone --

16  you've already said you don't know what factors they looked

17  at, what other credit accounts they looked at, or how they

18  calculated your score because that's not what you do; right?

19  A.   I mean, I understand what they're listing right here

20  why it wasn't approved, yes.

21  Q.   Okay.  And you never talked with Chase and they never

22  told you --

23  A.   No.

24  Q.   -- anything else about why they were denying your

25  Disney credit card?

David Daugherty - Cross (Manning)

1   A.   Well, I had no communication with Chase.

2   Q.   Thank you.  Let's go to Plaintiff's Exhibit 8 now,

3   please.  All right.  I'm having difficulty.

4        It says, "Dear David Daugherty, this letter is in

5   response to your recent request to open a bill-me-later

6   account."

7        Let me start with that.  Do you know what a

8   bill-me-later account is?

9   A.   Actually, in hindsight I remember what this one is.  I

10  believe this was a PayPal account.

11  Q.   Okay.  So let's start there.  This is not an attempt to

12  refinance your --

13  A.   No.

14  Q.   -- mortgage?

15  A.   It was not.

16  Q.   You were not attempting to get a bill-me-later account

17  from Comenity Capital Bank that you would intend to

18  refinance --

19  A.   No.

20  Q.   -- your Ocwen mortgage that was now becoming due?

21  A.   That's correct.

22  Q.   It says -- well, let me ask you this.  Did your wife

23  apply for this one or did you?

24  A.   I believe I did.

25  Q.   Okay.  Why did you want the PayPal account?

David Daugherty - Cross (Manning)

1    A.    I do a lot of business on PayPal.

2    Q.    Okay.  Nothing specific, not related to the home

3    refinance, just unrelated?

4    A.    Yes.

5    Q.    Okay.  So then it goes on in the second paragraph to

6    describe, "Your application was processed by a proprietary

7    scoring system that assigns a numerical value to the various

8    items of information we consider in evaluating an

9    application.  These numerical values are based upon the

10   results of analyses of credit histories of large numbers of

11   customers."

12        Did I read that right?

13   A.    I believe you did.

14   Q.    Okay.  So you don't know what the proprietary scoring

15   system is; right?

16   A.    That's correct.

17   Q.    You don't know all the factors that go into that.  You

18   just know that Comenity is telling you they used it, and as

19   a result of their use of it, they denied your application?

20   A.    That's correct.

21   Q.    So below this they say that they utilized the, the

22   Equifax Credit Information Services credit report with a

23   score of 580.  Do you see that?

24   A.    That's correct.

25   Q.    And on this account it doesn't say anything about an

David Daugherty - Cross (Manning)

1   Ocwen mortgage; right?

2   A.   Yes, you're correct.

3   Q.   And it doesn't say foreclosure; right?

4   A.   That's -- it goes back to the delinquencies was the

5   public record.

6   Q.   And at one point you had 11 accounts in collection;

7   right?

8   A.   Before -- well before this back when I had problems

9   with credit.

10  Q.   Okay.  And the two tax liens?

11  A.   The tax liens came later.

12  Q.   Okay.  So there's a number of other derogatory credit

13  information that's unrelated to Ocwen?

14  A.   The tax liens came later after my credit history was

15  cleaned up.

16  Q.   Okay.  So let me make sure I'm clear on that.  This is

17  a letter as of May, 2014; correct?

18  A.   Yes.

19  Q.   And are you saying that as of May, 2014, you had no tax

20  liens at any point in the past?

21  A.   None that I -- I believe that's correct.  I think it

22  was April of 2014 when the tax liens were put on there.  I

23  had had some in the past that were paid off.

24  Q.   All right.  I'm not sure what your answer to my

25  question is.  So there were tax liens in the past?

David Daugherty - Cross (Manning)

1   A.   Yes, but they were paid.

2   Q.   Okay.  And there were also tax liens that happened

3   later?

4   A.   Yes.

5   Q.   So you'd agree that there were a number of other

6   negative credit reporting issues unrelated to this Ocwen

7   mortgage account; right?

8   A.   Well, the tax liens is what really started the whole

9   thing having a problem with.

10  Q.   Okay.  Thank you.  So, now, are you aware that at this

11  time, the Experian report was actually giving you a higher

12  score than Equifax?

13  A.   I wasn't aware of that.

14  Q.   Okay.  And we'll get into some of your deposition

15  testimony.  Do you recall being deposed in this case?

16  A.   Yes.

17  Q.   Okay.  And I'll give you the opportunity to hear some

18  of your testimony.

19  A.   If I could, I'd like to -- if I understood right, --

20  disregard that.  I'm not sure about that.  Go ahead.

21  Q.   Well, there's, there's no question pending right now.

22  A.   Okay.

23  Q.   Is there something you want to correct?

24  A.   No.

25  Q.   Okay.  Let's go to Exhibit 9.  This one needs to not be

David Daugherty - Cross (Manning)

1  published yet.  Thank you.  This one hasn't been admitted

2  yet.

