IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA
AT BECKLEY

TRANSCRIPT OF PROCEEDINGS

```
----------------------------x
                            :
DAVID M. DAUGHERTY,         :          CIVIL ACTION
                            :          NO. 5:14-CV-24506
        Plaintiff,          :
vs.                         :
                            :
OCWEN LOAN SERVICING, LLC,  :          May 17, 2016
                            :
        Defendant.          :
                            :
----------------------------x
```

TRIAL
VOLUME II

BEFORE THE HONORABLE IRENE C. BERGER
UNITED STATES DISTRICT JUDGE

APPEARANCES:

For the Plaintiff:              MR. RALPH C. YOUNG
                                MR. JED ROBERT NOLAN
                                MR. STEVEN R. BROADWATER
                                Hamilton Burgess Young &
                                Pollard
                                P.O. Box 959
                                Fayetteville, WV  25840-0959

APPEARANCES (Continued):


For the Defendant:               MR. JASON E. MANNING
                                 MR. JONATHAN M. KENNEY
                                 Troutman Sanders
                                 Suite 2000
                                 22 Central Park Avenue
                                 Virginia Beach, VA  23462

                                 MS. SARA L. MARKERT
                                 1661 WORTHINGTON ROAD
                                 Suite 100
                                 West Palm Beach, FL  33409


Court Reporter:                  Lisa A. Cook, RPR-RMR-CRR-FCRR


Proceedings recorded by mechanical stenography; transcript
produced by computer.

I N D E X

PLAINTIFF'S WITNESSES:                                    PAGE

**DAVID DAUGHERTY**
     Cross Examination (By Mr. Manning) . . . . .  4
     Redirect Examination (By Mr. Nolan)  . . . .  39


**LATONYA MUNSON (BY DEPOSITION)**
     Direct Examination . . . . . . . . . . . .  70
     Cross Examination  . . . . . . . . . . . .  87


**STEVEN NAPIER (BY DEPOSITION)**
     Direct Examination . . . . . . . . . . . .  145
     Cross Examination  . . . . . . . . . . . .  165
     Redirect Examination . . . . . . . . . . .  166
     Recross Examination  . . . . . . . . . . .  168
     Re-Redirect Examination  . . . . . . . . .  169

**EVAN HENDRICKS**
     Direct Examination (By Mr. Nolan)  . . . . .  172
     Voir Dire Examination (By Mr. Manning) . . .  177
     Direct Examination (By Mr. Nolan)  . . . . .  179
     Cross Examination (By Mr. Manning) . . . . .  212

David Daugherty - Cross (Manning)

1          P R O C E E D I N G S

2          THE COURT:  Good morning, everyone.

3      Mr. Manning, are you ready to resume cross-examination?

4          MR. MANNING:  Yes, Your Honor.

5          THE COURT:  All right.

6      Mr. Daugherty, if you would take the stand, please.

7      **DAVID DAUGHERTY, PLAINTIFF, RESUMED THE WITNESS STAND**

8          MR. MANNING:  May I proceed, Judge?

9          THE COURT:  Yes, sir.

10                  CROSS EXAMINATION

11 BY MR. MANNING:

12 Q.   Good morning, Mr. Daugherty.

13 A.   Good morning.

14 Q.   We're going to continue with my examination now.

15 A.   Okay.

16 Q.   And I want to start by going through two of the

17 documents we didn't get a chance to talk about yesterday, if

18 we could start with Plaintiff's Exhibit 3.

19      So let's scroll to the top just so that you can see

20 what document this is.  This is the March 18th, 2013,

21 response letter from Ocwen.  It's been marked as Plaintiff's

22 Exhibit 3.  And you may recall that yesterday during your

23 examination with Mr. Nolan you, you seemed to suggest that

24 Ocwen got it wrong, that it addressed the wrong time period.

25 A.   That's correct.

David Daugherty - Cross (Manning)

1  Q.   That's your position; right?

2  A.   Yes.

3  Q.   Okay.  So let's just scroll down just so we can see

4  what Ocwen said.  And you see how -- concern number one,

5  that's the concern that they understood you to be making;

6  right?

7  A.   That's what they're saying in their response letter.

8  Q.   Okay.  And it says March, 2012.  And then below that it

9  addresses what was happening in 2012.  That's the subsequent

10 paragraphs; right?

11 A.   Yes.

12 Q.   And I took your testimony to mean you weren't

13 complaining about 2012.  You were complaining about

14 something else.

15 A.   That's what they understood on the phone too.  We

16 talked about currently.

17 Q.   Right.  And I just want to for now focus on what you

18 were intending to mean.  You were -- they were addressing

19 2012 and you thought that you had told them something else;

20 right?

21 A.   No, that's what I told them, currently.

22 Q.   In the letter?

23 A.   Yes.  No, on the phone and in the letter.

24 Q.   Okay.  On the phone and in the letter?

25 A.   Yes.

David Daugherty - Cross (Manning)

1    Q.    This is a response to the letter; right?

2    A.    Yeah, I would imagine it is.

3    Q.    Okay.  So let's look at the letter, Exhibit 2.  It was

4    the one right before this.  This is the letter that you had

5    sent regarding your concern regarding the account; right?

6    A.    Yes.

7    Q.    And you see at the top right-hand corner it doesn't

8    have a date; right?  It just says March 14, 20- and then

9    blank.  Did you just omit that?

10   A.    I don't know if it got cut off or what, what happened

11   there.

12   Q.    Well, if you follow it down on the right-hand margin

13   you can see the word "as" is actually further out.  You'd

14   agree with that; right?

15   A.    Okay.  Something happened where it didn't come across.

16   Q.    Okay, yeah.  That's fair.  If you go to the second

17   page, this is what you were asking Ocwen to address; right?

18   A.    Yes.

19   Q.    Okay.  If you look at the bottom where it identifies

20   the time period, it's relatively small.  You can see the

21   years 2010, 2011, 2012.  Right?

22   A.    Yes.

23   Q.    So in your letter -- you do a cover letter and you say,

24   "Address this issue."  You don't say anything about the time

25   period.  And then you attach this excerpt, an incomplete

David Daugherty - Cross (Manning)

1  credit report, just an excerpt from something; right?

2  A.    That's correct.

3  Q.    And then you say, "Address this."  But there's nothing

4  in here about 2013.

5  A.    I see that.

6  Q.    So when you sent this, you said, "Please address this,"

7  it only goes up through 2012.  You'd agree with that; right?

8  A.    Yes, that's what this states.

9  Q.    So when Ocwen received the letter and responded to it,

10  you can understand why they would have responded to 2012

11  because that's what you asked them to do in the letter;

12  right?

13  A.    In the letter, that's correct.

14  Q.    Okay.  Thank you.  Now let's go to the next letter,

15  Plaintiff's Exhibit 4.  You recall talking about this letter

16  yesterday also; right?

17  A.    Yes.

18  Q.    So the last exhibit, Exhibit 2, was March, 2013, when

19  you sent it.  And this one is March, 2014; correct?

20  A.    That's correct.

21  Q.    And there's no letters in between that you've

22  identified; right?

23  A.    No letters in between.

24  Q.    Okay.  So there's a whole year where you're not sending

25  any written correspondence ever since you said, "Look at

David Daugherty - Cross (Manning)

1    2012;" right?

2    A.    I believe I disputed some on the credit report as far

3    as the credit score.

4    Q.    Okay.  And by that I take it you mean you asked a third

5    party, Lorin Hanks, --

6    A.    No.  There's actually a dispute process on some of the

7    credit scores on the -- that you can look up that keeps your

8    credit.  You can actually dispute, and I disputed some of

9    those on there too.

10   Q.    Okay.  That's the first I've heard of it.  You didn't

11   talk about that with your attorney during trial; right?

12   A.    Not during trial, but I'm just saying I thought maybe

13   some of those 2009 was in that, but I did dispute on the

14   credit score.  It has a place -- when you look it up,

15   there's a place where you can dispute.  I believe there's

16   some on there.

17   Q.    I'm not following you.  So this is a different dispute

18   that you made with a different company, creditscore.com?

19   A.    Yes, I believe that's the one.

20   Q.    Okay.  But they're not in this case; right?

21   A.    No.

22   Q.    And they're not here to testify?

23   A.    That's correct.

24   Q.    And you don't have any documents from them?

25   A.    No.

David Daugherty - Cross (Manning)

1  Q.   Okay.  So let's just focus on this letter.  And this

2  letter is the one where in this situation it's been a full

3  year since you've sent anything to Ocwen; right?

4  A.   According to you, yes.

5  Q.   I'm asking for your testimony.

6  A.   I'm saying I disputed other matters.

7  Q.   Okay.  And you've just identified -- and correct me if

8  I'm wrong.  You've just identified those other disputes or

9  it was somebody else?

10  A.   Yeah, but I'm saying I did it.

11  Q.   And I understand that.  My question to you, sir, is for

12  a full year you're not sending any written communication to

13  Ocwen; correct?

14  A.   Personally, that's correct.

15  Q.   Okay.  And when you say "personally," --

16  A.   I myself.

17  Q.   You yourself did not do that?

18  A.   That's correct.

19  Q.   You hired a company who was separately doing something

20  and you didn't look at those letters either?

21  A.   That's correct, to my knowledge.

22  Q.   All right.  Now, in this letter what you're talking

23  about, if you look towards the bottom, is you're talking

24  about the 2013 reporting period; right?

25  A.   Yes.

David Daugherty - Cross (Manning)

1    Q.    You're saying Equifax -- and I don't want to belabor

2    this.  We went over it yesterday.  You're complaining

3    Equifax is still showing a past due in 2013; right?

4    A.    That's correct.

5    Q.    No mention of a duplicative tradeline in this letter?

6    A.    No.

7    Q.    So in response to this, do you recall saying that Ocwen

8    provided a response, and in that response it said it had

9    sent an automated universal data update?  Do you remember

10   that?

11   A.    Repeat that, please.

12   Q.    So let me make sure we're talking about the same

13   terminology.  You're aware of an AUD, or an AUD, a universal

14   data form that updates to all the credit bureaus?

15   A.    Correct.

16   Q.    You remember talking yesterday how in response to this

17   letter in March, 2014, Ocwen received it and then sent out

18   an update to all the credit bureaus; right?

19   A.    That's, that's what I understood.

20   Q.    So, again, in response to this letter, Ocwen is

21   responding to your concerns and doing something to update

22   all the other credit bureaus?

23   A.    No, I don't agree with that because I'm telling them

24   it's still on there.

25   Q.    I understand.  But you, you talked about yesterday how

David Daugherty - Cross (Manning)

1  you know that Ocwen doesn't control what these third-party

2  companies, the credit bureaus report; right?

3  A.   Well, according to -- the reason this letter even came

4  about, according to the lady from consumer credit, she told

5  me Ocwen can clear this up in less than 24 hours taking this

6  off my report.

7          MR. MANNING:  I'm going to object to that

8  statement as hearsay, Judge, and move to strike.

9          THE COURT:  Any objection, Mr. Nolan?

10          MR. NOLAN:  No, Your Honor.

11          THE COURT:  All right.  I sustain that objection.

12      And, ladies and gentlemen, I order that you not

13  consider that portion of his answer that indicated what he

14  was told by the other person.

15      Go ahead, please.

16          MR. MANNING:  Thank you, Judge.

17  BY MR. MANNING:

18  Q.   Mr. Daugherty, what I'm -- my client's Ocwen and I'm

19  asking you about what you told Ocwen and what Ocwen did.

20  You understand that; right?

21  A.   Yes.

22  Q.   Okay.  In response to this letter where you identified

23  these concerns and said, "Equifax is still doing something

24  wrong.  Please help."  Right?

25  A.   That's correct.

David Daugherty - Cross (Manning)

1   Q.   Ocwen did that by responding and updating not just

2   Equifax, but all the credit bureaus; right?

3   A.   Well, you say you did.  You're telling me they did.  I

4   don't agree with it that they did it correctly, no, because

5   they're still on there.

6   Q.   Okay.  And the basis for you saying that is because

7   Equifax kept doing it?

8   A.   No.  The basis I'm saying that I keep -- I just can't

9   call Equifax.  Go look up a number.  You have to sit there

10  and write them each time.  It takes six weeks to hear back

11  from them.

12       I'm saying that I got Ocwen on the phone on this

13  March 17th call, I believe that's when it was, and I'm

14  telling them that it's still on there and it kept getting

15  worse as 2013.  They just kept piling it on through all of

16  2013.

17  Q.   "They" being Equifax?

18  A.   No.  Well, it's being -- it's coming on the Equifax

19  report, but it's Ocwen's name on it.

20  Q.   Okay.  And, again, sir, you understand that Ocwen is a

21  separate business and doesn't control what Equifax does;

22  correct?

23  A.   I, I believe it's going to come out that when it's

24  their name on it, they are going to be.

25  Q.   My question to you is, do you personally understand it?

David Daugherty - Cross (Manning)

1    A.    I don't agree with it.

2    Q.    Okay.  Do you know?

3    A.    I'm just saying I don't agree with it.  I feel it's

4    going to come out it won't be agreed with either.

5    Q.    Let's look at the response just so that --

6    A.    Okay.

7    Q.    -- you can see it.  It's Plaintiff's Exhibit 5.  And

8    you recall talking about this yesterday; right?

9    A.    Yes, I remember.

10   Q.    This is the response from Ocwen to your prior letter

11   that we just looked at?

12   A.    Sure.

13   Q.    And Ocwen addresses those concerns and says, "We've

14   taken action.  We are sending --" I'm sorry.  On March 21st,

15   the third paragraph, 2014, "Our office submitted a request

16   to the four major credit reporting agencies, Equifax,

17   TransUnion, Experian, and Innovis, to reflect the current

18   balance of the loan in the amount of $80,499.78."  And then

19   it goes on to provide a confirmation number; right?

20   A.    That's correct.

21   Q.    So did you ever look that number up?

22   A.    No, no, I did not.

23   Q.    So there's a reference that you can track it if you

24   were interested to do so; right?

25   A.    I wasn't aware of that.

David Daugherty - Cross (Manning)

1    Q.    You see it in the letter?

2    A.    I see it in the letter, yes, but I wasn't aware of

3    anywhere where I could go track it.

4    Q.    And then below that it says, as I believe you've just

5    testified, "Unfortunately Ocwen is unable to control when

6    the credit reporting agencies will update their records."

7    Right?

8    A.    That's correct.

9    Q.    And as far as you know --

10   A.    Well, I'm going to rephrase that.  According to what I

11   was told, they could.

12   Q.    Okay.  And we're not going to ask about hearsay

13   statements.  I'm just asking for your knowledge.  Okay?  In

14   the interim, Ocwen also volunteers that you may use this

15   letter, right, saying that, "We've updated the account to

16   all the credit bureaus?"  Do you see that?

17   A.    I'm having trouble finding it here.

18   Q.    Sure.  It's the last sentence of the same -- too much.

19   Last sentence of the same paragraph we were just looking at.

20   It begins, "In the interim."

21   A.    Oh, yes, I see that.

22   Q.    Okay.  Can we scroll down?

23        You recall, Mr. Daugherty, that this is the one that

24   has a couple of subsequent responses embodied in it?  Right

25   there.  Okay.  Thank you.  So this is the comment that you

David Daugherty - Cross (Manning)

1   made regarding what was happening on the account; right?

2   A.   Yes.

3   Q.   And you identify that it's March, 2014, and in four

4   months you've got this balloon note due, so the full balance

5   is owed?

6   A.   Yes.

7   Q.   You identify the balance.  And it goes on to describe

8   about halfway down, "I am usually getting monthly reports

9   from Experian, but a couple weeks ago I ordered credit

10  reports from all three reporting agencies."  Do you see

11  where I'm reading?

12  A.   Yes.

13  Q.   And that's -- you're referring there to the

14  creditscore.com; right?

15  A.   Yes.

16  Q.   And it goes on to say, "Equifax shows on my credit

17  report that I was late on my mortgage payment by 120 days in

18  March, June, July, October, and December of 2014."  Do you

19  see that?

20  A.   I see that.

21  Q.   That's incorrect; right?

22  A.   That's incorrect.

23  Q.   Okay.  So here's another example where you're giving

24  information to Ocwen and telling them to investigate

25  something and you're giving them the wrong information;

David Daugherty - Cross (Manning)

1  right?

2  A.   That date is wrong on that letter, but they've received

3  letters just like it with the correct date on it.

4  Q.   And I'm asking you about this letter.

5  A.   That, that date is wrong.  January, 2014, it showed me

6  120 days late which also isn't on there.

7  Q.   Okay.

8  A.   So there was one in 2014.

9  Q.   So the information that you identified as being wrong

10  in 2014 is inaccurate in this letter?

11  A.   That's correct.

12  Q.   You sent this letter in March, 2014, and it -- I mean,

13  obviously we can't know what's going to happen in the

14  future; right?  So there's -- it's fair to say that Ocwen

15  understood that you intended 2013 because they responded

16  that way?

17  A.   They --

18         MR. NOLAN:  Your Honor, he's asking Mr. Daugherty

19  to speculate about what Ocwen understood.  Ocwen can testify

20  about what it understood at a later time.

21         THE COURT:  That objection is sustained, Mr.

22  Manning.

23         MR. MANNING:  I'll rephrase.

24  BY MR. MANNING:

25  Q.   This letter is about 2014.  Ocwen responded about 2013.

David Daugherty - Cross (Manning)

1    Right?

2    A.    I believe so.

3    Q.    So even though you put in the wrong information, Ocwen

4    addressed the 2013 issue; right?

5    A.    I'm not sure if they addressed that or not.  I don't

6    think they did because it was never taken off.

7    Q.    Okay.  And, again, let's go back up to the first piece.

8    You see where Ocwen is talking about 2013; right?

9    A.    Okay.

10   Q.    Because that's the relevant period of time even though

11   you identified a different period of time; right?

12   A.    Yes.

13   Q.    Okay.  Thank you.  There's nothing attached to this

14   letter; right?

15   A.    That's correct I believe.

16   Q.    And there's no subsequent letters?

17   A.    I believe that's correct.

18   Q.    Okay.  So we've talked about a March, 2013, letter;

19   then a year goes by; a March, 2014, letter; and then this

20   subsequent letter?

21   A.    Yes.

22   Q.    Those are your written communications with Ocwen?

23   A.    And they also had my phone number.  Their research

24   department could have called me.

25   Q.    Okay.  And we can talk about calls.

David Daugherty - Cross (Manning)

1   A.    If they wanted to investigate, they could have called

2   me.

3   Q.    Right now I'm just trying to understand all the

4   universe of your written communications with Ocwen.  We've

5   identified three.  The information you're providing is

6   inaccurate on all three.  Correct?

7   A.    I see on two.

8   Q.    We talked about this creditscore.com briefly in

9   response where you say you had recently -- if we could go

10  back down to Mr. Daugherty's entry where you identified that

11  when you ordered the credit reports from all three, that's

12  the creditscore.com report that you're referring to; right?

13  A.    Yes.

14  Q.    You're, you're aware that your creditscore.com report

15  is not prepared by Equifax; right?

16  A.    That's correct.

17  Q.    Again, creditscore.com --

18  A.    That's the name of the company.

19  Q.    We've been talking about roles a lot.  Creditscore.com

20  is a separate business?

21  A.    That's correct.

22  Q.    And what they purport to do is to gather the

23  information from those three credit bureaus, Experian,

24  Equifax, and TransUnion; right?

25  A.    Yes.

David Daugherty - Cross (Manning)

1  Q.   And then put it into a report, and that's how you get

2  it?

3  A.   That's correct.

4  Q.   But you don't know how creditscore.com prepares that

5  report?

6  A.   No, I would not.

7  Q.   You don't know if it's accurate or not?

8  A.   Well, I should know if it's accurate or not by looking

9  at it I would think.  I would know where I stood on each one

10  of those accounts.

11  Q.   What I'm asking you is because you don't know how

12  creditscore.com gathered that information or prepared that

13  document, you don't know what that document is representing

14  as those three other businesses are showing is accurate or

15  not.  You're just taking it at face value.

16  A.   You're taking it at face value.  But if you see an

17  inaccuracy, it's right there for you to dispute.

18  Q.   Let me re-ask the question.

19  A.   Okay.  We're not on the same page on this because it

20  should be correct when you look at it.

21  Q.   I understand your testimony to be it should be correct

22  and you should be able to rely on it because creditscore.com

23  is providing you something.  My question to you, sir, is you

24  don't know yourself whether it's accurate or not because you

25  don't know how it was prepared?

David Daugherty - Cross (Manning)

1   A.    Yeah.  I do not know how they prepared it.  That's

2   correct.  But when I look at it, it should be correct.

3   Q.    And you didn't undertake to compare a credit report

4   from Equifax itself with creditscore.com.  You were relying

5   on creditscore.com, a third party; right?

6   A.    That's correct.

7   Q.    And all of this dispute focuses on what Equifax is

8   reporting, but you never even undertook to obtain the credit

9   report directly from Equifax; right?

10  A.    Well, when everybody -- when all the other refinance

11  companies are showing me and telling me that it's in there,

12  I'd have to take creditscore.com's word that it's correct.

13  Q.    Okay.  And you may be reasonable.  My question to you,

14  sir, is you didn't undertake to obtain the Equifax credit

15  report direct even though they're the ones that you had the

16  problem with?

17  A.    I sent complaints to Equifax also.

18  Q.    Okay.

19  A.    If I sent them to Equifax, they should sit there and

20  send one back saying it, and they always come back that it's

21  correct.

22  Q.    Sir, I believe the question is a "yes" or "no"

23  question.

24  A.    Okay.

25  Q.    Let me re-ask it.  At any point did you undertake to

David Daugherty - Cross (Manning)

1  actually obtain your credit report from Equifax and compare

2  it to the credit score which you were relying on?

3  A.   No, I didn't buy a credit report specifically from

4  Equifax.

5  Q.   Thank you, sir.  We'll talk briefly about the

6  creditscore.com report.  Do you recall being asked about

7  that in your deposition?

8  A.   Yes.

9  Q.   Do you recall being shown a creditscore.com credit

10  report dated April 17th, 2014, that had scores from those

11  three credit bureaus and the Experian score was higher than

12  the Equifax score?  I'm sorry.  I said that wrong.  The

13  Equifax score was higher than the Experian score.  Do you

14  recall that?

15  A.   I, I'd have to be -- I've seen so many forms, I can't

16  really say I recall that.

17  Q.   Sure.  So let's go to your deposition, Page 77.  Oh,

18  yes.  We're going to take this off publishing just so I can

19  show him his deposition.  Thank you.  Okay.

20       So you'll see here, sir, on Page 77 and it's line -- it

21  begins the discussion around line 10 where it talks about,

22  "We're going to turn back to the creditscore.com report."

23  And then it says -- if we go to Page 38 of the

24  creditscore.com report, it gives you your three credit

25  scores.  Right?

David Daugherty - Cross (Manning)

1    MR. NOLAN:  Your Honor, I'm going to object to the

2    use of the creditscore.com report.  Mr. Manning has

3    proffered that there were reliability issues potentially

4    with this report.  It's a hearsay document.  It's not

5    admitted into evidence.  It's not admitted as an exhibit.

6    And any reliance on it through the deposition is misplaced

7    at this point.

8         THE COURT:  You all come to the bench, please.

9       (Bench conference on the record)

10        THE COURT:  It hasn't been published to the jury;

11   is that correct?

12        MR. NOLAN:  That's correct, Judge.

13        THE COURT:  Mr. Manning, you are using it to

14   question the witness.  Tell me where you're going with that.

15        MR. MANNING:  To refresh his memory.  He had this

16   report.  The date -- it's the same report that I just asked

17   him about.  He was asked about it in his deposition and the

18   same date.  And I was going to ask him about whether he

19   recalled the scores of that being shown on that document.

20   And it was discussed in his deposition.  I'm not going to

21   admit it.

22        MR. NOLAN:  Your Honor, this --

23        THE COURT:  I'm sorry.  It's your position that

24   there is something there that's inconsistent with his

25   testimony here today?

David Daugherty - Cross (Manning)

1       MR. MANNING:  Yes.

2       THE COURT:  What you're impeaching him with from

3   his deposition?

4       MR. MANNING:  Correct.

5       THE COURT:  I'm sorry.  Go ahead, Mr. Nolan.

6       MR. NOLAN:  I apologize, Your Honor.  You know, we

7   can withdraw our objection.  I would just note that this

8   sounds eerily similar to the arguments they're making about

9   the Equifax documents which they have not disclosed this

10  credit score report under 26(a) at any point.

11      They're using it to impeach the witness, and I think we

12  intend to use the Equifax reports at a later date with

13  Ocwen's witness for the same purpose as we move forward on

14  this today.

15      THE COURT:  All right.  You trailed off and I

16  thought you were done.  I apologize for the interruption.

17      MR. NOLAN:  I'm sorry.

18      THE COURT:  If the witness was questioned during

19  the deposition using this document and if he has given

20  inconsistent testimony -- I don't have the advantage of

21  having seen the deposition testimony.  But if he has given

22  inconsistent testimony today, I'm going to overrule the

23  objection because I believe it would be appropriate

24  impeachment under those circumstances.

25      MR. NOLAN:  Yes, Your Honor.

David Daugherty - Cross (Manning)

1              MR. MANNING:  At this point, Your Honor, I just

2    want it to be clear we're not seeking to admit this.

3              THE COURT:  You've said that.  Even I understand

4    that, Mr. Manning.

5              MR. MANNING:  Okay.  For impeachment purposes you

6    don't have to list exhibits.  You can use anything to

7    impeach.

8              MR. NOLAN:  That's correct.  I agree.

9              THE COURT:  I don't need a lesson on impeachment.

10   I've already ruled that you're able to use it.  But in order

11   for there to be an inconsistency, the same question has to

12   have been asked and an inconsistent answer been given here.

13       So if you had not used this document with him during

14   the course of the deposition and you're using it now, it

15   would not be proper impeachment.  That's the reason I asked

16   if it had been used.

17             MR. MANNING:  Yes.

18             THE COURT:  I overrule the objection, preserving

19   the plaintiff's objection --

20             MR. NOLAN:  Yes, Your Honor.

21             THE COURT:  -- and exception.

22       Counsel, one more thing here before I forget.

23       Ms. Brown, would you join us here at the bench, please.

24             (Juror Lindsay Brown approached the bench.)

25             THE COURT:  I don't want to single you out and

David Daugherty - Cross (Manning)

1    embarrass you.  You have a graduation this evening?

2            JUROR LINDSAY BROWN:  It's at 6:00.

3            THE COURT:  All right.  If we can adjourn at 4:00,

4    does that help you?

5            JUROR LINDSAY BROWN:  Yes, ma'am.  I think even

6    4:30 I would be fine.

7            THE COURT:  Okay.  I wanted to let you all know

8    because it happened outside of your presence and the

9    bailiff, court security officer after trial yesterday let me

10   know that Ms. Brown had a nephew graduating and she wanted

11   to attend at Pipestem.  And, so, we'll adjourn at 4:00.

12           JUROR LINDSAY BROWN:  Thank you.

13           THE COURT:  I don't want you speeding.

14           JUROR LINDSAY BROWN:  Okay.  Thank you.

15           THE COURT:  All right.  Thank you all.

16           (Bench conference concluded)

17   BY MR. MANNING:

18   Q.   Mr. Daugherty, you have in front of you the deposition

19   transcript.  You can confirm now that you were asked about

20   the creditscore.com report that you obtained that was dated

21   April 17th, 2014; correct?

22   A.   Yes.

23   Q.   And during your trial testimony yesterday you said you

24   didn't recall what the scores were; right?

25   A.   That's correct.

David Daugherty - Cross (Manning)

1   Q.   And here the question asked is:  "So the Experian score

2   is actually lower than the Equifax and TransUnion scores."

3   Do you see that?

4   A.   Yes.

5   Q.   And then your answer, sir, can you read that?

6   A.   Yes, they showed that to me.  I said I understood.

7   Q.   And your answer was, "Yes, I do."

8   A.   I understand that.

9   Q.   Okay.  So in your deposition you confirmed, based on

10  your creditscore.com report, that the Experian score, which

11  is not reporting anything wrong as far as you're concerned,

12  was lower than the Equifax and TransUnion scores; right?

13  A.   Yes.  I think that was after the liability was put on

14  there with the state, the lien with the state.

15  Q.   Thank you.  During your testimony with Mr. Nolan you

16  talked about how at a point in time after the lawsuit was

17  filed Equifax stopped reporting on the Ocwen account; right?

18  A.   Yes.

19  Q.   And that was -- the date you provided was

20  September 23rd, 2014; right?

21  A.   That's correct.

22  Q.   So that's the point at which the issue that you had

23  with the, with the Equifax credit report and the duplicative

24  tradeline with Ocwen was no longer an issue?

25  A.   That's correct.

David Daugherty - Cross (Manning)

1  Q.  But you still didn't qualify for refinance; right?

2  A.  Yes, I was pre-approved.

3  Q.  That wasn't until February, 2015; correct?

4  A.  That's correct.

5  Q.  Okay.  So the score came -- the bad report by Equifax

6  that you're complaining about came off with the duplicative

7  tradeline September, 2014, but you didn't receive approval

8  for a refinance until February, 2015; correct?

9  A.  That's correct.

10  Q.  So even though it was corrected by Equifax at this

11  point, you still weren't able to qualify for refinance?

12  A.  They knew about this lawsuit.

13  Q.  Okay.  I don't think that's responsive to my question,

14  sir.  September, 2014, the issue with Equifax is resolved,

15  but you personally are still unable to obtain financing;

16  correct?

17  A.  Yes.

18  Q.  So at that point, the full balance is owed by you to

19  Ocwen; right?

20  A.  Yes.

21  Q.  And that became due in the end of July of 2014?

22  A.  That's correct.

23  Q.  And you had testified that you understood that you had

24  to make the full payment, the full balance amount?

25  A.  That's correct.

David Daugherty - Cross (Manning)

1    Q.    And you understood that because you saw the note and

2    Ocwen reminded you about it; right?

3    A.    Yes.

4    Q.    Okay.  And during your testimony with Mr. Nolan you

5    said you tried to pay.  And I wanted to clarify that.  You

6    didn't try to pay the full amount; correct?

7    A.    No.  I tried to pay until this was all taken care of.

8    I wanted to go ahead and continue payments until this was

9    resolved.

10   Q.    You talked about letters that you received from Ocwen

11   giving you instructions about how to make that full balance

12   payment when it was due; right?

13   A.    Yes.

14   Q.    For identification purposes I'd like to --

15   A.    They didn't give me instructions.  They just said that

16   I'd have to have refinancing or pay it in full was the two

17   choices.

18   Q.    So they didn't give you any instructions on how to --

19   A.    Well, I mean, I guess you could consider that as

20   instructions.  They gave me two choices.

21   Q.    Thank you.  I'd like to show you one of those letters

22   for identification purposes.  If we could put up the Ocwen

23   letter, February 5th, 2014, for the witness only at this

24   point.

25          You'll see in this letter, Mr. Daugherty, that the

David Daugherty - Cross (Manning)

1    subject line has "balloon letter" and it's addressed to you

2    at your residence; right?

3    A.   Yes.

4    Q.   And the first paragraph -- and it identifies the loan

5    number.  That's the correct Ocwen loan number, just one

6    loan; right?

7    A.   I see the number.

8    Q.   And in the first paragraph it states, "This letter is

9    to notify you that your loan is due to mature on July 26th,

10   2014."  Correct?

11   A.   That's correct.

12   Q.   It goes on to state, "We are providing you notice of

13   the upcoming maturity date to allow you sufficient time to

14   secure alternate financing for your loan."  Do you see that?

15   A.   Yes.

16   Q.   "This loan must be paid in full on or before the

17   maturity date."  Correct?

18   A.   That's correct.

19   Q.   "Only the total payment will be accepted once the loan

20   matures."  Correct?

21   A.   Yes.

22   Q.   "We will not accept any mortgage payments beyond the

23   maturity date."  Right?

24   A.   That's what it says, but they did.

25   Q.   Those are all instructions that Ocwen provided to you

David Daugherty - Cross (Manning)

1  about when this is all due, you have to pay the full amount;

2  right?

3  A.   That's correct.

4  Q.   And they gave you this notice, at least this letter,

5  five months before -- over five months before it became due?

6  A.   That's correct.

7  Q.   And then it goes on to describe towards the bottom of

8  the letter, "Your final payment should be made payable to

9  Ocwen Loan Servicing and be mailed or delivered to the

10 following address," and it gives an address.   Right?

11 A.   Yes.

12 Q.   This was not able to be paid on-line; right?

13 A.   That's what it says.

14 Q.   So trying to make payments on-line wouldn't work

15 according to this letter; right?

16 A.   It says the final payment, but they took an extra

17 payment.

18 Q.   Okay.  And you also said that they stopped accepting

19 any payments; right?

20 A.   Yes.

21 Q.   And this letter explains why, because the full balance

22 was owed and they had told you they weren't going to --

23 A.   Well, the person that wrote this letter probably didn't

24 know what was going on with this account too.

