```
              IN THE UNITED STATES DISTRICT COURT
         FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA
                         AT BECKLEY


                 TRANSCRIPT OF PROCEEDINGS




----------------------------x
                            :
DAVID M. DAUGHERTY,         :        CIVIL ACTION
                            :        NO. 5:14-CV-24506
         Plaintiff,         :
vs.                         :
                            :
OCWEN LOAN SERVICING, LLC,  :        May 18, 2016
                            :
         Defendant.         :
                            :
----------------------------x




                       TRIAL
                     VOLUME III


        BEFORE THE HONORABLE IRENE C. BERGER
            UNITED STATES DISTRICT JUDGE




APPEARANCES:

For the Plaintiff:          MR. RALPH C. YOUNG
                            MR. JED ROBERT NOLAN
                            MR. STEVEN R. BROADWATER
                            Hamilton Burgess Young &
                            Pollard
                            P.O. Box 959
                            Fayetteville, WV  25840-0959
```

APPEARANCES (Continued):


For the Defendant:              MR. JASON E. MANNING
                                MR. JONATHAN M. KENNEY
                                Troutman Sanders
                                Suite 2000
                                22 Central Park Avenue
                                Virginia Beach, VA  23462

                                MS. SARA L. MARKERT
                                1661 WORTHINGTON ROAD
                                Suite 100
                                West Palm Beach, FL  33409


Court Reporter:                 Lisa A. Cook, RPR-RMR-CRR-FCRR


Proceedings recorded by mechanical stenography; transcript
produced by computer.

1                          <u>I N D E X</u>

2

3   <u>PLAINTIFF'S WITNESSES:</u>                          <u>PAGE</u>

4   **EVAN HENDRICKS**

5        Cross Examination (By Mr. Manning) . . . . .  10

6        Redirect Examination (By Mr. Nolan)  . . . .  51

7

8   **SANDRA LYEW**

9        Direct Examination (By Mr. Young)  . . . . .  58

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                    P R O C E E D I N G S

2          THE COURT:  Good morning.

3      My law clerk says you have a matter you want to take

4  up, Mr. Young.

5          MR. YOUNG:  Yes, Your Honor.  It's with respect to

6  the order of witnesses.

7      On Monday I asked Mr. Manning if he would make Ms.

8  Lyew, L-y-e-w, available for me to call her.  And Monday I

9  was told he didn't know where she was.  Yesterday I was told

10  she'd be here Wednesday, they were going to use her

11  Wednesday.  I asked Mr. Manning this morning if he would

12  make her available for me to call.  He said, "No."

13      The only reason I want to call her is -- if I don't

14  call her, I'm -- she's the 30(b)(6) witness.  I have her

15  166-page deposition.  I can read that deposition to the jury

16  in my case in chief, and I will.  But I imagine that Ms.

17  Lyew is down the street, you know, at a motel or somewhere.

18      If I call her, I won't have to read the 166-page

19  deposition.  I won't have to cross-examine her after Mr.

20  Manning calls her.

21      Mr. Manning told the jury he was going to call her,

22  told the jury what she was -- to what she was going to

23  testify, and even showed the jury a slide about her

24  testimony.

25      I'm just trying to save time.  That's, that's all there

1    is to it.  If he won't make the witness available, I'm going

2    to read a 166-page 30(b)(6) deposition to this jury.  If he

3    makes her available, I'll cover the same things.  It will

4    significantly shorten my cross-examination when they call

5    her.

6                 THE COURT:  Mr. Manning.

7                 MR. MANNING:  Good morning, Judge.

8                 THE COURT:  Good morning.

9                 MR. MANNING:  Ms. Lyew is our witness.  And as I

10   accurately represented to Mr. Young, she's available to me

11   to call her in my case in chief if we so elect to have her

12   here as a live witness.

13       That's our decision and it's a game time decision.  We

14   could elect just to use her deposition designation.  And

15   she's not subject to a trial subpoena.  She hasn't been

16   served with a subpoena.  We don't have to make her

17   available.  She's not required to be here.

18       And she's had a death in the family, and out of

19   consideration for her I want to minimize her time on the

20   stand so that when I call her, if I need to, in my case in

21   chief we shorten the period of time.

22                 THE COURT:  Go ahead.

23                 MR. YOUNG:  Well, Your Honor, I was told she would

24   be here Wednesday.  He told the jury he was going to call

25   her.  He even showed a slide of what she was going to

1    testify to.

2              THE COURT:  All right.  You said that and I heard

3    it the first time, Mr. Young.  Anything further?

4              MR. YOUNG:  But I don't know whether she's here or

5    not and counsel is rather coy about that.

6              THE COURT:  Well, I don't hear --

7              MR. YOUNG:  I'm sorry, Your Honor.  I just did

8    want to mention I did serve -- on Monday evening I served an

9    intent to issue a subpoena for the witness.  I have not

10   handed Mr. Manning a subpoena.  She is the designated

11   30(b)(6) representative of this defendant.  I'm sorry.  I

12   didn't add that earlier.  I'm sorry.

13             THE COURT:  All right.  Anything further on this

14   issue, gentlemen?

15             MR. MANNING:  Judge, filing a notice of intent to

16   serve a subpoena on Monday is different from serving a

17   subpoena on a witness.  There's no valid subpoena and that's

18   all I have to say.

19             THE COURT:  All right.  Well, all I have to say is

20   that I expect a level of professionalism from you lawyers

21   that you should be able to cooperate on matters like this.

22        If she's a 30(b)(6) representative of the defendant,

23   I'm going to order that she be made available.  You all can

24   both question her.

25        If you want to put her on in your case in chief,

1    Mr. Young, I'm going to ask that she be made available so

2    that you can put her on.

3        I don't hear any argument that it's unexpected or it's

4    prejudicial or anything of that nature.  And, again, with

5    the level of experience at counsel table on both sides, this

6    is a matter that you all in your professionalism that our

7    profession demands should be able to work out.  And, so,

8    I'll require that she be made available.

9        Mr. Manning, I owe to you an opportunity to address the

10   record, since we're out of the presence of the jury, on a

11   question that was asked of the expert.  You asked to

12   approach the bench.

13       And the question is at line 1446, I think point 24.

14   The expert witness gave a response.  You objected and asked

15   for a sidebar.  And I indicated in the interest of moving on

16   that I would allow you to address it at a break.

17       And, so, if you want to address that objection further

18   at this time, I'll hear you.

19             MR. MANNING:  Thank you, Judge.

20       The issue is I have repeatedly put on the record that

21   the expert does not have any opinions about causation or

22   damages.  And Your Honor has indicated on the record more

23   than once also that an expert is constrained by the scope of

24   their report pursuant to 26(a)(2) disclosures.  And the duty

25   to supplement under 26(e)(2), it has to be done by, by the

1    time of the filing of the 26(a)(3)s.

2       Then he gets up and even after the two cautionary

3    instructions, he volunteered testimony about this third

4    party, One Credit Federal Union (verbatim) and -- that was

5    number one; and, number two, referred to foreclosure as a

6    stop sign.

7       Neither of those things, Judge, are in his report and I

8    can hand up a copy to you again.  That is exactly the type

9    of sly interjection that I was hoping to avoid by having

10   plaintiff's counsel cautioned on this twice prior to him

11   putting the expert on.

12      Then when he does it and I have to object and I'm not

13   permitted to resolve that in front of the jury at that time,

14   I believe the only way of correcting that is a curative

15   instruction -- Your Honor can exercise discretion as to

16   when -- but to say, "Ladies and gentlemen of the jury, this

17   expert is not offering any opinions about causation or

18   damages.  He is not permitted to testify about anything

19   outside the scope of his report or the materials he relied

20   upon," however Your Honor wants to phrase it.

21      But I don't believe -- first of all, it has to be

22   stricken from the record.  Second, it has to be corrected in

23   the minds of the jurors.  And, again, I put this on the

24   record twice before he even got up there.  It's difficult to

25   unring the bell.  And he's clearly going outside the scope.

```
 1    I cautioned him on that and he did it anyway.
 2            THE COURT:  Any response, Mr. Nolan?  I'm not -- I
 3    will go back and review the question and the objection
 4    again.  I'm not convinced that this is the issue that was on
 5    the table at the time.  But I will review that, Mr. Manning,
 6    and, and make a determination about a cautionary
 7    instruction.
 8        Mr. Nolan, anything further to add on this issue before
 9    we bring the jury out?
10            MR. NOLAN:  Not at this time, Your Honor.
11            THE COURT:  All right.
12            MR. MANNING:  I'm sorry, Judge.  Could you just
13    note my objection for the record on the witness that when
14    you refer to a level of professionalism, plaintiffs are
15    professionals and they need to subpoena a witness they want
16    here and they haven't.
17            THE COURT:  That issue has been resolved, Mr.
18    Manning.  And once I resolve an issue, I really don't want
19    to hear further argument on it.
20            MR. MANNING:  I understand.
21            THE COURT:  We've had that to happen throughout
22    the course of this trial.  I do my best to listen to both of
23    you all and to give you a ruling.  And once that's done, I
24    don't want to go into it further.  And it's not enhancing
25    anybody's professionalism to continue to banter back and
```

Evan Hendricks - Cross (Manning)

1   forth about what I consider to be relatively minor issues.

2        Get the jury, please.  We will resume with the

3   cross-examination, Mr. Manning, of Mr. Hendricks.

4        Mr. Hendricks, would you take the stand, please.

5        **EVAN HENDRICKS, PLAINTIFF'S WITNESS, RESUMED THE**

6   **WITNESS STAND**

7        (Jury returned into the courtroom at 9:06 a.m.)

8            THE COURT:  Good morning, ladies and gentlemen,

9   one gentleman.  You all be seated.

10       Mr. Manning.

11           MR. MANNING:  Thank you, Judge.

12  BY MR. MANNING:

13  Q.   Good morning, Mr. Hendricks.

14  A.   Good morning.

15  Q.   We're back again.  We're continuing your examination

16  from yesterday.

17       I want to start roughly where we left off.  We were

18  talking about your expert report.  Do you have a copy up

19  there with you?

20  A.   No.

21       (Pause)

22       Thank you.

23  Q.   So just to orient you, Mr. Hendricks, where we left off

24  was -- we left on an agreement, that you agreed that Equifax

25  was reporting the one Ocwen account with the same account

Evan Hendricks - Cross (Manning)

1    number two times on plaintiff's credit report; correct?

2    A.   If I -- yeah, if I understand, Ocwen was reporting two

3    tradelines, --

4    Q.   Okay.

5    A.   -- two Ocwen tradelines.

6    Q.   I think you said it wrong.  Equifax was reporting two

7    Ocwen tradelines for the one Ocwen account?

8    A.   Right.  The credit -- yeah.  Ocwen's records showed it

9    had one account, and Equifax credit report showed there were

10   two Ocwen tradelines.

11   Q.   Okay.  So we -- this is where we left off I think.  You

12   agree that Equifax was reporting the one Ocwen account in

13   the form of a duplicative tradeline on that credit report?

14   A.   Yeah, I think, I think I agree.  Like what I can

15   describe is that there -- the Equifax credit report had two

16   Ocwen tradelines.  And, so, one showed a past due balance

17   and foreclosure proceedings started.  The other one was

18   mainly positive except for some old history on it.

19   Q.   And you'd agree that it is a mistake for Equifax to be

20   reporting one account twice in the form of two tradelines?

21   A.   Yes.  If it has the same account number, something's

22   wrong.  There should be -- if it's -- it does have the same

23   account number.  So that's -- it clearly is a red flag for

24   both Equifax and for Ocwen.

25   Q.   So Equifax has these two tradelines in its credit

Evan Hendricks - Cross (Manning)

1  report and Equifax is the one who actually compiles and

2  sends out the credit report; right?

3  A.   Yes, that's an Equifax product and that's their

4  business, yes.

5  Q.   There is a term of art in the industry called

6  duplicative tradeline; right?  You're familiar with that?

7  A.   I think so, yes.

8  Q.   Okay.  So this, this concept of a duplicative tradeline

9  is not something that has only happened in this case?

10  A.   Oh, no.  It happens a lot with student loans, for

11  example.

12  Q.   And student loans are a little bit different, right,

13  because the account number for a student loan is the Social

14  Security number of the student; right?

15  A.   Well, I mean, that depends.  A lot of student loans

16  have their own account numbers too.  But they get

17  transferred from one student loan grantor to another and

18  then they become duplicative.  That's just an example.  I'm

19  agreeing with you that it's foreseeable there are going to

20  be duplicate tradelines, yes.

21  Q.   Okay.  In this case, we're not dealing with student

22  loans?

23  A.   No.

24  Q.   We're dealing what a mortgage; correct?

25  A.   Yes.

Evan Hendricks - Cross (Manning)

1  Q.   There's one mortgage.  Equifax has it on there twice.

2  It's a mistake and it's called a duplicative tradeline.

3  A.   I think we can just agree on that, yes.

4  Q.   Okay.  Thank you.  In your report you never identify

5  why Equifax started reporting the duplicative tradeline;

6  right?

7  A.   That's true.

8  Q.   You say that Equifax failed to detect the duplicative

9  tradeline as being reported on its own credit report.

10  A.   Yes.

11  Q.   In your report you do not say anything about Ocwen's

12  monthly data, the furnishing of that data to Equifax as

13  being wrong; correct?

14  A.   Yeah, I did not say that in that report.  That is

15  correct.

16  Q.   On the contrary, you agree that Equifax at all times

17  had one tradeline for the Ocwen account that was correct;

18  right?

19  A.   Yes.

20  Q.   And that data is based on what Ocwen is furnishing to

21  Equifax; right?

22  A.   Yes.  That correct one was based on Ocwen's

23  furnishings, its routine monthly furnishings.  You

24  represented to me it's monthly and I would agree.

25  Q.   Okay.  So, again, this is a point of agreement where

Evan Hendricks - Cross (Manning)

1  you agree that Ocwen was giving the correct monthly data

2  that it was furnishing -- I know you don't know it's

3  monthly.  The regular updates by data tape --

4  A.    Right.

5  Q.    -- that was correct, and Equifax had that one

6  tradeline; correct?

7  A.    Yes.

8  Q.    Thank you.  Now, the other tradeline, the duplicate

9  that was wrong, it was not being updated; right?  It had old

10  information on it.

11  A.    I think that's correct.  It was -- yeah, if there's

12  no -- well, it was updated when the -- for instance, it was

13  updated when Ocwen responded to ACDVs.

14  Q.    Fair point.  What I'm -- it was a poor question.  Let

15  me clarify.  The information that Ocwen was furnishing,

16  which we know to be on a monthly basis, was not being

17  utilized by Equifax to update the duplicative account.

18  A.    I think that's right.  Ocwen's routine furnishing,

19  which we're going to call monthly furnishing -- right?

20  Q.    Yes.

21  A.    -- that, that was being channeled into the correct

22  account.  That was the monthly furnishing.

23  Q.    Thank you.  Now, you, you've talked already about some

24  Equifax ACDVs.  Do you recall doing that with Mr. Nolan?

25  A.    Yes.

Evan Hendricks - Cross (Manning)

1  Q.   Okay.  Thank you.  None of those -- we can agree on

2  this I believe.  None of those Equifax ACDVs ever identified

3  the words "duplicative tradeline" which is the term in the

4  industry; right?

5  A.   The question is did the ACDVs use, anywhere feature the

6  term "duplicative"?

7  Q.   Correct.

8  A.   No, the ACDVs didn't use the term "duplicative."  The

9  two ACDVs together showed there was a duplicative tradeline.

10  Q.   And I understand that's your testimony.  My question,

11  sir, is we can agree that whether it's by the word

12  "duplicative" or saying this account is reporting twice or

13  any version of those words, they don't appear anywhere on

14  the Equifax ACDVs; correct?

15  A.   I, I -- that's my recollection.  I agree with that.

16  Q.   Your -- you don't reference any notes or statements in

17  your report that Mr. Daugherty ever told Ocwen that there

18  was a duplicative tradeline; correct?

19  A.   That's true.  His -- because he's disputing what's

20  inaccurate.  So he was disputing the second inaccurate

21  tradeline.  So it's understandable to me that's what he

22  would dispute because the consumer can dispute any item of

23  information.  That's the right and the responsibility of a

24  consumer.  And, so, he was disputing the one that was wrong.

25  Q.   So, again, we can agree that you don't identify any

Evan Hendricks - Cross (Manning)

1    documents or telephone calls or anything from the plaintiff

2    in which he said "duplicative tradeline" or "you're

3    reporting this twice" or any version of that; correct?

4    A.   That's correct.  I didn't do that because it's really

5    not that important.

6    Q.   Well, it may not be important to you.  I understand

7    that.  But what I'm trying to get is what you did rely on

8    and what the basis of your opinion is.  It's important to my

9    client the duplicative tradeline issue.  You can understand

10   why.  Right?  Duplicative tradeline is the term of art and

11   you're agreeing that it was never used; correct?

12   A.   I mean, it's -- you keep saying it's a term of art.  It

13   is -- it's a term that's used in the industry.  And, and you

14   say I understand why it's important to you.

15        But what's really important is that once the consumer

16   disputes any item of information, Ocwen has a responsibility

17   to investigate it.  And that's what the problem was in this

18   case.  Ocwen did not investigate the disputed items of

19   information.

20   Q.   Now, the other thing you talked about -- I've asked you

21   now about what plaintiff said.  Nowhere in your report do

22   you reference that Aggressive Credit Repair ever told Ocwen

23   or Equifax that there was a duplicative tradeline; correct?

24   A.   Yeah, I believe that's correct.

25   Q.   Nowhere in your report do you reference that Equifax

Evan Hendricks - Cross (Manning)

1  ever told Ocwen that there was a duplicative tradeline;

2  correct?

3  A.   They didn't either call them or write the word

4  "duplicative" but Equifax communicated to Ocwen when they

5  put two ACDVs together coming within seconds of each other

6  that here's one ACDV for one account, one account number and

7  a second for the same account number with totally opposite

8  characterizations, one relatively positive, the other

9  completely derogatory.

10 Q.   Okay.  And we're going to get to what the meaning of

11 "derogatory" is in just a little bit.  Right now I want you

12 to focus on the question.  The question is when we're

13 talking about where that information would be designated on

14 the ACDV response, you're familiar with the box called the

15 FCRA relevant information field; right?

16 A.   Yes.

17 Q.   Now, that box was designed in the industry so that

18 there would be a field where more information could be

19 provided by the credit bureau to the furnisher, my client

20 Ocwen; correct?

21 A.   Yes.

22 Q.   And that box is there because on the forms there's only

23 two dispute fields.  And you're limited to putting in a

24 code.  And so that way the credit bureau has a space where

25 they can give the information about the dispute to the

Evan Hendricks - Cross (Manning)

1  furnisher so that the furnisher has the relevant

2  information.  Right?

3  A.   Yes.

4  Q.   Those fields -- the FCRA relevant information field you

5  agree never says "duplicative tradeline" or "borrower

6  complains it's reporting twice" or that "there's two

7  tradelines," any version of that.  It's never used.  Right?

8  A.   I, I believe that's correct.  I think the FCRA relevant

9  information box, which we call the free-form box, I don't

10 remember seeing anything in there.

11 Q.   Now, you have your, your report in front of you.  If

12 you ever need to look at the materials that you identify as

13 having been referenced, it's on Page 35.  I'm going to run

14 through this so we understand the basis of your opinion.

15     You don't specify any specific correspondence that you

16 relied upon in reaching your opinions.  Right?

17 A.   I think on Page 1 I reference some Bates numbers for --

18 I believe these are Ocwen documents and they relate to the

19 dispute correspondence.

20 Q.   And that was four pages?  Five pages?

21 A.   That sounds about right, yes.

22 Q.   Okay.  Anything else?

23 A.   Well, those are the pages that I specifically identify

24 as being relevant to my opinions.

25 Q.   That's the only specific identification of any

Evan Hendricks - Cross (Manning)

1   correspondence that you reference; correct?

2   A.   Of the, of specifying the precise correspondence, yes.

3   But my intention was to show that I considered all the

4   correspondence between the parties in this case.

5   Q.   You don't mention it in your "materials considered"

6   that you looked at anything from Aggressive Credit Repair

7   which is a third party and had its own production.  Right?

8   A.   Right.  But I think we discussed yesterday that those

9   were dispute correspondence.  And my, my sense was that

10  Aggressive Credit Repair was acting on behalf of plaintiff

11  and there was some sort of agent, though I can't give any

12  sort of legal opinion on that.  I'm not qualified for that.

13       But as a practical matter, Aggressive Credit Repair was

14  acting on behalf of plaintiff.  That's why they were sending

15  this dispute correspondence.  And, yes, I did consider that

16  correspondence.

17  Q.   Isn't it true that nowhere in your report you even

18  identify that the plaintiff had a third-party company

19  disputing his credit?

20  A.   I believe that's correct.

21  Q.   You never even mention the words "Aggressive Credit

22  Repair" or "Lorin Hanks."

23  A.   That's, that's correct, yes.

24  Q.   You never mention having considered the specific letter

25  that Aggressive Credit Repair produced on behalf of the

Evan Hendricks - Cross (Manning)

1    plaintiff; right?

2    A.    Right.

3    Q.    Now, let's talk about, on Page 5 of your report where

4    you talk about -- and you mentioned this in your direct, how

5    you characterized what Ocwen was doing with its ACDV

6    responses as a, quote, ACDV exchange, end quote.   Right?

7    A.    Yes.

8    Q.    And you say it was merely, quote, parroting, end quote,

9    back to the CRA, "Yep, that's what we have."   Right?

10   A.    Yes.

11   Q.    And those are your words, "ACDV exchange" and "parrots"

12   or "parroting;" right?

13   A.    Yes.   I said, yes, that is what we reported before, so

14   keep it on there.

15   Q.    In your report as the materials you considered, you

16   don't mention that you reviewed, other than those five pages

17   in the beginning, any other documents produced by my client,

18   Ocwen, in forming your opinions; correct?

19   A.    That's correct because at the time I wrote this report,

20   Ocwen had not produced any of its documents relating to

21   credit reporting.

22   Q.    And you agree that nowhere in your report do you

23   mention that you ever reviewed Ocwen's monthly data

24   reporting?

25   A.    That's right.   My recollection was that was clearly not

Evan Hendricks - Cross (Manning)

1  available to me.

2  Q.   Nowhere in your report do you mention that Ocwen sent

3  two what are called AUDs; right?

4  A.   Yes, AUDs.

5  Q.   And you're familiar that that's the Automated Universal

6  Data form where Ocwen says to all the credit bureaus,

7  "Update everything about this account that we're telling

8  you."  Right?

9  A.   Right, because yesterday I identified three ways that

10  furnishers furnish information.  The first was the monthly

11  reporting.  The second was the AUD.  And third is the ACDV.

12  Q.   Despite the opinions that you've rendered in your

13  report, nowhere in your report do you, do you give Ocwen

14  credit for having sent those AUDs; correct?

15  A.   That's correct because I'm focusing on the issue in the

16  case.  And that's the issue of did Ocwen investigate in

17  response to the ACDVs it received from Equifax.

18       So, you know, I need to focus on the issues that are

19  most relevant.  So that's what I -- that's how I can give

20  helpful testimony to the jury.

21  Q.   So it's your testimony that Ocwen sending AUDs is not

22  relevant to this dispute?

23  A.   It's, it's not, it's not relevant to the issue of did

24  they investigate in response to the ACDVs that they received

25  from Equifax.

Evan Hendricks - Cross (Manning)

1   Q.    Okay.  I understand your opinion.

2   A.    Yeah.

3   Q.    Next I want to ask you about another document.  Nowhere

4   in your report do you mention having reviewed or considered

5   Ocwen's comment log which references the various

6   communications, telephone calls, ACDV responses, or

7   investigation done by Ocwen; right?

8   A.    Right.  And you can correct me if my memory is bad, but

9   my recollection is that was not available to me.  And that's

10  something that I would normally look at.

11  Q.    Now, when you use the word "parroting" you'd agree that

12  if Ocwen's documents show that it did an investigation by

13  pulling up notes to investigate things, reviewing its system

14  like this comment log I've referred to, that's more than

15  mere parroting; right?

16  A.    If it, if it's, if it's delving into its historical

17  records, yeah, that would be more than parroting, sure.

18  Q.    Thank you.  So I want to go now to some of the exhibits

19  that plaintiff has marked in this case.  And hopefully this

20  will look clear on the ELMO here.

21      So I want to show you first -- this is Plaintiff's

22  Exhibit 18.  And, specifically, there's an identifying

23  number in the bottom -- I'm waiting for auto focus, there we

24  go -- EIS 276.  And that's just called a Bates stamp; right?

25  You're familiar with those?

Evan Hendricks - Cross (Manning)

1  A.   Yes.  I list those in my "materials considered" in the

2  expert report.

3  Q.   Thank you.  Okay.  So first we're talking here about --

4  can you see it okay, Mr. Hendricks?

5  A.   Yeah.  It's blurry but I, you know, can work with you.

6  And I think they have hard copies too, so if you ever feel

7  like putting those up.

8  Q.   Yeah.  Unfortunately that's what I'm using right now.

9  A.   Oh, okay.

10 Q.   Okay.  Well, this is an ACDV form that was created by

11 Equifax.  It's on Equifax letterhead.  Correct?

12 A.   Yes.

13 Q.   And it has a control number that Equifax assigned.

14 That's in the top left.

15 A.   Yes.

16 Q.   Then if we're -- if we move down from there, you can

17 see who the responder is and the date; right?

18 A.   Right, Ocwen Loan Servicing and Robert Rajina.

19 Q.   The date is April 24th, 2014; correct?

20 A.   Yes.

21 Q.   Below that there's a line that says "response code."

22 You'd agree that that, that whole row, "response code," is

23 something that Equifax prepares.  That's not a line that's

24 on the furnisher form.  Correct?

25 A.   I think if I -- I think I can agree with you because I

Evan Hendricks - Cross (Manning)

1  think your question is that an Equifax template; right?

2  Q.   Yes.

3  A.   It's a template, yes.  This format is an Equifax

4  template.  So Equifax presents these four options -- I think

5  we discussed this yesterday -- of either verified as

6  reported or modified as shown or delete account.

7  Q.   And that is data that Equifax is putting on this form

8  based on its interpretation of what it receives; right?

9  A.   Well, I mean, I think I, I think -- I'm not sure I

10 agree.  Equifax puts those -- they have four options.  The

11 fourth one is delete because it's fraud.  They have four

12 options that they're presenting to the furnisher.

13      So if the furnisher -- if they're just going to verify

14 as reported, they don't need to change any other data in all

15 the rest of the boxes.  But if they say modify as shown,

16 then the furnisher has to change the boxes.

17      So in answering your question, I think Equifax presents

18 these options, but then it's the furnisher that has to

19 decide what box to check.  And that's the information that's

20 furnished by the furnisher on the ACDV.

21 Q.   Well, I, I think you've already told me that the

22 form -- those actual boxes are on an Equifax form.  They're

23 not on the furnisher form.  Right?

24 A.   I mean, this is, this -- what we're looking at is the

25 Equifax form.  The, the ACDV -- at somewhere in Ocwen's

Evan Hendricks - Cross (Manning)

1  possession they have a similar form, a parallel form.

2  Q.   Okay.  And maybe you don't know.  Do you -- let me ask

3  you this way as a foundational question.  Do you know

4  whether Ocwen's ACDV forms that it produced included boxes

5  that it was checking when it sent in the response to

6  Equifax?

7  A.   I, I'd have to look at one to see if I remember.

8  Sitting here right now I don't remember if it has the boxes

9  just the way this one does.

10 Q.   And that's not something you talk about in your report;

11 right?

12 A.   Correct.

13 Q.   And you don't, you don't know whether there is even a

14 box that Ocwen checked or not; right?

15 A.   That -- on the, on the Ocwen form, that's right.  I

16 can't remember sitting here right now.

