```
 1                IN THE UNITED STATES DISTRICT COURT
              FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA
 2                          AT BECKLEY

 3                    TRANSCRIPT OF PROCEEDINGS

 4


 5    ----------------------------x
                                  :
 6    DAVID M. DAUGHERTY,         :        CIVIL ACTION
 7                                :        NO. 5:14-CV-24506
             Plaintiff,          :
 8    vs.                         :
                                  :
 9    OCWEN LOAN SERVICING, LLC,  :        May 19, 2016
                                  :
10           Defendant.           :
                                  :
11    ----------------------------x

12

13                           TRIAL
14                         VOLUME IV

15

16          BEFORE THE HONORABLE IRENE C. BERGER
                 UNITED STATES DISTRICT JUDGE

17


18    APPEARANCES:

19
      For the Plaintiff:          MR. RALPH C. YOUNG
20                                MR. JED ROBERT NOLAN
                                  MR. STEVEN R. BROADWATER
21                                Hamilton Burgess Young &
                                  Pollard
22                                P.O. Box 959
                                  Fayetteville, WV  25840-0959
23

24

25
```

```
 1    APPEARANCES (Continued):

 2

 3

 4    For the Defendant:          MR. JASON E. MANNING
                                  MR. JONATHAN M. KENNEY
 5                                Troutman Sanders
                                  Suite 2000
 6                                22 Central Park Avenue
                                  Virginia Beach, VA  23462
 7
                                  MS. SARA L. MARKERT
 8                                1661 WORTHINGTON ROAD
                                  Suite 100
 9                                West Palm Beach, FL  33409

10

11

12

13

14

15

16

17

18

19

20

21

22    Court Reporter:            Lisa A. Cook, RPR-RMR-CRR-FCRR

23

      Proceedings recorded by mechanical stenography; transcript
24    produced by computer.

25
```

I N D E X

PLAINTIFF'S WITNESSES:                                    PAGE

**SANDRA LYEW**

    Cross Examination (By Mr. Manning) . . . . .  4

    Redirect Examination (By Mr. Young)  . . . . 68


**TINA DAUGHERTY**

    Direct Examination (By Mr. Young)  . . . . . 114

    Cross Examination (By Mr. Kenney)  . . . . . 120


DEFENDANT'S WITNESS:                                      PAGE

**JOHN ULZHEIMER**

    Direct Examination (By Mr. Manning)  . . . . 145

Sandra Lyew - Cross (Manning)

1          P R O C E E D I N G S

2          THE COURT:  Good morning, everyone.

3      Mr. Manning, cross.

4          MR. MANNING:  Thank you, Judge.

5              CROSS EXAMINATION

6  BY MR. MANNING:

7  Q.   Good morning, Ms. Lyew.  How are you?

8  A.   Good morning.  I'm doing good.

9  Q.   Yesterday a number of times during Mr. Young's

10 questions you mentioned the word "workflow" regarding the

11 dispute resolution process.  Do you recall that?

12 A.   Yes.

13 Q.   That's where I'd like to start.  When you were

14 referring to workflow regarding a dispute resolution, what

15 department handles that workflow?

16 A.   The credit reporting department.

17 Q.   The individuals that were listed in various capacities

18 on Plaintiff's Exhibit 26, that comment log, do you recall a

19 number of different names and entries on that log?

20 A.   Yes.

21 Q.   So those individuals -- are those individuals part of

22 the credit department or are they a part of other

23 departments?

24 A.   They were part of the credit reporting department.

25 Q.   The individuals in the credit reporting department that

Sandra Lyew - Cross (Manning)

1  were referenced and the department as a whole - that's where

2  I want to start - what training do those individuals

3  receive?

4  A.   If we can go -- because he -- there was the ombudsman.

5  Each department has, has access to the system.  So mostly

6  regarding the ACDVs, that is the credit reporting

7  department.  Then you have the ombudsman's department that

8  handled the CFPB, and then the research department as well.

9  Q.   Okay.  Let me make sure I got all this.  Credit

10  department, research department, CFPB, ombudsman?

11  A.   Ombudsman's department.

12  Q.   So there's three different departments?

13  A.   Credit reporting, ombudsman, research.  Those are the

14  three areas that he went into.

15  Q.   Okay.  So let's, let's start with the first one.

16  Credit, research, CFPB, ombudsman, I know you talked about

17  all three of those yesterday in various capacities.  Let's

18  just start with credit.  What training do the credit

19  department individuals receive?

20  A.   They -- the new credit analysts and associates, they

21  receive one month of training.  It's two weeks of classroom

22  as well as two weeks of shadowing existing Ocwen employees

23  based on their duties side-by-side.

24  Q.   Okay.  Let's break that down.  You mentioned one month

25  of classroom.  What does that involve?

Sandra Lyew - Cross (Manning)

1   A.   That consists of training materials, learning the

2   function, system training, and as well as on-hands training

3   in that, in that training room.

4   Q.   What about shadowing?

5             MR. YOUNG:  Objection.

6             THE COURT:  Yes, sir.

7             MR. YOUNG:  Your Honor, this exceeds the scope of

8   direct examination.  I never examined this witness about

9   training of employees.  Moreover, the policies and --

10  training policies and procedures were never produced as

11  requested.

12            THE COURT:  Response, Mr. Manning?

13            MR. MANNING:  There was lengthy testimony by this

14  witness about workflow, individuals who handle it, how they

15  handle it, the departments as a whole.  And I'm within the

16  scope of those subjects.

17            THE COURT:  The issue of workflow I think is

18  appropriate.  The issue as it relates to training, however,

19  I think is outside of the witness's testimony yesterday.

20  But I do believe that you're within your right to get into

21  the issue of workflow.  Training is a separate issue,

22  although I recognize relating, Mr. Manning.

23       So with that tortured response by the Court, I sustain

24  the objection as it relates to the training, policies and

25  procedures type issue, but overrule it as it relates to the

Sandra Lyew - Cross (Manning)

1  workflow, Mr. Manning.

2  BY MR. MANNING:

3  Q.    You described workflow as the process of the dispute

4  resolution system; right?

5  A.    Yes.

6  Q.    Okay.  So let's start at the beginning.  Describe for

7  the jury, if you could, how the workflow process works by

8  the individuals in the credit department at Ocwen Loan

9  Servicing.

10         THE COURT:  Let me interrupt you for a moment.

11  You all come to the bench, Mr. Young, Mr. Manning.

12         (Bench conference on the record)

13         THE COURT:  Mr. Manning, I don't want to cut you

14  off prematurely.  I did not know whether you intend to

15  direct this witness as well.

16         MR. MANNING:  Well, Your Honor, up until --

17         THE COURT:  That would certainly affect the basis

18  of my ruling.

19         MR. MANNING:  Up until Your Honor instructed us to

20  have her present, we had intended to call her later.

21         THE COURT:  Uh-huh.

22         MR. MANNING:  Mr. Young represented that it wasn't

23  going to be necessary for us to call her if she was allowed

24  to be here in person.  So that's why I was surprised by the

25  scope objection.  But I understand he's now entitled to make

Sandra Lyew - Cross (Manning)

1    that.

2        My thought is it's going to -- I mean, we're behind

3    schedule, I mean, in terms of the timing of the trial.  And

4    my hope is that if I can get her testimony done today, then

5    she doesn't have to be recalled.

6        THE COURT:  Well, that's my question, whether you

7    intend to call her as your witness.  If you're doing that,

8    I'll let you do that now and you would not be limited simply

9    to Mr. Young's cross.  He would then be able to cross on any

10   new matters that you raise.

11       So, again, with respect to this issue of training and

12   policy, he has an objection that it was never disclosed.  So

13   at least the basis of my ruling would be different if you're

14   intending to also direct this witness at this time.

15       MR. MANNING:  I see.  I, I would like for

16   efficiency sake to direct the witness at this time so I

17   don't have to recall her later.

18       THE COURT:  All right.  Any objection to that, Mr.

19   Young?

20       MR. YOUNG:  No, Your Honor.  I would just ask that

21   you explain to the jury that she's also being called and

22   that's why she's going to be permitted to speak beyond so

23   we're --

24       THE COURT:  Matters covered on your direct.

25       MR. YOUNG:  Right.

Sandra Lyew - Cross (Manning)

1    THE COURT:  Do you have any continuing objection

2    with respect to the training issue?

3    MR. YOUNG:  I do, Your Honor.  We requested and

4    were never provided any training policies or procedures.

5    THE COURT:  All right.  Mr. Manning.

6    MR. MANNING:  Ms. Lyew was deposed on that subject

7    for eight hours and she testified at length about Ocwen's

8    training policies and procedures.  And there's no

9    requirement that such documents need to be written.  You can

10   have a procedure or a policy that's not written.

11   THE COURT:  Okay.  I don't need a lecture.  If she

12   went into it on deposition, Mr. Young, I will let her go

13   into it here today within the parameters of deposition

14   testimony on the same issue because I think you have notice

15   of it.  Any training issues outside of the deposition, if

16   you made a request for policies and didn't receive it, I

17   would not permit.  That gives you gentlemen some guidance.

18   MR. YOUNG:  Your Honor, I'd like an opportunity --

19   MR. MANNING:  It does.

20   MR. YOUNG:  -- to briefly review Ms. Lyew's

21   deposition.  I don't recall hours and hours of --

22   THE COURT:  All right.

23   MR. YOUNG:  -- testimony about policies and

24   procedures at all.

25   MR. MANNING:  Mr., Mr. Young wasn't there.  His

Sandra Lyew - Cross (Manning)

 1   associate, Mr. Nolan, took it.

 2          THE COURT:  Well, we'll let him review it and then

 3   we'll know where we're going to go, gentlemen.  Let's take a

 4   few minutes and see if you could discuss the matter with

 5   Mr. Nolan.  Again, I would limit it to what's in the

 6   deposition testimony because I think you're on notice of

 7   that.

 8          MR. MANNING:  Uh-huh.

 9          THE COURT:  Anything outside of that with respect

10   to training, if you made a request for policies and

11   procedures and you weren't provided, I will exclude.

12          MR. YOUNG:  I read the deposition, Your Honor.

13   No, I was not there, but I'll quickly review it now and

14   focus on whatever we covered in training.  I appreciate the

15   opportunity.

16          THE COURT:  All right.  Go ahead and do that.

17      Mr. Manning, are you in a position while he does that

18   to proceed with her in another area so we don't lose time

19   this morning?

20          MR. MANNING:  Yes.  I can continue right where I

21   left off and then loop back.

22          THE COURT:  Okay.  Thank you, gentlemen.

23          (Bench conference concluded)

24   BY MR. MANNING:

25   Q.   Ms. Lyew, I don't recall exactly my last question so

Sandra Lyew - Cross (Manning)

1    I'm going to propose to you that we just start at the

2    beginning of the workflow process.  How does that process,

3    the dispute resolution start?

4    A.    Each associate gets assigned from the supervisor a

5    certain amount of disputes that may come in.  The workflow,

6    as I mentioned yesterday, once it's assigned, the research

7    has to be conducted first.

8         Once the research is conducted, then the response is

9    sent through the e-OSCAR to the CRA.  From the -- once that

10   is completed, then they enter the codes into the

11   REALServicing system which is two separate systems to what

12   was received, what was done so that it is notated in Ocwen's

13   loan servicing system.

14   Q.    You said the two systems are separate?

15   A.    Yes.

16   Q.    What systems are you referring to?

17   A.    The e-OSCAR is a separate, separate system from the

18   REALServicing system.

19   Q.    Let's break them down.

20   A.    Okay.

21   Q.    What is the e-OSCAR system?

22   A.    E-OSCAR is the communication that's being done between

23   the furnishers and the credit reporting agencies.

24   Q.    What is the REALServicing system?

25   A.    That is Ocwen's main, main frame system that is

Sandra Lyew - Cross (Manning)

1  conducted on a daily basis.

2  Q.   What information is contained within the REALServicing

3  system about borrowers' loans?

4  A.   Everything, everything pertaining to payments being

5  received, correspondence, taxes and insurance, any,

6  anything, any correspondence being sent out to the borrower,

7  any correspondence being received.  It is Ocwen's employees'

8  daily function.

9  Q.   Is the REALServicing system an Ocwen-owned system?

10  A.   To my knowledge, yes.

11  Q.   Is the e-OSCAR system an Ocwen-owned system?

12  A.   No, it's not.

13  Q.   You mentioned disputes as part of the workflow.  You

14  specifically talked about ACDVs.  During your testimony

15  yesterday you said there were two ways disputes could be

16  received.  What are those two ways?

17  A.   A direct correspondence dispute that is sent directly

18  to Ocwen.  And the second one is through, through the credit

19  reporting agencies.

20  Q.   So let's take them one at a time.  The disputes that

21  are received straight from the, the borrower/customer, how

22  are those received?

23  A.   They can be received by fax, by mail.  Then once they

24  are received, they go into the research department that --

25  they determine whether it's an escalated matter or it's

Sandra Lyew - Cross (Manning)

1    something that they can handle, as well as -- or in this

2    case, it would go to the credit reporting department for

3    additional information if they're not able to answer it.

4    Q.    How is that direct dispute process different, if at

5    all, from the indirect dispute process when it comes in from

6    the e-OSCAR system?

7    A.    The, the, the disputes that come through e-OSCAR is

8    directly to the credit reporting department.

9    Q.    Okay.  So if I understand correctly, the direct

10   disputes, meaning the borrower sends in a letter or calls or

11   does a fax, that's direct to Ocwen.  What department

12   receives that?

13   A.    The research department receives it first.  And then,

14   and then they conduct whatever research, research that

15   they're able to do.  If they're not able to respond or

16   handle that, then it gets sent to the credit reporting

17   department for further information that they would need.

18   Q.    Once it is referred to the credit reporting department,

19   what does the credit reporting department do with it?

20   A.    The credit department would review the REALServicing

21   system.  And from that they, they conduct whatever research

22   depending on what the correspondence is about.  And then it

23   gets sent back to the research department to respond to the

24   written correspondence that was received.

25   Q.    Other than the REALServicing system, are there any

Sandra Lyew - Cross (Manning)

1   other systems that the research or credit department have

2   available to them to respond to those disputes?

3   A.    Yes.  They have available what we call now -- it was

4   once called CIS, but it's called the Vault now.  And that is

5   the image document repository.

6   Q.    When you say image document repository, what does that

7   mean?

8   A.    The -- any documentation that is -- it's an imaging

9   system.

10  Q.    What documents would be available on the imaging

11  system?

12  A.    For example, the note, the mortgage, any additional

13  correspondence, the origination of the file, any, pretty

14  much anything, copies of insurance policies, tax, tax

15  information, Ocwen correspondence that was sent out.  If a

16  borrower applied for a loan modification, the financials

17  would be in there as well.

18  Q.    Once that research is completed by the research

19  department or the credit department, what happens next?

20  A.    The -- it -- again, the research department responds

21  and sends a letter out to the borrower and notates the

22  system and copy/pastes the letter, the response that was

23  sent to the borrower into the system.

24  Q.    When you say the credit analyst or research department

25  notates the system, what system are you referring to?

Sandra Lyew - Cross (Manning)

1    A.    To the REALServicing system.

2    Q.    And specifically within the REALServicing system, what

3    is being notated?

4    A.    Basically once the, that the research has been

5    completed and a letter, a copy of the letter that was, that

6    was sent to the borrower, the letter would be completed

7    before it's actually entered into the system showing

8    complete.

9    Q.    Is that the comment log that you were asked about a

10   number of times yesterday with the time stamps?

11   A.    Yes, yes, that's part of the REALServicing system.

12   Q.    I see.  So the time stamps are reflective of when the

13   analyst or research person actually types in that entry?

14   A.    Yes.  When a code is entered into the system, the time,

15   the time an Ocwen employee enters a code into the system, as

16   well as the time when a, a date and time a borrower calls

17   in, a date and time if Ocwen calls out, anything being

18   received -- everything has a time, a date and time stamp on

19   it.

20   Q.    You mentioned that the e-OSCAR and REALServicing

21   systems are separate.  Is the e-OSCAR system somehow linked

22   to that?  As soon as that document is received it makes an

23   entry into the comment log in REALServicing?

24   A.    No, it does not.  The -- each department has their, has

25   codes that -- and the codes have templates.  Templates are

Sandra Lyew - Cross (Manning)

1   made based on those codes.  So when, when you put the code

2   in, all you have to do is complete the template.

3   Q.    Okay.  So that's the overview of the direct dispute

4   workflow process; right?

5   A.    That's correct.  And then they move on to the next one.

6   Q.    Okay.  So we've talked about direct.  Now let's talk

7   about the indirect.  That's the disputes that come in

8   through e-OSCAR; right?

9   A.    Okay, yes.

10  Q.    Okay.  So please tell us again, step one, what

11  initiates the workflow process.

12  A.    The supervisor goes into a main, the main cue in

13  e-OSCAR and then they assign to the associates the disputes.

14  It doesn't matter how many dispute codes that may be say to

15  one loan or everything is based on what is received from

16  that main cue.  It gets assigned.

17        And then once, once it's assigned to an associate, they

18  research.  And then once the research is completed, they

19  send through e-OSCAR the response.  Once they've done,

20  completed that, then they go ahead and enter it into the

21  system.

22  Q.    So I have five steps.  First through the indirect

23  process, the e-OSCAR system provides the ACDV.  That's

24  receipt.  That's step one?

25  A.    Yes.

Sandra Lyew - Cross (Manning)

1    Q.    Step two you said was assigned?

2    A.    Correct.

3    Q.    How are these ACDVs assigned to people?

4    A.    If you have five associates on one team that handles

5    the disputes that come in -- if, say, 50 as an example

6    disputes are in that main cue, then they get distributed to

7    the five associates to do, conduct the research.

8    Q.    After it's assigned, the next step you mentioned was

9    research.  What research is done?

10   A.    Based on the dispute, what the dispute is requesting

11   to, to -- whether in this case provide or confirm complete

12   ID.  That's what they're going to do.

13   Q.    Okay.  When they are instructed to provide complete ID,

14   what systems would the analyst have available to them to

15   confirm that?

16   A.    They go back to the REALServicing system to check

17   because part of the ACDV has the loan number.  They check it

18   by the loan number.  The information is through the

19   REALServicing.  They have access to the Vault.  And then

20   they identify the note, the mortgage, and anything else to

21   confirm the Social Security number.

22   Q.    Once the credit analyst goes in and reviews whatever

23   systems are appropriate for that dispute, what happens next?

24   A.    They go ahead -- they respond to e-OSCAR.

25   Q.    Okay.  So that's step four is response.  What -- how is

Sandra Lyew - Cross (Manning)

1    the response prepared?

2    A.    Through e-OSCAR.

3    Q.    Okay.  And you were asked at length about ACDV forms

4    yesterday.  I'm not going to go into all those.  When you

5    say the response through e-OSCAR, are you referring to the

6    ACDV responses?

7    A.    The ACDV responses are completed in the e-OSCAR to be

8    sent back to the credit reporting agency.

9    Q.    Okay.  So as part of that response, once it's sent is

10   that the end of the process?  Is that resolution of the

11   dispute?

12   A.    No.  It -- they have to show the workflow in

13   REALServicing.  So they go ahead and enter the codes, the

14   ACDV RC, what came in, what type of dispute codes.  Again,

15   it's a template so they have to complete that, as well as

16   what they, the ACDV FC which is advising that it was, they

17   did complete.

18   Q.    So all those first four steps are all completed before

19   anything is actually entered into the REALServicing system

20   on the comment log?

21   A.    That is correct.

22   Q.    And the entry on the comment log has a date stamp after

23   all that prior work has been completed?

24   A.    That is correct.

25   Q.    You mentioned that this loan with the borrower was

Sandra Lyew - Cross (Manning)

1    transferred over to Ocwen from another company.  Do you

2    recall that?

3    A.    Yes.

4    Q.    What company had this loan prior to Ocwen?

5    A.    Litton Loan Servicing.

6    Q.    Okay.  Did Litton Loan Servicing use the same system as

7    Ocwen or a different system?

8    A.    They use a different system called Radar.

9    Q.    So for loans that had been transferred over to Ocwen

10   from Litton, do those credit analysts have access to those

11   Litton systems?

12   A.    Most do.

13   Q.    Okay.  What's the name of that system?

14   A.    Radar.

15   Q.    When did that loan, Mr. Daugherty's loan transfer from

16   Litton to Ocwen?

17   A.    Towards the end of 2011.

18   Q.    What was the status of Mr. Daugherty's loan when it

19   transferred from Litton to Ocwen?

20   A.    The loan was already delinquent when it transferred

21   over to Ocwen.

22   Q.    Do you recall how delinquent it was?

23   A.    It was more than 120 days.

24   Q.    A couple of times during the testimony yesterday you

25   mentioned what you referred to as monthly data.  Do you

Sandra Lyew - Cross (Manning)

1  recall that?

2  A.   Yes.

3  Q.   When you refer to monthly data that Ocwen furnishes to

4  the credit bureaus, what are you talking about?

5  A.   There is a monthly data that is sent out to all the

6  agencies every month middle, towards the middle of the month

7  giving the status of the loan, a loan.

8  Q.   I'm going to show you for identification purposes

9  Defendant's Exhibit 2.

10       MR. YOUNG:  If Mr. Manning is going to move its

11  admission, we have no objection.

12       THE COURT:  What's the number?

13       MR. MANNING:  Defendant's Exhibit 2.

14       THE COURT:  All right.  You're moving it?

15       MR. MANNING:  Yes, Judge.

16       THE COURT:  All right.  Defendant's Exhibit 2 will

17  be admitted into evidence without objection and can be

18  published at your discretion.

19       MR. MANNING:  Thank you, Judge.

20       THE WITNESS:  Do you have a hard copy?  It's kind

21  of blurry.

22       MR. MANNING:  Yes.  I'm going to put a sticker on

23  it so we can track it.

24     Your Honor, may I approach the witness?

25       THE COURT:  Yes, sir.

Sandra Lyew - Cross (Manning)

1   BY MR. MANNING:

2   Q.   Ms. Lyew, you have what's been marked as Defendant's

3   Exhibit 2 in evidence.  What is this set of papers that is

4   identified as that document?

5   A.   These are, these are credit reporting screens that's

6   from REALServicing system.

7   Q.   Is this a depiction of the data that is transmitted

8   electronically through e-OSCAR to the credit bureaus?

9   A.   No.  As I said, there's nothing that's sent

10  electronically through e-OSCAR.  E-OSCAR -- the electronic

11  information comes from the CRAs to, through e-OSCAR to the

12  furnisher or Ocwen.

13  Q.   How is this information provided to the credit bureaus?

14  A.   This -- a report is -- a report is generated to be

15  electronically sent to the credit agencies.

16  Q.   How often is this data provided to the credit bureaus?

17  A.   Monthly.

18  Q.   What credit bureaus receive this data?

19  A.   All four bureaus; Experian, TransUnion, Equifax and

20  Innovis.

21  Q.   The fourth one you mentioned was Innovis?

22  A.   Innovis is a fourth credit reporting agency.

23  Q.   Okay.  Is the information that Ocwen furnishes on a

24  monthly basis to the credit bureaus the same for each of

25  those bureaus?

Sandra Lyew - Cross (Manning)

1    A.    Yes.

2    Q.    So let's talk about what this document shows.  If you

3    could direct your attention just to the first page, can you

4    identify the loan number at the top left of this document?

5    A.    The last four digits is 4537.

6    Q.    Do those match Mr. Daugherty's loan number?

7    A.    Yes.

8    Q.    How about the Social Security?  Do you see the last

9    four?

10   A.    Yes.

11   Q.    And, again, the record created -- we're still on that

12   top left box -- is a date and then a reporting period.  Do

13   you see those two dates?

14   A.    Yes.

15   Q.    So let's talk about each one.  The record created date,

16   what is that?

17   A.    That is the date that it's being generated, or I should

18   say reported.  This is the information that, the date that's

19   being reported to the credit, the CRAs, and the reporting

20   period is through the last date which is always a month

21   prior.

22   Q.    Okay.  So that's what the reporting period means that

23   this is -- it's conveying the information about

24   Mr. Daugherty's account from November and it's being sent

25   December 9th?

Sandra Lyew - Cross (Manning)

1    A.    Yes, that's correct.

2    Q.    Let's scroll down some.  Do you see the address, before

3    we move, address 35 Valley View Drive?

4    A.    Yes, I do.

5    Q.    Whose address is that?

6    A.    Mr. Daugherty's.

7    Q.    Okay.  Thank you.  Let's scroll down.

8          Now we have -- maybe we can blow this up a little bit.

9    The boxes can be difficult to read.  So account status,

10   portfolio type, compliance condition code.  There's a bunch

11   of comments in there.  Do you see that box, "account

12   status"?

13   A.    Yes.

14   Q.    Do you see that those fields mirror fields that appear

15   on the ACDV response?

16   A.    Yes.  Do you have the ACDV as well?

17              MR. MANNING:  Your Honor, may I approach?

18              THE COURT:  Yes, sir.

19   BY MR. MANNING:

20   Q.    Ms. Lyew, you have what's been marked as Plaintiff's

21   Exhibit 27 in front of you.  What are these documents?

22   A.    These are the ACDV forms.

23   Q.    And in the bottom right-hand corner you'll see that

24   there is a Bates stamp.  What does that Bates stamp

25   indicate?

Sandra Lyew - Cross (Manning)

1   A.   The Bates stamp of 1341?

2   Q.   The actual preface to it.  Who produced it?

3   A.   Oh, Ocwen.

4   Q.   So these are ACDV forms that Ocwen provided?

5   A.   That is correct.

6   Q.   Now, we can put these on the screen in a little bit.

7   The, the form of this document, you have both the ACDV

8   response and the monthly data.  The monthly data is what's

9   on the screen that the jury can see.  Right?

10  A.   Yes.

11  Q.   Okay.  So in "account status" then we have all these

12  different fields, and there's one called "compliance

13  condition code."  Do you see that?

14  A.   Yes.

15  Q.   On this monthly data page, that's blank; right?

16  A.   You're talking about this still?  Okay.  I'm sorry.

17  Q.   Yes.

18  A.   Yes.

19  Q.   There's nothing next to that field?

20  A.   No.

21  Q.   Now, if you turn to, in the, the hard copy that I gave

22  you to the Bates stamp OLS 606 I'd like you to look at that

23  screen.

24  A.   Okay.

25  Q.   Okay.  So please identify for the jury the reporting

                    Sandra Lyew - Cross (Manning)

 1   period and the record created dates.

 2   A.    The record created date was 4-10, 2012.  And it was

 3   reporting period through March 31st, 2012.

 4   Q.    Okay.  Now, if you scroll down on this, you'll see next

 5   to that, next to the "account status" box in the top left,

 6   on the top right there's account dates.  Do you see those?

 7   A.    Yes.

 8   Q.    Account date for date opened, can you identify what

 9   that date is?

10   A.    This is showing August 26th, 1999; and last payment

11   date March 20th, 2012.

12   Q.    Okay.  So date opened, I just want to focus on that

13   first.  What does that indicate about Mr. Daugherty's loan?

14   A.    This is the date that he signed the note and mortgage.

15   Q.    Okay.  Now, if you turn to the next page, OLS 607,

16   you'll see I'm looking at that same box, "account date."

17   And you'll see that the date opened has been modified.  Do

18   you see that date?

19   A.    Yes, it has been.

20   Q.    What is that date?

21   A.    July 20th, 1999.

22   Q.    Why was that date modified?

23   A.    It was modified because Litton had the incorrect open

24   date.  And when the loan transferred to Ocwen, once they

25   conducted their, their quality assurance, the note and

Sandra Lyew - Cross (Manning)

1    mortgage did not match the open date that was, that was

2    transferred over to Ocwen.  So they went ahead and had the

3    date changed in our system as well as forwarding it to the

4    credit reporting agencies when it's reported monthly.

5    Q.   Thank you.  Now, if you look to the, the bottom

6    right-hand, you'll see an "account history" box.

7    A.   Yes.

8    Q.   What does the "account history" box show?

9    A.   It identifies the, the months of delinquency from

10   December, 2011, January, February, and March.

11   Q.   So this is a little bit difficult for me to understand.

12   Do you see the row for 2011?

13   A.   Yes.

14   Q.   So I take it December, 2011, there's a 3.  Do you see

15   that box?

16   A.   Yes.

17   Q.   What does that mean?

18   A.   That means the loan was 90 days past due.

19   Q.   So 3 means three months past due?

20   A.   Yes.

21   Q.   Now, if you go one row up from there, we're looking at

22   the row for 2012.  In January there's a 2.  In February

23   there's a 3.  And in March there's a 4.  Is that right?

24   A.   That is correct.

25   Q.   Okay.  So this monthly data that's being furnished by

Sandra Lyew - Cross (Manning)

1    Ocwen to the credit bureaus is telling them in this box for

2    March, 2012, that the account is four months behind?

3    A.    That is correct.

4    Q.    So could we scroll up some?  Zoom out first.  And

5    what -- let's go to the previous page, okay, to the account

6    status.  Do you see the "account status" field?  There's a

7    little drop-down menu, an arrow that you can click.  What's

8    the code that's put in there?

9    A.    82.

10   Q.    What does 82 mean?

11   A.    It identifies the account status.

12   Q.    Do you know what that stands for?

13   A.    Delinquent.

14   Q.    Okay.  Do you know how many months delinquent it

15   represents?

16   A.    As of February, or I should say through March 31st,

17   2012, he was delinquent 90 days.

18   Q.    Okay.  Do you see under "account balances" on this same

19   page where it says "amount past due"?

20   A.    Yes.

21   Q.    What is the amount past due?

22   A.    $6,128.39.

23   Q.    And you saw a number of documents with that same amount

24   on it yesterday?

25   A.    Yes.

Sandra Lyew - Cross (Manning)

1    Q.    Now, let's go to the next page, 607.  And you can see

2    that under "account status" there's a new box -- well, I

3    misspoke.  It's not a new box.  It has a new code.  What's

4    the code?

5    A.    The code is 11.

6    Q.    What does 11 mean?

7    A.    11 I don't remember, but if you go down to the account

8    balance it's showing zero past due.  And that's through

9    April 30th, 2012.

10   Q.    So it may refresh your memory to look at the other

11   documents you have in front of you, the ACDVs from Ocwen.

