1

```
1              IN THE UNITED STATES DISTRICT COURT
           FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA
2                           AT BECKLEY

3                   TRANSCRIPT OF PROCEEDINGS

4


5
    ----------------------------x
6                               :
    DAVID M. DAUGHERTY,         :         CIVIL ACTION
7                               :         NO. 5:14-CV-24506
              Plaintiff,        :
8   vs.                         :
                                :
9   OCWEN LOAN SERVICING, LLC,  :         May 20, 2016
                                :
10            Defendant.        :
                                :
11  ----------------------------x

12


13
                         TRIAL
14                      VOLUME V

15
            BEFORE THE HONORABLE IRENE C. BERGER
16               UNITED STATES DISTRICT JUDGE

17


18
    APPEARANCES:
19
    For the Plaintiff:          MR. RALPH C. YOUNG
20                              MR. JED ROBERT NOLAN
                                MR. STEVEN R. BROADWATER
21                              Hamilton Burgess Young &
                                Pollard
22                              P.O. Box 959
                                Fayetteville, WV  25840-0959
23


24


25
```

```
1   APPEARANCES (Continued):

2


3


4   For the Defendant:              MR. JASON E. MANNING
                                    MR. JONATHAN M. KENNEY
5                                   Troutman Sanders
                                    Suite 2000
6                                   22 Central Park Avenue
                                    Virginia Beach, VA  23462
7
                                    MS. SARA L. MARKERT
8                                   1661 WORTHINGTON ROAD
                                    Suite 100
9                                   West Palm Beach, FL  33409

10

11

12

13

14

15

16

17

18

19

20

21

22   Court Reporter:                Lisa A. Cook, RPR-RMR-CRR-FCRR

23

     Proceedings recorded by mechanical stenography; transcript
24   produced by computer.

25
```

1                          I N D E X

2                                              PAGE

3   MOTIONS . . . . . . . . . . . . . . . . .  4 – 19

4

5   DEFENDANT'S WITNESS:                       PAGE

6   **JOHN ULZHEIMER**

7         Direct Examination (By Mr. Manning)  . . . .  20

8         Cross Examination (By Mr. Young) . . . . . .  57

9         Redirect Examination (By Mr. Manning)  . . .  101

10

11  RULING BY THE COURT . . . . . . . . . . . .  111 – 114

12  MOTIONS . . . . . . . . . . . . . . . . .  114 – 115

13  CHARGE CONFERENCE . . . . . . . . . . . .  116 – 125

14

15

16

17

18

19

20

21

22

23

24

25

P R O C E E D I N G S

THE COURT:  Good morning, everyone.

All right.  We'll begin this morning, Mr. Manning, with your Rule 50 motion.

MR. MANNING:  Thank you, Your Honor.

We're here on defendant Ocwen's Rule 50 motion.  The Court -- the standard is well established that the Court's the gatekeeper.  Here this is particularly true on two elements.  Number one, legal causation; number two, actual damages.

Those are things that the Court traditionally is in a position needing to ensure that the jury understands that they're not speculating.  And it has to be legally sufficient.

In this case, plaintiff's evidence cannot prove to a reasonable juror by preponderance of the evidence that either of those elements have been met.

There's no expert witness offering any disclosed opinion by the plaintiffs on either causation or damages.  Plaintiff has no Equifax credit report in evidence, not even for the truth of the matter asserted.  Plaintiff has no credit denials in evidence for the truth of the matter asserted.

Plaintiff can only invite the jurors to speculate as to the cause and any speculative damage.  There's no evidence

1    offered at all about quantifying any even speculative actual

2    damage.

3         The case law on these issues, Judge, is clear.

4    Plaintiff has to prove actual damages.  It's a required

5    element.  *Sarver* vs. *Experian*, 390 F.3d 969, Seventh Circuit

6    2004, no need to reach the issue of reasonable procedures

7    because plaintiff's claim failed for another reason, lack of

8    damages.

9         *Tinsley* vs. *TransUnion Corporation*, 879 F.Supp. 550,

10   the District of Maryland, 1995.  It was affirmed by the

11   Fourth Circuit, 64 F.3d 659.  That was also 1995.  There the

12   Court said, quote, "Plaintiff's case similarly falters on

13   the matter of damages.  Quite simply, he has none.  The

14   absence of any economic damage dooms plaintiff's venture in

15   this court," end quote.

16        In order to recover actual damages, plaintiff must show

17   that Ocwen's violation of the statute, the failure to

18   conduct a reasonable investigation, caused the loss of

19   credit.  And that case is *Bach* vs. *First Union National*

20   *Bank*, 149 F. App'x 354, Sixth Circuit, 2005; also *Cahlin* vs.

21   *General Motors Acceptance Corporation*, 936 F.2d 1151,

22   Eleventh Circuit, 1991, upholding the grant of summary

23   judgment because of plaintiff's failure to prove a causal

24   connection between the statutory violation and plaintiff's

25   injury.

1    Plaintiff has the affirmative duty to present evidence
2    supporting his claim that allegedly an inaccurate credit
3    report caused him, *Fahey* vs. *Experian*, 571 F.Supp. 2d 1082,
4    Eastern District of Missouri.
5    *Matise* vs. *TransUnion Corporation*, 1998, U.S. Dist.
6    LEXIS 19775, Northern District of Texas.  Quote:  "A
7    plaintiff asserting an FCRA claim has the burden of proving
8    that his damages were caused by the defendant's violations
9    of the FCRA.  To meet this burden, the plaintiff must show
10   the inaccurate information contained in the credit bureau
11   report, rather than a report from a different credit report,
12   caused his injury."
13   *Pendleton* vs. *TransUnion System Corporation*, 76 F.R.D.
14   192, Eastern District of Pennsylvania.  Quote:  "A consumer
15   who is denied credit must show that the denial is caused by
16   inaccurate entries rather than by correct adverse entries or
17   any other factors.  Plaintiff is required to show the
18   erroneous entry was, quote, a substantial factor in bringing
19   out the denial of the credit."
20   Here there's no evidence that's actually been admitted
21   for the truth of the matter asserted to prove that causal
22   connection.
23   As an initial matter, plaintiff can't show that Ocwen's
24   alleged failure to conduct a reasonable investigation caused
25   the Equifax duplicative tradeline.  The evidence is now

1    agreed by both parties that Equifax caused that error.

2        Next, each time Ocwen received the dispute, the Ocwen

3    employees investigated the dispute that was provided, 001 or

4    106/007.  Equifax continued to have both tradelines even

5    though the old information was still on there.

6        Claimed credit denials here from Quicken Loans and

7    Embrace Loans, Judge, those actually confirm that there's no

8    causation or damages.  In this case, both of those credit

9    denials, again, not for the truth of the matter asserted --

10   I understand the Court's ruling on that point -- but those

11   were in reliance on the TransUnion report which confirms

12   that there was no basis for claiming that anything Ocwen was

13   doing or failing to investigate could have caused a credit

14   denial.

15       As that prior case stated, Judge, they have to prove

16   the inaccurate entries on the Equifax report caused as

17   opposed to a different credit bureau's report.

18       Now, One Community Federal Credit Union was deposed and

19   there was a deposition read into evidence by their corporate

20   representative.  That was not a credit denial.  And there's

21   a clear distinction in the law on that.  It was not

22   processed to completion.  And that was admitted by the

23   corporate representative.

24       And that corporate representative went on to state that

25   based on plaintiff's credit report, he could not say that he

1    would have been approved.  There were too many other

2    factors.  That corporate representative also clearly stated

3    that he had not even considered the loan-to-value ratio or

4    the debt-to-income ratio, both of which he said were

5    required to even start the process.

6        There's no evidence of any quantifiable economic

7    damages.  This is that second piece, Judge.  There hasn't

8    been any evidence to identify any actual economic harm.

9    There's no denials.  There's no showing of any additional

10   interest or any, anything conceivable in the terms of a

11   quantifiable number.  It's raw speculation.

12       Now, plaintiffs have offered Mr. Hendricks and we had

13   moved to strike his testimony on causation and damages

14   because it was undisclosed.  And I know that that's pending

15   before Your Honor.  I'd like to renew that motion.

16       The 26(a)(2)(B) disclosure written report must contain

17   all of the opinions.  It's clear there's no causation or

18   damages disclosed.  And 26(e)(2) requires that to be

19   supplemented, which it wasn't.

20       So then you go to Rule 37 and there's two West Virginia

21   Federal Court cases on point.  And I'm going to cite both of

22   them for you, Judge.  *Markel* vs. *United States*, 2015, U.S.

23   Dist. LEXIS 95610.  The pin cite is 3.  Northern District of

24   West Virginia, July 22nd, 2015.

25       The second case, Judge, is *Hershberger* vs.

1    *E-t-h-i-c-o-n Endo-Surgery*, 2012, U.S. Dist. LEXIS 63618.

2    The pin cite is 5.  Southern District of West Virginia,

3    May 7th, 2012.

4        Very briefly, in *Hershberger* the expert opinion -- the

5    expert rendered an opinion during the *Daubert* hearing that

6    hadn't been disclosed.  The other party claimed prejudicial

7    impact and moved to strike.

8        The Court agreed that the untimely disclosure was

9    prejudicial; that no other cure was sufficient, and that the

10   non-disclosing party had no excuse for the failure to

11   disclose.

12       In the *Markel* case, very briefly, the United States

13   timely disclosed its expert and the expert's report.  The

14   expert, however, was then offered to provide undisclosed

15   opinions, just like this case, Judge, and he tried to talk

16   about causation, same as this case.

17       Applying the Fourth Circuit's *Southern States Rack and*

18   *Fixture* decision, 318 F.3d 592, pin cite 597, Fourth

19   Circuit, 2003, the Court there ruled that the failure to

20   disclose the opinion was not substantially justified or

21   harmless.  Accordingly, quote, the expert's testimony was

22   limited to the opinions expressed in his expert report.

23       And, Judge, we've asked for a curative instruction on

24   that issue to the jury.

25       Next we move to emotional distress damages.  Emotional

1    distress is, quote, from the Fourth Circuit, easily

2    susceptible to fictitious and trivial claims, end quote.

3    *Price* vs. *City of Charlotte*, 93 F.3d 1241, pin cite 1250,

4    Fourth Circuit, 1996.  Plaintiff must, quote, reasonably and

5    sufficiently explain the circumstances of the injury and not

6    resort to mere conclusory statements, end quote.

7        There's a number of factors that the Fourth Circuit has

8    talked about there.  The *Sloane* vs. *Equifax* case, F. -- I'm

9    sorry -- 510 F.3d 495, Fourth Circuit, 2007; *Ross* vs. *FDIC*,

10   625 F.3d 808, Fourth Circuit, 2010.

11       And there what happened was presented only with the

12   conclusory assertions, no reasonable jury could find that

13   the defendant's debt collection practices were the proximate

14   cause of his emotional distress.

15       Next, *Cousin* vs. *TransUnion*, 246 F.3d 359, Fifth

16   Circuit, 2001, holding, "In the context of an FCRA claim,

17   the emotional distress must be supported by evidence of

18   genuine injury requiring," quote, "a degree of specificity

19   which may include corroborating testimony or medical or

20   psychological evidence," end quote.

21       Here there's no corroborating evidence.  The only

22   testimony is that he felt stressed and from his wife that

23   he -- that she noticed that he felt stressed.  There's no

24   evidence of a genuine injury.

25       That stress has to be distinguished from all the

1   pre-existing medical conditions and the fact that he wasn't

2   able to qualify for credit for any other reason.

3       It's undisputed there were 11 other collection accounts

4   and two tax liens.  There's no medical attention.  There's

5   no psychiatric attention.  There's no psychological

6   treatment.  There's no physical manifestation whatsoever.

7   And the Fourth Circuit required factors don't exist.

8       Next, Judge, we move to no willfulness.  Plaintiff

9   cannot prove that Ocwen's practices and procedures were

10  objectively unreasonable interpretation of the statute.

11  Ocwen investigated and responded to every ACDV governed by

12  the Equifax dispute code that Equifax interpreted and

13  applied to the ACDV forms.

14      That governs the dispute resolution process.  And the

15  information provided in the ACDV is controlled by Equifax

16  and provided to Ocwen.

17      It's undisputed, Judge, that no one ever told Ocwen in

18  a single ACDV form, as even plaintiff's own expert

19  testified, duplicative tradeline or two, two tradelines, one

20  account should have been in the FCRA relevant information

21  box and it's undisputed it was not.

22      There's no evidence that Ocwen ignored a single ACDV,

23  that it failed to respond to a single ACDV, or that it was

24  late in responding to a single ACDV.  There's no conscious

25  disregard whatsoever.

1          The plaintiff bears the burden of demonstrating that

2    Ocwen's conduct was willful.  *Parker* vs. *Sony Pictures*

3    *Entertainment*, 260 F.3d 100, Second Circuit, 2001, willful

4    violations may be either knowing or reckless, as Your Honor

5    knows.  To prove a knowing violation -- I'm not going to

6    belabor this too much, Your Honor, just because there's no

7    evidence of it.

8          *Dalton* vs. *Capital Associated Industries*, 257 F.3d 409,

9    Fourth Circuit, 2001.  It requires willfulness

10   representations, concealment, refusal to investigate,

11   intention to thwart conscious rights of the plaintiff to

12   have accurate information.  None of that exists.  There's no

13   evidence of any of that.

14         The evidence shows, and it's undisputed, that Ocwen

15   didn't know the duplicative tradeline was being reported.

16   It didn't cause it and it wasn't told about it.

17         There's no evidence of knowing refusal.  Plaintiff

18   didn't tell Ocwen.  Plaintiff didn't tell Equifax.

19   Plaintiff didn't tell the CFPB.  The Aggressive Credit

20   Repair Company didn't tell Equifax.  Equifax didn't tell

21   Ocwen.  And Ocwen never even saw plaintiff's credit report.

22         Plaintiff's claim here, Your Honor, is they should have

23   figured it out.  That's not willful.  The mere failure to

24   conduct a reasonable investigation or the mere failure to

25   discover the dispute or if it could have been better, that's

1    not willful.  At best, that's negligent.  There's no basis

2    for willfulness in this case.

3         The next piece, Judge, after knowing is recklessness.

4    I've already touched on a lot of this.  In *Safeco* the first

5    inquiry is objective unreasonable.  That's the determination

6    of this Court.  It can even go beyond what I've already

7    talked about without inviting that consideration.

8         Next what we have here is the statute requires the

9    furnisher, that's Ocwen, to investigate the dispute

10   identified by the credit bureau.  That dispute governs the

11   dispute process.

12        The testimony is Ocwen went to the dispute code, took

13   all the information, had access to all the systems, was able

14   to access those and respond.  The test, Judge, isn't could

15   they have done more, or could they have somehow become a

16   detective and deduced the real source of the problem.

17   That's not the test.  There's no willfulness.

18        Next I'm going to touch briefly on the reasonable

19   investigation factors.  *Johnson* vs. *MBNA America Bank*, 357

20   F.3d 426, Fourth Circuit, 2004.  To succeed, plaintiff has

21   to prove by a preponderance of the evidence the

22   investigation was unreasonable.

23        And, again, the key here, Judge, is after receiving the

24   notice of the dispute with regard to the completeness or

25   accuracy of the information provided by the credit bureau to

1   the furnisher, in this case Ocwen, the requirement is the

2   furnisher uses the disputed information and reviews the

3   relevant information governed by that dispute.  And you've

4   heard that in this case.  And the evidence shows that that's

5   what they did.  They have to consider that the furnisher's

6   procedures mirror that requirement.

7        Now, the next case I'd like to cite is the

8   reasonableness depends on the information provided by the

9   credit bureau to the furnisher, *Alston* vs. *United*

10  *Collections Bureau*, 2014 U.S. Dist. LEXIS 27124.  That's the

11  District of Maryland, 2014.  And it was affirmed by the

12  Fourth Circuit, 585 F.App'x 196.

13       All of those disputes were provided, investigated,

14  responded to.  And the only thing that was being verified

15  was the dispute because the dispute code governs the

16  process.

17       Ocwen had no duty to investigate or discover on its own

18  that Equifax, separate and apart from anything that Ocwen

19  did, had incorrectly created this duplicative account and

20  then never updated it at any point in time until it later

21  removed it totally.  It never actually got updated.

22       The evidence is clear that here one of the two

23  tradelines Equifax was reporting was perfect.  Their expert

24  even said it was correct, there's no error, which further

25  demonstrates the reasonableness of Ocwen's investigation in

1    this case.

2        And for that reason, we would ask the Court to enter

3    judgment in favor of the defendant.

4        THE COURT:  All right.  Thank you.

5        Response, Mr. Nolan.

6        MR. NOLAN:  Your Honor, under the Fair Credit

7    Reporting Act, Section s-2(b)(1)(A), a furnisher has a duty

8    upon receiving a notice of a dispute from a credit reporting

9    agency in the form of an ACDV to conduct an investigation

10   with respect to the disputed information.

11       The Fourth Circuit has held in *Johnson* vs. *MBNA* that

12   this investigation has to be reasonable.

13       The Fourth Circuit has infused a qualitative element

14   into this requirement saying that a furnisher must conduct a

15   searching inquiry into the dispute.  That's the Eastern

16   District of Virginia case of *Jones* vs. *Experian*.

17       A reasonable investigation requires the data furnisher

18   to go beyond a cursory review of its internal records, again

19   stated by *Johnson* vs. *MBNA*.

20       The *Saunders* vs. *Equifax* court decided that a data

21   furnisher may not restrict its investigation to information

22   provide by the CRA.

23       And that last point I think is the most important point

24   to make here, Your Honor, because the entire defense has

25   been set up upon the basis of the fact that they restricted

1  their dispute investigation to the information provided in

2  the dispute code by the CRA, not even the entire ACDV.  They

3  just restricted their investigation to a dispute code.

4      They did not look at Mr. Daugherty's letters.  They did

5  not look in their internal records to see the CFPB

6  investigation.  They did not look at their records to see

7  any phone calls with Mr. Daugherty.  So we're not saying

8  that they should have done X, Y, or Z.  We're saying they

9  didn't even look at their own records in this case as the

10  evidence has shown.

11     They've testified that they're not going to look beyond

12  the dispute code; that the policy and procedure of Ocwen is

13  to only look at the dispute code.  It falls back to the

14  dispute code.  They don't go beyond the dispute code.

15     And, again, a data furnisher may not restrict its

16  investigation to the dispute code provided by the CRA.

17  Ocwen restricted its review to strictly that.

18     She stated it was a superficial investigation.  I

19  understand that there's a quibble over the terminology in

20  her testimony regarding that.

21     But, Your Honor, their entire defense is based on

22  faulty reading of Fourth Circuit law which has been clearly

23  established since 2004 with *Johnson* vs. *MBNA* that the

24  investigation must be a searching inquiry.  It must be a

25  reasonable investigation.

1     And their expert even said yesterday that all they are

2     looking at is the dispute code.  And that's a faulty basis

3     of the law.  And if anyone should be receiving a directed

4     verdict on that issue, I believe the plaintiff's entitled to

5     a directed verdict on liability, not only for negligence but

6     for willfulness for having a policy and procedure that does

7     not require a reasonable inquiry of disputes that come in.

