IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA
BECKLEY DIVISION

DAVID M. DAUGHERTY,                                    PLAINTIFF

V.                                                     CIVIL ACTION NO. 5:14-cv-24506

OCWEN LOAN SERVICING, LLC,                             DEFENDANT

**PLAINTIFF'S RESPONSE IN OPPOSITION TO DEFENDANT'S MOTION FOR A
NEW TRIAL OR ALTER THE JUDGMENT**

Plaintiff David Daugherty brought suit against Defendant Ocwen Loan Servicing for

negligent and willful violations of the Fair Credit Reporting Act (FCRA). The jury returned a

verdict for David Daugherty, finding that Ocwen willfully violated the FCRA and awarded Plaintiff

compensatory damages in the amount of $6,128.00 and punitive damages in the amount of $2.5

million. David Daugherty now opposes Ocwen's motion for new trial or alter the judgment.

**LEGAL STANDARD**

Rule 59(a)(1) of the *Federal Rules of Civil Procedure* ("FRCP") states:

*Grounds for New Trial*. The court may, on motion, grant a new trial on all or some
of the issues--and to any party--as follows:
(A) after a jury trial, for any reason for which a new trial has heretofore been granted
in an action at law in federal court.

A Rule 59 (a) motion will be granted if "(1) the verdict is against the clear weight of the evidence,

or (2) is based upon evidence which is false, or (3) will result in a miscarriage of justice, even

though there may be substantial evidence which would prevent the direction of a verdict." *Atlas*

*Food Systems v. Crane National Vendors, Inc.*, 99 F.3d 587, 594 (4th Cir. 1996). An appellate court

will not overturn a judgment on the grounds that evidence was erroneously admitted unless justice

so requires or a party's substantial rights are affected. *Creekmore v. Maryview Hosp.*, 662 F.3d 686,

693 (4th Cir.2011). The discretion bestowed under Rule 59 "should be exercised sparingly." *United*

*States v. Arrington*, 757 F.2d 1484, 1486 (4th Cir.1985); see also *United States v. Perea*, 458 F.2d

535, 536 (10th Cir.1972) ("A motion for a new trial is generally not regarded with favor, and is granted only with great caution.").  On a motion for a new trial, the Court must exercise its "independent judgment after a weighing of all the evidence and any other pertinent factors" and "determin[e] whether the verdict was against the clear weight of the evidence or would result in a miscarriage of justice." *Williams v. Nicols*, 266 F.2d 389, 393 (4th Cir.1959).

> A motion under Rule 59(e) is much stricter:

> The United States Court of Appeals for the Fourth Circuit has recognized three grounds for amending an earlier judgment: (1) to accommodate an intervening change in controlling law; (2) to account for new evidence not available at trial; or (3) to correct a clear error of law or prevent manifest injustice. *Pacific Ins. Co. v. Am. Nat'l Fire Ins. Co.*, 148 F.3d 396, 403 (4th Cir.1998).

Rule 59(e) motions may not be used to raise arguments which could have been raised prior to the issuance of the judgment, nor may they be used to argue a case under a novel legal theory that the party had the ability to address in the first instance. *Id*. A Rule 59(e) motion may not be used to relitigate old matters and is an extraordinary remedy that should be used sparingly. *Id*. It is improper to use such a motion to ask the court to rethink what the court has already thought through--rightly or wrongly.  *Moore v. Life Ins. Co. of N. Am.*, 708 F. Supp. 2d 597, 614 (N.D.W. Va. 2010), aff'd, 439 F. App'x 245 (4th Cir. 2011) (internal citations omitted).

## ARGUMENT

None of Ocwen's arguments -- taken individually or together -- convey the substantial error required to secure a new trial.  Ocwen's corporate representative and expert confirmed that Equifax's ACDV contained precisely the same information as Ocwen's ACDV.  Plaintiff's expert did not exceed his report and only testified to common sense interpretations of the ACDV.  Lorin Hanks' and Aggressive Credit Repair's ("ACR") testimony were  irrelevant to any issue in this case, as Ocwen never had any communication or relied on any information from ACR when investigating

Plaintiff's disputes.  Ocwen refused to provide any evidence regarding its financial status, refused throughout this litigation to disclose its financial information despite Plaintiff's repeated requests, failed to make its witness available despite knowing that this issue loomed, failed to object on relevancy grounds at trial, and adopted and compellingly relied on the consolidated financial information of its parent corporation at trial.  Ocwen has not been prejudiced by its litigation strategy of withholding information from the Plaintiff.

