UNPUBLISHED

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

**No. 16-2243**

DAVID M. DAUGHERTY,

        Plaintiff - Appellee,

    v.

OCWEN LOAN SERVICING, LLC,

        Defendant - Appellant,

    and

EQUIFAX INFORMATION SERVICES, LLC,

        Defendant.

Appeal from the United States District Court for the Southern District of West Virginia, at Beckley.  Irene C. Berger, District Judge.  (5:14−cv−24506)

Argued:  May 11, 2017                Decided:  July 26, 2017

Before AGEE, KEENAN, and HARRIS, Circuit Judges.

Affirmed in part, vacated in part and remanded by unpublished per curiam opinion.

**ARGUED:** John Curtis Lynch, TROUTMAN SANDERS, LLP, Virginia Beach, Virginia, for Appellant.  Rachel Sarah Bloomekatz, GUPTA WESSLER PLLC, Washington, D.C., for Appellee.  **ON BRIEF:** Megan Burns, Jonathan M. Kenney, Jason

E. Manning, TROUTMAN SANDERS, LLP, Virginia Beach, Virginia, for Appellant. Deepak Gupta, Matthew W.H. Wessler, GUPTA WESSLER PLLC, Washington, D.C.; Jed R. Nolan, Ralph C. Young, HAMILTON, BURGESS, YOUNG & POLLARD, PLLC, Fayetteville, West Virginia, for Appellee.

————————————

Unpublished opinions are not binding precedent in this circuit.

PER CURIAM:

Plaintiff David Daugherty filed a complaint under the Fair Credit Reporting Act (FCRA), 15 U.S.C. § 1681 *et seq.*, alleging that defendant Ocwen Loan Servicing, LLC (Ocwen) failed to investigate and to correct certain erroneous information on Daugherty's credit report as required under the FCRA. The case proceeded to a jury trial, in which the jury found that Ocwen willfully had failed to perform a reasonable investigation regarding the true status of Daugherty's account with Ocwen. After the jury awarded Daugherty $6,128.39 in compensatory damages and $2.5 million in punitive damages, the district court entered judgment in accordance with the jury verdict. Ocwen appeals, arguing that: (1) the district court committed various evidentiary errors at trial; (2) the evidence failed to support a finding of willfulness; and (3) the punitive damages award is unconstitutionally excessive.

Upon our review, we hold that the district court did not err in its evidentiary rulings or in submitting the question of Ocwen's willfulness to the jury. However, we conclude that the jury's award of $2.5 million in punitive damages is unconstitutionally excessive when considered in relation to Ocwen's conduct in this case. Accordingly, we affirm the award of compensatory damages and determination of willfulness, but reduce the award of punitive damages and grant a new trial nisi remittitur. We remand the case to the district court to provide Daugherty the option of accepting a punitive damages award in the reduced amount of $600,000 or proceeding to a new trial on punitive damages.

## I.

## A.

In July 1999, David Daugherty and his wife purchased a home in Vienna, West Virginia, which was financed through a note secured by a mortgage on the property. The terms of the note required that the Daughertys make monthly payments for 15 years, followed by a $82,666.36 "balloon payment" due on July 26, 2014. Ocwen acquired the Daughertys' note in November 2011.

When Ocwen acquired the note, the Daughertys were delinquent in making their monthly payments. By February 2012, the total delinquency on the account was $6,128.39, and Ocwen initiated foreclosure proceedings on the Daugherty property in April 2012. Ocwen accurately reported to certain consumer reporting agencies (reporting agencies), including Equifax Information Services, LLC (Equifax), that Mr. Daugherty's account was past due and in foreclosure proceedings. Within one month following Ocwen's report, the Daughertys used Mrs. Daugherty's retirement savings to pay the past due balance and had their payment plan reinstated.

The inaccuracies in the credit reports that form the basis of this lawsuit dealt with the status of Mr. Daugherty's credit, and did not involve his wife's credit status. At some time during the Daughertys' period of arrearages, Ocwen discovered that its predecessor in interest had conveyed to the reporting agencies an incorrect loan origination date of August 1999 for the Daughertys' loan. To correct this error, starting in April 2012, Ocwen submitted information to the reporting agencies that correctly reflected the accurate loan origination date of July 1999. However, Equifax misinterpreted Ocwen's

corrected reports as referencing a separate account, and created a new entry or "tradeline" in Mr. Daugherty's credit report. As a result, Equifax began reporting two separate tradelines for the same loan account.

After the Daughertys cured the loan delinquency and had their payment plan reinstated, Ocwen informed the reporting agencies that the loan account was no longer past due or in foreclosure. Equifax, however, updated only one of the two tradelines, and the uncorrected tradeline continued to reflect that an account in Mr. Daugherty's name was in foreclosure. Therefore, from April 2012 through July 2014, Equifax incorrectly reported an account opened in August 1999 that was over 120 days past due and in foreclosure, and at the same time correctly reported an account opened in July 1999 that was current and in good standing.