3       Mr. Daugherty, do you recall testifying earlier about

4  how when you initially applied for a refinance with Quicken

5  Loans they denied you?

6  A.    Yes.

7  Q.    Okay.  And do you see the letter on the screen?  I

8  can't see what your screen shows.

9  A.    Yes.

10 Q.    Okay, good.  So May 2nd, 2014, this is a letter from

11 Quicken Loans and it's addressed to David Daugherty.  And it

12 says, "Thank you for giving Quicken Loans the opportunity to

13 help with your home loan.  Unfortunately, we are unable to

14 offer you financing at this time."  Is this the letter you

15 were referring to --

16 A.    Yes.

17 Q.    -- when you were denied credit?

18 A.    Yes.

19 Q.    And it says "credit history," and it gives the reason

20 why they were giving you the denial.  It says

21 "current/previous, low payments, judgments, liens, or

22 bankruptcy."  Do you see that?

23 A.    Yes.

24 Q.    And you'd agree that your credit score was affected by

25 all those things; right?  Not bankruptcy.  You didn't file

David Daugherty - Cross (Manning)

1  for bankruptcy; right?

2  A.   Yeah, it was affected.

3  Q.   Okay.  In this letter when you received it -- let me,

4  let me --

5  A.   I'm going to revise that last statement.  It affected

6  it, but that wasn't the issue with them.

7  Q.   Okay.

8  A.   It was the, what was listed on the credit line

9  statement, what they told me.

10  Q.   So I'd like you to look at the second page now.  Do you

11  have that in front you?

12  A.   Yes, I do.

13  Q.   Okay.  Thank you.  It says on Page 2 of two in the top

14  right and Quicken Loans was denying you this refinance loan.

15  And in this first paragraph they say, "We obtained your

16  credit score from TransUnion and used it in making our

17  credit decision."  Do you see that?

18  A.   Yes.

19  Q.   It says, "Your credit score is a number that reflects

20  the information in your credit report and can change

21  depending on how the information in your credit report

22  changes."

23       Now, we've already established, I believe, that you had

24  no issue with the TransUnion report; correct?

25  A.   That's correct.

David Daugherty - Cross (Manning)

1  Q.  Okay.  So here TransUnion is saying your credit score

2  is 627; right?

3  A.  That's correct.

4  Q.  That's higher than Experian -- I'm sorry -- than

5  Equifax's score on that last letter we looked at which was

6  580; right?

7  A.  According to what your last letter was.  I had in my

8  head that the one I saw, I believe Equifax was lower than

9  the other two.

10  Q.  Yes.  And what I want you to focus here on is

11  TransUnion was denying you credit with a higher credit score

12  and not having any issue with your Ocwen mortgage account;

13  right?

14  A.  Yes, but my credit score was higher than that until the

15  two liens got put on there.

16  Q.  Okay.  And let me make sure we're clear.  This is

17  TransUnion.  You don't have a problem with what TransUnion

18  is reporting; correct?

19  A.  That's correct.

20  Q.  And TransUnion is giving you a higher credit score than

21  what Equifax was giving you; right?

22  A.  I'm not sure about that.

23  Q.  Do you recall seeing the letter that said 580?

24  A.  I remember seeing the letter but --

25  Q.  That's what I'm asking you about.

David Daugherty - Cross (Manning)

1   A.   Okay.  I remember seeing that.

2   Q.   Okay.  And, so, TransUnion is still denying you credit

3   even though there's no issue with the complaint you have

4   here today in this case; right?  It had nothing to do with

5   it.

6   A.   In this instance, yes.

7   Q.   All right.  Thank you.

8        MR. MANNING:  Your Honor, I would move to admit

9   this as Defendant's 1 not for the truth of the matter

10  asserted but, again, for the limited purposes of showing how

11  he responded and how it made him feel.

12       THE COURT:  Any objection, counsel?

13       MR. NOLAN:  No, Your Honor.

14       THE COURT:  Defendant's Exhibit 1 will be admitted

15  into evidence without objection and can be published.

16  BY MR. MANNING:

17  Q.   So let's publish this just so the jury has the benefit

18  of seeing what you've been seeing in front of you,

19  Mr. Daugherty.

20       So, again, this second page -- I want to go back just

21  so the jury has the benefit of seeing this.

22       So at the top you'll see Quicken Loans, May 2nd, 2014.

23  And they're denying you and they give a reason based on

24  current/previous, slow payments, judgments, liens,

25  bankruptcy; right?

David Daugherty - Cross (Manning)

1    A.    Yes.

2    Q.    And then on the second page they go on to provide

3    further detail.  They reference specifically in the first

4    line of the first paragraph TransUnion; right?

5    A.    That's correct.

6    Q.    They relied on TransUnion.  You didn't qualify.  It has

7    nothing to do with the Ocwen mortgage account; right?