25 Q.   I'm sorry, sir.  I hadn't finished my question.

David Daugherty - Cross (Manning)

1   A.   I'm sorry.

2   Q.   If you could wait for me to finish.

3   A.   Sure.

4   Q.   According to this letter, you understood that the full

5   balance was due and there were no further scheduled payments

6   after that; right?

7   A.   Not in that case because I knew there was a problem

8   with this.  I was hoping this was going to be addressed and

9   that's why I was going to go ahead and keep making payments

10  until it got addressed so I could secure financing.

11  Q.   You've already said that even after Equifax removed it,

12  you couldn't get financing; right?

13  A.   I was pre-approved for financing until this, the red

14  flags came up where Ocwen added another $15,000 in interest

15  to it and they saw the lawsuit and then it was stopped.

16  Q.   Okay.  Tell me if you're changing your testimony, sir.

17  You said you were not pre-approved by Quicken Loans until

18  February, 2015; correct?

19  A.   Yes.

20  Q.   You're not changing that testimony; right?

21  A.   I'm trying to go by what they had told me.

22  Q.   Okay.  So the first time you got that approval after

23  Equifax corrected its problem September, 2014, was October,

24  November, December -- five months later; right?

25  A.   That's correct.

David Daugherty - Cross (Manning)

1  Q.   Now, even after you obtained that pre-approval from

2  Quicken Loans, you still didn't pay Ocwen the balance that

3  was due all the way back in July, 2014; correct?

4  A.   That's correct because it was held up with this

5  lawsuit.

6  Q.   But you don't dispute the debt itself?

7  A.   I don't dispute the debt, no.

8  Q.   You --

9  A.   I don't dispute any debt that I've had.

10 Q.   You owe it and you haven't paid it and you know you

11 need to pay it; right?

12 A.   I know I need to pay it.  I sure would have appreciated

13 some help fixing it so I could get the refinancing.  That's

14 all I had requested all along.

15 Q.   You've already agreed that everything was fixed by

16 September, 2014, but you still even today, over a year and a

17 half later, haven't paid off that loan; correct?

18 A.   That part is correct.  But it goes right back to where

19 even with the One Community Bank financing, if they would

20 have given me a letter saying that all this was, was wrong

21 on my report, One Community would have gone ahead and given

22 me the financing.

23 Q.   That's speculation on your part; right?

24 A.   No, it's not speculation.  It's what they told me.

25 Q.   Okay.

David Daugherty - Cross (Manning)

1          MR. MANNING:  Objection, move to strike, Judge.

2  It's hearsay.

3          THE COURT:  Counsel.

4          MR. NOLAN:  Your Honor, it's responsive to the

5  question that he was asked.

6          THE COURT:  I overrule the objection, Mr. Manning.

7  And I overrule it based on the question before the last

8  question.

9          MR. MANNING:  Okay.

10          THE COURT:  In other words, you were asking

11  whether or not there was a basis for his answer, and that's

12  the basis that he gave to you.

13          MR. MANNING:  Let me try it this way.

14  BY MR. MANNING:

15  Q.   We can all agree, Mr. Daugherty, that Equifax's problem

16  with the duplicative tradeline had been corrected by Equifax

17  September, 2014.  You were unable to obtain financing until

18  February, 2015.  And even after you got that 2015

19  pre-approval letter, even today, a year and a half later,

20  you haven't paid off Ocwen's loan; correct?

21  A.   Yes, I have not paid that loan off.

22  Q.   Thank you.  During the time period that you were

23  claiming Equifax was reporting something wrong on your

24  account and you told Ocwen and Ocwen confirmed, "We're not

25  furnishing any data that you're late --" you recall that

David Daugherty - Cross (Manning)

```
 1   testimony; right?

 2   A.   Repeat that again, please.

 3   Q.   Okay.  I was just trying to orient you.  I'm trying not

 4   to redo yesterday.  So yesterday you talked about how you

 5   were complaining about the Equifax credit reporting of this

 6   duplicative tradeline that had the wrong information.  And

 7   you talked with Ocwen about it, and Ocwen confirmed to you

 8   both on the phone and in writing, "Ocwen is not furnishing

 9   any data to the Credit Bureau that you're late in those

10   months."  Correct?

11   A.   They were saying that they're in the clear on this.

12   Q.   Okay.

13   A.   And I was saying they weren't.

14   Q.   During those months when you were being reported as

15   late on this second tradeline with Equifax, you weren't

16   receiving default letters from Ocwen; right?

17   A.   No.  They were telling me on the phone that I was

18   clear, and I was telling them that I wasn't clear on the

19   credit reports.

20   Q.   And you had been in default with your Ocwen loan

21   before, so you knew that when you're unable to pay on time

22   they send you a notice that says you're past due; right?

23   A.   That's correct.

24   Q.   And during those months when Equifax separately is

25   reporting something wrong, Ocwen isn't sending you any
```

David Daugherty - Cross (Manning)

1    letters saying you're late; right?

2    A.    That's correct, but I'm telling them they are, or it's

3    coming out that way.

4    Q.    From Equifax; correct?

5    A.    I'm saying it's on my credit report.

6    Q.    Thank you.  Now, yesterday there was some testimony

7    that -- we talked about the three letters.  And you also

8    said that you had had calls with Ocwen.  And I think your

9    testimony yesterday was at least during one of those

10   calls -- I think you said there were three calls discussing

11   your credit report with Ocwen.  And at least during one of

12   those calls, you told Ocwen about a duplicative tradeline.

13   Is that accurate?

14   A.    I, I believe so.

15   Q.    Okay.

16   A.    I believe I said that yesterday, yes.

17   Q.    So there were three calls --

18   A.    We, we -- the last call that I had with Ocwen is when

19   we went in-depth with different things and we talked about

20   the case situation that I was talking to the person about

21   even though while I was requesting the letters.  But I was

22   trying to explain it and that was included.

23   Q.    So you're claiming that there was a call with Ocwen in

24   which you told somebody at Ocwen that there was a

25   duplicative tradeline on your Equifax report?

David Daugherty - Cross (Manning)

1   A.   Yes.  I was trying to explain the whole situation to

2   the person.  You have to explain -- every time you talk to a

3   different person, you end up pretty much saying your whole

4   side about what's going on to try to make them understand.

5   Q.   You don't have any memory or knowledge of who you

6   talked to or when that call was, do you?

7   A.   I believe that was the one in March of 2014.

8   Q.   Okay.  Do you recall being asked at your deposition

9   whether you ever told anyone about Equifax reporting a

10  duplicative tradeline?

11  A.   No, I don't remember.

12  Q.   Okay.  Let's look at the deposition.  So for the

13  witness's sake, can we just show him the page number?  Page

14  31 from your deposition, sir.

15       And if we go to the section where, a little above that,

16  there you go, the question is:  "Do you know if either you

17  or Aggressive Credit Repair did anything to tell Ocwen that

18  the account was appearing twice, that the Ocwen account was

19  appearing twice and should not be?"  Do you see that

20  question?

21  A.   Yes.

22  Q.   Your answer, sir, "I did explain that to Lorin Hanks

23  and he supposedly was going to send a letter trying to

24  dispute that being on there twice for the same account."  Do

25  you see that?

David Daugherty - Cross (Manning)

1   A.   Yes.

2   Q.   We've already talked about how you had nothing to do

3 with the letters and they don't show a disputed duplicative

4 account, but you weren't involved with that; right?

5   A.   That's correct.

6   Q.   Okay.  And then the following question:  "So you

7 explained to Lorin Hanks that the Ocwen account was

8 appearing twice.  Did you explain that to anyone else?"  Do

9 you see that?

10   A.   I see that.

11   Q.   Okay.  And then your answer, sir:  "I'm trying to

12 think.  I think I might have explained it to Consumer

13 Financial, a lady there."  That was your answer; right?

14   A.   Yes.

15   Q.   You were referring to the Consumer Financial Protection

16 Bureau?

17   A.   Yes.

18   Q.   The following question is:  "And was there anyone

19 else?"  Do you see that question?

20   A.   I see that.

21   Q.   And your answer is, "I don't believe so."  Right?

22   A.   That's correct.

23   Q.   Let's go to the top of this deposition, the first page,

24 so that you can see the date, June 17th, 2015.  So this was

25 already a while ago, almost a full year ago; right?

David Daugherty - Redirect (Nolan)

1  A.   Yes.

2  Q.   And that would have been a full year closer to whatever

3  alleged conversation you had with Ocwen than today; right?

4  A.   Yes.

5  Q.   And you never said you told Ocwen during your

6  deposition despite being asked; right?

7  A.   That was something I slipped up on.  I just don't -- at

8  the time when I was trying to think of one thing, I forgot

9  the other.

10 Q.   In fact, sir, the first time you ever said that was in

11 trial; right?

12 A.   That's -- yeah, that's the first time it really came up

13 after this.

14 Q.   Let's go to Page 4 of the deposition.  So the bottom of

15 this page, do you recall being asked, "This is the

16 opportunity for my client to find out what you know, what

17 your testimony will be at trial.  And this is a deposition,

18 which means that it's taken under oath.  So you're swearing

19 that everything you say is true and accurate to the best of

20 your knowledge."

21      And your answer is, "Yes;" correct?

22 A.   Yes.

23 Q.   You understood that --

24 A.   That's correct.

25 Q.   -- this deposition a year ago was my client's

David Daugherty - Redirect (Nolan)

1   opportunity to hear your full testimony and you never

2   told --

3   A.   That's correct.

4   Q.   -- Ocwen --

5   A.   There's times -- when you're trying to think at

6   different times where you're under pressure, there's times

7   you forget things.

8   Q.   And over a year ago, which is much closer to that, you

9   never said it happened; right?

10  A.   That's correct.

11  Q.   Now, let's turn to Page 89.  This is at the end of the

12  deposition.  At the conclusion of your questioning during

13  your deposition the question was asked:  "Do you have any

14  other testimony today to support your claims other than what

15  you've already told me?"  Do you see that question?

16  A.   Yes.

17  Q.   And your answer is, "No, I don't."

18  A.   That's correct.

19  Q.   Thank you.  I have no further questions.

20              THE COURT:  Redirect of this witness, Mr. Nolan?

21              MR. NOLAN:  Thank you, Your Honor.

22                      REDIRECT EXAMINATION

23  BY MR. NOLAN:

24  Q.   Okay.  Mr. Daugherty, on your screen we have what has

25  been admitted as Exhibit Number 2; correct?

David Daugherty - Redirect (Nolan)

1    A.    Yes.

2              MR. NOLAN:  May we go ahead and publish this?

3    BY MR. NOLAN:

4    Q.    And now there's a question about when this was sent

5    because the date -- you input March 14th, 20- was not filled

6    out.  Was there any other way to identify the date this

7    document was transmitted?

8    A.    It's right there at the top, March 14th, '13.

9    Q.    There's a fax transmittal.  When was the --

10   A.    At 8:36 p.m.

11   Q.    At 8:36 p.m., down to the minute, okay.  So in your

12   letter again you state, "I am currently behind."  Correct?

13   A.    That's correct.

14   Q.    Do you state anything in your letter about 2012?

15   A.    No.

16   Q.    Now, Ocwen was concerned that your attachment which

17   again -- when was this transmitted?

18   A.    March 14th, '13.

19   Q.    This was clearly attached to the document you sent?

20   A.    Yes.

21   Q.    Ocwen was concerned that you only attached this single

22   page to your dispute.

23   A.    Yes.

24   Q.    Why did you only attach one page to your dispute?

25   A.    That was the only one that was incorrect.

David Daugherty - Redirect (Nolan)

1  Q.   Did you think Ocwen needed to have additional pages

2  about --

3  A.   I don't think they needed to see the correct ones.  It

4  was the one that was incorrect I wanted fixed.  And that's

5  just the first month.  I had all throughout the rest of the

6  year month after month after month.

7  Q.   And, so, in your letter you said, "I am currently

8  behind."

9  A.   I'm currently, yes.

10  Q.   It says, "I'm currently behind."  And then the document

11  Equifax pointed out ends in 2012; correct?

12  A.   Yes.

13  Q.   So when the investigator reviewed this document, when

14  did you get a call to follow up about that issue?

15  A.   I never did get a call to follow up with it.

16  Q.   They never called you?

17  A.   No.

18  Q.   They were concerned about this issue?

19  A.   Supposedly.  I didn't see that.

20  Q.   Did they send you a letter asking you to follow up

21  about --

22  A.   No.

23  Q.   -- what you said currently and maybe 2012?

24  A.   No.

25  Q.   They never contacted you in 2013 about this letter?

David Daugherty - Redirect (Nolan)

1    A.    No, not about this letter.

2    Q.    Before responding about 2012?

3    A.    No.

4    Q.    I want to move back to -- this was Exhibit Number 4.

5    This is the second letter you sent to Ocwen; correct?

6    A.    That's correct.

7    Q.    And, again, can we identify when this was sent?

8    A.    March 19th, 2014.

9    Q.    And that's because you faxed it in?

10   A.    Yes.  I believe I also -- I sent this in by registered

11   mail too.

12   Q.    And Ocwen again asked you -- they were concerned

13   because there was only a partial credit score report here;

14   correct?

15   A.    Yes.

16   Q.    Why didn't you attach the other documents of the credit

17   score report?

18   A.    Because they were correct.

19   Q.    Were you disputing --

20   A.    I'm only disputing the negative things that was wrong

21   that was causing the whole problem with the refinancing.

22   Q.    And then to help Ocwen identify your specific dispute

23   again you directed them to what you were disputing at that

24   point?

25   A.    Yes.

David Daugherty - Redirect (Nolan)

1   Q.   And, again, when Ocwen got this partial report, if they

2   were concerned, they called you; right?

3   A.   I never did receive a call.

4   Q.   Their investigator sent you a letter asking you to

5   follow up?

6   A.   Their research department never did follow up.

7            MR. MANNING:  Objection, leading.

8            THE COURT:  The objection to leading is sustained,

9   Mr. Nolan.

10  BY MR. NOLAN:

11  Q.   Did anyone ever contact you from the research

12  department?

13  A.   No.

14  Q.   I direct your attention now to what is Exhibit Number

15  5.  Now, again, Ocwen was concerned in your letter that you

16  sent to them -- this was your complaint to them?

17  A.   Yes.

18  Q.   Your complaint -- can you again state what your

19  complaint was to Ocwen?

20  A.   My complaint was that they had my report wrong.

21  Q.   In what ways?

22  A.   They had me 120 days late March, June, July, October,

23  and December.

24  Q.   And, now, you sent this to the CFPB in March, 2014; is

25  that right?

David Daugherty - Redirect (Nolan)

1    A.    Yes.

2    Q.    And what's the date you put on the, on your letter?

3    A.    I'm trying -- I'm having trouble seeing it here.

4    Q.    Ocwen was concerned you put the date 2014 on your

5    letter; correct?

6    A.    Yes.

7    Q.    Now, obviously, December, 2014, hadn't come to pass yet

8    at this point; correct?

9    A.    No.

10   Q.    So when Ocwen got this dispute with the date that

11   obviously doesn't make sense, when did they contact you to

12   clarify this issue?

13   A.    They, they did not contact me.

14   Q.    They never wrote you to follow up about this issue?

15   A.    No.

16   Q.    You never got a call from an investigator?

17   A.    I never got called.

18   Q.    Once again, please describe -- identify all the

19   disputes you make about your tradeline in this letter.

20   A.    Could you repeat, please?

21   Q.    Please identify every issue you identified to the CFPB

22   in this letter for us.

23   A.    Well, I, I explained to them that my house has a

24   balance of $80,000 and the house has a value of $165,000,

25   and that I'll have to refinance my house to keep my house.

David Daugherty - Redirect (Nolan)

1    And I explained to them that we had some bad financial

2    times a few years ago and that we recently have been all

3    about getting my accounts paid off.  I even hired a credit

4    repair company to try to help.  I'm not getting very good

5    responses with the financial companies due to the reports.

6    Q.   Can you focus in for us on the specific issues with

7    your tradeline from Ocwen that you were having -- that you

8    identified in this letter?

9    A.   Okay.  The specific issues was the 120 days late March,

10   June, July, October, and December and January, 2014.  And

11   that's probably -- I must have left out January for some

12   reason.

13   Q.   And you also identified a past due amount; correct?

14   A.   Yes.  They showed I was currently past due $6,178.

15   That says 78 dollars.

16   Q.   Okay.  So we looked at this response from Ocwen, and

17   Ocwen's quite proud that they sent a form updating your

18   balance due.  Does this response address the issues you

19   raised in your letter?

20   A.   No.

21   Q.   What issues did Ocwen fail to address in this response?

22   A.   They didn't address any of the issues that I had.

23   Q.   So rather than investigating and contacting you, what

24   did they do?

25   A.   They basically sank me.  I felt like I was a ship going

David Daugherty - Redirect (Nolan)

1   down and they was the anchor.

2   Q.    Explain that.

3   A.    With, with everything I was trying to do to try to get

4   this fixed, it just seemed like I wasn't receiving any help

5   from Ocwen whatsoever with this being their name on the

6   credit line.

7            MR. NOLAN:  This hasn't been admitted as an

8   exhibit yet.  I apologize.  If we could mark this for

9   identification purposes as Plaintiff's 10 I believe.

10  BY MR. NOLAN:

11  Q.    Now, this is the letter we just looked at with Ocwen

12  from February, 2014.  Do you recall reading this letter?

13  A.    Yes.

14  Q.    What letter was this?

15  A.    This is the balloon letter notifying me that the loan

16  was going to mature July 26th, 2014.

17  Q.    And Ocwen sent you this letter?

18  A.    Yes.

19  Q.    And you received it in the mail?

20  A.    Yes.

21           MR. NOLAN:  Your Honor, I would move the admission

22  of Plaintiff's Exhibit Number 10.

23           THE COURT:  Any objection, Mr. Manning?

24           MR. MANNING:  No objection.

25           THE COURT:  Plaintiff's Exhibit Number 10 will be

David Daugherty - Redirect (Nolan)

1  admitted into evidence without objection and can be

2  published.

3           MR. NOLAN:  May we publish it, please?

4  BY MR. NOLAN:

5  Q.   Now, you received this letter February, 2014; correct?

6  A.   Yes.

7  Q.   Did you need a reminder that you had a balloon note

8  coming due?

9  A.   I didn't need a reminder, no.  I was already concerned

10  about it.

11  Q.   You read the line that Ocwen will not accept any

12  mortgage payments beyond the maturity date; correct?

13  A.   Yes.

14  Q.   Was that true?

15  A.   No.  They accepted one more.

16  Q.   They disregarded their own statement?

17  A.   Evidently.

18  Q.   Okay.  And, so, we were looking at your deposition.  We

19  can remove the publication at this point.  Let's make sure

20  we get the complete record.

21       On Page 45 do you recall being asked, "So you never

22  told Ocwen directly that the account was appearing twice in

23  your Equifax credit report; correct?"  And what was your

24  response?

25  A.   "Not until later."

David Daugherty - Redirect (Nolan)

1  Q.   So during the deposition you did tell them "not until

2  later"?

3  A.   Yes.

4  Q.   Okay.  But we didn't see that in the cross-examination

5  of you?

6  A.   No, we didn't see that.

7  Q.   But you did let them know?

8  A.   Yes, it is in this deposition after all.

9         MR. MANNING:  Objection, leading, Judge.

10        THE COURT:  The objection to leading is sustained,

11 Mr. Nolan.

12 BY MR. NOLAN:

13 Q.   Mr. Daugherty, is the stress that you suffered in this

14 case related directly to credit denial?

15 A.   Absolutely.

16        MR. MANNING:  Objection.  This is outside the

17 scope of the cross.

18        MR. NOLAN:  Your Honor, the cross --

19        THE COURT:  Response, counsel.

20        MR. NOLAN:  -- introduced multiple credit denials

21 asking the effect of those on him.  And I think this goes to

22 reaffirm that the damages are beyond those of just credit

23 denials at this point.

24        THE COURT:  I sustain the objection based on my

25 recollection of the parameters of cross-examination.

David Daugherty - Redirect (Nolan)

1       MR. NOLAN:  Yes, Your Honor.

2       MR. MANNING:  Thank you, Judge.

3   BY MR. NOLAN:

4   Q.   I just want to ask one more time.  How many times did

5   Ocwen contact you during the period of March, 2013, to July,

6   2014, when you're disputing this account?

7   A.   They never did.

8   Q.   They never followed up.

9       MR. NOLAN:  That's all I have, Your Honor.

10      THE COURT:  You can step down.

11      (Witness stepped aside.)

12      THE COURT:  Call your next witness.

13      MR. BROADWATER:  Your Honor, at this time we'd

14  like to read the deposition transcript of Latonya Munson

15  into the record.  We've already provided a copy to defense

16  counsel stating what we would not read so we can get through

17  it a little faster.

18      THE COURT:  All right.  Mr. Manning.

19      MR. MANNING:  Judge, this is the Equifax issue.

20      THE COURT:  Uh-huh.

21      MR. MANNING:  And we object to any portion of it

22  being read because it's not relevant, untimely, and it

23  shouldn't be admitted for any purpose.

24      THE COURT:  All right.

25      Ladies and gentlemen, I'm going to give you a brief

1    recess.  While you're out, do not discuss this case among

2    yourselves or permit anyone to discuss it with you or in

3    your presence.  And please be in your jury lounge at 20

4    minutes after the hour.  We'll stand in recess for your

5    purposes.

6         (Jury retired to the jury room at 10:07 a.m.)

7              THE COURT:  All right, counsel, this testimony, as

8    I recall, has to do with the ACDVs that the defendant has

9    objected to as not previously being disclosed or identified

10   as exhibits, and also based on hearsay.  There was an

11   objection to my permitting the deposition in this particular

12   case if it's the witness that I'm thinking of.

13        And I take it, Mr. Young, that you have something that

14   you want to present on the issue.

15             MR. YOUNG:  Yes, Your Honor.  I want to present

16   two things before I ask the Court to rule upon the

17   admissibility of the ACDV reports of the completed

18   investigation which happen to be printed out on the Equifax

19   letterhead as opposed to those printed out on the defendant

20   Ocwen's letterhead.

21             THE COURT:  All right.  I have read the written

22   submissions relative to this issue as well.  Go ahead,

23   please.

24             MR. YOUNG:  Okay.  Now, what I want the -- my

25   portion -- or I'm going to read -- I want to read the entire

1    deposition because I go through all the -- I ring all the

2    bells, jump through all the hoops to properly authenticate

3    the documents.

4        And then the cross-examination takes over and Mr.

5    Manning proves my case for me because he elicits from the

6    witness the fact that these are, in fact, not only what

7    Equifax sent to Ocwen, but these documents also contain the

8    information supplied by Ocwen and sent back to Equifax.  He

9    establishes that very clearly in his cross-examination of

10   the witness.

11       And then before I offer these in evidence, I'm going to

12   offer a portion of the 30(b)(6) deposition which I can

13   designate.  I have designated here wherein the 30(b)(6)

14   witness testifies that the Ocwen -- excuse me -- that the

15   Equifax documents are mirror images of the Ocwen documents;

16   that it's an electronic system; that it's all done through

17   data.

18       And there can be no doubt after reviewing the 30(b)(6)

19   witness deposition that, in fact, these documents are

20   reliable.  They are authentic.  If they don't fall under the

21   business rule exception, they clearly fall under Rule 807

22   which is the residual exception that if something is

23   trustworthy, it ought to be admissible as an exception to

24   hearsay.

25       And I can't address this without addressing the whole

1   issue of candor with the Court.  And that is Ocwen has the

2   counterparts to these documents.  They absolutely have them.

3   Their 30(b)(6) witness assured us that they were in the

4   thousand and some pages of the -- when we went to Virginia

5   Beach to take their deposition we were assured that we were

6   given those.  So we know they exist.

7              THE COURT:  I'm sorry.  You were assured that you

8   were given those by Ocwen?

9              MR. YOUNG:  Ocwen's 30(b)(6) witness.

10             THE COURT:  I just wanted to make sure.  I've read

11  it but I wanted to make sure that that is what you're

12  saying.

13             MR. YOUNG:  Right.  When Mr. Nolan asked, "Where

14  are those?"  She said, "They're in there."  And let me also

15  point out the 30(b)(6) witness --

16             THE COURT:  Does "in there" mean in the documents

17  that were disclosed to the plaintiff?

18             MR. YOUNG:  That's the way we interpret it, Your

19  Honor.  I can read the -- this came from Equifax like I

20  said.  This is Mr. Nolan speaking.  "I don't recall seeing

21  the response form from Ocwen to this specific dispute.

22  Other disputes in here we're going to go over.  Ocwen's

23  response forms are included and attached and we'll go over

24  that as well.  On this specific one, I didn't find that."

25        And he's referring to one of the early ACDVs where we

1  only had the Equifax copy.  We did not have the Ocwen copy.

2  And the witness replied, "It's there."  And clearly in the

3  context she was assuring us that we had already been

4  provided these.

5      And I provided the Court a chart, a color-coded chart

6  which shows that at some point in time starting in April of

7  2014 forward, we have not only the Equifax version of the

8  ACDV, we have the mirror image as the Ocwen version.

9      What I don't have are the Ocwen versions of the first

10  12 ACDVs.  They exist.  They have them.  The Magistrate --

11  Ocwen has them.  Maybe counsel doesn't.  But I even asked

12  the Magistrate Judge to ask Mr. Lynch, Mr. Manning's

13  counterpart during that hearing, "Will you, will you ask Mr.

14  Lynch if he will produce these ACDVs?" to which Mr. Lynch

15  responded "Well, we gave them everything.  We don't know if

16  Ocwen has them."

17      And if they don't have them by now, it's because

18  defense counsel made a strategic decision to remain ignorant

19  on whether they exist or not.  They absolutely exist.  If

20  they won't give them to us, we ought to be able to use the

21  reliable mirror images.

22      And that's why I want to offer the testimony of the

23  witness that authenticated the documents, the

24  cross-examination by Mr. Manning which demonstrates they

25  are, in fact, an Equifax ACDV to which Ocwen responded.

1     And then I want to offer the testimony of the 30(b)(6)

2  witness that actually uses the word "mirror images."  And at

3  that point, I want to move for the admission of those

4  documents.

5     THE COURT:  My understanding, or my

6  recollection -- I just want the record to be clear -- of

7  your asking the Magistrate Judge to make that inquiry of

8  counsel, was his answer not that he did not know whether

9  Ocwen could reproduce them at that point?  Was that not his

10  word as opposed to having them?

11     MR. YOUNG:  He, he -- my, my recollection, Your

12  Honor, is that he said, "We don't know if Ocwen has them or

13  not."

14     THE COURT:  All right.  Anything further?

15     MR. YOUNG:  No, Your Honor.  We just want to offer

16  the foundation so that we can move the admission of these

17  documents.

18     THE COURT:  The initial objection, as I understood

19  it from Ocwen, was that the use of the documents had not

20  been disclosed to the defendant.

21     MR. YOUNG:  Your Honor, we disclosed in the

22  pre-trial, integrated pre-trial order the documents were

23  provided over a year ago to both parties.  We always had

24  them.  Ocwen utilized those documents to cross-examine our

25  client.  We used the documents to examine the 30(b)(6)

1    witness.

2        Moreover, under the -- under Rule 26, supplementing

3    discovery, we have a duty to supplement unless the

4    additional or corrective information has not otherwise been

5    made known to the parties during the discovery process.

6        It's been made known.  It was in the pre-trial order.

7    Everyone's had them and used them freely throughout.  And

8    what we have now, I believe, is an attempt by counsel for

9    Ocwen to essentially say, "Well, they didn't get them.  They

10   didn't move to compel.  So they're stuck and there's nothing

11   they can do about it."

12       But that ignores the fact that we have mirror images of

13   them.  Their 30(b)(6) witness said they were mirror images,

14   and we ought to be able to use the mirror images if counsel

15   won't provide us with the same data printed out on the Ocwen

16   form which is printed out on the Equifax form which we

17   propose to use in lieu of using the Ocwen documents which

18   were never produced, even though their witness told us that

19   they had been.

20           THE COURT:  Mr. Manning, any response?

21           MR. MANNING:  Judge, we -- as Your Honor knows,

22   we've filed written briefs on this.  I'll spare you those

23   and incorporate those by reference.

24       The points I wanted to emphasize is there's been a

25   number of statements by Mr. Young that I believe are

1    inaccurate and I just want the record to reflect that.

2         The record will show what was said at the hearing.

3    What was said at the hearing was Ocwen has produced all

4    available documents.  Mr. Young's statements to the contrary

5    are nothing more than speculation.

6         The discussion at the deposition with the corporate

7    representative was only about one document.  And the

8    representative that -- the March, 2014 -- I'm sorry --

9    March, 2013, ACDV from Equifax.

10        Again, contrary to what Mr. Young said, that was the

11   only document that was actually on, identified on the

12   26(a)(3)s.  That's the only one.  And I want this to be very

13   clear on the record.

14        I have the 26(a)(3) disclosures.  I'm not sure if Your

15   Honor has them.  I can hand them up if you'd like to see

16   them.  They're not on there.  And the rules are very clear

17   that you cannot use at trial anything that you don't

18   disclose timely under 26(a)(3).

19        That's why we have Rules of Civil Procedure.  That's

20   why Your Honor enters orders setting deadlines for the

21   parties to ensure that they comply with.  And your order,

22   ECF 12, goes all the way back to October, 2014.  And in it

23   you state in Paragraph 2, "Please note that disclosures

24   after established deadlines to which an objection is made

25   will," underlined, all caps, bold, "be excluded from

1 evidence unless opposing counsel agree to the untimely

2 disclosure of the Court granting an extension to the

3 deadline."

4   There's no agreement here, Judge.  We've lodged our

5 objections long ago in accordance with Your Honor's

6 scheduling order.  There is no conceivable way that any of

7 this information can be admitted into evidence without it

8 being clear prejudice and harm.  There's zero basis for it.

9   The other rule, 26(e)(1), puts the burden on the

10 plaintiff to supplement or amend their 26(a)(3)s.  And it

11 says under (e)(1) that they have to -- I'm sorry.  It says,

12 "A party who has a disclosure under 26(a) or who has

13 responded to an interrogatory request for production or

14 request for admission must supplement or correct its

15 disclosure or response in a timely manner."

16   Judge, this 26, Rule 26(a)(3) disclosure which was

17 dated back in September, 2015, was never amended.

18 Mr. Young's representation that it's in the pre-trial order,

19 I have that too and Your Honor can look it up.  It's not in

20 there either.

21   This is a classic example of trying to shift blame to

22 somebody else.  The representation at the hearing was all

23 available documents have been produced.  Our representative

24 was asked about one document.  And she believed if it was

25 available, it was in the production.  That's all she was

1    saying.  She's not making any categorical claim about having

2    produced everything.

3        The production was with the plaintiff.  They have the

4    obligation to identify what there is and what there's

5    missing and follow the rules.

6            THE COURT:  Was there an e-mail or a telephone

7    conversation that was quoted in one of the written

8    submissions in which there was a request made for the

9    documents that I believe the plaintiffs indicated there was

10   no response to?  Am I remembering correctly or not?

11           MR. MANNING:  I'm not sure, Judge, but I can tell

12   you that I believe I did talk with Mr. Nolan about it and

13   said, "We've produced everything available."

14           THE COURT:  All right.

15           MR. YOUNG:  May I respond to the Court's inquiry?

16           THE COURT:  Yes, just my --

17           MR. YOUNG:  We did attach as an exhibit an e-mail

18   from Mr. Nolan to Mr. Manning, and I can sort of paraphrase

19   it.  It said, "We -- can you identify the Bates number of

20   the ACDV responses because we can't find them?"  We had no

21   response.

22       Then I sent the letter which was also attached to an

23   exhibit to a previous motion or response to a motion we

24   filed wherein I specified -- I just sort of laid it out

25   chapter and verse that these -- we need the mirror images of

1    what we have.  They weren't given to us.  And I give the

2    specific discrete 16-digit control number for each of those

3    ACDVs.

4         And Ocwen produced them for April, '14 through August,

5    14'.  They never produced them through March '14 -- or March

6    '13 through March '14.  I laid it all out and said, "Here

7    they are," and then this battle has then ensued.

8              THE COURT:  All right.

9              MR. YOUNG:  In fairness, they should have been --

10             THE COURT:  You've answered my question.

11             MR. YOUNG:  I'm sorry.

12        Mr. Manning, go ahead.  I apologize for the

13   interruption.  Go ahead.

14             MR. MANNING:  I don't have the submission.  This

15   is what they filed over the weekend.  But I do have the

16   actual brief.  So Your Honor could look at the actual e-mail

17   or the brief at your convenience.

18        But I have the brief and it says -- the quote in the

19   brief is, "I wanted to see if you could confirm for us the

20   Bates location of the ACDV response form that corresponds to

21   the investigation performed on Bates 1665 at 1:40:46 a.m. by

22   Harish Rao.  It does not appear to have been provided."

23        This is my point, Judge.  They're not giving you the

24   accurate record.  There is one request, one document that

25   was asked about during the deposition.  The witness

1  understandably believed it was in the production.  But it's

2  not because she understood, as we understand, Ocwen provided

3  everything.  The follow-up was on one, that one document.