17 Q.   So let's talk about this form.  We talked about the two

18 dispute fields.  And that's what we were just referring to,

19 dispute one, dispute two.

20     When a credit bureau receives a borrower dispute

21 letter, they look at it and they interpret what codes to

22 assign; correct?

23 A.   Yes.

24 Q.   And that's their decision how to interpret the codes

25 and assign them on the ACDV; correct?

Evan Hendricks - Cross (Manning)

1   A.   Yes.

2   Q.   So in this case, this is Equifax's decision to assign

3   the codes?

4   A.   Right, the 007 code.

5   Q.   And these two codes, or these fields, to the extent

6   there are other relevant information, whether it's in the

7   form of the letter, the identification that we talked about

8   of the duplicative tradeline, it's able to be put in this

9   third box, FCRA relevant information; right?

10  A.   Yes.

11  Q.   Now, on this form you can see that there are a number

12  of modifications where the first line where I'm pointing

13  under "account type," there is a series of fields.  And then

14  below that there's another row where there's modified data.

15  Right?

16  A.   Yes.

17  Q.   So this reflects that Equifax was sending the first

18  white row and Ocwen was responding back, to the best of your

19  knowledge, this information; right?

20  A.   Yes.

21  Q.   Now, you don't know whether that's, in fact, what Ocwen

22  said or not, but that's how you would interpret this form?

23  A.   Yes, that would be the industry standard, yes.

24  Q.   Date open.  You can see here that Ocwen is telling

25  Equifax the date open that you have for this loan of August,

Evan Hendricks - Cross (Manning)

1   1999, needs to be modified to July of 1999; right?

2   A.   Yes.

3   Q.   So Ocwen is saying what you have on this account is

4   wrong.  You need to modify it to reflect the correct date.

5   Right?

6   A.   Yes.

7   Q.   Then below that there's some additional information

8   that Ocwen provides.  First you have the request data.

9   That's what Equifax has.  I might be able to blow it up some

10  more.

11  A.   No, I think I see it.  I just wanted to make sure it's

12  the same number, it's updating to the same number, 100813.

13  Q.   Yes.

14  A.   Okay.

15  Q.   Then follow that over and you'll see "current balance."

16  Do you see how the "current balance" field has been modified

17  by Ocwen?

18  A.   Yes.

19  Q.   Go over one more field and you'll see "past due."

20  Equifax had a tradeline for this account as past due in the

21  amount of 6,000 and change and Ocwen modified it to zero;

22  right?

23  A.   Yes.

24  Q.   Then below that you have more information, specifically

25  last payment date.  Equifax sent to Ocwen last payment date

Evan Hendricks - Cross (Manning)

1  was January, 2012.  Ocwen updated it to March, 2014.  Right?

2  A.    Yes.

3  Q.    That's again Ocwen saying modify it to reflect that the

4  last payment was in March, 2014, which is the month right

5  before this request was sent to them; right?

6  A.    Right.

7  Q.    Next, on the far right-hand side we have "narratives."

8  Do you see that box?

9  A.    Yes.

10  Q.    Now, these narratives -- if you go to the codes here,

11  these codes in this box are Equifax codes; right?

12  A.    Yes.

13  Q.    So this is a little bit different and I just want this

14  to be clear.  There's kind of a, a pattern where line one is

15  what Equifax is sending to the furnisher to look at, and

16  line two is what the furnisher responds.  But this narrative

17  is different, right, because actually all these codes are

18  Equifax codes?

19  A.    I believe that's correct.

20  Q.    So Equifax is the one here, according to this document,

21  that it's putting these codes on; right?

22  A.    Yes.

23  Q.    Now, isn't it true that these codes can't be put on by

24  a furnisher because they don't have access to that?

25  A.    I believe, I believe that these are Equifax codes.

Evan Hendricks - Cross (Manning)

1  Q.   So, for example, when Equifax says "three-month update

2  freeze," do you see that?

3  A.   Yes.

4  Q.   That means Equifax is freezing this tradeline; right?

5  A.   Yes.

6  Q.   And, so, Equifax is receiving this.  It receives this

7  data that Ocwen is saying updated, and then it puts on a

8  code that says "freeze this tradeline."

9  A.   Yes.

10  Q.   Thank you.  Now, let's go a little bit further down

11  where we have "terms duration."  You see some additional

12  updates from Ocwen.  Terms duration -- Ocwen updates it from

13  30 -- it modifies or requests that field be modified by

14  Equifax to 360.  Correct?

15  A.   Yes.

16  Q.   Then you go to "frequency," no change there.  And then

17  Ocwen provides additional data here, "scheduled monthly

18  payment," and it gives an amount; right?

19  A.   Yes.

20  Q.   And, so, there was a blank which Equifax and Ocwen

21  provided that additional data?

22  A.   Yes.

23  Q.   Then below that -- I'm sorry, not below it.  Next to it

24  "actual payment."  And it has Equifax was listing it as 200

25  and Ocwen requests that Equifax modify that to reflect 1936.

Evan Hendricks - Cross (Manning)

1    Right?

2    A.    Yes.

3    Q.    Okay.  Let's keep going.  "Account status."  This is

4    one of the three fields that is actually being specified for

5    Ocwen in the dispute code; right?

6    A.    Yes.

7    Q.    Okay.  So these other, these other fields that we've

8    looked at, they're not part of what's being written here

9    as -- that wasn't helpful.  Sorry.  That was my fault.

10        The, the specific instructions, "verify payment history

11   profile, account status, and payment rating," now we're at

12   the first field that we've talked about so far that actually

13   is being instructive; right?

14   A.    I have to apologize.  I didn't understand the very last

15   part of that question.

16   Q.    Sure.  I'm sorry.  I'm trying to do too many things.

17   So the dispute code at the top asks Ocwen to, quote, verify

18   payment history profile, account status, and payment rating.

19   Those are three fields; correct?

20   A.    Yes.

21   Q.    And, so, now we're talking about the first of those

22   fields -- everything else Ocwen is doing that we've gone

23   through up to this point is not one of those fields.  You

24   agree; right?

25   A.    You mean of the boxes we just walked through?

Evan Hendricks - Cross (Manning)

1    Q.    Correct.

2    A.    Right.  We talked there was the balance and past due

3    amount.  Those are different boxes than things mentioned in

4    the 007 code.

5    Q.    So now we're talking about account status which is in

6    the specific dispute.  And Ocwen does update that or -- I'm

7    sorry -- the correct terminology I believe, sir, would be

8    request that Equifax modify their tradeline with a code 82,

9    account 120 days past the due date, to code 11 meaning

10   current account.  Correct?

11   A.    Yeah.  And I think we agree that's an update.  It's

12   updating or modifying, modifying to update.

13   Q.    So the way that works is Ocwen receives this response,

14   this -- I'm sorry -- this ACDV.  Then it responds to it with

15   this request that Equifax modify it to reflect it.  Right?

16   A.    Yes.

17   Q.    Now, with all these fields that we've just gone

18   through, you'd agree that that's more than mere parroting

19   because they've altered upwards of 10 fields, requested that

20   Equifax modify those fields; correct?

21   A.    Right.  And I believe in my direct examination we went

22   through that and notated that there were some good

23   corrections made on that ACDV.  But, most notably, the

24   foreclosure proceeding comment was not deleted.  That was

25   left on, and that needed to be deleted.  That was one of the

Evan Hendricks - Cross (Manning)

1  most important things.  And Ocwen didn't -- it just

2  disregarded that.

3  Q.   And that, as we've already established, is not one of

4  the fields that's being specified as, quote, verify payment

5  history profile, account status, or payment rating?

6  A.   Right.  But I, I just disagree with your representation

7  that those -- that Ocwen is supposed to look like a horse

8  with blinders on when it gets these ACDVs.

9       The ACDVs are notifying that there are serious

10 inaccuracies in this tradeline, and they have a duty to

11 investigate based on the information that's in the ACDV and

12 based on what Ocwen already knows.

13      And this is a situation where Ocwen already knew from

14 Mr. Daugherty's direct disputes that there was this bad

15 tradeline showing up on his Equifax report.  So that's what

16 they needed to focus on.

17      And, so, here they made -- instead of just verifying

18 like we saw so many times yesterday, they did modify and

19 they did modify some of the derogatory data.  But they still

20 left on the foreclosure proceedings starting and that was,

21 that was simply very inaccurate and very damaging.

22 Q.   And, sir, the question is about the dispute.  And when

23 you reference the dispute codes, you agree that the dispute

24 code is the instruction to the furnisher.  So when you say

25 "not his/not hers," that's a request that the furnisher

Evan Hendricks - Cross (Manning)

1   validate that individual's liability.  That's what it means.

2   Right?

3   A.   Right, or like we discussed yesterday is that account

4   truly his.

5   Q.   And we all agree that the account number and the fact

6   that this is his loan and the fact that he owes this money

7   is correct; right?

8   A.   That part is correct.  But it's also true that he --

9   the account showing foreclosure proceedings started and a

10  past due balance, that was not his.  That was, that was

11  something else.

12  Q.   So now having seen this form with what I've counted

13  as -- there we go -- this form with what we've gone through

14  and I've counted as 11 modified fields, it's still your

15  testimony that Ocwen is merely parroting back in a mere ACDV

16  exchange; correct?

17  A.   No.  On this they did a much more granular responsive

18  response.  But in those, in those instances where Mr. Rao

19  and the other employees in India just took a matter of

20  seconds to hit the "verify as reported" button, that was,

21  that's what I'm referring to when I talk about parroting.

22  Q.   And you've said this a number of times; those

23  individuals took a number of seconds.  You don't know how

24  long it took.  You never talked to them.  You never

25  mentioned any of that in your report.  Right?

Evan Hendricks - Cross (Manning)

1  A.   Well, yeah, the information -- Ocwen had not produced

2  that information.  And sometimes in cases I have to do my

3  expert report by a deadline.  And sometimes the defendants

4  don't produce the information that my understanding is

5  they're supposed to produce.  So you do the best you can.  I

6  think more information has been produced since then and is

7  available now.

8  Q.   And, sir, your report was produced over a year ago.

9  And it's been a year and you've never provided a

10  supplemental report.  Right?

11  A.   That is true, yeah.

12  Q.   Okay.  So this concept of what you keep referring to as

13  mere seconds, you agree you don't know how long it took and

14  you didn't talk about any of that in your report; correct?

15  A.   Well, I -- what I did is I expressed the opinion that

16  this was the ACDV exchange.  And when it's done this badly,

17  it leads me to the conclusion that not even a minute is

18  spent on it.  That's my opinion even back then when I wrote

19  this report.  And I think that opinion is proving to be a

20  justified and supported opinion.

21  Q.   Okay.  I understand your opinion.

22       You agree that there are documents such as this that

23  even you would say it's not just, "Polly want a cracker."

24  The parrot's saying, "No thanks.  I think I'd like a steak

25  medium well."  Right?

Evan Hendricks - Cross (Manning)

1    I mean, they're thinking about it.  They're modifying

2  it.  They're changing it.  And Equifax is then responsible

3  for getting it right.  Correct?

4  A.   On this ACDV more was done than almost any of the other

5  ones I saw, right.  But even on this one, they still left

6  "foreclosure proceedings starting."

7          MR. MANNING:  For the record, I'll identify the

8  next exhibit as Plaintiff's Exhibit 21.  And specifically

9  we're looking at the Bates stamp page EIS 322.

10 BY MR. MANNING:

11 Q.   Do you see that, sir?

12 A.   Yes.

13 Q.   Now I'll turn it so we can all read it.  Okay.  So

14 maybe I can make this a little bit clearer.  Here you'll see

15 this as a separate ACDV response.  Again, it's an Equifax

16 document that Equifax is preparing; right?

17 A.   Yes.

18 Q.   And it has a different control number.

19         MR. MANNING:  You know what I'm going to do.

20 Since I'm done with the other document, Your Honor, if it's

21 okay, I'm going to hand him the prior exhibit just so that

22 he can compare.

23         THE COURT:  All right.

24         THE WITNESS:  Thank you.

25 BY MR. MANNING:

Evan Hendricks - Cross (Manning)

1   Q.   So you have the previous exhibit, Mr. Hendricks.   And

2   you'll see on this document, which is Exhibit 21 that's on

3   the screen, that this has a different control number.   It

4   has the same account number, a different responder name, and

5   a different date.   Correct?

6   A.   Yes.

7   Q.   So the prior one was in April, 2014.   This one came in,

8   date created June 3rd, 2014; response date, June 23rd, 2014.

9   I take it that's -- I'm sorry, response due.   That's the due

10  date.   And this response was done June 20th, 2014.

11  A.   Yes.

12  Q.   So from the time it was created to the time that Ocwen

13  provided a response was 17 days?

14  A.   Yes.

15  Q.   And you've already testified that you don't know how

16  long this process took at Ocwen because you don't have any

17  opinion or facts about that in your report; right?

18  A.   Right.   My report -- as I said, I didn't have all the

19  records available.   So when I'm talking about ones that took

20  seconds, those are the ones where they hit the "verified as

21  reported" box.

22  Q.   Again, when you say "verified as reported" box, you're

23  not talking about a form that Ocwen checks because you don't

24  know whether its forms have that box or not; correct?

25  A.   Okay.

Evan Hendricks - Cross (Manning)

1  Q.   Now, we're going to do similar, a similar exercise here

2  where we go through the fields.  Again, the first row under

3  this section is the data that's being provided to Ocwen

4  about Equifax's reporting of the tradeline.  And then the

5  line below that is Ocwen's response.  Right?

6  A.   Yes.

7  Q.   So, again, here we have this same issue as the other

8  ACDV response we were looking at.  Equifax still has a date

9  open of August, 1999.  And Ocwen is telling them again this

10 needs to be modified to July, 1999.  Correct?

11 A.   Yes.

12 Q.   Below that, "high credit."  Those lines are the same.

13 Then we move over to "current balance," the first row.

14 Equifax is providing this data to Ocwen.  And Ocwen is

15 responding it needs to be modified to reflect a lower

16 balance.  Correct?

17 A.   Yes.

18 Q.   I'm hoping you all can see that.

19 A.   I can see.

20 Q.   Okay.  Sliding over to the next column below "past

21 due," again Equifax is telling Ocwen that it has on its

22 tradeline for this particular tradeline a past due amount of

23 $6,128; correct?

24 A.   Yes.

25 Q.   And Ocwen is responding to Equifax that they need to

Evan Hendricks - Cross (Manning)

1    modify that to zero.

2    A.    Yes.

3    Q.    So despite having seen in April that Ocwen had already

4    done this, in June Equifax is still doing the same thing;

5    right?

6    A.    Right.  It's kept coming back on to the report.

7    Q.    Now, we're talking about this narrative column.  We

8    talked about that already.  And we've got these codes here

9    in this section which are, again, codes that Equifax puts on

10   here; right?

11   A.    Yes.

12   Q.    And those are codes that Equifax -- whoever does it on

13   Equifax's side, whether it's a machine or a person or

14   whomever, that's not something that Ocwen does?

15   A.    I think that's correct, yes.

16   Q.    I don't want to belabor this but, again, we have

17   another series of fields that Ocwen is requesting Equifax

18   modify.  In this row there's one, two, three more where

19   Ocwen says, "Equifax, you need to modify these fields."

20   Correct?

21   A.    Yes.

22   Q.    We'll go down to the date of the account info.  Again,

23   we have one, two fields that Ocwen is modifying; right?

24   A.    Yes.

25   Q.    Then we go down to "account status" which is, again,

Evan Hendricks - Cross (Manning)

1   one of the specific fields identified in the dispute code

2   where Ocwen says, "Change it, Equifax, from Ocwen --" I'm

3   sorry -- "account 120 days past the due date to current

4   account."

5   A.   Yes.

6   Q.   So, again, this time I count ten fields that Ocwen is

7   telling Equifax to modify on this tradeline; correct?

8   A.   Yes.

9   Q.   And you had -- on the prior one you had pointed out,

10  well, they still didn't get this special comment code.  It

11  wasn't in the dispute, but they should have done it.  Here

12  it's not on there?

13  A.   That's correct.

14  Q.   So, again, this isn't, "Polly want a cracker."  Now

15  we're talking about filet mignon.  This is awesome.

16  A.   Well, no, I can't agree it's awesome.  It's better.

17  But the real issue is that that one box where it says

18  "delete account," an adequate investigation would

19  discover -- you look at Mr. Daugherty's credit report or you

20  look at what Mr. Daugherty said to Ocwen.  I don't have the

21  second account.  Or you look at the copy of the page he sent

22  in with his dispute where he's pointing arrows at it.

23       And your investigation discovers, lo and behold,

24  there's two accounts on Equifax and one of them shouldn't be

25  there.  That's what the investigation, a good investigation

Evan Hendricks - Cross (Manning)

1    would have discovered.  And then the proper response is

2    "delete this account."  Instruct Equifax to delete it.  That

3    solves the whole problem.  That was never done.  That's why

4    I don't agree it was awesome.

5    Q.   Okay.  So let me make sure I get this straight.  You

6    don't talk about what Ocwen actually did in its

7    investigation or any of the documents showing what it did in

8    your report.  You are basing your opinion that it still

9    wasn't good enough on the fact that this duplicative

10   tradeline that Equifax was reporting still appeared on it.

11   Correct?

12   A.   Right.  I mean, Ocwen itself knew that there should not

13   be the second tradeline on his Equifax report.  Yet, it

14   wouldn't investigate far enough to reach the conclusion to

15   see it needed to instruct Equifax to delete that tradeline.

16   Q.   But your report, sir, is focused on the, on the fact

17   that Ocwen should have discovered it, in your opinion, and

18   didn't.  You never say anywhere in your report or have ever

19   testified that they actually knew and were just disregarding

20   it.  Correct?

21   A.   Well, I thought that's -- I thought that is in my

22   report.

23   Q.   Okay.  So --

24   A.   And they disregarded the whole -- I mean, I said in the

25   very thing that -- in the very opening I say that Ocwen --

Evan Hendricks - Cross (Manning)

1  the fact that Ocwen failed to discover three things that I

2  enumerated shows how their investigation was inadequate.

3  Q.   And that's my point.  They failed to discover it.  Your

4  report is based on the fact that Ocwen didn't know.

5  A.   Well, but, no, Ocwen knew but they failed to discover

6  or remember what it already knew.  And that's what the

7  investigation should have done.

8  Q.   I think we're, we're quibbling over words.  You just

9  told me that your report says Ocwen failed to discover the

10  existence of the duplicative tradeline.  You believe it

11  should have and it didn't do a good enough job, but you

12  never in your report say Ocwen knew.  Correct?

13  A.   I don't know if I said Ocwen -- in the report whether

14  Ocwen knew.  But Ocwen is -- you, you impute the knowledge

15  that they have their own records.  Ocwen knew that at some

16  point in the past, it had reported a $6,128 past due

17  balance.

18      So if it really looked into its historical records, you

19  know, if it needed to, it could have looked and said, "Aha,

20  we reported this way before and this is, this is part of --

21  this must be part of the thing causing this problem."

22      I mean, that -- Equifax didn't conjure the derogatory

23  items on this tradeline out of thin air.  Originally they

24  did come from Ocwen.

25  Q.   And this is what I, this is what I want to get at now.

Evan Hendricks - Cross (Manning)

1   You just told me that it was correct that Ocwen was

2   furnishing data about Mr. Daugherty's account that at one

3   point he was, in fact, $6,128 late; right?

4   A.    I believe that's, that's my understanding of the facts

5   in this case, yes.

6   Q.    And this is what I was prefacing for you earlier in

7   your examination when I said we're going to talk about the

8   derogatory nature of a tradeline.  Being $6,128 behind, 120

9   days or more past due, or in foreclosure, all of which

10  Mr. Daugherty admits he was accurately reported as in 2012,

11  is all derogatory; correct?

12  A.    Yes.

13  Q.    And that's all accurate.  He was that late.  He was

14  that amount past due.  He was in foreclosure.  And that's

15  all derogatory and it's accurate.  Correct?

16  A.    Well, yeah, the foreclosure proceedings had started one

17  week in April, and two weeks later they ended.  So that

18  would -- that comment is accurate until the foreclosure is

19  cancelled.

20       Once that foreclosure is, proceeding stops or is ended,

21  that remark has to come off.  That's, that's a very serious

22  matter.

23  Q.    But you know, sir, that the derogatory nature of a

24  tradeline doesn't get removed for seven years; right?

25  A.    That's correct.

Evan Hendricks - Cross (Manning)

1  Q.   Okay.  So let's make sure we all understand that.

2  This -- what you just told me, being $6,128 late, 120 days

3  or more past due, in foreclosure, all accurately reported,

4  Mr. Daugherty gets current on that.  That information stays

5  on that report for seven years.  Yes?

6  A.   Yes, comma, but the problem is what really hits your

7  creditworthiness is a showing was it four, three or four

8  years old or is it now?  And the way this tradeline was, was

9  being portrayed, it showed him past due 120 days, past due

10 $6,128 as of today, and foreclosure proceedings started.

11      That's, that's why it was so damaging to him because

12 instead of showing the correct history -- I would agree with

13 you they could say back in those times, he did have -- he

14 was this far behind.  But you can't say today he's behind

15 $6,128 and foreclosure proceedings started because those

16 proceedings ended a long time ago and that comment has got

17 to go.

18 Q.   So with all that derogatory information on

19 Mr. Daugherty's credit report accurately, meaning

20 TransUnion, Experian, Equifax would all have the 2012

21 derogatory information on there until 2019; correct?

22 A.   They, they would have -- I'm not sure you understand.

23 They would show it -- they would -- up until 2019 they can

24 show it was the case back in 2012.  They can't show that in

25 this, in 2013, in 2014, no, they cannot say foreclosure

Evan Hendricks - Cross (Manning)

1   proceedings started under the industry standard, and they

2   cannot say that there was a past due balance when there

3   wasn't one.

4   Q.   It remains a derogatory comment on the borrower,

5   Mr. Daugherty's credit report; isn't that correct?

6   A.   Right.  If you have a history that's -- even if it's

7   six years old, it still counts as a derogatory tradeline.

8   It just doesn't damage your creditworthiness that much.

9   Q.   Okay.  You added that much.  Now, isn't it true, sir,

10  that the credit score is calculated still using that

11  previous derogatory information as a factor in the score?

12  A.   Absolutely, yeah, because the credit score is based on

13  all the information in your credit report.  And, so, a

14  credit score is going to take into account even a

15  six-year-old derogatory account, yes.

16  Q.   Thank you.  You don't say anything about a foreclosure

17  comment or SCC code anywhere in your report; correct?

18  A.   No, I do, I do point specifically to the "foreclosure

19  proceedings started" in my report.

20  Q.   Okay.  I'm going to look at Page 6 of your report.  And

21  you still have it; right?

22  A.   Yes.

23  Q.   And you would agree with me that on Page 6 of your

24  report there is a section where you talk about harm to

25  Ocwen, right -- or, I'm sorry -- harm to borrower?

Evan Hendricks - Cross (Manning)

1    A.    Yes.

2    Q.    Nowhere on that page do you mention the word

3    "foreclosure;" correct?

4    A.    On that page, no.  It's on Page 2.

5    Q.    Okay.  And nowhere -- anywhere in the report do you

6    ever mention Mr. Daugherty ever being denied any credit;

7    correct?

8    A.    In the report, yeah, I might not have.

9    Q.    You don't offer any opinion about referencing in your

10   report that there was ever a denial of credit based on

11   anything Ocwen did; correct?

12   A.    Let me just make sure.

13   Q.    Take your time.

14   A.    Yes.  Thank you.

15        (Pause)

16        Okay.  On Page 6 I say, "The derogatory Ocwen tradeline

17   in plaintiff's credit report was very damaging."

18   Q.    You never --

19   A.    Then I say when this happens it typically means the

20   creditor will not extend credit to applicants until they

21   resolve the outstanding debt.

22   Q.    Okay.  My question to you, sir, was you never identify

23   a single instance of when Mr. Daugherty was denied credit by

24   anything that's at issue in this case; correct?

25   A.    That's right.  I do not specifically allude to, for

Evan Hendricks - Cross (Manning)

 1    instance, the One Community Bank.  That's true.

 2    Q.   Or any of the other creditors that denied him who never

 3    even looked at the Equifax report; right?

 4    A.   That's correct.

 5    Q.   Nowhere in your report, sir, in your opinions stated or

 6    materials considered do you mention that the plaintiff had

 7    poor credit scores from TransUnion and Experian; correct?

 8    A.   Right.  I didn't mention that.  I didn't see why it was

 9    relevant.

10    Q.   Nowhere in your report, sir, do you mention that the

11    Equifax score was higher, despite having this duplicative

12    tradeline, than the Experian score which had no issue with

13    this duplicative tradeline.  Correct?

14    A.   Well, I, I'm trying to remember.  I remember earlier in

15    the case that you showed Mr. Daugherty.  I also remember

16    seeing credit reports where the Equifax credit score was

17    lower.  So I think it depends on which report we're looking

18    at which time.

19        But this -- the main issue in this case is not about

20    credit scores.  It's about the, the Ocwen, the duplicative

21    Ocwen tradeline having a foreclosure proceeding comment and

22    the past due balance.

23    Q.   And, sir, you may not understand this, but

24    Mr. Daugherty's claiming he was denied credit because of

25    what occurred.  You have no opinion in your report about

Evan Hendricks - Cross (Manning)

1  that happening; correct?

2  A.   I didn't -- yeah, I didn't specifically say that he was

3  denied by Community Bank because of the Ocwen tradeline.   I

4  did not, I did not say that.   But I talked about the

5  damaging nature of the tradeline, that he was going to have

6  trouble getting credit anywhere because of it.

7  Q.   Nowhere in your report do you ever identify that

8  Mr. Daugherty had 11 other collection accounts; right?

9  A.   That's true.   I didn't mention that, yeah.

10 Q.   Nowhere in your report do you mention that

11 Mr. Daugherty had two tax liens which are public record and

12 highly derogatory; correct?

13 A.   That's, that's correct.

14 Q.   And you actually in your report say tax liens are among

15 the worst derogatory information; right?

16 A.   Yes, yes, they -- public records are very derogatory,

17 yes.   The collections were paid collections.   So they didn't

18 have any past due balance on them.

19 Q.   I think you've anticipated my question.   Despite

20 Mr. Daugherty paying at some point later his state and

21 federal tax liens, that derogatory information stays on that

22 credit report for at least seven years; correct?

23 A.   Yes.

24 Q.   It doesn't go away by paying it.   It's there for seven

25 more years.

Evan Hendricks - Cross (Manning)

1   A.   Right.  But if it's a paid tax lien, which is what

2   they're anticipating in that transaction, and what the

3   gentleman who was with the bank testified, if it's a paid

4   tax lien it's not, it's not a stop sign.  And you're not

5   going to have any trouble going to the government and paying

6   your tax liens.  That's going to be a pretty simple matter.

7              MR. MANNING:  Objection.  I'm going to move to

8   strike the last answer.  It's nonresponsive and it's outside

9   the scope.  He's referring --

10             THE COURT:  Of the question?  Outside the scope of

11  your question, counsel?

12             MR. MANNING:  And outside the scope of his report.

13             THE COURT:  Any response that you want to give,

14  Mr. Nolan?

15             MR. NOLAN:  Your Honor, Mr. Manning asked the

16  question about tax liens and the effect of tax liens.  And

17  the witness was responding to the question he was asked.

18             THE COURT:  I overrule the objection, Mr. Manning,

19  believing that the answer and the explanation is responsive

20  to the question.  Although there's been some objection here

21  regarding the witness's testifying about causation type

22  issues, he's been asked over and over and over again during

23  the course of cross-examination about those very types of

24  issues.  This question -- this answer was, in fact,

25  responsive to the question.