12   A.    Yes.

13   Q.    Do you see those in front of you?

14   A.    Yes.

15   Q.    And you'll see that the first page has an account

16   status code of 11?

17   A.    Yes.

18   Q.    What is written next to that?

19   A.    "Account current."

20   Q.    Okay.  So the prior screen with the old opening date

21   had the borrower delinquent and a past due amount; correct?

22   A.    That is correct.

23   Q.    This screen has him current, zero past due, and the

24   date opened has been corrected?

25   A.    That is correct.

Sandra Lyew - Cross (Manning)

1  Q.   Now, if you could turn to OLS 625.

2  A.   Okay.

3  Q.   You'll see a lot of the same information about loan

4  number, Social Security, address, et cetera.  I'd like you

5  to focus on the bottom half of the page where again it's

6  showing account status with a code 11; right?

7  A.   Yes.

8  Q.   And in this document you'll see there's a compliance

9  condition code?

10 A.   Yes.

11 Q.   What's --

12 A.   XB.

13 Q.   When Ocwen was furnishing data to the credit bureaus

14 that this account had a compliance condition code of XB,

15 what does that mean?

16 A.   That means that the account is in dispute.

17 Q.   What's the amount past due at this point?

18 A.   Zero.

19 Q.   What's the account status code?

20 A.   11.

21 Q.   Now, let's blow up the account history if you could,

22 not you, Ms. Lyew.  I'll be more specific in my terms.

23 Let's look at the account history piece if you could focus

24 there.  You'll see that now we have another row populated

25 for 2013.  Do you see that?

Sandra Lyew - Cross (Manning)

1    A.    Yes.

2    Q.    And there's all zeros with the exception of one month.

3    What do the zeros indicate?

4    A.    That the account is current.

5    Q.    The exception to that is March, 2013.  What does the 1

6    indicate?

7    A.    The 1 indicates that the borrower was 30 days past due.

8    Q.    Why was Mr. Daugherty past due in March, 2013?

9    A.    I don't know.

10   Q.    Okay.  We are done with that document.  Thank you.

11         So we've talked now about direct and indirect disputes.

12   I want to get more specific on the indirect disputes.

13         When a credit analyst receives an ACDV response and

14   does the research, how do they know what codes to respond

15   with?

16   A.    That's part of their procedures.  They have codes that

17   they have to abide by.  The codes that are used for e-OSCAR

18   are also, we also use the same codes in REALServicing.

19   Q.    I'd like, I'd like to ask you -- I started about

20   training and I'd like to ask you about training again.  And

21   I want you to start with telling me about the credit

22   reporting department and their training that they receive

23   prior to being on the floor for actually doing the work.

24   A.    Okay.  They receive a one-month training class.  That

25   consists of two weeks classroom training which involves the

Sandra Lyew - Cross (Manning)

1  learning materials, the, their training manual, learning the

2  REALServicing system, the Vault, as well as e-OSCAR.

3  Q.    So after the classroom piece, the next piece you had

4  mentioned was shadowing.  What does the shadowing training

5  piece consist of?

6  A.    Yes.  So the -- they do shadow for two weeks as part of

7  the training process side-by-side with an experienced

8  analyst or associate depending on their, their position.

9  Q.    So two weeks in class, two weeks shadowing.  What

10  happens next?

11  A.    And then they go live.

12  Q.    Okay.  Once, once the analyst goes live and is able to

13  respond to either direct or indirect disputes, is there any

14  supervision of those individuals?

15  A.    There's always supervision to assure the quality

16  assurance.  The supervisors also do random, random pulling

17  on disputes that, whether you're experienced or a new

18  employee just to assure that everything is going correctly

19  and that's in compliance.

20  Q.    So let me make sure I understand that.  The compliance

21  department, which is separate from credit, is, --

22  A.    That is correct.

23  Q.    -- is doing random sampling?

24  A.    No.  The credit reporting supervisors do random pulling

25  of employees' work to confirm that they are in compliance

                        Sandra Lyew - Cross (Manning)

 1   to, and doing what they're supposed to do.

 2   Q.   The monthly data that we were just looking at, are you

 3   aware of any time when Ocwen was furnishing data to the

 4   credit bureaus through those monthly data packets that it

 5   was incorrect?

 6   A.   No.

 7   Q.   Now, I'd like to show you another document.  We looked

 8   at it at length yesterday.  It's Plaintiff's Exhibit 26.

 9   And I'll hand you a copy.

10       Plaintiff's Exhibit 26 is a very lengthy document.  The

11   first page of it has a Bates stamp.  And this is how I'm

12   going to orient us as we go through this.  The bottom corner

13   has 1635.  And then the last corner --

14   A.   I don't have 1635.

15   Q.   What's your first page?

16   A.   1636.

17   Q.   I'll give you mine.

18   A.   Unless it's in another section here.

19           MR. YOUNG:  This document hasn't been admitted.

20           MR. MANNING:  Plaintiff's Exhibit 26.

21           THE COURT:  It's not being published.

22           MR. YOUNG:  Excuse me, Your Honor?

23           THE COURT:  It is not being published.

24           MR. YOUNG:  Thank you.

25   BY MR. MANNING:

Sandra Lyew - Cross (Manning)

1  Q.   So, Plaintiff's Exhibit 26, the document that the

2  plaintiffs have marked as evidence, has a different first

3  page; right?  It's 16 --

4  A.   1636.

5  Q.   1636.  I handed you a page that's prior to that.  What

6  is that page?

7  A.   This is a detailed transaction history.

8        MR. YOUNG:  Your Honor, if counsel wants to make

9  that part of 26, I have no objection.

10        THE COURT:  All right.  I'll leave that to Mr.

11  Manning.

12        MR. YOUNG:  Okay.

13        MR. MANNING:  Thank you, Judge.  Just for clarity

14  sake, rather than altering what plaintiffs marked, I'll just

15  make it Defendant's 3.

16        THE COURT:  All right.

17  BY MR. MANNING:

18  Q.   So we'll talk about the missing page first.  What's

19  that page?

20  A.   A detailed transaction history.

21  Q.   What does the detailed transaction history show?

22  A.   It identifies the balance, any escrow balances, total

23  amounts, principal, any payments being received,

24  disbursements, if taxes are being paid, insurance.  It just

25  identifies the whole payment section for -- this is for the

Sandra Lyew - Cross (Manning)

1  cashiering department.

2  Q.   Okay.  Let's put this on the screen for the jury

3  because --

4       MR. MANNING:  Oh, Your Honor, I'd move for the

5  admission of Defendant's 3.

6       THE COURT:  Any objection, Mr. Young?

7       MR. YOUNG:  No objection, Your Honor.  I would

8  note that Exhibit 26 has the payment history as the last two

9  pages of the exhibit.

10       THE COURT:  All right.  Defendant's Exhibit Number

11  3 will be admitted without objection and can be published at

12  your discretion, Mr. Manning.

13       MR. MANNING:  Okay.  By my review, they're

14  different so let's stick with Defendant's Exhibit 3.

15       THE COURT:  If they are the same, I would admit

16  them just for ease of handling, counsel.  Go ahead.

17       THE WITNESS:  One is just easier to read than the

18  other.  This one is more detailed.

19       MR. MANNING:  Thank you, Judge.

20       THE COURT:  Go ahead.

21  BY MR. MANNING:

22  Q.   Let's, let's pull this up if we can.  I know there's a

23  lot of data on this sheet.  Let's take it in sections.

24       If you go to the top, it has borrower's name, property

25  address, next due, the mailing address, and then a whole

Sandra Lyew - Cross (Manning)

1    series of entries below that.  And let's just -- if you

2    could, for the jury identify at the top the heading of each

3    of those columns.  What columns are being represented?

4    A.   The loan number, the borrower's name, the property

5    address, the next due date, the mailing address, the

6    interest rate, the principal balance, and the escrow

7    balance.

8    Q.   Now, let's go down below that where it says

9    "transaction."

10   A.   Yes.

11   Q.   Could you read those headings off for the jury, please?

12   A.   The effective date, the time, the description, the next

13   due date, after principal, which was principal, principal

14   balance.  As payments are received, it gets reduced.  The

15   balance escrow, the total amount, which would be the total

16   amount of payment that was received, principal balance,

17   interest, escrow, suspense, other.

18   Q.   Thank you.  So let's scroll all the way to the bottom

19   now and it has the last date of a payment received

20   August 1st; is that right?

21   A.   That's correct.

22   Q.   It identifies it as a regular payment.  Do you see

23   that?

24   A.   Yes.

25   Q.   Let's scroll over to the right and see what the payment

Sandra Lyew - Cross (Manning)

1   amount was.

2   A.   The payment amount received was nine sixty-eight zero

3   eight.

4   Q.   What does that reflect in terms of what was received by

5   Ocwen from the borrower at that date?

6   A.   This was a payment that was received by the borrower.

7   Q.   I think you said by the borrower.  Do you mean from the

8   borrower?

9   A.   From the borrower.  I'm sorry.

10  Q.   Okay.  Thank you.  So that, that reflects the last

11  payment?

12  A.   Yes.

13  Q.   Now, let's go to the top where we can see the first

14  payment on the far left.  It has a couple of entries prior

15  to the first regular payment.  Is that right?

16  A.   Yes.

17  Q.   All right.  What does "new loan" mean?

18  A.   That is the description that is placed into

19  REALServicing when a loan is transferred into, from one

20  servicer to Ocwen's system.

21  Q.   Okay.  Then when do you see the first regular payment

22  that came in from the borrower on this loan?

23  A.   July 19th, 2012.

24  Q.   All right.  There are a couple of entries above that

25  that have a code of something else.  What's being reflected

Sandra Lyew - Cross (Manning)

1    there?

2    A.   It says "for multiple spread," between "spread" and --

3    I'll just keep it as "multiple."

4    Q.   And the 4-20, 2012, that's the timing of when Mr.

5    Daugherty had gotten his loan reinstated; right?

6    A.   That's when he reinstated his loan.

7    Q.   At that point, he had gotten current and then he began

8    making regular payments?

9    A.   That is correct.

10   Q.   So for the first roughly five months, Mr. Daugherty is

11   past due and referred to foreclosure?

12   A.   Yes.

13   Q.   Now, if you could turn back.  Put Defendant's Exhibit 3

14   to the side and let's talk about Plaintiff's Exhibit 26.

15        This is the comment history that you were asked about

16   yesterday.  Let's publish this.  Okay.  So when you started

17   today, you talked about what this document is.  What

18   information is contained in this comment log about

19   Mr. Daugherty's loan?

20   A.   Everything.

21   Q.   I'm going to try to be more specific with that and turn

22   to Page OLS 1727.

23   A.   Okay.

24   Q.   Thank you.  So the first entry on 1727 has a date

25   April 23rd, 2014.  And if you follow it over to the

Sandra Lyew - Cross (Manning)

1   right-hand side, it says "BWR automated CDV."  Is that

2   right?

3   A.   Yes.

4   Q.   Okay.  What is being reflected by the entry that was

5   made by the credit analyst at this time?

6   A.   It's identifying what was received.

7   Q.   What is identified as the borrower's concern?

8   A.   Disputes present/previous account status, payment

9   history profile, payment rating.  And then it says "verify

10  payment history profile, account status, and payment

11  rating."

12  Q.   And then below that there's another entry same date

13  five seconds later that says "completed."  Do you see that?

14  A.   Yes.

15  Q.   Okay.  And the entry there reflects what?

16  A.   The entry stating -- are you -- advising what was sent?

17  Q.   That was a bad question.  I'm sorry.

18  A.   Yeah.

19  Q.   What is the entry that the credit analyst made at that

20  time?

21  A.   Code 11 -- account status 11, current account as of

22  March, 2014.

23  Q.   So you began your deposition by saying that the four

24  prior steps in a dispute resolution process had occurred

25  prior to those two entries being made; is that right?

Sandra Lyew - Cross (Manning)

1   A.   That is correct.

2   Q.   Now, I want, I want you to have the Equifax document

3   that you were asked about yesterday so that we can see that

4   while you have that comment log page in front of you.

5   A.   I don't have the Equifax.

6   Q.   I'm going to get it for you.

7   A.   Oh, okay.

8   Q.   So you have in front of you Plaintiff's 18.  It has an

9   identification number as EIS 276.  Do you see that?

10  A.   276?  I'm sorry.  Where are you at?

11  Q.   Yeah.  I'm on the Equifax document.

12  A.   Oh, okay.

13  Q.   And that's a Bates stamp.  It's just a tracking number.

14  It says EIS 276.

15  A.   Okay.

16  Q.   Now, if you recall from yesterday, this is one of the

17  documents that you were asked about with -- matching the

18  control number up against the comment logs that you could

19  see.  This Equifax document has the same control number as

20  what's being entered into the comment log.

21  A.   Yes.

22  Q.   Okay.  We're on the same page.  Now, this is the

23  document that we've talked about already in the trial.  Do

24  you see how below a number of these fields there are rows

25  that have a slightly darker shade?

Sandra Lyew - Cross (Manning)

1    A.    On this?

2    Q.    Okay.  I'm sorry.  Let me try it this way.  I'm going

3    to ask you to focus specifically on "account type."

4    A.    Okay.

5    Q.    In "account type" you'll see that there's two white

6    rows below that.

7    A.    Yes.

8    Q.    The top row is a little bit lighter on my copy.  It may

9    not be on yours.  But the second row has information that's

10   being modified.  Do you see that?

11   A.    Yes.

12   Q.    Okay.  So, now, if you look at the date open, you'll

13   see that Equifax had a date open of August, 1999.  And Ocwen

14   is requesting it be modified to July, 1999.  Do you see

15   that?

16   A.    Yes.

17   Q.    And we saw those same dates on the monthly data that

18   we've already identified; right?

19   A.    Yes.

20   Q.    The next field below that there's three fields that

21   have, again, that darker bold shade.  High credit is the

22   same.  Current balance is different.  And past due is

23   different.  Do you see that?

24   A.    Yes.

25   Q.    Okay.  So let's focus on the past due column.  Do you

Sandra Lyew - Cross (Manning)

1  see the first row there?  It has an amount $6,128?

2  A.    Yes.

3  Q.    We saw that number also on the monthly data.  That was

4  that sheet that had the old incorrect open date; right?

5  A.    Yes.

6  Q.    And then Ocwen is requesting that Equifax modify that

7  also and reflect it as zero; right?

8  A.    Yes.

9  Q.    Below that you'll see "last payment date."  Do you see

10  that there's a date in bold that's a request from Ocwen to

11  modify it as March, 2014?

12  A.    Yes.

13  Q.    So Equifax was reporting that the last payment date was

14  January, 2012.  Ocwen requested it be modified to March,

15  2014.

16  A.    Yes.

17  Q.    All those fields that reflect Ocwen is requesting that

18  Equifax fix something are -- there's, there's a number of

19  them.  Could you just count, count those and tell me how

20  many you see that were requests to modify?

21  A.    I'm just going to count again.

22  Q.    Okay, sure.  I know it's hard to read.

23  A.    19.

24  Q.    My count was a little lower.  But, regardless, the

25  point is there's a number of fields that Ocwen is requesting

Sandra Lyew - Cross (Manning)

1   Equifax modify?

2   A.   Yes.

3   Q.   Okay.  Now, if we look back at the comment log, you'll

4   see that none of that work is being identified in the

5   comment log that corresponds with that ACDV response; right?

6   A.   Correct.

7   Q.   So in the comment log it doesn't say that there was any

8   research done?

9   A.   Correct.

10  Q.   Well, how did he know what fields to put in here?

11  A.   Again, it's done prior to the entries.  The, the codes

12  entered into REALServicing is identifying what was received

13  and what -- and, and it was completed.  Why it didn't get

14  into full details, I don't know.

15       However, again, it falls back to this is just part of

16  the, showing the workflow into REALServicing.  But

17  everything goes through the e-OSCAR and that's sent prior to

18  the entries into REALServicing.

19  Q.   The analyst who made this entry in the comment log, in

20  addition to not identifying the work that he or she did,

21  doesn't identify what systems he or she used; right?

22  A.   Correct.

23  Q.   So this data -- I mean, was it just a guess?  Where did

24  they get it from?

25  A.   They conducted their full research, again prior to,

Sandra Lyew - Cross (Manning)

1  prior to making any of these entries.  And the research is

2  conducted again through REALServicing, through the Vault,

3  just get all -- and they have their -- the screen -- they

4  have -- each department has certain screens.  They --

5  screens that they deal with for that department.

6     Taxes have their own taxes screen that they can only

7  make entries.  In this case, the credit reporting department

8  has their own screens that they deal with in REALServicing

9  as well.  And they, they don't have access to any other

10 departments.

11 Q.   Okay.  So the monthly data fields that, that -- the

12 monthly furnishing data that we looked at already, would

13 that be available to the credit analyst who was responding

14 to an ACDV?

15 A.   The associate has access to view it.  The analysts have

16 access to, to correct it.

17 Q.   Where, where is that data housed internally at Ocwen?

18 A.   The data?

19 Q.   Yes.

20 A.   The REALServicing?

21 Q.   Well, that's what I'm asking.  The monthly data and --

22 I know I'm asking without showing you.  Defendant's Exhibit

23 2 is the monthly data.  That's what I'm asking you about.

24 What, what system at Ocwen houses that data?

25 A.   This is in REALServicing.

Sandra Lyew - Cross (Manning)

1    Q.   Okay.  So when you were saying credit analysts have

2    access to REALServicing, that data is included?

3    A.   Yes.

4    Q.   I just wanted to give you the binder that has the ACDV

5    responses.  I know you have like four things in front of you

6    now, but we're going to do the best we can to correspond all

7    of these.

8         We talked about the comment log, the Equifax ACDV.  Now

9    I want to show you the corresponding Ocwen ACDV.  It's

10   already been marked as Plaintiff's Exhibit 27.  And just so

11   you know where I am, Ms. Lyew, the Bates stamp in the bottom

12   right is OLS 1343.

13   A.   Okay.

14   Q.   Okay.  OLS 1343, do you have that in front of you?

15   A.   Yes.

16   Q.   Okay.  So this has -- and the account number, once

17   again, is the same throughout all these documents; right?

18   A.   Yes.

19   Q.   And then it has a control number which corresponds to

20   both the comment log and Equifax's response?

21   A.   Yes.

22   Q.   All right.  So could you please identify what the

23   dispute is that was received?

24   A.   The dispute code?

25   Q.   Yes, in the first row, dispute code 1.

Sandra Lyew - Cross (Manning)

1  A.    Okay.  It says, "Disputes present/previous account

2  status, payment history profile, payment rating.  Verify

3  payment history profile, account status, and payment

4  rating."

5  Q.    Now, that code has corresponding instructions from

6  Equifax as to what Ocwen is to do next to it.  What does

7  that say?

8  A.    "Verify payment, payment history profile, account

9  status and payment rating."

10  Q.    Those three things that Ocwen is being instructed to

11  review corresponds with fields on this page; right?

12  A.    Yes.

13  Q.    So let's take them one at a time.  Payment history

14  profile, where does that appear?

15  A.    That would be in the -- Page 2.

16  Q.    Okay.  And this payment history, this box with various

17  years on the left-hand column with white "request" rows and

18  gray "request" rows below it mirrors the data that we looked

19  at that Ocwen has in its internal system?

20  A.    Correct.

21  Q.    Now, when I say "mirrors," I'm not saying they're all

22  identical.  I'm saying the format of it mirrors it.  It

23  looks the same.

24  A.    Similar, yes.

25  Q.    Okay, similar.  So when we're talking about this, do

Sandra Lyew - Cross (Manning)

1  you see here where there's a number of fields that Ocwen

2  requested Equifax modify?  Do you see that?

3  A.    Ocwen's response?  You're talking about Ocwen's

4  response?

5  Q.    Yes.

6  A.    Okay.

7  Q.    We're still on the payment history.  There's a number

8  of rows.  I'm not doing a great job guiding you, so let me

9  get more specific.

10  A.    Just tell me the year.

11  Q.    Do you see 2013?

12  A.    Yeah.

13  Q.    There's "request" and "response."  Do you see any boxes

14  where Ocwen is requesting that that information be modified?

15  A.    Yes.

16  Q.    Let's just focus on 2013.  How many different boxes did

17  Ocwen request be modified?

18  A.    The whole 12 months.

19  Q.    And it looks like they were all changed to zeros except

20  for one month?

21  A.    Correct.

22  Q.    And that one month is March, 2013?

23  A.    Correct.

24  Q.    We've already looked at the monthly data that shows the

25  same thing; right?

Sandra Lyew - Cross (Manning)

1   A.   Yes.

2   Q.   So Ocwen's sending monthly data.  Equifax is getting it

3   wrong.  Ocwen tells them again here, "Please fix those

4   months."

5   A.   Yes.

6   Q.   Okay.  That's all just what I'm calling one field,

7   payment history.

8   A.   Correct.

9   Q.   And there's other fields on here.  I'm not going to

10   belabor the point.  Let's go back to Page 1.

11        So we've checked one off the list, payment history.

12   Now let's talk about the second field that they're

13   instructed to review.  What is the second field?

14   A.   Account status.

15   Q.   All right.  Where does that appear on this document?

16   A.   In "account information" on the bottom, close to the

17   bottom, first row.

18   Q.   Okay.  So here there's another change.  What is it?

19   A.   Identifying that the account is current.

20   Q.   And there are codes?

21   A.   Yes, code 11.

22   Q.   And that was changed to 11 from what?

23   A.   82.

24   Q.   Okay.  So that's the second field in the instructions.

25   What's the third field?

Sandra Lyew - Cross (Manning)

1    A.    MOP.

2    Q.    If you look at dispute code 1, there's a code 106.  And

3    then next to the code there's the instructions.  We've

4    talked about payment history, account status, and then

5    there's a third field.

6    A.    The payment rating?

7    Q.    Yes.

8    A.    Okay.

9    Q.    Where would, where would I find payment rating on this?

10   A.    The same section as the account information below the

11   account status.

12   Q.    All right.  This field appears to be blank on both

13   Equifax and Ocwen's; is that right?

14   A.    The response is blank.

15   Q.    And, again, that was a bad question.  I apologize.  I'm

16   only asking you to look at the Ocwen ACDV.  Under "account

17   status" field there's a white column reflecting what Equifax

18   is requesting.  And do you see under "payment rating" how

19   that field is blank?

20   A.    Yes.

21   Q.    And then similarly the response from Ocwen is blank?

22   A.    Yes.

23   Q.    Were there any other dispute codes identified by

24   Equifax?

25   A.    No.

Sandra Lyew - Cross (Manning)

1  Q.   Were there any other instructions or information

2  provided about the borrower's dispute that Equifax received?

3  A.   No.

4  Q.   Okay.  Now, I'd like you to look at the monthly data --

5  I'm sorry, my mistake -- the comment log which is

6  Plaintiff's Exhibit 26.  That's the big binder.  And I'm

7  going to give you a specific -- let me get the others.  So

8  do you have the account log in front of you?

9  A.   Yes.  What page?

10 Q.   Page -- it has a Bates stamp of OLS 1734.

11 A.   Okay.

12 Q.   All right.  So on this page if you look at June 16th,

13 2014, and follow that over to the right-hand side you'll see

14 "borrower" and it's an abbreviation, BWR, "automated CDV."

15 Do you see that?

16 A.   Okay.

17 Q.   There's a control number for the ACDV received and it

18 ends 8129; right?

19 A.   Correct.

20 Q.   Now, I'm going to hand you another exhibit, the Equifax

21 ACDV that corresponds to this.  It is already in evidence as

22 Plaintiff's 21.  On Plaintiff's 21 if you could turn to EIS

23 322.

24 A.   You're going to have to give me that exhibit.

25 Q.   I'm sorry.

Sandra Lyew - Cross (Manning)

1   A.   Thank you.

2   Q.   Okay.  I know there's a lot of paper.  I'm sorry about

3   that.  The Equifax document that is an ACDV response has the

4   same control number ending 1129?

5   A.   Yes.

6   Q.   Now, it's similar to the last one we saw.  There are a

7   number of different fields that are being requested by Ocwen

8   that Equifax modify; right?

9   A.   Yes.

10  Q.   So this document has a date, a date created in the

11  upper left-hand column that says June 3rd, 2014?

12  A.   I'm sorry.  You are --

13  Q.   Still on the Equifax document.

14  A.   Oh, yes, yes.  I see it now.  Okay.  Thank you.  And

15  the response date -- the due date is June 23rd, 2014.

16  Q.   Yes.  So this document is two months later from the one

17  we just saw in April?

18  A.   Correct.

19  Q.   And this one also has various fields.  Again, we don't

20  have to go through all of them.  I'm just going to highlight

21  to "date open."  Do you see there's a "request" and a

22  "modify"?

23  A.   Yes.

24  Q.   And they're the same as two months ago when Ocwen

25  requested that Equifax modify the incorrect date open?

Sandra Lyew - Cross (Manning)

1   A.   Correct.

2   Q.   Similar, paid -- "past due," do you see there's that

3   same number which goes all the way back to when

4   Mr. Daugherty was in default $6,128?

5   A.   Correct.

6   Q.   And then the zero --

7   A.   Yes.

8   Q.   -- is what Ocwen is saying, "Please fix this;" right?

9   A.   Yes.

10  Q.   Okay.  This one at the bottom, there's -- again,

11  there's codes all over the place.  But what I'm pointing out

12  to you is the account status.  This is one of the fields

13  that's within the dispute that's identified.  Do you see the

14  account status 82 meaning 120 days past due?  Ocwen is

15  telling Equifax, "Change this to current account."

16  A.   Correct.

17  Q.   There's -- there was some discussion yesterday about

18  special comment code.  Do you know what that means?

19  A.   No.

20  Q.   You're not a fair credit reporting expert; right?

21  A.   No, I'm not.

22  Q.   Have you had -- I mean, you mentioned a bunch of

23  training that credit analysts receive.  Did you receive any

24  training in credit or dispute resolution?

25  A.   I'm -- I never worked in the credit reporting

Sandra Lyew - Cross (Manning)

1    department.

2    Q.    The account status here of "current account" is being

3    requested to be, to be altered.  And now I'd like -- now

4    that we've seen what that -- the modifications Ocwen is

5    requesting, I'd like you to look back at the comment log.

6    A.    Equifax is requesting?

7    Q.    I'll, I'll clarify my question.  Equifax is requesting

8    certain things per the dispute code --

9    A.    Yes.

10   Q.    -- that Ocwen investigate?

11   A.    Correct.

12   Q.    Ocwen is responding to Equifax that certain things need

13   to be fixed?

14   A.    Correct.

15   Q.    Thank you.  Now we'll go to the comment log.  And the

16   comment log 1734, this is the same entry -- let's see if we

17   can make this a little bit easier.  I'm going to give you a

18   highlighter so you can point out on the screen and highlight

19   the relevant piece; not this screen, the document here.

20   A.    Oh, okay.

21   Q.    So we can find our place.  So I'm talking about

22   June 16th, 2014.  There's the ACDV received.  You already

23   talked about how that's the last step.  This document was

24   created June 3rd.  This entry is being made June 16th.

25   Right?

Sandra Lyew - Cross (Manning)

1   A.   Yes.

2   Q.   So we're talking about two weeks later?

3   A.   Yes.

4   Q.   Now, similarly in this comment if we could scroll over

5   just to show the entries that are being made on the comment

6   log, you'll see what the credit analyst who handled this

7   dispute entered following their work.  Do you see that?

8   A.   The reporting to the credit bureau section?

9   Q.   I'm looking under the control number.

10  A.   Okay, so the ACDV RC code placed.  And then we have

11  Mr. Daugherty's name, the control number.

12  Q.   This, this is a different control number, so I need to

13  clarify that on the record.  This, this control number

14  doesn't correspond and that's my mistake.  I apologize.  Let

15  me find the right one.  Okay.  You need to turn to OLS 1736.

16  A.   Okay.

17  Q.   Are you there?

18  A.   Yes, I am.

19  Q.   And for the record, the last four digits of the control

20  number are 1129?

21  A.   Correct.

22  Q.   Can you confirm for me that you have an Equifax ACDV

23  response with the same last four control number in front of

24  you?

25  A.   Okay.

Sandra Lyew - Cross (Manning)

1    Q.   Okay.  So now I know we're shuffling a lot of paper.

2    You've got the comment log, Plaintiff's Exhibit 26, Page

3    1736?

4    A.   Yes.

5    Q.   You've got the Equifax document which is Plaintiff's

6    21, EIS 322?

7    A.   Yes.

8    Q.   And now you've got Ocwen's ACDV response which is part

9    of Plaintiff's 27, OLS 1357.

10   A.   Correct.

11   Q.   Okay, great.  Thank you.  So number of fields being

12   requested by Ocwen to be modified.  Now we're going to look

13   at the comment log.  Can you tell me what the entry made on

14   June 19th, 2014, reflects was received from Equifax?

15   A.   Code 106, "disputes present/previous account status,

16   payment history profile, payment rating."  And then it is

17   requesting to verify payment history profile, account

18   status, and payment rating.

19   Q.   And then on the next page there's that follow-up entry

20   which is completed.

21   A.   Correct.

22   Q.   As you talked about a lot yesterday, that follow-up

23   entry is made five seconds later.  Do you see it?

24   A.   Yes.

25   Q.   Okay.  So all of this work that's being done by Ocwen's

Sandra Lyew - Cross (Manning)

1  credit analyst and being put into a document, there's no way

2  that could have been done in five seconds; right?

3  A.    Correct.

4  Q.    And the numbers on it match Ocwen's monthly data?

5  A.    Correct.

6  Q.    Which is in REALServicing?

7  A.    That is correct.

8  Q.    And, so, in order to get that data, Ocwen's credit

9  analyst would have to go into that system, find the right

10  page, and then compare and pull the data into the ACDV

11  response?

12  A.    Can you repeat that?

13  Q.    Yeah, bad question.  The Ocwen credit analyst would --

14  in part of the research would go to REALServicing?

15  A.    Yes.

16  Q.    Then they would identify the correct time period of the

17  monthly data?

18  A.    Yes.

19  Q.    Then they would take that information field by field

20  and plug it into the ACDV response?