8     And, further, under Section s-2(b)(1)(B), Ocwen's

9     required to review all the relevant information provided by

10    the Consumer Reporting Agency.

11    Again, Ocwen testified that they limited their

12    investigations to the dispute code provided by the CRAs.

13    They testified they didn't even look at the entire ACDV

14    form.

15    They didn't look at the "foreclosure proceedings

16    started."  They didn't look at the past due amount.  They

17    didn't even look at the date open because when they checked

18    the document that the plaintiff signed, that was a document

19    signed in July of 1999.  The document they verified -- the

20    ACDV they verified said August, 1999.

21    So they're not even doing a proper check under their

22    own standards to verify the accuracy of the information.

23    Again, Your Honor, I believe the only finding is that

24    Ocwen's policy and procedure shows a willful disregard of

25    the established precedent and established law in the Fourth

1    Circuit about the investigation and about the information

2    that they must look at.  They did not conduct a reasonable

3    investigation of any of these disputes.

4        Regarding the damages the plaintiff suffered, he

5    suffered actual damages in this case, Your Honor.

6        One category of damages is credit denials.  There's no

7    dispute that he hasn't received a loan for his mortgage and

8    he's, in fact, denied loans by the One Community Federal

9    Credit Union based on the fact that that was a stop sign

10   when they saw the mortgage tradeline on his tri-merge

11   report, which has been admitted as Exhibit Number 25.

12       He's been inaccurately described as not creditworthy to

13   third parties based on his foreclosure notation on his

14   account.  He's expended time and energy to correct errors

15   that were not of his own making beginning in March, 2013,

16   and extending all the way up through the present.  He has

17   not had a moment's rest trying to dispute this account, this

18   wrong information that was not his making.

19       Ms. Daugherty testified regarding his sleeplessness,

20   his sense of helplessness.  He testified that he felt like

21   he was sinking and that Ocwen was the anchor.

22       These are categories of actual damages that have been

23   presented to the jury.  And this is distinguishable from a

24   case such as *Doe* vs. *Chao* where there was a data breach and

25   there was a potential that harm may occur if someone was

1   able to obtain a Social Security number and misuse it.

2      Here we have the concrete timeline that he's trying to

3   dispute inaccurate information on his report.  He has a

4   balloon note that's coming due, and the pressure that is

5   created by every dispute that passes, every month that

6   passes, every conversation that passes.

7      The increasing stress, the increasing pressure was

8   played out in his testimony, and he should be entitled to

9   have a jury determine whether or not he's entitled to

10   compensation on actual damages.

11      You know, some of the factors -- we've discussed the

12   time and energy it takes to solve the problem, the

13   expectation that the problem was solved, the number of

14   recurrences.

15      Ocwen claims they fixed it on a couple of occasions.

16   But due to their faulty investigations, the information

17   continued to occur over and over again.  And the period of

18   time -- the sheer span of time that he has dealt with this

19   issue are all bases that the jury could use to find actual

20   damages for the plaintiff.

21      So, Your Honor, we believe that he should be allowed to

22   continue with his case and go to the jury on those issues.

23         THE COURT:  All right, counsel, I will get you,

24   Mr. Manning, a ruling on your motion.

25      Gentlemen and lady, the jury is not due here until

John Ulzheimer - Direct (Manning)

1    10:00.  I did not want them waiting in the jury room while

2    we went over the motions.  So we'll stand in recess until

3    10:00.

4         (Recess taken from 9:28 a.m. until 10:03 a.m.)

5         THE COURT:  Good morning, everyone.

6         Mr. Manning.

7         MR. MANNING:  Yes, Your Honor.  Defendant will

8    call to continue his testimony from yesterday John

9    Ulzheimer.

10        THE COURT:  Sir, would you come up.  You're still

11   under oath.

12        **JOHN ULZHEIMER**, DEFENDANT'S WITNESS, RESUMED THE

13   WITNESS STAND

14                    DIRECT EXAMINATION

15   BY MR. MANNING:

16   Q.   Mr. Ulzheimer, we went through qualifications and

17   materials considered yesterday.  One thing that I didn't ask

18   you about is on your report you say that you are FCRA

19   certified.

20   A.   That's correct.

21   Q.   What does that mean?

22   A.   That's correct.

23   Q.   What does it mean to be FCRA certified?

24   A.   So the FCRA is the Fair Credit Reporting Act which is

25   the federal law that really governs how the credit reporting

John Ulzheimer - Direct (Manning)

1  agencies and the companies that use credit information have

2  to operate vis-a-vis that type of information.

3      And the credit reporting agencies' trade association

4  actually has a, a training program and course that people in

5  the industry can take.  And if they pass the test that comes

6  at the end of the course, then this organization confers the

7  designation FCRA certified.

8      I'm actually twice FCRA certified, once by an

9  association called the Associated Credit Bureaus, and then

10  once by an organization called the CDIA, the Consumer Data

11  Industry Association, which is currently the trade

12  association of the credit reporting agencies.

13  Q.   Okay.  So let's step back from the, from that.  And

14  what is it good for?  What do you use it for?

15  A.   Sure.  So the -- well, again, the Fair Credit Reporting

16  Act defines a variety of, of things that are very important

17  in not only my work as an expert witness in the world of

18  consumer credit, but also in the articles that I write about

19  people's rights regarding credit reports, the obligations

20  placed upon the credit reporting agencies and the companies

21  that furnish information to them, under what conditions are

22  credit reports allowed to be disclosed to third parties by

23  the credit bureaus.

24      And, so, essentially it's almost like the rule book, if

25  you will, regarding the use of credit reports and how -- you

John Ulzheimer - Direct (Manning)

1   know, the consumer's rights, obviously, and how the credit

2   reporting agencies must act.

3   Q.  You mentioned rule book.  Are you aware of any credit

4   industry publication that defines what is required for a

5   reasonable investigation?

6           MR. YOUNG:  Objection, Your Honor.

7           THE COURT:  Basis?

8           MR. YOUNG:  This witness has expressed no opinion

9   on reasonable investigation.  He absolutely has expressed no

10   opinion.  And now counsel is going to elicit information

11   about -- I mean about a reasonable investigation.  And

12   counsel's trying to elicit information from this witness

13   about what needs to be done in a reasonable investigation.

14           THE COURT:  My recollection is that we covered

15   this yesterday.

16           MR. MANNING:  My, my question, Judge, "Are you

17   aware of any credit industry publication," is a factual

18   question.

19           THE COURT:  Well, he can certainly testify to his

20   awareness of publications on the issue, but I think I

21   resolved yesterday, based on my review, that there wasn't

22   anything offered as an opinion about whether or not they

23   conducted a reasonable investigation.

24     And, so, if he wants to testify to his awareness of

25   those publications, he certainly can but not as to what

John Ulzheimer - Direct (Manning)

1   constitutes a reasonable investigation.

2          MR. MANNING:  I understand your ruling, Your

3   Honor.

4          THE COURT:  Either from those publications or, in

5   this case, given the parameters set forth in Mr. Ulzheimer's

6   report.  Anything further?

7          MR. YOUNG:  No.  Thank you, Your Honor.

8          THE COURT:  Mr. Manning.

9          MR. MANNING:  I'll re-ask the question.

10  BY MR. MANNING:

11  Q.   Are you aware of any credit industry publication that

12  defines what is required for a reasonable investigation?

13  A.   I am not.  I've never seen any publication in my 25

14  years in this industry that defines what is a reasonable

15  investigation.

16  Q.   Are you aware of any credit industry publication that

17  defines the type and nature of the dispute that the credit

18  bureau assigns to an ACDV that causes that to guide or limit

19  the investigation that the furnisher is to perform?

20  A.   Yes, I am aware of a publication that defines that

21  process, including the codes and the placement on the ACDVs.

22  Q.   What is it?

23  A.   It's the e-OSCAR training manual and the -- I know I'm

24  speaking in industry code.  But e-OSCAR is essentially the

25  communication protocol.  Think of it as a phone line, if you

John Ulzheimer - Direct (Manning)

1   will, between the credit reporting agencies and the

2   companies that furnish information to them.  And it's, it's

3   called e-OSCAR.

4       And e-OSCAR is used not only by the credit reporting

5   agencies to send communication to their furnishers or their

6   customers, but also for the furnishers to send information

7   back to the credit reporting agencies.

8       And in the training manual there is actually a list of

9   dispute codes, not only the numeric value but also the plain

10  English language that shows up when someone from the credit

11  reporting agency enters that numeric value onto an ACDV.

12  Q.   So, in other words, the e-OSCAR -- did you say

13  guidebook?  Glossary?

14  A.   Training manual.

15  Q.   Training manual?

16  A.   That's right.

17  Q.   -- is the language that the furnisher and the credit

18  bureau are supposed to be using in the communication with

19  the ACDVs?

20  A.   As it pertains to the dispute codes, yes.

21  Q.   All right.

22  A.   And which dispute code to use, meaning how do I know to

23  choose -- I know we've talked about 001 and 007 a lot in

24  this particular case.  So how do we know when to use 001 or

25  how do we know when to use 007?  That's part of the

John Ulzheimer - Direct (Manning)

1    training, the employee training procedures of the credit

2    reporting agencies.

3    Q.   On Page 11 of your report you talk about -- you say

4    that that code guides or limits the investigative actions.

5    What do you mean by that?

6    A.   Right.  And so the, the dispute code -- the intent of

7    the dispute code is to clearly communicate to the furnishing

8    party, which is usually a bank or a collection agency or a

9    credit card issuer, what the consumer is challenging with

10   respect to their entry on a credit report.

11       And, so, the importance of the code is, A, clarity.  I

12   need to know what you want me to investigate because the

13   consumer contacted you, not me.  And then, two, it helps me

14   to essentially optimize my investigative actions.

15       For example, if someone asks me to, whether or not the

16   account is mine or not, I'm not going to go search out,

17   research the balance.  That's, that's -- you know, that's

18   not a, that's not a, you know, a properly directed

19   investigation.

20       So it actually helps -- think of it as kind of like

21   road maps.  It helps the furnishing party to look in the

22   proper systems and look for the proper fields and validate

23   the proper items with respect to what the consumer is

24   actually challenging.

25   Q.   In this case there's been testimony about the Equifax

John Ulzheimer - Direct (Manning)

1   credit report and what it shows.  Have you actually seen an

2   Equifax credit report?

3   A.   One of the documents we looked at yesterday was a, a,

4   what's referred to as a tri-merge or a credit report that

5   has information from all three of the credit reporting

6   agencies.  So, yes, we looked at that.  We looked at that

7   yesterday, in fact.

8   Q.   Is it possible for -- so that tri-merge was something

9   that the plaintiff had?

10  A.   Right.  That's, that's formally referred to in the

11  credit reporting world as a consumer disclosure, meaning it

12  is information that is disclosed to, directly to the

13  consumer.  It's not given to a bank.  It's given only to the

14  consumer.

15      And that, that particular, I'll call it a product, that

16  particular product is an on-line deliverable.  So that would

17  have been delivered through the internet.

18  Q.   Are you aware -- of all those materials you listed

19  yesterday, are you aware in any of those materials whether

20  plaintiff ever provided a copy of that tri-merge report to

21  Ocwen at any point?

22  A.   I didn't see anything suggesting that that credit

23  report had been provided to Ocwen, no.

24  Q.   Is it possible that Ocwen could have somehow pulled

25  that credit report from Equifax itself?

John Ulzheimer - Direct (Manning)

1   A.   The creditreport.com report that we looked at

2   yesterday?

3   Q.   Yes.

4   A.   No.  That's, that's a consumer disclosure.  That, that

5   is a consumer product.  That is not something available to

6   companies that pull credit reports directly from the credit

7   bureaus, for example, for the purposes of underwriting a

8   loan.

9   Q.   What, what about a credit report from one of the three

10  credit bureaus?  Could Ocwen have pulled one of those?

11  A.   They could not have.

12  Q.   Why not?

13  A.   Ocwen is not a lender.  They're a servicer.  So there's

14  a difference regarding what type of access a servicer has

15  versus what a lender has.  And a moment ago you asked me

16  questions about what is the Fair Credit Reporting Act?  What

17  does that mean?  What is it?

18       And one of the, one of the sections of the Fair Credit

19  Reporting Act is called "Permissible Purpose."  And

20  Permissible Purpose in English is essentially the list of

21  the conditions, under what conditions can the credit

22  reporting agencies disclose a credit report to a third

23  party.

24       And one of the reasons is not because we're doing an

25  investigation pursuant to a consumer dispute.  That would be

John Ulzheimer - Direct (Manning)

1   actually a violation of the Fair Credit Reporting Act if

2   they would have done so.

3   Q.   So the suggestion that Ocwen should have pulled

4   Mr. Daugherty's credit is an invitation to violate the law?

5   A.   That's exactly right.

6   Q.   Are you familiar with plaintiff's claims in this case

7   that he was denied credit because of something on the

8   Equifax report or somehow connected to Ocwen?

9   A.   Yes, sir, I am.

10  Q.   And do you have opinions on that matter?

11  A.   Yes, sir.  They were actually part of my expert report.

12  Q.   Okay.  So I want to take these one by one.  So are you

13  aware that plaintiff claims he was denied credit by Embrace

14  Loans --

15  A.   Yes, sir.

16  Q.   -- because of something that Ocwen did?

17  A.   Yes, sir.

18  Q.   Okay.  Tell us what your investigation and analysis for

19  your report led you to conclude.

20  A.   Do you mind if I have a copy of my report so I can go

21  off of it rather than -- because there were multiple of

22  those, you know, alleged denials and I just want to make

23  sure that I keep them straight.

24  Q.   Of course.

25  A.   Thank you.  Give me a minute to find that.

John Ulzheimer - Direct (Manning)

1  Q.   Mr. Ulzheimer, I'm going to put it up on the screen.

2  A.   Oh, okay.

3  Q.   Is that what that is?

4  A.   Yes.

5  Q.   On Page 14 of your report you identify Embrace Loans

6  and you cite a couple documents.

7  A.   Yes, sir.

8  Q.   And I want to start just by -- what, what did you do to

9  investigate whether Mr. Daugherty's denial by Embrace Loans,

10 that credit application denial, was caused in any way or

11 related in any way to the Ocwen ACDV responses?

12 A.   So all of my investigation was done based on a review

13 of -- well, relying upon my knowledge of the industry and

14 how applications and denials take place and, maybe more

15 importantly, why they take place, but also a review of the

16 materials that were produced to me in this case which

17 included credit reports and letters from these different

18 lenders.

19 Q.   Okay.  So specifically now with Embrace, Embrace Loans,

20 what did you, what did you review and determine?

21 A.   So my review was, first off, the letter that came from

22 Embrace to Mr., Mr. Daugherty.  And what I concluded was

23 that the, you know, the duplicative Ocwen account on

24 Mr. Daugherty's Equifax credit report did not play a part in

25 Embrace's decision to deny Mr. Daugherty credit.

John Ulzheimer - Direct (Manning)

1      And the reason why, the reason why I came to that

2  conclusion is because Embrace Loans pulled Mr. Daugherty's

3  TransUnion credit report and Experian credit report.  They

4  did not pull Mr. Daugherty's Equifax credit report, which

5  means they didn't even see the duplicative Ocwen account.

6  So it's systemically impossible that it was a basis for

7  their decision.

8  Q.   How do you know that?

9  A.   If -- well, when a lender pulls a credit report from

10  one of the credit reporting agencies, they only get the

11  credit report from that one credit reporting agency.  So

12  I'll give you a hypothetical.

13      So if I go into a bank and I want to borrow money to

14  buy a car and that particular bank pulls Experian credit

15  reports and they pull my Experian credit report, they are

16  not seeing my TransUnion credit report and they are not

17  seeing my Equifax credit report.

18      So they're basing their decision, the credit reporting

19  component of their decision solely on the information that's

20  being provided by that one credit reporting agencies, or

21  credit reporting agency.

22  Q.   How were you able to determine that Mr. Daugherty's

23  credit application didn't utilize either the Experian -- I'm

24  sorry -- only utilized Experian and TransUnion?

25  A.   There was nothing to indicate that they received or

John Ulzheimer - Direct (Manning)

1    even attempted to pull an Equifax credit report.  However,

2    there was an indication that they pulled a TransUnion and an

3    Experian report.

4    Q.    Is there any way that the Equifax reporting of the one

5    Ocwen account twice could have been a factor in the Embrace

6    Loans' denial of Mr. Daugherty's credit application?

7    A.    No.

8    Q.    The next credit denial Mr. Daugherty is claiming has to

9    do with a company called Quicken Loans.  Are you familiar

10   with that credit application?

11   A.    I, I am.  Just for clarity, there was some production

12   that post-dates my report from Quicken.  But, yes, I am --

13   which I reviewed.  It was after I submitted my, this report.

14   Q.    Uh-huh.

15   A.    But, yes, I am familiar that Mr. Daugherty was denied

16   credit by Quicken.

17   Q.    So I'm going to ask you to limit your testimony to your

18   report.

19              MR. YOUNG:  Objection, move to strike the last

20   answer.  The witness prefaced it by saying that it was

21   received after his report.  The report's never been

22   supplemented.  And it shouldn't -- he shouldn't be permitted

23   to discuss that with the jury.

24              THE COURT:  Mr. Manning, any response?

25              MR. MANNING:  He hasn't testified to that yet.

John Ulzheimer - Direct (Manning)

1   There's -- he hasn't been asked anything about the Quicken

2   Loans process yet.  So -- and I was just about to ask him to

3   limit his inquiry or his testimony to what's in his report

4   which is on Page 14.

5           THE COURT:  All right.  I overrule the objection.

6       Go ahead, please.

7       And I overrule it for the reason that he's not stated

8   any opinion with respect to it, Mr. Young.

9       Go ahead.

10  BY MR. MANNING:

11  Q.   In your expert report, Mr. Ulzheimer, on Page 14 you

12  identify a Quicken Loans credit application by Mr. Daugherty

13  that was denied.

14  A.   That's right.

15  Q.   The documents that you reviewed as part of that opinion

16  for this report, what documents do you recall seeing?

17  A.   It wasn't necessarily what I saw.  It was what I didn't

18  see.  A, a credit denial and a credit application are very

19  easy to memorialize.  There is a paper trail a mile long

20  when these types of things take place.

21      And the lack of any documentation supporting an

22  application and a denial, which is exactly what I said in my

23  report, there are no documents suggesting the plaintiff ever

24  applied for a loan with Quicken or was denied a loan by

25  Quicken.

John Ulzheimer - Direct (Manning)

1   Q.   Okay.  So you're, you're not aware of any evidence that

2   shows Quicken Loans at any point relied on Mr. Daugherty's

3   Equifax credit report?

4   A.   No, sir.

5   Q.   The next one you talk about in your report is Chase on

6   Page 13.  There is a Chase credit card application.  Do you

7   recall reviewing that, any documents related to that?