**A.      Admitting Equifax's Records Prevented Prejudice to Plaintiff Due to Ocwen's Refusal to Disclose Its Own Records.**

At issue are eight ACDV's (Automated Consumer Dispute Verifications) printed off by Equifax instead of Ocwen. ACDV's are not documents.  Each is an exchange of data between the reporter of credit information (Equifax) and the furnisher of that information (Ocwen).  When a consumer such as Plaintiff disagrees with credit information shown in a consumer credit report, the consumer can dispute that information to the reporter of the information (Equifax). This dispute triggers an automated exchange of data between the reporter (Equifax) and the furnisher of the information (Ocwen). This is the e-Oscar system used by the three major credit reporting agencies.

When the system is triggered by a dispute, Equifax electronically transmits all of the credit information it is reporting back to Ocwen with a "code" to indicate the nature of the dispute. Under the FCRA, Ocwen is then required to reasonably investigate and respond, with one of four options: confirm the information's accuracy, modify the information as directed, delete the information, or delete the information due to fraud.  Such electronic response by Ocwen back to Equifax either verifies that the transmitted data is correct, or provides Equifax with corrected completed data.

At that point there are two complete sets of identical data, one set of data residing in that portion of cyberspace controlled by Ocwen, and its twin, the set of data residing in cyberspace controlled by Equifax.  In the normal course of business, there are no ACDV forms.  (Ex. 1, Trial

Tr. Vol.  V, 89-90, Testimony of Defendant Expert Ulzheimer) But if either Equifax or Ocwen is asked to produce a completed ACDV investigation, each will populate the identical data into its own paper "form."  According to Ocwen's own expert, John Ulzheimer, Ocwen and Equifax forms are cosmetically different but contain the "same information." (*Id*. at 90, 1-11; page 91 generally)

Equifax, when it was a party to this litigation, disclosed and produced all completed ACDV's relating to Mr. Daugherty's Ocwen account. The production was made to both Plaintiff and Ocwen. Ocwen then used the Equifax rendition of the completed ACDV's in his deposition of Mr. Daugherty,[1] and provided the Equifax rendition of the ACDV's to its expert Mr. Ulzheimer. The expert specified in his report that he relied upon the Equifax rendition of the ACDV's in reaching his opinions. (His report refers to the same as "EIS-Daugherty 1-1092".) Ocwen heavily relied upon and used the Equifax documents throughout this litigation.

Ocwen can and did take its identical data and populate its internal "form" to produce paper "copies" of ACDVs. Ocwen produced over 1700 pages of documents to Plaintiff's counsel, including numerous ACDVs. However, Ocwen did not produce all of its renditions of the ACDVs identical in content to the ACDVs provided by Equifax. Plaintiff, when preparing for trial, was perplexed as to why Ocwen was refusing to agree that the Equifax ACDVs were authentic.  Ms. Lyew, Ocwen's corporate representative, stated under oath at her deposition on August 28, 2015 (a mere two months prior to trial and well after the close of discovery), that Ocwen provided ACDVs for all disputes from Plaintiff.  (Ex. 2, Lyew Depo., page 47) Then counsel for Mr. Daugherty discovered the reason for the authenticity maelstrom.  Ocwen did not produce all of its renditions of the ACDVs, as it willfully withheld several ACDVs. The withheld ACDVs received by Ocwen from Equifax are documented in Ocwen's transactional notes as received, investigated, and

---

[1] As stated herein, Ocwen lied about its use of Equifax ACDVs during depositions and, in fact, relied extensively on Equifax's production during discovery.  (Ex 3, David Daugherty Deposition Table of Contents)

responded to/verified by Ocwen. (See Trial Exhibit 26) Ocwen has the ACDV data, identical in all respects to the Equifax data, to populate Ocwen's own internal form with that same information. Ocwen knows that the Equifax ACDVs are identical to the Ocwen ACDVs.