In March 2013, when the Daughertys prepared to refinance their mortgage, they discovered that Equifax had been incorrectly reporting that Mr. Daugherty's account with Ocwen was delinquent in the amount of $6,128.39, over 120 days past due, and in foreclosure. Mr. Daugherty wrote a letter to Ocwen, explaining that his credit report erroneously indicated that he was "currently behind $6,128.00" and in foreclosure, and requested that Ocwen "correct those records as soon as possible." Mr. Daugherty attached to the letter a portion of his credit report showing his payment history through February 2012, which also erroneously showed that his account was "closed," that the account was "[a]t least 120 days or more than four payments past due," and that "FORECLOSURE PROCESS STARTED." Ocwen responded in a letter to Mr. Daugherty dated March 18, 2013, stating that the past due amount was accurate "as of

March 2012," and that the foreclosure reporting was "valid and cannot be altered." Despite acknowledging that Mr. Daugherty's account was currently in good standing and not in foreclosure, Ocwen did not resolve the conflicting information in Mr. Daugherty's credit report.

Also in March 2013, Mr. Daugherty hired a company known as Aggressive Credit Repair (Aggressive) to help correct the errors in his credit report. From March 2013 through July 2014, Aggressive wrote numerous letters to Equifax concerning Mr. Daugherty's account with Ocwen.

Upon receipt of these letters, Equifax transmitted to Ocwen separate requests for "automated credit dispute verifications" (dispute verification requests) for each tradeline, seeking verification of the information disputed by Mr. Daugherty. Because Equifax did not notice the inaccurate, duplicate tradeline showing on Mr. Daugherty's account, Equifax transmitted the dispute verification requests in pairs, one with correct account information and one with erroneous account information. Each dispute verification request referenced at least one "dispute code," either a "001" dispute code indicating that the consumer disputed ownership of the account, or a "007" dispute code indicating that the consumer disputed the listed current account status, previous account status, payment history, or payment rating.[1]

In March 2013, Ocwen received the first two dispute verification requests, which each contained both "001" and "007" codes, only one day after replying to Mr.

---

[1] Some of the testimony and documents in the record refer to the "007" dispute code as "106." We refer to this code as "007" throughout this opinion.

Daugherty's direct correspondence concerning the same disputed information. Both dispute verification requests referenced the same account number. However, one of those requests referenced an incorrect current balance, past due amount, last payment date, and actual payment amount. This incorrect information was accompanied by additional incorrect notations: "Foreclosure proceedings started" and "Account 120 days past the due date." Ocwen did not notice the errors or the inconsistencies between the two dispute verification requests, and responded to Equifax that the information submitted was "Verified As Reported."

From March 2013 through July 2014,[2] Ocwen received from Equifax a total of 23 dispute verification requests, 11 of which had included erroneous information about Mr. Daugherty's account. As reflected in the chart below, Ocwen continued to report to Equifax as correct the erroneous information concerning Mr. Daugherty's loan account.

| Date | Dispute | Account Status Information | Response |
|------|---------|----------------------------|----------|
| March 2013 | 001 & 007 | Current | Verified As Reported |
| March 2013 | 001 & 007 | 120 days past due In foreclosure | Verified As Reported |
| May 2013 | 001 | Current | Verified As Reported |
| May 2013 | 001 | 120 days past due In foreclosure | Verified As Reported |
| July 2013 | 001 | Current | Verified As Reported |

[2] In June 2014, the Consumer Finance Protection Bureau (CFPB) sent Ocwen an inquiry regarding other errors on Mr. Daugherty's credit report not at issue in this appeal. That dispute related to other errors on Mr. Daugherty's credit report appearing in 2013. Ocwen's initial response failed to address the CFPB's questions about 2013 records and provided irrelevant information based on Ocwen's 2012 records. Although the information disputed in the matter addressed by the CFPB is not at issue in this appeal, Ocwen's careless handling of the government inquiry was part of the evidentiary record considered by the jury.

| | | | |
|---|---|---|---|
| July 2013 | 001 | 120 days past due In foreclosure | Verified As Reported |
| October 2013 | 001 | Current | Verified As Reported |
| October 2013 | 001 | 120 days past due In foreclosure | Verified As Reported |
| November 2013 | 001 | Current | Verified As Reported |
| November 2013 | 001 | 120 days past due In foreclosure | Verified As Reported |
| January 2014 | 001 | Current | Verified As Reported |
| January 2014 | 001 | 120 days past due In foreclosure | Verified As Reported |
| March 2014 | 001 | Current | Verified As Reported |
| March 2014 | 001 | 120 days past due In foreclosure | Verified As Reported |
| April 2014 | 007 | Current | Modify As Shown |
| April 2014 | 007 | 120 days past due In foreclosure | Modify As Shown |
| April 2014 | 001 | Current | Verified As Reported |
| May 2014 | 001 | Current | Verified As Reported |
| May 2014 | 001 | 120 days past due In foreclosure | Verified As Reported |
| June 2014 | 007 | Current | Modify As Shown |
| June 2014 | 007 | 120 days past due | Modify As Shown |
| July 2014 | 001 & 007 | Current | Verified As Reported |
| July 2014 | 001 & 007 | 120 days past due In foreclosure | Verified As Reported |

In nine of the dispute verification requests submitted by Equifax, Ocwen ultimately "verified" as correct information that was incorrect. In the remaining two dispute verification requests listing erroneous information, Ocwen updated the account status from "Account 120 days past the due date" to "Current account" but did not correct erroneous entries in the same account stating "5 or more payments past due" and "Foreclosure proceedings started."