8    A.    That particular statement, yes.

9    Q.    Okay.  It goes on to give a couple of other scores.

10   And, again, there's codes.  These credit bureaus, they love

11   codes.  But you'll see the codes are defined.  Then it says

12   you have serious delinquency and public record or collection

13   filed on your credit report.  Right?

14   A.    That's correct.  But that's back to the liens that

15   wouldn't have been there which dropped my credit score down

16   to the 627.

17   Q.    The tax liens?

18   A.    Yes.

19   Q.    And then it has balances are too high on your bank

20   revolving or all revolving credit history accounts; right?

21   A.    Yes.

22   Q.    And, so, revolving accounts are credit cards; right?

23   A.    Yes.

24   Q.    You're carrying high balances on a number of other

25   accounts, again unrelated to Ocwen's mortgage; right?

David Daugherty - Cross (Manning)

1   A.   Yes, that particular month, yes, on that month's

2   reporting.

3   Q.   And then below that, recent legal item or collection

4   item reported.  That's another separate reason.  Do you know

5   what Quicken Loans was referring to there?

6   A.   I'm not sure what that would have been.

7   Q.   And, lastly, too many delinquent accounts.

8   A.   That would be the liability with the tax liens.

9   Q.   You're, you're guessing.  You don't know because you

10  didn't actually talk to Quicken Loans and have them tell you

11  the tax liens are the issue?

12  A.   Well, personally I do know.  That was the only thing I

13  was -- I had all my other things on my credit report paid

14  off.

15  Q.   Okay.  Quicken Loans in this letter doesn't say tax

16  liens; right?

17  A.   No, but they always mention public records.

18  Q.   And you didn't talk with them and have them tell you

19  tax liens; right?

20  A.   No.  That's the only thing it could be.

21  Q.   You don't know.

22  A.   That's the only thing it could be.

23  Q.   Okay.  You're saying that based on what your

24  understanding of the letter is without the benefit of

25  actually having heard from Quicken Loans?

David Daugherty - Cross (Manning)

1    A.   But that's, that's, that's correct but that's all it

2    can be.

3    Q.   Thank you.

4         THE COURT:  Sir, I'm sorry.  Were you finished

5    with your answer?

6         THE WITNESS:  Yes.

7         THE COURT:  Okay.  Go ahead.

8         MR. MANNING:  Thank you, Judge.  I didn't mean to

9    interrupt.

10   BY MR. MANNING:

11   Q.   You also mentioned One Community Federal Credit Union;

12   right?

13   A.   Yes.

14   Q.   Okay.  And that's the local bank that you've been doing

15   business with?

16   A.   Yes.

17   Q.   Isn't it true that that bank never actually completed a

18   credit application for you?

19   A.   No, I don't think that's true.  I completed an

20   application with them with the loan officer.

21   Q.   I'm sorry?

22   A.   Yes, I completed an application with them.

23   Q.   Okay.  Have you read the deposition testimony of Steven

24   Napier?

25   A.   No, I have not.

David Daugherty - Cross (Manning)

1   Q.   And we're talking over a little bit.  I'm going to do

2   my best not to interrupt you.

3   A.   Sure.

4   Q.   Just let me finish my question.

5   A.   Sure.

6   Q.   She's trying to write everything down.

7   A.   I'm sorry.  I thought you were done.

8   Q.   No problem.  So are you aware that Mr. Napier testified

9   that he never completed a credit application for you?

10  A.   No, I'm not aware of that.

11  Q.   Are you aware that he said he stopped the process?

12  A.   I was told I was turned down.

13  Q.   Okay.  There isn't any letter that's been offered to

14  that effect; right?

15  A.   That, that's true.  I can't recall a letter.

16  Q.   And we, we've looked at Comenity, Chase, Quicken Loans.

17  That's three denials; right?

18  A.   Yes.

19  Q.   And then there's no letter from One Community Federal

20  Credit Union?

21  A.   I, I can't recall seeing one.  That's probably true.

22  Q.   Are you aware of a legal requirement that when you're

23  denied a credit application, they have to give you a written

24  notice that says why?

25  A.   Not really until now.

                    David Daugherty - Cross (Manning)

1   Q.    Okay.  Are you aware that Mr. Napier testified that the

2   reason you could have been denied had it been completed

3   would have been a number of factors?

4   A.    That's not what he told me.

5            MR. NOLAN:  Your Honor, I'd object to this line of

6   questioning about what Steve Napier testified to.  We're

7   going to hear his deposition testimony and he has -- Mr.

8   Napier's deposition testimony will have the first-hand

9   knowledge that Mr. Manning is seeking at this point.

10  Mr. Daugherty does not have first-hand knowledge of that.

11           THE COURT:  Any response?

12           MR. MANNING:  I'll move on, Judge.

13           THE COURT:  I'm sorry?

14           MR. MANNING:  I'll move on.

15           THE COURT:  All right.  As I understand it, the

16  question is being withdrawn.