4      Mr. Young is not accurate in saying the request was for

5  all ACDVs and identify everything.  It's irrelevant.  But

6  the point is I just want to make sure the record is clear.

7  The request was on one.

8      Mr. Young -- Mr. Nolan and I had conversations about

9  not -- "we've given you what's available."  I believe it's

10  true because I don't remember this e-mail.  It's probably

11  true I didn't respond by e-mail.  That doesn't mean we

12  didn't talk about it.

13      And the point is it's irrelevant.  We've given what's

14  available.  You have disclosure deadlines.  You didn't

15  comply.  It's clear prejudice.  You can't have trial by

16  ambush, Judge.

17          THE COURT:  And is it your position, Mr. Manning,

18  that Ocwen does not have those documents?

19          MR. MANNING:  Yes, Judge.  We've talked with our

20  client about it.  They've provided the available documents

21  in their possession.

22          THE COURT:  All right.  You had the Rule 26

23  disclosure you wanted to hand up I believe.

24          MR. MANNING:  Yes, Judge.

25          THE COURT:  All right.  Anything further, Mr.

 1   Manning?

 2              MR. MANNING:  No, Judge.

 3              THE COURT:  Any rebuttal argument, Mr. Young?

 4              MR. YOUNG:  Just -- I want to point out the rule.

 5   Mr. Manning cut it off when he read it.

 6       The disclosure rule clearly provides, 26(e)(1)(a) that

 7   the exception to disclosure is if counsel has been --

 8   otherwise been made known to the other party during the

 9   discovery process or in writing that they intended to use

10   them.

11       And I think we clearly fall within that.  There is no

12   surprise.  There is no ambush.  And the only reason we're

13   trying to use the Equifax version is because the Ocwen

14   version which, at least to the first one, their witness said

15   exists has never been produced.  So we want to use the

16   mirror image.

17              THE COURT:  All right.  This is an unusual

18   situation in terms of the arguments that I read that the two

19   of you have made, the arguments that you have made here in

20   open court.  It is unusual because of the language in the

21   respective rules.  It's unusual given the factual scenario.

22       And when I say the factual scenario, it being unusual,

23   there is an actual production by the defense in this case as

24   to a number of the ACDVs that correspond to the Equifax

25   documents.  And then there are 12 -- for some reason, I was

1    thinking 14.

2         You have argued, Mr. Young, that there are 12 that you

3    have the Equifax corresponding document, but there was no

4    disclosure by the defendant of the Ocwen documents that

5    would correspond to those Equifax documents as there were

6    with the latter group of documents.

7         So it's an unusual situation in that I think it's clear

8    to everyone here that there would, in fact, be Ocwen

9    documents that correspond to those Equifax documents given

10   the way the process works and given the disclosure of the

11   latter documents.

12        With respect first to the Rule 26(a)(3) disclosure,

13   there is a disclosure here by the plaintiff that is only

14   general in nature that the plaintiff may use all documents

15   produced by plaintiff in discovery.

16        There is more general language, "Plaintiff may use

17   other discovery answers, pleadings, and all other documents

18   exchanged in discovery and any and all exhibits listed by

19   defendant if the need arises."

20        The Rule 26(a)(3) disclosure is not as specific, in my

21   opinion, as the rule calls for.  However, again, I think

22   that this is an unusual situation in that when we talk about

23   surprise and we talk about fairness, as has been referenced

24   in the argument by Mr. Manning, it is clear to me from

25   looking at the actual disclosures that all parties know and

1    have known that the ACDVs from Ocwen that correspond to

2    those Equifax documents actually had to have existed or had

3    to have been a part of the process as it was on-going as it

4    involves Mr. Daugherty.

5        I find clearly on the record that the 26(a) rule

6    disclosure does not have the specificity that I want to see

7    and that I believe that the rule perhaps intended.  However,

8    again, because I think this is an unusual situation where

9    everyone is aware that those particular documents had to

10   exist given what's shown in the latter disclosures, it is of

11   no surprise or prejudice to anyone that those documents are

12   missing or that they did, in fact, exist.  They are not

13   unlike other documents except the time frame that's

14   involved.

15       Given the general nature of the 26(a) rule disclosure

16   and given the relatively small number of documents that the

17   parties have disclosed and exchanged in this case, I find

18   that there is no unfair surprise or prejudice with respect

19   to these particular documents.

20       Again, everyone had to know that those ACDVs existed

21   given the other facts that the parties have been aware of

22   and have deposed witnesses on.  There is no unfair surprise

23   or prejudice to the use of these documents.

24       The other issue is we have documents here which is

25   unusual in any discovery case or issue that I have had to

1    rule on previously, documents from Equifax that are the

2    documents that would have been and should have been

3    disclosed by Ocwen.

4         Those, given the process, are the ACDVs, as I

5    understand it, that are electronically sent from Equifax to

6    Ocwen.  Ocwen makes whatever statement or notation it makes

7    after its alleged investigation, and then the document is

8    returned to Equifax.  So both parties have the same

9    documents.

10        So it's an unusual situation where a third party has

11   the exact documents which are missing from the production of

12   Ocwen to the plaintiff and which the plaintiff now desires

13   to use.

14        I again find -- I've reviewed the arguments in your

15   written submissions.  I read the language of the 30(b)(6)

16   representative of Ocwen who indicated by virtue of the

17   testimony that those documents had been disclosed.  They

18   apparently were not included in the production.

19        I don't venture here on the record to indicate why,

20   whether it was something intentional, whether it was not,

21   whether Ocwen had them, lost them, whether Ocwen has given

22   them to their counsel or whether they've not.  I find no --

23   I have no factual basis to make any conclusions about that.

24        But given the process that has been described here,

25   it's clear that the document would have at some point -- and

1    I say "document" only if it's printed out.  It was a

2    computer document that ultimately was sent to Equifax, would

3    have also been in the possession and available to Ocwen.

4         So, again, I find no unfair surprise, although this

5    situation with the documents is a lot messier than it should

6    be under the rules.

7         I find there's no unfair surprise nor prejudice to the

8    use of documents that were obtained from Equifax which were

9    at some point in the possession of Ocwen and which all

10   parties again had to know from the procedure, the process,

11   and the deposition of witnesses existed as counterparts to

12   those Equifax documents.

13        I also will note that it is represented, and I don't

14   believe that it's disputed based on my review, that these

15   very documents were used in deposition testimony.  And it is

16   also my recollection that the deposition testimony that was

17   used as exhibits to the defendant's motion for summary

18   judgment included reference to some of the very same

19   documents.

20        And, so, again everyone's been on notice that these

21   documents were relevant to this case, were material to both

22   parties' position in the case, and it is of no surprise to

23   anyone that the documents existed.  And even though the,

24   quote, disclosure, end of quote, of the Equifax documents

25   has come late, the nature of the documents, the knowledge of

1   the parties regarding the facts of this case, and everyone's

2   dependence on those documents to present both the

3   plaintiff's and the defendant's case tells me again that

4   there is no prejudice to any party in the use of those

5   documents.

6        There is also touched on here by the parties a hearsay

7   issue which I can rule on once I see what the defendant's --

8   or what the plaintiff's evidence is.  But I find that they

9   should be allowed to use the documents which were at one

10  point in the possession of Ocwen which has not been produced

11  by Ocwen.

12       And I also want to note on the record when I consider,

13  Mr. Manning, the entirety of this factual situation, I do

14  not believe there's any prejudice to the defendant or

15  unfairness.

16       But, quite frankly, I think it would, in fact, be

17  unfair for Ocwen to have had these documents, not produced

18  them, and because they didn't produce the very same

19  documents that could be obtained elsewhere not be able to

20  use them.  That I find would be very, very unfair to the

21  plaintiff given the whole scenario here.

22       And, again, it's a messy situation with documents that

23  the rules do not contemplate.  If there is a late production

24  of something that's new, I agree wholeheartedly it should be

25  excluded and it is my practice to exclude it.  Here, though,

1  you all have been working with the similar documents and had

2  to know that these existed given the factual scenario.

3      And, so, I'm going to permit their use, preserving the

4  defendant's objection and exception, and finding not only no

5  unfairness or surprise to the defendant, but finding that

6  there would be unfairness to the plaintiff for Ocwen not to

7  produce them and, therefore, as a result the defendant not

8  be able to use them even though they could obtain the same

9  exact document from a third source.

10     Anything further on that issue before we proceed with

11  the jury?

12         MR. YOUNG:  No, thank you, Your Honor.

13         THE COURT:  Do you all need a break before I call

14  them back in?

15         MR. MANNING:  Judge, may I just make one comment?

16  I understand my objection is preserved, but for clarity

17  purposes, the unfairness isn't the lack of production.  The

18  unfairness is the lack, the failure to identify that they

19  would be used at trial.

20         THE COURT:  Well, I know that that's the

21  defendant's perspective.  I do not -- and I think that I've

22  covered that.  In the disclosure they -- I find there's a

23  disclosure that's general in nature.  It is not specific as

24  the rules would require.  But because you all have been

25  aware that these ACDVs were important and material to this

1    case, I find no, again, unfairness or surprise.

2        So even though this disclosure is not specific, given

3    the limited number of documents that are in use in this case

4    and given everybody's knowledge of how important these were,

5    I do not find any unfairness to the defendant nor any

6    prejudice.

7        Do you all need a break before I call the jury back?

8            MR. MANNING:  One more comment, Judge.  I

9    understand your ruling and I'm not going to belabor it.

10       The second -- the reference to the documents being the

11   same is inaccurate.  If you do a side-by-side of Equifax to

12   the Ocwen, they're not the same.  They contain different

13   information, different format.  And to say that just because

14   Ocwen at one point had it and it's no longer available, that

15   that same document is in the possession, doing the

16   side-by-side comparison you can see on its face that that is

17   not true.

18           THE COURT:  All right.  And to the limited extent

19   that you state that, I think that you're right.  But when we

20   talk about the substance of the use of the documents as they

21   relate to this trial, I do find them to be essentially the

22   same, Mr. Manning.  And I'm done with the issue.

23       Do you all need a recess before I call the jury back?

24           MR. NOLAN:  Yes, please, Your Honor.

25           THE COURT:  All right.  Let's get back here at 10

 1   minutes till the hour.

 2           MR. NOLAN:  Thank you, Your Honor.

 3       (Recess taken from 10:41 a.m. until 10:53 a.m.)

 4           MR. YOUNG:  Your Honor, may I approach the court

 5   reporter?  I wanted to make sure I gave her the proper

 6   transcript.

 7           THE COURT:  Yes, sir.

 8       (Jury returned into the courtroom at 10:55 a.m.)

 9           THE COURT:  You all be seated.

10       I apologize for the delay, ladies and gentlemen.

11       Mr. Young.

12           MR. YOUNG:  Your Honor, plaintiff calls by

13   deposition Latonya Munson.

14           THE COURT:  All right.

15       Ladies and gentlemen, you are about to hear testimony

16   from a deposition where a witness was placed under oath and

17   questioned prior to trial.  And you are to give that

18   evidence the same consideration you would give it if the

19   witness appeared here and testified from the witness stand.

20       In this particular instance, one of the lawyers will

21   ask the questions and the other will give to you the answers

22   that the witness gave during the course of the deposition.

23       Let's go forward, please.

24           MR. YOUNG:  May the Court note that the witness

25   was sworn by the stenographer at the deposition?

```
 1              THE COURT:  Yes, sir.

 2         LATONYA MUNSON, PLAINTIFF'S WITNESS, CALLED BY

 3    DEPOSITION AS FOLLOWS:

 4                        DIRECT EXAMINATION

 5    BY MR. YOUNG:

 6    Q.   "Ms. Munson, this is Ralph Young, counsel for the

 7    plaintiff, who is going to ask the questions at this time.

 8         Did the witness state her full name for the court

 9    reporter?"

10         And the court reporter asked, "Will you state your full

11    name, please?"

12    A.   "Latonya Munson.

13    Q.   Hello, Ms. Munson.  Could you tell me or at least tell

14    the court reporter your business address?

15    A.   I work out of 1100 Abernathy Road in Atlanta, Georgia.

16    Q.   And by whom are you employed?

17    A.   Equifax.  I am employed by Equifax.

18    Q.   And what is your job title or position?

19    A.   My job title is Consumer Research Analyst.

20    Q.   How long have you held that position?

21    A.   I have held this position for 11 years.

22    Q.   In the course of your employment in that capacity with

23    Equifax, have you been called upon to give deposition

24    testimony in the past?

25    A.   Yes, I have.
```

Latonya Munson - Direct

1  Q.   Have you given testimony in that position on behalf of

2  Equifax as it pertains to authentication of Equifax business

3  records?

4  A.   Yes, I have.

5  Q.   Are you familiar with how Equifax compiles and

6  maintains records of credit histories of consumers?

7  A.   Yes, I am.

8  Q.   If a consumer disputes their credit history entry with

9  respect to its credit history, does Equifax have in place a

10  system to address such concerns?

11  A.   Yes.  Equifax has policies and procedures to handle

12  consumers' disputes when they come to question.  Could you

13  rephrase it?"

14        MR. YOUNG:  We're reading across, Mr. Broadwater.

15        MR. BROADWATER:  Oh, okay.

16  A.   "Yes.  Equifax has policies and procedures to handle

17  consumers' disputes when they come to Equifax in regards to

18  information that is reporting on their Equifax credit file.

19  Q.   And in your capacity as an employee of Equifax, do you

20  deal with such consumer disputes on behalf of Equifax on a

21  daily basis?

22  A.   I don't necessarily deal directly with those disputes

23  on a daily basis.  I would deal with disputes that are

24  involving current litigants with Equifax.  To the extent

25  that we receive those on a daily, weekly, or monthly basis,

Latonya Munson - Direct

1   then I would handle those disputes at that time.

2   Q.   I want to ask -- I want to state specifically with

3   respect to this civil action where I represent Mr. Daugherty

4   and the defendant is Ocwen.  Have you reviewed certain

5   Equifax records relating to disputes by or on behalf of

6   Mr. Daugherty which were transmitted to Ocwen?

7   A.   Yes.  I have reviewed disputes that were handled by

8   Equifax on behalf of Mr. Daugherty in regards to the Ocwen

9   account.

10  Q.   When a dispute is received, such as a dispute from

11  Mr. Daugherty, is that dispute transmitted to Ocwen by

12  virtue of a particular form?

13  A.   I'm not sure that I understand your question.  Could

14  you rephrase it?

15  Q.   Does Equifax use the Automated Consumer Dispute

16  Verification system?

17  A.   Yes, Equifax does use the Automated Consumer Dispute

18  Verification database.

19  Q.   And as I understand it, this is generally called the

20  e-OSCAR system?

21  A.   Yes.  That is my understanding as well.

22  Q.   Now, specifically with respect to Mr. Daugherty's

23  account, you have before you Exhibits 1 through 15.

24  A.   I am looking at the documents.

25  Q.   Let's make it a little easier.  Let's look at what has

Latonya Munson - Direct

1   been marked as Equifax Records Deposition Exhibit 1.

2   A.    Okay.

3   Q.    Is Exhibit 1 an Automated Consumer Dispute Verification

4   form?

5   A.    Yes.  Exhibit 1 contains two Automated Consumer Dispute

6   Verification forms.

7   Q.    And is this information transmitted in the normal

8   course of business to Ocwen?

9   A.    Yes.  These ACDVs were transmitted to Ocwen in the

10  normal course of business.

11  Q.    Certainly.  You have before you Exhibit 1 which is two

12  ACDVs.  Do these paper copies actually get transmitted to

13  Ocwen or is it done by computer?

14  A.    It is my understanding that these ACDVs were

15  transmitted through an electronic means and not by paper.

16  Q.    Were the two ACDVs which compose Exhibit 1, or that

17  Number 1 consists of, were they transmitted electronically

18  to Ocwen?

19  A.    Yes, they were.

20  Q.    In the normal course of business, does Equifax receive

21  responses from creditors when Equifax sends an ACDV to that

22  creditor?

23  A.    Yes.  It is customary for Equifax to start the ACDV

24  process and to receive a response from a furnisher if they

25  respond to Equifax in a given amount of time for a

Latonya Munson - Direct

1  re-investigation.

2  Q.    And I want to again refer your attention to Deposition

3  Exhibit 1.  Does Exhibit 1, the two ACDVs contained in that

4  exhibit, does that contain -- do they contain not only the

5  information electronically transmitted by Equifax to Ocwen

6  but do they also contain Ocwen's response back to Equifax?

7  A.    Yes.  Both ACDVs contain Equifax's notification of

8  dispute to Ocwen and Ocwen's response to the ACDVs.

9  Q.    And the two ACDVs which consist of Exhibit 1, were they

10  created and maintained by Equifax in its normal course of

11  regularly conducted business activities?

12  A.    Yes, they were.

13  Q.    And are the two documents contained in Exhibit 1

14  records that would be routinely made and kept in the course

15  of business in the usual practice of Equifax business?

16  A.    Yes.

17  Q.    Were these records made at or near the time the actual

18  event that it reports?

19  A.    Yes, they were.

20  Q.    Was the report or the ACDV made by a person with

21  knowledge or from information transmitted by a person with

22  knowledge and reported such knowledge in the regular course

23  of business?

24  A.    I don't understand the question.

25  Q.    Were the two ACDVs contained in Exhibit 1, were they

Latonya Munson - Direct

75

1   made by someone at Equifax with knowledge of the information

2   contained in those documents?

3   A.   I don't know.  I am sure if these were actually -- I

4   believe these were generated and processed by an agent or a

5   live person.  So, therefore, yes, someone would have

6   reviewed the information to enter into the Automated

7   Consumer Dispute Verification forms."

8        MR. YOUNG:  Mr. Broadwater, you misread the

9   beginning.  Could you re-read that answer because you left

10  out the word "not."

11  A.   "I don't know.  I am not sure if these were actually --

12  I believe these were generated and processed by an agent or

13  a live person.  So, therefore, yes, someone would have

14  reviewed the information to enter into the Automated

15  Consumer Dispute Verification forms.

16  Q.   And the information contained in the two ACDVs which

17  are Exhibit 1, that would be based upon information compiled

18  and maintained in the normal course of business of Equifax.

19  Is that true?

20  A.   Yes, that is true.

21  Q.   What is the source of the information contained in the

22  ACDV as it is transmitted by Equifax to Ocwen, specifically

23  the two that are before the witness at present?

24  A.   The source of the trade information would have come

25  from Ocwen Loan Servicing.

Latonya Munson - Direct

1    Q.    Would you please refer to Equifax Records Deposition

2    Exhibit 2?

3    A.    I have the documents.

4    Q.    Do the two ACDVs that compose Exhibit 2, do they

5    reflect recent information -- excuse me.  Do they reflect

6    information transmitted electronically by Equifax to Ocwen?

7    A.    Yes, they do.

8    Q.    And were these documents created and maintained by

9    Equifax in the normal course of regularly conducted business

10   activity?

11   A.    Yes.

12   Q.    Are these records that are routinely -- excuse me.  Are

13   these records that are routinely made and kept in the course

14   of business and in a business as usual practice?

15   A.    Yes, they are.

16   Q.    Were these records made at or near the time of the

17   event that it reports?

18   A.    Yes.

19   Q.    Let me refer you to Equifax Records Deposition Exhibit

20   3.

21   A.    I have the documents.

22   Q.    Is Exhibit 3 an Automated Consumer Dispute Verification

23   form that's transmitted electronically by Equifax to Ocwen?

24   A.    Yes, it is.

25   Q.    And I meant to ask you this question earlier, but with

Latonya Munson - Direct

1   respect to the three exhibits that you've already looked at,

2   do each of these ACDVs have a discrete 17-digit control

3   number?

4   A.   They actually have a 16-digit control number.

5   Q.   Okay.  Well, I confess I don't count well here.  But

6   Exhibit 3, does that control number end in 4103?

7   A.   Yes, it does.

8   Q.   Exhibit 1 and Exhibit 2 each consisting of two separate

9   ACDVs, they each have their own 16-digit control number;

10  correct?

11  A.   That is correct.

12  Q.   Could you refer to Exhibit 4, please?

13  A.   I have it.

14  Q.   Is Exhibit 4 an Automated Consumer Dispute Verification

15  form transmitted electronically by Equifax to Ocwen?

16  A.   Yes.

17  Q.   Is this document an ACDV created and maintained by

18  Equifax in the normal course of regularly conducted business

19  activity?

20  A.   Yes, it is.

21  Q.   Is this record one that is routinely made and kept in

22  the course of business, the business as usual practice?

23  A.   Yes.

24  Q.   Was it made at or near the time of the event that it

25  records?

Latonya Munson - Direct

1    A.    Yes, it was.

2    Q.    Ms. Munson, may I ask you to refer to Exhibit 5 at this

3    time?

4    A.    I have the exhibit.

5    Q.    Is Exhibit 5 two Automated Consumer Dispute

6    Verifications created and maintained by Equifax in its

7    normal course of regularly conducted business activity

8    transmitted by Equifax to Ocwen?

9    A.    Yes, it is.

10   Q.    I think the witness still has before her Exhibit 5; is

11   that correct?

12   A.    Yes.

13   Q.    And I believe you already confirmed that these are two

14   Automated Consumer Dispute Verifications sent by Equifax to

15   Ocwen; is that correct?

16   A.    Yes, that is correct.

17   Q.    And does one of the ACDV forms end with control number

18   5113?

19   A.    Yes.

20   Q.    Does the other end with control number 5114?

21   A.    Yes, it does.

22   Q.    Are these documents, ACDVs created and maintained by

23   Equifax in the normal course of regularly conducted business

24   activity?

25   A.    Yes.

Latonya Munson - Direct

1  Q.   Are these records that are routinely made and kept in

2  the course of business and the business as usual practice?

3  A.   Yes.

4  Q.   Were these records made at or near the time of the

5  event that they record?

6  A.   Yes, they were made at the time -- at or near the time

7  of the event.

8  Q.   Could you please refer, Ms. Munson, to Exhibit 6.

9  A.   I have the records.

10  Q.   And does Exhibit 6 consist of two Automated Consumer

11  Dispute Verifications transmitted electronically by Equifax

12  to Ocwen?

13  A.   Yes.

14  Q.   Does one ACDV end with control number 0122?

15  A.   Yes.

16  Q.   Does the other end with control number 0123?

17  A.   Yes, it does.

18  Q.   Were these ACDVs created and maintained by Equifax in

19  the normal course of regularly conducted business

20  activities?

21  A.   Yes, they were.

22  Q.   Are these records that are routinely made and kept in

23  the course of business in the business as usual practice?

24  A.   Yes.

25  Q.   Was the record made at or near the time of the events

Latonya Munson - Direct

1    it records?

2    A.    Yes.

3    Q.    Ms. Munson, could you please refer to Exhibit 7?

4    A.    ACDVs?  I have the records.

5    Q.    Is Exhibit 7 two Automated Consumer Dispute

6    Verification forms electronically transmitted by Equifax to

7    Ocwen?

8    A.    Yes, they are.

9    Q.    Does one end in control number 1126 and the other end

10   in 1127?

11   A.    That's correct.

12   Q.    Were these ACDVs created and maintained by Equifax in

13   the normal course of regularly conducted business

14   activities?

15   A.    Yes.

16   Q.    Is this record one made in the routine course of

17   business and the business as usual practice?

18   A.    Yes.

19   Q.    Were these records made at or near the time of the

20   events they record?

21   A.    Yes, they were.

22   Q.    I'm getting better at this.  Could you refer now,

23   Ms. Munson, to Exhibit 8?

24   A.    I have the documents.

25   Q.    Does Exhibit 8 consist of two Automated Consumer

Latonya Munson - Direct

1  Dispute Verifications sent electronically by Equifax to

2  Ocwen, one bearing control number 8131 and the other bearing

3  control number ending in 8132?

4  A.    Yes, that is correct.

5  Q.    Were these ACDVs created and maintained by Equifax in

6  the normal course of regularly conducted business

7  activities?

8  A.    Yes.

9  Q.    Are these business -- are these ACDV records made and

10 kept in the course of business in the business as usual

11 practice?

12 A.    Yes.

13 Q.    And were these records made at or near the time of the

14 event that they record?

15 A.    Yes, they were.

16 Q.    Can you refer to Exhibit 9, Ms. Munson?

17 A.    I have the document.

18 Q.    Does Exhibit 9 consist of two Automated Consumer

19 Dispute Verifications transmitted electronically by Equifax

20 to Ocwen, one bearing control number ending in 5124 and the

21 other bearing control number ending in 5125?

22 A.    Yes.  These are both -- yes, these are those documents.

23 Q.    And these ACDVs were created and maintained by Equifax

24 in the normal course of its regularly conducted business

25 activity; is that correct?

Latonya Munson - Direct

1   A.   That is correct.

2   Q.   Are these records that are routinely made and kept in

3   the course of business in the business as usual practice?

4   A.   Yes, they are.

5   Q.   Are these -- and these records were made at or near the

6   time of the events that they recorded, weren't they?

7   A.   Yes, they were.

8   Q.   Ms. Munson, could you refer to Exhibit 10?

9   A.   I have Exhibit 10.

10  Q.   And does Exhibit 10 consist of two Automated Consumer

11  Dispute Verifications transmitted electronically by Equifax

12  to Ocwen, one bearing control number ending in 7122 and the

13  other bearing control number ending in 7123?

14  A.   Yes.

15  Q.   And these ACDVs were created and maintained by Equifax

16  in the normal course of its regularly conducted business

17  activity; is that correct?

18  A.   Yes, it is.

19  Q.   Are these records that are routinely made and kept in

20  the normal course of business in the business as usual

21  practice?

22  A.   Yes.

23  Q.   And were these records made at or near the time of the

24  events that they record?

25  A.   Yes, they were.

Latonya Munson - Direct

1    Q.    Could you refer to Exhibit 11 at this time?

2    A.    I have Exhibit 11.

3    Q.    Now, Exhibit 11 is five pages.  Take a moment and

4    peruse those for me, could you?

5    A.    I have done so.

6    Q.    With respect to Exhibit 11, when Equifax receives

7    correspondence from a consumer, does it routinely in the

8    normal course of business make photocopies or make a digital

9    record of that letter from a consumer?

10   A.    Yes, Equifax does image the consumer's dispute letter.

11   Q.    And Page 1 of Exhibit 11 is, in fact, a letter from

12   Mr. Daugherty which was received by Equifax?

13   A.    Yes.  The letter indicates that Mr. Daugherty sent this

14   information to Equifax.

15   Q.    And the second page of Exhibit 11, does it also appear

16   to be a letter written by Mr. Daugherty that was imaged into

17   the records of Equifax?

18   A.    I don't understand your question.

19   Q.    On the second page of Exhibit 11, a letter, a copy of

20   which was received by Equifax?

21   A.    Yes.  The second page of this document was received by

22   Equifax.

23   Q.    And was the third page of Exhibit 11 a document

24   received by Equifax?

25   A.    Yes.

Latonya Munson - Direct

1   Q.   Is the fourth page of Exhibit 11 an envelope that was

2   received by Equifax?

3   A.   Yes, it is.

4   Q.   You have to help me here.  But is the fifth page of

5   Exhibit 11 a copy of the reverse side of the envelope

6   previously mentioned?

7   A.   Yes, that is correct.

8   Q.   Ms. Munson, could you please refer to Deposition

9   Exhibit 12, please?

10  A.   I have the document.

11  Q.   Does Exhibit 12 consist of two Automated Consumer

12  Dispute Verifications electronically transmitted by Equifax

13  to Ocwen, one bearing a control number ending in 1128 and

14  the other bearing a control number ending in 1129?

15  A.   Yes.  The Exhibit 12 appears to include the ACDV for

16  control numbers ending in 1128 and then perhaps two copies

17  of the ACDV that ends in control number 1129.

18  Q.   Thank you for pointing that out to me.  We did produce

19  a second copy of 1129.  Thank you.  These ACDVs were created

20  and maintained by Equifax in the normal course of its

21  regularly conducted business activity, wasn't it?

22  A.   Yes, they were.

23  Q.   One moment, please.  I'm back, Ms. Munson.  I lost my

24  train of thought here.  I may have asked this already.  Let

25  me run through this one more time.  Were the two ACDVs, one

Latonya Munson - Direct

1   of which is duplicated twice contained in Exhibit 12, were

2   these ACDVs created and maintained by Equifax in its normal

3   course of regularly conducted business activities?

4   A.   Yes, they were.

5   Q.   Are these ACDVs routinely made and kept in the course

6   of business in the business as usual practice?

7   A.   Yes.

8   Q.   Were these records made at or near the time of the

9   events they record?

10  A.   Yes.

11  Q.   I apologize if I asked that once.  Could you refer to

12  Exhibit 13?

13  A.   I have Exhibit 13.

14  Q.   I found my Exhibit 13.  And does Exhibit 13,

15  Ms. Munson, does this consist of two Automated Consumer

16  Dispute Verification forms transmitted by Equifax to Ocwen?

17  A.   Yes.

18  Q.   And does one have a control number ending in 8128 and

19  the other control number ending in 8129?

20  A.   Yes, that is correct.

21  Q.   Were these ACDVs created and maintained by Equifax in

22  the normal course of regularly conducted business

23  activities?

24  A.   Yes.

25  Q.   Were these records routinely made and kept in the

Latonya Munson - Direct

1   course of business of Equifax and in Equifax's usual

2   practice?

3   A.   Yes.

4   Q.   Were these records made by Equifax near or at the time

5   the events they record?

6   A.   Yes, they are.

7   Q.   Could you please refer, Ms. Munson, to Exhibit 14?

8   A.   I have Exhibit 14.

9   Q.   Does Exhibit 14 consist of two Automated Consumer

10  Dispute Verification forms transmitted by Equifax to Ocwen,

11  one bearing control number 88137 and the other bearing

12  control number ending in 88138?

13  A.   Yes.

14  Q.   Were these ACDVs created and maintained by Equifax in

15  the normal course of regularly conducted business activity?

16  A.   Yes, they were.

17  Q.   Were these records routinely made and kept by Equifax

18  in the course of its business and in Equifax's usual

19  practice?

20  A.   Yes.

21  Q.   Were these records made at or near the time of the

22  events they record?

23  A.   Yes, they were.

24  Q.   Could you refer to Exhibit 15?

25  A.   I have Exhibit 15.

Latonya Munson - Cross

1    Q.    Ms. Munson, Exhibit 15 is a two-page document that was

2    produced by Equifax in this litigation.  Could you tell me

3    what is in that document?

4    A.    This is Equifax's re-investigation results of a dispute

5    of the West Asset Management account and other accounts that

6    were not reporting on Mr. Daugherty's credit file, and also

7    Litton Mortgage Service account.

8    Q.    Does the Exhibit 15, a two-page document, does it

9    appear to be a document created and maintained by Equifax in

10   the normal course of its regularly conducted business

11   activity?

12   A.    Yes, it is.

13   Q.    Is this record one that is routinely made and kept in

14   the course of business in the business as usual practice?

15   A.    Yes, it is.

16   Q.    Was this record made at or near the time of the events

17   it records?

18   A.    Yes, it was.

19   Q.    I have no further questions of the witness.  Thank you,

20   Ms. Munson."

21          THE COURT:  Mr. Kenney.

22          MR. KENNEY:  Mr. Broadwater, are you comfortable

23   continuing to play the role of Ms. Munson?

24          MR. BROADWATER:  I am.  Let's go.

25          MR. KENNEY:  All right.

Latonya Munson - Cross

1   CROSS EXAMINATION

2   BY MR. MANNING:

3   Q.   "This is Jason Manning.  I'm the attorney representing

4   the defendant, Ocwen Loan Servicing.  Can you hear me okay?

5   A.   Yes.

6   Q.   What did you do to prepare for your deposition today?

7   A.   Could you be more specific?

8   Q.   Do you understand the question?

9   A.   I was asking you if you could be more specific.

10  Q.   Yeah.  Preparation just means -- preparation just means

11  what you do to prepare.  I'm wondering what you did to

12  prepare.

13  A.   I reviewed these documents that were Exhibits 1 through

14  15 in regards to today's deposition.

15  Q.   Thank you.  Did you review any other documents?

16  A.   Not that I recall.

17  Q.   The sole source of information or knowledge you have

18  about this case is the 15 documents that you reviewed that

19  were provided to you by plaintiff's counsel; correct?

20  A.   No, that's incorrect.

21  Q.   What other knowledge do you have?

22  A.   Well, I recall that I was a team member who actually

23  printed out all of the documents that Equifax had in regards

24  to this litigation.  So I actually produced the documents on

25  behalf of Equifax to Equifax's counsel.

Latonya Munson - Cross

1   Q.   There were over a thousand pages of documents produced

2   by Equifax in this case; correct?

3   A.   I don't recall.

4   Q.   You recall it being more than the 15 exhibits that you

5   reviewed in preparation for today; right?