Evan Hendricks - Cross (Manning)

1    MR. MANNING:  I understand.

2    THE COURT:  I preserve Ocwen's objection and

3  exception to my ruling.

4    MR. MANNING:  I understand, Judge.  Thank you.

5  BY MR. MANNING:

6  Q.   What I'm, what I'm asking you, Mr. Hendricks, is

7  nowhere in your report do you reference what you just said,

8  foreclosure is a stop sign; correct?

9  A.   Right.  I just, I just pointed to the foreclosure

10  proceedings started as, as a real problem for Mr. Daugherty.

11  Q.   And the tax liens in your report you yourself say are

12  highly significant, derogatory information and you agree

13  continues to factor into his credit score and

14  creditworthiness even after they're paid; correct?

15  A.   Sure.  I mean, the credit score takes account of all

16  the information in the credit report.  The tax liens in

17  there is going to be a factor.

18  Q.   You keep mentioning other factors.  And you agree that

19  other factors like the 11 other collection accounts were not

20  referenced in your report?

21  A.   That's correct.

22  Q.   Nowhere in your report do you ever disclose that the

23  only entity that can remove the duplicative tradeline that

24  Equifax is reporting is Equifax; right?

25  A.   I'm sorry.  Would you just repeat that or have it

Evan Hendricks - Cross (Manning)

1  re-read so I make sure I understand the question?

2  Q.   Sure.  Equifax is the credit bureau that reports the

3  tradelines that it has in its system; right?

4  A.   Right.

5  Q.   The only entity that can stop reporting that or remove,

6  for example, the duplicative tradeline that it's been

7  reporting is Equifax?

8  A.   Right.  And my opinion is that -- and I said earlier --

9  Equifax looks to Ocwen to determine what's going to be done

10  with Ocwen-related tradelines in its credit report; and that

11  unless Ocwen instructs Equifax to delete that tradeline,

12  it's not going to get deleted.  They're not going to do it

13  on their own short of litigation, which is what happened in

14  this case.

15  Q.   In your report, sir, you said that Equifax itself

16  should have known about the duplicative tradeline and

17  deleted it itself; correct?

18  A.   Yeah.  I think that if they would have done a better

19  re-investigation, which would have included recognizing that

20  Ocwen was doing a horrible job here, they would have taken

21  it upon themselves to look even more deeply and say, well,

22  this is a duplicate tradeline and here's a case of a

23  furnisher not doing its job, so we're going to step up and

24  do our job.

25  Q.   You just mentioned that this was in litigation, and as

Evan Hendricks - Redirect (Nolan)

1  a result of the litigation Equifax removed the tradeline;

2  right?

3  A.   That's my understanding, yes.

4  Q.   And, so, that current account, the one that you've

5  already said was correct that showed Mr. Daugherty as 120

6  days late, $6,000 past due, in foreclosure in 2012, as a

7  result, Equifax removed even that one even though there was

8  nothing wrong with it?

9  A.   Yes, I saw that, yes.

10 Q.   You don't talk about that in your report either, do

11 you?

12 A.   Well, I mean, that happened well after I think -- yeah.

13 The answer is, no, I do not talk about that in my report.

14 Q.   And you don't talk about how even today after Equifax

15 has removed both tradelines two years later -- well, I don't

16 want to exaggerate.  A couple months short of two years

17 later, Mr. Daugherty still hasn't paid off his Ocwen loan;

18 correct?

19 A.   That's true.  I don't discuss that.

20 Q.   Thank you, sir.

21      THE COURT:  Is there redirect of this witness,

22 gentlemen?

23      MR. NOLAN:  Yes, Your Honor.

24                    REDIRECT EXAMINATION

25 BY MR. NOLAN:

Evan Hendricks - Redirect (Nolan)

1    Q.   Mr. Hendricks, we heard a lot about Equifax and what

2    they did or didn't do in this matter.  I just want to see if

3    we can make sure we're clear here.

4         What, what claims are available to a consumer such as

5    Mr. Daugherty when they have an issue with a credit

6    furnisher such as Ocwen?

7    A.   They have to, they have to do a dispute through a

8    credit bureau like Equifax.  Equifax has to forward that

9    dispute to the furnisher in the form of an ACDV.  And then

10   it's only after that furnisher doesn't do what I'll say is

11   an adequate investigation does the, the consumer can try and

12   do something about it through a court case.

13   Q.   So Mr. Daugherty's sole claim in this case is regarding

14   Ocwen's investigation or lack thereof?

15   A.   That's right.  If it's just the, the original

16   furnishing of the information, a consumer can't take them to

17   court over that.  They get, they get -- the furnishing is

18   not subject to, to the court.  It's only, it's only once the

19   dispute is made and the investigation is not adequate.

20   That's, that's the consumer's right.

21   Q.   And, so, I want to go and look at Exhibit Number 21

22   that we looked at previously here.  I'm going to hand you

23   the paper copy.  Do you have the paper copy?

24   A.   I have 18.

25   Q.   It begins on Page -- with the Bates stamp 317.  Have

Evan Hendricks - Redirect (Nolan)

1   you found that document?  Do you have it?

2   A.   I have 18.  I have 18.  You were talking about 21;

3   correct?

4   Q.   Let me go ahead and give you the full exhibit here.

5   A.   Yeah, this says 18.  Thank you.

6   Q.   I want to make sure I'm referring to the right exhibit.

7   Can you identify the control number you're looking at.

8   A.   This one ends in 1128.

9   Q.   Exhibit Number 21.  And, so, you discussed this with

10  Mr. Manning just a moment ago.

11  A.   Yes.

12  Q.   You identified the date it was received?

13  A.   The --

14  Q.   Or date created I should say.

15  A.   The date created was June 3rd, 2014.

16  Q.   And the response date?

17  A.   June 20th, 2014.

18  Q.   And the responder's name?

19  A.   Shalini Singh.

20  Q.   I know it's really hard to see again.  I'll try and

21  make that bigger there.  And it says -- the response code?

22  A.   Is modified as shown.

23  Q.   And what was the account status on this loan?

24  A.   The account status is shown at the bottom, "current

25  account."

                    Evan Hendricks - Redirect (Nolan)

1   Q.    So they received and responded to a dispute regarding

2   this account number on June 20th, 2014; correct?

3   A.    Yes.

4   Q.    Then I want to scroll ahead to EIS Number 324.  It's in

5   the stack I just handed you.  It's still a part of Exhibit

6   21.

7   A.    Oh, okay.  Here's 22.  You said 324?

8   Q.    Yes.

9   A.    Okay.  Bear with me.  I have -- mine ends at 323 I

10  think.

11  Q.    Do you have 322?

12  A.    Yes.

13  Q.    I'm sorry.  I was on the wrong page myself.  322.

14  A.    Okay.

15  Q.    So what was the date that this was created?

16  A.    This was also created the same date, June 3rd, 2014,

17  and responded on the same day, June 20th, 2014.

18  Q.    And who was the responder?

19  A.    The responder again is Shalini Singh.

20  Q.    Same as the one we just looked at?

21  A.    Yes.

22  Q.    And what was this tradeline responding to?

23  A.    This dispute was basically what we're going to call the

24  duplicative tradeline.

25  Q.    And, so, again they received two disputes on the same

Evan Hendricks - Redirect (Nolan)

1   account on the same day?

2   A.   Yes.

3   Q.   Now, in your opinion, is a modification the proper way

4   to address two accounts -- two disputes on the same account?

5   A.   No, it's not.  As I said before, Ocwen knew it only had

6   one account for Mr. Daugherty under this account number.

7   And when Equifax is showing that there's a second account

8   showing with all this derogatory information, the proper

9   response is to say "delete this account."

10  Q.   Okay.  I just want to make sure we're clear on that.

11       Now on Page 6 of your expert report, could you look at

12  that for a moment?

13  A.   Sure.

14  Q.   Mr. Manning says you didn't provide an opinion as to

15  the damage this tradeline did to Mr. Daugherty's credit

16  report.  Do you recall that?

17  A.   Yes.

18  Q.   Now, you did have an opinion on the effect of the Ocwen

19  tradeline's existence or the lack of its existence; correct?

20  A.   Yes.

21  Q.   And what was that opinion?

22  A.   I said, "The derogatory Ocwen tradeline on plaintiff's

23  credit report was very damaging.  This is because it showed

24  incorrectly plaintiff was $6,128 past due on his account.

25  When this happens, it typically means that a creditor will

Evan Hendricks - Redirect (Nolan)

1    not extend credit to applicants until they resolve the

2    outstanding debt."

3    Q.    So, essentially, once the tradeline was gone, he had

4    much more success?

5    A.    Yes, as we saw.

6          MR. NOLAN:    And I'd like to get Exhibit Number 22

7    and hand it to the witness if I may.

8          THE CLERK:    Mr. Manning has them.

9    BY MR. NOLAN:

10   Q.    I apologize.    I'm meaning to refer to Exhibit Number

11   23.   Let me hand that to you to look at.    Again, what was

12   the date that this was created?

13   A.    On Bates stamp 387 it was created on July 29th, 2014.

14   And the response date is August 8th, 2014.

15   Q.    Who was the investigator?

16   A.    Daniel John.

17   Q.    And what's the information that he verified?

18   A.    He verified this is a current account, no money past

19   due.    This is the -- basically the correct tradeline.

20   Q.    Let me back up here.    He was verifying the current

21   account, August 8th, 2014; correct?

22   A.    Yes.

23   Q.    Then we move ahead to the next investigation here on

24   the exhibit which is Bates stamp number 389.

25   A.    Yeah, 389, same date, July 29th, 2014; same response

Evan Hendricks - Redirect (Nolan)

1   date, August 8th, 2014; same responder, Daniel John.  And he

2   has "verified as reported" with the foreclosure proceedings

3   started and 82, account 120 days past due, with a $6,128

4   past due balance.

5   Q.   During your cross-examination there was a lot of focus

6   on a word that was not in any of these ACDVs, the word

7   "duplicative;" correct?

8   A.   That's right.

9   Q.   And I want to take a moment and ask you and talk to you

10  about what words are included on this ACDV.

11  A.   Well, the, the 007 code where he's disputing pretty

12  much everything about the account; current/previous account

13  status, payment history profile, payment rating, and account

14  status.  So he's disputing that.

15       And other words that are on here are "foreclosure

16  proceedings started" and "120 days past due."  Those are

17  some examples of extremely relevant information that's on

18  these ACDVs that's sent from Equifax to Ocwen.  And Ocwen

19  has a responsibility to review all the relevant information

20  on this ACDV.  And instead of doing that, my opinion is they

21  disregarded this extremely important damaging data.

22  Q.   Once Ocwen -- now, let's look at the top of the box

23  here.  And, now, Mr. Manning said Ocwen has a slightly

24  different form.  They don't have check boxes.  But the

25  options are "verified as reported," "modify as shown,"

Sandra Lyew - Direct (Young)

1   "delete account," "delete fraud."  Correct?

2   A.   Yes.

3   Q.   What happens when Ocwen checks the box or instructs

4   "delete account"?

5   A.   Industry practice and all my experience of years of

6   doing this, if Ocwen says delete the account, it comes off

7   like that.

8            MR. NOLAN:  That's all I have, Your Honor.

9            THE COURT:  You can step down, sir.

10           THE WITNESS:  Thank you.

11           THE COURT:  Call your next witness.

12       Actually, counsel, before you do that, let me give the

13   jury its morning recess so then I won't interrupt you

14   lawyers.

15       Ladies and gentlemen, I'm going to recess you at this

16   time.  While you're out, do not discuss this case among

17   yourselves or permit anyone to discuss it with you or in

18   your presence.  And please be in your jury lounge at 25

19   minutes till the hour.

20       We'll stand in recess.

21       (Recess taken from 10:19 a.m. until 10:36 a.m.)

22           THE COURT:  Thank you.

23       Plaintiff, call your next witness, please.

24           MR. YOUNG:  Plaintiff calls Ms. Lyew.

25           **SANDRA LYEW**, PLAINTIFF'S WITNESS, SWORN

Sandra Lyew - Direct (Young)

1                    DIRECT EXAMINATION

2   BY MR. YOUNG:

3   Q.    Hello.  Are you Ms. Sandra Lyew?

4   A.    Lyew.

5   Q.    Lyew?

6   A.    Yes.

7   Q.    Okay.  I'll get better at it as I go along.  Lyew.

8   A.    That is correct, yes.

9   Q.    Okay.  And are you employed by Ocwen Financial

10  Corporation?

11  A.    Yes, I am.

12  Q.    And are you a Senior Loan Analyst for Litigation?

13  A.    Yes, I am, Senior Loan Analyst.

14  Q.    And are part of your duties as a Senior Loan Analyst to

15  testify as a representative witness of Ocwen and its

16  investors in connection with legal proceedings, including

17  mediations, hearings, and trials?

18  A.    That is correct.

19  Q.    You also conduct thorough review, analysis,

20  interpretation of the events and actions that occurred on

21  disputed customer accounts?

22  A.    Yes.

23  Q.    And you have a working knowledge and do you fully

24  understand the policies and procedures of Ocwen's various

25  business units?

Sandra Lyew - Direct (Young)

1    A.    Yes.

2    Q.    Do you analyze loan-level servicing histories for

3    litigated loans?

4    A.    Yes, I do.

5    Q.    Do you provide support, oversight, and recommended

6    solutions -- excuse me -- recommended strategies for

7    residential mortgage loans that are in default and

8    foreclosure?

9    A.    Yes.

10   Q.    And did you previously give a deposition to Mr. Nolan

11   at the office of Mr. Manning in Virginia Beach, Virginia?

12   A.    Yes.

13   Q.    And when you gave that deposition, you were designated

14   by Ocwen as its corporate representative; is that correct?

15   A.    Yes.

16   Q.    So when you gave that deposition, you understood that

17   you were actually speaking for Ocwen and that your words

18   would bind your employer, Ocwen; is that correct?

19   A.    Yes.

20   Q.    I first want to ask you to look at what's been marked

21   as Plaintiff's Exhibit 26 which I'm going to call Ocwen's

22   notes.  It's 110 pages long produced by Ocwen.  And for the

23   record, the Bates numbers within the document are 1637

24   through 1744.

25        I also have an extra copy of the exhibit for the Court

Sandra Lyew - Direct (Young)

1   and I've provided a copy to Mr. Manning.

2       I may have misspoke as to -- what is the very last

3   document in what I just handed you?

4   A.   Number 16, tab 16.

5   Q.   Yeah.  It's right in front of tab 16.  What is the

6   little number in the corner?  Is it 1746?

7   A.   The last number.  The last page you mean?

8   Q.   Yes.

9   A.   1746, yes.

10  Q.   Okay.  Let's stay right on that page.  During your

11  deposition, from time to time you made reference to these

12  notes that Ocwen keeps of the transactions involving my

13  client, Mr. Daugherty; right?

14  A.   Yes.

15  Q.   And these records are kept in the normal course of

16  business; correct?

17  A.   That is correct.

18  Q.   And any time there's action or interaction with respect

19  to Ocwen and Mr. Daugherty's account, they're generally

20  reported in these notes; is that right?

21  A.   Yes.

22  Q.   And this very last page of the notes, I just wanted to

23  start there with the one that has 1746 in the lower corner.

24  What this shows is that from April 30th, 2013, through

25  August 1st, 2014, Mr. Daugherty made all of his payments on

Sandra Lyew - Direct (Young)

1   time and was current; correct?

2   A.    Yes.

3   Q.    So during the period of time we're going to discuss

4   that's an issue in this trial, the entire time there is

5   absolutely no doubt that Mr. Daugherty's house payment was

6   current and on time?

7   A.    It was current and on time based on this page, yes.

8   Q.    Well, these are Ocwen's records.  So based on Ocwen's

9   records, he was current and on time.  Would you agree with

10  me?

11  A.    On, for Page 1746, yes.

12  Q.    Well, would there be another record that would show he

13  wasn't current and wasn't on time during this period of

14  time?

15  A.    Well, he was in default -- he was in default when the

16  loan transferred to Ocwen.  And then from your Page 1746 he

17  was 30 days late from March, 2013.

18  Q.    That's not what I asked.  I asked you, are there any

19  other records that show anything other than Mr. Daugherty

20  was current and on time with his loan payments from

21  April 30th, 2013, through August 1st, 2014, as shown on the

22  page in front of you right now?

23  A.    No.  This is considered a transaction history.

24  Q.    And the answer to my question is, yes, he was current?

25  A.    He was current, as I said.

Sandra Lyew - Direct (Young)

1  Q.   Okay.  I have to refer to my timeline from time to time

2  to get my place.

3       Ms. Lyew, if you turn to tab 1 and then go back two

4  pages, I want to get you to 1662.

5            MR. MANNING:  I'm sorry, Mr. Young.  What page?

6            MR. YOUNG:  1662.

7            MR. MANNING:  Thank you, sir.

8            THE WITNESS:  Okay.

9  BY MR. YOUNG:

10 Q.   And the notes on this page, the last note is March 18,

11 2013; is that correct?

12 A.   Yes.

13 Q.   And if you turn the page, the first note on the next

14 page is also March 18, 2013, at 11:26 p.m.  Correct?

15 A.   Yes.

16 Q.   And does this page and the following page document the

17 receipt of a letter by Mr. Daugherty to Ocwen?

18 A.   Yes.

19 Q.   And does this page also document Ocwen's response to

20 Mr. Daugherty's letter?

21 A.   1663 is advising that the customer inquiry was

22 completed.  And then it shows the copy of the letter sent to

23 Mr. Daugherty.

24 Q.   So the answer to my question is, yes, it shows the

25 letter response from Mr. -- I mean from Ocwen to

Sandra Lyew - Direct (Young)

1   Mr. Daugherty; is that right?

2   A.   No.  It shows that the inquiry was completed based on

3   the -- it was based on an inquiry that was received from

4   Mr. Daugherty on Page 1663.

5   Q.   Does 1663 depict the actual language of a letter sent

6   by Ocwen to Mr. Daugherty in response to his dispute?

7   A.   Yes.

8   Q.   I want to show the witness Exhibit 11 if I may.  Ms.

9   Lyew, before I get to Exhibit 11 which I handed you, I want

10  to look at these notes that are before you in the white

11  binder, Plaintiff's Exhibit 26.  And I want to look under

12  tab 1 which is Page 1664.

13  A.   Okay.  This exhibit is not an Ocwen business record.

14  This is an Equifax exhibit.

15  Q.   I'm looking at the white binder, the notes.

16  A.   Okay.

17  Q.   Do you want to go ahead and open it up, the white

18  binder to the notes on that page?

19  A.   It's there, yes.

20  Q.   Okay.  And at the bottom of the page after the date

21  March 20, 2013, does it show that there was a dispute

22  received?

23  A.   Yes.

24  Q.   And that would be an Automated Consumer Dispute

25  Verification form otherwise known as an ACDV; correct?

Sandra Lyew - Direct (Young)

1  A.   An ACDV, yes.  An ACDV form was received which is from

2  a separate system.

3  Q.   Okay.  But it was received by Ocwen on March 20, 2013,

4  at 1:40 minutes and 41 seconds a.m. by Ocwen employee Harish

5  Rao; is that correct?

6  A.   Yes.

7  Q.   Do you know Mr. Harish Rao?

8  A.   No.

9  Q.   What was the -- what did the ACDV received on

10  March 20th, 2013, by Mr. Rao, based on these notes, looking

11  at 1664 and the following page, what did the ACDV ask for

12  from Ocwen?

13  A.   Okay.  You want me to refer back to your Exhibit 11?

14  Q.   Not yet.

15  A.   Oh, okay.

16  Q.   I just want to tell you -- if you just look at the

17  notes --

18  A.   Okay.

19  Q.   -- made by Mr. Harish Rao.

20  A.   Okay.  It stated, "Borrower's concerned with reporting,

21  not his/not hers.  Provide or confirm complete ID."

22  Q.   And that's what Mr. Rao entered on 1664 at the time I

23  mentioned earlier.

24      And if you turn the page, 1665, continue with what the

25  notes reflect Mr. Rao did with respect to this ACDV.

Sandra Lyew - Direct (Young)

1  A.    Yes.

2  Q.    What did he do next?  Starting at the top of Page 1665

3  on March 20th, 2013, what is next contained in the notes?

4  A.    Okay.  It says, "Hence, borrower is responsible for

5  reporting received -- reporting --" okay.  This is a

6  template.  For that code it is a template.  So based on the

7  template, certain fields are completed.  So based on the

8  template, it identified that, "Verified, hence borrower is

9  responsible."

10  Q.    Okay.  If we read verbatim, the entry made by Mr. Rao

11  after the one you already read, it says, "Reporting received

12  from credit bureau.  Reporting to credit bureau verified,

13  hence --"

14  A.    "Hence, borrower's responsible."

15  Q.    Okay, great.  And, so, at that point is he -- he

16  completes an electronic form and it goes back to Equifax; is

17  that right?

18  A.    The, the ACDV form gets sent back through e-OSCAR to

19  Equifax.

20  Q.    Okay.  So Mr. Rao puts information on the ACDV and

21  sends it back to Equifax after he has completed his

22  investigation; correct?

23  A.    That is correct.

24  Q.    Okay.  Now, back on the 1664, what time did Mr. Rao,

25  Harish Rao, what time did he start his investigation?

Sandra Lyew - Direct (Young)

1   A.   This is just an entry after the investigation was

2   completed and sent back through e-OSCAR to the CRA.

3        Once, once they receive -- once they receive the

4   dispute to research, the research is conducted.  Once it's

5   completed and sent through e-OSCAR back to the CRA, then

6   they notate the account, their findings, and advising that

7   it was received and completed as a workflow.

8   Q.   It was received on March 18th, 2013, by Condra

9   (phonetic) M; is that right?

10  A.   Can you repeat that again?

11  Q.   I'm looking --

12  A.   What page?

13  Q.   I'm looking at 1664.

14  A.   Okay.

15  Q.   Next to date, March 18, 2013, 11:37 p.m.  Did Condra M

16  receive the dispute at Ocwen?

17  A.   Again, there is a workflow that they have to follow, a

18  procedure.  So based on the dispute that comes in a cue

19  through e-OSCAR, it identifies that, that -- well, that part

20  is identifying the correspondence prior to what's completed,

21  which was the dispute on the letter to Mr. Daugherty.

22  Q.   I understand.

23  A.   Okay.

24  Q.   Well, then, with respect to the ACDV, what is the first

25  time entry as it relates to the ACDV that we're talking

Sandra Lyew - Direct (Young)

1   about?

2   A.   1:40 and 41 seconds a.m.

3   Q.   And going to the next page of the notes, when was

4   this -- when was the report, the ACDV, sent back by

5   Mr. Harish Rao to Equifax?

6   A.   Prior to these two codes being placed into the system,

7   or I should say entered into the system.

8   Q.   What is the time stamp when Mr. Rao was done?

9   A.   1:40:46 a.m.

10  Q.   So we go from 1:40:41 seconds, 42 seconds, 43 seconds,

11  44 seconds, 45 seconds, 46 seconds -- five seconds later

12  it's gone.  It's verified.  Right?

13  A.   Two separate systems.  It's not -- it is not sent

14  through the REALServicing System to the CRA.

15  Q.   I understand.

16  A.   Okay.

17  Q.   I just want to focus on the time stamps, ma'am.

18  According to the time stamps on the notes, Mr. Rao devoted

19  five seconds to this investigation; correct?

20  A.   No.

21  Q.   The time stamps start at 1:40, one hour -- excuse me --

22  1:40:41 in the a.m. and they end five seconds later.  That's

23  what -- that's the way the entries show and those are the

24  time stamps; correct?

25  A.   That shows on the time stamps, correct.

Sandra Lyew - Direct (Young)

1    Q.   And then looking again at Page 1665, within just a few

2    minutes, another employee of Ocwen receives and deals with

3    another ACDV; is that correct?

4    A.   Yes.

5    Q.   And that happened at, according to the time stamp,

6    2:08:50.  Is that right?

7    A.   Yes.

8    Q.   And the employee was Raj Kumar Singh.  Am I, am I

9    pronouncing that right?

10   A.   Last name is Singh.  I can't pronounce the first name.

11   Q.   Okay.  Do you know Raj Kumar Singh?

12   A.   No.

13   Q.   So you don't know either of these gentlemen, nor did

14   you speak or talk to them about what they did or did not do

15   with respect to this investigation.  Is that fair?

16   A.   I did speak with Mr. Harish Rao, not verbally but

17   through e-mail.

18   Q.   So you know him because you communicate with him but

19   you've never met him?

20   A.   I have never met him.  I have communicated through him

21   through e-mail with regards --

22   Q.   Sorry.  I didn't mean to interrupt you.  With respect

23   to this case?

24   A.   Yes.

25   Q.   So there is an e-mail from you to him and him back to

Sandra Lyew - Direct (Young)

1  you about this case?

2  A.    That is correct.

3  Q.    When did that occur?

4  A.    I received the response today, this morning.

5  Q.    Do you have that response with you?

6  A.    No, I do not.

7  Q.    Who has it?

8  A.    It's through e-mail.

9  Q.    Okay.  Did you give it or show it to Mr. Manning?

10 A.    No, I did not show it to Mr. Manning.

11 Q.    Did you tell Mr. Manning about it?

12 A.    Yes, I have.

13 Q.    Okay.  Now we're focusing on the second ACDV that came

14 in a few minutes later.  And this time Mr. Raj Kumar Singh

15 is dealing with it.  And looking just at the notes in front

16 of you that Ocwen maintains, what did Mr. Singh do to

17 investigate this ACDV?

18 A.    "Reporting to the credit bureau or has signed the note,

19 hence responsible, Social Security number matches, checks

20 CIS."

21 Q.    Okay.  So he actually checked something; is that right?

22 A.    Yes, he did.

23 Q.    And what is CIS?

24 A.    It is the old system that we use for the imaging

25 documentation.

Sandra Lyew - Direct (Young)

1    Q.    Okay.  So if someone wanted to see if a signature

2    appears on the note in question, you can look at the CIS and

3    see that signature; right?

4    A.    Yes.  It's now called the Vault.

5    Q.    Okay.  And Mr. Singh had access to that, as did

6    Mr. Rao; correct?

7    A.    Mr. Rao mentioned, "Verified, hence borrower is

8    responsible," versus then Mr. Singh detailed, "Borrower

9    signed a note, hence responsible, Social Security matches,

10   and check CIS."

11   Q.    The question was did Mr. Rao have access to this CIS if

12   he wanted to have access to it?

13   A.    He, he, he does have access.  Excuse me.

14   Q.    But he doesn't note that he accessed anything, does he?

15   A.    No, he did not specify.

16   Q.    Okay.  And the time stamp when Mr. Singh first gets

17   his, this comes to his attention, according to the notes, is

18   2:08:50 a.m.  Is that right?

19   A.    That's entering the code, advising the system that it

20   was completed, or I should say REALServicing.  I'm sorry.

21   Q.    What's the first time stamp next to Mr. Raj Kumar

22   Singh's name?

23   A.    2:08:50 a.m.

24   Q.    And at what -- what is the last time stamp next to Raj

25   Kumar Singh's name showing on this page of the record?

Sandra Lyew - Direct (Young)

1  A.   2:08:55 a.m.

2  Q.   Well, that would be five seconds later; right?

3  A.   Okay.

4  Q.   So five seconds later he completed and sent -- form

5  completed and sent electronically?  That's the ACDV going

6  back to Equifax; right?

7  A.   Again, it goes with the workflow.  Once the work is

8  completed, they notated the account.  So there is a process

9  prior to notating the account REALServicing on what the,

10 what job, the completion of what was sent to the CRA through

11 e-OSCAR.

12 Q.   But it took Mr. Singh five seconds?

13 A.   To enter the codes into REALServicing, not for the

14 research.

15 Q.   At that point, he's no longer involved with this ACDV.

16 It's on its way back electronically to Equifax.  Is that

17 right?