21  A.    Yes.  You mean enter it into the --

22  Q.    Yeah.  I keep using "plug it in."  I'm sorry.  Type it.

23  A.    Yeah, enter it into the e-OSCAR ACDV response.

24  Q.    So maybe, maybe I need to clarify.  Does that mean

25  somebody's literally looking at a screen and then looking at

Sandra Lyew - Cross (Manning)

1  a different screen or opening and closing fields?  How does

2  all that work?

3  A.    Yeah.  They have to come out of the REALServicing to,

4  to open up the e-OSCAR and log into the e-OSCAR based on the

5  IDs and passwords that was provided to them and enter all

6  the information that they research.

7       So this is why they research first and have their

8  findings so that they can enter it into the e-OSCAR system

9  to respond to the CRA.

10  Q.    Okay.  How long does that process take?

11  A.    It varies on the dispute.  So it can run from up to 10

12  minutes to days or even weeks.  The CRA, the CRA agencies

13  give them 22 days to, to respond back.  So they have, they

14  have a -- they have to respond by the date that is provided

15  on the request.

16  Q.    So on that -- on any of these documents, the three sets

17  of documents you have in front of you, Ocwen's ACDV

18  response, Equifax's ACDV response, and the comment log, I

19  don't see any date that shows when Ocwen actually received

20  it.

21  A.    No.  It would show on the ACD form when it was received

22  and responded to.  Let's see here.  This is just the

23  response date and it has the due date on the ACDV form.

24  Q.    Okay.  Let's put that one up.  It's Plaintiff's 27.  I

25  have it.  So just to point out what we're talking about, OLS

Sandra Lyew - Cross (Manning)

1    1357 -- and, Ms. Lyew, you were talking about the response

2    date and the response due date.  Is that right?

3    A.    Correct.

4    Q.    So it does -- the ACDV form that Ocwen has does show a

5    date that the response was made and a date that the response

6    was due, but it doesn't say when Ocwen actually received it?

7    A.    No.

8    Q.    Do you know if you compared that to the Equifax ACDV

9    response in front of you?  It has a date created; right?

10   A.    Yes, it does.

11   Q.    Do you know if that's the date that Ocwen received it?

12   A.    I don't know.

13   Q.    Okay.  That's fair.  That date is about two weeks

14   before the response was made?

15   A.    Correct.  As long as it's completed prior to the due

16   date, they have 22 days to complete.

17   Q.    And you're not aware of any of these responses that

18   were ever late; right?

19   A.    Based on my review for this, it's never been late.

20          MR. MANNING:  Your Honor, I'm about to transition

21   to a different document.  Should I keep going or are we

22   about at our morning break?

23          THE COURT:  If this is a good time, I'll give the

24   jury a break, Mr. Manning.

25          MR. MANNING:  Thank you, Judge.

Sandra Lyew - Cross (Manning)

1        THE COURT:  All right.  Thank you.

2        Ladies and gentlemen of the jury, I'm going to recess

3   you at this time.  Do not discuss the case among yourselves

4   or permit anyone to discuss it with you or in your presence.

5   And please be in your jury lounge at five minutes till the

6   hour.  We'll stand in recess.

7        (Recess taken from 10:37 a.m. until 10:57 a.m.)

8        THE COURT:  Mr. Manning.

9        MR. MANNING:  Thank you, Your Honor.

10  BY MR. MANNING:

11  Q.  Ms. Lyew, do you still have the comment log in front of

12  you, Plaintiff's Exhibit 18 -- I'm sorry -- 26?

13  A.  Yes, I do.

14  Q.  I'd like you to turn to Bates stamp OLS 1739, please.

15  A.  Okay.

16  Q.  We can scroll -- do you see the text of the entry --

17  this is June 26th, 2014.  Richard Hightower made an entry;

18  correct?

19  A.  Yes.

20  Q.  Okay.  Now, we'll look at what, what's written here.

21  What is being entered into this system as of that date and

22  time as indicated by this document?

23  A.  In the middle portion when it's beginning --

24  Q.  I'm starting at the top, June 26th, 2014.

25  A.  The heading?

Sandra Lyew - Cross (Manning)

1   Q.   Yes.

2   A.   "Consumer Financial Protection Bureau dispute

3   completed."

4   Q.   Then if you go to the next page, there's a Bates stamp

5   1740.  And there's an entry July 2nd where there's another

6   CFPB dispute completed entered.

7   A.   Yes.

8   Q.   And if you go towards that middle paragraph, just take

9   a moment and review that so you can tell me what's going on

10   in this, this entry.  What is Mr. Hightower entering into

11   the comment log in REALServicing as of that date and time?

12   A.   You want me to read it?

13   Q.   Just to yourself.  You don't need to do it verbatim.

14   A.   Oh, okay.

15   Q.   So there's two paragraphs in the middle there that

16   says, "Ocwen is obligated to report true and accurate

17   information to the credit bureaus.  Therefore, the credit

18   reporting cannot be changed.  We report to Equifax,

19   TransUnion, Experian, and Innovis."  Do you see where I'm

20   reading?

21   A.   Yes.

22   Q.   So below that it says, "However, in an effort to assist

23   David Daugherty, Ocwen's records indicate on July 2nd, 2014,

24   this office submitted a credit update to the four major

25   credit reporting agencies."  Do you see where I'm reading?

Sandra Lyew - Cross (Manning)

1  A.    Yes.

2  Q.    So what credit update is being referred to there?

3  A.    The Automated Universal Data to all four bureaus.

4  Q.    And that was one of the things you talked about

5  yesterday, but weren't able to see?

6  A.    Yes.

7  Q.    I'd like to show you a copy of that so that you can

8  identify it.  For the record, it's OLS 310.

9        Ms. Lyew, I've handed you what's been marked for

10 identification purposes -- and can you see the sticker on

11 that page?

12 A.    Yes, I do.

13 Q.    What, what number does it have on there?

14            MR. YOUNG:  Excuse me.  Your Honor, Mr. Manning, I

15 have no objection to the admission of this exhibit.

16            THE COURT:  It's 16?

17            MR. MANNING:  It's Defendant's 4.

18            THE COURT:  All right.

19      And you have no objection?  Is that what you've

20 indicated?

21            MR. YOUNG:  I have no objection, Your Honor.

22            THE COURT:  Are you moving it, Mr. Manning?

23            MR. MANNING:  Yes, Your Honor.

24            THE COURT:  All right.  Defendant's Exhibit 4 will

25 be admitted into evidence without objection and can be

Sandra Lyew - Cross (Manning)

1    published at your discretion.

2            MR. MANNING:  Thank you, Judge.  I'd like to

3    publish this so the jury can see it, please.

4    BY MR. MANNING:

5    Q.   So, Ms. Lyew, on your screen you'll see the same thing

6    that you have in hard copy form; correct?

7    A.   Yes.

8    Q.   All right.  So at the top it says "universal data form,

9    AUD correction indicator update."  Do you see that?

10   A.   Yes.

11   Q.   Okay.  So on this form -- let me start by asking you

12   what is it and what is it about?

13   A.   Again, this is a universal data form that is sent to

14   all four bureaus.  It's a factual report so that everyone --

15   to confirm that all the credit reporting agencies are on the

16   same page.  Again, this is the coach sending it to its

17   players.

18   Q.   So the top piece is customer information and it

19   identifies Mr. Daugherty with his property address; right?

20   A.   Yes.

21   Q.   Then you go to the account information and it has a

22   variety of information there.  Do you see the account

23   number?

24   A.   Yes.

25   Q.   There's only one account number that Mr. Daugherty has

Sandra Lyew - Cross (Manning)

1    with Ocwen; right?

2    A.    That is correct.

3    Q.    You haven't seen any documents or any indication

4    whatsoever that Ocwen ever furnished data twice to anybody?

5    A.    No.

6    Q.    The date open on this form is July 20th, 1999, which

7    goes back to what we started with, the monthly data.  That's

8    the same date that Ocwen over a year ago had told Equifax,

9    "Fix the opening date."

10   A.    Correct.

11   Q.    It gives a current balance.  Do you see that?

12   A.    Yes.

13   Q.    And then amount past due.  What's the amount past due

14   there?

15   A.    Zero.

16   Q.    Then if we go towards the bottom you'll see the account

17   history.  And we've seen a number of versions of this, one

18   on the monthly data, one on the ACDVs, and now on an AUD.

19   Is that right?

20   A.    Yes.

21   Q.    And this is that pay history field that we had talked

22   about; right?

23   A.    Yes.

24   Q.    Okay.  What are the numbers that are appearing in those

25   top two rows for the most recent 12-month periods?

Sandra Lyew - Cross (Manning)

1    A.    Zero.

2    Q.    What does zero indicate?

3    A.    Current.

4    Q.    When was this form created?

5    A.    July 2nd, 2014.

6    Q.    How do you know that?

7    A.    It's indicated on the bottom left-hand corner.

8    Q.    And that corresponds with what Mr. Hightower entered

9    into the comment log on July 2nd, 2014?

10   A.    Yes.  And above it identifies the AUD control number as

11   well to all four bureaus.

12   Q.    Was this the first AUD control number?

13   A.    No.  There was one prior to this.

14   Q.    And there was also some testimony about other Ocwen

15   ACDV responses.  The earliest Ocwen has is April, 2014?

16   A.    Yes.

17   Q.    Why is that?

18   A.    Ocwen did not archive -- save or archive prior to 2014.

19   That's when they began.

20   Q.    What was the most current information that Ocwen had

21   available to it when Mr. Daugherty filed his lawsuit

22   regarding forms available on e-OSCAR?

23   A.    Can you repeat that?

24   Q.    Yeah, bad question.  So yesterday you talked about the

25   e-OSCAR system and how data was only available for three

Sandra Lyew - Cross (Manning)

1   months on e-OSCAR.

2   A.    Yes.

3   Q.    So Mr. Daugherty filed his lawsuit on July 8th, 2014.

4   A.    Yes.

5   Q.    Three months prior to that would have been April?

6   A.    Yes.

7   Q.    What's the date of the earliest ACDV that Ocwen has?

8   A.    April.

9   Q.    Similarly, the prior AUD that Ocwen sent, the one

10  before the July AUD that we're looking at now was in March,

11  2014; right?

12  A.    Correct.

13  Q.    Does that explain why that one isn't available either?

14  A.    Correct.

15  Q.    Now, you still have Equifax documents in front of you.

16  A number of times yesterday you pointed out that you're not

17  in a position to interpret Equifax documents; right?

18  A.    Correct.

19  Q.    You never worked at Equifax?

20  A.    No.

21  Q.    You're not aware of what their policies and procedures

22  are?

23  A.    No.

24  Q.    You're not an expert in credit reporting?

25  A.    No.

Sandra Lyew - Cross (Manning)

1    Q.    The issue is -- with those Equifax documents you can

2    only identify the information that you can factually point

3    out and correspond it to Ocwen's data?

4    A.    Correct.

5    Q.    So I'm going to take all that stuff away from you and I

6    only have one more document.

7         Ms. Lyew, I've handed you what's been marked already as

8    Plaintiff's Exhibit 10.  I'd like to publish that to the

9    jury.  Do you see -- this document is on Ocwen letterhead.

10   Can you identify the date and to whom it was sent?

11   A.    The letter is dated February 5th, 2014, to David

12   Daugherty at 35 Valley View Drive, Vienna, West Virginia,

13   26105.

14   Q.    What is this letter about?

15   A.    This is regarding the balloon letter.

16   Q.    Okay.  What do you mean by balloon letter?

17   A.    Okay.  It's advising Mr. Daugherty that his loan is due

18   to mature July 26th, 2014.  And it also, it also states

19   that -- it does state that it will not accept any mortgage

20   payments beyond the maturity date.

21   Q.    Well, we have looked at Defendant's 3, the transaction

22   history earlier.  And I thought you had told me that there

23   was a payment that was accepted August 1st.

24   A.    Yes.  That was for the July 26th, 2014, payment.

25   Q.    Okay.  So that was accepted as a regular monthly

Sandra Lyew - Cross (Manning)

1   payment?

2   A.   Yes, as the last payment.

3   Q.   Now, after that, at that point the full balance on the

4   loan became due?

5   A.   Correct.

6   Q.   And do you know what the full balance was when it

7   became due?

8   A.   It is 79,000 -- it's on that payment history.

9   Q.   You may still have it in that binder.

10  A.   No.  You took everything.

11  Q.   You're right.  Sorry.  By looking at Defendant's

12  Exhibit 3, the payment history that we talked about earlier,

13  can you tell me what was due at the time the balloon became

14  mature?

15  A.   $79,198.72.

16  Q.   After that became due are you aware of whether

17  Mr. Daugherty ever attempted to make further payment?

18  A.   Not since the last web payment on 8-1.

19  Q.   Okay.  So that -- the last time Mr. Daugherty tried to

20  pay on the account was for that 8-1 regular payment?

21  A.   Yes.

22  Q.   When -- do you know when that 8-1 payment was actually

23  sent in by Mr. Daugherty?

24  A.   It was, it was received on 8-1.

25  Q.   Okay.  Then after that, how do you know Mr. Daugherty

Sandra Lyew - Redirect (Young)

1   never tried to pay anything ever again?

2   A.   Well, I reviewed the comment log.  The comment log

3   doesn't identify the borrower sending in a payment or, or

4   calling in with regards to trying to make a payment.

5   Q.   If Mr. Daugherty had attempted to make any payment,

6   would Ocwen have accepted it?

7   A.   If Ocwen -- Ocwen would not accept any additional web

8   payments or Speedpay payments.  It would only -- it would

9   accept if the borrower had mailed in a check.

10  Q.   Okay.  Would the check have to be in the full amount of

11  the 80,000 he owed?

12  A.   That, that's what is required.

13  Q.   Okay.  Was any such check ever received or attempted to

14  be made?

15  A.   No, no check for the full amount or a regular payment

16  was received.

17  Q.   Are you aware of how much is owed on that loan now?

18  A.   Roughly 95,000 and change which includes additional

19  fees and costs other than the principal balance.

20  Q.   So it's been about, almost two full years at that full

21  balance and it's now up to 95,000?

22  A.   Approximately.

23  Q.   Thank you.

24          THE COURT:  Anything further of this witness,

25  Mr. Young?

Sandra Lyew - Redirect (Young)

1          MR. YOUNG:  I do, Your Honor.

2          THE COURT:  Ladies and gentlemen, let me say to

3   you that normally when one party calls a witness, as I told

4   you in my opening instructions, the other party would

5   cross-examine.  And then the party that called would

6   redirect the witness.

7       Here both of the parties wanted to call this witness.

8   And, so, that's why you have seen somewhat of a different

9   situation than you saw with the other witnesses.

10      Mr. Young.

11          MR. YOUNG:  Thank you, Your Honor.

12                    REDIRECT EXAMINATION

13  BY MR. YOUNG:

14  Q.   Do you still have this white binder, ma'am?

15  A.   Yes.

16  Q.   Could you look at the very last page?  I want to talk

17  about the testimony that you just gave to the jury about

18  whether or not Ocwen accepted my client's payment after the

19  mortgage came due.

20  A.   Okay.

21  Q.   Look at the bottom line on the last page.

22  A.   Yes.

23  Q.   And Ocwen's records show that the payment for

24  August 26th, 2014, was made on August 1st, 2014.

25  A.   That's correct.

Sandra Lyew - Redirect (Young)

1  Q.   So your previous testimony was incorrect because you

2  testified that Ocwen did not accept this payment after the

3  balloon came due.  Is that right?

4  A.   Yes.  Well, yes, I said that, but the borrower --

5  Mr. Daugherty never made a payment after the, after the 8-1

6  payment was received and posted, applied.  It was accepted.

7  Q.   Right.  But he was paying his August 26th payment.

8  A.   No.  That 8-1 was paying -- that paid for the

9  July 26th, 2014, payment.  He was -- if anything, the

10  account would show due if the loan didn't mature for

11  August 26th, 2014.  Payments are paid in arrears.

12  Q.   Doesn't the last line show a regular payment made on

13  August 1st, 2014, that was applied to the August 26th,

14  2014 --

15  A.   No.

16  Q.   -- balance?  Would you, would you agree with me that

17  Ocwen has a duty to conduct a reasonable investigation

18  whenever it receives a dispute?

19  A.   They're not obligated, but they do under -- for -- as a

20  compliance.  And they made it their policy and procedure to

21  do so, and they have.

22  Q.   Let me ask that again.  As the designated corporate

23  representative of Ocwen, is Ocwen required to do a

24  reasonable investigation of a dispute?

25  A.   They have.

Sandra Lyew - Redirect (Young)

1  Q.   Are they required to or are they not required to?

2  A.   Yes, but not limited -- in either which way, they have,

3  they do for all disputes that do come in.

4  Q.   So is the answer to my question, "Yes, Mr. Young"?

5  A.   Yes.

6  Q.   Ocwen is required to do a reasonable investigation?

7  A.   Yes.

8  Q.   Okay.  And you would agree that this can't be a

9  superficial investigation; correct?

10      MR. MANNING:  Objection, calls for an opinion.

11      THE COURT:  I overrule it, Mr. Manning.  Again,

12 given what she has indicated her position and her duties are

13 and given her ability to answer the last question, I think

14 it is a fair and appropriate question based on her response

15 to the previous question as to the duty of conducting a

16 reasonable investigation.

17      For those reasons, I overrule the objection, preserving

18 Ocwen's objection and exception.

19      Go ahead, please.

20      THE WITNESS:  Can you repeat the question, please?

21 BY MR. YOUNG:

22 Q.   So Ocwen cannot just conduct a superficial

23 investigation.  It must conduct a reasonable investigation.

24 Correct?

25 A.   Can you be more specific with your "reasonable

Sandra Lyew - Redirect (Young)

1  investigation"?  There's, there's two types of

2  investigations in this case and they've, they've conducted

3  reasonable and went beyond as far as advising all four

4  bureaus with regards to their investigations on

5  Mr. Daugherty's account.

6  Q.   I don't think that was responsive.  Let me ask it

7  again.  We've gotten by the hurdle.  You've agreed that

8  Ocwen had a duty to conduct a reasonable investigation.

9  Correct?

10 A.   Yes.

11 Q.   And you would agree that a superficial investigation

12 doesn't meet the standard of a reasonable investigation,

13 does it?

14 A.   Can you please be more specific in "superficial"?

15 Q.   Do you understand the word "superficial"?

16 A.   Yes, but you're not, you're not identifying to the

17 invest-, reasonable investigation that you're, you're

18 talking about.

19 Q.   Well, based upon your understanding of the word

20 "superficial," please answer my question.

21 A.   Yes, they have.

22 Q.   They have a duty to go, to go beyond just a superficial

23 investigation.  Is that your answer?

24 A.   To what they're supposed to do and what they've

25 conducted has been a superficial, a superficial, reasonable

Sandra Lyew - Redirect (Young)

1   investigation.  And they went beyond by advising all four

2   bureaus and responding to each.

3   Q.  I don't know if you meant to say that, but what I heard

4   you say is that Ocwen conducted a superficial, reasonable

5   investigation.  Was that your testimony?

6   A.  They conducted their investigation to what they were

7   supposed to do.

8   Q.  Was it superficial or not?

9   A.  I believe it was.

10  Q.  So you believe it was a superficial investigation?

11  A.  Yes.

12  Q.  And would you agree that Ocwen must actually do a

13  searching inquiry?  They have to look at what's available

14  every time an ACDV comes in in order to conduct a reasonable

15  investigation.

16  A.  Yes, based on the request that comes in.  The request

17  identifies the specific, to provide or confirm complete ID

18  and verify certain information, yes.  That's what they do.

19  Q.  So would you agree with me that Ocwen has to do a

20  searching inquiry of the information available in order to

21  be, conduct a reasonable investigation?

22         MR. MANNING:  Objection, asked and answered.

23         THE COURT:  Well, quite frankly, I'm going to

24  overrule it because I'm not convinced that this is redirect

25  or cross, Mr. Manning, --

                        Sandra Lyew - Redirect (Young)

1           MR. MANNING:  Okay.

2           THE COURT:  -- given the posture of the two of you

3    having called the witness.  If you want to argue further, I

4    will hear you.

5           MR. MANNING:  Thank you.

6           THE COURT:  All right.

7           THE WITNESS:  Can you repeat the question, please?

8           MR. YOUNG:  Let me just ask the court reporter to

9    read it back if she could, please.

10       (The court reporter read back the previous question,

11   after which the following occurred:)

12          THE WITNESS:  Yes.

13   BY MR. YOUNG:

14   Q.   And when an ACDV comes in, what defines the scope of

15   the investigation?

16   A.   The dispute code.

17   Q.   So what Ocwen does is investigate the dispute code and

18   nothing else; right?

19   A.   That is correct.

20   Q.   So it restricts its investigation to the dispute code

21   assigned by the credit reporting agency; in this case,

22   Equifax.  Right?

23   A.   That is correct.

24   Q.   So Ocwen restricts its investigation to only the

25   information provided by the credit reporting agency; right?

Sandra Lyew - Redirect (Young)

1  A.   Can you rephrase your question, please?  Can you ask

2  that again?

3  Q.   Well, let me -- Ocwen restricts its investigation to

4  the dispute code assigned by the consumer reporting agency;

5  in this case, Ocwen -- excuse me -- Equifax?

6  A.   Ocwen conducts their investigation based on the, based

7  on what is requested.  Whatever the dispute code is, which

8  is the request, that's the investigation that they will

9  conduct.  Any additional information it -- further research

10  would be, come through a written response directly to Ocwen.

11  Q.   Well, I think we're in agreement, but let me make sure.

12  Ocwen restricts its investigation to the information

13  provided by the consumer reporting agency, Equifax.  So if

14  they provide a dispute code, Ocwen restricts its

15  investigation to the dispute code provided by Equifax;

16  right?

17  A.   Yes.

18       MR. MANNING:  Objection to form.

19       THE COURT:  Be more specific, Mr. Manning, when

20  you say "form."

21       MR. MANNING:  It's a vague and, and confusing

22  question.  I didn't understand it.

23       THE COURT:  All right.  Let's see if the witness

24  did.  I overrule it at this point.  If she understood it, in

25  other words, she can answer.

Sandra Lyew - Redirect (Young)

1    Go ahead, please.

2         THE WITNESS:  Your question was Ocwen restricts by

3    going beyond the dispute code request?  Is that, is that --

4    was that your question?

5    BY MR. YOUNG:

6    Q.   Well, let me just --

7    A.   Rephrase it.

8         MR. YOUNG:  Let me ask the court reporter to read

9    it back and see if we can't get a response.

10        (The court reporter read back the previous question,

11   after which the following occurred:)

12        THE WITNESS:  Then I rephrase that.  So was that

13   what you meant or --

14   BY MR. YOUNG:

15   Q.   If you can, answer the question that the court reporter

16   just read back.

17   A.   I don't understand the question or your phrase.

18   Q.   Let's back up again then.  Ocwen restricts its

19   investigation to the dispute code assigned by the credit

20   reporting agency; in this case, Equifax.  That is your

21   testimony, isn't it?

22   A.   They investigate strictly, as I mentioned yesterday and

23   I'll say it again, based on the, based on the dispute code

24   request.

25   Q.   So when Equifax sends an ACDV, Ocwen restricts its

Sandra Lyew - Redirect (Young)

1  investigation to that code, dispute code assigned by Equifax

2  and received by Ocwen; right?

3  A.    Yes.

4  Q.    You never worked in credit reporting, did you?

5  A.    No.

6  Q.    You never had the training to which you testified that

7  these account analysts have; correct?

8  A.    No, just general, just general training based on, based

9  on my knowledge as far as my reviews for, for --

10  Q.    You never had a one-month -- I didn't mean to interrupt

11  you.  I'm sorry.  Go ahead.

12  A.    No.  Go ahead.  I'm finished.

13  Q.    You never had the one-month classroom training that the

14  analysts receive that actually research and respond to the

15  ACDVs.  You haven't had that, have you?

16  A.    No.

17  Q.    And you haven't had the shadowing process either, have

18  you?

19  A.    I've had some shadowing.

20  Q.    You haven't had the shadowing process that follows the

21  one-month classroom training given to, given to credit

22  analysts, have you?

23  A.    No.

24  Q.    And you've never investigated an ACDV, have you?

25  A.    No.

Sandra Lyew - Redirect (Young)

1  Q.   Let me hand you the third notice of deposition which

2  was the notice of your deposition which was attached as

3  Exhibit 1 to the deposition you gave to Mr. Nolan.

4         MR. MANNING:  Objection, Judge, relevance.

5         THE COURT:  Well, he's going to hand that to her

6  and we'll see what the question is, counsel, before I make

7  any ruling on relevance.

8      Go ahead, please.

9         MR. YOUNG:  I've already marked the third notice

10  of deposition amended as Plaintiff's Exhibit 29 and it is

11  Document 83 in the court file in this matter.

12  BY MR. YOUNG:

13  Q.   Is Exhibit -- what's the exhibit number?

14  A.   29.

15  Q.   Is Exhibit 29 the notice of the deposition that you

16  identified and was attached to your deposition testimony as

17  Exhibit 1?

18  A.   I believe so.

19  Q.   And neither Mr. Daugherty, myself, or Mr. Nolan, we

20  didn't designate you as the corporate representative of

21  Ocwen, did we?

22  A.   No.

23  Q.   And you understood that when you gave that deposition

24  you were speaking on behalf of Ocwen and that Ocwen was

25  required to produce a witness that could address the various

Sandra Lyew - Redirect (Young)

1   items set forth in that notice of deposition; correct?

2           MR. MANNING:  Objection, Judge.  I've kind of let

3   it go because you wanted to hear what the questions were.

4   But the relevance about a deposition designation, it's just

5   not relevant.

6           THE COURT:  Well, I think it could have relevance

7   depending on where this is going.  In other words, those

8   notices generally set out areas that people are expected to

9   be able to testify on.  I am assuming without knowing, like

10  you, that this is where this is going.  And, so, at this

11  juncture, I overrule it.  Do not let that prevent you from

12  interjecting objections as we go forward.

13  BY MR. YOUNG:

14  Q.  Do you see on the first page of the notice below the

15  time and place where it states, "This corporate deponent --"

16  or, "The corporate deponents must designate an individual or

17  individuals to testify to the following matters."  And then

18  it lists several pages of detailed issues to which you were

19  offered to give testimony.

20  A.  Yes, I see it.

21  Q.  Okay.  And they start out with A and they end up with

22  triple K on the last page.

23  A.  Okay.

24  Q.  And although you've never conducted an ACDV

25  investigation or received any ACDV investigation training,

Sandra Lyew - Redirect (Young)

1  you're the person that Ocwen designated to come here to

2  court and testify; correct?

3  A.    That is correct.

4  Q.    How many re-investigations of credit disputes are

5  handled by Ocwen on an annual basis?

6  A.    I don't know.

7  Q.    Turn to Page 2 of the exhibit and look at the letter K.

8  A.    Okay.

9  Q.    And do you see now that you were designated by Ocwen to

10  testify to the number of re-investigations of credit

11  disputes on an annual basis?

12  A.    I see that.

13  Q.    Okay.  But you can't testify to that, can you, because

14  you don't know?

15            MR. MANNING:  Objection, Judge.  Again, the

16  relevance.  He's asking her about a deposition notice which

17  was served long ago.  And he can ask whatever questions he

18  wants, but that -- this is an improper set of questions.

19            THE COURT:  I overrule the objection, counsel.

20      Go ahead, please.

21  BY MR. YOUNG:

22  Q.    Do the investigators, the analysts, do they have a

23  quota or productivity targets when they're investigating

24  these disputes?

25  A.    That I, I have not heard of.

Sandra Lyew - Redirect (Young)

1   Q.   And if you'll look at the second page of the deposition

2   at the small letter M you were designated by Ocwen to give

3   testimony on that issue, weren't you?

4   A.   Yes.

5   Q.   But you can't do it because you don't know anything

6   about that?

7   A.   I have not heard of any, any quota.  And if you want to

8   talk about productivity targets, they have to, they have,

9   they have to conduct their work or, and/or disputes at a

10  reasonable time frame, especially prior to any, any due

11  dates that a response can be due.

12  Q.   Do you have any knowledge of quotas that, as they

13  relate to credit analysts?

14  A.   If I have any knowledge with regards to -- I'm sorry?

15  Q.   Do you have any knowledge with respect to quotas of

16  credit analysts?

17  A.   No.

18  Q.   And you don't have any knowledge of any productivity

19  targets for credit analysts, do you?

20  A.   No.

21       MR. MANNING:  Objection, Judge, relevance.  He's

22  asking about all these topics for something unrelated to

23  trial.  And there were a number of scope objections and

24  those were not resolved.

25       I mean, there were objections made to these topics

Sandra Lyew - Redirect (Young)

1  which I understand from the legal process Your Honor and I

2  can discuss with Mr. Young.  It's a separate process.  It's

3  not something that you can go through the topics and just

4  say, "You were supposed to know everything," when there's

5  timely served objections.

6          MR. YOUNG:  Judge, the speaking objections at this

7  point -- I'm merely referring to a 30(b)(6) notice of

8  deposition.

9          THE COURT:  Do you have a response to his

10  objection, Mr. Young?

11          MR. YOUNG:  Yes, Your Honor.  This witness was

12  designated to speak on these topics by notice.  The only

13  person produced was this witness.  And that's what I'm

14  attempting to show is that the witness really has no

15  knowledge of the issues before the jury.

16          THE COURT:  The last question, as I understood it,

17  that you asked her about having been designated had to do

18  with production.  Did I understand that correctly or not?

19          MR. YOUNG:  Yes, Your Honor.  The precise words

20  were "productivity targets" which is verbatim from topic M

21  in the notice of deposition.

22          THE COURT:  All right.  And its relevance as it

23  relates to the issues here before the jury is what from your

24  perspective, Mr. Young?

25          MR. YOUNG:  Well, we believe one view of the

Sandra Lyew - Redirect (Young)

1   evidence is that these investigations were rather brief.

2   And, hence, whether these investigators had quotas or

3   productivity targets would seem to be relevant.