8   A.   Yes, sir.  There was a letter from Chase.

9   Q.   Okay.  And what reasons did Chase provide for the

10  denial of Mr. Daugherty's credit application for a credit

11  card?

12  A.   So the Chase declination letter which is formally

13  referred to as a notice of adverse action, but we, we all

14  call them denial letters, the, the denial letter actually,

15  without even looking at it, it's got to include certain

16  attributes.  The Fair Credit Reporting Act requires that it

17  includes certain attributes.

18       One of those is where did you get the -- well, if you

19  did get a credit report, where did you get it from?  In

20  other words, they have to identify the credit reporting

21  agency that was the source of the information.  That's

22  number one.

23       The letter also has to convey Mr. Daugherty's rights

24  with regards to getting a free copy of that report because

25  it was used as a basis for a denial.

John Ulzheimer - Direct (Manning)

1      Number three, if a credit score was delivered as part

2   of the report, that credit score has to be included in the

3   letter, not, not a credit score, the credit score that was

4   used as the basis for the denial.

5      And then the letter also has to include at a high level

6   the reasons behind why the score is so low and the basis for

7   their decisions.

8   Q.    I'd like to show you a copy of that letter.  It's been

9   marked already as Plaintiff's Exhibit 7.

10  A.    Okay.

11  Q.    And this letter is already in evidence.  It says,

12  "Thank you for your interest in our Disney Visa platinum

13  credit card."  Is that right?

14  A.    It -- that's right.  Apparently Chase does the issuing

15  of the Disney Visa platinum credit card.

16  Q.    Now, Mr. Daugherty testified that the, the only thing

17  that's being referenced here is the Ocwen account.  Is that

18  consistent with your understanding of what is being

19  referenced in this letter and Mr. Daugherty's credit report?

20  A.    No, that's, that's incorrect.  The testimony that he

21  gave is incorrect.  There's certainly other things that are

22  referenced here other than the duplicative Ocwen account.

23  Q.    How do you know?

24  A.    Well, I don't know if you can see what I'm pointing at,

25  but just below the first paragraph kind of indented towards

John Ulzheimer - Direct (Manning)

1  the middle of the page --

2  Q.   Yes.

3  A.   -- Chase actually gives the specific reasons for their

4  denial.  And clearly line one you could make a reasonable --

5  Mr. Daugherty didn't have a repossession or an early lease

6  termination on his credit report.  So you can -- the

7  foreclosure is likely the duplicative Ocwen account on the

8  Equifax report.

9        But the second one, balances on accounts are too high

10  compared to credit limits.  That doesn't have anything to do

11  with Ocwen.  Ocwen is an installment mortgage loan.  Credit

12  limits are on credit cards.  It's completely meaningless

13  vis-a-vis Ocwen.

14  Q.   Let's stop there for a minute.

15  A.   Okay.

16  Q.   The second reason for the denial, balances on accounts

17  are too high compared to credit limits.

18  A.   That's right.

19  Q.   Why can't that be a mortgage?

20  A.   So let me tell you what that is.  Balances on accounts

21  too high compared to credit limits is what's referred to as

22  the debt-to-limit ratio.  And the debt-to-limit ratio is a

23  metric that credit scoring systems use to calculate a score

24  based on information regarding credit card accounts, so

25  plastic, credit card accounts on your credit report.

John Ulzheimer - Direct (Manning)

1    So what this actually means is that Mr. Daugherty's

2    balances on his credit cards were too close to the credit

3    limits on his credit card.  So that ratio or metric was too

4    high in their mind to grant him this credit card, the Disney

5    Visa platinum card.

6        This particular metric does not consider installment

7    accounts, which is what a mortgage is.  It only considers

8    revolving accounts; therefore, credit cards.

9    Q.    Okay.  So that's a separate and independent reason for

10   the denial?

11   A.    It has nothing to do with installment loans, has

12   nothing to do with mortgages.

13   Q.    Let's talk about the third one.  "Your credit report

14   reflects delinquent past/present credit obligations."  What

15   does that mean?

16   A.    That suggests that Mr. -- we looked at his credit

17   report yesterday, so it kind of makes sense -- that

18   Mr. Daugherty's Equifax credit report as of the time that

19   they accessed it had delinquent past or present credit

20   obligations, which when we went through the inventory

21   yesterday we can see that there were quite a few of them.

22   Q.    Now, let's scroll down to the second page.

23   A.    And you may, you may see -- again, I know you can't see

24   what I'm pointing at.  I referenced in my report that the

25   score was 561.  And you can see right here this is a

John Ulzheimer - Direct (Manning)

1  required disclosure of this letter, 561.

2  Q.   Okay.

3  A.   Yeah, that's right.

4  Q.   Now, I've got to see if I can figure out how to --

5  A.   I'm sorry about that.

6  Q.   No, don't worry.  That was neat.  Okay.  Let's go to

7  the second page, "primary factors that negatively affected

8  your credit score."

9  A.   Right.

10  Q.   What's being explained to Mr. Daugherty in this section

11  of the letter?

12  A.   So the, the prior page, and that's why I brought that

13  up when they referenced the credit scores being a basis for

14  their decision to deny him that Visa credit card, the Disney

15  card, they also have an obligation to give the consumer or

16  the applicant, Mr. Daugherty, reasons why the credit score

17  isn't higher.  And they're positioning it as primary factors

18  that negatively affected your score.

19       And, so, that's the inventory of reasons that they give

20  there.  And sometimes you'll see four.  Sometimes you'll see

21  five.  In this letter Chase chose to disclose five reasons

22  why that 561 from the prior page wasn't a higher score.

23  Q.   Which of these five reasons is consistent with your

24  testimony yesterday when you were telling us about how to

25  score someone's credit?

John Ulzheimer - Direct (Manning)

1   A.   Okay.  So the first bullet point, that one --

2   Q.   The delinquency?

3   A.   Yep.  So that's delinquency, public record, or

4   bankruptcy.  So if we remember the pie chart that we talked

5   about yesterday, the five factors, the payment history was

6   the number one most important factor.

7        You may recall Mr. Daugherty's credit report had a

8   record of tax liens.  Tax liens are public records.  And you

9   can see right there that's a reference to public records.

10       Number two, length of time since last delinquency on

11  all accounts.  That's a reference to delinquencies and

12  derogatory entries on credit reports.  That's also in that

13  payment history, you know, chunk of the pie, if you will.

14       The third has nothing to do with derogatory credit

15  entries.  This is the total available credit on revolving

16  accounts.  And that's --

17  Q.   What does that mean?

18  A.   It's kind of not well-written.  What that means

19  essentially is that Chase is concerned with the aggregate of

20  credit limits on Mr. Daugherty's credit cards on his Equifax

21  credit report.  And, so, they identify that as a factor.

22  Q.   Okay.  Next?

23  A.   Installment loans not paid as agreed compared to all

24  installment loans.  This is -- this would be in that payment

25  history chunk of the pie.

John Ulzheimer - Direct (Manning)

1    The fifth one, "request for new credit," you may recall

2  yesterday we talked about one of the smaller pieces of the

3  pie is the pursuit of new credit or inquiries.  That's what

4  this last bullet point is regarding.

5    So these are all reasons why that 561 wasn't, you know,

6  a much higher score and that 561 was one of the reasons why

7  they denied him.

8  Q.   Okay.  So in light of this letter, what is your opinion

9  as to whether this duplicative Equifax account was a factor

10  in the denial?

11  A.   It, it was not a factor in the denial.  There are so

12  many other conditions that have absolutely nothing to do

13  with the duplicative tradeline on the Equifax report.

14  Q.   Let's go to the next one.  And if I flip to your

15  report, again Page 14, --

16  A.   All right.

17  Q.   -- I have Comenity Bank.  This is a bill-me-later

18  account.  Do you recall reviewing documents regarding a

19  bill-me-later account?

20  A.   Yeah.  It's a PayPal, a PayPal service.

21  Q.   All right.  So let's put this up for the jury.  This is

22  Plaintiff's Exhibit 8.

23  A.   All right.  It's not up yet.

24  Q.   So this is another credit denial.  It's for a PayPal

25  account.  I mean, I'm not really sure what that is.  Is

John Ulzheimer - Direct (Manning)

1    it -- what type of credit is that?

2    A.   So I'm not sure if you're familiar with PayPal, but

3    PayPal allows you to pay for things and receive money.

4    Q.   Is it like a revolving account?

5    A.   No.  PayPal is just a service.  So people use it a lot

6    of times to pay for things that they may purchase on e-Bay

7    or to send out invoices to clients and you can pay through

8    PayPal.

9         Bill-me-later is essentially an extension of credit

10   that PayPal offers to their clients.  It's almost like a

11   credit card that doesn't really exist as a physical credit

12   card.  That's a good way to think about it.

13   Q.   Okay.  So it's -- is that considered a revolving

14   account?

15   A.   It would be.

16   Q.   Okay.

17   A.   Yeah.

18   Q.   All right.  I understand that.  Now, in this letter --

19   is this one of the letters that you reviewed in preparation

20   of your report?

21   A.   It is, yes, sir.

22   Q.   Okay.  What does this letter tell you about the reasons

23   why this bill-me-later credit through a PayPal account was

24   denied?

25   A.   Yeah.  So this is -- again, this is a notice of adverse

John Ulzheimer - Direct (Manning)

1   action or denial letter, so it has to include a variety of,

2   of metrics or -- excuse me -- attributes to disclose to the

3   applicant.  And as you can clearly see, they -- let's see.

4   I'm trying to find --

5   Q.   Maybe we can blow up the top.

6   A.   Yeah.  That's one thing.  No, maybe blow it down a

7   little bit.  There we go.  Okay.  That's fine.  So they,

8   they denied his request and they gave reasons.

9       Now, this one is a little bit more complicated.  They

10  actually scored information off of his application, which is

11  different than just a credit bureau score.  And they even

12  disclosed numeric value based upon the results of analysis

13  of credit histories of a large number of customers.

14      And then just below that, "The information you provided

15  in your application did not score a sufficient number of

16  points for approval."

17      So that has nothing to do with the credit report.

18  That's just information off of when you're filling out -- if

19  you can kind of think of yourself filling out a paper

20  application at a bank.  The answers you give to a lot of

21  those questions, which are not credit report, that

22  information is actually scored as well.  It's called an

23  application model.

24      So he was denied, first off, because of that which that

25  doesn't have anything to do with an Equifax report.  But

John Ulzheimer - Direct (Manning)

1  then when they actually did pull a credit report because

2  they use that as well as a basis, "too many accounts in your

3  credit file with serious delinquency," and, and clearly

4  identified a large number of those yesterday.

5  Q.    And we don't need to go through those.  That's the 11

6  other collection accounts?

7  A.    Yeah, 11 collections, a couple tax liens.  And if you

8  page down, you'll actually see the score.  They have to

9  disclose the score.  There it is, 580.  And then the reasons

10  why the score wasn't higher.

11      You can see that they're very similar to the letter we

12  just looked at a minute ago from Chase.  Serious

13  delinquency -- this actually contains two of them,

14  derogatory public record or collection.  Both of those were

15  on Mr. Daugherty's Equifax credit report, tax liens and the

16  collections.

17      This is -- the next one is another way of saying the

18  same thing that we talked about a moment ago with regards to

19  balances on your credit cards being too close to the credit

20  limit, so that ratio being too high.  Proportion of balances

21  to credit limits is too high on bank revolving or other

22  revolving accounts.

23      The third is "time since delinquency is too recent or

24  unknown."  That's a pretty easy one to determine.  That

25  means they feel like the delinquencies are too recent for

John Ulzheimer - Direct (Manning)

1    their comfort.

2        Number four is number of accounts with delinquency.

3    Thirteen -- too many inquiries in the past 12 months and

4    that's the pursuit of credit.  So they're uncomfortable with

5    the fact that he's applying for credit so much within the

6    prior year.

7    Q.    And when -- you said "13."  What do you mean by that?

8    A.    Oh, I'm sorry.  The 11 collections, the two tax liens.

9    Q.    So that's 13 totally separate and apart from the Ocwen

10   that Equifax is duplicating?

11   A.    That's right.  And I guess if you want to be kind of

12   hyper-accurate about this, the accurate representation of

13   the Ocwen account is my understanding did, in fact, have a

14   late payment on it.

15       So I guess you can, you can add that to the -- again,

16   we're beating a dead horse at this point.  So, you know, 11

17   collections, two tax liens unrelated to Ocwen.

18   Q.    Okay.  Now, the next one I'd like to ask you about is

19   One Community Federal Credit Union.  Do you recall

20   receiving --

21            MR. YOUNG:  Objection, Your Honor.

22            THE COURT:  Basis?

23            MR. YOUNG:  Not covered or mentioned whatsoever in

24   the report.

25            THE COURT:  Counsel, any response to the

John Ulzheimer - Direct (Manning)

 1   objection?  I'm looking to the pages.

 2        MR. MANNING:  Yes, Judge, Page 13, second

 3   paragraph -- I'm sorry -- third paragraph.  "Plaintiff

 4   suggests he was denied by Chase, Quicken Loans, Embrace, One

 5   Community Federal Credit Union and GE acting on behalf of

 6   Sandy Furniture.  He was, however, provided no documents

 7   from GE, Quicken Loans, Embrace Loans, or One Community

 8   Federal Credit Union suggesting that he applied for credit

 9   with them let alone was denied credit by them."

10        THE COURT:  And what is your intended inquiry with

11   respect to that one?

12        MR. MANNING:  Yes, Judge.  I was going to just

13   start by asking him what information he reviewed, if any,

14   what he was aware of when he prepared this report regarding

15   the One Community Federal Credit Union.

16        THE COURT:  All right.  I will overrule the

17   objection to that question based on what I see here,

18   counsel.  If there's a need as we go forward to impose

19   others, don't let that prevent you.  But he -- I think it is

20   a fair interpretation of this paragraph that he considered

21   that.  I don't know where the questioning is intended after

22   that.  So if you want to impose objections, you can.

23        MR. YOUNG:  May I point out, Your Honor, that the

24   "documents relied upon" portion of the opinion does not

25   include anything with respect to the loan mentioned.

John Ulzheimer - Direct (Manning)

1        THE COURT:  All right.  I'm going to permit this

2    question.  I overrule the objection.  And we'll see where it

3    goes after this, counsel.

4    BY MR. MANNING:

5    Q.   Let's, let's clarify that, Mr. Ulzheimer.  Exhibit C on

6    your report has all the documents you relied upon.  And we

7    went through all of them yesterday.

8    A.   Right.

9    Q.   I'm not going to ask you to read them all again.  But

10   if we can just flip to Page 21 of the report, it includes a

11   number of things that the plaintiff provided.  Plaintiff's

12   discovery responses -- I count seven separate discovery

13   responses.  Do you recall there being documents attached to

14   those?

15   A.   Yes.

16   Q.   Okay.  So what I'm asking you first is do you recall in

17   preparing this report seeing what you referred to as an

18   adverse action letter, meaning a letter in which One

19   Community Federal Credit Union actually denied Mr. Daugherty

20   a credit application?

21   A.   I do, yes.

22        MR. YOUNG:  Was the answer, "I do"?

23        THE WITNESS:  I do, yes.

24        THE COURT:  Yes, that was the answer.

25   BY MR. MANNING:

John Ulzheimer - Direct (Manning)

1   Q.   What, what document was that?

2   A.   I believe it was -- I believe it was an --

3        THE COURT:  Mr. Young, is there an objection?

4        MR. YOUNG:  Your Honor, I object.  There is no

5   such letter.

6        THE COURT:  Well, we'll see.  The witness has

7   indicated that he reviewed such a letter apparently.  That's

8   my understanding of his response to Mr. Manning's question.

9   And let's go from there.

10       Go ahead, please.

11       MR. MANNING:  I believe the witness is referring

12  to a Quicken Loans denial as opposed to a --

13       THE COURT:  Well, I don't want you to testify.

14  You can ask him a question.

15       MR. MANNING:  Okay.  I'll ask, Judge.

16  BY MR. MANNING:

17  Q.   I know you had already said there were things that were

18  produced in this case after your report --

19  A.   Right.

20  Q.   -- which you reviewed.

21  A.   Right.

22  Q.   And I'm not going to ask you what they are --

23  A.   Okay.

24  Q.   -- or ask you to offer an opinion about them.  I'm just

25  trying to get at specifically in your report the documents

John Ulzheimer - Direct (Manning)

1   that you reference.  And in your report you have Quicken

2   Loans.  You don't recall seeing -- or at the point of the

3   report, you don't recall ever seeing a Quicken Loans denial?

4   A.   Correct.

5   Q.   Okay.

6   A.   At the point that I wrote the report.

7   Q.   Right.

8   A.   That's right.

9   Q.   Which was May 13th, 2015?

10  A.   Last year, that's right.

11  Q.   Yeah, a year and a week.

12  A.   Uh-huh.

13  Q.   So what about -- in your report is there any reference

14  to an adverse action denial letter from One Community

15  Federal Credit Union?

16  A.   There is not.

17  Q.   Does that refresh your memory as to whether you ever

18  saw one?

19  A.   Well, again, limited to the report, there was no denial

20  letter prior to me writing this report that I ever saw from

21  One Community.

22  Q.   Okay.

23       MR. YOUNG:  Objection, Your Honor.  This witness

24  has sworn that there was such a letter and now has sworn

25  that such a letter doesn't exist.

John Ulzheimer - Direct (Manning)

1          MR. MANNING:  That's inaccurate.

2          THE COURT:  Well, that's not an objection -- an

3     evidentiary objection.  That's an issue in terms of the

4     jury's consideration of credibility, counsel.  He --

5     witnesses often testify inconsistently.  It will be up to

6     the jury to weigh that as they weigh all of the evidence in

7     this case.

8          MR. MANNING:  Thank you, Judge.

9     BY MR. MANNING:

10    Q.   Have we gone through all five of the issues that

11    Mr. Daugherty is claiming as credit issues?

12    A.   Chase, Quicken, Embrace, One Community.  I think the

13    one missing was GE acting on behalf of Sandy Furniture.

14    Q.   Okay.  So what's, what's GE acting on Sandy -- on

15    behalf of Sandy Furniture?

16    A.   What does that mean?

17    Q.   Yeah.  I don't know what that is.

18    A.   It's not uncommon for retailers like -- and I'm, I'm

19    assuming Sandy Furniture is a furniture store or a furniture

20    retailer.  We don't have them in Atlanta, so I'm not

21    familiar with them.  And it's not uncommon for retailers to

22    have financing relationships with lenders so that when

23    customers come in and want to buy a piece of furniture

24    that's really expensive, they can actually finance it.

25         And, so, rather than someone like Sandy Furniture

John Ulzheimer - Direct (Manning)

1    extending credit because that's not what their business is,

2    I assume they're just a furniture store, they can actually

3    submit an application to their financing partner, in this

4    case GE.  And GE has a GE Capital division that does extend

5    credit.

6    Q.   All right.  So do you recall -- that wouldn't be a

7    mortgage, right, --

8    A.   No.  That would be --

9    Q.   -- or mortgage application.

10   A.   That would be a short-term installment loan to pay for

11   an expensive piece of furniture.