Nonetheless, Defendant's Corporate Representative, Sandra Lyew, testified at her deposition that Equifax's ACDV was not significantly different from Ocwen's form.  (Ex 2, Lyew Depo, page 46)  Specifically, Ms. Lyew testified that "[Ocwen's ACDV] mirror and matches."  (*Id*. at 24-25). At trial, Ms. Lyew testified that "all the CRAs, which is credit reporting agencies, communicates through e-Oscar sytstem." (Ex 4, Trial Tr. Vol. III, 73, 19-20).  Ms. Lyew confirmed that if Plaintiff had the counterpart to the Equifax ACDV maintained by Ocwen, it would reflect the same control number, same investigator, and same investigation results.  (*Id*. at 105-107)  Ms. Lyew further confirmed that every single Equifax document correlated to Ocwen's transactional logs in terms of matching control numbers, matching investigators, matching dates, matching loan numbers, and matching subscriber codes.  (*Id*. at 138)  Finally, Ms. Lyew agreed:

> Q.  So all of these Equifax forms we looked at so far, we didn't have the counterpart from Ocwen.  But now that we have both of them before you and the jury, you'll concede that it's basically the same data, just arranged differently?
> A.  Yes

(*Id*. at 140, lines 18-23)

Although Ocwen refused to disclose its ACDV records, and although Ocwen's transactional logs confirm every bit of information contained in the Equifax ACDVs, and although Ocwen's corporate representative agreed that the Equifax ACDV contained the same data as Ocwen's, Ocwen now claims it was substantially prejudiced.  Even as late as August 28, 2015 (the first date that Ocwen made its corporate representative available for a deposition and already well beyond the close of discovery), Ocwen's corporate representative insisted that Ocwen had provided ACDVs for every dispute.  Ocwen cites to *S. States Rack And Fixture, Inc. v. Sherwin Williams Co.*, 318 F.3d

592, 596 (4th Cir. 2003), for a five factor unfair surprise test. However, *S. States* involved an expert opinion that was formulated on the day trial began and had never been seen or used by any party. This case does not apply here because Ocwen had the Equifax documents, and all of the information contained therein existed in Ocwen's own records. Ocwen cannot show surprise, Ocwen could have cured the surprise by producing its ACDVs for the missing disputes, and the trial was not disrupted except for Ms. Lyew's stubborn refusal to admit the obvious conclusion that the ACDVs all contained the same information. The Equifax ACDVs were important and were reviewed in depositions of Sandra Lyew and David Daugherty. Ocwen again lies about the record in footnote 6. (Document 216, page 8, n. 6) Ocwen claims only the March 2013 Equifax ACDV was used at any deposition. This is false. Equifax 30, 32, 60, 62, 89, 157, and 159 were all reviewed with Ms. Lyew. (See Ex 2, Lyew Deposition Table of Contents) In addition, Ocwen questioned David Daugherty about EIS 60, 62, 89, 95, as well as additional Equifax documents that Plaintiff never used (EIS 257-262). (Ex 3, David Daugherty Deposition Table of Contents) Ocwen's lack of candor is indicative of the stonewalling tactics that Plaintiff has dealt with this entire litigation.

Ocwen claims that Plaintiff offered the Equifax exhibits to establish that Ocwen verified the information contained therein. However, Ocwen's transaction logs establish the truth of the repeated verifications. Regardless, the Equifax documents are records of a regularly conducted activity under Rule 803(6), as established in the deposition *de bene esse* of Equifax. Ocwen did not show the ACDVs lacked trustworthiness. On the contrary, Ocwen's expert testified that Ocwen and Equifax would have forms that were cosmetically different but contain the "same information." (Ex 1, Trial Tr. Vol. V, 90, 1-11; page 91 generally) In any event, the residual exception to hearsay under Federal Rule 807 allows the entry of the Equifax documents as they have circumstantial guarantees of trustworthiness, were offered as evidence of a material fact, were more probative on the content

of Ocwen's investigations than any other evidence that Plaintiff could obtain due to Ocwen's refusal to provide its own records, and admitting the ACDVs served the interests of justice.