Mr. Daugherty (Daugherty) initiated this action against Ocwen under the FCRA,[3] alleging that Ocwen failed to comply with its statutory duties. After discovery, Ocwen filed a motion for summary judgment. The district court denied Ocwen's motion, concluding that a genuine issue of material fact remained with respect to the issue whether Ocwen conducted a reasonable investigation regarding the disputed information.

The district court conducted a bifurcated trial. The first phase of the trial dealt with issues of liability, compensatory damages, and whether any violation of the FCRA by Ocwen was willful. The second phase of trial resolved the question of punitive damages. When Daugherty rested his case during the first phase of the trial, Ocwen moved for judgment as a matter of law. Ocwen argued that there was no evidence either that Daugherty had suffered economic damages caused by the credit reporting errors or that Ocwen had acted unreasonably in its investigation. The district court granted Ocwen's motion with respect to economic damages, but denied the rest of the motion and submitted Daugherty's remaining claim to the jury. The jury found that Ocwen had violated the FCRA, that the violation was willful, and that the violation caused Daugherty $6,128.39 in non-economic damages.

---

[3] Daugherty also brought claims under West Virginia law, and the district court entered summary judgment for Ocwen on the state law claims. In addition, Daugherty sued Equifax for its role in reporting erroneous credit information, but Daugherty and Equifax settled the claims against Equifax after discovery concluded. Thus, only the FCRA claim against Ocwen remains at issue in this appeal.

During the punitive damages phase of trial, as evidence of Ocwen's wealth, the district court admitted evidence of a public filing by Ocwen Financial Corporation (OFC), Ocwen's parent company. The jury returned a punitive damages award of $2.5 million.

Ocwen filed a renewed motion for judgment as a matter of law, a motion for a new trial, a motion to vacate punitive damages, and a motion for remittitur (the post-trial motions). The district court denied Ocwen's post-trial motions, and Ocwen now appeals.

## II.

We first consider Ocwen's argument that the district court erred in the first phase of the trial by permitting the presentation of certain evidence to the jury. Ocwen raises three distinct evidentiary issues: (1) the admission of previously undisclosed records produced by Equifax; (2) the admission of certain expert testimony regarding Ocwen's duties under the FCRA; and (3) the exclusion of correspondence between Aggressive and Equifax. We review these evidentiary rulings for abuse of discretion. *Lord & Taylor, LLC v. White Flint, L.P.*, 849 F.3d 567, 572 (4th Cir. 2017) (collecting cases).

## A.

We consider Ocwen's three evidentiary arguments in the context of the substantive law governing Daugherty's claim and, thus, begin with an overview of the FCRA. The statute requires that furnishers of credit information, such as mortgage servicers like Ocwen, investigate disputes involving information that they furnish to the credit reporting agencies. The FCRA provides, in relevant part:

After receiving notice pursuant to section 1681i(a)(2) of this title of a dispute with regard to the completeness or accuracy of any information provided by a person to a consumer reporting agency, the person shall—

> (A) conduct an investigation with respect to the disputed information;
>
> (B) review all relevant information provided by the consumer reporting agency pursuant to section 1681i(a)(2) of this title;
>
> (C) report the results of the investigation to the consumer reporting agency;
>
> (D) if the investigation finds that the information is incomplete or inaccurate, report those results to all other consumer reporting agencies to which the person furnished the information and that compile and maintain files on consumers on a nationwide basis; and
>
> (E) if an item of information disputed by a consumer is found to be inaccurate or incomplete or cannot be verified after any reinvestigation under paragraph (1), for purposes of reporting to a consumer reporting agency only, as appropriate, based on the results of the reinvestigation promptly--
>
> > (i) modify that item of information;
> >
> > (ii) delete that item of information; or
> >
> > (iii) permanently block the reporting of that item of information.

15 U.S.C. § 1681s-2(b)(1).

The FCRA accordingly requires that a furnisher of credit information "conduct a reasonable investigation of [its] records to determine whether the disputed information can be verified." *Johnson v. MBNA Am. Bank, NA*, 357 F.3d 426, 431 (4th Cir. 2004). This determination whether a furnisher's investigation was "reasonable" is based on an evaluation of information within the furnisher's possession, such as correspondence between the consumer and the furnisher, the data identified by the reporting agency as

disputed, and the furnisher's other records relating to the disputed account. *See Saunders v. Branch Banking & Tr. Co.*, 526 F.3d 142, 151 (4th Cir. 2008) (holding that a bank's internal records of ongoing correspondence could support a conclusion that the bank intended not to furnish accurate information to the reporting agencies).

In addition to compensatory damages, the FCRA also permits an award of statutory and punitive damages for willful violations of the FCRA, as well as an award of attorneys' fees in cases involving willful misconduct. 15 U.S.C. § 1681n(a). The term "willfulness," within the meaning of the FCRA, includes acting with "reckless disregard" of one's obligations under the statute. *Safeco Ins. Co. of Am. v. Burr*, 551 U.S. 47, 57 (2007). A defendant may demonstrate reckless disregard of its statutory obligations by repeatedly ignoring warning signs that it is violating the law and by failing to take corrective action to prevent future violations. *See Am. Arms Int'l v. Herbert*, 563 F.3d 78, 85 (4th Cir. 2009) (applying the *Safeco* "willfulness" standard to the Gun Control Act of 1968, 18 U.S.C. § 921 *et seq.*, and concluding that "repeated failure to comply with known regulations can move . . . conduct from inadvertent neglect into reckless or deliberate disregard (and thus willfulness)"). However, as a matter of law, a party that relies on a reasonable but erroneous interpretation of the FCRA cannot be found to have acted recklessly or willfully. *Safeco*, 551 U.S. at 69–70.