17           MR. MANNING:  Yes, Judge.

18           THE COURT:  All right.  Go ahead, please.

19           MR. MANNING:  Thank you.

20  BY MR. MANNING:

21  Q.    There was also another credit application in Embrace

22  Home Loans?

23  A.    Yes.

24  Q.    Do you recall receiving a letter from Embrace Home

25  Loans?

David Daugherty - Cross (Manning)

1  A.   I recall something of that letter, yes.

2  Q.   And there wasn't a letter offered by plaintiffs denying

3  you credit from Embrace Home Loans; right?  I can be more

4  specific.  We haven't seen it today?

5  A.   No.

6  Q.   Okay.

7  A.   I don't, I don't think.  I've seen so many things

8  today.

9  Q.   Let me ask it this way.  Do you know whether there was

10 a letter from Embrace denying you credit?

11 A.   I, I believe there might have been possibly.

12 Q.   Are you aware that when Embrace Home Loans denied you a

13 credit application they did not reference your Equifax

14 credit report at all?

15      MR. NOLAN:  Your Honor, I would object to this

16 question because we don't have any documents.  He's

17 testifying about what a letter may or may not say.  I don't

18 see any basis for this line of questioning.

19      THE COURT:  I overrule the objection just because

20 he -- the witness has indicated that he may have received

21 such a letter.  And if that's the case, I think his

22 knowledge of it, Mr. Nolan, could be tested on cross.  So

23 I'm going to allow him to answer if he can.  I overrule the

24 objection for that reason.

25      Go ahead, please.

David Daugherty - Cross (Manning)

1          MR. MANNING:   Thank you, Judge.

2   BY MR. MANNING:

3   Q.   Do you need me to re-ask it?

4   A.   Yes, please.

5   Q.   Okay.  Are you aware that when Embrace Home Loans

6   denied your credit application that they did not reference

7   your Equifax credit report?

8   A.   I'm not aware of that.

9   Q.   Do you have any knowledge as you sit here today as to

10  why Embrace Home Loans denied your credit application --

11  A.   Yes, I do.

12  Q.   -- given that you don't recall what the letter says?

13  A.   Yes, I do.

14  Q.   Okay.  Do you have the letter with you?

15  A.   No.  That's not what I thought you were asking me.

16  Q.   Okay.

17  A.   You said if I had any knowledge.  To my knowledge, I

18  did not do an actual credit -- or an application.  It was

19  just all over the phone with them which turned out to be an

20  application.

21       And if it's the one I'm thinking of, I was kind of

22  surprised when I saw the rejection in the mail because we

23  just talked over the phone and the person for Chase I talked

24  to on the phone told me on the phone that I wouldn't be

25  approved with the foreclosure on my credit report because

David Daugherty - Cross (Manning)

1   they pulled it up while I was talking to them on the phone.

2   Q.   Okay.

3   A.   So, so the whole thing was dropped at that point.

4         MR. MANNING:  I'm going to move to strike as

5   nonresponsive.

6   BY MR. MANNING:

7   Q.   The question is, Mr. Daugherty, you don't have the

8   letter in front of you to know the reasons that were

9   provided by Embrace for why you were denied credit?

10  A.   Not in front of me, no.

11  Q.   In your answer -- and the Judge can see this in the

12  transcript -- you referenced Chase.

13        THE COURT:  I heard him reference Chase and you

14  didn't give me an opportunity to rule on your objection.

15  You kept talking.

16        MR. MANNING:  I'm sorry, Judge.

17        THE COURT:  Your objection was that -- or you

18  moved to strike it for being nonresponsive.  And his answer

19  was relative to Chase as opposed to Embrace.  And, so, for

20  that reason I sustain the objection and I would strike that

21  portion of his answer.

22        Go ahead, please.

23        MR. MANNING:  Thank you, Judge.  I'm sorry I kept

24  talking.

25  BY MR. MANNING:

David Daugherty - Cross (Manning)

1   Q.   What I'm trying to get at, Mr. Daugherty, is you don't

2   have the letter and you don't know what the letter stated as

3   to why you were denied credit by Embrace Home Loans?

4   A.   I do not have the letter.  That's correct.

5   Q.   And you -- and if the evidence later in this case shows

6   that Embrace Home Loans didn't even rely on your Equifax

7   credit report, then you'd agree that that has nothing to do

8   with the dispute here today; right?

9   A.   I can only tell you what they told me on the phone.

10  Q.   I'm asking for the reasons they provided you in the

11  letter.  And I take it your answer is --

12  A.   I'm, I'm having trouble recalling what the letter says.

13  There's been so many documents.

14  Q.   Okay.

15  A.   I'd have to see it in front of me before I could say

16  what it said.

17  Q.   I also have a lot of documents in front of me.  All

18  right.  So I mentioned earlier that you had given deposition

19  testimony in this case.

20  A.   Yes.

21  Q.   Okay.  Do you recall during your deposition testifying

22  that the first, the first time you learned you had issues on

23  your credit report that may have prevented you from

24  refinancing wasn't until October of 2013?