6   A.   Yes, that's correct.

7   Q.   Did you conduct any investigation into any of the

8   documents that you prepared for your attorneys in this case?

9   You mentioned that you undertook to identify and produce any

10  documents that were relevant to this case; right?

11  A.   Yes, I did.

12  Q.   And those documents are documents that you yourself

13  identified and produced to your attorneys; right?

14  A.   Yes.  I would have been the person who provided

15  documents to Equifax's counsel.

16  Q.   Other than identifying these documents, did you

17  undertake any investigation into the meaning of those

18  documents?

19  A.   I'm not sure that I understand your question.

20  Q.   I understand that you identified and printed out

21  documents.  I'm wondering if you did anything other than

22  identify documents pertaining to Mr. Daugherty and print

23  them out.

24  A.   I don't recall.

25  Q.   Do you recall reviewing any of the documents that you

Latonya Munson - Cross

1    provided to your attorneys?

2    A.    As I sit here today, I don't recall reviewing any of

3    the documents outside what we reviewed today.

4    Q.    Did you yourself undertake any investigation into this

5    dispute that is the subject of this litigation?

6    A.    I don't recall.

7    Q.    You said you were a consumer -- you said that you were

8    a Consumer Research Analyst for Equifax; right?

9    A.    Yes, I am.

10   Q.    Part of your job is to investigate litigated disputes;

11   right?

12   A.    Yes.  Part of my job is to conduct every investigation

13   of a consumer's concern when they are in litigation with

14   Equifax and they have contacted Equifax to dispute

15   information on their credit file pending a lawsuit.

16   Q.    Did you conduct any re-investigation of this matter?

17   A.    I don't recall.

18   Q.    As you sit here today, you have no knowledge of whether

19   you did or did not?

20   A.    No.  I don't recall whether or not I started any

21   disputes in regards to this consumer.  I believe it has been

22   a few years.  This is an on-going matter.  I do not recall.

23   Q.    Equifax was a party in this case as a defendant; right?

24   A.    That is my understanding.

25   Q.    So you showed up here today to testify about documents

Latonya Munson - Cross

1    that plaintiff's counsel gave you without the benefit of

2    having reviewed the entire production that Equifax provided

3    in this case as a defendant; correct?

4    A.   I don't know whether I have seen all of the documents

5    or not.

6    Q.   You don't know what other documents Equifax may have

7    regarding this dispute because you only reviewed the 15 that

8    plaintiffs provided to you; correct?

9    A.   Could you rephrase your question?

10   Q.   You've only seen the 15 documents that you recall

11   testifying about.  And as a result, you don't know what

12   other documents Equifax has produced in this case as a

13   defendant; right?

14   A.   No.  I mentioned earlier that I was the person that

15   provided Equifax's outside counsel with certain documents as

16   it relates to Mr. Daugherty's dispute with Equifax.  So I

17   have had those documents in my possession at some point.

18        However, I am not sure whether or not those are all the

19   documents that I -- I am not sure whether or not those are

20   all the documents as I sit here today that were produced.

21   Q.   Ms. Munson, you've talked about how you are here

22   pursuant to a notice of deposition; right?

23   A.   Yes, that is correct, my understanding.

24   Q.   Sure.  I understand your role as a Consumer Research

25   Analyst, at least as it is here today, is you didn't

Latonya Munson - Cross

1    actually generate any of the documents that are identified

2    as Exhibits 1 through 15 by the plaintiffs in this

3    deposition; correct?

4    A.    Could you be more specific?  When you say "generate the

5    documents" what do you mean by that?

6    Q.    Yes, I can clarify.  As a Consumer Research Analyst,

7    you don't yourself handle the disputes when they come in

8    from the consumer; correct?

9    A.    I do not handle disputes that come in from a consumer

10   on a general basis if they are not already involved with

11   litigation with Equifax.

12   Q.    So all of the documents, Exhibits 1 through 15, are

13   generated prior to this case being in litigation; correct?

14   A.    I don't recall whether or not all the documents were

15   prior to litigation.  I do see where there is an indication

16   that I assisted with the re-investigation as it relates to

17   Exhibit 15.

18   Q.    You yourself didn't handle any of Mr. Daugherty's

19   third-party Aggressive Credit Repair letters to Equifax;

20   correct?

21   A.    I do not recall whether or not I handled any of those

22   disputes.  If they were received post-notification of the

23   lawsuit or around the time of notification of the lawsuit if

24   they were --

25   Q.    As you sit -- I'm sorry.

Latonya Munson - Cross

1    A.   If they were received during or pending the litigation,

2    I may have had some involvement with the dispute process.

3    Q.   As you sit here today, you're not able to identify any

4    of the 15 exhibits from plaintiffs in this deposition that

5    you yourself actually prepared; correct?

6    A.   That is incorrect.  The only one that I can see and

7    determine that I have had some type of involvement in is in

8    regards to Exhibit 15.

9    Q.   Let's talk about that one for a minute.  The only one

10   you would have personal knowledge of is Exhibit 15; correct?

11   A.   At this time, that is the only one I, upon reviewing

12   the documents at face value, that I can recall or have some

13   indication that I have had some type of involvement in the

14   dispute.  And that would be in regards to Exhibit 15 only at

15   this time.

16   Q.   Great.  Do you have Exhibit 15 in front of you?

17   A.   Yes, I do.

18   Q.   Thank you.  How do you know you prepared this document?

19   A.   Upon looking at the document, I can see where my

20   Equifax log-in is printed on the document.

21   Q.   Could you identify that for me?

22   A.   Yes, I can.

23   Q.   Where is it?

24   A.   It is on Page EIS 412 and 413 where there is an X86

25   printed on the document.

Latonya Munson - Cross

94

1  Q.   I see.  I think I see it.  Is it on the bottom

2  right-hand corner where there is a footer?  It is to the

3  right of the page numbers?

4  A.    That is correct.

5  Q.    And, so, the number there is somewhat long.  That

6  identifies you as an employee of Equifax as the creator of

7  this document?

8  A.    No.  That just means that there is a confirmation

9  number there.  And then the X86 means that I completed

10  the -- handled the completed re-investigation to some

11  extent.

12  Q.    Is that the -- X86 is that your number?

13  A.    Yes, it is.

14  Q.    What about the number prior to the X86?  Does that

15  identify you?

16  A.    No, it does not.

17  Q.    What does that number mean?

18  A.    That is the confirmation number that is associated with

19  this re-investigation.

20  Q.    I see.  This is also -- that's also in the upper

21  left-hand corner?

22  A.    Yes.

23  Q.    What about the document after -- after the X86 there's

24  a dash followed by another number.  What is that number?

25  A.    I don't know what that stands for.

Latonya Munson - Cross

1  Q.   You mentioned that you were the person who identified

2  and collected relevant documents in this case.  Is there

3  anyone other than you who would have more knowledge at

4  Equifax about this dispute?

5  A.   I don't know.

6  Q.   If we stay on Exhibit 15, I want to make sure I

7  understand what the document is saying.  If you look about

8  the middle of the first page it says, "We have reviewed your

9  concerns and our conclusions are."  Do you see that?

10 A.   Yes, I do.

11 Q.   It says, "Please be advised the following accounts are

12 not reporting on your Equifax credit file."  And then there

13 is a list of accounts.  Right?

14 A.   Yes.

15 Q.   What does that mean?

16 A.   The document indicates, "Please be advised that the

17 following accounts are not reporting on your Equifax credit

18 file:  Verizon account number, starts with 3829; West Assets

19 1278, 1146, 1756; Ocwen 709224; credit col 72 -- excuse

20 me -- 27022; NCO 8034; Frontier 3042; Green Tree 8828;

21 Fidelity 308; First Federal 1323, 1238; Ocwen 709224; tax

22 lien 1641; and West Assets 1797, 1669.

23 Q.   I see you just read off what is written there.  I'm

24 asking you since you created the document, what does that

25 mean?

Latonya Munson - Cross

1  A.  Well, as it states, it states that, "Please be advised
2  the following accounts are not reporting on your Equifax
3  credit file," and lists those accounts.
4  Q.  So when it says "not reporting on your Equifax credit
5  file," what does that mean?
6  A.  Perhaps I don't understand your question.
7  Q.  Well, it says, "Some accounts are not reporting on your
8  Equifax credit file."  For someone who doesn't do this work
9  every day, how do you explain that?  What does that mean?
10  A.  This means that Equifax was responding to a
11  re-investigation of those accounts.  And we advised upon
12  completion of the re-investigation that these accounts were
13  not reporting on the Equifax credit file and listed a few
14  accounts.
15  Q.  So at least as of September 23rd, 2014, Equifax made a
16  determination that it would no longer report anything on
17  Mr. Daugherty's credit file pertaining to those accounts
18  that are listed there; correct?
19  A.  This document indicates that Equifax advised
20  Mr. Daugherty that this information in regards to the
21  accounts listed were not reporting on his credit file at the
22  time of this re-investigation.
23  Q.  Up until September 23rd, 2014, when you created this
24  document, all those accounts were being reported by Equifax;
25  correct?

Latonya Munson - Cross

1    A.   I don't know whether they were reporting or not.  This

2    indicates they were not reporting at that time.

3    Q.   Do you know when Equifax stopped reporting those

4    accounts?

5    A.   No, I do not.

6    Q.   Do you know why Equifax stopped reporting those

7    accounts?

8    A.   No, I do not.

9    Q.   Do you know what the process is for Equifax internally

10   to make the decision to stop reporting on accounts?

11   A.   I think that's a very broad question.  It depends on

12   the circumstances.  Could you be more specific and provide

13   me with an example of what type of concerns you are speaking

14   of?

15   Q.   Yes, I'd be happy to do so.  If we look at the document

16   in front of you, it lists Ocwen twice.  Do you see that it

17   has the same account listed two times there?

18   A.   Yes, I do.

19   Q.   And, so, up until this point, Equifax was reporting the

20   same single Ocwen account twice on Mr. Daugherty's credit

21   report; correct?

22   A.   I don't know as we sit here and look at this one

23   document whether or not we were reporting that information

24   up until this point or not.  I don't know.

25   Q.   Are you aware of any other document that indicates

Latonya Munson - Cross

1    Equifax stopped reporting the same account twice prior to

2    this document?

3    A.    Could you rephrase your question?

4    Q.    Yes.  Are you aware of any other documents other than

5    this one dated September 23rd, 2014, in which Equifax stated

6    that it would stop reporting the Ocwen accounts that it was

7    reporting?

8    A.    I don't know because I don't have any documents in

9    front of me to review.  And I don't know that this -- this

10   document states that this information was not reporting on

11   the file and not that it would no longer be reporting on the

12   file.

13   Q.    There's testimony in this case by other witnesses that

14   September, 2014, is when Equifax stopped reporting anything

15   about Mr. Daugherty's Ocwen account.  And what I'm asking

16   you is are you aware of any other documents other than this

17   one that would reflect that?

18   A.    I don't know.

19   Q.    You see, Ms. Munson, where there is two Ocwen accounts

20   listed there that are the same?

21   A.    I see that the document -- this document indicates that

22   Ocwen 709224 and Ocwen 709224 were not reporting on this

23   credit file.

24   Q.    And they have the same account number listed; right?

25   A.    Yes, they do have the same digits reporting on all

Latonya Munson - Cross

1   these re-investigation results.  However, I am not aware of

2   whether or not this is the full account number for the Ocwen

3   accounts.

4   Q.   You've anticipated my next question.  That is actually

5   an incorrect account number; right?  If we look at the other

6   ACDVs, the account number has additional digits which are

7   missing.  537 should be at the end of that account number;

8   correct?

9   A.   I don't recall what the additional numbers were.  I

10  don't know.

11  Q.   You would agree that Exhibit 14 and the other ACDVs

12  list a longer account number than Exhibit 15 which is

13  missing three digits; correct?

14  A.   Yes, I do see where -- I do see where the ACDVs in

15  Exhibit 14 in regards to the account number or account

16  numbers are longer than the account numbers that are listed

17  on Exhibit 15 in regard to the Ocwen accounts.

18  Q.   So one of those numbers is wrong.  You just don't know

19  which one.  Correct?

20  A.   One of them perhaps is incomplete and wrong if you have

21  more information than I do.

22  Q.   You would agree that it's important to have the correct

23  account number listed.  And although you don't know which

24  one of these is correct, one of them is wrong; right?

25  A.   I am not sure whether I agree with that or not.  I

Latonya Munson - Cross

```
 1  don't know.

 2  Q.   I'm sorry?  You don't know the account number is

 3  important?

 4  A.   No, I don't.

 5  Q.   Ms. Munson, my question to you is the account number is

 6  different.  You prepared Exhibit 15.  You did not prepare

 7  Exhibit 14.  Correct?

 8  A.   No.  I mentioned that I can tell by my log-in I had

 9  something to do with the re-investigation of this particular

10  confirmation number.  As I sit here today, I don't know to

11  what extent I did anything, that I handled the

12  re-investigation.  But based upon my log-in here, I can

13  determine that I did have some involvement.  I do not recall

14  what that involvement specifically was.

15  Q.   So is it fair to say that the sole basis for you saying

16  that this series of documents, Exhibits 1 through 15, was

17  created and prepared in the ordinary course of business is

18  the fact that Equifax produced them?

19  A.   I don't understand your question.

20  Q.   We've already established that you don't have personal

21  knowledge of Exhibits 1 through 14; correct?

22  A.   Not that I am aware of.

23  Q.   So you don't know how these documents were prepared, 1

24  through 14, who prepared them or what they mean; correct?

25  A.   No.  I mentioned that I was the person that produced
```

Latonya Munson - Cross

1    the documents as it relates to Equifax's relationship with

2    the outside counsel and provided the information to them.  I

3    do have knowledge as to what the documents mean to some

4    extent that I have been prepared to review them.

5        However, I am indicating that as far as Exhibit 15, I

6    just can determine that my log-in is on these documents and

7    so that I did have some personal knowledge in how this

8    re-investigation was completed and handled at some point.  I

9    don't specifically know what my involvement was as we sit

10   here today.

11   Q.   And as a result, you don't have any personal knowledge

12   about how they were created or maintained, Exhibits 1

13   through 14; correct?

14   A.   No, that is incorrect.  I do know how Equifax maintains

15   and creates its documents.  And, so, I do know how these

16   documents in Exhibits 1 through 14 were maintained and

17   handled in Equifax's regular course of business.

18   Q.   So in creating and maintaining documents, how would it

19   occur that Equifax is getting the account number wrong on

20   its documents?

21   A.   Again, as the document indicates, it indicates that

22   Ocwen account number 709224, Ocwen 709224 may have been

23   taken from documents that were provided in the dispute

24   history or dispute process.  But I don't know any more of

25   that as I sit here today in reviewing Exhibit 15.

Latonya Munson - Cross

1    Q.    Thank you.  I'll move on then.  Let's look at Exhibit

2    15 at the second page.  You will see this as Bates stamp

3    413.

4    A.    I have this document.

5    Q.    And here it has, at the top it says Litton Mortgage

6    Services Center; is that right?

7    A.    Yes.

8    Q.    It has an account number.  Do you see that account

9    number?

10   A.    Yes, I do.

11   Q.    That account number doesn't match the account number on

12   the prior page; right?

13   A.    Could you be more specific with your question?

14   Q.    Sure.  So in the document that you prepared, Exhibit

15   15, on the second page it says account number 1290 asterisk.

16   On the first page it says Ocwen 709224.  Right?

17   A.    Yes.  The second page indicates that there was a Litton

18   Mortgage Loan Servicing account that began with 1290 that

19   was re-investigated.  On the first page there was or there

20   were two Ocwen accounts that began with account number

21   709224 that were not on the file.

22   Q.    So on the second page, you're identifying a Litton

23   account with a different account number.  And that account

24   is not listed on the first page.  Right?

25   A.    That's correct.

Latonya Munson - Cross

1   Q.   So as you sit here today, do you know whether Equifax

2   continued to report the Litton account that is listed on the

3   second page?

4   A.   I don't recall.  I don't know.

5   Q.   Do you know whether it is the same account as one of

6   those two Ocwen accounts that Equifax was reporting on?

7   A.   Well, they have different account numbers and different

8   names.  So that would lead me to determine that they are two

9   different accounts.

10  Q.   And by virtue of the fact that the first page doesn't

11  say we're not reporting on the Litton account, doesn't that

12  indicate that Equifax continued to report on the Litton

13  account?

14  A.   Yes.  The document indicates that Litton Mortgage

15  Services Center account number 1290 was reporting on the

16  credit file upon completion of this re-investigation

17  September 23rd, 2014.

18  Q.   So just to make sure I understand that, at least as of

19  the date of Exhibit 15, Equifax was still reporting on the

20  Litton account; correct?

21  A.   The Litton Mortgage Service account Number 1290 was

22  reported on the Equifax credit file as of September 23rd of

23  2014 based upon these documents that I am reviewing as EIS

24  412 and 413.

25  Q.   If you look on the second page next to the account

Latonya Munson - Cross

1  number, it has a date open.  Do you see that?

2  A.   Yes, I do.

3  Q.   And the date open is listed as August 17th, 1999;

4  right?

5  A.   Yes.

6  Q.   Do you know whether that is accurate?

7  A.   No, I do not.

8  Q.   Do you know if Mr. Daugherty had a separate account

9  with Litton that needed to be reported in addition to its

10  Ocwen account?

11  A.   I don't know whether or not Mr. Daugherty does or does

12  not have at least one or more Litton mortgage accounts.

13  However, the information he is reporting on his credit file,

14  and I'm not sure what the nature of the dispute was in

15  regards to the Litton mortgage loan and why we

16  re-investigated it at this time.

17  Q.   If you look at Exhibit 14, it is one of the ACDVs we

18  had talked about previously, you'll see on the first page

19  EIS 387 also has a high credit field similar to the second

20  page of Exhibit 15.  Exhibit 15 says high credit $100,813.

21  And Exhibit 14 has high credit $100,860.  Do you see that?

22  A.   Yes, I do see where the ACDVs have -- one of them was a

23  high credit of 100,860 and the second was 100,813.

24  Q.   Do you know whether Mr. Daugherty, in fact, had two

25  loans on the amount of 100,000 and change or if there was

Latonya Munson - Cross

1    just one?

2    A.    No, I don't.

3    Q.    Do you recall answering Mr. Young's questions about two

4    ACDVs behind each of the relevant exhibit tabs?

5    A.    Yes.

6    Q.    You identified that one of those exhibits actually had

7    a duplicate.  It was not a separate ACDV.  Do you recall

8    that?

9    A.    Yes, I do.

10   Q.    What exhibit number was that?

11   A.    I don't recall the exhibit number.

12   Q.    Let's just focus on 14 then.  So at least as to 14, you

13   would agree that there are two different ACDVs; correct?

14   A.    Yes.

15   Q.    And you are identifying them as different ACDVs by the

16   control number; correct?

17   A.    That is one of the indications, correct.

18   Q.    You talked about the process by which Equifax receives

19   disputes.  And we actually talked about one of the letters

20   that plaintiffs provided you.  Right?

21   A.    I don't recall talking about the dispute process.

22   Q.    So we're -- we are talking about two ACDVs being

23   provided behind each of the exhibits that you have been

24   asked about.  I want to turn specifically to Exhibit 1.

25   Ms. Munson, do you have Exhibit 1 in front of you?

Latonya Munson - Cross

1    A.    I have it now.

2    Q.    So earlier in this deposition you talked about the

3    process by which a consumer disputes credit history and then

4    Equifax has a system to address those concerns; right?

5    A.    That is one of the means in which Equifax can receive a

6    dispute and start a re-investigation on the consumer's

7    behalf.  That is correct.  That is one example."

8          MR. KENNEY:  So I think we're at Page 64, seven.

9    A.    "Yes.  I testified that Equifax uses an electronic

10   means to process ACDVs or consumer dispute verifications.

11   Q.    So when the dispute comes in, there's a credit analyst

12   at Equifax who receives the data, interprets it, and codes

13   it as listed on Exhibit 1; right?

14   A.    That is one of the means in which Equifax can receive a

15   dispute and start a re-investigation on a consumer's behalf.

16   That is correct.  That is one example.

17   Q.    And the disputes on Exhibit 1, there are codes 001 not

18   his/hers with instructions to provide the complete ID;

19   right?

20   A.    Yes.  That is the dispute code that was used in this

21   particular dispute.

22   Q.    Second, there is a second dispute code 007, disputes

23   current/previous account status, payment history profile,

24   payment rating.  Then there are instructions to verify

25   payment history profile, account status, and payment rating;

Latonya Munson - Cross

1    correct?

2    A.    Yes.

3    Q.    There are no other disputes listed; correct?

4    A.    Well, there are no other dispute codes listed on either

5    of the ACDVs.  The ACDV process can only utilize two dispute

6    codes.

7    Q.    And there's actually a box right below that called FCRA

8    relevant information; right?

9    A.    Yes, there is.

10   Q.    And that box allows Equifax additional room to provide

11   any other relevant information regarding the disputes;

12   right?

13   A.    Yes.  The relevant information field can contain

14   additional information that may have been provided by the

15   consumer during the dispute process.

16   Q.    None of these exhibits that plaintiffs provided you in

17   the FCRA relevant information box listed duplicate

18   tradelines; correct?

19   A.    These two particular ACDVs in front of me don't list

20   that type of information in the FCRA relevant information

21   field, and I don't recall that the FCRA relevant information

22   fields indicated any information regarding a duplicate

23   account.

24   Q.    Yeah.  And we've got all the exhibits.  You can look

25   through them if you'd like to confirm that.  But I can tell

Latonya Munson - Cross

1    you -- I can represent on the record that there is never a

2    mention of a duplicative tradeline by Equifax.  Are you

3    aware of any information to the contrary?

4    A.   No.  I just made mention that I was reviewing these two

5    in front of me at this time and that these two do not

6    indicate that there was a duplicate dispute or -- excuse

7    me -- a dispute that there was a duplicate Ocwen account.  I

8    don't recall that any of the other ACDVs mentioned that FCRA

9    relevant information.

10   Q.   But, in fact, Equifax was reporting the same Ocwen

11   account twice.  The ACDV showed that; right?

12   A.   I don't know if these are duplicate accounts.  The

13   ACDVs indicate that there are certain information that is --

14   like including the account number.  However, there is other

15   information that is different, and that being the date open

16   and some of the numeric values on the ACDVs are different as

17   well.  So I don't know whether or not these are duplicate

18   accounts or not.

19   Q.   So even as you sit here today, Equifax doesn't know

20   whether it was reporting a duplicate tradeline for

21   Mr. Daugherty's Ocwen account; correct?

22   A.   Yes.  I do not know whether or not these were duplicate

23   accounts as I am sitting here today in regards to the

24   information that is reported on the file, was reporting on

25   the file rather.

1   Q.   We can agree that the account number that is listed for

2   Mr. Daugherty's Ocwen account is the same on each of the

3   ACDVs that you've identified in plaintiff's exhibits in this

4   case in this deposition; right?

5   A.   Yes, that is correct.  They do have the same account

6   number.

7   Q.   Doesn't that indicate to Equifax that it was reporting

8   the same account twice?

9   A.   This indicates to Equifax that Ocwen had provided

10  information in regards to two items having the same account

11  number, different open, high credit amounts, different

12  balance information, different payment history, and

13  different status.  However, they were reporting the same

14  account number.

15  Q.   But you don't know what Ocwen actually furnished on a

16  monthly basis because you haven't reviewed any of those

17  documents; right?

18  A.   No, I have not reviewed any information that Ocwen

19  might have reported on a monthly basis.

20  Q.   So as you sit here today, you can't say that Ocwen was

21  reporting or furnishing data for two accounts or duplicating

22  the accounts; right?

23  A.   I don't know.

24  Q.   What you do know is that Equifax was aware that it was

25  sending ACDVs with the same account because it was reporting

Latonya Munson - Cross

1  the same account twice; right?

2  A.   From my recollection, I recall that the consumer

3  disputed two different Ocwen accounts that had the same

4  account number.  Therefore, Equifax re-investigated those

5  accounts based upon receipt of the consumer's dispute

6  letters that indicate that he had a concern with two

7  different Ocwen accounts reporting the same account number

8  and, in some cases, disputed the information in just

9  different ways if I recall correctly.

10 Q.   Do you know or are you guessing?

11 A.   I am speaking to the best of my recollection.

12 Q.   So you're not sure?

13 A.   No.  I am speaking to the best of my recollection that

14 the consumer disputed the Ocwen account on more than one

15 time or one occasion and that that account number was

16 disputed twice within their dispute letter.

17 Q.   Maybe this will help refresh your memory.  If you go

18 back to Exhibit 15 that you prepared, it references the

19 Litton account.  On that account it says the date of last

20 activity was October, 2011, and it was closed November,

21 2011.  Do you see that?

22 A.   No.  Just bear with me a moment while I gather that

23 document.  Could you repeat your question?

24 Q.   Let's read it back."

25      The record was read by the reporter.

1  A.    "Yes, I do see the document indicates that the Litton

2  Mortgage Service Center account number 1290 DLA was 10 of

3  2011 and the date closed was 11 of 2011.

4  Q.    So you don't know if that's accurate or not; right?

5  A.    No, I don't know whether or not that information is

6  accurate or not.  And I don't recall the nature of the

7  dispute in regards to that item and whether it was disputed

8  as inaccurate or not.

9  Q.    So let's just make sure we're talking about the same

10 terminology.  You used the word "furnisher."  That's what

11 Ocwen is in relation to its role to Equifax.  It furnishes

12 on a monthly basis information about the account that it has

13 with Mr. Daugherty; correct?

14 A.    Ocwen is a data furnisher as I understand.  They are a

15 member of Equifax's credit reporting system.  So they

16 furnish information to Equifax.  I don't know whether or not

17 Ocwen reports on a monthly basis or 30-, 60-, or 90-day

18 basis or not.

19 Q.    Then when it receives the data from Ocwen, it is in the

20 form of electronic data that Equifax has to load into its

21 system; right?

22 A.    Yes.

23 Q.    Right.  When Ocwen furnishes data, Equifax receives it

24 and there's a group of people at Equifax that are

25 responsible for loading that information to ensure that it

Latonya Munson - Cross

1  is accurately loaded into Equifax's system?

2  A.   Yes.  It is my understanding that Equifax does receive

3  information from data furnishers electronically and that

4  information is uploaded into our database.  It goes through

5  a quality process.

6  Q.   Are there written policies and procedures and training

7  manuals regarding this process?

8  A.   I don't know.

9  Q.   Do you know whether you identified and produced them in

10  this case?

11  A.   No, I don't recall producing any of those manuals

12  because I don't know whether or not they exist.

13  Q.   So let's go back to Exhibit 1 where we have the ACDVs.

14  You have identified that there are two disputes listed on

15  those.  They each have the same account number and the same

16  borrower; right?

17  A.   Yes, they do show that they have the same account

18  number and the same consumer ID information.

19  Q.   And you haven't reviewed the data that Ocwen furnished

20  in order to determine whether these ACDVs accurately reflect

21  the information Ocwen was providing, have you?

22  A.   No, I have not.

23  Q.   So you don't know if they're accurate or not?

24  A.   Well, I mean, as it relates to these ACDVs, these are

25  the ACDVs where the consumer contacted Equifax and had a

Latonya Munson - Cross

1   concern with the information that was being reported on the

2   credit files.  So, therefore, Equifax started a

3   re-investigation of the concerns and contacted Ocwen to

4   determine whether or not the information was being reported

5   accurately on our credit file.

6   Q.   Right.  And, so, the way Equifax prepares -- this is

7   the process I'm trying to understand.  The way Equifax

8   prepares Exhibit 1, these two ACDVs, is by going into

9   Equifax's system and pulling the information about the

10  tradelines it is reporting; right?

11  A.   Yes.  Equifax will review the information as far as a

12  dispute a consumer has and start a re-investigation of the

13  item if we are unable to make some type of update to the

14  file based upon its own policies and procedures.

15       And then we would start an ACDV and send that

16  information electronically to the furnisher, in this case

17  Ocwen, and ask Ocwen to review the consumer's concern and

18  start the re-investigation of the concerns as well.

19  Q.   And someone at Equifax has to assign dispute codes in

20  order to notify the furnisher what needs to be investigated;

21  right?

22  A.   In this particular situation, if I recall correctly,

23  all of the disputes were disputes that we received by mail.

24  Therefore, in those instances where Equifax would have an

25  agent review the consumer's dispute letter, that agent would

Latonya Munson - Cross

1    determine what their dispute was and create a dispute code

2    to transmit during the ACDV process.

3        And that would be based upon the information received

4    on the consumer's disputes.  And in some cases where Equifax

5    is able, was able to transmit a copy of the consumer's

6    dispute letter to Ocwen, we did so as well.

7    Q.   So someone at Equifax interprets the letter that you

8    have referred to, determines what the dispute is, and then

9    assigns a dispute code; correct?

10   A.   That is correct.  When the dispute is received by mail

11   from a consumer, that is how the process is initiated and is

12   part of the process.

13   Q.   And none of these ACDVs identified a duplicative

14   tradeline; correct?

15   A.   I don't understand your question.

16   Q.   Well, we've been talking about this for some length.  I

17   want to make sure we're on the same page.  There is an

18   account number on these ACDVs, Exhibit 1, which is the same

19   which you said indicates that Equifax is reporting that

20   account twice; right?

21   A.   Yes.  Equifax was reporting the account twice, and the

22   consumer disputed both accounts as he listed it.  If I

23   recall correctly, within his dispute letter he disputed the

24   item twice.  So we sent out an ACDV for each item that was

25   reported on in the file that had the Ocwen account number.

Latonya Munson - Cross

1    Q.    Okay.  Whether it is on a monthly basis or some other

2    basis, Ocwen furnishes data and the record reflects that

3    Ocwen only furnished data on one account.  Are you aware of

4    that?

5    A.    No, I don't know.

6    Q.    So let me ask you a different question.  Equifax is the

7    one that controls what it puts into its credit report for a

8    particular consumer; right?

9    A.    Equifax compiles data that it receives from furnishers

10   of information as it relates to customers, consumers and

11   then compiles a consumer credit report for many consumers.

12   Q.    And Ocwen doesn't have direct access to Equifax's

13   internal database; right?

14   A.    That's correct.

15   Q.    Ocwen can't look at any particular consumer's credit

16   report just by asking Equifax; right?

17   A.    No.  I mean, Ocwen can request a copy of a consumer's

18   credit report and review that information if they have a

19   legitimate business purpose with the consumer.

20   Q.    Ocwen doesn't control the generation, creation of a

21   credit report for a consumer; right?

22   A.    If Ocwen is a business customer of Equifax and they

23   also do business with a consumer and they report information

24   to Equifax about the same consumer, then they are reporting

25   information and are the furnisher of information, credit

Latonya Munson - Cross

1    data that could be compiled with the consumer credit report.

2    Q.   I understand.  Maybe we're quibbling over terminology.

3    I won't use the word "control."  I understand Ocwen

4    furnishes data.  Equifax is the one responsible for

5    compiling and accurately reporting it; right?

6    A.   Equifax is a national credit reporting agency.  And as

7    part of being a national credit reporting agency, we

8    contract with businesses or furnishers of information that

9    certify that their information is accurate when they're

10   reporting it to Equifax.

11        Therefore, if there is information that is incorrect

12   during the dispute process, that is the opportunity for

13   Equifax either to follow its policies and procedures and

14   make changes to a credit report or contact the source of

15   that information.

16        As it relates to Mr. Daugherty, we sent ACDVs on

17   numerous occasions to Ocwen to verify the information that

18   was being disputed.

19   Q.   And Equifax continues to report the same account twice

20   and at least up until September, 2014, it was still

21   reporting the Litton account; right?

22   A.   Based upon the documents we received here today, yes.

23   We did discuss that Equifax advised Mr. Daugherty on or

24   about September 23rd of 2014 that two Ocwen accounts with

25   the same account number or numbers that start with the same

Latonya Munson - Cross

1   digits were not reporting on the Equifax credit file.

2       However, that time -- at that time we verified a Litton

3   Mortgage Service account that remained on the credit report

4   based upon the documents I reviewed today and the best of my

5   determination.

6   Q.   Let's look at Exhibit 11.  This is the letter that you

7   talked about earlier.

8   A.   I have the document.

9   Q.   How do you know Equifax received this document?

10  A.   I can determine that Equifax received the documents

11  because on the bottom of the letter in the left-hand side

12  there is an indication of EFX, original document with a date

13  there, looks like May 30th of 2014.  It is stamped and that

14  is a stamp that Equifax would put on a document that we

15  received by mail or by fax.

16  Q.   Okay.  So using that date stamp, this exhibit would

17  have been received by Equifax May 30th, 2014?

18  A.   Yes.

19  Q.   And that includes the subsequent pages; right?

20  A.   Yes, it does.

21  Q.   The first page of this letter it says, "Equifax is

22  still refusing to fix the huge mistake on our credit

23  record."  Do you see that?