18 A.   Again, the research and the, the response back to the

19 CRA is completed before the, before the codes are entered

20 into e-OSCAR.

21 Q.   Well, but doesn't the record before you show that the

22 ACDV that was addressed by Mr. Singh was received at 2:08:50

23 past the hour on March 20, 2013?

24 A.   That is -- that's what the document identifies the

25 time.

Sandra Lyew - Direct (Young)

1   Q.   Okay.  So, now, two different employees have looked at

2   two different ACDVs.  Now I'd like to direct your attention

3   to what's been admitted into evidence as Exhibit -- as

4   Plaintiff's Exhibit 11.  And I'd like to focus your

5   attention on the first page of Exhibit 11 that has over in

6   the right-hand corner a, what we call a Bates number of 60.

7   And this is an admitted document, so I would like to

8   simultaneously publish it.  Thank you.  And we've looked at

9   a lot of these out of your presence.

10  A.   I'm sorry.  This is 30.

11  Q.   I'm sorry.  You're right.  Mine says 32.  30 as well.

12  Okay.  Thank you.  We've looked at a lot of these with

13  various witnesses.  But this is an ACDV; right?

14  A.   This is an Equifax business record.  This is not an

15  e-OSCAR ACDV form that Ocwen uses.

16  Q.   Okay.  This is -- if the ACDV data transmitted from

17  Ocwen -- I mean transmitted from Equifax to Ocwen and Ocwen

18  responds, that's a stream of data; right?

19  A.   Equifax -- all the, all the CRAs, which is credit

20  reporting agencies, communicates through e-OSCAR system.

21  Q.   So it's all electronic data?

22  A.   Yeah, that is electronic.

23  Q.   And if we want to see it, either Ocwen or Equifax would

24  have to download that data into a form; correct?

25  A.   Correct.  Again, this is an Equifax business record.

Sandra Lyew - Direct (Young)

1    This is probably, most likely through their old system that

2    mirrors -- excuse me -- as far as what e-OSCAR has.

3    Q.   Okay.  You've given that answer three times.  Yet, I've

4    never asked that question.  So let me ask you again.  Is

5    this -- does this appear to you to be an ACDV form, the same

6    one you saw when you gave your deposition?

7    A.   Your exhibit.  This is your exhibit, yeah.  So based on

8    your exhibit that you, that was shown to me on the

9    deposition --

10   Q.   It's no longer mine.

11   A.   Oh, okay.

12   Q.   It's been ruled upon by the Court.  It is in evidence.

13   The jury has seen it.  I'm just going to ask you some

14   questions about it and I don't want to argue about it.

15   A.   Okay.

16   Q.   I just want to go over this form.  And let me ask you

17   to look at the upper right-hand corner -- left-hand corner.

18   This -- the name Harish Rao, that's the same fellow that we

19   were talking about when we were looking at the notes on

20   March 20th, 2013; is that right?

21   A.   The employee that completed the RCDV -- ACDV.  I'm

22   sorry.

23   Q.   All right.  So this is -- so Ocwen -- when Equifax sent

24   this to Ocwen, they didn't know who was going to investigate

25   it, did they?

Sandra Lyew - Direct (Young)

1    A.    No.

2    Q.    Ocwen assigned Harish Rao to investigate this, didn't

3    they?

4    A.    Yes.

5    Q.    And Harish Rao is the one that responded, didn't he?

6    A.    Yes.

7    Q.    And did he -- when he responded, did he verify the

8    information that was transmitted over by Equifax?

9    A.    It was information through e-OSCAR, that came in

10   through e-OSCAR.  Again, this is Equifax's business record

11   and the ACD form is, does not look exactly like what you're

12   showing me right now.

13   Q.    Sure.  Actually, Ocwen has a version of this, don't

14   they?

15   A.    Ocwen has an ACD form that is generated from e-OSCAR.

16   Q.    Okay.  And it shows what came in from Equifax and it

17   shows what Harish Rao sent back to Equifax; right?

18   A.    Yes.

19   Q.    But it looks different than this form because the data

20   is in different places; right?

21   A.    The fields are in different places, that is correct.

22   Q.    Okay.  But there's no doubt that Harish Rao verified as

23   reported, is there?

24   A.    What, what was verified was what came over.

25   Q.    Okay.  In fact, Mr. Rao uses the word "verified" in the

Sandra Lyew - Direct (Young)

1    notes, doesn't he?

2    A.    Yes.

3    Q.    And what Mr. Rao was asked to -- let's look at the

4    dispute codes.  Equifax sent over two dispute codes, 001,

5    not his or hers, 007 where a number of various things are

6    disputed; correct?

7    A.    Based on the comment log on Page 1 -- I mean 1665 or --

8    I'm sorry -- 1664.

9    Q.    Okay.  So what -- you're going back to the notes now --

10   A.    That is correct.

11   Q.    -- and looking at the notes you can see that Harish Rao

12   investigated this ACDV.  Now, the first dispute code is 001.

13   And he investigated that, didn't he?

14   A.    Yes.

15   Q.    And the only reason we know he investigated --

16   A.    Yes.

17   Q.    And the only reason we know he investigated is the

18   single line, "reporting to credit bureau verified, comma,

19   hence borrower is responsible."  That's all we know based on

20   the notes that Mr. Rao did; is that right?

21   A.    Yes.

22   Q.    So it looked like -- what did he verify?  Did he verify

23   the dispute not his/not hers?

24   A.    That is correct.

25   Q.    Did he verify the dispute over the current/previous

Sandra Lyew - Direct (Young)

1  account status, payment history, verified -- did he, did he

2  investigate and verify all of those things as well?

3  A.   What was, what was investigated or you want to call

4  research is based on what the associate or analyst had

5  received.

6  Q.   Okay.  Well, but part of what -- the second dispute

7  listed here, "disputes current history, disputes previous

8  history status, payment history, asked to verify the payment

9  history profile, the account status, the payment rating,"

10 all of those things were on the ACDV that Equifax sent over.

11 And Mr. Rao verified, according to the form, all of that

12 information and sent it back to, sent it back to Equifax.

13 Is that right?

14 A.   Mr. Rao verified what came through e-OSCAR and verified

15 it.

16 Q.   Right.  And this is what came through e-OSCAR, this,

17 the not his or hers, the 001 dispute code, and the 007

18 dispute code.

19 A.   Again, this is Equifax's business record.  This is

20 probably through their system.

21 Q.   You can -- you keep telling -- I'm sorry.  Finish your

22 answer.  I'm sorry.

23 A.   Again, this -- again, this is Equifax's business

24 system.  I don't know how their system works, how, how

25 their, their workflow, how they enter their disputes into,

Sandra Lyew - Direct (Young)

1   to, to, to communicate with Ocwen.  I would say Ocwen versus

2   a furnisher.

3   Q.   You, you can answer me as many times as you want

4   pointing out that this was an Equifax business record.  But

5   isn't the Equifax business record a mirror image of Ocwen's

6   business record?

7   A.   No.  Everything is communicated through e-OSCAR.

8   Q.   Mr. Nolan asked you in your deposition about the

9   e-OSCAR system.

10  A.   I recall the question.

11  Q.   And did you tell him that the system mirrors and

12  matches the data?

13  A.   You're taking that out of context really because

14  technically when I said it mirrors, it matches the system,

15  the actual, the ACD form on fields that, based on, based on

16  this exhibit that was provided to me are the, based, similar

17  fields based on the ACDV form.  But I was not speaking about

18  the data.

19  Q.   Okay.  And, of course, one of the things that was

20  verified was that there is a foreclosure proceeding started

21  and the account is 120 days past due; correct?

22  A.   Based on this exhibit, yes.

23  Q.   What basis did Mr. Rao have to verify that this loan

24  was in foreclosure and more than 120 days past due when, in

25  fact, Mr. Daugherty was current?

Sandra Lyew - Direct (Young)

1   A.   The comment log identifies one dispute code came

2   through and that was what was verified.

3   Q.   No, it shows two dispute codes came through.

4   A.   Okay.  That's on your Exhibit 11 which is Equifax's

5   business record.

6   Q.   You won't concede that Ocwen has an identical record to

7   this with the same data on it just in a different format?

8   A.   No.  Certain fields are similar based on the ACDV form.

9   Again, I cannot identify that this Equifax business record

10  is from their system or through e-OSCAR.  What I have

11  through e-OSCAR is not, does not have the heading or

12  anything like this.

13  Q.   Okay.  Well, have you looked at the Ocwen version of

14  this ACDV that happened to -- that was responded to on

15  June 2nd, 2013?  As an analyst, have you reviewed that in

16  preparation for litigation here today?

17  A.   You mean February 20th or February 19th, 2013?

18  Q.   Well, you were asked about this ACDV response of

19  June 2nd, 2013, during your deposition.  And you were shown

20  this Equifax version of the ACDV.  Correct?

21  A.   Yes.

22  Q.   And you assured Mr. Nolan during your deposition that

23  there was -- that Ocwen actually had an ACDV form that

24  showed how it responded -- what it received and how it

25  responded to these two ACDVs which came in and were

Sandra Lyew - Direct (Young)

1    responded to on June 2nd, 2013.  Correct?

2    A.   Well, I was -- the ACD form that I know of is for 2014.

3    We -- unfortunately, this was not saved in the year 2013.

4    So there was no way that we were able to provide a copy to

5    you, nor have I seen it.

6    Q.   Were they just accidentally lost?

7    A.   No.  E-OSCAR only archives for three months.

8    Q.   So we know what Mr. Rao verified.  Let's look at the

9    same exhibit and see what Mr. Raj Kumar verified.  He

10   verified that the account was current.  Correct?

11   A.   Mr. Singh you mean?

12   Q.   I'm looking at the -- I guess it would be the fourth

13   page of the exhibit.

14   A.   It does have the associate's name on it.

15   Q.   And what's that name?

16   A.   Mr. Singh.

17   Q.   The records show that it was Mr. Singh that did the

18   second ACDV, the notes; is that correct?

19   A.   Yes.

20   Q.   And the notes show that Mr. Harish Rao did the first

21   ACDV; is that correct?

22   A.   Yes.

23   Q.   But the corresponding ACDV to the notes -- there we go.

24   The notes show that control number 9087, that was responded

25   to by Raj Kumar Singh.  I got you.  I see the difference.

Sandra Lyew - Direct (Young)

1    Okay.  Let me withdraw that question.

2        Raj Kumar Singh responded to the second ACDV on the

3    same date verifying the information according to this

4    document; correct?

5    A.   Yes.

6    Q.   And I was assuming that Raj Kumar and Raj Kumar Singh

7    are the same people.  Does that make sense that they would

8    be the same people dealing with the same 16-digit control

9    number?

10   A.   That is correct.

11   Q.   So on this day, Ocwen received two ACDVs and verified

12   the data in both of them.  In one verification they verified

13   the account was current and the other verification they

14   verified that the account was in foreclosure and more than

15   120 days late.  Correct?

16   A.   No.

17   Q.   Why am I incorrect?

18   A.   Because based on, based on my review of the comment log

19   that, that the only thing that was verified is identifying

20   not his/not hers, provide complete ID.  And that's what they

21   responded to.

22   Q.   Well, that's what they responded to.  But the ACDV has

23   two dispute codes, doesn't it?

24   A.   This is Equifax's business record.  And if you want me

25   to clarify based on, based on what the business record,

Sandra Lyew - Direct (Young)

1   their records state, then you are correct.

2   Q.   During your deposition that Mr. Nolan took did you ever

3   testify that Ocwen's version of the ACDVs for this period of

4   time were no longer available?

5   A.   I don't remember that.  I don't think so.

6   Q.   When Mr. Nolan asked you about where the corresponding

7   ACDV was through the records before you now, did you tell

8   him that it's there, that it's within what was produced by

9   Ocwen?

10  A.   Everything, everything that Ocwen had was produced with

11  regards to any and all ACDV forms as well as AUD forms.

12  Q.   Well, did Mr. Nolan ask you, "Ocwen's response forms

13  are included at and attached and we'll go over that as well.

14  On this specific one, I didn't find that."  We're talking

15  about the one before you.  And you replied, "It's there."

16  A.   Well, I'm sorry, unless I didn't understand the

17  question and the year.  However, what I meant was it was

18  there meaning that everything was provided and that was all

19  of the AUDs and ACDV forms that was responded to was

20  provided.

21  Q.   Okay.  Well, we're, we're in June of 2013 and two ACDVs

22  have come in and they've both been replied to and they're

23  contradictory.  One verifies foreclosure.  The other

24  verifies current.  Is that where we are?

25  A.   This is Equifax's business record.  So based on

Sandra Lyew - Direct (Young)

1   Equifax's business record, that's what the exhibit states.

2   Q.   Okay.  Let's jump ahead from June of 2013 to July of

3   2013.  And I think if you go to tab 3 in the white notebook,

4   Plaintiff's Exhibit 26, there's a record there of two more

5   ACDVs coming in with respect to Mr. Daugherty's account;

6   correct?

7   A.   Yes.

8   Q.   And one ends with a control number 4102; correct?

9   A.   Yes.

10          MR. MANNING:  Excuse me, Mr. Young.  What page are

11   you on?

12          MR. YOUNG:  1677.

13          MR. MANNING:  Thanks.

14   BY MR. YOUNG:

15   Q.   And who was the Ocwen employee that dealt with that

16   ACDV that came in on July 5, 2013, at 12:43:14 a.m?

17   A.   Mr. Singh.

18   Q.   Raj Kumar Singh?

19   A.   Raj Kumar Singh.

20   Q.   And according to just the notes, what did Mr. Raj Kumar

21   do to either verify or ask Equifax to modify or ask Equifax

22   to delete information?  According to these notes, what did

23   he do?

24   A.   It identifies that the borrower is concerned with

25   reporting, was 001 code, not his/not hers, provide or

Sandra Lyew - Direct (Young)

1    confirm complete ID.

2         And then what it did was it says "reporting to the

3    credit bureau."  It says "no signature docs in CIS."  And

4    "the borrower's Social Security number is matching, verified

5    in REALServicing, hence he/she is responsible/liable on the

6    account."

7    Q.   So he verified the Social Security number; correct?

8    A.   Yes.

9    Q.   And he also looked in CIS to verify the signature on

10   the documents, didn't he?

11   A.   He, he said "verified in REALServicing."

12   Q.   Read what's in parentheses there, ma'am.

13   A.   It says "no signature docs in CIS."

14   Q.   So this time when Raj Kumar Singh looked in CIS, he

15   couldn't find any signature docs, could he.  That's what he

16   noted.  Correct?

17   A.   That's what he noted.

18   Q.   Well, but we just looked at an earlier investigation in

19   May where the investigator looked in the signature

20   documents, or the CIS, and confirmed the signature.  Is that

21   right?

22   A.   Yes.

23   Q.   Well, either the signature documents are in the CIS or

24   they aren't; correct?

25   A.   That's what he noted in his, in his comment.

Sandra Lyew - Direct (Young)

1   Q.   Now, according to the time stamps, this came in at

2   12:31:14.  What's the last time stamp relating to the ACDV

3   ending in 4102?

4   A.   12:43:29 a.m.  Let me see.  It goes down.  I'm sorry.

5   Q.   Well, look at the time stamp that you just mentioned,

6   12:43:29 a.m., Raj Kumar Singh.  And doesn't it say "form

7   completed and sent electronically.  It is not mailed."  Is

8   that what's next to the time stamp 12:43:29; correct?

9   A.   Yes.

10  Q.   So that's five seconds after we first see Mr. Singh's

11  name next to a time stamp in these notes; is that right?

12  A.   Yes.

13  Q.   Now, a second ACDV comes in moments later that's shown

14  on that page of the electronic notes in front of you on

15  1677.  And this ACDV ends in 4103, doesn't it?

16  A.   Yes.

17  Q.   And it ends up in the hands of Mr. Raj Kumar Singh

18  again, doesn't it?

19  A.   Yes.

20  Q.   Now, Mr. Singh just responded to one at 12:43:29.  And

21  now he gets another one at 12:45:02.  So a minute and a half

22  later he gets another ACDV to investigate, doesn't he?

23  A.   That's entered into REALServicing.

24  Q.   Is the answer to my question, yes, he got another ACDV

25  to investigate at 12:45:02?

Sandra Lyew - Direct (Young)

1    A.    If you go by time, sure, yes.

2    Q.    Well, I just want to go by the time stamps that Ocwen

3    put in its own record.  So that's -- and that's what I'm

4    looking at; right?  12:45:02 is when Mr. Raj Kumar Singh got

5    the second ACDV from Equifax; is that right?

6    A.    That was entered, yes.

7    Q.    And if you turn the page, page 1678, what did Raj Kumar

8    do -- Raj Kumar Singh do to deal with this ACDV that came

9    in?

10   A.    Another "not his/not hers, provide or confirm complete

11   ID, reporting to credit bureau," has the same, has the same

12   response, "no signature docs in CIS and borrower's Social

13   Security is matching, verified in REALServicing, hence

14   he/she is responsible/liable on the account."

15   Q.    And the next entry we have by Raj Kumar Singh is "form

16   completed and sent electronically.  It is not mailed."  Is

17   that correct?

18   A.    Yes.

19   Q.    And that's five seconds after that ACDV came into his

20   hands.  Isn't that true?

21   A.    Based on the timing, yes, based on your -- based on the

22   time stamp that you're, you're identifying.

23   Q.    Well, let's look at the, the ACDVs for that date.  It's

24   Plaintiff's Exhibit 13.

25            MR. YOUNG:  May I hand the witness an exhibit,

Sandra Lyew - Direct (Young)

1    Your Honor?

2         THE COURT:  Yes, sir.

3    BY MR. YOUNG:

4    Q.    And on the front of the first document that I just

5    handed you is there a Bates number on the side?  Is it 89?

6    A.    Yes.

7    Q.    Okay.  Let's look at that.  And the -- I've highlighted

8    this control number 4103.  Yours isn't highlighted.  I'm

9    sorry.  But do you see the control number up on top, 4103?

10   A.    Yes.

11   Q.    And that matches the notes that we just looked at for

12   this same date.  And that's what Raj Kumar Singh looked at,

13   the ACDV with control number ending in 4103; correct?

14   A.    Yes.

15   Q.    And the response date was July 5, 2023 -- I mean 2013?

16   A.    Correct.

17   Q.    And the responder was Raj Kumar?

18   A.    Yes.

19   Q.    Also known as Raj Kumar Singh; correct?

20   A.    Yes.

21   Q.    And the form indicates "verified as reported;" correct?

22   A.    That's what Equifax's business record states.

23   Q.    So if this is what truly happened, Raj Kumar Singh just

24   verified that my client is in foreclosure and he's 120 days

25   past due; correct?

Sandra Lyew - Direct (Young)

1   A.    This is Equifax's business record and this is what

2   their records state.  The dispute code -- the dispute one

3   says "not his/not hers, provide complete ID."  That's what

4   was verified.

5   Q.    Okay.  Let's assume for the purpose of my question that

6   Mr. Daugherty's credit report, his credit report shows an

7   Ocwen mortgage that's current and an Ocwen mortgage with the

8   same number that's in foreclosure.  Under my hypothetical,

9   that's not possible, is it?

10  A.    No.  We report to all bureaus the same thing each

11  month.  We don't have control of how Equifax or any other

12  credit reporting agencies notate, input their tradeline

13  whether it's what we -- again, we report it accurately.  We

14  report the same thing every month to the, to the agencies.

15          MR. YOUNG:  Your Honor, may I ask the court

16  reporter to read my last question back?

17          THE COURT:  Yes, sir.

18     (The court reporter read back the previous question,

19  after which the following occurred:)

20          THE WITNESS:  It's not supposed to be, no.

21  BY MR. YOUNG:

22  Q.    It's not, not possible.  It's not possible for him to

23  be current and in foreclosure on the same mortgage, is it?

24  A.    No.

25  Q.    But according to the documents we're looking at, Raj

Sandra Lyew - Direct (Young)

1  Kumar Singh verified back to Equifax that he was current on

2  his mortgage and that he was in foreclosure on the same

3  mortgage; is that correct?

4  A.   Ocwen reported the same thing every month as current,

5  not in foreclosure.

6  Q.   Okay.  Let's -- monthly reporting is different from

7  responding to ACDVs, isn't it?

8  A.   That is correct.

9  Q.   Okay.  So every month there's something called a data

10 tape that has all of the Ocwen loans in the world on it for

11 American citizens.  And they send that electronic tape over

12 to Equifax which puts it into a system.

13 A.   To all the credit agencies.

14 Q.   Yeah, Equifax, Experian, TransUnion.  Okay.  Now,

15 that's different from ACDVs, though.

16 A.   That is correct.

17 Q.   So if the month before when this data tape was sent by

18 Ocwen to Equifax, it could show that Mr. Daugherty's account

19 was current, couldn't it?

20 A.   That is correct.

21 Q.   And, in fact, for this month it would have shown he was

22 current?

23 A.   That is correct.

24 Q.   But Equifax sent two ACDVs and said -- with the same

25 account number and said, "Verify that this account is

Sandra Lyew - Direct (Young)

1    current and verify that this account is in foreclosure."

2    And Ocwen verified both, didn't they?

3    A.    Ocwen only verified again showing in the transaction

4    history identifying that the account, the code 001, not

5    his/not hers and this -- again, Equifax's business record

6    says "provide complete ID."  They're not going to go beyond

7    what the dispute request is asking.  Everything else here

8    that you're trying to show me is, is Equifax's notes.

9    Q.    So you want the jury to ignore the part that says

10   "foreclosure proceedings started, account 120 days past the

11   due date."

12   A.    I'm saying that this is not an Ocwen record.  This is

13   an Equifax business record.

14   Q.    Which was sent to Ocwen, and Raj Kumar Singh verified

15   it and sent it back, didn't he?

16   A.    I don't know Equifax's policies and procedures.  All

17   the communications are done through e-OSCAR.

18   Q.    And he also verified that there was $6,000 past due,

19   didn't he?

20   A.    If you want me to clarify what you're -- what this

21   exhibit is stating, okay.

22   Q.    Let's move -- now, there have been four ACDVs so far

23   we've discussed.  And the fifth one comes in, I believe, in

24   October of 2013, Plaintiff's Exhibit 14.  And in your white

25   notebook there could you turn over to tab 4, 1688, counsel.

Sandra Lyew - Direct (Young)

1 And these notes of -- these are Ocwen's internal notes

2 again. And these reflect some ACDVs that came in in October

3 of 2013; is that right?

4 A.   Correct.

5 Q.   And two ACDVs came in back to back from Equifax; is

6 that right?

7 A.   Yes.

8 Q.   One was 5113 control number. One was 5114 control

9 number.

10 A.   Correct.

11 Q.   And the same Ocwen employee dealt with both of them; is

12 that right?

13 A.   That is correct.

14 Q.   And that's Kusum initial V I guess. Would that be,

15 would that be his last name or would you know?

16 A.   I don't know.

17 Q.   Okay. But the first one, the one ending in 5113,

18 according to these notes, when did Kusum, Mr. Kusum, when

19 did he first make a notation about the ACDV ending in 5113?

20 When did he first time stamp a notation next to his name?

21 A.   It was a time of 1:06 and 18 seconds a.m.

22 Q.   On October 10, 2013?

23 A.   Yes.

24 Q.   And what do the notes show with respect to what

25 Mr. Kusum did to investigate this ACDV?

Sandra Lyew - Direct (Young)

1  A.    That borrower signed the note, hence responsible,

2  Social Security matches, check CIS.

3  Q.    Okay.  So Mr. Kusum looked in the CIS and he verified

4  that the signatures were there?

5  A.    Yes.

6  Q.    But Raj Kumar Singh, he looks in the same CIS and he

7  can't find those documents.  We've established that, didn't

8  we?

9  A.    That is correct.

10  Q.    And there's a notation next to Mr. Kusum's name, "form

11  completed and sent electronically.  It is not mailed."  Do

12  you see that notation?

13  A.    Yes.

14  Q.    What is the time stamp on that notation?

15  A.    1:06 21 a.m.

16  Q.    So the first time stamp is 18 seconds, 19 seconds 20

17  seconds, 21 seconds.  This is a three-second investigation

18  by Mr. Kusum of an ACDV that came in from Equifax; correct?

19  A.    The codes being entered into the system.

20  Q.    Is the answer to my question, yes, that's correct?

21  A.    Yes, based on the comment log.

22          THE COURT:  I'm sorry, I didn't hear the last part

23  of your answer.

24          THE WITNESS:  I said, yes, based on the comment

25  log.

Sandra Lyew - Direct (Young)

1        THE COURT:  All right.

2   BY MR. YOUNG:

3   Q.   And this isn't my comment log.  This is Ocwen's comment

4   log, isn't it?

5   A.   Yes.

6   Q.   If anyone wants to know what in the world Ocwen did

7   with respect to any ACDV related to Mr. Daugherty, they just

8   have to go here and there's a contemporaneous record of

9   everything that happened, isn't there?

10  A.   Yes.

11  Q.   Now, Mr. Kusum is done and sent this form

12  electronically.  And at 1:06:21 a.m., a little over a minute

13  later he got another ACDV on Mr. Daugherty, didn't he?

14  A.   Yes.

15  Q.   And this one was control number 5114?

16  A.   Yes.

17  Q.   So we have 5113 and 5114 looked at by Mr. Kusum, one

18  right after the other.  Would it -- is it fair to say that

19  these were generated and sent over at the same time since

20  they have consecutive numbers?

21  A.   I don't know.

22  Q.   Would it be unfair for me to assume that?

23  A.   I thought we're not supposed to assume.

24  Q.   No, you can assume all you want and I can assume.

25  A.   Okay.

Sandra Lyew - Direct (Young)

1  Q.   I'm asking you, is that a fair assumption?

2  A.   Again, as I mentioned earlier, that the research and

3  the response back through e-OSCAR to the CRA is done prior

4  to the, the codes being entered into REALServicing.

5  Q.   What did Mr. Kusum do to investigate the second

6  dispute?

7  A.   Verified that the borrower signed the note, hence

8  responsible, Social Security matches, check CIS.

9  Q.   So he verified both of them; correct?

10  A.   That is correct.

11        MR. YOUNG:  Plaintiff's 14, please.

12     May I hand the witness Exhibit 14?

13        THE COURT:  Yes, sir.

14  BY MR. YOUNG:

15  Q.   And the top page of Exhibit 14 is an Automated Consumer

16  Dispute Verification, isn't it?

17  A.   Equifax Credit Information Services, yes.

18  Q.   No, my question was:  Is this an Automated Consumer

19  Dispute Verification?

20  A.   By Equifax Credit, Credit Information Services and I

21  said "yes."

22  Q.   And is this Mr. Kusum responding to the ACDV we just

23  saw over in the notes with the same control number as shown

24  on this form?

25  A.   That's what, that's what the document says, yes.

Sandra Lyew - Direct (Young)

1  Q.   And it shows the same response date as it does in the

2  notes, doesn't it?

3  A.   That is correct.

4  Q.   And it shows "verified," doesn't it?

5  A.   That's what, that's what their records state.

6  Q.   Well, that's what Ocwen's records state; right?  They

7  verified it.

8  A.   That -- okay.  Are we -- we're back on -- are we still

9  on Exhibit 14 or we're on the comment log?

10  Q.   Let me clear this up.  We're on Exhibit 14.  And I said

11  it shows that Mr. Kusum verified this.  And then you said

12  this record shows --

13  A.   Right.  It says "responder's name."  It identifies who

14  responded at Ocwen.

15  Q.   And what did -- according to this form, did Mr. Kusum

16  verify the data on this form?

17  A.   Based on this form, Equifax's record, they have checked

18  that -- they have checked off that, yes.

19  Q.   So not only does the ACDV form show "verified," if we

20  go over to the notes that we started with at page 1688, it

21  also shows that this particular ACDV was verified by Ocwen

22  employee Mr. Kasum, doesn't it?