4           THE COURT:  All right.  I overrule the objection,

5   Mr. Manning.

6       Go ahead.

7           MR. MANNING:  Judge, if I may make a clarification

8   point in response to what he just said.

9           THE COURT:  I've overruled the objection but,

10  again, will let you address the record at a break if you

11  want to.

12      Go ahead, please.

13  BY MR. YOUNG:

14  Q.   You do not have any knowledge of productivity targets

15  for credit analysts, do you?

16  A.   Again, no.

17          MR. YOUNG:  I move for the introduction of

18  Plaintiff's Exhibit 24 at this time and I do not wish to

19  publish it at this time.

20          THE COURT:  Is that the designation?

21          MR. YOUNG:  That, Your Honor, is the 30(b)(6)

22  notice of deposition which was an exhibit.

23          THE COURT:  All right.

24      And you object to it, Mr. Manning, for the reasons

25  you've previously stated?

Sandra Lyew - Redirect (Young)

1          MR. MANNING:  And additional reasons.

2      First, relevance; second, what Mr. Young hasn't said is

3  that there were timely served objections.  And that

4  deposition that he's referring to was conducted by agreement

5  with them subject to the objections.  Third, it's improper

6  impeachment.

7          THE COURT:  All right.  I don't construe it to be

8  impeachment, but I will hear you all at a break before

9  ruling on the admissibility of the document regarding the

10  agreement that you indicate that the parties reached.  So I

11  will withhold ruling on the admissibility of that document

12  pending my hearing you all at a recess.

13      Go ahead, please, Mr. Young.

14          MR. YOUNG:  Thank you.  May I hand the witness

15  Plaintiff's Exhibit 28?

16          THE COURT:  Yes, sir.

17          MR. YOUNG:  This exhibit has already been

18  admitted.

19          THE COURT:  The clerk does not show it as having

20  been admitted, counsel.

21          MR. YOUNG:  Oh, I'm sorry.  It's admitted by

22  agreement of counsel, Your Honor.

23          MR. MANNING:  This is the demonstrative.  Yes, I

24  don't have an objection, Your Honor.

25          MR. YOUNG:  I'm sorry.

Sandra Lyew - Redirect (Young)

1    THE COURT:  Plaintiff's Exhibit 28 will be

2  admitted into evidence without objection and can be

3  published.

4  BY MR. YOUNG:

5  Q.   Okay.  The -- so you understand what we're seeing here,

6  the yellow column, those are all the Equifax exhibits that

7  were admitted as Plaintiff's Exhibits 11 through 23.

8    And if you look over to the next column, if you would,

9  please, and you'll see the pink column.  Those are

10  Plaintiff's 27.

11    And the orange column, that's Plaintiff's 26 which is

12  that white binder full of notes.  I just do that for you to

13  orient yourself.

14    And Numbers 1 through 14 show 14 separate Equifax ACDVs

15  in the yellow column.  And I'm showing that where my marker

16  there ends on March 23rd, '14, with item number 14.

17    If you focus on that, the next column is blank.  And

18  that's because we don't have the ACDV because Ocwen didn't

19  keep them.  Is that fair?

20  A.   Correct.

21  Q.   Now, Ocwen, if it wants to know about Mr. Daugherty's

22  loan, it can go back in time 15 years and pull up the actual

23  deed of trust and mortgage agreement, can't it?

24  A.   For the note -- to pull up the note and mortgage.

25  Q.   Yes.

Sandra Lyew - Redirect (Young)

1    A.    Yes.

2    Q.    So with the click of a button it can see everything

3    that's happened in the last 15 years with respect to this

4    mortgage, can't it?

5    A.    A click of a button is kind of a little -- it takes

6    more than a click, but, yes.

7    Q.    Well, weren't these, weren't these analysts looking at

8    this EIS file and confirming that he signed this note 15

9    years ago?

10   A.    The CIS, yes.

11   Q.    So the analysts were able to look back 15 years and see

12   that he signed the note; right?

13   A.    Yes.  That is a separate repository that they would

14   have to get into.  That is not in the REALServicing system.

15   Q.    But it's readily accessible to the credit analysts;

16   right?

17   A.    Yes.

18   Q.    And Plaintiff's Exhibit 26, this binder, if you want to

19   know anything that happened with respect to Mr. Daugherty's

20   note, these notes start August 15th, 2011.  So clear back to

21   October -- clear back to October of 2011 Ocwen has notes of

22   everything that happened; right?

23   A.    Ocwen has notes.  And should they need additional

24   information, they go directly to the department that, that

25   handles, that would handle that concern.

Sandra Lyew - Redirect (Young)

1    Q.    So its notes go back to 2011.  And in some respects

2    they go -- it's able to go back 15 years.  And if someone --

3    if a consumer such as Mr. Daugherty wants to challenge

4    whether or not Ocwen conducted a reasonable investigation of

5    a dispute, Ocwen can only back, go back three months and

6    produce ACDV data.  Is that right?

7    A.    From 1 to 14?  We're still on 1 to 14; right?  Correct?

8    Q.    Well, I mean, I left it up there.  But the question was

9    if someone like Mr. Daugherty makes a claim that Ocwen

10   wasn't reasonable in investigating an ACDV, Ocwen somehow

11   can only go back three months; is that right?

12   A.    E-OSCAR goes back three months.

13   Q.    Now, Equifax didn't have any problem going clear back

14   to March 20th, 2013, and bringing up these records.  We've

15   looked at them, haven't we?

16   A.    Okay.

17   Q.    But Ocwen can't do that, can it?

18   A.    To provide their ACDV, no.

19   Q.    So we have to rely on the notes in this orange column;

20   right?

21   A.    Yes.

22   Q.    And all we know and all anyone can testify to now

23   because after three months the records are gone, all we have

24   is this white notebook; correct?

25   A.    Yes.

Sandra Lyew - Redirect (Young)

1   Q.    Okay.  But fortunately the white notebook correlates

2   and mentions by the green column, the last four digits of

3   the control number, fortunately we can take the history

4   notes, we can take the Equifax ACDV, and we can try to piece

5   together what happened because we don't have the Ocwen

6   records because they aren't available anymore.  Is that

7   right?  That's all we can do?

8   A.    Correct.

9   Q.    And the only records we have about an investigation,

10  what happened and how long it took is this white notebook of

11  Ocwen notes; correct?

12  A.    I, I have to disagree on that one.

13  Q.    What do you disagree with?

14  A.    As far as the timing.  You mentioned timing and I have

15  to disagree on the timing part.  But, again, as I mentioned

16  earlier, those are the -- those codes are entered into the

17  system after the research has been conducted.

18  Q.    Okay.  Well, that's where I want to go because if we

19  look at the white notes, this white notebook full of notes,

20  it appears on the face of these notes that the dispute was

21  received and dispatched within a very short period of time;

22  correct?  If we only look at the notes; right?

23  A.    If you go by the notes, I suppose.

24  Q.    Okay.  But your testimony is that, oh, no, there was

25  all this research done by the credit analysts.  And after

Sandra Lyew - Redirect (Young)

1   they did all their research, then they made the entry

2   "dispute received."  Correct?

3   A.   Yes.

4   Q.   And then when they sent the ACDV back, they made the

5   entry "form sent electronically."  Right?

6   A.   Yes.

7   Q.   So -- and if that happened to be five seconds or seven

8   seconds or 12 seconds, that doesn't really reflect the

9   length of the investigation, does it?  Is that your

10  testimony?

11  A.   If you're going by the time of the entries in the

12  notebook, I already told you what the policy, what the

13  procedure was for conducting a dispute, that they have to

14  conduct the research.  But, no, it does not take five

15  seconds.  It doesn't even take five seconds to log into the

16  com-, into REALServicing.

17  Q.   Well, I'm not sure you answered my question at all.

18  All I was trying to establish is that it's your position

19  that these time stamps don't really reflect the length of

20  the investigation.  Isn't that your testimony?

21  A.   That is correct.

22  Q.   So before the time stamp, the first time stamp is ever

23  made when it says "dispute received," that really doesn't

24  mean dispute received.  It means that the dispute had been

25  received sometime earlier and then all this investigation

Sandra Lyew - Redirect (Young)

1   was done and then Mr. Rajani or Mr. Rao, whoever it was,

2   then they made the time stamped entry "dispute received."

3   Correct?

4   A.   Yes.

5   Q.   And then when they sent the response, they made the

6   time stamp entry "response sent electronically."  Correct?

7   A.   After they entered the received code.

8   Q.   Is there any other record maintained by Ocwen which

9   would indicate when it received an ACDV other than the

10  entries in this note log?

11  A.   No.

12  Q.   Is there any record maintained by Ocwen of the nature,

13  extent, and duration of the investigation conducted by a

14  credit analyst other than appears in this exhibit of the

15  white notebook?

16  A.   No.

17  Q.   Well, let's look at the notes that are admitted into

18  evidence.  And I'll just grab one at random.  And I'm

19  looking at Page 1695 of the white notebook if that would be

20  easier for you.  Are you -- down on the screen I have this

21  highlighted 0123 and it is on that Page 1695.  That's a --

22  that's an ACDV control number, isn't it?

23  A.   You said 1695?

24  Q.   Right.  On the screen is --

25  A.   Okay.

Sandra Lyew - Redirect (Young)

1  Q.    -- 1695.

2  A.    Yes.

3  Q.    Are you there?

4  A.    Yes.

5  Q.    And you see on the screen I highlighted that 0123.

6  That's a control number of an ACDV that came in; --

7  A.    Yes.

8  Q.    -- right?  And if you go to the next page, we see that

9  it is now resolved; that the information on the ACDV was

10  verified.  Right?

11  A.    Yes.

12  Q.    And although it appears that it was resolved on

13  11:54:38 seconds by SV Akshatha, and although it appears the

14  investigation just started seconds before that, you're

15  telling me that this does not really reflect what this

16  analyst did.  These time stamps don't reflect the actual

17  duration of the investigation.  That's your testimony.

18  Right?

19  A.    Yes.

20  Q.    Okay.  So before this entry is ever made, this

21  particular analyst has already received the dispute, done a

22  thorough investigation, and then logged onto the system to

23  show that the, that the dispute was received.  Correct?

24  A.    They research.  They respond back to the, through

25  e-OSCAR to the CRA, then enter --

Sandra Lyew - Redirect (Young)

1   Q.   So although this document only appears to show a few

2   seconds, you're saying that before the, before the credit

3   analyst ever logged on, they had done this reasonable

4   investigation.  Then they logged on and that's why we only

5   see a few seconds involved in each investigation.  Is that

6   fair?

7   A.   The research is conducted before the entry --

8   unfortunately before the entry of showing being received

9   and, and completed into the notes.  So the research -- the

10  system -- you're confusing the five seconds.  It takes

11  longer to log in than five seconds.

12       But it -- they conduct the research, whether it's

13  through the REALServicing system, the, the Vault, or if

14  they, there is some note stating that they've even went to

15  Radar which was Litton's old system and did what they -- and

16  conducted a research there before entering the "received and

17  complete."

18       Everything is researched and sent to the credit

19  reporting agencies before the, before these entries are

20  made.

21  Q.   Well, I'm not trying to confuse anything.  I'm just

22  trying to make sure that we understand your testimony.  And,

23  that is, that these time stamps don't reflect the length of

24  the investigation, do they?

25  A.   No.

Sandra Lyew - Redirect (Young)

1    Q.    That's your testimony?

2    A.    Yes.

3    Q.    But there are no other records which would show the

4    length of investigation; right?

5    A.    No.

6    Q.    But before SV Akshatha logged on, she had already done

7    an investigation, logged on, said that the dispute had been

8    received and then a few seconds later electronically sent

9    out the response; correct?  That's what really happened?

10   A.    Can you repeat that, please?

11   Q.    I'm trying to agree with you here.  Isn't it your

12   testimony that despite the fact that it only shows a few

13   seconds on the logs between when the dispute was received

14   and resolved, what really happened was that there was an

15   extensive investigation in this case by Ms. Akshatha before

16   she logged on with the time stamp?

17   A.    You mean entered the code?

18   Q.    Before she -- no.  Let's use logged on.  Before she

19   logged on and said "dispute received," she had already done

20   her investigation; right?

21   A.    E-OSCAR is a separate system.  The -- she's already

22   logged on, if anything, into the system because

23   REALServicing is part of her research, or his research.

24   Q.    But according to the notes, the notes say "ACDV

25   received" and they have a time and a date.  And you're

Sandra Lyew - Redirect (Young)

1    telling the jury that that's not the real time and date that

2    the ACDV was received.  It was actually received before that

3    and fully investigated.  And then the analyst logs on and

4    puts a time stamp next to "ACDV received."  Do you follow me

5    so far?  Is that your testimony?

6    A.    Without the log-on, yes.

7    Q.    Well, what would you rather me say than log-on?

8    A.    Before entering the codes into the system.  Again,

9    REALServicing is part of their research on the dispute that

10   is received from e-OSCAR.

11   Q.    Okay.  So on the one we're talking about, 0123, even

12   though the record only shows a few seconds between the

13   dispute coming in and the response going out, there was much

14   more time spent investigating.  We just don't have those

15   records.  Fair?

16   A.    Fair.

17            THE COURT:  How much longer, Mr. Young?

18            MR. YOUNG:  May I just finish this one line, Your

19   Honor?

20            THE COURT:  Yes, sir.

21   BY MR. YOUNG:

22   Q.    Okay.  Look at 1696.

23   A.    I'm there.

24   Q.    Now, you see 0123.  It's been resolved.  Right?

25   A.    Yes.

Sandra Lyew - Redirect (Young)

1   Q.   Okay.  And it was resolved at 11:54:40; right?  That's

2   when the electronic report went back; correct?

3   A.   Based on the notes in the system, this is what you're

4   referring to.

5   Q.   Okay.  Well, but that note is accurate when the ACDV

6   was -- when the investigation was completed and the ACDV was

7   sent back to Equifax.  You don't have a problem with that

8   time stamp, do you?  That's when it was done and sent

9   electronically as the record says; right?

10  A.   Okay.

11  Q.   But Ms. Akshatha seconds later got another ACDV, didn't

12  she, 0122; right?

13  A.   I see it.

14  Q.   So seconds after the first response was gone, another

15  one came in, "automated borrower, automated CDV."  That came

16  in at 11:54:44; right?

17  A.   That's -- that was entered.

18  Q.   It was entered.  And then the investigation was

19  complete and it was verified in a matter of just a few

20  seconds; right?

21  A.   Sure.

22  Q.   Okay.  Well, but between the report going out, the

23  first one going out and her note of the second one, just a

24  few seconds have elapsed; right?

25  A.   Sure, Mr. Young, if you -- again, if you're going by

Sandra Lyew - Redirect (Young)                    95

1   dates and time stamps and codes, yeah.

2   Q.   But if only a few seconds elapsed between when

3   Ms. Akshatha was finished with the first ACDV and sent out

4   the response to the second ACDV, when did she have time to

5   do this extensive investigation of this second ACDV?

6   A.   It could have been -- you want an assumption?  Again,

7   all the -- every, everything that's assigned to them, to the

8   associates are, are -- they conduct their work before

9   entering it into the REALServicing system.

10  Q.   But all we know is what was entered on this form and

11  the times that were logged on this form; right?

12  A.   Sure.

13         MR. YOUNG:  I'm finished with that line, Your

14  Honor.

15         THE COURT:  All right.

16      Ladies and gentlemen, I'll give you your luncheon

17  recess.  While you're out, do not discuss this case among

18  yourselves or permit anyone to discuss it with you or in

19  your presence.  And please be in your jury lounge at 1:30.

20      We'll stand in recess.

21      (Recess taken from 12:07 p.m. until 1:30 p.m.)

22         THE COURT:  Good afternoon, everyone.

23      Mr. Young.

24         MR. YOUNG:  Thank you, Your Honor.

25  BY MR. YOUNG:

Sandra Lyew - Redirect (Young)

1    Q.    You understand that one of my client's complaints is

2    that he had to refinance a balloon mortgage and at least his

3    claim is that the credit reporting interfered with that

4    process.  You understand that's the issue in this case,

5    don't you?

6    A.    I understand that, but we don't have control on how the

7    credit bureau reports.

8    Q.    And you were designated as Ocwen's spokesman for all

9    things relating to my client in August of 2015.  And you

10   gave a deposition to Mr. Nolan.  Is that right?

11   A.    Yes.

12   Q.    And when you gave that deposition, you really didn't

13   know anything about this case, Mr. Daugherty, and the

14   issues, did you?

15   A.    That's inaccurate.  That's not true.  I did.

16   Q.    You didn't even know that there was a balloon note, did

17   you?

18   A.    That's not true.

19   Q.    Did you testify, "I believe this is a fixed rate

20   mortgage and not a balloon"?

21   A.    It is a fixed rate but it has a maturity date.

22   Q.    Did you testify, "I believe this is a fixed rate

23   mortgage and not a balloon"?

24   A.    It is a fixed rate of 9.75 from the origination to the

25   maturity date.

                    Sandra Lyew - Redirect (Young)

1   Q.   Did you testify, "I believe this is a fixed rate

2   mortgage and not a balloon"?

3   A.   I don't recall.

4   Q.   Okay.  Let me show you the testimony I'm referring to.

5   Does that refresh your memory?

6   A.   Okay.  That's what the deposition says.  However, it is

7   a fixed --

8   Q.   First --

9           THE COURT:  Just a second.

10  BY MR. YOUNG:

11  Q.   First, answer my question now that you've had the

12  chance to refresh your memory.  Was my statement true that

13  that's what you testified to at your deposition?

14  A.   I said it's not a balloon, so we spoke about this

15  account.  It reports -- it's based on a note.  So it is a

16  fixed -- it wasn't an adjustable balloon.  It was a fixed

17  rate balloon.

18  Q.   Please answer my question.  Was the statement I read

19  from that deposition that's before you now, that's what you

20  actually said, isn't it?

21  A.   And I also said that this information is regards to the

22  actual mortgage, whether it was a fixed rate, adjustable

23  rate, balloon, there is a maturity date.

24  Q.   Is the answer to my question, "Yes, Mr. Young, those

25  are the exact words I said at your deposition"?

Sandra Lyew - Redirect (Young)

1   A.   Those are -- that's part, that's part of my answer.

2   Q.   Okay.  Now, you read to the jury those exact words at

3   your deposition, please.

4   A.   I just read it.  I just read it to you.

5   Q.   I want you to read that phrase that I just pointed out

6   to the jury from your sworn testimony.

7   A.   "But this is not a balloon, so we speak -- so we can

8   speak about this account.  So how it, it reports is based on

9   the note.  This information in regards to the actual

10  mortgage, whether it is an adjustable rate, fixed rate,

11  balloon, there is a maturity date."

12  Q.   May I have the deposition back, please?  Your exact

13  words were, "I believe this is a fixed rate mortgage and not

14  a balloon."  Correct?

15  A.   I said but it's -- are we reading the same response?

16  Because I just read a response that I made.

17  Q.   See here where it says "the witness"?  Does it say, "I

18  believe this is a fixed rate mortgage and not a balloon,"

19  period?

20  A.   And I also -- okay.  That says that.  And I also read

21  the response that I, I answered below it.

22  Q.   Fair enough.  Then Mr. Nolan asked you another

23  question; right?  And he said, "If it was a balloon, would

24  Ocwen be required to record something in that box?"  And

25  again you replied, "But it's not a balloon."  Correct?

Sandra Lyew - Redirect (Young)

1    A.    Okay.

2    Q.    And then Mr. Nolan asked you, "So if I had a

3    hypothetical where there was a balloon due, would it be

4    inaccurate to leave that box blank?"

5         And didn't you reply, "If there is a balloon amount, I

6    don't know how, how they would, how it's completed."

7         And before you answer, you can refresh your memory by

8    looking at your testimony.

9         (Pause)

10   BY MR. YOUNG:

11   Q.    Having had the opportunity to look at your sworn

12   testimony, did I fairly characterize the question and the

13   answers given on that page?

14   A.    Okay.

15   Q.    So the answer is, yes, I fairly characterized the

16   testimony given on that date?

17   A.    I read the, I read the testimony that's on, that's

18   stated in the deposition.

19   Q.    And did I fairly characterize it when I represented

20   what happened?

21   A.    You can characterize it any how you would like.

22   This -- based on what I read, this is my deposition and it

23   was a fixed rate balloon, okay.  That was my mistake.

24   Q.    Was I fair or unfair when I characterized your

25   testimony that you have before you?

Sandra Lyew - Redirect (Young)

1    A.    I read the response.  I, I acknowledged that this is

2    what the deposition says.

3    Q.    So is the answer to my question, "Yes, Mr. Young, you

4    fairly represented what is shown in my deposition"?  Is that

5    right?

6    A.    Yes, Mr. Young.

7    Q.    Thank you.  Let me take that back, please.

8    A.    You might want to leave a copy here so that you don't

9    have to walk back and forth.

10   Q.    I appreciate that, but I'd like this back.

11   A.    Okay.

12   Q.    If you need it again, you just ask me and I'll bring it

13   up here.

14            THE COURT:  Let's get back to the questioning,

15   ma'am.  Wait for a question, please.

16   BY MR. YOUNG:

17   Q.    Counsel -- Mr. Manning covered with you some of the

18   ACDVs which I've been referring to as Ocwen's copies, but I

19   think you called them the actual e-OSCAR system.

20            MR. YOUNG:  These -- the auto focus does not seem

21   to be working.  I'll try once more.  Could I have Exhibit

22   27, please, the red binder?  May I hand the witness Exhibit

23   27, Your Honor?

24            THE COURT:  Yes, sir.

25   BY MR. YOUNG:

Sandra Lyew - Redirect (Young)

1  Q.  Could you turn to the document marked 1351 within the

2  red binder before you?  Are you there?

3  A.  Yes.

4  Q.  And this is the June 16 ACDV response of Ocwen authored

5  by Mr. Raj Kumar; is that right?

6  A.  Yes.

7  Q.  It has to do with the ACDV 8126; correct?

8  A.  Yes.

9  Q.  And Mr. Raj Kumar's name is right below that control

10  number; right?

11  A.  Yes.

12  Q.  And I believe when Mr. Manning went over this document

13  with you, he went over the account information at the bottom

14  of that same page showing the code 11 account status.

15  A.  No, he went over June 20th, 2014.

16  Q.  I have it -- I have the wrong document.  I apologize.

17  Were there -- there were two -- could you turn to the

18  document that he went over and tell me the one that has that

19  date on it?

20  A.  Control number 1128.

21  Q.  And what was the --

22  A.  And control number -- actually, I'm sorry.  It's 1129.

23  I have it highlighted here.

24  Q.  Okay.  Does 1128, does it precede that?

25  A.  They're both completed on the same day.

Sandra Lyew - Redirect (Young)

1  Q.  Do you have page 1351 there?

2  A.  Yes.

3  Q.  And that's the dispute I just had up on the screen

4  ending in 8128; correct?

5  A.  Yes.

6  Q.  Okay.  And looking at the 8128 dispute code, Raj Kumar

7  verified that the account was current and that my client was

8  paying as agreed; correct?

9  A.  No.  Raj Kumar verified "not his --" based on the

10  dispute code, "provide or confirm complete ID."

11  Q.  And what was -- the first document that you referred me

12  to was 0129?

13  A.  No.  Which document are you speaking about?

14  Q.  Let's look at 1353.  And, again, it's Raj Kumar, isn't

15  it?

16  A.  Yes.

17  Q.  And, again, this one shows past the due date and pays

18  five or more days -- five or more payments past due.  Right?

19  A.  That is Equifax's request data, the dispute code 1,

20  requested to provide or confirm complete ID.

21  Q.  Did Ocwen respond to data transmitted over by Equifax

22  which showed the account 120 days past due and five or more

23  payments behind?

24  A.  No.

25  Q.  And if Ocwen doesn't respond or change that data and

Sandra Lyew - Redirect (Young)

1    sends this back, "account information accurate as of date,"

2    then this information remains on my client's credit, doesn't

3    it?

4    A.   The dispute code requests to provide or confirm

5    complete ID.  And this -- that is what was completed on this

6    form.

7    Q.   And we get back to the very beginning of my redirect

8    then.  And, that is, it's Ocwen's policy not to look beyond

9    the dispute code, to just look at the dispute code and

10   confirm or modify based on the dispute code; right?

11   A.   That was my response.

12   Q.   So Ocwen restricts its investigation to the information

13   provided by Equifax in this particular case that we just

14   looked at?

15   A.   Equifax is -- if Equifax detailed their dispute codes,

16   then it was detailed, that's what was, that's what would be

17   verified.  In this case, they, they asked to, for Ocwen to

18   provide or confirm a complete ID.

19   Q.   Then --

20   A.   Then it falls back to 6-14 -- 6-20 when the request

21   from Equifax came in to verify payment history profile,

22   account status, and payment rating.  And that's the

23   investigation that was complete, the response to the CRA,

24   Equifax.

25            MR. YOUNG:  Could the court reporter repeat my

Sandra Lyew - Redirect (Young)

1   last, read back my last question, please?

2       (The court reporter read back the previous question,

3   after which the following occurred:)

4           THE WITNESS:  Ocwen provides an investigation

5   based on what is asked.  In this case, it was asked to

6   provide or confirm a complete ID and that's what was done.

7   BY MR. YOUNG:

8   Q.   Okay.  So I guess more fairly Equifax -- I mean, Ocwen

9   restricts its investigation to the dispute code provided by

10  Equifax; correct?

11          MR. MANNING:  Objection, asked and answered.

12          THE COURT:  Overruled.

13          MR. MANNING:  She's answered these questions a

14  number of times, Judge.

15          THE COURT:  Overruled, Mr. Manning.

16          THE WITNESS:  It conducts the investigation based

17  on what is asked.

18  BY MR. YOUNG:

19  Q.   And it conducts its investigation based upon the

20  dispute code and nothing else; correct?

21  A.   Correct.

22  Q.   Based upon your review of the records, did Ocwen do

23  anything wrong with respect to responding to the 24 ACDVs?

24          MR. MANNING:  Objection, calls for an opinion.

25          THE COURT:  Overruled.  Again, given her

Sandra Lyew - Redirect (Young)

1    testimony, given her position with the company and the

2    duties that she's indicated, for those reasons, Mr. Manning,

3    I overrule your objection.

4           THE WITNESS:  Yes.

5    BY MR. YOUNG:

6    Q.   Yes, Ocwen did things wrong?

7    A.   No, they did not.

8    Q.   Okay.  Let me ask the question again.  Did Ocwen do

9    anything wrong in this entire process of responding to 24

10   ACDVs that we've looked at?

11   A.   No, not that I can recall.

12   Q.   So your testimony is Ocwen did nothing wrong with

13   respect to the entire process of receiving and responding to

14   the 24 ACDVs; correct?

15   A.   I feel that they did nothing wrong.

16          MR. YOUNG:  Your Honor, no further questions of

17   the witness and I would like to approach about a matter.

18          THE COURT:  All right.  Mr. Manning.

19          THE WITNESS:  Can I step down?

20          (Bench conference on the record)

21          MR. YOUNG:  Your Honor, at the beginning I made an

22   objection about this witness testifying to training.  And I

23   reviewed the deposition --

24          THE COURT:  You're not at the bench chewing gum,

25   are you, Mr. Manning?

1          MR. MANNING:  I'm sorry?

2          THE COURT:  You're not at the bench chewing gum,

3    are you?

4          MR. MANNING:  No, ma'am.

5          THE COURT:  Go ahead, counsel.

6          MR. YOUNG:  I've reviewed the testimony and I

7    think 137 and 138 is where the witness testified about

8    training at the deposition.  And her testimony is about

9    identical to what she testified here today.

10        Then later in the deposition she was asked, "You

11   discussed policies and procedures and training.  Are these

12   written down somewhere at Ocwen?"

13        The answer is, "Yes."

14        "Can you all --" this is Mr. Nolan.  "Can you all

15   provide to us, provide those to us so we can review them

16   pursuant to our discovery request?  I believe we requested

17   that."

18        And Mr. Manning replied, "I'll make a note of that."

19        In light of that, Your Honor, I'd ask the Court to

20   instruct the jury to disregard the witness's testimony about

21   the, about the policies, the training policies and

22   procedures.

23        Moreover, when I examined this witness she testified

24   that she did not undergo such training.  She did not undergo

25   the one-week or the one-month training course.  She did not

1   undergo the shadowing.  And, so, really there's no basis for

2   her to testify to this at all.  That's separate and apart

3   from asking for these written policies and counsel

4   indicating that he would provide those.

5              THE COURT:  Mr. Manning, I'll let you respond.

6   But as to the latter issue, I believe that that is an issue

7   that goes to the weight of her testimony with the jury, the

8   fact that she herself has not received any training or

9   shadowing.  And as you've indicated, it's a separate issue

10  from whether or not there was disclosure of policies and

11  manuals that were provided.

12      So as to the latter issue, that does not cause me to

13  exclude any testimony.  I think that's an issue that bears

14  on the weight that the jury will give to the witness's

15  testimony.

16              MR. YOUNG:  Thank you, Your Honor.

17              THE COURT:  Preserving your objection and

18  exception for not excluding if that's what you're asking on

19  that basis.

20      That limits it to the disclosure of the policies, Mr.

21  Manning.  Response?

22              MR. MANNING:  Yes, Judge.

23      Your Honor, we discussed this previously about how she

24  testified at length in the deposition.  Mr. Young is not

25  disputing that.  And I -- if Your Honor would like, I have

 1   those sections enumerated if you'd like to see them.  But

 2   there's lengthy testimony that was disclosed at her

 3   deposition over a year ago --

 4              THE COURT:  Uh-huh.

 5              MR. MANNING:  -- about the training, about the

 6   policies, and about the procedures.  And, therefore, as Your

 7   Honor indicated, there's no notice issue.  And it was

 8   disclosed, so there's no valid objection to them.

 9              THE COURT:  I'm happy to review the deposition

10   testimony before making a final ruling on this.

11        But the other thing that I would say, Mr. Young, is

12   that in her testimony here today in front of the jury there

13   has not been extensive testimony, in my opinion, regarding

14   training procedures and policies.  And if you want to point

15   to me -- if you want to disagree with that, I certainly want

16   you to be able to do that.