12   Q.   And there were -- we talked yesterday about the

13   credit -- what did you call it?  A tri-merge report from

14   creditscore.com?

15   A.   That's right.

16   Q.   And that -- would that include the, any discussion of

17   Sandy Furniture or GE on behalf of Sandy Furniture?

18   A.   No.  The credit reports don't, don't contain a record

19   of denials of credit.  So any of these denials wouldn't be

20   memorialized on a credit report.  There's no section of a

21   credit report that says, you know, "Mr. Jones was denied

22   credit from these two lenders."  So, no, that denial would

23   not be memorialized on a report.

24   Q.   Okay.  You also in your report -- this is again at the

25   back, Exhibit C -- have the report of Evan Hendricks listed.

John Ulzheimer - Direct (Manning)

1   A.   Yes.

2   Q.   And you, you've testified that the reason this was

3   caused was because Equifax misinterpreted the open date that

4   Ocwen corrected as a new account.

5   A.   And created the duplicative tradeline, that's right.

6   Q.   What was Mr. Hendricks's opinion on that matter?

7   A.   I recall his opinion being that the root of the problem

8   started because of Equifax creating this duplicative

9   account.  And I may be paraphrasing his testimony, or his

10  opinion in his report.  But I, I believe that accurately

11  captures his opinion.

12  Q.   So at least on that point, the cause of this whole

13  issue, you and Mr. Hendricks agree?

14  A.   We are in total agreement on that issue, that's

15  correct.  I also believe that Equifax misinterpreted the

16  opening date and, therefore, caused a duplicative tradeline.

17  Q.   Now, after reviewing all of the materials and the

18  alleged credit denials and Mr. Daugherty's claims, based on

19  your 24 years of experience, including six years at Equifax

20  and seven years at FICO, what is your expert opinion on

21  whether Ocwen caused any damages to plaintiff?

22  A.   I, I'm of the opinion that they did not.

23  Q.   Thank you, sir.

24  A.   You're welcome.

25         MR. YOUNG:  Your Honor, I'd like to approach on a

John Ulzheimer - Direct (Manning)

1    request to strike certain testimony.

2            THE COURT:  All right.

3            (Bench conference on the record)

4            MR. YOUNG:  Your Honor, I move to strike the

5    testimony of this witness wherein he testified that Ocwen is

6    not permitted by law -- is not permitted by the Fair Credit

7    Reporting Act to obtain a copy or to check the Equifax

8    information or data because it is not a permissible purpose.

9    That's what he unequivocally told the jury.

10           First, there is no such opinion set forth anywhere in

11   his report.  He never opined that Ocwen can do it.

12           Moreover, it goes directly to whether or not Ocwen did

13   a reasonable investigation which this Court has repeatedly

14   admonished counsel not to go there.  He went there anyhow.

15   The testimony is absolutely contrary to the Fair Credit

16   Reporting Act.

17           But we don't even need to get there.  I can show you

18   the statute which says this is absolutely permissible

19   purpose.  But that testimony that Ocwen can't do it, one is

20   it is not in his report.  Two, it goes to the issue that

21   we've already prevailed on.  That is the reasonableness of

22   the investigation.

23           But if I need to go further, I can show the Court the

24   statute.  And if we don't get the curative instruction or

25   the exclusion, then I'm left with putting the law up there

John Ulzheimer - Direct (Manning)

1    on the screen and debating the law with this witness.

2              THE COURT:  All right.  Any response, Mr. Manning?

3              MR. YOUNG:  I have the cite here.  I can further

4    cite directly to the statute.

5              THE COURT:  All right.

6              MR. YOUNG:  If I cite specifically to the statute,

7    it would be 1681b(a)(3)(A) which says that it's a

8    permissible purpose to review collection of an account of

9    the consumer.  Moreover, they can get the information under

10   sub-capital (F), "otherwise has a legitimate business need

11   for the information," and specifically, "to review an

12   account to determine whether the consumer continues to meet

13   the terms of the account."  That's what the law says.  He's

14   wrong on the law.

15        I, I would like it stricken and the jury instructed to

16   disregard, Your Honor, because he gave no such opinion.  And

17   it clearly goes to whether or not Ocwen did a reasonable

18   investigation, which this Court has repeatedly upheld my

19   objection.

20             THE COURT:  Mr. Manning.

21             MR. MANNING:  Thank you, Judge.  My -- I'm sorry.

22   I always talk too loud.

23        My first response is there was no timely objection.

24   That's his obligation to timely object.  If he wanted to

25   keep the testimony out, it's his obligation to object in a

John Ulzheimer - Direct (Manning)

1    timely manner.  And under the rules, if you don't it's

2    waived.

3        Number two, it is disclosed in the report on Page 5 of

4    his FCRA certification and what he utilizes it for, how he

5    obtains it.  It's relevant to his experience and his

6    knowledge.

7        Number three, Page 9 talks about the hard inquiry pull.

8    That's when he talked about the difference between a soft

9    pull and a hard pull.  His language is a little bit

10   different.  He calls it a soft inquiry and a hard inquiry.

11   But he goes on to describe all of that at length.

12       There's no failure to disclose this.  This is clearly

13   within his report.  And there's quite a bit of discussion

14   about it.  You notice he says "lenders can pull credit."

15   And he identified that Ocwen is not a lender and, therefore,

16   could not pull credit.

17           THE COURT:  Point that out to me.  "His inquiries

18   are visible to lenders and credit scoring."  That is on Page

19   9.  Is that where you are talking about?

20           MR. MANNING:  Yes, Judge.

21           THE COURT:  Then he refers to it as a soft

22   inquiry.

23           MR. MANNING:  Okay.  The soft inquiry up at the

24   top of the page goes on to discuss there are several types

25   of soft inquiries and what those mean and how they're

John Ulzheimer - Direct (Manning)

 1   utilized.

 2       And then he goes on to talk about hard inquiries and

 3   how they can have an impact on his trustworthiness.  And it

 4   says they're visible to lenders, and he's identified that

 5   Ocwen is not a lender and they're not a credit scoring

 6   company.

 7       And these inquiries usually result from a lender

 8   requesting a consumer's credit report when the consumer

 9   applies for a credit card or a bank loan.  Hard inquiries

10   can but, --

11           THE COURT:  Excuse me, gentlemen.  Go ahead.

12           MR. MANNING:  -- but do not always affect the

13   borrower's credit score.  And then -- so this is, this is

14   all -- they're on notice of all these issues, Judge.

15           THE COURT:  Okay.  That's Page 9.  Point out to me

16   the language that you refer to on Page 5.

17           MR. MANNING:  Yes, Judge, the certification at the

18   top, --

19           THE COURT:  Uh-huh.

20           MR. MANNING:  -- paragraph D.  "I have been an

21   FCRA certified by the credit reporting --" these are the two

22   organizations that he identified.  And he says it was

23   developed to prepare consumer reporting agencies and

24   companies that furnish information to the consumer reporting

25   agencies to meet -- and then what does he say -- the

John Ulzheimer - Direct (Manning)

1   baseline requirements set forth in the FCRA.

2       That's exactly what he's talking about on the stand.

3   The course covers -- and he goes on to describe how consumer

4   credit grantors and those who use and furnish information to

5   consumer reporting agencies are affected by the FCRA.

6           THE COURT:  All right.

7           MR. MANNING:  It's all there, Judge.

8           THE COURT:  As I understand it, Mr. Young, I want

9   to make sure that I am getting to the portion of the

10  testimony that you are asking to be stricken.  It's that

11  portion of the witness's testimony where he indicated Ocwen

12  could not as a furnisher obtain a credit report.  Is that

13  correct or not?

14          MR. YOUNG:  That is correct.  But he said it

15  was -- that the law did not permit it, that the --

16          THE COURT:  I understand.  That opinion, counsel,

17  is not included in what you have pointed to, Page 5 or Page

18  9.  I do not believe, and I specifically find, that that

19  language, Mr. Manning, doesn't put an opposing party on

20  notice that that is an opinion that the expert is going to

21  give.

22      There are statements here in very general terms as to

23  when he's talking about soft and hard inquiries as to what

24  those are.  And in telling what those are, he talks about in

25  general terms and as examples who make those requests and

John Ulzheimer - Cross (Young)

1    whether they are hard or whether they are soft.  And on Page

2    5 in terms of his certifications it's even less there.

3        I find that the opinion that it is not permitted by law

4    is, in fact, not included in the report, and I'm going to

5    order that the jury disregard it, preserving Ocwen's

6    objection and exception.  And I do so because I find that

7    it's not been disclosed.

8        Had it been disclosed, even if it was incorrect by law,

9    it would have put you, Mr. Young, in the position of

10   cross-examining him and impeaching him.  I would have

11   permitted that.  But being that it's not disclosed, I'm not

12   going to permit that opinion.

13           MR. YOUNG:  Understood, Your Honor.

14           THE COURT:  Thank you.

15           (Bench conference concluded)

16           THE COURT:  Ladies and gentlemen of the jury, you

17   heard Mr. Ulzheimer give testimony regarding it not being

18   permitted by law.  And I believe he was specifically

19   questioned that he would be entitled -- or Ocwen would be

20   invited to violate the law if they sought to obtain the

21   credit report.

22       I am ordering that you disregard the witness's

23   testimony in that, as to that issue.  I'm ordering it

24   stricken from the record and that you make it no part of

25   your deliberations whatsoever.

John Ulzheimer - Cross (Young)

1    All right.  Is there cross-examination of this witness?

2           MR. YOUNG:  There is, Your Honor.  Thank you.

3                    CROSS EXAMINATION

4    BY MR. YOUNG:

5    Q.  Mr. Ulzheimer, I looked at your website.  You have an

6    FCRA website.  Isn't that true?

7    A.  I have a variety of websites, yes.

8    Q.  Well, let's talk about your FCRA website.

9    A.  Which one?  There are multiple FCRA websites.  I don't

10   know which one to which you're referring.

11   Q.  FCRAexpertwitness.com.

12   A.  Okay.  Thank you.

13   Q.  And on that website you have a list of recent cases in

14   which you offered expert testimony.  Is that your

15   recollection?

16   A.  I know what you're talking about, but it's not a list

17   of recent cases where I offered testimony.

18   Q.  Okay.  Well, --

19   A.  I'm happy to tell you what that is if you'd like me to.

20   Q.  I'll just show it to you.

21   A.  Okay.  Thank you.

22   Q.  Do you see where it says "FCRA" -- what does it say on

23   the website?

24   A.  I've got to blow it up.  It's basically a list of cases

25   where I was an expert for the defense and another tab where

John Ulzheimer - Cross (Young)

1   I was an expert for the plaintiff.  And this is grossly

2   outdated.

3   Q.  Well, I found the list where you testified as an expert

4   on behalf of the defense, and I counted 47 cases where you

5   testified as an expert for the defense.  Is that what your

6   website represented at that time?

7   A.  I'm -- yes.  Again, that's grossly outdated, both

8   sides, the plaintiff and defense list.  I can't even

9   remember the last time that's been updated, maybe -- many

10  years.

11  Q.  Okay.  So it's much higher in terms of defense.  And if

12  we look at plaintiffs, it should be much higher also?

13  A.  Correct.  Yeah, the aggregate is going to be 230 cases,

14  give or take.  And if you add up the two, the cases listed

15  under both tabs, I don't think you're going to get to

16  anywhere close to that number.

17  Q.  Okay.  Is it split fifty-fifty maybe?

18  A.  As of --

19  Q.  As of today.

20  A.  No.  If you took, if you took the total of all of the

21  expert witness work that I've ever done, then I would say

22  that it is -- and I haven't done this exercise in a while so

23  I'm giving you my best estimate.  I would say probably

24  75 percent defense, 25 percent plaintiff.

25  Q.  But your website holds out to the -- even though it's

John Ulzheimer - Cross (Young)

1   outmoded, the website that's still out there says

2   fifty-fifty defense versus plaintiff, doesn't it?

3   A.   That's right.  At the time, that was a more accurate

4   distribution.

5   Q.   But, for example, if I had a credit issue, I could

6   contact you and if I was willing to pay your retainer, I

7   could get your expert advice on a consumer issue, couldn't

8   I?

9   A.   You could certainly contact me.  I would have to do a

10  conflict check.  But certainly you would be welcome to

11  contact me.

12  Q.   And your rate is $425 an hour?

13  A.   Correct.

14  Q.   Okay.  Is there a minimum retainer of three hours?

15  Four hours?  Something like that?

16  A.   The way I structure my agreements is a $7,500

17  refundable retainer.  So if you use $1,000 of, of,

18  quote/unquote, work, then I would end up writing you a check

19  back for $6,500.  It's not a, it's not a gift.

20  Q.   Right.  So to hire you and have you tell me whether or

21  not you could help me with a consumer credit issue, I'd have

22  to give you the materials and send you $7,500.  You'd do a

23  conflict check.  And at that point, you may or may not be

24  able to help me.  Is that fair?

25  A.   No, the order -- the chronology of events that you just

John Ulzheimer - Cross (Young)

1    laid out is not at all what I do.

2    Q.    Okay.  Well, lay it out correctly.

3    A.    Okay.  So if you contacted me, the first thing I would

4    do before we even had a substantive discussion about

5    anything would be a conflicts check.  So I would ask for you

6    to -- regardless of whether you're representing a plaintiff

7    or a defendant, it doesn't matter, I would need to know who

8    the parties are that are involved just to make sure that I

9    don't have any conflicts.

10        And, so, let's say that we get past that conflicts

11   step.  Then we would have a substantive discussion about --

12   and that would, frankly, be something that you would lead

13   because you would be representing somebody and you would

14   explain to me the facts of the case.

15        And then based on our discussion, I would tell you,

16   "This is something I can't help you with because it's either

17   something that's not in my ballpark of knowledge," or, "Yes,

18   this is something that I could help you with."

19        And if you and I agree to terms, meaning that you're

20   okay with my retainer agreement and fees and such, I would

21   send you a retainer agreement that we would both execute.

22   And once all that administrative work has been taken care

23   of, then generally the next step would be that you -- well,

24   you would also give me a calendar, meaning we have an expert

25   report due on this date.  Check your calendar.  Is that

John Ulzheimer - Cross (Young)

1   something you can even do?  We have trial on that date.  How

2   does your calendar look?  Can you even be at a trial

3   somewhere else on that date?

4       So let's assume that all of those things are thumbs up.

5   Then generally what happens next is you would provide me

6   with materials that either you feel I would need to do my

7   work or that I asked you for because I feel like I would

8   need them to do my work.  And then we would proceed.

9   Q.   Well, I'm an attorney but I'm also a consumer.  If I

10  wanted to hire you to help me with a --

11  A.   Okay.

12  Q.   -- with an issue that I was having over credit

13  reporting, could I hire you?

14  A.   My apologies.  I thought you were asking in the

15  attorney/expert witness scenario, not just a consumer

16  calling John for help scenario.  You could call me but we

17  wouldn't have a discussion because that's not a service that

18  I offer.

19  Q.   You don't help consumers solve credit problems?

20  A.   Not on an individual contract fee basis type of

21  scenario.  That's actually illegal in Georgia where I live

22  to do something like that.  I can write a book.  You can buy

23  a book and read about how to do that.  But, in other words,

24  Mr. Young hiring John Ulzheimer to sit down and look at your

25  credit report and tell you, you know, in exchange for money

John Ulzheimer - Cross (Young)

1   what you can do to improve your credit, that's, that's
2   called credit repair and that's illegal in Georgia and I
3   don't do it.
4   Q.   Can I retain you as an expert if I represent a client
5   who has an absolute false, wrong entry on his credit report
6   that he can't seem to get fixed?  As an attorney, can I
7   retain you on behalf of my client to get your advice on how
8   I can fix that?
9   A.   As an attorney/expert witness type of relationship?
10  Q.   Yes.
11  A.   Yes, assuming we don't have conflicts and assuming that
12  everybody is agreeable to the terms of my retainer
13  agreement, then absolutely you can.
14  Q.   And once this case is behind you, could I hire you to
15  help out one of my clients that can't seem to get an Equifax
16  report fixed, or is that a conflict?
17  A.   In litigation or just as credit repair?
18  Q.   Credit repair.
19  A.   Credit repair is illegal in the State of Georgia.  I do
20  not do credit repair.
21  Q.   Litigation.
22  A.   If, if -- well, I wouldn't be able to help you.  I
23  don't -- I choose not to take cases against the credit
24  bureaus because I blog for some of them from time to time.
25  So I would be conflicted out.  But if there was no conflict,

John Ulzheimer - Cross (Young)

1   then certainly that would be a type of expert

2   witness/attorney relationship that I would consider.

3   Q.   So all the -- you're conflicted out of all, anything

4   involving a claim against a credit reporting agency; right?

5   A.   Because I have existing relationships, that's correct.

6   I consider that to be a conflict.

7   Q.   Do you blog for Equifax?

8   A.   I blog for several of the consumer reporting agencies,

9   not Equifax specifically.

10  Q.   Do you have a conflict if I tried to retain you in a

11  credit reporting issue involving a furnisher?

12  A.   So you're suing a -- like in this case you're suing a

13  furnisher?  I absolutely take cases like that.  It, again,

14  would depend on who the furnisher is as to whether or not

15  I'm conflicted out.

16  Q.   And you've been an expert witness on behalf of the

17  plaintiff in cases against furnishers, haven't you?

18  A.   I have, yes, many times.

19  Q.   But with this case behind you, would you have a

20  conflict with Ocwen?

21  A.   If the -- I have other cases where I'm an expert

22  witness on behalf of Ocwen.  So it, it seems like a

23  conflict.  Even though this case would be over, there would

24  still be a conflict going forward.

25  Q.   So you're not only an expert witness for Ocwen in this

John Ulzheimer - Cross (Young)

1    case.  You're an expert witness for Ocwen in other cases.

2    Is that right?

3    A.    Yes, sir, two others.

4    Q.    Involving Fair Credit Reporting Act issues; right?

5    A.    Say that one more time.  I'm sorry.

6    Q.    Involving Fair Credit Reporting Act issues.

7    A.    Yes.

8    Q.    When you've served as an expert witness on behalf of

9    plaintiffs who have claimed injuries or damages from bad

10   credit reporting or false credit reporting, you've given

11   testimony about some of the things that can -- some of the

12   damages that a consumer can have when their credit is

13   falsely reported, haven't you?

14   A.    Are you -- I don't recall that specifically.

15   Q.    Well, let's shift gears here.

16   A.    Okay.

17   Q.    How can -- as an expert of all these years in this

18   field, tell the jury how a false, bad credit mark on your

19   credit history can hurt a consumer.

20   A.    I could think of -- I mean, I can cherry-pick scenarios

21   or craft a very specific scenario for you where a

22   legitimately false piece of information that's derogatory

23   could cause a lower credit score.  So that's certainly

24   something that can make it harder for a consumer to, you

25   know, to do what they want to do with lenders for example.