Because Ocwen refused to disclose its ACDV records, because Ocwen's transactional logs confirm every bit of information contained in the Equifax ACDVs, because Ocwen's corporate representative and expert agreed that the Equifax ACDV contained the same data as Ocwen's, Ocwen cannot show any prejudice, much less substantial prejudice.

**B.    Plaintiff's Expert Did Not Testify Outside the Boundary of His Report.**

Ocwen is concerned that Expert Evan Hendricks described the contents of the ACDVs that he reviewed.  Specifically, Ocwen is concerned that Mr. Hendricks described the "007/106" dispute code as requiring the furnisher to investigate everything on the ACDV.  This is not an opinion that requires expert disclosure. On a 007/106 dispute code, which contains the same language on Ocwen and Equifax forms, Ocwen is directed to investigate current history, previous history, payment history, payment history profile, account status, and payment rating.  A lay person can understand that this dispute code requires a furnisher to investigate everything regarding the tradeline.  There is nothing improper in Mr. Hendricks stating such.  Mr. Hendricks had all of the Equifax ACDVs that were admitted as exhibits in this trial when he drafted his report.  His report references two investigations as exemplary of his review on page 2 of his report.  (Ex 5, Expert Report) He opined in his report that Ocwen's investigation was inadequate while referencing these Equifax ACDVs (he did not have access to Ocwen's ACDVs because Ocwen never disclosed ACDVs from 2013).  In order to provide his opinion to the jury, he described the form ACDV to the jury.  Part of that explanation included defining the '007' code.

In addition, Ocwen attempts to argue that Mr. Hendricks improperly stated that any information on an ACDV that was not modified was verified by the response.  However, this is

precisely what Ocwen's corporate representative testified to at trial.  Ms. Lyew confirmed that "[w]hat was verified was what came over."  (Ex 4, Trial Tr. Vol. III, 75, line 24)  Ms. Lyew confirmed that Ocwen's investigators used the term 'verified.'  (Ex 4, Trial Tr. Vol. III, 75-76, line 25-2)  Ms. Lyew confirmed that when an Ocwen investigator notes on the ACDV that information is accurate as of this date on an ACDV, then that is what he means:

> Q.  That's the purpose of the ACDV.
> A.  Based on the dispute code, yes.  It does say "verify payment history, profile account status, and payment rating.
> Q.  What Mr. John Wesley Daniel... said this information is accurate as of this date, didn't he?
> A.  Yes, that's what that says.

(Ex 4, Trial Tr. Vol. III, 174, line 17-24)  Ms. Lyew also confirmed that when Ocwen's investigator left a section of an ACDV blank, it was because the investigator found that information to be accurately reported:

> A.  ...the response data is left blank, so there was no need to modify.
> Q.  Okay, no need to modify because it's right.  He's current, isn't he?
> A.  Yes.  He has been current.

(Ex 4, Trial Tr. Vol. III, 175, line 7-11)

Mr. Hendricks' testimony on this issue only supports Ocwen's explanation and the common sense finding that a document that claims that the information is accurate as of date reported actually means what it says.  Mr. Hendricks' report opines that when Ocwen responded to ACDVs verifying false information, it failed to reasonably investigate to discover the incorrect reporting.  Ocwen's legal argument, which has been debunked, is that it is entitled to restrict its investigation to a dispute code from Equifax.  Mr. Hendricks' report opines that Ocwen's lack of investigation is inadequate.  (Ex 5, Expert Report Page 2, 6)  Ocwen claims that Mr. Hendricks did not disclose his basis for opining on Ocwen's duties as a furnisher under the FCRA.  This is patently false.  Pages 3-5 of Mr. Hendricks report define the standard for furnisher investigations.  Ocwen's motion is meritless and

must be denied.