## B.

We first consider Ocwen's argument that the district court abused its discretion in admitting into evidence certain Equifax records of the relevant dispute verification requests, because Daugherty failed to include such documents in disclosures required

under Federal Rule of Civil Procedure 26(a)(3). The district court admitted the documents on the basis that because Ocwen already had its own copies of the same documents, any untimely disclosure by Daugherty was harmless.

We agree with the district court's assessment of this issue. Rule 26(a) requires that litigants disclose before trial the exhibits that they intend to use. *See* Fed. R. Civ. P. 26(a)(3). The district court should sanction failures to comply with the requirements of Rule 26(a) by excluding the use of the undisclosed evidence, "unless the failure was substantially justified or is harmless." Fed. R. Civ. P. 37(c)(1). We apply a five-factor test in determining whether a failure to disclose trial exhibits was "substantially justified" or "harmless," and consider:

> (1) the surprise to the party against whom the evidence would be offered; (2) the ability of that party to cure the surprise; (3) the extent to which allowing the evidence would disrupt the trial; (4) the importance of the evidence; and (5) the nondisclosing party's explanation for its failure to disclose the evidence.

*S. States Rack & Fixture, Inc. v. Sherwin-Williams Co.*, 318 F.3d 592, 597 (4th Cir. 2003). The first four of these factors relate to the issue whether the nondisclosure was "harmless," and the fifth factor relates to the question whether the nondisclosure was "substantially justified." *Id.*

Applying these factors, we conclude that the district court did not abuse its discretion in determining that Daugherty's late disclosure of Equifax's records was harmless. Because Ocwen used copies of the same Equifax records in deposing Daugherty, Ocwen was not unfairly surprised by the content of those documents. *See id.* Moreover, the jury was required to decide whether Ocwen's responses to the dispute

verification requests were reasonable. Therefore, accurate copies of those requests were important evidence that did not disrupt the trial in any manner. Accordingly, all four of the *Southern States* factors relating to harmlessness weighed in favor of admission of the Equifax documents. *See* Fed. R. Civ. P. 37(c); *S. States*, 318 F.3d at 597.

## C.

Ocwen next argues that the district court should have excluded the testimony of Daugherty's expert witness, Evan Hendricks, on two bases. Ocwen contends that Hendricks' expert witness report was too vague to provide the basis for, or the substance of, his expert opinion. Additionally, Ocwen argues that the district court improperly permitted Hendricks to testify about the legal standard to which furnishers of credit information are held under the FCRA. We disagree with Ocwen's arguments.

First, we conclude that Hendricks' expert witness report provided adequate notice to Ocwen concerning the substance of his anticipated testimony. His report disclosed that he relied on "Bates-Stamped documents produced by Defendant Equifax" in forming his expert opinion. His examination of these documents led him to conclude in his report that "Ocwen did nothing more than engage in the superficial [exchange of dispute verification requests], reflecting its disregard of the history and context that clearly put it on notice" that its investigation was not reasonable for a dispute of this nature. Thus, Hendricks' expert report provided sufficient notice that he was prepared to testify about Ocwen's inadequate responses to particular dispute verification requests. Additionally, Hendricks' report placed Ocwen on notice that the content of the dispute verification

requests would be central to Hendricks' opinion that comprehensive investigation procedures were required under the circumstances but were not undertaken by Ocwen.

We also are not persuaded by Ocwen's argument that Hendricks improperly provided legal conclusions during his testimony. We recognize the general rule that expert witnesses are not permitted to "state[] a legal standard or draw[] a legal conclusion." *United States v. Offill*, 666 F.3d 168, 175 (4th Cir. 2011) (quoting *United States v. McIver*, 470 F.3d 550, 562 (4th Cir. 2006)). However, Hendricks' testimony did not violate this general rule. Reasonableness is a subject on which experts routinely testify. *See United States v. Barile*, 286 F.3d 749, 761 (4th Cir. 2002) (holding that an expert could properly give his opinion whether certain actions by the defendant were "reasonable" in light of the defendant's legal obligations under section 510(k) of the Food, Drug, and Cosmetic Act, 21 U.S.C. § 360(k)). Here, Hendricks' testimony addressed the reasonableness of Ocwen's conduct in light of the regulatory framework of the FCRA. This testimony did not draw legal conclusions but was offered as an explanation why Ocwen's cursory investigation in response to the dispute verification requests was deficient. Therefore, we conclude that the district court did not abuse its discretion in permitting Hendricks to testify regarding the reasonableness of Ocwen's investigations.

### D.

Finally, Ocwen argues that the district court abused its discretion by excluding the letters sent by Aggressive to Equifax, on which the dispute verification requests were based. We disagree. As discussed above, the reasonableness of Ocwen's investigation

rested on an evaluation whether Ocwen properly investigated the disputed information using its own records, not records from a remote source. Thus, the district court did not abuse its discretion in excluding the letters that Aggressive sent to Equifax, because such extrinsic information was not known to Ocwen and, thus, was not relevant to the reasonableness of Ocwen's investigation under the facts presented.