25  A.   No, I don't remember saying that.

David Daugherty - Cross (Manning)

1   Q.   All right.  We've got to do a little connection so I

2   can show you the deposition.  Okay.

3       So, Mr. Daugherty, I can't see your screen.  Do you

4   have --

5   A.   It's on there.

6   Q.   -- the deposition?  So let's just -- for the benefit of

7   the witness, let's just go to the top of the page.  I just

8   want to show that this is -- at the first page it says

9   deposition of Mr. Daugherty.  Correct?

10  A.   Yes.

11      MR. MANNING:  And, Judge, I'd like to publish this

12  to the jury because it's -- this is all party statements.

13  It's sworn testimony.  I believe that anything in his

14  deposition would be appropriate to show the jury.

15      THE COURT:  Well, I'm not -- I won't allow that

16  because the deposition itself is not admissible evidence.

17  It is proper to question him on what you perceive to be

18  inconsistent statements.  But, otherwise, that deposition

19  which might also, or that page which might also contain

20  consistent statements is not admissible.

21      So I'll permit you to question him from it, impeach him

22  if that is your intent.  But the deposition isn't

23  admissible.  And, so, I'm not going to permit you to show it

24  to the jury.

25      MR. MANNING:  I understand, Judge.  Thank you.

David Daugherty - Cross (Manning)

1   BY MR. MANNING:

2   Q.   So now let's go to Page 19.  And you'll see,

3   Mr. Daugherty, -- I'm not sure how familiar you are with

4   these documents.  But each page has a page number and on the

5   left-hand column there's a bunch of numbered lines.  And I'm

6   going to ask you to look at Page 19, line 1 where it asks a

7   question, "When did you first determine that your credit

8   report contained information that you wanted to dispute?"

9        And your answer, "I would say it was around October,

10   2013, somewhere in the fall."

11        Do you see that?

12   A.   Yes.  I was wrong.  That statement was wrong.

13   Q.   Okay.  So this sworn testimony is -- you're now saying

14   is incorrect?

15   A.   Yes.  I didn't have the dates in front of me at the

16   time on the timeline.  Yes, I was wrong with that statement.

17   Q.   Okay.  You'd agree that during this deposition you were

18   under oath; right?

19   A.   Yes.

20   Q.   And your testimony now is that that statement is false?

21   A.   That's correct.  That was -- I was wrong.

22   Q.   Okay.

23   A.   It wasn't anything that was intentional.  I was just

24   incorrect.

25   Q.   Thank you.  Next, if we move forward from there,

David Daugherty - Cross (Manning)

1  regarding your Ocwen account, we've already talked about how

2  Equifax was the only credit bureau that was reporting this

3  disputed issue, the duplicative tradeline; right?

4  A.   Yes.

5  Q.   And you hired a company called Aggressive Credit Repair

6  to help you dispute the negative reporting information;

7  right?

8  A.   I was trying to get him to get the record cleaned off.

9  Q.   Aggressive Credit Repair was disputing a number of

10  accounts, not just the Ocwen account; right?

11  A.   He was doing other accounts, yes.

12  Q.   And there were --

13  A.   I'm not -- I didn't know which ones that he was working

14  on.  He did -- now, the Ocwen account, when I realized that

15  was specifically, I was trying to get him to work on it.

16  Q.   Okay.  So you don't know what accounts Aggressive

17  Credit Repair disputed?

18  A.   That's correct.

19  Q.   You hired a company to dispute your credit and then you

20  just let them --

21  A.   I'm going to rephrase that.  There were times where we

22  talked and certain accounts that he was trying to fix,

23  trying to get corrected.  So there were times I knew what

24  accounts that he was trying to correct, and in most cases

25  that he did get corrected.

David Daugherty - Cross (Manning)

1  Q.   And that's because you had other negative reporting

2  information on your credit report unrelated to Ocwen?

3  A.   That's correct.  But it was -- those were -- mostly

4  they were paid and still on there when they should have been

5  taken off.  They were already outdated.

6  Q.   And you hired a company to take care of that --

7  A.   Yes.

8  Q.   -- and dispute those debts?

9  A.   Yes.

10  Q.   Right?  And you didn't tell him what to put in the

11  letter.

12  A.   No.  I had no idea how he did his business as far as

13  getting it --

14  Q.   So you, you hired him and you said, "Go do whatever

15  letter needs to be done."  Is that fair?

16  A.   Yeah.  I had no knowledge of how he corrected accounts.

17  He had also told me that accounts I owed on I needed to pay,

18  which I did.

19  Q.   Have you ever seen the letters that he sent?

20  A.   No.

21  Q.   So you're not aware that he was disputing over 10

22  different accounts?

23  A.   Early on he might have been.

24  Q.   Okay.  Are you aware that the dispute that Aggressive

25  Credit Repair was making were all that --

David Daugherty - Cross (Manning)

1      MR. NOLAN:  Your Honor, I'd object because

2  Mr. Daugherty has testified he's not aware of what the

3  disputes contained.  And Mr. Manning is now testifying for

4  his lack of knowledge.