24  A.   Yes, I do see that.  A portion of the sentence that is

25  within this letter, yes, I do see that.

Latonya Munson - Cross

1   Q.   And you are not aware of anything that Ocwen reported

2   that was inaccurate; right?

3   A.   I don't think I understand your question.  Could you

4   rephrase it?

5   Q.   You are not aware of any data that Ocwen furnished to

6   Equifax or responded in the form of an ACDV response that

7   Ocwen provided that was incorrect; right?

8   A.   To the best of my recollection, when I reviewed some of

9   the ACDVs based upon the consumer's dispute to Equifax and

10  Equifax starting a re-investigation and contacting Ocwen, I

11  believed there was at least one occasion where Ocwen changed

12  certain information on the accounts, or one or more of the

13  accounts.  And, so, I don't know if that information was

14  accurate or not.

15  Q.   So as you sit here today, you're not aware of any

16  single error that Ocwen ever made regarding Mr. Daugherty's

17  credit; right?

18  A.   I don't understand your question.

19  Q.   Let me try again.  As you sit here today, you're not

20  aware of a single error that Ocwen ever made regarding any

21  of the data it furnished regarding Mr. Daugherty's account;

22  correct?

23  A.   I am not in a position to determine whether or not

24  Ocwen made an error with the information it reported or not.

25  I think Ocwen would be the best source of that question, or

Latonya Munson - Cross

1  best in the position to answer that question.

2  Q.   And Ocwen has stated in deposition that it did not make

3  any errors.  You don't have any evidence to refute that, do

4  you?

5  A.   I don't know if any of these documents refute or do not

6  refute that.

7  Q.   Let's look at the second page of Exhibit 11.  You'll

8  see it as another letter.  I can't tell the date because it

9  says March 14th, 20- and then it doesn't have a year.  Do

10 you see that?

11 A.   Yes, I do.

12 Q.   That's just missing.  But your testimony is that

13 Equifax would have received it in May, 2014, based on the

14 stamp at the bottom; right?

15 A.   That is correct.  This document was included in a

16 letter sent to Equifax dated May 26th, 2014.  This document

17 was included with the consumer's letter to Equifax.

18 Q.   And in this letter, Mr. Daugherty or someone writing on

19 his behalf is saying he has one Ocwen account, and he

20 provides the loan number there, which matches the loan

21 number we identified as the account number on the ACDVs;

22 right?

23 A.   Are you referring to the page March 14, 20-?

24 Q.   Yes.  About the middle of the page it says Ocwen loan

25 number 7092244537 which is the same account number we have

Latonya Munson - Cross

1   identified -- which is the same number we have identified on

2   the ACDVs that Equifax sent; right?

3   A.   Yes, that is the same.  Those appear to be the same

4   account numbers.  However, I don't see that statement that

5   you indicate that he says this is one account that he has

6   with Ocwen.

7   Q.   Well, there's only one number listed for Ocwen; right?

8   We can agree on that?

9   A.   This document has Ocwen loan number and 7022 -- excuse

10  me -- 7092244537 on this page.

11  Q.   That's the same account number that is on all these

12  ACDVs that Equifax sent; right?

13  A.   I am just confirming that, yes.

14  Q.   Mr. Daugherty doesn't identify that he has a second

15  account with a different number with Ocwen; right?

16  A.   This page of the communication does not indicate that.

17  Q.   You're not aware of any other document that anyone ever

18  told Equifax that Mr. Daugherty had a second account with

19  Ocwen; right?

20  A.   Again, if I recall correctly, there were letters that

21  indicated Mr. Daugherty was disputing two Ocwen loans listed

22  on those letters, listed on those letters that had the same

23  account number and there were different dispute types for

24  each of those accounts.

25  Q.   I'm sorry.  Were you finished?

Latonya Munson - Cross

1    A.    Yes, I was.

2    Q.    Doesn't the same account number indicate we are talking

3    about one account?

4    A.    I don't know.  It depends.  I mean, there could be

5    times a consumer is disputing a student loan that had the

6    first few digits and they are all the same.  Those are not

7    duplicates.  So I can't say whether or not it is a duplicate

8    or not.

9         There was certain information that was different about

10   the accounts that were reported on the Equifax credit file

11   such as the high credit, the balances, the status of

12   account, the open date of the account which perhaps

13   indicates that there was more than one account.  But I don't

14   know whether that is so or not.

15   Q.    You're not aware of any documents that indicate

16   Mr. Daugherty actually had two accounts even though Equifax

17   is reporting two accounts; right?

18   A.    No, I am not.  I haven't seen any other documents

19   outside of what Equifax received from the consumer and the

20   ACDV responses.

21   Q.    Thank you.  If you turn to the third page of Exhibit

22   11, it talks about -- it is another letter which you

23   identified Equifax as having received; correct?

24   A.    Yes.

25   Q.    So this one again references, "Ocwen has my mortgage

Latonya Munson - Cross

1    account 7092244537."  Do you see that?

2    A.    Yes.

3    Q.    And he goes on to complain that Equifax is reporting it

4    as having a past due balance; right?

5    A.    I'm looking at the balance, the letter, rather, and it

6    does say that, "Equifax also shows I have a past due

7    balance."  I see that statement.

8    Q.    And Equifax was sending these ACDV forms for the same

9    account reflecting that Equifax was reporting one tradeline

10   is current and the other tradeline is past due; right?

11   A.    Yes.  Equifax was reporting more than one account.  And

12   one was reporting it as having I think an adverse status.

13   The other is a paid-as-agreed status, both with late payment

14   histories.

15   Q.    Both with the same account number?

16   A.    Yes.

17   Q.    You would agree that it is incorrect for Equifax to be

18   reporting the same account twice with two informations;

19   right?

20   A.    I don't know.

21   Q.    Well, if there's only one account and its status is

22   established by the accurate data -- here ACDVs show Equifax

23   is reporting one account twice with different data.  Doesn't

24   that indicate Equifax made a mistake here?

25   A.    I don't know.  I think that we contacted -- we

Latonya Munson - Cross

```
 1    conducted a re-investigation of the disputes as we received
 2    them and went to the source of the information.  And Ocwen
 3    responded to all of the ACDVs; in some instances, I believe,
 4    updating information, verifying, or asking that Equifax
 5    modify certain information.  We were not advised to delete
 6    the information in the credit file.
 7    Q.    Have you seen any of the ACDV responses from Ocwen for
 8    Mr. Daugherty's account?
 9    A.    Yes, I have.
10    Q.    Are you aware that Ocwen repeatedly responded to the
11    ACDVs showing him past due to correct it, to show current,
12    but Equifax failed to correct it?
13    A.    I don't agree with that.  I think that the -- based
14    upon what we reviewed today, the ACDVs we received two
15    different --
16    Q.    I'm asking about whether you can identify a single ACDV
17    response from Ocwen as you sit here today.
18    A.    We had several that were provided within the Exhibits 1
19    through 14.
20    Q.    Let's make sure that that is clear in the record.
21    There are not responses from Ocwen.  These are Equifax ACDV
22    requests for verification that went to Ocwen; correct?
23    A.    No.  This captures Equifax's re-investigation that was
24    sent to Ocwen and Ocwen's response to the ACDVs -- excuse
25    me -- ACDV.
```

Latonya Munson - Cross

1    Q.    Okay.  Well, our expert witness disagrees with you.

2    Can you identify where on here Ocwen provided a response to

3    an ACDV request from Equifax?

4    A.    Sure.  On Exhibit 1 Ocwen was contacted and the

5    responder's name, Raj Kumar, with a responder's phone

6    number, date of the response, the method or response code

7    which verifies correct as reported is contained within --

8    Q.    Let me stop you there.  I don't see that.  Where is

9    that?

10   A.    I will be more than happy to point that out to you.  It

11   is under the tradeline information under the control number

12   and --

13   Q.    Are you on the second ACDV?

14   A.    I am on the first one.

15   Q.    My order is off.  Okay."

16        MR. KENNEY:  Mr. Young states, "Might I suggest

17   the witness give us the last four digits of the control

18   number so we are all on the same number."

19      Mr. Manning says, "Let's use the Bates number."

20        MR. BROADWATER:  I'm skipping to page -- excuse

21   me.  I got a little lost there.

22        MR. KENNEY:  So the witness says, "I'm looking at

23   Bates 34, 35, 30 and 31."

24      Mr. Manning picks up again stating:

25   Q.    "So on this information on this sheet, where on the

Latonya Munson - Cross

1    sheet does it contain information that Ocwen responded with

2    to Equifax"?

3            MR. KENNEY:  Mr. Young states, "Are we looking at

4    sheet 34, Bates 34, counsel?"

5        Mr. Manning states, "Yes."

6        Mr. Young, "Thank you."

7    A.    "So if you look under the control number toward the

8    middle of those fields, rather, the grantor name, Ocwen Loan

9    Servicing, and followed by that is the responder name, and

10   followed by that is the responder's phone number and

11   response code from the responder.

12   Q.    So make sure I'm on the same page as you.  If you look

13   toward the bottom of Bates 34, it has an account status.

14   And it is your testimony that Ocwen responded to this ACDV

15   with current account under account status as well as current

16   account under payment rating.  Isn't that right?

17   A.    I was referring to the grantor name, the responder's

18   name, response date, and response code verified correct as

19   reported.

20   Q.    See the bottom of the page, account status?

21   A.    I do.

22   Q.    Is it your testimony that Ocwen responded to the

23   account status and payment rating with the statement

24   "current account"?

25   A.    No.  It is my testimony that Ocwen responded and did

Latonya Munson - Cross

1  not advise Equifax to modify any information in the account

2  status field, and they verified the account correct as

3  reported.

4  Q.   Is it your testimony that because Equifax was reporting

5  this account for this ACDV is current in account status and

6  payment rating that Ocwen verified it to be accurate?

7  A.   I am stating that Equifax contacted Ocwen via the ACDV

8  process.  And the response was that the account was verified

9  correct as reported in regards to ACDV EIS number 34.

10 Q.   And I'm asking you what that means because here I think

11 we're reading the same page.  The account status and payment

12 rating are listed as current; right?

13 A.   Yes.  When the ACDV was sent to Ocwen, the account

14 status showed current account.  However, if Ocwen wanted to

15 modify that information, there would be another account

16 status underneath that.

17     And, so, Ocwen verified the account as correct as

18 reported when it checked off the box in the response code

19 "verified as reported."

20 Q.   Okay.  So by checking the box "verified as reported"

21 here, Ocwen confirmed that the account was current; right?

22 A.   Yes.

23 Q.   So this document -- I think Mr. Young asked you about

24 this.  This is not a document that came from Equifax; right?

25 This is something -- I'm sorry.  It didn't come from Ocwen.

Latonya Munson - Cross

1  It is something generated from Equifax itself?

2  A.   It is my understanding that this is Equifax's

3  memorialization of the ACDV process.  And so that that

4  process, because it is electronic, this is how Equifax

5  captures -- Equifax sent out the ACDV and then how the

6  response was received from the furnisher.

7  Q.   Which means that there is some person, not you, at

8  Equifax that was receiving Ocwen's response to the ACDV and

9  interpreting it and determining what to report on this form;

10  right?

11  A.   No.  I don't know if this was handled through an

12  automated process completely or whether or not it was

13  handled by a live agent.  However, it is my understanding

14  that there, during the ACDV process, Ocwen is one, is the

15  one who has completed the verification and determined the

16  information should be verified, modified, deleted, or

17  deleted as fraud.  In this case, Ocwen advised Equifax that

18  the information was verified as reported.

19  Q.   And verified as reported pertains to the specific

20  disputes that are identified by Equifax on the dispute at

21  the top of the page; right?

22  A.   Yes, that is correct.  My understanding that they

23  verified the dispute that was initiated.  It -- I'm sorry.

24  Yes, that is correct.  My understanding is they verified the

25  dispute that was initiated during the re-investigation.

Latonya Munson - Cross

1   Q.   And it is accurate that this was an account --

2   actually, I should ask whether you know.  Do you know

3   whether it is accurate that Mr. Daugherty, in fact, had this

4   account with Ocwen and that he was current?  Do you know?

5   A.   Could you rephrase your question?

6   Q.   There are two dispute codes on EIS 34.  And it's your

7   testimony that Ocwen did what it was supposed to by

8   responding to the specific disputes identified.  And you

9   don't -- do you know whether that is accurate?

10  A.   I still don't understand the question you are asking

11  me.

12  Q.   So you don't know whether this form was generated by a

13  human being or a computer; right?

14  A.   No, I don't know whether or not the information

15  processed here as part of the verification was processed

16  through an agent or an electronic means.  Based upon looking

17  at the ACDV, I don't know.  But that is something, you know,

18  that could be determined.

19  Q.   Further discovery.  You just don't know today?

20  A.   Correct.

21  Q.   You don't know how this document was created.  And

22  that's true for all these ACDVs; right?"

23          MR. KENNEY:  Mr. Young states, "Excuse me.  I hate

24  to interrupt, Mr. Manning.  I just want to make sure that

25  you and the witness, when you say "this document" you're

Latonya Munson - Cross

1    referring to the document that is Bates number 34."

2         Mr. Manning states, "Correct."

3         Mr. Young states, "Okay.  Carry on.  Thank you.  Sorry

4    to interrupt."

5         Mr. Manning begins again:

6    Q.   "I will re-ask it.  Make sure we are all on the same

7    page.

8         Ms. Munson, you don't know how this document Bates

9    stamped 34 was created, nor do you know how any of the other

10   ACDVs that are identified as exhibits to this deposition

11   were created; correct?

12   A.   No, that's incorrect.  I recall that the majority of

13   the disputes that Equifax received were disputes that we

14   received by mail from the consumer.  Therefore, an agent

15   would have reviewed the consumer's dispute letters and

16   created these ACDVs.

17   Q.   All right.  So as you sit here today, can you identify

18   for me the process by which the ACDVs identified in this

19   deposition were created?

20   A.   Yes, I can.

21   Q.   All right.  Let's start with one.  Is it generated by a

22   computer or by a human?

23   A.   This was initiated by a dispute that Equifax received

24   by mail, and an agent would have started the

25   re-investigation, the ACDV process.

Latonya Munson - Cross

1   Q.   And you are referring to EIS 30 right now?

2   A.   I was referring to 34 because that's the one I have in

3   front of me, but 30 would be the same.

4   Q.   How do you know that?

5   A.   For some reason, I remember the consumer's first

6   dispute.  I remember that it was received by mail.  I know

7   the Equifax process is that an agent would have reviewed the

8   letter to start an ACDV process and start the

9   re-investigation process of the consumer's concern.

10  Q.   So is it your testimony that the April 30th, 2013, ACDV

11  is the first dispute by Mr. Daugherty?"

12          THE COURT:  Mr. Kenney, find a convenient stopping

13  place and we'll break for lunch, please.

14  A.   "Yes, I am."

15          MR. KENNEY:  Can you remind me what line we're at?

16          MR. BROADWATER:  I just read line 25 on Page 95.

17  Q.   "Okay.  And what is your basis of stating that?

18  A.   This is the first ACDV that we have in the consumer

19  documents as the earliest date.  Therefore, that leads me to

20  believe that this was the first dispute from the consumer

21  based upon reviewing these documents today.

22  Q.   But I thought you said you hadn't gone back and

23  reviewed the entire production of a thousand pages; is that

24  right?

25  A.   That is correct.  I said based upon these ACDVs, this

Latonya Munson - Cross

1    is the oldest one.

2    Q.   Oh, Okay.  So there may be one that is earlier.  You're

3    saying of the exhibits that plaintiff provided you today,

4    this is the earliest.  So you're assuming it was the first

5    one, but you don't know?

6    A.   Yes."

7          MR. BROADWATER:  Do you want to skip to the next

8    page at line 5?

9          MR. KENNEY:  Sure.

10   Q.   "Let me try it this way.  Exhibit 1 has two ACDVs;

11   right, Ms. Munson?

12   A.   That's correct.

13   Q.   You don't know whether these, those documents marked as

14   Exhibit 1 are the first disputes or not; correct?

15   A.   No.  I believe these are the first disputes.  They have

16   the oldest date.  And, so, I believe this was the first

17   dispute in regards to the Ocwen account.

18   Q.   So are you basing that on the fact that you have only

19   been provided the documents and you have only reviewed the

20   documents that are marked as deposition exhibits, but there

21   is a thousand other pages; right?

22   A.   That's my understanding from today's deposition, that

23   there are a thousand pages, correct.

24   Q.   So there may be disputes that are earlier in time that

25   occurred prior to Exhibit 1.  You just don't know?

Latonya Munson - Cross

1   A.   As we sit here today, I believe this is the first

2   dispute based upon the documents that were produced."

3            MR. KENNEY:  Your Honor, I think this would be a

4   good stopping point.  There are only three more pages of

5   this transcript.

6            THE COURT:  Three pages with 12 pages on them?

7            MR. KENNEY:  Yes, Your Honor.

8            THE COURT:  All right.  Let's stop then, Mr.

9   Kenney.  Thank you.  We'll resume after lunch.

10       To make that clear, each of those 8 x 11 inch pages has

11  four deposition pages on it; is that correct?

12           MR. KENNEY:  That's correct, Your Honor.

13           THE COURT:  All right.  We'll recess for lunch.

14       While you're out, do not discuss this case among

15  yourselves or permit anyone to discuss it with you or in

16  your presence.  Ladies and gentlemen, please be in your jury

17  lounge this afternoon at 1:30.  We'll stand in recess.

18       (Recess taken from 12:15 p.m. until 1:30 p.m.)

19           THE COURT:  Good afternoon, everyone.

20       Mr. Kenney.

21           MR. KENNEY:  If it please the Court, we'll just

22  pick up right where we left off.

23           THE COURT:  Whether it pleases the Court or not,

24  you can.  Nothing personal to you, Mr. Kenney.

25           MR. KENNEY:  I appreciate that, Your Honor.

Latonya Munson - Cross

1      (The deposition testimony of Latonya Munson was resumed

2   as follows:)

3   Q.   "I'm going to turn to Exhibit 12 to ask you about what

4   is referenced on Bates stamp 318 as images sent.  Do you see

5   that, Ms. Munson?

6   A.   Yes, I do.

7   Q.   There are no images attached to these ACDVs.  This page

8   EIS 318 indicates that this document is incomplete because

9   there were images provided but they are not attached as an

10  exhibit.  Is that accurate?

11  A.   The ACDV indicates that an image was sent when the ACDV

12  was sent to Ocwen.  However, if you are asking me whether or

13  not the document that was sent is part of the exhibit today,

14  no, it is not.

15  Q.   So we can agree, Ms. Munson, those images are not part

16  of the exhibit.  Therefore, these exhibits that include

17  images sent are incomplete; right?

18  A.   They are not here today, so they are not part of this

19  exhibit.

20  Q.   Do you know whether Equifax produced them or not?

21  A.   Yes.  It would be my -- or to the best of my

22  recollection, there is -- when we would have provided

23  Equifax's counsel with the documents, we would have included

24  a copy of the dispute letter.

25  Q.   Yeah.  My question is do you agree that this document

Latonya Munson - Cross

1   is incomplete because it does not include the images sent

2   that are referenced on EIS 318 which is also true about a

3   number of these other ACDVs; correct?

4   A.   I don't think I agree with you.  I think that the ACDV

5   indicates that we sent an image to the furnisher, and that

6   image is associated with Equifax having sent something to

7   Ocwen during this ACDV process.

8   Q.   I understand that your testimony is that it indicates

9   something was sent.  But you don't know what was sent or if,

10  in fact, it was produced; correct?

11  A.   No.  I will clarify that.  I would indicate that

12  Equifax either received a dispute letter or a fax, that we

13  sent out an ACDV to Ocwen and included one of those, either

14  a dispute letter or a fax.  And those would be the only

15  documents that we would have received from the consumer and

16  imaged.  And, therefore, the ACDV tells me that we sent

17  either a mail dispute or an image or mail dispute or fax to

18  Ocwen.

19  Q.   Let's focus just on the question.  Exhibit 12, EIS 318

20  references two images as a TIF file; right?

21  A.   It is one image that indicates it is stamped here

22  twice, correct.

23  Q.   You don't know what images are being referenced on that

24  document, do you?

25  A.   No, I do not know the specific image that was sent in

Latonya Munson - Cross

1  addition to this ACDV.  I know that it was a letter or a

2  fax.

3  Q.   You don't know whether it was produced in this case, do

4  you?

5  A.   Because I am the person that pulled these documents, it

6  would be reasonable for me to say that I pulled the

7  corresponding letter or fax and would have provided that

8  information to Equifax's outside counsel.

9  Q.   But you can't tell me what the Bates stamp is today;

10  right?  You don't know for sure?

11  A.   No, I don't know the Bates number.

12  Q.   Right.  You're just going based on your habit to have

13  provided it.  But you don't know what the document is or

14  whether, in fact, it was produced; correct?

15  A.   As I sit here today, again, it is our process that I

16  would have printed any documents associated with this ACDV

17  and sent that information to Equifax's counsel.  I don't

18  know the Bates number.  I don't know what the contents of

19  the document would have been.  I have no reason to believe

20  that I would not have provided that information to Equifax's

21  counsel.

22  Q.   All right.  Let's look at the next page, EIS 320,

23  historical account data.  Do you see that?

24  A.   Yes, I do.

25  Q.   What does this information reflect?  What is it?

Latonya Munson - Cross

1   A.   This information reflects that Equifax captured certain

2   balances, scheduled payment, actual payment, date of last

3   payment, high credit in the month of October, 2013, and

4   August of 2013.

5   Q.   Who would have provided it?  I'm sorry.  Go ahead.

6   A.   Also the type of loan.

7   Q.   Where would Equifax have obtained that information

8   from?

9   A.   That information would have come from Ocwen Loan

10  Servicing.

11  Q.   How do you know that?

12  A.   I'm familiar with what historical account data means.

13  Q.   So because you didn't prepare this document, you don't

14  know how it was actually prepared.  You're just going based

15  on your knowledge of how generally Equifax's system works.

16  Is that fair?

17  A.   Yes, it is.  I'm speaking about the historical account

18  data as it has been explained to me.

19  Q.   But you don't have any personal -- you don't have any

20  personal knowledge of that?

21  A.   I don't have anymore knowledge as far as it would have

22  been explained to somebody in my position in regard to the

23  historical account data.  I am not in an area that maintains

24  that information.

25  Q.   The other ACDVs in the exhibits provided here that also

Latonya Munson - Cross

1    list images have been sent with TIFs that are not provided

2    or also incomplete; correct?

3    A.    I believe that the ACDVs that indicate that images were

4    sent do indicate that a document such as a letter or a fax

5    was sent through the ACDV process to Ocwen.  However, these

6    exhibits do not contain that information here today.

7    Q.    You don't have any knowledge as you sit here today why

8    Equifax was reporting the same Ocwen account twice; correct?

9    A.    Whether the information would have been furnished by

10   Ocwen to Equifax and, therefore, it would have been compiled

11   in the Equifax's credit report?

12   Q.    Right.  But you already said you haven't reviewed and

13   haven't seen the data that Ocwen actually furnished to

14   Equifax, so you don't know; right?

15   A.    No, I have not seen the data as it reported via tape to

16   Equifax.

17   Q.    Who at Equifax would actually have the knowledge about

18   why Equifax continued to report the same Ocwen account twice

19   incorrectly?  Who at Equifax would know why Equifax was

20   reporting the same Ocwen account twice?

21   A.    I'm not sure.

22   Q.    Is there someone who would have more personal knowledge

23   other than you as to why Equifax never told Ocwen that it

24   was reporting the same Ocwen account twice?

25   A.    Perhaps the plaintiff if the plaintiff would have

Latonya Munson - Cross

1   disputed that it was duplicated.  Equifax would have

2   forwarded that information to Ocwen during the process.

3   Q.   And you can't point to a document where the plaintiff

4   ever said duplicate tradeline; correct?

5   A.   Not that I recall."

6            THE COURT:  Mr. Young.

7            MR. YOUNG:  Thank you, Your Honor.

8       Plaintiff moves the admission of deposition Exhibits 1

9   through 15 which have been renumbered for trial purposes as

10  Exhibits 11 through 24.

11           THE COURT:  All right.

12      Mr. Manning, anything other than what we've discussed?

13           MR. MANNING:  No, Your Honor.

14           THE COURT:  All right.  I'll admit Plaintiff's

15  Exhibits --

16      Give me the numbers again, Mr. Young.

17           MR. YOUNG:  Numbers 11 through 24, Your Honor.

18           THE COURT:  -- 11 through 24, preserving the

19  defendant's objection and exception.  They can be published

20  at your discretion.

21           MR. YOUNG:  Thank you, Your Honor.  I'm just going

22  to publish a few and then move on.  Thank you.

23      For the record, I'm publishing Exhibit Number 11, an

24  Automated Consumer Dispute Verification dated April 10,

25  2013.  And I'm now displaying the upper left-hand corner

Latonya Munson - Cross

 1    which shows the responder name and the response date and

 2    response code.

 3            MR. MANNING:  Your Honor, --

 4            THE COURT:  Yes, sir.

 5            MR. MANNING:  -- may I have a brief sidebar?

 6            THE COURT:  Yes, sir.

 7            (Bench conference on the record)

 8            THE COURT:  I want you to be able to address the

 9    record, Mr. Manning, but I think we are a step ahead of

10    where we left off.  My recollection is that I've ruled on

11    the use of them.  And then there was a hearsay objection

12    which I said I would wait until I saw how plaintiff wanted

13    to use the document.

14            MR. MANNING:  Yes.

15            THE COURT:  Go ahead.

16            MR. MANNING:  I had two comments on that.

17        Your Honor heard the testimony.  A number of times the

18    witness said that she wasn't involved in the creation or

19    preparation of any of those documents and had no personal

20    knowledge about them with the exception of Exhibit 15 which

21    is the one she actually did participate in.

22        So she's not in a position to talk about how they were

23    created or maintained and it's -- I don't believe it

24    satisfies the hearsay exception with the exception of

25    Exhibit 15.

1        The second thing I was going to note is I don't believe

2   Mr. Young can give any commentary about the documents except

3   in his closing.  There's no witness to testify about these.

4   He can -- they're in evidence.  Your Honor has ruled so.  So

5   they can go back with the jury after the conclusion of the

6   case.  But it's improper, I believe, to now have him stand

7   up and say anything about the document.

8        THE COURT:  Mr. Young, anything you want to place

9   on the record?

10       MR. YOUNG:  Your Honor, I was trying to be

11  exceedingly fair and merely indicating a portion of the

12  document because I didn't introduce them one by one as the

13  deposition took place and display each one.

14       The way they're displayed, it's hard to see them and I

15  wish to blow up and show a portion of a few of them to the

16  jury without any commentary other than showing the upper

17  left-hand corner, as I said, or this is dated such and such.

18       THE COURT:  Well, the -- you will not be permitted

19  to comment on them, obviously, unless you want to take the

20  oath and get on the witness stand, which I doubt you want to

21  do.  That is improper.

22       But, again, gentlemen, I think that we're a step ahead.

23  I have not placed on the record any ruling about the

24  admissibility and the objection as to hearsay.

25       If I understand, these documents -- I've given this

1    some consideration and I want to hear you on this.

2         Mr. Young, as I understand, these documents are being

3    put into evidence to show what information Ocwen submitted

4    to Equifax.  Is that correct or not?

5              MR. YOUNG:  That's correct, Your Honor.

6              THE COURT:  All right.  This is my ruling.

7         In listening to the testimony of the witness from

8    Equifax, Mr. Manning, when I look at the criteria for

9    establishing a business record, I think when looking at her

10   testimony overall she establishes the criteria, even though

11   she wasn't personally involved with each of those documents.

12        Obviously, if we always had someone with personal

13   knowledge it would alleviate the reason for the rule, the

14   hearsay rule because they would have personal knowledge and

15   be able to testify.  So I find them admissible under that

16   exception.

17        But, more importantly, these are not being offered for

18   the truth of what's asserted.  This gentleman has testified

19   that he was current with Ocwen.  They're not being offered

20   for that purpose.  They're being offered to show what

21   information Ocwen sent to Equifax, which means to me that

22   they're not offered for the truth of what's contained in

23   them.

24        And if I'm missing something as to why they're being

25   offered, I want you to tell me.  I do not believe, based on

1   what I understand their purpose to be, Mr. Manning, that

2   they are hearsay.

3        The other thing I will place on the record is that when

4   you look at 801, they are statements by a representative or

5   an employee of Ocwen who has put information on these

6   documents.  And, so, there's also information in them that

7   could be considered a statement against a party opponent by

8   a representative of that party.

9        So for all of those reasons, I think there's not a

10  hearsay issue but primarily, if I understand their use as

11  I've placed it on the record, they're not being used for the

12  truth of what's contained in them.  So I don't believe that

13  there is a hearsay issue.

14       In the event there is, though, there's 801 as well as

15  the business records exception that I do believe and I find

16  have been met.

17       For all of those reasons, I preserve the defendant's

18  objection and exception to their admissibility and I admit

19  them and they can be published without comment, Mr. Young.

20            MR. YOUNG:  Your Honor, when you say "without

21  comment," may I indicate the date of the document or the --

22            THE COURT:  You can indicate the exhibit number.

23  The jury just heard the numbers that were being placed into

24  evidence.  You can indicate the exhibit number and the date

25  on the document, but nothing further.

1      Mr. Manning, do you object to that portion of comment?

2 If you do, I want to --

3           MR. MANNING:  I do because I don't -- I believe

4 any commentary by the attorney is improper.  He would need a

5 witness here to do that.

6      The other point, if I may, Judge, on the truth of the

7 matter, I understand your ruling and I respect it.  My

8 understanding is there's no -- that the plaintiff is

9 intending to use that to show the truth of what Ocwen

10 responded, "Does this accurately reflects what Ocwen's

11 response was?"  And this witness said she doesn't know.

12           THE COURT:  Well, that's a different truth.  It's

13 not the truth of what's contained in the document or whether

14 or not this man was accurate.  Let's say Ocwen reported that

15 he was current.  They're not offering it to show that he was

16 current.  They're offering it to show what information Ocwen

17 sent to Equifax.  That's different.  The witness himself in

18 terms of substantive evidence has testified that he was

19 current.  That's substantive.

20      This is not being offered to show whether or not he was

21 current, which is the information contained in it.  It is

22 being offered, as I understand plaintiff's case, to show

23 what information Ocwen submitted to Equifax.

24      Again, for those reasons, I preserve the defendant's

25 objection and exception.

1      You can publish these by referring to the exhibit

2  number and the date, nothing further.

3      And to that I preserve Ocwen's objection and exception

4  as well.

5           MR. YOUNG:  Understood.  Thank you, Your Honor.

6           MR. MANNING:  Thank you, Judge.

7           (Bench conference concluded)

8           MR. YOUNG:  May I proceed, Your Honor?

9           THE COURT:  Yes.

10          MR. YOUNG:  Thank you.

11     Exhibit 11 dated April 10, 2013, --

12          THE COURT:  It has been admitted into evidence.

13  Is that correct, counsel?

14          MR. YOUNG:  Yes, Your Honor.

15          THE COURT:  All right.  I just wanted to make sure

16  it was one of the ones that I just admitted into evidence.

17          MR. YOUNG:  I'm now going to publish Exhibit,

18  Plaintiff's Exhibit 12.

19     Plaintiff's Exhibit 13 is being published.  The date is

20  July 24, 2013.

21     Plaintiff's Exhibit 14 is being published, response

22  date of October 11, 2013.

23     Fourth page of the same exhibit, response date of

24  October 11th, 2013.

25     First page of Plaintiff's Exhibit number 15 with a

1    response date of December 2nd, 2013.

2         The fourth page of the same exhibit, the first page of

3    Exhibit 16, January 17, 2014.

4         The third page of the same exhibit, same date,

5    January 7, 2014.

6         First page of Exhibit 17, March 23rd, 2014.

7         Fourth page of the same exhibit having the same date.

8         I'll skip ahead to the last exhibit -- excuse me -- to

9    Exhibit Number 23.  First page, August 8th, 2014.

10        I apologize.  I've confused myself.  I'm going to

11   publish one more.

12        Exhibit 19, first page, date 5-5 of '14.

13        Same Exhibit 19, same date, 5-5 of '14, the fourth page

14   of the exhibit.

15        Thank you, Your Honor.

16             THE COURT:  Call your next witness, counsel.

17             MR. NOLAN:  Your Honor, at this time we'd like to

18   call Steven Napier and present him through his deposition

19   testimony.

20             THE COURT:  Yes, sir.

21             MR. BROADWATER:  Hello again.

22             THE COURT:  Mr. Broadwater.

23             MR. KENNEY:  May we proceed, Your Honor?

24             THE COURT:  Yes, sir.

25        **STEVEN NAPIER, PLAINTIFF'S WITNESS, CALLED BY**

1    **DEPOSITION AS FOLLOWS:**

2                          DIRECT EXAMINATION

3    BY MR. KENNEY:

4    Q.    "Now I'd like to, I'd like -- I'd ask you to please

5    state your name and date of birth on the record, please.