23  A.   Yes, identifying or responding to the dispute section

24  001, not his/not hers, provide complete ID.

25  Q.   Okay.  Now, on this one he was actually confirming it

Sandra Lyew - Direct (Young)

1   was a current account; is that right?

2   A.   It verified -- okay.  Based on Equifax's record, this

3   is what they -- this is what it does state.

4   Q.   And if we had Ocwen's record, it would state the same

5   thing, wouldn't it?

6   A.   No.

7   Q.   Let's jump ahead to December, December, 2013.  I want

8   you to look at your notes, if you could, in the white binder

9   under tab 5 at Page 1695, counsel.  On that page on

10  December 2nd, 2013, does it show another ACDV coming in from

11  Equifax about David Max Daugherty?

12  A.   Yes.

13  Q.   And does that end in 0123, the control number assigned

14  by Equifax when it was sent over to Ocwen?

15  A.   Yes.

16  Q.   And according to the time stamp next to December 2nd,

17  2013, we have 11 past the hour, 54 minutes and 36 seconds in

18  the p.m.  Correct?

19  A.   Yes.

20  Q.   And who is this employee?  I'll let you try the name

21  first before I do.

22  A.   It's spelled A-k-s-h-a-t-h-a.

23  Q.   Okay.  So it has SV and then Akshatha?

24  A.   I'm not going to pronounce that.

25  Q.   Okay.  Somebody has to.  I'll do the best I can.  You

Sandra Lyew - Direct (Young)

1   don't know Mr. or Ms. Akshatha, do you?

2   A.   No.

3   Q.   Never met them?

4   A.   No.

5   Q.   Haven't talked to them?

6   A.   No.

7   Q.   Haven't exchanged e-mails with them?

8   A.   No.

9   Q.   And what did this person, Mr. or Ms. Akshatha, what did

10  they do to investigate ACDV 0123?

11  A.   Okay.  It's another 001 dispute code, "not his/not

12  hers, provide or confirm ID."  And then they have checked

13  the CIS and they indicated "no signature docs found in CIS,

14  verified signature in mortgage and the borrower's signature

15  is matching, verified in REALServicing, he/she is

16  responsible/liable on the account."

17  Q.   So it appears that some Ocwen employees are able to

18  look in the CIS file and find a document with my client's

19  signature while other employees look in the same file and

20  can't find a signature.  Is that fair based upon the notes

21  we've reviewed?

22  A.   It's fair that some are able to locate and some are

23  not.

24  Q.   Have you ever tried to verify -- investigate and verify

25  an ACDV?

Sandra Lyew - Direct (Young)

1   A.   No.

2   Q.   So when did Mr. or Ms. Akshatha, when were they, when

3   did they send the completed ACDV back to Equifax?

4   A.   December 2nd, 2013, 11:54:38 p.m.

5   Q.   So 36, 37, 38.  Two seconds elapsed time according to

6   these date stamps; is that correct?

7   A.   Yes.

8   Q.   But Ms. -- Mr. or Ms. Akshatha, they aren't done yet

9   with Mr. Daugherty, are they, because another consecutively

10  numbered ACDV rolls in two seconds -- is it two seconds

11  later?

12  A.   Yes.

13  Q.   I'm sorry, six seconds later.  It rolls in at 44 -- 11

14  hours, 54 minutes, 44 seconds.  And that has a consecutive

15  control number 0 -- the other one had 0123.  This one has

16  0122.  Correct?

17  A.   Yes.

18  Q.   And what did Mr. or Ms. Akshatha do to investigate this

19  ACDV?

20  A.   Okay.  The dispute came in as an 001, "not his/not

21  hers, provide or confirm complete ID."  They've checked the

22  CIS.  It also states "no signature docs found in CIS,

23  verified signature in mortgage, and the borrower's Social

24  Security numbers matching, verified in REALServicing, hence

25  he/she is responsible/liable on the account."

Sandra Lyew - Direct (Young)

1   Q.   And Mr. or Ms. Akshatha was able to do this, according

2   to the time stamps, in two seconds?

3   A.   Sure if you go by time stamp.

4   Q.   Okay.

5           THE COURT:  Mr. Young, --

6           MR. YOUNG:  May we look at Exhibit 15, please?

7           THE COURT:  -- if you will find a convenient

8   stopping place, I'll give the jury a recess.

9           MR. YOUNG:  I'll stop right here.  Thank you, Your

10  Honor.

11          THE COURT:  All right.

12      Ladies and gentlemen, I'm going to give you your

13  luncheon recess.  While you're out, do not discuss this case

14  among yourselves.  Do not permit anyone to discuss it with

15  you or in your presence.  And please be in your jury lounge

16  at 1:30 this afternoon.  We'll stand in recess.

17      (Recess taken from 11:59 a.m. until 1:30 p.m.)

18          THE COURT:  Good afternoon, everyone.

19      Mr. Young.

20  BY MR. YOUNG:

21  Q.   Ms. Lyew, Mr. Nolan pointed out to me that I skipped

22  the month of June, 2013.  So I want to ask you to -- in your

23  white book with the notes in it I need you to go back to tab

24  number 3, I believe -- excuse me -- tab 2.  And in the

25  corner of that page it should say 1673.

Sandra Lyew - Direct (Young)

1    A.    Okay.

2    Q.    And do these notes show that on June 2nd, 2013, two

3    more ACDVs rolled in from Equifax relating to

4    Mr. Daugherty's account?

5    A.    Yes.

6    Q.    And the first one was handled by -- came at 11:52:13

7    p.m. and handled by Daniel Wesley; is that right?

8    A.    Yes.

9    Q.    Do you know Mr. Wesley?

10   A.    No.

11   Q.    Have you ever communicated with Mr. Wesley?

12   A.    No.

13   Q.    Do you know where Mr. -- Mr. Wesley is an employee of

14   Ocwen, though, isn't he?

15   A.    You mean which location?

16   Q.    Yeah.  Do you know where?

17   A.    No.

18   Q.    And according to the notes, when ACDV ending in 3103

19   came in, what did this fellow do to investigate this ACDV?

20   A.    The dispute is shown to come in as an 001, "not his/not

21   hers, provide or confirm complete ID."  And the "reporting

22   to the credit bureau, borrower has signed the note, hence

23   responsible, Social Security number matches, check the CIS."

24   Q.    And that came at 11:52:13.  And if we turn the page,

25   what was the time -- what's the time stamp when the form was

Sandra Lyew - Direct (Young)

1  completed and sent electronically?

2  A.   11:54:22 p.m.

3  Q.   So it came in 17 seconds, 18, 19, 20, 21, 22 -- five

4  seconds later this investigation is over.  Is that fair?

5  A.   That is what's entered into the comment log.

6  Q.   That's what's entered into and time stamped on Ocwen's

7  own internal record; correct?

8  A.   Yes.

9        MR. MANNING:  Your Honor, maybe to speed it up, we

10 could stipulate that the entries were made at the times

11 stamped.  I mean, I think that would save us a lot of time.

12       THE COURT:  Mr. Young, I will leave that up to you

13 inasmuch as I don't want to interfere with the strategy of

14 either of your cases whether you accept that stipulation or

15 inquire of the witnesses.

16     But thank you, Mr. Manning.

17       MR. MANNING:  Thank you, Judge.

18 BY MR. YOUNG:

19 Q.   Now, as I understand it, Mr. Daniel Wesley looked at an

20 ACDV that came in from Equifax and verified it.  And all he

21 did to investigate was to confirm the Social Security

22 number.  Is that what -- and that he signed the note.

23 A.   Correct.

24 Q.   And is it your testimony that that is all that Ocwen

25 should do when it receives an ACDV in this case from Equifax

Sandra Lyew - Direct (Young)

1   is to verify Social Security number and signature?

2   A.   When the dispute comes in as an 001, that's what it --

3   not his/not hers, provide or confirm complete ID, yes.

4   That's what they -- that's what they will confirm and

5   verify.

6   Q.   And is that the policy and procedure of Ocwen?

7   A.   Yes.

8   Q.   Well, what if there's other relevant information on

9   that form that's coming in that he is verifying and sending

10  back the ACDV?  They don't -- the, the investigators don't

11  look at anything else?  They just look at a dispute code and

12  if the signature matches and the Social Security matches,

13  it's verified and out the door it goes five seconds later?

14  A.   It is researched by dispute code.  And that's what they

15  will confirm and verify.

16       In this case, it's showing that the dispute from

17  e-OSCAR came in as an 001, "please confirm -- please provide

18  and confirm the complete ID," and that's what they verified.

19  Q.   Assume for the purpose of my question that there were

20  other relevant facts relating to Mr. Daugherty's account on

21  that ACDV such as, for instance, he was in foreclosure and

22  more than 120 days late.  In that case are you telling me

23  it's the policy and procedure of Ocwen to just confirm his

24  identity and respond?

25  A.   The only thing that is the policy that whatever the

Sandra Lyew - Direct (Young)

1   request is, if it says provide or verify, in this case, an

2   001 code, that's what, that's what is going to be verified.

3   Q.   Well, what if there's other relevant information on the

4   form?

5   A.   They're not told to do that unless it's specified on

6   the dispute code.

7   Q.   So if it says he's in foreclosure and more than 120

8   days late, Ocwen is going to look at a dispute code that

9   says it's not his or hers.  They're going to verify his

10  Social Security number and his signature.  And they're going

11  to verify that back to Equifax.  Correct?

12  A.   On the ACDV form, yes.  Every month -- there is a

13  monthly data report that is sent to all the bureaus

14  identifying the accuracy and, and the monthly reporting of,

15  of the tradeline for the, for the loan number or, in this,

16  in this case, the individual, Mr. Daugherty.

17  Q.   Excuse me.  Ms. Lyew, I didn't ask you about the

18  monthly report that goes to -- I'm talking about the ACDV.

19  Let's stick to the ACDV.  This one happens to be the

20  one June 2nd, 2013.

21       And it's your testimony here as the representative of

22  Ocwen that if the only dispute code is not his or hers,

23  that's all Ocwen is going to confirm.  They aren't going to

24  look at any other information on that form.  Is that your

25  testimony?

Sandra Lyew - Direct (Young)

1    A.    That is correct.

2    Q.    So if the form has in foreclosure, more than 120 days

3    late, $6,000 in default, Raj Kumar or Daniel Wesley or any

4    of those folks, they're going to verify that and ship it

5    right back to Equifax; correct?

6    A.    Correct.

7          MR. YOUNG:  May I hand the witness Exhibit 12,

8    Your Honor?

9          THE COURT:  Yes, sir.

10   BY MR. YOUNG:

11   Q.    Ms. Lyew, we've already looked at the records for this

12   dispute code at the notes.  Let's look at the, the document

13   I've handed you which is on top.  The first document is --

14   let's first confirm that the notes we just looked at were

15   for a dispute identified as control number ending in 3102.

16   Correct?

17   A.    That's correct.

18   Q.    This matches the notes we just looked at, doesn't it?

19   A.    The control number?

20   Q.    Yes.

21   A.    Yes.

22   Q.    Okay.  And we have Daniel John here.  And it says

23   Daniel Wesley on the notes.  Is it perhaps that his name is

24   Daniel John Wesley or John Daniel Wesley?

25   A.    The note states Daniel Wesley.  I don't know anything

Sandra Lyew - Direct (Young)

1    about a John.

2    Q.   Oh, so, you won't accept that John Daniel Wesley and

3    Daniel Wesley are the same person?

4    A.   Again, I see Daniel Wesley.  I cannot -- I'm not going

5    to say that Daniel John is the same as Daniel Wesley.

6    Q.   Even though his name is on this form that's before you,

7    Plaintiff's Exhibit 12?

8    A.   Again, this is an Equifax business record.

9    Q.   And according to this record, this information was

10   verified; correct?

11   A.   Based on the dispute code 001 and the control number.

12   I can't see the screen.

13   Q.   And, so, what was verified is a current account on this

14   particular document; is that right?

15   A.   No.  This is, again, based on Equifax's business

16   record.  This is -- that's what it states.

17   Q.   So if we -- we don't have the counterpart because Ocwen

18   doesn't save them.  And you're telling me that if we had the

19   counterpart, it wouldn't show current account.  It wouldn't

20   show this, the name that's shown on this form.  It wouldn't

21   show Daniel John.  It would show something else.  Is that

22   what you're telling us?

23   A.   Can you repeat the question?

24   Q.   If we had the counterpart to the Equifax ACDV

25   maintained by Ocwen but no longer maintained because they

Sandra Lyew - Direct (Young)

1    only keep them for three months, wouldn't it have the same

2    16-digit code on the form ending in 3102?

3    A.   Based on the comment log, it's fair to say, yes.

4    Q.   And wouldn't it have the name of the investigator?

5    A.   And the investigator is showing Daniel Wesley.

6    Q.   That's what's shown here.  But if we had, and we don't,

7    if we had Ocwen's records, it would show the name of the

8    person who responded; correct?

9    A.   As Daniel Wesley.

10   Q.   And but for the fact that Ocwen doesn't keep these

11   records, there would have been a response date of June 2nd,

12   2013, to this dispute code of -- or dispute control number

13   of 3102; correct?

14   A.   3102, yes.

15   Q.   And Ocwen's version, if they still had it, would show

16   the account status as current and the payment rating as

17   current, wouldn't it?

18   A.   It would only identify what was completed per the

19   transaction history.

20   Q.   Yeah.  Within the same exhibit is the consecutively

21   numbered ACDV 3103.  Again, the responder's name was Daniel

22   John; correct?

23   A.   Yes.

24   Q.   And it was responded on June 1st, 2013, just like the

25   one we looked at; correct?

Sandra Lyew - Direct (Young)

1    A.    June 2nd.

2    Q.    I'm sorry, June 2nd, 2013; correct?

3    A.    Yes.

4    Q.    And this form indicates it was verified as reported;

5    correct?

6    A.    That's what this form is stating.

7    Q.    Don't the notes for Daniel Wesley for control number

8    ending in 3103 say the same thing?

9    A.    Identifies the date that it was received and responded

10   to.

11   Q.    And it shows it was verified; correct?

12   A.    And what they did to verify, yes.

13   Q.    So there's no doubt that Ocwen verified Automatic

14   Consumer Dispute Verification sent by Ocwen with, ending in

15   control number 3103; correct?

16   A.    The control number does match, yes.

17   Q.    And isn't the investigator or the responder here

18   confirming that there's a foreclosure and it's 120 days past

19   due?

20   A.    This is the information that Equifax would complete on

21   their side of the ACDV.

22   Q.    Okay.  So Equifax would put on there that their records

23   show he's in foreclosure.  He's 120 days past due.  He's

24   $6,000 in default.  And they would send that over to Ocwen,

25   and Ocwen would hit "verify" and send it back; correct?

Sandra Lyew - Direct (Young)

1    A.    They only identify what the dispute code is being sent

2    over to respond to.  So in this case, again, they have a

3    dispute code 001, "not his/not hers, provide complete ID."

4    If Equifax was more specific in their dispute, they would

5    make additional comments below that.

6    Q.    Well, how about the comment that says "foreclosure

7    proceedings started, account 120 days past the due date"?

8    Those comments are on there and they were verified, weren't

9    they?

10   A.    Again, the same response.  My same answer is the

11   dispute, based on the dispute code, is identified -- is

12   responded by codes.  If they were specific in their dispute

13   codes, then it would have been responded to.  In this case,

14   it was an 001, "not his/not hers, provide complete ID."

15   Q.    Wouldn't a complete investigation, a thorough

16   investigation look at all of the information that was made

17   available to Ocwen by Equifax including the $6,000 in

18   default and the foreclosure and the more than 120 days past

19   due?

20   A.    That is not what Equifax asked Ocwen to do.  So

21   regardless of the information, they input it on their end.

22   They do not go beyond what was requested to verify.

23   Q.    Are you telling the jury that if, if we had Ocwen's

24   version it wouldn't say anything about foreclosure when it

25   was verified back?  If we just happen to have Ocwen's own

Sandra Lyew - Direct (Young)

1    records, which we don't, that they wouldn't have foreclosure

2    started, account 120 days past due on Ocwen's records?  Is

3    that your testimony?

4    A.    That is, that is correct.

5    Q.    I had to go back and cover June.  I want to go forward

6    to January 17, 2014.

7           MR. YOUNG:  And may I see Plaintiff's Exhibit 16,

8    please?

9    BY MR. YOUNG:

10   Q.    Let's go back to the notes in the white binder.  I'll

11   get you a tab number here.

12   A.    I am just about there.

13   Q.    It would be tab 6.  And in January of 2014 two more

14   ACDVs rolled in from Equifax to Ocwen regarding

15   Mr. Daugherty's account; is that right?

16   A.    Yes.  If you can just reconfirm the page that you're

17   looking at so I know I'm on the same page.

18   Q.    Yeah.  It's 1709.

19   A.    Okay.

20   Q.    So you see there's an ACDV ending in 1127?

21   A.    Yes.

22   Q.    And there's also one at the bottom of the page ending

23   in 1126; correct?

24   A.    Yes.

25   Q.    Who investigated both of these ACDVs to confirm or

Sandra Lyew - Direct (Young)

1   verify the information contained thereon?

2   A.   S-u-r-e-s-h, letters VK.

3   Q.   So it says Suresh VK.  Do you know Suresh VK?

4   A.   No.

5   Q.   Have you corresponded with him?

6   A.   No.

7   Q.   Have you sent him an e-mail today?

8   A.   No.

9   Q.   I'm going to call him Mr. Suresh.

10  A.   VK?

11  Q.   If you prefer, I can call him Mr. VK if you want.

12  A.   It's easier to say than his name --

13  Q.   Okay.

14  A.   -- or her name.

15  Q.   All right.  Well, the ACDV that came in, the first one,

16  the one ending 1127, when did Suresh VK receive that?  When

17  is it time stamped?

18  A.   12:45:16 a.m.

19  Q.   And what did he check, according to this record, before

20  it was verified back to Equifax?

21  A.    It stated that the code 001 came in, "not his/not hers,

22  provide or confirm complete ID, reporting to the credit

23  bureau, David Max Daugherty had signed a note and is

24  responsible, check CIS, Social Security number matches."

25  Q.   And that form was completed and sent electronically at

Sandra Lyew - Direct (Young)

1    12:45:22 according to the timeline stamped on this document;

2    is that right?

3    A.    That's the code that was entered.

4    Q.    So it comes in at 16, 17, 18, 19, 20, 21, 22.  Six

5    seconds have elapsed, is that right, according to the time

6    stamp?

7    A.    According to the time stamp, yes.

8    Q.    Okay.  And no sooner than that goes out the door at

9    12:25:22 in the a.m., at 12:45:44, 22 seconds later, another

10   ACDV rolls in for Mr. Suresh VK to verify the information

11   requested by Equifax; is that correct?

12   A.    Correct.

13   Q.    And what did Suresh VK do to investigate this ACDV?

14   A.    The code came in as 001, "not his/not hers, provide or

15   confirm complete ID, what was reported, David Max Daugherty

16   has signed the note, hence responsible, check CIS, Social

17   Security number matches."

18   Q.    Came in 32 seconds.  It goes out six seconds later.

19   That's done.  The -- both ACDVs got six seconds each of

20   attention and they were both verified.  That's what these

21   records show.  Is that correct?

22             MR. MANNING:  Objection, misstates the testimony.

23             THE COURT:  Any response to the misstating

24   objection, counsel?

25             MR. YOUNG:  I, I don't know what I misstated, Your

Sandra Lyew - Direct (Young)

1   Honor.

2            THE COURT:  Mr. Manning.

3            MR. MANNING:  We offered a stipulation on this

4   point, Judge.  The witness has stated that this is the time

5   stamp of the entry.  And Mr. Young keeps saying there's only

6   five seconds elapsed.  That's not her testimony.

7            THE COURT:  Response to the objection, counsel?

8            MR. YOUNG:  Your Honor, I'm asking her to confirm

9   what the business records show, the amount of time between

10  when that employee was assigned the account and when that

11  employee sent out the response.  In this case, it was six

12  seconds each.

13           THE COURT:  Restate your question, please.

14           MR. MANNING:  Thank you, Judge.

15  BY MR. YOUNG:

16  Q.   Do the Ocwen records reflect that Suresh VK from the

17  time it is time stamped to the time he sent out the response

18  to the first ACDV, the one ending in 1126, was six seconds?

19  Is that what the records reflect?

20  A.   Those are the codes entered into the system to show the

21  workflow, that the work has been received, responded, and

22  completed --

23  Q.   And they --

24  A.   -- in REALServicing because, again, as I mentioned

25  earlier, that the research and the response back to, through

Sandra Lyew - Direct (Young)

1  e-OSCAR to the CRA is completed before these codes are made,

2  or I should say entered into REALServicing.

3  Q.   All right.  Well, let's look at Page 1709 when it says

4  January 17, 2014, at 12:45:44, "credit inquiry dispute

5  received."  Does that mean that Suresh VK received the

6  credit inquiry dispute at that time stamped on this

7  document?

8  A.   No.

9  Q.   Is there some other record that would show what really

10  happened?

11  A.   No.

12  Q.   So the only record we have -- the only record of the

13  investigation we have is in this white binder, Plaintiff's

14  Exhibit Number 26; correct?

15  A.   Based on the, the research that was completed and the

16  dispute code.

17  Q.   Let me hand you --

18        MR. YOUNG:  If I may, Your Honor, hand Exhibit 16

19  to the witness.

20        THE COURT:  Yes, sir.

21  BY MR. YOUNG:

22  Q.   And if we look at the top corner of that document, the

23  control number ending in 1126 corresponds with the control

24  number shown in the contemporaneous notes of Ocwen, correct,

25  on Page 1709?

Sandra Lyew - Direct (Young)

1   A.    1709 says 1127.

2   Q.    Now look at the bottom, third entry.

3   A.    Yes.

4   Q.    Okay.  And, so, these records show that Suresh VK

5   received it.  Now, this record in the plaintiff's exhibit

6   shows Suresh Krishnamuthy.  Do you think that's the same

7   fellow as Suresh VK that we see in the Ocwen record?

8   A.    Again, I can only go by the Ocwen business record which

9   says Suresh VK.

10  Q.    Well, the only way Ocwen would know -- yeah, the only

11  way Equifax -- the only way an Equifax form would show an

12  investigator is for Ocwen to tell them, for Ocwen to respond

13  back to an ACDV and give the name of the person who

14  investigated it.  Is that fair?

15  A.    I don't know.

16  Q.    Am I asking you to make a leap of faith to agree that

17  Suresh Krishnamurthy who was shown on the Equifax version of

18  the ACDV as the respondent is the same respondent shown in

19  the notes as Suresh VK?

20  A.    Under the same control number?

21  Q.    Yes.

22  A.    Yes.

23  Q.    Okay.  Well, are we in agreement it's probably the same

24  guy?

25  A.    Again, this Suresh, however you want to pronounce that

1  name, is showing on Equifax's business record.  However,

2  again, I don't know the full name.  The control number

3  matches our business record as well.

4  Q.  And what Suresh is doing is confirming a current

5  account here; is that right?

6  A.  Yes.  At this time, the -- January 17th, 2014, the

7  account was current.

8  Q.  And we know that because it says on the ACDV response

9  "current account" and there's nothing entered under it to

10  change it; correct?

11  A.  Again, the dispute code was only to verify, or I should

12  say provide complete ID due to the code 001 "not his/not

13  hers."

14  Q.  Okay.  Go back a few pages on the same exhibit and we

15  have the other ACDV.  Again, Mr. Suresh is involved and it's

16  the same date, January 17, 2014?

17  A.  Identifies the same control number.

18  Q.  Great.  And it's verified as reported it shows; right?

19  A.  That, again, is Equifax's business record.

20  Q.  And if we happen to -- if we just by chance had the

21  Ocwen version, it would show "verified" also, wouldn't it?

22  A.  The ACD form for e-OSCAR does not have a section to

23  check off "verified as reported" shown on the Equifax

24  business record.

25  Q.  Because Ocwen uses some -- when Ocwen wants to verify

Sandra Lyew - Direct (Young)

1   an ACDV that it gets in back to Equifax, what does it --

2   what code does it put on it to verify?

3   A.   What code does --

4   Q.   Sure.  If, if Equifax sends some information to Ocwen

5   and Ocwen says, "It looks good to me, it's all correct,"

6   what -- when they send it back, what code do they put on it?

7   A.   I don't recall the code.

8   Q.   Is there --

9   A.   However, again, based on the documents, the transaction

10  history is identifying what was verified.

11  Q.   Okay.  And this form, of course, shows the $6,000 in

12  default; correct?

13  A.   That's Equifax's data.  That's what it shows.

14  Q.   My client wasn't $6,000 in default in January of 2014,

15  was he?

16  A.   No, he wasn't, nor did Ocwen report it that way.

17  Q.   And we see a -- do you see the section in the middle of

18  the document?  You may want to look at -- you can look at

19  either copy.  But there it's "foreclosure process started,

20  120 days past due."  That's false, isn't it?

21  A.   The response date of January 17th, 2014, yes, based on

22  Equifax's record again.

23  Q.   And this information at the bottom, the special comment

24  code and the account status, that's false as well; correct?

25  A.   For 2014, yes.

Sandra Lyew - Direct (Young)

1  Q.   Okay.  We're up to January of 2014.  I want to ask you

2  about a phone call that shows up in these notes.  Right now

3  you're open to 1709.  We need to go forward to 1715.  Do you

4  see a phone call in, from the borrower where TR Rajani spoke

5  with the borrower?

6  A.   Yes.

7  Q.   And that was March 17th, 2014 at 7:47:02; correct?

8  A.   Yes.

9  Q.   And there's notes made by TR Rajani there.  And about

10 10 minutes later -- 10 minutes, 20 some seconds later it

11 appears from these notes and the time stamps that the

12 conversation was over.  So about 10, 10 minutes or so there

13 was a conversation over the phone.  Is that what this shows?

14 A.   Yes, roughly, uh-huh.

15        MR. YOUNG:  Plaintiff moves for the introduction

16 of Plaintiff's Exhibit 26 which has already been marked in

17 which the, the marked copy is before the witness.  These

18 are, for the record, the notations, contemporaneous notes of

19 Ocwen provided through discovery by Ocwen and identified by

20 this witness.

21        THE COURT:  Any objection, Mr. Manning?

22        MR. MANNING:  No objection, Your Honor.

23        THE COURT:  Plaintiff's Exhibit 26 will be

24 admitted into evidence without objection.

25 BY MR. YOUNG:

Sandra Lyew - Direct (Young)

1  Q.   So let's turn to the next page.  After Mr. Daugherty

2  talked to TR Rajani, he faxed something in, didn't he?

3  A.   Yes.

4  Q.   And would this be considered a dispute?

5  A.   It is a written dispute directly to Ocwen.

6  Q.   Now, way back in March of 2013 he sent a written

7  dispute to Ocwen, didn't he?

8  A.   Yes.

9  Q.   Okay.  So again in March of 2014 he sends another

10  written dispute; correct?

11  A.   That is correct.

12  Q.   Now, when Ocwen receives a written dispute directly

13  from a customer directly to the provider, Ocwen, they're

14  required to show a dispute code on the account, aren't they?

15  A.   It's -- it depends.  I mean, it depends on the dispute.

16  So they're not required to.  However, again, it's at their

17  own discretion.

18  Q.   So it's not the law that when a customer disputes

19  directly with the reporter, the creditor, isn't it the law

20  that the account has to be marked as disputed?

21         MR. MANNING:  Objection, calls for a legal

22  conclusion, Your Honor.

23         THE COURT:  Response, counsel?

24         MR. YOUNG:  Your Honor, this witness indicated

25  that part of her duties is to testify at trial, to analyze

Sandra Lyew - Direct (Young)

1    records and reports, and conduct thorough review, analysis,

2    interpretation of events.  It would seem to me that she has

3    the expertise to answer that question.