17        But, in other words, in order to exclude it for the

18   jury there should be testimony specifically that you're

19   asking me to exclude because these were not revealed or

20   disclosed as requested.

21        I do not recall in listening to your examination of her

22   getting into any lengthy or detailed testimony regarding

23   training procedures other than the fact that she did not

24   receive certain training which, again, I think is up to the

25   jury to bear on the weight of the testimony that she has

```
 1    given.

 2              MR. YOUNG:  Judge, I'm going to withdraw any

 3    objection I have and just move on with the case.  I don't

 4    want to submit anything else.

 5              THE COURT:  You're tired of hearing from me,

 6    aren't you, Mr. Young?

 7              MR. YOUNG:  Excuse me?

 8              THE COURT:  You're tired of hearing from the

 9    Court, aren't you?

10              MR. YOUNG:  No, I'm not and I do -- Judge, when I

11    listen intently, I do so with my eyes closed, and I tell the

12    preacher that all the time.  Sometimes when you're ruling

13    I'm --

14              THE COURT:  I'm not offended by that.

15              MR. YOUNG:  Okay.  I just wanted to make sure.

16              THE COURT:  The objection has been withdrawn, Mr.

17    Manning.

18              MR. MANNING:  Thank you, Judge.

19              (Bench conference concluded)

20              THE COURT:  Mr. Young, you're done?

21              MR. YOUNG:  I'm done with this witness, Your

22    Honor.  We're ready to call our next witness.

23              THE COURT:  Mr. Manning, anything further?

24              MR. MANNING:  Yes, Judge.  I'll be brief.

25                        RECROSS EXAMINATION
```

Sandra Lyew - Recross (Manning)                                    110

1    BY MR. MANNING:

2    Q.   Ms. Lyew, you took the stand before lunch yesterday;

3    right?  Is that right?

4    A.   Yes.

5    Q.   So you've been at this for more than a day, almost a

6    day and a half, and I'm going to keep this real brief.

7         During Mr. Young's testimony -- I'm sorry -- his

8    questions, there were a lot of questions.  And at one point

9    you said something about superficial.  What does the word

10   "superficial" mean to you?

11   A.   It could mean a number of things.

12   Q.   Well, and I know that you weren't given the opportunity

13   to explain yourself.  My question to you is at one point you

14   were saying there was reasonable investigation.

15   "Superficial" in the, just the dictionary definition of

16   Merriam-Webster says not --

17            MR. YOUNG:  Objection, Your Honor.

18            MR. MANNING:  -- not complete.

19            THE COURT:  Just a second.  There's an objection

20   on the floor.

21       Mr. Young, basis?

22            MR. YOUNG:  It's leading.  He's reading a

23   dictionary, trying to read a dictionary definition to have

24   this witness agree with it to attempt, I think, to change

25   her previous testimony.

1          THE COURT:  Well, I overrule the objection.  This

2    witness was asked during your examination if she understood

3    the meaning of the word.  She indicated that she did.  She

4    then gave an answer to a question with the word in it which

5    the jury will recall.

6       Now she is being examined on what I believe Mr. Manning

7    is trying to get at his, whether -- when she said that, what

8    her understanding of the meaning of the word was.  And I

9    think that's appropriate.  I'm going to permit it and let

10   the jury give it the weight it believes it's entitled to

11   receive, preserving the plaintiff's objection and exception.

12   BY MR. MANNING:

13   Q.   So the dictionary says "superficial --" one of the

14   definitions -- I agree with you there's several.  But one of

15   the definitions is not complete.

16      So my question to you is would you agree with Mr. Young

17   and his questions that the investigation here was not

18   complete?

19   A.   And the answer to that is "no" because it was

20   completed.

21   Q.   Okay.  Another thing Mr. Young asked you about was, in

22   a series of questions, does Ocwen restrict its investigation

23   to the dispute code.  Do you recall answering that one a

24   couple times?

25   A.   Yes.

Sandra Lyew - Recross (Manning)

1  Q.   Okay.  This morning we started with going over a whole

2  series of documents, you and I, and we went over those.  Do

3  you recall that?

4  A.   Yes.

5  Q.   And that was a discussion about all the work that these

6  credit analysts do in order to respond to an ACDV; --

7  A.   Yes.

8  Q.   -- right?  I recall you saying -- and I just want to

9  make sure I understand your testimony.  I recall you saying

10  that those credit analysts have access to Radar, a system

11  from Litton --

12         THE COURT:  Mr. Manning, you are leading at this

13  point.  Just rephrase your question.

14         MR. MANNING:  Yes, I will, Judge.

15  BY MR. MANNING:

16  Q.   Do you recall testifying about the various systems that

17  the credit analysts have access to?

18  A.   Yes.  I also mentioned it to Mr. Young.

19  Q.   What were those systems?

20  A.   REALServicing, the Vault, e-OSCAR, and Radar.

21  Q.   Those are all systems that contain information?

22  A.   That is correct.

23  Q.   That information is not contained within the dispute

24  code.

25  A.   That is correct.

Tina Daugherty - Direct (Young)

1  Q.   So when Mr. Young was asking you, does Ocwen restrict

2  its investigation to the dispute code, how would you answer

3  that question?

4          MR. YOUNG:  Objection, Your Honor.

5          THE COURT:  Basis?

6          MR. YOUNG:  The witness unequivocally answered

7  "yes" to that question repeatedly.

8          THE COURT:  I understand that to be the case, but

9  I overrule the objection.  The objection is based on one

10  of -- potentially one of credibility and that's going to be

11  up to the jury to determine.

12     Go ahead, please.

13          MR. MANNING:  I don't recall the question exactly.

14  Would you mind reading it back, Ms. Court Reporter?

15     (The court reporter read back the previous question,

16  after which the following occurred:)

17          THE WITNESS:  That part of the question is "no."

18  It restricted the -- based on the ACDV dispute response,

19  request and how it was responded.  It was responded based on

20  that request.

21     And I've tried to explain that to him.  And we -- how

22  it is in -- the research and investigated, it does go

23  through numerous systems, sections available to view in the

24  REALServicing, as well as the Radar and the Vault.

25          MR. MANNING:  That's all I have.  Thank you.

Tina Daugherty - Direct (Young)

1        THE COURT:  You can step down, ma'am.

2        THE WITNESS:  Thank you, Your Honor.

3        THE COURT:  Plaintiff, call your next witness.

4        MR. YOUNG:  Plaintiff calls Tina Daugherty.

5        THE COURT:  Ms. Daugherty, would you come up and

6   take an oath or affirmation, please.

7        **TINA DAUGHERTY**, PLAINTIFF'S WITNESS, SWORN

8                    DIRECT EXAMINATION

9   BY MR. YOUNG:

10  Q.   Please state your name.

11  A.   Tina Daugherty.

12  Q.   Are you married?

13  A.   Yes.

14  Q.   Who is your husband?

15  A.   Dave Daugherty sitting at the table there.

16  Q.   Have you ever testified in court before?

17  A.   No, I have not.

18  Q.   Are you scared to death?

19  A.   Yes.

20  Q.   How long were you -- have you and Dave been married?

21  A.   We've been married approximately 38 years, 39 actually.

22  Q.   And at this anniversary it will be 40; right?

23  A.   Correct.

24  Q.   And the home you live in is subject to a mortgage

25  that's serviced by Ocwen, isn't it?

Tina Daugherty - Direct (Young)

1  A.    Yes.

2  Q.    Who takes care of the finances at your house?

3  Historically, who's taken care of the finances?

4  A.    My husband.

5  Q.    And throughout your marriage, have you worked?

6  A.    Yes, I did.

7  Q.    Tell the jury your line of work and how long you've

8  stayed at it.

9  A.    I was retired as a Human Resource specialist, but I had

10  a total of 35, 37 years of federal service working with

11  different agencies of the government.  I retired in May of

12  2012 with the Bureau of Public Debt in Parkersburg, West

13  Virginia.

14  Q.    So throughout your employment and since your

15  retirement, has Dave always taken care of all of the

16  finances?

17  A.    Yes, he has.

18  Q.    We're talking payment of utility bills?

19  A.    Pardon?

20  Q.    Utility bills?

21  A.    Everything, all the utilities, all the finances.

22  Q.    Do you all have a joint bank account?

23  A.    Yes, we did.

24  Q.    And your paychecks and his paychecks go in that account

25  and he pays the bills; is that correct?

Tina Daugherty - Direct (Young)

1  A.   Yes, that's correct.

2  Q.   For much of your married life your father -- your

3  husband was a fireman.  Yes?

4  A.   Correct.  That is correct.

5  Q.   How is it -- what's it like being married to a fireman?

6  A.   A little bit crazy.  He worked two 24-hour shifts a

7  week.  And then also he worked full-time as an EMT.  So we

8  kind of crossed each other coming home from work.

9  Q.   And the home that secures this -- that secures the

10  Ocwen mortgage, is that where you all have raised your

11  family?

12  A.   Yes, for the majority of my children's life, yes.

13  Q.   How long have you been in that house?

14  A.   We've been there about 18 years now.

15  Q.   Let me direct your attention to the spring of 2013.

16  Did it come to your attention that there may be an issue

17  about refinancing the home at that time?

18  A.   Yes.  I was aware of it.

19  Q.   Okay.  And how did you become aware of it?

20  A.   My husband discussed it with me.

21  Q.   Other than what your husband told you, did you have any

22  involvement at all in either disputing credit history or

23  trying to obtain refinancing?

24  A.   No.  That was all done by him.

25  Q.   Having been married almost 40 years, if something is

Tina Daugherty - Direct (Young)

1  bothering Dave, does he have to tell you that something is

2  bothering him?

3  A.   No.  I could usually tell.  He would get quiet, a

4  little bit withdrawn.  It would affect his sleep patterns.

5  But he didn't really talk about it because he didn't want to

6  worry me.  But I could -- you know, after being married so

7  long, I could see the signs if something was bothering him.

8  Q.   And beginning in the spring of 2013 through today, what

9  have you observed with respect to your husband and whether

10  or not this whole credit issue and foreclosure has affected

11  him?

12  A.   He was under a lot of stress, not sleeping well,

13  getting up and down during the night, not eating which is

14  one of his favorite things to do.  He likes to eat.

15  Q.   During his career as a fireman, he suffered a couple of

16  serious injuries, didn't he?

17  A.   Yes.

18  Q.   And I think we heard some testimony, but did the first

19  injury have something to do with the floor collapsing or the

20  ceiling collapsing while fighting a fire?

21  A.   Yes, when a floor collapsed -- well, a ceiling

22  collapsed on top of him actually, yes.

23  Q.   How did you hear about that?

24  A.   Well, I was notified by my husband when he called me

25  from the hospital.

Tina Daugherty - Direct (Young)

1    Q.   Up to that point in his life, was he in pretty good

2    health?

3    A.   No.  He had suffered, you know -- he had had a heart

4    stent put in prior, several years prior to that, a couple

5    years prior to that.

6    Q.   So he had some heart issues.  But he was still able

7    with those issues to keep work as a full-time fireman?

8    A.   Oh, yes, yes.

9    Q.   And he returned after his injury where you heard from

10   him from the hospital.  He returned to work after that

11   injury?

12   A.   He did.

13   Q.   Did he ever get back 100 percent where he was before

14   that first injury as a fireman?

15   A.   No, not 100 percent.  Several years later he ended up

16   with a herniated disk in his neck due to that several years

17   later.  So it was an on-going problem.

18   Q.   And was there a second injury also on the job as a

19   fireman?

20   A.   Yes.  He had another injury where they were fighting a

21   fire and one of the other firemen was up on a ladder and

22   fell and he tried to break his fall and they both went down

23   with the, the other fireman on top of him, which he injured

24   his shoulder in that, that incident.

25   Q.   Based on your observations of your husband and the fact

1  that you've lived with him for almost 40 years, after --

2  starting in the spring, March of 2013 to today, have you

3  observed anything that would lead you to believe that this

4  whole credit reporting thing has caused him stress?

5  A.   I'm sorry.  Caused him to?

6  Q.   To suffer from stress.

7  A.   Well, he was under a great deal of stress and he, he

8  didn't sleep well.  So, you know, I think it affected his

9  health in that way.

10       He was hospitalized a couple times with pneumonia.  I

11  don't -- you know, from an injury also that they thought was

12  due from one of his incidents with the fire department where

13  he has a lung problem.  So he's had a couple stints in the

14  hospital with pneumonia from that.

15  Q.   Do you have any opinion on whether you believe that

16  the, this whole credit dispute had any effect on your

17  husband's day-to-day well-being?

18  A.   Yes, I do believe so just under, being under so much

19  stress of, you know, worrying about losing your home that

20  you've lived in for 18 years.

21  Q.   It's your home as well and you signed the same note,

22  didn't you?

23  A.   Yes.

24  Q.   When it came to trying to deal with this, your husband

25  took the brunt of the hit?

Tina Daugherty - Cross (Kenney)

1  A.  He did.

2  Q.  Did he try to shield you from all this?

3  A.  Yes, yes.

4  Q.  Thank you, Tina.

5  A.  Thank you.

6              CROSS EXAMINATION

7  BY MR. KENNEY:

8  Q.  Good afternoon, Ms. Daugherty.

9  A.  Good afternoon.

10 Q.  Do you remember having your deposition taken in this

11 case?

12 A.  Yes.

13 Q.  And you recall that that deposition was under oath?

14 A.  Pardon?

15 Q.  You recall that that deposition was under oath;

16 correct?

17 A.  Yes.

18 Q.  And I asked you how Mr. Daugherty had been affected by

19 the credit issues in this case and you told me that it did

20 add stress; is that right?

21 A.  I said he was under a great deal of stress, that's

22 correct.

23 Q.  And you also told me that during this time you

24 understood that there was a negative Ocwen account appearing

25 on his credit report, but you weren't aware of any of the

Tina Daugherty - Cross (Kenney)

1    other negative accounts on his credit report at that time,

2    were you?

3    A.    That's correct.

4    Q.    And you, you had mentioned some of the physical

5    ailments that Mr. Daugherty had, and I believe you had said

6    that those resulted from some accidents that happened in his

7    previous employment; is that correct?

8    A.    With the fire department, yes.

9    Q.    And I had asked you how his status was at that time and

10   you said that he was stable; is that right?

11   A.    I don't recall saying that he was stable.  He has

12   on-going health problems.

13   Q.    And with regard to how Mr. Daugherty's behavior had

14   changed, I had asked you what about his behavior had changed

15   and I believe you had said that his temper had started to

16   flare a little bit and he tires easily; is that right?

17   A.    I did not say anything about his temper.  I did say I

18   could tell he was under stress because he wasn't sleeping at

19   night.  I don't recall saying anything about temper flaring.

20   I've not seen that side of him.  Just -- he would get quiet

21   actually and not talk.

22   Q.    So how about with respect to him tiring easily?  I know

23   you had previously just testified that you noticed a change

24   in his sleep pattern.  So is that change -- are you saying

25   that he, he's tiring easier now or it's the other way?

Tina Daugherty - Cross (Kenney)

1   A.   He just didn't sleep well.  He would get up and down

2   during the night.

3   Q.   Okay.  So when you, when you told me at the deposition

4   that he tires easily, was that incorrect or would you still

5   agree with that?

6   A.   Well, I meant that he didn't sleep well at night.

7   Q.   And I had asked you if there was anything else to tell

8   me about his behavior or the stress.  And you said "no" and

9   that you just couldn't put your finger on it.  Is that

10  right?

11  A.   Well, just that he was quiet, you know.  He didn't want

12  to worry me about anything, so he would keep things to

13  himself.

14  Q.   Okay.  So he didn't tell you much about all of this?

15  A.   Well, I knew, you know, that he was trying -- he was

16  having problems with Ocwen but, you know, he didn't -- he

17  tried to keep me from worrying as much as possible.

18  Q.   But you didn't know that he was having problems with

19  any other credit agencies; is that right?

20  A.   No, I did not.

21  Q.   That's all the questions I have for you, Ms. Daugherty.

22  I appreciate your time.

23  A.   Thank you.

24         THE COURT:  Any further questions of this witness,

25  counsel?

1      MR. YOUNG:  No, Your Honor.  May this witness be

2  excused.

3      THE COURT:  Any objection, counsel?

4      MR. KENNEY:  No objection.

5      THE COURT:  All right, ma'am, you can step down.

6      THE WITNESS:  Okay.  Thank you.

7      THE COURT:  Plaintiff, call your next witness.

8      MR. YOUNG:  Plaintiff rests, Your Honor.

9      THE COURT:  All right.  Let me see you lawyers

10  here at the bench for a moment.

11      (Bench conference on the record).

12      THE COURT:  Mr. Manning, we had a bench conference

13  relative to an objection -- well, out of the presence of the

14  jury, whether it was at the bench or not -- relative to an

15  exhibit that the plaintiff has offered regarding the

16  designation for the deposition.  I would like to preserve

17  that until we have a break.  And I anticipate that you have

18  other motions.  I would like for you to call your witness

19  and I will take up all of the motions at a recess.

20      MR. MANNING:  Okay.  So the Rule 50 motion is

21  preserved?  We just proceed with our witness?

22      THE COURT:  Yes.  And I only do it in the interest

23  of time so that we can proceed and me not play musical

24  chairs with the jury making them come in and out.

25      Anybody have any objection to proceeding in that

1    fashion?

2              MR. MANNING:  No, Your Honor.

3              THE COURT:  All right.  Thank you all.  The

4    plaintiff has rested.  Then I'll call on you to ask you in

5    front of the jury if you have evidence that you want to

6    present.

7              (Bench conference concluded)

8              THE COURT:  Mr. Manning, the plaintiff has rested.

9    Any evidence to present?

10             MR. MANNING:  Yes, Your Honor.  The first witness

11   that we're going to call is by deposition.

12             THE COURT:  All right.

13             MR. MANNING:  It's the individual Lorin Hanks

14   who's the representative of Aggressive Credit Repair, the

15   company that the plaintiff hired.  And we're going to read

16   it in.  I thought if it's okay with Your Honor that I will

17   read the questions and Mr. Kenney can read the answers.

18             THE COURT:  Yes, however you all want to do it.

19      Mr. Young.

20             MR. YOUNG:  I have an objection, Your Honor.

21             THE COURT:  All right.  That you want to voice

22   from there or you need to approach the bench?

23             MR. YOUNG:  The objection is relevance of the, all

24   of his testimony.

25             THE COURT:  All right.

1      Counsel, did you hear?

2            MR. MANNING:  I'm sorry, Judge, I did not.

3            THE COURT:  There is a relevancy objection.

4            MR. MANNING:  To Aggressive Credit Repair?

5            MR. YOUNG:  Yes.

6            MR. MANNING:  Okay.  This is the company that

7      we've been talking about since the beginning of trial.  It's

8      the company that Mr. Daugherty hired to dispute his credit.

9            THE COURT:  I understand the company.  You all

10     come up here, please.  I've missed you both.

11           (Bench conference on the record)

12           THE COURT:  I understand the company.  Let me hear

13     the basis of the relevancy.  I assumed that it had to do

14     with the nature of the testimony of the deposition, but you

15     all know that better than I do.

16           MR. YOUNG:  It's the relevancy of all of this

17     testimony by this witness.  That's my objection because

18     nothing this witness did -- what he did was write letters to

19     Equifax.  And based upon those disputes, Equifax generated

20     its ACDV and sent it to Ocwen.  Ocwen never saw any of what

21     Mr. Hanks sent to Ocwen.

22       Moreover, the letters that he sent were not sent to

23     Ocwen.

24           THE COURT:  They were sent to Equifax you mean?

25           MR. YOUNG:  They were only sent to Equifax.  Ocwen

1    never saw the letters, never knew of the existence of the

2    letters until this action was filed.  They didn't see the

3    letters.  Nothing they said or did was based upon those

4    letters.  Those letters merely triggered the Equifax ACD,

5    ACDV.

6        The issue here is what, what did Ocwen do to reasonably

7    investigate the ACDV that came in.  It never even knew of

8    the existence of Aggressive reporting.  If Aggressive

9    reporting sent those letters or the man on the moon or

10   Mr. Daugherty himself sent those to Equifax, they would have

11   never ended up in the hands of Ocwen or had any effect on

12   its behavior.

13       And, in addition, Ms. Lyew testified that when they

14   received the ACDVs, they did not receive any documents with

15   them.  That's clear in her 30(b)(6) deposition.

16       So it's really an extraneous matter.  It has no bearing

17   on the issue before the Court, nor does it help explain the

18   conduct or behavior of Ocwen when they receive these ACDVs.

19           THE COURT:  Tell me the relevance, Mr. Manning,

20   from your perspective, your client's perspective.

21           MR. MANNING:  It goes to the core of the case,

22   Judge.  The whole case is about what the plaintiff did to

23   dispute his credit and his responsibility for notifying with

24   accurate, relevant information.  The statute says all

25   relevant information must be provided.  And that's the

1    plaintiff's burden and he's the one who initiated the

2    dispute.

3         And in those letters -- we've talked a lot about what

4    the letters say and what he, Mr. Daugherty did.  The letters

5    that triggered the ACDV, which Mr. Young has spent an

6    inordinate amount of time talking about, were based on a

7    letter which is a form letter.  Every single month it's the

8    same.  And there's a number of federal decisions that say

9    that's a frivolous dispute and there's no need to

10   investigate it at all.

11        The nature of the letter is a core issue to this case.

12   And, further, when it goes to Equifax, Equifax has to review

13   that and, based on that, identify the code, this dispute

14   code that we keep talking about, and incorporate all the

15   data from that letter into the ACDV that it generates.

16        The ACDV relies on the letter.  Mr. Daugherty never

17   disputed a single one to the credit bureaus.  So when he

18   sent this letter through this third party that he never even

19   looked at the letters, that's what triggers this whole issue

20   of an ACDV response.

21        And what's important, nowhere in the letter does it say

22   duplicative tradeline.  Nowhere in the letter does it say,

23   "I have one account being reported twice."  And those are

24   the issues that Equifax, if it had existed, needed to put in

25   the FCRA relevant information box, that box that we've been

 1   talking about, again, throughout the trial.

 2             THE COURT:  Keep your voice down, please.

 3             MR. MANNING:  I'm sorry, Judge.  That FCRA

 4   relevant information box is where the duplicative tradeline

 5   by industry standard is to be identified.

 6        And, again, Equifax, to the extent that it should have

 7   known because the duplicative tradeline was actually in its

 8   own report and in its own system, if, even if ACR never told

 9   it, which is what the letter will show, it should have known

10   and put that in there.

11        But clearly this letter goes to the core issue of

12   responsibility in the case and the plaintiff's decision not

13   to accept responsibility for his disputes in this case.

14             THE COURT:  Okay.  This is my ruling.

15        There are cases which talk about frivolous disputes.

16   Those are instances where the consumer files a frivolous

17   dispute.  And the law -- the precedent talks about what the

18   receiver of that information, what obligation the receiver

19   has.

20        Here it's my understanding that Ocwen never received

21   these letters.  The core of this case is whether or not

22   Ocwen conducted a reasonable investigation based on the

23   information that it had.

24        And, so, if you all are telling me, and it's not

25   disputed that Ocwen never received these letters from this

```
 1   entity that assisted the plaintiff, then I would have to

 2   agree that it's not relevant for the jury's consideration

 3   because it's not information that came to Ocwen.

 4        Equifax is no longer in the case.  Ocwen's duty is to

 5   make a reasonable investigation based on the information

 6   that it has.  And, so, if -- unless it's disputed that Ocwen

 7   received this information, then I would have to agree it's

 8   not relevant.

 9             MR. MANNING:  Well, two --

10             THE COURT:  Do you dispute that?

11             MR. MANNING:  Yes, Your Honor.

12             THE COURT:  They did receive it?

13             MR. MANNING:  There's two issues --

14             THE COURT:  Did you receive the letters that Ocwen

15   received -- did Ocwen receive the letters?  Answer my

16   question, please.

17             MR. MANNING:  The "not his/not hers, never late,"

18   those, those words -- you know what I'm talking about, the

19   "not his," 001 code and the "never late."

20             THE COURT:  The letter.  I mean, I think my

21   question is clear.  Did Ocwen receive the letters that will

22   be discussed in this deposition written by the, what was it,

23   Aggressive Credit Company?

24             MR. MANNING:  Aggressive Credit Repair.

25             THE COURT:  Uh-huh.
```

1        MR. MANNING:  Those four words, "not his" and

2   "never late" from the letter are put into the ACDV response

3   dispute.

4        THE COURT:  Okay.

5        MR. MANNING:  So the actual letter --

6        THE COURT:  Uh-huh.

7        MR. MANNING:  I don't believe there is a dispute

8   that it was received.  The issue is the substance of the

9   letter which creates the dispute by Equifax and what it

10  relies on to code it and put it into the ACDV.  Your Honor

11  has ruled all the Equifax ACDVs come in.  You have to know

12  where that information comes from.

13       THE COURT:  Okay.  Any other point?  You said two

14  points.  I don't want to cut you off.

15       MR. MANNING:  Oh, relevance.  The -- it's very

16  broad, anything that's likely to prove or may prove, and

17  it's --

18       THE COURT:  The existence or nonexistence of a

19  fact.

20     I find it's not relevant and I make that finding based

21  on case law that -- I'm going to instruct this jury that the

22  defendant is, under law, required to conduct a reasonable

23  investigation based on the information that's received.  And

24  this is not information that was received.

25     And I preserve Ocwen's objection and exception to my

1    not permitting testimony regarding those letters, finding

2    them not to be relevant to the ultimate issue that the jury

3    has to determine in this case.

4       Other, other matters other than this issue before we

5    leave the bench?

6           MR. MANNING:  Is, is Your Honor's ruling that none

7    of this, this party's testimony comes into evidence?

8           THE COURT:  I don't know what the party's

9    testimony is.  But if it is about these letters -- you all

10   know what's in the deposition.  I have ruled that the

11   content of those letters isn't relevant because it's not

12   information that Ocwen received.  And Ocwen can only act

13   upon the information that it receives for the jury to

14   determine whether or not it acted reasonably, preserving

15   again Ocwen's objection and exception.

16          MR. MANNING:  And I can proffer what's in the

17   deposition just so Your Honor understands.

18          THE COURT:  All right.

19          MR. MANNING:  The issue there is Mr. Daugherty,

20   the borrower, the creditor who's doing the dispute, he is

21   responsible for generating the dispute.

22          THE COURT:  I understand that.  We've gone over

23   it.

24          MR. MANNING:  No, no, I'm not going to redo it,

25   Judge.

132

1          THE COURT:  All right.

2          MR. MANNING:  The issue is with him and the

3    testimony of this, this third-party company.

4          THE COURT:  Uh-huh.

5          MR. MANNING:  The third-party company is relevant

6    to what Mr. Daugherty has said on the stand.  In his

7    deposition Mr. Daugherty said, "I never told anybody about

8    Aggressive Credit Repair.  I believed Aggressive Credit

9    Repair was going to put that in its letter."

10        That's an important issue for the credibility not only

11   of the reasonable investigation, but for the plaintiff

12   himself.  And the plaintiff knew about the letter, and the

13   letter is relevant to the plaintiff's credibility.

14         THE COURT:  Well, if you have impeachment, Mr.

15   Manning, you have to use the impeachment consistent with the

16   rules of evidence.  But that does not permit that letter to

17   come in as substantive evidence because it's not relevant.

18        It's like you could have impeachment testimony from

19   some entity or person that wasn't even involved in the case

20   at all.  You would be permitted to impeach him if there is

21   impeachment.  But it doesn't come in as substantive

22   evidence.  If he said something inconsistent here, you get

23   to impeach him.

24         MR. MANNING:  Uh-huh.

25         THE COURT:  You have that right.  But it does not

1    come in as evidence because it's not relevant based on what

2    you or Mr. Young have told me, that specifically being that

3    Ocwen never received these letters, could not have acted on

4    these letters, couldn't be part of their reasonable or

5    unreasonable investigation because they didn't know about

6    them.

7         Again, I preserve Ocwen's objection and exception.

8    Let's go forward, gentlemen.

9              (Bench conference concluded)

10             THE COURT:  Ladies and gentlemen, I apologize.  I

11   need to give you a recess.  While you're out, do not discuss

12   this case among yourselves or let anyone discuss it in your

13   presence.  And be back in your jury lounge at, let's say

14   five minutes till the hour.

15        (Jury retired from the courtroom at 2:34 p.m.)

16             THE COURT:  Counsel, while we were at the bench

17   several of the jurors apparently asked the court security

18   officer about going to the restroom.  That's why I took the

19   recess.  We'll stand in recess.

20        (Recess taken from 2:35 p.m. until 2:55 p.m.)

21             THE COURT:  Mr. Manning, you wanted to address an

22   issue before the jury comes in?

23             MR. MANNING:  Yes.  The deposition that we're

24   about to read from Aggressive Credit Repair, I wanted to

25   make sure I understood what was, what I'm not permitted to

 1   read.

 2               THE COURT:  I excluded that I thought.

 3               MR. MANNING:  And that's what I want to clarify,

 4   Judge, because there's, there's two issues.

 5        My understanding of your ruling was the letter itself

 6   can't come in for the truth of the matter asserted, but it's

 7   relevant to the state of mind of both the plaintiff, the

 8   defendant, and Aggressive Credit Repair because it's

 9   reasonable investigation.  And that's what's relevant to

10   this whole concept of the investigation.

11        And then the second point, Judge, was the frivolous

12   disputes.  The -- there's a specific statute on, directly on

13   point.  And I just -- before Your Honor rules, if I could

14   just put it on the record so you can see what statute I'm

15   referring to.

16               THE COURT:  Yes, sir.

17               MR. MANNING:  It's 1681s-2(a)(8)(f), frivolous or

18   irrelevant dispute.  And specifically it says, this section,

19   that's, that we're here to talk about, shall not apply if

20   it's frivolous including," and then subpart little (i), big

21   (I) -- sorry for all the parens -- "by reason of the failure

22   of a consumer to provide sufficient information to

23   investigate the disputed information or the submission by a

24   consumer of a dispute that is substantially the same as a

25   dispute previously submitted."

1    In this case, the testimony from this witness, ACR, and

2    the letter that's attached to that deposition and identified

3    is an identical letter that's sent every month with the same

4    dispute, "not his, never late."