John Ulzheimer - Cross (Young)

1   That's a good example.

2       Another one could be a false piece of information on a

3   credit report causing a lower credit score.  That could lead

4   to a higher insurance premium because insurance companies

5   use credit reports and credit scores as well.

6       There are some scenarios where employers will pull a

7   credit report as part of the pre-employment screening

8   process.  And if they see -- this isn't a credit score based

9   issue.  It's a credit report based issue.  But there's a

10  possibility you could come up with a, you know, kind of

11  cherry-pick an example where a piece of information on a

12  credit report could cause an employer to question whether or

13  not they wanted to hire a, an applicant or promote an

14  applicant.  That's another example.  They could be --

15  Q.   I don't mean to interrupt you.  Go ahead.

16  A.   No, no, go ahead.  I think another scenario would be if

17  you were approved for a loan, you could get a higher

18  interest rate.  So you could have to pay more for, you know,

19  higher interest rate on a credit card for example.

20  Q.   So, sir, if I had a big false foreclosure black mark on

21  my credit -- assume for the purpose of my question that I

22  have a big false foreclosure black mark on my credit.  It's

23  going to hinder me in getting new credit, isn't it?

24  A.   No.  It's not as clean as just saying it is going to

25  hinder me.  We've looked at letters in this case where

John Ulzheimer - Cross (Young)

1   clearly it didn't.

2   Q.   This is -- an example, the hypothetical is me and I'm

3   absolutely current on my mortgage and I have a big false

4   foreclosure black mark.  That's going to hinder me in

5   obtaining credit, isn't it?

6   A.   Again, that's -- your hypothetical is missing so many

7   required attributes that I, I can't answer "yes" or "no" to

8   that.  And I don't know what a big false black mark --

9   there's nothing in my world that identifies anything on a

10   credit report as being big or black.  So I don't, I don't

11   know.  That doesn't make -- to me that doesn't make any

12   sense.

13   Q.   Well, because you're an expert in this field and you

14   use words like "derogatory" and things like that.  But to

15   me, a layperson, if I have a foreclosure that's absolutely

16   wrong on my credit that shows I'm $6,000 behind and I'm out

17   there trying to re-fi my mortgage, I'm going to have

18   trouble, aren't I?

19   A.   There's a possibility, yes.  There's also a

20   possibility, no.

21   Q.   And if I get someone that's going to lend me money with

22   a big false foreclosure black mark on my credit, I'm going

23   to pay more for that credit than I would than if that big

24   false foreclosure black mark wasn't there.  Isn't that true?

25   A.   There is a possibility, yes, and there's a possibility,

John Ulzheimer - Cross (Young)

1    no.  It's not as clean as just saying "yes."

2    Q.   Okay.  And you already mentioned this could keep me

3    from getting a job if, if an employer pulled my credit and

4    sees that I don't pay my mortgage payment, --

5              MR. MANNING:  Objection to relevance.

6    BY MR. YOUNG:

7    Q.   -- that I haven't paid my mortgage payment.

8              THE COURT:  What's the objection?

9              MR. MANNING:  Relevance.

10             THE COURT:  Just a minute.

11             MR. MANNING:  Relevance.

12             THE COURT:  Response to the relevancy objection?

13             MR. YOUNG:  It's well within the scope of the

14   direct testimony.  I'm cross-examining this witness to

15   determine -- in this particular case I already asked about a

16   job and now I don't recall what I was asking.

17             THE COURT:  As I understand it, Mr. Manning, this

18   questioning about the big false --

19             THE WITNESS:  Foreclosure black mark.

20             THE COURT:  -- foreclosure black mark and whether

21   or not that hinders someone's ability to obtain credit is

22   questioning about the witness's opinion that he gave that no

23   one issue is determinative of whether one obtains credit or

24   not.

25             MR. MANNING:  I have no problem with that, Judge.

John Ulzheimer - Cross (Young)

1  His question was this big false black mark foreclosure will

2  keep me from getting a job.

3        THE COURT:  All right.

4        MR. MANNING:  And my objection is relevance.

5        THE COURT:  As to the job issue.

6        MR. MANNING:  That's right.

7        THE COURT:  Well, I would sustain that objection,

8  hearing no response.

9  BY MR. YOUNG:

10  Q.   It can hurt me in applying for credit.  And if I get

11  credit, I may have to pay more for it.  Correct?

12  A.   That's a possibility.

13  Q.   And you already mentioned that credit can even impact

14  the insurance premiums I pay like for my automobile

15  insurance; right?

16  A.   Credit can be a factor in both homeowners and auto

17  insurance premiums, that's correct, yes, sir.

18  Q.   And if I want to rent an apartment for my daughter in

19  college, if someone pulls my credit this could affect

20  whether or not I even can rent an apartment for my daughter.

21  A.   That's a possibility, yes, sir.

22  Q.   If I go try to get a loan to buy property and I have

23  this big false foreclosure black mark showing I am currently

24  in default, five or more payments, $6,000 in default, I'm

25  going to have trouble getting a real estate loan, aren't I?

John Ulzheimer - Cross (Young)

1  A.   That's a possibility.  Maybe yes, maybe no.

2  Q.   Now, if I look at my credit and I see this big false

3  foreclosure black mark on my credit, is it understandable

4  that I might be upset when, in fact, I am current and

5  haven't missed a payment in the last year?

6         MR. MANNING:  Objection, scope.

7         THE COURT:  Response to the scope?

8         MR. YOUNG:  Your Honor, the witness testified as

9  to damages or lack thereof with respect to the credit

10  reporting and I'm exploring that area.

11         THE COURT:  All right.

12         MR. MANNING:  Not on emotional damages.  He's not

13  an expert on emotional damages.

14         THE COURT:  No, he is not an expert on emotional

15  damages.  But one of his opinions was that this issue had

16  not harmed the defendant.  And I'm going to permit it,

17  preserving Ocwen's objection and exception for that reason.

18      Go ahead, please.

19  BY MR. YOUNG:

20  Q.   So if I'm blameless and I find out this is on my

21  credit, it's understandable that I might get upset; right?

22  A.   You're asking me a question outside of what I'm

23  knowledgeable about.  I'm not clinically trained in any way.

24  But, I mean, I guess.

25  Q.   Would you be upset, sir, if your mortgage was current

John Ulzheimer - Cross (Young)

1  and you pulled your credit and you saw that it said you were

2  in foreclosure, five or more months behind, and you were

3  $6,000 delinquent?  That would upset you, wouldn't it, sir?

4  A.   If it was incorrect, that would upset me, yes.

5  Q.   And it would be -- you would set out trying to fix

6  this, wouldn't you, if you saw this and it was absolutely

7  wrong?  You would set out trying to fix it, wouldn't you?

8  A.   Yes.  I can speak for myself personally.  I -- because

9  of what I do for a living, yes, I understand what my rights

10  are and how I would get something like that corrected.

11  Q.   You could fix it in a matter of a few minutes, couldn't

12  you?

13  A.   No.  Unfortunately, the system isn't quite that nimble.

14  I could certainly figure out what my next steps would be

15  fairly quickly.  But as far as getting it corrected in a few

16  minutes, that's, that doesn't happen in the dispute

17  resolution world.

18  Q.   Well, it probably was exaggerated when I said a few

19  minutes.  But I was reading one of your articles, "How Long

20  Does it Take to Correct Credit File Errors?"  That's an

21  article you wrote and published on your website; right?

22  A.   I, I've written so many that I don't have them

23  inventoried, but that sounds like an article I would

24  absolutely write.  So I will concede that I have written

25  that, about that topic probably many times.

John Ulzheimer - Cross (Young)

1   Q.   Well, I'm just -- I want to ask you about this specific

2   one, so let me just show you the blog that I found under

3   your name by Googling it.

4   A.   Okay.

5   Q.   I want to ask you about this one.  Go ahead and review

6   it.

7   A.   I got it.  You can, you can proceed.

8   Q.   Okay.

9   A.   Well, I don't have it memorized.  If you're going to

10  ask about it, can I keep it so I can --

11  Q.   Well, I need to ask the question but I'll hand it right

12  back to you.

13  A.   Okay, fair enough.  Okay.

14  Q.   Well, the title of the article is "How Long Does it

15  Take to Correct Credit File Errors?"  And you wrote it.  And

16  the first numbered paragraph, "In some instances, it can be

17  done in a couple of days."  Is that right?

18  A.   Yes.

19  Q.   "There's this process called Rapid Update."  Right?

20  A.   That's right.

21  Q.   And the major credit unions you say could probably --

22  with this Rapid Update fix the credit file in 24 to 72

23  hours.

24  A.   So you mean credit bureaus, right, not credit unions?

25  Q.   I'm sorry.

John Ulzheimer - Cross (Young)

1  A.   That's okay.  I just want to make sure we keep a clear

2  record.

3  Q.   At that Paragraph Number 1.

4  A.   Yeah, Rapid Update is a product offered by mortgage

5  lenders where they will, for a fee, take a consumer's

6  dispute directly to a special department with the credit

7  bureaus kind of outside of the normal dispute resolution

8  process.

9       And as funny as this is going to sound, they can

10 actually pay the credit bureaus to prioritize their dispute

11 because the consumer has a loan pending.  And you can

12 actually pay the credit bureaus to, for them to correct one

13 of their errors faster than, say, a garden variety dispute

14 that wouldn't go through the Rapid Update process.

15 Q.   So in that respect, money talks, so to speak, if you

16 want to try to get something fixed in a hurry; correct?

17 A.   Rapid Update is not a free -- some people call it Rapid

18 Update.  Some people call it Rapid Rescore.  It's

19 essentially the same thing.  But there is a fee involved for

20 Rapid Updating.

21 Q.   Is there any doubt in your mind, sir, that if your

22 mortgage payment was absolutely up-to-date and current and

23 you had a foreclosure shown on your credit, five or more

24 months in default, over $6,000 owed, is there any doubt in

25 your mind, sir, that you couldn't have that fixed in 24 to

John Ulzheimer - Cross (Young)

1  72 hours with all of your expertise?

2  A.   Oh, sure.  I mean, I, I have contacts at the credit

3  bureaus.  And so I, I would be able -- if I had an incorrect

4  item on my credit report, which regardless of whether it's a

5  big false foreclosure black mark or a big false collection

6  black mark or any other big false marks, I wouldn't go

7  through the normal consumer dispute process.

8      I would go directly to the people that I know who work

9  for the credit bureaus and tell them, "Please fix my

10 credit."  It's not something that any consumer can do.  But

11 because I -- what I do for a living, I would suggest to you

12 that I have a back door to getting something like that

13 corrected pretty quickly.

14 Q.   How about the average guy on the street?  He doesn't

15 have that key to that back door, does he?

16 A.   He does not.  His fastest option would be -- or he or

17 she's fastest option would be this Rapid Update process.

18 And, of course, there's, there are fees involved with that.

19 So it's not something that I would always suggest.

20 Q.   Well, if you didn't have contacts and sources and a key

21 to the back door, would it be fair that if you wrote a

22 letter to your mortgage company and said, "Hey, I'm

23 absolutely current and you're showing me in foreclosure,

24 five or more payments past due, $6,000 delinquent," you

25 would expect that to be fixed, wouldn't you?

John Ulzheimer - Cross (Young)

1   A.    That would be my expectation, yes.  I would like to

2   think that sending a letter to the company that -- I mean, I

3   would probably incorrectly make the assumption that they

4   would be the ones who did it.  But I would certainly expect

5   that my letter would be sufficient.

6        And I would also probably file a dispute with the

7   credit bureaus concurrently just because, to burn the candle

8   at both ends.

9   Q.    Okay.  But when you make that direct dispute right to

10  the mortgage company, the people that own your mortgage,

11  that's a, that's a direct dispute; right?

12  A.    That is a direct dispute, yes, sir.

13  Q.    And when you make that direct dispute, your mortgage

14  company is required to put an XB code on your credit report

15  that you're disputing this; right?

16  A.    That's correct.

17  Q.    And when Mr. Daugherty sent a letter saying on

18  March 13th, 2013, which was received on March 14th, 2013, by

19  Ocwen and said that, "My loan is current but it's showing me

20  in foreclosure and $6,000 in default," that's when Experian

21  was required to put an XB code on his loan; right?

22  A.    Experian would only be required to pay --

23  Q.    I, I completely fouled that up.  When Ocwen got that

24  letter disputing this foreclosure that was absolutely false,

25  Ocwen is required by law to put an XB code on this account;

John Ulzheimer - Cross (Young)

1   correct?

2   A.   That's right.

3   Q.   The month that they get it, they have to put that XB

4   code on it; right?

5   A.   Yes.  They have a reasonable amount of time to place

6   the XB code on the tradeline that they are reporting to the

7   credit reporting agencies because it's actively in dispute

8   at that point.

9   Q.   Well, if they get the letter March 14th, by May 14th

10  should that XB code be there?

11  A.   Did you say March and then May?

12  Q.   Yeah, 30 days later.

13  A.   That's 60 days later.

14  Q.   I'm sorry, April.  I'm sorry.

15  A.   And I'm not trying to be a pain in the butt, but these

16  are very -- these are time sensitive obligations which is

17  why I'm trying to get these dates correct.  I'm not trying

18  to be a pain.

19      Thirty days is the amount of time that the entire

20  investigation process can take place.  And, so, what would

21  happen after 30 days -- the answer to your question is, no,

22  it wouldn't take 30 days for the XB to be added because the

23  entire investigation has to be completed in 30 days.

24      The XB code would be added prior to 30 days because it

25  has to be displayed on the tradeline that the furnisher,

John Ulzheimer - Cross (Young)

1  Ocwen in this case, actually sends to the credit bureau

2  while they're actively investigating it.  So 30 days would

3  be the end of it, not the, the beginning of it.

4  Q.   But the XB code should start to appear shortly after

5  the consumer directly disputes with Ocwen; correct?

6  A.   Yes.  The obligation is for Ocwen or the furnisher to

7  place the XB code on the item that they -- and this is

8  important -- on the item that they have furnished to the

9  bureau because that is what they believe is in dispute.

10     That's the only thing that they can add the XB code to.

11  They don't have the ability to add XB codes to extraneous

12  information on a credit report.  It's only the item that

13  they, in fact, reported.

14  Q.   So by April, 2013, the XB code should be there.

15  A.   Give me the dates again, please, the date range.

16  Q.   From March to April.  It's reported in March.  It's

17  disputed in March.  By April it ought to have the XB code.

18  A.   If it's disputed in March, if we're talking 30 days

19  later in April, the dispute code should have been added and

20  likely removed by that point because the investigation would

21  have been over.  You don't need -- you don't generally leave

22  the XB code on an item once the investigation is over.

23  Q.   Ocwen didn't put an XB code on Mr. Daugherty's credit

24  line after receiving that March dispute, did they?

25  A.   I would need to see the credit reporting screen logs

John Ulzheimer - Cross (Young)

1  that we were looking at yesterday that actually showed -- I

2  don't remember the dates of all of those entries, but some

3  of them did have XB.  So I can't answer for sure without

4  seeing the materials.

5  Q.    And that's the thing we call timeline or the time

6  tape -- excuse me -- the tape, the data tape, that exhibit?

7  A.    I don't remember what the number of the exhibit was.

8  Q.    Defendant's 2.

9           MR. YOUNG:  May I see Defendant's 2?

10 BY MR. YOUNG:

11 Q.    This is Defendant's 2.  It says "Credit Reporting

12 Histories."  And --

13 A.    Thank you.

14 Q.    You can confirm, sir, but I think you'll find that

15 there was never an XB code put on this account until

16 October.  The dispute was in March but it wasn't put on

17 until October.

18 A.    What am I looking at here?

19 Q.    Well, --

20          MR. MANNING:  Objection.  I'm not sure what the

21 question is.  What is he asking the witness to do?

22          MR. YOUNG:  The witness wanted to see this exhibit

23 showing the monthly reporting by Ocwen to the credit bureaus

24 and I just handed it to him and he's looking at it now.  And

25 I want him to tell me when Ocwen first put the XB code on my

                    John Ulzheimer - Cross (Young)

1    client's account.

2              THE WITNESS:  Is that the question?

3    BY MR. YOUNG:

4    Q.    Yes.

5    A.    Okay.  All right.  It looks like -- in this stack of

6    papers that I have here it looks like there is an XB code

7    added.  It's Bates 625.  Record created 11-18, 2013,

8    reporting period 10-31, 2013.

9    Q.    So I misspoke.  It was November, not October.

10   A.    Pardon me?

11   Q.    Well, I misspoke earlier then.  It was November of 2013

12   when the XB code first appears on this account; correct?

13   A.    I don't know what "record created date" is meant to

14   represent.  It's probably a question better for the Ocwen,

15   the young lady from Ocwen.  But I'm just giving you the

16   dates on the top of this document.

17   Q.    Somewhere October, November the XB code gets put on the

18   account; correct?

19   A.    Those are the dates associated with this screen capture

20   and the XB code is part of this particular screen capture.

21   Q.    Thank you.

22   A.    You're welcome.

23   Q.    Now, putting an XB code on an account that's directly

24   disputed by a consumer to Ocwen, that's not something Ocwen

25   does as a courtesy or favor.  It is -- in fact, the law

John Ulzheimer - Cross (Young)

1   requires that. Correct?

2   A. It is, it is in the Fair Credit Reporting Act, yes.

3   They have to show the item as being in dispute if it, in

4   fact, is in dispute and if they don't deem that dispute to

5   be frivolous.

6   Q. And the law required Ocwen to place the XB dispute code

7   in March as soon as they received the March 14, 2013,

8   dispute letter. That's when it was required to be done.

9   Correct?

10   A. Right. They would have been required to place the

11   code, again, on the account that they had reported soon

12   after receiving the direct dispute.

13   Q. And you looked at a record which suggests that they

14   didn't do it until October or November of 2013; correct?

15   A. Well, I looked at a record that showed that it was done

16   and the dates were October, November. I don't know if that

17   was until -- I'm just -- that's just me reading my

18   understanding of that page of the document. I don't know if

19   it's sequential to a dispute or whatnot. I'm just telling

20   you those are the dates on that document.

21   Q. Well, assume that the documents don't show an XB code

22   until that date range you mentioned, October, November.

23   Ocwen violated the Fair Credit Reporting Act if they did not

24   mark this account with the XB code after receiving, after

25   receiving that letter on March 14th, 2014, disputing this

John Ulzheimer - Cross (Young)

 1  foreclosure.  Isn't that true?

 2          MR. MANNING:  Objection, calls for a legal

 3  conclusion.

 4          THE COURT:  Overruled, counsel.  I'm sorry.  I

 5  didn't hear the latter part, Mr. Manning.

 6          MR. MANNING:  I said it's a legal conclusion and I

 7  believe it's outside the scope of what the Court's already

 8  ruled on the FCRA.

 9          THE COURT:  All right.  I heard the issue -- I

10  heard that part which indicated legal conclusion.

11      Any response to the entirety of the objection, counsel?

12          MR. YOUNG:  Your Honor, this witness has been held

13  out by the defense as an expert on FCRA, a certified FCRA

14  expert.  He's offered testimony almost 100 times on these

15  issues.  I believe he is competent to conclude that Ocwen

16  violated the law when they did not put the XB code on as

17  required.