**C.     The Court Properly Excluded Lorin Hanks Testimony on Relevancy Grounds.**

Federal Rule of Evidence 401 provides that evidence is relevant if "it has a tendency to make a fact more or less probable than it would be without the evidence." Fed.R.Evid. 401.   Ocwen never received any documents from Aggressive Credit Repair or Lorin Hanks.  Ocwen never spoke with Aggressive Credit Repair or Lorin Hanks.  Ocwen claims prejudice because it may have been able to take discovery from Equifax to prove that it received records that Ocwen does not possess. Ocwen's sole duty in this case was to investigate ACDV disputes received from Equifax in light of all relevant information Ocwen had.  This evidence has no bearing on Ocwen's investigations because Ocwen never had this evidence.  Rule 401 states that the evidence has to make a fact more or less probable to be relevant.  Ocwen can show neither.

Ocwen testified that it never received any documentation from Equifax regarding any disputes; instead, Ocwen only received the dispute code.  (Ex 2, Lyew Deposition 20-21:1-10) Regardless of the content of Lorin Hanks's disputes, Ocwen claims it investigated each dispute and never disregarded a dispute as frivolous:

> Q.  ...it seems like Ocwen conducted an investigation each time.
> A.  That is correct.
> Q.  And does Ocwen ever say -- refuse to conduct a reinvestigation if they deem a dispute is repetitive?
> A.  It's regardless whether it's the same or not, to still conduct the same account -- same review, research.

(Ex 2, Lyew Deposition 30-31:22-6)  Ocwen cannot claim Lorin Hanks had any impact on its reinvestigations, which is the sole issue presented to this Court. Ocwen's *post hoc* application of the frivolous dispute standard is disingenuous in light of the explicit testimony of its corporate representative.

Ocwen's duty under 15 U.S.C. 1681s-2(b) is to conduct a reasonable investigation of any

consumer dispute referred by a credit reporting agency, using all available information. *See Johnson v. MBNA Am. Bank*, 357 F.3d 426, 431 (4th Cir. 2004); *Saunders v. Equifax Info. Servs., L.L.C.*, 2006 WL 2850647, at \*7 (E.D. Va. Oct. 3, 2006) *aff'd sub nom. Saunders v. Branch Banking and Trust Co. Of VA*, 526 F.3d 142 (4th Cir. 2008); *Alabran v. Capital One Bank,* 2005 WL 3338663, at \*7 (E.D.Va.Dec.2005).  Any reference to Lorin Hanks will only distract the jury from the issue of whether Ocwen, upon receiving the dispute code from Equifax, conducted a reasonable reinvestigation of its reportings by looking at all the information that was available to Ocwen at that time.  Ocwen never received the disputes prepared by Aggressive Credit Repair.  Ocwen cannot imply to the jury that it relied on information contained in letters that it never received.

Rule 403 provides that a court "may exclude relevant evidence if its probative value is substantially outweighed by a danger of one or more of the following: unfair prejudice, confusing the issues, misleading the jury, undue delay, wasting time, or needlessly presenting cumulative evidence." Fed.R.Evid. 403.  Ocwen was properly barred from making any reference to the content of Lorin Hanks's disputes because Ocwen had no knowledge of the contents of these disputes, their admission would have mislead the jury, and confused the issues.

**D.     Ocwen Failed to Object to Financial Documents, Relied on the Documents, and Is Estopped from Objecting Due to Its Misconduct.**

Ocwen claims that this matter was not bifurcated because the Court never entered an order. Ocwen requested bifurcation to prevent potential prejudice, and Plaintiff consented.  (Document 129)  Parties can agree to bifurcation without the necessity of a court order.  This matter was clearly bifurcated, entitling each side to present additional evidence regarding punitive damages in the event of a willfulness finding.  Ocwen's argument is disingenuous because it sought bifurcation, received a bifurcated trial, and now claims foul.  However, Ocwen's "gotcha" tactics do not end there.