## III.

We next consider Ocwen's argument that, as a matter of law, the evidence failed to show that Ocwen "willfully" violated the FCRA. Ocwen argues that it reasonably interpreted the FCRA as requiring furnishers of credit information to investigate only the information identified by the credit reporting agency as "disputed," and to consult only records within its own possession. Thus, Ocwen argues, its conduct falls under the safe harbor of *Safeco Insurance Co. of America v. Burr*, 551 U.S. 47, 57 (2007), and does not support the jury's finding of a "willful" violation. We disagree.[4]

We review de novo the district court's denial of Ocwen's renewed motion for judgment as a matter of law, and view the trial record in the light most favorable to Daugherty, the prevailing party. *See Bresler v. Wilmington Tr. Co.*, 855 F.3d 178, 196

---

[4] In the district court, Ocwen initially raised this willfulness argument in a motion for summary judgment. However, we do not review the denial of a motion for summary judgment in a case that proceeded to a full trial and final judgment on the merits. *Chesapeake Paper Prods. Co. v. Stone & Webster Eng'g Corp.*, 51 F.3d 1229, 1237 (4th Cir. 1995). Therefore, we analyze the issue of willfulness only in the context of reviewing the district court's denial of Ocwen's renewed motion for judgment as a matter of law. *See* Fed. R. Civ. P. 50(b).

(4th Cir. 2017). We must affirm the district court's judgment regarding Ocwen's liability for willful misconduct if there was sufficient evidence to support the jury's verdict. Fed. R. Civ. P. 50(a)(1); *Bresler*, 855 F.3d at 196.

The jury was presented evidence that eight separate dispute verification requests were transmitted to Ocwen with the "007" dispute code. This dispute code signaled a broad challenge to the accuracy of Ocwen's report of account status, payment history profile, and payment rating. Four of these eight dispute verification requests, transmitted in March 2013, April 2014, June 2014, and July 2014, contained account information that erroneously showed that Daugherty's account was in foreclosure or that amounts owed were past due more than 120 days. Ocwen's responses to the erroneous information in the dispute verification requests of March 2013 and July 2014 was "Verified As Reported." With regard to the dispute verification requests of April and June 2014, Ocwen replied, "Modify As Shown," but provided corrections to only some of the erroneous information.

The evidence further showed that Ocwen possessed the information in its own records necessary to correct the erroneous data identified by Equifax as "disputed" in its "007" verification requests. Thus, the jury could have concluded that it was reckless for Ocwen, after having received the "007" dispute verification requests, not to investigate and correct the erroneous information regarding Daugherty's current balance, past due amounts, last payment date, actual payments, and foreclosure status. In addition, the fact that Ocwen responded to all the dispute verification requests by confirming only Daugherty's ownership of the account, regardless whether those requests also contained a

"007" dispute code, would support a conclusion that Ocwen systematically ignored the "007" dispute code on any dispute verification request that contained more than one code.

The evidence at trial also showed that Ocwen lacked any procedure for correcting erroneous reports that an account is *currently* past due or in foreclosure, when that account *previously* had been past due or in foreclosure but had been fully reinstated. Indeed, Ocwen's corporate representative testified that Ocwen had no obligation to correct the foreclosure or past due codes appearing in the dispute verification requests, because Daugherty's account formerly had been in foreclosure and payments had been 120 days past due back in April 2012.

A jury also could conclude from the evidence that Ocwen was reckless in processing each dispute verification request independently, without consulting the context of prior correspondence from Daugherty, the CFPB, or Equifax regarding the same account. For example, Ocwen received the March 2013 dispute verification requests only five days after receiving a letter from Daugherty stating that his Equifax credit report erroneously indicated that he is "*currently* behind $6,128.00 [in his payments to Ocwen] . . . [and] in foreclosure." (emphasis added). Despite this information in its records, Ocwen responded to the dispute verification requests merely by verifying Daugherty's ownership of the account. Thus, Ocwen's procedures completely failed to recognize that the "007" dispute code referred to the same issue presented in Daugherty's letters to Ocwen. In addition, Ocwen's practice of assigning each dispute verification request to a different investigator, without regard for another dispute verification request filed at the same time about the same account, would support

a conclusion that Ocwen recklessly disregarded its FCRA obligations. *See Saunders*, 526 F.3d at 151.

Ocwen's repeated failure to correct errors over a 17-month period also would support a conclusion that Ocwen acted recklessly. By July 2014, Ocwen had received 23 dispute verification requests concerning Daugherty's account, eight of which contained "007" codes, and four of which contained "007" codes regarding erroneously reported information. Nevertheless, in July 2014, despite receiving direct correspondence from Daugherty and inquiries from the CFPB describing erroneous credit reporting related to Daugherty's account, Ocwen still transmitted "Verified As Reported" in responding to a dispute verification request containing erroneous account information and a "007" dispute code. Ocwen's repeated noncompliance with its FCRA obligations over this extended period of time therefore would support a finding that Ocwen acted recklessly and was not merely negligent. *See Am. Arms Int'l*, 563 F.3d at 85.