5      THE COURT:  Any response, counsel, based on his

6  earlier answer?

7      MR. MANNING:  Yes, Judge.  Mr. Daugherty said he

8  did think there were 10 different accounts, at least early

9  on, that were being disputed.  So he has knowledge, at least

10  some.

11      THE COURT:  Mr. Nolan, I believe that that

12  statement is correct.  I'm going to overrule the objection

13  and see where it's going.  But do not let this prevent you

14  from interjecting other objections as we go forward.

15      Go ahead, please, Mr. Manning.  I want to see where

16  you're going from here.

17      MR. MANNING:  And to be honest, Judge, I don't

18  remember what my last question was.  Could the court

19  reporter maybe read it back?

20      (The court reporter read back the previous question,

21  after which the following occurred:)

22  BY MR. MANNING:

23  Q.   -- were all that the account was not yours and you were

24  never late?

25  A.   I wasn't aware of that.

David Daugherty - Cross (Manning)

1    Q.   Did you have any discussions at any point with Lorin

2    Hanks or anyone from Aggressive Credit Repair as to what to

3    say the dispute was?

4    A.   No.

5    Q.   So you never told him what the dispute -- you just let

6    him dispute whatever --

7    A.   I did --

8    Q.   Let me just finish my question.

9    A.   I'm sorry.

10   Q.   You never told him what the dispute.  You just let him

11   dispute whatever accounts were reporting negatively; right?

12   A.   No, that's not true, not with the Ocwen account.

13   During my deposition it kept getting pointed out to me that

14   on the report showing April 26th your associate kept

15   pressing the good line item from Ocwen loans.  And I kept

16   telling them that it was listed twice.  And I told Lorin

17   Hanks the same thing.  That -- because Lorin had called me

18   up and told me he got Ocwen to fix that account.  And I told

19   Lorin, no, it's on there twice.

20   Q.   Okay.  You don't know whether Mr. Hanks --

21   A.   So I did -- the answer is I did have some knowledge

22   with that particular account because I instructed him there

23   was still a problem with it because it was listed twice.

24   Q.   All right.  I'd just like you to focus on my question.

25   A.   Okay.

David Daugherty - Cross (Manning)

1  Q.    You don't know what Mr. Hanks wrote on your behalf when

2  it disputed the Ocwen account and other accounts?

3  A.    That's correct.

4  Q.    You don't know whether he ever said there's a

5  duplicative tradeline being reported; right?

6  A.    I don't know first-hand, no.

7  Q.    You didn't undertake to even look at the letter to

8  ensure that it said that; correct?

9  A.    I never had that opportunity.

10  Q.    Okay.  Well, he worked for you; right?

11  A.    He was in Utah is where he works out of.  But, no, he

12  never sent dispute letters on what he actually told them,

13  any of the companies.

14  Q.    So all you know is you had conversations with him.  You

15  gave him access to your credit report.  And then he wrote a

16  whole series of letters, but you never looked at any of

17  them?

18  A.    That's correct.

19  Q.    And you don't know -- I mean, you're here today to talk

20  about an Ocwen duplicative account and you don't know

21  whether he ever put that in the letter; right?

22  A.    That's correct.

23  Q.    You have no evidence whatsoever --

24  A.    He was told to.

25  Q.    You have no evidence whatsoever that he sent a single

David Daugherty - Cross (Manning)

1   letter that identified, quote/unquote, duplicative

2   tradelines; right?

3   A.   I don't know that first-hand, no, sir.

4   Q.   And you have no knowledge that Mr. Hanks even knew that

5   there was a duplicative tradeline being reported; right?

6   A.   Not until I told him.

7   Q.   And despite your testimony here today that you told him

8   that, you never undertook to ensure that he actually put it

9   in a letter that was being sent to Equifax to dispute it;

10  right?

11  A.   Well, I paid him monthly.  I trusted that he would do

12  what I told him to do.

13  Q.   And, similarly, he never put in a letter to Ocwen the

14  words "duplicative tradeline" or identified duplicative

15  tradeline or gave a credit report; right?

16  A.   Not in writing.

17  Q.   Okay.  You mentioned conversations with Mr. Hanks.  He

18  told you that there were multiple problems with your credit

19  report; right?

20  A.   Yes.

21  Q.   And you didn't know exactly what he was doing to help

22  dispute or correct those problems?

23  A.   If you would go back and rephrase your last question to

24  make sure we're on the same page on that if you would,

25  please, that I answered that correctly.

David Daugherty - Cross (Manning)

1    Q.    Okay.

2    A.    When you say multiple problems, what do you mean by

3    multiple problems?  Problems that he sees that he can fix?

4    Is that what you're stating?

5    Q.    I thought you answered "yes," but if you're not sure,

6    I'll re-ask it.

7    A.    I'm saying that there was problems that he saw that he

8    could fix.  If you mean it that way, yes.