6    A.    Steven F. Napier, May 14, 1965.

7    Q.    And how long have you been working for One Community?

8    A.    I have been with One Community since 2006, but in the

9    credit union business since 1995.

10   Q.    And what is your current position with One Community?

11   A.    The Operations Manager.

12   Q.    And when you were hired at One Community, what was your

13   position?

14   A.    Operations Manager.

15   Q.    So is it fair to say that the entire span of your

16   employment with One Community you've been the Operations

17   Manager?

18   A.    Yes, sir.

19   Q.    Okay.  And what are your duties as Operations Manager?

20   A.    I have multiple duties as far as the oversight of the

21   overall general operations of the credit union and as far as

22   supervision of its staff, procedures, and policies.

23   Q.    Okay.  And did you receive any sort of specialized

24   training other than your Bachelor's before taking this

25   position?

Steven Napier - Direct

1    A.   Just various trainings throughout the years of being in

2    the credit union movement as far as seminars or webinars,

3    things along that nature.

4    Q.   And is this just internal training that's done by the

5    bank?

6    A.   No.  Most of it was done either by lead services or

7    other third-party institutions.

8    Q.   Okay.  And do you understand that you are testifying

9    today both in your personal capacity and as the

10   representative of One Community?

11   A.   Yes, sir.

12   Q.   And do you understand that the questions that you give

13   today are binding on One Community?

14   A.   Yes, sir.

15   Q.   Okay.  I'd just like to ask you now a couple of

16   questions about your relationship with the plaintiff in this

17   case, Mr. Daugherty.  Do you recall when you first met

18   Mr. Daugherty?

19   A.   It was many years ago, many, many years ago at a former

20   credit union that I used to work at.  He was one of our

21   members in another credit union I used to work at years ago.

22   Q.   Okay.  And do you have an approximation?  Has it been

23   10 years?  20 years?

24   A.   If I had to guess, I would say it's probably been

25   around 10 years.

Steven Napier - Direct

1    Q.   Okay.  And when you had moved over to One Community, is

2    this about the time that Mr. Daugherty had moved over to One

3    Community?

4    A.   I think Mr. Daugherty had been at One Community long

5    before I got there.  I think he was a member there long

6    before that time.

7    Q.   Okay.  And specifically about in the last three years

8    or so, I understand Mr. Daugherty had got a couple of loans

9    from One Community; is that right?

10   A.   I think that he had gotten some car loans and maybe

11   some unsecured loans at One Community during that time.

12   Q.   And did he ever interact with you when trying to get

13   any of the loans, the car loan?

14   A.   Most of the time, the loan officers dealt with David.

15   Q.   Have you ever dealt with him directly?

16   A.   Not directly on a loan.  I would sometimes look at some

17   of his requests after the fact.

18   Q.   Do you know if you ever discussed applying for or being

19   denied for credit as a result of what appeared on his credit

20   report?

21   A.   Not until this mortgage loan.  When he was looking to

22   refinance his house with us, Debbie Lee (phonetic) is

23   actually the first person that talked with him.  And for One

24   Community procedures, if there's a person that's in

25   bankruptcy or foreclosure, then we're not allowed to proceed

Steven Napier - Direct

1   with that loan as far as doing any other steps into that

2   loan.

3   Q.   Do you recall when Mr. Daugherty had first spoken with

4   One Community regarding attempting to refinance his

5   property?

6   A.   Debbie Lee had brought that to my attention and wanted

7   to know if there was anything that we could do for him.  But

8   I told them with the foreclosure we couldn't proceed any

9   further.

10  Q.   Do you recall when he first sought to refinance with

11  One Community?

12  A.   No, I don't remember the exact dates.

13  Q.   And did he ever tell you or anyone at One Community

14  that his credit report was reflecting the property as being

15  in foreclosure?

16  A.   No.  The only thing he said that he had some credit

17  report issues that were in error, that they weren't correct.

18  Q.   Did he tell you anything -- did he tell you or One

19  Community anything specifically about the Ocwen tradelines

20  that were appearing on his credit report?

21  A.   The only thing he said was Ocwen had things on his

22  credit report that were not correct.  That's basically all

23  that he said until we actually pulled credit on him.

24  Q.   Okay.  And how many times did Mr. Daugherty meet with

25  One Community to discuss this refinance?

Steven Napier - Direct

1    A.    I believe that he met with Debbie Lee one time.  And

2    there -- he came into my office one time and talked with me

3    about the possibilities of it.  So a total of just two times

4    that I can remember.

5    Q.    Were there any other employees at One Community that

6    worked with Mr. Daugherty about this refinance?

7    A.    Not on the mortgage, no.

8    Q.    And I know that you had said that he had spoken with

9    Debbie Lee and he had spoken with you.  Do you recall when

10   he had spoken with you?

11   A.    If I had to guess, I would say it was probably maybe

12   May of 2014 possibly, somewhere in that time frame.

13   Q.    And do you recall when he had first spoken with Debbie

14   Lee?

15   A.    I would say it was probably within that same month.

16   And don't quote me on that.  I'm not exactly sure of those

17   dates.

18   Q.    Okay.  And I'd like to ask you now just a couple

19   questions about the documents that were produced in response

20   to the subpoena.  I'd like to -- I'd first like to look

21   at -- it looks to be some computer notes.  I believe these

22   were what was previously marked as tab seven.

23         Mr. Napier, are you familiar with this screen print?

24   A.    Yes, sir.

25   Q.    And can you just describe generally what this is?

Steven Napier - Direct

 1   A.   This is basically a loan officer's comments about a

 2   loan that is being applied for.  And this is where they put

 3   in their notes so two months down the road we can remember

 4   why we did what we did.

 5   Q.   So this was not Debbie Lee or you.  This is a separate

 6   employee of One Community?

 7   A.   Yes, sir.  That 001 up there in the square, and it's

 8   got the 731, that 001 is a teller ID.  And that belongs to

 9   our own loan officer named Stacie Darling.  So this would be

10   her notes.

11   Q.   Okay.  But Ms. Darling didn't have any direct

12   interaction with Mr. Daugherty; is that right?

13   A.   Not about the mortgage loan, correct.

14   Q.   And this was just her notes after reviewing his file;

15   correct?

16   A.   Correct, about a consumer loan.

17   Q.   And these notes, the first one here appears to be dated

18   July 23rd, 2014, at 10:38 a.m.  Is that right?

19   A.   Yes, sir.

20   Q.   And is this the date this note would have been entered?

21   A.   Correct.

22   Q.   And just going through the notes here, I see it

23   mentions a couple of tax liens.  Are you aware of any tax

24   liens that were appearing on Mr. Daugherty's credit report?

25   A.   Yes, sir.

Steven Napier - Direct

1   Q.   And what is your understanding of those tax liens?

2   A.   They -- from my understanding, they were federal or

3   state tax liens.  I think they were federal tax liens.

4   Q.   And these were outstanding non-paid liens?

5   A.   Yes, sir.  They were outstanding liens.  That was part

6   of the reason that he was asking for the refinance, I

7   believe, was to refinance a house so he could pay those tax

8   liens.

9   Q.   Okay.  And it looks like there's a note in here about a

10  van.  It's notated.  It says, "Member wants loan to repair

11  van instead of taking on a new car payment, LTV," which I

12  imagine stands for loan to value.  Is that correct?

13  A.   Yes, sir.

14  Q.   And, so, these notes are with regard to a consumer loan

15  to repair a van it appears; is that correct?

16  A.   Correct.

17  Q.   Okay.  And on the next page there's another entry of

18  notes underneath this note.  And this one looks like it's

19  also dated July 24th, 2014.  It looks like it says, "I've

20  known Dave for a long time.  I believe he will pay.  Other

21  income not included from the business.  Value of the van

22  will cover most of the loan if push comes to shove."  And it

23  looks like that's your name; is that right?

24  A.   Yes, sir.

25  Q.   So was this an entry made by you?

Steven Napier - Direct

1   A.   Yes.

2   Q.   So when Mr. Daugherty was applying for this consumer

3   loan, what was the process for that?  The consumer loan with

4   regard to this van that's being spoke of in these notes

5   here, what is the process for applying for that loan?

6   A.   He would have come in and talked to Stacie Darling and

7   applied for the loan.  And if I remember correctly, Stacie

8   come around and had talked to me about the loan, wanted to

9   make sure we were comfortable granting the loan for the van

10  repairs.

11  Q.   Was there any formal application that was made with

12  regard to this private consumer loan?

13  A.   Yes.

14  Q.   And what did that application involve?

15  A.   What a normal process you'd go through for an

16  application; name, address, Social Security number, income.

17  Q.   Was there a credit check that was done with regard to

18  this loan?

19  A.   I'm almost positive there was, yes.

20  Q.   And that credit check would have been done within the

21  same time period, July 24th, 2014?

22  A.   Yes, sir.

23  Q.   And it looks like he was ultimately approved for this

24  loan; right?

25  A.   Correct.

Steven Napier - Direct

1    Q.    Okay.  I'd like you to turn now to the affidavit that

2    you had submitted.  Mr. Napier, are you familiar with this

3    document?

4    A.    Yes, sir.

5    Q.    And this is an affidavit that was executed by you; is

6    that correct?

7    A.    Correct.

8    Q.    Did you write this affidavit?

9    A.    Yes.

10   Q.    I'd like to turn to Paragraph 4 here which says, "One

11   Community Federal Credit Union procedures require that the

12   lending process ends if an applicant is in bankruptcy or

13   foreclosure."

14   A.    Okay.

15   Q.    Is that right?

16   A.    Yes, sir.

17   Q.    And I understand that the context of this was that

18   because there was a foreclosure appearing on Mr. Daugherty's

19   credit report, there was no further inquiry in the

20   application process; is that right?

21   A.    Correct.  We could not proceed any further with the

22   process.

23   Q.    And how did you know that the foreclosure was

24   appearing?

25   A.    It showed up on his tri-merge credit report when Debbie

Steven Napier - Direct

1  Lee pulled credit on Mr. Daugherty.

2  Q.   So in connection with this refinance, you had actually

3  run a credit inquiry; is that right?

4  A.   Yes.

5  Q.   And going back to this affidavit, Paragraph 5 says,

6  "Although Mr. Daugherty had state tax liens on his credit

7  report and other collections, the credit union may have

8  offered a loan to Mr. Daugherty because of his history with

9  the credit union."  Is that correct?

10  A.   Yes, sir.

11  Q.   And I understand you've written here the word "may."

12  And I just want to ask, you can't say with reasonable

13  certainty that One Community would have offered this loan;

14  is that correct?

15  A.   Correct, too many variables.

16  Q.   And you have here at the bottom of it, "May have

17  offered a loan to Mr. Daugherty because of his history with

18  the credit union."  However, it's not a, it's not a common

19  practice to approve loans simply because of a relationship

20  with One Community.  Is that right?

21  A.   It depends on the situation and the individual.

22  Q.   If there were adverse tradelines on a consumer's credit

23  report, it wouldn't be the normal practice of One Community

24  to approve a large refinance such as the one at issue here

25  simply on the basis of the, of the consumer's relationship

Steven Napier - Direct

1   with the bank; is that correct?

2   A.    Correct.

3   Q.    And, so, the last paragraph here, Paragraph 6, says,

4   "The credit union cannot proceed with the loan after noting

5   that Ocwen reported to Equifax that his home is in

6   foreclosure."  Is that right?

7   A.    That's correct.

8   Q.    So what would be the next step after a credit report is

9   run?  What would be the next step in proceeding with the

10  loan application?

11  A.    They would make sure that the -- probably the next

12  thing is to make sure that the debt-to-income ratio would

13  fall in line.

14  Q.    And how about after that?  I'm asking in your typical,

15  in your typical loan such as the one at issue here, after a

16  credit report is run I'm just wondering what the next steps

17  are to proceed with the loan application that would

18  ultimately lead to approval or denial.

19  A.    Yeah.  You've got several factors that would be

20  involved.  You'd have to look at a debt-to-income ratio.

21  You'd have to look at the loan-to-value ratio.  Okay.  You'd

22  have to look at the number of tradelines the member may or

23  may not have.  There's several factors involved in going

24  through whether you're going to approve or deny a loan.

25  Q.    And it's my understanding that there was no

Steven Napier - Direct

1  debt-to-income ratio analysis that occurred here, is that

2  correct, with Mr. Daugherty?

3  A.   Correct.  Once the foreclosure was reported, everything

4  stopped.

5  Q.   And there was no loan-to-value analysis with

6  Mr. Daugherty; is that correct?

7  A.   Correct.

8  Q.   So even if Mr. Daugherty had no foreclosure appearing

9  on his credit report, it is possible that he could have

10  still been ultimately denied for the loan depending on the

11  debt-to-income ratio and the loan-to-value ratio?

12  A.   Yes, that's true.

13  Q.   Did Mr. Daugherty ever fill out a formal credit

14  application?

15  A.   I don't know.  I wasn't in when Debbie Lee took the

16  application, but I'm assuming he did.

17  Q.   Is this a common practice that a consumer would fill

18  out a formal loan application before a credit inquiry would

19  be run?

20  A.   Yes.

21  Q.   And when One Community runs their credit check, is

22  there a particular service they use?  For example, do they

23  typically check the TransUnion FICA score, Equifax or

24  Experian?

25  A.   On the mortgages?  Mortgage loans are what they call a

Steven Napier - Direct

1   tri-merge.  They pull all three.  And then on the consumer

2   side, we pull a TransUnion credit score.

3   Q.   I'm sorry.  So who pulls the TransUnion?

4   A.   On the consumer side, it's TransUnion.

5   Q.   Oh, for consumer loans it's a TransUnion report.  And

6   for the mortgage loans, it's the tri-merge.  Is that right?

7   A.   Yes, sir.

8   Q.   Okay.  I understand.  So going -- I'd like to discuss

9   the TransUnion report that was produced.  Mr. Napier, the

10  first page here of Exhibit 5 is a CBC Innovis.  Do you see

11  that?

12  A.   Yes, sir.

13  Q.   It looks like it says "in file credit report."  Is that

14  right?

15  A.   Correct.

16  Q.   Can you tell me what that document is?

17  A.   This is the tri-merge report that would be pulled for a

18  mortgage application.

19  Q.   Okay.  And this is done -- is this done internally

20  within the bank or how do you -- how does One Community

21  obtain a tri-merge report?

22  A.   We input the system, put the information into the

23  system, and then it creates the tri-merge report.  And then

24  we can print it off for review.

25  Q.   When you say "the system," do you mean One Community's

Steven Napier - Direct

1   own computer systems?

2   A.   Yes.  And I think that ties in with the CBC.

3   Q.   Okay.  And on the next page it looks like there are a

4   couple entries here about tax liens; is that right?

5   A.   Yes, sir.

6   Q.   And on the page after that, the next page, it looks

7   like there are some entries there for Ocwen Loan Servicing.

8   Do you see that?

9   A.   Yes, sir, on the bottom of the page.

10  Q.   One of them says "foreclosure process started."  Do you

11  see that one?

12  A.   Yes, sir.

13  Q.   And to the right of that it says EFX 01; is that

14  correct?

15  A.   Correct.

16  Q.   Does that mean that the foreclosure was appearing on

17  the Equifax report?

18  A.   Yes.

19  Q.   And the entry above that, it also says "Ocwen loan" and

20  it has the same number.  Do you see that?

21  A.   Correct.

22  Q.   Does that mean that these two entries are for the same

23  loan?

24  A.   That's what we weren't clear on.  It could be.  I'm not

25  real, real sure.  But if you notice, the balances owing are

Steven Napier - Direct

1   different on there as far as the dollar amounts.

2   Q.   Right.  And this one also says EFX 01; is that right?

3   A.   Correct.

4   Q.   What does the TRU in parentheses mean?

5   A.   That I'm not sure.

6   Q.   So other than this tri-merge report, was there ever a

7   formal solely Equifax report run by One Community?

8   A.   No, sir.

9   Q.   So where it says here the foreclosure process started,

10  is this how One Community knew that Mr. Daugherty's credit

11  file was showing foreclosure?

12  A.   Correct.

13  Q.   And did you review any other documents that indicated

14  Mr. Daugherty's credit file was showing a foreclosure?

15  A.   No, sir.

16  Q.   And, so, is it fair to say that the only way One

17  Community knew that Equifax was reporting a foreclosure is

18  just by this tri-merge report?

19  A.   Correct.

20  Q.   Now, I'd like to just -- if we keep turning a couple

21  pages, I believe it's actually the last, the last three

22  pages here, this looks to be another credit report.  It

23  looks like a TransUnion credit report.  Just let me know

24  when you're there.

25  A.   Okay.

Steven Napier - Direct

1  Q.   And the inquiry date here is May 21st, 2015, as well;

2  is that right?

3  A.   Yes, sir.

4  Q.   Do you know what the date means?  What's the

5  significance of that date?

6  A.   That's when the credit report would have been pulled.

7  Q.   So this credit report wasn't pulled until May 21st,

8  2015?

9  A.   Correct.

10  Q.   And do you recall why this particular credit report was

11  pulled?

12  A.   I think this had to do with the consumer loan that

13  Mr. Daugherty applied for in regards to his van repairs.

14  Q.   So is it your understanding that this TransUnion report

15  was irrelevant with regard to the refinance of the mortgage

16  loan?  Is that right?

17  A.   That's correct.

18  Q.   And as we discussed, the inquiry date here, 5-21-15,

19  and just going back to that tri-merge report, we discussed

20  the date completed 5-21-15 as well?

21  A.   Right.

22  Q.   Is it possible that both of these reports were run on

23  the same day?

24  A.   It's possible, but I wouldn't see why.  But, again, I

25  wasn't in with the initial interview with Mr. Daugherty or

Steven Napier - Direct

1   the refinance of his mortgage or his inquiry on the consumer

2   loan.

3   Q.   And, so, this consumer loan that we're talking about is

4   for the vehicle; correct?

5   A.   Correct.

6   Q.   And under the report date here it says 7-22, 2014.  Is

7   it possible that could have been the date that the credit

8   report was pulled?

9   A.   It's possible.  But more than likely, it was probably

10  May 21 of 2015.

11  Q.   Well, going back to those computer notes that we've

12  previously discussed, I know these notes were regarding the

13  consumer loan, the car loan.  And those notes were dated

14  July 23rd, 2014, which is the day after this credit report

15  date is dated.

16  A.   Uh-huh.

17  Q.   Is it possible that this report was run with regard to

18  the consumer loan in July of 2014?

19  A.   Yes.

20  Q.   In going through this TransUnion report, you would

21  agree that there's no mention of a foreclosure on this

22  report; correct?

23  A.   No mention of a foreclosure on this one.

24  Q.   I know we had talked earlier about how -- because you

25  saw the foreclosure in the tri-merge report, the application

Steven Napier - Direct

1    process ended there; correct?

2    A.    Yes, sir.

3    Q.    Was there ever any formal denial letter that was sent

4    to Mr. Daugherty?

5    A.    I'm not so sure if there was one or not.  I'd have to

6    check with Debbie Lee and see.  Generally, there's an

7    adverse -- what we call an adverse action that's sent.

8    Q.    Sure.  I just have a few more questions for you.  I

9    appreciate your patience.

10   A.    No problem.

11   Q.    I'd like to turn to some notes.  Mr. Napier, are you

12   familiar with these notes?

13   A.    Yes, sir.

14   Q.    And who were those notes created by?

15   A.    They were created by me.

16   Q.    Is that your signature at the bottom of this page?

17   A.    Yes, sir, it is.

18   Q.    And the notes say, the notes say it looks like it was

19   dated June 5th, 2015; correct?

20   A.    Correct.

21   Q.    And it says -- looks like it says, "Dave gave me

22   permission to talk to Jed concerning any of his accounts.  I

23   gave Dave a copy of this packet and informed him he needed,

24   if he needed anything to let us know."  Is that correct?

25   A.    Correct.

Steven Napier - Direct

1    Q.   Did you ever speak directly with Mr. Daugherty's

2    attorney?

3    A.   Yes.

4    Q.   And what was the nature of that conversation?

5    A.   He just basically was filling me in on what was going

6    on as far as Mr. Daugherty's complaint.

7    Q.   And how many times would you say that you had met with

8    Mr. Daugherty's attorney?

9    A.   I think I only talked to him once on the phone.

10   Q.   And during the conversation when you talked about the

11   basis of the complaint, did you talk about anything else?

12   A.   No, not really.

13   Q.   And did you tell Mr. Daugherty's attorney that he was

14   denied a refinance loan?

15   A.   Yes, I did.

16   Q.   And did you tell him that the formal application was

17   never completed because the tradelines or the tri-merge

18   report showed a foreclosure?

19   A.   I don't remember if I told him that or not.  I just

20   know that once we saw the foreclosure, we would have stopped

21   the process.

22   Q.   Do you recall if you ever told him about the TransUnion

23   report not showing a foreclosure on it?

24   A.   I don't recall.

25   Q.   Did you speak with Mr. Daugherty's attorney regarding

Steven Napier - Cross

1  anything that we've not previously discussed?

2  A.   Not that I'm aware of.

3  Q.   And did you seek assistance from anyone outside of One

4  Community when reviewing or working on Mr. Daugherty's

5  credit file?

6  A.   No, we did not.

7  Q.   Okay.  And is there anything you talked about with

8  Mr. Daugherty or his attorney that we've not discussed here

9  today?

10  A.   Not I'm aware of.

11  Q.   Okay.  That's all the questions I have for you, Mr.

12  Napier.  All right, sir.  I'll turn you over to Jed."

13                   CROSS EXAMINATION

14  BY MR. NOLAN:

15  Q.   "Hello, Mr. Napier.  Thanks for meeting with us today.

16  A.   No problem.

17  Q.   I just have a couple questions.  You denied

18  Mr. Daugherty's mortgage loan application because of

19  foreclosure; correct?

20  A.   Yes, sir.

21  Q.   Now, when you pulled his consumer credit report from

22  TransUnion, there was no foreclosure; correct?

23  A.   Correct.

24  Q.   But the TransUnion file did have other adverse

25  tradelines; correct?

1    A.    Yes, sir.

2    Q.    Such as tax liens and medical bills; is that correct?

3    A.    Yes, sir.

4    Q.    And despite those other negative tradelines on his

5    credit report, you still extended a loan to Mr. Daugherty;

6    is that correct?

7    A.    Yes, we did.

8    Q.    Had there been a foreclosure on the TransUnion report,

9    would you have extended him a loan on the consumer

10   application?

11   A.    Repeat that again, please.

12   Q.    Sorry.  If the foreclosure had appeared on his

13   TransUnion credit report during his consumer loan

14   application, would you have granted his application?

15   A.    For a consumer loan?  Probably not.

16   Q.    Once One Community saw the foreclosure notation on the

17   tri-merge application, they immediately denied his

18   application; correct?

19   A.    Correct.

20   Q.    I don't have anything further."

21                       REDIRECT EXAMINATION

22   BY MR. KENNEY:

23   Q.    "Mr. Napier, I have a few follow-up questions.  We

24   discussed earlier that the processes for applying for a

25   consumer loan are different than the processes for applying

Steven Napier - Redirect

1   for a mortgage loan; correct?

2   A.   Correct.

3   Q.   And it's fair to say that the process for applying for

4   a mortgage loan is a bit more strict than applying for a

5   consumer loan of lesser value?

6   A.   Yes, that's a fair assessment.

7   Q.   And you had previously said that had the foreclosure

8   appeared on Mr. Daugherty's TransUnion report, you would

9   likely have denied him the consumer loan; is that right?

10  A.   Correct.

11  Q.   Is it fair to say that despite the fact that the

12  foreclosure was not appearing on the TransUnion report, you

13  knew that there was a foreclosure appearing on his Equifax

14  report, or at least on a tri-merge report at the time this

15  loan was granted?

16  A.   Yes.

17  Q.   So despite the fact that you knew that there was a

18  foreclosure report appearing on his credit report, One

19  Community still offered the loan to him simply because the

20  foreclosure didn't appear on the TransUnion report?

21  A.   No.  Chances are if we had pulled only a TransUnion

22  credit report, we would not have known.  But for

23  conversation sake, if the foreclosure was on the TransUnion

24  report and he had applied for a consumer loan, we would --

25  excuse me -- he would have been denied.

Steven Napier - Recross

1    Q.    So before the TransUnion report was run, One Community

2    knew that a foreclosure was appearing on the tri-merge

3    report; correct?

4    A.    Correct.

5    Q.    So One Community knew that the foreclosure was

6    appearing but offered the loan for the -- the consumer loan

7    because it didn't show up on the TransUnion report, on the

8    TransUnion report?  Is that right?

9    A.    That, that and circumstances.

10   Q.    And what circumstances are those?

11   A.    That he was trying to dispute that on his credit

12   report.

13   Q.    Okay.  I don't think I have any further questions for

14   you.

15   A.    Okay.  Thank you."

16          MR. NOLAN:  I'm sorry.  It will be quick.

17                  RECROSS EXAMINATION

18   BY MR. NOLAN:

19   Q.    "You testified that the foreclosure was a stop sign, so

20   to speak, on his credit application; correct?

21   A.    Repeat that again.  What was the sign?

22   Q.    A stop sign.

23   A.    Yes, yes.

24   Q.    Is a tax lien a stop sign on a mortgage application?

25   A.    Not always.

Steven Napier - Re-Redirect

1  Q.   And were other negative tradelines a stop sign on a

2  mortgage application?

3  A.   Not in every circumstance, no.

4  Q.   That's all I have."

5                    RE-REDIRECT EXAMINATION

6  BY MR. KENNEY:

7  Q.   "And I'll just follow up with one last thing.  You said

8  not always.  But it is possible that the tax liens could be

9  a stop sign on a mortgage application; is that correct?

10 A.   Yes, sir.

11 Q.   Again, it's going to have to be looked at on an

12 individual basis?

13 A.   Sure, sure.

14 Q.   If it's a small tax lien or a large tax lien, you know.

15 A.   Sure.

16 Q.   That's all the questions I have."

17          THE COURT:  You may step down, Mr. Broadwater.

18          MR. NOLAN:  Your Honor, at this time I'd like to

19 move the admission of the tri-merge credit report that was

20 discussed in that deposition.

21          THE COURT:  Any objection?

22          MR. MANNING:  Yes, Judge.  It's a hearsay

23 document.  There was no foundation laid for it.

24          THE COURT:  All right.  Response to the hearsay

25 objection, counsel?

1        MR. NOLAN:  It was reviewed and testified to as

2  being the report that Mr. Napier observed.  It's being

3  offered for the effect on the listener, why Mr. Napier

4  observed that he was denied the loan.  It's not being

5  offered for the truth that Mr. Daugherty was in foreclosure,

6  that Equifax was reporting that.  It's being offered to show

7  that when Mr. Napier reviewed these documents, he made a

8  decision based on these documents.

9        THE COURT:  All right.

10     Mr. Manning, anything further?

11        MR. MANNING:  There was no testimony as to the

12  reliability or the accuracy of the report also, Judge.  It's

13  just not sufficiently reliable.

14        THE COURT:  All right.  Well, I'm going to admit

15  it for the limited purpose of the impact it had on him, but

16  not for any other purpose, counsel, given that there was no

17  further testimony or foundation for the admissibility of the

18  document.

19     I do believe, however, and I find that if it's

20  something that he reviewed in connection with the

21  allegations in this case that it can come in to show what,

22  if any, impact it had on him, --

23        MR. NOLAN:  Yes, Your Honor.

24        THE COURT:  -- preserving Ocwen's objection and

25  exception, Mr. Manning.

1          MR. MANNING:  Thank you, Judge.

2          THE COURT:  Call your next witness, counsel.

3          MR. NOLAN:  Your Honor, the plaintiff calls Evan

4    Hendricks.

5          THE COURT:  Sir, would you come up and take an

6    oath or affirmation, please.

7          **EVAN HENDRICKS**, PLAINTIFF'S WITNESS, SWORN

8          MR. MANNING:  Your Honor, before we start while

9    he's getting some water could we have a brief sidebar on

10   this?

11         THE COURT:  Yes, sir.

12         (Bench conference on the record)

13         THE COURT:  Mr. Manning.

14         MR. MANNING:  This is the issue that I raised at

15   the beginning of the trial regarding the scope of the

16   expert.  And, obviously, I don't know what questions he's

17   going to ask, but it's difficult to unring the bell.

18       And to the extent he's going to go beyond the scope of

19   his report, I don't know that an instruction to the jury

20   cures it.  I know Your Honor has already ruled you're

21   limited to the 26(a)(2) and Mr. Young in the beginning said

22   they weren't going to go beyond it.  But we had his 26(a)(2)

23   back in April.  It wasn't supplemented.  The rules are real

24   clear.  And I didn't want to be in a situation where we had

25   to do this and interrupt the witness.

Evan Hendricks - Direct (Nolan)

1          MR. NOLAN:  Your Honor, the events he testified to

2     are in his report and we plan to examine him on the basis of

3     his opinions.  He had certain documents available to him at

4     that time and we're going to review those documents.  He

5     testified about credit reporting in general which is the

6     basis of his expertise.  That's what we're going to examine

7     him on today.

8          THE COURT:  Okay.  If there are objections, let me

9     know and I'll handle this as we go, Mr. Manning.

10         MR. MANNING:  Thank you, Judge.

11         MR. NOLAN:  Is there anything specific I can be

12    aware of?

13         MR. MANNING:  Well, the same thing that I

14    addressed in the opening.  There's no opinions here

15    regarding causation or damages.  Further, there's no

16    evidence that he has ever reviewed or seen any of Ocwen's

17    training procedures and policies.  As a result, he can't

18    talk about any of those things.

19         THE COURT:  I'll take objections as I hear them,

20    gentlemen.

21         (Bench conference concluded)

22                  DIRECT EXAMINATION

23    BY MR. NOLAN:

24    Q.   Mr. Hendricks, could you please introduce yourself to

25    the jury?

Evan Hendricks - Direct (Nolan)

1    A.    Hi.  My name is Evan Hendricks.  I'm the owner of a

2    small company called Privacy Times, Inc.

3    Q.    What is Privacy Times?

4    A.    Privacy Times most of its life was a publishing

5    company.  I published a newsletter called *Privacy Times*

6    which was a specialized newsletter that I started back in

7    1981 which covered lots of privacy laws including the Fair

8    Credit Reporting Act.  And I published it for 33 years and

9    closed it down in December, 2013.

10        And for the last 15 years, I was doing two jobs.  I was

11   doing that and also doing expert witness work.  And I've

12   also done consulting for government agencies and other

13   private companies.

14   Q.    Now, let's unpack that a little bit.  So you say you

15   served as an expert previously?

16   A.    Yes.  I served as an expert witness many times in many

17   cases and testified in trials and had my deposition taken.

18   Q.    And how has serving as an expert helped provide you

19   with specialized knowledge?

20   A.    Yeah.  That's -- I'm the kind of an expert that's a

21   specialized knowledge expert.  And if you get -- if you're

22   an expert witness, you get access to all the documents in

23   the case.

24        And in the credit reporting cases, all these documents

25   and all these policies and their practices, it's not public

Evan Hendricks - Direct (Nolan)

1   information.  You can't go on the internet and find it.

2   Sometimes you only get to see it because you live under a

3   protective order.

4       But that way, you get access to all the information of

5   the credit bureaus and the big creditors and all the

6   entities that furnish information.  And, so, I've had an

7   opportunity through the years to look at all those

8   practices, policies, and procedures.

9   Q.   So you mentioned also that you had worked with

10  Congress.

11  A.   Yeah.  I've testified before Congress about 10 times,

12  always by invitation, usually on credit reporting related

13  issues but sometimes on the privacy of other types of

14  personal information.

15  Q.   When did your involvement first begin?

16  A.   Well, in the -- the first law that was ever passed --

17  privacy law that was passed in the U.S. was the Fair Credit

18  Reporting Act.  And that was way back in 1970 even before I

19  started.

20      But by the 19 -- by the early 1990s, it became a very

21  big news issue which I covered in my newsletter about

22  problems people are having with the accuracy of credit

23  reports.

24      And, so, all that interest got Congress to revisit the

25  law.  And they had hearings and they amended the law.  And

Evan Hendricks - Direct (Nolan)

1    what was really significant there, until that time there

2    were no responsibilities on the creditors to make sure that

3    they reported accurately and they investigated disputes.

4         So that was the first time that they did that.  And I

5    was involved with the whole process of working with the

6    groups that worked with Congress to see how that law would

7    be shaped.

8    Q.   And when was that?

9    A.   That was in 1996.

10   Q.   Okay.  Did you continue to work with Congress after

11   that?

12   A.   Yes.  I would -- I would do dual roles.  I would

13   monitor, report on stories.  But sometimes I'd be asked to

14   testify before the committees if they had certain subject

15   matters that they're interested in.

16        And then seven years after that 1996, Congress spent

17   another whole year amending the act to try and strengthen it

18   more for consumers.  And that's when they also strengthened

19   the, the responsibilities of the creditors and furnishers to

20   make sure that they investigated disputes when their

21   consumers were disputing information.