4          THE COURT:  I sustain the objection, Mr. Young, to

5    the question that's on the floor.

6          MR. MANNING:  Thank you, Judge.

7          THE COURT:  You don't have to thank me, Mr.

8    Manning.  Unfortunately, it's my job.  So don't thank me for

9    my rulings.

10         Go ahead, please.

11   BY MR. YOUNG:

12   Q.   As a result of the phone call or the fax did Ocwen,

13   according to these notes, do any investigation or respond to

14   Mr. Daugherty?

15   A.   Yes, they did.  They responded "acknowledgment of

16   receiving" which would have -- they would have at that point

17   conducted their -- continued to conduct their investigation

18   at that time.  And then they responded to Mr. Daugherty on

19   April 19th.

20   Q.   Okay.  Well, let's go clear back to March 21 when he

21   faxed the letter in at Page 1716 of Plaintiff's Exhibit

22   Number 26.  What was the reason in his fax that this dispute

23   was raised?

24   A.   "Borrower states that a report from Equifax shows

25   incorrect details to the loan balance owed by borrower.

Sandra Lyew - Direct (Young)

1    Please report as per contractual status to all, to all four

2    bureaus."

3    Q.   And when did you say there was a response?  It would

4    have been in May, was it?

5    A.   April.

6    Q.   April what?  Could you help me with the page number?

7    A.   April 19th.

8    Q.   What's the page number there in the lower right-hand

9    corner?

10   A.   1723.

11   Q.   As a result of this letter faxed in by Mr. Daugherty

12   and the response by Ocwen, were there any changes made in

13   the reporting of Mr. Daugherty's credit history?

14   A.   Ocwen conducted, sent, sent an AUD to all four bureaus

15   to confirm that all four bureaus have the accurate and

16   correct information based on Ocwen's records.

17   Q.   I'm showing you what's been admitted as Plaintiff's

18   Exhibit Number 4.  And I think the testimony was that this

19   is what Mr. Daugherty faxed over at that time when he

20   talked, and then two days later sent the fax.  And you'll

21   see a big circle and an arrow where it says "inaccurate."

22   Do you see that?

23   A.   It's still blurry.  Do you have that exhibit?

24   Q.   I do, Exhibit 4.

25        MR. YOUNG:  I'm handing the witness Exhibit 4.

Sandra Lyew - Direct (Young)

1  BY MR. YOUNG:

2  Q.   And the last page of Exhibit 4 is this chart.  And I

3  think yours is much clearer.  Tell the jury -- that arrow is

4  pointing at a number that's blurry on what the jury and I

5  are looking at.  What's that number, past due number?

6  A.   The past due number is showing 61 -- $6,128.  And that

7  is under the Equifax section of this page.

8  Q.   Now, that is inaccurate information, isn't it?

9  A.   That is correct.

10 Q.   I am correct that this is inaccurate information.  Is

11 that your answer?

12 A.   Yes, based on the report date, Mr. Daugherty's

13 handwriting of 3-16, 2014.

14 Q.   And --

15 A.   This doesn't actually show -- identify the actual date

16 this was printed out as part of his proof.

17 Q.   Okay.  But it shows a payment history down at the

18 bottom for 2013, doesn't it?

19 A.   It does show that.

20 Q.   And it's circled and the word "inaccurate" and a bunch

21 of arrows are drawn on it; correct?

22 A.   That is correct.

23 Q.   Mr. Daugherty was not 120 days late in March of 2013,

24 was he?

25 A.   No, he was not.

Sandra Lyew - Direct (Young)

1    Q.    In fact, it's impossible for someone to be 120 days

2    late in March when they were current the previous November,

3    December, January, and February; correct?

4    A.    That is correct.

5    Q.    So this can't -- this makes no sense whatsoever, does

6    it?

7    A.    No, as well as we don't have control on how Equifax

8    reports.  We send the same report to all bureaus.  And,

9    obviously, according to this page, Experian, TransUnion

10   didn't have the same issue that Equifax did.

11   Q.    This information as it pertains to June, 2013, is

12   false; correct?

13   A.    At the time, yes.

14   Q.    And it's false as it pertains to July, 2013; correct?

15   A.    I'm sorry?  Say that again.

16   Q.    It's false insofar as it shows Mr. Daugherty in default

17   120 days in July of 2013; correct?

18   A.    Yes.

19   Q.    And it's false when it shows that he's 120 days late in

20   October and the same in December, isn't it?

21   A.    Based on this page, this document.

22   Q.    So there's arrows pointing to five different pieces of

23   false information; correct?

24   A.    Based on how Equifax reported, yes.

25   Q.    Well, according to Ocwen's own records, all of this

1  information would be false because he's, in fact, current,

2  paying on time the whole 2013?

3  A.   Per Ocwen's records, he was current at that time, yes.

4  Q.   Well, Ocwen received this from Mr. Daugherty.  What did

5  it do to fix this for him?

6  A.   It sent an AUD, which is like a factual report, to all

7  four bureaus detailing the whole account so that all the

8  CRAs were on the right, had the right, correct information.

9  And, obviously, Equifax still had it incorrect.  So we don't

10  have control on how, again, how they report.

11  Q.   But Ocwen never asked or never instructed Equifax to

12  delete this information and this tradeline which was false,

13  did they?

14  A.   Ocwen was not aware of two -- Equifax having two

15  tradelines.  We don't have that capability of knowing.

16  Q.   Ocwen -- Equifax was receiving two ACDVs one right

17  after another both with the same account number and one

18  showing current and one showing in default and foreclosure.

19      How could -- by this time, March of 2014, how could --

20  excuse me -- January of 2014, how could they possibly not

21  know that there was a problem that needs to be fixed with

22  respect to Mr. Daugherty?

23          MR. MANNING:  Objection, argumentative.

24          THE COURT:  The objection to argumentative is

25  sustained, counsel.  If you want to rephrase, you can.

Sandra Lyew - Direct (Young)

1   BY MR. YOUNG:

2   Q.   So is it your testimony that sending out this -- is it

3   AUD?

4   A.   AUD, yes.  It's Automated Universal Data.

5   Q.   And it told the three major credit agencies, or maybe

6   all four, that he was current; correct?

7   A.   That is correct.

8   Q.   And should that fix this problem?

9   A.   It should fix the problem.  It's universal to all four

10  bureaus.  Excuse me.

11  Q.   A couple days later, March 26th, the CFPB got involved

12  on behalf of Mr. Daugherty, didn't they?

13  A.   Yes.

14  Q.   Tell the jury who the CFPB is.

15  A.   The Credit Financial Protection -- yeah, Protection

16  Bureau.

17  Q.   This is a federal agency that monitors compliance with

18  credit reporting standards, isn't it?

19  A.   That is correct.

20  Q.   And they contacted Ocwen on behalf of Mr. Daugherty,

21  didn't they?

22  A.   That is correct.

23  Q.   And when they did, Ocwen sent a letter to Mr. Daugherty

24  saying, "We've received a request from the CFPB and we're

25  going to get right on it and check this out."  Is that

1  essentially what they did on March 26th, 2014, as shown on

2  Page 1720 of the notes?

3  A.   Yes.

4  Q.   So this universal data form was sent out to fix the

5  problem that we see on the screen from Exhibit 4.  But in

6  April, April -- if you'll go to 1726 which is at tab 9, two

7  more ACDVs from Equifax roll into Ocwen, 5124 and 5125;

8  correct?

9  A.   Yes.

10  Q.   And 5124, the first one noted "received on April 23rd,

11  2014, was investigated by a Rajina Robert or Robert Rajina."

12  Is that what the records show?

13  A.   Yes.

14  Q.   I'm going to have to show the date of April 23rd at

15  1:15:29.  And I'm going to slide over here and see what

16  Mr. Rajina did.

17      What the notes show of Ocwen is that his concern was

18  with reporting; correct?

19  A.   Yes, with a 106 code, "disputes present/previous

20  account status, payment history profile, payment rating."

21  And then it's telling Ocwen to verify payment history

22  profile, account status, and payment rating.

23  Q.   That's 11 different items that he's disputing; correct?

24  A.   Four.

25  Q.   Well, he's disputing present account status; right?

Sandra Lyew - Direct (Young)

1    A.    One.

2    Q.    Previous account status.

3    A.    Two.

4    Q.    Payment history profile.

5    A.    Three.

6    Q.    Payment rating.

7    A.    Four.

8    Q.    Asking that the, that payment be verified?

9    A.    And it's stating to the -- Equifax stating to verify

10   payment history profile, account status, and payment rating.

11   Q.    That's what Ocwen was going to do?

12   A.    That's what was -- that's the request that came through

13   from Equifax for us to verify.

14   Q.    And what did Mr. Robert Rajina do to check out this

15   dispute?

16   A.    It states "current account" and date of account

17   information, January 1st, 2013.

18   Q.    Well, explain to the jury what, --

19   A.    And the reporting --

20   Q.    -- what he did.

21   A.    The reporting to the bureau says "current account as of

22   March, 2014."

23   Q.    And, so, it came in at 15:29 hours -- or 1:15:29 and

24   back out at 1:15:40.  So that's eleven seconds there to --

25   elapsed time as shown by this document?

Sandra Lyew - Direct (Young)

1    A.    That the codes were entered into REALServicing.

2    Q.    And according to this document, one second later

3    another ACDV rolled in, this one being 5125; correct?

4    A.    Yes.

5    Q.    And I think I'm showing the jury 5125.  Same concern by

6    the borrower; correct?

7    A.    Yes.

8    Q.    And the reporting received from the credit bureau shows

9    120 days past due; correct?

10   A.    Yes.

11   Q.    So the ACDV that came in must have said 120 days past

12   due.  And this is what Mr. Rajani was going to investigate;

13   correct?

14   A.    Yes.

15   Q.    And he investigated it and said, "This account is

16   current."

17   A.    That is correct.

18   Q.    And he sent that back at 1:19:25.  I just want to see

19   the time stamp.  I'm sorry.  So the time stamps begin at

20   1:15:57 and the response goes out at 1:19:25.  Is that

21   right?

22   A.    That is the time the codes were entered into

23   REALServicing.

24   Q.    Were these entered by Robert Rajina whose name is next

25   to these time stamps?

Sandra Lyew - Direct (Young)

1   A.    Yes.

2   Q.    So two ACDVs came in and Mr. Rajina responded to both

3   of them; is that right?

4   A.    That is correct based on the dispute code 106.

5          MR. YOUNG:  May I see Exhibit 18?

6      May I hand the witness Exhibit 18?

7          THE COURT:  Yes, sir.

8   BY MR. YOUNG:

9   Q.    Do you have Exhibit 18?  I've marked my notes.  There

10  we go.  We were just talking, looking at the notes about the

11  control number ending in 5125.

12  A.    Yes.

13  Q.    And those were notes entered by Robert Rajina; is that

14  right?  When we looked at the notes it was Robert Rajina,

15  the one that investigated control number 5125?

16  A.    Yes.

17  Q.    And did Ocwen respond by asking Equifax to modify data?

18  A.    It responded stating that the account is current as of

19  March, 2014.

20  Q.    Would you look over at the screen and make sure we're

21  both looking at the same document, 5125?

22  A.    I'm here.

23  Q.    Okay.  Well, it says "modify as shown" is what's

24  checked; is that right?

25  A.    Yes, that's what's checked on Equifax's record.

Sandra Lyew - Direct (Young)

1  Q.   Okay.  And if we look down below in the "past due" box,

2  the past due amount goes from $6,128 down to $0.  Correct?

3  A.   That's correct.

4  Q.   And that would indicate that Robert Rajina replied to

5  the ACDV and said, "Change the past due to zero," wouldn't

6  it?

7  A.   Yes.

8  Q.   And as we move down the form, it would also show that

9  he changed the last payment date from January, 2012, to

10 March, 2014.  So that's what Ocwen asked Equifax to do;

11 correct?

12 A.   Yes.

13 Q.   And this document, in the narrative section under code

14 245 Ocwen reported or -- excuse me -- Equifax reported to

15 Ocwen that it was showing a foreclosure process started

16 under, next to code 245; correct?

17 A.   That is the code there, yes.

18 Q.   The code 245 has next to it "foreclosure process

19 started;" correct?

20 A.   Yes.

21 Q.   And it also has the notation of code 262, 120 days past

22 due; correct?

23 A.   Yes.

24 Q.   And in the next box isn't this what Ocwen told Equifax

25 to fix?

Sandra Lyew - Direct (Young)

1  A.   Again, --

2         MR. MANNING:  Objection, Judge, misstates the

3  testimony.  There was already a witness who talked about

4  those.

5         THE COURT:  Any response you want to give to the

6  objection, counsel?

7         MR. YOUNG:  No, Your Honor.

8         THE COURT:  I think that -- I'm going to allow her

9  to answer if she can, Mr. Manning.  I overrule the

10 objection.

11    Go ahead, please.

12        THE WITNESS:  If you can repeat the question,

13 please.

14 BY MR. YOUNG:

15 Q.   In the top box at the center of the screen where it

16 says "foreclosure process started," in the box below that

17 isn't that what Ocwen is telling Equifax to change?

18 A.   I don't know.  Again, this is Equifax's business record

19 and our ACDV form is not what, is not -- you have the left

20 side which Equifax as a credit reporting agency would input

21 their information, and the right side Ocwen would do that.

22 So, you know, this, again, is not in the same format as the

23 ACD form in the e-OSCAR.

24 Q.   So -- but we don't have the benefit of Ocwen's version

25 of this document.  So you're telling me that on Ocwen's

Sandra Lyew - Direct (Young)

1   version of this document it wouldn't say "foreclosure

2   started;" is that right?

3   A.   Again, our records indicated that the account was, was

4   always reported accurate as far as current.  And in this

5   case it was responded to as current to -- responded to the

6   ACDV through, to Equifax as the account is current as of

7   March, 2014.

8   Q.   But if we actually had the Ocwen records of its

9   response to ACDV 5125, it wouldn't have anything about

10  foreclosure like this crazy Equifax form; right?

11  A.   No, not that I know of, not for Ocwen's responses.

12  Q.   Well, let's look down at the bottom.  And I see XR,

13  compliance condition code.  They're removing something

14  there.  Who put -- who filled in that line?  Equifax or

15  Ocwen?

16  A.   I don't know.

17  Q.   The code BO, "foreclosure proceedings started," who

18  filled that line in?

19  A.   Again, this is Equifax's business record.  So based on

20  their notes, I can't identify.  I can only identify what's

21  stated in the comment log unless I have, unless I have the

22  actual copy of the ACD form for this.

23  Q.   So the line before -- underneath "foreclosure

24  proceedings started," isn't that a line where Ocwen can

25  correct this information and take that off if it's not

1   correct?  Isn't that the purpose of that blank line right

2   underneath "foreclosure proceeding"?

3   A.   If you can rephrase that question, please.

4   Q.   I have indicated with the point of my pen on the screen

5   a blank line underneath the BO, "foreclosure proceedings

6   started," notation.  And I'm asking you isn't it true that

7   the purpose of providing that space there is for Ocwen to

8   respond whether or not this foreclosure proceeding notation

9   is correct?

10  A.   Ocwen has a section in the ACDV form that they, they

11  will respond.  This -- you're talking about, again, an

12  Equifax business record and this is their format.

13  Q.   Would you agree same data, different format?

14  A.   I'm sorry?

15  Q.   Would you agree that the only difference between

16  Equifax's version and Ocwen's version is how it's formatted,

17  how the numbers are arranged on a page?

18  A.   Through e-OSCAR to an extent.  I mean, again, how,

19  how -- I would have to see the actual ACD form for, to

20  identify that, that these actual codes were placed.

21  Q.   Well, let's look at the last one.  Doesn't -- where the

22  pen point is on the screen there's a code 82, account 120

23  days past the due date.  And below it is a code 11, current

24  account.

25       Isn't that -- doesn't that mean that Ocwen reported it

Sandra Lyew - Direct (Young)

1   or -- excuse me -- Equifax reported it 120 days past the due

2   date and Ocwen corrected it with a code 11 to make it a

3   current account?

4   A.   Based on the transaction history, there is an 11, a

5   code 11, current account, as of 3-14 -- 3, 2014 I mean.

6   So --

7   Q.   Are you agreeing with me that the second line here,

8   code 11, would be an input into this system by Ocwen to

9   correct an inaccuracy?

10  A.   Again, they have a code 11 in the transaction history.

11  How it's inputted into the system, where it's inputted I can

12  only match the code 11 to the code 11 that's on the

13  Equifax's business record.

14  Q.   And you won't concede that where it -- where there's a

15  space provided below "foreclosure proceedings started" that

16  that space is to enable Ocwen to correct that misstatement?

17          MR. MANNING:  Objection, Judge.

18          THE COURT:  Basis?

19          MR. MANNING:  A number of times he's asked this.

20  She said she can't interpret somebody else's document.

21          THE COURT:  Well, that's not her answer to this

22  question.  He's asked her if she would not concede it.  I

23  overrule the objection.  She can answer that question "yes"

24  or "no."

25          THE WITNESS:  Counsel, can you ask that question

Sandra Lyew - Direct (Young)

1    please again?

2    BY MR. YOUNG:

3    Q.    Will you concede that the blank line below "foreclosure

4    proceedings started" is a place for Ocwen to indicate

5    whether or not that foreclosure notation is correct?

6    A.    That's possible.  I mean, I can, I can also identify

7    that the account was once in foreclosure, and I can assume

8    that was blank because that part was accurate at one point.

9    Q.    So you're telling this jury right now that all of a

10   sudden this "foreclosure proceedings started" that's showing

11   up on an ACDV goes way back to 2011 or 2012 when Ocwen

12   acquired this loan, mortgage from Litton?  Is that what your

13   testimony is?

14   A.    That is correct.  The loan was in default when the loan

15   transferred to Ocwen.

16   Q.    The date of the account information is either March or

17   April, 2014.  That's not valid information, "foreclosure

18   proceedings started," is it?

19   A.    It's identifying that the account is current as of

20   March, 2014.

21   Q.    I'm looking at these two points here.

22   A.    Your exhibit which was the transaction history from

23   March 20th -- I mean March -- April 30th, 2013, down to

24   August 1st, 2014, the account was current at that time.

25   Q.    So we are just looking at -- we were just looking at

Sandra Lyew - Direct (Young)

1   5124 and 5125, these documents that came from Equifax;

2   correct?

3   A.   Yes.

4   Q.   And as the spokesman for Ocwen here at this trial, you

5   want to disavow any involvement of Ocwen in responding to

6   this form and confirming foreclosure.  Is that a fair

7   summary of your testimony?

8   A.   Can you repeat that question, please, or rephrase it I

9   should say?

10  Q.   Let me ask it this way.  This form 5125 that's on the

11  screen which is an Equifax document, according to you, shows

12  that Robert Rajina responded and left the "foreclosure

13  proceedings started" code on there, didn't ask that it be

14  taken off.  Is that correct?

15  A.   That's what's showing on the Equifax's form,

16  "foreclosure proceedings started."  And it left -- and if

17  you -- below it, it is blank.

18  Q.   So it wasn't corrected, was it?

19  A.   With the one tradeline.  Keep in mind that the borrower

20  was once in foreclosure.  Foreclosure proceedings had

21  started.  And then he brought the loan current and has been

22  current since the loan was reinstated.

23       So if a code -- and this is advising that the, the

24  account is current now.  And Ocwen has been reporting it

25  accurately from the time it was -- from the time

Sandra Lyew - Direct (Young)

1    foreclosure -- it was in default to the time it was current

2    until present.  Why would -- by it showing "foreclosure

3    proceedings started," that did take place at one point.

4    Q.   But that's not the present condition.  That shouldn't

5    be reported on someone's credit that there is an active

6    foreclosure going on right now, should it?

7    A.   It was back in 2012.

8    Q.   But the date of the account information is March of

9    2014 or April of 2014.  Now, he wasn't in foreclosure then,

10   was he?

11   A.   That's why the account status is showing current.

12   Q.   It's been changed from account 120 days past due to

13   current; correct?

14   A.   He's been current since the loan has been reinstated

15   in, I believe, 2012.

16   Q.   But the ACDV received by Ocwen showed him 120 days late

17   and here they corrected it to show current; correct?

18   A.   It's showing as a current account.  However, again,

19   Ocwen has reported accurately to all bureaus the current

20   status of, of this individual.  And, again, we don't have

21   control on how Equifax reports their tradeline.

22   Q.   So Ocwen did not take this opportunity to correct the

23   foreclosure proceeding entry to show that it wasn't in

24   foreclosure, did it?

25   A.   The borrower -- I should say Mr. Daugherty was in

1    foreclosure, and foreclosure proceedings have started at one

2    point.  So my analyzation identifies that it remains there

3    because that was accurate information in 2012.

4    Q.   Well, then, why doesn't it appear on the other ACDV

5    which shows the account current and was confirmed?  Time

6    after time the current account has been affirmed without any

7    foreclosure notation on it.  Yet, simultaneously Ocwen was

8    confirming foreclosure.  Isn't that true?  Isn't that what

9    we went over with all of these ACDVs that I have listed

10   here --

11          MR. MANNING:  Objection, argumentative.

12   BY MR. YOUNG:

13   Q.   -- in green?

14          THE COURT:  Objection overruled.

15          THE WITNESS:  Again, it falls back to we don't

16   have control on how Equifax --

17          MR. MANNING:  Objection, Judge.  This document I

18   don't believe is in evidence and shouldn't be published.

19          MR. YOUNG:  It's a demonstrative exhibit, Your

20   Honor.  It's just a summary.

21          THE COURT:  There's an objection to it?

22          MR. MANNING:  Yes, Your Honor.

23          THE COURT:  All right.  Unless you all want to

24   feather through an objection, I will order that it not be

25   disclosed to the jury until the objection is resolved.

Sandra Lyew - Direct (Young)

1  Go ahead, please.

2  BY MR. YOUNG:

3  Q.  What we've done starting in March of 2013, June of '13,

4  July of '13, October, December of '13 and January of '14 is

5  we've looked at two sets of ACDVs received simultaneously by

6  Ocwen; correct?

7  A.  You showed me Equifax's business record.  Anything else

8  I've identified came from Ocwen's comment log.

9  Q.  And every one of those Equifax records correlates to

10  the log, correct, in terms of matching numbers, matching

11  investigator, matching dates?  Correct?

12  A.  Yes.

13  Q.  Here again is 5125, the control number on a document

14  that shows that it was verified that my client was in

15  foreclosure; is that correct?

16  A.  That's what the document is stating.

17          THE COURT:  I'm sorry, I didn't hear your answer.

18          THE WITNESS:  That's what the document states,

19  yes.

20          THE COURT:  All right.

21  BY MR. YOUNG:

22  Q.  And does this dispute code up here, 007, does that

23  match the dispute code in these notes in the white binder?

24  A.  No, but the verbiage does say the same thing.

25  Q.  Well, what do we have here showing on the screen right

Sandra Lyew - Direct (Young)

1   now?

2   A.   Can you provide me that exhibit, please?

3   Q.   I'm handing you the document, a portion of which is

4   showing on the screen.

5   A.   Okay.  And your question is?

6   Q.   What is this document?

7   A.   This is the ACDV form that is completed through e-OSCAR

8   automated system to the credit reporting agency.

9   Q.   So this depicts what data Equifax sent to Ocwen and

10  what Ocwen sent back; correct?

11  A.   Yes.

12  Q.   The exact same thing that was shown by every one of

13  those Equifax documents that we've viewed here today;

14  correct?

15  A.   The form, yes.  And this is dated -- the response is

16  dated on this one April 24, 2014.

17  Q.   What's the control number end in?

18  A.   This is saying 5125 ending four digits.

19  Q.   The same as the one we just looked at from Equifax;

20  correct?

21  A.   Yes.

22  Q.   There it is.  We just looked at the Equifax 5125 and

23  now we have before us the version with the same data by

24  Ocwen; is that right?

25  A.   Similar, yes.

Sandra Lyew - Direct (Young)

1    Q.    Control number 16 digits long, ends in 5125; correct?

2    A.    I did respond, yes, earlier.

3    Q.    The control number on the Equifax version 16 digits

4    ending in 5125; correct?

5    A.    Yes.

6    Q.    The subscriber code on the Equifax version ends in

7    1690; correct?

8    A.    Yes.

9    Q.    And the subscriber code on the document in your hand is

10   the same subscriber code, isn't it?

11   A.    Yes.

12   Q.    And is the loan number, 4537, on one the Equifax

13   version and the same loan number on the Ocwen version?

14   A.    Yes.

15   Q.    These are mirror images of each other with the data

16   placed in other spots on the form, isn't it?

17   A.    Yes.

18   Q.    So all of these Equifax forms we looked at so far, we

19   didn't have the counterpart from Ocwen.  But now that we

20   have both of them before you and the jury, you'll concede

21   that it's basically the same data, just arranged

22   differently?

23   A.    Yes.

24         THE COURT:  Counsel, the document that you have up

25   now, has it been admitted?

Sandra Lyew - Direct (Young)

1        MR. YOUNG:  Your Honor, at this time --

2        THE COURT:  The clerk has not published it because

3   she didn't know what you were referring to.

4        MR. YOUNG:  Okay.  I'm going to go ahead and move

5   the admission of what's been marked as Plaintiff's Exhibit

6   27 which is a series of the ACDVs provided through discovery

7   by Ocwen that correspond to the remaining ACDVs that have

8   already been admitted into evidence.

9        THE COURT:  Plaintiff's Exhibit Number 27, Mr.

10  Manning, is there an objection?

11       MR. MANNING:  I'm sorry, Judge, no objection.

12       THE COURT:  Plaintiff's Exhibit 27 will be

13  admitted into evidence without objection and can be

14  published.

15       MR. YOUNG:  Thank you, Your Honor.

16  BY MR. YOUNG:

17  Q.   I'm just going to go back to the same page we've been

18  on, ma'am.  I didn't realize the jury wasn't seeing this.

19  So let's do a quick recap.  Control number 5125 on the one,

20  5125 on the other; correct?

21  A.   Yes.

22  Q.   Account number 4537 -- it's on here somewhere.  Oh,

23  account number 4537; name, David Max Daugherty; name, David

24  Max Daugherty; investigator, Robert Rajina; response date,

25  4-24-14.  That matches, doesn't it, with the Robert Rajina

Sandra Lyew - Direct (Young)

1    and the response date of 4-24-14 shown on the Ocwen version

2    of the form?  Correct?

3    A.    Yes.

4    Q.    These are mirror images of each other, aren't they?

5    A.    Yes.

6    Q.    Now, Ocwen uses dispute code 007 for "disputes

7    current/previous account status," et cetera, correct,

8    according to this form?

9    A.    Equifax.

10   Q.    I'm sorry, Equifax, yes.

11   A.    Yes.

12   Q.    Okay.  And Ocwen actually uses 106 for that same

13   dispute code; correct?

14   A.    Yes.

15   Q.    So -- but it is actually the same verbiage after the

16   106; correct?

17   A.    Yes.

18   Q.    So somehow Ocwen received this information from Equifax

19   and pushed it into its own format.  We now have mirror

20   images of the same document which we didn't have for all of

21   the earlier ones.  But starting this month, we actually have

22   the mirror image, don't we?

23   A.    With the same fields which is what I meant by

24   "mirroring."

25   Q.    Well, let's look at this field down at the bottom of

Sandra Lyew - Direct (Young)

1    the Ocwen form.

2    A.    This is the e-OSCAR form.  This is how -- this is the

3    e-OSCAR form of the communications to all bureaus.  Ocwen

4    did not create this form.

5    Q.    Well, this specific form, though, is a specific

6    response by Ocwen to an ACDV received from Equifax; correct?

7    A.    This is -- yes, this goes -- this is responded through

8    the e-OSCAR system back to the CRA.