5    And then you go down and follow that through and it

6    says, "The act specifies the information that a consumer who

7    disputes the accuracy of information must provide to the

8    furnisher including," quote, "identifying the specific

9    information that is being disputed, explaining the basis for

10   the dispute, and including all supporting documentation

11   required by the furnisher to substantiate the basis of the

12   dispute."

13   That letter is the information that's generating the

14   dispute.  And the text of that letter is in the dispute

15   code, and also in at least some of the ACDVs.

16   There's actually that FCRA relevant information box

17   where it says "call Albert or Tony Gill."  That's directly

18   from the letter that goes into the ACDV by Equifax and gets

19   sent to Ocwen.  And that is received.

20   And the testimony from this particular ACR is that that

21   person doesn't exist.  It's, it's made up and it's

22   frivolous.  And that goes to this statute.

23   And then if you follow further down on that statute,

24   the Court determines that a dispute is frivolous if the

25   consumer has failed to provide sufficient information to the

1   furnisher to aid in the furnisher's investigation of the

2   dispute.  If the dispute is frivolous, the furnisher cannot

3   be liable to a consumer for the failure to investigate the

4   completeness or accuracy of that information.

5       If the consumer does not comply, the furnisher has no

6   duty to report the debt as disputed and the furnisher is not

7   subject to liability under 1681s-2(b).

8       Courts have held that it is relevant in determining

9   whether a furnisher has violated that section.  There is a

10  duty to, to re-investigate a consumer complaint lodged

11  directly against or through a consumer reporting agency when

12  the dispute is determined to be frivolous or irrelevant;

13  again, no duty.

14      Then I have a couple of case cites for Your Honor.  And

15  the first is *Palouian* vs. *FIA Card Services*.  It's 2013 U.S.

16  Dist. LEXIS 61861 from the Eastern District of Pennsylvania,

17  April 29th, 2013, granting a motion to dismiss holding it

18  was not necessary to decide whether the notice of

19  determination pursuant to that section.

20      Next, plaintiff here did not tell Equifax that there

21  were two different tradelines.  ACR also didn't tell.  And

22  ACR in its deposition says it didn't know, even though it

23  had more information than Ocwen had.  They actually had the

24  credit report with the two tradelines.

25      And that further goes to support the information that

1  Ocwen had which is less than what they had, both the

2  plaintiff and ACR, and that they were not providing to

3  Equifax demonstrates further that it's not only a frivolous

4  dispute, but that Ocwen's investigation was reasonable.

5      Plaintiff has not provided for why the account was not

6  his in that letter.  This is insufficient information and

7  does not comply with the requirements of the section.

8      The cite there, Judge, is *Noel* vs. *First Premier Bank*,

9  2012 U.S. Dist. LEXIS 32595, Middle District of

10  Pennsylvania, March, 2012.

11      Plaintiff's request was frivolous and irrelevant

12  pursuant to 1681s-2(b)(A)(8)(f)(ii) because plaintiff failed

13  to provide sufficient information to investigate.

14      Next, identifying a problem with a payment history,

15  profile account status, which is that dispute code that's in

16  the ACDV, was insufficient to alert either Ocwen to the fact

17  that Equifax was reporting two tradelines for the same

18  account.  Because plaintiff didn't provide sufficient

19  information, Ocwen corrected the information that plaintiff

20  had identified.

21      So, again, this goes to the state of mind and it's

22  directly relevant to the exact statute that we're here to

23  talk about.

24      Disputes after the first dispute were frivolous because

25  the plaintiff here submitted the same dispute through this

1   company, ACR, every month for over a year with no additional

2   information.  And the testimony from ACR is that information

3   doesn't change and it's being incorporated, at least in

4   part, into the ACDVs, the Albert or, "call Albert or Tony

5   Gill" which he says isn't actually a real person at Ocwen.

6        Another cite, *McCallum* vs. *Experian*, 2006 U.S. Dist.

7   LEXIS 57068, Northern District of Illinois, 2006, holding

8   that three successive letters repeating the same assertion

9   with no additional information does not trigger a duty to

10  investigate.

11       *Omar* vs. *Experian*, 2012 U.S. Dist. LEXIS, 99694,

12  Southern District Indiana, 2012, repeat disputes are

13  frivolous if the consumer provides no additional relevant

14  information with them.

15       Here the plaintiff and ACR on behalf of the plaintiff

16  submitted the same disputes repeatedly, "not his, never

17  late," and even his letters in March, March, 2014, simply

18  complain again about those same issues.  And even his direct

19  disputes just regurgitate the same thing, "not his, never

20  late," as opposed to identifying the actual problem, a

21  duplicative tradeline or one account reporting twice.

22       And for that reason, obviously we believe that it's a

23  frivolous dispute, but this deposition testimony and the

24  letter are relevant to that claim.

25            THE COURT:  Any response you want to give,

1  counsel?

2      MR. YOUNG:  Your Honor, the Court ruled this

3  testimony is irrelevant because Ocwen never saw or acted

4  upon it.

5      Now, counsel raises now the frivolous exception or the

6  frivolous defense.  Mr. Nolan and I are well aware of that

7  defense.  That's why when we took the deposition, the

8  30(b)(6) deposition of the witness we had her testify

9  specifically that these were never considered frivolous and

10  that they investigated each and every one as a new dispute.

11      And here is the testimony, the question:  "So if they

12  do check and they see similar disputes in the past, would

13  they make a note in their log saying this is a frivolous

14  dispute, so to speak?"

15      Answer:  "No.  They just -- they'll notate the account

16  accordingly based on the current dispute that comes in,

17  whether it's the same or slightly different or pretty much,

18  for instance, this account the same."

19      Question:  "And that's one thing I noticed.  We'll get

20  into it.  It seems like Ocwen conducted an investigation

21  each time."

22      Answer:  "That is correct."

23      "And does Ocwen ever say, refuse to conduct a

24  re-investigation if they deem a dispute is repetitive?"

25      Answer:  "It's regardless whether it's the same or not,

1    to still conduct the same account, same review, same

2    research."

3         "And, now, so when Ocwen returns the ACDV to the credit

4    reporting agency, are there any additional --"

5         She goes into something else there.  But we clearly

6    cover that at no time did Ocwen ever treat any of these as

7    frivolous disputes.  It investigated each and every one.

8    Counsel is re-arguing a ruling of the Court and there's no

9    basis for it.

10        He didn't mention to the Court that we covered the

11   frivolous issue in the deposition.  It should not come in

12   for any purpose.  And until you absolutely tell counsel

13   that, we're going to continue this dialogue I'm afraid.

14        THE COURT:  And is it your position that I have

15   not absolutely told counsel that, Mr. Young?

16        MR. YOUNG:  I think you absolutely have told

17   counsel that.

18        THE COURT:  The, the evidence that is sought to be

19   admitted here is evidence of which Ocwen was never made

20   aware of.

21        I have before me and have also reviewed the entirety of

22   the applicable statute, including that provision under (f)

23   that refers to frivolous or irrelevant disputes.  And the

24   language in it, when it speaks to a situation where someone

25   submits a previous dispute, it refers to it as frivolous

1  when the person receiving it has already performed the

2  person's duties under the paragraph.

3       This letter, this testimony that has to do with

4  Aggressive Credit Repair, information that this particular

5  defendant did not have at the time it received and acted on

6  the ACDVs is simply not relevant.

7       It did not come to them.  It is not a frivolous dispute

8  that was received by them.  The letter went to Equifax.

9  That's undisputed.  And, quite frankly, there's no way that,

10 as I've indicated previously, that Ocwen could have acted

11 reasonably or unreasonably based upon information that it

12 did not receive.

13      And, so, again I find that the evidence is not

14 relevant.  I exclude it.  And, again, I preserve Ocwen's

15 objection and exception to that ruling.

16      There is an outstanding issue, since we've got the jury

17 held up now well past time, with respect to the Plaintiff's

18 Exhibit 26.  There's been an objection.  You've rested but I

19 preserved this issue until we could get to a break.

20      The plaintiff has rested and Mr. Manning cited an

21 objection to this document during the course of the

22 testimony that you presented.  Is there any response to this

23 objection?

24           MR. MANNING:  From me?

25           THE COURT:  Is there a response to the objection?

1          MR. YOUNG:  Your Honor, my response is this was

2     the notice of the deposition.  This was the designated --

3     this was the designee in response to that notice.  The --

4          THE COURT:  Mr. Manning indicated that there was

5     agreement between the parties -- that there was an objection

6     to it and that there was an agreement to the parties with

7     respect to certain aspects of it.  And as I understood it,

8     that was his primary objection.  Is there a response?

9          MR. YOUNG:  There is no such agreement, Your

10    Honor.  It's not reflected in the deposition.  It's not

11    memorialized anywhere.  I asked Mr. Nolan.  He's the one

12    that actually went to the deposition.  He as an officer of

13    the Court can address this.  But normally if you have

14    somekind of agreement, you put it at the beginning of the

15    deposition and on you go, but it's not there.

16          THE COURT:  Mr. Manning.

17          MR. MANNING:  Yes.  It was a response.  I sent an

18    e-mail to Mr. Nolan.  We followed up on it.  It wasn't

19    written correspondence.  Mr. Nolan said to me, "Yes, this

20    deposition is being conducted subject to your objections."

21          THE COURT:  All right.  Well, that's -- as I

22    understand it, and maybe you all meant something entirely

23    different, but generally when someone indicates that, it

24    doesn't mean that there is an agreement of any type other

25    than that you're going forward with the deposition and that

1    the party has an opportunity to bring up the objections

2    later.  That's before the Court.

3        Going forward with the deposition subject to your

4    objections, that's what I interpreted that to mean.  Did you

5    all mean something different or was it your interpretation

6    that it meant something different?

7            MR. MANNING:  That, yes, Judge, that our

8    objections were preserved.  And throughout that deposition

9    we objected based on scope, form, preserving and also

10   limiting the testimony of that witness.

11           THE COURT:  All right.  And was that -- when you

12   say limiting that witness, did you mean in the context of

13   the issues which have been outlined in it as to what she

14   would testify to, Mr. Manning?

15           MR. MANNING:  I can't speak for Mr. Nolan's

16   understanding.  But my understanding, Judge, was that we

17   would not be postponing and, and having motions practice.

18   Instead, our objections would be preserved.

19       Mr. Nolan, if he was unsatisfied with this witness's

20   knowledge, would then tell me and I would provide a new

21   witness because I had to only permit this person to testify

22   as to what she knew.

23           THE COURT:  Mr. Nolan.

24           MR. NOLAN:  Your Honor, this deposition had been

25   rescheduled on several occasions and actually took place

 1    after the Court's deadline to end discovery and end

 2    depositions.

 3         After that point, we had no more opportunity to

 4    schedule anyone else as the trial date was fast approaching.

 5    My understanding was Mr. Manning filed objections to the

 6    notice of deposition and we proceeded to take the deposition

 7    at that point.

 8         I don't recall a specific agreement saying that,

 9    anything along these lines of, you know, "You'll produce

10    someone else."  It was just a matter of, "Here's the notice

11    of deposition."  They objected to it.  We took the

12    deposition at that point.

13              THE COURT:  All right.  Well, I have two people

14    saying two different things.  I wasn't there.  There's no

15    way for me to ascertain and I'm not going to prejudice

16    anyone when I'm in a position that I don't know.

17         And, so, out of an abundance of caution, I'm going to

18    exclude -- and I think I referred to it as 26 and it's

19    actually written here as Plaintiff's Exhibit 29.  And I

20    exclude it only for the reason that I am in a position where

21    I cannot determine whether or not there was an agreement.

22         I preserve everybody's objection and exception to the

23    ruling.

24         Get the jury, please.

25         (Jury returned into the courtroom at 3:18 p.m.)

John Ulzheimer - Direct (Manning)

1          THE COURT:  You all be seated.

2      Mr. Manning, call your next witness.

3          MR. MANNING:  Your Honor, the defendant calls John

4  Ulzheimer.

5          THE COURT:  Sir, would you come up and take an

6  oath or affirmation, please.

7          **JOHN ULZHEIMER**, DEFENDANT'S WITNESS, SWORN

8                    DIRECT EXAMINATION

9  BY MR. MANNING:

10  Q.   Good afternoon, Mr. Ulzheimer.

11  A.   Good afternoon.

12  Q.   Will you please state your full name for the Court.

13  A.   John Robert Ulzheimer.

14  Q.   Have you ever been employed in the consumer credit

15  industry?

16  A.   I have.

17  Q.   Where?

18  A.   A variety of places.  I have worked at Equifax Credit

19  Information Services.

20      I've worked at a company called FICO, or Fair Isaac,

21  which is commonly known for their work in credit scoring.

22      I worked for a company called Credit.com.

23      I worked for a company called Smart Credit.

24      And I have done concurrent contract work for a variety

25  of credit-related companies for the past decade or so.

1  Q.   How long did you work at Equifax?

2  A.   Six years.

3  Q.   When did that start?

4  A.   Thanksgiving, 1991.

5  Q.   What was your role there?

6  A.   I started as a Consumer Service Agent, which is a fancy

7  way of saying I took phone calls from consumers who had

8  issues with their credit reports.

9       I performed aspects of the consumer dispute process all

10  the way from speaking with the consumer, logging their

11  complaint in the Equifax system, all the way through to

12  receiving the verification response from the furnisher,

13  which is usually a bank or a credit card issuer or

14  collection agency.

15      I then moved on to a more managerial level role where I

16  actually managed a variety of teams that performed that

17  function, as well as working with what Equifax calls

18  specialty teams that deal with specialized types of disputes

19  relevant to things like mixed credit reports, fraud, credit

20  repair types of disputes.

21      Later on in my time with Equifax, I moved into what

22  they refer to as an account management position, which means

23  that I managed the relationship between Equifax and the

24  users of their information.

25      And, so, now instead of dealing with consumers, I'm

John Ulzheimer - Direct (Manning)

1   dealing with banks, credit card issuers, auto lenders, auto

2   dealerships, the companies that would actually buy the

3   credit report information and use it for risk assessment

4   purposes.  That was my last position with the company.

5   Q.    Okay.  Why did you leave that position?

6   A.    My last position took me from Atlanta to Jacksonville,

7   and my role was to manage the relationship between Equifax

8   and the company formerly known as Barnett Bank.

9       And soon after I relocated my family to Jacksonville,

10  Barnett Bank was sold to the bank formerly known as Nations

11  Bank which then became Bank of America through acquisition.

12      So I had a choice.  I could either move my family to

13  Charlotte, which is where Bank of America is headquartered,

14  or I could stay in Jacksonville, or I could look for other

15  opportunities.  And, so, I chose to look for other

16  opportunities.

17  Q.    After leaving Equifax, you went to -- you mentioned a

18  company called FICO.

19  A.    That's correct.

20  Q.    What is FICO?

21  A.    So FICO is an acronym.  And it's an acronym for Fair

22  Isaac Corporation.  And FICO is commonly known in the credit

23  related world for essentially inventing and managing the

24  industry standard credit scoring system.

25      In fact, it's almost become an institutionalized name.

1    Instead of looking at a credit score, you look at a FICO

2    score.  That's primarily what FICO does.  That's their core

3    competency.

4    Q.   While you were at -- let's start with this.  How long

5    were you at FICO?

6    A.   Seven years.

7    Q.   While you were there, what were your roles and

8    responsibilities?

9    A.   So FICO is one of those jack-of-all-trades,

10   master-of-all types of companies.  And, so, my -- I was in

11   the credit bureau products unit which means that anything

12   that had anything to do with the credit scoring systems that

13   we built that were sold by any of the five North American

14   credit reporting agencies, which are the three big ones in

15   the U.S. and then the two big ones in Canada, was managed

16   out of our group, which means anything from education to

17   design and development to installation to validation,

18   pricing.  I mean, if it touched the credit scoring models,

19   it was managed out of our group.

20   Q.   So when you talk about credit scores, you refer to

21   credit bureaus, the three national ones.  What are they?

22   A.    In the U.S. Equifax, TransUnion, and at the time it was

23   TRW, but TRW doesn't have a credit services division any

24   longer.  They sold their data and it is now owned by a

25   company called Experian.

John Ulzheimer - Direct (Manning)

1  Q.   So at FICO you were involved with the actual scoring

2  model, how a credit score is, is computed or generated?

3  A.   That's exactly right.

4  Q.   In your role at FICO were you involved with how the

5  various factors that are considered on a credit report for a

6  consumer are actually used to compute credit scores?

7  A.   Yes.

8  Q.   During your involvement there were you involved with

9  how those credit scores and the various information on

10  credit reports affect credit applications or denials?

11  A.   Like risk assessment and underwriting?

12  Q.   Yes.

13  A.   Yes.

14  Q.   So tell us just about the credit application denial

15  process and how someone's credit score and credit report are

16  utilized in that model.

17  A.   Sure.  So I'll give you a real good example.  If a

18  consumer wants to go out and buy a car and they want to

19  finance the car, they may go to their bank or their credit

20  union and try to get qualified for an auto loan before they

21  go to the different car dealerships to test-drive

22  automobiles so that they're actually bringing the financing

23  with them.

24       So they would go to their financial institution.  They

25  would fill out a credit application.  And it's ubiquitous in

John Ulzheimer - Direct (Manning)

1   the credit application process that the lender is going to

2   want to access a credit report and a credit score.

3       They get to choose which of the credit bureaus they're

4   going to use, of course, but they will generally pull one

5   credit report from one of the three national credit

6   reporting agencies.

7       Once they have this information, now they have the

8   consumer's credit history and then the credit score that's

9   generated off of that credit history.  They will use that

10  information and, based on their own policies, their own, you

11  know, risk assessment policies, they'll determine do I want

12  to do business with this consumer and, if I do want to do

13  business with this consumer, under what terms do I want to

14  do business with this consumer, meaning how much am I

15  willing to let he or she borrow, what kind of interest rate

16  am I going to assess, what kind of down payment requirement

17  am I going to, to apply before I'm going to do business with

18  this consumer.

19      And there are going to be scenarios, unfortunately,

20  where the lender just simply says, "I don't want to do

21  business with this consumer because they're just simply too

22  risky for me."

23      That's commonly referred to as a credit denial, or more

24  formally referred to as an adverse action.  And, so, that

25  process, as that -- as the process continues, the lender

1  will generally send a letter to the consumer or the

2  applicant notifying them that they have been denied credit.

3  And they'll give some required disclosures, where they got

4  the credit information from, how to contact the credit

5  bureau, their rights.  And more recently since 2011 that

6  letter has had to include a credit score.

7  Q.   So that --

8           MR. YOUNG:  Your Honor, --

9           THE COURT:  Yes, sir.

10          MR. YOUNG:  Your Honor, it appears that Mr.

11 Manning's covered this witness's qualifications.  We'd like

12 an opportunity to *voir dire* the witness as to his

13 qualifications before he begins giving opinions.

14          THE COURT:  Any objection to that, Mr. Manning?

15          MR. MANNING:  I just hadn't finished.  I still

16 have more qualifications to go through.

17          THE COURT:  Is there an objection to their asking

18 questions before he's qualified as a witness?

19          MR. MANNING:  I would prefer to finish.

20          THE COURT:  I'm not saying you can't finish.  I'm

21 simply asking is there an objection to them questioning him

22 before he's qualified as a witness?

23          MR. MANNING:  Oh, I understand.  No, there's not.

24          THE COURT:  All right.  When he finishes, then

25 you'll be able to examine the witness.

John Ulzheimer - Direct (Manning)

1    Go ahead, please.

2    BY MR. MANNING:

3    Q.   So we've covered Equifax, FICO, and the credit scoring

4    credit application that you did at FICO.  Next you went to

5    Credit.com?

6    A.   Correct.

7    Q.   What did you do there?

8    A.   I -- at Credit.com I had a variety of roles with the

9    company, a lot of content work which means I did a lot of

10   writing.  I actually wrote several books about credit

11   scoring and credit reporting when I was at FICO.

12       I also built some web-based credit scoring tools for

13   the company that they actually still have installed on their

14   website.

15       And I actually started doing a lot of media interviews

16   on behalf of the company regarding, you know, how credit

17   scores are used in mortgage lending, how they're used in

18   their types of lending, what influences credit scores, what

19   are consumers' rights.  And I was there -- let me think --

20   for a little over six years.

21   Q.   Okay.  After the additional six years at Credit.com,

22   you mentioned another company, Smart --

23   A.   Smart Credit.

24   Q.   Smart Credit?

25   A.   That's right.

John Ulzheimer - Direct (Manning)

1    Q.    And how long were you there?

2    A.    I was there for a shade less than three years.

3    Q.    What did you do at Smart Credit?

4    A.    So my role there was similar to my role at Credit.com,

5    a lot of content work, again a lot of writing.  I actually

6    wrote my fourth book when I was working for Smart Credit.

7          I did a lot of media interviews on behalf of the

8    company.  The company's primary product, if you will, was a

9    credit monitoring service.  So I actually did a lot of

10   consulting with the company to help them optimize the

11   deliverable of that service.

12   Q.    Okay.  So after the three years at Smart Credit, where

13   did you go next?

14   A.    So, so at that time and, actually, when I went to work

15   for Credit.com, I had actually also formed my own small

16   business.  And I started doing a lot of expert witness work

17   and other contract type of work concurrently.

18   Q.    When you mentioned your fourth book -- and you don't

19   have to tell me about all of them.  I'm sure they're long.

20   What's the -- topically, what are the books about?

21   A.    One of them is about identity theft.  And three of them

22   are, are essentially about credit reporting and credit

23   scoring.

24   Q.    Now, you mentioned already quite a bit about credit

25   scoring, credit applications, credit denials, and that whole

John Ulzheimer - Direct (Manning)

1  process, how it's utilized by lenders or potential lenders.

2      In addition to your work for those businesses, actually

3  working in the industry for what I compute as 23 years -- is

4  that right?

5  A.   It's -- this is -- since '91, so we're in the 25th year

6  now.

7  Q.   And I was just going up through Smart Credit.

8  A.   I see.

9  Q.   I haven't gotten to the rest yet.  But for that, that

10 first period where you're actually employed as someone

11 working for a business that does credit and credit

12 application scoring, et cetera, is that 23 years

13 approximately?

14 A.   Give or take.  I haven't actually added it up like

15 that, but that sounds about right.

16 Q.   Now, I want to ask you about other publications.  I

17 have your expert report.  It is lengthy in the publications.

18 I want you to tell, tell us about just the publications that

19 you've written about credit scoring, credit applications,

20 and credit denials.

21 A.   I -- so since I left FICO, part of any contract or job

22 I've had since then has involved content, so writing.  And

23 it's -- we're in the thousands at this point because every

24 single month I have a certain number of deliverables that I

25 have to send to my clients.  And these articles are all

John Ulzheimer - Direct (Manning)

1   about something having to do with consumer credit, and most

2   of them having to do with, to some extent, credit reports

3   and, to some extent, credit scores.

4        And it's hard for me to sit down and give you an exact

5   number just because I've been doing this for almost 12 years

6   now.  But we're, we're talking well into the thousands.

7   Q.   Now, the second category I'd like you to ask -- I'd

8   like to ask you about the publications.  Have you written

9   publications about the credit dispute resolution process?

10  A.   Yes.  And, in fact, that's something that was in at

11  least two of my books, actually two of my books and one of

12  my consumer handbooks.  And many of my articles, at the very

13  least, tacitly mention the fact that the consumer has the

14  right to challenge information on their credit report.

15       And many of my articles go even deeper than that and

16  actually explain this is how you do it.  And some even go

17  deeper than that and explain this is the process that

18  actually occurs when you do it.

19       So it depends on who the audience is intended to be for

20  the article as to how deep I dive into that particular

21  topic.

22  Q.   So 23 years actually working as an employee for a

23  business in the industry, then 12 additional years; 35

24  total.

25  A.   Well, concurrent.  A lot of that is concurrent.

John Ulzheimer - Direct (Manning)

1   Q.   So just give me the total number of years.

2   A.   So '91 through today.  So it's my entire post-college

3   working career.

4   Q.   Have you ever -- well, you've already answered you've

5   testified as an expert witness before.  Can you proximate

6   the number of times you've been retained as an expert

7   witness on a credit industry issue?

8   A.   I actually had to count that for another case a couple

9   of weeks ago; 230, give or take, cases where I've been

10  retained.

11  Q.   Are you being paid for your role as an expert witness

12  in this case?

13  A.   I am.

14  Q.   And what are you being paid by the hour?

15  A.   $425 plus whatever expenses I incur like travel and

16  such.

17  Q.   Have you reviewed any materials in preparation of your

18  expert report and your testimony here today?

19  A.   I have, yes.

20  Q.   What materials have you reviewed in preparing your

21  analysis and opinions of the issues relevant to this matter?

22          MR. NOLAN:  Your Honor, I would interject at this

23  point and ask that the scope of the expert's testimony and

24  his report is going to be the heart of our *voir dire* of him

25  as well.  I would like the opportunity before he begins

John Ulzheimer - Direct (Manning)

1   offering what he's reviewing and what he's relying upon to

2   ask him these questions as well.

3         THE COURT:  The -- what he has reviewed and what

4   he -- for purposes of his testimony and for purposes of

5   giving his opinion I think is beyond the qualifications of

6   an expert.  Mr. Young has asked to question him before we go

7   beyond that and I've granted that to him.

8         MR. MANNING:  So at this point, Judge, I would, I

9   would move for the -- I would tender this witness as an

10  expert in the credit industry on issues including credit

11  reporting, credit disputes, credit scoring, credit

12  applications, and credit denials.

13        THE COURT:  All right.

14     Mr. Young or Mr. Nolan, whoever is going to do the *voir

15  dire*, you can do it at this point.

16        MR. NOLAN:  We're going to focus on the scope of

17  the testimony today as to the issues he'll be presenting to

18  the Court based upon his report that he's provided at this

19  point.  His credentials are extensive.  We understand he

20  probably will be able to assist the trier of fact.  And I

21  just wanted to question the witness about the content of his

22  point so we can have a clearer idea of what the scope of his

23  testimony will be today.

24        THE COURT:  Well, that's a different issue than I

25  understood from Mr. Young.

John Ulzheimer - Direct (Manning)

1        Is there an objection to that, Mr. Manning?

2              MR. MANNING:  Yes, Judge.

3              THE COURT:  All right.  I'm going to sustain the

4    objection to questioning him on the boundaries of his

5    opinion.  If you want to question regarding his

6    qualifications, I'll permit that.  But, otherwise, I will

7    expect you to object if he goes beyond the boundaries of the

8    report which I'm sure has been provided, preserving the

9    plaintiff's objection and exception.

10        Let's move forward, please.

11             MR. MANNING:  I take it there's no objection from

12   the plaintiffs to my request to tender this witness as an

13   expert and I assume --

14             THE COURT:  Mr. Nolan.

15             MR. NOLAN:  No objection, Your Honor.

16             THE COURT:  All right.  Go ahead, please.

17   BY MR. MANNING:

18   Q.   So, now, on the materials, the materials that you

19   reviewed in preparation of your expert report.  I have your

20   expert report in front of me.  And I'm going to hand it to

21   you because it has all of your analysis and opinions in this

22   case.

23             MR. MANNING:  May I approach, Your Honor?

24             THE COURT:  Yes, sir.

25   BY MR. MANNING:

John Ulzheimer - Direct (Manning)

1   Q.   Mr. Ulzheimer, the report is lengthy.  The last exhibit

2   attached to it, Exhibit C, is "documents relied upon."

3   A.   That's correct.

4   Q.   What materials did you have available to you and did

5   you consider in preparation of your analysis and opinions in

6   this case?

7   A.   The list is about 40 documents long, so just please

8   bear with me.

9       The complaint; the answer to the complaint; the notice

10  of filing of notice of removal; the notice of removal;

11  Ocwen's financial interest disclosure statement; a standing

12  order assignment and referral of civil actions and matters;

13  an order of, an order and notice -- defendant's, excuse me,

14  defendant Equifax's answer and defenses to plaintiff's

15  complaint; defendant Equifax's corporate disclosure

16  statement; notice of change of attorney information

17  regarding Jed Nolan and Sara Brown; report of parties'

18  planning meeting; the Court's scheduling order; motion to

19  extend plaintiff's deadline to disclose expert witness; the

20  report of Mr. Evan Hendricks; Ocwen's Rule 26(a)(1)

21  disclosures; plaintiff's Rule 26(a)(1) disclosures;

22  Equifax's Rule 26(a)(1) disclosures; Equifax's first, excuse

23  me, Equifax's first request for admissions; Equifax's first

24  request for production of documents; plaintiff's first set

25  of interrogatories to Equifax; plaintiff's first request for

John Ulzheimer - Direct (Manning)

1    production of documents to Equifax; plaintiff's first set of

2    interrogatories to Ocwen; plaintiff's first request for

3    production of documents to Ocwen; plaintiff's responses to

4    Equifax's discovery requests; Ocwen's responses to

5    plaintiff's first set of interrogatories and RFP, request

6    for production, excuse me; Equifax's responses to

7    plaintiff's first set of interrogatories; Equifax's

8    responses to plaintiff's first request for admissions;

9    Equifax's responses to plaintiff's first request for

10   production of documents; the 1,092 pages with the Bates

11   range EIS Daugherty 1 through 1,092.

12   Q.   What are those document?  Who provided them?

13   A.   These are Equifax Information Services documents.

14   Q.   Thank you.

15   A.   They're Equifax's docs.

16        The 1,746 pages with the Bates range D like David, D

17   like David, slash OLS 1 through 1,746.

18   Q.   Who provided those documents?

19   A.   Those are Ocwen's.

20   Q.   Please continue.

21   A.   Okay.  And then the 118 pages with the Bates range or

22   the Bates numbers ACRLLC 1 through 118.

23   Q.   Whose documents are those?

24   A.   Those are Aggressive Credit Repair's documents.

25        MR. YOUNG:  Objection, Your Honor.

John Ulzheimer - Direct (Manning)

1            THE COURT:  Basis?

2            MR. YOUNG:  He's referring to something upon which

3    the Court already made a ruling.

4            THE COURT:  Mr. Manning.

5            MR. MANNING:  He's merely identifying documents

6    that are part of his report and what was considered in

7    forming his analysis and opinions.