18          THE COURT:  Are you done?

19      Mr. Manning, I overrule the objection.  I do so given

20  the expertise of this witness.  I also find that the

21  question generally is not outside of the scope of what was

22  asked on direct examination.

23      As I indicated to you all yesterday, there are times

24  when what we in the legal community would refer to as legal

25  conclusions intersect with expert opinions depending on who

John Ulzheimer - Cross (Young)

1   the expert is.  And, so, here I find it to be within the

2   province of the expert given his expertise, preserving

3   Ocwen's objection and exception to my ruling.

4        Go ahead, please.

5   BY MR. YOUNG:

6   Q.   In fact, sir, in your written opinion, your opinion

7   number three, you contradict the plaintiff's expert.  And

8   you state, "The plaintiff's expert has suggested in his

9   report that Ocwen failed to list their accounts as being in

10  dispute.  This is simply incorrect.  And there are a variety

11  of documents produced to confirm that Ocwen did, in fact,

12  report the account on multiple occasions as being in

13  dispute."

14       That was your written opinion; correct?

15  A.   Yes.

16  Q.   What you left out of your written opinion was they

17  didn't do it back in March when they were supposed to.  They

18  violated the law and didn't do it until October or November.

19  A.   Well, --

20  Q.   That was not in your opinion, was it?

21  A.   Okay.  So you keep pointing to this up here.  And, so,

22  --

23  Q.   This, this is the time line --

24  A.   Let me finish my answer.

25  Q.   Okay.

John Ulzheimer - Cross (Young)

1  A.    You are pointing to a tradeline that Ocwen did not

2  report to Equifax.  I think everybody has -- we've covered

3  that.  You continue to point to this false reporting of the

4  foreclosure with the $6,100 past due.  And I keep answering

5  you.  You can't show something in dispute if you didn't put

6  it on the credit report.  You can only show something in

7  dispute that you did put on the credit report.

8  Q.    Here's what I'm pointing to.

9  A.    Okay.  You keep on pointing.  It's kind of hard --

10 Q.    Okay.  Well, this is the letter.  It's in evidence.

11 This is the letter that my client sent to -- and I can give

12 you the original so you don't have to --

13 A.    I'm good.

14 Q.    This is the one he sent that was received March 14th

15 where he's disputing directly with Ocwen that, "I am

16 currently behind $6,000 and in foreclosure."  This is what I

17 am pointing to.  This is just for me because, you know, I

18 can't even keep the months straight.

19 A.    Uh-huh.

20 Q.    This is how I keep track of this.  This is what I'm

21 referring to.  And this, sir, is when the XB code upon

22 receipt of this dispute by Ocwen should have been placed on

23 his account.  Correct?

24 A.    That's impossible.  And I'm glad you clarified that.  A

25 furnisher cannot show something as being in dispute unless

John Ulzheimer - Cross (Young)

1   they reported it to the credit bureaus in the first place.

2   The only thing that Ocwen could have shown as being in

3   dispute is the non-duplicative account that no one has an

4   issue with in this case.

5   Q.   So that's not in your report, is it?

6   A.   No.  It's in response to your question.

7   Q.   Okay.  And, so, now you're saying that, no, Ocwen --

8   when they got the letter from Mr. Daugherty -- you're now

9   telling this jury that they should not have put the XB code

10  on the account.

11  A.   That's not what I said.  I said they could not put it

12  on that account because they had no control over that

13  account.  They didn't report it in the first place.  There's

14  nothing in their system in those credit reporting screen

15  captures that you just showed me a few moments ago that show

16  the duplicative nature of Mr. Daugherty's account.

17       So adding an XB code to that particular account isn't

18  something that was systemically possible.  Only the credit

19  bureau could have done that.

20  Q.   But they added it in November and you say they can't do

21  that.  Nothing has changed.  You say they can't do it and

22  here it is added in November.

23  A.   Yeah.  I need to see the screen capture again of the

24  credit reporting timeline if you've got that.

25            MR. YOUNG:  I walked off with the exhibit.

John Ulzheimer - Cross (Young)

1   BY MR. YOUNG:

2   Q.   Here it is back again, sir, Defendant's Exhibit 2.

3   A.   Thank you.  So Mr. -- I'm sorry.  Is it Young?

4   Q.   Yes.

5   A.   Mr. Young, this page represents the non-duplicative

6   Ocwen account.  This is the one that's in good standing,

7   status code 11.  That means current account paid as agreed,

8   not five times -- or 120 days late, whatever all the

9   negative aspects of, of the account that was duplicative.

10  Q.   Ocwen put it there in November, 2013; correct?

11  A.   They put it on the good account, that's right.  That's

12  the one they had control over, the right account, not the

13  duplicative account.

14  Q.   Mr. Daugherty wasn't disputing the fact that he was

15  current.  He was disputing the fact that it was -- the other

16  one was showing him in foreclosure.  So now you're telling

17  me that in November they put the XB code on his good

18  account.  Right?

19  A.   Yes, sir, that's correct.

20  Q.   And the effect of the XB code on the good account is

21  that when someone is scoring him, they can't even consider

22  the good account; correct?

23  A.   That is incorrect.

24  Q.   What is the effect of an XB code marked on his good

25  account when it comes to looking at his creditworthiness?

John Ulzheimer - Cross (Young)

1  A.   If the account is in good standing, the only thing that

2  would be excluded from the scoring process would be the

3  balance.  So any credit score that would have been

4  calculated while Mr. Daugherty's correct Ocwen tradeline was

5  XB coded would have been he would not have been penalized

6  for the debt owed on that account.

7  Q.   Under the Fair Credit Reporting Act, this XB code is

8  the notice of dispute code to use the technical language;

9  right?

10  A.   I don't think the FCRA refers to XB anywhere.  It just

11  requires that an item be shown as in dispute.  And that's --

12  the XB code is how the industry complies with that

13  requirement.

14  Q.   Okay.  So if the completeness or the accuracy of any

15  information furnished by any person to any consumer

16  reporting agency is disputed to such person by a consumer,

17  the person may not furnish the information to any consumer

18  reporting agency without notice that such information is

19  disputed by the consumer.  That is the law, isn't it?

20  A.   You named it, furnished to the credit bureau.  Ocwen

21  never, ever furnished this duplicative tradeline to any

22  credit bureau.

23  Q.   If the completeness or accuracy of any information --

24  A.   Keep going.

25  Q.   -- furnished by any person to any consumer reporting

John Ulzheimer - Cross (Young)

1 agency is disputed, the furnisher, Ocwen, can't furnish it

2 anymore without putting the XB code on it; right?

3 A.   You -- that's exactly right.  If Ocwen would have

4 furnished this duplicative account with all this big

5 foreclosure black mark stuff on it and Mr. Daugherty

6 contacted them and said, "You are furnishing an account to

7 Equifax that has a foreclosure and $6,000 past due and a

8 bunch of late payments associated with it that are wrong, as

9 the furnisher I want you to show it, you know, fix it."

10      Then as the furnisher, which they are not, Ocwen would

11 have been required to show it as XB coded because it would

12 have been in dispute.  But they are, they are not the

13 furnisher of that account.

14      Your expert and I both agree that Equifax is the cause

15 of that duplicative account, not it being furnished by any

16 servicer or any lender.

17 Q.   So it didn't have to be put on the code back in March

18 of 2013; correct?  That's your testimony?

19 A.   That's not what my testimony is.  You keep saying "have

20 to."  I've never said that.  I keep saying it was

21 systemically impossible because they didn't control that

22 account because they're not the furnisher of that account.

23 Q.   But somehow magically they could put the XB code on in

24 November.  What's changed between March and November?

25 A.   So they put the XB code on the one that they actually

John Ulzheimer - Cross (Young)

1   furnished, which is the non-duplicative account, the one

2   that Mr. Daugherty did not have a problem with.

3   Q.    Why didn't they put that XB code on way back in March?

4   A.    On -- Mr. Daugherty -- well, there was no foreclosure

5   associated with -- I don't believe, anyway -- the good

6   account or the non-duplicative account back in March.

7   Therefore, what he's challenging regarding that account

8   doesn't contain a big false foreclosure black mark on it.

9       I believe that was fixed -- or not fixed, modified

10  after Mr. Daugherty caught the payments back up.  And I

11  don't have the dates right, but I believe that happened

12  sometime in the prior year.

13  Q.    Will you agree that in March of 2013 that Equifax asked

14  Ocwen to confirm whether or not Mr. Daugherty's account was

15  current?

16  A.    Say -- okay.  So now we're talking about an indirect

17  dispute.  So you're asking me if Equifax sent an ACDV to

18  Ocwen in March of 2013?

19  Q.    Yes.

20  A.    Okay.  So I remember looking at almost two dozen ACDVs,

21  most of them sent throughout 2013 and 2014.  So I don't know

22  if there was one for March, but that is plausible.  That

23  makes sense because there were so many that were sent in

24  2013.

25  Q.    There were actually 24 sent from 2013 to 2014 and they

John Ulzheimer - Cross (Young)

1    were sent in groups of two.  You remember that from

2    reviewing them; correct?

3    A.    Yes, I do.

4    Q.    And each group of two ACDVs that came from Equifax to

5    Ocwen, each group of two had one ACDV where Equifax said,

6    "Please confirm that this gentleman is current."  You saw

7    that ACDV, didn't you?

8    A.    You're paraphrasing the dispute code.  But -- so I

9    don't believe it said exactly what you just said.  You're

10   paraphrasing it.  They asked for a variety of fields to be

11   investigated.  And if you'd like to hand me one of -- if you

12   want to look at ACDVs again, I'm happy to read the text of

13   the 106 code if you'd like me to.

14   Q.    Everybody's seen these ACDV codes, forms over and over

15   and over again.  You've seen them and you have them.  Isn't

16   that true?

17   A.    Many times, yes, sir.

18   Q.    And not only was there one sent in March which said

19   confirm that he's current, there was another one that said

20   confirm he's in foreclosure, $6,000 in default, and five or

21   more months past due.  Those two documents came in Ocwen's

22   hands in March of 2013.  Correct?

23   A.    I don't recall ever seeing an ACDV that said what you

24   just suggested.  Almost every ACDV that I saw disputed

25   liability, meaning not his or hers, the 001 code; and then

John Ulzheimer - Cross (Young)

1  three specific fields on a credit report, account status,

2  payment history, and I can't remember what the last one is.

3      But I don't recall any ACDV, any of the two dozen that

4  you're referring to ever saying anything about, "Please

5  confirm whether or not this account is in foreclosure or

6  past due." That's actually not even a dispute code. That

7  would have to go into the FCRA relevant box that's below the

8  dispute codes where someone can actually kind of key type in

9  the dispute.

10 Q.  So are you telling the jury that Ocwen didn't verify on

11 12 occasions both that my client was current and that he was

12 in foreclosure? That's your testimony; is that right?

13 A.  My testimony is that Ocwen was never asked to verify if

14 your client was in foreclosure. They were asked if the

15 account even belonged to your client, and then to verify the

16 three fields that were identified in the 106 or the 007

17 dispute code.

18 Q.  There is no such thing as a paper ACDV. It's really

19 just data that goes back and forth through this e-OSCAR

20 system. Is that fair?

21 A.  Well, the A stands for automated. So the CDV which

22 pre-dates the ACDV was a paper form of the same form.

23 Actually, if you kind of can think of a tablet of paper that

24 you rip the top one off to get to the next one, that's how

25 CDVs used to exist. But, no, in today's environment that

John Ulzheimer - Cross (Young)

1  form is sent in an automated environment which is why it's

2  called the ACDV.

3  Q.   So as far as this trial is concerned, Equifax sends

4  computer data electronically over to Ocwen.  And Ocwen can

5  either confirm the information reported, modify it, delete

6  it, or delete it as fraud.  Those are the four options when

7  Ocwen gets this information from Equifax.  Correct?

8  A.   That's right.  They can, they can verify what is in

9  dispute.  They can delete the tradeline.  They can -- if the

10 tradeline is caused because of fraud, that's a different

11 type of deletion.  But, yes, it essentially results in the

12 item being gone.  Or they can modify the account

13 accordingly.

14 Q.   So if I wanted to see how this ACDV process worked back

15 in March, I could go to Equifax and say, "Hey, let me see

16 your data."  And then they could print it out on a piece of

17 paper for me, couldn't they?

18 A.   I believe so, yes.  They can recreate the e-OSCAR,

19 which is that phone line we talked about, the e-OSCAR log.

20 Q.   And when they re-create it, it shows not only what they

21 sent over to Ocwen.  It shows what Ocwen sent back.

22 A.   That's correct, yeah, the response.

23 Q.   So if I go to Equifax and say, "Give me this," they're

24 going to print out a piece of paper that shows this data on

25 their template.  And if I go over to Ocwen and say, "Hey,

John Ulzheimer - Cross (Young)

1   give me that ACDV that shows the information that was

2   transmitted to you and sent back to Equifax," if they

3   printed it out, it would be on a different template.  They

4   wouldn't, they wouldn't be exactly the same.

5   A.   It would cosmetically look different, that's correct.

6   Q.   Yeah.  They're mirror images of each other, aren't

7   they.

8   A.   I'm not, I'm not -- mirror image means it would be

9   backwards.  It's the same information.  It's just

10  cosmetically laid out differently.  I think we're saying the

11  same thing.

12  Q.   I'm not exactly Bill Nye, The Science Guy.  You're

13  right.  A mirror would be reversal.  But the control

14  number -- there is a 16-digit control number that every ACDV

15  gets attached to; right?

16  A.   Yeah.  That's how you correlate.  That's right.

17  Q.   So whether we look at Ocwen's or Equifax's form,

18  they're both going to have the 16-digit number on them?

19  A.   If they're correlated, then they would be the same

20  control number, that's right.

21  Q.   Same account number, same name, same data; correct?

22  A.   That's right.

23  Q.   Of course, we couldn't -- a furnisher -- how long do

24  they keep these?  If I want to ask a furnisher say, "Hey,

25  what did you guys do in July of 2013," and I go to Equifax

John Ulzheimer - Cross (Young)

1  and they say, "Well, here's what we did, we can print it

2  out," if I go to Ocwen they should have the parallel

3  document, shouldn't they?

4  A.   I, I don't know.  I don't know what any furnisher's

5  policy is regarding document retention.

6  Q.   Is there any reason why Equifax could produce it and

7  Ocwen couldn't?

8  A.   Well, I mean, I guess the most obvious answer would be

9  that if Ocwen can't produce it but Equifax could, maybe

10  Equifax has a longer retention policy or maybe even systemic

11  ability to retain documents longer.  I don't know why they

12  would -- those are just kind of speculation as to why one

13  party would be able to and the other wouldn't.

14  Q.   Well, what if one of these ACDVs -- what if the

15  information on one of these ACDVs that, received by Ocwen

16  from Equifax and then responded back to Equifax, what if one

17  of those really, really could hurt Ocwen?  It wouldn't want

18  to keep that stuff around, would it?

19  A.   I don't -- what do you mean "hurt"?

20       MR. MANNING:  Objection, calls for speculation.

21  He's just said they're mirror images.  I don't know where

22  he's going with this.

23       MR. YOUNG:  I withdraw the question, Your Honor.

24       THE COURT:  All right.  The question has been

25  withdrawn, Mr. Manning.

John Ulzheimer - Cross (Young)

1      And you need to find a convenient stopping place,

2   Mr. Young.

3            MR. YOUNG:  This is it, Your Honor.

4            THE COURT:  All right.

5      Ladies and gentlemen, I'll give you your luncheon

6   recess.  While you're out, do not discuss this case among

7   yourselves or permit anyone to discuss it with you or in

8   your presence.  And please be in your jury lounge at 1:15.

9      We'll stand in recess.

10      (Recess taken from 12:00 p.m. until 1:20 p.m.)

11            THE COURT:  Good afternoon, everyone.

12      Mr. Young.

13            MR. YOUNG:  Thank you.

14   BY MR. YOUNG:

15   Q.   Mr. Ulzheimer, when I started my examination, or

16   cross-examination we talked about the big false foreclosure

17   black mark that I hypothetically have on my credit even

18   though I'm absolutely current on my mortgage.  And I think

19   you agreed with me that it wouldn't be unreasonable for me

20   to be angry and upset when I discovered that.  Correct?

21   A.   That's correct, yes.

22   Q.   And you also said it wouldn't be unreasonable for me to

23   believe that if I wrote a letter to my mortgage company that

24   it ought to be fixed; correct?

25   A.   I'm not sure I used those exact words, but I don't

John Ulzheimer - Cross (Young)

1    disagree with your paraphrasing.

2    Q.   Okay.  And I think you also said you probably ought to

3    send a letter to the credit reporter too; right?

4    A.   That's -- if you asked me what I would have done, I

5    said I would have burnt the candle at both ends by sending

6    it to the credit reporting agencies.

7    Q.   So, I'm angry and I'm upset.  This false foreclosure

8    black mark is on my credit.  And I send a letter to my

9    mortgage company and I tell the credit reporting agency that

10   this is wrong.  And I check my credit again and it's still

11   on there.

12        It's not unreasonable for me to be angry and upset that

13   even after I wrote my mortgage company and reported this to

14   the credit reporting agency that it's still on there, that's

15   not an unreasonable response, is it?

16   A.   That you're angry and upset?

17   Q.   Yes.

18   A.   I -- again, I'm not clinically trained, but I, I don't

19   disagree with your hypothetical.

20   Q.   I'm not talking medically.  I'm talking every day.

21   People get angry and they get upset, don't they?

22   A.   They do.

23   Q.   And if I got angry and upset when I saw it on there and

24   it shouldn't have been there and then when I tried two

25   different ways to get it fixed, that anger is going to get

John Ulzheimer - Cross (Young)

1   greater and the upset is going to get greater, isn't it?

2   A.   I, I, I don't know.  I'll, I'll concede that you would

3   be angry.  As far as the ascending degree of your anger, I,

4   I don't know.

5   Q.   Well, I sent a letter to my creditor.  I reported it to

6   the credit agency.  I tried to fix it and I failed.  Now,

7   let's say I try again and again and again and again and

8   again and again and again and again and again and I've tried

9   ten times and it's still there.

10       Would you agree that that is stress right there?  Ten

11  times I tried and failed to get a false statement off my

12  credit.  Would it be fair to say that I might be a little

13  bit stressed after ten times?

14  A.   I, I don't know.  I don't know if that would cause

15  stress or just continued anger.  I don't know.

16  Q.   If you tried ten times to fix your credit and it wasn't

17  fixed, you wouldn't feel a little bit stressed?

18  A.   I've personally never gone through that situation, so

19  I, I can't tell you how I might feel if that were to occur.

20  Q.   Well, what if I tried 15 times and it's still not

21  fixed?  You won't concede that I might be justifiably a

22  little bit stressed?