Following the jury's finding of willfulness, Plaintiff called Defendant's 30(b)(6) witness to

testify regarding Ocwen's net worth.  (Ex 6, Trial Tr. Vol. VI, at 89, 12).  Defendant refused to produce the witness, claiming that the witness was in a different state, despite Plaintiff's counsel demanding her availability days prior.  (*Id*. at 15-16.)  Defendant's 30(b)(6) witness was never excused by the District Court.  (Ex 7, Trial Tr. Vol. IV, at 114, 1).[2]  Plaintiff provided Defendant with notice of his intent to recall the 30(b)(6) witness several days before the verdict was returned.  (Ex 6, Trial Tr. Vol. VI, at 92, 1-3) Plaintiff explained that in lieu of calling the 30(b)(6) representative, who had been made unavailable despite never having been excused, he would offer a public record filed by Defendant.  (Ex 6, Trial Tr. Vol. VI at 92, 5-8)

Ocwen now claims it was ambushed by the evidence.  It has no grounds to make this claim.  In this case, Plaintiff sought copies of all quarterly profit and loss statements for the past three years in its 10th request for production, copies of all current balance sheets and financial statements in its 11th request for production, and copies of income tax returns for the past three years in its 12th request for production in its initial discovery requests.  Defendant objected to each request, claiming that the request was premature until Plaintiff demonstrated his claim was viable.  (Ex 8) In addition, Plaintiff noticed a 30(b)(6) deposition seeking a witness to testify regarding the net worth of Defendant, the annual revenue of Defendant, and the net income of Defendant.  Defendant again objected on maturity grounds, claiming that Plaintiff was not entitled to this discovery until he proved his claim was 'viable.'  (Ex 9)  Plaintiff sought this evidence and was stonewalled by Ocwen.

Defendant has not produced any records to support its Rule 59 motion demonstrating that the financial records admitted somehow prejudiced Defendant.  Defendant did not submit any new evidence that would warrant altering or amending the earlier order.  *See eg Moore,* 708 F. Supp. 2d

---

[2]The only witness who was ever excused was Tina Daugherty.  (Ex 7, Trial Tr. Vol. IV, at 123, 1-5).

at 615.[3]  Defendant has not shown any evidence that the jury relied on the exhibits in its award.  Nor

has Defendant shown any evidence contrary to the great weight of evidence that lead to the jury's

willfulness finding and award of punitive damages.

Defendant Ocwen incorrectly accuses Plaintiff of misrepresenting the exhibits it presented

at trial.  Plaintiff never misrepresented the contents of the exhibit.  (Ex 6, Trial Tr. Vol. VI, at 89-

90).  Plaintiff stated that the proposed exhibit was "the most recent financial document of Ocwen

Financial Corporation, and I – that's all I'd want to offer into evidence."  *Id*.  Plaintiff anticipated

that Ocwen would hide its corporate representative and sought a public record filed with the

Securities and Exchange Commission on Ocwen stationary. (Ex 6, Trial Tr. Vol VI, 91-92)

Defendant did not raise any objection to the relevance of this exhibit.  Rule 103(a)(1) of the Federal

Rules of Evidence requires litigants to state a specific ground for an objection to evidence, and

"[g]rounds not presented cannot be raised later, else both judge and adversary are sandbagged (and

preventable errors occur)."  *United States v. Schalk*, 515 F.3d 768, 776 (7th Cir. 2008) (internal

citations ommitted).  In other words, "[t]he specific ground for reversal of an evidentiary ruling on

appeal must also be the same as that [previously] raised." *United States v. Swan*, 486 F.3d 260, 264

(7th Cir.2007) (quoting *United States v. Wynn*, 845 F.2d 1439, 1442 (7th Cir.1988)).

Defendant contends that the exhibit belongs to its parent corporation, yet offers no evidence

to show that these records do not relate to it.[4]  The 10-K filing of Ocwen Financial Corporation

---

[3]"It is well settled that courts will not be blinded by corporate forms nor permit them to be used to defeat public convenience, justify wrong or perpetrate fraud, but will look through the forms and behind the corporate entities involved to deal with the situation as justice may require." *Stone v. Eacho*, 127 F.2d 284, 288 (4th Cir. 1942) (applying corporate veil piercing analysis in a bankruptcy proceeding).