We are not persuaded by Ocwen's argument that it relied on a reasonable interpretation of the FCRA and, therefore, under the safe harbor of *Safeco*, could not have acted "willfully." *Safeco*, 551 U.S. at 69–70. The district court correctly instructed the jury, consistent with *Johnson v. MBNA America Bank, NA*, that Ocwen had a duty to "conduct a reasonable investigation into the information identified as disputed" on each dispute verification request and to conduct a "careful inquiry" into its own records. *See Johnson*, 357 F.3d at 431. The court further instructed that this duty "does not necessarily require Ocwen to consult external sources." Nothing in the record suggests

that Ocwen acted in reliance on any other interpretation of the statute.[5]  In light of this evidentiary record, we hold that there was abundant evidence from which the jury reasonably could have concluded that Ocwen willfully violated the FCRA.  Accordingly, we affirm the district court's denial of Ocwen's renewed motion for judgment as a matter of law.

IV.

We turn to consider Ocwen's contention that the district court erred by denying Ocwen's motion to vacate the award of punitive damages and motion for remittitur. Ocwen first argues that the punitive damages award must be vacated because Daugherty improperly relied on an annual report (the 10-K), which Ocwen's parent company, OFC, had filed with the Securities and Exchange Commission, in order to prove Ocwen's financial worth.  Ocwen observes that Daugherty had failed to disclose his intent to use the 10-K, and maintains that OFC's 10-K was "false" evidence of Ocwen's financial worth.  Alternatively, Ocwen contends that the jury's punitive damages award of $2.5 million was unconstitutionally excessive and should be remitted.  We consider these issues in turn.

---

[5] For the same reason, we reject Ocwen's argument that the district court was required to make a preliminary determination about the reasonableness of Ocwen's interpretation of the FCRA before submitting questions of fact to the jury.

## A.

During the punitive damages phase of the bifurcated trial, Daugherty attempted to recall Ocwen's corporate representative, Sandra Lyew, to testify about Ocwen's financial worth. Although the district court had not excused Lyew as a witness, she already had left West Virginia and was unavailable to provide further testimony. As a substitute for Lyew's testimony, Daugherty proffered the 10-K of Ocwen's publicly traded parent company, OFC, which contained a consolidated balance sheet of OFC and its subsidiaries, including Ocwen. Although Ocwen objected that the documents had not been previously disclosed by Daugherty, Ocwen did not object to the documents on the ground that they reflected the financial status of OFC, rather than of Ocwen. The district court permitted Daugherty to present the documents as a substitute for Lyew's testimony.

By summarily releasing its corporate representative while the trial was still in progress, Ocwen was responsible in large part for the problem that the district court faced. Because Lyew no longer was available to testify, Daugherty was unable to develop his case for punitive damages through her testimony. And, although OFC's 10-K was not perfect evidence of Ocwen's financial worth, we agree with the district court that OFC's filings were sufficiently related to Ocwen's finances to be relevant for determining the appropriate amount of punitive damages. The 10-K included "consolidated balance sheets" of Ocwen, as well as of OFC. The 10-K also reported that OFC's "[s]ervicing business is primarily comprised of our core residential mortgage servicing business and currently accounts for the majority of our total revenues." In view of the sudden departure of Ocwen's corporate representative during the trial, and in the

absence of an objection from Ocwen challenging the substance of the information in the 10-K, the district court was within its discretion to admit this alternative evidence of Ocwen's financial worth.[6]

B.

We next consider Ocwen's argument that the $2.5 million punitive damages award violated the Due Process Clause. We review the constitutionality of a punitive damages award de novo. *Saunders*, 526 F.3d at 152.

Unlike compensatory damages, which compensate a plaintiff for harm suffered, punitive damages serve the dual purposes of deterrence and retribution. *Cooper Indus., Inc. v. Leatherman Tool Grp., Inc.*, 532 U.S. 424, 432 (2001). The purpose of retribution is served by setting punitive damages proportionally to the outrageousness of the conduct or the magnitude of the harm. *See id.* Deterrence principles support the imposition of higher penalties for misconduct that is difficult to detect or injury that is difficult to quantify. *Mathias v. Accor Econ. Lodging, Inc.*, 347 F.3d 672, 676 (7th Cir. 2003). Moreover, adequate deterrence may require consideration of a defendant's financial worth when determining the amount of a punitive award. *Stamathis v. Flying J, Inc.*, 389 F.3d 429, 442 (4th Cir. 2004).

---

[6] Ocwen filed a motion to vacate damages under Federal Rule of Civil Procedure 60(b)(3), arguing that the use of OFC's 10-K was misrepresentation amounting to misconduct. The district court appropriately exercised its discretion in denying this motion, which appears to have been nothing more than an after-the-fact evidentiary challenge that could have been raised at trial.

The Due Process Clause[7] nevertheless sets procedural and substantive limits on the award of punitive damages. *State Farm Mut. Auto Ins. Co. v. Campbell*, 538 U.S. 408, 416–17 (2003). "Elementary notions of fairness" require that a person receive advance notice of the penalties that the law might impose for certain conduct. *BMW of N. Am., Inc. v. Gore*, 517 U.S. 559, 574 (1996). Therefore, in our review of the constitutionality of a punitive damages award, we consider the extent to which the award achieves retribution and deterrence, while remaining mindful of the limits provided by the principle of fair notice. To this end, the Supreme Court has instructed courts to consider three "guideposts" when reviewing punitive damages awards for compliance with the Due Process Clause:

(1) the degree of reprehensibility of the defendant's misconduct;

(2) the disparity between the actual or potential harm suffered by the plaintiff and the punitive damages award; and

(3) the difference between the punitive damages awarded by the jury and the civil penalties authorized or imposed in comparable cases.