9    Q.    Okay.  Let me try it this way to make sure we're on the

10    same page.

11    A.    Okay.

12    Q.    Were you told by Aggressive Credit Repair, this company

13    that you hired, that there were multiple issues with your

14    credit reports that were negatively impacting your scores?

15    A.    Yes.

16    Q.    And by "multiple" we mean not just Ocwen.  There's

17    other problems with your credit.  Right?

18    A.    I had medical bills early on, yes.

19    Q.    And my next question -- I just want to make sure we're

20    still on the same page -- was you don't know what Aggressive

21    Credit Repair was doing exactly to try to fix that because

22    you never saw any of the letters?

23    A.    That's correct.

24    Q.    Do you know as you sit here today how often Aggressive

25    Credit Repair was sending out letters?

David Daugherty - Cross (Manning)

1   A.   It sent so many a month.  I don't know -- I assume just

2   once a month is what I assumed.  I'm not sure.

3   Q.   Okay.  So the answer is you don't know?

4   A.   I'm not sure.  Yes, that's correct.  I'd get responses

5   once a month.

6   Q.   You talked about how you were asked at your deposition

7   about a letter from Aggressive Credit Repair; right?

8   A.   Repeat that, please.

9   Q.   Sure.  I believe while we were talking here today you

10  said, "I remember being at a deposition and being asked

11  about the letter, or at least a letter that Aggressive

12  Credit Repair sent on my behalf."  Do you remember that?

13  A.   Which, which letter are you talking about, please?

14  Q.   Let me, let me put it up on your screen.

15  A.   Sure, sure.  I'm a little lost.

16  Q.   Okay.  So, Mr. Daugherty, on your screen there's a

17  letter that's addressed to Equifax with a number of

18  different accounts.  And if you scroll all the way to the

19  bottom you'll see that it's, it has your name and your

20  address, your date of birth, and your Social Security

21  number.

22  A.   Yes.

23  Q.   Do you see that?

24  A.   Yes.

25  Q.   Is that correct?

David Daugherty - Cross (Manning)

1   A.    I see this, yes.

2   Q.    Okay.  Did you prepare this letter?

3   A.    No, I did not.

4   Q.    Do you know who prepared it?

5   A.    Lorin Hanks as far as I know.

6   Q.    Okay.  So Lorin Hanks prepared this letter on your

7   behalf.  And this is one of the letters that you're

8   referring to in your deposition testimony -- I'm sorry --

9   your testimony here today earlier that he sent on your

10  behalf?

11  A.    Yes.

12  Q.    All right.  So in this letter I count one, two, three,

13  four -- 12 different accounts that Aggressive Credit Repair

14  is disputing on your behalf; is that right?

15  A.    Yes.

16  Q.    And those are all accounts that were reporting negative

17  information that was affecting your credit score and causing

18  it to be low; right?

19  A.    Yes.

20  Q.    And --

21  A.    That was early on.  These were all -- most of those

22  should have been taken off because they were outdated.

23  Q.    So you had conversations with Mr. Hanks about this and

24  you at least knew that he was going to be disputing a number

25  of the accounts.  You just didn't know which ones or what

David Daugherty - Cross (Manning)

1  the letter would say.

2  A.   I didn't know which ones were first or that he was

3  going to be disputing.  He told me the ones that had

4  balances like the West Asset Management, which was all

5  medical bills and I had quite a few of those.  He told me

6  that, you know, that's something you have to pay, which I

7  understood.

8  Q.   Okay.  And you didn't have any input into the creation

9  of this letter?

10  A.   No.

11  Q.   So, then, I'm not going to ask you anything else about

12  it.  We'll take that one down.  Okay.

13       So we talked a little bit during your direct

14  examination with your plaintiff's attorneys about how you

15  had, at least I think you said three conversations with

16  Ocwen.

17  A.   Yes.

18  Q.   And you were told -- were you told by Ocwen that you

19  were not being furnished data as being late in the months of

20  June, July, October, and December?  Do you remember that?

21  A.   Repeat the --

22  Q.   Yeah.  It's a difficult question.  I'm sorry.  Let me

23  try it again.  So let's think back to the, one of the

24  exhibits that we looked at earlier where you had given that

25  excerpt from your credit report with that one Ocwen account.

David Daugherty - Cross (Manning)

1    A.    Yes.

2    Q.    And it had four months that you were disputing.

3    A.    Yes.

4    Q.    Okay.  And those four months were June, July, October,

5    and December of 2013; right?

6    A.    Correct.

7    Q.    And when you talked with Ocwen, Ocwen on the phone

8    confirmed with you that you were not being reported as late

9    by Ocwen.  It wasn't giving that data to anybody.  Right?

10   A.    They told me that.  But at the same time in that

11   conversation is when I told them that it was still being

12   listed.  And I believe the conversation we're talking about

13   is like March 17th, 2013.  And we, we discussed the problem

14   on the phone with it being listed twice.