22   Q.   Did you continue to track the development of that law?

23   A.   Yeah.  It's always been -- because credit report data

24   is so important, I mean, I wrote my book, *Credit Scores and*

25   *Credit Reports*, around this time in 2003-2004.  And there

Evan Hendricks - Direct (Nolan)

1    was just always a lot of interest because of the importance

2    of credit report data.

3        And, and you've heard about the CFPB, the Consumer

4    Financial Protection Board.  There's other institutions that

5    have oversight or enforcement responsibilities.  And in 2004

6    there was issued what I considered extremely important

7    notice to all the creditors that if they got a dispute from

8    a credit bureau like Equifax that they had to do a good

9    enough investigation; that they had to do a searching

10   inquiry, something with enough care to it to find out what

11   the problem was.  And it wasn't enough to just do some

12   superficial response.

13       So that was sort of a real important form of notice to

14   the industry.

15   Q.   And when was that?

16   A.   2004.

17   Q.   So over 10 years ago?

18   A.   Uh-huh.

19   Q.   Have you had any media appearances in your time?

20   A.   I'm sorry?

21   Q.   Media appearances.

22   A.   Yeah.  I got to be on all the cable channels like CNN

23   and FOX and CNBC.  I was interviewed in the newspapers like

24   the *Wall Street Journal* and the *New York Times*.  And I also

25   got to be on the *Oprah Winfrey* show once.

Evan Hendricks - Voir Dire Examination (Manning)

1          MR. NOLAN:  Your Honor, at this time I'd like to

2    move to qualify Mr. Hendricks as an expert under the FCRA.

3          THE COURT:  Any objection, Mr. Manning?

4          MR. MANNING:  May I ask a question that goes to

5    qualifications?

6          THE COURT:  Any objection?

7          MR. NOLAN:  No, Your Honor.

8          THE COURT:  Just a second.  No objection to the

9    question?

10          MR. NOLAN:  That's correct, no objection, Your

11    Honor.

12          THE COURT:  All right.  Go ahead, please.

13               VOIR DIRE EXAMINATION

14    BY MR. MANNING:

15    Q.   Mr. Hendricks, have you ever worked at Equifax?

16    A.   No.

17    Q.   Have you ever worked at TransUnion?

18    A.   No.

19    Q.   Have you ever worked at Experian?

20    A.   I was on the Consumer Advisory Council for Experian,

21    yes.

22    Q.   Were you an employee?

23    A.   I was -- no, I was invited as an expert to serve on

24    their Consumer Advisory Council.  It was a paid position,

25    yes.

Evan Hendricks - Voir Dire Examination (Manning)

1   Q.   So you haven't actually worked as an employee for any

2   of the credit bureaus?

3   A.   No, not a full-time employee, no.

4   Q.   And, so, although you have some experience in the

5   industry, you've never actually worked for any of the credit

6   bureaus?

7   A.   That's correct.

8            MR. MANNING:  Your Honor, I would object to this

9   witness being offered as an expert.  He has no first-hand

10  knowledge of this industry having worked at none of the

11  credit bureaus.

12           THE COURT:  Any response you want to give,

13  Mr. Nolan?

14           MR. NOLAN:  Yes, Your Honor.

15      Mr. Hendricks just testified that he worked with

16  Experian on their board.  He's worked directly with Congress

17  who's the body that created this law.  The fact that he

18  hasn't worked inside the industry is neither here nor there

19  on whether he has experience and whether he has relevant

20  testimony that can be helpful to the trier of fact in this

21  matter which is the standard for an expert.

22           THE COURT:  All right.  Listening to the

23  testimony, this witness has indicated that for many years he

24  published a specialized newsletter on privacy matters,

25  including those related to credit reporting.  He's served as

Evan Hendricks - Direct (Nolan)

1   an expert many times.

2       He has specialized knowledge that he has garnered as a

3   result of working in the field.  He was involved in 1996

4   with groups that worked with Congress on how the law should

5   be shaped.  And then, as I understand it, he was involved

6   again in 2003 when Congress took on the effort to amend the

7   statute.  He has written a book regarding credit scores and

8   credit reports.

9       I find that he has experience, related experience,

10  counsel, and that he should be allowed to give expert

11  testimony in the field related to this case.  I find that

12  that testimony could be helpful to the jury in determining

13  the issues in this case.

14      And, so, for those reasons, I overrule the objection,

15  preserving the objection and exception of the defendant

16  Ocwen.

17          MR. MANNING:  Thank you, Judge.

18          THE COURT:  I specifically find that in order for

19  him to have specialized knowledge that's useful to the jury,

20  it is not necessary that he have first-hand experience with

21  working with one of the credit reporting agencies.

22      Go ahead, please.

23          MR. NOLAN:  Thank you, Your Honor.

24  BY MR. NOLAN:

25  Q.  So let's start with some basics.  How does a furnisher

Evan Hendricks - Direct (Nolan)

1  provide or furnish information to a credit reporting agency?

2  A.   There are three main ways that a creditor/furnisher

3  furnishes information.

4       One -- you've heard about all three of them.  One is

5  the, the monthly reporting that they do.  Every month they

6  tape about their customers or they do it through a pipeline.

7       The second way is through that form that's called the

8  AUD, the Automated Universal Data form.  That's if they're

9  sending in -- the creditor gets a call from a customer and

10 says, "Well, we can send in this correction.  If the

11 customer's right, we'll send in the correction."

12      And the third one which you've heard a lot about and

13 you're going to continue to hear about is the ACDV.  That's

14 the third type of form or way that the furnisher will

15 furnish information to a credit bureau like Equifax.

16 Q.   And let's back up.  Can you define the term "furnish"

17 just so we're all clear?

18 A.   Yeah.  "Furnish" just means that they're reporting the

19 information.  They're giving it.  They're communicating it.

20 I think we could go on.  There's probably a long list of

21 synonyms.

22 Q.   And can you tell us how does a derogatory or negative

23 tradeline affect a consumer?

24 A.   There's two ways that derogatory data can harm a

25 consumer's creditworthiness.  The first way is it can lower

                        Evan Hendricks - Direct (Nolan)

1    their credit score.  But that's really not the main issue in

2    this case.

3         It's the second way that's most relevant here, and

4    that's that a tradeline can have a certain derogatory nature

5    to it like a foreclosure.  And there are underwriters that

6    will scan the credit report for key derogatory terms, and

7    "foreclosure" is one of them.

8         So it serves, as you heard, a stop sign.  I like to

9    call it a scarlet letter.  And that's why that in this case

10   Mr. Napier said while it could give him -- even though he

11   had problems on his credit report with TransUnion, they

12   would give him a loan because there was no scarlet letter on

13   there.  There was no foreclosure.

14        But with the Equifax -- when -- in a mortgage they pull

15   all three.  So one scarlet letter on one credit report

16   becomes the stop sign.  And that's -- so the second way, the

17   scarlet letter, is the way --

18             MR. MANNING:  Judge, I need to object here.  This

19   is outside the scope of the report.

20             THE COURT:  Response?

21             MR. NOLAN:  This is the basis of credit scoring.

22             THE COURT:  Response to the objection?

23             MR. NOLAN:  This is contained directly in his

24   report.  He has a section on how credit affects consumers

25   and credit scoring.

Evan Hendricks - Direct (Nolan)

1      THE COURT:  And your specific objection to what he

2  stated, Mr. Manning?

3      MR. MANNING:  Yes, Judge.  There are -- there's a

4  report that he's offered and that report doesn't say

5  anything that includes his last answer.  It should be

6  stricken from the record.

7      THE COURT:  Well, give me specifically what it is

8  about his last answer that you're objecting to.

9      MR. MANNING:  His application of this general

10  concept to the facts of this case.  He has not offered any

11  opinion about the facts of this case as per his last answer.

12  And I can show you the report.

13      THE COURT:  I would like to have a copy of the

14  report.  I don't need you all.  I just need the report.  You

15  both have the same report.  Right?

16      MR. MANNING:  It's on Page 6.

17      THE COURT:  All right.  Thank you.

18    (Pause)

19      THE COURT:  Counsel, I have reviewed the portion

20  of the report that you all have directed me to, as well as

21  reviewing the witness's last answer.

22    I find that there is no opinion given in this last

23  answer, the best that I can read it, Mr. Manning, that's

24  inconsistent with what I see here.  It appears to me to be a

25  general discussion about credit reporting.

Evan Hendricks - Direct (Nolan)

1    And, so, for that reason, I overrule the objection,

2    preserving Ocwen's objection and exception.

3              MR. MANNING:  Your Honor, if I may have a brief

4    sidebar just to clarify --

5              THE COURT:  No, sir.

6              MR. MANNING:  May I just state it in open court?

7              THE COURT:  No.  I will let you address the record

8    at a break, though, Mr. Manning.

9              MR. MANNING:  Thank you, Judge.

10             THE COURT:  Yes, sir.

11   BY MR. NOLAN:

12   Q.   Mr. Hendricks, what documents did you, were you able to

13   review when you were preparing your report?

14   A.   Well, the documents that were available at the time

15   which basically were produced by the plaintiff or by

16   Equifax.  To my recollection, at that point in time

17   defendant Ocwen had not disclosed the documents that were, I

18   guess, asked for or demanded in discovery at that point.

19   Q.   Let me draw your attention to the monitor.  Have you

20   seen this document before?

21   A.   Yes.

22   Q.   Can you describe what this document is?

23   A.   How do I focus this?

24   Q.   I'll work on that.

25             MR. NOLAN:  Actually, Your Honor, I'd like to

Evan Hendricks - Direct (Nolan)

1   publish this.  This is Plaintiff's Exhibit Number 11.

2          THE COURT:  It's previously been admitted and can

3   be published at your discretion.

4          MR. MANNING:  Objection, Judge.  This isn't in the

5   report.

6          THE COURT:  I'm sorry?

7          MR. MANNING:  This document is not identified by

8   this witness in his report.

9          THE COURT:  All right.  I overrule the objection

10  until I see where we're going, Mr. Manning.  The fact that

11  he wants to show him the document is not objectionable.

12         THE WITNESS:  Okay.  We talked about ACDVs.  And

13  this is an ACDV that shows on March 19th, 2013, --

14  BY MR. NOLAN:

15  Q.   Would you like me to take it section by section and we

16  can --

17  A.   Yes.

18  Q.   -- zoom in a little bit better.  Beginning at the top

19  left --

20         MR. YOUNG:  We can give the witness a hard copy.

21         THE WITNESS:  Thank you.  Okay.

22  BY MR. NOLAN:

23  Q.   So what information is contained in the top left block?

24  A.   Well, the top left has -- the first line is the control

25  number that you heard about.  And then it says the

Evan Hendricks - Direct (Nolan)

1   originating CRA, which means consumer reporting agency.

2   That's EFX for Equifax.  Date created, March 19th, 2013.

3   Next is the subscriber code which is Ocwen's subscriber code

4   with Equifax.

5       Below that is the account number that you've heard a

6   lot about.  And then the grantor's name means credit

7   grantor's name is Ocwen Loan Servicing.  The responder's

8   name is Harish Rao.  And it has a phone number for him.

9       And then the box before, right below that it says --

10  there's a box that says "verified as reported."  And that's

11  the one that's checked.

12      That's the way that this captures what Equifax sent to

13  Ocwen and what Ocwen returned back, what it furnished back

14  to Equifax.

15  Q.   That's what I'd like to ask you.

16  A.   Okay.

17  Q.   Specifically identify which portions of this box were

18  placed by Equifax and which portions of this box were placed

19  by Ocwen.

20  A.   Okay.  The --

21          THE COURT:  Just a second.  There's an objection.

22      Mr. Manning, go ahead.

23          MR. MANNING:  Judge, again, the expert has to

24  disclose his opinions and what he relies on prior to trial.

25  This was not disclosed.  It's improper.

Evan Hendricks - Direct (Nolan)

1      THE COURT:  Response to the objection, counsel?

2      MR. NOLAN:  Your Honor, in the expert report he

3  cited these documents, similar documents to this one as

4  well.  He reviewed all of these and he's going to -- we're

5  trying to get to the basis of his opinion by illustrating

6  how he arrived at the opinion.  Before blurting out his

7  opinion, we want to demonstrate how he arrived at that

8  place.  And these documents are instructive as to how he

9  arrived there.

10      THE COURT:  Are you indicating that he reviewed

11  these documents in formulating the opinions which he's going

12  to give here today?

13      MR. NOLAN:  That's correct, Your Honor.

14      THE COURT:  Mr. Manning.

15      MR. MANNING:  If Mr. Nolan could show me where

16  they're identified in the report, then maybe I won't have an

17  objection.

18      MR. NOLAN:  Your Honor, on Page 2 he indicates

19  specific documents.  Page 30 is not one of these specifics,

20  but it's in the page ranges.  It's in the documents he did

21  review.

22      THE COURT:  What types of documents are included,

23  gentlemen, in what he indicates that he's reviewed?

24      MR. NOLAN:  Plaintiff's Exhibit Number 12 was

25  specifically referenced, as well as Plaintiff's Exhibit

Evan Hendricks - Direct (Nolan)

1  Number 13 which are all of the ACDVs that Mr. Young

2  published to the jury previously as exemplars of the

3  documents he reviewed to arrive at his ultimate conclusion

4  on Page 2 of his report.

5           THE COURT:  All right.

6      And your objection, Mr. Manning, as I understand it, is

7  that there's nothing no indicate that he reviewed this

8  specific document.  Is that correct?

9           MR. MANNING:  Or he's already gone beyond even the

10  documents that he did identify as to what he was identifying

11  on them.  He's gone beyond -- not only this document is not

12  part of it, but also what he said about it is already past

13  what he disclosed in his report.

14           THE COURT:  All right.  Let me, counsel, ask this

15  witness a question.  And I want a copy of the report,

16  please, while I'm doing that.

17      All right.  You have before you Plaintiff's Exhibit

18  Number what, sir?

19           THE WITNESS:  This is Exhibit Number 11.

20           THE COURT:  All right.  And the nature of that

21  Exhibit, is it an ACDV?

22           THE WITNESS:  Yes, ma'am.

23           THE COURT:  And is this document something that

24  you reviewed in order to formulate your opinions that are

25  reflected in this report or not?

Evan Hendricks - Direct (Nolan)

1    THE WITNESS:  Yes, it was something I -- I

2  reviewed the Bates stamped documents that were available at

3  that time, yes.

4    THE COURT:  All right.  And was this one of those

5  documents or not?

6    THE WITNESS:  Yes, it was.

7    THE COURT:  And there is an objection on the floor

8  that that is not stated specifically in your report.  Is

9  that correct, sir?

10    THE WITNESS:  I think the specific pages I cite to

11  are different ACDVs.  I think that's on Page 2 if I remember

12  correctly.  But in the -- near the back there should be a

13  "materials considered" section.  And I, I recollect putting

14  in that that I reviewed the Bates stamped documents that had

15  been produced by defendant at that, at that point.

16    THE COURT:  All right.  Before I rule on this, I

17  want you all to hand him a hard copy of this document.  Go

18  to that portion where he indicates what he reviewed in order

19  to formulate his opinions so that I can rule on this matter.

20    THE WITNESS:  Let me start on Page 2.  Okay.

21  Thank you.  Okay.

22    I guess the specific side I think you want me to

23  address that first.  On -- I mentioned for instance -- I

24  said -- on Page 2 I said in a parentheses when I was stating

25  an opinion, I said, "See, for instance, comma, EIS dash

Evan Hendricks - Direct (Nolan)

1  Daugherty 4060, 60 through 63, and EIS Daugherty 89 through

2  95."  That's on Page 2.

3      And then if you go to the Page 32, "materials

4  considered," the last item listed is Bates stamped documents

5  produced by defendant Equifax.

6          THE COURT:  All right.  Anything further?

7          MR. MANNING:  Yes, Judge.  The witness has

8  accurately identified the specific Bates numbers that he's

9  referenced.  And I don't have an objection as to him talking

10  about those.

11      Beyond that, Judge, it's not disclosed and there's no

12  reference as to what the Bates stamped documents produced by

13  Equifax at that time were.  That's it.

14          THE COURT:  Is it your position, Mr. Manning, that

15  you do not have those Bates stamped numbers?

16          MR. MANNING:  No, Judge.  My position is they're

17  not identified in his report as to what he had available to

18  him at that time.

19          THE COURT:  All right.  I overrule the objection,

20  counsel.  If this document is one of those Bates stamped

21  numbers, then I don't think that there's any basis for the

22  objection.

23          MR. NOLAN:  Yes, Your Honor.

24          THE COURT:  The witness has indicated that he

25  reviewed this particular document.  And, as I understand it,

Evan Hendricks - Direct (Nolan)

1  it's referred to in the latter portion of his report where

2  he indicates the Bates numbers of the documents to which he

3  reviewed when he issued his report.

4          MR. NOLAN:  That's correct, Your Honor.

5          MR. MANNING:  It's not.  The last page, Page 32 of

6  the report, Judge, there is not a reference to Bates

7  numbers.

8          THE COURT:  What page number is it?

9          THE WITNESS:  It's 32.

10          THE COURT:  All right.  Well, it's in black and

11  white, counsel.  Either it's there or it isn't.  You all are

12  looking at the same page.  And, again, I do not have it in

13  front of me.  If you want to show counsel --

14          MR. MANNING:  I have a copy, Judge.  I'm looking

15  at Page 32, and I'll quote, "Bates stamped documents

16  produced by defendant Equifax."

17          THE COURT:  All right.

18          MR. MANNING:  It has no range.  There's no

19  indication as to what he had available at that time.  We

20  weren't told about it.  It's not properly disclosed.

21          THE COURT:  All right.  I overrule the objection,

22  preserving Ocwen's objection and exception.  Let's go

23  forward.

24          MR. MANNING:  Thank you, Judge.

25          THE COURT:  And to save us time, I will preserve

Evan Hendricks - Direct (Nolan)

1   an objection for Ocwen to similar objections regarding the

2   specific document not being laid out on that last page, or

3   Page 32, as we go forward if he makes reference to documents

4   that are not specifically laid out of which he indicates he

5   had reviewed in order to formulate his opinion.

6           MR. NOLAN:  Yes, Your Honor.

7   BY MR. NOLAN:

8   Q.   So, Mr. Hendricks, can you indicate the portion of the

9   information that comes from Ocwen versus the portion of the

10  information that comes from Equifax in the box in the top

11  left corner?

12  A.   Just in the top left corner?

13  Q.   For now.

14  A.   Okay, yeah.  The information that comes from Equifax is

15  pretty much the first five lines up through probably through

16  the date created and the response due date.  And then the

17  subscriber code either is sort of pre-printed in there --

18  not printed because it's electronic -- or it's provided by

19  Ocwen, as well as the name Ocwen Loan Servicing.  Either

20  that's going to be pre-populated or provided by Ocwen.  And

21  then the responder's name, Mr. Harish Rao, if it's -- is

22  going to be responded by -- provided by Ocwen.  And the

23  verified report is provided by Ocwen.  That's the key.

24  Q.   So look at the top left for a moment.  What's contained

25  in this section of the document?  Top right.

Evan Hendricks - Direct (Nolan)

1   A.   Oh, the top right.   Okay.   The top right has the two

2   dispute codes you've heard about.   You have dispute code 001

3   which stands for not his or hers; and dispute code two which

4   is a very broad dispute code for just about everything that

5   has to do with the account.

6        So we call that -- we call it the 007 code because you

7   have to be like a really good diligent agent to investigate

8   all these factors that could be wrong with the, with the

9   account.

10  Q.   So the next section of the document under the "reported

11  consumer identity" field, can you describe what goes in

12  there?

13  A.   Right.   On the left side you have an Equifax

14  pre-populated -- they take the information from the

15  consumer's file and they say this is what we have with the

16  consumer's name, address, social, date of birth, and

17  sometimes phone number.

18       So Equifax is saying, showing to Ocwen this is what we

19  have on him.   And that left side is coming from Equifax

20  showing what's in the Equifax file.   That's the purpose of

21  these ACDVs for Equifax to show Ocwen this is what we have

22  on this customer of yours.

23  Q.   So on the right-hand side of that column, what goes

24  there?

25  A.   The right-hand side is Ocwen's response saying they

Evan Hendricks - Direct (Nolan)

```
 1   have the same -- see, there's a box that says "same" and
 2   that's checked.  They have -- Daugherty David is the same.
 3   They didn't check the same address but they had the street
 4   address pretty much as very similar.  And -- but they had
 5   the same Social Security number, so they checked that.  And
 6   they checked the same phone number.
 7   Q.   Okay.  And as we move down to the file here, describe
 8   this section of the form for us.
 9   A.   This is -- as you get down, this is all the, all the
10   particulars about the tradeline.  And you can see the
11   different boxes.  They're somewhat self-explanatory,
12   including the date of first delinquency, the high credit,
13   the date open.
14       If you go below, importantly, it says "past due."  And
15   that's where you hear that $6,128 past due.  And then if you
16   keep going down further, you'll see the special comment code
17   "foreclosure proceedings started."
18   Q.   Don't get ahead of me here.
19   A.   Okay.  I'm sorry.
20   Q.   What, what's the special comment code?
21   A.   The special comment code is to show something that's,
22   something that's going on that's relevant so that, you know,
23   it's, it's important enough that they have a special comment
24   for.  And it's recent enough and active enough that it needs
25   to be included on this at this point in time.
```

Evan Hendricks - Direct (Nolan)

1   Q.   So would Ocwen have the opportunity upon receipt of

2   this to make any changes to this form?

3   A.   Yeah.  That's the -- the whole, the whole purpose of

4   this is so Ocwen can see from Equifax this is what's showing

5   in the Equifax file for Mr. Daugherty.  And you see where it

6   says "verified as reported."  You have the option of "modify

7   as shown" or "delete account."

8        So that those are other options that they had.  They

9   can modify it and fill in something new to replace what's

10  here or they can instruct Equifax to delete it.

11  Q.   And I want to move ahead on Exhibit Number 1 to the

12  third page if you would.

13  A.   Did you say Exhibit 1 or 11?

14  Q.   Or Exhibit 11.  I apologize.  The third page of that

15  document.

16  A.   Okay.  This is Bates stamp 34?

17  Q.   Yes, sir.

18  A.   Okay.

19  Q.   Is this another ACDV?

20  A.   Yes.  It's another ACDV for the same account number.

21  And it's on the same response date, which is March 20th,

22  2013.  One of the -- it has a name of a different responder,

23  but it also has "verified as reported" checked.

24  Q.   In this case, the responder's name was Raj Kumar?

25  A.   Raj Kumar.

Evan Hendricks - Direct (Nolan)

1  Q.   So the same date you said?

2  A.   Same date, same account number.

3  Q.   And what was the result of the investigation?

4  A.   Well, this is the account that shows current account.

5  Do we have it up there?  Yeah.  And if you jump all the way

6  to the bottom, it has the code 11 which means current

7  account and it has no past due amount.

8       So this is the one that's basically more of a positive

9  tradeline.  It has some payment -- derogatories in the

10 payment history which is a very tiny box there.  But it says

11 past -- payment history months 1 through 12 and payment

12 history months 13 through 24.  And that's, that's where you

13 have those past delinquencies that you heard about.

14      But you have these two ACDVs on the same day with the

15 same account number.

16 Q.   And how would you characterize the responses from

17 Ocwen?

18 A.   Well, the responses from Ocwen were just like they,

19 they basically just checked the "verified as reported" box.

20 And they didn't seem to notice that these two ACDVs are

21 telling you together that for the same account number, we

22 have completely opposite data.  One is current and one is

23 foreclosure.

24      So if you want to call this a duplicative notice, this

25 is notice that there were two tradelines with the same

Evan Hendricks - Direct (Nolan)

1  account number and that, you know, it needed to require some

2  sort of special care to see that this shouldn't be.  And

3  Equifax is asking Ocwen to investigate this and say, "Is

4  this right?"

5  Q.   And, so, Ocwen is telling Equifax something with this

6  document?

7  A.   Yes.  Ocwen is telling Equifax by checking "verified as

8  reported" that all of this information is complete.  And in

9  terms of how they responded, this is something that they did

10 just -- it didn't even take a minute.  Just a matter of

11 seconds is how long they spent on each one of these.

12 Q.   Now, you discussed previously the standard since 2004

13 has been a searching inquiry; correct?

14 A.   Yeah.  You have to do some sort of -- exercise enough

15 care so you can find out, diagnose what is the nature of the

16 dispute, what's this guy really disputing?  And does it --

17 you know, is the dispute genuine?  You know, whatever -- you

18 have to take some sort of logical, investigative step to

19 find out how the dispute should be handled.

20 Q.   And what information should they be looking at?

21 A.   Well, one thing that's standard in the industry is that

22 creditors regularly look at their customers' credit reports.

23 They can pull their customers' credit reports and see how is

24 our tradeline showing up on this customer's credit reports.

25 So that would be one way to do it.

Evan Hendricks - Direct (Nolan)

1    But clearly if they're getting, showing -- which is I

2  think one of the best steps they could have taken

3  considering they have the same account number and one is

4  very derogatory and one is basically pretty positive.

5  Q.   Based on that standard, even looking at this ACDV

6  itself, do you have any opinion on their investigation of

7  just solely this ACDV?

8  A.   Yeah.  I think that they -- my opinion is that Ocwen

9  just disregarded all the red flags that were -- that you

10  should take together with these two ACDVs and disregarded

11  them and said just -- somebody just took a few seconds to

12  hit the, the "verified as reported" button and didn't truly

13  investigate it.

14  Q.   Now, you also mentioned in your report something called

15  a disputed code.  What is a dispute -- a code that's

16  disputed?

17  A.   Right, a dispute code.  When -- another standard,

18  industry standard is if the consumer disputes directly to a

19  furnisher like Ocwen about something, you know, in his

20  credit file, then Ocwen has a responsibility to mark it as

21  disputed by consumer.  And there's a special code for it

22  under this standard called Metro 2.  And the code is called

23  the XB code.

24    And, so, my recollection is that Mr. Daugherty did that

25  in March of 2013, more or less.  And to my knowledge, I

Evan Hendricks - Direct (Nolan)

1   never saw Ocwen mark this derogatory tradeline with that XB

2   code showing it was disputed by consumer.

3   Q.   Now, in your report you specifically reference

4   Plaintiff's Exhibit Number -- Plaintiff's Exhibit Number 2.

5   You referenced this specifically in your report; correct?

6   A.   I think so, but I didn't have that exhibit number.

7   Q.   Let's take a look here on the screen.  Is this the

8   letter you're referencing with the direct dispute?

9   A.   Oh, yes.  This is the March 14th, 2013, direct dispute

10  from Mr. Daugherty to Ocwen Loan Services.

11  Q.   So, again, when Ocwen receives a direct dispute, what

12  should they do?

13  A.   They should -- when they -- from then on as they report

14  or furnish this tradeline to Equifax, they should mark it

15  with this XB code so it would show the language "disputed by

16  consumer" on his credit report.

17       And that XB code would show up in this thing called a

18  compliance condition code on Exhibit 11.  You see that on

19  Exhibit 11.  The special comment code has the BO for

20  foreclosure proceedings started.  And the compliance

21  condition code is right above that.  That's where the XB

22  code should go.

23  Q.   And what benefits does the XB code have again?

24  A.   Well, the XB code mitigates the damage to the credit

25  score because the XB code means that the status is not going

Evan Hendricks - Direct (Nolan)

1    to be scored.  And, so, on the derogatory account, the

2    status was 120 days past due.

3         So it would have basically neutralized that and would

4    not, and would not score the past due balance either.  And

5    those are the two worst things about that tradeline.

6         So if -- you know, there are some people that if

7    they're trying to hurry up, like raise their credit score

8    quickly, a temporary fix is to try and do this "disputed by

9    consumer," do a direct dispute and see if you can get that

10   code.

11        I mean, it works in some ways, doesn't work in others.

12   But it does -- it is established that it does neutralize the

13   negative aspect of the credit score, tradeline and credit

14   score.

15   Q.   Is an XB a cure-all?  Would it hide the entire

16   tradeline?

17   A.   No.  And, like I said, the credit score is not the main

18   issue in this case.  It just shows that there was not -- a

19   standard wasn't being followed.  But it's still not -- like

20   the whole issue of a foreclosure, an XB code is not going to

21   do anything to ameliorate that.  It's still going to harm

22   someone's creditworthiness to have that term on their credit

23   report.

24   Q.   Okay.  I want to move ahead.  Now, in your review did

25   you see other instances of ACDVs similar to these two?

Evan Hendricks - Direct (Nolan)

1   A.   Yes.   They kept following the same pattern.   There was

2   two ACDVs at the same time with the same account number.

3   One was very derogatory and, and damaging to Mr. Daugherty's

4   creditworthiness.   The other one was mainly positive.

5        And they're all -- each one of them, each set of these

6   is telling -- Equifax telling Ocwen that this account number

7   has basically a Dr. Jekyll and Mr. Hyde nature to it.   And,

8   and that all Ocwen did was take a few seconds, not even a

9   minute, to hit the "verified as reported" box and then send

10  it back to Equifax saying, "This information stays on

11  Mr. Daugherty's credit report," because the way the system

12  is, if Ocwen doesn't instruct Equifax to remove it, Equifax

13  is not going to remove it.   That's, that's where they look

14  to when it comes to this kind of creditor information.   They

15  rely on Ocwen to tell them is it, is it truly this

16  customer's or not.

17  Q.   I'm going to hand you Plaintiff's Exhibit Number 12.

18  A.   Thank you.

19  Q.   Now, in your report you specifically identify this ACDV

20  form as one that you relied upon in general for the basis of

21  your opinion regarding the investigations; correct?

22  A.   Yes.

23  Q.   When did this -- when was this ACDV created?

24  A.   Created on May 31st, 2013; both on the same day, two

25  ACDVs.

Evan Hendricks - Direct (Nolan)

1  Q.   When was it responded to?

2  A.   On June 2nd, 2013, both of them.

3  Q.   Now, what's the dispute in this ACDV?

4  A.   This one is simply the 001 code which is not his/not

5  hers.  And then it goes on to say "provide complete ID."

6  Q.   So on -- for instance, on Bates Page 60 this is the

7  current account reporting; correct?

8  A.   Yes.

9  Q.   If we look ahead to Page 62 and, again, you said --

10 what is the date created?

11 A.   May 31st, 2013.

12 Q.   Same as the last one?

13 A.   Yes.

14 Q.   And the result, of course, you see at the top is

15 verified; correct?

16 A.   Yes, verified as reported.

17 Q.   And, now, we don't dispute that Mr. Daugherty had a

18 loan with Ocwen; correct?

19 A.   Right.  That seems very well established.

20 Q.   Do you find it disingenuous for him to dispute this

21 account saying "not mine"?

22 A.   No.  In fact, the -- they only give you so many things

23 to choose from when you make your dispute.  But the reality

24 is that this second derogatory account that was past due and

25 foreclosure proceedings starting, that was not his account.

Evan Hendricks - Direct (Nolan)

1    It was -- so the dispute saying it's not his is true.

2        And the responsibility of Ocwen is to investigate to

3    say, "Well, he's saying it's not his.  And we have to

4    investigate to find out, well, is it, is that correct?"

5        And, and they never even -- they just disregarded that

6    whole important factor.

7    Q.   I also wanted to draw our attention to one more aspect

8    of this dispute.  Let's go back to the first one on Page 60.

9    Both received the same day and both responded the same day;

10   correct?

11   A.   Yes.

12   Q.   And who was the investigator, the responder I should

13   say?

14   A.   The responder on 60 was the same one this time.  His

15   name is Daniel John.

16   Q.   And then who investigated the ACDV on Page 62?

17   A.   Daniel John.

18   Q.   The same investigator on the same day verified two

19   accounts.  One said he's in foreclosure.  One said he's

20   current.

21   A.   With the same account number.

22   Q.   Is that a reasonable investigation?

23   A.   No, that's, that's, that's so un-- that's just so

24   illogical that I can't find an excuse for, for doing

25   something like this.

Evan Hendricks - Direct (Nolan)

1   Q.   I want to jump ahead several disputes to Plaintiff's

2   Exhibit Number 18.  I'll put that on the screen.

3   A.   Okay.

4   Q.   Can you read off that Bates stamp for us?

5   A.   The Bates stamp on the first one is 274 and the other

6   one is EIS Daugherty 276.

7   Q.   Are these documents you reviewed when preparing your

8   report?

9   A.   Yes.

10  Q.   So when was the date these were created?

11  A.   April 1st, 2014, both of them.

12  Q.   And who responded to these disputes?

13  A.   This would be Robert Rajina on both of them.

14  Q.   On both of them?

15  A.   Yes.

16  Q.   Okay.  And now here we have a new wrinkle on the ACDVs.

17  A.   Yes.

18  Q.   All right.  Can you identify what's new about this?

19  A.   Well, as I said, there's boxes where you have options.

20  This one has the box checked "modify as shown."  And, so,

21  then you drop down to see what have they modified.  And --

22  Q.   And where would the modifications appear on this form

23  because we haven't seen modifications yet?