9    Q.    Okay.  And let's look down at this bottom box.  The

10   request data -- I've got my pen pointed to it there -- this

11   is what Equifax is asking Ocwen to either confirm or verify

12   or modify; is that right?

13   A.    Yes, based on the dispute code.

14   Q.    Okay.  So Equifax says, "We're showing this 120 days

15   past due."  And Ocwen is on its toes and it says, "Oh, no,

16   the response shows this as current."  Isn't that what we see

17   here?

18   A.    It identifies that the account is current.

19   Q.    But what's in the gray, that's what was added to the

20   data by Ocwen in responding back to Equifax; correct?

21   A.    In the gray section, yeah.

22   Q.    Okay.  So here Ocwen fixed it from being 120 days past

23   due, the due date, to a code 11 current account; right?

24   A.    It modified.

25   Q.    Okay.  And that's what's called --

Sandra Lyew - Direct (Young)

1    A.    Response data.

2    Q.    Well, but that's the account status.

3    A.    The account status.

4    Q.    Okay.  So it went from 120 days past due to current;

5    right?  Now, how about down here, the MOP, manner of

6    payment; right?

7    A.    I see that.

8    Q.    Okay.  And MOP does mean manner of payment, doesn't it?

9    A.    Sounds to be correct.

10   Q.    Some people say method of payment.  But I think it's

11   actually manner of payment.  But, in any event, let's go

12   over and look at what Equifax was asking whether or not this

13   is true.

14       Equifax is saying, "We show this as an 05, pays over

15   120 days, five or more payments past due."  That's the

16   method of payment or manner of payment that Equifax sent

17   over to Ocwen and said, "Is this right or is this wrong?"

18   Correct?

19   A.    Equifax's request data indicates that, yes.

20   Q.    Equifax is asking, "Is this account 120 days

21   delinquent, five or more payments past due?" and sends that

22   over to Ocwen and Ocwen responds.  Correct?

23   A.    Ocwen's response doesn't have anything there.

24   Q.    Okay.  And because Ocwen didn't change anything in the

25   gray field, this MOP sticks to the account.  And, so, no

1   matter how many times they take off the 120 days past due up

2   in "account status" and Ocwen did change it to "current," as

3   long as the method of payment or manner of payment code is

4   on there, Ocwen just verified back to Equifax that

5   Mr. Daugherty is five or more payments behind, didn't they?

6           MR. MANNING:  Objection, calls for speculation.

7           THE COURT:  Response, Mr. Young?

8       Mr. Young, is there a response to the objection?

9           MR. YOUNG:  I'm sorry, Your Honor.  I, I just

10  asked -- she was able to correctly respond to the previous

11  question with respect to the request data as opposed to

12  response data.  And I was asking her about the request data

13  which she conceded.  And I'm asking if the response data

14  shows that Ocwen did not respond to that inquiry.

15          THE COURT:  Counsel, I overrule the objection.

16  The question, I believe, has been altered a little, but I

17  believe that the question was directed to whether or not she

18  could garner the information from the documents that she

19  viewed.

20      And, Mr. Manning, I overrule the objection.  I do not

21  believe it's based on speculation necessarily.

22      Go ahead, please.

23          THE WITNESS:  Okay.  It left that section blank.

24  The borrower was 120 days or more past due in 2012.  So the

25  current account status is marking as current.  However,

Sandra Lyew - Direct (Young)

1   Ocwen is not going to advise the credit bureau to remove the

2   120 days that the borrower was past due in 2012.

3   BY MR. YOUNG:

4   Q.   This is based upon current data, isn't it?   Okay.   I

5   found it.   A second page of that document -- the date of the

6   account information was March 24, 2014, corrected to

7   April 24, 2014, by Ocwen; correct?

8   A.   Yes.

9   Q.   And in April of 2014 Mr. Daugherty was not 120 days

10  late or five or more payments past due, was he?

11  A.   Not in 2014.   In 2013 he had one -- there was one 30

12  days late in March reported, in March for 2013.

13  Q.   I didn't ask you about 2013.   I'm asking you about this

14  report sent to Ocwen which says "five or more payments

15  behind."   And you want to identify for me a late payment in

16  March of 2013.   I'm talking about five or more payments past

17  due.

18       Ocwen allowed this to remain on the credit report as --

19  based upon the current data that we just showed you;

20  correct?

21  A.   The dispute code asks for a payment -- to verify

22  payment history.   That's what was done.   A payment -- full

23  payment history from the time Ocwen acquired the servicing

24  to present of 2014.

25  Q.   What is this SCC code at the top of the second page of

Sandra Lyew - Direct (Young)

1    the document we're looking at?

2    A.    I don't know.

3              THE COURT:  Mr. Young, when you find a convenient

4    place, I'll give the jury a break.

5              MR. YOUNG:  This is convenient, Your Honor.

6              THE COURT:  They've been in the box about an hour

7    and 40 minutes I believe.

8         Ladies and gentlemen, we're going to break.  While

9    you're out, do not discuss this case among yourselves or

10   permit anyone to discuss it with you or in your presence.

11   And please be in your jury lounge at half after the hour.

12        We'll stand in recess.

13        (Recess taken from 3:10 p.m. until 3:31 p.m.)

14             THE COURT:  Mr. Young.

15             MR. YOUNG:  Thank you, Your Honor.

16   BY MR. YOUNG:

17   Q.   I believe just before the break I asked you about the

18   SCC on the top of the form that's on the screen.  Let me

19   help you out there.  Isn't that the special comment code,

20   SCC?

21   A.   Again, I said I don't know.

22   Q.   Okay.  Well, we heard testimony from a witness that

23   was, testified to this jury as an expert.  And he told the

24   jury that the special comment code, or the SCC, was for

25   current relevant information.  You don't know whether that's

Sandra Lyew - Direct (Young)

1   true or not, do you?

2   A.   No, I don't know.

3   Q.   But a foreclosure that happened before Ocwen ever had

4   the loan would not be current relevant information, would

5   it?

6   A.   Can you repeat that question, please?

7   Q.   A foreclosure that happened before Ocwen ever even

8   acquired this loan wouldn't be important relevant

9   information when this ACDV was responded to, would it?

10  A.   No.  The Ocwen -- the loan came, was transferred over

11  to Ocwen delinquent and foreclosure proceedings did begin at

12  that time.

13  Q.   And the foreclosure was cured.  Mr. Daugherty brought

14  his account current.

15  A.   When the loan -- after the loan transferred over to

16  Ocwen.

17  Q.   Okay.  But as I understand your testimony, the reason

18  this BO code of "foreclosure proceedings started" is there

19  is because it's true back in 2012 there was a foreclosure

20  proceeding.  Is that, is that why that's on there and that

21  is true?

22  A.   That is correct to my knowledge.

23  Q.   So whenever there's a response to an ACDV by Ocwen back

24  to anybody, including Equifax, they would be sure to note

25  this because that's -- even though it's -- in terms of

Sandra Lyew - Direct (Young)

1    credit, I would characterize it as ancient history.  You

2    believe that it should be there.  Right?

3    A.    It's not about what I believe.

4    Q.    Well, you believe as the corporate spokesman for Ocwen

5    that it is correct to leave that "foreclosure proceedings

6    started" after the SCC that's on the top line of the

7    document before you; correct?

8    A.    It identifies the payment, part of the payment history.

9    Q.    Okay.  And then because it's supposed to be there,

10   there's no reason for it to be removed over in the gray

11   section where Ocwen's responding back to Equifax; right?

12   A.    Based on how it was response, that --

13   Q.    Okay.  And while we're at it, your loan history never

14   goes away.  It stays on there for, what, eight years or so;

15   is that right?

16   A.    To my knowledge, it's 10 years now.

17   Q.    All right.  Well, but the loan history is on this form

18   clear back to, to 2011 when there were some delinquencies.

19   All that history is still there; right?

20   A.    Ocwen acquired the loan late 2011.

21   Q.    Okay.  So the loan history still stays there.  But what

22   I'm asking you is should this "foreclosure proceedings

23   started" code still be on his credit in 2014?  And as I

24   understand it, your testimony is, yes, that's right, it

25   should be there.

Sandra Lyew - Direct (Young)

1   A.   Based on the, based on the, the associate that

2   completed this, that's why nothing was done.

3   Q.   Okay.  And who was that fellow?  Robert Rajina?

4   A.   Rajina Robert.

5   Q.   Okay.  So that should have been there.  It was

6   important.  And that's why it's there.  But let's look at

7   the, the companion ACDV that came in along with 5125 that we

8   just looked at.  This one is 5124.  And do you have the --

9   you don't have the book with the document in it?

10  A.   No, I don't.

11  Q.   Okay.  Let me give that to you.  It's now been admitted

12  into evidence and let me turn it to the right page for you.

13      I'm handing You Plaintiff's Exhibit 27 and it's open to

14  Page 1343, counsel.

15      Now, this is the companion to what we just went over.

16  It came into Mr. Rajina within seconds of the other one.  Is

17  that right?

18  A.   It came in the same day.

19  Q.   Well, actually, within seconds when we go back and look

20  at the notes.

21  A.   If you're, if you're going by time, then, yes, in the

22  comment log, fine.

23  Q.   Well, what I'm -- yeah, I was going by time.  Okay.  So

24  we're done with that one.  Let's look at this one.  This one

25  again is control number 5125.  We just looked at 5124.

Sandra Lyew - Direct (Young)

1   A.   No, they're both the same, 5125.

2   Q.   Okay.  Let me see.  We just finished with 5125.  I'm

3   sorry.

4   A.   I'm, I'm to your page.

5   Q.   Okay.  Now we're going to look at 5124.  Again, it's

6   Mr. Robert Rajina; correct?

7   A.   Yes.

8   Q.   Same account number, same subscriber number, same

9   borrower; correct?

10  A.   Yes.

11  Q.   And down in the important part it's showing he's

12  current.  And over in the gray it was confirmed as current;

13  the payment rating current.  There's no need to change it so

14  there's no need to put anything in the gray.  And when you

15  get down to the method of payment, "as agreed, not more than

16  one payment past due."  That's correct.  So there's no need

17  to change it.  Right?

18  A.   Yes, I see that.

19  Q.   Okay.  Now, let's go to the second page and look at the

20  special comment code that's so important that Ocwen report

21  it correctly.  Here Mr. Rajina -- there is no special

22  comment code that he's in foreclosure on this one, is there?

23  A.   No.  Equifax did not place that information there.

24  Q.   Well, but Mr. Rajina just confirmed one that said

25  "foreclosure proceedings started" and one that didn't;

Sandra Lyew - Direct (Young)

 1  right?

 2              MR. MANNING:  Objection, misstates the testimony.

 3              THE COURT:  The objection to it misstating the

 4  testimony is overruled, Mr. Manning.

 5              THE WITNESS:  There is nothing that Equifax has

 6  stated in the SCC comment nor anything was responded.

 7  BY MR. YOUNG:

 8  Q.   I'm going to overlay these two documents in looking at

 9  the SCC, the special comment code on both.  Wouldn't you

10  agree that Ocwen is sending mixed signals to Equifax?

11  A.   Ocwen never responded to either one of them.

12  Q.   And by not responding, it leaves them as is, doesn't

13  it?

14              MR. MANNING:  Objection, misstates the testimony,

15  Judge.  She said they respond to the dispute.

16              THE COURT:  Well, she can answer the question.  It

17  doesn't misstate the testimony.  Again, I overrule the

18  objection.  Go ahead, please.

19              THE WITNESS:  I don't know.  Again, it was never

20  responded.  When Equifax stated an SCC comment, Ocwen did

21  not respond to that, as well as the, the most current one

22  you're talking about, the 5124.  There is no comment, SCC

23  comment there nor did Ocwen respond to that.

24  BY MR. YOUNG:

25  Q.   So you wouldn't agree that this is sending mixed

Sandra Lyew - Direct (Young)

1  signals as I suggested?

2  A.    I don't know.  I mean, again, it goes back to the

3  dispute information code to verify payment history profile,

4  account status, and payment rating.

5  Q.    Well, payment history is:  Are you current or are you

6  behind; correct?

7  A.    Payment history is identifying account history which is

8  showing on Page 2.  So it's providing a payment history from

9  the time Ocwen started servicing the loan to the present

10 time in 2014.

11 Q.    Well, let's overlay both ACDVs for April of 2014 when

12 we look at the manner of payment.  And, again, I'll ask you

13 a similar question.

14      Isn't Ocwen sending misinformation to Equifax when it

15 confirms that the account is current in the one form and on

16 the other form it changes 120 days past due to current?  But

17 down in the method of payment it's still five or more

18 payments past due and that has not been changed, has it?

19 A.    No, nothing has been changed.

20 Q.    Okay.  So he can't be paying as agreed, not more than

21 one payment due, and five or more days past due

22 simultaneously, can he?

23 A.    Seems to me Equifax has their information incorrect and

24 is providing mixed information to Ocwen as Ocwen, again, has

25 reported accurately to all bureaus.

Sandra Lyew - Direct (Young)

1  Q.  But this is what Equifax -- "as agreed, not more than

2  one payment due," and "pays over 120 days late, five or more

3  payments past due," that's what they sent over to Ocwen and

4  said, "Please verify this."  And by leaving them both alone,

5  they both stayed on my client's credit.  Correct?

6          MR. MANNING:  Objection, misstates the testimony.

7          THE COURT:  The objection to misstating testimony

8  is overruled.  She can answer the question, counsel, based

9  on the documents that she has before her.

10          THE WITNESS:  Can you ask the question again,

11  please?

12  BY MR. YOUNG:

13  Q.  What Equifax is asking Ocwen to confirm on the one ACDV

14  is that he pays as agreed and not more than one payment

15  behind, and Ocwen let that stand.  But they also ask him to

16  confirm the 120 days past due and five or more days, five or

17  more payments past due and they let that information stand

18  also.  Is that correct?

19  A.  I do see that.  It's blank.

20  Q.  Well, and you've turned my analogy around when you

21  suggested that Equifax is sending mixed signals to Ocwen;

22  right?

23  A.  They're sending two -- I mean, if you want -- if you're

24  trying to get my opinion, then, again, I don't see anything

25  inaccurate as far as what is being provided to verify.

Sandra Lyew - Direct (Young)

1  Again, we report to all three bureaus.  We report

2  accurately.  I can't, I can't answer for Equifax to the

3  reason why they had two tradelines for Ocwen when Ocwen only

4  reports to -- for one loan number.

5  Q.  We're not talking about reporting.  We're talking about

6  responding to ACDVs.  And this one right here that I

7  circled, that's wrong, dead wrong, false; correct?

8  A.  Again, it falls back to the -- Mr. Daugherty was 120

9  days past due at one time.  And the account history

10 identifies that.  So if -- my analogy is if the, if the

11 associate is providing the information -- providing the

12 dispute code, verify payment history and account status

13 profile based on that history, the account history

14 identifies that the borrower, Mr. Daugherty, was 120 days

15 past due based on the payment history.

16 Q.  Okay.  Well, I'm not quite sure I follow you, but here

17 I've circled both of them.  And I just want you to explain

18 to the jury how you can as a spokesman for Ocwen reconcile

19 these two contradictory bits of information.  Just tell the

20 jury how you as a spokesman for Ocwen can reconcile that.

21       MR. MANNING:  Objection, asked and answered.

22 She's already explained.  They're responding to the dispute

23 code.  That's not within the dispute code.

24       THE COURT:  I overrule the objection, counsel. I

25 do so because she is a 30(b)(6) witness of the defendant's.

Sandra Lyew - Direct (Young)

1   If this were cross-examination, he would be able to repeat

2   questions.  It's a means of testing credibility.

3       The fact that she is a representative of a party, I'm

4   going to permit it for that reason.  And I preserve again

5   Ocwen's objection and exception to my ruling.

6       Let's move forward, please.

7   BY MR. YOUNG:

8   Q.   I asked the witness to explain to the jury how she

9   could reconcile those two contradictory statements.

10  A.   I can't.

11  Q.   And in the same manner, you cannot reconcile the

12  special comment code which is blank in one and "foreclosure

13  proceedings" started in the other, can you?

14  A.   No.

15  Q.   Look at -- turn to tab 10 in your notes maintained by

16  Ocwen.  There are -- two more ACDVs roll in, 7122 and 7123,

17  correct, on May 4, 2014?

18  A.   Yes.

19  Q.   And the same employee, Robert Rajina, responds to both;

20  correct?

21  A.   Yes.

22  Q.   And his response to one ending in 7123 is, "Borrower

23  has signed the note, hence responsible, Social Security

24  number matches."  That's the thorough investigation

25  conducted by Mr. Rajina on behalf of Ocwen to this ACDV;

Sandra Lyew - Direct (Young)

1  correct?

2  A.   For the dispute code 001, "not his/not hers, provide or

3  confirm complete ID."

4  Q.   Okay.  Now, everybody knows that there's two accounts

5  reporting, one current and one in foreclosure; correct?

6           MR. MANNING:  Object to the form.  At what time?

7           THE COURT:  Response to the objection, counsel?

8           MR. YOUNG:  Well, I can specify the time as being

9  the time this document was generated.

10           THE COURT:  All right.  The question is being

11  modified.  Let's go toward with an answer, please.

12           THE WITNESS:  And we're still on control number

13  7123?

14  BY MR. YOUNG:

15  Q.   Yes, the one that's on the screen before you.  And let

16  me ask the question again.  What they're investigating is

17  that it's not his or hers; correct?

18  A.   That's what was investigated.

19  Q.   Yeah.  Well, only one of those accounts, the account

20  that was current, was Mr. Daugherty's; correct?

21  A.   We only have one loan number for Mr. Daugherty.

22  Q.   And we all know Mr. Daugherty was current at this time;

23  correct?

24  A.   And I mentioned earlier that we're not aware of two

25  tradelines for the same account for Equifax.

Sandra Lyew - Direct (Young)

1   Q.   My question was confirm that he was current at the time

2   this document was generated.

3   A.   May 4th, 2014, yes.

4   Q.   Had been current for the past year; correct?

5   A.   Yes.

6   Q.   And if there's two tradelines reporting, one of them is

7   his, the one that says he's current because he is.  The

8   other one can't be his, can it?

9   A.   Again, we've only reported to one tradeline that we

10  have in our records.  And that's how it is reported to all

11  bureaus each month.

12  Q.   But here simultaneously an employee from Ocwen received

13  two ACDVs for the same gentleman, the same loan number, and

14  he confirmed one was in foreclosure and the other was

15  current; correct?

16        MR. MANNING:  Objection, misstates the testimony.

17        THE COURT:  The objection to misstating testimony

18  again is overruled.  The question, in other words, counsel,

19  doesn't assume any testimony.

20     Go ahead, please.  You all -- you can answer, ma'am.

21        THE WITNESS:  There is two ACDVs, one showing

22  current and the other showing 120 days past due.  However,

23  it's still on one account.  We don't have two of the same

24  accounts for Mr. Daugherty.  And it's responded to the same

25  way.

Sandra Lyew - Direct (Young)

1  BY MR. YOUNG:

2  Q.   Shouldn't Mr. Rajina by now who is the seventh -- I

3  think the seventh person that's looked at these dual sets of

4  ACDVs, to do a thorough investigation shouldn't he try to

5  reconcile what's being presented to him and not merely

6  confirm opposite conclusions, current and in default?

7  A.   If our records indicate that we've been reporting

8  accurately, then we don't have control of Equifax which I

9  feel that they should have done their investigation because

10 they're the ones that -- they're the only credit bureau or

11 credit agency sending the same thing to Ocwen.

12      And Mr. Daugherty in one of the response letters from

13 Ocwen advised that we don't have control on how the credit

14 bureaus report and that they need to direct their, their

15 dispute with the credit bureau directly because Ocwen has

16 been reporting correctly.

17 Q.   It may have been reporting correctly, but it wasn't

18 responding to ACDVs correctly, was it?

19 A.   Again, based -- everything is based on, based in our

20 system and based on our records.  Our records indicate,

21 again, that this information was accurately reported

22 correctly to all bureaus.

23 Q.   So isn't your response pretty much which came first,

24 the chicken or the egg; that you think it's Equifax's fault

25 for sending over faulty information?  Is that right?

Sandra Lyew - Direct (Young)

1    A.   I feel that Equifax should have conducted their

2    research -- their own investigation on why they keep sending

3    the same thing since Ocwen has been reporting the same

4    information to them each month.

5    Q.   Well, you keep wanting to go back to monthly reporting.

6    And I want to stick to ACDVs because it's ACDVs that trigger

7    the responsibility of Ocwen to conduct an investigation.

8    Correct?

9    A.   Okay.  And then it falls back to the dispute code based

10   on how Equifax sent over their dispute request, "not

11   his/hers, provide or confirm complete ID."  And that is what

12   is -- that's what's been verified based on what the dispute

13   information is requesting.

14   Q.   Equifax sent two conflicting ACDVs over, one showing

15   him current and one showing him in foreclosure; correct?

16   A.   Based on your, based on your exhibits, yes.

17   Q.   Well, first, they aren't my exhibits.  We have the

18   Equifax exhibits that we've been looking at.  Correct?

19   A.   Yes.

20   Q.   And we have the Ocwen mirror image that we've been

21   looking at for these most recent.  And they both show that

22   when Equifax sends over two pieces of information, faulty or

23   not, both of them are getting verified by Ocwen; correct?

24        MR. MANNING:  Objection, asked and answered.  It's

25   cumulative.

Sandra Lyew - Direct (Young)

1          THE COURT:  Any response to the objection,

2    counsel?

3          MR. YOUNG:  Well, it may be cumulative, Your

4    Honor, but that's sort of the -- one of the theories of the

5    case here is that it happened 12 times.

6          THE COURT:  Well, that question has been asked

7    over and over and over again.  And, again, because she's a

8    30(b)(6) representative, I will give you some leeway.  But

9    I'm going to sustain this objection given the number of

10   times that question has been asked, counsel.

11         MR. YOUNG:  Okay.

12   BY MR. YOUNG:

13   Q.   Well, we, we've talked about May.  Let's go to June of

14   2014 and I'll abbreviate this a little.  Two more ACDVs come

15   in, June 20th, 2014, tab 11.  Have you found the June 20,

16   2014?  I may have misdirected you.  Let's jump way ahead to

17   tab 14.

18   A.   What page?

19   Q.   Okay.  I'm going to withdraw the previous question.

20   Just refer to tab 14, Page 1738.

21   A.   Okay.

22   Q.   And what this shows is a June 26th, 2014, inquiry by

23   the Consumer Financial Protection Bureau on behalf of

24   Mr. Daugherty making inquiry of Ocwen; correct?

25   A.   Yes.

Sandra Lyew - Direct (Young)

1   Q.   And this shows that Mr. Richard Hightower received this

2   on June 26th, 2014, at 10:49 in the morning; correct?

3   A.   Has responded, yes, yes.

4   Q.   Okay.  Do you know Richard Hightower?

5   A.   No.

6   Q.   And the CFPB specifically asks Ocwen to investigate the

7   payment history of Mr. Daugherty; correct?  Let me help you

8   out.  If you go to the middle of the page on 1739, the

9   Consumer Financial Protection Bureau sent a copy of that

10  same document which Mr. Daugherty had previously provided to

11  Ocwen, the one with the arrows and the circles and

12  everything on it; correct?

13  A.   You would have to show it to me.  This is identifying

14  that, that a dispute was received from the Consumer

15  Financial Protection Bureau.

16  Q.   And that something was attached to it?

17  A.   Okay, yes.

18  Q.   Okay.  And what do the records show that Mr. Hightower

19  did to respond to the Consumer Bureau -- the Office of the

20  Consumer -- excuse me -- the -- I get these acronyms mixed

21  up.  The Consumer Financial Protection Bureau.  What did he

22  do?

23  A.   Okay.  It advised when a payment is not received within

24  30 days from the due date, the loan is reported as

25  delinquent to the credit bureaus.  Ocwen is obligated to

Sandra Lyew - Direct (Young)

1    report true and accurate information to the credit bureaus.

2    Ocwen records show that the credit reporting correctly

3    reflected the loan as current for the Ocwen -- for the

4    months March, 2012, to June -- yeah, March, 2012, June,

5    2012, July, 2012, October, 2012, December, 2012.

6         Ocwen's reports do not indicate that, that you are

7    currently receiving an account statement.  Attaches -- Ocwen

8    payment history reconciliation -- I should say payment

9    reconciliation history which reflects all credit and

10   disbursements made to the loan by Ocwen and resulting loan

11   status.  Is also -- it also reflects the details of the

12   fees, expenses assessed and satisfied on the loan.

13        And then it says, "The Office of Consumer Ombudsman as

14   your advocate insures that Ocwen servicing of the loan

15   remains fair, reasonable, and proper."

16   Q.   This is a letter drafted by Mr. Hightower back to the

17   Consumer Bureau; right?

18   A.   Yes.

19   Q.   But it's written as if it was written to Dave

20   Daugherty; right?

21   A.   Yes, because the response was -- well, actually, this

22   was sent directly to them.

23   Q.   Right.  It was sent to them, but it was a form letter,

24   the same form letter you'd send out to Dave Daugherty except

25   this one -- they just put the address of the Federal

Sandra Lyew - Direct (Young)

1  Consumer Bureau on it and mailed it out.  They didn't even

2  bother to change the form, did they?

3  A.   Which letter is that?  Would you like to show it to me?

4  Q.   The one on Page 1740.

5  A.   No.  The one that you're saying, that is the same

6  letter sent to Mr. Daugherty.

7  Q.   Well, let's look at the one on 1740 signed by Richard

8  Hightower.  Isn't that the letter Ocwen sent back to the

9  Consumer Financial Bureau because of their inquiry on behalf

10 of Mr. Daugherty?

11 A.   Again, you're making an assumption that the same letter

12 was sent to the borrower as it was sent to the CFPB.  And

13 you're not showing me that letter.

14 Q.   The letter is at 1740, but I'm going to move on.  Let's

15 back up to Page 1738.  Does Mr. Hightower note at 1738 that

16 the CFPB request was to indicate whether Mr. Daugherty was

17 current for March, June, July, October, and December, 2013?

18 Isn't that what they asked Mr. Hightower to confirm?

19 A.   Yes.

20 Q.   And that was at 10:49:42 seconds, correct, on

21 June 26th?

22 A.   Yes.

23 Q.   And at 10:50:18, 36 seconds later, Mr. Hightower

24 reported the credit reporting correctly reflected the loan

25 as current for the months of March, 2012, June, 2012, July,

Sandra Lyew - Direct (Young)

1    2012, October, 2012, and December, 2012.  Wasn't that his

2    response 36 seconds later?

3    A.   If you're going by timing, yes.  The, the dates

4    confirming the year is incorrect based on this response.  It

5    should have been for 2013.  However, they did attach a

6    payment reconciliation history which would have identified

7    the correct dates.

8    Q.   Well, if I'm going by time, perhaps if Mr. Hightower

9    spent more than 36 seconds, he would have actually responded

10   to what the Consumer Financial Protection Bureau actually

11   asked which was those months in 2013 rather than those

12   months in 2012.  Correct?

13           MR. MANNING:  Objection, argumentative.

14           THE COURT:  The objection to argumentative is

15   sustained, Mr. Young.  If you want to rephrase, you can.

16   BY MR. YOUNG:

17   Q.   Certainly.  Thirty-six seconds after the CFPB asked

18   Mr. Hightower to confirm certain dates in 2013,

19   Mr. Hightower confirmed certain dates in 2012, didn't he?

20   A.   Yes, it was responded -- if you can repeat that

21   question.

22   Q.   Was Mr. Hightower's response wrong?

23   A.   As I mentioned, the year in the response is incorrect.

24   It should have been 2013.

25   Q.   Would you agree that based on the time stamps, 36

Sandra Lyew - Direct (Young)

1    seconds elapsed between the inquiry by the CFPB and

2    Mr. Hightower's incorrect response?

3    A.   Can you repeat that, please?  The timing?

4    Q.   With respect to timing, would you agree that the

5    records, the Ocwen notes of the investigation in Plaintiff's

6    Exhibit 26 show that 36 seconds after the CFPB asked to

7    confirm certain information in 2013, Mr. Hightower responded

8    by confirming certain information in 2012?  Is that right?