8            THE COURT:  At this point in time, Mr. Young,

9    given the response to the question as to what he reviewed, I

10   overrule it.  That should not preclude you from making other

11   objections on the subject matter if need be as we go

12   further.  But I find nothing improper about the witness

13   testifying to what he's reviewed.

14           THE WITNESS:  I'm sorry.  I don't know if you

15   wanted me to --

16   BY MR. MANNING:

17   Q.   No problem.  I'll get us back on track.  The last thing

18   you read was Aggressive Credit Repair documents that they

19   provided in this matter, 118 documents.

20   A.   Pages 1 through 118, that's right.

21   Q.   Okay.  Now, based on your analysis of all those

22   documents, have you formed opinions about what occurred in

23   this matter?

24   A.   I have, yes, sir.

25   Q.   Now, let's, let's get to those by starting with some

John Ulzheimer - Direct (Manning)

1  explanation about roles, responsibilities.

2  A.   Okay.

3  Q.   And I know you could talk about this at length, so I'm

4  going to encourage you, given the time, to try to keep it

5  relatively short.

6  A.   Okay.

7  Q.   Give us the short version.  The -- generally, what's,

8  what's the consumer credit report?  What is it?

9  A.   It's -- a credit report is essentially a list of

10 liabilities and some public records that are maintained by

11 credit reporting agencies, Equifax, TransUnion and Experian.

12     And this report, practically speaking, looks

13 essentially like a list of all of the accounts that you have

14 with your lenders, any collections you may have, any public

15 records that you may have, things like bankruptcies and

16 judgments and tax liens.

17     There's also a listing of your personal information,

18 your name, your, your current address, and a variety of

19 former addresses, date of birth, your Social Security

20 number.

21     Some credit reports contain employment information.

22 Some don't.  And most credit reports contain a list of

23 what's referred to as inquiries; in other words, a record of

24 companies that have pulled your credit report.

25 Q.   There are -- you mentioned a number of things.  One of

John Ulzheimer - Direct (Manning)

1   the things you mentioned was personal information.  Why, why

2   is it important for a credit report to have personal

3   information?

4   A.   So the, the primary reason is so that the credit

5   reporting agencies can actually attach the proper liability

6   to the proper consumer's report, if you will.

7        So a credit report is not a document that's sitting in

8   a filing cabinet somewhere and when someone asks for it, the

9   credit bureau gets it out of a filing cabinet and gives it

10  to a lender.

11       A credit report is actually a pool of information.  And

12  when someone asks for someone's credit report from one of

13  the credit bureaus, the bureaus will use matching logic and

14  find information in the pool that they believe belongs to a

15  consumer using the consumer's identification information.

16       And they will actually compile this into what we

17  commonly refer to as the credit report and then deliver it

18  to the lender.

19  Q.   Okay.  So when you're talking about liability for an

20  account and that's why you need to make sure you have the

21  personal information right, --

22  A.   Yeah.

23  Q.   -- is that relevant in any way to one of the dispute

24  codes that we've been talking about in this case, the 001

25  code?

John Ulzheimer - Direct (Manning)

1    A.    Yeah.  That's the "not his or hers" code.

2    Q.    What does that code mean?

3             MR. NOLAN:  Your Honor, I'm going to object

4    because this is going beyond the scope of his report.  He

5    didn't have any opinions in his five opinions offered in his

6    report regarding dispute codes from a consumer.

7             THE COURT:  Response, counsel.

8             MR. MANNING:  Yes, he did, Judge.  I have the

9    report.  I'm happy to hand it up.

10            THE COURT:  Well, point it out to Mr. Nolan.  If

11   you all need to come up and let me read to you, I'm happy to

12   do that.

13            MR. NOLAN:  Your Honor, I withdraw my objection.

14            THE COURT:  All right.  Let's proceed, please.

15            THE WITNESS:  Can I get you to repeat your

16   question?  I'm sorry.

17   BY MR. MANNING:

18   Q.    No, I'm sorry for the interruption.  What I was asking

19   you about is this dispute code 001.

20   A.    Okay.

21   Q.    That -- you told me it means "not his/not hers."  How

22   is that dispute code used in the industry?

23   A.    So that dispute code and every dispute code, not just

24   the 001, "not his or hers" dispute code, the intent of that

25   code is to essentially focus not only the credit bureau but

John Ulzheimer - Direct (Manning)

1   also the lender, or what is commonly referred to as the

2   furnisher, the company that furnishes information to the

3   credit bureaus on a certain aspect of the dispute that the

4   consumer has communicated to the credit bureaus.

5       And, so, really what it's meant to do is to optimize or

6   streamline the dispute such that everyone is focused on the

7   same aspect of dispute.  So in the "not his or hers"

8   example, if the consumer tells a credit reporting agency,

9   "Hey, this account isn't mine, please investigate it," the

10  credit bureau will then homogenize that disputed language

11  into this code "not his or hers" because that's what the

12  consumer is asking them to investigate.

13      And then the credit bureau will then communicate that

14  code on a form called an ACDV, or an Automated Consumer

15  Dispute Verification form.  They will communicate that code

16  on that form to the furnishing party, essentially asking

17  them, "Look, we have a dispute from a consumer.  He or she

18  is saying that this item is not his or hers.  We want you to

19  investigate that aspect of the account.  Get back to us when

20  you're done with your investigation."

21      So the code essentially guides not only the credit

22  bureau but the furnishing party to investigate the item that

23  the consumer is actually objecting to.

24  Q.   What -- when that code is on there with the

25  instructions "please confirm ID," what, what does that, what

John Ulzheimer - Direct (Manning)

1   does that require the furnisher to do?

2           MR. NOLAN:  Objection, Your Honor.  Can we

3   approach on this issue?

4           THE COURT:  Yes, sir.

5           (Bench conference on the record)

6           THE COURT:  Mr. Nolan.

7           MR. NOLAN:  Your Honor, the expert report contains

8   five specific opinions on how a report determines a score,

9   on potential damages in his claim, and he has rebuttal on

10  Mr. Hendricks's report about the XB codes marking rebuttal

11  about the claim that two tradelines were furnished, and

12  rebuttal about the credit tape never showing correct data.

13      He never offers anything on investigation, on what a

14  dispute code is intended to convey, or what actually a

15  furnisher is expected to do once it receives the

16  investigation or any specifics regarding using any

17  investigation in this case.

18          THE COURT:  Mr. Manning, response.

19          MR. MANNING:  Judge, this is the third objection.

20  On Page 11 it specifically --

21          THE COURT:  I don't need to see it.  Tell me what

22  it says and lower your voice.

23          MR. MANNING:  It specifically says dispute code

24  001 refers to a situation where the consumer says "not

25  his/not hers, provide or confirm complete ID."  And it goes

John Ulzheimer - Direct (Manning)

1   on to talk about the dispute codes.  So, I mean, I don't --

2   there's no basis for the objection.

3          THE COURT:  Okay.  Mr. Nolan.

4          MR. NOLAN:  Your Honor, in this case he's not

5   offered any opinions on the investigatory process.  He's

6   offered a broad outline about when a consumer sends a

7   dispute to a CRA.  The CRA sends a code such as 001 to the

8   furnisher.  The furnisher responds to that code.

9      The specifics he's getting into are well beyond the

10  scope of his report that he offered in this case and he's

11  never supplemented.

12         THE COURT:  Given what I heard the statement of

13  the witness to be thus far, or the question, I'm going to

14  overrule the objection.  And I want a copy of this that I

15  can keep up here.  I preserve the plaintiff's objection and

16  exception.

17         (Bench conference concluded)

18         MR. MANNING:  May I proceed, Judge?

19         THE COURT:  If someone gets me an extra copy of

20  the report.

21         MR. MANNING:  You can have mine.  I don't have

22  another copy.

23         THE COURT:  Well, if you need it to examine the

24  witness with, I don't want that.  I just wanted a copy to

25  have so that when these objections come I have something

John Ulzheimer - Direct (Manning)

1  before me that I can read.  If that's your only copy, that's

2  fine.

3          MR. MANNING:  Judge, I'll give this one to you.

4  BY MR. MANNING:

5  Q.   You were talking about the 001 code and the question

6  was what does that code instruct the furnisher to

7  investigate?

8  A.   The -- excuse me -- the 001 code is a liability dispute

9  for claiming that it's not their account.  And in order for

10 the credit reporting agency to complete their obligation to

11 perform a reasonable investigation, they're essentially

12 asking the furnishing party to determine if the

13 identification that they have associated with the liability

14 actually matches what is on the consumer credit report;

15 practically speaking, is the account really his or hers or

16 is it not.

17 Q.   Does it instruct the furnisher to investigate anything

18 other than that?

19 A.   The 001 code?  No, it's specific to "not his/not hers,"

20 the liability dispute.

21 Q.   So any of the other fields on the ACDV that aren't

22 relevant to 001, are those relevant to the instruction of

23 the code?

24 A.   No.  They're actually outside of the relevance of the

25 code.

John Ulzheimer - Direct (Manning)

1  Q.   When the furnisher responds to that ACDV with complete

2  identification, is it verifying any of the other material on

3  that ACDV?

4  A.   No.

5  Q.   Why not?

6  A.   That's not what it was asked to do.  It was asked to

7  verify and investigate if this person is actually liable for

8  this account or not.

9  Q.   Now, the, the other code you mentioned was an XB code.

10 A.   That's right.

11 Q.   What is, what is that code for?

12 A.   So the XB code is what's formally known as a compliance

13 condition code.  If you haven't figured it out by now,

14 credit reports are all code, and different codes mean

15 certain things.

16     A compliance condition code, or specifically the XB, X

17 as in -- actually B as in boy -- compliance condition code

18 is added to a credit report entry when the consumer is

19 disputing it and it's actively under investigation.

20     So, again, from a chronology perspective, if a consumer

21 files a dispute with a credit reporting agency, the credit

22 reporting agency adds the XB code to the item in dispute so

23 that while the item is being investigated, if any future

24 credit reports are pulled, whoever pulls it sees that that

25 particular item is in dispute and actively being

John Ulzheimer - Direct (Manning)

1    investigated.

2    Q.    Do you recall reviewing any documents in which Ocwen

3    furnished data on its monthly data tape to any of the credit

4    bureaus with an XB code on it?

5    A.    Yes.

6    Q.    What, what documents do you recall seeing?

7    A.    They were the screen captures of the monthly reporting

8    for the Ocwen account.  And there was a -- I think it's --

9    it either said compliance condition code or CCC and there

10   was a little arrow with a drop-down menu where you could

11   select a code.  And some of those did, in fact, have the XB

12   code filled into the field.

13             MR. MANNING:  Your Honor, may I approach?

14             THE COURT:  Yes, sir.

15   BY MR. MANNING:

16   Q.    Mr. Ulzheimer, I'm handing you what's been marked as

17   Defendant's Exhibit 2.

18   A.    Okay.

19   Q.    Are you familiar with that document?

20   A.    Yeah.  These are the screen captures I just referred

21   to.

22   Q.    Okay.  So you identified that there were screen

23   captures with an XB code, and that XB code means what?

24   A.    That the item is actively in dispute and being

25   investigated.

John Ulzheimer - Direct (Manning)

1  Q.   Now, what's the significance of the XB code for credit

2  scoring purposes?

3  A.   So while an item has the XB code associated with it,

4  the credit scoring system, all of them, FICO, the FICO

5  brand, the Vantage score brand, which are -- those are

6  really the only, only two credit score brands that are used.

7       The credit scoring system will not consider the payment

8  history or the balance associated with that account.  The

9  reason that FICO and Vantage score chose to treat an item in

10 dispute like that is because they did not want the item to

11 be considered while there was a possibility that it could be

12 modified or changed because of the investigation process.

13      And, so, they essentially protected the consumer's

14 score from being possibly affected by the entry by ensuring

15 that they didn't consider the payment history aspect of the

16 account which would include things like late payments, past

17 due balances, any sort of narrative language that indicates

18 non-performance on the account, and then the debt related to

19 the accounts; in other words, whatever the balance is.

20 Q.   So as long as the, the furnisher is reporting that XB

21 code on that month, then it's telling the credit bureaus,

22 "Don't consider any negative information for scoring this

23 account."

24 A.   Negative information or debt information for scoring

25 purposes.  That's right.

John Ulzheimer - Direct (Manning)

1  Q.    So when you say for scoring purposes, does that also

2  mean it's not being utilized by creditors for purposes of

3  credit applications?

4  A.    Well, the -- even though the item is in dispute and

5  being investigated, it's still physically on the credit

6  report.  It's just that any score that the lender would

7  consider while it's being investigated wouldn't consider

8  that item.

9        This has become problematic in some instances because

10  the credit -- lenders know that the score doesn't consider

11  items that are in dispute.  So you actually run into

12  scenarios where lenders will not underwrite an account while

13  things are in dispute because they recognize that the score

14  may not be actually a valid score because it's not

15  considering aspects of the account any longer.

16  Q.    And you reference in your report the months in which

17  Ocwen was furnishing data with the XB code on it.

18  A.    That's right.

19  Q.    We also want to talk about the -- I'm sorry.  I don't

20  want to get too bogged down in documents yet.

21  A.    Okay.

22  Q.    Do you recall also talking about the "date opened"

23  field on the monthly data?

24  A.    Yes.

25  Q.    What is the significance of the "date opened" field as

John Ulzheimer - Direct (Manning)

1   to the, what happened in this matter?

2   A.  Well, Ocwen changed or corrected the date opened.

3   Apparently, it was incorrect.  It was actually opened in a

4   different month in 1999 than was on the credit report.

5       And it appears that when Ocwen sent the correction to

6   Equifax, instead of overlaying the incorrect date opened

7   with a correct date opened and just simply leaving the

8   account as one account, it appears Equifax duplicated the

9   account leaving a -- what's referred to as either a dupe or

10   duplicative account on the report in addition to the one

11   account that Ocwen reported.

12       And you can tell the difference.  One had the correct

13   date opened and one had the incorrect date opened.  So the

14   significance of the date opened issue, essentially it's the

15   core issue and, frankly, why we're here today because that's

16   what really created this duplicate account.

17   Q.  Now, the, the duplicate account -- so Ocwen makes a

18   correction to somebody else's data about the account and

19   tells the three credit bureaus to fix it?

20   A.  That's right.

21   Q.  Did the credit bureaus fix it?

22   A.  It appears two of the three did.  It looks like

23   TransUnion and Experian didn't have an issue with what's

24   kind of a garden variety change to an entry.  But it appears

25   that Equifax systemically -- something happened and it

John Ulzheimer - Direct (Manning)

1  created that duplicate account.

2  Q.   What is the significance of the fact that two of the

3  three national credit bureaus got it right and Equifax

4  didn't?

5  A.   Well, the, the significance is this was not something

6  that Ocwen did just sending incorrect information to

7  Equifax.  This was something that they did in the normal

8  course of business.

9      Lenders and furnishers do this all the time making

10 proactive changes to the information on credit reports.  And

11 when you send the same essentially update order to all

12 three -- or it actually may have been all four of the credit

13 reporting agencies -- and two of the three or three of the

14 four had a non-issue with it, yet the last one had a problem

15 with it, it kind of underscores the, where this issue

16 actually came from.

17 Q.   We've talked a lot about different roles during this

18 trial.  What are Equifax's responsibilities when they

19 receive that monthly data?

20 A.   So when Equifax receives the monthly data -- and, and

21 this normally comes in a tape.  So think of a gigantic,

22 looks like a big eight-track tape for those of you who

23 remember what those look like.  And essentially that's what

24 it is is the furnisher will cut three of these identical

25 tapes and send them to the three credit reporting agencies.

John Ulzheimer - Direct (Manning)

1   And then that's where their ability to control this process

2   ends because now the credit reporting agencies now have this

3   tape.

4        And, so, they will essentially schedule the upload of

5   the information on that tape.  And, you know, for lack of a

6   better analogy, they'll, they'll put the tape into their

7   system and hit "run" and they will upload this information

8   and it will generally overlay the prior month's information.

9        And this is something that's a common occurrence across

10  thousands and thousands of lenders.  It occurs on a monthly

11  basis and has -- the process pre-dates me.  So this is the

12  process that's been around for over 25 years.

13  Q.   And once that data is received, then what does Equifax

14  do with it?

15  A.   Say that again.

16  Q.   Once that monthly data is received from a furnisher,

17  what does Equifax do with it?

18  A.   So they will, they will run it into their system which

19  normally overlays the prior month's update.  And they

20  actually have an audit team.  And the audit team will look

21  for meaningful variances in the information, meaning if last

22  month you sent us a million accounts, this month you sent us

23  15 million accounts, those two don't make, necessarily make

24  sense.

25       So they're just looking for variances that don't make a

John Ulzheimer - Direct (Manning)

1    lot of sense so that they can question or audit the

2    furnisher as to why the data tape this month looks so

3    different to the data tape from the prior month.

4        Once the data is run into their, into their main

5    frames, it just becomes part of this pool of credit file

6    data that's just essentially waiting for a future lender to

7    ask for a credit report so it can be compiled onto someone's

8    report and then used for underwriting.  And this happens

9    generally once every statement cycle period which is usually

10   once every 30 days.

11   Q.   So the monthly data that Ocwen is sending in, is there,

12   is there one set of that or are there two sets of it?

13   A.   I'm not sure I understand.  Meaning do they send one to

14   Equifax and a different one to TransUnion or --

15   Q.   Correct.

16   A.   Okay.  No.  Lenders will send in an identical tape to

17   all the credit reporting agencies that they choose to report

18   to.  Most, most lenders report to all three of the big

19   credit bureaus.  So they'll essentially make a carbon copy

20   of the same tape and send it to all three.

21   Q.   Did Ocwen ever furnish data on more than one account

22   for Mr. Daugherty?

23   A.   Not in any of the records that I saw.

24   Q.   And the, the monthly records that you have in front of

25   you are the, the relevant documents for this matter; right?

John Ulzheimer - Direct (Manning)

1   A.    That's correct.

2   Q.    Are there any issues in the monthly data that Ocwen is

3   sending to these three credit bureaus?  Anything wrong with

4   them?

5   A.    No.  They're in the standard reporting language, a

6   language called Metro.  It's in the standard language.  It

7   has the same fields that we see on a credit report.

8   Q.    So what happened?  Why did Equifax keep reporting a

9   duplicative tradeline when Ocwen is telling them there's

10  only one?

11  A.    Well, Ocwen didn't know there were two accounts.

12  That's, that's the problem.  So -- and, and this issue with

13  Equifax is a systemic issue, meaning that now we have two

14  accounts associated with one consumer when in reality

15  there's only one account associated with that one consumer

16  from this particular lender.

17       And, you know, for better or for worse, Equifax isn't

18  aware of this issue.  And, so, therefore, they're not doing

19  anything about the issue.  Ocwen is not aware of it because

20  they certainly didn't report two accounts to Equifax.  So

21  they don't even know that it's an issue.

22       And, so, unless someone raises their hand and says,

23  "Wait a minute, I only have one account with Ocwen, not two

24  accounts, you have a -- there's something wrong with your

25  credit report, you need to fix it," then really it just kind

John Ulzheimer - Direct (Manning)

1  of perpetuates until someone raises their hand and asks that

2  it be addressed.

3  Q.   What is the industry standard way of reporting a

4  duplicative tradeline?

5  A.   It, it shows up twice on the same credit report.  And

6  if you look at it with the human eye, you can see pretty

7  clearly that it's the same thing.

8  Q.   Now, that's when someone like Mr. Daugherty has the

9  credit report?

10 A.   That's right.

11 Q.   Are you aware of whether Ocwen ever received

12 Mr. Daugherty's credit report?

13 A.   I am not.

14 Q.   Of all those documents you listed off to the jury, you

15 haven't seen anything in there that suggests Ocwen ever knew

16 or received that information?

17 A.   That's correct.

18 Q.   Now, Mr. Daugherty had it but he never provided it to

19 Ocwen.

20 A.   That -- well, if he had, then Ocwen would have known

21 that there were two accounts.

22 Q.   So had someone known about the duplicative tradeline

23 and actually said, "Hey, this is a duplicative tradeline,"

24 how should Equifax have notified Ocwen about that?

25 A.   They never would have.

John Ulzheimer - Direct (Manning)

1   Q.    Why not?

2   A.    Equifax actually has written policies on how to deal

3   with duplicative accounts on a consumer's credit report.

4   And that policy essentially -- the policy is that they won't

5   even contact the furnisher.  They'll just unilaterally

6   remove one of the two accounts themselves without even

7   involving the furnishing party.

8           MR. NOLAN:  Your Honor, I object to this question

9   because this is clearly not in the report about Equifax's

10  policies and procedures disclosed by Mr. Ulzheimer.

11          THE COURT:  Response?

12          MR. MANNING:  It is, Judge.  It's referenced in

13  his report among the contents.

14          THE COURT:  Here's your copy.  If you will direct

15  me to it, I will look.

16          MR. MANNING:  It's Exhibit C, the last page,

17  Judge.  Thank you for making a copy.

18       Toward the bottom of the page you'll see that

19  Mr. Ulzheimer identified EIS 1 through 1,092 of all the

20  documents Equifax produced.  And the policy appears within

21  that document and it has duplicative trade accounts and it's

22  EIS 542, 543.  And it specifically addresses the duplicative

23  trade accounts.

24          MR. NOLAN:  Your Honor, there's no opinion offered

25  in the entire report.  There's a document cited at the end

John Ulzheimer - Direct (Manning)

1   of his report as something he reviewed, but there's no

2   opinion on those documents inside his report.

3           THE COURT:  What's in the document?  In other

4   words, gentlemen, I want to be fair.  This is a similar

5   situation that we had with the plaintiff's expert where

6   there was a list on the back and I allowed him to testify

7   about that.

8       I don't know what's in the document such that I can

9   compare it to the testimony of the witness, but I'm happy to

10  do that if that's what you're asking, Mr. Nolan.

11          MR. NOLAN:  No, Your Honor.  I would concede that

12  the document was probably contained in those documents.  But

13  what we're objecting to is the fact that he didn't opine on

14  that in his report at any point.

15          THE COURT:  Anything further?

16          MR. MANNING:  Judge, you've already ruled on the

17  issue of an expert being permitted to testify to things

18  that, like the Equifax ACDVs with Mr. Hendricks that he

19  hadn't talked about or identified.  This is actually

20  identified in the report.

21          THE COURT:  Well, it's identified as his having

22  relied on it.  Do you have a copy of the document?

23          MR. MANNING:  Yes, Your Honor.

24          THE COURT:  All right.  I am looking at the

25  document which contains Bates stamp -- I'm going to refer to

John Ulzheimer - Direct (Manning)

1   it, counsel, as 542.

2        And in it, Mr. Nolan, it has information, if not exact,

3   similar to what the witness has just testified to.  And, so,

4   I don't see it as an opinion but a repetition of what's

5   contained in this document.

6            MR. NOLAN:  Yes, Your Honor.

7            THE COURT:  For that reason, I overrule the

8   objection.

9   BY MR. MANNING:

10  Q.  I'm going to hand you what was just being reviewed.  It

11  is EIS 542 and 543.

12  A.  Okay.

13  Q.  And can you identify what that document is?

14  A.  Yes, sir.  This is -- well, it's three pages out of the

15  Equifax, what's referred to as the indicating manual.  And

16  "indicating" at Equifax means dispute manual.

17       And this particular -- these particular three pages

18  refer specifically to Equifax's policies and practices

19  regarding duplicate trade accounts or duplicate credit

20  report entries.

21  Q.  Now, there's a third page, if you could look at that.

22  I'm sorry the print is small, but in the bottom right-hand

23  corner you'll see there's another Bates stamp.  What's that

24  one?

25  A.  EIS Daugherty 512.

John Ulzheimer - Direct (Manning)

1   Q.   Thank you.  And what is that document?

2   A.   This is the Table of Contents of that manual.

3   Q.   And it identifies specifically in the Table of Contents

4   "duplicative trade accounts"?

5   A.   On Page IND018 is a section titled "duplicate trade

6   accounts."

7   Q.   So this indicates that this isn't an uncommon thing

8   that happens in the industry, so much so that Equifax has a

9   policy specifically on it?

10  A.   We had a policy when I worked there about it.  And

11  that's, you know, in the early '90s.  This manual is from

12  2004, which is 12 years ago.

13       Duplicate trade accounts are not as common as, say, you

14  know, catching a cold.  But they're common enough that the

15  credit bureaus have policies regarding how to deal with

16  them.

17  Q.   Despite this policy, Equifax didn't delete the

18  duplicative tradeline?

19  A.   That's correct.

20  Q.   Why not?

21  A.   They never were made aware -- well, they were never

22  made aware that there was a duplicative tradeline.  So the

23  policy is -- the way a policy is written is how they will

24  react when they're notified that there is a duplicative

25  tradeline.

John Ulzheimer - Direct (Manning)

1    And, so, because they were never notified or put on

2    notice that there was a duplicative tradeline, they couldn't

3    react and, therefore, deploy this policy.

4    Q.   How would they have been informed by Mr. Daugherty that

5    there was this duplicative tradeline?

6    A.   Through the standard consumer dispute resolution

7    process, which generally means that the consumer contacts

8    the credit bureau, you know, one of a variety of ways,

9    either on the phone or through the mail or through the

10   internet and actually identifies an error on their credit

11   reports and explains why they believe that it's wrong.

12   Q.   You've reviewed all the documents that the plaintiff

13   provided that are listed in your report; right?

14   A.   Yes, sir.

15   Q.   At any point did Mr. Daugherty ever identify a

16   duplicative tradeline?

17   A.   I did not see anything that referenced duplicative

18   tradeline, no, sir.

19   Q.   Mr. Daugherty sent letters to Equifax.  Equifax

20   received those letters.  How did Equifax determine what

21   codes to put on the ACDV responses?

22   A.   So Equifax will -- once they receive a dispute

23   communication, whether it's on-line or through a telephone

24   call or through the internet, they will use their judgment

25   and essentially homogenize the communication from the

John Ulzheimer - Direct (Manning)

1  consumer into what they believe the dispute to be.  And

2  that's how they'll convert a letter or a conversation into

3  all of these dispute codes.

4  Q.   So in this case we're -- what dispute codes were used?

5  A.   So I saw two that showed up.  And I don't have the

6  library of ACDVs committed to memory.  But if, if I remember

7  correctly, the 001 dispute code was commonly present which

8  is the "not his or hers."  And then a 007 code which on some

9  documents showed up as an 016 code.  The language of the

10  code is identical, however.  And that particular code

11  disputes three specific fields on the credit report.

12      And I don't recall what they are off the top of my

13  head.  I think account status is one.  Payment history may

14  be the other.  And, so, those are the two that I saw on, on

15  every dispute related communication.

16  Q.   And you've already told us about the 001 as instructing

17  the furnisher to check the ID.  What do those three specific

18  fields of the 106 or 007, what does that instruct the

19  furnisher to review?

20  A.   It instructs the furnisher to investigate the three

21  specific fields that are identified in that particular

22  dispute code.

23  Q.   What about other, in other fields?  Is the furnisher

24  required to respond to those?

25  A.   That would be outside of what the consumer has asked

John Ulzheimer - Direct (Manning)

1  them to investigate.

2  Q.   So whose responsibility is it to respond to the code

3  that's received?

4  A.   Well, the --

5          MR. NOLAN:  Your Honor, I'd object again because

6  this is going right to the issue we discussed at the bench.

7  It's outside the scope of Mr. Ulzheimer's report.

8          THE COURT:  In terms of the question of the

9  responsibility, whose responsibility it is to respond to the

10 code?

11         MR. NOLAN:  Your Honor, I believe it goes directly

12 to the reasonableness of any investigation that would be

13 done after that point.  And that's an issue that

14 Mr. Ulzheimer did not opine upon in his report.

15         THE COURT:  Response, counsel?

16         MR. MANNING:  Judge, you have the report.  I

17 welcome you to read it.

18         THE COURT:  Just direct me to the page.

19         MR. MANNING:  Yes.  So first on Page 11, Paragraph

20 5.

21         THE COURT:  Anything further, Mr. Nolan?  Numbered

22 5 on Page 11 to the top two paragraphs on Page 12.

23         MR. NOLAN:  Your Honor, the page appearing on

24 section 5 gives a general overview of the dispute process.

25 It does not mention a 007 dispute or what a furnisher is

John Ulzheimer - Direct (Manning)

1  tasked with doing once it receives a specific dispute such

2  as that.

3          THE COURT:  All right.

4          MR. NOLAN:  It talks generally about how long a

5  data furnisher has to respond to that and to fill out the

6  response portions of the ACDV regarding that.  It doesn't

7  have any specifics about any directions from the CRA at that

8  point.

9          THE COURT:  Mr. Manning, you were going to point

10 me to another section.

11         MR. MANNING:  No, Judge, that's the section where

12 it talks about who's doing what.

13         MR. NOLAN:  And what's more is that section offers

14 no opinion as to who was supposed to do what once these

15 disputes are traded.

16         MR. MANNING:  And my response, Judge, is he's

17 describing the process.

18         THE COURT:  When I look at Numbered Paragraph 5 on

19 Page 11 of the expert report of Mr. Ulzheimer, it does, in

20 fact, describe the process.  It describes what the parties

21 involved in the process do.

22      And I do not believe as I look at this response,

23 Mr. Nolan, that it's any different.  I want to review it

24 again.

25      (Pause)

John Ulzheimer - Direct (Manning)

1        THE COURT:  All right.  I'm looking here at the

2   answer and the question regarding responsibility.  And,

3   again, I believe that it's a general discussion in keeping

4   with what I see here on Page 11 as opposed to an opinion in

5   this particular case, Mr. Nolan.

6        MR. NOLAN:  Yes, Your Honor.

7        THE COURT:  I preserve the plaintiff's objection

8   and exception to my ruling and overrule it.

9      Go ahead, please.

10       MR. MANNING:  I'm sorry, I don't recall the

11  question.

12     Ms. Court Reporter, could you read it back?

13       THE COURT:  I think the last question was -- I'm

14  sorry.  Go ahead.

15     (The court reporter read back the previous question,

16  after which the following occurred:)

17       THE WITNESS:  The furnisher is responsible for

18  responding to the code.  They're, in fact, the only party

19  that receives the code.