23  A.   If, if you're stressed because of that, then, okay.  I

24  don't -- again, I don't, I don't have a barometer for how

25  many of those would cause stress versus anger.  That's just

John Ulzheimer - Cross (Young)

1    not my specialty.  I'm sorry.

2    Q.    Okay.  Well, would I be unreasonable if I was stressed

3    out because 15 times I tried and failed to fix my credit?

4    Is that unreasonable?

5    A.    That you've tried 15 times and failed to correct --

6    Q.    Yeah.  Not if that's unreasonable.  Is it unreasonable

7    that I might be stressed out after failing 15 times to get

8    my credit fixed?

9    A.    I, I wouldn't purport to call you unreasonable for

10   anything regarding your own personal feelings about

11   anything, including the credit report process.

12   Q.    And when I get up to 20 times and it's still not fixed,

13   I still wouldn't be unreasonable to be stressed out over the

14   fact that I tried 20 times to get something untrue off of my

15   credit, would I?

16   A.    Again, I wouldn't, I would never purport to call you

17   reasonable or unreasonable regarding how you feel about

18   these things.  That's not my place to do that.

19   Q.    Put four more on there.  That's 24.  You reviewed 24

20   ACDVs, didn't you?

21   A.    Yes, sir, that's correct.

22   Q.    And you saw where there were two phone calls by

23   Mr. Daugherty to Ocwen complaining about this.  You saw

24   that, didn't you?

25   A.    Yes, sir, I did.

John Ulzheimer - Cross (Young)

1    Q.    And you saw the two letters that Mr. Daugherty sent to

2    Ocwen complaining about this, didn't you?

3    A.    I did, yes.

4    Q.    And you saw the three times the Federal Consumer

5    Agency -- what's the name of that agency again?

6    A.    I think you're referring to the CFPB, or the Consumer

7    Financial Protection Bureau.

8    Q.    And if three times they intervened on my behalf in

9    addition to the 24 ACDVs, the two phone calls, and the two

10   letters, I'm up to 32 times I have tried and failed to get

11   this big false foreclosure black mark off my record.  Am I,

12   am I -- hypothetically am I justifiably upset, distressed

13   about this?

14   A.    Again, I wouldn't purport to call you reasonable or

15   unreasonable to be stressed about this scenario or any other

16   thing in your life that may cause you discomfort.

17   Q.    Wouldn't you agree that after I failed to get this

18   untruth, this lie off of my credit, after I failed 32 times

19   that it may begin to affect my health, this stress?

20             MR. MANNING:  Objection, calls for speculation.

21             THE COURT:  Response to the speculation objection?

22             MR. YOUNG:  It's well within the scope of this

23   expert's testimony.  He testified as to damages.  And I'm

24   exploring that with the actual facts of this case, Your

25   Honor.

John Ulzheimer - Cross (Young)

1    THE COURT:  Anything further, Mr. Manning?

2    MR. MANNING:  Yes, Your Honor.  He's also said a

3  number of times, "I'm not a doctor."  And Mr. Young just

4  asked him about his health.  He's not a doctor.

5    THE COURT:  I'm going to sustain the objection,

6  Mr. Young, to the last question.

7    MR. YOUNG:  Okay.

8  BY MR. YOUNG:

9  Q.   I'm not going to ask you about health in the medical

10 sense, sir.  I'm going to ask you about stress that we all

11 encounter on a day-to-day basis.  And you understand that

12 kind of stress.  You've experienced it yourself, haven't

13 you?

14 A.   Sure.  Some things cause me stress.

15 Q.   And it would be -- would it be unreasonable for me to

16 be stressed when I failed 31 times to get the truth out,

17 that even after 31 tries there is still this black big false

18 foreclosure black mark on my credit?  That is the definition

19 of "stress," sir, isn't it?

20 A.   I'm not familiar with what the actual definition of

21 "stress" is.  Not to be curt, but I'm pretty sure it doesn't

22 have anything to do with big false foreclosure black marks.

23 But, again, I wouldn't purport to suggest that you wouldn't

24 be stressed from anything in your life.  I'm just not

25 qualified to identify things that are stressful --  I'm

John Ulzheimer - Cross (Young)

1    qualified to identify things that are stressful to me, not

2    to you or any other individual.  I'm sorry.

3    Q.   Well, assume further that after 31 attempts to get the

4    truth out and to get this lie off of my credit -- let me ask

5    it this way.  Should I have to file a lawsuit in the United

6    States District Court for the Southern District of West

7    Virginia to get this false report off of my credit?

8              MR. MANNING:  Objection, argumentative.

9              THE COURT:  The objection to it being

10   argumentative as well as the substance of it is sustained,

11   Mr. Young, for this witness.

12   BY MR. YOUNG:

13   Q.   Sir, after I file my lawsuit because my credit still

14   shows a lie and one more time I ask Ocwen to fix it and they

15   verify that I'm still in foreclosure, do you see anything

16   wrong with that?

17   A.   I can identify a lot of things that went wrong that

18   pre-date the filing of the lawsuit.  I'm not sure I --

19   again, if the item was not furnished by Ocwen and Ocwen

20   wasn't aware that it was being disputed, then I'm still of

21   the same opinion that they wouldn't know to investigate the

22   issue of duplicative tradelines.

23   Q.   This lawsuit was filed July 8th, 2014.  And you

24   reviewed the two ACDV responses from Ocwen back to Equifax

25   dated August 7, 2014, didn't you?

John Ulzheimer - Redirect (Manning)

1  A.   Yes, sir.

2  Q.   So I'm in the United States District Court.  I've had

3  all of these attempts to fix my credit and it's not fixed.

4  And when I come into court Ocwen says it's all my fault.  Is

5  that fair to blame all this on me that it's my fault that I

6  couldn't get this lie off of my credit?  Is it my fault?

7         MR. MANNING:  Objection, argumentative.

8         THE COURT:  Objection is sustained.

9  BY MR. YOUNG:

10  Q.   You did testify that Mr. Daugherty should have done

11  more, didn't you?

12  A.   I don't think I said that.  I'm pretty sure we all

13  identified Equifax as the root cause, not Mr. Daugherty.

14  Q.   So it's not your opinion in this case that

15  Mr. Daugherty is at fault for the fact that this lie

16  remained on his credit even after this lawsuit was filed.

17  Is that, is that your opinion?

18  A.   I'm hesitant to answer the question because I think my

19  answer is going to dovetail into a topic that Her Honor may

20  not want me to discuss.

21  Q.   Okay.  I'll withdraw the question.

22  A.   Okay.

23  Q.   I don't want to put you in any dilemma.

24  A.   Yeah.

25  Q.   Thank you very much, sir.

John Ulzheimer - Redirect (Manning)

1   A.    Thank you, sir.

2              THE COURT:  Redirect of this witness, Mr. Manning?

3              MR. MANNING:  Yes, Your Honor.

4                      REDIRECT EXAMINATION

5   BY MR. MANNING:

6   Q.    Let's start with this, Mr. Ulzheimer.  Is there

7   anything special about foreclosure on a credit report as

8   opposed to any other negative derogatory marks?

9   A.    No.  There are a variety of major derogatory entries on

10  a credit report.  Foreclosure's on par with many other

11  entries that are considered made or derogatory entries.

12  There's nothing super about a foreclosure relative to a

13  bankruptcy or a tax lien or a charge-off or a repo or a

14  collection.

15  Q.    Its size, shape, and color is not relevant?

16  A.    I'm sorry?

17  Q.    Its size and shape and color is not different or

18  relevant in any way?

19  A.    That just seems theatrical.  It's not -- none of

20  that -- none of those words are on a credit report except

21  for the word "foreclosure."

22  Q.    Let's get back to the facts.  Mr. Young was asking you

23  a variety of hypotheticals.

24  A.    Okay.

25  Q.    A couple of times you had said, "You're missing facts.

John Ulzheimer - Redirect (Manning)

1  You're missing assumptions."  So I'm going to provide you

2  with a couple of hypotheticals --

3  A.    Okay.

4  Q.    -- with some additional facts.

5        Hypothetically if in May, 2014, there was a mortgage

6  lender who denies Mr. Daugherty a mortgage loan after a

7  credit application is processed -- are you with me so far?

8  A.    Yes.

9  Q.    -- but that mortgage lender never looks at the Equifax

10 report --

11 A.    Okay.

12 Q.    -- so never sees the foreclosure duplicative account

13 that Equifax is reporting --

14 A.    Nothing on the Equifax report at all; right?

15 Q.    Right.

16 A.    Are we on the same page?

17 Q.    Yes.

18 A.    Okay.

19 Q.    What does that tell you about the cause of the denial

20 of that mortgage loan?

21 A.    Using your hypothetical, because the Equifax report was

22 not a component considered by the mortgage lender any reason

23 for denial, and there could be a variety of reasons for

24 denial of a mortgage loan, but none of them would have been

25 because of anything on an Equifax credit report because they

John Ulzheimer - Redirect (Manning)

1   never got it to consider it.

2   Q.   Okay.  Let me give you another one.  Let's say in July,

3   2014, Mr. Daugherty approaches a mortgage lender and that

4   mortgage lender stops the application process because

5   Mr. Daugherty tells them there's a foreclosure.  Are you

6   with me so far?

7   A.   Pre-underwriting or post-underwriting?

8   Q.   Good question.  Okay.  So define "underwriting."

9   A.   Appraisals are ordered.  You know, when you apply for a

10  mortgage loan, you're usually filling out a stack of

11  paperwork about aye thick.  And it's sent off to another

12  group of people whose role it is to actually assess the risk

13  of doing business with the applicant considering credit,

14  income, the loan-to-value of the home.  That's generally

15  referred to as underwriting.

16  Q.   Okay.  So thank you.  The hypothetical I want to give

17  you then is pre-underwriting.

18  A.   Okay.

19  Q.   So the facts of the hypothetical are there's a mortgage

20  lender in July, 2014, who stops the application process

21  because of that particular bank or representative's policy

22  not to proceed if there is a foreclosure.

23  A.   Okay.

24  Q.   But none of that stuff you just described was done.

25  A.   Okay.

John Ulzheimer - Redirect (Manning)

1   Q.   No appraisals, no loan-to-value.

2   A.   Pre-underwriting.

3   Q.   Yes.

4   A.   Okay.

5   Q.   Does that constitute denial of credit based on the

6   foreclosure?

7   A.   No.  A denial of credit would result -- well, a denial

8   of credit is a denial of credit.  And I realize that's kind

9   of a silly way of putting it.  But when a denial of credit

10  occurs, it sets into motion an additional series of events

11  which would include the declination letter, the adverse

12  action letter notifying the consumer of his rights, et

13  cetera, et cetera -- we looked at a couple of those letters

14  before lunch -- just telling somebody, you know, "We can't

15  go any further, we're not even going to go to underwriting,"

16  that's not a denial.

17       And the reason that's meaningful and relevant is

18  because you can be denied a mortgage loan for something

19  other than a credit report.  If, if I have a fantastic

20  credit report, yet I am trying to borrow too much money

21  relative to my income, I'm going to be denied.

22       I can have a fantastic credit report and a huge income.

23  However, if I'm trying to borrow $100,000 for a house that

24  appraises for $50,000, I'm going to be denied because what

25  is referred to as the LTV, or loan-to-value, is out of

John Ulzheimer - Redirect (Manning)

1    whack.

2        So you can't just -- that's why you have to let

3    underwriting completely proceed so that all of these other

4    non-credit related metrics can, or measurements can occur

5    before you truly approve or deny a mortgage application.

6    Q.   So in light of that, what does the fact that there was

7    no actual denial of credit, no adverse action letter that

8    actually occurred, what does that tell you about whether the

9    foreclosure was a factor?

10   A.   It couldn't have been a factor because underwriting

11   didn't proceed.  It's kind of casually telling someone,

12   "Hey, you shouldn't apply for credit because I don't think

13   you're going to be approved."

14   Q.   I'd like to move on to the hypotheticals about stress.

15   A.   Okay.

16   Q.   So here's a hypothetical about stress.  Let's say you

17   want to get your car fixed.

18   A.   Okay.

19   Q.   And you bring it into the mechanic and you drop it off

20   and say, "Fix my car."

21   A.   Okay.

22   Q.   And the mechanic returns it.  The oil is changed.  And

23   you get in there and like, "He didn't fix my car."  Are you

24   justified in feeling stressed by that?

25   A.   In your example, and I don't know if you meant to --

John Ulzheimer - Redirect (Manning)

1   you didn't really tell me what's wrong with the car.  You

2   just kind of vaguely said, "Hey, fix my car."  And I'm not a

3   mechanic, but I'm pretty sure cars have a lot of -- I've

4   paid for enough repairs to know that cars have a lot of

5   things that can go wrong with them.

6       So I don't think you can -- you can't just assume that

7   just because you say, "Hey, fix my car," and you get it back

8   and whatever you in your mind thought was wrong or if it

9   wasn't addressed because you didn't, you didn't focus the

10  mechanic on, I don't know, the, the noise in the rear-end

11  housing -- I don't know.  You see where I'm headed.

12  Q.   Right.  Whatever it is that you were concerned about

13  wasn't identified to the mechanic.

14  A.   I didn't tell you what to fix or what I -- I didn't

15  tell you anything to diagnose what I think is wrong with my

16  car.

17  Q.   Okay.  What if you do that ten times?  Are you anymore

18  justified in feeling stressed?

19  A.   Again, I'm not a stress expert, but I wouldn't -- you

20  know, what's the saying?  Fool me once, shame on you; fool

21  me twice, shame on me.  If I recognize that I'm not

22  providing enough information to this mechanic over and over

23  and over again, I think eventually I would, I would tell him

24  or her, you know, "Stop trying to fix my radio.  It's really

25  the sound in the engine that I'd like you to focus on."

John Ulzheimer - Redirect (Manning)

1  Q.   Okay.  I'm going to give you another hypothetical.

2  A.   Okay.

3  Q.   That one was just you and the mechanic.  Now you've got

4  a friend and your friend is good with cars.

5  A.   Okay.

6  Q.   Okay?  And you ask your friend, "Hey, can you help fix

7  my car?"  And your friend takes your car and drops it off at

8  the mechanic.  He doesn't tell the mechanic anything except,

9  "Please fix the car."  So it's you giving it to a third

10  party who drops it off at the mechanic.  But the message is

11  the same, "Fix the car."  And it comes back with an oil

12  change.  Are you justified in feeling stressed?

13  A.   I kind of don't think I needed my friend in that

14  scenario, though, because I could have dropped it off at the

15  mechanic shop myself.  So it seems like I'm not optimizing

16  the process.  And that seems like something that I think I

17  would do.

18     I wouldn't ask someone to fix my car and then have he

19  or she just drop it off at the dealership.  I could have

20  done that.  And, certainly, I would say -- look, this is me

21  personally.  If something was wrong with my car, I would

22  take it upon myself to take it to a fix-it shop and tell

23  whoever the person was who was in front of me, "Look, Mr.

24  Smith, I'm pretty sure I've got something wrong with my

25  engine because it's making this funny noise.  Can you

John Ulzheimer - Redirect (Manning)

1  please --" you know, "I'll either recreate it for you and

2  you can look at it and I'll show it to you.  Here it is.

3  Can you please address that issue?  Thank you very much."

4  Q.    But what if, what if you didn't know what the problem

5  was and you were hoping your friend would help you?

6  A.    Okay.

7  Q.    In that hypothetical -- and your friend doesn't give

8  any additional information to the mechanic than you -- is

9  that justified in the fact that it still wasn't resolved?

10  A.    I think I'd be more angry with my friend because if he

11  or she portrayed himself as, I think you said knowing a lot

12  about cars, I think dropping it off at a dealership really

13  isn't indicative of knowing a lot about cars.

14      So I think I would be actually more angry with my

15  friend rather than the mechanic.  We're still not giving the

16  mechanic the relevant information which is clearly

17  identifying what in the world I believe is wrong with my

18  car.

19  Q.    So in all those -- I can't remember the number that

20  Mr. Young provided.  We know approximately 24 ACDVs, two

21  telephone calls, two letters.

22  A.    I think we were at 31 on his chart.

23  Q.    Okay.  In any of those, was the actual problem

24  identified?

25  A.    No.  I never saw any, anything that led me to believe

John Ulzheimer - Redirect (Manning)

1   that someone actually said, "We have a duplicative

2   tradeline.  Obviously, I don't have two loans with, with

3   this company.  That's erroneous.  Address it."  I didn't see

4   anything that said that.

5   Q.   As a result, is there any basis for plaintiff to be

6   seeking Ocwen's responsibility for causing him damages?

7   A.   I don't believe so.

8   Q.   Thank you.

9              THE COURT:  Sir, you can --

10             MR. MANNING:  No further questions.

11             THE COURT:  Sir, you can step down.

12             THE WITNESS:  Thank you, ma'am.

13             THE COURT:  Call your next witness.

14             MR. MANNING:  Your Honor, the defense rests.

15             THE COURT:  Any rebuttal evidence, counsel?

16             MR. YOUNG:  No rebuttal, Your Honor.

17             THE COURT:  All right.

18       Ladies and gentlemen of the jury, I'm going to excuse

19   you to your jury lounge.  While you're out, do not discuss

20   this case or permit anyone to discuss it with you or in your

21   presence.  And be in your jury lounge at a quarter after the

22   hour.  We'll stand in recess for your purposes.

23       (Jury retired to the jury room at 1:45 p.m.)

24             THE COURT:  All right, counsel, I will shortly

25   have the charge brought to you so that you can have a little

1  time here to review it before I charge the jury.

2       How much time do you want to argue this case?

3             MR. YOUNG:  Plaintiff would like 30 minutes.  We'd

4  like to use at least 20 of it to begin with and reserve 10.

5             THE COURT:  All right.  Is that sufficient, Mr.

6  Manning?

7             MR. MANNING:  I haven't actually timed it, but I

8  think I can do it in 45.

9             THE COURT:  Given the amount of evidence in this

10  case, that seems lengthy to me.  Why don't I help a little

11  bit and give you both 35 minutes a side.

12            MR. MANNING:  That's fair, Judge.

13            THE COURT:  All right.

14            MR. YOUNG:  I'd like to allot mine, Your Honor, 25

15  and 10.

16            THE COURT:  And does that mean that you want to be

17  noticed when you are about to use 25?  Because I don't

18  interrupt people unless you ask me to.

19            MR. YOUNG:  I'll interrupt Mr. Nolan if he runs

20  over because he's running into my time after that.

21            THE COURT:  All right.  He would probably me

22  rather do it than you, but that's fine.

23       Counsel, I want to put on the record my Rule 50 ruling

24  based on your arguments here this morning.

25       I have reviewed your arguments relative to the

1    defendant's Rule 50 motion for judgment as a matter of law.

2        I find, counsel, in viewing this evidence in the light

3    most favorable to the plaintiff that the evidence is, in

4    fact, sufficient to go to the jury on the issues of whether

5    the defendant conducted a reasonable investigation on the

6    issue of willfulness as well as the issue of causation.