[4]Upon closer inspection brought about with Defendant's motion, the Ocwen Financial Corporation Statement, utilized by both Plaintiff and Defendant in their closing arguments, explains at Exhibit F-9that Ocwen Financial Corporation "owns all of the outstanding stock of its principal operating subsidiary, Ocwen Loan Servicing, LLC (OLS)."  At Exhibit F-37 of the financial statement of Owen Financial Corporation, it shows loan servicing revenue for 2015 of 1,531,797,000, and loan servicing receivables of $286,981,000.00.  At Exhibit 21.1 of the Ocwen Financial Corporation financial statement, OLS is listed first in the list of "SIGNIFICANT DIRECT AND INDIRECT SUBSIDIARIES OF

clearly showed that Ocwen Financial Corporation owned all of the stock of Ocwen Loan Servicing, LLC. As such, under Generally Accepted Accounting Principles (GAAP), Ocwen Financial Corporation was required to include within its financial statement the assets and liabilities of its wholly-owned subsidiary. There can be no doubt that the 10-K filed by Ocwen Financial Corporation was a consolidated financial statement which included and incorporated the financials of its wholly owned subsidiary, Ocwen Loan Servicing, LLC.

Ocwen Financial Corporation lists its business address as 1661 Worthington Road, Suite 100, West Palm Beach, Florida. Ocwen Financial Corporation is not registered to do business in West Virginia, but Ocwen Loan Servicing, LLC is registered with a principal place of business address of 1661 Worthington Road, Suite 100, West Palm Beach, Florida – the same as Ocwen Financial Corporation. Ocwen Loan Servicing, LLC, has but one stockholder – Ocwen Financial Corporation. At Exhibit F-9 to Trial Exhibit 30, form 10-K reflects that all of the stock of Ocwen Loan Servicing, LLC is owned by Ocwen Financial Corporation. Hence the requirement of the consolidated financial statement. The 10-K refers to itself as a consolidated financial statement 34 times. (See Trial Exhibit 30, more particularly 10K exhibits F-4 through F-71, 12.1, 21.1)

Ocwen's entire argument seeks to mislead the Court that the documents identified by Plaintiff as "the financial statements of Ocwen Financial Corporation" were somehow the wrong documents. Perhaps there are separate financial statements for the various wholly-owned subsidiary corporations, such as Ocwen Loan Servicing, LLC. However, those financial statements are not public documents. The SEC requires consolidated financial reports so that the public may fully and fairly assess the value of a corporation. The Plaintiff did not intentionally mislead the Court or the jury. Plaintiff accurately described the documents that it procured from a government source after

---

OCWEN FINANCIAL CORPORATION."

being stonewalled time and again by Ocwen when seeking the same information.

Due to its refusal to disclose any financial documents, Defendant was in the best position to inform the Court and Plaintiff if anything were inaccurate about the proposed exhibit. Defendant could have obviated the need for these exhibits(1) if it had answered direct discovery requests on this issue or (2) if it had not actively prevented its witness from testifying. The Court noted the sole reason for the exhibit's admission: "it's my understanding [Plaintiff's counsel] are submitting them in lieu of the fact that Ms. Lyew is not here present to testify." (Ex 6, Trial Tr. Vol VI 94, 7-9) The Court noted that Defendant "is fully aware of these documents," *id*., to which Defendant's counsel offered no objection to relevance. Defendant Ocwen has offered no evidence of its financial status, either through discovery or through its witness, and has offered no evidence that it was prejudiced by these documents aside from speculation regarding jury deliberation.

The West Virignia Supreme Court of Appeals dealt with this precise issue in the landmark case of *TXO*. *TXO Prod. Corp. v. All. Res. Corp.*, 187 W. Va. 457, 477, 419 S.E.2d 870, 890 (1992), *aff'd*, 509 U.S. 443, 113 S. Ct. 2711, 125 L. Ed. 2d 366 (1993). In *TXO*, on appeal from a jury verdict of $19,000 in compensatory damages and $10 million in punitive damages, the Defendant argued that the jury was allowed to consider irrelevant financial information of its parent corporation rather than the Defendant subsidiary. *Id*. The *TXO* Court found no prejudice when examining the record as a whole, noting that the plaintiff had sought TXO's financials by interrogatory and was stonewalled. *Id*. Even though TXO argued that the introduction of the parent corporation's net worth was unfairly prejudicial because the TXO division was "comprised of at least 15 corporate entities in addition to [defendant subsidiary]," the Court found no error because:

> First, TXO was not forthcoming during discovery with information about the worth of TXO Production Corporation, nor did TXO offer such evidence at trial. Furthermore, even lingering on this point obscures the more important issue. The worth of the TXO Division of USX, and the worth of USX for that matter, is relevant. **If we did not allow trial judges**

**in their sound discretion to admit evidence of the worth of parent corporations, corporations could escape liability simply by incorporating separate departments as a number of undercapitalized subsidiaries**. It is the management of USX that must ultimately make the decision that its employees will not engage in malicious and nefarious business activities, and, therefore, it is the pocketbook of USX that the jury verdict must reach. Consequently, we find that the punitive damages awarded in this case were not so unreasonable as to demonstrate such passion and prejudice that a new trial is warranted. *Id*. (Emphasis added)

The United States Supreme Court granted certiorari and affirmed this decision without specifically touching on this holding other than a footnote regarding the procedural history.[5]

These exact factors exist in this case. Ocwen was not forthcoming during discovery with financial information that was directly requested. Ocwen did not offer any evidence of its net worth at trial. Plaintiff's reliance on the consolidated financial statement, which included Ocwen Loan Servicing, LLC's financial information, was not misplaced and has been upheld. Defendant offered compelling arguments regarding $102 million and $68 million losses in the prior quarter to the jury, which just as likely relied on Defendant's arguments as Plaintiff's, who only argued for $280,000, or one-tenth of one percent, up to one percent. Defendant also ignores the great weight of evidence that supports the punitive damage finding in this matter.

## CONCLUSION

For the reasons stated herein, Defendant's motion must be denied.

---

[5]Because TXO had refused to disclose any financial records in response to Alliance's discovery requests, Alliance employed an expert witness who analyzed public financial statements of TXO's parent, USX Corporation; he estimated that the TXO division of USX had a net worth of between "$2.2 billion and $2.5 billion." 187 W.Va., at 477, 419 S.E.2d, at 890. Although TXO objected to the evidence as including assets of affiliates, it did not offer any rebuttal testimony on that issue. Ibid." *TXO Prod. Corp. v. All. Res. Corp.*, 509 U.S. 443, 451 n. 9 (1993).

# DAVID DAUGHERTY

BY COUNSEL

Hamilton, Burgess, Young
        & Pollard, *pllc*


BY:    /s/    Jed R. Nolan
          Ralph C. Young  *(W. Va. Bar #4176)*
              ryoung@hamiltonburgess.com
          Christopher B. Frost  *(W. Va. Bar #9411)*
              cfrost@hamiltonburgess.com
          Steven R. Broadwater, Jr. (*W. Va. Bar #11355*)
              sbroadwater@hamiltonburgess.com
          Jed R. Nolan (*W. Va. Bar #10833*)
              jnolan@hamiltonburgess.com
          *Counsel for Plaintiff*
          P. O. Box 959
          Fayetteville, WV 25840
          304-574-2727

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA
BECKLEY DIVISION

DAVID M. DAUGHERTY,                          PLAINTIFF


V.                                          CIVIL ACTION NO. 5:14-cv-24506


OCWEN LOAN SERVICING, LLC,          DEFENDANT


## CERTIFICATE OF SERVICE

I, Jed R. Nolan, counsel for Plaintiff, hereby certify that I have filed **PLAINTIFF'S RESPONSE IN OPPOSITION TO DEFENDANT'S MOTION FOR A NEW TRIAL OR ALTER THE JUDGMENT** with the Clerk of the Court using the CM/ECF system which will send notification of such filing to the following CM/ECF participants, on July 11, 2016:

> John C. Lynch, Esq.
> Jason E. Manning, Esq.
> TROUTMAN SANDERS LLP
> 222 Central Park Avenue, Suite 2000
> Virginia Beach, VA  23462
> *Counsel for Defendant Ocwen Loan Servicing, LLC*
> john.lynch@troutmansanders.com
> jason.manning@troutmansanders.com

/s/ Jed R. Nolan
**JED R. NOLAN** *(WVSB #10833)*
jnolan@hamiltonburgess.com

F:/CM/21352/21352Resp 59.wpd