*State Farm*, 538 U.S. at 418. We have observed that the third *State Farm* guidepost, the difference between the amount of a particular punitive damages award and comparable civil penalties, "provides little assistance in FCRA suits." *Saunders*, 526 F.3d at 152

---

[7] The cases cited by the parties discuss the Due Process Clause of the Fourteenth Amendment and punitive damages awarded under state law. *See State Farm Mut. Auto Ins. Co. v. Campbell*, 538 U.S. 408, 416–17 (2003); *Cooper Indus.*, 532 U.S. at 433; *BMW of N. Am., Inc. v. Gore*, 517 U.S. 559, 574 (1996). The same rules apply with equal force to punitive damages awarded under federal law, governed by the Due Process Clause of the Fifth Amendment. *E.E.O.C. v. Fed. Express Corp.*, 513 F.3d 360, 376 (4th Cir. 2008).

(internal quotation marks omitted). We therefore focus our analysis of the present punitive damages award on the first two *State Farm* guideposts.

1.

The first *State Farm* guidepost, the degree of reprehensibility, is the most important. *State Farm*, 538 U.S. at 419 (citing *BMW*, 517 U.S. at 575). This first "reprehensibility" guidepost is further defined by five factors, namely, whether:

> [1] the harm caused was physical as opposed to economic;
>
> [2] the tortious conduct evinced an indifference to or a reckless disregard of the health or safety of others;
>
> [3] the target of the conduct had financial vulnerability;
>
> [4] the conduct involved repeated actions or was an isolated incident; and
>
> [5] the harm was the result of intentional malice, trickery, or deceit, or mere accident.

*Id.* Any determination of reprehensibility requires a highly fact-dependent analysis that necessarily varies from case to case. *See TXO Prod. Corp. v. Alliance Res. Corp.*, 509 U.S. 443, 457 (1993) (plurality opinion); *Bach v. First Union Nat'l Bank*, 486 F.3d 150, 156 (6th Cir. 2007).

In *Saunders v. Branch Banking & Trust Co.*, 526 F.3d 142 (4th Cir. 2008), we observed that Congress' authorization of punitive damages in FCRA cases required us to discount the importance of factors not typically present in such cases. *Id.* at 152–53. Accordingly, we held that the absence of physical harm or danger to health or safety did not weigh strongly against a finding of reprehensibility in FCRA cases. *Id.* at 153. We

also held that willful violations of the FCRA can support substantial punitive damages even though only one reprehensibility factor, financial vulnerability, is met. *Id.*

In this case, the reprehensibility factors lead us to conclude that Ocwen's conduct was more reprehensible than the credit furnisher's conduct in *Saunders*. As with most FCRA cases, including *Saunders*, Ocwen's conduct presented minimal risk of danger to physical safety or health. *See id.* at 152–53. However, Daugherty, who faced potential foreclosure of his home, was more financially vulnerable than the plaintiff in *Saunders*, whose car was repossessed. *See id.* at 146, 153. With respect to the "repeated actions" factor, not present in *Saunders*, Ocwen repeatedly failed to correct Daugherty's erroneous account information over a 17-month period, despite receiving multiple letters from Daugherty, governmental inquiries, and multiple dispute verification requests bearing the "007" dispute code. *See State Farm*, 538 U.S. at 419. Unlike in *Saunders*, however, there is no evidence that Ocwen intentionally reported credit information it knew to be misleading. *See id.*; *Saunders*, 526 F.3d at 153.

Nevertheless, when we view the entirety of Ocwen's conduct in this case, we conclude that its conduct was more reprehensible than the actions at issue in *Saunders*. Therefore, mindful of the seriousness of Ocwen's conduct, we turn to consider the second *State Farm* guidepost.

## 2.

That second guidepost, the disparity between actual or potential harm and the punitive damages award, cannot be reduced to a simple mathematical ratio. *See State Farm*, 538 U.S. at 424–25. Nevertheless, the Supreme Court has cautioned that "few

awards exceeding a single-digit ratio between punitive and compensatory damages, to a significant degree, will satisfy due process." *Id.* at 425; *see also Pac. Mut. Life Ins. Co. v. Haslip*, 499 U.S. 1, 23 (1991). Our application of the second *State Farm* factor requires consideration of the total amount of actual or compensatory damages. Small awards of actual damages may justify comparatively larger punitive damages, whereas large awards of actual damages ordinarily will require application of a lesser ratio. *State Farm*, 538 U.S. at 425.

The reprehensibility of the conduct, determined in the first guidepost, may justify a higher ratio of punitive damages to compensatory damages. The Due Process Clause permits higher ratios for "particularly egregious" conduct or conduct with potential to cause greater harm. *Id.* at 424–25 (emphasis added); *see also TXO*, 509 U.S. at 460–61 (endorsing the consideration of "the magnitude of the *potential harm* that the defendant's conduct would have caused . . . if the wrongful plan had succeeded"). In addition, courts have upheld high punitive damages awards to deter misconduct undertaken for financial gain. *See TXO*, 509 U.S. at 446, 453, 462 (concluding that a $10 million dollar punitive damages award, 526 times larger than compensatory damages of $19,000, was appropriate to punish and deter a thwarted attempt to defraud victims of millions of dollars); *Mathias*, 347 F.3d at 677 (upholding a high punitive damages award against a hotel for systematically concealing a bedbug infestation rather than paying for extermination).