15   Q.    Okay.  And you don't have any record, voice recording,

16   or anything of that conversation?

17   A.    No.  But how many times do I need to talk to them over

18   the same issues?

19   Q.    Well, I think you said you talked to them a total of

20   three times.

21   A.    Actually, I believe it was more than just three times,

22   but three that you showed on the record.

23   Q.    Okay.  So let's go to your deposition testimony.  And

24   before we go there, I want to make sure I have your answer

25   clear.

David Daugherty - Cross (Manning)

1    Were you told by Ocwen that it was not giving any

2    information to the credit bureaus that you were late in the

3    months of June, July, October, and December of 2013?

4    A.    They were telling me I was current.

5    Q.    Okay.  And you don't have any evidence to show that

6    Ocwen was giving anybody information that you were late in

7    those months; right?

8    A.    They were telling me I was current and I was telling

9    them it was still coming up on their account that I was

10   late.

11   Q.    And you can't point to any documents or any evidence

12   that shows Ocwen was furnishing data to any of the credit

13   bureaus that you were late in those months?

14   A.    No, I can't show that.

15   Q.    Did, did Ocwen inform you that the issues with you

16   being reported as late by Equifax in 2013 were the result of

17   something Equifax was doing?

18   A.    They were blaming them from the start.  They, they --

19   and even when I would ask them to fix it, they would not

20   help at all.

21   Q.    Okay.  Well, when you say that Ocwen wouldn't help at

22   all, you'd agree they wrote you back; right?

23   A.    Well, a letter telling me that, that they investigated

24   it doesn't help me any.  The only thing that's going to help

25   me is if they'd actually correct the record that's being

David Daugherty - Cross (Manning)

1   shown on the credit report.

2   Q.   All right.  Let's, let's -- I'll put this up if you

3   need it.  But do you recall the Plaintiff's Exhibit 5, the

4   CFPB letter in which Ocwen says, "We have reported to all

5   four credit agencies your current balance"?

6   A.   Yes, I remember that.

7   Q.   So they also went on to say Ocwen is unable to control

8   when the credit reporting agencies will update their

9   records; right?

10  A.   I understand that.  When it's their line item, you

11  would think they'd want to go back and have it fixed,

12  especially when it's affecting somebody like they were doing

13  me.

14  Q.   But do you have any understanding that Ocwen doesn't

15  control these other companies and what they're reporting?

16  A.   Repeat that.

17  Q.   Do you have any understanding that Ocwen, my client,

18  the furnisher that is responsible for your mortgage loan,

19  doesn't control what any other business says about your

20  loan?  It can only give accurate data about your loan.

21  Right?

22  A.   That's what they might say.

23  Q.   Do you understand that?

24  A.   I, I understand.

25  Q.   And you'd agree with that.  We can't control other

David Daugherty - Cross (Manning)

1    companies.

2    A.   I don't believe that.  That I don't agree with.  I

3    think that if that's your line item, your company and your

4    company's being, is saying -- or they may not be saying but

5    it's actually being reported your company is saying I'm late

6    all them days, I think it's your responsibility to make sure

7    it's fixed.

8    Q.   But you've just told me that Ocwen never said you were

9    late in those months.

10   A.   They told me that over the phone.  But at the same

11   time, I'm telling them, yes, they are reporting me.  I am

12   being reported late on the report.

13   Q.   But the information that Ocwen had given wasn't wrong;

14   right?

15   A.   I, I don't know that for a fact.

16   Q.   Okay.  Thank you.

17            THE COURT:  Counsel, how much longer on your

18   cross?  That's not to rush you.  I just want to know.

19            MR. MANNING:  Quite a bit, Judge.

20            THE COURT:  All right.  Then I want to recess for

21   the evening.  We'll pick up in the morning as you move to

22   another area.  Is that agreeable?

23            MR. MANNING:  Yeah.  I'm just about to change

24   subjects, but I -- it's going to be a while.

25            THE COURT:  And that's what I'm saying.  As you

1    move to another area, this is a good time to recess for the

2    evening.

3              MR. MANNING:  Absolutely.

4              THE COURT:  Ladies and gentlemen, I'm going to

5    recess you for the evening.  While you're out, do not

6    discuss this case among yourselves or permit anyone to

7    discuss it with you or in your presence.  Do not listen to,

8    view, or read any media coverage that there might be of the

9    trial.  Have a good restful evening and I'll see you all at

10   9:00 tomorrow morning.

11        We'll stand in recess.

12        (Trial recessed at 5:00 p.m.)

13

14

15

16

17

18

19

20

21

22

23

24

25

1          I, Lisa A. Cook, Official Reporter of the United

2    States District Court for the Southern District of West

3    Virginia, do hereby certify that the foregoing is a true and

4    correct transcript, to the best of my ability, from the

5    record of proceedings in the above-entitled matter.

6

7

8          s\Lisa A. Cook                    June 5, 2016

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25