24  A.   How do they -- they have a second line before the

25  original line.  So the top line is the original line and

Evan Hendricks - Direct (Nolan)

1   then the line right below it shows what the changes are.

2   Q.   So, for instance, an account status that was current

3   should be reporting as 11, and then they modified it to show

4   11?

5   A.   Yeah.  You mean to the bottom of -- are we at 274?

6   Q.   Yes.

7   A.   Yeah, that's right.  On 274 they, they did -- yeah,

8   they basically modified it to show the same current status.

9   Q.   I want to ask you to -- XR, what does that compliance

10  condition code mean?

11  A.   That means they're removing whatever the previous

12  compliance condition code was.

13  Q.   So if Mr. Daugherty had marked it as XB, this would

14  remove the marking as disputed?

15  A.   Yes.  There are different compliance condition codes.

16  But whatever it was, XR is removing the one that was there.

17  Q.   So he would lose the slight protection the XB provided?

18  A.   Right.  And he never -- and it's also -- the XR means

19  they're removing a compliance condition code.  They're doing

20  it in relation to the positive tradeline, and Mr. Daugherty

21  never disputed that.  So that means that if they put an XB

22  code on, they put it on the wrong one which was the positive

23  one.

24  Q.   Let's scroll ahead to Page 276 which is part of Exhibit

25  Number 18.  Again, this was opened on April 1st just as the

Evan Hendricks - Direct (Nolan)

1   last one was?

2   A.    Yes.

3   Q.    And who was the investigator on this one?

4   A.    Robert Rajina.  We're on 276; correct?

5   Q.    That's correct, yes.

6   A.    Robert Rajina.

7   Q.    Again this tradeline was modified?

8   A.    Yes.

9   Q.    Ocwen took some steps in this specific investigation?

10  A.    Yes.

11  Q.    Was this sufficient to pass muster under a reasonable

12  investigation in your opinion?

13  A.    I -- no, I don't think so because they're still leaving

14  the "foreclosure process started" which is the most

15  damaging --

16  Q.    Can you point that out for us, please?

17  A.    On the -- let's see.  Actually, on the right-hand side

18  there's a box that says "narratives."  Yeah, go over there.

19  There it is.  And you see the top one is how it was

20  originally -- it has both foreclosure and the 120 days past

21  due.  But still on the new, updated version it still has

22  that foreclosure, that code 245, "foreclosure process

23  started."

24  Q.    So let's take a look.  What did Ocwen update -- so they

25  didn't update the foreclosure code; correct?

Evan Hendricks - Direct (Nolan)

1  A.   Right.  According to this, it looks like they didn't.

2  Q.   They did update the past due amount; correct?

3  A.   Yes.  The past due, under that 6128 you see there's a

4  zero, so they, they got that right that there's no past due.

5  Q.   So Ocwen looked at part of it, but not all of it.  Is

6  that accurate?

7  A.   Right.  They got like three out of four maybe, but

8  still left on like the, what I consider the most damaging

9  aspect of the credit report was the reference to

10  foreclosure.

11  Q.   How would you characterize such an investigation?

12  A.   Just considering what was at stake, it was wholly

13  inadequate.  And considering how many times before this they

14  had a chance to get it right, it's, to me it's a whole

15  pattern of reckless behavior.

16  Q.   And, so, did they get points for trying on this?

17  A.   No.  You have to do -- for an investigation to be good

18  enough, you have to figure out what's the cause of the

19  dispute and what you need to do to fix it.  And that means

20  you have to be thorough enough.  And they simply weren't

21  thorough enough here.

22  Q.   So this is in April of 2014; correct?

23  A.   Yes.

24  Q.   I would like to jump ahead once more just to get an

25  overview of the entire process here.  I'm handing you what's

Evan Hendricks - Direct (Nolan)

1  been marked as Plaintiff's Exhibit 23.  Can you give us the

2  date on this ACDV?

3  A.    This is -- there are two ACDVs.  They're both dated --

4  well, the first two I have here, July 29th, 2014.

5  Q.    What's the response date?

6  A.    August 8th, 2014.

7  Q.    Who was the responder?

8  A.    It's Daniel John.

9  Q.    We saw him before; right?

10  A.    Yes.

11  Q.    Okay.  And, so, on August 8th on Page 387 -- let me ask

12  you again.  Is this another one of the documents you

13  reviewed when preparing your report?

14  A.    Yes.

15  Q.    Okay.  What does -- and he's verified this report as

16  well?

17  A.    Yeah.  This is -- he's verified his report.  On the top

18  right-hand side it has the two dispute codes again, 001 for

19  not his or hers and 007 for disputes current/previous

20  account status, payment history, payment rating, and the

21  payment history profile.  Basically, like I said, 007 you're

22  saying there's potentially a lot of things wrong with this

23  account.

24  Q.    And, so, do you recall when the balloon note was due?

25  A.    July of 2014; right?

Evan Hendricks - Direct (Nolan)

1   Q.   So this dispute is after that point?

2   A.   Yes, that's correct.

3   Q.   So this is the first tradeline verifying that

4   Mr. Daugherty was current at that point and wasn't behind;

5   correct?

6   A.   Right.

7   Q.   And let's move along to -- find the number on it

8   here -- 389.  When did this dispute -- when was it created?

9   A.   The same day.  It was created on July 29th, 2014.  And

10  the response date was August 8th, 2014.

11  Q.   And responded by?

12  A.   Daniel John.

13  Q.   Daniel John.  Had them both again?

14  A.   Uh-huh.

15  Q.   Same dispute, same day.  Both of them after the balloon

16  note's come due; correct?

17  A.   Yes.

18  Q.   And the result of his investigation was?

19  A.   Verified as reported, furnishing that same wrong

20  information saying that a foreclosure proceeding is starting

21  and account 120 days past due with a past due balance of

22  $6,128.

23  Q.   So what, in your opinion, does it say to have this

24  tradeline continually to reappear after Ocwen tried to

25  modify it?

Evan Hendricks - Direct (Nolan)

1  A.   Well, it, it, it shows that there's -- I mean, no --

2  there's no institutional memory as part of their, of their

3  investigation.  It's like -- an entity like Ocwen has to

4  have a way to remember what it already knows.

5       And it already knows it's only supposed to have one

6  account listed in Equifax.  And then it knows that even with

7  the one that wasn't supposed to be in his Equifax report, it

8  finally changed it to a zero balance.  And then when it

9  comes back showing $6,128 past due, it forgets that it

10 already corrected that one.

11      So you're just -- you're seeing just no level of care

12 here and disregard of responsibility and of the sensitivity

13 of this information.  I mean, this is very delicate stuff.

14 You know, you can't go into a china shop and start throwing

15 your elbows around and break all that pretty crystal.  This

16 is that sensitive when it comes to people's lives.

17      And here, again, you just have Ocwen having somebody

18 press a button saying "verified as reported" without putting

19 any due regard into the importance of the information.

20 Q.   Mr. Hendricks, in your report you discuss the ACDV data

21 exchange.

22 A.   Yes.

23 Q.   Can you please describe that for the jury?

24 A.   Well, it's what all this is.  A consumer sends a

25 dispute to Equifax or any credit bureau and they create an

Evan Hendricks - Direct (Nolan)

1  ACDV.  And then they electronically send it to the

2  furnisher; in this case Ocwen.  And Ocwen's job is then to

3  investigate.  That's the responsibility.  And then they

4  return the ACDV.

5      But what I talk about is that if that's all you do --

6  if all you're doing is sending one electronic message and,

7  you know, doing some superficial glance of one record system

8  and pushing a button saying "verified as reported," that's

9  not going to be enough for a complex dispute like this one

10 where something is really wrong and it's really damaging.

11     And, so, I talk about that saying, sure, you can do the

12 ACDV exchange.  But if that's all you do, it's not going to

13 amount to an adequate investigation.

14 Q.  And you testified that this has been the standard in

15 the industry?

16 A.  The ACDV exchanges, yes.  I mean, this is the way they

17 communicated back and forth.  I mean, some furnishers will

18 do a thorough enough check of their records and, you know,

19 find that there's something wrong and then, you know,

20 instruct the credit bureau to correct it.

21     But the thing you can't forget is that Equifax and the

22 other credit bureaus, when it's information about a

23 creditor's account, they're looking to that creditor to, to

24 tell them what to do with it, to instruct them to either

25 delete it or modify it or leave it.  And if -- whatever the

Evan Hendricks - Direct (Nolan)

1   creditor says, that's what it goes when it comes to that

2   account.

3   Q.    And how long has, has the standard been in place that

4   you have to do an investigation?

5   A.    1996 -- '97 is when it took effect.  But, yeah, we

6   talked about those 1996 amendments.  That's when they first

7   put this duty on creditors like Ocwen.

8   Q.    So for 20 years they've had this notice that they have

9   to investigate disputes?

10  A.    Yes, sir.

11  Q.    And you testified too that this duty was enhanced?

12  A.    Enhanced and strengthened in 2003 by more work by

13  Congress.  And then in 2004 another institution got specific

14  saying you can't do a superficial response.  You've got to

15  do something searching, something with care.

16  Q.    So for 12 years now they've known that this is

17  inadequate?

18  A.    They knew or should have known.

19  Q.    And, yet, here Mr. Daugherty is trying to clear up his

20  credit report that's stuck inside this system?

21  A.    Yeah.  I mean, the, the system is set up so you

22  shouldn't have to file a federal lawsuit to get your credit

23  report corrected.  But that's exactly what happened here.

24  It just wasn't going to get corrected until he went to all

25  this trouble and did all this fighting.

Evan Hendricks - Direct (Nolan)

1    I mean, you talk about a consumer who's responsible and

2    did everything he possibly could, I, I think Mr. Daugherty

3    has just done an amazing job of staying with this, you know.

4        And this is about responsibility.  I mean, we all have

5    responsibilities in the system.  And Ocwen's responsibility

6    is to investigate when they get a dispute.  And they have

7    not lived up to that responsibility, in my opinion, in this

8    case.  They disregarded it.

9    Q.   So what is your ultimate opinion in this case?

10   A.   That from everything we've seen so far, this is the way

11   Ocwen has always done things and I see no evidence --

12   they're showing no interest in changing or even

13   acknowledging they made any mistakes in this case despite

14   everything that we're producing right now.

15       So my opinion is that, that the same thing will happen

16   to other consumers.  If they have any sort of dispute,

17   they're not going to get a reasonable investigation as long

18   as Ocwen keeps operating this way.  And my opinion is

19   they're showing that they continue to, they're going to

20   operate this way.

21   Q.   Thank you, Mr. Hendricks.

22           THE COURT:  Cross-examination, Mr. Manning?

23           MR. MANNING:  Thank you, Judge.

24           THE COURT:  And remember that it will be necessary

25   for me to interrupt you.

Evan Hendricks - Cross (Manning)

1          MR. MANNING:  Oh, that's right.  Thank you for

2    reminding me.

3          THE COURT:  Yes, sir.  Go ahead, please.

4                    CROSS EXAMINATION

5    BY MR. MANNING:

6    Q.    Good afternoon.

7    A.    Good afternoon.

8    Q.    We haven't met before; right?

9    A.    No.

10   Q.    Okay.  So I want to start just at the beginning.  We

11   talked a little bit about your background.  And I understand

12   that according to your resume which you've attached to your

13   report that you've testified at trial or been deposed over

14   100 times?

15   A.    That sounds about right, yes.  It's in that ballpark.

16   Q.    You're a professional witness; right?

17   A.    Well, I'm not sure what that means, but I try and be

18   professional in everything I do that I get paid for, yes.

19   Q.    And, in fact, you're a witness who gets paid $400 an

20   hour for the testimony you render for the plaintiffs; right?

21   A.    I get $400 an hour for trial testimony and $400 an hour

22   if they take my deposition and the other side has to pay for

23   that, but they didn't take my deposition in this case.  But

24   my regular rate for doing the expert reports is $300 an

25   hour.

Evan Hendricks - Cross (Manning)

1   Q.   And for today -- so that means every hour for the last

2   couple days -- I guess yesterday and today you're at $400 or

3   is it capped at a certain number?

4   A.   Yeah.  It's going to be $400 an hour for the time I

5   actually spent, you know, working inside the courtroom.

6   Q.   I think in your report you said for a day it could be

7   $1,200 a day plus your expenses?

8   A.   Right.  It's like -- especially for a deposition.  So

9   if someone takes my deposition, I usually have a minimum of

10  $1,200 to cover three hours.  And then if the deposition --

11  they can go up to seven hours if they want and that's

12  usually not much fun.  But then I'll invoice them for the

13  balance.  So that's -- yeah, $1,200 usually refers to a

14  minimum for a day for deposition testimony.

15  Q.   Would that apply here as well?

16  A.   Yeah, sure.

17  Q.   How much have you been paid by the plaintiffs to date?

18  A.   It's around $5,500.

19  Q.   And that's not including the trial?

20  A.   That's right.  That's not including the trial.

21  Q.   And that's not including your preparation or travel for

22  the trial?

23  A.   That's correct.

24  Q.   Do you know how much you're running a tab right now?

25  A.   No.  I mean, today is the second day of trial.  Right?

Evan Hendricks - Cross (Manning)

1   So today is day number two.  And I was able to fly here in

2   an hour-long flight and drive an hour from Charleston.  That

3   was quite a drive.

4   Q.   And you had a report, so I take it your report was

5   really the bulk of that $5,500 or approximate amount?

6   A.   Yes, sir.

7   Q.   Okay.  And do you still have a copy of the report in

8   front of you?

9   A.   I apologize.  No.  I thought I did but I don't.

10  Q.   Do we have a copy for the witness?  I know you prefer a

11  hard copy.

12          THE WITNESS:  Thank you.  May he approach?

13  BY MR. MANNING:

14  Q.   So that's your expert report; right?

15  A.   Yes, sir.

16  Q.   And this was the report that you prepared for the

17  plaintiff to support their case; right?

18  A.   Yes.

19  Q.   This is --

20  A.   Well, I mean, it's to express my expert opinions in the

21  case.

22  Q.   And it's dated April 3rd of 2015, right, on Page 32?

23  A.   Yes, April 3rd, 2015.

24  Q.   So as of the date of this report, which as we sit here

25  today is over a year ago, you have not undertaken to

Evan Hendricks - Cross (Manning)

1   investigate anything further; right?

2   A.   Oh, yeah, after, after I found out there was going to

3   be a trial in this case, all sorts of additional information

4   came my way which I've analyzed.

5   Q.   All right.  Well, let me ask it this way then.  You've

6   identified your expert report and you've identified the

7   materials considered.  And this is the report which is the

8   basis of your opinions which plaintiff just asked you about?

9   A.   Yes.

10  Q.   And the materials considered here are plaintiff's

11  summons --

12  A.   Yes.

13  Q.   You could read along with me.

14  A.   Okay.  Go right ahead.

15  Q.   Plaintiff's summons.  I take it by that you mean the

16  complaint.

17  A.   Yes.

18  Q.   So you started with the plaintiff's lawsuit and what he

19  claims happened; right?

20  A.   Right.

21  Q.   Then you go to the plaintiff's credit reports; is that

22  right?

23  A.   Yes.

24  Q.   You don't identify anything by Bates stamp or a

25  particular credit report or anything at all?

Evan Hendricks - Cross (Manning)

1    A.    Right.  My intention is that in the case it's typical

2    that both sides have, they produce to each other the

3    information.  So the credit reports are referred to as what

4    at that point in time both sides had, meaning Ocwen and the

5    plaintiff.

6    Q.    The next subject that you identify there is having

7    considered is various correspondences by plaintiff and

8    defendants; right?

9    A.    Yes.

10   Q.    You don't identify what those are?

11   A.    No.  It's a similar answer.  There was -- we've seen a

12   little bit of the dispute correspondence.  There were

13   letters written by Ocwen, by Equifax, and by the plaintiff.

14   And, so, all the correspondences that were in play at that

15   point are the ones I'm referring to.

16   Q.    And there were a lot of documents produced after that,

17   but you don't reference specifically which ones you had

18   available to you at the time you prepared your opinions

19   which you just rendered in this case; right?

20   A.    Well, I mean, I hope I'm answering your question, but

21   in my report which is dated April 3rd, 2015, I reference the

22   documents that I had available to me at that time.

23         And since then, I mean, in the last month or two, a lot

24   more documents have come my way because it became clear that

25   this case was going to go to trial.

Evan Hendricks - Cross (Manning)

1  Q.   But you never updated your report?

2  A.   No.

3  Q.   You never -- okay.  So let me make sure this is clear.

4  You're now claiming that you looked at other things, but in

5  your report you don't list those and you never gave a new

6  report amending your opinions or changing them in any way;

7  correct?

8  A.   Right.  I can't -- in my report like I couldn't, I

9  couldn't list that I reviewed Ocwen's documents because you

10  had not produced them by then.

11  Q.   So this report -- again, that's all I'm asking you

12  about.  I just want to know about this report and what you

13  just talked about with the plaintiff and what you considered

14  with this report.  Do you understand that?

15  A.   Yes.

16  Q.   Okay.  With this report I'm trying to get to what was

17  available to you at that time because you're rendering

18  opinions -- I think you understand this.  You're rendering

19  opinions and you're telling the jury what you think

20  happened, but you're not giving them the basis for what your

21  report is.

22  A.   Yes, I am.

23  Q.   And here you have the plaintiff's complaint, which is

24  what he's claiming --

25  A.   Uh-huh.

Evan Hendricks - Cross (Manning)

1  Q.  -- in the lawsuit.  You said you started there.  And

2  then you went to his credit reports, but you don't say which

3  ones or who they were from.

4        MR. NOLAN:  Your Honor, I'd like to object and see

5  if we can get a question for Mr. Hendricks's answer here.

6        THE COURT:  Yeah.  The objection, Mr. Manning, to

7  your statements are --

8        MR. MANNING:  Are you telling me to break it down?

9        THE COURT:  Well, no, I don't want you to break

10 down statements.  I want you to ask the witness a question.

11        MR. MANNING:  Okay, Judge, I will do so.

12 BY MR. MANNING:

13 Q.  Mr. Hendricks, if you look at Page 32 you'll see

14 "materials considered;" right?

15 A.  Yes.

16 Q.  The first one is plaintiff's summons.  That's the

17 complaint and that's where you started.  That's the first

18 basis of your opinion.  Right?

19 A.  Yes.

20 Q.  The next one is the plaintiff's credit reports.  And

21 you don't identify from whom you obtained the credit

22 reports, what the dates were, or what you reviewed by any

23 other identification, identifying features so that we could

24 know as we sit here today which credit reports you actually

25 looked at, do you?

1    A.   Well, but you just asked me that and I explained those

2    are the credit reports that were available, had been

3    produced in this case as of April 3rd, 2015.

4    Q.   But we don't know which ones you looked at because you

5    don't tell us.  You would agree with that?

6    A.   I looked at all the ones that are listed.  I listed

7    plaintiff's credit reports, plural.  I listed -- I looked at

8    all the ones that were available at that point in time.

9    Q.   And let me back up.  You don't tell us which ones were

10   available to you or that you reviewed specifically; correct?

11   A.   That's correct because you knew which ones were

12   available at that point in time, so I didn't want to be

13   redundant.

14   Q.   You understand that you wrote the report and you're the

15   one who needs to identify what you relied upon; right?

16   A.   And that's why I did that.

17   Q.   The next thing you say that you considered was various

18   correspondences by plaintiff and defendants.  And there's no

19   identification about what we're talking about in terms of a

20   letter, a fax, an e-mail of any kind.  It just says

21   "correspondence."  Right?

22   A.   Right.

23   Q.   So as we sit here today, there's no way for us to know

24   based on your report or the opinions that you offered what

25   the correspondence is that you had available or even looked

Evan Hendricks - Cross (Manning)

1   at; right?

2   A.   No, I disagree.  It's like all the correspondence -- I

3   mean, there was -- there's correspondence -- you can call

4   this is a voluminous case, but I've seen bigger.  But you

5   know all the correspondence that were in play produced by

6   plaintiff and defendants in this case as of April 3rd.  The

7   plaintiff's counsel know.  You know and I knew.  And those

8   are the ones I looked at.

9   Q.   The issue, Mr. Hendricks, is the jury doesn't know.

10  And your report doesn't say --

11  A.   I'm just telling them.

12  Q.   Let me just finish my question.

13  A.   Okay, all right.

14  Q.   The issue, sir, is you're rendering opinions and you're

15  claiming to have reviewed documents.  But the only documents

16  that the jury knows that you've actually seen or looked at

17  are the ones the plaintiffs showed you today and what's in

18  your report which doesn't identify anything else

19  specifically; isn't that correct?

20  A.   I'm afraid I got lost in that question.  I

21  definitely -- we definitely talked about these documents

22  that are exhibits here today.  We talked about those here

23  today.  So the jury knows about those ones.  And the jury

24  knows about the letter we put on the screen.  And what was

25  the rest of the question?

Evan Hendricks - Cross (Manning)

1   Q.   Let's start there.

2   A.   Okay.

3   Q.   The jury doesn't know about anything else that you

4   would have considered because you don't tell them anything

5   else; right?

6   A.   I just told them.  I just told the jury that everything

7   that was in play by April 3rd, 2013, is what I reviewed

8   because that's all that was available at that time.

9   Q.   Okay.  And, Mr. Hendricks, I don't mean to quibble with

10  you, but you're not telling us what was available to you in

11  the form of what those correspondences were other than what

12  you looked at today; right?

13          MR. NOLAN:  Your Honor, I object to this

14  questioning.  If it's this important for Mr. Manning and

15  Ocwen to know what he relied on, they had an opportunity to

16  take his deposition and review that with Mr. Hendricks at

17  any point in time during this litigation.

18          THE COURT:  Well, he does have that option, but he

19  also has the option not to depose him.  I'm going to let him

20  explore.  And the reason I do that is I think the basis of

21  the opinion -- when I instruct the jury on how to consider

22  expert opinions, the basis of the opinion is important.  The

23  witness can answer if he can.  I overrule the objection.

24          MR. NOLAN:  Yes, Your Honor.

25          MR. MANNING:  Thank you, Judge.

Evan Hendricks - Cross (Manning)

1    THE WITNESS:  So, I, I reviewed all the Bates

2    stamped documents produced by Equifax, all the

3    correspondence that was relevant to their disputes.  We've

4    gone through some of the Equifax documents, Bates stamped

5    documents here today.  You know, we don't want to spend

6    three days going through all of them.  We just went through

7    some of the most important ones.

8        And, so, I -- you know, it's up to the jury to decide

9    if they think that my opinions are worthwhile and if these

10   documents support them.  But I thought we've laid it out

11   pretty openly.

12   BY MR. MANNING:

13   Q.   Okay.  So other than what you've talked about today,

14   the basis for your opinion is focused on those documents

15   because here you're not identifying anything else.  We can

16   agree on at least that much.  Right?

17   A.   No.  The jury has seen other Bates stamped documents.

18   They've seen other Equifax documents that have come in like

19   all -- they just spent I don't know how long showing all of

20   those ACDVs, those 12, ones that they went to the trouble of

21   getting those into evidence.  So these are not all 12 of

22   those.  But, yes, these are the most important documents to

23   understanding what went wrong with Ocwen's investigation,

24   yes.  And that is the basis of my opinion, yes.

25   Q.   And in this report you don't purport to be basing your

Evan Hendricks - Cross (Manning)

1  opinion on everything that was conveyed between Ocwen and

2  Equifax or Aggressive Credit Repair and Equifax or between

3  Mr. Daugherty and Aggressive Credit Repair or between

4  Equifax and Ocwen.  There's a whole series of players.

5  Right?

6  A.    Right.  And I think -- these documents, for starters,

7  encompasses what went back and forth between Equifax and

8  Ocwen and shows what was done and, more importantly, was not

9  done in their investigation.

10      And, you know, that's -- these are industry standard

11  documents.  And Ocwen's responses are accurately reflected

12  in these documents and I can rely on them and I came up with

13  my opinions.

14      As for the correspondence, yeah, I was familiar with

15  the correspondence from -- Aggressive Credit Repair had done

16  some of the correspondence.  That's in the category of

17  correspondence.  And we've heard about that in this trial.

18  Q.    So if you look again on Page 32, sir, "materials

19  considered," it says various correspondences by plaintiff

20  and defendants.  You're aware that Aggressive Credit Repair

21  is not a defendant; right?

22  A.    That's true.  That's a good point.  But he was doing it

23  on behalf of plaintiff, so I consider that part of

24  plaintiff's as he was kind of like an agent of plaintiff.

25  Q.    Okay.  So this statement that you say you based your

Evan Hendricks - Cross (Manning)

1  opinions on various correspondences between plaintiff and

2  defendants without further specificity you're now saying

3  would encompass Aggressive Credit Repair correspondence?

4  A.   Sure.  Back then, yes, I knew some of the

5  correspondence -- not all of it -- some of the dispute

6  correspondence was done by Aggressive Credit Repair, yes.

7  Q.   Okay.  The next item was Bates stamped documents

8  produced by defendant Equifax.  I think I know what you're

9  referring to there because we've seen some of those today.

10 Is that what you're referring to?

11 A.   Right.  And they're also these internal documents by

12 Equifax that are called ACIS cases, which is A-C-I-S.  And

13 they reflect what happens when Equifax interacts with the

14 consumer file.  And they list out dates.  To some extent,

15 they might parallel or encompass some of the information in

16 the ACDV.

17      But the ACDVs are the ones that tell you the most about

18 the investigation and the re-investigation.  So those are

19 the most relevant to my opinion, and that's why I'm glad

20 we've gone through them today.

21 Q.   And you identify a number of things in your report that

22 you believe Equifax did wrong; right?

23 A.   Yes, sir.

24 Q.   Okay.  So you're here today and all you've been

25 focusing on is what you think Ocwen did wrong.  But you

Evan Hendricks - Cross (Manning)

1   agree, and you've stated in your report, that Equifax was at

2   fault here?

3   A.   Yeah, Equifax, Equifax made mistakes, yes.  They had a

4   responsibility to do things and in my opinion they didn't do

5   some of them.

6   Q.   Okay.  And we've -- I know the jury at this point has

7   probably gotten sick of my difference in roles, but you know

8   there's a difference between furnishers and reporting

9   creditors.

10  A.   Yes, there are furnishers and then there are consumer

11  reporting agencies.  That's how this statute defines them.

12  Q.   And you understand that the furnisher conveys the data.

13  Credit reporting compiles and has it reported accurately.

14  And they have different roles.

15  A.   Right.  We talked about a furnisher can do it monthly

16  reporting or on an AUD or an ACDV.  That's how they can

17  furnish the information.

18  Q.   And they have separate responsibilities?

19  A.   Yes, yes, that's right.  They have -- one overarching

20  responsibility -- at the top of their responsibility is

21  accuracy, completeness, and fairness.  And that's one --

22  that's a general responsibility that they both share.

23  Q.   You'd agree that furnishers such as my client, Ocwen,

24  don't control what the credit bureaus do.  They can't make

25  them report something.

Evan Hendricks - Cross (Manning)

1    A.    Well, I have trouble agreeing with that because I just

2    testified today that on a situation like this, Equifax is

3    looking to Ocwen for its instructions about what, how to

4    keep or to leave or to modify the Ocwen related information

5    in its databases.  So control, no, but overarching

6    influence, yes.  Ocwen has tremendous influence into what

7    its data looks like in Equifax's database.

8    Q.    Okay.  My question to you, sir, was control.  And your

9    answer is, no, they don't control.  Right?

10   A.    Well, I mean, I don't know how we're going to define

11   "control."  But, I mean, yeah, they're separate companies,

12   yes, and the credit report is sold by Equifax.  That's

13   Equifax's credit report.

14   Q.    Thank you.  When you were talking about your

15   background, I believe you mentioned you had written a book.

16   That book involved you interviewing people at Equifax;

17   right?

18   A.    No.  Actually, I interviewed people from Fair Isaac for

19   the chapters on credit scoring.  I had deposition and trial

20   testimony from Equifax because Equifax has been in trial

21   several times.

22   Q.    So it's your testimony that you, you never interviewed

23   anyone who had worked at Equifax as part of your book?

24   A.    The book does not quote -- I don't remember it quoting

25   anybody from Equifax stemming from an interview.  I've

Evan Hendricks - Cross (Manning)

1    interviewed people from Equifax before in the past but not

2    for the book.

3    Q.   Okay.  The knowledge that you started to talk about

4    related to your experience in the industry is not knowledge

5    that you gained from working at any credit bureaus; correct?

6    A.   That's correct except through my being on the Experian

7    Consumer Advisory Council.  I accumulated really good

8    specialized knowledge there because the council consisted of

9    creditors like American Express and Capital One and other,

10   other mortgage companies.  So it was, it was pretty useful.

11   Q.   In your expert report you state that it's your opinion

12   that Equifax's procedures for ensuring accuracy were not

13   adequate; correct?

14   A.   That's correct.

15   Q.   You go on to state that Equifax's re-investigation of

16   Mr. Daugherty's dispute in this matter to determine the

17   disputed information was accurate was not correct; right?

18   A.   Right.  I criticized it, right, because they were

19   over-relying on -- they rely too much on Ocwen when it was

20   clear that Ocwen was not doing a good enough job and they

21   could have taken a closer look on the fact that there's two

22   account numbers.

23   Q.   In fact, you state that Equifax has stood out for its

24   nonresponsiveness to consumer disputes; right?

25   A.   Yes, there is an interesting history there, yes.

Evan Hendricks - Cross (Manning)

1  Q.   And in your report you talk about that.  You say that

2  Equifax has a pattern of failing to perform adequate

3  re-investigations of consumer disputes; right?

4  A.   Yes.

5  Q.   Why is that?

6  A.   Why is Equifax?

7  Q.   Yes.

8  A.   I guess you want my opinion on that.  Right?  Because,

9  I mean, --

10 Q.   You talk about it in your report.  I'd like you to tell

11 the jury about it.

12 A.   Equifax has its way of doing things, and it just has

13 not shown any interest in changing how it does things.  And,

14 so, they just -- I guess "stubborn" is one word for it.  But

15 they keep -- despite several events where they have been

16 shown to be doing the wrong thing, they really have not

17 changed some of those things yet.

18 Q.   In your report you state that Equifax continues to

19 fail -- these are your words and I'll quote it.  Quote:

20 "Equifax continues to fail to make obviously needed changes

21 to be sufficiently responsive to consumers' disputes and to

22 avoid inflicting foreseeable damage on consumers rights." Do

23 you recall that?

24 A.   Yes.

25 Q.   Do you still maintain that opinion today?

Evan Hendricks - Cross (Manning)

1    A.   I mean, yeah, for, for -- yes, for certain cases for

2    sure, yes.  This is an on-going problem, yes.

3    Q.   And you point out that in this case in your report that

4    Equifax was the one that included one, not two, accounts

5    with the same account number; right?

6    A.   Well, they had it in their database, yes, absolutely.

7    Q.   And they were reporting on a single account --

8    Mr. Daugherty had a single account -- with the same account

9    number but they were doing it twice; right?

10   A.   Right.  And they continued to do that after Ocwen

11   furnished them -- furnished information telling Equifax to

12   keep that second derogatory account in there.

13   Q.   And we'll get, we'll get to that because I understand

14   that you want to talk about that and I'll let you in a

15   little bit.  One of the accounts --

16        THE COURT:  You need to find a stopping place,

17   counsel.

18        MR. MANNING:  I'm sorry?

19        THE COURT:  You need to find a stopping place.

20        MR. MANNING:  Okay.  Let me get just two questions

21   into this.  One of the -- because I'm still on the same

22   subject.

23   BY MR. MANNING:

24   Q.   One of the accounts that Equifax included in

25   plaintiff's file showed the $6,128 past due with foreclosure

Evan Hendricks - Cross (Manning)

1 proceedings started. The other one was current. And your

2 report says the other report the tradeline was correct.

3 Right?

4 A.   Right.

5 Q.   So because Ocwen was furnishing monthly data that was

6 accurate, one of the tradelines with Equifax was correct?

7 A.   I think I agree with that.

8 Q.   Okay. That's a perfect stopping point. Thank you.

9        THE COURT: Ladies and gentlemen of the jury, I'm

10 going to release you for the evening. While you're out, do

11 not discuss this case among yourselves or permit anyone to

12 discuss it with you or in your presence. And remember that

13 you're under continuing obligation not to listen to, view,

14 or read any media coverage that there might be.

15    Have a good, restful evening and I will see you all

16 tomorrow morning at 9:00. We'll stand in recess.

17    (Trial recessed at 4:00 p.m.)

18

19

20

21

22

23

24

25

1          I, Lisa A. Cook, Official Reporter of the United

2     States District Court for the Southern District of West

3     Virginia, do hereby certify that the foregoing is a true and

4     correct transcript, to the best of my ability, from the

5     record of proceedings in the above-entitled matter.

6

7

8          s\Lisa A. Cook                    June 1, 2016

9               Reporter                          Date

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25