9    A.   That's the information that's entered in the system.

10   Q.   And it's the only record of the investigation we have,

11   isn't it?

12   A.   To the CFPB?

13   Q.   Of this particular CFPB inquiry and response.  The only

14   record we have is what's in this white binder showing time

15   stamps and dates on what Ocwen did when this federal agency

16   contacted them on behalf of Mr. Daugherty.

17   A.   If you're going by information on what is stated in the

18   payment history, it's there.  As far as proof, again, it

19   identifies what was attached.  You, you do have a copy as

20   part of your exhibits the payment history, or I should say

21   the payment reconciliation history that would have been

22   attached to this correspondence to the CFPB.

23   Q.   Would you agree that when the CFPB made inquiry of

24   Ocwen which ended up on the desk of Mr. Hightower that Ocwen

25   had a duty to do a thorough, reasonable investigation

Sandra Lyew - Direct (Young)

1   looking at all the data that it had available?

2          MR. MANNING:  Objection, calls for a legal

3   conclusion.

4          THE COURT:  Response to the objection, counsel?

5          MR. YOUNG:  This is the representative of the

6   company, and I believe I can ask them if they have a duty to

7   conduct a reasonable, fair, and complete investigation.

8          THE COURT:  Well, sometimes these matters

9   intersect questions which may be proper.  They also call for

10  what we consider in the legal profession to be legal

11  conclusions.

12     Given what she has indicated her position to be, Mr.

13  Manning, given her duties, I'm going to allow the question,

14  finding that it's within the parameters of what she

15  indicates her position with the defendant is.  And I

16  preserve the defendant's objection and exception.

17  BY MR. YOUNG:

18  Q.   Let me re-ask it.  Did Mr. Hightower conduct a

19  reasonable investigation of this inquiry by the CFPB when he

20  responded by referring to 2012 account data when he was

21  asked about 2013 account data?

22          MR. MANNING:  Same objection, Judge, slightly

23  different question.

24          THE COURT:  All right, overruled for the reasons

25  that I stated.

Sandra Lyew - Direct (Young)

1    THE WITNESS:  I would feel that Mr. Hightower

2  conducted a full investigation.  Again, the year is a typo.

3  It does happen.

4  BY MR. YOUNG:

5  Q.   So it's your position that this 36-second

6  investigation, that it was merely a typographical error that

7  he typed 2012 five times instead of 2013?

8  A.   That is correct.

9  Q.   Okay.

10  A.   And, again, based on, based on the, the, the response

11  to the CFPB, they also provided to them a payment history

12  that would reflect a full -- from the time Ocwen received

13  the servicing of the loan to present which would be

14  June 26th, 2014.

15  Q.   Let me move ahead to August 7, 2014.  I believe that

16  would be tab 15 in your binder.  Are you there?

17  A.   Yes, I am.

18  Q.   Now, by August there have been 22 ACDVs sent by Equifax

19  to Ocwen to which Ocwen responded; correct?

20  A.   Yes, --

21  Q.   And --

22  A.   -- roughly.  I didn't -- I haven't counted, but it's

23  been close to that.

24  Q.   And 11 of the responses verify current and 11 responses

25  verify him in foreclosure?

Sandra Lyew - Direct (Young)

1    MR. MANNING:  Objection, misstates the evidence.

2    THE COURT:  The objection to misstating the

3    evidence is overruled.

4    Go ahead, please.

5    THE WITNESS:  Based on the ACDV if that's what

6    you're referring to.

7    BY MR. YOUNG:

8    Q.   Okay.  22 ACDVs; 11 favorable, 11 unfavorable.  There

9    are also two disputes over the telephone and by fax by

10   Mr. Daugherty; correct?  I can help you out with the two

11   disputes by Mr. Daugherty.  Do you need the dates?

12   A.   For the -- I'm sorry.  For the August --

13   Q.   No.  I'm talking about the inquiries in March of '13

14   and March of '14, the disputes by Mr. Daugherty personally

15   rather than through the ACDV process.  So we have the 22

16   ACDVs and the two disputes by Mr. Daugherty by this time;

17   correct?

18   A.   Okay.  If I can go back to your last thing with regards

19   to the CFPB response, I wanted to bring to your attention

20   that because of the discrepancy in the year on 7-2, 2014,

21   Mr. Hightower responded back to the Consumer Federal --

22   Financial Protection Bureau apologizing, in other words,

23   apologizing for his error and, and made the corrections to,

24   to his response from June 26th.

25   Q.   Okay.  When was that?

Sandra Lyew - Direct (Young)

1  A.   July 2nd, 2014, which is a few days after the

2  June 26th, 2014, response that you --

3  Q.   Okay.  Mr. Hightower fixed everything.  And what was

4  that date?  July?

5  A.   July 2nd, 2014.

6  Q.   Okay.  It's all better now.  It's fixed.  He took care

7  of it.  Correct?

8  A.   Okay.

9  Q.   You said he apologized and said, "I'm going to take

10  care of it.  I'm going to send in this form.  We're going to

11  fix up Mr. Daugherty."  That's essentially what happened

12  there in July of 2014; correct?

13  A.   He was correcting his 2012.

14  Q.   And he took the necessary steps to fix Mr. Daugherty's

15  credit history, didn't he?

16  A.   To fix his credit?

17  Q.   To fix the credit history of which he's been

18  complaining for the past 14, 15 months.

19  A.   Yes.  At the -- at around that same time, another AUD

20  was sent to all bureaus again.

21  Q.   And that should fix the problem; correct?

22  A.   Again, they sent one back in March.  They did -- Ocwen

23  did what they felt was best.  And they did it again in July

24  to reaffirm what was sent back in March, I believe, March,

25  2012, if I'm not mistaken.

Sandra Lyew - Direct (Young)

1    Q.    Then on July 26th, 2014, Mr. Daugherty's balloon note

2    became due, didn't it?

3    A.    Yes.

4    Q.    And because Mr. Hightower -- was it Mr. Hightower that

5    sent in the form to fix everything?

6    A.    He is not in the credit reporting department.  So most,

7    most cases a request would be sent to them to, to make this,

8    to send out an Automated Universal Data.

9    Q.    Okay.  Well, who did that?

10   A.    Who did what?

11   Q.    Who sent in the universal data form?

12   A.    It would be -- again, that would be completed from the

13   credit reporting department.  I don't know who.  There is a

14   copy that was presented to you with regards to that, I

15   believe, as part of an exhibit for the deposition.

16   Q.    But you don't know who prepared it?

17   A.    I don't recall the name that prepared it.

18   Q.    All right.  But at that point, July, 2014, the balloon

19   is coming due.  Everything should have been taken care of by

20   this AUD that was sent in by somebody at the behest of

21   Mr. Hightower.  But -- and this suit was actually filed

22   July 8th, 2014.

23        Yet, in August after this lawsuit is in court, after

24   it's been assigned to Judge Berger, doesn't Ocwen receive

25   two more ACDVs from Equifax asking Ocwen to confirm certain

Sandra Lyew - Direct (Young)

1   data about Mr. Daugherty's credit history?

2   A.   Yes.

3   Q.   And they're consecutively numbered 8137, 8138?

4   A.   Yes.

5   Q.   And who replied to them?

6   A.   Daniel Wesley.

7   Q.   And we now know that Daniel Wesley is, in fact, the

8   same Daniel John that we have seen referred to at various

9   times in these responses; correct?

10  A.   Yes.

11  Q.   Okay.  Because in your notes it shows Daniel Wesley

12  responding to 8137.  And in the Ocwen records it shows that

13  same individual as Daniel John.

14  A.   Yes.

15  Q.   Okay.  And, so, what Daniel John did in response to

16  dispute 8137 on August 8th, 2014, was to ask Ocwen or --

17  excuse me -- what Mr. Wesley did was confirm that the

18  account was current as to account status and that the

19  payment rating was a current account and the method or

20  manner of payment was as agreed, not more than one payment

21  due.  That's what he confirmed by responding to this ACDV

22  after this lawsuit was filed; correct?

23  A.   The response was done on 8-7, 2014.

24  Q.   Right.  This suit was filed in July.

25  A.   Okay.

Sandra Lyew - Direct (Young)

1  Q.   So we're in court before Judge Berger and the Ocwen

2  employee confirms that Mr. Daugherty is current; correct?

3  A.   You're looking on the ACDV or we're still on the

4  comment log?

5  Q.   Let's go back to the ACDV.  Daniel John, account

6  information accurate as of this date.  Do you see that?

7  A.   Yes.

8  Q.   Response date August 8th, 2014; correct?

9  A.   Yes.

10  Q.   And you see down here the account status is current.

11  The payment rating is current.  And the method of payment or

12  manner of payment is as agreed, not more than one payment

13  due.  That is correct, isn't it?

14  A.   That is a response from Equifax, or request from

15  Equifax I mean.

16  Q.   To which Daniel John Wesley responded and confirmed

17  that everything was current?

18  A.   He did not respond.

19  Q.   Isn't this the response?  Isn't the gray area the

20  response to the data that Equifax provided in the white

21  area?

22  A.   The response -- Ocwen's response is in the gray area.

23  And that is for the "not his, provide or confirm complete

24  ID" dispute code.

25  Q.   Okay.  But when we go down to the bottom, when Equifax

Sandra Lyew - Direct (Young)

1    asks that these things be confirmed, there is no response so

2    those things stay as they are which is absolutely correct;

3    is that right?

4    A.   It was left blank.

5    Q.   Well, doesn't that mean that Ocwen is saying back to

6    Equifax, "Don't change these things.  You got them right.

7    Current, current, pays as agreed."  Isn't that what this

8    form does?

9    A.   This was left blank, again, in July which was not even

10   a month prior to another ACDV request was sent to Ocwen, a

11   universal data which is a factual data giving a full account

12   history, verification of borrower's name, and all the

13   information that's needed to all the bureaus.

14   Q.   Well, my question is the ACDV is information from

15   Equifax, and Equifax asks that the data be confirmed.

16   A.   Based on the --

17   Q.   That's the purpose of the ACDV.

18   A.   Based on the dispute code, yes.  It does say "verify

19   payment history, profile account status, and payment

20   rating."

21   Q.   What Mr. John Wesley Daniel, however that name is

22   formatted, he said this information is accurate as of this

23   date, didn't he?

24   A.   Yes, that's what that says.

25   Q.   So it was accurate when he said "current, current, pays

Sandra Lyew - Direct (Young)

1   as agreed," wasn't it?

2   A.   Where do you see that part?  I'm sorry.  What section?

3   What date are you looking at?  I'm sorry.

4   Q.   I've never changed documents.  I'm still on document

5   ending in 8137 dated August 8th, 2014.  It's document number

6   1361 in the binder, in the red binder.

7   A.   Okay.  I'm sorry.  It -- the response data is left

8   blank, so there was no need to modify.

9   Q.   Okay, no need to modify because it's right.  He's

10  current, isn't he?

11  A.   Yes.  He has been current.

12  Q.   And Mr. John Daniel Wesley, Daniel John Wesley or

13  however, whatever order he puts his name, he says everything

14  is rosy as far as Mr. Daugherty is concerned and his credit.

15  He's now current.  Everything is on the -- everything is a

16  go for him to go out and refinance his mortgage --

17          MR. MANNING:  Object to the form.

18  BY MR. YOUNG:

19  Q.   -- because his credit history is being reported

20  current.  Right?

21          MR. MANNING:  Judge, I'm not sure you heard me.  I

22  just said objection to form.

23          THE COURT:  I did not hear you.

24          MR. YOUNG:  Let me withdraw the question.

25  BY MR. YOUNG:

Sandra Lyew - Direct (Young)

1  Q.  We're going to move on from the form that shows that my

2  client is current in August of 2014.  And I'm going to go to

3  the other ACDV received simultaneously by Ocwen with the one

4  we just looked at where he was confirmed as current, all

5  systems go.  But here we have 8138 control number by the

6  same employee on the same date, don't we?

7  A.  Yes.

8  Q.  What's the response code?

9  A.  01.

10  Q.  What does 01 mean?

11  A.  This is account information accurate as of date.

12  Q.  And that's the same thing that if you look at the

13  Equifax version of that same form, instead of using this 01

14  account information accurate as of this date, what Equifax

15  says is "verified as reported."  They both mean the same

16  thing, don't they?

17  A.  The response code of Equifax says "verified as

18  reported."  And the ACDV says "account information accurate

19  as of date."

20  Q.  Okay.  So the response codes used by Equifax -- and

21  Ocwen receives thousands of these from Equifax, don't they,

22  in the course of a year?

23          MR. MANNING:  Objection.  During what time period?

24          THE WITNESS:  I don't know.  I don't know.

25          MR. YOUNG:  I said in the course of a year.

Sandra Lyew - Direct (Young)

1       MR. MANNING:  Well, the forms are different at

2  different years.  So I'm asking as of this time period in

3  2014 or --

4       THE COURT:  Do you know what he's referring to?

5  You started to answer the question.

6       THE WITNESS:  Yes.  He's comparing the response

7  code on the ACDV form to the Equifax response code on their,

8  on their, from their business records --

9       THE COURT:  I overrule the --

10      THE WITNESS:  -- that's on the screen.

11      THE COURT:  I overrule the objection, Mr. Manning.

12  It apparently is clear to the witness.

13      Go ahead, please.  The time frame is apparently clear.

14  Go ahead.

15  BY MR. YOUNG:

16  Q.  The Equifax Automated Consumer Dispute Verification for

17  August 8th, 2014, that's before you on the screen shows a

18  response code in black and it shows four possibilities:

19  "Verified as reported," "modified as shown," "delete

20  account," or "delete fraud."  Correct?

21  A.  Yes.

22  Q.  And that's the way Equifax uses -- that's their version

23  of the response code from their form; right?

24  A.  Yes.

25  Q.  And --

Sandra Lyew - Direct (Young)

1   A.   Yes.

2   Q.   And the response code used by Ocwen, rather than

3   "verified as reported," they use 01, "account information

4   accurate as of date."  They're one in the same, aren't they?

5   A.   One -- I'm sorry?  What are you -- what are you trying

6   to compare that's one in the same?  You're trying to make a

7   comparison.  I'm asking a question what do you mean?

8   Q.   I'll ask it again.

9   A.   Yes.

10       THE COURT:  Repeat your question, counsel.

11  BY MR. YOUNG:

12  Q.   See my finger pointing at "verified as reported"?

13  A.   Okay.

14  Q.   Do you see that?

15  A.   Yes.

16  Q.   Doesn't that have the same effect as what my finger is

17  pointing at now, "account information accurate as of date"?

18  A.   I can only read what the, what the response code on the

19  ACDV form is saying.  I'm not going to speculate a

20  comparison between Equifax's information to what is in front

21  of me as well.

22  Q.   Okay.  Well, what's response code 2?  We know that 1 is

23  "account information accurate as of date."  What is response

24  code 2 that Ocwen uses?

25  A.   I don't know.

Sandra Lyew - Direct (Young)

1   Q.   Isn't it "modify as requested"?

2   A.   I don't remember.

3   Q.   We've looked at it on multiple forms.  Let me show you

4   one.

5   A.   I found it.  I see it.

6   Q.   Okay.  So code 2 is "modify as requested;" right?

7   A.   "As indicated," uh-huh, yes.

8   Q.   Or "as indicated."  There you go.  Okay.  So one is

9   accurate as of this date.  2 is modify.  The first option on

10  Equifax is "verified as reported."  And the second option is

11  "modify as shown."  And what was the code 2 for, that Ocwen

12  uses?

13  A.   "Modify account information as indicated."

14  Q.   Okay.  Same thing as "modify as shown;" right?

15  A.   Okay.

16  Q.   And the third option under the Equifax form is "delete

17  account."  Do you see that where my finger is there, "delete

18  account"?

19  A.   Yes, I see it.

20  Q.   And the third option, the 03 code for response code for

21  Ocwen is "delete," "delete data;" correct?

22  A.   You mean on Equifax's.

23  Q.   No.  This -- we know that code 1 is "account

24  information accurate as of date."  We know that code 2 is

25  "modify as shown," close to that.  And the third response

1    code used by Ocwen would be to "delete."  And the fourth

2    response code would be to "delete as fraud."  Right?

3    A.    I'm not sure.  I would have to see the two.

4    Q.    You're an account specialist, aren't you, employed by

5    Ocwen for the purpose of giving testimony at trials and

6    designated as the representative here.  And you can't tell

7    me what the four possibilities are for Ocwen to respond to

8    an ACDV?

9    A.    Because I'm the designated, that doesn't mean I

10   remember all the codes that is, you know, specified for,

11   for, for, you know, for testifying.  I'm not -- yeah,

12   because, again, yes, I'm the 30(b)(6).  However, I am a

13   witness, a corporate rep that handles all different types

14   of, of cases.

15   Q.    Well, we know two response codes.  We know "information

16   accurate as of the date" and we know the other one,

17   according to you, is "modify as shown," or something close

18   to that.  Now, isn't there another option in responding to

19   an ACDV where Ocwen can say "delete this as wrong"?

20   A.    Yes, that could be an option of course.

21   Q.    The same option shown on this form "verify, modify,

22   delete."  Basically the same nomenclature system is used by

23   Ocwen as used by Equifax; right?

24   A.    Yes, but you were going by code numbers.

25   Q.    When Equifax sends an ACDV to Equifax relating to

Sandra Lyew - Direct (Young)

1   Mr. Daugherty, it is showing Ocwen, "Here is the data we

2   have for Mr. Daugherty.  Please confirm, modify, let us know

3   how to change it."  Isn't that what the process is all

4   about?

5   A.   Yes.  Again, Ocwen is only showing one account in their

6   system, and they're not going to tell a credit bureau to

7   delete the one tradeline that we are reporting each month to

8   all credit bureaus.

9   Q.   Well, as often as I go there, you want to shift the

10  attention to the monthly reports.  I want to focus on the 24

11  ACDVs, 12 of which verify that my client was in foreclosure.

12  Don't those reflect a pervasive attitude at Ocwen not to

13  conduct a reasonable investigation of a consumer's dispute?

14  A.   Again, I don't know.  The other credit reporting

15  agencies didn't have this issue.

16  Q.   Well, that's why the other credit agencies aren't on

17  trial.  What the issue before us is --

18           MR. MANNING:  Objection, Judge.

19           THE COURT:  Objection sustained to the statement.

20           MR. YOUNG:  The question --

21           THE COURT:  Ladies and gentlemen, I'm ordering

22  that that be stricken from the record and disregarded by

23  you.

24       Go ahead, please.

25  BY MR. YOUNG:

Sandra Lyew - Direct (Young)

1  Q.   The question presented to this jury, I believe, is

2  going to be did Ocwen reasonably investigate using all the

3  relevant information each of the 24 times that ACDVs were

4  sent regarding Mr. Daugherty's account.  You understand

5  that's the issue here; right?

6          MR. MANNING:  Objection, Judge, to the form.

7          THE COURT:  Basis?

8          MR. MANNING:  Form.

9          THE COURT:  Overruled as to form, Mr. Manning.

10          MR. MANNING:  Argument -- well, I understand.

11          THE WITNESS:  Yes.

12  BY MR. YOUNG:

13  Q.   And the only conclusion that can be reasonably drawn

14  from the evidence that we've reviewed today is that Ocwen

15  does not conduct a reasonable investigation.  Isn't that

16  true?

17  A.   No.

18          MR. MANNING:  Objection, Judge.  It's

19  argumentative.

20          THE COURT:  The objection to that question being

21  argumentative is sustained.  In other words, as I -- as I

22  recall it, Mr. Young, you asked that "the only conclusion

23  that could be drawn is."  I sustain the objection to that

24  being argumentative.

25          Go ahead, please.

Sandra Lyew - Direct (Young)

1  BY MR. YOUNG:

2  Q.   And so we're clear, each time one of these 24 ACDVs

3  come in, it's Ocwen's policy and procedure not to look

4  beyond the dispute code, just to look at the dispute code

5  and nothing else; right?

6          MR. MANNING:  Objection, misstates the testimony.

7          THE COURT:  Objection to the misstating of

8  testimony is overruled, counsel.

9      Go ahead.  You can answer.

10         THE WITNESS:  As I mentioned earlier, they, they

11  refer to the dispute based on the dispute code that is being

12  requested to verify, and they do not go beyond.

13  BY MR. YOUNG:

14  Q.   So even if there's other relevant information or

15  correct, incorrect, absolutely false information on an ACDV,

16  the only thing Ocwen is going to look at is the dispute code

17  and nothing else; right?

18  A.   Yes.

19  Q.   And even if the dispute code is more than "not his or

20  hers," even if they're disputing account history, Ocwen

21  still limits itself to confirming the Social Security number

22  or signature and looking to see if they're showing the

23  balance as current or not; correct?

24  A.   If there's more than one dispute code to be verified or

25  to -- provide or confirm based on the request, that is what

1   is going to be verified.

2       So if you're discussing about the code 2 to verify

3   payment history profile, account status, and payment rating,

4   that's what they're supposed to verify, as well as the

5   "provide and confirm complete ID."

6   Q.   And Ocwen doesn't have any procedure in place to

7   recognize or detect a situation where something is being

8   mistakenly reported twice, do they?

9   A.   It is case by case and it -- they're not obligated to

10  do so.  In this case they did it twice as a universal data

11  to all bureaus to, to confirm that all bureaus are on the

12  same page and make the necessary changes and corrections

13  that they need to make based on that universal data.

14  Q.   Doesn't the evidence here demonstrate that Ocwen does

15  not have a system, a workable system to detect and correct

16  duplicate tradelines?

17              MR. MANNING:  Objection, argumentative.

18              THE COURT:  Overruled.

19              THE WITNESS:  Ocwen doesn't -- is not aware of

20  duplicate tradelines.  And to confirm that, again, it falls

21  back into sending a universal data.  Once the same dispute

22  comes in time after time, the universal data is the

23  correction, is the mother of, of -- or the parents, I should

24  say, the coach that has to direct all bureaus to make sure

25  that everyone is on the same page.

Sandra Lyew - Direct (Young)

1  BY MR. YOUNG:

2  Q.   And when Ocwen verifies two ACDVs with completely

3  contrary information, it's doing its job.  It's done a

4  reasonable investigation.  Right?

5  A.   On a normal basis, we do a soft pull.  A soft pull only

6  identifies Ocwen's account.  There's a second one called a

7  bull's-eye which, which identifies if there are any

8  duplicate tradelines.  And the bull's-eye that we use is

9  Experian.  And Experian never identified two tradelines.

10  Q.   So what Ocwen does when it gets these dual conflicting

11  ACDVs where someone's complaining about Equifax, it looks

12  over and sees what Ocwen -- what's the other one?  Who does

13  it look for for its bull's-eye report?

14  A.   We -- our company that we use is Experian.

15  Q.   Okay.  So Mr. Daugherty's complaining about Equifax

16  reporting.  And even if Ocwen amps up and goes to this next

17  stage beyond the soft pull, what they do is they look over

18  here at Experian.  They don't look at Equifax, do they?

19  A.   No, we don't -- no.

20  Q.   And any time it wanted, Ocwen could have pulled the

21  Equifax report, compared it to the ACDVs and said, "Oh, my

22  goodness, here is the problem.  Let's fix it."

23  A.   No, we do not pull.

24  Q.   They can pull.

25  A.   No, we can't.

Sandra Lyew - Direct (Young)

1  Q.   Sure.  You have a legitimate purpose.  Ocwen has a

2  legitimate purpose when investigating a dispute over an

3  Equifax reporting to request and receive the Equifax data,

4  doesn't it?

5            MR. MANNING:   Objection, argumentative, calls for

6  a legal conclusion.

7            THE COURT:   Overruled, counsel.

8            THE WITNESS:   That is incorrect.

9  BY MR. YOUNG:

10 Q.   So you're telling the jury that Ocwen can't go and look

11 at the Equifax report any time it wants?

12 A.   No.  That would be considered a, what they call a hard

13 pull.  And that can affect a borrower -- an individual's

14 credit.

15 Q.   Soft pull.  And what's the second one where they go

16 look at Experian?

17 A.   Bull's-eye which does not affect the borrower's credit

18 score.

19 Q.   A hard pull would have fixed this day one, wouldn't it?

20 A.   Not without authorization.  And, again, this is, this

21 is an error that Equifax made, not Ocwen.

22 Q.   Whose authorization is needed to do a hard pull to find

23 out what Dave Daugherty was complaining about?

24           MR. MANNING:   Objection, calls for a legal

25 conclusion.

Sandra Lyew - Direct (Young)

1        THE COURT:  Overruled given her, again, her

2    position and what she has stated during the course of her

3    testimony as her duties and her experience in these matters.

4    I overrule the objection.

5        THE WITNESS:  Ocwen is a loan servicer.  Ocwen

6    does not pull a hard pull, a hard credit report.  We only

7    use a bull's-eye for certain information.  And based on the

8    certain information, a loan modification -- if we're

9    modifying a loan, as well as, as well as multiple disputes.

10    We do not pull a hard pull on any, on any borrower or

11    individual that we service for.

12    BY MR. YOUNG:

13    Q.   Well, you're the one that volunteered this information

14    about this hard pull; correct?

15    A.   There's no way that Ocwen -- Ocwen is, is not -- it's

16    not Ocwen's policy to do any type of hard pull.  Ocwen is

17    not a bank.  Ocwen is a loan servicer.

18    Q.   Whose authorization would be necessary for a hard pull?

19    A.   It would have -- the investigation would have had --

20    Equifax would have had to conduct their investigation and

21    realize themselves that they had made this error by

22    duplicating Ocwen's tradeline on Mr. Daugherty's account.

23    Q.   Who would have to authorize Ocwen to make a hard pull?

24    Mr. Daugherty?

25    A.   Ocwen does not pull hard pulls.  I was -- I was just

1    identifying a hard pull with, with -- I would identify that.

2    Mr. Daugherty, when he made his complaint, did not provide a

3    copy of his credit report identifying, identifying the two

4    tradelines on his credit report.  He sent one image that

5    identifies one Ocwen loan and not -- did not identify the

6    two loans showing on his credit report.

7    Q.   This is Mr. Daugherty's fault because when he saw false

8    data on his report, he sent the false data directly to

9    Ocwen.  And you're saying he should have not only sent the

10   false data that he was disputing, he should have also sent

11   all the correct data.  So it all goes back to him.  This

12   lays in his lap.  It's his problem that his, that his credit

13   shows foreclosure when it shouldn't.

14           MR. MANNING:  Objection, argumentative.

15           THE COURT:  Objection to argumentative is

16   sustained.

17           MR. YOUNG:  Thank you very much.

18           THE COURT:  Mr. Manning, unless you want to go for

19   12 minutes, I'm going to recess for the evening.

20           MR. MANNING:  I will spare the jury that, Judge.

21           THE COURT:  All right.

22       Ladies and gentlemen of the jury, I'm going to release

23   you for the evening.  While you're out, do not discuss the

24   case among yourselves or permit anyone to discuss it with

25   you or in your presence.  Remember that you can't read,

1    listen to, or view any media coverage that there could be of

2    the trial.

3         Have a good, restful evening and I'll see you tomorrow

4    morning at 9:00.

5         (Trial recessed at 4:51 p.m.)

6                           *  *  *  *  *

7

8

9

10

11        I, Lisa A. Cook, Official Reporter of the United

12   States District Court for the Southern District of West

13   Virginia, do hereby certify that the foregoing is a true and

14   correct transcript, to the best of my ability, from the

15   record of proceedings in the above-entitled matter.

16

17

18        s\Lisa A. Cook                          June 7, 2016

19             Reporter                               Date

20

21

22

23

24

25