20  BY MR. MANNING:

21  Q.   And when they receive that code, what are they

22  responsible for doing about it?

23  A.   Well, they're investigating -- their entire

24  investigation is directed by the code.  The code is the

25  point guard.  It essentially tells them "confirm ID.

John Ulzheimer - Direct (Manning)

1    Confirm the balance.  Confirm whether or not this account

2    was late."

3        Whatever the consumer is objecting to on his or her

4    credit report generates the code.  And the code directs the

5    furnisher to investigate what the consumer finds

6    objectionable about the credit reporting.

7    Q.   Here the, the dispute codes that you've identified, at

8    no point was there ever identification by Equifax, the

9    credit bureau, reporting this error that there was a

10   duplicative tradeline or any other way of saying those

11   words, "duplicative tradeline"?

12   A.   That's right.

13   Q.   So what responsibility did Ocwen have regarding

14   Equifax's mistake?

15   A.   I would suggest they never knew about it.  No one,

16   including Equifax, ever brought it to their attention.  And,

17   frankly, if, if you -- back to the Equifax dispute

18   resolution manual, if someone would have bought it to

19   Equifax's attention, their policy straight out of their

20   manual is to not even involve the furnishing party.  It's

21   just to unilaterally delete one of the two on their own.

22   Q.   And Equifax had a policy to do that?

23   A.   That's the policy we talked about a few minutes ago.

24   Q.   So we've, we've talked about this reasonable

25   investigation concept.  What is a reasonable investigation?

John Ulzheimer - Direct (Manning)

1   A.   So that's a tricky one.  Reasonable does not have a

2   definition.

3              MR. NOLAN:  Your Honor, I object at this point.

4   Again, there is nothing in his report about an

5   investigation, what constitutes a reasonable investigation.

6   And the attempt to bring this in as a back door through

7   general practices of what a credit dispute is is improper.

8              THE COURT:  Response to the fact that he has been

9   asked what is a reasonable investigation which is asking for

10  an opinion, counsel?  Any response to that objection?

11             MR. MANNING:  Yes.  Judge, I was just asking this

12  expert to identify in the industry what is considered to be

13  a reasonable investigation.

14             THE COURT:  Well, that's an opinion and it does

15  not appear to be listed as one of his opinions.  Anything

16  further you have on that issue?

17             MR. MANNING:  I would just like the expert -- not

18  to apply it to this case, just to be able to explain in the

19  industry what a reasonable investigation is.

20             THE COURT:  All right.  I sustain the objection,

21  finding that that would be an opinion on his part that does

22  not appear from what I'm seeing here to have been disclosed,

23  Mr. Manning.  I preserve the defendant's objection and

24  exception to that ruling.

25  BY MR. MANNING:

John Ulzheimer - Direct (Manning)

1  Q.   When Ocwen receives a dispute -- you've reviewed the

2  various ACDV responses; right?

3  A.   Correct.  That's right.  I have.

4  Q.   And you've seen all the responses?

5  A.   I have.

6  Q.   You've seen the codes and what Ocwen responded with?

7  A.   I've, I've seen them, yes.

8  Q.   And when Ocwen responded, do you believe they did

9  anything wrong?

10 A.   I do not.

11 Q.   Why not?

12 A.   Because they were directed to investigate certain

13 aspects of the credit reporting --

14          MR. NOLAN:  Your Honor, I object.

15          THE COURT:  There is an objection.

16          MR. NOLAN:  I'm sorry.

17          THE COURT:  Go ahead, please.

18          MR. NOLAN:  He's asking a direct question --

19          THE COURT:  When you hear an objection, I need you

20 to --

21          THE WITNESS:  Be quiet.  Okay.  Sorry about that.

22          THE COURT:  No apology necessary.

23          MR. NOLAN:  Your Honor, that's a direct question

24 about the investigation that took place in this case.  And

25 there's, once again, no opinions on anything that Ocwen did

John Ulzheimer - Direct (Manning)

1   to investigate plaintiff's dispute.

2         THE COURT:  Or whether or not they did anything

3   wrong.  Is that your position?  That's the question as I

4   understood it or heard it.

5         MR. NOLAN:  Your Honor, my, my objection relates

6   solely to testimony regarding the investigation.  If he has

7   an opinion about whether they furnished information in the

8   credit score or otherwise, that's a separate matter than the

9   issues that he did not provide an opinion on which is

10  relating to Ocwen's investigation in this case.

11        THE COURT:  Not intending to argue with you,

12  Mr. Nolan.  Is it your position that the question which I

13  believe was whether or not they did anything wrong goes to

14  the investigation?  Is that what you're saying or not?

15        MR. NOLAN:  Yes, Your Honor.

16        THE COURT:  All right.

17     Mr. Manning, response?

18        MR. MANNING:  Your Honor, I'm not dealing with the

19  investigation.  I'm dealing with the facts of what Ocwen

20  responded with which is disclosed in his report as the

21  contents of the materials that he relied upon.

22        THE COURT:  And with respect to the opinion as to

23  whether or not Ocwen did anything wrong, does, is that

24  included from your perspective in his report?

25        MR. MANNING:  Yes, Judge.

John Ulzheimer - Direct (Manning)

1         THE COURT:  All right.  And point it out to me.

2         MR. MANNING:  Judge, the, the report talks about

3    all the information that he reviewed in preparation.  And it

4    discusses all the responses.  And there is a discussion

5    about how Ocwen responded with adequate information.

6    Specifically, it references the codes that were utilized on

7    the ACDVs.

8         THE COURT:  All right.

9         MR. MANNING:  If you'd like me to rephrase, I can

10   try to do that.

11        THE COURT:  I'm looking at his opinions which he

12   has indicated that he will give.  The response to a question

13   as to whether or not they did anything wrong certainly gives

14   an opinion from the witness's perspective as to whether or

15   not they did what they were supposed to do for purposes of

16   the jury's consideration.

17       I don't see that opinion here.  I see other opinions,

18   but I do not see that.  And if you, again, want to point it

19   out to me, I'm happy to consider it.

20        MR. MANNING:  Judge, why don't I try to rephrase

21   it?

22        THE COURT:  All right.

23       Your objection to the question on the floor is

24   sustained, Mr. Nolan.

25       You go forward, Mr. Manning.

John Ulzheimer - Direct (Manning)

1    If there are additional objections, I will hear them.

2    BY MR. MANNING:

3    Q.   You're aware of, as I was saying, all the ACDVs and how

4    they came in with dispute codes and how Ocwen responded to

5    them?

6    A.   Yes.

7    Q.   Are there codes that Ocwen received in the form of a

8    dispute that directed it to do anything other than what it

9    did?

10   A.   No.

11   Q.   In terms of what Ocwen responded with, are there things

12   that it should have done differently?

13   A.   I don't believe so.

14   Q.   Why not?

15   A.   The responses were specific to the codes which direct

16   the -- communicate the consumer dispute and direct the

17   investigation.

18   Q.   Now, I'd like to ask you about the credit report

19   concept.  The credit report concept we've talked about

20   generally.  Now I'm going to get more specific.

21       When you talk about scoring -- and, again, I'd like you

22   to give me the version I'll understand.  What factors go

23   into computing a credit score?

24   A.   Okay.  So a credit score only considers certain

25   information off of a credit report, nothing external that's

John Ulzheimer - Direct (Manning)

 1    not on a credit report.

 2        So within the credit report, the information falls very

 3    cleanly into five separate categories.  And these five

 4    separate categories have varying degrees of influence on the

 5    actual score.  So I'll go from the most important to the

 6    least important.

 7    Q.   Can you give me a road map first?  Like how many

 8    factors are you about to give me?

 9    A.   Five --

10    Q.   Okay.

11    A.   -- real quick.

12    Q.   So we're going to start with number one first, most

13    important.

14    A.   Right.  This is a payment history category which is

15    really the presence or lack of derogatory information,

16    period.

17    Q.   I got it.

18    A.   Okay.

19    Q.   What's number two?

20    A.   Number two is your debt load.  So there's a variety of

21    metrics that are underneath the category of debt.

22    Q.   Got it.

23    A.   Okay.

24    Q.   Number three?

25    A.   It's -- number three the category is called time and

John Ulzheimer - Direct (Manning)

1   file which is a fancy way of saying how old is your credit

2   report.

3   Q.   Got it.

4   A.   Number four is the pursuit of credit which is the

5   inquiry category, so a record of you actually going out

6   there and making applications for credit.

7   Q.   And fifth?

8   A.   Diversity, meaning do you have experience managing

9   different types of accounts or do you only have experience

10  managing one type of an account.

11  Q.   In your report you talk about -- this is on Page 12 --

12  that no single item on a credit report determines a credit

13  score.

14  A.   That's right.

15  Q.   So you've just given five factors that these credit

16  scores utilize --

17  A.   That's right.

18  Q.   -- when they're computed.  Do the different credit

19  bureaus come up with different scores?

20  A.   The credit reporting agencies, because the information

21  on your three credit reports is different, it's not

22  identical, will generally yield different scores if for no

23  other reason than the fact that the data going into the

24  scoring model is different across the three credit reporting

25  agencies.

John Ulzheimer - Direct (Manning)

1  Q.   I understand that.  Now let's talk about the number one

2  factor, payment history category.  What information is

3  considered for that number one category?

4  A.   So it's basically the presence or lack of bad stuff.

5  And that will include public record information.  And

6  there's only three public records that appear on a credit

7  report; bankruptcy, tax lien, and judgments.

8       Next would be what's referred to as third-party

9  collections.

10  Q.   Are you giving me these in order of significance or --

11  A.   No.  I'm just giving you kind of the inventory of

12  derogatory credit report entries.

13  Q.   Got it.

14  A.   Public records.  The next is third-party collections.

15  And if you don't know, a collection -- what a collection is

16  is when someone defaults on some sort of loan or a service

17  with a lender or service provider.  They may outsource the

18  collection process to a third-party company referred to as a

19  collection agency.  And the collection agency will then

20  place that item on your credit report.  And it shows up as

21  what's referred to as a collection account.

22       So that's -- so public records and collections.  And

23  then you now have all of the information in the account

24  section.  And, so, that would include things like late

25  payments, past due balances, repossessions, settlements,

John Ulzheimer - Direct (Manning)

1    charge-offs and defaults, accounts included in bankruptcy,

2    short sales, foreclosures, anything that indicates that the

3    account is not being paid on time.

4        So what I just gave you, those three things, is a

5    pretty full and complete list of the, of the inventory of

6    bad things that can end up on a credit report.

7    Q.   Got it.  And all those things fall into category number

8    one?

9    A.   Payment history.

10   Q.   Most important.  Okay.  So, now, we've all heard about

11   how Mr. Daugherty has one account with Ocwen that's being

12   reported twice by only Equifax.  One of them is perfect.

13   The other one is wrong.  Right?

14   A.   Correct.

15   Q.   Okay.  So let's exclude that account for a moment.

16   A.   Which one?

17   Q.   The whole -- both.

18   A.   All of it, okay.

19   Q.   Just take them out.  I only want to ask you now about

20   the other stuff on Mr. Daugherty's credit report.

21   A.   Okay.

22   Q.   You've reviewed his credit report?

23   A.   Yes.

24   Q.   It was produced by Mr. Daugherty that he had in his

25   possession and provided for this case?

John Ulzheimer - Direct (Manning)

1   A.    Yes, sir.

2   Q.    Now, do you recall the date of it?

3   A.    I want to say April, 2014.

4   Q.    It's on Page 12 of your report, Paragraph B, second

5   paragraph.

6   A.    Oh, okay, April, 2013.  My apologies.  No, no,

7   April 17th, 2014.  I was right.

8   Q.    Okay.

9   A.    Yeah.

10  Q.    I'm going to hand you a document that is labeled

11  creditscore.com report as of April 17th, 2014, David

12  Daugherty.

13  A.    Okay.

14  Q.    Are you able to identify that document as the same

15  document you're referencing in your report?

16  A.    Yes, sir, I am.  It is the same document.

17  Q.    All right.  So what, what was the state of

18  Mr. Daugherty's credit as of that point in time?

19  A.    It was, it was very poor.

20  Q.    Okay.  When you say very poor, let's just start high

21  level scores and then you can tell me why that is.  So let's

22  start at the top.  What are the scores and who are providing

23  the scores?

24  A.    Sure.  So these scores are a part of the

25  creditscore.com credit report which creditscore.com is an

John Ulzheimer - Direct (Manning)

1  Experian property.  So this is actually an Experian product.

2      The scores associated with the -- and this is what's

3  referred to as a tri-merge.  So this is actually

4  Mr. Daugherty's credit reports not only from Experian but

5  also from TransUnion and from Equifax.  So this is a

6  360-degree view of Mr. Daugherty's credit reports because

7  it's all of them.

8      So as such, there are three scores in this particular

9  exhibit because there are, in fact, three credit reports.

10     On Page -- well, it's in a separate section called

11  "credit score."  So that's where I'm at right now.

12  Q.  Okay.

13  A.  There's a credit score of 561 at Experian, 564 at

14  Equifax, --

15  Q.  Hold on.  Hold on.  561 Experian?

16  A.  564 at Equifax, 565 at TransUnion, or based on

17  TransUnion data based on Equifax data based on Experian

18  data.

19  Q.  Okay.  So those are the three scores that Mr. Daugherty

20  had for his credit at that point in time from the three

21  different major credit bureaus?

22  A.  Correct.

23  Q.  And those scores include the Ocwen duplicative issue

24  with Equifax?

25  A.  With just Equifax, not with the other two.

John Ulzheimer - Direct (Manning)

1  Q.   Okay, because we're going to go into the other stuff on

2  his report in a moment.  But you're telling me that this

3  report shows Mr. Daugherty's Experian score was actually

4  lower than his Equifax score?

5  A.   By three points, that's correct, yes.

6  Q.   But I thought Equifax was reporting a dupe with a

7  foreclosure.

8  A.   They were.

9  Q.   And that -- 120 days late?

10  A.   Correct.

11  Q.   Well, how could -- I mean, if that's so bad, how could

12  Equifax be higher than Experian?

13  A.   Again, no one item on a credit report determines a

14  credit score.  It's -- everything on a credit report goes

15  into the scoring system.

16       And, so, Mr. Daugherty, outside of this duplicate

17  account that showed up only on his Equifax credit report, on

18  all three of his credit reports had a pretty extensive

19  inventory of severely derogatory entries that have nothing

20  to do with Ocwen which is why you see low scores even at the

21  credit bureaus that did not have the duplicative Ocwen

22  account.

23  Q.   Okay.  So Experian and TransUnion have it right.

24  Mr. Daugherty has no dispute with them.  Equifax has it

25  wrong but it's giving a higher score?

John Ulzheimer - Direct (Manning)

1   A.   That's right.  The data is generating a higher score,

2   that's right.

3   Q.   So what does that indicate to you about whether this

4   issue caused any harm to Mr. Daugherty?

5   A.   Well, certainly you, you can't say that it had any sort

6   of meaningful influence on his credit scores because, A, his

7   three credit scores are all within four points of each

8   other.  And that's -- in the credit scoring world, that's a

9   meaningless difference in the numbers.

10       Yet, two of those credit reporting agencies had no

11  record of the duplicative -- the foreclosure related

12  account.  And one of them did, and still there wasn't any

13  sort of meaningful difference in the scores which goes to

14  the opinion which is no one item is responsible for any

15  consumer's credit score.  It's the entirety of their credit

16  report, even unrelated items such as payment history, debt,

17  and then the other metrics that I mentioned.

18  Q.   I understand.  Now, I'd like to move from there into

19  the more specific information about the other derogatory

20  items on Mr. Daugherty's report which would explain why the

21  scores were so low.

22  A.   Okay.

23  Q.   Now, let's just start high level again.  What is the

24  total number of the actual collection accounts?

25  A.   So I counted 11 total collections.

John Ulzheimer - Direct (Manning)

1    Q.    When you say "collections," what does that mean?

2    A.    So a collection is a, is a credit report entry meaning

3    it's a line item on a consumer's credit report.  And a

4    collection essentially memorializes some sort of default or

5    severe delinquency with some service provider or lender who

6    gave up trying to collect their money.

7          And, so, they outsourced that particular function to a

8    company that specializes in collecting money that someone

9    else is having a hard time collecting.  And that's the

10   collection agency.

11         And the collection agencies have long had the ability

12   to place their accounts on the credit reports of all the

13   credit reporting agencies.

14         So when one of them does that, they usually will do it

15   and it will show up on the consumer's credit report as a

16   line item that reads their name, so ABC collector or John's

17   Collection Company.  I'm making those up, obviously.  But

18   it's very easy to tell that it's some sort of collection

19   account.

20   Q.    So to make sure I understand that, the collection

21   account is something that's actually been referred out to

22   pursue the debtor about?

23   A.    Correct, because he or she defaulted or is severely

24   delinquent with some other original creditor or service

25   provider.

John Ulzheimer - Direct (Manning)

1  Q.   So I'm trying to figure out the significance of 11.

2  Now, does it matter if you have two versus five versus ten?

3  A.   Yes and no.  Clearly, having more is not as good as

4  having fewer.  Having zero is better than having any number

5  greater than zero obviously.

6       But the way the credit scoring system works is there is

7  a prevalence metric meaning that you're actually penalized

8  if you have a larger number of these entries than if you

9  have a smaller number of the entries.

10      However, that's capped, meaning that while one is worse

11  than zero and two is worse than one, eventually the category

12  is five or more.

13      And, so, really it's not incrementally worse to have 50

14  collections than it would be to have 40 collections.  At

15  some point the horse is dead.  You can't kill the horse

16  again.

17      So once you've exceeded that number, there's really no

18  incremental harm being caused to the consumers for which is

19  yet another explanation as to why these scores are

20  essentially the same.

21  Q.   So why -- at what point -- you said it hits a cap.  At

22  what point did Mr. Daugherty hit that cap?

23  A.   It's a pretty low bar, meaning that once you have more

24  than a couple of these major derogatory entries, you have,

25  you have forfeited the points associated with that

John Ulzheimer - Direct (Manning)

1   particular metric within the category.  And the fact that

2   you may have five collections versus six really isn't any

3   better.

4       And the evidence is right here in these scores.  These

5   scores are essentially identical, you know, save a few

6   points.  While one credit report, the Equifax one, you know,

7   there is no dispute that it's got one additional item that

8   isn't on the other two.

9       So you, you can't really -- and it's actually higher

10  than one of the other scores that doesn't have it, which

11  underscores why you can't simply look at it and say that's

12  why I have a bad credit score.

13  Q.  So what, what difference, if any, would the

14  Equifax/Ocwen duplicative account make?

15  A.  I would suggest that if you -- and this is based on my

16  time at FICO.  If you were to delete that account, my -- I

17  believe the score would stay the same.  And, in fact, I feel

18  comfortable even going one step further and saying you could

19  delete that account and several of the collections in the

20  score would still stay the same because he's so far past

21  that line that there isn't any sort of additional negative

22  influence because there's just so many of those entries.

23  Q.  And that's as of April, 2014, which is, which is just

24  three months before July, 2014.

25  A.  Yes.  That's right, yeah, three months.

John Ulzheimer - Direct (Manning)

1   Q.   Okay.  Now, you also talk about tax liens.

2   A.   Yes.

3   Q.   Were there any tax liens on Mr. Daugherty's account?

4   A.   There were two.  That's correct.

5   Q.   What were they for?

6   A.   If memory serves, I believe one -- and I'm going to

7   confirm this obviously.

8        If memory serves, I believe one was a state tax lien.

9   Let's see.  Looks like one was for the State of West

10  Virginia and one was for Wood County, the Wood County Court.

11  And it appears those were the only two tax liens that

12  appeared on his credit reports.

13  Q.   Now, Mr. Daugherty talked about how at some point in

14  time he, he paid tax liens and paid collections accounts.

15  A.   Okay.

16  Q.   What difference does that make to a credit score and

17  the derogatory nature of those adverse reports?

18  A.   Can I start with liens?

19  Q.   Yes.

20  A.   Okay.  So when you, when you have a tax lien, it shows

21  up on your credit report essentially as an open and active

22  lien.

23       When a consumer pays the lien or settles with the

24  taxing authority, a release of lien is filed.  And most of

25  the time if the credit reporting agencies are doing their

John Ulzheimer - Direct (Manning)

1   job, they will actually pick up the release and update the

2   credit file accordingly to show that it has been released.

3       And, so, now we go from an open lien to a released tax

4   lien.  It doesn't -- just because it's released does not

5   cause it to be removed from the credit report.  In fact, the

6   credit bureaus keep those for seven more years after they've

7   been released.  And a released tax lien is considered a

8   derogatory entry just like an unreleased tax lien.

9       So from a scoring perspective, it still sees the item

10  first off because it's still physically present.  And,

11  number two, it's still considered to be a derogatory item.

12  Just because it has been paid doesn't mean that it never

13  happened and doesn't mean that it was never bad.

14  Q.   Now, the only exception to that is, for example, after

15  the lawsuit was filed, Equifax removed both of the Ocwen

16  accounts.

17  A.   That's my understanding.

18  Q.   Does that affect the derogatory nature?

19  A.   Remember, the credit score and this -- the credit score

20  only - there's no exception - only considers information

21  that is on the credit report at the time that the score is

22  calculated, not information that used to be on it or may be

23  on it in the future, but is only on it as of the day that

24  the score is calculated.  And if there's information that is

25  not on the credit report, then the credit scoring system

John Ulzheimer - Direct (Manning)

1    does not consider it.

2       Moreover, credit scores don't have a memory.  They

3    don't know, wait a minute, Mr. Daugherty had a tax lien a

4    year ago but it's not on there today so I'm still going to

5    consider the fact that it used to be there.

6       No, no, that's not how the scoring system works.  It's

7    very flat.  It only looks at what's on the report today.

8    And if it's not on the report, there is no influence.

9    Q.   Okay.  So by virtue of the fact that Equifax deleted

10   not only its duplicative tradeline but also the correct

11   derogatory information that he had been late 120 days or

12   more and in foreclosure back in 2012, what effect would that

13   have on his credit?

14   A.   So they removed the duplicative, which is the one that

15   had all the, the negative aspects associated with it.  They

16   also removed the one that I think everyone agrees is right

17   and could still be on his credit report as of today.

18      So removing the negative item removes one of the

19   negative events on his credit report.  I haven't seen a

20   score calculated with that particular variation of his

21   credit report.  You know, if I did, I could give you a

22   pretty good idea of what the score would likely be.

23      But -- and this is something that I think is important

24   as well.  The credit scoring systems also consider the good

25   stuff on your credit report.  They don't just look for the

John Ulzheimer - Direct (Manning)

1   bad stuff to penalize you.  They look for the good stuff to

2   reward you.

3       And removing a good mortgage loan -- remember the

4   diversity category where you have experience managing

5   different types of accounts?  Managing a mortgage is very

6   different than paying your credit card because of the dollar

7   amount involved usually.

8       So removing that aspect of a credit report essentially

9   erases it from the consumer's history, meaning that any

10  future credit score, any future lender that were to look at

11  the report doesn't know that this gentleman had a performing

12  mortgage for X number of years that he had it unless he

13  tells them, "Wait a minute.  I've got a mortgage that's not

14  on my report."

15      But, generally speaking, it's actually more beneficial

16  to have that on a credit report than it would be just to

17  say, "We're just going to remove it."

18  Q.   What does it indicate that is the reason why Equifax

19  would have deleted both of those?

20  A.   Well, clearly they would have deleted the duplicate not

21  only because it's wrong.  Mr. Daugherty didn't have two

22  accounts.  He had one account.

23      Number two, it's their policy to do so as per their

24  manual.  Why they would have removed the positive account,

25  of course there's no obligation to do that in the law

John Ulzheimer - Direct (Manning)

1  because you can keep good stuff on a credit report forever.

2      That's generally the type of thing you see -- out of an

3  abundance of caution, sometimes you see it in a settlement.

4  They'll agree to just remove everything off the credit

5  report just so they essentially wash their hands of ever

6  having to deal with it again.

7  Q.   Now, when you, when you talk about the good stuff

8  staying on, I want to make sure I've got the categories in

9  my mind.  Collection accounts.  How long does the negative

10 information stay on?

11 A.   So collections are always negative.  They are never

12 good.  So a collection account is a negative entry.

13     And that particular negative entry -- and this is a

14 little complicated.  A collection can stay on a credit

15 report legally for no longer than seven years from the

16 default of the original account.  Okay?

17     So if it took two years for it to get to a collection

18 agency, the clock doesn't start then.  It's only five more

19 years because essentially it took two years to get there.

20 So no more than seven years from the date of the original

21 default.

22 Q.   Okay.  Now, that collections -- was the Ocwen account

23 in collections?

24 A.   No.  A collection is its own separate entity

25 collection.  Ocwen was what's referred to in my world as a

John Ulzheimer - Direct (Manning)

1    tradeline or an account.

2    Q.   Okay.  And that account was, was not in collections?

3    A.   Which one are we talking about?  The duplicate or the

4    one that's not a duplicate?

5    Q.   Either one.

6    A.   Okay.  So the one that's a duplicate was not in

7    collections but it showed as, if I, if I remember correctly,

8    foreclosure and as, I think, 120 days late if I remember.

9         And then you have the other one which did not show as

10   being in foreclosure, but may have had some minor derogatory

11   entries associated with it.

12   Q.   With the 11 other collection accounts, is there any,

13   any meaning or significance attached to the fact that there

14   was also this duplicative in terms of scoring and

15   creditworthiness?

16   A.   No.  Just because of the, just because of the sheer

17   inventory or the aggregate of all the bad stuff -- I mean,

18   this is, this is the simplest way I can put it.

19        You, you can't ignore derogatory entries 1 through 13

20   and then blame everything on derogatory entry 14.  That's

21   not how credit scoring systems work.  That's not how lenders

22   evaluate credit reports.

23   Q.   Okay.  That makes sense to me.  So there's a difference

24   between -- I may have this wrong.  There's a difference

25   between collections and tax liens?

John Ulzheimer - Direct (Manning)

1    A.   That's correct.

2    Q.   Okay, good.

3    A.   A tax lien is a public record.  A collection is not a

4    public record.

5    Q.   Now, the public record category, there were two

6    derogatory items in that category in addition to the 11

7    other collection accounts.

8    A.   That's correct.  And just for clarity -- I know there

9    are a lot of different types of public records; right?  If

10   you're married, the amount of taxes you pay on your house,

11   all that stuff is public information.

12        As far as credit reporting goes, there are only three.

13   They're all bad; bankruptcy, tax lien, judgment.  So if

14   you've got a public record on your credit report, it can't

15   be anything other than derogatory.

16   Q.   How long does that stay on the credit report?

17   A.   So it depends on the type.  Bankruptcies can remain no

18   longer than ten years.  Judgments can remain no longer than

19   seven years from the date the judgment was filed.

20        Tax liens are a different animal.  Tax liens can remain

21   on credit reports indefinitely, or no longer than seven

22   years from the date they're released or they have to be

23   removed immediately if they've been withdrawn.  So it's

24   going to depend on kind of the current status of the lien.

25   Q.   Okay.  So I think I understand the categories

John Ulzheimer - Direct (Manning)

1   generally.  Which one of those categories applied to

2   Mr. Daugherty?

3   A.   So his liens were released, so they would still remain

4   on his credit report for seven years from the date of the

5   release.

6   Q.   Okay.  So can you tell from the credit report when they

7   were released?

8   A.   The date of release is not -- excuse me.  The date of

9   release is not on this particular credit report, this

10  whatever exhibit, --

11  Q.   Creditscore.com.

12  A.   Creditscore.com, yes.  The date filed is on the report.

13  Q.   Okay.  Tell me the date filed.

14  A.   So the Wood County --

15  Q.   Yes.

16  A.   -- tax lien was filed February 27th of 2011.  So let's

17  just say hypothetically that Mr. Daugherty paid it the same

18  day it was filed, which is unusual because then you would

19  have paid it beforehand and you wouldn't have had a lien.

20  But let's just say hypothetically that that's what occurred.

21       Then the credit reporting agencies would be allowed to

22  maintain that now released lien until February 27th of 2018.

23  And that's the best case scenario.

24  Q.   Okay.  So even if the moment it was filed he paid it

25  that same day, it's staying on his report for seven years,

John Ulzheimer - Direct (Manning)

1   which is well beyond today.

2   A.   February, 2018, that's right.

3        The second one, which looks like it's a lien from the

4   State of West Virginia, the filing date of that one is

5   January 23rd, 2009.

6        And, again, in the absolute best case scenario, he was

7   standing there when they filed it and immediately paid it.

8   Then you would add seven years to that date which already

9   would have passed.  It would have been 1-23 of 2016.

10  Q.   Okay.  Gotcha.  And it doesn't say when that was

11  released?

12  A.   This particular type of credit report doesn't have that

13  field, no.

14  Q.   Got it.

15            THE COURT:  Find a convenient stopping place,

16  counsel.

17            MR. MANNING:  Judge, I can stop right now.

18            THE COURT:  All right.  I didn't intend to rush

19  you.

20       Ladies and gentlemen of the jury, I'm going to give you

21  a recess for the evening.  While you're out, do not discuss

22  this case among yourselves.  Do not permit anyone to discuss

23  it with you or in your presence.

24       Remember that you're under a continuing obligation not

25  to listen to, view, or read any media coverage that there

1   might be.  And I'm going to release you.  Have a good,

2   restful evening and please be in your jury lounge tomorrow

3   morning at 10:00 a.m.  I'll see you then.

4        (Jury retired from the courtroom at 4:54 p.m.)

5            THE COURT:  Mr. Manning, I'll hear your Rule 50

6   motion at 9:00.  I'll see you all then.  Have a good

7   evening, counsel.

8        (Trial recessed at 4:55 p.m.)

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1          I, Lisa A. Cook, Official Reporter of the United

2    States District Court for the Southern District of West

3    Virginia, do hereby certify that the foregoing is a true and

4    correct transcript, to the best of my ability, from the

5    record of proceedings in the above-entitled matter.

6

7

8          s\Lisa A. Cook                    June 12, 2016

9              Reporter                           Date

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25