7        When the evidence, in my opinion, is viewed as

8    required, given the testimony of the plaintiff, the

9    testimony of Tina Daugherty, the witness Hendricks, Napier I

10   believe was the name, and even that, quite frankly, of

11   Sandra Lyew, as well as the documents that were admitted

12   into evidence, I find there is sufficient evidence for the

13   jury's consideration of non-economic damages, particularly

14   in light of the defendant's and his wife's testimony.

15       In other words, I find that the evidence is such that a

16   reasonable jury could find for the plaintiff on those

17   issues.

18       Now, I have not seen all of the documents that have

19   been admitted into evidence.  I've listened carefully to

20   what I understood was being presented.

21       Based on my review, I agree with the defendant that the

22   plaintiff has not presented any evidence that quantifies

23   economic damages which would result in the jury having to

24   speculate about those damages.  And, therefore, as it

25   relates to economic damages, the motion is granted.

 1          In other words, there was no evidence, for instance, to

 2     indicate if the defendant had been able to obtain a loan

 3     what the difference economically would have been for him

 4     then as opposed to obtaining it at some later date.

 5          So since that's not been quantified for the jury, the

 6     jury would be required to speculate.  So I grant the motion

 7     as it relates to that.

 8          The defendant has also objected and specifically relied

 9     on the *Safeco* case as it relates to the issue of

10     willfulness.

11          I find that the holding in that case is not applicable

12     to the facts in this case.  I've reviewed the case law.  And

13     specifically if we look to the *Safeco* opinion, as you all

14     will recall, the Court, the District Court reviewed motions

15     for summary judgment for both a case related to *Safeco* and

16     one related to *Geico*.  Those cases were later consolidated

17     on appeal.

18          As I recall, the District Court granted summary

19     judgment in favor of both of those entities, and the Court

20     of Appeals reversed on one and I believe reversed and

21     remanded on the other.

22          And on appeal before the Supreme Court after they

23     granted cert. the Supreme Court with respect to the *Safeco*

24     *Insurance Company* found that there was some ambiguity given

25     how *Safeco* was determining its premium rates for first-time

1  insurance customers.

2      They found that there was some ambiguity inasmuch as

3  the rate was not the best rate depending on -- the rate was

4  awarded, I believe, based on your credit score. And in the

5  case of the two plaintiffs in this case, they did not

6  receive the best rate because of their credit score.

7      So there was a lot discussion in the case as to whether

8  or not that constituted an increase in the premium rate

9  which would be adverse action which would trigger the notice

10 provision.

11     The Court found that there was nothing in the statute

12 to indicate when you would count something as an increase.

13 They also found that there was no precedent by any appellate

14 court which would have guided *Safeco* in its determination as

15 to whether or not a notice was required under those

16 particular facts.

17     And that being the case, the Court indicated that there

18 was no -- that *Safeco's* reading of the statute was not

19 objectively unreasonable. It was somewhat amusing that they

20 also indicated in finding that it was not objectionably

21 unreasonable that it had been sufficient to convince the

22 appellate court that it was correct.

23     So looking at that case, in other words, looking at the

24 facts of this case, I find that it's not applicable. This

25 case is about reasonable investigation. No *Safeco* type

1   situation exists in this case.  The statute isn't ambiguous.

2   And, plus, we all know that there's been precedent in case

3   law sufficient to guide a furnisher like Ocwen at least

4   since -- at least since 2004 if we look to the *Johnson* case.

5   So there's been precedent and there's no ambiguity in the

6   statute like the facts in *Safeco* presented for the Court's

7   consideration.

8       So, again, I find that there is sufficient evidence

9   here, should the jury decide to accept it, to support a

10  finding of willfulness.  I preserve the defendant's

11  objection and exception to my findings with respect to

12  reasonable investigation, causation, and willfulness, as

13  well as non-economic damages going to the jury.  I preserve

14  the plaintiff's objection relative to my finding as to

15  economic damages.

16      I'll have someone to bring in to you all the charge and

17  you can review it and then I'll take the bench here shortly.

18          MR. MANNING:  Your Honor, --

19          THE COURT:  Yes, sir.

20          MR. MANNING:  -- now that we've completed our

21  case, we would renew our Rule 50 motion based on Mr.

22  Ulzheimer's testimony on the issues that we've already

23  discussed with Your Honor.

24          THE COURT:  All right.  Response, Mr. Nolan?

25          MR. YOUNG:  I'm sorry, Your Honor?

1    THE COURT:  I asked Mr. Nolan if he had a response

2    to the renewal of the Rule 50 motion now that Mr. Ulzheimer

3    has testified.

4    MR. NOLAN:  Your Honor, I believe Mr. Ulzheimer's

5    testimony just further supports our claim that they do not

6    have reasonable investigation policies and procedures in

7    place because he's testified that they can restrict their

8    investigation to the dispute code contained in the CRA and

9    not look at all the relevant information on the ACDV and not

10    look at other relevant documents when they receive these

11    disputes.  And based on his testimony, we should still be

12    allowed to proceed on that count.

13    And, further, he testified regarding the types of

14    non-economic damages the plaintiff is seeking in this

15    matter.  We believe that nothing in his testimony has

16    affected the Court's ruling from before.

17    THE COURT:  Giving consideration to the witness's

18    testimony, I reaffirm the rulings that I have placed on the

19    record, finding that those matters that I've indicated are

20    proper for the jury's consideration remain so.

21    You reminded me -- and I preserve the defendant's

22    objection and exception.

23    You reminded me as you stood, Mr. Nolan, that during

24    the course of your argument relative to the Rule 50 motion

25    you at least impliedly requested judgment as a matter of law

1   for the plaintiff on a couple of issues.  And I deny that,

2   finding those issues are appropriate for the jury's

3   consideration, preserving an objection and exception for you

4   if it was your intent to argue it.  I know it was at least

5   implied by the statements that you made in support of your

6   argument.

7           MR. NOLAN:  Yes, Your Honor.

8           MR. YOUNG:  Your Honor, I was trying to rise

9   before you left the bench to raise that.  It's been

10  addressed and thank you.

11          THE COURT:  All right.  I'll return shortly,

12  counsel.

13      (Recess taken from 1:57 p.m. until 2:23 p.m.)

14          THE COURT:  Counsel, I don't know if you've had an

15  opportunity to get through the charge or not, but you will

16  see that I've tried to keep the substantive portion as

17  simple for the jury as I possibly can.

18      Plaintiff, have you finished?

19          MR. NOLAN:  Yes, Your Honor.

20          THE COURT:  Mr. Nolan, objections to the charge?

21          MR. NOLAN:  No, Your Honor.

22          THE COURT:  All right.

23      Defendant, have you completed your review?

24          MR. MANNING:  Not yet, Your Honor.

25          THE COURT:  All right.  How much longer do you

```
 1    need, Mr. Manning?

 2              MR. MANNING:  I'm making good progress.  I'm on

 3    Page 16.

 4              THE COURT:  All right.  Thank you.

 5         (Pause)

 6              THE COURT:  Mr. Manning, I assume that you know

 7    that there were no instructions filed on behalf of the

 8    defense.

 9              MR. MANNING:  We, we did provide instructions,

10    Your Honor.  We actually sent them straight to the clerk in

11    chambers.  And this was way back.  And we actually called

12    and confirmed that.

13              THE COURT:  I don't know who you spoke with, but

14    this is my clerk and we received no instructions nor were

15    there any filed by the deadline set forth in the scheduling

16    order.  I just wanted to make sure that you all knew that.

17              MR. MANNING:  No, Your Honor.  And I actually have

18    some e-mail confirmation of this.  So I'd be happy to

19    provide that to you.

20              THE COURT:  That's fine.  And who is your e-mail

21    from?

22              MR. MANNING:  I will find out.

23              THE COURT:  All right.

24         Mr. Kenney, are you completing those?

25              MR. KENNEY:  Yes, I will.
```

```
 1              THE COURT:  Thank you.  That will let us proceed.
 2         (Pause)
 3              THE COURT:  All right, Mr. Kenney, let's begin
 4    with your objections, please.
 5              MR. KENNEY:  Your Honor, may I go out in the
 6    hallway and grab Mr. Manning just because he wrote these
 7    earlier notes so I'd like to get his insight on what he
 8    meant --
 9              THE COURT:  And if you need to take over looking
10    for an e-mail or something, that's fine but I want to get on
11    with this.
12              MR. KENNEY:  Yes, Your Honor.  Thank you.
13              THE COURT:  Yes, sir.
14         (Pause)
15              MR. MANNING:  Karen Sword on October 26th.
16              THE COURT:  Of last year?
17              MR. MANNING:  Yes.
18              THE COURT:  All right.  I will check.  But we have
19    been looking for them and not received them.  But I will
20    check.  Karen Sword is my Judicial Assistant, Mr. Manning.
21              MR. MANNING:  And she did confirm that we were not
22    to file them.  She said the order says send them to
23    chambers.  Do not file them.  And, so, that's why we did not
24    file them on ECF.  We sent them to chambers pursuant --
25    because the order doesn't say that.  It doesn't say file.
```

1    So we called to make sure.

2          THE COURT:  All right.

3          MR. MANNING:  Karen Sword confirmed, "Yes,

4    e-mail."  And then she responded, "I have received them," on

5    that date.

6          THE COURT:  Well, I apologize to you.  There's

7    some mixup then because I have checked with her as well as

8    the law clerks as I was trying to prepare the charge and

9    unable to locate them.

10          MR. MANNING:  Would you like me to forward that

11   e-mail to you right now?

12          THE COURT:  No, it's not necessary.  I accept your

13   word, Mr. Manning.

14          MR. MANNING:  Okay.

15          THE COURT:  Let's proceed with your objections.

16   The jury is waiting.

17          MR. MANNING:  Well, Judge, the disadvantage I'm at

18   is obviously the Court hasn't considered our jury

19   instructions.

20          THE COURT:  I have not.  But you have considered

21   the charge and you can tell me what objections you have to

22   what's in it and what isn't.  And if there's something that

23   I need to put in it, I'm certainly open to doing that.  But

24   we need to get on with it.  I'm ready.  Let's begin, Mr.

25   Manning, with your objections.

1    MR. MANNING:  Judge, very candidly, I haven't had

2 the opportunity to finish reviewing these, but I will make

3 the ones that I can.

4    THE COURT:  I'm sorry.  When you left you were on

5 Page 16.  And I then asked Mr. Kenney if he was continuing

6 the review which I thought meant he would take up the

7 objections.  And he wanted to come and get you.

8    So between the two of you, maybe he's completed from 16

9 through.  I'll hear from either of you.  But the jury's

10 waiting and I want to get on with the objections.

11    Go ahead, please.

12    MR. MANNING:  On Page 15, Your Honor, it says,

13 "The Court instructs the jury that to determine whether

14 Ocwen conducted a reasonable investigation," right at the

15 bottom of the page --

16    THE COURT:  Uh-huh.

17    MR. MANNING:  -- insert there "of the dispute,"

18 comma.

19    THE COURT:  Of the defendant's dispute?

20    MR. MANNING:  Well, the plaintiff's dispute.

21    THE COURT:  Plaintiff's dispute.

22    Any objection, counsel?  I think that's clarity.

23    MR. NOLAN:  No objection, Your Honor.

24    THE COURT:  All right.

25    MR. MANNING:  Moving forward from there, right

1  where you left off, Judge, "You must consider," and then

2  insert "the information Ocwen received from the credit

3  bureau," comma.

4          THE COURT:  Okay.  That is included in the

5  statutory language.  This is a different concept of

6  considering each of the steps it took and what steps it

7  might have taken but did not.

8      The statutory language tells them "review all relevant

9  information provided by the consumer reporting agency."  So

10  that's the issue that you're talking about.

11          MR. MANNING:  Yes, Your Honor.

12          THE COURT:  It's included on Page 13, Mr. Manning.

13          MR. MANNING:  And, Your Honor, because it's not

14  included two pages later, I want to include just those five

15  words because in context is how people understand things.

16  And it says -- it's telling the jury what you must consider

17  for a reasonable investigation.  And it says --

18          THE COURT:  All right.

19          MR. MANNING:  And it needs to say "the information

20  Ocwen received from the credit bureau," comma.

21          THE COURT:  All right.  I will give consideration

22  to that language.

23      Any objection, Mr. Nolan?

24          MR. NOLAN:  No objection to Your Honor considering

25  it.

1      THE COURT:  All right.  Go ahead, Mr. Manning.

2      MR. MANNING:  On the next page, Page 16 --

3      THE COURT:  Uh-huh.

4      MR. MANNING:  -- "under the law any information

5  Ocwen furnishes to a credit bureau."  Do you see where I'm

6  reading?

7      THE COURT:  Yes, sir.

8      MR. MANNING:  Insert "about the dispute" and then

9  continue "must be complete and accurate" consistent with the

10  statute.

11     THE COURT:  I don't think it's necessary but I

12  certainly have no objection to adding it.  I think the jury

13  understands that this is all about the dispute raised by the

14  plaintiff.

15     Go ahead, sir.

16     MR. MANNING:  At the bottom of that same

17  paragraph, it's the paragraph that ends "consumer's

18  dispute."

19     THE COURT:  Uh-huh.

20     MR. MANNING:  Instead of period make it a comma.

21  "Though it need not resolve --" what the first part of the

22  sentence is saying is it can't be casual, hasty, or

23  superficial.  That's all plaintiff's language.  I'd like to

24  add a second clause where it says "though it need not

25  resolve the dispute or discover the validity of the

1   dispute." It needs to be balanced because it's mutual.

2   Reasonableness is both sides.

3        THE COURT:  I am going to deny adding that.  This

4   language is directly from the case law.  It isn't the

5   plaintiff's language.  This is directly from case law in my

6   effort to try to get the jury to understand what constitutes

7   a reasonable investigation.

8      You're certainly free to argue that, counsel, but this

9   is directly from the case law that I read in trying to

10  prepare your charge.

11       MR. MANNING:  And --

12       THE COURT:  I preserve the defendant's objection

13  and exception.  Next objection.

14       MR. MANNING:  Judge, I certainly understand that I

15  would -- since we don't need to add it right there, it just

16  needs to be balanced somewhere in that instruction that the

17  requirement isn't -- it's, it's reasonable investigation.

18  The requirement isn't discover the true cause or fix the

19  issue.  That's not in here yet.  We need to balance it.

20       THE COURT:  Well, --

21       MR. MANNING:  It's only one way.

22       THE COURT:  Again, you can argue that, but this is

23  the law lifted directly from the case law.  And I preserve

24  your objection.  Let's move on, Mr. Manning, to your next

25  objection.

1          MR. MANNING:  Paragraph 9, damages.

2          THE COURT:  Uh-huh.

3          MR. MANNING:  My understanding was we needed to

4    modify this instruction because all that's left is

5    non-economic damages.  And here it really doesn't specify

6    what they're talking about.

7          THE COURT:  Well, it says compensatory.  And

8    compensatory damages include non-economic damages.  And

9    there is language at the bottom of Page 17 which goes into

10   the issues for which they can award damages -- I know you

11   haven't read that yet -- which will also be included on the

12   jury verdict form.

13         MR. MANNING:  The -- currently the way the

14   instructions -- there's no distinction between economic and

15   non-economic made.

16         THE COURT:  Uh-huh.

17         MR. MANNING:  And I think that needs to be part of

18   the instructions to the jury so that they understand what

19   they're, what they're being asked to find in terms of

20   damages.

21         THE COURT:  I understand your position.  I

22   overrule it again because the charge does not refer to

23   economic damages and it does specifically state those items

24   of damages for which they can or cannot award damages and

25   the jury verdict form will have those specifics on it to

1    ensure that they aren't awarding damages, if they award any

2    at all, for items that are not included in my charge.

3        All right.  Next objection, please.

4            MR. MANNING:  I'm checking to see if there's

5    anything else in that "damages" section that I need to

6    mention here.

7        (Pause)

8            MR. MANNING:  Your Honor, the only other objection

9    I have is that the Court be permitted the opportunity to

10   consider the jury instructions --

11           THE COURT:  That you submitted.

12           MR. MANNING:  -- that we submitted back in

13   October, 2014.

14           THE COURT:  All right.

15           MR. MANNING:  I'm sorry.  It would have been 2015.

16   I forgot where we were in the years.

17           THE COURT:  That's fine.  Let the jury know that

18   they're going to have 15 to 20 additional minutes, please,

19   Officer, while I look at those instructions.

20           COURT SECURITY OFFICER:  Yes, ma'am.

21       (Recess taken from 2:41 p.m. until 2:50 p.m.)

22           THE COURT:  Let me say this to you all.  It is 10

23   till 3:00 and there are 30 some instructions I want to go

24   through because this is my error.  So I'm contemplating

25   sending the jury home.  Either of you want to take a

```
 1   position?

 2           MR. YOUNG:  We, we don't have any position, Your

 3   Honor.  It's entirely up to the Court.

 4           THE COURT:  All right.

 5           MR. KENNEY:  We would certainly just like the

 6   Court to consider our instructions so --

 7           THE COURT:  I want to take time to do that.  I

 8   think that's fair and appropriate.  But I believe it will

 9   take some time for me to do that and to also incorporate any

10   that I believe should be included in the charge.

11       So in the meantime, the jury is just waiting.  And once

12   I finish it, and I don't know when that will be, whether or

13   not you'll have time to get your closings in and they will

14   have any time left to deliberate today anyway.

15       So my proposal is that we start fresh on Monday

16   morning.  No objection I take it.

17           MR. YOUNG:  None, Your Honor, on behalf of

18   plaintiff.

19           THE COURT:  Let's get the jury.

20       And, Mr. Kenney, my apologies to your client for my

21   error.

22           MR. KENNEY:  We understand, Your Honor.  Thank

23   you.

24       (Jury returned into the courtroom at 2:51 p.m.)

25           THE COURT:  You all be seated, ladies and
```

1    gentlemen.

2        I am going to release you all for the evening.  I have

3    some work to do and I don't want you to be locked back there

4    in the jury room waiting on me and I'm not sure how long it

5    will take me.  So I'm going to release you for the weekend.

6        While you're out, do not discuss this case among

7    yourselves or permit anyone to discuss it with you or in

8    your presence.  Don't listen to, view, or read any media

9    coverage that there might be of the trial.  And please be in

10   your jury lounge promptly at 9:30 on Monday morning.  Have a

11   good, restful weekend.

12       (Jury excused from the courtroom at 2:53 p.m.)

13           THE COURT:  All right, counsel, I will take the

14   opportunity to review the instructions and provide you with

15   a new copy of the charge of any that I've incorporated on

16   Monday morning at 9:00.  And the jury will be here at 9:30.

17       You all have a good, restful evening.  We'll stand in

18   recess for your purposes at this point.  Thank you all.

19       (Trial recessed at 2:54 p.m.)

20

21

22

23

24

25

1          I, Lisa A. Cook, Official Reporter of the United

2   States District Court for the Southern District of West

3   Virginia, do hereby certify that the foregoing is a true and

4   correct transcript, to the best of my ability, from the

5   record of proceedings in the above-entitled matter.

6

7

8          s\Lisa A. Cook                    June 17, 2016

9             Reporter                           Date

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25