These principles support the conclusion that large ratios between punitive damages and compensatory damages are permissible when a defendant's willful FCRA violation

causes small amounts of compensable harm.  *Saunders*, 526 F.3d at 154 (upholding

$80,000 punitive damages award in case involving $1,000 statutory damages).  In such

FCRA cases, we look beyond a simple analysis of the mathematical ratio to ensure that

the punitive damages award still serves the goals of punishment and deterrence,

particularly against wealthy defendants.  *See id.*  On the other hand, the act of

misreporting credit information provides no direct financial benefit to a defendant, so

multimillion dollar awards are rarely necessary to achieve punishment and deterrence.

*See TXO*, 509 U.S. at 462; *Bach*, 486 F.3d at 155.

These principles lead us to conclude that the jury's punitive damages award of

$2.5 million is unconstitutionally excessive in this case.  Because Ocwen does not profit

from misreporting its customers' account information, and errors in reporting are easily

detected by consumers after the fact, we conclude that a multimillion dollar punitive

damages award far exceeds the amount necessary to sufficiently deter similar

wrongdoing in the future.  In addition, $2.5 million is an amount greatly disproportionate

to the reprehensibility of Ocwen's conduct, and thus exceeds the amount necessary for

punishment or retribution.  Therefore, we hold that, under the second *State Farm*

guidepost, the punitive damages award is unreasonably disproportionate to the $6,128.39

award of compensatory damages.

## C.

We have recognized that "our options in remedying an excessive verdict are not

unlimited."  *Cline v. Wal-Mart Stores, Inc.*, 144 F.3d 294, 305 n.2 (4th Cir. 1998).  A

plaintiff has a right under the Seventh Amendment to have a jury set the amount of

punitive damages. *Def. Indus., Inc. v. Nw. Mut. Life Ins. Co.*, 938 F.2d 502, 507 (4th Cir. 1991) (en banc). However, within this context, we also have acknowledged the practical value of having an appellate court set the upper limit of punitive damages that will withstand scrutiny under the Due Process Clause, and have addressed the manner in which this may be achieved. In our decision in *Cline v. Wal-Mart Stores, Inc.*, we observed that "for purposes of avoiding conflict with the Seventh Amendment, the preferable course, upon identifying a jury's award as excessive, is to grant a new trial nisi remittitur, which gives the plaintiff the option of accepting [a] remittitur or of submitting to a new trial" on the particular damages held to be excessive. *Cline*, 144 F.3d at 305 n.2.

In *Cline*, we examined a $182,500 award of punitive damages under factors that pre-dated the Supreme Court's decision in *State Farm*, and held that $50,000 was the "outermost punitive damages award that could be sustained." *Id.* at 306–07. We accordingly reduced that award to $50,000 and granted a new trial nisi remittitur, giving the plaintiff the option of accepting the reduced award or of submitting to a new trial on that issue. *Id.* at 307.

We employ the same methodology here, and turn to consider the outermost punitive damages award that can be upheld on the evidence presented. Although our decision in *Saunders* did not result in a new trial nisi remittitur, that case nevertheless provides useful guidance regarding the upper constitutional boundary for punitive damages awards in this FCRA case.

We ultimately held in *Saunders* that the jury's award of $80,000 in punitive damages was too low to require remittitur for constitutional reasons. *Saunders*, 526 F.3d

at 154–55.  In reaching this conclusion, we recognized that willful violations of the FCRA have the potential to cause emotional harm even in the absence of economic damages.  *See id.* at 152–53.  Moreover, in concluding that a punitive damages award 80 times larger than the statutory damages award was constitutional in a case involving a large corporate defendant, our decision provided fair notice to defendants that punitive damage awards in FCRA cases appropriately may reflect high, double-digit multipliers of the statutory or compensatory damages awarded.  *See id.* at 154–55.

Unlike in *Saunders*, however, the jury here found that Daugherty had suffered actual damages, which reflected an injury in kind and amount more serious than the statutory award of $1,000 imposed in *Saunders*.  526 F.3d at 147.  We therefore apply a higher, double-digit ratio than the one we approved in *Saunders* in fixing the upper limit of punitive damages in this case.  Accordingly, we hold that $600,000 is "the outermost punitive damages award that could be sustained" on the evidence presented.  *See Cline*, 144 F.3d at 307.  We therefore reduce the punitive damages award to $600,000 and award Daugherty a new trial nisi remittitur, providing him the option of accepting the reduced amount of punitive damages or of proceeding to a new trial on punitive damages.  *See id*.

V.

For these reasons, we affirm the district court's judgment, except with respect to the court's award of punitive damages.  We reduce the award of punitive damages, grant a new trial on punitive damages nisi remittitur, and remand the case to the district court

with instructions to provide Daugherty the option of accepting the reduced punitive

damages award of $600,000 or of proceeding to a new trial on punitive damages.

*AFFIRMED IN PART,*
*VACATED IN PART*
*AND REMANDED*